WILLIAM P. HORN
D.C. Bar No.: 375666
Birch, Horton, Bittner & Cherot, P.C.
1155 Connecticut Avenue
Suite 1200
Washington, D.C. 20036
Telephone: (202) 659-5800
Facsimile: (202) 659-1027
Email: whorn@dc.bhb.com

Attorney for Plaintiff State of Alaska

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

_____
KATIE JOHN, GERALD NICOLIA,               )
  et al.                                        )
      Plaintiffs,              )
           )  Case No.: A05-0006-CV (HRH)
    v.                                        )    (Consolidated)
           )
THE UNITED STATES OF AMERICA,      )
  et al.,                                       )
           )
      Defendants.              )
_____)

**PLAINTIFF STATE OF ALASKA'S OPENING BRIEF REGARDING
WHAT RULES OF LAW GOVERN ESTABLISHMENT OF FEDERAL RESERVED
WATER RIGHTS IN ALASKA AND DETERMINATIONS OF "PUBLIC LANDS"**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

I.      INTRODUCTION ................................................................................................. 1

II.     STANDARD OF REVIEW ....................................................................................... 4
        A.      Standard of Review for Issues of Law – Federal Reserved Water
                Rights (FRWRs) ........................................................................................ 5
        B.      Standard of Review for Issues of Fact – FRWRs ................................... 7
        C.      Standard of Review for Statutory Issues ................................................ 14

III.    FEDERAL RESERVED WATER RIGHTS DOCTRINE ............................................ 16
        A.      Requirements of the Federal Reserved Water Rights Doctrine ............ 16
                1.      FRWRs Are Limited to a Federal Reservation/Enclave ............ 17
                2.      FRWRs May Arise Only From Primary Purposes ..................... 18
                3.      FRWRs Must Be Necessary To Prevent Purpose(s) From
                        Being Entirely Defeated ............................................................. 19
                4.      FRWRs Must Be Quantified ....................................................... 20
                5.      FRWRs Must Be Established By Proper Adjudication ............. 21
                6.      FRWRs and Prior Appropriation Doctrine ................................ 22
                7.      Summary ..................................................................................... 24
        B.      1999 Regulations Fail to Satisfy FRWR Requirements ....................... 24
                1.      Failure to Limit FRWRs to Federal Reservations ..................... 24
                2.      Failure to Identify Federal Reservation/Enclave Primary Purposes .......... 27
                3.      Failure to Demonstrate that Primary Purposes Would be
                        Entirely Defeated ....................................................................... 29
                4.      Failure to Identify Water Quantities for FRWRs ...................... 31
                5.      Failure to Adjudicate Existence of FRWRs ............................... 31
                6.      There Can Be No FRWRs in Marine Waters ............................. 33

IV.     THE 1999 REGULATIONS CONTRARY TO ANILCA'S PLAIN LANGUAGE
        IMPROPERLY TREAT AS "PUBLIC LANDS" MARINE AND TIDALLY
        INFLUENCED WATERS OVERLYING STATE-OWNED SUBMERGED LANDS
        AND OTHER STATE-SELECTED LANDS ................................................................. 35
        A.      The Plain Language of ANILCA States That These Waters As Well As
                Validly Selected State Lands Are Not Public Lands ............................. 36
        B.      Plain Statutory Language Establishes That Marine And Tidally Influenced
                Waters Overlying State-Owned Submerged Lands Are Not "Public Lands" ........ 37
        C.      The Statutory Framework Clearly Delineates Subsistence Decisions Under
                Title VIII From State Selections Under Title IX .................................... 39
                1.      Plain Language of ANILCA Shows Title I Definitions Govern
                        "Public Lands" for Title VIII Purposes ..................................... 39
                2.      The Legislative History Highlights Congress' Goal of Using
                        Title IX to Resolve Issues Remaining from Prior Acts ............. 40

i

D.     Summary ....................................................................................................42

V.     CONCLUSION ....................................................................................................42

ii

# TABLE OF AUTHORITIES

## CASES

*Adams Fruit Co. v. Barrett*, 494 U.S. 638 (1990)...................................................5, 6, 13

*Air N. America v. Dep't of Transp.*, 937 F.2d 1427 (9th Cir. 1991) ...........................5, 6

*Albillo-Figueroa v. INS*, 221 F.3d 1070 (9th Cir. 2000)...............................................5

*Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531 (1987)..............................38

*Arizona v. California*, 373 U.S. 546 (1963)..................................................................17

*Ass'n to Protect Hammersley, Eld & Totten Inlets v. Taylor Res., Inc.*,
    299 F.3d 1007 (9th Cir. 2002) ..................................................................35, 36

*Cappaert v United States*, 426 U.S. 128 (1976) .................................................. *passim*

*Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984) ....................5, 15, 16, 35

*Chickaloon-Moose Creek Native Ass'n, Inc. v. Norton*, 360 F.3d 972 (9th Cir. 2004)...............5, 6

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ........................8

*Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976)........9, 11, 13, 21

*Colville Confederated Tribes v. Walton*, 647 F.2d 42 (9th Cir. 1981) .........................17

*Colville Confederated Tribes v. Walton*, 460 F. Supp. 1320 (E.D. Wash. 1978).........20

*Gorbach v. Reno*, 219 F.3d 1087 (9th Cir. 2000) (en banc) .....................................8, 12

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49 (1987).....................35

*John v. United States*, 247 F.3d 1032 (9th Cir. 2001) ("*Katie John II*") .........................1

*Kentuckians for Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425 (4th Cir. 2003) ....................8

*K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281 (1988) ....................................................39

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950).........................11

*Nagahi v. INS*, 219 F.3d 1166 (10th Cir. 2000)...........................................................13

iii

*Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998)..........................................................12

*Potlatch v. United States*, 12 P.3d 1260 (Idaho 2000)...................................................................18

*Railway Labor Executives Assoc. v. Nat'l Mediation Board*, 29 F.3d 655 (D.C. Cir. 1994) .........8

*Sierra Club v. Andrus*, 487 F. Supp. 443 (D.D.C. 1980)................................................................18

*Sierra Club v. Block*, 622 F. Supp. 842 (D. Colo. 1985) .........................................................17, 34

*Sierra Club v. Lyng*, 661 F. Supp. 1490 (D. Colo. 1987) ........................................................17, 18

*Sierra Club v. Watt*, 659 F.2d 203 (D.C. Cir. 1981)........................................................ 17-19, 27

*Sierra Club v. Yeutter*, 911 F.2d 1405 (10th Cir. 1990) ....................................................18, 20, 29

*Solid Waste Agency of N. Cook County v. U.S. Army Corps of Engr's*, 531 U.S. 159 (2001) ........................................................................................................................... *passim*

*State of Alaska v. Babbitt*, 54 F.3d 549 (9th Cir. 1995).................................................................1

*State of Alaska v. Babbitt*, 72 F.3d 698 (9th Cir. 1995) ("*Katie John I*").............................. *passim*

*State v. United States*, 12 P.3d 1284 (Idaho 2000) .......................................................................19

*Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598 (D.C. Cir. 1992) ......7, 14

*Totemoff v. State*, 905 P.2d 954 (Alaska 1995)...............................................................................9

*United States v. Adair*, 723 F.2d 1394 (9th Cir. 1983) ...........................................................6, 21

*United States v. Alpine Land & Reservoir Co.*, 340 F.3d 903 (9th Cir. 2003) .............................17

*United States v. Ahtanum Irrigation Dist.*, 124 F. Supp. 819 (E.D. Wash. 1954)........................17

*United States v. Anderson*, 736 F.2d 1358 (9th Cir. 1984)......................................................17, 23

*United States. v. Bell*, 724 P.2d 631 (Colo. 1986) ..................................................................17, 21

*United States v. Fallbrook Public Utility Dist.*, 108 F. Supp. 72 (S.D. Cal. 1952) ......................17

*United States v. City and County of Denver*, 656 P.2d 1 (Colo. 1982)................................. *passim*

*United States v. Dist. Court in & for the County of Eagle and the State of Colorado*, 401 U.S. 520 (1971)...........................................................................................12, 17, 18

iv

*United States v. Lewis*, 67 F.3d 225 (9th Cir. 1995) ...................................................39

*United States v. Mead Corp.,* 533 U.S. 218 (2001) ....................................................39

*United States v. Medico Indus., Inc.*, 685 F.2d 230 (7th Cir. 1982) ..........................8, 14

*United States v. New Mexico*, 438 U.S. 696 (1978)............................................ *passim*

*United States v. Reisman*, 611 F.2d 325 (9th Cir. 1980) ............................................7, 14

*United States v. State*, 23 P.3d 117 (Idaho 2001) ......................................20, 21, 29, 31

*United States v. State of Washington, Dep't of Ecology*, No. 2:01 CV 00047Z,
    2005 WL 1244797 (W.D. Wash. May 20, 2005)...................................................21

*United States v. Washington*, 375 F. Supp. 2d 1050 (W.D. Wash. 2005) ....................18

*West Virginia Highlands Conservancy v. Norton*, 343 F.3d 239 (4th Cir. 2003)............6

*Winters v. United States*, 207 U.S. 564 (1908)  ................................................ 6, 23, 34

## STATUTES AND REGULATIONS

Alaska National Interest Lands Conservation Act, P.L. 96-487, 94 Stat. 2371 (Dec. 2, 1980)
    § 102; 16 U.S.C. § 3102...............................................................25, 36, 39
    § 102(3); 16 U.S.C. § 3102(3) ................................................................36
    § 102(3)(A); 16 U.S.C. § 3102(3)(A) ................................................15, 25, 26
    § 102(3)(B); 16 U.S.C. § 3102(3)(B)........................................................26
    § 102(4), 16 U.S.C. § 1618(4) ...............................................................26
    § 103; 16 U.S.C. § 3103........................................................................37
    § 103(a); 16 U.S.C. § 3103(a)......................................................15, 36, 37
    § 103(c); 16 U.S.C. 3103(c).............................................................26, 37
    § 103(2); 16 U.S.C. § 3103(2)................................................................36
    §§ 201, 202;  16 U.S.C. §§ 420hh, 410hh-1 .........................................27, 28
    § 201(3)(B), (C); 16 U.S.C. § 3102(3)(B),(C) .......................................26, 36
    § 201(10); 16 U.S.C. § 3101 ..................................................................30
    §§ 302(1)-(9); 303(1)-(7); 16 U.S.C. § 668dd note ................................27, 28
    § 304(a) ........................................................................................ 11
    § 401(a); 16 U.S.C. § 460mm(a)..............................................................11
    § 501(b); 16 U.S.C. § 539(b) .................................................................11
    §§ 601, 602 and 603; 16 U.S.C. § 1274(a) ...............................................19
    § 606; 16 U.S.C. § 1286.......................................................................11
    §§ 804-05; 16 U.S.C. §§ 3114-15 .......................................................27, 36
    § 906(d), (g); 48 U.S.C.  n. prec. § 21; 43 U.S.C. § 1601 note.....................39
    § 906(o); 48 U.S.C. n. prec. § 21.; 43 U.S.C. § 1601 note ..........................39

v

§ 906(o)(1); 43 U.S.C. n. to § 1601, § 1616 ................................................41
§ 906(o)(2); 48 U.S.C. n. prec. § 21 .........................................................45
§ 1314; 16 U.S.C. § 3202 ..........................................................................11
§ 1319; 16 U.S.C. § 3207 ..................................................3, 10, 22, 23, 31
§ 2011; 16 U.S.C. § 431 note ....................................................................28
§ 2013; 16 U.S.C. § 431 note ....................................................................28

Alaska Native Claims Settlement Act, P.L. 92-203, Dec. 18, 1971, 85 Stat. 688 ......................41
§§ 17(d)(1), (2); 43 U.S.C. §§ 1616(d)(1), (2)...........................................41

Alaska Statehood Act, P.L. 85-508, July 7, 1958, 72 Stat. 339............................................15, 35

The Desert Land Act, 44 Cong. Ch. 107, March 3, 1877, 19 Stat. 377 ........................................33

Reclamation Act, 57 Cong. Ch. 1093, June 17, 1902, 32 Stat. 388, 43 U.S.C. §§ 371 *et seq*.......33

Submerged Lands Act, 83 Cong. Ch. 65, May 22, 1953, 67 Stat. 29, 43 U.S.C. §§ 1301 *et seq*..15

36 C.F.R. § 242 (Jan. 8, 1999) ...............................................................................2
§ 242.26(i)(3)(xxi)(B) ...............................................................30
§ 242.3...........................................................................15
§ 242.3(1)(2) ....................................................................15

50 C.F.R. § 100 (Jan. 8, 1999) ...............................................................................2
§ 100.4(2) ..................................................................35, 39
§ 100.26(i)(4)(ix).................................................................25
§ 100.3............................................................................15
§ 100.3(1)(2) ....................................................................15

64 Fed. Reg. 1276 (Jan. 8, 1999) ........................................................................2, 7

70 Fed. Reg. 76400 (Dec. 27, 2005) ....................................................... *passim*

5 U.S.C. § 706(2) ...................................................................................................4
§§ 706(2)(A), (B) ............................................................6, 16
§ 706(2)(C)....................................................................6, 7
§ 706(2)(D) .......................................................................6

16 U.S.C. § 1 .....................................................................................................19

16 U.S.C. § 3 .....................................................................................................8

16 U.S.C. § 410aaa-76(b) ...................................................................................9

16 U.S.C. § 410hh...............................................................................................27

PLAINTIFF STATE OF ALASKA'S OPENING BRIEF                    CASE NO.:  A05-0006-CV (HRH)

16 U.S.C. § 410hh-2 .................................................................................................11

16 U.S.C. § 410hhh-4 ...............................................................................................9

16 U.S.C. § 431 note ................................................................................................27

16 U.S.C. § 460mm ..................................................................................................27

16 U.S.C. § 460mm-2 ...............................................................................................27

16 U.S.C. § 460xx-1(d) .............................................................................................9

16 U.S.C. § 460iii-5(d)(4) .........................................................................................9

16 U.S.C. §§ 473 *et seq.* ...................................................................................18, 19

16 U.S.C. §§ 528 *et seq.* .........................................................................................18

16 U.S.C. § 539 ........................................................................................................27

16 U.S.C. § 551 ..........................................................................................................9

16 U.S.C. § 1132 note ..............................................................................................27

16 U.S.C. § 1274 ......................................................................................................27

16 U.S.C. § 1274(a) .................................................................................................19

16 U.S.C. § 1286 ......................................................................................................11

16 U.S.C. §§ 3111 *et seq.* .......................................................................................27

16 U.S.C. § 3124 ......................................................................................................12

16 U.S.C. § 3207 ......................................................................................................35

28 U.S.C § 1345 ...........................................................................................6, 21, 32

28 U.S.C. § 2409a ....................................................................................................13

43 U.S.C. § 372 ........................................................................................................17

43 U.S.C. § 666 ............................................................................................6, 9, 21

43 U.S.C. §§ 1701 *et seq.* .......................................................................................17

PLAINTIFF STATE OF ALASKA'S OPENING BRIEF                    CASE NO.:  A05-0006-CV (HRH)

## ADDITIONAL AUTHORITIES

*Federal Water Rights of the National Park Service, Fish & Wildlife Service, Bureau of Reclamation and the Bureau of Land Management*, 86 Interior Dec. 553 (1979) (Solicitor's Opinion) ..........................................................................................19

*Note*, Todd A. Fisher, *The Winters of Our Discontent: Federal Reserved Water Rights in the Western States*, 69 CORNELL L. REV. 1077 (1984) ..........................................................22

H.R. REP. NO. 95-1045 (1978) ................................................................................40, 41

S. REP. NO. 95-1300 (1978) ............................................................................................41

4 Waters and Water Rights § 37.01 (Robert E. Beck, ed., Michie 1996) ......................22

W. A. Wilcox, Jr., *Special Issues in Environmental Law Involving Federal Agencies*, 14 VILL. ENVTL. L. J. 39 (2003) ..............................................................................22, 23

## I.    <u>INTRODUCTION</u>

Pursuant to the Court's April 26, 2006 Order, this Opening Brief is submitted by Plaintiff State of Alaska to address "Issue l.  The 'What Process' Issue."  Addressed herein are applicable judicial doctrines, statutory provisions and case law that set forth the substantive and procedural standards governing (a) establishment of Federal Reserved Water Rights (FRWRs) in Alaska and (b) determination of what marine and tidally influenced waters and validly selected State lands are "public lands" for the purposes of Title VIII of the Alaska National Interest Lands Conservation Act ("ANILCA").  P.L. 96-487, 94 Stat. 2371 (Dec. 2, 1980).

Only "public lands," as defined by ANILCA, including those specific reaches of waterways with properly established FRWRs, are subject to preemptive federal authority pursuant to Title VIII of the same Act.  *State of Alaska v. Babbitt*, 54 F.3d 549 (9th Cir. 1995), *State of Alaska v. Babbitt*, 72 F.3d 698 (9th Cir. 1995) ("*Katie John I*"); *John v. United States*, 247 F.3d 1032 (9th Cir. 2001) ("*Katie John II*").  In holding that specific waterways or reaches of waterways with FRWRs are "public lands," the *Katie John I* Court expressly referenced the Supreme Court cases that prescribe the procedural and substantive requirements to establish FRWRs.  72 F.3d at 703; *Cappaert v. United States*, 426 U.S. 128 (1976); *United States v. New Mexico*, 438 U.S. 696 (1978).  Moreover, the *Katie John I* Court only directed the agencies to "identif[y]" waterways that might include FRWRs consistent with applicable doctrine and recognized that adherence to the FRWR doctrine imposed "an extraordinary administrative burden on the federal agencies." *Katie John I*, 72 F.3d at 700, 704.

The January 1999 federal agency regulations, 64 Fed. Reg. 1276 (Jan. 8, 1999) ("1999 Regulations" or "Regulations"),[1] improperly go beyond identification and expansively purport to adjudicate and establish FRWRs (and preemptive federal authority) in numerous Alaska waterways.  This "establishment" process fails to adhere to the exacting Supreme Court requirements for the identification, assertion, adjudication and establishment of such rights and is in excess of Congressionally delegated authority.  In unilaterally promulgating these Regulations, the Federal Defendants (or "Agencies")[2] (a) failed to identify on the record the specific, primary purposes of federal reservations that impliedly give rise to the purported water rights; (b) failed to restrict their claims to waterways on or within federal reservations or on federal lands; (c) failed to demonstrate the necessity for the asserted rights on reserved appurtenant lands and demonstrate which reservation primary purposes, if any, would be entirely defeated without the FRWR; (d) failed to quantify the necessary water right; and (e) failed to properly adjudicate and establish the claimed rights.  This routine rulemaking did not require an "extraordinary" effort by the Agencies and nothing in the FRWR doctrine, ANILCA or other federal statutes empowers the Agencies to short circuit the FRWR process and act as their own water court for adjudicating the water rights and interests they claim.

Additionally, the 1999 Regulations improperly extend preemptive authority over certain marine and tidally influenced waters where the FRWR doctrine does not recognize the existence of reserved water rights <u>and</u> the State owns the underlying submerged land.

Lastly, the Regulations extend federal authority over certain State-selected lands even though those lands are not "public lands" pursuant to ANILCA.

---

[1]   36 C.F.R. § 242; 50 C.F.R. § 100 (Jan. 8, 1999).
[2]   U.S. Department of the Interior, U.S. Department of Agriculture

The result is an illegal expansion of federal authority in derogation of ANILCA, at § 1319; 16 U.S.C. § 3207 – two savings clauses mandating that the State's traditional authority over water, as well as fish and wildlife, are not to be diminished except as "specifically provided otherwise" by ANILCA.  The expansive assertion and establishment of FRWRs, in excess of congressionally delegated authority and inconsistent with the standards that govern such rights, pushes the envelope of federal preemption contrary to the letter and spirit of these important savings clauses.

Plaintiff, the State of Alaska, seeks a determination, at this phase of the case, that the identification, adjudication and establishment of FRWRs in Alaska must be preceded by adherence to the Supreme Court standards regarding such rights:

(1)     the Agencies must limit their FRWRs to waterways on or within the boundaries of federal reservations or enclaves as well as waterways that flow on or within federally-owned land;

(2)     the Agencies must expressly identify in an appropriate record, the specific and primary purposes which purportedly reserve an implied federal water right for each particular federal reservation in Alaska where the Agencies seek to establish such a right;

(3)     the Agencies must demonstrate in an appropriate record the necessity for the implied right and show specifically for each such claimed right that the primary purpose of the appurtenant federal reservation would be "entirely defeated"[3] absent the establishment of a FRWR;

(4)     the Agencies must quantity the specific amount of water necessary to satisfy the "entirely defeated" criterion; and

---

[3]  *See New Mexico*, 438 U.S. at 700.

(5)     the Agencies must establish the properly identified or claimed FRWR in an appropriate State or federal forum or proceeding rather than unilaterally establish such rights or interests via a rulemaking process controlled totally by the Agencies.

Moreover, the State seeks affirmations that FRWRs cannot be asserted in marine or tidally influenced waters and that ANILCA prescribes that "public lands" do not include marine and tidally influenced waters that overlay State-owned submerged lands or all State validly selected lands.

Establishing these "ground rules" for the precise and legally correct determination of "public lands" will enable a proper delineation, in the second phase of this case, of where federal authority may be applied.

## II.     **STANDARD OF REVIEW**

Section 706(2) of the Administrative Procedure Act ("APA") (5 U.S.C. § 706(2)) sets forth the standard of review of agency action.   Under this standard, the Court must:

"(2)     hold unlawful and set aside agency action, findings, and conclusions found to be—

(A)     arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)     contrary to constitutional right, power, privilege, or immunity;

(C)     in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D)     without observance of procedure required by law ..."

5 U.S.C. § 706(2).  The State will address the standard of review applicable to three types of determinations made by the Federal Defendants:  (1) legal determinations regarding the law of

FRWRs, which has been developed by the courts rather than by federal statute, (2) fact-findings regarding FRWRs, and (3) legal determinations regarding statutory law (i.e., ANILCA).

### A.     Standard of Review for Issues of Non-Statutory Law – FRWRs

The doctrine of FRWRs is of judicial rather than statutory origin, meaning the standard of review for related legal determinations is the familiar *de novo* standard.  The concept of deference, which can alter the *de novo* standard in appropriate circumstances, applies only to judicial review of agency interpretations of an ambiguous statute that an agency is charged with administering.  *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649 (1990); *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984); *Air North America v. Dep't of Transp*., 937 F.2d 1427, 1436 (9th Cir. 1991).  Here there is no statute (whether ambiguous or unambiguous) governing the adjudication of FRWRs for the Defendant Agencies to interpret or apply, so there can be no deference to permissible agency interpretation.  *See Chevron*, 467 U.S. at 843 (deference limited to "agency's construction of the statute which it administers" where that statute is ambiguous).

In particular, no deference applies in a situation such as the case at bar in which an agency in the course of administering a statute for which it is responsible (here, ANILCA) finds itself construing other law (here, the law of FRWR) such as judicially-developed law or a statute which the agency is not charged with administering.  *See Chickaloon-Moose Creek Native Ass'n, Inc. v. Norton*, 360 F.3d 972, 980 (9th Cir. 2004) (rejecting Department of Interior's contention that because Interior implemented the Alaska Native Claims Settlement Act ("ANCSA"), its construction of a contract entered into pursuant to ANCSA is subject to *Chevron* deference – holding that Interior was construing judicially-developed law of federal contracts, not ANCSA itself); *Albillo-Figueroa v. INS*, 221 F.3d 1070, 1072 (9th Cir. 2000) (no

deference due to the INS's construction of federal or state criminal statutes incorporated into immigration statutes); *see also Adams Fruit Co.*, 494 U.S. at 649 (federal agency construction of statute granting private cause of action); *Air North America,* 937 F.2d at 1436 (federal agency construction of the APA itself); *West Virginia Highlands Conservancy v. Norton*, 343 F.3d 239, 245 (4th Cir. 2003) (federal agency construction of common law principles relating to agency's rules).

The Supreme Court and other federal and state courts have developed the elements of a FRWR over the years, starting with the Supreme Court's seminal decision in *Winters v. United States*, 207 U.S. 564 (1908),[4] pursuant to the concurrent jurisdiction that Congress has given the federal and state courts to adjudicate FRWR claims.  28 U.S.C § 1345; 43 U.S.C. § 666; *see United States v. Adair*, 723 F.2d 1394, 1400 (9th Cir. 1983).  The Secretaries of the Interior and Agriculture have never functioned as adjudicators to determine the presence or non-presence of FRWRs, and have developed no expertise in such adjudication.  *See Chickaloon-Moose Creek Native Ass'n,* 360 F.3d at 980 (Department of Interior had no particular expertise in construing ANCSA-related contracts).  Thus the Court itself must determine de novo whether the Federal Defendants' action in unilaterally establishing FRWRs via rulemaking was "in accordance with law …, contrary to constitutional right …, in excess of statutory jurisdiction [or authority or] without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).

The fact that the Federal Defendants enlarged their own property rights by purporting to adjudicate their claims to FRWRs is an additional reason under Ninth Circuit precedent why no deference is due.  *See Chickaloon-Moose Creek Native Ass'n,* 360 F.3d at 980 (alternative holding that because the Department of the Interior was a party to the contract it construed and

---

[4]  *Winters* was the first articulation of the FRWR doctrine applied to federally reserved Indian lands.  Subsequent cases such as *Cappaert* and *New Mexico* extended the Doctrine to other federal reservations (e.g., Parks, Forests).

"stands to gain or lose depending on the outcome of this litigation, the agency should not be accorded any deference").

**B.    Standard of Review for Issues of Fact – FRWRs**

The standard of review for any factual determinations by the Federal Defendants depends on the crucial question of whether or not Congress authorized the Agencies to unilaterally adjudicate and establish FRWRs, or whether Congress merely authorized the Agencies to identify and claim FRWRs in an appropriate federal or state forum.  The 1999 Regulations purport to adopt a binding rule establishing conclusively that FRWRs exist in specific waters and so operate like a judicial decree adjudicating water rights.  *See* 64 Fed. Reg. at 1279.  As shown below, Congress did not authorize the Agencies to act as both "prosecutor and judge" by establishing title to water rights in their own favor.  *Katie John I* directed the Agencies to "identif[y]" the waters in which they asserted FRWRs and thus claimed federal subsistence jurisdiction, but that court could not and did not authorize the Agencies to adjudicate FRWRs. *Katie John I*, 72 F.3d at 703-04.  Thus, the Agencies' 1999 rulemaking order, which purported to adjudicate FRWRs, is "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), and no aspect of it, including any factual findings, is entitled to any deference whatsoever on judicial review.  *See Transohio Sav. Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir.  1992) (administrative action without authority is void); *United States v. Reisman*, 611 F.2d 325, 328 (9th Cir. 1980) (power of administrative tribunal to make binding factual findings depends on proper authorization to adjudicate issues);

*United States v. Medico Indus.*, 685 F.2d 230, 236 (7th Cir. 1982) (factual findings made without proper authorization to adjudicate issues are "null and void").[5]

The Federal Defendants lack statutory authority to adjudicate their own claimed water rights. When reviewing a particular agency action challenged under section 706(2) of the APA, "[t]he court is first required to decide whether the [agency] acted within the scope of [its] authority." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415 (1971). "The first step in this analysis is an examination of the statute providing authority for the agency to act." *Kentuckians for Commonwealth, Inc. v. Rivenburgh,* 317 F.3d 425, 439 (4th Cir. 2003).

Only Congress can delegate to an agency the authority to take action, including quasi-legislative action such as the adoption of rules or quasi-judicial action such as conducting administrative adjudications. *Gorbach v. Reno*, 219 F.3d 1087, 1093 (9th Cir. 2000) (en banc). Thus the Federal Defendants must establish their authority to adjudicate title to FRWRs by finding a statute authorizing such unilateral adjudication. *See Railway Labor Executives Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (rejecting argument that absence of a statutory prohibition on agency action means the agency has free rein to act -- "[w]ere courts to presume a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony") (italics in original).

In this case, no such authorizing statute exists. Several provisions authorize the Federal Defendants to adopt rules concerning the *management* or *administration* of federal property, but none authorize unilateral agency rulemaking to adjudicate (and establish) the *extent* of federal property interests. *See* 16 U.S.C. § 3 (authorizing the Department of the Interior's National Park

---

[5]    The power of the agencies involved in the *Reisman* and *Medico Industries* opinions to make binding fact determinations depended on the existence of a government contract containing a dispute clause, as the applicable statute empowered the agency to act only when such a clause was present. These opinions are cited here for the more general principle that the agency's power to make factual findings depends on statutory authorization.

Service to adopt rules concerning the "*use and management*" of federal property) (emphasis added); § 551 (similarly authorizing the Department of Agriculture to adopt rules governing the "*occupancy and use*" of the National Forests and to "preserve" those forests from destruction) (emphasis added).

Rather than authorize the Agencies themselves to adjudicate the claimed FRWRs, Congress in a variety of statutes specific to particular park, wildlife refuge, or conservation units has authorized or directed the Federal Defendants to take steps to assert FRWR claims by participating in litigation in federal or, more often, state court. *See, e.g.,* 16 U.S.C. § 410aaa-76(b)   (Secretary shall protect asserted FRWRs for the California Desert Lands Park and Preserve by pursuing a claim in any state court adjudication under the McCarran Amendment); § 410hhh-4 (directing Secretary to "protect and maintain" FRWR for irrigation purposes in Boca National Wildlife Refuge, Colorado); § 460xx-1(d) (expressly reserving a FRWR for San Pedro National Conservation area, and stating that "the Secretary shall file a claim for the quantification of such rights in an appropriate stream adjudication"); § 460iii-5(d)(4) (directing Secretary to assert a FRWR for the Snake River Birds of Prey National Conservation Area in a state water court proceeding in Idaho conducted pursuant to the McCarran Amendment, 43 U.S.C. § 666).  These statutes demonstrate that Congress understands that FRWRs are property rights[6] that the federal agencies assert in federal or state court, rather than adjudicating themselves.

Where Congress in creating a particular federal reservation or enclosure (e.g., a park, forest unit, Indian reservation, etc.) is silent as to water rights, federal and state courts evaluate

---

[6]   *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 819 (1976) ("the allocation of water essentially involve[s] the disposition of property").  However, the interests are a limited form of use rights. *Totemoff v. State*, 905 P.2d 954 at 965 (Alaska 1995); *see also* 70 Fed. Reg. 76400, 76402 (Dec. 27, 2005).

assertions by the federal agencies that Congress implicitly created a FRWR. *New Mexico,* 438 U.S. at 700-01. But in no case has the absence of Congressional discussion of water rights been construed as authorizing the Federal Defendants to go beyond asserting a FRWR and actually enter an order purporting to adjudicate that an FRWR exists. Thus, the 1999 Regulations are a truly unprecedented expansion of federal power to administratively adjudicate and unilaterally establish FRWRs.

In contrast, ANILCA preserved the long-established process in which federal agencies assert FRWRs and federal and state courts adjudicate whether those assertions are valid. Section 1319 expressly addresses water rights and declares that ANILCA neither expands nor contracts the Federal Defendants' jurisdiction or powers regarding water rights. The full statute reads:

> "*Nothing in this Act shall be construed as* limiting or restricting the power and authority of the United States or –
>
> (1)    as a*ffecting in any way* law governing appropriation or use of, or *Federal rights to, waters* on lands within the State of Alaska;
>
> (2)    as *expanding* or diminishing *Federal or State jurisdiction*, responsibility, interests, or rights in water resources development or control; or
>
> (3)    as superseding, *modifying*, or repealing, except as specifically set forth in the Act, *existing laws applicable to the various Federal Agencies* which are authorized to develop or participate in the development of water resources *or exercise licensing or regulatory functions* in relation thereto."

ANILCA, at § 1319; 16 U.S.C. § 3207 (emphasis added). Because section 1319 confirms that ANILCA did not "expand[] … Federal … jurisdiction" or alter "the law governing … Federal rights ... to … water" or "modif[y]" the normal "licensing" and "regulatory" functions of the Agencies in managing federal land and waters, this plain statutory provision defeats any strained claim that Congress took the unprecedented step of implicitly empowering the Federal

Defendants to act as their own water court.  *Id.*  Instead, for example, section 203 of ANILCA simply references the general authority of the Secretary of the Interior to adopt rules and regulations regarding the "use and management" of National Park Service property.  *See* § 203; 16 U.S.C. § 410hh-2 (incorporating 16 U.S.C. § 3 and other general management provisions). Moreover, the authority to regulate ANILCA-added units is expressly "subject to valid existing rights."  *Id.* (e.g., *see also* § 304(a); 401(a), 16 U.S.C. § 460mm(a); § 501(b), 16 U.S.C. § 539(b); § 606, 16 U.S.C. § 1286).[7]

Another savings clause in ANILCA is also relevant.  Section 1314 states plainly that nothing in the Act shall enlarge or diminish the State's traditional authority over fish and wildlife except as "specifically provided in the Act."  ANILCA, at § 1314; 16 U.S.C. § 3202. This clear language protects State authority, and sovereignty, in this realm from Federal Agency action unless such action is specifically authorized.  Each FRWR purportedly adjudicated and established by the 1999 Regulations expands federal authority over fish and wildlife and diminishes State authority over the same.  As there is no specific provision in ANILCA for such federal action (and section 1319 plainly provides the contrary), section 1314 is another clear marker that Congress did not authorize the Agencies to unilaterally adjudicate and establish FRWRs via rulemaking that serves to diminish State authority over fish and wildlife.  *Id.*

Each of these savings clauses manifests Congressional intent to protect and maintain the State of Alaska's traditional authority over water and fish and wildlife.  Any federal agency action to diminish or impinge upon these traditional State powers must be based upon a clear statement by Congress demonstrating unmistakable intent to authorize such agency action (i.e.,

---

[7]   Additionally, since a water right is a property right, Fifth Amendment Due Process requirements are applicable, *see Colorado River*, 424 U.S. at 819; *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950). The unilateral rulemaking process likely provided insufficient notice to other parties with interests in, or potential, claims to water rights that could be imported by establishment of FRWRs.

the Clear Statement rule). *Solid Waste Agency v. U.S. Army Corps of Engr's*, 531 U.S. 159, 173 (2001); *see also Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209 (1998) (Congressional intent to alter federal-state balance with respect to traditional state functions must be unmistakably clear).

The Federal Defendants appear instead to rely on the generic language in Title VIII authorizing the Secretaries to "prescribe such regulations as are necessary and appropriate to carry out his responsibilities under this subchapter."  16 U.S.C. § 3124.  This general, non-water-specific authorization to make rules regarding subsistence hunting and fishing is not a "clear statement" of unmistakable Congressional intent to impinge upon State authority and cannot overcome:  (a) the-water-rights-specific disclaimer in section 1319 providing that nothing expands federal jurisdiction or power over water rights; (b) the fish and wildlife savings clause in section 1314 that protects State authority except as "specifically provided"; (c) the decision of Congress to establish concurrent jurisdiction in the federal and state courts to adjudicate FRWRs, *United States v. District Court in & for the County of Eagle & the State of Colorado*, 401 U.S. 520, 522-23 (1971); (d) the many examples in 16 U.S.C. in which Congress indicated the role of the Federal Defendants was to assert FRWRs rather than adjudicate them; and (e) the novelty and absurdity of a reading that would allow a federal agency to act as judge of its claimed property rights.  *See Gorbach,* 219 F.3d at 1093-1097 (given the long history in which courts decided petitions to "denaturalize" a citizen, the presence of a statute empowering the courts to denaturalize, and the absence of a statute specifically authorizing the Immigration and Naturalization Service to administratively denaturalize, the mere fact that the INS had broad statutory authority to make rules necessary to administer the naturalization statute,  is not sufficient to empower the INS to denaturalize a citizen by administrative action); *see also*

*Nagahi v. INS,* 219 F.3d 1166, 1170 (10th Cir. 2000) (general power to adopt rules "necessary" to carry out naturalization law insufficient to justify adoption of a rule limiting time period for judicial review of denial of naturalization petition).

The fact that disputes regarding the property interests or rights of the federal government relative to other claimants are normally adjudicated in court, pursuant to a long legal tradition, means that Congress must clearly state its intent to empower an agency to adjudicate its own property interests administratively especially if establishment of the federal interest would diminish the authority and interest of another sovereign. *See* 28 U.S.C. § 2409a (Quiet Title Act); 43 U.S.C. § 666 (McCarran Amendment)*; Adams Fruit Co.*, 494 U.S. at 650-651 (agency's authority must not be construed to authorize adoption of a rule limiting a litigant's rights in a subsequent court proceeding under a judicial remedy provided by Congress); *Gorbach*, 219 F.3d at 1099 (Congress must clearly state any decision to authorize the INS to administratively strip citizenship rights). The McCarran Amendment policy of encouraging state-court adjudication of water rights including FRWRs would also be undercut (if not eviscerated) if federal agencies asserting FRWRs could themselves conclusively establish such rights in their favor before a McCarran Amendment proceeding began. *See Colorado River,* 424 U.S. at 819 ("actions involving the allocation of water essentially involve the disposition of property and are best conducted in unified proceedings," affirming federal district court's decision to abstain in favor of concurrent McCarran Amendment proceedings in state court); *see also New Mexico*, 438 U.S. at 701 ("Where Congress has expressly addressed the question of whether federal entities must abide by state water law, it has almost invariably deferred to the state law.").

The *Katie John I* and *II* opinions do not (and could not) create statutory authorization for the Agencies to act as their own water court. That court stated "the federal agencies that administer the subsistence priority are responsible for identifying waters" in which FRWRs may exist. *Katie John I*, 72 F.3d at 700. The court did not say whether "identifying" meant informing the public (and the State) of the location of the specific waters in which the Federal Defendants assert the existence of FRWRs, or purported to expand federal authority to adjudicate and establish FRWRs via agency rulemaking. No statute authorizes the Federal Defendants to adjudicate FRWRs, and only Congress can delegate that kind of authority to the Agencies. Furthermore, the unprecedented stretching of the laws to allow the Agencies to serve as their own water court is contrary to the plain limitations in sections 1319 and 1314. Accordingly, the only permissible reading of "identify" is that the Federal Defendants were directed to simply identify where they would assert FRWRs, thus giving the public and the State fair notice of the Agencies claims.

Since administrative rulemaking and adjudication orders entered in excess of statutory jurisdiction are entitled to no deference, it follows that none of the determinations made by the Agencies, factual as well as legal, are entitled to any deference. 5 U.S.C. § 706(2)(C); *Transohio Sav. Bank,* 967 F.2d at 621; *Reisman*, 611 F.2d at 328; *Medico Indus.*, 685 F.2d at 236. The de novo standard of review applies to all FRWR issues in this case.

**C.    Standard of Review for Statutory Issues (Construction of ANILCA)**

The Federal Defendants construed ANILCA in promulgating several non-FRWR-related regulations in the 1999 Regulations. Court review of federal agency regulatory interpretation of statutes administered by that agency is governed first by a simple inquiry:  if Congress has "directly spoken to the precise question [and] the intent of Congress is clear," that is the end of

the matter. *Chevron*, 467 U.S. at 842. The Agencies are required to give effect to the unambiguously expressed or plain intent of Congress. *Id.* Agencies have interpretive latitude and receive deference from a reviewing court only if the statute is ambiguous or silent regarding a specific issue. *Id.* at 843.

Express and unambiguous provisions of ANILCA govern two other claims of the State: section 102(3)(A) provides that "lands which have been confirmed to" the State are not "public lands." ANILCA, at § 102(3)(A); 16 U.S.C. § 3102(3)(A). As submerged lands were confirmed to Alaska upon its entry into the Union (Submerged Lands Act of 1953, 43 U.S.C. § 1311(c); Alaska Statehood Act, § 6(m), 72 Stat. 339, 343 (1959) ("The Submerged Lands of 1953 … shall be applicable to the State of Alaska.")) these lands are not "public lands." Section 103(A) specifies "the boundaries of areas added to the National Park, Wildlife Refuge and National Forest Systems SHALL, IN COASTAL AREAS, NOT EXTEND SEAWARD BEYOND THE MEAN HIGH TIDE LINE TO INCLUDE LANDS OWNED BY THE STATE OF ALASKA. . . ." ANILCA, at § 103(a); 16 U.S.C. § 3103(a) (emphasis added). Lastly, section 102(3)(A) prescribes that "lands selections of the State of Alaska which have been … validly selected under the Alaska Statehood Act" not "public lands." ANILCA, at § 102(3)(A); 16 U.S.C. § 3102(3)(A). Contrary to these plain provisions, the 1999 Regulations treat as "public lands" (1) marine and tidally influenced waters that overlay submerged lands "confirmed to" the State of Alaska even though these same waters are "seaward beyond the mean high tide line" (50 C.F.R. § 100.3; 36 C.F.R. § 242.3) and (2) certain State of Alaska valid land selections. *Id.* at § 100.3(1)(2); § 242.3(1)(2).

These portions of the Regulations are to be reviewed pursuant to the first prong of *Chevron* which provides that agencies cannot promulgate regulations contrary to the

unambiguous or plain meaning of the statutory language.  *Chevron*, 467 U.S. at 842-43.
Regulations inconsistent with the plain meaning are considered arbitrary and capricious and not
in accordance with law.  5 U.S.C. §§ 706(2)(A), (B).


## III.    FEDERAL RESERVED WATER RIGHTS DOCTRINE

### A.    Requirements Of The Federal Reserved Water Rights Doctrine

*Katie John I* held that "the definition of public lands includes those navigable waters in
which the United States has an interest by virtue of the reserved water rights doctrine."  72 F.3d
at 704.  The court expressly cited *Cappaert* and *New Mexico* as the sources of this judicial
doctrine.  *Id.* at 703.  Furthermore, the court noted that "by holding that public lands include
SOME specific navigable waters as a result of reserved water rights, we impose an
EXTRAORDINARY ADMINISTRATIVE BURDEN on federal agencies."  *Id.* at 704
(emphasis added).

*Cappaert*, *New Mexico* and their progeny establish rigorous substantive and procedural
requirements (i.e., "an extraordinary administrative burden") for the identification and
establishment of FRWRs pursuant to the "implied-reservation-of-water doctrine."  *New Mexico,*
438 U.S. at 700.  These requirements, subject to "careful examination," *id.* at 701, are:
(1) demonstration of a federal land reservation; (2) demonstration of a primary purpose to be
served by the claimed water right appurtenant to the reserved land; (3) demonstration that the
water right is necessary and that the primary purposes would be "entirely defeated" absent the
water right; (4) determination of the specific quantity of necessary water; and (5) adjudication of
the claimed or identified water right in an appropriate federal or state forum.  *Id.*

### 1.    FRWRs Limited to a Federal Reservation/Enclave

Only a special federal land reservation, or enclave, can give rise to the implied water right.  *District Court for Eagle County,* 401 U.S. at 523; *Arizona v. California*, 373 U.S. 546, 601 (1963); *Sierra Club v. Lyng*, 661 F. Supp. 1490 (D. Colo. 1987).  For purposes of the doctrine, and this case, reservations or enclaves can include National Park Service lands (*Cappaert*), National Wildlife Refuges (*Arizona*), National Forests (*New Mexico*), and Wild and Scenic Rivers and Wilderness areas (*Sierra Club v. Block*, 622 F. Supp. 842 (D. Colo. 1985)). There are no FRWRs associated with "public domain" or public lands administered by the Bureau of Land Management pursuant to the Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1701, *et seq.* ("FLPMA") since the Act does not specifically reserve any federal land.  *Sierra Club v. Watt*, 659 F.2d 203, 206 (D.C. Cir. 1981).

In addition, the implied water right must be directly associated with the federal reservation or enclave.  The FRWR may exist only in "appurtenant water," meaning water associated directly with reserved land.[8]  The water rights may arise from "previously unappropriated waters IN" the reservation.  *Block*, 622 F. Supp at 861 (emphasis added).  Such rights are also properly restricted to "waters on, under, or touching the reserved lands."  *United States v. City & County of Denver*, 656 P.2d 1, 35 (Colo. 1982).  Attempts by the U.S. to claim FRWRs "off reservation" have been denied.  *United States v. Bell*, 724 P.2d 631, 647 (Colo. 1986) (en banc).

FRWRs can be established only on federal reservations – not on adjacent, non-federal land especially non-federal lands downstream of reservations.  The Supreme Court has used the

---

[8]  Appurtenant water rights are rights to the use of water on particular parcels of land.  *See* 43 U.S.C. § 372; *United States v. Alpine Land & Reservoir Co.*, 340 F.3d 903, 919 (9th Cir. 2003); *United States v. Ahtanum Irrigation Dist.*, 124 F. Supp. 819 (E.D. Wash. 1953).  Water rights are appurtenant to particular pieces of land.  *United States v. Fallbrook Public Utility Dist.*, 108 F.  Supp. 72 (S.D. Cal. 1952); *see also Colville Confederated Tribes v. Walton*, 647 F.2d 42, 46 (9th Cir. 1981) and *United States v. Anderson*, 736 F.2d 1358 (9th Cir. 1984).

term "enclave" to characterize federal reservations; *see District Court for Eagle County*, 401 U.S. at 523 (citing *Arizona*, 373 U.S. at 600-01); *see also Lyng*, 661 F. Supp. at 1494. Enclave has limited meaning and does not authorize free-floating FRWRs not associated with the actual reservation or enclave. The Idaho Supreme Court has concluded that FRWRs related to federal Wilderness units in the State do not extend beyond the boundaries of the designated Wilderness lands. *Potlatch v. United States*, 12 P.3d 1260, 1266 (Idaho 2000).

The Agencies have expressly acknowledged that FRWRs do not include reaches of waterways upstream or downstream of federal reservations: "[a] Federal reserved water right is a usufruct which gives the right to divert water for use on specific land or the right to guaranty flow in a specific reach of a water course. As such, the water right does not affect the water downstream of the use area and does not have an effect on upstream areas except in times of shortage when a junior use may be curtailed." 70 Fed. Reg. 76400, 76402 (Dec. 27, 2005).

Finally, only federal agencies have the ability to claim FRWRs and third parties have not been able to force an agency to claim such rights. *See Sierra Club v. Andrus*, 487 F. Supp. 443, 455, 448 (D.D.C. 1980); *Sierra Club v. Watt*, 659 F.2d 203 (1981); *Sierra Club v. Yuetter*, 911 F.2d 1405 (10th Cir. 1995).

### 2. FRWRs May Arise Only From Primary Purposes

FRWRs may arise only in connection with the "primary" purposes of a federal reservation or enclave: "where water is valuable for a secondary use of the reservation" no FRWRs may arise. *See New Mexico,* 438 U.S. at 701; s*ee also United States v. Washington*, 375 F. Supp. 2d 1050 (W.D. Wash. 2005). In *New Mexico*, the Supreme Court rejected a variety of FRWR claims for wildlife, instream flows, and recreation purposes as being secondary purposes of the Gila National Forest. The Court also held that general management statutes, such as the

1960 Multiple Use and Sustained Yield Act (16 U.S.C. §§ 528 *et seq.*) and the 1897 Organic

Administration Act (16 U.S.C. §§ 473 *et seq.*), although applicable to the Gila Forest did not

create FRWRs. *New Mexico,* 438 U.S. at 713-14. These Acts were not sufficiently specific to

that particular Forest unit. Following this lead, other courts have rejected claims that FRWRs

may arise from general National Park statutes such as the 1916 National Park Service Organic

Act (16 U.S.C. § 1), *see City & County of Denver*, 656 P.2d at 28, or from a general public land

statute such as FLPMA, *see Watt*, 659 F.2d at 206. Primary purposes are to be determined by

reviewing the specific legislative provisions or executive orders that create the particular unit,[9]

s*ee Cappaert,* 426 U.S. at 139-40, and even then federal statutes creating reservations (i.e., the

Sawtooth National Recreation Area) have been found to be insufficiently particular to establish a

FRWR. *State v. United States*, 12 P.3d 1284, 1288-91 (Idaho 2000).

### 3.    FRWR Must Be Necessary to Prevent Primary Purpose(s) From Being Entirely Defeated

A most critical element of the FRWR doctrine is the "necessity" test. The Supreme Court

has "repeatedly emphasized that Congress reserved 'only that amount of water necessary to

fulfill the purpose of the reservation, no more.'" *New Mexico,* 438 U.S. at 700 (citing *Cappaert*,

426 U.S. at 141). The Supreme Court held further that the federal agencies claiming a FRWR

must show that the primary purpose(s) of the reservation or enclave would be "<u>entirely defeated</u>"

absent the FRWR. *Id.* (emphasis added). *Cappaert* concluded that the survival of the Devil's

Hole Pupfish depended on the establishment of the FRWR and without the right, the Pupfish –

for which the reservation was made – would die. *Cappaert*, 426 U.S. at 141-42. "Entirely

---

[9]    In the case of Wild and Scenic Rivers, of which there are 25 in Alaska (*see* ANILCA §§ 601, 602 and 603, 16 U.S.C. § 1274(a)) "examination of the individual features which led to a component river's designation must be conducted to determine the extent of the reserved water right." Department of the Interior Solicitor's Opinion 86 Interior Dec. 553, 609 (1979).

defeated" is a very high hurdle and mere demonstrations of agency convenience or even harm to reservation/enclave purposes are insufficient. Failure by federal agency claimants to meet this burden of proof means that no FRWR can be recognized and exercised.

In upholding a U.S. Forest Service decision to not seek a FRWR in a Wilderness area in Colorado, the Tenth Circuit stated that "absent a diversion within or above the wilderness area, it is difficult to see what harm might befall the wilderness water values that a wilderness water right could prevent." *Yeutter*, 911 F.2d at 1419. The same court also stated "there is no guarantee that any diversion which might occur in or above a wilderness area WOULD EVEN HAVE A NOTICEABLE IMPACT on wilderness water values." *Id.* (emphasis added).

The Idaho Supreme Court determined that the United States failed to demonstrate that the "principal object" for creating a federal Wildlife Refuge on islands in the Snake River would be defeated absent a FRWR and denied the claim for a reserved water right. *United States v. State of Idaho*, 23 P.3d 117 (Idaho 2001). Specifically, the purpose was found to be "creation of sanctuaries for migratory birds" and the islands would continue to serve as sanctuaries without a FRWR. *Id.* at 125. Accordingly, the claim failed to satisfy the "entirely defeated" criteria.

Access to alternative water sources has also defeated claims for FRWRs. *In Colville Confederated Tribes v. Walton*, 460 F. Supp. 1320, 1330 (E.D. Wash. 1978), the court denied a claim for federal Indian reserved water rights for one parcel of land (allotment no. 26) on the grounds that the necessity of the right had not been demonstrated since alternative sources of water were available to satisfy the Indians' water needs.

### 4.    FRWR Must Be Quantified

Federal claimants of a FRWR must identify "only that amount of water necessary to fulfill the purpose of the reservation." *Cappaert*, 426 U.S. at 141. Construing this requirement,

the Ninth Circuit has stated "the scope [i.e., amount] of the implied [water] right is circumscribed by the necessity that calls for its creation." *Adair*, 723 F.2d at 1409. This important limitation grows out of competition for limited water resources and deference to state water law. *New Mexico*, 438 U.S. at 699, 701. Other courts have recognized that since the federal rights can be imposed on state water users, equitable considerations as well as competition for limited resources, support the notion of limits on the specific amounts of water that can be claimed as FRWRs. *See Bell*, 724 P.2d at 643-44. Since FRWRs can be established only where absolutely needed – meaning that there is competition for limited water resources – the Supreme Court has seen fit to impose this important restriction on the establishment of FRWRs. *New Mexico*, 438 U.S. at 705.

### 5.    FRWRs Must Be Established by Proper Adjudication

Properly claimed FRWRs must also be adjudicated in an appropriate forum: "Federal water rights are not dependent upon state law or state procedures and they need not be adjudicated only in state courts; federal courts have jurisdiction under 28 U.S.C. § 1345 to adjudicate the water claims of the United States." *Cappaert*, 426 U.S. at 145. Congress addressed this issue by enacting the McCarran Amendment, 43 U.S.C. § 666, which waives United States sovereign immunity for the purpose of joining the federal agencies in state water adjudications. As a result, it is common practice for the federal government to seek to establish its asserted reserved water rights in either state or federal courts. *See Colorado River*, 424 U.S. at 805-06; *United States v. State of Washington, Dep't of Ecology*, No. 2:01CV000472, 2005 WL 1244797 (W.D. Wash. May 20, 2005); *Idaho*, 23 P.3d at 119. ANILCA addressed this issue providing plainly that the Act was not to expand or diminish federal or State jurisdiction regarding water rights or affect State law governing the appropriation of water in Alaska.

ANILCA, at § 1319; 16 U.S.C. § 3207.  Furthermore, the *Katie John I* Court instructed the agencies to only "identify" waterways that might possess FRWRs – the court did not direct the agencies to adjudicate such rights.  72 F.3d at 703-04.  The Agencies are not empowered to be judge, jury and executioner of their water claims especially in derogation of §§ 1314 and 1319 and there is no Congressional delegation of authority granting them such unprecedented power.

### 6.    FRWRs and Prior Appropriation Doctrine

The FRWR doctrine arose from and operates within the Prior Appropriation Doctrine of water rights.  *See City & County of Denver*, 656 P.2d at 6-9.  Although the FRWR doctrine can clash with state authority and the Prior Appropriation system, the Supreme Court has been at pains to assure that establishment of FRWRs is narrowly tailored because of Congressional deference to western state water law that codifies the Prior Appropriation Doctrine.  *New Mexico*, 438 U.S. at 701, 714.  The Doctrine sprung from 19th Century practices that developed in the arid West and recognized that "the first appropriator of water from a natural stream for a beneficial purpose ... has [the] prior right" to continued use of the water.  *City & County of Denver*, 656 P.2d at 6-7 (citing *Coffin v. Left Hand Ditch Co.*, 6 Colo. 443, 447 (1882)).  The system, "based on continued beneficial use of appropriated water and strict quantification of the rights of users, insists that water may not be wasted or go unused."[10]  Commonly referred to as the "use it or lose it" doctrine, it provides that establishment of water rights is dependent upon bona fide use of appropriated water.[11]  Use traditionally refers to taking the water from the stream, river or lake and putting it on the land for some utilitarian or beneficial purpose such as

---

[10]  *Note*, Todd A. Fisher, *The Winters of Our Discontent: Federal Reserved Water Rights in the Western States*, 69 CORNELL L. REV. 1077, 1077-78 (1984); *see also* W.A. Wilcox, Jr., *Special Issues in Environmental Law Involving Federal Agencies*,  14 VILL. ENVTL. L.J. 39, 63-64  (2003).
[11]  4 Waters and Water Rights, § 37.01(a), at 219-21; § 37.01(c)(1), at 232-33 (Robert E. Beck, ed., Michie 1996).

farming, ranching or mining.[12]    Unused water that flows downstream is "lost" and becomes

surplus water available for appropriation (or regulation) by others.[13]    *See also Anderson*, 736

F.2d at 1362.  Beginning in 1866, federal statutes and case law adopted these doctrines which

remain vital today.  *See also City & County of Denver*, 656 P.2d at 7.  The Prior Appropriation

Doctrine applies in 19 western states, including Alaska, *id.*, is expressly referenced in ANILCA,

at § 1319 (16 U.S.C. § 3207), and relates solely to uses of freshwater (since salt water cannot be

used "beneficially" for farming, ranching, etc.).

    The Agencies also acknowledge that there can be no FRWRs in marine waters noting that

"there are apparently no cases in which the federal government has asserted reservation of rights

to marine waters under the Winters doctrine."  70 Fed. Reg. at 76401.  The Regulations also state

that extending "reserved water rights to marine waters [i.e., salt waters] would be without

precedent."  *Id.*

    Conflicts between irrigators and Indian tribes gave rise to the first articulation of the

FRWR doctrine nearly a century ago.  The Milk River flowed through the Fort Belknap Indian

Reservation in central Montana and was the primary source of water for the Tribe.  Farmers and

ranchers upstream began to divert the River, under the Prior Appropriation Doctrine, leaving the

Tribe with an insufficient water supply.  The United States filed suit on behalf of the Tribe to

protect its water interests arguing that in reserving particular land for the Indians, the U.S. had

impliedly reserved sufficient water rights for that land from the Milk River to protect the

Indians' interest.  In this seminal case, the U.S. Supreme Court agreed and held that sufficient

water had been reserved from those reaches of the Milk River, flowing through the Reservation,

to carry out the purposes of the land reserved for the Indians.  *Winters*, 207 U.S. at 564.

---

[12]    14 VILL. ENVTL. L.J., at 63-64.
[13]    *Id.* at 64.

*Cappaert*, *New Mexico* and similar cases effectively picked up this doctrine and applied it to other federal reservations or enclaves holding that water needed for particular reserved lands may have been impliedly reserved by the United States.

### 7.    Summary

As restated by the Colorado Supreme Court: "For each federal [reserved water rights] claim, the <u>trier of fact</u> must examine the documents reserving the land from the public domain and the underlying legislation authorizing the reservation; determine the precise federal purposes to be served by such legislation; determine whether water is essential for the primary purposes of the reservation; and finally determine the precise quantity of water – the minimal need as set forth by *Cappaert* and *New Mexico* – required for such purposes." *City and County of Denver*, 656 P.2d at 20 (emphasis added).  Failure to adhere to this litany of requirements and pass "careful examination," *New Mexico*, 438 U.S. at 701, means that no FRWR can be identified, claimed, and established by federal agencies.

### B.    1999 Regulations Fail To Satisfy FRWR Requirements

"Careful examination" as mandated in *New Mexico*, *id.*, will reveal that the 1999 Regulations fail to adhere to and satisfy the litany of procedural and substantive requirements associated with the FRWR doctrine and extend preemptive federal jurisdiction over a variety of waterways and waters that do not or cannot support FRWRs.  Specific examples are presented to demonstrate these failures and deficiencies as well as demonstrate that the State is suffering concrete injury arising from the Agencies' action.

### 1.    Failure to Limit FRWRs to Federal Reservations

FRWRs may be properly identified and established only on federal reservation lands. The 1999 Regulations violate this basic tenet by asserting FRWRs outside of federal reservations

or enclaves and asserting FRWRs on lands inside reservation boundaries that are, as a matter of law, not part of such reservations.   Contrary to these limitations and ANILCA, the 1999 Regulations expansively purport to establish FRWRs and diminish State authority in contravention of sections 1314 and 1319, and the Clear Statement Rule (*see Solid Waste Agency*, 531 U.S. at 173), over a variety of reaches of waterways that flow on or within such non-federal, non-public, non-reserved lands.

For example, approximately 20 miles of the lower Goodnews River is outside of and downstream from the boundary of the Togiak National Wildlife Refuge (*see* Exh. 1).  This reach of the River flows through a mix of non-federal and non-public lands selected by or conveyed to the Alaska Native Corporations and the State of Alaska.  *Id.*   These lands are expressly not "public lands" per § 102 of ANILCA; 16 U.S.C. § 3102.   Nonetheless, the 1999 Regulations assert jurisdiction over this reach of the River, 50 C.F.R. § 100.26(i)(4)(ix).[14]  Under the FRWR doctrine (and the Prior Appropriation Doctrine within which it is embedded) water that flows downstream from a reservation or enclave (e.g., the Togiak National Wildlife Refuge) is "lost," and no longer subject to a FRWR claim.   Consequently, waterways downstream from the boundaries of a federal reservation cannot as a matter of law be subject to FRWRs.

The Holitna River, a tributary of the Kuskokwim, flows through State land and is not within or adjacent to any federal reservation/enclave (Exh. 2).  State lands are not "public lands" for purposes of Title VIII.   ANILCA, at §102(3)(A); 16 U.S.C. § 3102(3)(A).   Nonetheless, the 1999 Regulations assert federal preemptive authority over it, 50 C.F.R. § 100.26(i)(4)(ix),

---

[14]   The 1999 Regulations assert jurisdiction even though the maps issued by the Federal Subsistence Board do not appear to assert jurisdiction.  There are numerous similar instances in which the Regulations do not match these FSB maps.

presumably on the basis of a FRWR as there is no other basis in law for imposing "public land" status on the River.

ANILCA also expressly prescribes that non-federal lands within the boundaries of federal reservations (i.e., Conservation System Units)[15] are <u>not</u> part of the federal reservation: "only those lands within the boundaries of any conservation system unit which are public lands (as such term is defined in this Act) shall be deemed to be included as a portion of such unit." § 103(c); 16 U.S.C. § 3103(c).  The statute excludes all State of Alaska lands, including "tentatively approved" or "validly selected" lands, from the definition of "public lands." § 102(3)(A); 16 U.S.C. § 3102(3)(A).  Similarly land selections of Native Corporations are excluded.  § 102(3)(B); 16 U.S.C. § 3102(3)(B).  Since such lands are not part of the federal reservation/CSU, waterways on or within these State, Native or other private inholdings cannot have bona fide FRWRs.

Contrary to this limitation, the 1999 Regulations apparently assert and purport to establish FRWRs (and preemptive federal authority) over waterways that flow on or within such non-federal lands.  For example, the Crescent River within Lake Clark National Park and Preserve flows off of NPS lands onto land selected and conveyed to a Native Corporation (Exh. 3).  Although approximately 15 miles of the River is downstream of the NPS lands and flows across only Native Corporation non-federal, non-public land, the agencies claim Title VIII authority over it apparently on the basis of a FRWR.  *See* "Federal Subsistence Management" Map, Oct. 1, 1999 (Administrative Record 010867).

---

[15]   Monuments, Parks, Preserves, Refuges, Wild and Scenic Rivers, and Wilderness areas (i.e., federal reservations or enclaves) are defined in ANILCA as "conservation system units" or "CSUs." § 102(4); 16 U.S.C. § 1618(4).

## 2.     Failure to Identify Federal Reservation/Enclave Primary Purposes

FRWRs may only arise from, and be established, to achieve the "primary purposes" of a federal reservation or enclave. *New Mexico*, 438 U.S. at 701. The Administrative Record for the 1999 Regulations (and the related "establishment" of FRWRs) is devoid of any identifications of primary federal purposes to be served by the purported water rights. The Agencies' complete failure to make such identifications violates the FRWR doctrine and renders invalid the identification and establishment of FRWRs via the 1999 Regulations.

Primary purposes must derive from the provisions, statutory or otherwise, that create EACH federal reservation; FRWRs cannot be established relying upon more generalized legislation. *See, e.g.,* the National Park Service Organic Act for NPS units (*City & County of Denver*, 656 P.2d. at 29); Organic Act or Multiple Use Sustained Yield Act for Forests (*New Mexico*, 438 U.S. at 711, 715); FLPMA for public domain (*Watt*, 659 F.2d at 206). Those portions of ANILCA that do not specifically create reservations/enclaves (i.e., CSUs) and establish unit particular purposes must be treated as similar or comparable general legislation.

In this case, ANILCA Title VIII (16 U.S.C. §§ 3111, *et seq.*) reserves no land, sets forth no particular purposes for any federal reservation or enclave and consequently cannot be the basis for any FRWRs. It outlines a general "preference" or "priority" for the taking of fish and wildlife for nonwasteful subsistence purposes on <u>all</u> "public lands" in Alaska including the unreserved public domain. *See* ANILCA, at § 804; 16 U.S.C. § 3114. Title VIII provides a management direction for "public lands" in Alaska like the general management directions in the Federal Land Policy and Management Act which do not impliedly establish FRWRs. *Watt*, 659 F.2d at 206.

In contrast, Titles II through VIII withdraw and reserve National Park units, National Wildlife Refuges, National Recreation Areas, National Conservation Areas, National Forest Additions, National Monuments, Wild and Scenic Rivers and Wilderness units.[16]  However, the Agencies' deficient Administrative Record fails to distinguish among the myriad types of federal reservations in Alaska.   Most Refuge units include specific statutory purposes language regarding water quality or quantity (*see* ANILCA, at §§ 302(1)-(9); 303(1)-(7); 16 U.S.C. § 668dd note), and all Refuge units (except Kenai) include an "opportunity for continued subsistence uses by local residents" purpose.  *Id.*  In contrast, National Park Service (NPS) units lack comparable water language and none include subsistence uses as a purpose.[17]   *See* ANILCA, at §§ 201, 202; 16 U.S.C. § 431 note, § 410hh-1.  These vital differences indicate that Congress had different expectations regarding Refuges compared to NPS units and these manifestations of Congressional intent are crucial to the determination of the existence of an implied water right.  In *New Mexico*, the Supreme Court noted that precise language in the Lake Superior National Forest statute referencing minimum instream flows was absent in the Gila National Forest documents.  438 U.S. at 710.  These differences led the Court to find no instream flow FRWR in the Gila.  *Id.*  In Alaska, the U.S. Fish and Wildlife Service might be able to satisfy the primary purposes test for Refuge units if that agency were to fulfill this requirement of the FRWR doctrine.  However, it is unknown if NPS or the Forest Service could comply.  The Agencies must satisfy this element of the FRWR doctrine by preparing an appropriate administrative record to enable this court to conduct the requisite "careful examination" and adjudicate Agency compliance with this element of the FRWR doctrine.

---

[16]  *See* 16 U.S.C. §§ 410hh, 410hh-1, 431 note, 460mm, 460mm-2, 539, 668dd note, 1132 note, 1274.

[17]  In some NPS units, subsistence uses are "permitted" (e.g., § 2011; 16 U.S.C. § 431 note) and in others subsistence resources are to be "protected" (e.g., § 2013, 16 U.S.C. § 431 note).

### 3. Failure to Demonstrate that Primary Purposes Would be Entirely Defeated

The Administrative Record for the 1999 Regulations is utterly devoid of any information, data, or findings regarding the necessity for FRWRs to fulfill primary purposes of federal reservations. This egregious procedural deficiency violates another key element of the FRWR doctrine and means that the Agencies did not act in accordance with law in simply establishing numerous claimed FRWRs via the 1999 Regulations.

The FRWR claims fail substantively, too. The Agencies, as a matter of fact, cannot demonstrate the requisite "necessity" since water in Alaska is not in short supply, the waterways are not over-subscribed, there are no proposed upstream diversions, and there are no proposed upstream uses. FRWRs can be established only where necessary – if there is no "necessity", there is no FRWR. *See Cappaert*, 426 U.S. at 141; *New Mexico*, 438 U.S. at 700; *see also Idaho*, 23 P.3d at 117; *Yeutter*, 911 F.2d at 1419.

The Agencies that promulgated the 1999 Regulations and broadly asserted FRWRs cannot demonstrate that the claimed rights are needed to avoid "entirely defeating" the unidentified primary purposes of the federal reservations/enclaves in Alaska. The Agencies have not identified any proposed upstream water diversions, proposed dams, ditches, canals or any other activities that could impact the amount of water flowing onto these federal enclaves and create the water shortages necessary to trigger a FRWR. Indeed, the Agencies have acknowledged that there are no water shortages impacting federal reservations in Alaska. 70 Fed. Reg. at 76402. Absent such demonstrations of shortages, the Agencies cannot, as a matter

of law, satisfy the "entirely defeated" criterion of the FRWR doctrine articulated emphatically in *New Mexico*.

In reality, factual circumstances likely bar the Agencies from being able to demonstrate successfully that primary purposes will be "entirely defeated" unless a FRWR is established. For example, within the Yukon Charley Rivers National Preserve, the 1999 Regulations assert Title VIII jurisdiction over navigable reaches of the Yukon River.[18] NPS cannot (and has not even tried to) demonstrate that the primary purposes of the Preserve would be entirely defeated absent an established FRWR in this reach of the Yukon River. The primary purposes of the Preserve, that relate to the Yukon, are limited to "protect habitat for and populations of fish and wildlife including but not limited to the peregrine falcons and other raptorial birds, caribou, moose, Dall Sheep, grizzly bears and wolves" and to protect historical and certain pre-historical values. ANILCA, at § 201(10); 16 U.S.C. § 3101. Subsistence is not a purpose of this unit. *Id.* For nearly two decades (1980-1999), NPS successfully administered this unit in accordance with its ANILCA purposes without claiming any FRWR on the Yukon – a clear and compelling demonstration that no FRWR is necessary. And there is absolutely no evidence in the Administrative Record (and likely none available) that these habitat protection purposes or historical values will be "entirely defeated" if NPS does not establish a FRWR in this reach of the Yukon. There are no proposed upstream diversions, no plans to pump the River dry and no plans to impound it and stop it from flowing that need to be prevented by establishing a FRWR. As in the Colorado Wilderness cases (*Yeutter*), a FRWR in this reach of the Yukon River is presently immaterial (i.e., unnecessary) to achievement of the Preserve's primary purposes. This immateriality means NPS cannot satisfy the Supreme Court's emphatic "entirely defeated"

---

[18]   36 C.F.R. § 242.26(i)(3)(xxi)(B): "for the Yukon River drainage from the upstream mouth of 22 Mile Slough to the U.S.-Canada border."

requirement, there can be no FRWR established in this reach of the Yukon River, and federal preemption over this navigable reach of the Yukon and State submerged lands, as included in the 1999 Regulations, is not in accordance with law.

Notwithstanding these factual realities, the Agencies still have an obligation, not yet fulfilled, to make substantively sufficient "entirely defeated" showings before any FRWRs can be established and exercised in Alaska.

### 4.    Failure to Identify Water Quantities for FRWR

The Administrative Record is similarly devoid of any information, data, and findings regarding specific amounts of water needed for FRWRs.  This procedural failure, as before, means the court is also unable to review the identifications until the Agencies produce the necessary record.  If and when the Agencies are compelled to prepare the necessary findings and quantifications, important substantive standards then apply.  Agency claimed FRWRs will not be recognized if the reservation purposes do not establish or provide a "standard for quantification." *Idaho*, 23 P.3d at 125 (citing *Potlatch*, 12 P.3d at 1266).  If the FRWR cannot be quantified, as required by *Cappaert*, *New Mexico*, *et al.*, there can be no FRWR.

### 5.    Failure to Adjudicate Existence of FRWRs

The 1999 Regulations represent an illegal, unauthorized Agency adjudication of water right claims via unilateral agency rulemaking.  There is no Congressional authorization for this unprecedented action and nothing in the FRWR doctrine that allows the Agencies to be their own water court.  Furthermore, such an expansion of federal power would be directly contrary to ANILCA which plainly states that nothing in the Act (including Title VIII) is to enlarge Federal authority over water in Alaska.  § 1319; 16 U.S.C. § 3207.  FRWRs must be adjudicated in an appropriate federal or state forum (e.g., federal or state court, state water board, etc.).

As discussed previously in the Standard of Review section, there is a fundamental difference between asserting a FRWR and adjudicating a FRWR.  Asserting a FRWR, which is a property right or interest, is comparable to any landholder, private or governmental, erecting a fence, placing cornerstones, sending a demand letter to an alleged trespasser, or taking other action that informs other interested persons of claimed property interests.  By contrast, adjudicating a FRWR conclusively establishes the existence or non-existence of the FRWR, and thus directly and substantively impacts the priorities of other prospective claimants to the use of the water.  Under longstanding practice, the adjudication of a FRWR comes in the form of a court decree.

Since the 1999 Regulations declare that FRWRs exist in a variety of waters and purport to be a binding rule, the Regulations must be read as an effort to administratively adjudicate the existence of FRWRs.  However, as demonstrated in the Standard of Review section above, the Federal Defendants, under ANILCA, have been granted no clear or unmistakable authority to administratively adjudicate and establish their claims of FRWR especially as such action diminishes or impinges on traditional state authority.  *See Solid Waste Agency*, 531 U.S. at 173.

Thus, in addition to complying substantively with the federal reservation, primary purposes, necessity and quantification elements of the FRWR Doctrine, the Federal Defendants must obtain an adjudication of their identified and claimed rights from a court system or other appropriate forum before any such rights can be genuinely established and exercised.  Under the Ninth Circuit's ruling in *Adair*, the Federal Defendants are free to file a suit pursuant to 28 U.S.C. § 1345 to obtain such an adjudication, but as of yet have not done so.

**6.    There Can Be No FRWRs in Marine Waters**

Despite the Agencies' acknowledgment that there are no FRWRs in marine waters, 70 Fed. Reg. 76400, and that "public lands" in such waters are limited to circumstances where the U.S. owns the underlying submerged lands, *id.* at 76402, the 1999 Regulations, as amended, continue to illegally treat as "public lands" other tidally influenced, salt and brackish waters that overlay State-owned submerged lands below the mean high tide line:  "although submerged lands under portions of rivers which are tidally influenced may be owned by the State or other entity, those stretches are still part of the river and <u>remain subject to potential Federal reservation of water rights</u>." *Id.* (emphasis added). As previously noted, the FRWR doctrine arises from and is embedded within the Prior Appropriation Doctrine of water rights often referred to as the Colorado Doctrine because of its origin.  *City & County of Denver*, 656 P.2d at 6-7.  Prior Appropriation grew out of the practices and customary uses of settlers, notably miners, in the Colorado Territory in the mid-19th Century. *Id.* at 6.  Diversion of limited fresh water from streams for mining and agriculture were the early hallmarks of the practice.  Principle factors that created the doctrine were: (1) the scarcity of water in the arid west; and (2) putting these waters to beneficial use for agriculture, ranching, mining, or household use and consumption.  *Id.* at 6-7.  The related body of water law that developed out of the need to appropriate the scarce supply of fresh water specifically referred to water that flowed from "the rivers of this State." *Id.* at 7.  Since the origin of this doctrine arose from the need to adjudicate Colorado's rivers, it necessarily follows that the water concerned and to be appropriated was fresh water and not salt or brackish water.

The federal government chose to recognize this system of water rights during the late 19th Century in 1877 in the Desert Land Act (19 Stat. 377) and subsequently in the 1902

Reclamation Act.  *City & County of Denver*, 656 P.2d at 7; Reclamation Act of 1902, 57 Cong. Ch. 1093, June 17, 1902, 32 Stat. 388, 43 U.S.C. §§ 371, *et seq.*  The Desert Land Act explicitly referred to "the water of all lakes, rivers and other sources of water <u>supply</u> upon the public lands."  Act of March 3, 1877, ch. 107, 19 Stat. 377 (emphasis added).  For these reasons, the Prior Appropriation Doctrine has been limited and applied exclusively to the appropriation and use of water supplies from fresh water lakes, rivers, streams and springs as well as ground water sources.  Ultimately the Prior Appropriation or Colorado Doctrine was adopted by 19 western states, including Alaska.  *City & County of Denver*, 656 P.2d at 6 n.7.

The concept of FRWRs did not arise until the *Winters* case in 1908 long after the federal government had expressly recognized the Prior Appropriation Doctrine.  *Winters*, 207 U.S. at 577.  The creation of the FRWR doctrine was about securing fresh water from the Milk River for agricultural and other beneficial uses on the Fort Belknap Indian Reservation in Montana.  *Id.* at 577.  "The effect of *Winters* was to superimpose a judicially implied federal water right on a state system that based water rights on prior appropriation."  *Block*, 622 F. Supp. at 852.  FRWRs for non-Indian reservations, first in 1963 in *Arizona* and in the 1970s in *Cappaert* and *New Mexico* continued to reflect the origins of the appropriation system and the exclusive focus on fresh waters capable of being used beneficially.

Plaintiffs are unaware of any instance in which the United States has identified, claimed, asserted, adjudicated and established FRWRs in any marine or tidally influenced waters. Similarly, the Federal Defendants have recognized that extending "reserved water rights to marine waters would be without precedent."  70 Fed. Reg. at 76401.  Simply put, neither the Colorado Doctrine (the Prior Appropriation Doctrine), developed as a response to allocating scarce fresh water among users on arid Western lands, is not applicable in the salt water

environment.  Marine and tidally influenced waters (salt or brackish waters) are not scarce and cannot be put to traditional beneficial uses.  Expanding the FRWR doctrine to include, for the first time, salt waters would also be contrary to section 1319 which expressly states that nothing in ANILCA (including Title VIII) is to expand or diminish federal interests or rights in waters in Alaska.  16 U.S.C. § 3207.  Accordingly, FRWRs cannot exist in any of the marine or tidally influenced salt or salt influenced waters of Alaska.

A separate consideration is that FRWRs must be appurtenant to reserved federal land, *Cappaert*, 426 U.S. at 138, and most of the submerged lands underlying marine and tidally influenced waters passed to the State of Alaska upon entry into the Union in 1959.  Alaska Statehood Act, § 6(m), 72 Stat. 339, 343 (1959) ("The Submerged Lands Act of 1953 ... shall be applicable to the State of Alaska ...").  The Agencies may not claim FRWRs in marine or tidally influenced waters overlaying submerged lands that are not federally-owned and not subject to a particular federal reservation.

## IV.   THE 1999 REGULATIONS CONTRARY TO ANILCA'S PLAIN LANGUAGE IMPROPERLY TREAT AS "PUBLIC LANDS" MARINE AND TIDALLY INFLUENCED WATERS OVERLYING STATE-OWNED SUBMERGED LANDS AND OTHER STATE-SELECTED LANDS

The 1999 Regulations also treat illegally as "public lands" (1) certain marine and tidally influenced waters in bays and river mouths, seaward of the mean high tide line, that also overlay State-owned submerged lands, (Exh. 4); and (2) certain validly selected state lands within the boundaries of federal CSUs.  *See* 50 C.F.R. § 100.4(2).  The plain language and the legislative history of ANILCA make clear that the Agencies exceeded their congressionally delegated authority when promulgating these regulations.

### A.    The Plain Language Of ANILCA States That These Waters As Well As Validly Selected State Lands Are Not Public Lands

The starting point for interpreting a statute is the language of the statute itself.    *See Chevron,* 467 U.S. at 842-43; *see also Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56 (1987); *see also Ass'n To Protect Hammersley, Eld & Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1015 (9th Cir. 2002).   Congress has provided express and unambiguous direction on the matter and specified plainly in Title I that neither State-owned nor "validly selected" State lands are "public lands" for purposes of Title VIII's subsistence provisions.  *See* ANILCA, at § 102(3); 16 U.S.C. § 3102(3).   State-owned lands also include almost all submerged lands underlying marine and tidally influenced waters in Alaska.[19]  Alaska Statehood Act § 6(m).  Title VIII of ANILCA applies the section 804 subsistence priority only "on public lands," and section 805(d) also limits this priority to only "public lands."  *See* ANILCA, at §§ 804-05; 16 U.S.C. §§ 3114-15.  Section 102(2) defines "Federal lands" as those in which the U.S. holds title after the date of enactment (ANILCA, at § 102; 16 U.S.C. § 3102), but section 102(3) sets forth a critical exception:  "public lands" are lands situated in Alaska that are "Federal lands, … *except* land selections of the State of Alaska which have been tentatively approved or *validly selected* under the Alaska Statehood Act and lands which have been confirmed to, validly selected by, or granted to the Territory of Alaska or the State under any other provision of Federal law."  ANILCA, at § 102(3); 16 U.S.C. § 3102(3) (emphasis added).[20] Therefore, under the plain language of the statute, State lands including submerged lands as well as those "validly selected" are not "public lands."

---

[19]   The State of Alaska took title to all submerged lands except those reserved by the federal government at the time of Statehood.

[20]   Land selections of Native Corporations are also exempted from the definition of "public lands."  ANILCA, at §§ 201(3)(B), (C); 16 U.S.C. §§ 3102(3)(B), (C).

Section 103(a) of ANILCA states clearly that the boundaries of federal reservations established in the Act do "not extend seaward beyond the of mean high tide line to include lands owned by the State of Alaska" (i.e., submerged lands). *Id*.; 16 U.S.C. § 3103(a).

Section 103(c) further plainly specifies that *only* "public lands" inside a CSU (*i.e.*, Parks, Preserves, Monuments, Refuges, Trails, Wild and Scenic Rivers, and Wilderness areas) are included as part of the CSU and thus subject to Federal agency regulations.    ANILCA, at § 103(c); 16 U.S.C. § 3103(c).   Accordingly, non-public lands may exist inside a CSU, but these non-public lands (including validly selected State lands) *are not* subject to regulation and management as part of the CSU by the Federal Defendants.

### B.    Plain Statutory Language Establishes That Marine and Tidally Influenced Waters Overlying State-Owned Submerged Lands Are Not "Public Lands"

Per the Statehood Act and the Submerged Lands Act the State owns virtually all of the submerged lands underlying tidally influenced coastal waters including those in bays and river mouths up to the line of tidal influence.   "Public lands" plainly do not include these State-owned submerged lands per section 102(3).   The federal reservations established or expanded by ANILCA do not encompass these State-owned submerged lands and expressly stop at and do not extend seaward beyond the mean high tide line[21]   Wherever there are tidally influenced waters these federal reservation boundaries are Congressionally set at the mean high tide line. ANILCA, at § 103; 16 U.S.C. § 3103.   Accordingly, the Agencies have no basis in ANILCA for treating as "public lands" and extending their authority over these tidally influenced waters including those that overlay State-owned submerged lands.

---

[21]   Some pre-Statehood federal reservations have boundaries that encompass marine and tidally influenced waters as these units were established before the limitation in section 103(a) was enacted in December 1980.

In direct contravention of these plain statutory standards, the Agencies have drawn "headland to headland" boundary line across bays and river mouths that treat as "public lands" tidally influenced waters in these bays and river mouths even though these waters are outside of federal reservations (i.e., seaward of the mean high tide line), and clearly overlay State-owned submerged lands, *see e.g.,* Exh. 4.  The rationale for this action is reliance on boundary conventions:

> the regulations use the methodology found in the Convention on the Territorial Sea and Contiguous Zone from the United Nations Law of the Sea for closing the mouths of rivers.  The use of the headland-to-headland delineation across the mouths of rivers is also described in Shore and Sea Boundaries by Aaron Shalowitz (1964) and Water Boundaries by George Cole (1997).

70 Fed. Reg. at 76402.  Nowhere in ANILCA is there any authority for the Agencies to disregard section 103(b) to set boundaries on the mean high tide line or to treat as public lands tidally influenced waters overlying State lands.  *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 548 (1987) ("Where an expression is capable of precise definition we will give effect to that meaning absent strong evidence that Congress intended another meaning"; holding that ANILCA Title VIII and "public lands" did not extend offshore onto the Outer Continental Shelf.)  Furthermore, there is no clear, unmistakable Congressional authorization for this expansion of federal authority and concomitant diminution of or impingement upon traditional State authority (which also happens to be in derogation of §§ 1314 and 1319).  The Agencies' reliance on extra-statutory "boundary conventions" is contrary to *Chevron* and violates the Clear Statement rule.  *Solid Waste Agency*, 531 U.S. at 173; *Pennsylvania Dep't of Corr.*, 524 U.S. at 209.  Consequently, the Agencies may not define (and treat) as "public lands" marine and tidally influenced waters seaward of the mean high tide line and that overlay State-owned submerged lands.

C.   **The Statutory Framework Clearly Delineates Subsistence Decisions Under Title VIII From State Selections Under Title IX**

1.   **Plain Language of ANILCA Shows Title I Definitions Govern "Public Lands" for Title VIII Purposes**

The structure and purpose of ANILCA also demonstrates Congress' clear intent that the definition of "public lands" under Title I cannot be wiped out by the Agencies through a regulatory interpretation of Title IX. *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988); *see also United States v. Lewis*, 67 F.3d 225, 228-29 (9th Cir. 1995) (stating that "[p]articular phrases must be construed in light of the overall purpose and structure of the whole statutory scheme"). The 1999 Regulations wrongly amended the controlling Title I definition of "public lands" to extend Title VIII to "selected but not yet conveyed lands" inside CSUs, 50 C.F.R. § 100.4(2). Deference to the Federal Defendants' interpretation is available only when an agency acts pursuant to "delegated authority." *United States v. Mead Corp.,* 533 U.S. 218, 226-27 (2001). The Agencies point to section 906(o)(2) as a source of preemptive authority over validly selected State lands inside CSUs. They argue that the sections reference to "until conveyed," means that "validly selected" lands within a CSU not yet conveyed to the State are to be treated as part of the CSU notwithstanding the contradictory language in section 103(c). *Id.* Their reliance on this section is completely misplaced.

First, the definitions in Title I do not apply to Title IX. As noted above, section 102, "Definitions," opens with an express reference that the Title I definitions of "public lands" and "Federal land" do not apply to Title IX. ANILCA, at § 102; 16 U.S.C. § 3102. Second, Title IX is plainly entitled "Implementation of Alaska Native Claims Settlement Act ["ANCSA"] and Alaska Statehood Act." Third, other language in section 906 itself undercuts their argument. Specifically, subsections (d) ("Prior State Selections") and (g) ("Conveyance of Specified

Lands") purport to convey to Alaska a variety of "Prior State Selections" and "State Selection Lands" unless such lands are within CSUs.  ANILCA, at § 906(d), (g); 48 U.S.C. n. prec. § 21.; 43 U.S.C. § 1601 note.  But if these identified lands qualified as "previously selected," they were to be "conveyed," even if they were within a CSU.  *See id.*  In addition, section 906(o), relied on by the Federal Defendants, makes no reference to "public lands," but instead indicates that "Federal lands" within CSUs remain subject to Federal authority "until conveyed" to the State. *See* ANILCA, at § 906(o); 48 U.S.C. n. prec. § 21.; 43 U.S.C. § 1601 note.  Additionally, Title VIII jurisdiction is keyed to "public lands" not "federal lands."

Finally, this Court has already rejected the Federal Defendants' assertion that the decision to amend the definition "public lands" was a decision under Title IX.[22]

### 2.    The Legislative History Highlights Congress' Goal of Using Title IX to Resolve Issues Remaining from Prior Acts

Any doubt that Congress intended that "validly selected" State lands are not "public lands" for purposes of Title VIII's subsistence provisions is resolved by a review of the legislative history of ANILCA.  The history details how section 906(o) is targeted at a narrow, specific set of land withdrawals that arose under ANCSA and the Statehood Act – a completely different focus than the comprehensive land withdrawal system under Titles I through VII and subsistence management set forth in Title VIII of ANILCA.  Nothing in Title IX relates to determinations of what are "public lands" under Titles I and VIII, and the Agencies cannot hide behind Title IX to justify the 1999 Final Rule.

The first versions of Title IX and § 906(o) appeared in the House Committee bill (H.R. 39) in 1978.  *See* H. R. REP. NO. 95-1045, pt. VIII at 188-195 (1978) (Exh. 5).  The purpose of the Title is described as an effort to resolve the difficulties associated with land conveyances and

---

[22]   *See Order, Motion for Judgment on the Pleadings*, Case No. 3:05-cv-0006-HRH (Filed Mar. 10, 2006)

transfers per ANCSA and the Statehood Act. *See id.* at 188-89 (Exh. 5 at 2-3). The Committee noted that millions of acres of land in Alaska were tied up in ANCSA and "national interest" withdrawals and these were impeding Statehood land selections. *Id.* at 192-195 (Exh. 5 at 6-9). The initial purpose of section 906 therefore was to resolve one specific issue: the ability of the State to select "(d)(1) withdrawals" (*i.e.,* withdrawals of federal lands per section 17(d)(1) of ANCSA for purposes of Native selection and possible subsequent inclusion, if not selected, into federal CSUs). ANCSA, at § 17(d)(1); 43 U.S.C. § 1616(d)(1). The Committee Report noted the situation and the need for the provision as follows: "None of this land [§ 17(d)(1) withdrawals] is available to anyone including the State, until the Native selection and conveyances have been finalized and the 'fall out' of lands then occurs. At that point lands not selected by the Natives (except land in § 17(d)(2) withdrawn areas) become available for State selection." H.R. REP. NO. 95-1045 at 193-194 (Exh. 5 at 7-8). It further explained that the provision was to prevent "further diversity of land holdings within the boundaries of conservation system units" by preventing State selections in those areas and noted the priorities enjoyed by different entities and interests: "the priorities for land selection and conveyance . . . are: Village corporations first; the 'National Interest' second, Regional corporations third; and the State of Alaska last." *Id.* at 195 (Exh. 5 at 9). Accordingly, § 17(d)(1) lands would only be available to the State if not selected by an ANCSA corporation or not included in a CSU by Congress.[23]

---

[23]    The Senate bill of late 1979 had an almost identical provision labeled § 906(o). *See* S. REP. NO. 95-1300 (1978) at 44. It too was described as resolving the status of § 17(d)(1) withdrawals. *Id.* at 242. It is similarly important to note that Congress expanded section 906(o)(1) in its final iteration to expressly spell out the relative withdrawal and selection priorities between and among ANCSA corporations, the "national interest," and the State. ANILCA, at § 906(o)(1); 43 U.S.C. n. to § 1601, § 1616.

**D.    Summary**

The Agencies' attempt to expand their jurisdiction to include tidally influenced waters seaward of the mean high tide and overlying State submerged lands as well as validly selected state lands within CSUs flies in the face of ANILCA's plain language, framework, and legislative history.  In short, neither these waters nor these State lands are "public lands" for purposes of ANILCA.  As a result, these provisions of the 1999 Regulations are contrary to the plain language of Titles I and VIII of ANILCA and also diminish State authority contrary to sections 1314 and 1319 of ANILCA and should be vacated.

**V.    CONCLUSION**

Affirmation of the correct "ground rules" for (a) the establishment of FRWRs in Alaska and (b) determinations of what marine and tidally influenced waters as well as validly selected State lands are not "public lands" for Title VIII purposes will enable proper delineation of where preemptive federal authority may be applied.  Congress in ANILCA demonstrated clear intent to restrict the extent of federal preemption by limiting Title VIII authority to only "public lands" while including savings clauses to protect the State's traditional authority over water and fish and wildlife.  Recognition of the applicable procedural and substantive requirements governing FRWRs and definitions of "public lands", grounded in established judicial doctrine and plain statutory provisions, will help fulfill this Congressional intent.

To this end, the State maintains that the express references in *Katie John I* to *Cappaert* and *New Mexico* establish that all of the elements of the FRWR Doctrine, as prescribed by the Supreme Court, are fully applicable.  These include: (1) only federal reservations/enclaves can give rise to implied FRWRs and the rights are limited to waters appurtenant (i.e., on, within, or

adjacent) to these reservations/enclaves; (2) FRWRs may arise only from the primary purposes of each reservation/enclave; (3) FRWRs can be established only where the primary purposes would be "entirely defeated" absent such water right; (4) rights must be quantified, and (5) FRWRs, a form of property interest, must be properly adjudicated. Nothing in ANILCA expands the scope of FRWRs or reduces the duties and obligations associated with this judicially established doctrine and the *Katie John I* Court only authorized the Agencies to "identify" FRWRs and did not, and could not, empower the Federal Defendants to act as their own water court to adjudicate and establish such property/use interests. Indeed, that court recognized that compliance with the FRWR Doctrine was an "extraordinary" burden. This is especially true since Congress has not delegated to the Agencies the authority to adjudicate and establish their water claims via unilateral rulemaking controlled by the Agencies. Such unprecedented action would diminish or impinge upon the State's traditional authority and there is no clear or unmistakable statutory provision in ANILCA – or elsewhere – so empowering the Agencies. Finally, the FRWR Doctrine is judicially established and the Agencies' actions pursuant to it are reviewed de novo. The court is under no duty or obligation to defer to any of the Federal Defendants' legal or factual determinations regarding FRWRs.

The State of Alaska has also objected to the Agencies' extension of preemptive authority over marine and tidally influenced waters by setting "headland to headland" boundaries pursuant to "boundary conventions." These waters overlay State-owned submerged lands which plainly are not "public lands" per ANILCA. Furthermore, these boundaries are set "seaward of the mean high tide line" in contravention of the Act.

Lastly, the 1999 Regulations define as "public lands" State of Alaska valid land selections within the boundaries of CSUs. This is contrary to the plain meaning of section 102 of

ANILCA which expressly establishes that valid State selections are not "public lands." The Agencies rely on a provision in Title IX although it is inapplicable to Titles I and VIII.

Accordingly, the State seeks the following declarations from the court:

(1)    Federal Defendants must comply procedurally and substantively with all elements of the FRWR Doctrine in order to identify, claim, and establish such rights in Alaska including –

(a)    limiting claims to waters, waterways or reaches of waterways on, within or adjacent to federal reservations/enclaves;

(b)    preparation of an appropriate record that identifies the primary purpose(s), if any, of each federal reservation that may reserve a FRWR;

(c)    preparation of an appropriate record that substantively demonstrates that the primary purpose(s) of a federal reservation would be entirely defeated without establishment of a FRWR; and

(d)    quantification of each claimed FRWR.

(2)    Only those provisions of ANILCA which specifically establish federal reservations/enclaves (i.e., Titles II, III, IV, V, VI, and VII) set forth purposes that may impliedly create a FRWR.

(3)    FRWRs may not be established via Agency rulemaking and shall only be established by proper adjudication of Agency claimed FRWRs in a proper federal or state forum.

(4)    FRWRs may not be established in marine or tidally influenced salt or brackish waters.

(5)    Marine and tidally influenced waters below the mean high tide overlying State-owned submerged lands are not "public lands" for purposes of Title VIII.

(6)     The Agencies have no authority in ANILCA to use "boundary conventions" in derogation of sections 102(3), 103(b), 1314, or 1319 of that Act.

(7) The definition of "public lands" for Title VIII purposes is governed by ANILCA section 102, not section 906(o)(2).

These declarations will recognize "ground rules" consistent with judicial doctrine and applicable statutes to facilitate proper identification of those lands, waters, and interests therein that are "public lands" for purposes of Title VIII.

DATE:  14th day of July, 2006.

/s/ William P. Horn_____
William P. Horn
Birch, Horton, Bittner & Cherot, P.C.
1155 Connecticut Avenue, NW
Suite 1200
Washington, D.C. 20036
Telephone: (202) 659-5800
Facsimile: (202) 659-1027
Email: whorn@dc.bhb.com
D.C. Bar No.: 375666

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing *Plaintiff State Of Alaska's Opening Brief Regarding What Rules Of Law Govern Establishment Of Federal Reserved Water Rights In Alaska And Determinations Of "Public Lands"* was served electronically, this 14th day of July, 2006 to the following:

Robert T. Anderson
Randolph H. Barnhouse
Carol H. Daniel
Steven A. Daugherty
Dean K. Dunsmore
Gregory L. Fisher
Phillip E. Katzen
Heather R. Kendall-Miller
William F. Sherman

/s/ William P. Horn_____
William P. Horn