Case 3:05-cv-00006-HRH Document 68-6 Filed 07/14/2006 Page 1 of 9

95th Congress, 2d Session - - - - - - - House Report No. 95–1045, Part I

# ALASKA NATIONAL INTEREST LANDS CONSERVATION ACT OF 1978

## REPORT

OF THE

## COMMITTEE ON INTERIOR AND INSULAR AFFAIRS HOUSE OF REPRESENTATIVES

together with

ADDITIONAL, DISSENTING, AND SUPPLEMENTAL VIEWS AND ADDITIONAL COMMENTS

TO ACCOMPANY

H.R. 39

(Including the cost estimate of the Congressional Budget Office)

APRIL 7, 1978.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE
25–830 O WASHINGTON : 1978

EXHIBIT 5

## TITLE VIII. IMPLEMENTATION OF THE ALASKA NATIVE CLAIMS SETTLEMENT ACT AND THE ALASKA STATEHOOD ACT

### *Overview*

This bill is the legislative manifestation of the ending of a long process which began with the purchase of the vast lands of Alaska from Russia in 1867. That purchase, accomplished by treaty between the United States and the Czar, was, in effect, a quitclaim by which the United States acquired whatever rights and whatever title Russia had acquired over Alaska by its activities there since such explorers as Vitus Bering first revealed the subcontinent to Europeans. The Russians never attempted to negotiate a "purchase" from the Eskimos, Indians, or Aleuts who inhabited the islands and the mainland—and the United States did not do so either, although there were of course ample precedents for treaties to acquire lands from Native peoples.

Except for a relatively brief period during the turn-of-the-century gold rush, inattenion and neglect characterized the nation's policies toward Alaska until the Second World War, and there was no attempt to reach a final resolution of the question of what lands were ultimately to be regarded as "Native lands" as opposed to the general category of "public lands." (There were almost no private lands at all.) As a result, when Congress responded to the longstanding dream of Alaskan immigrants for equality with other Americans by providing for the admission of Alaska to the Union, the Statehood Act included the following provision (modelled on a number of earlier Statehood Acts):

> Section 4: As a compact with the United States, said State [of Alaska] and its people do agree and declare that they forever disclaim all right and title to any lands or other property (including fishing rights) . . . the right or title to which may be held by any Indians, Eskimos, or Aleuts (hereinafter called Natives) or is held by the United States in trust for said Natives; that all such lands or other property . . . which may belong to said Natives, shall be and remain under the absolute jurisdiction and control of the United States until disposed of under its authority, except to such extent as the Congress has prescribed or may hereafter prescribe * * *.

This reservation of Federal authority over settlement of Native claims to Alaska's lands and waters had little practical significance until after the discovery of oil at Prudoe Bay in 1963. Before then, the State had already begun to implement the Statehood Act's sweeping land grants by selecting some areas around existing settlements and other areas which seemed promising for agriculture, transportation and minerals. But the prospect of further great oil and mineral developments, combined with a resurgence of Native self-assertion and a new Native unity, brought dramatic developments. Pressed by suits filed by the Native groups, Secretary of the Interior Stewart Udall in 1966 suspended all further public land transactions in Alaska until resolution of the Natives' claims.

This, in, turn produced the novel spectacle of a coalition which included representatives of the State, the Native groups, conservationists, and petroleum and other resource companies. Out of the resulting legislative process came the Alaska Native Claims Settlement Act of 1971, which extinguished all claims (including claims of hunting and fishing rights) based on the "aboriginal title" of the Natives, and in return provided for transfer to the Native groups of more than 44 million acres of public lands and the payment over time of more than 900 million dollars.

Had the Settlement Act done no more, it would remain a monumental and historic Act of Congress; but, in also providing for the consideration of the national interest in protecting the unmatched wildlife, natural, cultural, scenic, geologic, archaeologic, paleontologic, wilderness, and other values of the public lands, the Settlement Act represented one of the greatest legislative steps taken toward a comprehensive and coherent national land policy since the Northwest Ordinance.

This legislation as a whole carries that policy toward its final fruition, which means a resolution of the status of all the public lands in Alaska; Title VIII contains the substantive provisions which follow from the second general finding, namely that a prompt and thorough resolution of the status of the Alaskan public lands is in the best interests of everyone in the Nation.

*Native Land Interests*

Such a resolution must be based upon careful consideration of the significance and intended effect of the Alaska Native Claims Settlement Act. The Committee views that Act as primarily a settlement act, and only secondarily as a general land act or other type of public land law. (In this connection, the Committee stresses that nothing in section 17 or any other section of the Settlement Act requires that this implementing legislation address the desire of the State to a more rapid conveyance of its land entitlement; inclusion of section 805 and similar provisions was done on the Committee's initiative, in response to requests by the State administration.)

Section 14 of the Alaska Native Claims Settlement Act required the Secretary to issue conveyances to Native village and regional corporations immediately after the lands were selected from the withdrawals. This mandate for immediate conveyance was consistent with the Congressional commitment in section 2(b) of the Act that the settlement should "be accomplished rapidly, with certainty, in conformity with the real economic and social needs of the Natives, without litigation (and) with maximum participation by Natives in decisions affecting their rights and property . . ."

As part of its consideration of legislation to implement section 17(d)(2) of the Settlement Act, the Subcommittee on General Oversight and Alaska Lands held a series of oversight hearings on implementation of the provisions of that Act mandating the transfers of land to the Native corporations and other groups. The Subcommittee was dismayed to find that six years after enactment of the Act, despite Congress' directive of an early transfer of title, the

Natives collectively have not been able to acquire title to more than five million of the 44 million acre entitlement. The Subcommittee believed that there was a sound basis for the conclusion of the American Indian Policy Review Commission that this delay was in large measure the result of past maladministration by the Department of the Interior.

The Committee notes that the present Administration has undertaken an extensive review of its policies and procedures regarding implementation of the Settlement Act, and it has confidence that measures are being taken to greatly improve that implementation. Nonetheless, the Committee believes this legislation is an appropriate means of resolving some of the problems which have impeded swift implementation of the Settlement Act.

One of the chief problems which has impeded swift transfer of lands to the Natives has been the controversy surrounding the provisions of Section 17(b) of the Settlement Act, which dealt with the reservation of easements affecting the lands which are to be conveyed. Initial delays within the Interior Department in formulating an easement policy and subsequent litigation by Native corporations, the State and other groups challenging that policy have slowed the conveyancing process. In *Calista Corporation, et al.* v. *Andrus*, the Federal District Court in Alaska ruled on July 7, 1977, that the Secretary's public easement criteria contained in Secretarial Orders 2982 and 2987 were violative of section 17(b) of the Settlement Act. That case is now on appeal to the Ninth Circuit. The Committee is of opinion that unless this controversy is addressed and the potential impacts on Native lands reduced, there is a danger that the Settlement Act will be fundamentally undermined. Therefore, the bill eliminates the requirement to reserve many easements which otherwise might have to be reserved in the so-called "core" townships. In so acting, the Committee noted that valid existing rights must be protected under existing law, and believes that placing Native landowners on the same footing as other private landowners is consistent with the fundamental intent of the Settlement Act.

Illustrating additional problems in implementing the Settlement Act, the Bureau of Land Management, charged with the responsibliity for adjudicating the Native land selections, complains that it lacks sufficient manpower and funds to process expeditiously the substantial number of selection applications that have been filed. Some estimates are given that at least five more years will be required to process the bulk of the remaining applications.

Mindful, however, of the commitment made to the Natives in 1971 when their aboriginal titles were extinguished in exchange for the prompt coneyance of 44 million acres plus a cash settlement, the Committee has determined that fairness, justice and equity demand the provision for an expedited conveyancing process in this bill. Section 802 provides such a process. The Committee recognizes that such an expedited process will impose difficult administrative tasks, but nonetheless is of opinion that the new implementation procedures being adopted by the Administration can meet this challenge.

Case 3:05-cv-00006-HRH Document 68-6 Filed 07/14/2006 Page 5 of 9

The legislation also addresses a number of other factors which bear on implementation of the Alaska Native Claims Settlement Act. One involves the status of certain offers for oil and gas leases which have not been approved and issued. The Federal courts have consistently held that a pending offer for a non-competitive oil and gas lease does not constitute a valid existing right but, is instead, a mere "hope or perhaps expectation" unless and until the Secretary exercises his discretion to issue a lease. The Secretary has already rejected hundreds of these applications on Native-selected lands in the conveyance process under the Alaska Native Claims Settlement Act. Yet, disgruntled lease offerors have commenced several lawsuits in the Federal District Court in Alaska against the United States, the Secretary, and the affected Native corporation. To end what cannot be characterized as other than "nuisance" litigation, the Committee believes it appropriate to make this clarification, does so in subsection 803(d).

*Cook Inlet Exchange Legislation*

The Committee has also included specific provisions (in section 803 (e)) to ensure that nothing in this bill can be construed as modifying, repealing, or otherwise affecting any part of the so-called "Cook Inlet Exchange" legislation (Public Law 94–204, 89 Stat. 1145); in this regard, the Committee has recognized that after protracted negotiations among the Secretary of the Interior, the State, and the Cook Inlet Regional Corporation, a complex document, termed the "Terms and Conditions for Land Consolidation and Management in the Cook Inlet Area" was ratified and rendered binding by the Congress through Public Law 94–204. By this statute, with its subsequent amendments (extending the time for its implementation), there was established a "pool" of lands available to Cook Inlet Regional Corporation for nomination to the Secretary for possible conveyance to that corporation. This "pool" included all then-withdrawn lands under section 17(d)(1) of the Alaska Native Claims Settlement Act, subject to the limitations specified in paragraph I(C)(1)(c) of the "Terms and Conditions."

In addition, the statute (Public Law 94–204) embraced a scheme of priorities which permitted the State to continue to select lands after July 1, 1975, but made any lands so selected subject to the prior rights of the Cook Inlet Regional Corporation if the corporation nominated such lands and succeeded (after the striking process set forth in the "Terms and Conditions") in having those lands remain for conveyance by the Secretary. The Committee intends that nothing in this bill shall alter the availability for nomination of lands within the "pool" as set forth in the "Terms and Conditions"; further, the Committee does not intend that anything in this bill shall be construed to empower the Secretary to convey any lands to the State in a manner which would conflict with the priorities established for Cook Inlet Regional Corporation in Public Law 94–204, as amended, of which would in any way conflict with the ability of any Native corporation to make valid selections and receive conveyances under the Alaska Native Claims Settlement Act.

*"Land Bank"*

Looking to the future significance of the delays in implementation of the Settlement Act, the Committee notes that under section 21(d) of that Act, tax-exempt staus of the undeveloped and unleased real property interests to which the Natives are entitled will expire on January 18, 1991, and that already Native corporations are being subjected to pressures to anticipate the ending of this tax-exempt status. Because the Committee is convinced that the unforeseen delays in implementation of the Settlement Act should not work to deprive its beneficiaries of the full settlement, provisions are included in Section 804 to extend the duration of the tax-exemption and in section 806 to enable the Native corporations to voluntarily enter into a program of cooperation with the State to shield their undeveloped and unimproved lands from future taxation. (In so acting, the Committee noted that the Settlement Act's provisions regarding exemption from taxation apply equally to all Native corporations, including the so-called "urban corporations" formed pursuant to Section 14(h)(3); and the provisions of section 804 and 806 of this legislation also apply to all Native Corporations, including the "urban corporations".)

*State Land Interests*

As to the State's interests, the Committee has incorporated into Section 805 numerous provisions, proposed by the State and not objected to by the Administration, for facilitating future State action to receive its land entitlement under the Alaska Statehood Act. In addition, the Committee has provided for an immediate, legislative conveyance of a considerable portion of that entitlement, to reduce further delays in State selections which have been incident to the Alaska Native Claims Settlement Act, even though the State supported passage of the Settlement Act with awareness of its delaying effect on State land selection activities.

*Background Information*

Alaska contains 375 million acres of land (over twice the size of Texas, the next largest state). Prior to granting of Statehood in 1958, all but about 600,000 acres were owned and administered by the Federal Government. The 1958 Statehood Act granted the State the right to select about 104 million acres of "vacant, unappropriated and unreserved" Federal lands (lands not previously withdrawn for specific purposes such as military reservations, national parks, national forests, national wildlife refuges, petroleum reserves, etc.). Land selections pursuant to this grant, the most generous in the Nation's history and totaling nearly 30 percent of the State, had to be completed twenty-five years after passage of the Statehood Act.

To date, the State of Alaska has selected approximately 72.5 million acres of which about 21.1 million acres have been patented and 15.4 million acres have been "tentatively approved" by the Secretary of the Interior. Selections to date have been mainly in three categories: (1) lands to meet existing and possible future settlement needs, (2) lands with high potential for natural resources (hard rock minerals,

: delays in implementation that under section 21(d) of ›ed and unleased real prop- :led will expire on January ions are being subjected to tax-exempt status. Because seen delays in implementa- : to deprive its beneficiaries ed in Section 804 to extend section 806 to enable the o a program of cooperation und unimproved lands from ittee noted that the Settle- tion from taxation apply ıg the so-called "urban cor- h) (3); and the provisions so apply to all Native Cor- s".)

*sts*

› has incorporated into Sec- the State and not objected iture State action to receive ehood Act. In addition, the ›, legislative conveyance of to reduce further delays in › the Alaska Native Claims ›orted passage of the Settle- fect on State land selection

*ıtion*

nd (over twice the size of granting of Statehood in ›d and administered by the Act granted the State the f "vacant, unappropriated previously withdrawn for ›ns, national parks, national eum reserves, etc.). Land enerous in the Nation's his- State, had to be completed ıood Act.

›d approximately 72.5 mil- es have been patented and pproved" by the Secretary mainly in three categories: ıture settlement needs, (2) ›urces (hard rock minerals,



oil and gas, timber, etc.) development; and (3) control of land along major highway arteries. The State of Alaska has designated about two million acres as State parks and wildlife areas.

The Committee notes that the various withdrawal actions directed by the Alaska Native Claims Settlement Act were intended to provide the means by which Native peoples could select and receive title to certain public lands; that the "national interest" in certain public lands would be protected and the options of the Congress preserved (Sec. 17(d)(2)) and the "public interest" in certain other public lands would be protected (Sec. 17(d)(1)). An explanation of the latter provision as it relates to State selections appears to be in order. The Conference Committee, fearful of a "land rush" on the public lands of Alaska (after a five year administrative land freeze), which might conflict with Native peoples getting clear title to their land grants, developed specific laguage in Sec. 17(d)(1) to assure that such activities could not occur.

Section 17(d)(1) of the Alaska Native Claims Settlement Act extended the land freeze imposed by Secretary Stewart Udall for 90 days after enactment and directed the Secretary to review the public lands of Alaska to determine whether any portion of these lands should be withdrawn to protect the "public interest". Section 17(d)(1) also authorized the Secretary to classify lands and open them to the public land laws in accordance with such classifications, including State selection. The purposes of the 90 day withdrawal were:

1. To insure that sufficient lands to satisfy the Native land claims settlement were reserved;
2. To provide the Secretary with time to withdraw the 17(d)(2) areas;
3. To determine whether other public lands in Alaska should be withdrawn, classified or reclassified before they would be opened to selection by the State or entry under the public land laws; and
4. To insure that the larger public interest in the public of Alaska would be protected.

Within the 90 day period specified, the Secretary of the Interior withdrew all public lands in the State (except for relatively minor tracts) under the authority of section 17(d)(1). This action withdrew the lands from "vacant unappropriated and unreserved status." The purpose of the withdrawals was to provide time to withdraw sufficient public lands in the State (including deficiency lands) for selection by Native Village and Regional Corporations and to identify and withdraw the "National Interest" lands as directed by section 17(d)(2). (In order to further protect Native selection rights and national interest lands, the Secretary "overlaid" a d–1 withdrawal on all Native withdrawal lands and the national interest withdrawals.)

The effect of these d–1 withdrawals was that between 110 and 120 million acres of public lands were withdrawn for exclusive selection by Natives of their basic 40 million acre entitlement. These lands still are withdrawn. None of this land is available to anyone, including the State, until the Native selection and conveyances have been finalized and the "fall-out" of lands then occurs. At that point lands not se-

lected by the Natives (except land in d–2 withdrawn areas) becomes available for State selection.

Thus the principal reason that the State has not been able to select much land since passage of the Settlement Act is not, as some have testified, the 17(d)(2) withdrawals, the 17(d)(1) withdrawals located within conservation system units, or even potential Native "fall-out" lands in proposed conservation system units, but the immense acreage withdraw in 1972 to protect Native selection rights, and the unexpected and inordinate delays in transferring title to Native corporations. In fact, this past year, as Native land selections became more evident, the State did indeed select about two million acres, mainly from lands withdrawn for Native selections and which were not selected by Native corporations and which became available for State selection. Obviously, as Native selections became final, as expedited by this legislation, as much as sixty million acres, or over twice the State's remaining entitlement, will become available from this source alone.

In view of the d–1 withdrawal process and the reasons for the withdrawals, it is not accurate to assume that 17(d)(1) public lands located within conservation system units are available for State selection. The State may indicate an interest, which it has done, but to assume that by expressing an interest the lands automatically become available is not an accurate interpretation of the legislative history of the 17(d) withdrawals. Further, the Department of the Interior (in a letter to the Committee, dated January 31, 1978, full text of which is included in this report) stated, in part:

> Most otherwise unreserved federal lands in Alaska have in fact been placed by public land orders into d–1 withdrawals which preclude selection by the State. The State may not now lawfully file applications for these lands within these areas. . . .
>
> It is intended that after Congress had legislated the conservation system units, the d–1 lands not included within those units may be classified and opened, consistent with good land management principles, to selections by the State for fulfillment of its remaining land selection entitlement.
>
> It is the Department's position that those d–1 lands included within its recommended boundaries are properly to be included as conservation system lands within the designated unit. . . .

Additionally, a review of the legislative history of Sec. 17(d)(2) reveals quite clearly that while the State may indicate an interest in selecting certain of these withdrawn lands, the priorities for land selection and conveyance there are: Village corporations first; the "National Interest" second; Regional corporations third; and the State of Alaska last.

*Protected Areas*

The Committee considered and rejected a number of proposals either to convey outright or to allow the State to select additional unconveyed and unselected lands within conservation system bound-

ithdrawn areas) becomes

ias not been able to select Act is not, as some have 7(d)(1) withdrawals lo- en potential Native "fall- units, but the immense selection rights, and the ring title to Native corpo- d selections became more wo million acres, mainly and which were not se- came available for State ime final, as expedited by acres, or over twice the vailable from this source

and the reasons for the at 17(d)(1) public lands available for State selec- hich it has done, but to ids automatically become the legislative history of nent of the Interior (in a 978, full text of which is

nds in Alaska have ders into d–1 with- State. The State may se lands within these

d legislated the con- not included within consistent with good by the State for ful- itlement. those d–1 lands in- es are properly to be ithin the designated

istory of Sec. 17(d)(2) y indicate an interest in the priorities for land corporations first: the ions third; and the State

a number of proposals tate to select additional servation system bound-

aries. In particular, the Committee decided against authorizing the State to make any additional selections of any such lands within the conservation system units which are currently withdrawn for Native selections or which have been withdrawn under sections 17(d)(1) or 17(d)(2) of the Alaska Native Claims Settlement Act. It is not the intent of the Committee to permit unnecessary further diversity of land holdings within the boundaries of the conservation system units; in this connection, the Committee has noted the existence of the Memorandum of Understanding between the United States and the State of Alaska dated September 2, 1972 and the attendant limitations on the availability of certain lands for State selection, and does not intend to make available for such selection any lands which are unavailable under the terms of that Memorandum. (Text of the Memorandum of Understanding is included in the Appendix to this Report.) Further, nothing in subsection 805(c) permits any State selection of lands within a conservation system unit.

Similarly, the Committee does not intend this bill to provide the State any new rights in connection with such presently reserved areas as the National Petroleum Reserve, the Arctic National Wildlife Range, or any other reserved area, including lands administered by the Department of Defense regardless of the State's interest in selecting or receiving lands or interests in any such reserved area.

At the same time, the Committee has recognized that there will be State and private (including Native) inholdings with the boundaries of the conservation system units, and it has acted to protect these and other valid rights.

*Summary*

The provisions of Title VIII, taken together with the other Titles, are intended to reduce to a substantial degree the uncertainty that presently affects every aspect of Alaskan financial, political, and social affairs. The Committee believes that this is in the particular interest of the people of Alaska, as well as in the general interest of the nation, and expects that all parties will act to further the reduction of uncertainty; by providing for such procedures as "overselections," it is not anticipated that this legislation will cause undue delays in resolving the status of Alaska's lands.

## TITLE IX. MINERALS ASSESSMENTS, EXPLORATION, DEVELOPMENT, AND EXTRACTION ON CONSERVATION SYSTEM UNITS

*Overview*

In developing Title IX, the Committee had the benefit of: (1) the latest United States Geological Survey (U.S.G.S.) maps and tables describing the areas in Alaska which possess metallic mineral potential; (2) current maps showing sedimentary basins and ratings of such areas for oil and gas potential; (3) Alaska Regional Profiles prepared by the Arctic Environmental Information and Data Center of the University of Alaska in cooperation with the Joint Federal-State Land Use Planning Commission for Alaska; (4) detailed briefings by the U.S.G.S. and the Bureau of Mines on the mineral assessment programs related to and the mineral potential of lands in Alaska; (5) on-the-ground visits to several mining areas in Alaska;