# SHORE AND SEA BOUNDARIES

WITH SPECIAL REFERENCE
TO THE INTERPRETATION AND USE
OF COAST AND GEODETIC SURVEY DATA

BY

AARON L. SHALOWITZ, LL.M.
*Special Assistant to the Director*

In Two Volumes



Publication 10-1

U.S. DEPARTMENT OF COMMERCE
Luther H. Hodges, *Secretary*
COAST AND GEODETIC SURVEY
H. Arnold Karo, *Director*

EXHIBIT 8
Page 1 of 6

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1962

For Sale by the Superintendent of Documents, U.S. Government Printing Office
Washington 25, D.C. - Price $3.50

Exhibit 8
Page 2 of 6

that are waiting for dock space; just as the concept of a railroad terminal includes switching yards and waiting rooms." On the question of outer harborworks, he believed the position of the United States with regard to title in the submerged lands in such enclosed areas not passing to California would lead "to an anomalous and . . . unsound conclusion" by "attributing a double status to these water areas" (see 6422 B).[71] Since a breakwater is usually planned to include a reasonable and adequate anchorage for the port in question, he recommended that "in front of harbors the outer limit of inland waters should embrace an anchorage reasonably related to the physical surroundings and the service requirements of the port, and, absent contrary evidence, may be assumed to be the line of the outermost harborworks."[72]

### 47. BOUNDARY AT RIVERS

The question of the boundary of inland waters at the mouths of rivers raised no difference of opinion among the parties. This seems to have also been the case at the 1930 Hague Conference. It does not appear that the United States made any specific recommendation on this matter; however, the final report of the Second Sub-Committee of the Conference may be said to be an accurate reflection of the views expressed on the subject in the replies made by the various governments to the questions circulated by the Preparatory Committee for the Codification Conference. The report of the Committee contains the following: "When a river flows directly into the sea, the waters of the river constitute inland waters up to a line following the general direction of the coast across the mouth of the river, whatever its width. If the river flows into an estuary, the rules applicable to bays apply to the estuary."[73] The recommendation of the Special Master was substantially the same.[74]

Although the general principle is clear, the location of the two points from which the line across the mouth of a river is to be drawn presents certain

---

71. Final Report of Special Master, *supra* note 23, at 46, 47. To adopt the rule urged by the Government, he believed, "would be a particularly hard rule on a coast like that of California on which nature has afforded relatively little shelter." *Id.* at 47. This view of the Special Master seems to overlook the fact that neither the position of the marginal belt would be changed under the Government's contention, nor would the value of the areas as places of shelter be altered. The only thing involved would be the status of the title to the submerged lands in such areas.

72. *Id.* at 47–48. The 1958 Geneva Conference regarded the outermost permanent harborworks as forming part of the coast (*see* Part 3, 2211 E(*a*)).

73. Acts of Conference, *supra* note 8, at 220.

74. Final Report of Special Master, *supra* note 23, at 4. The 1958 Geneva Convention is to the same effect except that no mention is made of rivers that flow into estuaries (*see* Part 3, 2211 A(*c*)).

EXHIBIT 8
Page 3 of 6

*Inland Waters Problem* 63

difficulties of a practical nature and apply equally well to the mouth of a bay. These are discussed in the following section.

### 48. TERMINI AT HEADLANDS

Both with respect to true bays and rivers, the line marking the seaward limit of inland waters is a headland-to-headland line. This is the general principle. But more specific rules are required. The problem of defining the actual limits of a body of water tributary to a larger body is not always a simple one. The solution lies in finding the exact place where the tributary waterway merges into the principal waterway. In the absence of established criteria regarding the limits of a specific body of water, a basic consideration is the physical configuration of the tributary waterway at its terminus. The headland principle is based on this consideration and has been applied internationally for ascertaining the limits of inland waters.[75] The more pronounced the physical features or headlands are, the more closely will the opinions of experts agree as to the boundary.

For establishing the precise boundary points or termini at headlands (referred to as "landmarks" by the Special Master in the *California* case) that will best establish the limiting line of inland waters, certain physical facts must be kept in mind.

Headlands are subject to almost limitless variations as to size, shape, and orientation. Therefore, any rule laid down must be general in character and may require exceptions in individual cases. In common usage, the word headland implies a land mass having considerable elevation, something that the navigator can see from offshore—a kind of landmark for him.[76] However, in the context of the law of the sea, elevation is not a pertinent attribute. What is important are the relationships between land and water which lie in a horizontal plane. A headland can then be defined generally as the apex of a salient of the coast; the point of maximum extension of a portion of the land into the

---

75. This is logical since the word "inland" connotes "within the land" (see *United States v. California*, 332 U.S. 19, 30, 34 (1947)) and therefore the limiting line of inland waters should be associated with the configuration of the coast at the body of water in question. The headland principle has also been applied domestically. *Grace v. Town of North Hempstead*, 152 N.Y. Supp. 122 (1915) involved the boundary between Manhasset Bay and Long Island Sound, and *Bliss v. Benedict et al.*, 195 N.Y. Supp. 690 (1922) involved the boundary between Westchester Creek and Long Island Sound.

76. It has been defined as "A precipitous promontory or cape" (Navigation Dictionary (1956), *op. cit. supra* note 65, at 100); and as "A point or portion of land jutting out into the sea, a lake, or other body of water" (Webster's New International Dictionary (1961)).

EXHIBIT 8
Page 4 of 6

water; or a point on the shore at which there is an appreciable change in direction of the general trend of the coast.[77]

The shores of the headlands are formed by two different groups of forces—those of the ocean and those of the estuary or tributary waterway. The points sought are where the shores resulting from these forces meet. Therefore, each terminus of the headland-to-headland line is taken as a point at the outermost extension of the headland from which it is drawn. There is frequently some



FIGURE 12.—Method of determining termini at headlands.

one characteristic point, some minor shore form, as a sandspit or cusp, which obviously is the point sought. (*See* point A in fig. 12.) Where the headland is of considerable extent with a gently rounded and featureless shore, a satisfactory solution may be reached by bisecting the angle formed by a line coinciding with the general trend of the low-water mark along the open coast, and a line coinciding with the general trend of the low-water mark along the bay or

77. A word of caution is necessary here in order that this definition of "headland" will not be interpreted to apply to small protuberances or projections in an otherwise straight coastline. For the purpose intended, that is, to determine the limiting line of inland waters at bays or rivers, these protuberances must bear a definite relationship to the curvature or waterway whose status is to be determined. These small projections in the shoreline come into play only after a particular indentation has been determined to fall into the category of a true bay or inland waters. (*See* note 57 *supra*.)


EXHIBIT 8
Page 5 of 6

tributary waterway. Where this bisectrix intersects the low-water mark will be the point sought. (*See* point *B* in fig. 12.)[78]

---

78. This follows the recommendation of the Special Master, which in turn followed the view taken by the Government based on the Bureau's suggestion to the Department of Justice (*see* 2112(*f*)). Final Report of Special Master, *supra* note 23, at 4. The Master, however, did not recommend a definition for a headland. In applying this rule, it may be difficult at times to determine what is the general trend line of the low-water mark along a particular stretch of open coast or in the tributary waterway, or what length of coastline is to be used. But the observation of the International Court of Justice in the *Anglo-Norwegian Fisheries* case (*see* 51), and cited with approval by the Special Master, that "too much importance need not be attached to the few uncertainties or contradictions, real or apparent . . . in Norwegian practice," would seem to be appropriate here. *Id.* at 22.

EXHIBIT 8
PAGE 6 of 6