# EXHIBIT A-2

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . .   ii

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . .   1

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . .   1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . .   1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . .   5

    SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . .   5

    I.   CONGRESS DID NOT INTEND TO INCLUDE WATERS SUBJECT
        TO THE FEDERAL RESERVED WATER RIGHT IN ITS
        DEFINITION OF "PUBLIC LANDS." . . . . . . . . . .   6

        A.   "LANDS, WATERS, AND INTERESTS THEREIN" IS
            BOILERPLATE LANGUAGE THAT APPLIES WELL IN
            DEFINING THE SECRETARY'S AUTHORITY BUT DOES
            NOT USEFULLY DEFINE THE GEOGRAPHIC BOUNDARIES
            OF "PUBLIC LANDS" UNDER ANILCA. . . . . . . .   7

        B.   IF THE UNITED STATES HAS TITLE TO AN INTEREST
            IN LANDS OR WATERS, ONLY THAT INTEREST
            CONSTITUTES "PUBLIC LANDS"; THEREFORE WHERE
            THE UNITED STATES ESTABLISHES A NON-
            CONSUMPTIVE FEDERAL RESERVED WATER RIGHT, ONLY
            ITS RIGHT TO PREVENT APPROPRIATION OF WATER BY
            OTHERS CONSTITUTES "PUBLIC LANDS." . . . . . .   10

        C.   THE INHERENT PROBLEMS WITH USING THE FEDERAL
            RESERVED WATER RIGHT AS A GEOGRAPHIC
            DESIGNATION INDICATE THAT CONGRESS DID NOT
            INTEND TO INCLUDE THE WATERS SUBJECT TO THE
            RIGHT AS "PUBLIC LANDS." . . . . . . . . . . .   13

    II.   CONGRESS DID NOT INTEND TO INCLUDE ALL NAVIGABLE
        WATERS IN ALASKA BY VIRTUE OF THE NAVIGATIONAL
        SERVITUDE. . . . . . . . . . . . . . . . . . . .   20

    III.  A BROAD READING OF TITLE VIII VIOLATES THE "CLEAR
        STATEMENT" REQUIREMENT FOR LAWS THAT ALTER THE
        TRADITIONAL BALANCE OF STATE AND FEDERAL POWER. . .   21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . .   23

STATEMENT OF RELATED CASES . . . . . . . . . . . . . . .   24

# TABLE OF AUTHORITIES

## Cases

Amoco Production Co. v. Gambell, 480 U.S. 542 (1987) . 8, 18, 19

Cappaert v. United States, 426 U.S. 128 (1976) . . 7, 10, 15-17

City of Angoon v. Hodel, 803 F.2d 1016 (9th Cir. 1986), cert. denied, 484 U.S. 870 (1987) . . . . . . . . . . . . . . . . 11

Ide v. United States, 263 U.S. 497 (1924) . . . . . . . . . 12

In re General Adjudication of All Rights to Use Water in Big Horn River System, 835 P.2d 273 (Wyo. 1992) . . . . . . . . . . 18

McDowell v. State, 785 P.2d 1 (Alaska 1989) . . . . . . . . 2, 3

Metlakatla Indian Community v. Egan, 362 P.2d 901 (Alaska 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Reed v. Reese, 374 A.2d 665 (Pa. 1976) . . . . . . . . . . 15

Sierra Club v. Yeutter, 911 F.2d 1405 (10th Cir. 1990) . 17, 19, 20

United States v. Adair, 723 F.2d 1394 (9th Cir. 1984), cert. denied, 467 U.S. 1252 (1984) . . . . . . . . . . . . . 14, 18

United States v. Bass, 404 U.S. 336 (1971) . . . . . . . . 22

United States v. New Mexico, 480 U.S. 696 (1978) . . . . . 17

## Statutes and Regulations

5 AAC 01.647 . . . . . . . . . . . . . . . . . . . . . . 2, 3

16 U.S.C. 410hh(9) . . . . . . . . . . . . . . . . . . . . 17

16 U.S.C. 3101(a) . . . . . . . . . . . . . . . . . . . 8

16 U.S.C. 3102 . . . . . . . . . . . . . . . . . 1, 6, 7, 9, 11

16 U.S.C. 3192 . . . . . . . . . . . . . . . . . . . . 9

16 U.S.C. 773 . . . . . . . . . . . . . . . . . . . . . 22

16 U.S.C. 1021-1035 . . . . . . . . . . . . . . . . . . 22

16 U.S.C. 1801-1882 . . . . . . . . . . . . . . . . . . 22

43 U.S.C. 945 . . . . . . . . . . . . . . . . . . . . . 12

57 Fed. Reg. 22,940 (May 29, 1992) . . . . . . . . . . . . 3

### Other Authorities

Black's Law Dictionary (5th Ed. 1979) . . . . . . . . . . . 12

L. Tribe, American Constitutional Law (2d ed. 1988) . . . 21, 22

## STATEMENT OF JURISDICTION

The State of Alaska accepts the United States' Statement of Jurisdiction.

## ISSUES PRESENTED FOR REVIEW

1. Whether "public lands" as defined in § 102 of the Alaska National Interest Lands Conservation Act ("ANILCA"), 16 U.S.C. 3102, includes those waters in Alaska subject to a federal reserved water right.

2. Whether the United States has "title" to an interest in waters by virtue of the federal reserved water right.

3. Whether "public lands" as defined in § 102 of ANILCA, 16 U.S.C. 3102, includes those waters in Alaska subject to the navigational servitude.

4. Whether the United States has "title" to an interest in waters by virtue of the navigational servitude.

## STATEMENT OF THE CASE

Introduction:

This case presents the issue of geographic scope of ANILCA, specifically whether Congress intended the provisions of ANILCA to apply to all waterways in Alaska that are subject to a doctrine known as the federal reserved water right. The plaintiffs in this case, Katie John, Doris Charles, and the Mentasta Village Council ("the Katie John plaintiffs"), argue that Congress intended to include such waters, and therefore that the waters at

1

Batzulnetas, where they fish, are subject to federal fisheries management and control. The State opposes this position and proposes that Congress carefully limited ANILCA's application to federally-owned lands and waters. The United States recently changed its long-standing position opposing the plaintiffs' arguments and now agrees with them in part.

Since 1960 the State of Alaska ("the State") has managed the fish and wildlife on all lands in Alaska. Management control of Alaska's fisheries was one of the primary reasons Alaskans sought statehood in the 1950's. Alaska's salmon stocks were decimated under the management of federal authorities who responded more to fishing industry interests than to principles of conservative management. See generally Metlakatla Indian Community v. Egan, 362 P.2d 901 (Alaska 1961).

The Secretaries of Interior and Agriculture ("Secretary") recently assumed management of fish and wildlife for subsistence purposes on public lands, however, in response to the Alaska Supreme Court decision in McDowell v. State, 785 P.2d 1 (Alaska 1989). In McDowell, the court held unconstitutional Alaska's law giving rural residents a subsistence priority; Alaska law now gives a priority to all subsistence users regardless of their residence. A.S. 16.05.258 (1992).[1]

---

[1]    State regulations provide for subsistence fishing at Batzulnetas, the focus of this controversy. They permit fish to be taken with fishwheels and dip nets on the Copper River, and with dip nets and spears in Tanada Creek. The season for salmon is June 1 through September 1 or until closed by emergency order. Fishing is open two days per week during the month of June and 3.5 days per week for the remainder of the season. 5 AAC 01.647(i)(1)-(5).

2

In response to McDowell, the Secretary promulgated regulations for subsistence hunting and fishing on public lands in Alaska.   He created the Federal Subsistence Board and gave it authority to adopt regulations for the day-to-day management of subsistence hunting and fishing. 57 Fed. Reg. 22,940 (May 29, 1992).   The regulations define as "public lands" subject to the subsistence priority federally owned lands and those waters running over federally-owned submerged lands.  Id.   The Katie John plaintiffs have challenged these regulations as too restrictive; they seek to have the priority apply to all waters, and seek federal management of Alaska's fisheries as well as its wildlife.

The Katie John plaintiffs may fish for subsistence purposes at Batzulnetas under state law with a Batzulnetas subsistence salmon fishing permit.  5 AAC 01.647(i), 01.630(f). The Katie John plaintiffs rarely have taken advantage of this opportunity, however.  In 1987, the state issued eight permits for Batzulnetas, under which 22 sockeye salmon were harvested.  State's Supp. ER at 67, ¶ 3.  No one requested permits for the 1988, 1989, 1990, 1991, or 1992 seasons, however, and no salmon were harvested. Id., ¶¶. 4-6.   In 1993, a single permit was requested, and a harvest of 160 sockeye salmon was reported. Id., ¶¶ 7-9.  In 1994, the State issued one permit for the Batzulnetas subsistence fishery, to the Katie John family.  Therefore, although the Katie John plaintiffs seek federal management for subsistence purposes at the Copper River and Tanada Creek, they have rarely sought to fish there when provided the opportunity.

3

Proceedings Below:

        The Katie John plaintiffs filed suit in 1990 against the
United States, alleging that contrary to the Secretary's
interpretation, Congress intended the subsistence priority granted
by ANILCA § 804 and applicable to all "public lands" to apply to
all navigable waters and many nonnavigable waters in Alaska.  John
v. United States, D.Ct. No. 90-484-CV.  The plaintiffs later also
named the State as a defendant, and all parties moved for summary
judgment.

        In its briefing and at oral argument, counsel for the
United States defended the regulations, arguing repeatedly that the
United States does not hold title to any interest in navigable
waters.[2]  The change of presidential administration provoked a
change of the United States' legal analysis, however, and after
three years of consistently arguing that Congress did not intend
"public lands" to include navigable waters, the United States
suddenly abandoned its conviction on the matter.  At a second oral
argument on the same cross-motions for summary judgment, counsel
for the United States announced that the Secretary now agrees that
the priority applies to waters running through federal enclaves and
subject to a federal reserved water right.

        The district court not base its decision on the United
States' new position, ruling in March 1994 that the United States
has title to the navigational servitude and that therefore

---

[2] See State's Supp. ER at 71 for a list of the briefs filed by the
United States in this and related cases taking a position contrary
to its present stance.

4

navigable waters constitute "public lands" subject to federal
fisheries management.  United States' ER at 53.  The court stayed
its decision pending appeal. United States' ER at 119.  The State
also has appealed the decision on the issue of whether the
navigational servitude renders navigable waters "public lands" and
on the issue of whether Congress granted the Secretary authority to
assume fish and wildlife management in ANILCA. C.A. No. 94-35480.

**ARGUMENT.**

**SUMMARY OF ARGUMENT.**

Congress did not intend its definition of "public lands"
in ANILCA to include waters subject to the federal reserved water
right.  Congress defined "lands" as "lands, waters, and interests
therein" because that is boilerplate language it uses routinely in
statutes establishing conservation areas and parks, and ANILCA is
a land conservation act.   Congress did not intend federal
"interests" in land and water to serve as geographic determinants,
however.  The United States does not have "title" to the federal
reserved water right, but even if it did, section 102 does not
define as areas subject to ANILCA any lands in which the United
States has an interest.

Using the reserved water rights doctrine to define the
Act's applicability is so problematic as to be infeasible.  A non-
consumptive federal reserved water right cannot serve as a
geographic boundary because it is non-possessory, does not adhere
to any identifiable water, and its existence and extent is

5

uncertain and must be established on a case-by-case basis. Even if the waters subject to the right constituted "public lands," they are unidentifiable. If they could be identified, the Secretary still would have management authority only over the portions of waters running through federal reservations. Congress would not have expressed an intent to include waterways in its definition of "public lands" in such a convoluted manner, and could not have intended the Secretary to have to painstakingly establish which waters constitute "public lands" on a case-by-case basis through litigation.

## I. CONGRESS DID NOT INTEND TO INCLUDE WATERS SUBJECT TO THE FEDERAL RESERVED WATER RIGHT IN ITS DEFINITION OF "PUBLIC LANDS."

In enacting ANILCA, Congress did not intend to include waters as "public lands" by virtue of the possibility that federal reserved water rights might exist in some waters in Alaska. The United States' argument to this effect requires a contrived and irrational interpretation of the definitional provision.

ANILCA defines "public lands" as follows:

As used in this Act . . .

(1) The term "land" means lands, water and interests therein.

(2) The term "Federal land" means lands the title to which is in the United States after December 2, 1980.

(3) The term "public lands" means land situated in Alaska which, after December 2, 1980 are Federal lands [except for certain lands selected by the State or Native corporations].

16 U.S.C. 3102(1)-(3) (citations omitted).

The United States argues that "public lands" include waters subject to the federal reserved water right because it "owns" an interest in these waters. The federal reserved water right arises when the United States withdraws its lands from the public domain and reserves it for a federal purpose, and by implication reserved appurtenant waters then unappropriated. Cappaert v. United States, 426 U.S. 128, 138 (1976).

"Public lands" do not include waters subject to the federal reserved water right, however, because Congress clearly did not intend this doctrine to delineate the geographic boundaries of ANILCA. Assuming arguendo that an interest in lands or waters to which the United States has title might constitute "public lands" under § 102, that interest does not convert the lands or waters into "public lands." Further, the United States does not have "title" to the federal reserved water right. Even if an interest of the United States in lands or waters converted the lands and waters to "public lands," the federal reserved water right cannot practically serve as a geographic determinant because it is not a possessory right and never adheres to any particular water.

A.   "LANDS, WATERS, AND INTERESTS THEREIN" IS BOILERPLATE LANGUAGE THAT APPLIES WELL IN DEFINING THE SECRETARY'S AUTHORITY BUT DOES NOT USEFULLY DEFINE THE GEOGRAPHIC BOUNDARIES OF "PUBLIC LANDS" UNDER ANILCA.

The definition of "land" in ANILCA has two purposes: (1) to establish the extent of the authority the statute gives the Secretary to acquire and dispose of property, and (2) to establish where some of ANILCA's provisions apply, as a geographic

7

designation.

ANILCA's definition of "land" -- "lands, waters, and interests therein" -- clearly was intended to serve the first function rather than the second. The phrase "lands, waters, and interests therein" is boilerplate language that appears in hundreds of statutes in title 16 of the United States Code, authorizing federal officials to acquire property for parks and conservation units.[3] Congress presumably chose this language for ANILCA also because it is a land conservation statute.[4] Inclusion of "interests therein" in addition to lands and waters makes sense in this context. Congress' grant of authority to the Secretary as to lands, waters, and interests therein empowers him to take actions applicable to less than full fee title interests. For example, a provision in ANILCA authorizing the Secretary to acquire "lands" would permit him to acquire a leasehold interest if more practical

---

[3] See, e.g., 16 U.S.C. §§ 90b, 110c(c)(3), 121, 228b(a), 230a(b), 230g(a), 272(a), 273, 398d, 410j, 410o, 410p, 410bb(b)(1), 410ff-1(a), 410gg, 410gg-1, 410ii-3(a), 410jj-3(c), 410mm-2(b), 410qq-2(a), 410rr-2, 410rr-7(c), 459d-3(a), 459e-1(a), 459h-1(a), 459i-1, 460l-8, 460l-9, 460-10a, 460l-10b, 460m-3, 460m-9(a), 460m-16(a), 460p-2(a), 460q-2(a), 460r-2(a), 460v-7, 460z-6(a), 460z-13, 460aa-12, 460bb-3(a), 460cc-1(a), 460ee(c)(1), 460kk(c)(1), 460nn-1, 460ww(b).

[4] See preamble to ANILCA, 94 Stat. 2371:

An act to provide for the designation and conservation of certain public lands in the State of Alaska, including the designation of units of the National Park, National Wildlife Refuge, National Forest, National Wild and Scenic Rivers, and National Wilderness Preservation Systems, and for other purposes.

See also 16 U.S.C. 3101(a); Amoco Production Co. v. Gambell, 480 U.S. 542, 549 (1987) ("ANILCA's primary purpose was to complete the allocation of federal lands in the State of Alaska").

or beneficial than full fee title.  Section 1302 is such a case; it
gives the Secretary authority to acquire by purchase, donation,
exchange, or otherwise any lands, waters, and interests therein
within the boundaries of any conservation system units. 16 U.S.C.
3192.  Inclusion of "interests therein" grants the Secretary the
flexibility to acquire or dispose of whatever type of property
interest is most useful to the United States.

The phrase "interests therein" cannot practically serve
the second function of the definition, to delineate the geographic
area where certain provisions of ANILCA apply.[5]  In order to
establish that the geographic boundaries of ANILCA are limited to
federally-owned lands, Congress defined "Federal land" and "public
lands" as "lands the title to which is in the United States [with
certain exceptions]."  ANILCA § 102(2), (3), 16 U.S.C. 3102(2),
(3).  Congress' intent in this provision clearly was to provide a
simple guideline for the area of ANILCA's application -- federally
owned lands -- not to create a complex puzzle for courts to spend
years attempting to solve.  As interpreted by the United States,
however, Congress' true meaning reveals itself only when the
definition of "lands" is added into the definition of "federal
land" or "public lands"; they are then defined as "lands, waters,
and interests therein, title to which is in the United States."
While lands or waters easily can serve as geographic determinants,

---

[5] The boilerplate language "lands, waters, and interests therein"
never has been interpreted by a court to denote the geographic
boundaries of a statute's effect despite its numerous occurrences
in title 16 of the United States Code.

9

however, "interests" in lands or waters generally do not denote a definite geographic area.  Further, as explained below, while the interest itself could be construed to constitute "lands" under the definition of § 102, the existence of an interest does not convert the lands or waters to which it applies into "public lands."

B.  IF THE UNITED STATES HAS TITLE TO AN INTEREST IN LANDS OR WATERS, ONLY THAT INTEREST CONSTITUTES "PUBLIC LANDS"; THEREFORE WHERE THE UNITED STATES ESTABLISHES A NON-CONSUMPTIVE FEDERAL RESERVED WATER RIGHT, ONLY ITS RIGHT TO PREVENT APPROPRIATION OF WATER BY OTHERS CONSTITUTES "PUBLIC LANDS."

Aside from federally-owned lands and waters, § 102 defines as "public lands" the interests to which the United States holds title.  Therefore, assuming that a federal reserved water right is an interest to which the United States holds title, only the interest, the water right, constitutes public lands, not the entire waterway to which it applies.

A federal reserved water right does not constitute ownership of the water.  In a consumptive context, the right permits the United States to use the minimal amount of water necessary to fulfill the primary purposes of a reservation. Cappaert, 426 U.S. 128.  In this case, the right is even more tenuous; the United States claims a right to preserve the in-stream flow of the water, a non-consumptive right to exclude others.  If the United States could have "title" to the federal reserved water right in this case, only its right to prevent others from appropriating more water than that necessary to sustain sufficient in-stream flows would constitute "public lands" under ANILCA § 102.

10

"Public lands" are lands, waters, and interests therein, title to which is in the United States, not "lands and waters in which the United States has an interest," the definition the United States effectively proposes, contrary to its argument before the district court.[6]  Section 102 is not this broad; as this Court essentially has noted, only the <u>interest to which the United States holds title</u> constitutes "public lands" under § 102, not all lands in which the United States has any interest. <u>See</u> <u>City of Angoon v. Hodel</u>, 803 F.2d 1016, 1027-28 n.6 (9th Cir. 1986), <u>cert.</u> <u>denied</u>, 484 U.S. 870 (1987)("Since the United States does not hold title to the navigational servitude, the servitude is not 'public land' within the meaning of ANILCA").  The fact that the United States has some interest does not convert the remaining non-federal interests in the proverbial bundle of sticks to "public lands."

The United States' interpretation, that the existence of a federal reserved water right converts the entire river to "public lands," would lead to absurd results.  For example, this

_____

[6]  The United States' position on this point directly contradicts its briefing before the district court:

> **Congress did not provide that federal lands are "lands to which the United States holds an interest," which is how plaintiffs would read the statute. Congress provided that "Federal land means lands the title to which is in the United States...." 16 U.S.C. § 3102(2). Congress was thus mindful that in creating federal duties and responsibilities, that these duties be limited so as not to encroach on the authority of the State over non-federal lands.** <u>See</u> 16 U.S.C. §§ 3202(a), (b).

Reply Brief in Support of Federal Defendants' Motion to Dismiss at 6 (emphasis added), State's Supp. E.R. at 6.

interpretation of § 102 would render most private lands in Alaska "public lands," because under 43 U.S.C. 945, all patents for land taken up after August 30, 1890 west of the 100th meridian are issued subject to a reserved federal right-of-way for construction of ditches and canals. See Ide v. United States, 263 U.S. 497 (1924). The United States also has agreements with the State that entitles it to use state lands (e.g., for military exercises), I.R.S. liens on private property, and access rights to inholdings. Obviously Congress did not intend these interests to convert non-federal property into "public lands"; if it had, Congress would have defined the term simply as "all lands and waters in Alaska." The Court's job is to apply the law as intended by Congress, not to permit its unintended expansion based on a hypertechnical, illogical interpretation.

Moreover, the United States does not have "title" to the federal reserved water right. The ordinary meaning of "title" denotes fee ownership of property;[7] it does not designate the nature of a right to prevent others from appropriating more than a certain amount of water. While reference to "having or holding an interest" in property would be appropriate, reference to "having title to an interest" in property does not constitute normal

---

[7]  "Title" is defined in Black's Law Dictionary 1331 (5th Ed. 1979) as follows:

> Title is the means whereby the owner of lands has just possession of his property. The union of all elements which constitute ownership. Full independent and fee ownership. The right to or ownership in land, also the evidence of such ownership.

12

parlance in property law. "Title" is not commonly used to describe an interest in a lease, an easement, or a right-of-way, and Congress would not have expressed its intent to include as "public lands" lands subject to an interest of the United States in this unconventional way.

The United States masks the awkwardness of its interpretation by avoiding any claim of "title" to the federal reserved water right. It claims only to "own an interest in water through the reserved water rights doctrine." See, e.g., United States Appellant Br. at 21. Its position is based on an extremely technical reading of the statute, however, and it cannot logically support its argument by substituting less awkward language than that used in § 102. In plain terms, the United States argues that Congress expressed its intent to include as "public lands" those waters in which it has "title" to the federal reserved water right, an expression based on a peculiar use of a word well understood in law.

    C.   THE INHERENT PROBLEMS WITH USING THE FEDERAL RESERVED WATER RIGHT AS A GEOGRAPHIC DESIGNATION INDICATE THAT CONGRESS DID NOT INTEND TO INCLUDE THE WATERS SUBJECT TO THE RIGHT AS "PUBLIC LANDS."

Congress cannot have intended the reserved water right doctrine to be employed as a geographic delineator, because it is wholly unsuitable for this purpose. The interest is non-possessory and does not adhere to any identifiable water, and its existence and extent is uncertain and must be established on a case-by-case basis.

The Secretary's ability to exert control over lands or waters in which the United States holds an interest requires that the interest be of a nature that adheres to a definite area. The United States contends that because "public lands" include those waters subject to a federal reserved water right, the United States must replace state management of fisheries for subsistence purposes. Designating a federal reserved water right as "public lands" cannot give the Secretary management authority over fish and wildlife as to any particular area, however, because the interest does not itself constitute identifiable lands or waters; managing fish and wildlife on such "public lands" is meaningless. Similarly, if the United States is granted a contingent remainder in a piece of property, the interest might constitute "public lands" for the Secretary to "manage" under ANILCA, e.g., to hold or convey, but the Secretary could not manage fish and wildlife on it because the interest does not constitute a definite area of lands or waters.

Even if some limited interests in lands or waters could sufficiently identify an area subject to fish and wildlife management, a non-consumptive federal reserved water right could not, because it does not entitle the United States to use any lands or waters. In a non-consumptive context, the federal reserved water right never becomes a possessory interest; the right simply entitles the United States to protect instream flows by prohibiting other appropriators from depleting the waters below a protected level. United States v. Adair, 723 F.2d 1394, 1411 (9th Cir.

14

1984), cert. denied, 467 U.S. 1252 (1984). An analogy as to lands would be a covenant with adjacent property owners that permits them to remove ground fill from a mountain on their property, but prohibits them from removing more than an amount sufficient to sustain a hill of a particular height.[8] This right could not effectively function to identify a geographic area because while it permits the holder to prevent a certain level of activity on the land, it is not a possessory interest and does not adhere to any identifiable land. Similarly, a non-consumptive federal reserved water right does not entitle the United States to possess or use any water and does not adhere to any particular water, and therefore could not serve to identify an area for fish and wildlife management.

Even if the waters subject to the right rather than the right itself constituted "public lands," using the federal reserved water right to determine "public lands" still would be hopelessly complex and unworkable. The right cannot serve as the basis for a geographic boundary because the waters to which it applies still would be unidentifiable. The right applies only where Congress implicitly reserved water and only to the extent absolutely necessary to fulfill the primary purpose of the reservation. Cappaert, 426 U.S. at 141. Therefore, assuming that the primary

---

[8] This interest could be established as a restrictive covenant or as a negative easement. See 3 Powell on Real Property § 34.02[2][c] at 34-16 – 34-17; see also Reed v. Reese, 374 A.2d 665 (Pa. 1976)(Based on an easement in plaintiff's deed, use of the adjacent land for purposes other than a park was held to damage the plaintiff).

15

purpose of a withdrawal were to provide for sufficient in-stream flows to provide habitat for fish, the doctrine would not reserve the entire water column of a river, but only the minimal amount of water necessary for fish habitat, a difficult factual determination. Even if the minimal amount of water is quantified, that amount of water would be protected against upstream appropriation without identification of any particular waters. It is thus impossible to divide the waters in any given water column between "public lands," the minimal amount of the water reserved for fish passage, and the remaining waters, which would remain unreserved by the United States and therefore would not constitute "public lands" subject to the title VIII priority.

Congress also would not have intended the federal reserved water right to designate a geographical boundary because its existence and quantity must be established on a case-by-case basis. The federal reserved water right does not apply to all federal lands or even all federal reservations. The doctrine arises when the United States withdraws its land from the public domain and reserves it for a federal purpose, and by implication reserves appurtenant water then unappropriated. Cappaert, 426 U.S. at 138. The question of whether a particular body of water is subject to a federal reserved water right raises legal questions regarding the purpose for which a particular area of federal land has been set aside, and factual questions concerning whether any portion of the flow of a particular waterway is necessary to achieve the purposes for which the federal land has been reserved.

16

See Cappaert, 426 U.S. 128; Sierra Club v. Yeutter, 911 F.2d 1405, 1417 (10th Cir. 1990).

Quantification of the minimum amount of water necessary to fulfill some, but not all purposes of a particular conservation system unit in Alaska would be a complex undertaking. Teams of specialists in hydrology, geomorphology, aquatic and riparian biology, limnology, and botany would be necessary to quantify the minimum amount of water necessary to support the numerous and complex dynamics of the specific purpose or purposes for which Congress sets aside a conservation unit. Moreover, for purposes of the reserved waters doctrine, a distinction exists between the "uses" of a conservation system unit and the specific "purposes" for which it is set aside. For example, hunting and fishing are permitted uses of some national parks in Alaska, but they are not a primary purpose of the parks. See, e.g., 16 U.S.C. 410hh(9); see generally United States v. New Mexico, 480 U.S. 696 (1978). Purposes take precedence over permitted uses, and reserved water rights are available only to meet the minimum needs of the primary purposes for which federal enclaves are established.

While the broad legal principle of federal reserved water rights doctrine is easily asserted, its application has proved daunting. The doctrine is judge-made law, and courts are the only forum available to define and clarify the nature and scope of the right. Only the issues framed by each particular controversy brought to litigation are resolved, leaving further issues to be defined as new controversies arise. The judicial mechanism is

17

complex, protracted, and costly, a single controversy characteristically taking years to complete. Congress has not undertaken a comprehensive legislative solution, and the matter has been left to adjudication on a case-by-case basis.

Further, Congress would not have implicitly incorporated a doctrine into the "public lands" definition has had little or no application in Alaska. The record reflects that no federal agency has sought to establish, apply for, quantify, or receive federal reserved water rights in Alaska. Affidavit of Gary Prokosch, State's Supp. ER at 19.[9] Had Congress intended ANILCA's provisions to apply to navigable waters in Alaska, it would not have limited their application to those waters running through federal reservations that might be found implicitly to include water rights yet unasserted and unrecognized. Under the United States' interpretation, Congress itself could not have been certain to which waters the right might attach. As noted above, ANILCA is not primarily a subsistence statute, but is a land conservation act comprised of 15 titles and spanning 181 pages of the Statutes at Large, 91 Stat. 2371-2551. Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 549 & n. 16 (1987). Congress defined "public lands" in order to provide specific geographic boundaries to the

---

[9] The priority of a federal reserved water right is in part determined by state law, and the precise quantity of water protected must be determined in accordance with state techniques and procedures. United States v. Adair, 723 F.2d 1394, 1411 n.19 (9th Cir. 1983), cert. denied 467 U.S. 1252 (1984); In re General Adjudication of All Rights to Use Water in Big Horn River System, 835 P.2d 273, 278 (Wyo. 1992) ("Federal law has not preempted state oversight of reserved water rights.").

18

act's application and to the jurisdiction of the Secretary. As the Supreme Court has noted, Congress did not simply wave its hand in the general direction of Northwest North America when it defined the scope of ANILCA. Id. at 548. Congress intended it to designate a finite, specific area, federally-owned lands.

Congress could not have expected the Secretary to evaluate, assert, and possibly litigate federal reserved water rights for every federal reservation in Alaska to which the rights might apply, simply to establish the areas subject to federal management authority. Unless directed by statute, the Secretary has no obligation to assert federal reserved water rights absent a threat to the purposes for which the federal reserve was established. Sierra Club v. Yeutter, 911 F.2d 1405, 1418 (10th Cir. 1990). ANILCA contains no such requirement, the waters in Alaska are practically untouched by appropriation, and the mere possibility of a reserved water right is insufficient to render the waterways "public lands" under any interpretation of § 102. In this case, the United States made no showing before the district court of the elements required to establish the existence of a federal reserved water right. Although the district court decision indicates that the parties agree that the waters at issue are subject to a reserved water right, the State has never conceded this and disputed the suggestion several times. See State's Supp. ER at 59, 64-65. Because the United States did not assert a reserved water right, the questions of whether a right existed and if so in what amount were not ripe for judicial review. See

19

Yeutter, 911 F.2d 1405.

The untenable effect of the United States' interpretation of § 102 is that, given the United States' position that Congress granted the Secretary authority to manage fish and wildlife on all public lands in Alaska,[10] the Secretary would manage subsistence fishing on portions of rivers, but not necessarily on entire rivers. Congress could not have condoned such a consequence. The Katie John plaintiffs agree that this result would be undesirable; they propose that the court extend the federal reserved water right theory to the entire waterways, and into the territorial seas, regardless of where a reserved water right actually may exist. Memorandum of Katie John Plaintiffs et al. in Opposition to State's Motion for Partial Summary Judgment at 42, State's Supp. ER at 18. While theoretically a federal reserved water right might be justified upstream of a federal reservation, it could not exist downstream or in the ocean, where appropriation can have no effect on the flow within the reservation. This argument requires the Court to accept the view that although Congress specifically defined "public lands," it had no concept of a geographic limitation on the scope of ANILCA's provisions.

## II. CONGRESS DID NOT INTEND TO INCLUDE ALL NAVIGABLE WATERS IN ALASKA BY VIRTUE OF THE NAVIGATIONAL SERVITUDE.

The district court held that the navigational servitude

---

[10]  The State does not agree that Congress granted the Secretaries of Interior and Agriculture authority to manage fish and wildlife on any lands in Alaska, and currently is litigating the issue in a separate appeal in this Court. State v. Babbitt, A94-35480.

is an "interest" in the waters of Alaska to which the federal government holds title, and that therefore Alaska's navigable waters are "public lands" pursuant to § 102(3). United States' ER at 91. The State agrees with the United States that the district court should be reversed on this issue, and its appeal is pending before this Court, No. 94-35480. Its briefing on this issue is attached as an addendum to this brief and is incorporated herein by reference.

### III. A BROAD READING OF TITLE VIII VIOLATES THE "CLEAR STATEMENT" REQUIREMENT FOR LAWS THAT ALTER THE TRADITIONAL BALANCE OF STATE AND FEDERAL POWER.

"Public lands" should not be interpreted to include waterways by virtue of the federal reserved water right because Congress did not make that purpose plain. The Supreme Court will interpret a law to affect all activities within Congress' control under its commerce power only if the statutory language or legislative history constitutes a clear statement that Congress intended to exercise this power in full. L. Tribe, American Constitutional Law, § 5-8 at 316 (2d ed. 1988). The fact that the United States has to rely on an abstruse doctrine such as the federal reserved water right demonstrates how far § 102 is from constituting a "clear statement."

The Supreme Court has invoked the clear statement requirement most notably where a judgment that a federal statute reached to the outer limits of the commerce power would be inconsistent with state institutional interests. Id. The purpose

21

of the doctrine is to ensure that federal legislation is not applied in a manner that may alter the delicate balance of federal and state power unless Congress has carefully considered and fully intended such a result. United States v. Bass, 404 U.S. 336, 349 (1971). It is an important complement to the political check on congressional exercise of the commerce power. In traditionally sensitive areas such as legislation affecting the federal balance, the clear statement requirement ensures that the legislature has faced and intended to bring into issue the critical matters involved in the judicial decision. Id. at 350. The requirement prevents Congress from resorting to ambiguity to cloak its failure to accommodate the competing interests bearing on the federal-state balance. Tribe, supra, § 5-8 at 317. The doctrine increases the likelihood that Congress will give full attention to states' interests when it considers preemptive legislation.

In the context of fisheries management, the idea that some waterways are "public lands" by virtue of a potential, unrecognized implicit water right conflicts with Congress' usual practice of carefully delineating the conditions under which federal jurisdiction over fisheries is to be exercised. For example, the North Pacific Halibut Act of 1982, 16 U.S.C. 773-773(k), the North Pacific Fisheries Act, 16 U.S.C. 1021-1035, and the Magnuson Fisheries Conservation and Management and Fisheries Act, 16 U.S.C. 1801-1882, all contain explicit language regarding federal management authority for fisheries. The Court should not assume that Congress failed to exercise the care with which it

22

usually prescribes federal and state fisheries management jurisdiction.

CONCLUSION

     "Public lands" as defined in ANILCA does not include waters by virtue of federal reserved water rights. The United States does not have "title" to a federal reserved water right. Even assuming that the United States did hold title to an interest in waters, that interest does not convert the waters into public lands under § 102. A non-consumptive federal reserved water right cannot serve as a geographic boundary because it is non-possessory, does not adhere to any identifiable water, and its existence and extent is uncertain and must be established on a case-by-case basis. Even if the waters subject to the right constituted "public lands," they are unidentifiable. If they could be identified, the Secretary still would have management authority only over the portions of waters running through federal reservations. Congress would not have expressed an intent to include waterways in its definition of "public lands" in such a convoluted manner, and could not have intended the Secretary to have to painstakingly establish which waters constitute "public lands" on a case-by-case basis through litigation.

     "Public lands" also does not include navigable waters by virtue of the navigational servitude. While an interest to which the United States holds title in navigable waters might constitute "lands," such an interest does not convert the waters into public

23

lands.  The navigational servitude is not a property interest but is a power of the United States that arises from the U.S. Constitution.   Therefore, this Court should find that "public lands" do not extend to waters subject to the federal reserved water right or the navigational servitude.

When Congress enacts laws that alter the traditional balance of federal and state powers, it makes its intent plain.  In this case, the complex nature of the federal reserved water right and the awkwardness of applying it or the navigational servitude to the act's definition of "public lands" do not demonstrate a clear intent of Congress to usurp state fisheries management.

## STATEMENT OF RELATED CASES

The State also appealed the issue of whether the United States has a property interest in the navigational servitude, as well as a related issue, in the consolidated case of State v. Babbitt, C.A. No. 94-35480.  This Court previously has decided two related cases, John v. United States, C.A. No. 93-35295, and Native Village of Quinhagak v. United States, C.A. No. 93-35496.

DATED October 17, 1994.

BRUCE M. BOTELHO
ATTORNEY GENERAL

By: _____
Joanne M. Grace
Assistant Attorney General

24

CERTIFICATE OF SERVICE

I certify that I caused to be mailed two correct copies of BRIEF FOR APPELLEE STATE OF ALASKA in this proceeding to the following:

Elizabeth Ann Peterson
Appellate Section
Environment & Natural Resources Divison
Department of Justice
P. O. Box 23795
L'Enfant Plaza Station
Washington, D.C. 20026

Dean Dunsmore
U.S. Department of Justice
Environmental & Natural Resources
801 B Street, Suite 504
Anchorage AK 99501-3657

Robert T. Anderson, Esq.
Native American Rights Fund
310 K Street Suite 708
Anchorage AK 99501

Michael A. D. Stanley, Esq.
130 Seward Street, Suite 413
P O Box 020449
Juneau AK 99802

Marc D. Slonim, Esq.
Ziontz, Chestnut, Varnell,
 Berley & Slonim
2101 Fourth Ave., Suite 1230
Seattle, WA 98121

by depositing in the U.S. Mail at Anchorage, Alaska, postage prepaid.

DATED at Anchorage, Alaska this 17th day of October, 1994.

Joanne M. Grace

## ADDENDUM

5 AAC 01.647

State's Brief in <u>State v. Babbitt</u>, A94~35480, pp. 24-31
(navigational servitude arguments)

5 AAC 01.647    ALASKA ADMINISTRATIVE CODE    5 AAC 01.647

**5 AAC 01.647. COPPER RIVER SUBSISTENCE SALMON FISHERIES MANAGEMENT PLANS.** (a) The purpose of this plan is to ensure that adequate escapement of salmon in the Copper River system occurs and that subsistence uses, as described under AS 16.05.251 and 5 AAC 99.010, are accommodated.

(b) The following are directives pertaining to the management of Copper River System salmon:

(1) this policy governs only those salmon which pass the department sonar counters located at the Million Dollar Bridge;

(2) the department will manage the Copper River commercial salmon fishery to attain a total escapement into the Copper River of 516,000 salmon to ensure that an adequate escapement reaches the spawning grounds and to provide for hatchery brood stock and for subsistence, personal use, and sport fisheries;

(3), (4) repealed 4/28/84.

(c) — (h) Repealed 4/28/84.

(i) Salmon, other than chinook salmon, may be taken in the vicinity of the former Native village of Batzulnetas under the following conditions:

(1) unless modified by this subsection, 5 AAC 01.001 — 5 AAC 01.040 and 5 AAC 01.600 — 5 AAC 01.645 apply to this fishery;

(2) salmon may be taken only under the authority of a Batzulnetas subsistence salmon fishing permit issued by the department;

(3) salmon may be taken only in those waters of the Copper River between ADF&G regulatory markers located near the mouth of Tanada Creek and approximately one-half mile downstream from that mouth and in Tanada Creek between ADF&G regulatory markers identifying the open waters of the creek;

(4) fish wheels and dip nets only may be used on the Copper River; dip nets and spears only may be used in Tanada Creek;

(5) salmon may be taken only from June 1 through September 1 or until the season is closed by emergency order; fishing periods are to be established by emergency order and are two days per week during the month of June and 3.5 days per week for the remainder of the season;

(6) chinook salmon taken must be released to the water unharmed; fish wheels must be equipped with a live box or be monitored at all times;

(7) annual bag and possession limits are as specified in 5 AAC 01.630(f);

(8) the permit must be returned to the department's Glennallen office no later than September 30 of each year. (In effect before

54

5 AAC 01.648    FISH AND GAME    5 AAC 01.648

1984; am 4/28/84, Register 90; am 6/2/88, Register 106; am 4/30/91, Register 118; readopt 5/15/93, Register 126)

**Authority:** AS 16.05.251    AS 16.05.258

Editor's notes. — At its February 23 — 27, 1993 meeting, the Board of Fisheries readopted 5 AAC 01.647 in its entirety without change, under ch. 1    SSSLA 1992 (the 1992 subsistence law), which repealed and reenacted AS 16.05.258.

**5 AAC 01.648. PRINCE WILLIAM SOUND SUBSISTENCE SALMON FISHERIES MANAGEMENT PLANS.** (a) Salmon may be taken for subsistence purposes in those waters of the Southwestern District, as described in 5 AAC 24.200, and along the northwestern shore of Green Island from the westernmost tip of the island to the northernmost tip, only as follows:

(1) repealed 6/27/93;

(2) salmon may be taken only by gillnets up to 150 fathoms in length, except that pink salmon may be taken in fresh water by dip nets only;

(3) salmon may be taken only from May 15 through September 30;

(4) fishing periods are,

(A) from May 15 until two days before the commercial opening of the Southwestern District, seven days per week;

(B) during the commercial salmon fishing season, only during open commercial salmon fishing periods;

(C) from two days following the closure of the commercial salmon season until September 30, seven days per week;

(5) no fishing is allowed within the closed waters areas described in 5 AAC 24.350 and 5 AAC 39.290 for commercial salmon fisheries; only pink salmon may be taken in fresh water;

(6) there are no bag and possession limits for this fishery;

(7) permits may be issued only at Chenega Bay village.

(b) Salmon may be taken for subsistence purposes in those waters north of a line from Porcupine Point to Granite Point, and south of a line from Point Lowe to Tongue Point, only as follows:

(1) repealed 6/27/93;

(2) salmon may be taken only by gillnets up to 150 fathoms in length, with a maximum mesh size of 6.25 inches, except that pink salmon may be taken in fresh water by dip nets only;

(3) salmon may be taken only from May 15 through October 31;

(4) fishing periods are,

(A) from May 15 until two days before the commercial opening of the Eastern District, seven days per week;

(B) during the commercial salmon fishing season, only during open commercial salmon fishing periods;

55

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

NO. 94 - 35480

STATE OF ALASKA
Plaintiffs-Appellant,

vs.

BRUCE BABBITT, Secretary of Interior, et al.,

Defendants-Appellees

APPEAL FROM THE JUDGMENT OF THE UNITED STATES
DISTRICT COURT, DISTRICT OF ALASKA
D.C. NO. CV-A92-00264-HRH
CONSOLIDATED

<u>BRIEF FOR APPELLANT STATE OF ALASKA</u>

BRUCE M. BOTELHO
ATTORNEY GENERAL

Joanne M. Grace
Assistant Attorney General
Office of the Attorney General
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
(907) 269-5100

## TABLE OF CONTENTS

TABLE OF CASES AND AUTHORITIES . . . . . . . . . . . . . . . . iii

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . 4

I.   THE DISTRICT COURT ERRED IN HOLDING THAT CONGRESS
     INADVERTENTLY NEGLECTED TO GRANT MANAGEMENT AUTHORITY TO
     THE SECRETARY; IN TITLE VIII CONGRESS DELIBERATELY
     PRESERVED STATE AUTHORITY TO MANAGE FISH AND GAME ON
     PUBLIC LANDS EVEN WITHOUT A STATEWIDE LAW. . . . . . . . 4

     A.   ANILCA'S PLAIN LANGUAGE INDICATES THAT CONGRESS
          INTENDED THE STATE TO MANAGE FISH AND GAME ON
          PUBLIC LANDS. . . . . . . . . . . . . . . . . 5

          1. ANILCA Changed Existing Management Authority
             Only as Provided, and ANILCA Does Not Vest the
             Secretary With Authority to Manage Fish and
             Wildlife. . . . . . . . . . . . . . . . . 5

          2. Congress Intended the State to Regulate Fish
             and Wildlife on Public Lands Even if The State
             Does Not Enact and Implement a Statewide
             Subsistence Law Guaranteeing a Rural
             Preference. . . . . . . . . . . . . . . . . 6

          3. Title VIII Prescribes a Judicial Rather Than an
             Administrative Remedy to Those Entitled to the
             Subsistence Priority. . . . . . . . . . . . 9

          4. Congress Did Not Intend to Give the Secretary
             Authority to Manage Fish and Game through the
             General Rulemaking Authority of § 814 or
             through the Broad Purposes of the Act. . . . . 11

     B.   ANILCA'S LEGISLATIVE HISTORY CONFIRMS THAT CONGRESS
          DECIDED NOT TO GRANT THE SECRETARY AUTHORITY TO
          ENFORCE THE FEDERAL SUBSISTENCE RIGHT, AND INTENDED
          THE COURT TO BE THE EXCLUSIVE ENFORCER OF THE
          RIGHT. . . . . . . . . . . . . . . . . . . . 12

          1.   The Initial Udall Bill Gave the Secretary
               Complete Management Authority. . . . . . . . 13

2.  The House Interior Committee Bill in the 95th
    Congress Gave the Secretary Authority to
    Displace State Management. . . . . . . . . .    13

3.  The House Merchant Marine Committee Bill Gave
    the Secretary Selective Closure Authority. . .    14

4.  The Senate Energy Committee Bills in the 95th
    and 96th Congresses Gave the Secretary
    Judicial Enforcement Authority. . . . . . .    16

5.  The Subsistence Provisions of ANILCA as Enacted
    Gave the Secretary No Enforcement Authority. .    19

C.  CONGRESS INTENDED THE SECRETARY TO IMPLEMENT THE
    SUBSISTENCE PRIORITY IN HIS TRADITIONAL ROLE AS
    MANAGER OF THE PUBLIC LANDS. . . . . . . . . .    20

D.  THE  AGENCY  INTERPRETATION  IS  NOT  ENTITLED  TO
    DEFERENCE. . . . . . . . . . . . . . . . . .    23

II. THE DISTRICT COURT ERRED IN HOLDING THAT CONGRESS INTENDED
    "PUBLIC LANDS" TO INCLUDE NAVIGABLE WATERS. . . . . . .    24

A.  THE  PLAIN  LANGUAGE  OF  ANILCA  DEMONSTRATES  THAT
    CONGRESS DID NOT INTEND TITLE VIII TO APPLY TO THE
    NAVIGABLE WATERS OF ALASKA. . . . . . . . . . . .    24

B.  THE  NAVIGATIONAL  SERVITUDE  IS  NOT  AN  INTEREST  TO
    WHICH THE UNITED STATES HOLDS TITLE. . . . . . . .    26

C.  A BROAD READING OF TITLE VIII VIOLATES THE "CLEAR
    STATEMENT"  DOCTRINE  OF  INTERPRETING  STATUTES
    ENACTED UNDER THE COMMERCE CLAUSE. . . . . . . .    31

D.  CONGRESS DID NOT INTEND TO PROVIDE A PRIORITY TO ALL
    AREAS WHERE SUBSISTENCE USES OCCURRED. . . . . .    33

CONCLUSION  . . . . . . . . . . . . . . . . . . . . .    34

STATEMENT OF RELATED CASES  . . . . . . . . . . . . . .    35

ii

entitling the Secretary to deference in his judgments.

## II. THE DISTRICT COURT ERRED IN HOLDING THAT CONGRESS INTENDED "PUBLIC LANDS" TO INCLUDE NAVIGABLE WATERS.

The district court also erred in holding that the subsistence priority applies to all navigable waters in Alaska. ANILCA's plain terms do not provide this, but the court accepted the argument that if the United States has any property interest in Alaska's navigable waters, then those waters become "public lands." This interpretation greatly expands the meaning of ANILCA's definitional provision by rendering any lands or waters in which the United States has even a small, partial interest "public lands."

### A.  THE PLAIN LANGUAGE OF ANILCA DEMONSTRATES THAT CONGRESS DID NOT INTEND TITLE VIII TO APPLY TO THE NAVIGABLE WATERS OF ALASKA.

ANILCA's plain terms indicate that Congress did not intend "public lands" to include all lands or waters in which the United States holds any interest.  ANILCA defines "public lands" as follows:

> (1)  The term "land" means lands, waters, and interests therein.

> (2)  The term "Federal land" means lands the title to which is in the United States after December 2, 1980.

> (3)  The term "public lands" means land situated in Alaska which, after December 2, 1980, are Federal lands, except [for certain lands selected but not yet conveyed].

16 U.S.C. 3102(1)-(3).  Under this definition, "public lands" are lands, waters, and interests therein, title to which is in the United States.  The district court found the navigational servitude to constitute an interest in waters to which the United States holds title and concluded that therefore all navigable waters are

"public lands" for purposes of ANILCA.

For the navigational servitude to convert all navigable waters into public lands, however, would require that "public lands" be defined as "lands and waters in which the United States holds title to any interest."  Section 102 is not this broad; as this Court essentially has noted, under § 102, only the interest to which the United States holds title constitutes "public lands," not all lands in which the United States has any interest.  See City of Angoon v. Hodel, 803 F.2d 1016, 1027-28 n.6 (9th Cir. 1986), cert. denied, 484 U.S. 870 (1987) ("Since the United States does not hold title to the navigational servitude, the servitude is not 'public land' within the meaning of ANILCA").

Therefore, even assuming that the navigational servitude were an interest to which the United States holds title, only the interest, the servitude, would constitute public lands, not all navigable waters in Alaska.  This makes sense in the context of ANILCA as a whole, to which § 102's definition applies.  By including as "public lands," lands, waters, and interests therein owned by the federal government, Congress empowered the Secretary to promulgate regulations applicable to less than full fee title interests.  Thus, for example, the Secretary could manage as "public lands" lands the United States leases within a federal enclave, but his control would be limited to that permitted a lessee. A provision in ANILCA authorizing him to dispose of public lands would permit him to dispose only of the leasehold interest, not to convey fee title.  Only the leasehold interest is "public lands"; the fact that the United States has some interest does not

25

convert the entire bundle of sticks to "public lands."

Such a result would be absurd. This interpretation of § 102 would render most private lands in Alaska "public lands" under ANILCA. Under 43 U.S.C. 945, all patents for land taken up after August 30, 1890 west of the 100th meridian are issued subject to a reserved federal right-of-way for construction of ditches and canals. See Ide v. United States, 263 U.S. 497 (1924). Under the district court decision, federal "title" to this interest renders these private lands "public lands." Obviously Congress did not intend this result; by including "interests" that the United States holds in lands and waters, Congress authorized the Secretary to manage and control less than full fee interests, and these interests constitute "public lands." Assuming therefore that the navigational servitude were an interest to which the United States holds title, only the interest would be "public lands," not all the navigable waters to which it applies. The Secretary's inability to convey or manage the navigational servitude as habitat reflects the fact that it is not a property interest, but is a federal power.

## B.  THE NAVIGATIONAL SERVITUDE IS NOT AN INTEREST TO WHICH THE UNITED STATES HOLDS TITLE.

The district court held that the navigational servitude is an "interest" in the waters of Alaska to which the federal government holds title, and that therefore Alaska's navigable waters are "public lands" pursuant to § 102(3). ER at 39. In so concluding, the district court disregarded Ninth Circuit precedent directly on point. In City of Angoon v. Hodel, 803 F.2d at 1027-1028 n.6, the Ninth Circuit explicitly rejected the argument that the United

26

States holds title to the navigational servitude, concluding that the servitude is not public land within the meaning of ANILCA. The district court distinguished <u>Angoon</u> because its "issues were different from those in this case." ER at 36-37:

> <u>Angoon</u> did not involve the scope of federal and state management of fish, nor did it address the subtleties regarding the terms "interests" or "title" presented by this case. The Ninth Circuit's observation in <u>Angoon</u>, that the United States does not hold title to the navigational servitude, appears to be premised on the conclusion that the servitude is a "power of government" rather than a property interest. <u>Angoon</u> contains no analysis of the character of the navigational servitude.

That <u>Angoon</u> did not raise the scope of federal and state management of fish is irrelevant to its control of this case. <u>Angoon</u> raised the issue of whether § 810, which requires the Secretary to consider the impact on subsistence of activities on "public lands," applied to the granting of permits under the Clean Water Act. The plaintiffs argued that the Secretary must follow § 810 because these determinations used "public lands," namely the navigational servitude. 803 F.2d at 1027-28 n. 6. In finding that the United States does not have title to an interest in the navigational servitude, this Court defined "public lands" for purposes of § 810, but the same definition is applicable to all of title VIII and all of ANILCA. Therefore, that <u>Angoon</u> did not raise the scope of fisheries management is inconsequential.

The district court's other distinguishing point, that the Ninth Circuit apparently premised its holding on the conclusion that the servitude is a "power of government" rather than a property interest, should have prompted the court to follow rather than disregard <u>Angoon</u>. The fact that the navigational servitude is a

27

power rather than a property interest is the Ninth Circuit's <u>ruling</u> in the case; the plaintiffs had argued that the navigational servitude was a geographically-defined property interest to which the United States holds title, and the Ninth Circuit rejected the argument.    <u>See</u> Petition for Writ of Cert. to the U.S. Court of Appeals for the Ninth Circuit, ER at 61; Federal Opposition, ER at 74.    <u>Angoon</u>'s holding is indistinguishable on any relevant ground, and the district court was bound to follow it.

The district court relied instead on <u>Boone v. United States</u>, 944 F.2d 1489 (9th Cir. 1991).    <u>Boone</u> raised the issue of whether the navigational servitude gave the public the right to boat on a lagoon.    The Ninth Circuit found the navigational servitude inapplicable, but nevertheless discussed it:

> The label, "servitude," implies a property interest.  How a constitutional grant of authority to Congress creates such an interest is explained in <u>United States v. Twin City Power Co.</u>, 350 U.S. 222 ... (1956).  The Court stated:
>
> > "The interest of the United States in the flow of a navigable stream originates in the Commerce Clause.  That Clause speaks in terms of power, not of property.  But the power is a dominant one which can be asserted to the exclusion of any competing or conflicting one.  The power is a privilege which we have called 'a dominant servitude,' or 'a superior navigational easement.'"
> <u>Id.</u> at 224-25... (citations omitted).

<u>Boone</u>, 944 F.2d at 1494 n.9.    The district court placed undue significance on this discussion, which is not in any sense a reconsideration of the principle decided in <u>Angoon</u>.    <u>Boone</u> did not involve ANILCA; the discussion the district court finds controlling was dictum; and the case quotes the U.S. Supreme Court for the proposition that the navigational servitude originates in the Commerce Clause, which speaks in terms of power, not of property.

28

The only sentence even marginally relevant simply states that one aspect of the navigational servitude is analogous to a property interest, the fact that the power is dominant and can be asserted to the exclusion of any competing or conflicting one. It does not state that the navigational servitude <u>is</u> a property interest; the Supreme Court made clear that it is not in <u>Twin City Power</u>, as quoted in <u>Boone</u>. Like all the federal government's constitutional powers and unlike property interests, the navigational servitude is bound to the sovereign, which cannot convey it to another party. A federal Constitutional power is not something to which the United States "has title," even if it has some similarity to a property interest. Therefore, this Court's discussion of the navigational servitude as a dominant servitude does not warrant the conclusion that Congress intended to include navigable waters as public lands because it is an interest to which the United States has title.

The district court also relied on <u>Amoco Production Co. v. Village of Gambell</u>, 480 U.S. 531 (1987). <u>Gambell</u> raised the issue of whether the outer continental shelf ("OCS") constituted "public lands" under ANILCA § 102. The court found that the OCS is not "public land" because it is outside the boundary of Alaska. In dictum, it stated that while the United States may not hold title to the submerged lands of the OCS, it hesitated to conclude that the United States did not hold title to any interests therein. <u>Id.</u> at 548 n. 15. The district court concluded from this statement that the term "title" in § 102 can refer to less than technical fee title, and therefore the United States holds title to an interest in the navigable waters of Alaska. ER at 39.

29

The district court again overstated the significance of the Supreme Court's statement. While the Supreme Court was hesitant to conclude that the United States did not hold title to any interests in the submerged lands, it did not imply that federal title to an interest in the OCS would convert it to public lands. Section 102 makes clear that only the interest itself to which the United States holds title constitutes public lands. Therefore, Amoco cannot be cited as support for the district court's holding that "title" to the navigational servitude converts all navigable waters into public lands subject to the provisions of ANILCA.[8]

Congress itself has defined the navigational servitude as regulatory authority rather than a property interest. In the Submerged Lands Act, 43 U.S.C. 1301-1315, Congress defined the navigational servitude expressly to exclude any ownership rights. In confirming in and granting to states title to certain submerged lands, the United States retained:

> all its navigational servitude and rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, navigation, national defense, and international affairs, all of which shall be paramount to, but shall not be deemed to include, proprietary rights of ownership....

---

[8]    Furthermore, the interest of the United States in the OCS is quite different than its interest in navigable waters. The United States has a property interest in the oil and gas in the OCS, which it leases to private entities. Congress has declared the OCS to be an area appurtenant to the United States, subject to its jurisdiction, control, and power of disposition. Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. 1331-1356, 1332(1). The purpose of the OCSLA was to assert the exclusive jurisdiction and control of the United States vis-a-vis the states over the seabed and subsoil of the outer continental shelf and to provide for the development of its vast mineral reserves. Gulf Offshore Co. v. Mobil Oil Corp., 453 U.S. 473, 470 n.7 (1981).

30

43 U.S.C. 1314 (emphasis added).  The district court's conclusion that the navigational servitude is a property interest of the United States is not shared by the Supreme Court, the Ninth Circuit, or Congress, and therefore it is extremely unlikely that Congress intended its definition of public lands to include navigable waters based on this unprecedented theory.[9]

## C.  A BROAD READING OF TITLE VIII VIOLATES THE "CLEAR STATEMENT" DOCTRINE OF INTERPRETING STATUTES ENACTED UNDER THE COMMERCE CLAUSE.

As additional grounds for its ruling, the district court found that Congress specifically invoked its constitutional authority under the commerce clause "to protect and provide the opportunity for continued subsistence uses" when it enacted title VIII.  ER at 41.  The finding that Congress has authority to manage fisheries in navigable waters does not substitute for principled statutory interpretation, however.  The Court should not find that Congress intended to exercise that authority unless it made that purpose plain.  The Supreme Court will interpret a law to affect all activities within Congress' control under its commerce power only if the statutory language or legislative history constitutes a clear statement that Congress intended to exercise this power in

---

[9]