**EXHIBIT A-3**

For Opinion See 72 F.3d 698Briefs and Other Related Documents
United States Court of Appeals,
Ninth Circuit.
Katie JOHN, et al., Plaintiff-Appellees,
v.
UNITED STATES OF AMERICA, et al., Defendants-Appellants.
No. 94-35481.
October 17, 1994.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ALASKA

Brief for Appellees Katie John, et al., and Alaska Federation of Natives
Robert T. Anderson, Lawrence A. Aschenbrenner, Heather Kendall, Native American
Rights Fund, 310 "K" Street, Suite 708, Anchorage, Alaska 99501, (907) 276-0680,
Attorneys for Katie John, et al., and Alaska Federation of Natives

**\*i TABLE OF CONTENTS**

TABLE OF AUTHORITIES ... iii

STATEMENT OF JURISDICTION ... 1

ATTORNEY'S FEES ... 1

STATEMENT OF THE CASE ... 1

SUMMARY OF ARGUMENT ... 9

ARGUMENT ... 10

I. THE APPLICABLE RULES OF STATUTORY CONSTRUCTION SUPPORT THE DISTRICT COURT'S
DECISION ... 10

 A. Congress Has Spoken Directly To The Public Lands Issue So That The Secretary's
Narrow Interpretation Of The Definition Is Not Entitled To Any Deference ... 10

 B. Title VIII of ANILCA Is Remedial Indian Legislation That Should Be Broadly
Construed To Accomplish Its Purpose ... 12

II. THE STATE'S INTERPRETATION OF THE PUBLIC LANDS DEFINITION IMPERMISSIBLY EXCLUDES
ANY INTERESTS IN WATER FROM THE STATUTE AND ERRS IN FOCUSING ON THE IRRELEVANT
FACTOR OF OWNERSHIP OF THE SUBMERGED LANDS ... 14

III. THE NAVIGATIONAL SERVITUDE ... 18

 A. The Navigational Servitude Constitutes The Paramount Interest In All Navigable
Waters ... 18

 B. The Interplay Between *Amoco Production Co. v. Gambell* And *Angoon v. United
States* ... 25

IV. WATERS TO WHICH THE UNITED STATES HOLDS RESERVED RIGHTS ARE "PUBLIC LANDS" AS
DEFINED BY ANILCA ... 28

 A. Federal Reserved Water Rights Constitute Interests In Lands, Title To Which Is
Held By The United States ... 28

**\*ii**  B. The United States Holds Reserved Water Rights To The Waters Of Wrangell-St.

Elias National Park And Preserve ... 31

CONCLUSION ... 33

STATEMENT OF RELATED CASES ... 33

CERTIFICATE OF SERVICE ... 34

## *iii TABLE OF AUTHORITIES

**CASES**

*Alaska v. Ahtna, Inc.,* 891 F.2d 1401 (9th Cir. 1989), *cert. denied,* 495 U.S. 919 (1990) ... 18

*Alaska v. Babbitt,* No. 94-35480 ... 11

*Amoco Production Co. v. Village of Gambell,* 480 U.S. 531 (1987) ... *passim*

*Arizona v. California,* 373 U.S. 546 (1963) ... 16, 28

*Bobby v. Alaska,* 718 F. Supp. 764 (D. Alaska 1989) ... 4

*Boone v. United States,* 944 F.2d 1489 (9th Cir. 1991) ... 25

*California Oregon Power Co. v. Beaver Portland Cement Co.,* 295 U.S. 142 (1935) ... 16

*California v. Tahoe Regional Planning Agency,* 766 F.2d 1308 (9th Cir. 1985) ... 10

*Cappaert v. United States,* 426 U.S. 128 (1976) ... 28, 29, 32

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984) ... 10

*City of Angoon v. Hodel,* 803 F.2d 1016 (9th Cir. 1986), *cert. denied,* 484 U.S. 870 (1987) ... 9, 25

*Colville Confederated Tribes v. Walton,* 647 F.2d 42 (9th Cir.), *cert. denied,* 454 U.S. 1092 (1981) ... 28, 33

*Conrad Inv. Co. v. United States,* 161 F. 829 (9th Cir. 1908) ... 28

*Escondido Mut. Water Co. v. F.E.R.C.,* 692 F.2d 1223 (9th Cir. 1982), *rev'd in part, aff'd in part, Escondido Mutual Water Co. v. La Jolla Indians,* 466 U.S. 765 (1984) ... 30

*Gibson v. United States,* 166 U.S. 269 (1897) ... 19

*Gilman v. Philadelphia,* 70 U.S. (3 Wall.) 713 (1865) ... 18, 23

*iv Hill v. Newman,* 5 Cal. 445 (1855) ... 30

*Ide v. United States,* 263 U.S. 497 (1924) ... 20

*International Paper Co. v. United States,* 282 U.S. 399 (1931) ... 29

*John, et al. v. State of Alaska,* No. A85-698 ... 6

*Kaiser Aetna v. United States,* 444 U.S. 164 (1979) ... 18, 20

*Kenaitze Indian Tribe v. Alaska,* 860 F.2d 312 (9th Cir. 1988), *cert. denied,* 491 U.S. 905 (1989) ... 1, 4, 5, 17

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Kleppe v. New Mexico, 426 U.S. 529 (1976)* ... 23

*Lewis Blue Point Oyster Cultivation Co. v. Briggs*, 229 U.S. 82 (1913) ... 18, 19, 20

*Louisville Bridge Co. v. United States, 242 U.S. 409 (1917)* ... 19

*McDowell v. Alaska, 785 P.2d 1 (Alaska 1989)* ... 4, 6

*NLRB v. United Food and Commercial Works Union*, 484 U.S. 112 (1987) ... 11

*Native Village of Quinhagak v. United States, et al.*, No. 93-35496 (9th Cir. Sept. 1, 1994) ... 2, 9

*People of the Village of Gambell v. Clark, 746 F.2d 572 (9th Cir. 1984)*, rev'd on other grounds, sub nom., *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531 (1987) ... 12, 13

*Pollard's Lessee v. Hagan, 44 U.S. (3 How.) 212 (1845)* ... 16, 23

*Presley v. Etowah County Comm'n, 502 U.S. 491, 112 S. Ct. 820 (1992)* ... 11

*In re Rights to Use Water in Big Horn River, 753 P.2d 76 (Wyoming 1988)*, aff'd, 492 U.S. 406 (1989) ... 28

*Scranton v. Wheeler, 179 U.S. 141 (1900)* ... 19

*Shively v. Bowlby*, 152 U.S. 1 (1894) ... 16

*Toibb v. Radloff, 501 U.S. 157 (1991)* ... 11

*Union Bank v. Wolas, 502 U.S. 115, 112 S. Ct. 527 (1991)* ... 11

**V** *Union Bridge Co. v. United States, 204 U.S. 364 (1907)* ... 19

*United States v. Adair, 723 F.2d 1394 (9th Cir. 1983)*, cert. denied, 467 U.S. 1252 (1984) ... 28, 29, 33

*United States v. Ahtanum Irrig. Dist., 236 F.2d 321 (9th Cir. 1939)*, cert. denied, 352 U.S. 988 (1957) ... 28

*United States v. Alaska, 423 F.2d 764 (9th Cir. 1970)* ... 28

*United States v. Alexander, 938 F.2d 942 (9th Cir. 1991)* ... 2

*United States v. Appalachian Power Co., 311 U.S. 377 (1940)* ... 18

*United States v. California, 332 U.S. 19 (1947)* ... 21, 22

*United States v. California, 436 U.S. 32 (1978)* ... 22

*United States v. Cherokee Nation of Oklahoma, 480 U.S. 700 (1987)* ... 18

*United States v. Chicago, Minneapolis, St. Paul & Pac. R.R., 312 U.S. 592 (1941)* ... 19

*United States v. Commodore Park, 324 U.S. 386 (1945)* ... 19, 21, 25, 26

*United States v. Cress, 243 U.S. 316 (1917)* ... 18

*United States v. Handy, 761 F.2d 1279 (9th Cir. 1985)* ... 30

*United States v. Kansas City Ins. Co., 339 U.S. 799 (1950)* ... 24

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16058590 (C.A.9)                                        Page 4
**(Cite as: 1994 WL 16058590)**

*United States v. Louisiana, 339 U.S. 699 (1950)* ... 21, 22

*United States v. New Mexico, 438 U.S. 696 (1982)* ... 28, 32

*United States v. Rands, 389 U.S. 121 (1967)* ... 19

*United States v. Texas, 339 U.S. 707 (1950)* ... 21, 22

*United States v. Virginia Elec. & Power Co., 365 U.S. 624 (1961)* ... 26

*United States v. Vogler, 859 F.2d 638 (9th Cir. 1988)*, *cert. denied*, 488 U.S. 1006 (1989) ... 23

*Untied States v. Walker River Irrigation Dist., 104 F.2d 334 (9th Cir. 1939)* ... 28

**\*vi** *Winters v. United States, 207 U.S. 564 (1908)* ... 28

**CONSTITUTION, STATUTES AND REGULATIONS**

*U.S. Const.* art. IV, § 3, cl. 2 ... 23

16 U.S.C. § 1 ... 32

16 U.S.C. § 410hh ... 32

16 U.S.C. § 410hh(9) ... 32

16 U.S.C. § 796(11) ... 30

16 U.S.C. § 797(e) ... 30

16 U.S.C. § 1371(b) ... 5

16 U.S.C. § 1539(e) ... 5

16 U.S.C. § 3102(1) ... 14

16 U.S.C. § 3102(2) ... 14

16 U.S.C. § 3102(3) ... 14

16 U.S.C. § 3111(4) ... 5, 13, 23

16 U.S.C. § 3113 ... 5, 9, 28

16 U.S.C. § 3114 ... 5, 9, 11, 28

16 U.S.C. § 3117 ... 1

16 U.S.C. § 3117(a) ... 1

16 U.S.C. § 3202(a) ... 12

28 U.S.C. § 1362 ... 1

43 U.S.C. § 1301 ... 22, 26

43 U.S.C. § 1302 ... 26

**\*vii** 43 U.S.C. § 1311(a) ... 22, 26

43 U.S.C. § 1313(a) ... 22

43 U.S.C. § 1314(a) ... 22, 23, 26

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16058590 (C.A.9)                                                    Page 5
**(Cite as: 1994 WL 16058590)**

43 U.S.C. § § 1601 *et seq* ... 3

43 U.S.C. § 1603(b) ... 4

Act of July 7, 1958, Pub. L. 85-508, section 4, 72 Stat 339 ... 3

Act of Dec. 18, 1971, Pub. L. No. 92-203, 85 Stat. 688 ... 3

Act of Dec. 2, 1980, Title VIII, Pub. L. No. 96-487, 94 Stat. 2371 ... 2, 4

Treaty of March 30, 1867, art. III, 15 Stat. 539 ... 3

35 Stat. 2149 ... 17

35 Stat. 2226 ... 17

50 C.F.R. § 100.3(b) ... 16

50 C.F.R. § 100.3(c) ... 16

50 C.F.R. § 100.4 ... 15

55 Fed. Reg. 9223 (March 12, 1990) ... 29

55 Fed. Reg. 23,522 (April 13, 1990) ... 6, 7

55 Fed. Reg. 23,526 (June 8, 1990) ... 7

55 Fed. Reg. 27,115 (June 29, 1990) ... 7

55 Fed. Reg. 27,122 (June 29, 1990) ... 7

57 Fed. Reg. 22,942 (May 29, 1992) ... 8

57 Fed. Reg. 22951 (May 29, 1992) ... 16

57 Fed. Reg. 22,952 (May 29, 1992) ... 8

**\*viii** 58 Fed. Reg. 54364 (Oct. 21, 1993) ... 2

5 AAC § 01.647(i) ... 6

**LEGISLATIVE MATERIAL**

H. Rep. No. 1045, Part I, 9th Cong., 2d Sess. 182 (1978) ... 27

H. Conf. Rep. No. 92-476, 92d Cong. 1st Sess. 37, *reprinted in* 1971 U.S. Code Cong. & Ad. News 2247 ... 4, 13

H.R. Rep. No. 215, 83d Cong. 1st Sess. (1953), *reprinted in* 1953 U.S. Code Cong. & Ad. News 1385 ... 23

125 Cong. Rec ... 5

126 Cong. Rec ... 13, 27

S. Rep. No. 96-413, 96th Cong. 1st Sess. 267-68 (1978), *reprinted in* 1980 U.S. Code Cong. & Ad. News 5211-5212 ... 12

S. Rep. No. 413, 96th Cong. 1st Sess., *reprinted in* 1980 U.S. Code Cong. & Ad. News 5070 ... 13

*Submerged Lands: Hearings Before the Senate Comm. on Interior and Insular Affairs,*

83d Cong., 1st Sess. 256 (1956) (statement of Harry Brockel) ... 22

**MISCELLANEOUS**

Bartke, *The Navigation Servitude and Just Compensation - Struggle for a Doctrine*, 48 Or. L. Rev. 1 (1968) ... 24

CASE, ALASKA NATIVES AND AMERICAN LAWS (1984) ... 4

CRIBBET, PRINCIPLES OF THE LAW OF PROPERTY (2d ed. 1975.) ... 15

LAWSON, INTRODUCTION TO THE LAW OF PROPERTY (1958 2d ... 15

Munro, *The Navigation Servitude and the Severance Doctrine*, 6 Land and Water L. Rev. 491 (1971) ... 24

R. CLARK, ED., WATERS AND WATER RIGHTS § 53.1 (1967) ... 30

Sol. Op. M-31634, *Fishing Rights of Alaska Indians* (Feb. 13, 1942) ... 3

**\*ix** Wiel, *Water Rights in the Western States* § 283 (3d. 1911) ... 30

*Federal Water Rights of the National Park Service, Fish and Wildlife Service, Bureau of Reclamation and the Bureau of Land Management*, 86 I.D. 553 (June 25, 1979) ... 31

## \*1 STATEMENT OF JURISDICTION

Plaintiffs-appellees Katie John, *et al.* agree with the United States' statement of jurisdiction, but add that the district court's jurisdiction was also based on § 807 of ANILCA, 16 U.S.C. § 3117, and 28 U.S.C. § 1362 (Indian tribe jurisdiction).

### ATTORNEY'S FEES

Plaintiffs-appellees seek an award of costs and attorney's fees pursuant to § 807(a) of AMLCA, 16 U.S.C. § 3117(a). *See Kenaitze Indian Tribe v. Alaska*, 860 F.2d 312, 318 n. 9 (9th Cir. 1988), *cert. denied*, 491 U.S. 905 (1989).

### STATEMENT OF THE CASE

### Factual Background

These consolidated cases[FN1] find their genesis in the State of Alaska's closure of an historic Native fishery at a site known as Batzulnetas, which is traversed by Tanada Creek and borders the Copper River within Wrangell-St. Elias National Park (maps attached as Addendum A).[FN2] Katie John is a seventy-nine year old upper Ahtna Athabaskan Indian and a member of Mentasta Village. She is the owner of a Native allotment at Batzulnetas, which is a fish camp site used and occupied by Katie John, her ancestors and her extended family for non-wasteful subsistence purposes from time immemorial. Doris Charles is an upper Ahtna elder who now resides in Dot Lake, Alaska and is the owner of a Native allotment located at Batzulnetas where she was born in 1902 and lived on a permanent basis until the early 1930s. Ms. Charles and her extended family have a long-standing custom and tradition of fishing on and near the site of her allotment. ER at 3.

> FN1. This case was consolidated in the district court with *Alaska v. Babbitt*, No. A92-264 (HRH), which is docketed on appeal to this court as No. 94-3540. The Alaska Federation of Natives (AFN) participated in that action as a defendant-intervenor, while the *John* plaintiffs participated in that action as a party upon its consolidation. CR 101. AFN participated in this action as *amicus curiae* prior to consolidation of the actions. CR 18.

> FN2. Both waterways have been administratively determined to be navigable. ER

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

at 24-25.

Mentasta Village Council is a traditional tribal council and constitutes the governing **2** body of Mentasta Village, which is a federally recognized Indian tribe. 58 Fed. Reg. 54364, 54369 (Oct. 21, 1993). Mentasta Village is located forty-eight miles southwest of Tok, and has a population of about 100. Its residents are heavily dependent upon gathering fish and wildlife for their subsistence needs. Nearly the entire population of the present village traces its familial roots to Batzulnetas. The members of Mentasta Village have a custom and tradition of carrying on subsistence activities at Batzulnetas and at other sites throughout a well-defined geographic area. From time immemorial those activities have been governed by traditional law and custom which is passed on from generation to generation. ER at 2-4. Batzulnetas is an important site for gathering food and is also central to the maintenance of Native culture. As noted by this Court in *Native Village of Quinhagak v. United States, et al.*, No. 93-35496 (9th Cir. Sept. 1, 1994), "Congress repeatedly and explicitly expressed its interest in protecting all subsistence uses against unnecessary regulatory interference," and "many Alaska natives who are not fully part of the modern economy rely on fishing for subsistence. If their right to fish is destroyed, so too is their traditional way of life." Slip op. at 10245, *quoting* United States v. Alexander, 938 F.2d 942, 945 (9th Cir. 1991).

Nevertheless, in 1964, State officials barred all subsistence fishing on tributaries of the Copper River and on the Copper River itself above its junction with the Slana River. ER at 74. The State's action exemplifies its pattern of discrimination against predominately Native upriver subsistence fisheries in favor of commercial fisheries located in marine waters. In 1980, Congress passed the subsistence title to the Alaska National Interest Lands Conservation Act (ANILCA)[FN3] in order to ensure that such upriver subsistence fisheries were preserved. Unfortunately, the State has failed utterly to comply with the congressional mandate and now seeks a ruling that would in effect eviscerate the Act. In order to understand the immediate controversy, a review of events leading to the adoption of

FN3. Act of Dec. 2, 1980, Title VIII, Pub. L. No. 96-487, 94 Stat. 2371, *codified at* 16 U.S.C. § § 3101, *et seq.*

**3** ANILCA and the subsequent federal takeover of subsistence regulation is necessary.

### The Regulatory Framework

The Treaty of Cession between Russia and the United States simply provided that the rights of the Native population would be subject to the same body of laws that govern Native American rights in general. Treaty of March 30, 1867, art. III, 15 Stat. 539. The situation remained the same through the formation of the territorial government in 1884 and Statehood in 1959. Throughout this period, the question of Native aboriginal rights was simply not addressed in a comprehensive manner. The Statehood Act continued this pattern by providing that "the State and its people do agree and declare that they forever disclaim all right and title... to any lands or other property (including fishing rights), the right or title to which may be held by any Indians, Eskimos, or Aleuts." Act of July 7, 1958, Pub. L. 85-508, section 4, 72 Stat. 339. Section 6(e) of the Act provided that the State would not obtain management authority "of the fish and wildlife resources of Alaska" until after the Secretary of Interior certified that the state "has made adequate provision for the administration, management, and conservation of said resources in the broad national interest." *Id*. That certification was obtained in 1959, and the State assumed management of fish and wildlife in 1960.

The State of Alaska used its newly-gained authority for the first time in the Copper River Basin in 1964 when it closed most of the plaintiffs' traditional fishing sites to subsistence fishing. ER at 3. This included the closure of the fishery at Batzulnetas. Prior to passage of the Alaska Native Claims Settlement Act in 1971 (ANCSA),[FN4] plaintiffs possessed unextinguished aboriginal fishing rights so that the State regulation was of doubtful validity. *See*, Sol. Op. M-31634, *Fishing Rights*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*of Alaska Indians* (Feb. 13, 1942), *reprinted in* I op. OF THE solicitor 1096, 1106 (concluding that "aboriginal occupancy **\*4** establishes possessory rights in Alaskan waters and submerged lands, and that such rights have not been extinguished by any treaty, statute, or administrative action").

> FN4. Act of Dec, 18, 1971, Pub. L. No. 92-203, 85 Stat. 688, codified at 43 U.S.C. § § 1601 *et seq.*

During the 1960s, the discovery of oil on Alaska's North Slope and the controversy engendered by the State's selection of lands subject to aboriginal title prompted Congress to extinguish Native claims of aboriginal title, including hunting and fishing rights. 43 U.S.C. § 1603(b). As the settlement bills moved through Congress, they contained various provisions providing for the protection of Native hunting and fishing rights. *See* CASE, ALASKA NATIVES AND AMERICAN LAWS 294-95 (1984). Although those provisions were deleted just prior to passage, the final conference committee report expressed the committee's understanding that Alaska Native subsistence uses would be protected. "The Conference Committee expects both the Secretary [of the Interior] and the State to take any action necessary to protect the subsistence needs of the Natives." H. Conf. Rep. No. 92-476, 92d Cong. 1st Sess. 37, *reprinted in* 1971 U.S. Code Cong. & Ad. News 2247, 2250.

By the late 1970s, however, it was clear that the State and Secretary were not living up to the expectations of Congress. "At least until 1983, it was a fact of Alaska political life that the state's Department of Fish and Game was dominated by non-Native urban, sports and commercial hunting [and] fishing interests." CASE, *supra*, at 296-97.[FN5] Work thus began on a subsistence title for inclusion in what became the Alaska National Interest Lands Conservation Act (ANILCA). Act of Dec. 2, 1980, Title VIII, Pub. Law No. 96-487, 94 Stat. 2371. In anticipation of ANILCA's passage, Alaska enacted its first subsistence law in 1978 - a subsistence law of general applicability with a priority that (at least in theory if not in practice) satisfied the version of ANILCA then being considered by Congress.[FN6]

> FN5. This Court's decisions in *Kenaitze Indian Tribe v. Alaska, 860 F.2d 312 (9th Cir. 1988)*, *cert. denied*, 491 U.S. 905 (1989), and *Native Village of Quinhagak v. United States, et al.*, No. 93-35496, (9th Cir. Sept. 1, 1994), demonstrate that little has changed since 1983.

> FN6. For the history of Alaska's subsistence laws in relation to Title VIII of ANILCA prior to the Alaska Supreme Court's decision in *McDowell v. Alaska, 785 P.2d 1 (Alaska 1989)*, see *Kenaitze Indian Tribe v. Alaska, supra*, n. 2; and *Bobby v. Alaska, 718 F. Supp. 764, 766-68 (D. Alaska 1989)*.

**\*5** It was the State's insistence that persuaded Congress to adopt a rural, rather than purely Native, priority. 125 Cong. Rec. 9904 (May 4, 1979) (Cong. Udall). *See also, Kenaitze Indian Tribe v. Alaska, 860 F.2d at 313 n. 1,* Congress was advised and believed that "because of restrictions imposed on State action by the Alaska Constitution... it would have been impossible for the State of Alaska to have developed a subsistence management program which provided a priority for Alaska Natives." *Id.* If anything, the approach adopted was a marked change in the manner in which Native hunting and fishing rights had been protected in Alaska in the past - even in the post-ANCSA era. *See, e.g.*, Marine Mammal Protection Act, 16 U.S.C, § 1371(b) (Native exemption to moratorium with State authority preempted); Endangered Species Act, 16 U.S.C. § 1539(e) (same). Thus, the State's repeated references to the continuation of the so-called "traditional balance" of state/federal authority, insofar as it infers a preference for state authority, misstates the true traditional balance. In fact, Congress was giving the State an unprecedented opportunity to exercise authority over Native hunting and fishing rights by adopting a law that complied with ANILCA. There is no indication that the federal government was abdicating its authority and responsibility to provide for the subsistence priority established in Title VIII.

It was against this backdrop that Congress established subsistence uses of fish and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16058590 (C.A.9)                                                Page 9
(Cite as: 1994 WL 16058590)

game as the priority use on the public lands. ANILCA § § 803 and 804; 16 U.S.C. § §
3113 and 3114. Indeed, Congress found that:
in order to fulfill the policies and purposes of the Alaska Native Claims Settlement
Act and as a matter of equity, it is necessary for the Congress to invoke its
constitutional authority over Native affairs and its constitutional authority under
the property clause and the commerce clause to protect and provided the opportunity
for continued subsistence uses on the public lands by Native and non-Native
residents.


16 U.S.C. § 3111(4).

**\*6 The Effect of ANILCA on State Regulation of the Batzulnetas Fishery** Four years
after this remedial statute was signed into law, the State Board of Fisheries
refused Katie John's and Doris Charles' request to re-open the fishery at
Batzulnetas. ER at 15. Plaintiffs responded by filing an action against the State in
1985 pursuant to § 807 of ANILCA to compel the State to re-open the historic
Batzulnetas fishery. *John, et al v. State of Alaska*, No. A85-698 Civil (HRH) (D.
Alaska). After extensive summary judgment proceedings, the State agreed to allow a
limited fishery at Batzulnetas. 5 AAC § 01.647(i); ER at 74. In 1990 the district
court set aside this restrictive State regulation and remanded the case to the Board
of Fisheries for further proceedings consistent with applicable state and federal
law. *John, et al., v. State of Alaska*, No. A85-698 Civil (HRH) Order on Summary
Judgment (January 19, 1990, D. Alaska). Before further action could be taken by the
Alaska Board of Fisheries on remand, the State's rural preference statute was
declared unconstitutional in *McDowell v. Alaska, 785 P.2d 1 (Alaska 1989)*. The
*McDowell* decision was stayed until July 1, 1990, to give the State time to amend its
Constitution, or otherwise bring its program into compliance with ANILCA. After
failing to act during its regular session in 1990, the State Legislature convened at
a special session to address subsistence issues, but it too failed to take action to
remedy the situation. As a result, the federal government announced its intent to
take over the management of subsistence uses effective July 1, 1990. 55 Fed. Reg.
23,522 (April 13, 1990).

From the outset of the federal takeover, it was apparent that the United States
adopted a "minimal intrusion" rationale as the foundation of its temporary
subsistence regulations. The government explained:
Given the short time frame to prepare this final temporary rule, and in anticipation
of the State returning to compliance with Title VIII, these temporary regulations
establish a Federal program that *minimizes change* to the State's program consistent
with meeting the Federal government's responsibilities under Title VIII. To do
otherwise would be extremely **\*7** disruptive to subsistence users and create
unnecessary chaos if and when the State is able to bring its subsistence program
back into compliance with ANILCA....
These temporary regulations will remain in place until December 31, 1991, or until
the State brings its subsistence program back into compliance with ANILCA, whichever
comes first.


*Id.* (emphasis added). The federal government adhered to this conservative strategy
when the temporary regulations became effective.
In view of the uncertainty over the resumption of State management of subsistence, a
major objective of the Federal program has been to *minimize disruption* to Alaska and
the State's continuing fish and game management.


55 Fed. Reg. 27,115 (June 29, 1990) (emphasis added). *See also*, 55 Fed. Reg. 23,522
(June 8, 1990) ("The Federal Government intends to *minimize disruption* to
traditional State regulation and management offish and wildlife.") (emphasis added).

It was in this context that the federal government initially adopted its
interpretation of the critical term "public lands" that is challenged here.
According to the interpretation first announced in the 1990 temporary regulations,
the Secretaries construed the term "public lands" as defined in ANILCA to exclude

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16058590 (C.A.9)                                              Page 10
**(Cite as: 1994 WL 16058590)**

all navigable waters. Indeed, the Secretaries' interpretation of public lands in the temporary regulations was so narrow as to exclude *all* waters. They defined "public lands" to include certain Federal lands, and "Federal lands means lands the title to which is in the United States." 55 Fed. Reg. 23,526 (June 8, 1990) (proposed temporary regulations); 55 Fed. Reg. 27,122 (June 29, 1990) (proposed regulations adopted without including statutory language pertaining to waters).

The federal government's explanation was that although the statute expressly encompasses *interests in waters* within the definition of "public lands," its temporary regulations excluded navigable waters from the "public lands" definition because "[t]he United States generally does not hold title to navigable waters." 55 Fed. Reg. 27,115 (June 29, 1990). There was no explanation of why any "interests in waters" to which the United States held title were excluded from the definition. This element of the public lands **8** definition was simply not addressed. In this manner, navigable waters were initially excluded without regard to whatever interests the United States might own in those waters.

When the final regulations were adopted, both the definition and the explanation changed, but the result remained essentially the same. The definition now tracked the statutory language, but without elaboration: "Federal lands means lands and waters and interests therein the title to which is in the United States." 57 Fed. Reg. 22,952 (May 29, 1992). Despite making this modification that appeared to conform the regulatory definition to the statute, the Secretaries announced that their interpretation of that language still excluded navigable waters. This time, however, their explanation for the exclusion was different. Abandoning their reliance on ownership of the water column itself as irrelevant, the Secretaries opined that the relevant inquiry was ownership of the land underlying the water.

Because *the United States does not generally own title to the submerged lands beneath navigable waters* in Alaska, the public lands definition in ANILCA and these regulations generally excludes navigable waters.

57 Fed. Reg. 22,942 (May 29, 1992) (emphasis added). As shown below, by placing the focus on ownership of the submerged lands, the United Sates failed to give full effect to the entire "public lands" definition.

In short, the Secretaries' interpretation of the statutory term "public lands" was nothing more than an exercise in expediency adopted for the purpose of minimizing disruption at a time when the federal government thought (or at least hoped) the Alaska Legislature would obviate the need for federal implementation of Title VIII by "fixing" *McDowell* with a State constitutional amendment. Unfortunately, the government's hopes were not realized. The question is no longer how to minimize interference with existing State management schemes that defy ANILCA. The question instead is how to fully implement the congressional mandate that there be a subsistence priority for rural residents **9** on the public lands under Title VIII. The district court's decision correctly gives effect to the plain meaning of the statute.

                              **SUMMARY OF ARGUMENT**

The United States' construction of the "public lands" definition is unlawfully narrow. It is inconsistent with the language of the statute and defies the manifest intent of Congress to provide protection for *all* subsistence uses of "*fish* and wildlife." The State of Alaska's interpretation is even more restrictive and would effectively eliminate subsistence fishing from ANILCA's coverage, despite the fact that fish are mentioned over twenty times in the operative sections of ANILCA, § § 803-805, 16 U.S.C. § 3113-3115.

The United States' change in position with regard to federally reserved waters provides some benefit to rural subsistence users. However, it simply does not come close to fulfilling the congressional mandate that subsistence uses be given priority on all the public lands and does not give effect to the plain meaning of the words in the statute. Much, if not most, subsistence fishing by rural Alaska Natives occurs in navigable waters that are outside of conservation system units.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16058590 (C.A.9)                                                    Page 11
**(Cite as: 1994 WL 16058590)**

*Native Village of Quinhagak v. United States, et al.*, No. 93– 35496, slip op. at
10243 n. 4 (9th Cir. Sept. 1, 1994) (non-navigable waters "cannot alone satisfy
subsistence fishing needs"). The critical issue presented in this case is whether
the federal government's navigational servitude constitutes "an interest in waters"
to which the United States has title. By failing to recognize that the term "title"
simply connotes a right of control and disposition – rights the United States
unquestionably exercises over waters subject to the navigational servitude – the
United States ignores the Supreme Court's decision in *Amoco Production Co. v.
Village of Gambell*, 480 U.S. 531, 548 n.15 (1987), and the reasoning underlying the
Supreme Court decisions involving the navigational servitude. That Supreme Court
decision effectively undercuts any precedential value that might otherwise be due to
this Court's decision in *City of Angoon v. Hodel*, 803 F.2d 1016, 1027–28 n.6 (9th
Cir. 1986), *cert. denied*, 484 U.S. 870 (1987), the case the federal and **\*10** State
governments claim is dispositive. The State and federal governments also ignore the
plain language of ANILCA and its legislative history, which compel the conclusion
that Congress intended the priority to extend to all customary and traditional
subsistence uses occurring in all navigable waters in Alaska. Accordingly, the
district court decision should be affirmed.

                                    **ARGUMENT**

   **I. THE APPLICABLE RULES OF STATUTORY CONSTRUCTION SUPPORT THE DISTRICT COURT'S
                                    DECISION**


   **A. Congress Has Spoken Directly To The Public Lands Issue So That The Secretary's
       Narrow Interpretation Of The Definition Is Not Entitled To Any Deference**


The district court applied a "reasonableness" standard to the federal government's
public lands definition on the ground that the definition supplied by Congress was
ambiguous. ER at 80. Although the district court did not conclude that the agency's
interpretation of the statute was "reasonable," (ER at 39–41) it erred by giving the
agency's interpretation any deference at all, and in its briefing on appeal the
government has abandoned its claim to deference. An agency's interpretation of a
statute is not controlling – "the courts are the final authority on questions of
statutory construction." *California v. Tahoe Regional Planning Agency*, 766 F.2d
1308, 1313 (9th Cir. 1985). That conclusion follows from the Supreme Court's
unequivocal directions:

When a court reviews an agency's construction of the statute which it administers,
it is confronted with two questions. *First, always, is the question whether Congress
has directly spoken to the precise question at issue*. If the intent of Congress is
clear, that is the end of the matter; for the court, as well as the agency, must
give effect to the unambiguously expressed intent of Congress. If, however, the
court determines Congress has not directly addressed the precise question at issue,
the court does not simply impose its own construction on the statute, as would be
necessary in the absence of an administrative interpretation. Rather, *if the statute
is silent or ambiguous with respect to the specific issue*, the question for the
court is whether the agency's answer is based on a permissible construction of the
statute.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–
43 **\*11** (1984) (emphasis added, footnotes omitted). *See also Presley v. Etowah County
Comm'n*, 502 U.S. 491, 112 S. Ct. 820, 831 (1992) ( "we defer to an administrative
interpretation of a statute... only if Congress has not expressed its intent with
respect to the question."); *NLRB v. United Food and Commercial Works Union*, 484 U.S.
112, 134 (1987) (Scalia, J., concurring) (key is whether "'the statute is silent or
ambiguous'"). In this case, the statutory term defining the scope of ANILCA's
subsistence priority is neither silent nor ambiguous. Congress provided a definition
of the phrase "public lands," using terms that themselves have a plain meaning.
Congress' failure to further define the words used in the definition does not render
the statute ambiguous. Indeed, "[t]he fact that Congress may not have foreseen all
of the consequences of a statutory enactment is not a sufficient reason for refusing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16058590 (C.A.9)                                              Page 12
**(Cite as: 1994 WL 16058590)**

to give effect to its plain meaning. _Toibb v. Radloff, 501 U.S. 157 (1991)_."_Union Bankv, Wolas, 502 U.S. 115,  , 112 S. Ct. 527, 531 (1991)_.

For its part, the State argues that the district court violated the State's rights when it construed the statute to give effect to every word and accomplish Congress' plain objective, _i.e._, the protection of Native subsistence rights. The State relies on a "clear statement"doctrine in support of its argument that Congress could not have intended to protect subsistence fishing in navigable or federal reserved waters. State's Br. at 31–34. This argument turns the whole premise of ANILCA's Title VIII on its head. Title VIII was intended to protect subsistence rights, not the State's rights. In fact, Congress announced its intent to preempt state fish and game law on the public lands in § 804of ANILCA, 16 U.S.C. § 3114, when it declared that "the taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded priority over the taking of such resources for other purposes." That surely manifests a clear intention to exercise the commerce power to preempt any inconsistent state law governing hunting and fishing on the "public lands." Moreover, the general disclaimer on which the State rests its case in _Alaska v. Babbitt_, No. 94-35480, provides that:
**\*12** Nothing in this Act is intended to enlarge or diminish the responsibility and authority of the State of Alaska for management of fish and wildlife on the public lands _except as may be provided in title VIII of this Act_, or to amend the Alaska constitution.


16 U.S.C. § 3202(a) (emphasis added). Thus, Congress plainly contemplated that Title VIII would alter the State's role with respect to management offish and wildlife on the "public lands." Otherwise, there would have been no need to exempt Title VIII from the general disclaimer.

The subsistence title was enacted expressly for purposes of changing the law in such a way as to force either the State or the Secretary to provide the priority for subsistence uses that they had failed to provide in the past. It was not, as the State would have it, adopted with an overriding goal of protecting the State's rights. For that reason, the Court need only address whether the navigational servitude can be considered an interest in waters to which the United States holds title within the context of the public lands definition of ANILCA.

## B. Title VIII of ANILCA Is Remedial Indian Legislation That Should Be Broadly Construed To Accomplish Its Purpose

Title VIII of ANILCA should be broadly construed to effect Congress' intended purpose of protecting subsistence uses. It was intended to remedy the State and federal governments' failure to protect Native subsistence rights as contemplated by Congress in 1971 when the Alaska Native Claims Settlement Act was passed. Moreover, any ambiguities in the Act should be resolved in favor of Alaska Natives who engage in subsistence uses. _People of the Village of Gambell v. Clark, 746 F.2d 572, 581 (9th Cir. 1984), rev'd on other grounds, sub nom., Amoco Production Co. v. Village ofGambell, 480 U.S. 531 (1987)_.  Title VIII was described as the "culmination of Congressional action initiated by Congress by the Alaska Native Claims Settlement Act to protect and provide for continued subsistence uses by Alaska Natives...." S. Rep. No. 96-413, 96th Cong. 1st Sess. 267–68 (1978), _reprinted in_ 1980 U.S. CODE CONG. & AD. NEWS 5211–5212. Congressman Morris Udall, the legislation's chief sponsor in the House, explained as **\*13** follows:
While the Alaska National Interest Lands Conservation Act obviously is not Indian legislation in its entirety, the subsistence title and the other subsistence related provisions are. _And under well-recognized canons of statutory construction, any ambiguities in the title and other provisions must be resolved in favor of the Alaska Native people_.


126 cong. rec. H29279 (Nov. 12, 1980) (emphasis added), quoted in _Village of Gambell v. Clark, supra, 746 F.2d at 581_. In addition, the congressional findings fully support the conclusion that Congress intended the term "public lands" to have an expansive purview. Congress found and declared that:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*in order to fulfill the policies and purposes of the Alaska Native Claims Settlement Act and as a matter of equity, it is necessary for the congress to invoke its constitutional authority over Native affairs* and its constitutional authority under the property clause and the commerce clause to protect and provide for the opportunity for continued subsistence uses on the public lands by Native and non-Native rural residents;

16 U.S.C. § 3111(4) (emphasis added). Indeed, the subsistence title was necessitated because the Secretary of Interior and the State failed to heed Congress' admonition that they "take any action necessary to protect the subsistence needs of the Natives." H. Conf. Rep. No. 746, 92d Cong. 1st Sess. 37, *reprinted in* 1971 U.S. code cong. & ad. news 2247, 2250; *see* S. Rep. No. 413, 96th Cong. 1st Sess., *reprinted in* 1980 U.S. code cong. & ad. news 5070, 5174-75. In essence, Title VIII brought back to life the aboriginal fishing rights extinguished in ANCSA. As this Court noted: "It is a reasonable assumption that Congress intended the preference and procedural protections for subsistence uses mandated by Title VIII of the Conservation Act to be co-extensive with the extinguishment of aboriginal rights that made those measures necessary." *Gambell, supra,* 746 F.2d at 580.

With this backdrop to the subsistence title, it is absurd in the extreme to construe the statute to exclude fishing from its coverage.

**\*14 II. THE STATE'S INTERPRETATION OF THE PUBLIC LANDS DEFINITION IMPERMISSIBLY EXCLUDES ANY INTERESTS IN WATER FROM THE STATUTE AND ERRS IN FOCUSING ON THE IRRELEVANT FACTOR OF OWNERSHIP OF THE SUBMERGED LANDS**

The Supreme Court in *Amoco Production Co. v. Village of Gambett,* 480 U.S. 531, 548, n.15 (1987), construed the very statute at issue in this case and rejected "the assertion that the phrase 'public lands,' in and of itself, has a precise meaning, without reference to a definitional section or *its context in a statute."* (emphasis added). The State and federal governments ignore this admonition and completely disregard the purposes of Title VIII of ANILCA as well as key words of the statute.

Analysis of the definition and the navigational servitude demonstrate the correctness of the district court's decision. The district court concluded that waters subject to the navigational servitude are "public lands" due to the United States' overriding ownership and control of such waters. As shown more fully below, navigable waters have always been considered public property – a proposition put forth by the United States in seminal cases before the Supreme Court. Moreover, contrary to their assertions, a decision that navigable waters are public lands for purposes of Title VIII of ANILCA would be limited to Alaska and would not have dire consequences for the rest of the Nation. Such a decision would not increase the power of the United States over navigable waterways beyond ensuring that the subsistence title of ANILCA is applicable to such waters. Indeed, the United States' navigational servitude is truly *sui generis* and gives the government control over navigable waters that exceeds its control over any other subject matter in the Nation.

Section 102 of ANILCA defines "public lands" as "federal lands," 16 U.S.C. § 3102(3). Federal lands "means lands, the title to which is in the United States after Dec. 2, 1980." 16 U.S.C. § 3102(2). Finally, "the term 'land' means lands, waters and interests therein." 16 U.S.C. § 3102(1). The Supreme Court has melded this tripartite definition, concluding that Congress defined" 'public lands' as 'lands, waters and interests therein' 'the **\*15** title to which is in the United States."' *Village of Gambell,* 480 U.S. at 548, n.15.

In *Village ofGambell, supra,* the Department of the Interior argued that § 810 of ANILCA did not apply to submerged lands in the Outer Continental Shelf (OCS) because the United States did not hold "title" to the OCS or its mineral resources. Although the Supreme Court ruled that the subsistence title of ANILCA does not apply to the OCS (because it is not "in Alaska"), it rejected the notion that "title" to an interest refers to fee title, or some technical record or deed title. Adopting the plain and ordinary meaning of the word "title" – which is simply the right to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

control or dispose of an interest – the Supreme Court specifically rejected the
claim that the United States did not hold title to interests in the OCS. The Court
stated:
The United States may not hold "title" to the submerged lands of the OCS, but we
hesitate to conclude that the United States does not have "title" to any "interests
therein." Certainly, it is not clear that Congress intended to exclude the OCS by
defining public lands as "lands, waters, and interests therein" "the title to which
is in the United States."

*Id.* Thus, in conformity with the plain language of ANILCA, the Supreme Court
concluded that the United States need not hold fee simple title to property; rather,
it need only possess *some interest* in the land or water to bring those lands or
waters within the definition of public lands. This conclusion is supported by the
plain meaning of the term "title." "Title is a term which is frequently used as
synonymous with ownership." Cribbet, *Principles of the Law of Property* 15 (2d ed.
1975.). "Title is a shorthand term used to denote the facts which, if proved, will
enable a plaintiff to recover possession or a defendant to retain possession of a
thing." *Id citing* Lawson, *Introduction to the Law of Property* 35 (1958 2d ed.).

Although the Final Rule adopted by the Secretaries of the Interior and
Agriculture[FN7] defines "public lands" in essentially the same manner as in the
statute, their application of **16** the definition is extremely narrow and would
exclude most Alaska waters. The rule provides that "[t]he regulations contained in
subpart D apply on all public lands including all non-navigable waters located on
these lands." 57 Fed. Reg. 22951 (May 29, 1992); 50 C.F.R. § 100.3(b). This
statement is followed by a list of waters which the United States considers public
lands, along with the caveat that the list may be modified "pending a Department of
Interior review of title and jurisdictional issues regarding certain submerged lands
beneath navigable waters in Alaska." 50 C.F.R. § 100.3(c).[FN8] The United States and
the State focus on ownership of the streambed as determining whether waters
constitute "public lands." While such ownership may be relevant in certain limited
circumstances, it generally has no bearing on the issue of whether the United States
holds "title to interests in water."[FN9]

    FN7. 55 Fed. Reg. 22592 (May 29, 1992); 50 C.F.R. § 100.4.

    FN8. The process the Secretaries undertook and the reasons for their narrow
    interpretation are detailed in the at pp. 1–9, *supra.*

    FN9. Indeed, the assertion (and State's concession) that the United States has
    an interest in non-navigable waters overlying federal lands is surprising and
    demonstrates the lack of principle in their respective positions. It has long
    been the law that non-navigable waters on federal public lands are generally
    available for appropriation under state law, *California Oregon Power Co. v.
    Beaver Portland Cement Co., 295 U.S. 142 (1935)*, unless such waters are
    subject to the federal reserved rights doctrine. The United States simply owns
    the land beneath non-navigable waterways, and thus it is hard to imagine what
    "interests" the United States has in the water itself. Neither the State nor
    federal government explains what interest the United States has in such
    waters.

In *Arizona v. California, 373 U.S. 546 (1963)*, the Supreme Court answered arguments
by the State of Arizona that the federal government lacked power to obtain property
rights in water after Arizona attained Statehood. Arizona argued that under the
equal footing doctrine, the State had obtained title to the lands underlying
navigable waters and thus had exclusive control of the waters. The Court rejected
its argument:
Arizona's contention that the Federal Government had no power, after Arizona became
a State, to reserve waters for the use and benefit of federally reserved lands rests
largely upon statements in *Pollard's Lessee v. Hagan, 3 How. 212 (1845)*, and *Shively
v. Bowlby, 152 U.S. 1 (1894)*. Those cases and others that followed them gave rise to
the doctrine that lands underlying navigable waters within territory acquired by the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Government are held in trust for future States and that title to such lands is automatically vested in the
**\*17** States upon admission to the Union. *But those cases involved only the shores of and lands beneath navigable waters*. They do not determine the problem before us and cannot be accepted as limiting the broad powers of the United States to regulate navigable waters under the Commerce Clause and to regulate government lands under Art. IV, 3, of the Constitution. We have no doubt about the power of the United States under these clauses to reserve water rights for its reservations and its property.


*Id.* at 587–98.

Without making a distinction between ownership of the streambed and ownership of an interest in flowing waters, the Secretaries' explanation in the Final Rule applies the "public lands" definition solely to waters which overlie submerged lands to which the United States holds title, *i. e.*, non-navigable waters over federal lands and navigable waters over land withdrawn prior to statehood. With respect to the latter category, however, the United States has not extended its regulatory authority to such pre-statehood withdrawals as the Chugach National Forest and the Tongass National Forest. *See* 35 Stat. 2149 & 2226 (maps showing the extent of these 1907 and 1909 withdrawals). Thus, the federal government's application of ANILCA's "public lands" definition is not only inconsistent with the plain language of ANILCA, it is internally inconsistent with respect to waters overlying pre-statehood withdrawals.

The federal defendants' and the State's refusal to acknowledge the unquestionable federal "interest" in navigable waters is very similar to the wooden and stingy analysis condemned by this Court in *Kenaitze Indian Tribe v. State of Alaska*, 860 F.2d 312 (9th Cir. 1988), *cert. denied*, 491 U.S. 905 (1989). The United States and Alaska seek to apply "an unusual definition" of a phrase in order to deny the subsistence priority. *Id.* at 316. As shown below, the waters of Wrangell–St. Elias National Park are "public lands" by virtue of the navigational servitude and alternatively, because the waters are "federally reserved."

### \*18 III. THE NAVIGATIONAL SERVITUDE

### A. The Navigational Servitude Constitutes The Paramount Interest In All Navigable Waters


Whether or not a waterway is navigable is important because navigable and non-navigable waters have different attributes with regard to federal authority under the navigational servitude. All waters that are navigable in fact and in their natural condition are subject to the United States' navigational servitude and as such constitute the "public property of the nation." *Oilman v. Philadelphia*, 70 U.S. (3 Wall.) 713, 724 (1865).[FN10]

> FN10. The standards for determining whether a body of water is navigable are set forth in *Alaska v. Ahtna, Inc.*, 891 F.2d 1401, 1404 (9th Cir. 1989), *cert. denied*, 495 U.S. 919 (1990). There is also authority for the proposition that waters which are capable of becoming navigable with reasonable improvements are also subject to the servitude. *United States v. Appalachian Power Co.*, 311 U.S. 377, 407–408 (1940); *cf. Kaiser Aetna v. United States*, 444 U.S. 164, 171 (1979) (inferring that *Appalachian Power* adopted a definition of navigability for purposes other than "delimit [ing] the boundaries of the navigational servitude"). This Court, however, need not deal with the niceties of this issue, for the question here is the character of the servitude in relation to the public lands definition applicable to Title VIII of ANILCA,

The consequences that flow from application of the navigational servitude relate principally to the lack of an obligation to pay compensation under the Fifth Amendment to property owners whose interests in the natural stream are impaired when

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the servitude is invoked. *United States v. Cherokee Nation of Oklahoma*, 480 U.S. 700, 704-05 (1987); *United States v. Cress*, 243 U.S. 316, 320 (1917); *Lewis Blue Point Oyster Cultivation Co. v. Briggs*, 229 U.S. 82 (1913). By contrast, where a body of water is non-navigable, the United States may not effect a taking of the property interests without the payment of just compensation under the Fifth Amendment.[FN11] For example, in *Kaiser Aetna v. United States*, 444 U.S. 164 (1979), the United States could not force the private owner of a **\*19** formerly non-navigable fish pond to allow access to the public simply because the owner had constructed improvements that made the pond into a navigable marina connected to the ocean. The Court concluded that such a result would result in a taking of the owner's power to exclude others from his property. If the United States wishes to remove such a property right in originally non-navigable waters, it must do so in a manner consistent with the Fifth Amendment's command that just compensation be paid.

FN11. It is important to note, however, that both navigable and non-navigable waterways are clearly subject to Congress' authority under the Commerce Clause:
Reference to the navigability of a waterway adds little if anything to the breadth of Congress' regulatory power over interstate commerce. It has long been settled that Congress has extensive authority over this Nation's waters under the Commerce Clause.
*Kaiser Aetna v. United States*, 444 U.S. at 173.

On the other hand, the Supreme Court has held that the United States need not compensate property owners when exercise of the navigational servitude results in loss of riparian access,[FN12] loss of use of submerged lands,[FN13] or loss of structures blocking navigation.[FN14] Even in the context of otherwise compensable takings, the Supreme Court has refused to grant compensation for losses of property value attributable to, or dependent upon, exercise of the servitude. *United States v. Rands*, 389 U.S. 121 (1967). In *Scranton v. Wheeler*, 179 U.S. 141 (1900), the United States constructed a pier that blocked a riparian owner from access to the navigable stream fronting his property and thus prohibited him from utilizing a log transfer facility. The Court denied the claim for compensation and stated:

FN12. *See, e.g.,* *United States v. Commodore Park*, 324 U.S. 386 (1945); *Gibson v. United States*, 166 U.S. 269 (1897).

FN13. *See, e.g.,* *United States v. Chicago, Minneapolis, St. Paul & Pac. R.R.*, 312 U.S. 592 (1941); *Lewis Blue Point Oyster Cultivation Co. v. Briggs*, 229 U.S. 82 (1913).

FN14. *See, e.g.,* *Louisville Bridge Co. v. United States*, 242 U.S. 409 (1917); *Union Bridge Co. v. United States*, 204 U.S. 364 (1907).

Whatever the nature of the interest of a riparian owner in the submerged lands in front of his upland bordering on a public navigable water, his title is not as full and complete as his title to fast land which has no direct connection with the navigation of such water. *It is a qualified title, a bare technical title, not at his absolute disposal, as is his upland*, but to be held at all times subordinate to such use of the submerged lands and of the waters flowing over them as may be consistent with or demanded by the public right of navigation.
*Id.* at 163-64 (emphasis added).

**\*20** In other words, private citizens, or even states, have no compensable property rights when the United States properly exercises its navigational servitude. This is because the bundle of sticks that make up their property rights are all subject to the paramount navigational servitude, *i.e.*, the owner of the submerged lands or water rights in a navigable waterway simply do not have any property rights when measured against the United States' interest in the land or water.[FN15]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN15. Moreover, the servitude reaches across the entirety of the water surface. *See* _Kaiser-Aetna, 444 U.S. at 171 n.6,_ *quoting*, _33 C.F.R. § 328.4 (1978)._ Thus, the State's argument that the public lands definition only applies to the interest to which the United States has title, State's Br. at 25-26, takes the State nowhere. The navigational servitude is ever-present on all navigable waters and thus makes all those waters public lands within the meaning of ANILCA. The State's arguments based on the ditch easement statute are likewise inapposite. The easements are reserved only to allow the federal government to obtain a means for transportation of water across neighboring lands for federal water projects. It is not a right retained by the United States that is in any way similar to the navigational servitude since the reservation is of a right to construct narrow ditches or canals across land conveyed by the federal government. The very terms of the statute demonstrate that the easement may only be exercised with the United States permission and the purpose of the easement is to allow irrigation of adjacent lands. _Ide v. United States, 263 U.S. 497 (1924)._ Indeed, one need only compare the impressive body of law surrounding the navigational servitude with the State's *reductio* argument to see its lack of merit.

The position taken by the United States, State of Alaska and their *amid* is also inconsistent with the position of the United States in many of the seminal cases that defined the nature of the navigational servitude. For example, in _Lewis Blue Point Oyster Cultivation Co. v. Briggs, 229 U.S. 82 (1913)_, the United States sought to dredge a channel under a navigable waterway. The submerged land was leased by an oyster farmer from a private owner who had received title to the submerged land pursuant to New York law. The farmer claimed that the dredging would destroy many of the oyster beds. Contrary to the position it now takes, the United States commenced its argument to the Court by stating:
Conceding, for the purpose of the argument, that the New York property rights of the plaintiff in error are the utmost which a private person can possibly hold in the bed of a navigable stream within that State, it is thoroughly settled, even under the local law, that they are subject, *as a matter of property title*, to a limitation, in the nature of an easement, servitude, or trust, in favor of the necessities of navigation (the "*jus publicum*").
United States' Br. in *Lewis Blue Point Oyster Cultivation Co. v. Briggs*, at 2 (April 23, 1913) (attached as Addendum B). The United States further described the servitude as a **\*21** "public property easement." *Id.* at 7. In answer to the question of whether the oyster bed owner was due compensation, the Court held:
By necessary implication from the dominant right of navigation, title to such submerged lands is acquired and held subject to the power of Congress to deepen the water over such lands, or to use them for any structure which the interest of navigation, in its judgment, may require. *The plaintiff in error has, therefore, no such private property right which, when taken, or incidentally destroyed by the dredging of a deep water channel across it, entitles him to compensation as a condition.*

*Id.* at 88 (emphasis added).

In _United States v. Commodore Park, 324 U.S. 386 (1945)_, the construction of a naval base resulted in the filling in of certain navigable and non-navigable waterways adjacent to Willoughby Bay, a navigable body of water. The riparian land owners above the filled areas consequently lost value in their property because they could no longer access the waterway. One landowner sued for damages under the Tucker Act and was granted relief by the district court. The appellate court affirmed and the United States sought review in the Supreme Court. In its brief on the merits to the Court, the United States began its summary of argument by stating:
Willoughby Bay and Mason's Creek, like other navigable waters of the United States, *are the public property of the nation*, and any private rights therein are subject to the servitude in respect of navigation created in favor of the federal government by the constitution.
Br. of the United States in *United States v. Commodore Park*, at 10 (January 1945) (emphasis added) (Addendum C). The Supreme Court agreed and denied the claim for compensation.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16058590 (C.A.9)                                              Page 18
**(Cite as: 1994 WL 16058590)**

The source and nature of this federal interest was articulated by the Supreme Court in the "paramountcy cases." *See United States v. Texas, 339 U.S. 707 (1950); United States v. Louisiana, 339 U.S. 699 (1950);* and *United States v. California, 332 U.S. 19 (1947).* In these cases, the Supreme Court rejected the claims of coastal states that they held title to submerged lands within their territorial waters. In doing so, the Court held that "paramount **\*22** rights in and power over" the coastal zone vest in the federal government and that "acquisition" of the coastal zone is an incident of national sovereignty. *California, 332 U.S. at 34, 39; Louisiana, 339 U.S. at 704; Texas, 339 U.S. at 719.*

The Submerged Lands Act confirms the principle, made explicit by the "paramountcy" cases, that the navigational servitude is an "interest in water" to which the United States holds title. Since the "paramountcy" cases had cast a cloud upon the presumed state title to the submerged lands beneath navigable waters, the states lobbied Congress for legislation which would remove that cloud.[FN16] In 1953, Congress enacted the Submerged Lands Act, 43 U.S.C. § 1301, which conveyed to the several states "title to and ownership of the lands beneath navigable waters." 43 U.S.C. § 1311(a). State's Br. at 30. Additionally, and of greatest importance here, the Act provides that:

> FN16. *See, e.g., Submerged Lands: Hearings Before the Senate Comm. on Interior and Insular Affairs*, 83d Cong., 1st Sess. 256 (1956) (statement of Harry Brockel).

the United States retains all its navigational servitude and rights and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, navigation, defense and international affairs, all of which shall be paramount to, but shall not be deemed to include proprietary rights of ownership....

43 U.S.C. § 1314(a). *See United States v. California, 436 U.S. 32, 41 n.18 (1978).* This reservation of the navigational servitude expressly declares the servitude to be paramount to, but not inclusive of, the states' rights of ownership and control of those lands and resources conveyed by other sections of the act. *Id* In other words, the navigational servitude retained the same character in relation to the marginal sea that it has with regard to inland navigable waters. *See, e.g., Lewis Blue Point Oyster Cultivation Co. v. Briggs, supra.*

The State and federal governments place far too much reliance on the portion of the Submerged Lands Act vesting "the states with title to the lands beneath navigable waters within [their] boundaries and the natural resources within such lands and waters...." 43 U.S.C. § 1313(a), United States' Br. at 20, and the disclaimer of proprietary rights of **\*23** ownership in 43 U.S.C. § 1314(a). State's Br. at 30. The Act was only intended to restore the submerged lands in the marginal sea to the assumed state ownership believed to exist before the Supreme Court's rulings in the paramountcy cases. H.R. Rep. No. 215, 83d Cong. 1st Sess. (1953), *reprinted in* 1953 U.S. CODE CONG. & ad. news 1385, 1395.[FN17] No change was made in the character of the servitude and it retains the same dominant quality that caused the United States in 1912 to characterize it as "*the public property of the Nation.*" United States Br. in *Lewis Blue Point Cultivation Co., supra*, at 6, *quoting Gilman v. Philadelphia, 70 U.S. (3 Wall.) 713, 724 (1865)* (Addendum B). The exercise of the servitude is also grounded in Congress' power under the Commerce Clause, but in exercising its ownership rights, the unmistakable effect of the servitude is that the United States in effect has title to navigable waters. It thus may adversely affect the property interests of others without payment of compensation. That is surely "an interest" in waters.

> FN17. Before the paramountcy cases were decided, the common belief was that the rule of *Pollard's Lessee v. Hagan, 44 U.S. (3 How.) 212 (1845),* applied to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the marginal sea as well as to inland navigable waters.

That the navigational servitude constitutes an interest in water for purposes of ANILCA is further confirmed by the fact that Congress derived its authority for enacting Title VIII of ANILCA not only from the Property and Indian Commerce Clauses, but also from the Commerce Clause - the same clause in which the navigational servitude is grounded. 16 U.S.C. § 3111(4). Under the property clause, U.S. Const., art. IV, § 3, cl. 2, which the Supreme Court has described as vesting Congress with authority over public lands "without limitation," Kleppe v. New Mexico, 426 U.S. 529, 539 (1976), Congress has all the authority it needs to regulate fish and wildlife on federally-owned fast lands. See also, United States v. Vogler, 859 F.2d 638, 641 (9th Cir. 1988), cert, denied, 488 U.S. 1006 (1989) ("the United States can prohibit absolutely or fix the terms on which its property may be used"). In light of its exclusive authority over "public lands" and over "Indian affairs," Congress had no need to invoke its authority under the Commerce Clause in enacting Title **24 VIII of ANILCA, except for the fact that it intended the subsistence priority for fishing to extend to all navigable waters in Alaska - not just to lands which it owned in fee simple title. In order to accomplish that goal, it defined "public lands" broadly to include lands, waters and interests therein, thus placing all navigable waters within the scope of the definition.

Indeed, as the commentators have pointed out, prior decisions issued by the Supreme Court make sense only if the United States owns the navigational servitude, Bartke, The Navigation Servitude and Just Compensation - Struggle for a Doctrine, 48 Or. L. Rev. 1, 2 (1968) ("the interest should be recognized for what it is and be dealt with in the context of the property clause of the Constitution"). In Munro, The Navigation Servitude and the Severance Doctrine, 6 Land and Water L. Rev. 491, 503 (1971), the author states:
This [navigational servitude] is a far cry from a mere regulatory power. It is in effect ownership of the entire stream flow. Thus the navigational servitude is regarded as a property right under the administration of the Congress. If that property right is appropriated by others, it makes little sense to insist that the government should pay to reclaim its own property.


The federal and State governments' reliance on the language in Supreme Court opinions that characterizes the navigational servitude as simply a regulatory power ignores reality. If it were a mere power exercised pursuant to the commerce clause, compensation would be required for harm to property owners. As the Supreme Court has explained, "[i]t is not the broad constitutional *power* to regulate commerce, but rather the *servitude* derived from that power and narrower in scope that frees the government from liability." United States v. Kansas City Ins. Co., 339 U.S. 799, 808 (1950) (emphasis added). In other words, since the government is exercising its navigational servitude, it need not pay compensation, because the servitude constitutes an interest in waters superior to the property rights of private individuals and the states.

## *25 B. The Interplay Between *Amoco Production Co. v. Gambell* And *Angoon v. United States*

The United States' and State's assertions that the navigational servitude does not constitute an interest in waters to which the United States holds title rests on a single conclusory footnote statement in City of Angoon v. Hodel, 803 F.2d 1016, 1027-28 n.6 (9th Cir. 1986), cert, denied, 484 U.S. 870 (1987). The district court correctly concluded that the Angoon holding has been effectively undermined by the subsequent decisions in Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 548 n.15 (1987), and Boone v. United States, 944 F.2d 1489 (9th Cir. 1991). ER at 89-92.

In its criticism of the district court's ruling, the State adheres to its narrow construction of the term "title," which, as shown above, is simply a right of ownership or control. The State also persistently ignores the fact that the construction of title it advances is identical to the theory advanced by the United States and rejected by the Supreme Court in *Gambell*. Moreover, as the district court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

stated, the navigational servitude may not be a fee simple property right, but it does not follow that the servitude is not an "interest in water" which, as the Supreme Court pointed out in *Gambell*, might bring these waters within the "public lands" definition of ANILCA. That the *Angoon* Court overlooked this point can be explained by the fact that it handed down its decision in 1986, before *Gambell* was decided the following year. Indeed, the *Angoon* Court and the district court devoted a total of four sentences to the issue.

In addition, the Supreme Court cases cited by the *Angoon* Court do not stand for the proposition that the navigational servitude does not constitute an "interest in waters" to which the United States holds "title," *i.e.*, a paramount right to and power over navigable waters. In <u>United States v. Commodore Park, 324 U.S. 386 (1945)</u>, the Court dealt with a complaint for damages by a private property owner whose land was reduced in value because the government altered a navigable stream adjacent to his property. The Court **26** responded that:
[r]espondent's property was always *subject to a dominant servitude*; it did not have a vested right to have this navigable stream remain fixed and unaltered simply because of the consequent reflected additional value to adjacent lands. Whatever market value of riparian lands may be attributable to their closeness to navigable waters, does not detract from the government's "absolute" power in the interests of commerce, to make necessary changes in a stream.
*Id.* at 391 (emphasis added; footnote omitted). The Court in <u>United States v. Virginia Elec. & Power Co., 365 U.S. 624, 627–28 (1961)</u>, the other case cited by the *Angoon* Court, describes the navigational servitude as a "dominant servitude." A dominant servitude is unquestionably an interest in land. Of more importance, the Supreme Court's intervening *Gambell* decision implicitly overrules, *City of Angoon*. Indeed, the arguments made by the State and federal governments were expressly rejected by the Supreme Court in *Gambell*. In *Gambell* the United States argued that: Second, the OCS is not "federal land" as defined by the Act. ANILCA's definition of "federal lands" reflects the traditional notion that public lands are only those in which the United States holds formal "title." During the last four decades, however, Congress has deliberately and repeatedly declined to equate the federal government's interest in the OCS with formal title....

Congressional enactments reflect this settled and carefully drawn characterization of the federal interest in the OCS. In the Submerged Lands Act of 1953, <u>43 U.S.C. § 1301</u> *et seq.*, Congress carefully distinguished the "title" to the seabed granted to the states from the "jurisdiction and control" over the OCS retained by the federal government. *See* <u>43 U.S.C. 1302</u>, <u>1311(a)(1)</u>, <u>1314(a)</u>. In the Outer Continental Shelf Lands Act of 1953, enacted just a few months later, Congress similarly avoided a formal claim of title and instead declared that "the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition."
United States' Br. at 30–31 (July 1986)(relevant portions attached as Addendum D), *compare* State's Br. at 29–30. The United States even cited to congressional reports stating that "[t]he U.S. does not hold title to the OCS, nor is the OCS subject to 'sale or other disposition under general laws.'" *Id.* In its Reply, the United States strongly reasserted its position. *See* United States Reply Br. at 9–12 (December 1986)(Addendum E)

The Supreme Court flatly rejected the arguments of the United States:
**27** The United States may not hold "title" to the submerged lands of the OCS, but we hesitate to conclude that the United States does not have "title" to any "interests therein." Certainly, it is not clear that Congress intended to exclude the OCS by defining public lands as "lands, waters, and interests therein" "the title to which is in the United States."

<u>480 U.S. at 548.</u> The State's attempt to resurrect these arguments must therefore fail.

Finally, the legislative history is replete with statements of congressional intent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16058590 (C.A.9)                                              Page 21
**(Cite as: 1994 WL 16058590)**

to extend the § 804 priority to the taking of fish for subsistence purposes in all waters in Alaska. Congressman Udall explained in detail the congressional understanding that § 804 applied to all navigable waters in Alaska:
As long ago as August of 1977 Governor Hammond testified to the importance to resource protection that one management system, and one manager, be in control of fish and wildlife resources throughout their range. This is particularly important with fishery resources. Consequently, it *has always been our intent to apply the subsistence preference to all fish stocks in the waters of Alaska.* This result enables the State of Alaska to continue its lead in fisheries management without unnecessary disruption. *It also should be stressed that if for any reason the State should ever repeal its subsistence statute, this preemptive section would continue the subsistence preference for fish throughout the waters of Alaska.*

126 CONG. REC. 29280 (November 12, 1980) (Cong. Udall) (emphasis added). Most of the more than two hundred small Native villages in Alaska, including plaintiff Villages, are located on the coast of the North Pacific or Arctic Oceans, the shore of a lake or along a river. The proximity to water is no accident. Rather, it reflects the dependence of Native and other "rural Alaska residents" on access to fish stocks for sustenance and as the basis of their traditional way of life. As the House Interior Committee described the situation in 1977: "There are more than 200 rural communities throughout Alaska. In many, fresh meat, and produce are unavailable except through the subsistence harvest." H. Rep. No. 1045, Part I, 9th Cong., 2d Sess. 182 (1978) (emphasis added). *See* CR 19 (documenting the importance of fishery resources to Alaska Natives, which comprise over 60% of the annual subsistence take).

The State and federal government's construction of the public lands definition would **\*28** be flatly inconsistent with congressional intent and the words of the statute. They accordingly must be rejected.

### IV. WATERS TO WHICH THE UNITED STATES HOLDS RESERVED RIGHTS ARE "PUBLIC LANDS" AS DEFINED BY ANILCA

#### A. Federal Reserved Water Rights Constitute Interests In Lands, Title To Which Is Held By The United States

The district court also agreed that certain waters could be considered public lands based on the federal reserved rights doctrine, ER at 84-85, although it declined to rest its decision on this more narrow ground. The United States now agrees that reserved water rights are interests in waters to which it holds title, but the State holds to its position that such waters may not be considered public lands. Under the State's theory, subsistence fishing would not receive any protection under ANILCA – despite the fact that fish are mentioned over 20 times in the operative sections of the statute. 16 U.S.C. § 3113-3115. An examination of the reserved rights doctrine demonstrates the flaws in the State's attempt to stamp out any protection for rural subsistence fishers.

When the United States reserves land from the public domain for certain purposes, it also reserves sufficient water to fulfill the stated purposes. *Arizona v. California, 373 U.S. 546, 601 (1963)*; *see also United States v. New Mexico, 438 U.S. 696 (1982)* (reserved water rights for national forests); and *United States v. Alaska, 423 F.2d 764 (9th Cir. 1970)* (Kenai Moose Range).[FN18] The clearest explication of the doctrine is found in *Cappaert v. United States, 426 U.S. 128 (1976)*, where the Court stated that:

    FN18. The federal reserved water rights doctrine was first applied in *Winters v. United States, 207 U.S. 564 (1908)*, a case involving the Fort Belknap Indian Reservation. The doctrine has since been routinely applied to Indian reservations. *See, e.g., In re Rights to Use Water in Big Horn River, 753 P.2d 76, 100-01 (Wyoming 1988), aff'd, 492 U.S. 406 (1989)*; *United States v. Adair, 723 F.2d 1394 (9th Cir. 1983), cert, denied, 467 U.S. 1252 (1984)*; *Colville*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Confederated Tribes v. Walton, 647 F.2d 42 (9th Cir.)*, *cert, denied*, *454 U.S. 1092 (1981)* *United States v. Ahtanum Irrig. Dist., 236 F.2d 321 (9th Cir. 1939)*, *cert, denied*, *352 U.S. 988 (1957)*; *United States v. Walker River Irrigation Dist., 104 F.2d 334 (9th Cir. 1939)*; *Conrad Inv. Co. v. United States, 161 F. 829, 832 (9th Cir. 1908)*.

This Court has long held that when the Federal Government withdraws land from the public domain and reserves it for a federal purpose, the Government, **29** by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation. In so doing the United States acquires a reserved right in unappropriated water which vests on the date of the reservation and is superior to the rights of future appropriators. Reservation of water rights is empowered by the Commerce Clause, Art. I, § 8, which permits federal regulation of navigable streams, and the Property Clause, Art. IV, § 3, which permits federal regulation of federal lands. This doctrine applies to Indian reservations and other federal enclaves, encompassing water rights in navigable and non-navigable streams....

In determining whether there is a federally reserved water right implicit in a federal reservation of public land, the issue is whether the Government intended to reserve unappropriated and thus available water. Intent is inferred if the previously unappropriated waters are necessary to accomplish the purpose for which the reservation was created.

*Cappaert, 426 U.S. at 138–39* (citations omitted).

The owner of a reserved water right has the power to stop others from interfering with the use of such reserved water. This is the case whether the waters have been reserved for consumptive uses such as irrigation, or for non-consumptive uses such as instream flows to support fish populations. As this Court has stated, the owner of reserved instream flow rights has "*the right to prevent other appropriators from depleting the stream waters below a protected level in any area where the non-consumptive use applies*" *United States v. Adair, 723 F.2d 1394, 1411 (9th Cir.)*, *cert. denied*, *467 U.S. 1252 (1984)* (emphasis added). The Department of the Interior has declared that "Indian water rights are vested property rights for which the United States has a trust responsibility, with the United States holding *legal title* to such water in trust for the *Indians.*" *55 Fed. Reg. 9223 (March 12, 1990)* (emphasis added). If the United States holds "title" to Indian reserved rights, it is difficult to comprehend why it does not hold "title" to other federal reserved rights.

Moreover, the Supreme Court has ruled that owners of water rights possess a property interest for which the United States must pay compensation if it takes the water pursuant to any power *except* the navigational servitude. *International Paper Co. v. United States, 282 U.S. 399, 407 (1931)*. In the course of discussing whether water rights constitute property interests, this Court held that:

**30** First of all, water rights are interests in land:
A water right is generally considered to be real property or "land." As Wiel says, "the right to the flow and use of water being a right in a natural resource, is real estate." A water right is real property for purposes of determining title in a quiet-title action, a mortgage recording requirement, satisfying the statute of frauds, descent and inheritance, and taxation.
1 R. Clark, ed., *Waters and Water Rights* § 53. 1 at 345 (1967) (footnotes omitted). *See* *Hill v. Newman, 5 Cal. 445 (1855)*; 1 Wiel *Water Rights in the Western States* § 283 (3d. 1911) (further citations omitted).
*Escondido Mut. Water Co. v. F.E.R.C., 692 F.2d 1223, 1235–36 (9th Cir. 1982)*, *rev'd in part, aff'd in part, sub. nom. Escondido Mutual Water Co. v. La Jolla Indians, 466 U.S. 765 (1984)*. Although this Court's *Escondido* decision was reversed in part, the Supreme Court noted "that for many purposes water rights are considered to be interests in lands." *Id.* at 765.[FN19]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN19. The issue in *Escondido* was whether reserved water rights constituted "reservations" within the meaning of the Federal Power Act. 16 U.S.C. § 797(e). The Court construed "reservation" to include only the geographic reservation and not other reserved rights that are outside of the reservation boundaries. In another part of the FPA, the Court noted, Congress has expressly defined "project" to include "'all water rights... lands, or interests in lands'.... 16 U.S.C. § 796(11). Had Congress thought that water rights were always covered by the term 'interests in lands' it would not have felt it necessary to refer to water rights." 466 U.S. 765, 781 n.25. The same is true with respect to ANILCA's public lands definition. If Congress had meant only to include fast lands, it would not have referred to *interests in water* in the definition.

Water rights are property and as such constitute "interests in water" which the United States owns. If, as the State asserted below, one can never hold title to an interest in water, the portion of the "public lands" definition that extends to "interests therein" is rendered superfluous. Under that reading of the statute, public lands consist only of "lands [and] waters, *fee* title to which is in the United States." The correct reading, as the Supreme Court held in *Gambell*, is that the definition includes "lands, waters *and interests therein*" to which the United States holds title. 480 U.S. at 548 n. 15 (emphasis added). The State's construction would drop the italicized language from the statute. It is a cardinal rule of statutory construction that federal agencies must seek to give effect to every word in a statute. *United States v. Handy*, 761 F.2d 1279, 1280 (9th Cir. 1985). The language used **\*31** by Congress extends the definition of public lands to all waters in which the United States holds title to an interest. Reserved water rights fall within the plain language of the statute.

**B. The United States Holds Reserved Water Rights To The Waters Of Wrangell-St. Elias National Park And Preserve**

The United States now agrees that through the reserved water rights doctrine the United States holds a significant and currently unquantified interest in the waters of the Copper River and Tanada Creek at the Batzulnetas site. United States Br. at 27. That is the end of the matter. As the "holder" of reserved rights to the waters of Tanada Creek and the Copper River, the United States has "title" to an interest in those waters. The *John* plaintiffs agree with the United States' analysis insofar as it supports the conclusion that reserved water rights are interests in water to which it holds title and set out some additional support for the proposition that the waters at issue in this case are in fact subject to the reserved rights doctrine.

The conclusion that the United States owns reserved rights to all waters within the Park is supported by an opinion on the issue by the Solicitor of the Department of Interior. In 1979 the Solicitor published a comprehensive Opinion discussing "the nature and extent of the United States' rights to use water on the federal lands administered by the National Park Service... [and other agencies] within the Department of Interior." *Federal Water Rights of the National Park Service, Fish and Wildlife Service, Bureau of Reclamation and the Bureau of Land Management*, 86 I.D. 553 (June 25, 1979) (hereinafter Solicitor's Opinion).[FN20] The Solicitor first addressed whether a reserved water right should be implied for certain national parks created by Congress prior to 1916. That early legislation described park purposes simply as the "preservation of natural resources and curiosities, and public enjoyment thereof." 86 I.D. at 595. The Solicitor stated that:

FN20. This Solicitor's Opinion has been supplemented twice, but neither supplement has disturbed the portions that deal with federal reserved water rights. *See* 88 IX). 1055 n.2 (1981); and 88 IX). 253, 254 n.3 (1981).

**\*32** In *United States v. New Mexico, [438 U.S.] at 709-11,* the Court intimated in *dictum* that the early park legislation's express concern for the natural curiosities and biotic elements would allow the assertion of reserved water rights required to fulfill such purposes. *But see id.* at 711, fn. 19. Like the 1916 Act discussed

below, these broadly articulated purposes support a variety of reserved water
rights, both consumptive and non-consumptive, and the priority date for such claims
is the pre-1916 date of each area's enabling legislation.
*Id.* (footnote omitted). In 1916 the Congress adopted an organic act providing for a
central administration and containing what the Solicitor described as an "enduring
statement of purpose." *Id.* The general purpose of the park system "is to conserve
the scenery and the national and historic objects and the wild life therein." 16
U.S.C. § 1.[FN21] This statement of purpose, the Solicitor concluded, established
reserved water rights for:


> FN21. Wrangell-St. Elias National Park was designated by Congress to "be
> administered by the Secretary under the laws governing the administration of
> such lands and under the provisions of this Act." 16 U.S.C. § 410hh. Congress
> thus intended the generally stated purposes embodied in 16 U.S.C. § 1 to
> apply to the Park.

Wildlife conservation uses, such as:... the protection, reproduction and management
of fish and other aquatic wildlife *(e.g.,* minimum stream flows and lake levels)....
These enumerated reserved water rights uses for national parks are largely
consistent with the Master-Referee and Colorado district court's decree in the
*Colorado 4, 5 and 6* litigation, *supra.*
86 I.D. at 596 (footnote omitted). If such general statements of purpose support the
establishment of reserved water rights, it is certain that the more expansive and
particular language used by Congress in creating Wrangell-St. Elias National Park
supports a finding that the United States possesses reserved water rights in Tanada
Creek and the Copper River. The purposes of establishing the Park were to:
maintain unimpaired the scenic beauty and quality of high mountain peaks, foothills,
glacial systems, lakes, and streams, valleys and coastal landscapes in their natural
state; to protect habitat for, and populations of, fish and wildlife.... Subsistence
uses by local residents shall be permitted in the park, where such uses are
traditional.
16 U.S.C. § 410hh(9). Certain stream flows, as yet unquantified, are necessary to
fulfill the purposes expressed by Congress and were thus reserved as of the date of
the Park's creation. Under the test set forth in *Cappaert, 426 U.S. at 138-39,* there
is clearly a reserved water
**33 right held by the United States for Wrangell-St. Elias National Park.[FN22]


> FN22. A reservation of water is also necessary to fulfill the purposes behind
> the Alaska Native Allotment Act pursuant to which Katie John and Doris Charles
> received allotments at Batzulnetas. Given the purpose behind the Allotment Act
> of providing Natives with property as a homeland and for subsistence purposes,
> a reserved right to the use of water to fulfill such purposes should be
> implied. *Cf. Colville Confederated Tribes v. Walton, 647 F.2d at 47* (broadly
> construing reserved rights based on intent to provide a homeland for Indians);
> *and United States v. Adair, 723 F.2d at 1410. See* Collins, *Indian Allotment
> Water Rights,* 20 land AND water L. rev. 421, 437 (1985).

## CONCLUSION

As demonstrated by the Supreme Court decisions, the commentators and the United
State's previous briefs to the Supreme Court, the navigational servitude is
tantamount to a property interest of the United States. Anyone with "ownership" of
water rights or the streambed beneath a navigable waterway takes such ownership with
knowledge that the federal government has an overriding interest in that property
that permits it to be taken without payment of any compensation. Reserved to the
United States by the Submerged Lands Act, the servitude is clearly an "interest" of
which the United States is the owner. Under the plain language of ANILCA § 102 and
the Supreme Court's *Gambell* decision, the United States' paramount right to and
power over navigable waters is an "interest" to which the United States holds title.
Alternatively, all federally reserved waters constitute public lands. Accordingly,
the district court's judgment should be affirmed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16058590 (C.A.9)                                                    Page 25
**(Cite as: 1994 WL 16058590)**


### STATEMENT OF RELATED CASES

To counsel's knowledge, there are no other pending related cases beyond those
identified by the United States.

Katie JOHN, et al., Plaintiff-Appellees, v. UNITED STATES OF AMERICA, et al.,
Defendants-Appellants.
1994 WL 16058590 (C.A.9)

Briefs and Other Related Documents  (Back to top)

• 1994 WL 16012379 (Appellate Brief) Reply Brief of Appellant State of Alaska (Nov.
22, 1994) Original Image of this Document with Appendix (PDF)
• 1994 WL 16057704 (Appellate Brief) Reply Brief for the Federal Appellants (Nov.
15, 1994) Original Image of this Document (PDF)
• 1994 WL 16012450 (Appellate Brief) Brief for Appellees Alaska Federation of
Natives and Katie John, et al. (Oct. 21, 1994) Original Image of this Document (PDF)
• 1994 WL 16012376 (Appellate Brief) Brief for the Federal Appellees (Oct. 18, 1994)
Original Image of this Document (PDF)
• 1994 WL 16058811 (Appellate Brief) Brief of Amici Curiae States of Arizona,
California, Idaho, Montana, and Oregon (Oct. 17, 1994) Original Image of this
Document (PDF)
• 1994 WL 16012377 (Appellate Brief) Brief for Appellant State of Alaska (Sep. 20,
1994) Original Image of this Document (PDF)
• 1994 WL 16012378 (Appellate Brief) Brief of Amici Curiae State of Arizona,
California, Idaho, Montana, Nevada, and Oregon (Sep. 20, 1994) Original Image of
this Document (PDF)
• 1994 WL 16058810 (Appellate Brief) Brief for the Federal Appellants (Sep. 19,
1994) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.