# EXHIBIT A-5

Westlaw.

1994 WL 16012377 (C.A.9)                                    Page 1
(Cite as: 1994 WL 16012377)


For Opinion See 72 F.3d 698, 54 F.3d 549Briefs and Other Related Documents
United States Court of Appeals,
Ninth Circuit
STATE OF ALASKA, Plaintiffs-Appellant,
v.
Bruce BABBITT, Secretary of Interior, et al., Defendants-Appellees.
No. 94-35480.
September 20, 1994.

APPEAL FROM THE JUDGMENT OF THE UNITED STATES DISTRICT COURT, DISTRICT OF ALASKA
D.C. NO. CV-A92-00264-HRH CONSOLIDATED

Brief for Appellant State of Alaska

Bruce M. Botelho, Attorney General, Joanne M. Grace, Assistant Attorney General,
Office of the Attorney General, 1031 West Fourth Avenue, Suite 200, Anchorage,
Alaska 99501, (907) 269-5100

*i TABLE OF CONTENTS

TABLE OF CASES AND AUTHORITIES ... iii

STATEMENT OF JURISDICTION ... 1

ISSUES PRESENTED FOR REVIEW ... 1

STATEMENT OF THE CASE ... 1

SUMMARY OF ARGUMENT ... 4

ARGUMENT ... 4

I. THE DISTRICT COURT ERRED IN HOLDING THAT CONGRESS INADVERTENTLY NEGLECTED TO
GRANT MANAGEMENT AUTHORITY TO THE SECRETARY; IN TITLE VIII CONGRESS DELIBERATELY
PRESERVED STATE AUTHORITY TO MANAGE FISH AND GAME ON PUBLIC LANDS EVEN WITHOUT A
STATEWIDE LAW ... 4

 A. ANILCA'S PLAIN LANGUAGE INDICATES THAT CONGRESS INTENDED THE STATE TO MANAGE
FISH AND GAME ON PUBLIC LANDS ... 5

  1. ANILCA Changed Existing Management Authority Only as Provided, and ANILCA Does
Not Vest the Secretary With Authority to Manage Fish and Wildlife ... 5

  2. Congress Intended the State to Regulate Fish and Wildlife on Public Lands Even
if The State Does Not Enact and Implement a Statewide Subsistence Law Guaranteeing
a Rural Preference ... 6

  3. Title VIII Prescribes a Judicial Rather Than an Administrative Remedy to Those
Entitled to the Subsistence Priority ... 9

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16012377 (C.A.9)
(Cite as: 1994 WL 16012377)

4. Congress Did Not Intend to Give the Secretary Authority to Manage Fish and Game through the General Rulemaking Authority of § 814 or through the Broad Purposes of the Act ... 11

B. ANILCA'S LEGISLATIVE HISTORY CONFIRMS THAT CONGRESS DECIDED NOT TO GRANT THE SECRETARY AUTHORITY TO ENFORCE THE FEDERAL SUBSISTENCE RIGHT, AND INTENDED THE COURT TO BE THE EXCLUSIVE ENFORCER OF THE RIGHT ... 12

1. The Initial Udall Bill Gave the Secretary Complete Management Authority ... 13

*ii    2. The House Interior Committee Bill in the 95th Congress Gave the Secretary Authority to Displace State Management ... 13

3. The House Merchant Marine Committee Bill Gave the Secretary Selective Closure Authority ... 14

4. The Senate Energy Committee Bills in the 95th and 96th Congresses Gave the Secretary Judicial Enforcement Authority ... 16

5. The Subsistence Provisions of ANILCA as Enacted Gave the Secretary No Enforcement Authority ... 19

C. CONGRESS INTENDED THE SECRETARY TO IMPLEMENT THE SUBSISTENCE PRIORITY IN HIS TRADITIONAL ROLE AS MANAGER OF THE PUBLIC LANDS ... 20

D. THE AGENCY INTERPRETATION IS NOT ENTITLED TO DEFERENCE ... 23

II. THE DISTRICT COURT ERRED IN HOLDING THAT CONGRESS INTENDED "PUBLIC LANDS" TO INCLUDE NAVIGABLE WATERS ... 24

A. THE PLAIN LANGUAGE OF ANILCA DEMONSTRATES THAT CONGRESS DID NOT INTEND TITLE VIII TO APPLY TO THE NAVIGABLE WATERS OF ALASKA ... 24

B. THE NAVIGATIONAL SERVITUDE IS NOT AN INTEREST TO WHICH THE UNITED STATES HOLDS TITLE ... 26

C. A BROAD READING OF TITLE VIII VIOLATES THE "CLEAR STATEMENT" DOCTRINE OF INTERPRETING STATUTES ENACTED UNDER THE COMMERCE CLAUSE ... 31

D. CONGRESS DID NOT INTEND TO PROVIDE A PRIORITY TO ALL AREAS WHERE SUBSISTENCE USES OCCURRED ... 33

CONCLUSION ... 34

STATEMENT OF RELATED CASES ... 35

*iii TABLE OF CASES AND AUTHORITIES

*Cases*

Amoco Production Co. v. Village of Gambell, 480 U.S. 531 (1987) ... 29, 30

Bobby v. State of Alaska, 718 F.Supp. 764 (D. Alaska 1989) ... 14

Boone v. United States, 944 F.2d 1489 (9th Cir. 1991) ... 28, 29

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16012377 (C.A.9)
(Cite as: 1994 WL 16012377)

Bowen v. Georgetown University Hospital, 488 U.S. 204 (1988) ... 11

Chevron U.S.A. v. Natural Resource Defense Council, Inc., 467 U.S. 837 (1984) ... 23

City of Angoon v. Hodel, 803 F.2d 1016 (9th Cir. 1986), cert. denied, 484 U.S. 870 (1987) ... 25-28

Davies Warehouse Co. v. Bowles, 321 U.S. 144 (1944) ... 32

Defenders of Wildlife v. Andrus, 627 F.2d 1238, 1248 n. 7 (D.C. Cir. 1980) ... 6

Gulf Offshore Co. v. Mobil Oil Corp., 453 U.S. 473 (1981) ... 30

H.Rep. No. 1045, Part II, 95th Cong., 2d Sess. (1978) ... 15

Ide v. United States, 263 U.S. 497 (1924) ... 26

McDowell v. State, 785 P.2d 1 (Alaska 1989) ... 1, 2, 10, 14

McNally v. United States, 483 U.S. 350 (1987) ... 32

Rodriguez v. United States, 480 U.S. 522 (1987) ... 12

United States v. Bass, 404 U.S. 336 (1971) ... 32, 33

United States v. Enmons, 410 U.S. 396 (1972) ... 32

United States v. Five Gambling Devices, 346 U.S. 441 (1953) ... 32

United States v. M/V BIG SAM, 693 F.2d 451 (5th Cir. 1982), cert. denied, 462 U.S. 1132 (1983) ... 12

United States v. Twin City Power Co., 350 U.S. 222 (1956) ... 28, 29

United States v. United Verde Copper Co., 196 U.S. 207 (1905) ... 11

*iv Statutes and Regulations

16 U.S.C. 3102 ... 24, 25, 29

16 U.S.C. 3114 ... 1, 9, 20, 22

16 U.S.C. 3115(d) ... 7, 8, 14

16 U.S.C. 3116 ... 8

16 U.S.C. 3117 ... 9, 22

16 U.S.C. 3125 ... 8

16 U.S.C. 3202 ... 6, 11, 12, 19, 22, 23, 31

28 U.S.C. 1292(b) ... 1

28 U.S.C. 1331(a) ... 1

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16012377 (C.A.9)
(Cite as: 1994 WL 16012377)

43 U.S.C. 945 ... 26

43 U.S.C. 1301-1315 ... 30

43 U.S.C. 1331-1356 ... 30

56 Fed. Reg. 64404 (December 9, 1991) ... 14

57 Fed. Reg. 22,940 (May 29, 1992) ... 2

Alaska Statutes 16.05.258 (1992) ... 9

*Legislative Materials*

126 Cong. Rec. 33471 (Dec. 11, 1980) ... 23

126 Cong. Rec. H10527 (daily ed. November 12, 1980) ... 19

126 Cong. Rec. H11111, H11115 (daily ed. November 21, 1980) ... 20

126 Cong. Rec. S10670 (daily ed. August 4, 1980) ... 21

126 Cong. Rec. S11047 (daily ed. August 18, 1980) ... 19

126 Cong. Rec. S15129, 15130 (December 1, 1980) ... 20

126 Cong. Rec. S15131 (daily ed. December 1, 1980) ... 20

H. Con. Res. 452, 96th Cong., 2d Sess. (1980) ... 20

*v H.R. 39, 95th Cong., 1st Sess. (1977) ... 13

H.Rep. 96-97, Part I, 96th Cong., 1st Sess. (1979) ... 22

H.Rep. No. 1045, Part I, 95th Cong., 2d Sess. (1978) ... 13

S. Rep. No. 96-413, Committee on Energy and Natural Resources, 96th Cong., 1st Sess. (1979) ... 17, 19, 22

S. Rep. No. 1300, Committee on Energy and Natural Resources, 95th Cong., 2d Sess. (1978) ... 16, 18, 21

## *1 STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. 1331(a). It certified the issues for interlocutory appeal on March 31, 1994, then recertified them on April 6, 1994. ER at 88. The State filed its petition for review on April 18, which is timely under Fed. R. App. P. 5(a). This Court granted permission to appeal pursuant to 28 U.S.C. 1292(b) on May 17, 1994. No. 94-80141.

## ISSUES PRESENTED FOR REVIEW

(1) The district court erred in ruling that in the Alaska National Interest Lands Conservation Act ("ANILCA") Congress gave the Secretaries of Interior and Agriculture authority to manage fish and wildlife on public lands in Alaska for subsistence purposes.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(2) The district court erred in finding that the navigational servitude is an interest to which the United States holds title.

(3) The district court erred in ruling that Congress intended navigable waters to constitute "public lands" under ANILCA § 102.

## STATEMENT OF THE CASE

Congress granted rural Alaska residents a priority for subsistence hunting and fishing on public lands in title VIII of ANILCA. ANILCA § 804, 16 U.S.C. 3114. Since 1960 the State of Alaska ("State") has managed the fish and wildlife on all lands in Alaska. The Secretaries of Interior and Agriculture ("Secretary") recently assumed management of fish and wildlife for subsistence purposes on public lands, however, in response to the Alaska Supreme Court decision in *McDowell v. State*, 785 P.2d 1 (Alaska 1989). In *McDowell*, the court held unconstitutional Alaska's law *2 giving rural residents a subsistence priority; Alaska law now gives a priority to all subsistence users regardless of their residence.

In response to *McDowell*, the Secretary promulgated regulations for subsistence hunting and fishing on public lands in Alaska. He created the Federal Subsistence Board and gave it authority to adopt regulations for the day-to-day management of subsistence hunting and fishing. 57 Fed. Reg. 22,940 (May 29, 1992), AD at 202-25.[FN1] He defined as "public lands" subject to the subsistence priority federally owned lands and those waters running over federally-owned submerged lands. AD at 214.

    FN1. "ER" refers to the excerpts; "AD" refers to the addendum.

These regulations raise two issues addressed in the cases consolidated in the district court. Katie John, Doris Charles, and the Mentasta Village Council filed suit in 1990 against the United States, alleging that contrary to the Secretary's interpretation, Congress intended the subsistence priority to apply to all navigable waters in Alaska. *John v. United States*, D.Ct. No. 90-484-CV. The plaintiffs later also named the State as a defendant, and all parties moved for summary judgment. Counsel for the United States initially defended the regulations, arguing that the United States did not hold title to any interest in navigable waters. The United States suddenly changed its position at oral argument, however, more than three years after the suit began, announcing that the Secretary now agrees that the priority applies to navigable waters running through federal enclaves and subject to a federal reserved water right. The court ruled in March 1994, *3 holding that the United States has title to the navigational servitude and that therefore navigable waters constitute "public lands" subject to the subsistence priority. ER at 1.

The State filed suit against the Secretary in 1992, alleging that both ANILCA's text and legislative history demonstrate that Congress deliberately withheld from the Secretary authority to assume fish and wildlife management in Alaska. *State v. Babbitt*, D.Ct. No. 92-264-CV. The State moved for partial summary judgment. On November 19, 1993 the district court tentatively decided that ANILCA was ambiguous as to the Secretary's authority and that the legislative history revealed that Congress did not vest the Secretary with authority to regulate subsistence hunting and fishing on public lands. ER at 49-50, 53. The court requested supplemental briefs on the legislative history. ER at 53.

On March 30, 1994, the district court held that the Secretary is authorized to regulate subsistence hunting and fishing on public lands. The court acknowledged

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that Congress did not expressly delegate the Secretary such authority, but found this omission "unintentional and inadvertent." ER at 15-16, 17. The court appended its earlier legislative history analysis, deleting without explanation its conclusion that the legislative history showed Congress' intent not to give the Secretary authority to manage fish and wildlife. *Cf.* ER at 44, 45 with ER at 51, 52.

The district court stayed its decision on both issues pending appeal. ER at 80 - 87.

### *4 SUMMARY OF ARGUMENT

Congress intended the State to manage fish and game on public lands even without laws granting a statewide priority. ANILCA gives the Secretary responsibility to administer the regional councils, monitor state management, ensure access to subsistence resources on public lands, and to close the public lands to hunting and fishing for conservation purposes. Congress did not intend ANILCA to change the State's authority to manage fish and wildlife on public lands except as provided in title VIII. No provision of title VIII authorizes creation of the Federal Subsistence Board or promulgation of federal regulations governing day to day management of fish and wildlife on public lands in Alaska.

"Public lands" as defined in ANILCA does not include navigable waters. While an interest in navigable waters to which the United States holds title might constitute public lands, such an interest does not convert the waters to public lands. Further, the navigational servitude is not a property interest; it is a federal power that arises from the United States Constitution.

### ARGUMENT

**I. THE DISTRICT COURT ERRED IN HOLDING THAT CONGRESS INADVERTENTLY NEGLECTED TO GRANT MANAGEMENT AUTHORITY TO THE SECRETARY; IN TITLE VIII CONGRESS DELIBERATELY PRESERVED STATE AUTHORITY TO MANAGE FISH AND GAME ON PUBLIC LANDS EVEN WITHOUT A STATEWIDE LAW.**

The district court's conclusion that Congress "unintentionally and inadvertently omitted" a grant of authority in ANILCA to the Secretary for fish and wildlife management is insupportable. ANILCA's plain language and legislative history manifest Congress' *5 intent not to displace State management of fish and wildlife on public lands. A grant of authority that encroaches so intrusively into an area traditionally governed by states requires a clear statement of congressional intent, and can not be based on the inference that Congress carelessly neglected to express its intent to upset traditional federal/state regulatory roles. The Secretary cannot bestow on himself authority to usurp state management simply because he considers it inadequate. The district court's endorsement of his action is especially dubious in the context of ANILCA, where Congress provided that it intended only explicit grants of authority and where the legislative history clearly shows that Congress thoroughly considered and rejected such authority.

**A. ANILCA'S PLAIN LANGUAGE INDICATES THAT CONGRESS INTENDED THE STATE TO MANAGE FISH AND GAME ON PUBLIC LANDS.**

The language of ANILCA evidences Congress' intent that the State manage fish and wildlife on public lands in Alaska in two respects. First, the act provides that it is intended to diminish the State's authority to manage fish and wildlife on public lands only as provided in title VIII. Second, contrary to the Secretary's position

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that repeal of Alaska's rural preference subsistence law prompted his authority to preempt State regulation, title VIII clearly provides for state management of fish and game on the public lands even absent a statewide rural priority.

**1. ANILCA Changed Existing Management Authority Only as Provided, and ANILCA Does Not Vest the Secretary With Authority to Manage Fish and Wildlife.**

The district court disregarded the provision through which *6 Congress assured that ANILCA would not be interpreted to grant the Secretary fish and wildlife management authority on public lands:

### TAKING OF FISH AND WILDLIFE

Sec. 1314. (a) Nothing in this Act is intended to enlarge or diminish the responsibility and authority of the State of Alaska for management of fish and wildlife on the public lands except as may be provided in title VIII of this Act, or to amend the Alaska constitution.
(b) Except as specifically provided otherwise by this Act, nothing in this Act is intended to enlarge or diminish the responsibility and authority of the Secretary over the management of the public lands.

16 U.S.C. 3202(a), (b).

States traditionally exercise authority for regulating fish and wildlife on federal lands, while federal land managers manage the other resources of the land, including fish and wildlife habitat. When Congress has wished to change this traditional allocation of tasks, it has done so consciously and precisely. *Defenders of Wildlife v. Andrus,* 627 F.2d 1238, 1248 n. 7 (D.C. Cir. 1980). Title VIII does not grant the Secretary fish and wildlife management authority, and in § 1314 Congress protected against misinterpretation of his authority. The district court's inference of Secretarial authority to manage fish and wildlife disregards both the requirement of clear congressional intent to replace state management and § 1314's clear statement to the contrary.

**2. Congress Intended the State to Regulate Fish and Wildlife on Public Lands Even if The State Does Not Enact and Implement a Statewide Subsistence Law Guaranteeing a Rural Preference.**

The appellees argued below that § 805 conditions state management of subsistence hunting and fishing on public lands on statewide "laws of general applicability." The district court *7 apparently agreed with this analysis, for it referred to the State as being out of compliance with the requirements of § 805(d). ER at 19. Title VIII's provisions indicate that Congress intended the State to manage fish and wildlife on public lands with or without a law granting a statewide rural subsistence priority, however. Section 805(d) provides that if the State enacts and implements laws of general applicability, these laws will supersede § § 803-804, and 805 "insofar as these sections govern State responsibility ... for the taking of fish and wildlife on public lands for subsistence uses." 16 U.S.C. 3115(d). The unavoidable implication of these words is that without state laws of general applicability, § § 803-805 are not superseded and continue to govern State responsibility for subsistence hunting and fishing on public lands.

That Congress did not intend § 805 to trigger fish and wildlife management authority in the Secretary also is clear from its explanation of how the State and the Secretary will use advisory council recommendations. Under § 805, the State can establish regional advisory councils, which advise it regarding subsistence

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16012377 (C.A.9)
(Cite as: 1994 WL 16012377)

uses of fish and wildlife. *Id.* If the State does not establish the councils statewide, the Secretary must establish them. § 805(a), 16 U.S.C. 3115(a). If state-established, the councils' recommendations are to be considered by the *state rulemaking authority* in its administrative proceedings. ANILCA § 805(d), 16 U.S.C. 3115(d). Section 805 has no parallel provision providing for advice to a federal rulemaking authority; if federally-established, the councils' recommendations must be considered by the Secretary in monitoring state management and in *8 exercising his closure and other administrative authority over the public lands. ANILCA § 805(c), 16 U.S.C. § 3115(c). Similarly, § 815(1) states that no privilege that may be granted an individual "by the State" may be assigned; the section mentions no privilege that may be granted by the Secretary. 16 U.S.C. 3125.

The fact that the Secretary has a duty to monitor state implementation of the priority even without state laws of general applicability also demonstrates Congress' intent that the State manage fish and wildlife with or without such laws. ANILCA requires the Secretary to monitor and report on the State's implementation of the subsistence preference. ANILCA § 806, 16 U.S.C. 3116. If the State does not enact and implement laws of general applicability and the Secretary establishes regional advisory councils, then § 805(c) directs the Secretary to consider their reports in performing his monitoring responsibility. 16 U.S.C. 3115(c). The roles of the State as manager of fish and wildlife and of the Secretary as monitor and reporter to Congress are constant with or without a statewide law.

Title VIII's enforcement provision also evidences this intent. Section 807 provides for judicial enforcement for those "aggrieved by a failure of the State or the Federal Government to provide for the priority for subsistence uses set forth in section 804" (if the State has not implemented a statewide preference) *or* "with respect to the State as set forth in a State law of general applicability if the State has fulfilled the requirements of section 805(d)" (if the State has implemented a statewide preference). ANILCA § 807, *9 16 U.S.C. 3117.[FN2] In either case § 807 anticipates an action against the State; the only distinction is that in the latter case the party files suit to enforce state rather than federal law.

> FN2. Section 807's reference to a failure of the State or Federal Government to provide for the priority absent a law of general applicability does not imply Secretarial authority to manage fish and wildlife on public lands. Except for early bills that would have given the Secretary management authority, the legislative history consistently refers to the State's role in implementing the priority as manager of the fish and wildlife and to the Secretary's role as manager of the habitat. *See infra*, pp. 20-23.

Thus, the terms of title VIII indicate that Congress intended the State to manage fish and wildlife on public lands even if it does not have a statewide rural preference.

   **3. *Title VIII Prescribes a Judicial Rather than an Administrative Remedy to Those Entitled to the Subsistence Priority.***

Section 804 creates for rural residents a right to a priority for subsistence hunting and fishing on public lands, and § 807 provides for enforcement of this right in federal court.

Title VIII does not guarantee that the State will implement a particular statutory scheme; it guarantees only a priority for a reasonable opportunity to hunt and fish. State law provides a priority to most rural residents who hunt and fish for subsistence on public lands, so the court's oversight role is limited.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

State law grants a priority for subsistence uses of fish and game. AS 16.05.258 (1992), AD at 76-79. When fish and game populations are insufficient to provide for all subsistence users, a "tier two" level of resource abundance, the statute grants a preference to some users based on:
(1) the subsistence user's customary and direct dependence on the *10 fish or game population for human consumption as a mainstay of livelihood;
(2) the proximity of the subsistence user's domicile to the stock or population; and
(3) the subsistence user's ability to obtain food if subsistence use is restricted or eliminated.

AS 16.05.258(b)(4)(B). The law's effect is that when fish and game populations are sufficient for all subsistence uses, all rural users will have a reasonable opportunity to meet their subsistence needs. When populations are limited, the State first eliminates nonsubsistence uses, then restricts subsistence users to the extent necessary to sustain the population. Most rural Alaskans still are eligible for subsistence hunting and fishing in a tier two fishery or hunt because they live nearer to the resource, rely on it more, and have fewer alternative resources. See AS 16.05.258(b)(4).

State law cannot limit the priority to only rural residents because of the constitutional limitations established by McDowell. Rural residents nearly always will have a priority, however, because all subsistence users either will have a reasonable opportunity to take fish and wildlife, or due to shortages, rural residents likely will qualify under the tier two criteria. Only rural users excluded when urban users are permitted to hunt and fish on public lands would be entitled to court protection. The court can accord relief by permitting these users to participate in a particular tier two fishery or hunt on public lands. The State, which is mandated by its constitution to manage fish and game for sustained yield, then will determine whether it must exclude other users in order to maintain a sufficient resource population.

> *11 *4. Congress Did Not Intend to Give the Secretary Authority to Manage Fish and Game through the General Rulemaking Authority of § 814 or through the Broad Purposes of the Act.*

The district court concluded that § 814 empowers the Secretary to promulgate regulations to assume fish and wildlife management, Congress having unintentionally and inadvertently forgotten to authorize the Secretary to do so. ER at 17. The Secretary's rulemaking authority cannot exceed the responsibilities expressly delegated him, however. By its terms, § 814 limits the Secretary's rulemaking authority to regulations "necessary and appropriate to carry out his responsibilities" in title VIII. Therefore, the Secretary's rulemaking authority is enlarged only to the extent ANILCA specifically enlarges his traditional responsibilities. ANILCA § 1314(b), 16 U.S.C. 3202(b).

An administrative agency's power to promulgate regulations is limited to the authority delegated by Congress. Bowen v. Georgetown University Hospital, 488 U.S. 204, 208 (1988). If by issuing regulations the Secretary could intrude where Congress granted him no responsibility, then he could "abridge or enlarge the statute at will." United States v. United Verde Copper Co., 196 U.S. 207, 215 (1905). Such power is not regulation; it is legislation. Id. ANILCA's legislative history indicates that Congress painstakingly considered whether to vest the Secretary with authority to manage fish and wildlife and chose not to do so.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Having determined that Congress left a statutory "gap" as to the Secretary's authority and did not clearly state its intent, the district court invoked the ANILCA's broad purposes. It found *12 reasonable the Secretary's position as to his authority given the "clarity of the congressional policy and purpose of ANILCA Title VIII, coupled with the clear grant of general regulatory power to the Secretary." ER at 20-21. General recourse to broad purposes unrelated to particular meaning of an enacted text is impermissible, however. Deciding precisely what competing values will be sacrificed to the achievement of an objective is the essence of legislative choice, and it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law. _Rodriguez v. United States_, 480 U.S. 522, 525-26 (1987). In disregarding § 1314's express limitation on the Secretary's authority to manage fish and wildlife, the district court ignored plain, unambiguous language in the guise of providing statutory interpretation. _See United States v. M/V BIG SAM_, 693 F.2d 451, 455 (5th Cir. 1982), cert. denied, 462 U.S. 1132 (1983).

**B. ANILCA'S LEGISLATIVE HISTORY CONFIRMS THAT CONGRESS DECIDED NOT TO GRANT THE SECRETARY AUTHORITY TO ENFORCE THE FEDERAL SUBSISTENCE RIGHT, AND INTENDED THE COURT TO BE THE EXCLUSIVE ENFORCER OF THE RIGHT.**

Title VIII's legislative history reinforces what is evident from its language: Congress vested the Secretary with only limited authority to affect state management of subsistence hunting and fishing on public lands. The Alaska lands bill evolved through several versions that demonstrate that Congress considered and rejected granting the Secretary authority to manage fish and game.

**\*13 1. The Initial Udall Bill Gave the Secretary Complete Management Authority.**

The Alaska Lands Bill initially gave the Secretary complete responsibility for managing fish and game for subsistence uses. Mr. Udall introduced H.R. 39 (95th Cong., 1st Sess.) on January 4, 1977, and the House referred it to the Committee on Interior and Insular Affairs ("House Interior Committee"). Subs. title, AD at 80-90. As introduced, H.R. 39 authorized the Secretary to regulate the taking of wildlife of federal lands. § 701(a), AD at 81-82. The Secretary would establish "regulatory subsistence boards" to approve subsistence permit applications, and could enforce and veto the boards' decisions. _Id._ The House found this extensive grant of management authority to the Secretary unacceptable, however, and eliminated it before passing H.R. 39.

**2. The House Interior Committee Bill in the 95th Congress Gave the Secretary Authority to Displace State Management.**

The next version of the bill explicitly would have given the Secretary what he now claims, authority to assume fish and game management on public lands if he finds state management unacceptable. After hearings on the Udall bill, the Interior Committee ordered H.R. 39 reported on April 7, 1978. H.Rep. No. 1045, Part I (95th Cong., 2d Sess.), subs. title, AD at 91-112.

Instead of vesting the Secretary with complete management authority, the Interior Committee bill authorized State management, but directed the Secretary to take over should State management be inconsistent with ANILCA. H.Rep. No. 95-1045, Part I, AD at 113-122. The bill mandated certain provisions for a state program, §   *14 704(c), and required the Secretary to issue a certificate of approval if the program complied with these provisions. If the State failed to submit a program within 18 months, the Secretary would "regulate the taking of fish and wildlife on the public lands in Alaska for subsistence uses in a manner consistent with the provisions of this Act." § 704(d), AD at 101. If the State received approval, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16012377 (C.A.9)
(Cite as: 1994 WL 16012377)

Secretary could suspend it if the State failed to make changes deemed necessary, §
704(c), and would assume fish and wildlife management for subsistence uses on the
applicable public lands. § 705(c), AD at 103-104.

The Secretary believes that ANILCA gives him the same authority this bill would
have granted him. In reviewing state subsistence laws under § 805(d), he has
presumed that he can take over fish and wildlife management on public lands if he
finds the State "out of compliance."[FN3] Title VIII is drastically different from
this bill, however, as Congress authorized the Secretary only to establish advisory
councils, to monitor state management, and to close public lands to all hunting and
fishing under certain circumstances.

> FN3. *See, e.g.,* September 23, 1985 letter from William Horn to Governor Bill
> Sheffield, Appendix I to *Bobby v. State of Alaska,* 718 F.Supp. 764, 813 (D.
> Alaska 1989); *see also* Preamble to the <u>Federal Subsistence Regulations, 56
> Fed. Reg. 64404 (December 9, 1991)</u> ("As a result of [*McDowell*], the Department
> of the Interior and the Department of Agriculture . . . were required to
> assume responsibility for the implementation of title VIII of ANILCA on
> Federal public lands on July 1, 1990").

### 3. *The House Merchant Marine Committee Bill Gave the Secretary Selective Closure Authority.*

After the House Interior Committee reviewed the bill, it was referred to the
Committee on Merchant Marine and Fisheries (House *15 Merchant Marine Committee).
This committee further modified the bill to remove entirely Secretarial authority
to enforce state implementation of the subsistence preference, replacing it with
selective closure authority. H.Rep. No. 1045, Part II, 95th Cong., 2d Sess., subs.
title, AD at 123-135. The Merchant Marine Committee deliberately eliminated the
Secretary's authority to assume fish and game management because "only the State of
Alaska, not the Federal Government, can hope to effectively manage the subsistence
taking of the fish and wildlife resources in the State." *Id.* at 76, AD at 132. The
committee described the difference in Secretarial authority in the two bills:
In contrast to the Interior Committee version of title VII, the Secretary would
not be authorized to suspend the State's authority to manage subsistence resources or
to take over the management of those resources on the public lands. Rather, the
Secretary's discretion would be limited to closing the public lands to subsistence
and nonsubsistence uses under certain circumstances and opening the lands to
subsistence uses by local residents under very extraordinary circumstances.

*Id.* at 91, AD at 133.

While the bill still required a state program with certain elements, § 704(b), it
differed as to sanction if the Secretary found the state program to be ineffective.
The Secretary could close public lands to all but subsistence hunting and fishing
if the State failed to make changes or to implement a subsistence program, and in
emergencies could open public lands to subsistence uses to protect the public
welfare. § 705. These provisions were in the bill the House passed on May 19, 1978
and sent to the Senate. Subs. title, AD at 29-47.

### *16 *4. The Senate Energy Committee Bills in the 95th and 96th Congresses Gave the Secretary Judicial Enforcement Authority.*

The Senate referred H.R. 39 to the Senate Energy Committee on June 8, 1978. The
Energy Committee ordered H.R. 39 reported with an amendment in the nature of a
substitute on October 5, 1978. S. Rep. No. 1300, Energy Committee, 95th Cong., 2d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Sess. (October 9, 1978) at 112, subs. title, AD at 52-58. This bill also rejected any Secretarial authority to regulate hunting and fishing on public lands, and further limited the Secretary's closure authority. It did not require a state program and replaced the Secretary's administrative enforcement role with a judicial advocacy role.

The bill provided for the Secretary to establish local and regional advisory committees, unless the State set up a similar committee structure. § 805, AD at 53. Instead of investing the Secretary with authority to require changes to the state program or to assume fish and wildlife management, the bill directed the Secretary to monitor the State's provision of the subsistence priority and report his findings to the State and relevant Congressional committees. § 806, AD at 54-55.

As in the version ultimately enacted, § 807 of this bill provided for judicial enforcement of the priority. Unlike the version ultimately enacted, however, § 807 directed the Secretary to file suit in federal court on behalf of the committees or regional councils if he determined that the State was failing to *17 provide the priority. § 807, AD at 55. [FN4]

> FN4. The substitution of a judicial remedy for the House bill's administrative closure remedy was advanced by Senator Hatfield, who clearly did not intend the Secretary's responsibilities to include fish and wildlife management. See Senate Energy Com. markup session, August 2, 1978, AD at 138-140.

The committee members understood that even the House bill would not have given the Secretary management authority:

[W]ith regard to a preemption, the only club the Federal Government has with regard to what they can do if the state proceeds in a manner in regard to subsistence that is unacceptable to the Secretary, the only authority they have is the traditional closure authority that a land manager exercises now under the National Wildlife Act, you can close those lands and do it today.
That is the only "club" in H.R. 39. You are not changing that. **You are not saying the Federal Government can come in and take over the subsistence program and write their own subsistence program.** So in that effect you are not tampering with the traditional relationship.

Energy Com., July 14, 1978 (emphasis added), AD at 141-44. [FN5]

> FN5. Because the Senate Energy Committee bill differed from the House bill, an "Ad Hoc Conference" of Senate and House members and the Interior Secretary negotiated a compromise bill with the same subsistence title as the Senate Energy Committee bill. All the participants agreed to it except Senator Gravel, and the Alaska Lands bill progressed no further in the 95th Congress. H.Rep. 96-97, Part I at 138, AD at 146.

In 96th Congress, Senator Jackson introduced S.9, which was virtually identical to the 1978 Senate Energy Committee bill. [FN6] *18S. Rep. No. 96-413, 96th Cong., 1st Sess. at 134, AD at 26. The few changes the Energy Committee made to its bill during the 96th Congress again reflect its understanding that the bill preserved traditional state management. In the 95th Congress, the committee had added the provision now found in § 1314. § 816(3), S. Rep. No. 1300 at 32, AD at 58. In a markup session in the 96th Congress, a committee staffperson explained that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

section was intended to clarify that nothing in ANILCA is intended to enlarge or diminish the responsibility of either the State or the Secretary with regard to management of fish and wildlife, and that the Secretary retained his traditional closure authority. Senate Energy Committee markup session, October 9, 1979, AD at 180-81. Senator Stevens asked that the committee report reflect that the act would not change the traditional relationship between the State's management of fish and game and the Secretary's management of the habitat:

> FN6. In the 96th Congress, Mr. Udall introduced H.R. 39, which was referred jointly to the Interior and Merchant Marine Committees. On February 28, 1979, the Interior Committee substituted for Udall's bill the text of H.R. 2199, which had the same text as the Ad Hoc Conference bill. *Id.* The Merchant Marine Committee reported its bill on April 23 with amendments, but also vested enforcement authority in the judiciary rather than the Secretary. H.Rep. 96-97, Part II, subsistence title, App. at 150-57.
> Mr. Udall then introduced the Udall-Anderson substitute amendment, which the House passed on May 16, 1979. H.R. 3636. In passing this substitute, the House rejected the Senate approach to subsistence and vested the Secretary with authority to close lands to nonsubsistence consumptive uses and to open public lands to subsistence uses. $ 704(d), (e)(2), App. at 168. The House later concurred with the Senate-passed version of the subsistence title.

*SENATOR STEVENS:* On page 59, the reference is to taking of fish and wildlife, and it says in accordance with provisions of this Act, applicable state and federal law - that is not intended to change the relationship between the management of the habitat by the federal agencies and the determination of taking by state law, is it?
*MR. WILLIAMS:* No, sir.
*SENATOR STEVENS:* There is nothing in this that is intended to change that. Your explanation says that, but I just want to make certain that the report is going to say this is not intended to change that traditional balance between the state and federal agencies as far as management and taking of fish and game.
Can we get appropriate language for the state to do that, the report to state that? That language with an explanation would satisfy it I think.

**\*19** *Id.* AD at 181.

Senator Steven's characterization of the provision was incorporated into the committee report, which indicates that the Secretary's responsibility under the "traditional balance" is for management of the habitat, not of fish and wildlife.
*Section 1314: Taking of Fish and Wildlife*
This section, adopted as a Committee amendment, preserves the status quo with regard to the responsibility and authority of the State to manage fish and wildlife, and reconciles this authority with the Act, including the subsistence title. At the same time, the section confirms the status quo with regard to the authority of the Secretary to manage the wildlife habitat on Federal lands.

S.Rep. No. 413, 96th Cong., 1st Sess. p. 308, AD at 27.

### 5. The Subsistence Provisions of ANILCA as Enacted Gave the Secretary No Enforcement Authority.

ANILCA as enacted differs from 1978 Senate Energy Committee bill as to the Secretary's role in only one significant respect - it eliminated the Secretary's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16012377 (C.A.9)
(Cite as: 1994 WL 16012377)

Page 14

duty to bring suit on behalf of aggrieved parties and provides them a direct remedy instead. After both the House and Senate passed bills in the 96th Congress,[FN7] Congress passed Concurrent Resolutions 452 and 453 to make changes **20** to the Senate-passed version of H.R. 39. These concurrent resolutions completely rewrote the judicial enforcement provision, § 807, to eliminate the Secretary's role as advocate in federal court and establish a private cause of action. H.R. 39; 126 Cong. Rec. H11111, H11115 (daily ed. November 21, 1980); 126 Cong. Rec. S15129, 15130 (December 1, 1980), AD at 186-190, 182-84.

> FN7. On October 31, 1979, the Senate Energy Committee ordered H.R. 39 reported with an amendment in the nature of a substitute. On November 15, 1979, Senators Tsongas, Roth and 10 co-sponsors introduced Amendment No. 626 as a substitute for the Energy Committee bill. Soon after the Senate began floor debate on July 21, 1980, pressure to add lands to wilderness, national park, and refuge designations suggested the need for compromise. The Senate passed a revised amendment known as the Tsongas-Roth-Jackson-Hatfield substitute on August 19, 1980. It retained the Energy Committee language in its subsistence title and incorporated most of Amendment No. 1787. 126 Cong. Rec. S11047 (daily ed. August 18, 1980). The House concurred in the bill on November 12, 1980. 126 Cong. Rec. H10527 (daily ed. November 12, 1980), App. at 185.

Senator Stevens submitted a statement supporting the amendment, listing as reasons the damage to the traditional State-Federal management relationship that could result from the use of § 807, and the concern that § 807 did not give a right of action to aggrieved persons and organizations. 126 Cong. Rec. S15131 (December 1, 1980), AD at 184. Consequently, instead of directing the Secretary to file suit on behalf of a regional council, § 807 now establishes a private right of action for any aggrieved party.

ANILCA's subsistence title thus represents the culmination of an evolutionary process during which Congress deliberately backed away from investing the Secretary with authority to regulate subsistence hunting and fishing on public lands. Ultimately Congress had no intention to give the Secretary management authority and inserted § 1314 to insure that ANILCA would not be interpreted to give him indirectly what Congress chose to withhold.

   C. *CONGRESS INTENDED THE SECRETARY TO IMPLEMENT THE SUBSISTENCE PRIORITY IN HIS*
          *TRADITIONAL ROLE AS MANAGER OF THE PUBLIC LANDS.*

The appellees argued below that because § 804 contemplates a federal role in providing the priority, Congress must have granted the Secretary fish and wildlife management authority. This argument blurs an essential distinction Congress made between the **21** roles of the State and the Secretary. Congress precisely limited the Secretary's role in providing the preference to his traditional management of the public lands and several additional duties such as monitoring state implementation.

The committee reports illustrate these distinct roles. In the 95th Congress, the Senate Energy Committee abolished administrative enforcement of the priority from the House-passed version of the subsistence title. Its report describes the Secretary's role under § 804 as implementing the priority as manager of the *lands*: [After describing the State's role as granting the priority in its management of fish and wildlife ....] This section [804] also requires the Secretary of the Interior and the Secretary of Agriculture to give subsistence uses preferential consideration in their management activities on the public lands which directly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

relate to the taking of fish and wildlife, and to take appropriate action to
protect such uses and the continued viability of fish and wildlife populations upon
which the continuation of such uses depend.


S. Rep. 95-1300 at 222 (emphasis added), AD at 67.

The legislative history contains two more explanations of the Secretary's role
based on the Senate Energy bill version of § 804. The Ad Hoc Conference bill had a
subsistence title identical to that in the Energy Committee bill. 126 Cong. Rec.
S10670 (daily ed. August 4, 1980), AD at 191. The committee cited as one of the
"highlights of the accord" that "State regulation of fish and game is maintained -
**The Secretary of Interior is not given authority to take over fish and game
management from the State of Alaska.**" 126 Cong. Rec. S10703 (emphasis added), AD at
192.

The House Interior Committee bill in the 96th Congress also had the same
subsistence title and also describes the Secretary's role as manager of public
lands:
*22 The Committee feels strongly that the traditional daily management authority of
the State of Alaska should be maintained. The State, with its existing
infrastructure, is best able to manage subsistence and other resources....
Traditionally, setting of seasons for the taking of resident fish and wildlife is a
matter left to State management and administration.... [The Committee] feels the
final decision as to whether that preference is being properly instituted rests not
with the Secretary of the Interior but with the Federal courts through specific
judicial action....
The effect of this section is to provide judicial oversight of the State's action
to provide the preference under specifically drawn guidelines rather than
Secretarial action to enforce that preference. The committee feels that **it is
important for the traditional Federal-State relationship in which the Secretary's
major responsibility is that of habitat protection** and the State's responsibility
is that of daily management of fish and game, including the setting of seasons, bag
limits, determination of methods and means, and other specific management decisions
initially left to the State management authorities.


H.Rep. 96-97, Part I at 231 (emphasis added), AD at 148-49.

The Senate Energy Committee echoed this intent when in the 96th Congress it moved
to title XIII clauses applicable to the entire act, including the clause that
became § 1314:
This section, adopted as a Committee amendment, preserves the status quo with
regard to the responsibility and authority of the State to manage fish and
wildlife, and reconciles this authority with the Act, including the subsistence
title. At the same time the section confirms the status quo with regard to the
authority of the Secretary to manage the wildlife habitat on Federal lands.


S. Rep. No. 413 at 308 (emphasis added), AD at 27. The United States also argued
below that § 807's judicial remedy under "the State or the Federal Government"
suggests secretarial authority to manage fish and wildlife. Again, the legislative
history indicates that § 807 applies to the Secretary to enforce his
implementation of § 804 in managing public lands. As explained by Mr. Udall:
Of particular importance is the redraft of the "judicial enforcement" provision
established by section 807 of the act to insure that the Federal Government will
conform its management *23 of public lands resources, and the State government its

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

responsibilities related to fish and wildlife on the public lands in Alaska, to the requirements of the subsistence priority established by section 804.

126 Cong. Rec. 33471 (Dec. 11, 1980)(emphasis added), AD at 199; *see also* statement of Senator Stevens, 126 Cong. Rec. S15131, AD at 184 ("[Section 807] establishes a private Federal right of action for any aggrieved local [party] ... who believes that the State or the Federal government has not met their **respective responsibilities** under section 804...") (emphasis added).

### D. THE AGENCY INTERPRETATION IS NOT ENTITLED TO DEFERENCE.

The district court deferred to the Secretary's conclusion that ANILCA authorizes him to manage fish and wildlife on the public lands. Deference is inappropriate, however, because the district court misapplied the first step of the analysis provided in *Chevron U.S.A. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984). *Chevron* establishes a two-step determination of whether an agency's interpretation of a statute is entitled to deference. First the court must determine whether Congress has spoken to the precise question at issue; if it has, the court must give effect to Congress' unambiguously expressed intent. *Id.* at 842-43. If Congress has not addressed the issue, then the court decides whether the agency based its interpretation on a permissible construction of the statute. *Id.* at 843. In § 1314(b) Congress directly addressed the Secretary's authority, unambiguously providing that it intended only express enlargement of his traditional authority. Accordingly, § 1314(b) establishes silence as repudiation of secretarial authority, not as a statutory "gap" *24 entitling the Secretary to deference in his judgments.

### II. THE DISTRICT COURT ERRED IN HOLDING THAT CONGRESS INTENDED "PUBLIC LANDS" TO INCLUDE NAVIGABLE WATERS.

The district court also erred in holding that the subsistence priority applies to all navigable waters in Alaska. ANILCA's plain terms do not provide this, but the court accepted the argument that if the United States has any property interest in Alaska's navigable waters, then those waters become "public lands." This interpretation greatly expands the meaning of ANILCA's definitional provision by rendering any lands or waters in which the United States has even a small, partial interest "public lands."

### A. THE PLAIN LANGUAGE OF ANILCA DEMONSTRATES THAT CONGRESS DID NOT INTEND TITLE VIII TO APPLY TO THE NAVIGABLE WATERS OF ALASKA.

ANILCA's plain terms indicate that Congress did not intend "public lands" to include all lands or waters in which the United States holds any interest. ANILCA defines "public lands" as follows:
(1) The term "land" means lands, waters, and interests therein.
(2) The term "Federal land" means lands the title to which is in the United States after December 2, 1980.
(3) The term "public lands" means land situated in Alaska which, after December 2, 1980, are Federal lands, except [for certain lands selected but not yet conveyed].

16 U.S.C. 3102(1)-(3). Under this definition, "public lands" are lands, waters, and interests therein, title to which is in the United States. The district court found the navigational servitude to constitute an interest in waters to which the United States holds title and concluded that therefore all navigable waters are *25 "public lands" for purposes of ANILCA.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

For the navigational servitude to convert all navigable waters into public lands, however, would require that "public lands" be defined as "lands and waters in which the United States holds title to any interest." Section 102 is not this broad; as this Court essentially has noted, under § 102, only the *interest to which the United States holds title* constitutes "public lands," not all lands in which the United States has any interest. *See City of Angoon v. Hodel,* 803 F.2d 1016, 1027-28 n.6 (9th Cir. 1986), *cert. denied,* <u>484 U.S. 870 (1987)</u> ("Since the United States does not hold title to the navigational servitude, the servitude is not 'public land' within the meaning of ANILCA").

Therefore, even assuming that the navigational servitude were an interest to which the United States holds title, only the interest, the servitude, would constitute public lands, not all navigable waters in Alaska. This makes sense in the context of ANILCA as a whole, to which § 102's definition applies. By including as "public lands," lands, waters, and interests therein owned by the federal government, Congress empowered the Secretary to promulgate regulations applicable to less than full fee title interests. Thus, for example, the Secretary could manage as "public lands" lands the United States leases within a federal enclave, but his control would be limited to that permitted a lessee. A provision in ANILCA authorizing him to dispose of public lands would permit him to dispose of only of the leasehold interest, not to convey fee title. Only the leasehold interest is "public lands"; the fact that the United States has some interest does not *26 convert the entire bundle of sticks to "public lands."

Such a result would be absurd. This interpretation of § 102 would render most private lands in Alaska "public lands" under ANILCA. Under <u>43 U.S.C. 945</u>, all patents for land taken up after August 30, 1890 west of the 100th meridian are issued subject to a reserved federal right-of-way for construction of ditches and canals. *See Ide v. United States,* 263 U.S. 497 (1924). Under the district court decision, federal "title" to this interest renders these private lands "public lands." Obviously Congress did not intend this result; by including "interests" that the United States holds in lands and waters, Congress authorized the Secretary to manage and control less than full fee interests, and *these interests* constitute "public lands." Assuming therefore that the navigational servitude were an interest to which the United States holds title, only the interest would be "public lands," not all the navigable waters to which it applies. The Secretary's inability to convey or manage the navigational servitude as habitat reflects the fact that it is not a property interest, but is a federal power.

**B. THE NAVIGATIONAL SERVITUDE IS NOT AN INTEREST TO WHICH THE UNITED STATES HOLDS TITLE.**

The district court held that the navigational servitude is an "interest" in the waters of Alaska to which the federal government holds title, and that therefore Alaska's navigable waters are "public lands" pursuant to § 102(3). ER at 39. In so concluding, the district court disregarded Ninth Circuit precedent directly on point. In *City of Angoon v. Hodel,* 803 F.2d at 1027-1028 n.6, the Ninth Circuit explicitly rejected the argument that the United *27 States holds title to the navigational servitude, concluding that the servitude is not public land within the meaning of ANILCA. The district court distinguished *Angoon* because its "issues were different from those in this case." ER at 36-37:

Angoon did not involve the scope of federal and state management of fish, nor did it address the subtleties regarding the terms "interests" or "title" presented by this case. The Ninth Circuit's observation in *Angoon*, that the United States does not hold title to the navigational servitude, appears to be premised on the conclusion that the servitude is a "power of government" rather than a property

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

interest. *Angoon* contains no analysis of the character of the navigational servitude.

That *Angoon* did not raise the scope of federal and state management of fish is irrelevant to its control of this case. *Angoon* raised the issue of whether § 810, which requires the Secretary to consider the impact on subsistence of activities on "public lands," applied to the granting of permits under the Clean Water Act. The plaintiffs argued that the Secretary must follow § 810 because these determinations used "public lands," namely the navigational servitude. 803 F.2d at 1027-28 n. 6. In finding that the United States does not have title to an interest in the navigational servitude, this Court defined "public lands" for purposes of § 810, but the same definition is applicable to all of title VIII and all of ANILCA. Therefore, that *Angoon* did not raise the scope of fisheries management is inconsequential.

The district court's other distinguishing point, that the Ninth Circuit apparently premised its holding on the conclusion that the servitude is a "power of government" rather than a property interest, should have prompted the court to follow rather than disregard *Angoon*. The fact that the navigational servitude is a *28 power rather than a property interest is the Ninth Circuit's *ruling* in the case; the plaintiffs had argued that the navigational servitude was a geographically-defined property interest to which the United States holds title, and the Ninth Circuit rejected the argument. *See* Petition for Writ of Cert. to the U.S. Court of Appeals for the Ninth Circuit, ER at 61; Federal Opposition, ER at 74. *Angoon*'s holding is indistinguishable on any relevant ground, and the district court was bound to follow it.

The district court relied instead on *Boone v. United States*, 944 F.2d 1489 (9th Cir. 1991). *Boone* raised the issue of whether the navigational servitude gave the public the right to boat on a lagoon. The Ninth Circuit found the navigational servitude inapplicable, but nevertheless discussed it:
The label, "servitude," implies a property interest. How a constitutional grant of authority to Congress creates such an interest is explained in *United States v. Twin City Power Co.*, 350 U.S. 222 ... (1956). The Court stated:
"The interest of the United States in the flow of a navigable stream originates in the Commerce Clause. That Clause speaks in terms of power, not of property. But the power is a dominant one which can be asserted to the exclusion of any competing or conflicting one. The power is a privilege which we have called 'a dominant servitude,' or 'a superior navigational easement.'"
*Id.* at 224-25... (citations omitted).

*Boone*, 944 F.2d at 1494 n.9. The district court placed undue significance on this discussion, which is not in any sense a reconsideration of the principle decided in *Angoon*. *Boone* did not involve ANILCA; the discussion the district court finds controlling was dictum; and the case quotes the U.S. Supreme Court for the proposition that the navigational servitude originates in the Commerce Clause, which speaks in terms of power, not of property. *29 The only sentence even marginally relevant simply states that one aspect of the navigational servitude is analogous to a property interest, the fact that the power is dominant and can be asserted to the exclusion of any competing or conflicting one. It does not state that the navigational servitude *is* a property interest; the Supreme Court made clear that it is not in *Twin City Power*, as quoted in *Boone*. Like all the federal government's constitutional powers and unlike property interests, the navigational servitude is bound to the sovereign, which cannot convey it to another party. A federal Constitutional power is not something to which the United States "has

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

title," even if it has some similarity to a property interest. Therefore, this Court's discussion of the navigational servitude as a dominant servitude does not warrant the conclusion that Congress intended to include navigable waters as public lands because it is an interest to which the United States has title.

The district court also relied on *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531 (1987). *Gambell* raised the issue of whether the outer continental shelf ("OCS") constituted "public lands" under ANILCA § 102. The court found that the OCS is not "public land" because it is outside the boundary of Alaska. In dictum, it stated that while the United States may not hold title to the submerged lands of the OCS, it hesitated to conclude that the United States did not hold title to any interests therein. *Id.* at 548 n. 15. The district court concluded from this statement that the term "title" in § 102 can refer to less than technical fee title, and therefore the United States holds title to an interest in the navigable waters of Alaska. ER at 39.

*30 The district court again overstated the significance of the Supreme Court's statement. While the Supreme Court was hesitant to conclude that the United States did not hold title to any interests in the submerged lands, it did not imply that federal title to an interest in the OCS would convert it to public lands. Section 102 makes clear that only the interest itself to which the United States holds title constitutes public lands. Therefore, *Amoco* cannot be cited as support for the district court's holding that "title" to the navigational servitude converts all navigable waters into public lands subject to the provisions of ANILCA.[FN8]

> FN8. Furthermore, the interest of the United States in the OCS is quite different than its interest in navigable waters. The United States has a property interest in the oil and gas in the OCS, which it leases to private entities. Congress has declared the OCS to be an area appurtenant to the United States, subject to its jurisdiction, control, and power of disposition. Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. 1331-1356, 1332(1). The purpose of the OCSLA was to assert the exclusive jurisdiction and control of the United States vis-a-vis the states over the seabed and subsoil of the outer continental shelf and to provide for the development of its vast mineral reserves. *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 470 n.7 (1981).

Congress itself has defined the navigational servitude as regulatory authority rather than a property interest. In the Submerged Lands Act, 43 U.S.C. 1301-1315, Congress defined the navigational servitude expressly to exclude any ownership rights. In confirming in and granting to states title to certain submerged lands, the United States retained:
all its navigational servitude and rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, navigation, national defense, and international affairs, all of which shall be paramount to, but shall not be deemed to include, proprietary rights of ownership....

*31 43 U.S.C. 1314 (emphasis added). The district court's conclusion that the navigational servitude is a property interest of the United States is not shared by the Supreme Court, the Ninth Circuit, or Congress, and therefore it is extremely unlikely that Congress intended its definition of public lands to include navigable waters based on this unprecedented theory.[FN9]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16012377 (C.A.9)
(Cite as: 1994 WL 16012377)

FN9. The plaintiffs also argued below that some navigable waters constitute public lands based on the United States' interest in federal reserved water rights. The United States opposed this argument by the plaintiffs for three years, but suddenly changed its position at oral argument. Nevertheless, the district court based its decision on the navigational servitude rather than federal reserved water rights. The United States filed a petition for interlocutory appeal, arguing that the district court should have relied on federal reserved water rights. The Ninth Circuit granted the petition, and the case has the same briefing schedule as is this case. *John v. United States*, C.A. No. 94-35481.

C. A BROAD READING OF TITLE VIII VIOLATES THE "CLEAR STATEMENT" DOCTRINE OF INTERPRETING STATUTES ENACTED UNDER THE COMMERCE CLAUSE.

As additional grounds for its ruling, the district court found that Congress specifically invoked its constitutional authority under the commerce clause "to protect and provide the opportunity for continued subsistence uses" when it enacted title VIII. ER at 41. The finding that Congress has authority to manage fisheries in navigable waters does not substitute for principled statutory interpretation, however. The Court should not find that Congress intended to exercise that authority unless it made that purpose plain. The Supreme Court will interpret a law to affect all activities within Congress' control under its commerce power only if the statutory language or legislative history constitutes a clear statement that Congress intended to exercise this power in *32 full. L. Tribe, *American Constitutional Law*, § 5-8 (2d ed. 1988) at 316. The Supreme Court has invoked the clear statement requirement most notably where a judgment that a federal statute reached to the outer limits of the commerce power would be inconsistent with state institutional interests. *Id.*

The purpose of the doctrine is to ensure that federal legislation is not applied in a manner that may alter the delicate balance of federal and state power unless Congress has carefully considered and fully intended such a result. *United States v. Bass*, 404 U.S. 336, 349 (1971); See also *McNally v. United States*, 483 U.S. 350, 360 (1987) ("If Congress desires to go further it must speak more clearly than it has"); *United States v. Enmons*, 410 U.S. 396 (1972) ("[I]t would require statutory language much more explicit than that before us here to lead to the conclusion that Congress intended to put the Federal Government in the business of policing the orderly conduct of strikes"); *United States v. Five Gambling Devices*, 346 U.S. 441, 450 (1953) ("unmistakable intention of Congress" necessary to apply the Act in its most extreme impact upon the affairs considered normally reserved to the states); *Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 152 (1944) ("Where Congress has not clearly indicated a purpose to precipitate conflict [between federal agencies and state authority], we should be reluctant to do so by decision").

The clear statement rule is an important complement to the political check on congressional exercise of the commerce power. In traditionally sensitive areas such as legislation affecting the federal balance, the clear statement requirement ensures that the *33 legislature has faced and intended to bring into issue the critical matters involved in the judicial decision. *United States v. Bass*, 404 U.S. at 350. The clear statement requirement is essential to prevent Congress from resorting to ambiguity to cloak its failure to accommodate the competing interests bearing on the federal-state balance. Tribe, *supra*, § 5-8 at 317. The doctrine increases the likelihood that Congress will give full attention to states' interests when it considers preemptive legislation.

D. CONGRESS DID NOT INTEND TO PROVIDE A PRIORITY TO ALL AREAS WHERE SUBSISTENCE USES OCCURRED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The district court held that because Congress wanted to provide for continued subsistence uses by rural Alaska residents it must have intended the priority to apply to navigable waters. This reasoning would be logical if prior to enactment of ANILCA, all subsistence hunting and fishing had been limited to federal lands and navigable waters, or if Congress had attempted to provide the preference in all areas of the state where subsistence hunting and fishing occurred. In fact, subsistence hunting and fishing has occurred traditionally on federal, state, and private lands, yet Congress limited the preference to "public lands." Therefore, Congress' intent to provide for continued subsistence uses cannot be interpreted literally to extend the priority everywhere Alaska residents previously engaged in subsistence hunting and fishing.

While obviously the Court should avoid interpretations that frustrate the purposes of a statute, Congress' express restriction of the geographic scope of a statute does not frustrate its purpose *34 in the areas where it applies. Congress' restriction of the rural preference to public lands is a matter of comity, and to interpret it as a Congressional determination of the most important subsistence areas in Alaska is senseless; Congress made no judgment about where subsistence hunting and fishing was most vital. It may be nonexistent on some federal lands and crucially important on some state and private lands, but this has no bearing on what Congress meant in defining "public lands."

Alaska has thousands of waterways containing anadromous fish, many which are nonnavigable and run through the 60% of the State that is federally owned. Obviously, some are navigable and important to subsistence users, but Congress did not pass a statute that offers no protection for subsistence fishing because it does not include navigable waters. Title VIII's provisions would be more protective of subsistence uses if Congress had applied them to all lands and waters regardless of ownership, but as with hunting, Congress intended to protect subsistence fishing in particular areas of Alaska, not statewide. The Court cannot expand judicially Congress' express restrictions on the scope of its legislation.

## CONCLUSION

The district court erred in finding that Congress intended but forgot to grant the Secretary authority to regulate the taking of fish and wildlife for subsistence purposes. Although Congress created a federal right to a subsistence priority for rural residents in taking of fish and wildlife on public lands in ANILCA, it intended the State to manage fish and wildlife. This intent is *35 apparent from both the language of title VIII and the legislative history of the subsistence title. Furthermore, § 1314 of ANILCA refutes any claim of implicit authority for the Secretary to usurp the state's role as manager of fish and wildlife on public lands. The Secretary's recent takeover of fish and wildlife management is unauthorized, and therefore this Court should find it invalid.

"Public lands" as defined in ANILCA does not include navigable waters. While an interest to which the United States holds title in navigable waters might constitute public lands, such an interest does not convert the waters into public lands. The navigational servitude is not a property interest but is a power of the United States that arises from the U.S. Constitution. Therefore, this Court should find that ANILCA's subsistence priority does not extend to navigable waters.

## STATEMENT OF RELATED CASES

The United States also appealed the issue of whether it has a property interest in the navigational servitude in the consolidated case of *John v. United States*, C.A. No. 94-35481. This Court previously has decided two related cases, *John v. United*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16012377 (C.A.9)                                                    Page 22
(Cite as: 1994 WL 16012377)


*States*, C.A. No. 93-35295, and *Native Village of Quinhagak v. United States*, C.A.
No. 93-35496.

DATED September 16, 1994.

STATE OF ALASKA, Plaintiffs-Appellant, v. Bruce BABBITT, Secretary of Interior, et
al., Defendants-Appellees.
1994 WL 16012377 (C.A.9)

Briefs and Other Related Documents  (Back to top)

• 1994 WL 16012379 (Appellate Brief) Reply Brief of Appellant State of Alaska (Nov.
22, 1994) Original Image of this Document with Appendix (PDF)
• 1994 WL 16057704 (Appellate Brief) Reply Brief for the Federal Appellants (Nov.
15, 1994) Original Image of this Document (PDF)
• 1994 WL 16012450 (Appellate Brief) Brief for Appellees Alaska Federation of
Natives and Katie John, et al. (Oct. 21, 1994) Original Image of this Document
(PDF)
• 1994 WL 16012376 (Appellate Brief) Brief for the Federal Appellees (Oct. 18,
1994) Original Image of this Document (PDF)
• 1994 WL 16058590 (Appellate Brief) Brief for Appellees Katie John, et al., and
Alaska Federation of Natives (Oct. 17, 1994) Original Image of this Document (PDF)
• 1994 WL 16058811 (Appellate Brief) Brief of Amici Curiae States of Arizona,
California, Idaho, Montana, and Oregon (Oct. 17, 1994) Original Image of this
Document (PDF)
• 1994 WL 16012378 (Appellate Brief) Brief of Amici Curiae State of Arizona,
California, Idaho, Montana, Nevada, and Oregon (Sep. 20, 1994) Original Image of
this Document (PDF)
• 1994 WL 16058810 (Appellate Brief) Brief for the Federal Appellants (Sep. 19,
1994) Original Image of this Document (PDF)

END OF DOCUMENT

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.