**EXHIBIT A-7**

For Opinion See 72 F.3d 698, 54 F.3d 549Briefs and Other Related Documents
United States Court of Appeals,
Ninth Circuit
STATE OF ALASKA, Plaintiff-Appellant,
v.
Bruce BABBITT, Secretary of Interior, et al., Defendants-Appellees,
andAlaska Federation of Natives, Defendant-Intervenor-Appellee.
No. **94-35480**.
October 21, 1994.

On Appeal from the United States District Court for the District of Alaska

Brief for Appellees Alaska Federation of Natives and Katie John, et al.
Of Counsel: William E. Caldwell, Alaska Legal Services Corp., 1648 Cushman, Suite
200, Fairbanks, Alaska 99701, (907) 452-5181Robert T. Anderson, Lawrence A.
Aschenbrenner, Heather Kendall, Native American Rights Fund, 310 "K" Street, Suite
708, Anchorage, Alaska 99501, (907) 276-0680, Attorneys for Alaska Federation of
Natives and Katie John, et al.

### *i TABLE OF CONTENTS

TABLE OF AUTHORITIES ... iii

BRIEF FOR THE PRIVATE APPELLEES ... 1

JURISDICTION ... 1

ATTORNEY'S FEES ... 1

COUNTERSTATEMENT OF THE CASE ... 1

 A. Introduction ... 1

 B. The Legal And Historical Background Against Which Congress Acted ... 2

 C. The Enactment Of ANILCA ... 5

 D. The Consistent Construction Of The Statute By Both The Secretary And The State
 ... 8

 E. The Current Litigation ... 12

ARGUMENT ... 13

I. INTRODUCTION AND SUMMARY ... 13

II. THE STATE'S POSITION IS FORECLOSED BY PRECEDENT ... 14

III. THE STATE'S ARGUMENT IS REFUTED BY THE PLAIN LANGUAGE AND STRUCTURE OF THE
STATUTE, CONSTRUED IN ACCORD WITH APPLICABLE RULES OF STATUTORY CONSTRUCTION ... 17

 A. The Local/Regional-Participation Mandate ... 18

  1. The Secretary's implementation mandate ... 19

  2. The carrot held out to the State ... 21

 B. The Judicial Enforcement Provision ... 23

1994 WL 16012450 (C.A.9)                                                        Page 2
**(Cite as: 1994 WL 16012450)**

  C. The "Indian Law" Rule Of Construction ... 25

  D. The Canon Requiring Avoidance Of Constitutional Issues ... 26

**\*ii** IV. THE CUMBERSOME, INTRUSIVE SCHEME CONTEMPLATED BY THE STATE LIKELY WOULD
VIOLATE THE TENTH AMENDMENT: AT THE VERY LEAST, IT WOULD RAISE SERIOUS
CONSTITUTIONAL QUESTIONS ... 26

V. THE LEGISLATIVE HISTORY CONFIRMS THE DUTY AND AUTHORITY OF THE SECRETARY TO
IMPLEMENT THE FEDERAL SUBSISTENCE PRIORITY ... 29

  A. The Authoritative Legislative History Demonstrates That Congress Intended The
Secretary To Enforce Title VIII's Subsistence Priority In The Event Of State
Withdrawal ... 29

  B. After The State Passed Its Subsistence Law In 1978, There Was No Debate About
Whether The State Would Participate In The Program, And Thus The History Regarding
State Management Is Premised On The Assumption Of State Compliance ... 31

CONCLUSION ... 32

STATEMENT OF RELATED CASES ... 33

CERTIFICATE OF SERVICE ... 34

### *iii TABLE OF AUTHORITIES

**CASES**

*Alaska v. Andrus,* 429 F. Supp. 958 (D. Alaska 1977), *aff'd,* 591 F.2d 537 (9th Cir.
1979) ... 17

*Alaska v. Babbitt,* No. A92-0264-CV (HRH) (D. Alaska) ... 1

*Amoco Production Co. v. Village of Gambell,* 480 U.S. 531 (1987) ... 23, 25

*Antoine v. Washington,* 420 U.S. 194 (1975) ... 2, 3, 6

*Ardestani v. INS,* 502 U.S. 129, 112 S. Ct. 515 (1991) ... 17

*Ashwander v. TVA,* 297 U.S. 288 (1936) ... 26

*Beecham v. United States,* 114 S. Ct. 1669 (1994) ... 18

*Board of Natural Resources v. Brown,* 992 F.2d 937 (9th Cir. 1994) ... 27, 28

*Bobby v. Alaska,* 718 F. Supp. 764 (D. Alaska 1989) ... 8, 10, 15, 24

*Burgess v. Alaska Lieutenant Governor,* 654 P.2d 273 (Alaska 1982) ... 8

*Chugach Alaska Corp. v. Lujan,* 915 F.2d 454 (9th Cir. 1990) ... 26

*Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust
for Southern California,* 113 S. Ct. 2264 (1993) ... 26

*County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation,* 502
U.S. 251, 112 S. Ct. 683 (1992) ... 25

*Defenders of Wildlife v. Andrus,* 627 F.2d 1238 (D.C. Cir. 1980) ... 17

*Department of Revenue of Oregon v. AFC Industries, Inc.,* 114 S. Ct. 843 (1994) ...
21

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568 (1988)* ... 26

*Fisher v. District Court, 424 U.S. 382 (1976)* ... 26

*Gomez v. United States, 490 U.S. 858 (1989)* ... 26

*Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S 264 (1982)* ... 31

*Katie John v. United States,* 9th Cir. No. 94-35481 ... 2

*Katie John v. United States,* No. A90-0484-CV (HRH) (D. Alaska) ... 1

**\*iv** *In re Kelly, 841 F.2d 908 (9th Cir. 1988)* ... 30

*Kenaitze Indian Tribe v. Alaska, 860 F.2d 312 (9th Cir. 1988),* cert. denied, *491 U.S. 905 (1989)* ... passim

*Kenaitze Indian Tribe v. Alaska,* Alaska Superior Court No. 3AN-91-4569 CIV (Oct. 26, 1993) (appeal pending) ... 7, 15, 26

*Kimball v. Callahan, 590 F.2d 768 (9th Cir.),* cert. denied, *444 U.S. 826 (1979)* ... 2

*King v. St. Vincent's Hospital, 502 U.S. 215, 112 S. Ct. 570 (1991)* ... 18

*Kluti Kaah Native Village of Copper Center v. Alaska,* No. A90-004, Civil (D. Alaska Aug. 15, 1990) ... 13, 24

*Lechmere, Inc. v. NLRB, 502 U.S. 527, 112 S. Ct. 841 (1992)* ... 16

*Madison v. Alaska Dept. of Fish & Game, 696 P.2d 168 (Alaska 1985)* ... 8, 10

*McDowell v. State, 785 P.2d 1 (Alaska 1989)* ... 11, 13, 15

*McDowell v. United States,* No. A92-531 (D. Alaska Oct. 7, 1992), vacated, No. 93-35200 (9th Cir. July 25, 1994) ... 15, 23

*Menominee Tribe v. United States, 391 U.S. 404 (1968)* ... 2

*Mesa v. California, 489 U.S. 121 (1989)* ... 26

*Native Village of Quinhagak v. United States,* No. 93-35496 (9th Cir. Sept. 1, 1994) ... 1, 7, 15, 26

*Negonsott v. Samuels, 113 S. Ct. 1119 (1993)* ... 17

*New Mexico v. Mescalero Apache Tribe, 462 U.S. 324 (1983)* ... 2

*New York v. United States, 112 S. Ct. 2408 (1992)* ... 15, 27, 28

*Organized Village of Kake v. Egan, 369 U.S. 60 (1962)* ... 3

*Pennhurst State School & Hospital v. Halderman, 465 U.S. 89 (1984)* ... 24

*People of Togiak v. United States, 470 F. Supp. 423 (D.D.C. 1979)* ... 5

*People of Village of Gambell v. Clark, 746 F.2d 572 (9th Cir. 1984),* rev'd sub nom., *Amoco Production Co. v. Village of Gambell, 480 U.S. 531 (1987)* ... 6

*People of Village of Gambell v. Hodel, 774 F.2d 1414 (9th Cir. 1985),* rev'd sub nom., *Amoco Production Co. v. Village of Gambell, 480 U.S. 531 (1987)* ... 6

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16012450 (C.A.9)                                                    Page 4
**(Cite as: 1994 WL 16012450)**

**\*v** *Ponca Tribe of Oklahoma v. Oklahoma, ... F.3d ..., 1994 WL 476316 (10th Cir. Sept. 2, 1994)* ... 27

*Puyallup Tribe v. Washington Game Dep't, 433 U.S. 165 (1977)* ... 28

*Rake v. Wade, 113 S. Ct. 2187 (1993)* ... 17

*Ratzlaf v. United States, 114 S. Ct. 655 (1994)* ... 17

*Reynolds v. Martin, 985 F.2d 470 (9th Cir. 1993)* ... 23

*Rust v. Sullivan, 500 U.S. 173 (1991)* ... 26

*Saudi Arabia v. Nelson, 113 S. Ct. 1471 (1993)* ... 25

*Settler v. Lameer, 507 F.2d 231 (9th Cir. 1974)* ... 2

*Sohappy v. Smith, 529 F.2d 570 (9th Cir. 1976)* ... 2

*State v. Morry, 836 P.2d 358 (Alaska 1992)* ... 27

*United States Nat'l Bank of Oregon v. Independent Ins. Agents of America, 113 S. Ct. 2173 (1993)* ... 18

*United States v. Alexander, 938 F.2d 942 (9th Cir. 1991)* ... 15

*United States v. Berrigan*, 2 Alaska Rep. 442 (D. Alaska 1905) ... 3

*United States v. Ron Pair Enterprises, 489 U.S. 235 (1989)* ... 29

*United States v. Washington, 520 F.2d 676 (9th Cir. 1975)*, *cert. denied,* 423 U.S. 1086 (1976) ... 2

*Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658 (1979)* ... 2, 28

*West Virginia University Hospitals, Inc. v. Casey, 499 U.S. 83 (1991)* ... 17, 25

**STATUTES AND REGULATIONS**

2 U.S.C. § 653 ... 30

16 U.S.C. § 712(1) ... 5

16 U.S.C. § 1152 ... 5

16 U.S.C. § 3111 ... 6, 7, 18, 20

16 U.S.C. § 1371(b) ... 5

**\*vi** 16 U.S.C. § 1539(e)(1) ... 5

16 U.S.C. § 3102(12) ... 12

16 U.S.C. §§ 3113 ... 6, 9, 14, 17

16 U.S.C. § 3114 ... 6, 20

16 U.S.C. § 3115 ... 19

16 U.S.C. § 3115(c) ... 20

16 U.S.C. § 3115(d) ... 2, 11, 13, 15, 21

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16012450 (C.A.9)                                      Page 5
**(Cite as: 1994 WL 16012450)**

16 U.S.C. § 3115(e) ... 22

16 U.S.C. § 3117(a) ... 1, 23

16 U.S.C. § 3124 ... 15

16 U.S.C. § 3202(a) ... 14, 17

25 U.S.C. § 71 ... 3

28 U.S.C. § 1292(b) ... 13

28 U.S.C. § 1362 ... 1

30 U.S.C. § § 1201, *et seq.* ... 31

43 U.S.C. § § 1601, *et seq.* ... 5

43 U.S.C. § 1603(b) ... 5

43 U.S.C. § 1653(a)(1) ... 5

43 U.S.C. § § 1701 *et seq.* ... 17

Alaska Stat. § 16.05.258(c) ... 26

Treaty of Purchase, 15 Stat. 539 ... 3

Sen. Doc. No. 152, 81st Cong., 2d Sess. (6 April 1950) ... 3

Act of July 1, 1870, ch. 189), 16 Stat. 180 ... 3

Act of March 2, 1889, 25 Stat. 1009 ... 4

Act of June 7, 1902, 32 Stat. 327 ... 3

Act of June 26, 1906, 34 Stat. 478 ... 4

**\*vii** Act of March 11, 1908, 35 Stat. 102 ... 3

Migratory Bird Treaty, 39 Stat. 1702 ... 3

Act of June 6, 1924, 43 Stat. 464 ... 3, 4

Act of January 13, 1925, 43 Stat. 739 ... 3

Act of February 14, 1931, 46 Stat. 1111, 1113 ... 4

Act of April 16, 1934, 48 Stat. 594 ... 4

Act of Sept. 1, 1937, 50 Stat. 900 ... 4

Act of June 25, 1938, 52 Stat. 1169, 1171-71 ... 4

Act of October 10, 1940, 54 Stat. 1103 ... 4

Act of Aug. 18, 1941, 55 Stat. 632 ... 4

Act of July 1, 1943, 57 Stat. 301, 306 ... 3, 4

Act of July 7, 1958, Pub. L. No. 85-508, 72 Stat. 339, 341 ... 4

Act of June 25, 1959, 73 Stat. 141 ... 4

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16012450 (C.A.9)                                                    Page 6
**(Cite as: 1994 WL 16012450)**

Act of December 2, 1980, Pub. L. No. 96-487, 94 Stat. 2374 ... 6

43 Fed. Reg. 57009, *et seq*. (Dec. 5, 1978) ... 5

43 Fed. Reg. 60252, *et seq*. (Dec. 26, 1978) ... 5

5 Alaska Admin. Code 99.010 ... 10

**LEGISLATIVE MATERIAL**

125 Cong. Rec. ... 32

126 Cong. Rec. ... 6, 23, 30

 H. Conf. Rep. No. 92-746, 92d Cong., 1st Sess. (1971), *reprinted in* 1971 U.S. CODE
                CONG. & AD. NEWSS 2247, 2250 ... 5


H.R. Rep. No. 96-97, Part I, 96th Cong., 1st Sess. (1979) ... 24

H.R. Rep. No. 97, 96th Cong., 1st Sess. Part I (1979) ... 30

*Hearings on H.R. 39 et al. Before the Subcomm. on General Oversight and Alaska Lands
of the House Comm. on Interior and Insular Affairs*, 95th Cong., 1st Sess., part XII
(1978) ... 31

**\*viii** S. Rep. No. 1300, 95th Cong. 2d Sess. (1978) ... 30, 31

S. Rep. No. 95-1300, 95th Cong., 2d Sess. 221 (1978) ... 7

 S. Rep. No. 96-413, 96th Cong., 2d Sess. 339 (1979), *reprinted in* 1980 U.S. CODE
                CONG. & ADMIN. NEWS 5283 (1980) ... 30


**MISCELLANEOUS**

Black's Law Dictionary (1979) ... 22

C. WILKINSON, AMERICAN INDIANS, TIME, AND THE LAW (1987) ... 6

D. CASE, ALASKA NATIVES AND AMERICAN LAWS (1984) ... 3, 5

                    **\*1 BRIEF FOR THE PRIVATE APPELLEES**

Both this interlocutory appeal of the State of Alaska and the companion appeal of
the federal defendants (No. 94-35481) are taken from a decision (ER at 1) filed by
Chief District Judge Holland in two consolidated cases: *Katie John v. United States,*
No. A90-0484-CV (HRH), and *Alaska v. Babbitt,* No. A92-0264-CV (HRH). The plaintiffs
in the *Katie John* case are two individual Alaska Natives (Katie John and Doris
Charles) and a federally recognized Indian tribe (Mentasta Village Council). In
*Alaska v. Babbitt,* the Alaska Federation of Natives ("AFN"), a statewide Native
organization, intervened as a defendant and filed a cross-claim against the federal
defendants. CR 110. (Prior to consolidation of the cases, AFN also participated in
*Katie John* as *amicus curiae* in support of plaintiffs.) This appellees' brief is
submitted on behalf of the *Katie John* plaintiffs and intervenor/cross-claimant AFN,
hereafter the "private plaintiffs."

                               **JURISDICTION**

The private plaintiffs agree with Alaska's statement of jurisdiction. State's Br. at
1. In addition, the district court has subject-matter jurisdiction under § 807(a)
of ANILCA, 16 U.S.C. § 3117(a), and 28 U.S.C. § 1362.

                            **ATTORNEY'S FEES**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16012450 (C.A.9)                                          Page 7
**(Cite as: 1994 WL 16012450)**

051 Extra cent-Y found within cent-Y markup. 051 Extra cent-Y found within cent-Y markup.

The private plaintiffs are authorized to recover full costs and reasonable attorney's fees pursuant to ANILCA § 807(a), 16 U.S.C. § 3117(a). *See Native Village of Quinhagak v. United States, No. 93-35496, slip op.* at 10246-47 (9th Cir. Sept. 1, 1994); *Kenaitze Indian Tribe v. Alaska, 860 F.2d 312, 318 n.9 (9th Cir. 1988), cert. denied, 491 U.S. 905 (1989).*

### COUNTERSTATEMENT OF THE CASE

### A. Introduction

The State's interlocutory appeal places two questions before the Court: 1) whether the geographic scope of the subsistence priority secured by Title VIII of ANILCA (16 U.S.C. §§ 3111-3126) encompasses navigable and/or federally reserved waters (the "public lands" **\*2** question); and 2) whether Alaska retains management authority to implement a federal program governing subsistence uses of fish and wildlife on the "public lands" when it has effectively repealed the "laws of general applicability" prescribed by ANILCA § 805(d), 16 U.S.C. § 3115(d)? As to the first question, the State argues that no navigable waters in Alaska are covered, thus essentially removing subsistence uses of fish and other aquatic resources from the protection of federal law. In the companion appeal, *Katie John v. United States,* 9th Cir. No. 94-35481, the United States takes the position that the "public lands" definition of ANILCA encompasses federal reserved waters and non-navigable waters overlying federal lands, but that it does not generally extend to navigable waters in Alaska as determined by the court below. The private plaintiffs' arguments on the "public lands" issue are set forth in their brief for private appellees in the companion appeal, No. 94-35481. This brief is devoted to the State's contention that, notwithstanding its inability to comply with the conditions of § 805(d) of ANILCA, Alaska retains day-to-day management authority over subsistence uses of fish and wildlife on the public lands. A proper analysis of the State's claim entails an examination of the historical and legal background and framework.

### B. The Legal And Historical Background Against Which Congress Acted

The history of the national government's treatment of the subsistence rights of Alaska Natives is similar to that accorded to the reserved hunting and fishing rights of the Indian tribes in the lower 48 States, whereby state authority to regulate Native hunting and fishing is either precluded entirely, or is narrowly permitted only for imperative conservation measures. [FN1] From the time Alaska was purchased by the United States in 1867, at the end of **\*3** the treaty-making era, [FN2] until the present day, the hunting and fishing rights of Alaska Natives have been affirmatively recognized and protected (at least on paper) by Congress, the Executive Branch, and the federal courts. *See generally* D. CASE. ALASKA NATIVES AND AMERICAN LAWSS 279-306 (1984). [FN3] Congress has consistently and repeatedly acted to protect the hunting and fishing opportunities of Alaska Natives (and often other rural residents and travelers, as well), usually by exemptions for subsistence (and some commercial) hunting and fishing activities from the operation of territorial fish and game laws or international treaties, and by the imposition of rural residency requirements. [FN4]

FN1. *See, e.g., New Mexico v. Mescalero Apache Tribe, 462 U.S. 324 (1983); Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658 (1979); Antoine v. Washington, 420 U.S. 194 (1975); Menominee Tribe v. United States, 391 U.S. 404 (1968); Kimball v. Callahan, 590 F.2d 768 (9th Cir.) , cert. denied, 444 U.S. 826 (1979); Sohappy v. Smith, 529 F.2d 570 (9th Cir. 1976); United States v. Washington, 520 F.2d 676 (9th Cir. 1975), cert. denied, 423 U.S. 1086 (1976); Settler v. Lameer, 507 F.2d 231 (9th Cir. 1974).*

FN2. The same year as Alaska's acquisition, dissatisfaction by House of Representatives over its virtual exclusion from any affirmative role in Indian affairs led to the passage of legislation prohibiting the Executive Branch

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

from treating with the Indian tribes, but that act was repealed a few months later; in 1871, however, Congress enacted a permanent ban on treaty-making. *See Antoine v. Washington, 420 U.S. 194, 201-02 (1975)*; 25 U.S.C. § 71.

FN3. Article III of the 1867 Treaty of Purchase, 15 Stat. 539, left the land and land-related claims of Alaska Natives for future resolution by Congress, which did not begin the process of resolution until the 1971 enactment of the Alaska Native Claims Settlement Act. Even Alaska's admission into the Union in 1959 did not compel Congress to address the issue, but only once again to reserve it for future disposition. *See, e.g., Organized Village of Kake v. Egan, 369 U.S. 60 (1962)*.

FN4. Prior to Alaska's purchase, Native subsistence rights were protected by the "laws of an antecedent government [Russia]." *United States v. Berrigan,* 2 Alaska Rep. 442, 446 (D. Alaska 1905). *See* the Second (1821) and Third (1844) Charters of the Russian American Company, *reprinted in Russian Administration of Alaska and the Status of the Alaska Natives,* SEN. DOC. NO O. 152, 81st Cong., 2d Sess. 45, 50-51 (6 April 1950). In its very first action to protect wildlife resources in the new territory from over-exploitation, an Act to Prevent the Extermination of Fur-bearing Animals in Alaska (July 1, 1870, ch. 189), 16 Stat. 180, Congress imposed bag limits and closed seasons on the commercial taking of fur-seals on St. Paul and St. George Islands, but expressly exempted from these restrictions Native hunting for food, clothing and the manufacture of boats (§ 1).

Alaska's first game law, enacted June 7, 1902, 32 Stat. 327, imposed season, bag-limit and other restrictions on the taking of game animals, but expressly exempted hunting for food or clothing by "native Indians or Eskimos or by miners, explorers, or travelers on a journey when in need of food" (§ 1). [FN5] Similarly with respect to fisheries, an act of June 6, 1924, 43 **\*4** Stat. 464, exempted from methods and closed-season restrictions "the taking of fish for local food requirements or for use as dog food." *Id*. at 466 (§§ 4 and 5). [FN6]

FN5. This exemption, so classified, was re-enacted when the 1902 Act was amended by the Act of March 11, 1908, 35 Stat. 102. When the government negotiated the Migratory Bird Treaty of 1916 with Canada, it exempted Alaska Natives from the closed seasons for certain species. 39 Stat. 1702, 1703 ("The close season on other migratory nongame birds shall continue throughout the year, except that Eskimos and Indians may take at any season auks, auklets, guillemots, murries and puffins, and their eggs for food and their skin for clothing.")
By the Act of January 13, 1925, 43 Stat. 739, the Alaska Game Commission was established, and the Secretary of Agriculture, in consultation with the Commission, was directed to regulate the taking of game and other animals, but again there was an exemption (§ 10) for "any Indian or Eskimo, prospector, or traveler to take animals and birds during the close seasons when he is in absolute need of food and other food is not available." (This exemption was retained by amending acts of October 10, 1940, 54 Stat. 1103, and July 1, 1943, 57 Stat. 301, 306, except that the word "absolute" was dropped in these later amendments.) The 1925 Act also contained a one-year residency requirement (§ 3), which was amended by act of June 25, 1938 to provide that whenever the Secretary finds "that the economic welfare and interests of native Indians or Eskimos, or the fur resources of Alaska, are threatened by the influx of trappers from without the Territory," he may impose a three-year residency requirement for a resident trapping license. 52 Stat. 1169, 1170. Section 11(H) of the 1925 Act also provided an exemption from the fur-dealer licensing requirement for Natives and hunters and trappers selling the skins of lawfully-taken animals. This exemption was amended by act of February 14, 1931, 46 Stat. 1111, 1113, to extend to "cooperative stores" operated by and for Natives, or by missions for Natives. These exemptions were continued in the amending acts of June 25, 1938, 52 Stat. 1169, 1171-71, and July 1, 1943, 57 Stat. 301, 308.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16012450 (C.A.9)                                                    Page 9
(Cite as: 1994 WL 16012450)

FN6. The predecessor Act of June 26, 1906, 34 Stat. 478, did not contain the exemption in these words, although it did "except Cook Inlet, the Delta of Copper River, Bering Sea, and the waters tributary thereto." *Id.* at 479 (§ 5). (The earlier fisheries act of March 2, 1889, 25 Stat. 1009, prohibiting the obstruction of spawning streams, did not contain any exceptions.) When the 1924 fisheries act was amended on April 16, 1934, 48 Stat. 594, Congress excepted the "Karluk, Ugashik, Yukon, and Kuskokwim Rivers" from the restrictions on fish fences, traps, fishwheels, etc. (§ 3), as well as other methods and means restrictions (§ 4). Congress explained that this exception "shall be solely for the purpose of enabling native Indians and bona fide permanent white inhabitants along the said rivers" to take king salmon "for commercial purposes and for export," but (*id.* at 595):
*Provided further,* That no person shall be deemed to be a bona fide permanent inhabitant of the said rivers who has not resided thereon, or within fifty miles thereof for a period of over one year, and that the term "native Indians" as used herein shall be taken to mean members of the aboriginal races inhabiting Alaska when annexed to the United States, and their descendants of the whole or half blood.

And so it went until Statehood. [FN7] Section 6(e) of the Statehood Act of July 7, 1958, Pub. L. No. 85-508, 72 Stat. 339, 341, established the mechanism for transfer of primary fish and game management to the new State (which occurred in 1960), but § 4 (as amended by the Act of June 25, 1959, 73 Stat. 141) again reserved for future disposition the land claims and hunting and fishing rights of Alaska Natives. *See* note 3, *supra.* [FN8] Congress continued to **5 legislate on the subject of Alaska Native subsistence, however, and in the Fur Seal Act of 1966 it again exempted from the Act's prohibitions "Indians, Aleuts, and Eskimos who dwell on the coast of the North Pacific Ocean." 16 U.S.C. § 1152.

FN7. *See* notes 5 and 6, *supra.* The Reindeer Industry Act of September 1, 1937 was addressed explicitly to Native "subsistence." 50 Stat. 900. Four years later, on August 18, 1941, legislation was enacted prohibiting the taking of walruses, with but two exceptions -- for "scientific or educational purposes," and: "That walruses may be taken at any time by natives for food and clothing for themselves and by miners or explorers or any other person when in need of food and other food is not available, and the skins, hides, tusks, or ivory of walruses so taken may be possessed, sold, bartered, or purchased in the Territory and said tusks or ivory, when carved or otherwise manufactured or processed in the Territory, may be exported therefrom." 55 Stat. 632, 633.

FN8. Section 4 of the Statehood Act provided that "the State and its people do agree and declare that they forever disclaim all right and title . . . to any lands or other property (including fishing rights), the right or title to which may be held by any Indians, Eskimos, or Aleuts."

Finally, in 1971, Congress confronted the issue it had postponed for a century and enacted the Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. §§ 1601, *et seq.* Section 4(b) explicitly extinguished hunting and fishing rights based on aboriginal title: "All aboriginal titles, if any, and claims of aboriginal title in Alaska based on use and occupancy, . . . including any aboriginal hunting and fishing rights that may exist, are hereby extinguished." 43 U.S.C. § 1603(b). Despite this extinguishment, Congress made clear its intent to continue federal protection of the non-title-based usufructuary hunting and fishing rights of Alaska Natives that had long been recognized. [FN9] No cent-Y cent-R found.
052

FN9. Although, in the end, ANCSA did not contain express statutory protections for Native subsistence rights (*see* D. CASE, ALASKA NATIVES AND AMERICAN LAWS 279-306 (1984)), the ANCSA Conference Report recognized these rights and expressed the conviction that the Secretary of the Interior (presumably by virtue of his ongoing trust obligations) could "exercise his existing withdrawal authority" to "protect Native subsistence needs and requirements." The report directs: "The Conference Committee expects both the Secretary and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the State to take any action necessary to protect the subsistence needs of the
Natives." H. CONF. REP. NOO. 92-746, 92d Cong., 1st Sess. 37 (1971), *reprinted
in* 1971 U.S. CODE CONG. & AD. NEWSS 2247, 2250.
In the wake of ANCSA, Congress and the Executive continued to act
affirmatively to recognize and protect the subsistence rights of Alaska
Natives. The very next year, Congress passed the Marine Mammal Protection Act
of 1972, expressly exempting from the taking moratorium "any Indian, Aleut, or
Eskimo who dwells on the coast of the North Pacific Ocean or the Arctic
Ocean," if such taking is for "subsistence purposes" or for the "creating and
selling" of handicrafts and clothing. 16 U.S.C. § 1371(b). *See People of
Togiak v. United States, 470 F. Supp. 423 (D.D.C. 1979).* The next year, in the
Trans-Alaska Oil Pipeline Act of 1973, Congress imposed strict damages
liability for any harm to the subsistence resources of Natives or others. 43
U.S.C. § 1653(a)(1). That same year, the Endangered Species Act again
contained exemptions for subsistence uses by Natives and "any non-native
permanent resident of an Alaskan native village." 16 U.S.C. § 1539(e)(1). In
the Fish and Wildlife Improvement Act of 1978, Congress vested the Secretary
with authority "to assure that the taking of migratory birds and the
collection of their eggs, by the indigenous inhabitants of the State of
Alaska, shall be permitted for their own nutritional and other essential
needs." 16 U.S.C. § 712(1). In the same year, the Executive land withdrawals
leading up to the "d-2" legislation (ANILCA) contained expansive subsistence-
protection mandates: each of the national monument proclamations signed by
President Carter on December 1, 1978, with the exception of Kenai Fjords,
contained identical provisions expressly protecting continued subsistence
hunting, 43 FED. REG . 57009, *et seq.* (Dec. 5, 1978), and the National Park
Service adopted interim subsistence regulations to carry out the intent of the
proclamations. 43 FED. REG. 60252, *et seq.* (Dec. 26, 1978).

                          **C. The Enactment Of ANILCA**

Congress acted to fulfill its commitment to protecting Native subsistence in the **\*6**
comprehensive legislation classifying the remaining federal lands in Alaska (some
two-thirds of the State), which became law on December 2, 1980, Pub. L. No. 96-487,
94 Stat. 2374. Through Title VIII of ANILCA, Congress affirmatively sought to
protect the subsistence way of life, "because the Secretary and the state failed to
heed Congress' admonition [in the ANCSA conference report to 'take any action
necessary to protect the subsistence needs of the Natives']." *People of Village of
Gambell v. Clark, 746 F.2d 572, 580 (9th Cir. 1984),* rev'd on other grounds sub
nom., Amoco Production Co. v. Village of Gambell, 480 U.S. 531 (1987). *See* note 9,
*supra.* Title VIII is premised upon federal supremacy over Native affairs, as well as
federal supremacy over federal property and interstate commerce. [FN10] While Title
VIII also protects subsistence uses of non-Native rural Alaskans, it is nonetheless
"Indian legislation." [FN11] It is therefore a "treaty substitute," a term referring to
the various congressional and executive mechanisms for dealing with Native American
tribes following the end of the treaty-making era in 1871 (*see* note 2, *supra*). [FN12]


    FN10. Congress found that the subsistence title was necessary "in order to
    fulfill the policies and purposes of the Alaska Native Claims Settlement Act
    and as a matter of equity"; Congress therefore "invoke[d] its constitutional
    authority over Native affairs and its constitutional authority under the
    property clause and the commerce clause." ANILCA § 801(4), 16 U.S.C. §
    3111(4). "Early drafts of Title VIII protected only subsistence uses by Alaska
    Natives. When the state advised Congress that the Alaska Constitution might
    bar the enforcement of a preference extended only to Natives, Congress
    broadened the preference to include all 'rural residents.' 126 Cong. Rec.
    29,278-79 (1980) (statement of Rep. Udall)." *Kenaitze, 860 F.2d at 313 n.1.*051
    Extra cent-Y found within cent-Y markup. 051 Extra cent-Y found within cent-Y
    markup.

    FN11. *People of Village of Gambell v. Clark, supra, 746 F.2d at 581,* and
    *People of Village of Gambell v. Hodel, 774 F.2d 1414, 1425 (9th Cir. 1985)
    (Gambell II),* rev'd on other grounds sub nom., Amoco Production Co. v. Village
    of Gambell, 480 U.S. 531 (1987).

                © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

       FN12. *See* C. WILKINSON, AMERICAN INDIANS, TIME, AND THE LAW 8, 63–68 (1987). Statutory treaty substitutes, including statutes like Title VIII designed to preserve Native hunting and fishing rights, have the same force and effect as do the pre-1871 treaties -- they are the supreme law of the land. *Antoine v. Washington, 420 U.S. 194, 203–14 (1975);* WILKINSON at 64–65.

The statute confers a priority for subsistence uses on the "public lands" (§ 804), and defines subsistence uses as the "customary and traditional uses" of "rural Alaska residents" (§ 803). 16 U.S.C. § § 3113 and 3114. Congress employed features of both federal pre-emption and cooperative federalism. It "direct[ed] the Secretary of the Interior to establish the administrative structure necessary for the implementation of the statute." *7*Kenaitze Indian Tribe v. Alaska,* 860 F.2d 312, 313–14 (9th Cir. 1988),* cert. denied, 491 U.S. 905 (1989),* citing § § 805(a)-(c), 16 U.S.C. § § 3115(a)-(c). "The federal regulatory scheme is to be stayed, however, if the state of Alaska enacts laws 'which are consistent with, and which provide for the definition, preference, and participation specified in, sections 3113, 3114, and 3115 of this title.'" *860 F.2d at 314, citing* § 805(d), 16 U.S.C. § 3115(d). Accordingly, Congress gave Alaska "the choice between federal regulation or self-regulation with federal oversight." *Id.* [FN13]

       FN13. The purposes and goals of Congress are plain from the face of the legislation: "to protect and provide the opportunity for continued subsistence uses on the public lands by Native and non-Native rural residents" (§ 801(4), 16 U.S.C. § 3111(4)), which opportunity "is essential to Native physical, economic, traditional, and cultural existence and to non-Native physical, economic, traditional, and social existence" (§ 801(1)), and which opportunity "is threatened by the increasing population of Alaska" and the "increased accessibility of remote areas containing subsistence resources," among other things (§ 801(3)).

Ironically (in retrospect), Congress shifted from a Native-preference approach to a "rural residents" one because of Alaska's State-law equal-protection objections to a Native preference. *Kenaitze, 860 F.2d at 313 n.1; see also* note 10, *supra.* Congress acted upon the belief that the rural preference would provide protection to most subsistence-dependent Alaska Natives. Nearly all of the more than two hundred small Native villages in Alaska are located along the coast, the shore of a lake, or a river. The proximity to water reflects the dependence of Native and other "rural Alaska residents" on the harvest of fish stocks for sustenance and as the basis of their traditional way of life. *See, e.g., Native Village of Quinhagak v. United States,* No. 93-35496 (9th Cir. Sept. 1, 1994); *Kenaitze, supra.* As the Senate Energy Committee observed in 1978, "in many instances the failure to obtain fish to dry for winter use or fresh meat to supplement other foods can engender considerable individual, community and cultural trauma and hardship." S. REP. NO. 95-1300, 95th Cong., 2d Sess. 221 (1978). *See* CR 19 (documenting the importance of fishery resources to Alaska Natives, which comprise over 60% of the annual subsistence take).

*8 **D. The Consistent Construction Of The Statute By Both The Secretary And The State**

Shortly after ANILCA became law on December 2, 1980, an initiative petition to repeal the State's 1978 subsistence law (the centerpiece of the State's efforts to comply with ANILCA) [FN14] was certified by the Lieutenant Governor for inclusion on the November 1982 general election ballot (the voters rejected the measure at that election). *See Burgess v. Alaska Lieutenant Governor, 654 P.2d 273 (Alaska 1982).* In a memorandum opinion dated April 23, 1981, the Alaska Attorney General concluded that the initiative, if approved, would prevent the State from complying with the requirements of § 805(d), which would "almost certainly" have a number of adverse consequences, including "federal control over subsistence management" pursuant to "substantive fish and game management regulations, including such subjects as seasons, bag limits, and methods and means, controlling the subsistence taking of fish and wildlife on all federal lands in Alaska," which "will necessarily have an effect, including a preemptive effect, upon state laws and regulations governing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

non-subsistence (i.e., sport and commercial) harvest on federal lands within the
State where such harvest is otherwise permitted." CR 133, Exhibit 1 at 6-8; *see also*
*id.* at 9.

> FN14. After the House of Representatives had passed an earlier version of
> ANILCA in 1978, the Alaska Legislature responded by enacting the State's first
> subsistence-preference law, *reprinted in* *Bobby v. Alaska, 718 F. Supp. 764,
> 788-91 (D. Alaska 1989).* The State's law was modelled on the 1978 House
> version, which did not prescribe a rural preference. *See* *Madison v. Alaska
> Dept. of Fish & Game, 696 P.2d 168, 176-77 n.13 (Alaska 1985).*

This was the consistent interpretation of both the State and the Secretary
throughout the process by which the State sought and obtained the Secretary's
certification of a State program complying with §  805(d).[FN15]  The State made its
formal submission to the Secretary **9 on December 2, 1981 (the deadline), consisting
principally of a formal opinion from the Attorney General to Governor Hammond, which
begins with the observation that under §   805(d)

> FN15. The ANILCA "certification" process commenced with a "preliminary
> submission" from the State to the Secretary on May 27, 1981. The preliminary
> submission was followed by a formal submission on December 2, 1981, and
> supplemental submissions on December 23, 1981 and May 5, 1982. *See* CR 133,
> appendix to Exhibit 15 (May 14, 1982, memorandum from Interior's Solicitor to
> the Secretary) (outlining the chronology of the certification process). Early
> on, Interior construed §  805(d) "as imposing a nondiscretionary duty on the
> Secretary. If the State satisfies the ANILCA subsistence use definition,
> preference, and local participation requirements, the Secretary must defer to
> State administration of subsistence uses on Federal lands in Alaska." CR 133,
> Exhibit 2 at 2. At a meeting with State officials on September 28-29, 1981,
> Interior representatives highlighted four main problems with the existing
> State program ("rural residency, customary trade, local and regional
> participation, and funding") and "took a firm stand on these matters and
> indicated that, if an adequate program was not submitted on December 2 [the §
> 805(d) deadline], Secretary Watt would begin to impose a federal subsistence
> program." CR 133, Exhibit 3 at 2. The State agreed with this construction of §
> 805(d). *See* CR 133, Exhibit 4 at 4.

the State of Alaska forfeits its right to regulate subsistence uses on federal lands
unless, by December 2, 1981, *i.e.,* one year from the enactment of ANILCA, it
demonstrates that it has enacted and implemented laws which are consistent with and
provide for the subsistence use definition, preference, and local participation
provisions of sections 803, 804, and 805 of ANILCA. If the State is unable to meet
this burden, the Secretary . . . is under a nondiscretionary duty to implement a
federal program for the regulation of subsistence uses.

CR 133, Exhibit 5 at 1. The Attorney General recommended a number of State
regulatory actions to resolve the problems preliminarily identified by the
Secretary.[FN16]

> FN16. The Secretary acknowledged the Governor's submission on December 11 with
> the assurance that "[i]t is the Department's position that Alaska's residents
> and resources will be best served if, consistent with the Alaska Lands Act,
> the state has responsibility for the day-to-day regulation of the subsistence
> use of wild, renewable resources located on Federal lands in Alaska." CR 133,
> Exhibit 6; *see also* Exhibits 8 & 9.

By February of 1982 the Secretary had determined that there continued to be flaws in
the subsistence program submitted by the State, including the fact that the State
statute did not assure a subsistence priority to "rural residents," as required by
ANILCA §  803, and that other parts of the State's program consisted only of "policy
resolutions," thus raising the issue of whether they had been adopted by "laws of

1994 WL 16012450 (C.A.9)                                              Page 13
**(Cite as: 1994 WL 16012450)**

general applicability" as required by §  805(d). By letter to Governor Hammond on
February 25, 1982, Secretary Watt outlined some of the Department of the Interior's
concerns, primarily focusing on the need to assure the subsistence priority to
"rural residents."[FN17]

      FN17. CR 133, Exhibit 10. After outlining the problems and suggesting ways in
which the State could comply with ANILCA, the Secretary expressed his
confidence that it would do so, but warned:
We earnestly hope to be able to approve the State program as such action would
be in accord with our commitment to States' rights, particularly the right to
manage resident fish and game. The State's inability to provide such a program
will, however, force us to assume fish and game management on federal lands in
Alaska. Such a step would run counter to our philosophy but enforcing the law
is our sworn duty.
*Id.* at 1. And on March 30, the Secretary responded to a request from Senator
Stevens about the evolution of Title VIII, in which the Secretary reiterated
that "[i]f [State] compliance is not established, however, Title VIII mandates
that this important function be carried out by the Secretary of the Interior."
CR 133, Exhibit 11 at 3.

**\*10** The Joint Boards of Fisheries and Game met in the spring of 1982[FN18] and took
regulatory actions addressed to the Secretary's concerns, including adoption of what
is popularly known as the "eight-criteria regulation," defining "subsistence uses"
as those of rural residents. 5 ALASKA ADMIN. CODE §  99.010 (1982), *reprinted in
Bobby, 718 F. Supp. at 794-95.* These regulations were provided to the Secretary as
part of the State's final submission of May 5, 1982. CR 133, Exhibit 13. On May 14,
1982, Secretary Watt wrote Governor Hammond certifying the State's program as
complying with § §  803-805 of ANILCA, and expressing his determination that "[a]s a
result of this certification of compliance, the State retains its traditional role
in the regulation of fish and wildlife resources on the public lands in Alaska."[FN19]

      FN18. Deputy Under Secretary Horn appeared before the Joint Boards on April 5,
1982, and emphasized the necessity that the Boards adopt regulations complying
with ANILCA's requirements in order to avoid federal assumption of subsistence
management on the public lands. Exhibits 12-A and 12-B.

      FN19. CR 133, Exhibit 14, *reprinted in Bobby v. Alaska, 718 F. Supp. at 812-
13.* The Secretary's certification was based upon an opinion memorandum of the
same date from his Solicitor. Exhibit 15.

This contemporaneous interpretation has been the consistent position of both the
Secretary and the State (until the State's contentions *sub judice*) since that time.
*See, e.g.,* CR 133, Exhibit 16 (February 25, 1983 memorandum from the Attorney
General to Governor Sheffield). In the wake of the decision in *Madison v. Alaska
Dept. of Fish & Game, 696 P.2d 168 (Alaska 1985),* for example, the Secretary again
asserted his authority to assume subsistence management on the public lands, and the
State agreed with his interpretation of the statute. [FN20] And when the Alaska Supreme
Court's *McDowell* decision clearly "repealed" **\*11** the State's compliance with
ANILCA,[FN21] the State not only acquiesced in the Secretary's decision to assume
subsistence management on the public lands, but conceded his statutory and
constitutional authority to do so. *See* CR 133, Exhibits 18-A through 18-F.

      FN20. *See* CR 133, Exhibits 17-A through 17-F, and *Bobby, 718 F. Supp. at 813-
15* (Secretary's letter of September 23, 1985, threatening federal takeover).
(The *Madison* decision invalidated the regulatory criteria limiting the
preference to rural residents, as being inconsistent with the 1978 law. *See*
note 14, *supra*. The Alaska Legislature responded in 1986 with the "rural area"
amendment to the law, *reprinted in Bobby, 718 F. Supp. at 791-93,* which this
Court in *Kenaitze* held inconsistent with ANILCA). Because the *Madison* decision
did not actually constitute a "repeal" of Alaska's subsistence law, however,
this Court held in *Kenaitze* that the Secretary had exceeded his authority *(860*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

F.2d at 315):
The Secretary's responsibility in administering the Act includes an initial certification that the state has implemented a statute that complies with ANILCA and that federal regulation should accordingly be withheld. 16 U.S.C. § 3115(d). Once the state regulatory scheme is in place, the Secretary's powers are limited to monitoring the state's implementation of its legislative program and making periodic reports to Congress. Id. § 3116. ANILCA thereafter vests the power to approve or disapprove the state's performance in the courts alone. Id. § 3117(a).

FN21. The State had argued specifically to the Alaska Supreme Court that it would lose subsistence-management authority on the public lands if the court declared the rural preference unconstitutional, and the court accepted that consequence of its ruling. See McDowell v. State, 785 P.2d 1, 10 n.20 (Alaska 1989).

The Secretary therefore began implementing a public-lands subsistence-use management program on July 1, 1990,[FN22] and the State continued to acquiesce in that construction of ANILCA until the spring of 1993, when it filed its motion giving rise to this appeal.[FN23]

FN22. Secretary Lujan wrote to Governor Cowper on June 20, 1990, informing him of the impending federal regulatory program, which "represent[s] the minimum extension of Federal authority necessary to fulfill the statutory obligation the Federal government has in this matter." CR 133, Exhibit 19 at 2. The Secretary expressed his desire for a cooperative management agreement with the State, because (id. at 1, 2):
For both governments this responsibility [to protect and provide for continued subsistence uses on the public lands] will require coordinated and cooperative action to ensure that sufficient fish and wildlife resources are available on public lands to meet customary and traditional needs for those resources by rural residents. In some cases this responsibility will require action to ensure that harvest allocations of migratory resources on non-public lands are set at levels that will protect the ability of rural residents on public lands to take at the customary and traditional level.
* * * *
One of the things I must consider is the possibility that Federal authority may have to be extended predicated on the Federal government's constitutional mandate to protect Native American interests and our fish, wildlife, and other natural resources.

FN23. Even after Governor Hickel assumed office at the end of 1990, the State continued to accede to the long-standing interpretation that Title VIII requires federal management in the absence of conforming State laws. See CR 133, Exhibits 20-A and 20-B. The State did not so much as intimate doubt about the Secretary's duty and authority in its August 14, 1991 request for reconsideration of the Secretary's 1991-92 regulations. CR 133, Exhibit 21 at pp. V-30 through V-33. (This request for reconsideration was based exclusively on the State's (erroneous) contention that the federal subsistence fisheries regulations applied to navigable waters.) Nor did the State even suggest that it, rather than the Secretary, should be the primary subsistence-use manager on the public lands in the State's December 9, 1991 comments to the Federal Subsistence Board on the Draft Environmental Impact Statement (CR 133, Exhibit 21 at pp. V-11 through V-29); indeed, the Commissioner of Fish and Game stated that the State, through ADF&G, "looks forward to working with the [federal subsistence-management program] and the individual federal agencies as each develops a final program for federal management of subsistence uses on federal public lands." Id. at p. V-13. (These comments did object "to any assertion that the Federal Subsistence Board may implement Title VIII of ANILCA on non-federal public lands under any circumstances without the concurrence of the State." Id. at V-11. The Board responded that "[l]egal authority generally supports the exercise of Federal power affecting non-Federal public lands if that power is directed toward protection of Federal lands; however, no policy

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16012450 (C.A.9)                                                          Page 15
(Cite as: 1994 WL 16012450)

decision currently exercises that power." *Id.* at p. V-36.)
**\*12 E. The Current Litigation**

Even in the federal court litigation that ensued following the *McDowell* decision and the federal government's assumption of subsistence-management authority on July 1, 1990, the State, in the cases in which it was a party, continued to accept the undisputed construction of ANILCA requiring federal management. *See, e.g.,* CR 39; CR 131. Exhibits 6 & 7. When the State later filed the instant action against the Secretary in 1992, it still was unclear that the State had altered its course and now contested the government's authority to displace State subsistence management on federal lands and waters. [FN24] But on March 19, 1993, the State filed a motion for partial summary judgment announcing that its review of ANILCA's voluminous legislative history (including hand-written notes from mark-up sessions) had disclosed congressional intent to continue State subsistence management on the public lands even if the State failed or refused to comply with the express conditions of § 805(d). CR 113. The Secretary's [FN25] authority, under this newly discovered interpretation of the statute, is limited to protection of the habitat of fish and wildlife on federal lands and waters and to conservation-based closures of the public lands to hunting and fishing, but does not include **\*13** any authority directly related to the "taking" of such resources (the essential component of "subsistence uses"). State's Br. at 4. The remedy for subsistence users aggrieved by the State's non-complying subsistence-management regime on federal lands, according to this view, is case-by-case adjudication in the federal court for the District of Alaska, which assertedly has been empowered to issue injunctions requiring State officials to adopt regulations (otherwise unlawful under State law) to implement the federal subsistence program mandated by Title VIII of ANILCA. *Id.* at 9-10.

> FN24. The State's initial complaint, filed on February 27, 1992 (No. A92-264 Civil, CR 1), focused primarily on allegations that the government had asserted jurisdiction over lands and waters that were subject to the jurisdiction of the State; indeed, paragraph 7 of that complaint conceded: "Title VIII of ANILCA authorizes the Secretary to implement a joint program to provide a preference in favor of subsistence uses of fish and wildlife on 'public lands' in Alaska by rural Alaska residents." And in paragraph 9 of its First Amended Complaint (the one underlying this appeal), the State continues to concede that the statute provides that if Alaska "fails to enact a subsistence law of general applicability consistent with the subsistence priority established in ANILCA, the Secretary of Interior and Agriculture shall undertake to accord a priority to the opportunity to take fish and wildlife for nonwasteful subsistence uses by rural Alaska residents on 'public lands.'" ER at 94-95. Nonetheless, the State proceeds to contradict this concession by alleging in Count III that the regulations the Secretary of the Interior and Agriculture have promulgated to implement Title VIII somehow "diminish[]" the State's "authority to manage fish and wildlife on the 'public lands' and off the 'public lands,' in violation of sections 103(c), 1314(a) and (b) of ANILCA." *Id.* at 104, ¶ 27.

> FN25. "Secretary" refers to the Secretary of the Interior, except with respect to National Forest System lands in Alaska, in which event it refers to the Secretary of Agriculture. ANILCA § 102(12), 16 U.S.C. § 3102(12).

Judge Holland initially got bogged down in this "legislative history" argument (*see* ER at 48-54), but in his final decision on the issue he upheld the authority of the federal government to implement a subsistence-management program on the "public lands" (ER at 10-21), [FN26] which he also construed to encompass all navigable waters in Alaska. ER at 21-42. This permissive appeal under 28 U.S.C. § 1292(b) followed.

> FN26. In his first decision after implementation of the federal subsistence management program, *Kluti Kaah Native Village of Copper Center v. Alaska,* No. A90-004 Civil (D. Alaska Aug. 15, 1990) (in the record on appeal at CR 131, Exhibit 1), Judge Holland held that the Alaska Supreme Court's *McDowell* decision (785 P.2d 1) had effectively "repealed" the State's compliance with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ANILCA, and that, therefore,
the State of Alaska is no longer entitled to have its subsistence law
supersede the operative provisions of Title VIII of ANILCA. The Secretary of
the Interior was not only justified in acting to implement Title VIII of
ANILCA, *he was required to do so* by Section 805(d), 16 U.S.C. § 3115(d).
*Slip op.* at 15 (emphasis added). Judge Holland explained that the State "is
entitled to enforce its generally applicable law for a subsistence priority as
to 'public lands,' if -- but only if -- the state's law provides 'for the
definition . . . specified in' Section 803 of ANILCA." *Id.* at 14-15 (footnote
omitted). As a result of the *McDowell* decision's "'decoupling' of the federal
and state subsistence hunting and fishing schemes," said the court, "Title
VIII of ANILCA -- by its own terms -- becomes operative, . . . and applicable
only as to 'public lands.' . . . We now have two free-standing systems for the
promotion of a priority for subsistence hunting and fishing. The Secretary of
the Interior has responsibility for the subsistence priority on federal lands,
and the State of Alaska has responsibility for effecting its statute as to
lands it controls." *Id.* at 16-17 (footnote omitted).

**ARGUMENT**

## I. INTRODUCTION AND SUMMARY

The State's novel argument asserts that the Secretary is without authority to
implement a comprehensive subsistence-use management program on the public lands in
the wake of the effective repeal of the State's laws of general applicability which,
prior to the decision in **\*14** McDowell v. State, 785 P.2d 1 (Alaska 1989), had been
certified by the Secretary and accepted by the courts as complying with the
requirements of § §  803, 804 and 805 of ANILCA. The State does not dispute that § §
803 and 804 mandate that subsistence hunting and fishing on the public lands by
rural residents be given priority over all other uses, nor that the State of its own
volition is disabled from affording that priority by the Alaska Constitution, as
authoritatively construed in *McDowell*. Faced with this seemingly insurmountable
hurdle, the State urges this Court to construe ANILCA (§  1314(a) of which expressly
disclaims any intent "to amend the Alaska constitution." 16 U.S.C. § 3202(a)) as
empowering *the federal courts* to order State fish and game managers and regulators
to defy their own constitution and implement ANILCA's subsistence-management program
on federal lands. It is most unusual, to say the least, to see a sovereign State of
the Union embracing such an expansive and intrusive view of federal judicial power.
But there is reason behind the apparent madness, for if the Court were to accept the
State's argument, Title VIII of ANILCA likely would be rendered unconstitutional,
thereby freeing the State entirely from any federal constraints on its desire to
prefer urban sport and commercial users of fish and wildlife resources over the
subsistence users of rural Alaska.

Regardless of its motive, the State is asking this Court to accept a wholly
impractical and unworkable construction of Title VIII of ANILCA that, during more
than 12 years of relentless controversy over the statute, no Secretary, no Governor,
no State Attorney General (until now), no litigant, and no court (state or federal)
has ever suggested is plausible. The State's argument is foreclosed by settled
judicial precedent; it is refuted by the plain language and structure of the whole
statute, construed in accord with established rules of statutory construction; a
constitutional rule of construction requires its rejection; and it is repudiated by
the very same "legislative history" from which the State derives its newly
discovered meaning.

## II. THE STATE'S POSITION IS FORECLOSED BY PRECEDENT

Section 814 of ANILCA explicitly directs that the Secretary "shall prescribe such
**\*15** regulations as are necessary and appropriate to carry out his responsibilities
under this title [VIII]." 16 U.S.C. § 3124. The issue raised by the State is
whether this general authority -- indeed, duty -- authorizes the Secretary to
prescribe regulations according rural Alaska residents the priority right to engage
in subsistence uses of fish and wildlife on the public lands if the State fails to
enact and implement, or if it repeals, the "laws of general applicability" specified

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16012450 (C.A.9)                                              Page 17
**(Cite as: 1994 WL 16012450)**

in § 805(d), 16 U.S.C. § 3115(d).

This Court and the district court (as well as the Alaska Supreme Court, *see* note 21, *supra*) have consistently and repeatedly (though without using the term) construed Title VIII as creating a program of "cooperative federalism"[FN27] in which the State has the choice of either enacting and implementing laws of general applicability that conform to the requirements of § § 803-805 or of surrendering subsistence-management authority on the public lands to the federal government. *See, e.g., Native Village of Quinhagak v. United States,* No. 93-35496, slip op. at 10237 (9th Cir. Sept. 1, 1994) ("Alaska's noncompliance with ANILCA made the federal government responsible"); *United States v. Alexander, 938 F.2d 942, 945 (9th Cir. 1991)* (ANILCA "leaves implementation to the Secretary of the Interior," but it "also contains an opt-in clause for the state of Alaska"); *Kenaitze Indian Tribe, supra, 860 F.2d at 318.*[FN28]

>    FN27. In *New York v. United States,* 112 S. Ct. 2408 (1992), the Supreme Court, in discussing the scope of Congress' power under the Commerce Clause, noted that "where Congress has the authority to regulate private activity under the Commerce Clause, we have recognized Congress' power to offer States the choice of regulating that activity according to federal standards or having state law preempted by federal regulation." *Id.* at 2424. The Court observed that "[t]his arrangement, which has been termed 'a program of cooperative federalism,' . . . is replicated in numerous federal statutory schemes," specifically including Title VIII of ANILCA. *Id., citing Kenaitze Indian Tribe v. Alaska, 860 F.2d 312, 314 (9th Cir. 1988),* cert. denied, 491 U.S. 905 (1989).

>    FN28. *Accord, e.g., McDowell v. United States,* No. A92-531 Civil, *slip op.* at 3-4, 10, 19-26 (D. Alaska Oct. 7, 1992) (*McDowell II*) (in the record on appeal at CR 131, Exhibit 4), *vacated on other grounds and remanded,* No. 93-35200 (9th Cir. July 25, 1994) (unpublished); *Kluti Kaah Native Village of Copper Center* (see note 26, *supra*); *Bobby v. Alaska, 718 F. Supp. 764, 766-68 (D. Alaska 1989); McDowell v. State, 785 P.2d 1, 3 (Alaska 1989).*

A brief review of this Court's decision in *Kenaitze Indian Tribe v. Alaska, supra,* suffices to demonstrate that the issue is foreclosed. In *Kenaitze,* the Court was obliged to **\*16** respond to the State's argument that the courts should defer to the State's interpretation of ANILCA's use of the term "rural." 860 F.2d at 315-16. The Court rejected the argument for several reasons, including:
Most fundamentally, unlike a federal agency, the state is delegated no authority under ANILCA. The statute only provides that if the state wishes to regulate in a manner consistent with federal law, *federal regulation will be withheld.* ANILCA does not assign any particular functions to the state as, indeed, if could not. As a separate sovereign, the state is at all times free to refuse to regulate; Congress could not compel it to do so. If the state refuses, *the Department of the Interior will step in and do the job.* The state's role is thus more accurately characterized as supplanting the federal regulatory scheme, rather than implementing it.

*Id.* at 316 (emphases added). The Court underscored this holding when the State, in its petition for rehearing, argued that the federal Constitution's Guarantee Clause and Tenth Amendment "preclude a federal court from directing a state to amend its laws to make them consistent with ANILCA." *Id.* at 318 n.8. The Court rejected the argument as irrelevant: "We do not purport to be directing the state to amend its laws; it is free to eschew any further entanglement with the federal government by advising the Department of the Interior that it is withdrawing from its role in administering ANILCA." *Id.*

The State does not ask the Court to overrule *Kenaitze* or any of the other decisions cited above. Indeed, the State does not even acknowledge their existence, just as it ignores the inconsistent position the State itself advocated for a dozen years (*see* pp. 8-12, *supra*). But these decisions are binding, and they require that the State's argument be summarily rejected.[FN29]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16012450 (C.A.9)                                                Page 18
**(Cite as: 1994 WL 16012450)**

FN29. In the court below, the State argued that these prior decisions were not controlling because none of them had ever considered the State's newly-discovered "legislative history" argument. Nonetheless, the operational function of the statutory scheme was precisely what *was* at issue in *Kenaitze,* in particular. Once a statute has been authoritatively construed by a court, that construction represents the governing meaning of the statute. *Lechmere, Inc. v. NLRB,* 502 U.S. 527, ___, 112 S. Ct. 841, 847-48 (1992), *quoting Maislin Industries, U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 131 (1990). In any event, we show below that there is no basis for overruling this settled body of precedent.

**\*17 III. THE STATE'S ARGUMENT IS REFUTED BY THE PLAIN LANGUAGE AND STRUCTURE OF THE STATUTE, CONSTRUED IN ACCORD WITH APPLICABLE RULES OF STATUTORY CONSTRUCTION**

The State places heavy reliance (State's Br. at 5-6, 11) upon the provisions of ANILCA § 1314 which provide that nothing in ANILCA "is intended to enlarge or diminish" the State's authority to manage fish and wildlife on the public lands "*except as may be provided in Title VIII,*" nor to enlarge or diminish the Secretary's authority over management of the public lands "*[e]xcept as specifically provided, otherwise by this Act.*" 16 U.S.C. § § 3202(a) and (b) (emphases added). Manifestly, the express language of Title VIII *does* provide for the diminishment of State authority and, concomitantly, for the enlargement of the Secretary's authority. [FN30]

FN30. The State rests its entire case on the proposition that, unless specifically provided otherwise by ANILCA, the Secretary has no traditional responsibility or authority to regulate the taking of fish and wildlife on the public lands. *E.g.,* State's Br. at 6. This premise is fundamentally mistaken. If there is any presumption of traditional allocation of authority applicable here, it is that the *states* have no or only limited authority over Native hunting and fishing practices (*see* note 1, *supra*) -- a presumption whose applicability is underscored by the traditional federal protection afforded to the subsistence rights of Alaska Natives. *See* pp. 2-5, *supra*. Furthermore, in the single case to our knowledge in which the State litigated the general issue of secretarial authority and received a decision, Judge von der Heydt rejected the State's position. In that pre-ANILCA case, the court held that the provisions of the Federal Land Policy and Management Act, 43 U.S.C. § § 1701 *et seq.* ("FLPMA" of "BLM Organic Act"), *do* empower the Secretary to displace State authority and regulate the taking of wildlife (there, a State wolf-kill program) on the public lands. *Alaska v. Andrus,* 429 F. Supp. 958, 961-62 (D. Alaska 1977), *aff'd on other grounds,* 591 F.2d 537 (9th Cir. 1979); *see also Defenders of Wildlife v. Andrus,* 627 F.2d 1238, 1249-50 (D.C. Cir. 1980). It is unnecessary here, however, for the Court to decide what authority the Secretary might otherwise have, because Title VIII unmistakably preempts State authority if it fails to afford the required subsistence priority through State laws of general applicability, and instead imposes that duty upon the Secretary.

We note preliminarily that the State's argument flouts the most elementary principles of statutory construction. The State devotes the bulk of its argument to the legislative history (State's Br. at 11-23), but time and again the Supreme Court has emphasized that statutes must be construed on the basis of their text and context, and that "legislative history" has an extremely limited, last-resort role to play in the judicial implementation of federal statutory law. And in no case may a court "resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States,* 114 S. Ct. 655, 662 (1994). There is a "strong presumption" that the language of a statute is the authoritative expression -- the "best evidence" -- of **\*18** congressional intent, [FN31] to be enforced according to its terms. [FN32] Complexity or difficulties of language and structure, moreover, are not alone sufficient to warrant a conclusion of ambiguity or incoherence. [FN33] Perhaps the most fundamental flaw in the State's presentation, in those few pages (5-9) of its brief which purport to address the actual statutory language, is its failure to abide by the overriding rule that courts must "look to the provisions of the whole

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16012450 (C.A.9)                                              Page 19
**(Cite as: 1994 WL 16012450)**

law, and to its objects and policy" for the meaning of statutes. [FN34] "The plain
meaning that we seek to discern is the plain meaning of the whole statute, not of
isolated sentences." *Beecham v. United States,* 114 S. Ct. 1669, 1671 (1994). In
short, the "court should adopt that sense of [the statutory] words which best
harmonizes with [their] context and promotes [the] policy and objectives of [the]
legislature." *King v. St. Vincent's Hospital,* 502 U.S. 215, ___, 112 S. Ct. 570, 574
n.10 (1991), *citing United States v. Hartwell,* 6 Wall. 385, 396 (1868).

>   FN31. *E.g., Ardestani v. INS,* 502 U.S. 129, ___, 112 S. Ct. 515, 520 (1991)
>   ("The 'strong presumption' that the plain language of the statute expresses
>   congressional intent is rebutted only in 'rare and exceptional
>   circumstances,'. . . when a contrary legislative intent is clearly expressed")
>   (citations omitted); *West Virginia University Hospitals, Inc. v. Casey,* 499
>   U.S. 83, 98-99 (1991) ("The best evidence of [statutory] purpose is the
>   statutory text adopted by both Houses of Congress and submitted to the
>   President [, . . . and] we do not permit it to be expanded or contracted by
>   the statements of individual legislators or committees during the course of
>   the enactment process").

>   FN32. *E.g., Rake v. Wade,* 113 S. Ct. 2187, 2191-92 (1993); *Negonsott v.
>   Samuels,* 113 S. Ct. 1119, 1122-23 (1993) ("'Our task is to give effect to the
>   will of Congress, and where its will has been expressed in reasonably plain
>   terms, that language must ordinarily be regarded as conclusive'") (citation
>   omitted).

>   FN33. *See, e.g., United States Nat'l Bank of Oregon v. Independent Ins. Agents
>   of America,* 113 S. Ct. 2173 (1993), where the Court engaged in an exacting
>   textual analysis in order "'to render the true meaning of the statute'" (*id.*
>   at 2186 (citation omitted)), and then refused to consider the legislative
>   history. *Id.* at 2186 n.11.

>   FN34. *E.g., United States Nat'l Bank of Oregon, supra,* 113 S. Ct. at 2182
>   ("Over and over we have stressed that 'in expounding a statute, we must not be
>   guided by a single sentence or member of a sentence, but look to the
>   provisions of the whole law, and to its object and policy.' [quoting more than
>   a dozen prior decisions] . . . . Statutory construction 'is a holistic
>   endeavor,' . . . and, at a minimum, must account for a statute's full text,
>   language as well as punctuation, structure, and subject matter" (citations
>   omitted)).

### A. The Local/Regional-Participation Mandate

In § 801(5) Congress found that
the national interest in the proper regulation, protection, and conservation of fish
and wildlife on the public lands in Alaska and the continuation of the opportunity
for a subsistence way of life by residents of rural Alaska require that an
administrative structure be established for the purpose of enabling rural **\*19**
residents who have personal knowledge of local conditions and requirements to have a
meaningful role in the management of fish and wildlife and of subsistence uses on
the public lands in Alaska.

16 U.S.C. § 3111(5). Section 805 contains the means by which Congress sought to
ensure this "meaningful role," whether the primary subsistence-use manager be the
State or the federal government. 16 U.S.C. § 3115. Section 805(a) directs the
Secretary, one year after ANILCA's enactment, to establish a local and regional
participation scheme consisting of at least six subsistence resource regions with a
regional advisory council (composed of local residents) in each region, and also (if
he finds the State's committees to be inadequate) a system of local advisory
committees. The regional council system is the central mechanism by which Congress
sought to ensure that local users would have a "meaningful role" in management.
Subsections 805(a)(3)(A)-(C) provide that the regional councils shall have the
authority to review and evaluate "proposals for regulations, policies, management
plans and other matters relating to subsistence uses," provide a forum for local

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16012450 (C.A.9)                                            Page 20
**(Cite as: 1994 WL 16012450)**

viewpoints, and encourage "local and regional participation . . . in the decision-
making process affecting the taking of fish and wildlife on the public lands within
the region for subsistence uses." Subsection 805(a)(3)(D) directs the councils to
prepare annual reports to the Secretary identifying and evaluating subsistence uses
and needs, recommending a "strategy for the management of fish and wildlife
populations within the region to accommodate such subsistence uses and needs," and,
finally, making "recommendations concerning policies, standards, guidelines, and
regulations to implement the strategy." And § 805(b) directs the Secretary to
adequately staff the regional councils and provide them with timely information.

### 1. The Secretary's implementation mandate

Section 805(c) then mandates that the Secretary shall (absent specified
circumstances) implement the regional council recommendations, in the following
terms:
The Secretary, in performing his monitoring responsibility pursuant to section 806
*and in the exercise of his closure and other administrative authority over the
public lands,* shall consider the report and recommendations of the regional **\*20**
advisory councils *concerning the taking of fish and wildlife on the public lands . .
. for subsistence uses.* The Secretary may choose not to follow any recommendation
which he determines is not supported by substantial evidence, violates recognized
principles of fish and wildlife conservation, or would be detrimental to the
satisfaction of subsistence needs. If a recommendation is not adopted by the
Secretary, he shall set forth the factual basis and the reasons for his decision.


16 U.S.C. § 3115(c) (emphases added).

Subsections 805(a) through (c) thus clearly direct the Secretary to implement a
comprehensive subsistence-use management system on the public lands. The regional
councils are authorized to recommend a "strategy for the management of fish and
wildlife *populations*" to satisfy subsistence uses and needs, and to recommend
"policies, standards, guidelines, and regulations to implement the strategy." The
Secretary is directed to "follow" the regional council recommendations "concerning
the *taking* of fish and wildlife on the public lands" for subsistence uses, absent
the presence of one or more of three prescribed reasons for not following them.[FN35]
This clear language flatly contradicts the State's suggestion that Congress was
merely referring to the role of the Secretary as habitat manager, or as nothing more
than a "monitor and reporter to Congress." State's Br. at 8.[FN36] The Secretary could
hardly implement a strategy for the management of subsistence *fish and wildlife
populations* and concerning the *taking* of those resources if all he were authorized
to do were monitor State management, protect fish and wildlife habitat, and close
the public lands to all takings.


> FN35. The specified reasons justifying a refusal to follow a council's
> recommendation underscore the congressional understanding that the federal
> government would undertake day-to-day management responsibility: the
> "substantial evidence" reason contemplates rule-making, and the "conservation"
> and "subsistence needs" standards suggest a "hands on" regulatory scheme.

> FN36. The express language of § 805(c) also refutes the district court's
> mistaken conclusion "that Congress unintentionally and inadvertently omitted
> an express provision authorizing the Secretary to implement Section 804 in the
> absence of a state program." ER at 17; *see also id.* at 13 (§ 805(c) "says not
> a word about implementing the subsistence preference for rural Alaskans
> created by Section 803 or the subsistence priority created by Section 804").
> While § 805(c) does not actually *cite* § § 803 and 804, it plainly "says a
> word" about them when it directs the Secretary to follow the comprehensive
> subsistence-management recommendations of rural regional councils (composed of
> rural residents) "*concerning the taking of fish and wildlife on the public
> lands . . . for subsistence uses*" (emphasis added). Compare the language of §
> 804, which mandates a priority for "the taking on the public lands of fish and
> wildlife for nonwasteful subsistence uses." 16 U.S.C. § 3114.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16012450 (C.A.9)                                              Page 21
**(Cite as: 1994 WL 16012450)**

**\*21** The State's proposed construction of the statute, moreover, would effectively nullify the explicit intent of Congress to enable local rural residents "to have a meaningful role in the management of fish and wildlife and of subsistence uses on the public lands." § 801(5), 16 U.S.C. § 3111(5). Under the State's reading (State's Br. at 7-8), the State retains subsistence-use management authority on the public lands, but it has no obligation to either create or listen to local committees and regional councils, while the Secretary is responsible for establishing a precisely-defined, federally-funded local and regional participation system that makes subsistence-management recommendations only to him -- *though he has no power to follow them*. This would render the "meaningful role" requirements of § 805 a cruel hoax, limiting the voices of rural subsistence users to the ear of one who has no authority to do anything meaningful. Manifestly, Congress did not intend to play such a trick on the subsistence way of life of Alaska Natives. The State's reading, moreover, "would contravene the 'elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.'" *Department of Revenue of Oregon v. AFC Industries, Inc.*, 114 S. Ct. 843, 848 (1994).

### 2. The carrot held out to the State

The State's belabored construction fares no better when it comes to the pivotal language of § 805(d), 16 U.S.C. § 3115(d), which provides:
The Secretary shall not implement subsections (a), (b), and (c) of this section if within one year of the date of enactment of this Act, the State enacts and implements laws of general applicability which are consistent with, and which provide for the definition, preference, and participation specified in, sections 803, 804, and 805, such laws, unless and until repealed, shall supersede such sections insofar as such sections govern State responsibility pursuant to this title for the taking of fish and wildlife on the public lands for subsistence uses.


Focusing on the concluding language in the first sentence of § 805(d) -- "insofar as such sections [803-805] govern State responsibility pursuant to this title for the taking of fish and wildlife on the public lands for subsistence uses" -- the State argues that, obviously, in the **\*22** absence of conforming laws of general applicability, "§ § 803-805 are not superseded and continue to govern State responsibility for subsistence hunting and fishing on public lands." State's Br. at 7. It is correct that, in one sense, § § 803-805 "continue to govern State responsibility" in the absence of the required State laws, but it is not correct that the State continues to be the subsistence manager on the public lands. For in the absence of the specified laws of general applicability, the Secretary is required to supplant State public-lands subsistence-management authority. It is in this sense that § § 803-805 continue to "govern" State authority, *i.e.,* by diminishing, "directing," and "controlling" it. *See* BLACK'S LAW DICTIONARY 625 (1979) ("govern" means "[t]o direct and control the actions or conduct of, either by established laws or by arbitrary will; to direct and control, rule, or regulate, by authority"). The remainder of subsection 805(d) -- *i.e.,* the context in which the disputed language appears -- and the overall structure of § 805 leave no room for the State's suggested meaning of the word "govern" as used in the statute.

According to the State, Congress was merely recognizing in § 805(d) that the State *might* want to enact a statewide rural preference for subsistence uses but did not intend to require it to do so as a condition of State subsistence management on the public lands. State's Br. at 7. The only consequence of the State's failure to enact and implement such a state-law preference, or its repeal of such laws, is that the Secretary rather than the State is responsible for setting up the (now meaningless) local/regional-participation system, and the State loses the million dollars a year it has been receiving under § 805(e) from the federal government for this purpose.
[FN37]

FN37. Section 805(e) requires the Secretary to reimburse the State for no more than fifty percent of the annual costs of operating the regional council/local committee system (16 U.S.C. § 3115(e)); these federal payments never exceeded

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

one million dollars in any one year (substantially less than 50% of the
State's actual costs). The State has apparently abandoned the argument it made
below, suggesting that either Congress or the State deemed this relatively
trifling monetary contribution to be a sufficient "financial incentive" to
induce the State into enacting and implementing state-wide laws of general
applicability guaranteeing a rural subsistence preference and implementing a
federal "public lands" program on a state-wide basis.

If the State's construction had a shadow of merit, it would have been entirely **23**
unnecessary for Congress in § 805(d) to mention the "definition" and "preference"
of "sections 803 [and] 804." In other words, if all Congress sought to do in §
805(d) was entice the State into creating adequate local committees and regional
councils and giving them a meaningful role in subsistence management, there would
have been no reason for Congress to specify that the State's laws of general
applicability must also comply with § 803 (defining subsistence uses as "customary
and traditional uses" of "rural Alaska residents") and § 804 (mandating a priority
for such uses by rural residents). Indeed, under to the State's reading, it retains
subsistence-management control over public lands regardless of whether it even *has* a
subsistence-preference law, much less one that complies with Title VIII. State's Br.
at 7. The State's construction thus removes any real incentive for the State to
comply with Title VIII, and it deletes important words (the references to the § 803
definition and the § 804 preference) from the statute -- neither of which is
permissible. [FN38] The State's interpretation of § 805(d) must therefore be rejected.

> FN38. *E.g.*, *Reynolds v. Martin, 985 F.2d 470, 473 (9th Cir. 1993)* ("'cardinal
> principle of statutory construction is to save and not to destroy. It is our
> duty to give effect, if possible, to every clause and word of a statute,
> rather than to emasculate an entire section . . . .' *United States v.
> Menasche, 348 U.S. 528, 538-39 (1955)*").

### B. The Judicial Enforcement Provision

Nor does the State's new-found meaning have any support in the language of §
807(a), 16 U.S.C. § 3117(a), which provides that subsistence users
aggrieved by a failure of the State or the Federal Government to provide for the
priority for subsistence uses set forth in section 804 (or with respect to the State
as set forth in a State law of general applicability if the State has fulfilled the
requirements of section 805(d)) may, upon exhaustion of any State or Federal (as
appropriate) administrative remedies which may be available, file a civil action in
the [federal court] to require such actions to be taken as are necessary to provide
for the priority. [FN39]

> FN39. The section continues by authorizing preliminary injunctive relief in
> "appropriate" circumstances, and by specifying the scope of final relief that
> may be granted in an action against the State, namely, an order "directing the
> State to submit regulations which satisfy the requirements of section 804;
> when approved by the court, such regulations shall be incorporated as part of
> the final judicial order, and such order shall be valid only for such period
> of time as normally provided by State law for the regulations at issue." The
> State asserted below that the absence of a similar prescription of the scope
> of relief available in an action against the Secretary is further evidence
> that Congress did not contemplate secretarial implementation. To the contrary,
> the remedial provisions of the statute merely reflect congressional
> sensitivity to principles of federalism, and the desire of Congress to
> precisely limit the exercise of federal judicial power against the State.
> Similar concerns of federal/state relations are not present in an action
> against the Secretary; in such a case, the Court is simply left with the broad
> remedial powers traditionally possessed by a federal court of equity, to be
> exercised in accord with familiar principles controlling equitable discretion.
> *See Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 54 (1987)*.

**24** Why would Congress waive the sovereign immunity of the United States, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

authorize suits against the federal government (subjecting it to awards of full
costs and attorney's fees, and unrestricted equitable relief) for failing to provide
for the subsistence priority, if Title VIII did not contemplate, under any
circumstances, that the government would be responsible for meaningful subsistence-
use management (*i.e.,* management of the *taking* of fish and game for subsistence
uses)? As this Court held in *Kenaitze, 860 F.2d at 315 n.5* (emphasis added):[FN40]

>    FN40. The State relies upon the parenthetical language in the first sentence
>    of § 807(a) -- "(or with respect to the State as set forth in a State law of
>    general applicability if the State has fulfilled the requirements of section
>    805(d)" -- for the proposition that Congress expected the State to be
>    managing under § 804 even if the State had not fulfilled the requirements of
>    § 805(d). State's Br. at 8-9. The sentence otherwise reads: "Local residents
>    and other persons and organizations aggrieved by a failure of the State or
>    Federal government to provide for the priority for subsistence uses set forth
>    in section 804 . . . may, upon exhaustion of any State or Federal (as
>    appropriate) administrative remedies which may be available, file a civil
>    action in the United States District Court for the District of Alaska to
>    require such actions as may be necessary to provide for the priority."
>    The rather awkward parenthetical insertion in an otherwise clear statutory
>    provision must be taken simply to make it clear that the State would be
>    subject to § 804 if it decided to participate pursuant to § 805(d). As the
>    district court noted, this language merely "reiterates that state programs are
>    optional with the state." ER at 18. The likely explanation for this poor
>    draftsmanship is the last-minute nature of the final compromise version of §
>    807. Probably no provision of Title VIII engendered more vigorous debate than
>    this key section which determined the manner of federal enforcement against
>    the State. The dispute was between those who wanted to give principal
>    enforcement authority to the Secretary and those who wanted to lodge that duty
>    in the federal courts. *See, e.g.,* H.R. Rep. No. 96-97, Part I, 96th Cong., 1st
>    Sess. 283-84 (1979); *compare with id.* at 538-39 (dissenting views of
>    Representative Udall and 20 other Congressmen). When the bill passed both
>    houses of Congress in the fall of 1980, it contained a cumbersome § 807,
>    which obliged the Secretary to go through certain administrative hoops and
>    then bring an action in federal court (on behalf of local advisory committees
>    or regional councils only) to require the State to provide the mandated
>    subsistence preference. *See* 126 Cong. Rec. 21,613 (1980). But dissatisfaction
>    lingered and, before submission to the President for approval, § 807 was
>    amended by House Concurrent Resolution 452 to read as we now know it. *See* 126
>    Cong. Rec. 30,495, 30,496 (1980) (House), 31,108-09 (1980) (Senate).
>    Congressman Udall and Senator Stevens provided the legislative history in
>    similar language. *Id.* at 30,499 (Udall), 31,109 (Stevens); *see also id.* at
>    31,110 (Stevens).
>    The only other plausible construction of the parenthetical language at issue
>    is that, as the district court apparently has previously construed it (*see
>    Bobby v. Alaska, 718 F. Supp. 764 (D. Alaska 1989)*; *Kluti Kaah Native Village
>    of Copper Center v. Alaska,* No. A90-004 Civil, *slip op.* at 16 (D. Alaska Aug.
>    15, 1990)), Congress was expressing an intention for the federal courts to
>    apply the State subsistence law (rather than federal law directly) in an
>    action against the State, *if* the State had met the requirements of § 805(d).
>    Absent waiver or consent, as by voluntarily submitting to a federal program
>    with explicit conditions, the federal courts are normally without power to
>    apply *state* law to compel action by a state. *See Pennhurst State School &
>    Hospital v. Halderman, 465 U.S. 89 (1984).* Admittedly, none of these
>    explanations (other than the "poor draftsmanship" one) is entirely satisfying.
>    But the State's proposed explanation is worse; it is unacceptable. As shown in
>    text, and as construed in *Kenaitze,* the State's view would impermissibly
>    delete § 807(a)'s express authorization for an action against the Secretary
>    "to require such actions to be taken as are necessary to provide for the [§
>    804] priority."

**\*25** it is clear in context that 'Federal (as appropriate) administrative remedies'
refers to remedies that would exist if the state had not supplanted ANILCA's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16012450 (C.A.9)                                                Page 24
**(Cite as: 1994 WL 16012450)**

regulatory scheme with its own. Because the state has accepted section [§ 805(d)'s] invitation to *supersede federal regulation,* there is no federal administrative remedy for a plaintiff to exhaust.

In sum, the language and structure of the *whole* of Title VIII negate the State's position. Only by reading certain words and members of the statutory provisions in complete isolation from the structure and purpose of the law as a whole is the State able to make its argument with an apparent straight face. If, even after a thorough analysis, however, the statute were still thought to be ambiguous, the Court of course would not "have the option to throw up [its] hands."[FN41] But neither is it required or authorized to immediately begin prowling through the "legislative history" in search of an answer. For at this point in the analysis certain other controlling rules of textual interpretation come into play.

    FN41. *See Saudi Arabia v. Nelson,* 113 S. Ct. 1471, 1478 (1993) ("We do not, however, have the option to throw up our hands. The term has to be given some interpretation, and congressional diffidence necessarily results in judicial responsibility to determine [the meaning of the term] for purposes of the Act"). "[I]t is our role to make sense rather than nonsense out of the *corpus juris."* *West Virginia University Hospitals, Inc. v. Casey,* 499 U.S. 83, 101 (1991).

### C. The "Indian Law" Rule Of Construction

Foremost among the canons applicable here is the venerable and "familiar rule of statutory construction that doubtful expressions must be resolved in favor of Indians." *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 537 (1987). As the Supreme Court recently described and applied this rule in a case presenting competing plausible interpretations of a statute:
When we are faced with these two possible constructions, our choice between them must be dictated by a principle deeply rooted in this Court's Indian jurisprudence: "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."

**\*26** *County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation,* 502 U.S. 251, ___, 112 S. Ct. 683, 693–94 (1992). Because the State's proposed interpretation here is manifestly hostile to the interests of Alaska Natives,[FN42] and the Secretary's construction is demonstrably more beneficial to them, the Supreme Court's "cases require [the Court] to apply that [latter] interpretation for the benefit of [Alaska Natives]." *Id.*

    FN42. Unlike the situation in *Chugach Alaska Corp. v. Lujan,* 915 F.2d 454, 457 n.4 (9th Cir. 1990), the question here is not which group of Natives to favor in a property dispute over a finite amount of land. Instead, the question is whether the congressional policy of protecting Native subsistence use on the public lands will be fulfilled. The possibility that *some* Native groups might not favor federal subsistence management does not make Title VIII any less Indian legislation subject to the favorable canon of construction. *See Fisher v. District Court,* 424 U.S. 382, 390–91 (1976) (harmful "disparate treatment of [an] Indian is justified because it is intended to benefit the class of which he is a member"). In all events, this Court has already held in the *Gambell* litigation that Title VIII is Indian legislation. *See* note 11, *supra.*

### D. The Canon Requiring Avoidance Of Constitutional Issues

That should be the end of the matter, but even if it were not, the application of yet another interpretive norm is triggered, and it too controls. This is the rule requiring courts "to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question."[FN43] As we now show, the State's proposed reading of Title VIII would likely make the statute invalid under the Tenth Amendment; for that reason alone, the State's construction is impermissible.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN43. *Gomez v. United States*, 490 U.S. 858, 864 (1989). *See also, e.g.,* *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 113 S. Ct. 2264, 2282–83 (1993); *Rust v. Sullivan*, 500 U.S. 173, 190–91 (1991); *Mesa v. California*, 489 U.S. 121, 136 (1989); *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *Ashwander v. TVA*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring).

## IV. THE CUMBERSOME, INTRUSIVE SCHEME CONTEMPLATED BY THE STATE LIKELY WOULD VIOLATE THE TENTH AMENDMENT; AT THE VERY LEAST, IT WOULD RAISE SERIOUS CONSTITUTIONAL QUESTIONS

The State, as it must, agrees that federal law provides the substantive standard for the regulation of subsistence uses on the public lands, but asserts that the State nevertheless should be permitted to apply its non-conforming law[FN44] to such uses, and that Congress' **27 command that subsistence uses on the public lands be accorded priority can be implemented through the injunctive decrees of the federal courts. State's Br. at 9–10. Aside from the emptiness of this suggested case-by-case remedy,[FN45] this scheme almost certainly would violate the Tenth Amendment to the United States Constitution.

FN44. The State jests when it suggests (State's Br. at 9–10) that application of its law will result in few conflicts. (For the latest example to the contrary, *see Native Village of Quinhagak v. United States,* No. 93-35496 (9th Cir. Sept. 1, 1994).) The State's new law provides for "non-subsistence areas" where no subsistence uses are allowed. ALASKA STAT. § 16.05.258(c). This provision has been declared unconstitutional under State law in *Kenaitze Indian Tribe v. Alaska,* Alaska Superior Court No. 3AN-91-4569 CIV (Oct. 26, 1993) (appeal pending). Under State law, all Alaskans are eligible to participate in any subsistence harvest. That is, an urban Anchorage sport hunter has as much right to hunt on the Lime Village hunting grounds as a resident of Lime Village. The new State law has a sunset provision so that it expires in 1995 at which time it will be supplanted by the 1986 law. Sec. 3, ch. 1, SSSLA 1992. That law has the same "all Alaskans" flaw and also conflicts with ANILCA in that it does not mandate protection of customary and traditional uses. *See, e.g.,* *State v. Morry, 836 P.2d 358 (Alaska 1992)*.

FN45. As the State explained it below, any individual aggrieved by the State's failure to provide the opportunity guaranteed by Title VIII must file suit in federal court in order to obtain relief. The court would then measure the State regulation against ANILCA's mandate that subsistence uses by *rural residents* be accorded priority over all other uses and users. This review would be undertaken without the benefit of any regulatory record evaluating the regulation against the requirements of federal law and thus would be a *nisi prius* trial. Should the court determine that the priority had been denied, it would issue an order setting aside the State regulation and directing the appropriate State board to promulgate a regulation that complies with Title VIII's priority. The court would then review the regulation for compliance with ANILCA at a second hearing, and if it met the federal standard, the court would incorporate the regulation into a decree. Judge Holland viewed this proposed scenario as a political one suggesting "that sometimes situations must get worse before they get better." ER at 20.

In *New York v. United States*, 112 S. Ct. 2408 (1992), the Supreme Court considered the constitutionality of a provision of an Act of Congress that, under one plausible construction, "would clearly 'commandee[r]' the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program."' *Id.* at 2425. The Court, however, rejected that construction because "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Id.* (citations omitted). This constitutional rule of construction is fully applicable to the State's proposed reading of ANILCA. For "[w]hatever the outer limits of [the states' retained]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sovereignty may be, one thing is clear: The Federal Government may not compel the States to enact or administer a federal regulatory program." *Id.* at 2435. *Accord,* Ponca Tribe of Oklahoma v. Oklahoma, 37 F.3d 1422, 1994 WL 476316, *9-12 (10th Cir. 9/2/94); Board of Natural Resources v. Brown, 992 F.2d 937 (9th Cir. 1994). Yet that is precisely **28** what the State says Congress did.

The only distinction here from the scenario in *New York v. United States* is that Congress, under the State's proposed interpretation, has not directly ordered the State to promulgate regulations that comply with Title VIII's priority, but rather has directed the federal courts to order the State to promulgate them. But if Congress lacks power to directly *order* the State to implement a regulatory program on the public lands, it is likewise foreclosed from empowering the federal courts to do so.[FN46] As the *New York* Court stated:

> FN46. Federal courts do, of course, have the power to order state officials to comply with federal law, 112 S. Ct. at 2430, but that by no means can be understood to extend to ordering a state to fully implement a federal regulatory program as suggested here. The cases cited by the *New York* Court as being within the federal judiciary's power to order compliance with federal law all dealt with federal court orders designed to halt state interference with the exercise of federal rights. For example, in Washington v. Washington State Comm'l Passenger Fishing Vessel Ass'n, 443 U.S. 658 (1979), the Court reviewed the district court's order, 384 F. Supp. at 416-417, that certain state regulations be crafted so as not to interfere with the harvest of the portion of fish guaranteed to the Indians by treaty. In none of the cases did the federal court authorize or order complete state regulation of an area. *See* Puyallup Tribe v. Washington Game Dep't, 433 U.S. 165, 177 n.18 (1977) (discussing with approval State regulations that were designed to guarantee non-interference with allocation to tribes under treaty, but that were "without any restriction as to time, place, or method of fishing" by the Indian fishermen). In contrast, the present case involves regulatory authority as to time, place and methods of fishing and hunting by rural residents on the public lands. The difference between the federal court orders that could be required in this case and those entered in the Northwest treaty fishing litigation is that under the State's reading § 807 of ANILCA *requires* the court to order the State to promulgate and implement regulations governing subsistence hunting and fishing itself, if the State has "opted in" pursuant to § 805(d). Such relief does not simply proscribe non-interference with a federal right. In short, the proposition that "federal courts may in proper circumstances order state officials to comply with federal law, . . . by no means impl[ies] any authority on the part of Congress to mandate State regulation." New York, 112 S. Ct. at 2431.

No matter how powerful the federal interest involved, the Constitution simply does not give Congress the authority to require the States to regulate. The Constitution instead gives Congress the authority to regulate matters directly and to pre-empt contrary state regulation. Where a federal interest is sufficiently strong to cause Congress to legislate, it must do so directly; it may not conscript state governments as its agents.

112 S. Ct. at 2429.  The construction advocated by the State here suffers from the same constitutional defect and must be rejected. Nor does the fact that the State willingly seeks to inflict this harm upon itself save its constitutional infirmity. "As the Supreme Court held in *New York* . . ., the support or consent of state officials is irrelevant to the determination of whether Congress has exceeded its authority under the Tenth Amendment." Board of Natural Resources v. Brown, supra, 992 F.2d at 945, *citing* 122 S. Ct. at 2431.

**29** Since Title VIII is readily susceptible to a constitutional construction -- namely, the one that has been adhered to for over a decade by the Secretary, the courts, and (until now) the State -- that is the one that must prevail here.

### V. THE LEGISLATIVE HISTORY CONFIRMS THE DUTY AND AUTHORITY OF THE SECRETARY TO

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16012450 (C.A.9)                                              Page 27
**(Cite as: 1994 WL 16012450)**

### IMPLEMENT THE FEDERAL SUBSISTENCE PRIORITY

The foregoing points obviate the need for any analysis of legislative history. We proceed to briefly discuss it, however, since it is essentially the whole of the State's case. It is important to appreciate, nonetheless, that the legislative history of Title VIII, with respect to the issues under consideration, wholly failed to keep pace with the political compromises and statutory formulations as they evolved through two Congresses and several legislative sessions. [FN47] Even at the very end, Title VIII's legislative record was not in lock-step with the bill that was enacted into law. The reason for Title VIII's inclusion in ANILCA, however, was clear throughout the process: Congress intended to protect and preserve the Alaska Native subsistence way of life, at least on the public lands. Since the statutory text is entirely compatible with that goal, the Court must construe the law to effect that purpose.

> FN47. *Cf.* United States v. Ron Pair Enterprises, 489 U.S. 235, 240-41 (1989): In such a substantial overhaul of the system, it is not appropriate or realistic to expect Congress to have explained with particularity each step it took. Rather, as long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute.

### A. The Authoritative Legislative History Demonstrates That Congress Intended The Secretary To Enforce Title VIII's Subsistence Priority In The Event Of State Withdrawal

The State's entire case is premised on fragments of legislative history spanning an evolution of the statute from one that had no role for the State to one that provided for optional State management under federal standards and supervision. If anything can be gleaned from the complete history, it is that Congress intended to make room for State implementation *only if* the State conformed its law and practice to the requirements of federal **\*30** law. Congress did not bar federal implementation: it expressly provided for it. The authoritative sources of legislative history -- committee reports from the Congress that passed the law[FN48] -- reveal that with respect to § 804 (Title VIII's substantive provision). Congress "require[d] both the State *and the Federal Government* to accord nonwasteful subsistence uses a preference over the *taking* of such resources for other purposes on the public lands."[FN49]

> FN48. "To the extent that legislative history may be considered, it is the official committee reports that provide the authoritative expression of legislative intent." In re Kelly, 841 F.2d 908, 912 n.3 (9th Cir. 1988). Comments by individual legislators may be important when otherwise supported by the text and structure of the Act. By contrast, much of the State's case is built upon extraneous sources such as a statement by "a committee staffperson" (State's Br. at 18), and, of course, comments by Senator Stevens, who ultimately voted against the legislation. On the other hand, the "history" presented by the State contradicts the language and structure of the statute and is built on fragmented glimpses of legislative history that do not reveal the big picture. Senator Stevens noted the political reality: "We accept bills like this on the basis of faith in the people who present them." 126 CONG. REC. 21,580 (1980). Obviously, the text and structure of the statute are a better guide to the statute's meaning than faith, or isolated statements by Senator Stevens in committee mark-up sessions and colloquies with Senate staffers. The State's view of legislative history, moreover, ignores the mandate expressed in Committee reports regarding the Secretary's duty to ensure the priority under § 804.

> FN49. H.R. REP. NO. 97, 96th Cong., 1st Sess. Part I at 280 (1979) (House Interior Committee) (emphasis added); H.R. REP. NO. 97, 96th Cong., 1st Sess. Part II at 193 (1979) (House Merchant Marine Committee); S. REP. NO. 413, 96th Cong. 2d Sess. at 269 (1980) (Senate Energy and Natural Resources Committee); *see also,* S. REP. NO. 1300, 95th Cong. 2d Sess. at 221 (1978). These Committee

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16012450 (C.A.9)                                                    Page 28
**(Cite as: 1994 WL 16012450)**

    Reports all deal with the federal government's obligation to provide the subsistence preference as set forth in the form that finally became law as § § 803-805.

Most conclusively, the final Senate Report explicitly describes the system: This title [VIII] guarantees Alaska Natives the continued opportunity for subsistence uses of public lands. The Secretary of the Interior is directed either to approve or monitor a subsistence program developed and implemented by the State of Alaska *or to develop a Federal program if the State does not establish such a program within one year of enactment of this legislation*.

052 No cent-Y cent-R found.
S. REP. NO. 96-413, 96th Cong., 2d Sess. 339 (1979), *reprinted in* 1980 U.S. CODE CONG. & ADMIN. NEWS 5283 (1980) (emphasis added). [FN50] That report continues: "If the State establishes a subsistence program, the Secretary is authorized to reimburse up to 50 percent of its cost, but in no case more than $5 million annually." Thus, the text of every report (and **\*31** the analysis of the Congressional Budget Office) fully supports the settled understanding and long-standing practice; the legislative history inquiry should be concluded.

    FN50. The State complained below that since this language is from the Congressional Budget Office's analysis of the bill, it somehow should not be given any credence. To the contrary, such a source is entitled to as much weight as any other part of the Committee Report. It is mandated by statute to be included in all reports from congressional committees to the floor of the House or Senate. 2 U.S.C. § 653. Given the Congress' careful attention to budgeting matters that prompted creation of the CBO, it is likely that more members of Congress understood the legislation based on that aspect of the report than on remarks by staff or Senators in committee mark-up sessions.

  **B. After The State Passed Its Subsistence Law In 1978, There Was No Debate About Whether The State Would Participate In The Program, And Thus The History Regarding State Management Is Premised On The Assumption Of State Compliance**

The change from the originally mandated secretarial enforcement of the subsistence priority on federal lands resulted from the fact that in mid-stream the State enacted its 1978 subsistence law formally expressing its ability and willingness to protect subsistence in a manner generally acceptable to Congress. *See* note 14, *supra.* After that enactment by the State Legislature, there was little reason for Congress to doubt the State's sincerity. [FN51] Congress gave no extended consideration to the situation at hand in this case, and no one forecast it. Rather, the focus was on the role of the Secretary in the event the priority was not provided in specific circumstances; as a result, much of the legislative history relied on by the State is simply irrelevant, because it is premised on State compliance. What was clear throughout the remainder of the process was the congressional assumption that the State would be opting into the federal regulatory scheme subject to federal oversight and the exercise of federal administrative authority. [FN52] To be sure, by shifting from a Native preference to a rural preference Congress sought to make the scheme as palatable as possible **\*32** to the State, but it did not surrender its commitment to Alaska Natives nor its determination to require the Secretary to adopt regulations necessary to enforce federal law.

    FN51. S. REP. NO. 1300, 95th Cong. 2d Sess. at 220 (1978) (noting that the State had adopted a subsistence provision that provided a preference nearly identical to that contemplated by Congress).

    FN52. There can be no doubt that the constitutionally permissible "cooperative federalism" approach served as the foundation for the scheme ultimately adopted in Title VIII. The Supreme Court's decision in *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S 264 (1982), upheld the constitutional validity of the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § § 1201, *et seq.* That act, known as the "strip mining law," was at least one of the precedents relied upon by Congress in framing Title

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

VIII of ANILCA. At a congressional hearing in Fairbanks on August 20, 1977, for example, Congressman Seiberling suggested to Governor Hammond that one way to ensure the subsistence priority "would be for the Federal Government to do what we did in the strip mining law, to lay down conditions governing management of game on federal lands and then say if the State were willing to meet those conditions we would turn over that management to the State." *Hearings on H.R. 39 et al. Before the Subcomm. on General Oversight and Alaska Lands of the House Comm. on Interior and Insular Affairs,* 95th Cong., 1st Sess., part XII at 18 (1978). After the 1978 State subsistence law was passed, the likelihood that the State would be unwilling or constitutionally unable to meet the general conditions imposed by Title VIII simply was not part of the analysis.

As previously mentioned (note 10 and p. 7, *supra*), the priority had been changed from a Native preference to a "rural residents" one in order to accommodate the State's view that it would be unconstitutional as a matter of State law for it to provide a Native-only priority. *See* 125 CONG. REC. 9904 (May 4, 1979) (Rep. Udall). Congress believed that "because of restrictions imposed on State action by the Alaska Constitution . . . it would have been impossible for the State of Alaska to have developed a subsistence management program which provided a priority for Alaska Natives." *Id.* If anything, the approach adopted was a marked change in the manner in which Native hunting and fishing rights had historically been protected in Alaska -- even in the post-ANCSA era. *See* pp. 2-5, *supra*. The State's (and the legislative history's) repeated references to the continuation of the so-called "traditional balance" of state/federal authority thus reflect nothing more than the fact that Congress had devised a scheme for giving the State an opportunity to exercise authority over Native hunting and fishing by adopting and implementing laws that complied with ANILCA. There is not the slightest hint in the legislative history that the State could refuse to comply with impunity, nor that the federal government was abdicating its authority and responsibility to provide for the subsistence priority established in Title VIII.

### CONCLUSION

In the many ways discussed above -- judicial construction, clear statutory intent, and contemporaneous and consistent secretarial and State interpretation -- it has become firmly settled that the Secretary had not only the authority but the affirmative, non-discretionary duty to implement a federal subsistence-use management program on federal lands in the event the State either failed to enact or repealed the specified laws of general applicability. Against the weight of the foregoing, the State offers only legislative history confirming nothing but the truism that Congress preferred, hoped, and expected that the State would manage subsistence **33** uses on the public lands. After all, Congress had no reason to foresee the construction of the Alaska Constitution imposed by the *McDowell* decision.

Despite the hopes and desires of both Congress and the State, the fact remains that Congress conditioned State public-lands subsistence management on compliance with § 805(d), requiring general laws consistent with § § 803-805. No amount of legislative history could overcome that manifest meaning of the statute. In the end, "legislative history is not a panacea; it cannot overcome the structural and semantic problems [we have identified]." *Kenaitze, 860 F.2d at 318*.

The judgment of the district court should be affirmed.

STATE OF ALASKA, Plaintiff-Appellant, v. Bruce BABBITT, Secretary of Interior, et al., Defendants-Appellees, Alaska Federation of Natives, Defendant-Intervenor-Appellee.
1994 WL 16012450 (C.A.9)

Briefs and Other Related Documents (Back to top)

• 1994 WL 16012379 (Appellate Brief) Reply Brief of Appellant State of Alaska (Nov. 22, 1994) Original Image of this Document with Appendix (PDF)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 16012450 (C.A.9)                                                        Page 30
**(Cite as: 1994 WL 16012450)**

- 1994 WL 16057704 (Appellate Brief) Reply Brief for the Federal Appellants (Nov. 15, 1994) Original Image of this Document (PDF)
- 1994 WL 16012376 (Appellate Brief) Brief for the Federal Appellees (Oct. 18, 1994) Original Image of this Document (PDF)
- 1994 WL 16058590 (Appellate Brief) Brief for Appellees Katie John, et al., and Alaska Federation of Natives (Oct. 17, 1994) Original Image of this Document (PDF)
- 1994 WL 16058811 (Appellate Brief) Brief of Amici Curiae States of Arizona, California, Idaho, Montana, and Oregon (Oct. 17, 1994) Original Image of this Document (PDF)
- 1994 WL 16012377 (Appellate Brief) Brief for Appellant State of Alaska (Sep. 20, 1994) Original Image of this Document (PDF)
- 1994 WL 16012378 (Appellate Brief) Brief of Amici Curiae State of Arizona, California, Idaho, Montana, Nevada, and Oregon (Sep. 20, 1994) Original Image of this Document (PDF)
- 1994 WL 16058810 (Appellate Brief) Brief for the Federal Appellants (Sep. 19, 1994) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.