# EXHIBIT B-9 (Part 2)

had never been construed to reach navigable waters 8/—and omitted any

reference to navigable waters. Moreover, other federal statutes that employ

*both* the terms "public lands" and "navigable waters" indicate that Congress

does not view the term "public lands" as including "navigable waters." 9/

---

8/    In particular, the definition of "land" to include "lands, waters, and
interests therein" is not unique to ANILCA and, in fact, is boilerplate
language found in numerous federal statutes authorizing federal officials to
acquire property for parks and conservation units. *See, e.g.,* 16 U.S.C.
§§ 90b, 110c(c)(3), 121, 228b(a), 230a(b), 230g(a), 272(a), 273(a), 398d,
410j, 410o, 410p, 410bb(b)(1), 410ff-1(a), 410gg, 410gg-1, 410ii-3(a),
410jj-3(c), 410mm-2(b), 410qq-2(a), 410rr-2, 410rr-7(c), 459d-3(a), 459e-
1(a), 459h-1(a), 459i-1, 460*l*-8(a), 460*l*-9(a), 460*l*-10a, 460*l*-10b, 460m-3,
460m-9(a), 460m-16(a), 460p-2(a), 460q-2(a), 460r-2(a), 460v-7, 460z-6(a),
460z-13, 460aa-12, 460bb-3(a), 460cc-1(a), 460ee(c)(1), 460kk(c)(1),
460nn-1, 460ww(b). The "interests therein" language authorizes officials to
acquire less than full fee title interests, such as leaseholds. The inclusion of
this boilerplate language in ANILCA makes sense in this context. *See* 16
U.S.C. § 3192 (authorizing Secretary to acquire "lands within the boundaries
of any conservation system unit other than National Forest Wilderness").
On the other hand, this boilerplate language has never before been applied to
*expand* federal regulatory jurisdiction over waters (or lands) in the dramatic
fashion achieved by the prior panel, or even to denote the geographic reach
of a statute.

9/    *See, e.g.,* 16 U.S.C. § 817(1) ("It shall be unlawful for any person,
State, or municipality, for the purpose of developing electric power, to
construct, operate, or maintain any dam, water conduit, reservoir, power
house, or other works incidental thereto across, along, or in any of the
*navigable waters* of the United States, *or upon any part of the public lands*
or reservations of the United States (including the Territories) or utilize the
surplus water or water power from any Government dam, except under and
in accordance with the terms of a permit or valid existing right-of-way
granted prior to June 10, 1920, or a license granted pursuant to this
chapter.") (emphasis added).

Likewise, the prior panel majority's interpretation of ANILCA cannot be squared with the Submerged Lands Act. As noted, ANILCA defines "public lands" as federal "lands, waters, and interests therein," "*the title to which is in the United States*." 16 U.S.C. § 3102(1)-(2) (emphasis added). The Submerged Lands Act expressly grants States—and *not* the United States—"title to and ownership of the lands beneath navigable waters within [their] boundaries * * *, and the natural resources within such lands and waters." 43 U.S.C. § 1311(a). And, as the Supreme Court has declared, "[o]wnership of submerged lands * * * carries with it the power to control * * * fishing, and other public uses of water." *United States v. Alaska*, 521 U.S. at 5. While it is true that the Submerged Lands Act does not give States title to the *water itself*, it is undisputed that the United States does not hold such title either. Indeed, even the government recognizes that its "reserved water rights" theory at most gives it "a use interest" in the water—"*not* a title interest." Tr. of Mar. 18, 1994 Hearing in D. Ct. No. A90-0494 CV (HRH), at 36 (emphasis added), ER33. *See also Totemoff*, 905 P.2d at 965 (explaining that under settled property law, "the United States cannot hold title to * * * reserved water rights").

Under the government's latest interpretation of ANILCA, even though Alaska plainly holds "title" to the land beneath navigable water, and even

though such title plainly carries with it the right to control the waters for public purposes including fishing, ANILCA's definition of "public lands" divests Alaska of the authority to regulate fishing along the same navigable waters because the United States purportedly holds an implied "use interest" in the waters, which the United States concedes is "not a title interest." Regardless of the requirement of a clear statement, that interpretation simply cannot be squared with ANILCA's express terms. The government's initial interpretation of ANILCA, on the other hand, makes perfect sense in view of a plain reading of the Act's definition of public lands and the Submerged Lands Act: because "[t]he United States generally does not hold title to navigable waters," "navigable waters generally are not included within the definition of public lands." 55 Fed. Reg. at 27115. 10/

---

10/    This conclusion is further solidified by a narrowing provision of ANILCA's definition of public lands. Consistent with the requirement that the United States own "title" to the "lands, waters, or interests therein" that qualify as public lands, ANILCA excepts from the definition of public lands "land * * * granted to the Territory * * * or the State under any other provision of Federal law." 16 U.S.C. § 3102(3)(A). That includes the title granted Alaska by the Submerged Lands Act and equal footing doctrine.

Under the equal footing doctrine, the federal government may defeat a State's title to land under navigable waters by explicitly withdrawing the land prior to statehood. *See Utah Div. of Lands*, 482 U.S. at 197. Consistent with this understanding, the federal government initially took the position that—while "the public lands definition in ANILCA * * * generally excludes navigable waters"—the definition could possibly apply to

The prior panel majority stated that because ANILCA "indicate[s] that subsistence uses include subsistence fishing," and because "subsistence fishing has traditionally taken place in navigable waters," "we have no doubt that Congress intended that public lands include at least some navigable waters." 72 F.3d at 702. The panel's conclusion, however, does not follow from its premises because subsistence fishing traditionally also has taken place in *non-navigable* waters and, more to the point, there is no evidence that Congress sought to define the geographic scope of the priority based on the concept of "traditional subsistence use." To the contrary. Congress defined ANILCA's reach based on "title" to or ownership of federal lands. 16 U.S.C. § 3102(2). Subsistence hunting and fishing may be nonexistent on some federally-owned lands and crucially important on some state and private lands, but there is no indication that Congress attempted to make any such judgments when it confined Title VIII to federally-owned, "public lands."

Alaska has three million lakes, and the Alaska Department of Fish and Game has documented nearly 15,000 waterways containing anadromous fish, many of which are non-navigable and run through the 60% of the State that is

_____

navigable waters on lands withdrawn *prior to statehood*, including waters in certain national wildlife refuges and preserves. 57 Fed. Reg. at 22942.

- 28 -

federally owned. 11/ Some of these waters are navigable and are important to subsistence users, and ANILCA would no doubt be *more* protective of subsistence uses if Congress had applied Title VIII to all lands in Alaska regardless of federal ownership. But in enacting ANILCA, Congress only expressly intended to regulate subsistence uses on federally-owned, public lands. The panel majority's resort to "reserved water rights" to expand the geographic scope of the federal takeover of fisheries management in Alaska is a "judicial * * * solution" (72 F.3d at 704) with no support in ANILCA or its legislative history, and an unprecedented and unruly barometer for establishing geographic boundaries in the first place. *See infra* at 35-36.

    2.    In fact, the legislative history of ANILCA provides further evidence that Congress did not intend the definition of public lands to reach all or most navigable waters in Alaska. During the final deliberations on ANILCA, the principals considered—and rejected—a proposal that would have expanded ANILCA's rural subsistence priority to navigable waters. As part of the effort to reconcile the differences between the Senate and House versions of ANILCA, Arizona Congressman Udall proposed various

---

11/    *See Water Supply and Use: Alaska*, U.S. Geological Survey Water-Supply Paper 2350, at 1; Alaska Almanac 80 (6th ed. 1981); Alaska Dep't of Fish and Game, Catalog for Waters Important for Spawning, Rearing or Migration of Anadromous Fishes.

- 29 -

amendments to the Senate-passed bill, including an amendment that would have extended Title VIII's subsistence priority *beyond public lands* to "the waters of Alaska."  The amendment provided in pertinent part:

> SEC. 804.  The taking of fish stocks, wildlife populations, and other wild renewable resources for nonwasteful subsistence uses shall be the priority consumptive uses of each such stock, population and resource on the public lands *and within the waters of Alaska*. Whenever it is necessary to restrict the taking of a fish stock or wildlife population on such lands *or within such waters* for subsistence uses in order to protect the continued viability of such stock or population, such priority shall be implemented through appropriate limitations or restrictions * * *.  [7 ANILCA Legislative History 7, at 375 (emphases added) (reproduced in addendum hereto).]

The amendment also proposed to substitute the word "priority" where the Senate-passed version used "preference."  *See id.*

The Joint Resolution (No. 452) adopted by the Senate and the House agreeing to ANILCA included the latter change but not the former.  That is, the resolution substituted the word "priority" for "preference," but did *not* add "the waters of Alaska" to the geographical description of the priority's scope. *See* 39 ANILCA Legislative History, at 492, col. 3, amend. 34.  Congress obviously considered Representative Udall's proposed amendment to § 804, since it accepted part of it.  But it rejected the proposal to extend ANILCA's

~a" at large.  Instead of giving effect to the statute

ɔanel majority in effect resurrected the

ʰ *Mut. Life Ins. Co. v. Harris Trust & Sav.*

- 30 -

*Bank*, 510 U.S. 86, 100-101 (1993) ("Instead of enacting the Senate draft, which would indeed have settled [insurance industry] expectations, Congress adopted an exemption containing words of limitation. We are directed by those words, and not by the discarded draft.") (quotations and citations omitted); *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 220 (1983).

3.     The upshot of the prior panel decision is also compelling evidence that the panel majority strayed from Congress' intent. Because Congress left no hint as to which navigable waters, if any, are covered by ANILCA's definition of public lands, the panel charged "that the federal agencies that administer the subsistence priority are responsible for identifying those waters." 72 F.3d at 704. At the same time, the panel recognized that this "impose[d] an extraordinary administrative burden on federal agencies," and "complicated" an already complex "regulatory scheme." *Id.* at 704. *See id.* (recognizing that decision created a "heavy administrative burden"). In the *Totemoff* case, the Alaska Supreme Court aptly summarized the complexity of this undertaking as follows:

Employing the reserved water rights doctrine to define the geographic

ascertain the amount of water necessary to fulfill the primary purpose of the reservation.  Afterwards, the agencies would have to somehow convert that amount of water into a surface area of water constituting "public lands" under ANILCA.  This last step could be especially difficult, because reserved water rights represent the right to use a set volume of water or to prevent others from appropriating water, and not specific geographic areas around which property lines may be drawn.  [905 P.2d at 967 (citations omitted).]

Not to mention that this multifaceted inquiry would have to be undertaken with respect to the largest and most extensive water system in the United States.  Yet, in all the volum~ ~ ·~··~ ~A's legislative history, there is not a peep about this "ad                                              ). 12/

It is inconc~

unmistakably i·

---

12/    ᴛ
sever·
ANᴶ
co·
~

admin~
rulema
administration ~.                                    ~~~~ ~aw.  ).  Nor does such authority "permit the [agencies] to expand [their] jurisdiction beyond the boundaries established by Congress."  474 U.S. at 373 n.6.  The regulations sanctioned by the prior panel decision do little *but* that.

none of the hundreds of Congressmen who worked on ANILCA or their

staffs breathed a word of it during the lengthy process that led to its

enactment. As a matter of statutory construction, it was plainly wrong for

the panel majority to so hold on the prior appeal. See *Chisom v. Roemer*,

501 U.S. 380, 396 n.23 (1991) ("In a case where construction of legislative

language such as this makes so sweeping and relatively unorthodox a change

as that made here, I think judges as well as detectives may take into

consideration the fact that a watchdog did not bark in the night.") (quotation

omitted); *Edmonds v. Compagnie Gen. Transatlantique*, 443 U.S. 256, 266-

267 (1979) (Congress' "silence is most eloquent, for such reticence while

contemplating an important and controversial change in existing law is

unlikely."); *see also Totemoff*, 905 P.2d at 967. 13/

---

13/    If Congress had intended to extend ANILCA to navigable waters, it is
extremely unlikely that it would have done so on the basis of the reserved
water rights doctrine. In a non-consumptive context, the purpose of a water
right is to prevent other appropriators from depleting the stream waters below
a protected level in any area where the non-consumptive use applies. *See
Totemoff*, 905 P.2d at 965; *Alaska v. Babbitt*, 72 F.3d at 706 (Hall, J.,
dissenting). No one has claimed or presented evidence that fish habitats in any
of the waterways in any of these cases is being depleted by any appropriation
activity. Absent such a threat, the United States has no reason to assert a
federal reserved water right. Had Congress intended federal regulators to
begin asserting such rights specifically for the purpose of defining the
geographical boundaries of public lands, it would have given *some* indication
of this in ANILCA, or at least in its extensive legislative history. There is
none. Indeed, before delegating to an administrative agency the
extraordinarily complicated and highly controversial task of identifying what

The panel majority's interpretation of ANILCA may also have unintended—and perhaps even more dramatic—consequences for the Act's application to land. The panel accepted the notion that public lands could be defined by the existence of an implied water right. It interpreted the existence of such implied right—no matter how small—to convert all the water in the river or lake touched by the right—from bank to bank—into public lands subject to federal subsistence management. In effect, in other words, the Court interpreted "public lands" as "lands and waters *in which the United States holds any interest*." As the definition actually reads, however, "public lands" include only the federal "interests" in land or water, not the entire waterway, and thus under the reserved water rights theory only the water rights themselves would be "public lands," and only then if the United States actually holds "title" to them. 16 U.S.C. § 3102(2).

The term "public lands" appears throughout the various titles of ANILCA, a product of nearly a decade of political controversy and compromise. As noted, the "primary purpose" of ANILCA was "to complete the allocation of federal lands in the State of Alaska," *Amoco Prod. Co. v.*

---

navigable waters are subject to ANILCA, Congress itself would have been constitutionally obligated to provide the agency with intelligible principles as to how covered waters should be identified. Such guidance is completely lacking from the naked delegation contained in the prior panel decision.

- 34 -

*Village of Gambell*, 480 U.S. at 549, not to regulate subsistence uses. The Act places some 106 million acres of land into conservation systems. If any federal interest in water renders an entire river "public land" within ANILCA, then under the same principle any federal interest in land renders it public land within ANILCA. This interpretation potentially reaches nearly everything Seward purchased. For example, all patents for land issued after 1890 west of the 100th meridian—nearly all non-federally owned land in Alaska—is subject to a reserved federal right-of-way for construction, 43 U.S.C. § 945. Also, the United States has agreements with the State to use state lands (*e.g.*, for military exercises), IRS liens on private property, and access rights to inholdings.

Congress could not possibly have intended every federal interest to have such a midas touch, converting all it touches into "public lands" for purposes of ANILCA and, thus, extending ANILCA to practically *all* of Alaska. Yet this result is hardly far-fetched. "The government's new subsistence regulations permit the Federal Subsistence Board to identify the existence of additional * * * Federal interests in land or waters, including those in which the United States holds less than a fee ownership, to which the Federal subsistence priority attaches, and make appropriate recommendation to the Secretaries for inclusion of those interests within the Federal Subsistence

- 35 -

Management Program." 64 Fed. Reg. at 1290. In this respect, the fallout from the prior panel decision may only have just begun.

The panel majority's interpretation also eliminates certainty as to the geographic units to which ANILCA applies. Properly construed, ANILCA's definition of public lands establishes concrete geographic boundaries for ANILCA's application—federally-owned lands such as national parks or reserves. The panel's decision, however, has resulted in a crazy patchwork of waters to which ANILCA now applies, purportedly based on the existence of reserved federal water rights, and may well produce an even crazier quilt for land. There is no evidence that Congress intended ANILCA or its subsistence priority to be applied in such a haphazard fashion, and certainly no evidence that Congress intended federal regulators to canvass the millions of lakes and thousands of miles of waterways in Alaska to decide on the basis of implied water rights where the Act applies. "Reserved water rights" are scarcely, *if ever*, used to delineate geographic units. Instead, Congress intended the area subject to Title VIII to be immediately clear to all potential users and to the State, and selected a time-tested proxy for that determination—federal title to or ownership of lands.

4. As Judge Hall explained, the panel majority's interpretation, particularly its novel use of the reserved water rights doctrine, also raises

profound questions as to Congress' constitutional authority to extend

ANILCA to navigable waters for the purposes of subsistence uses, intrastate

activities that lack any substantial relationship to interstate commerce. *See*

72 F.3d at 706-707 (dissenting) (citing, *e.g.*, *United States v. Lopez*, 514

U.S. 549, 559 (1995)). Where an alternative construction—such as the

federal government's *initial* interpretation of ANILCA—is not only possible

but also far better aligned with traditional indicia of congressional intent on

this important matter, the Court should construe ANILCA to avoid these

constitutional doubts. *See Jones v. United States*, 120 S. Ct. 1904, 1911

(2000) (where alternative construction is possible, Court should construe act

to avoid constitutional problem); *Edward J. DeBartolo Corp. v. Florida Gulf

Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).

> **D.** **Neither The *Chevron* Doctrine Nor Appellees'
> Congressional Acquiescence Theory Sanctions The Result
> Reached By The Prior Panel Majority.**

Lacking any footing in the statute, the private appellees and federal

defendants are forced to rely almost entirely on downstream "agency

deference" and "congressional acquiescence" theories. But neither of these

approaches can make up for the lack of a clear statement from Congress that

it intended ANILCA to cover all or most navigable waters in Alaska, let

alone eliminate the evidence that Congress in fact did *not* intend that result.

- 37 -

The *Chevron* doctrine does not negate the need for clear guidance *from Congress* when courts construe a statute in a manner that would curtail state sovereignty. Because *Chevron* is only triggered when a statute is silent or ambiguous, it does not apply to save an interpretation that must be clearly expressed in the *statute*. The clear statement rule ensures that decisions on matters that may disrupt the federal balance are made by Congress—an institution comprised of representatives of the States and therefore sensitive to such matters—and not, for example, by federal bureaucrats who may be far less sensitive to such issues, and are not accountable at all to the States. *See Gregory v. Ashcroft*, 501 U.S. at 461 ("In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the *legislature* has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision.") (quotation omitted; emphasis added). No one—not the private plaintiffs, not the federal defendants, and least of all the prior panel majority—has argued that the conclusion "that the definition of public lands includes those navigable waters in which the United States has an interest by virtue of the reserved water rights doctrine," 72 F.3d at 703-704, is unmistakably clear in the

language of ANILCA. To the contrary, it is unmistakably *absent* from

ANILCA. And *Chevron* can do nothing to change that. 14/

In any event, wholly apart from the absence of any clear statutory

language supporting the agency's construction, the case for *Chevron*

deference is especially weak in the circumstances here. The federal agencies

adopted their "reserved water rights" interpretation in the midst of this

litigation, following a change in federal administrations, and in contradiction

of the initial interpretation of ANILCA arrived at following both temporary

and final rulemaking proceedings. *See Bowen v. Georgetown Univ. Hosp.*,

488 U.S. 204, 212 (1988); *Resource Invs., Inc. v. United States Army Corps*

*of Eng'rs*, 151 F.3d 1162, 1165 (9th Cir. 1998); *Totemoff*, 905 P.2d at 967-

968. Such a catch-as-catch-can interpretation is entitled to little if any

weight. And of course, quite apart from any of this, no deference is due

---

14/    In analogous circumstances, courts have refused to defer to an agency
interpretation of silent or ambiguous language where, given the subject
matter involved, Congress is required to legislate in clear and unambiguous
terms. *See, e.g., Virginia Dep't of Educ. v. Riley*, 106 F.3d 559, 567 (4th
Cir. 1997) ("It is axiomatic that statutory ambiguity defeats altogether a
claim by the Federal Government that Congress has unambiguously
conditioned the States' receipt of federal monies in the manner asserted.");
*United States v. Rohm & Haas Co.*, 2 F.3d 1265, 1274 n. 14 (3d Cir. 1993)
("Because only a clear congressional statement will be sufficient for us to
impose an agency's costs on a regulated private party, the usual deference
accorded a reasonable agency interpretation of an ambiguous statutory
provision is inapplicable.").

when, as here, the agency "interpretation is unreasonable." *National R.R. Passenger Corp. v. Boston & Me. Corp.*, 503 U.S. 407, 418 (1992). As discussed, the interpretation in this case finds no support in the statute or its legislative history, and leads to multiple implausible if not absurd results.

The argument that Congress has "ratified by appropriation this Court's prior decision" is also fundamentally flawed, and is a sign of just how little appellees have to offer in the way of legal justification for their position. Pl. Opp. to Hearing En Banc at 14; *see* U.S. Opp. to Hearing En Banc at 13. As this Court has held, "[t]he mere appropriation of funds * * * does not constitute congressional ratification." *Zarr* v. *Barlow*, 800 F.2d 1484, 1493 (9th Cir. 1986) (quotation omitted). *Cf. Rincon Band of Mission Indians* v. *Harris*, 618 F.2d 569, 573 (9th Cir. 1980) (government bears "heavy burden" in attempting to show "[r]atification by appropriation"). None of the appropriation riders cited by appellees (*see* U.S. Opp. to Hearing En Banc at 7; Pl. Opp. to Hearing Banc at 8-10) calls for a different conclusion here. Furthermore, whatever may be inferred from these riders, Congress has indisputably failed to heed the prior panel's request to "clarify both the definition of public lands and its intent" with respect to the Act's coverage to navigable waters. 72 F.3d at 702, 704.

More fundamentally, these riders—none of which expressly embraces the prior panel decision in this case, and all which can also be explained in terms of delaying the federal takeover to give Alaska more time to amend its Constitution and adopt a rural subsistence priority—do not establish the sort of "unmistakably clear" intent on the part of Congress that the Supreme Court has repeatedly demanded when "Congress intends to alter the usual constitutional balance between the States and the Federal Government." *Gregory*, 501 U.S. at 460. Mere congressional "acquiescence in" (U.S. Opp. to Hearing En Banc at 13) judicial lawmaking is hardly sufficient to satisfy the clear statement rule. That is especially true with respect to the sort of acquiescence alleged here, based on one-paragraph riders to thousand-page appropriations bills that are notorious for being filled with items that escape any meaningful deliberation. And while Congress may be able to clearly state its agreement with a particular judicial interpretation of a statute (which it has not done here), courts should be reluctant to apply the clear statement doctrine in a manner that would permit or even encourage courts to come up with judicial solutions that infringe state sovereignty, and then wait and see if Congress will "acquiesce." U.S. Opp. to Hearing En Banc at 13.

*          *          *

The federal structure of government is one of America's unique contributions to political thought and most cherished assets. *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838 (1995) (Kennedy, J., concurring). The Constitution safeguards that structure by limiting to Congress the authority to transfer power traditionally held by the States to the federal government. The most benevolent of motives cannot overcome this vital check. Alaska's control over its navigable waters and fish and game along such waters is central to its sovereignty. Only Congress can take that control away from Alaska and only then in clear and unmistakable terms. Because Congress has not done so, this Court should vacate the prior panel decision, and reverse the judgment of the District Court.

## CONCLUSION

For the foregoing reasons, the prior panel decision should be vacated

and the judgment of the District Court should be reversed.

Respectfully,

*Of Counsel*:
John G. Roberts, Jr.
Gregory G. Garre
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5810

*Joanne M. Grace / psc*

Bruce M. Botelho
*Attorney General*
Joanne M. Grace
*Assistant Attorney General*
STATE OF ALASKA
Attorney General's Office
1031 W. 4th Avenue
Anchorage, Alaska 99501
(907) 269-5100

September 13, 2000

*Counsel for Defendants-Appellants*
*State of Alaska, et al.*

- 43 -

## STATEMENT OF RELATED CASES

Appellants are unaware of any related cases pending in this Court.

## CERTIFICATE OF COMPLIANCE PURSUANT TO
## FED. R. APP. 32(A)(7)(C) AND CIRCUIT RULE 32-1
## FOR CASE NUMBER 00-35121

I certify that:

__X__   1.   Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached opening brief is

__X__        Proportionately spaced, has a typeface of 14 points or more and contains 10,230 words (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words; reply briefs must not exceed 7,000 words),

9/27/00
Date

_Joanne M. Grace / jmg_
Attorney for State of Alaska

**ADDENDUM**

# TABLE OF CONTENTS

Page

**STATUTES:**

16 U.S.C. § 3102 .................................................................................ADD 1

16 U.S.C. § 3114(a)............................................................................ADD 2

16 U.S.C. § 3202 .................................................................................ADD 3

43 U.S.C. § 1311(a).............................................................................ADD 4

**LEGISLATIVE HISTORY:**

Proposed Udall Amendments .............................................................ADD 5

16 U.S.C. § 3102

### § 3102. Definitions

As used in this Act (except that in titles IX and XIV the following terms shall have the same meaning as they have in the Alaska Native Claims Settlement Act [43 U.S.C. 1601 et seq.], and the Alaska Statehood Act)—

(1) The term "land" means lands, waters, and interests therein.

(2) The term "Federal land" means lands the title to which is in the United States after December 2, 1980.

(3) The term "public lands" means land situated in Alaska which, after December 2, 1980, are Federal lands, except—

(A) land selections of the State of Alaska which have been tentatively approved or validly selected under the Alaska Statehood Act and lands which have been confirmed to, validly selected by, or granted to the Territory of Alaska or the State under any other provision of Federal law;

(B) land selections of a Native Corporation made under the Alaska Native Claims Settlement Act [43 U.S.C. 1601 et seq.] which have not been conveyed to a Native Corporation, unless any such selection is determined to be invalid or is relinquished; and

(C) lands referred to in section 19(b) of the Alaska Native Claims Settlement Act [43 U.S.C. 1618(b)].

ADD 1

16 U.S.C. § 3114(a)

**§ 3114. Preference for subsistence uses**

(a) Except as otherwise provided in this Act and other Federal laws, the taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded priority over the taking on such lands of fish and wildlife for other purposes. Whenever it is necessary to restrict the taking of populations of fish and wildlife on such lands for subsistence uses in order to protect the continued viability of such populations, or to continue such uses, such priority shall be implemented through appropriate limitations based on the application of the following criteria:

(1) customary and direct dependence upon the populations as the mainstay of livelihood;

(2) local residency; and

(3) the availability of alternative resources.

ADD 2

16 U.S.C. § 3202

§ 3202. Taking of fish and wildlife

(a) Responsibility and authority of State of Alaska

  Nothing in this Act is intended to enlarge or diminish the responsibility and authority of the State of Alaska for management of fish and wildlife on the public lands except as may be provided in subchapter II of this chapter, or to amend the Alaska constitution.

(b) Responsibility and authority of Secretary

  Except as specifically provided otherwise by this Act, nothing in this Act is intended to enlarge or diminish the responsibility and authority of the Secretary over the management of the public lands.

ADD 3

43 U.S.C. § 1311(a)

§ 1311. Rights of States

(a) Confirmation and establishment of title and ownership of lands and resources; management, administration, leasing, development, and use

It is determined and declared to be in the public interest that (1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters, and (2) the right and power to manage, administer, lease, develop, and use the said lands and natural resources all in accordance with applicable State law be, and they are, subject to the provisions hereof, recognized, confirmed, established, and vested in and assigned to the respective States or the persons who were on June 5, 1950, entitled thereto under the law of the respective States in which the land is located, and the respective grantees, lessees, or successors in interest thereof;

ADD 4

358²mendment to _____

Offered by _____

At the end of the bill, add the following:

## TITLE II

AMENDMENTS TO ALASKA NATIONAL INTEREST LANDS CONSERVATION ACT

Sec. 201. For purposes of this Title, the term "Act" means the Alaska National Interest Lands Conservation Act as approved by the Senate and the House of Representatives of the United States.

### National Forest Wilderness

Sec. 202 (α) Section 703(a)(14) of the Act is hereby amended to read as follows:

(14) West Chichagof-Yakobi Wilderness of approximately three hundred and seventy-five thousand acres, as generally depicted on a map entitled "West Chichagof-Yakobi Wilderness", dated January, 1979;

(b) Section 703 (a) of the Act is hereby further amended by the addition at the end thereof of the following new subsections:

"(15) Karta Wilderness of approximately thirty-nine thousand acres, as generally depicted on a map entitled "Karta Wilderness," dated January 1979; and

*AMENDMENTS TO THE SENATE BILL HAND DELIVERED BY UDALL ET AL. TO STEVENS AND OTHER SENATE PRINCIPALS ON THE AFTERNOON OF 9-18-80. BUT NOT INTRODUCED AS A HOUSE BILL AT THAT TIME.*

ADD 5

"(16) Rocky Pass Wilderness of approximately seventy-two thousand acres, as generally depicted on a map entitled 'Rocky Pass Wilderness,' dated January 1979."

## Admiralty Island

Sec. 504. Section 506(c) of the Act is hereby amended to read as follows:

(c)(1) In satisfaction of the rights of the Natives of Sitka as provided by section 14(h)(3) of the Alaska Native Claims Settlement Act, the Secretary of Agriculture shall designate alternative lands of equal or greater timber value located in southeast Alaska other than within the Admiralty Island and Misty Fjords National Monuments and not in wilderness or wilderness study for the benefit of Shee Atika, Incorporated. For purposes of this section, corporations formed pursuant to section 14(h)(3) of the Alaska Native Claims Settlement Act shall be considered as Village Corporations formed pursuant to section 16 of that Act. Upon notice that any such land is acceptable to Shee Atika, Incorporated, the Secretary shall immediately convey the surface estate in such land to such corporation and shall immediately convey the subsurface estate to the SEAlaska Corporation. As a condition of such conveyance, Shee Atika, Incorporated, shall release any claim to land selections on Admiralty Island and SEAlaska Corporation shall release any claim to subsurface right on Admiralty Island which corresponds to the land selections so released by Shee Atika, Incorporated.

ADD 6

(2) Nothing in this section shall be construed to affect any valid rights which Shee Atika, Incorporated, may have on Admiralty Island pursuant to section 14(h)(3) of the Alaska Native Claims Settlement Act nor shall it in any way be deemed to compel Shee Atika, Incorporated, to surrender any rights they may have on Admiralty Island prior to their voluntary acceptance of other land.

(3) If within one year after the date of enactment of this Act, the Secretary of Agriculture has failed to designate alternative lands pursuant to paragraph (1) of this subsection which are acceptable to Shee Atika, Incorporated, then Shee Atika, Incorporated may identify a reasonably compact tract of not more than twenty-three thousand and forty acres of land within the Tongass National Forest, other than in wilderness or a national monument, conforming as nearly as practicable to the United States Land Survey System; and the lands so identified shall then be conveyed to Shee Atika, Incorporated, and the subsurface estate therein to SEAlaska, Incorporated, by the Secretary of Agriculture.

(4) All lands conveyed to Shee Atika, Incorporated, under any section of this Act shall be charged against such corporation's total entitlement to receive lands pursuant to the Alaska Native Claims Settlement Act, and nothing in this Act shall be construed to enlarge or diminish such entitlement.

ADD 7