# EXHIBIT B-10 (Part 2)

reasonable. 72 F.3d at 703-704. Even Judge Hall, who dissented from the earlier ruling, concluded that no alternative interpretation was reasonable; the majority therefore deferred to the agencies' view as the <u>only</u> reasonable interpretation of the definition before it.

    B. <u>Even in the absence of deference, the panel's ruling and the current regulations should be upheld because Title VIII unambiguously protects the subsistence use of fish and wildlife on public lands</u>. – ANILCA's statement of purpose sets out two primary goals, both of which include protection of subsistence uses and resources. 16 U.S.C. 1301. First, ANILCA is intended to preserve Alaska's vast natural and scenic resources, ecosystems, wilderness resource values, historic and archaeological sites, and recreational and educational opportunities, including "the resources related to subsistence needs." Second, ANILCA is intended to "provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so." 16 U.S.C. 1301(c).

    Throughout the subchapter devoted to establishment and administration of a system of local and regional advisory committees and councils to assure the provision of the subsistence priority, the statute refers to regulation of "fish and wildlife" for subsistence use. It requires the Secretary to review and act on recommendations of the councils and provide access to subsistence resources on the public lands, including allowing subsistence hunters and fishermen to conduct activities otherwise prohibited, such as "use for subsistence purposes of snowmobiles, motorboats, and other means of surface transportation traditionally employed for such purposes by local residents." 16 U.S.C. 3121. Unequivocally,

- 21 -

therefore, the statute was intended as a partial preemption of Alaska's regulatory authority with regard to both fish and wildlife, on lands and waters owned by the United States.

    1. The United States holds title to interests in waters appurtenant to federal lands. – The reserved water rights doctrine holds that when the federal government withdraws land from the public domain and reserves it for a federal purpose, the government by implication reserves a sufficient quantity of water appurtenant to the reservation necessary to accomplish the purposes of the reservation. Arizona v. California, 373 U.S. 546, 600 (1963). Federal reserved water rights are a component of the property in which the United States holds title, where lands are reserved for purposes that are water dependent, see Cappaert v. United States, 426 U.S. 128, 138-42 (1976). And usufructuary water rights, such as those reserved under the federal reserved water rights doctrine, are themselves recognized in the law as property interests. F.P.C. v. Niagara Mohawk Power Corp., 347 U.S. 239, 251 (1954); Colville Confederated Tribes v. Walton, 647 F.2d 42, 48 (9th Cir.), cert. denied, 454 U.S. 1092 (1981) (Tribe has vested property right in reserved water). Accordingly, it is reasonable to conclude that when Congress directed the provision of the subsistence priority on "lands, waters, and interests therein, title to which is in the United States," it intended that the priority would be provided not only on lands to which the United States holds title, but also on appurtenant waters in which the United States owns interests in the form of reserved water rights.

    2. By defining "public lands" on which the statute applies to include "waters and interests therein" Congress extended its protections to waters appurtenant to

federal lands. – Contrary to the States's characterization of the statutory definition as "boilerplate" (Br. 25, n.25), the statutory "public lands" definition itself reflects Congress's intent to apply the priority on waters in which the United States owns interests, and not only on federal lands and the waters overlying them. Federal land management statutes ordinarily define as "public lands" those lands and interests therein that are owned by the federal government, see e.g., Federal Land Policy and Management Act, 43 U.S.C. 7102(e), or lands subject to disposition pursuant to the public land laws. See, e.g., 16 U.S.C. 796. The Alaska Native Claims Settlement Act (ANCSA) defined "public lands" as "all Federal lands and interests therein located in Alaska" with certain exceptions. 43 U.S.C. 1602.

It is therefore significant that, when Congress defined the same term in ANILCA, it included "waters and interests therein" as a part of the "public lands" on which a priority for subsistence use of fish and wildlife would be provided. Congress expected at the time of enactment that Title VIII would be administered by the State in accordance with the provisions of section 805 – the State had already enacted legislation for that purpose – and may therefore have been less concerned with the practicalities of implementing a federal management program than it would have been if not. However, Congress unequivocally expected that Title VIII would protect the subsistence way of life in rural Alaska, which depends heavily on fishing, particularly for anadromous fish (see, e.g., ER 19 ). As Congress was well aware, these fish are taken almost exclusively in navigable waters. See S. Rep. No. 96-413, supra, at 272 (regarding judicial enforcement for failure to adequately restrict harvest of particular fish and wildlife  populations,

- 23 -

"e.g. salmon in the Copper River" pursuant to section 804) and see Alaska v. Babbitt, 72 F.3d at 702.   Congress directed the that the Secretary to "permit on the public lands appropriate use for subsistence purposes of * * * motorboats," 16 U.S.C. 3121(b), revealing a clear intent to protect subsistence activities in navigable waters. It is therefore reasonable to interpret the scope of the "lands, waters and interests therein" on which federal law would ensure a priority for subsistence uses of "fish and wildlife" to include those waters – navigable or otherwise – that are appurtenant to federal land reservations in Alaska.

ANILCA itself reserved vast tracts of land to the United States, many of them for purposes explicitly related to the protection of fish and fisheries. Nowhere in the statute is federal authority to protect fish or subsistence fishing tied to federal ownership of submerged lands.  Indeed, the purposes of reservations such as the Wrangell-St. Elias National Park and Preserve, in which the private plaintiffs in this action traditionally have fished, could not be achieved without the assertion of federal regulatory authority over waters as well as lands, although the waters traversing the park include major navigable rivers.  Congress provided that the park and preserve be managed for purposes including:

> To maintain unimpaired the scenic beauty and quality of high mountain peaks, foothills, glacial systems, lakes, and streams, valleys, and protect habitat for, and populations of, fish and wildlife including but not limited to caribou, brown/grizzly bears, Dall sheep, moose, wolves, trumpeter swans and other waterfowl, and marine mammals; and to provide continued opportunities, including reasonable access for mountain climbing, mountaineering, and other wilderness recreational activities.  Subsistence uses by local residents shall be permitted in the park, where such uses are traditional, in accordance with [Title VIII].

16 U.S.C. 410hh(9)(emphasis supplied).  Among the traditional subsistence uses

- 24 -

by local residents in the park is the fishery at Batzulnetas where Katie John and other private plaintiffs traditionally have conducted subsistence activities.

The federal reserved water rights doctrine has grown out of precisely the kind of concern that is at issue here. Congress in ANILCA invoked its plenary authority over lands and its paramount authority to regulate commerce to achieve the statute's purposes, a primary one of which was preserving the opportunity to engage in subsistence uses of fish and wildlife in rural Alaska. Just as Congress is presumed, regardless of ownership of the beds of rivers bordering or traversing Indian reservations, to have reserved a sufficient quantity of the water flowing over them for irrigation use by the reservation's inhabitants, Arizona v. California, 373 U.S. 546, 600 (1963); Colville Confederated Tribes v. Walton, supra, 647 F.2d at 48, it has reserved rights in waters necessary to the achievement of the purposes of federal reservations in rural Alaska. The fact that a state may have obtained title to the bed and banks of navigable rivers pursuant to the equal footing doctrine does not preclude Congress – before or after statehood – from reserving waters in these rivers for federal purposes.

As this Court has previously held, where a federal reservation is made for purposes of maintaining the traditional hunting and fishing practices of native people, the reservation includes ownership of the right to maintain water in the stream sufficient to support a fishery. U. S. v. Adair, 723 F.2d 1394, 1411 (9th Cir. 1983), cert. denied, 467 U.S. 1252 (1984). "The holder of such a right is not entitled to withdraw water from the stream * * *. Rather, the entitlement consists of the right to prevent other appropriators from depleting the streams [sic] waters

- 25 -

below a protected level in any area where the non-consumptive right applies." 723 F.2d at 1411. The purposes of Wrangell-St.Elias National Park and Preserve, cited above, for example, include maintenance of water quality and populations of fish and waterfowl, and protection of the traditional subsistence activities of local residents, all of which require the reservation of non-consumptive water rights for their achievement. It is in those reserved waters that the subsistence priority is to be accorded. The priority accorded by Title VIII thus reasonably applies on federal lands and reserved waters in Alaska, for subsistence fishing by rural Alaska residents.

By defining "public lands" to include "waters and interests therein," Congress defined as "public lands" for ANILCA's subsistence priority all of what remains in federal ownership when lands are reserved by the United States: federal lands and the waters necessary to achieve the purposes for which they are reserved. Congress's clearly stated intent to preserve the "subsistence way of life" on federally owned "public lands," unambiguously included the intent to preserve the opportunity to engage in subsistence fishing on and in the "lands, waters, and interests therein" subject to the priority, including lands and waters reserved for purposes related to fishing or subsistence.

3. A definition that reads out "waters and interests therein" is inconsistent with ANILCA – The prior panel concluded that unless waters appurtenant to federal lands are subject to Title VIII, its protection of the subsistence way of life is ineffective, as virtually all subsistence includes fishing, and very little subsistence fishing takes place in non-navigable waters. See, e.g., Alaska Pacific Fisheries v.

- 26 -

United States, 248 U.S. 78, 87-89 (1918).  In the 1990 federal subsistence regulations, the priority was extended only to areas where the United States owned lands, and therefore excluded all waters except those whose beds were owned by the United States. See 55 Fed. Reg. 27114, 27115 (June 29, 1990).  Alaska now urges this Court to reinstate that definition of "public lands."  That proposal should be rejected, because there is no basis for resurrecting the prior regulatory definition.

As discussed above, the definition of "public lands" in ANILCA, unlike those in other land management statutes, includes waters and interests in waters. The inclusion of the term "waters" in the public lands definition reasonably must be given some meaning.  It is a well-established doctrine that "enactments should not be construed to render their provisions mere surplusage." Dunn v. Commodity Futures Trading Com'n, 519 U.S. 465, 472 (1997), and an interpretation of "public lands" that excludes "waters and interests therein" would do just that. Accordingly, the prior panel was correct in rejecting the Secretaries' initial regulatory definition. The Secretaries' revised view that the definition of "public lands" mandates a priority for subsistence use of fish and wildlife both on federal lands and in their appurtenant waters, on the other hand, avoids nullifying the inclusion of "waters" in the definition and permits meaningful application of the priority consistent with the statute's purpose of preserving the subsistence way of life in rural Alaska.

C. Congress is aware of, and has acquiesced in, the agencies' definition of "public lands." – As discussed above, there is no basis in the law for overturning the prior panel's decision affirming the agencies' reasonable interpretation of "public lands."  Moreover, Congress has acquiesced in the interpretation

- 27 -

expressed in the prior panel's decision. After this Court upheld the agencies' interpretation of public lands as encompassing certain navigable waters in which the United States owns reserved rights, Congress took a series of actions to permit Alaska to make the necessary changes to its constitution to allow State administration of the priority.[5/] Among other measures, Congress enacted temporary amendments to ANILCA that would expire if Alaska failed to take the necessary legislative actions. It is therefore clear that Congress is well aware of the circumstances of Title VIII's implementation and has acquiesced in the current status quo. In light of this Court's prior ruling and Congress's clear knowledge of the agencies' interpretation of the statute, there is no basis for concluding that the prior panel erred in adopting the agencies' interpretation of "public lands" as inclusive of federal reserved waters.

II

TITLE VIII REPRESENTS AN APPROPRIATE
EXERCISE OF CONGRESS'S AUTHORITY
UNDER THE PROPERTY CLAUSE

In ANILCA, Congress invoked its authority under the Property Clause as well as the Commerce Clause and Congress' constitutional authority to provide for Native American affairs, to protect the national interest in preserving the subsistence

---

[5/] See Act of April 26, 1996 § 336, Pub. L. No. 104-134, 1996 U.S. Code Cong. & Admin. News (110 Stat.) 1321, 1321-210; Act of September 30, 1996 § 317, Pub. L. No. 104-208, 1996 U.S. Code Cong. & Admin. News, 110 Stat. 3009, 3009-222; Act of November 14, 1997 § 316, Pub. L. No. 105-83, 1998 U.S. Code Cong. & Admin. News (111 Stat.) 1543, 1592; Omnibus Consolidated Appropriations Act of October 21, 1998 , Pub. L. No. 105-277, 1998 U.S. Code Cong. & Admin. News (112 Stat.) 2681, 2681-251-252, 271-295, 298.

- 28 -

way of life of rural Alaskans (16 U.S.C. 3111). Although fish and wildlife
traditionally have been regulated by states, and not by the federal government, Geer
v. Connecticut, 161 U.S. 519 (1896), the states' power to regulate wild animals
within their boundaries exists "only so far as such protection * * * does not
contravene the power of Congress in the regulation of interstate commerce."
Hughes v. Oklahoma, 441 U.S. 322 (1979). And the United States may, in the
exercise of its powers under the Property Clause, regulate and protect wildlife and
may pass laws that pre-empt State management of fish and wildlife on federal lands.
Kleppe v. New Mexico, 426 U.S. 529, 540-541 (1976)("when Congress so acts the
federal legislation necessarily overrides conflicting state laws under the Supremacy
Clause"); Defenders of Wildlife v. Andrus, 627 F.2d 1238, 1248 (D.C. Cir. 1980).
And see Missouri v. Holland, 252 U.S. 416 (1920)(upholding the constitutionality
of the Migratory Bird Treaty Act)("it is true that as between a State and its
inhabitants the State may regulate the killing and sale of [fish and wildlife], but it
does not follow that its authority is exclusive of paramount powers"). In short, the
states' interest in the authority to regulate fish and wildlife within their borders is
"important," but is shared with the federal government when the United States
chooses to exercise its own sovereign authority pursuant to an enumerated power.
Minnesota v Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 204 (1999).

The Constitution provides in the Property Clause that Congress has the
power "to dispose of and make all needful Rules and Regulations respecting the
Territory or other Property belonging to the United States." U.S. Const. Art. VI,
sec. 3, cl. 2. Moreover, Congress "may deal with [its] lands precisely as an

ordinary individual may deal with his farming property. It may sell or withhold them from sale." Light v. United States, 220 U.S. 523, 536 (1911). Indeed, the establishment of a forest reserve by Congress is a "right[] incident to proprietorship, to say nothing of the power of the United States as a sovereign over the property belonging to it." United States v. Gardner, 107 F.3d 1314, 1318 (9th Cir.), cert. denied, 522 U.S. 907 (1997), quoting Light, supra, 220 U.S. at 537.

Throughout its brief (Br.14, 18, 22, 31, 32, 33) the State emphasizes the statute's failure to specify that "waters and interests therein" might include navigable waters, and Alaska urges (Br. 22) that therefore it is necessary to conclude that such waters are excluded from "public lands" as defined by the statute unless their beds are owned by the United States. As discussed above, Congress plainly viewed interests in water owned by the United States as "public lands;" if not, the definition would be limited to "lands and interests therein, and waters" the title to which is in the United States. Alaska might prefer to so rewrite the statute, but neither the State nor this Court has the authority to do so. "Our task is to apply the text, not to improve upon it." Fogerty v. Fantasy, Inc., 510 U.S. 517, 538 (1994) (Thomas, J. dissenting), quoting Pavelic & LeFlore v. Marvel Entertainment Group, 493 U.S. 120, 126 (1989).

The United States' title to federal lands includes title to the right to maintain instream waters unappropriated at the time of the reservation of the lands, to the extent that such waters are necessary to the purposes of the reservation. Cappaert v. United States, supra, 426 U.S. at 138-42; U. S. v. Adair, 723 F.2d at 1411. The title to the submerged lands that was transferred to Alaska upon statehood does not

- 30 -

limit the United States' authority to reserve lands or to assert federal regulatory authority over appurtenant waters.  To the contrary, Congress's authority to regulate federal lands pursuant to its authority under the Property Clause has been held to be "without limitations." <u>Kleppe v. New Mexico</u>, 426 U.S. at 540-541; see <u>United States v. Gardner</u>, <u>supra</u>, 107 F.3d at 1318 (9th Cir. 1997)(collecting cases).

III

ANILCA CONTAINS A "CLEAR STATEMENT"<br>
OF INTENT TO REGULATE IN AREAS TRADITIONALLY<br>
MANAGED BY STATES IN ORDER TO PROTECT<br>
THE SUBSISTENCE WAY OF LIFE, INCLUDING SUBSISTENCE FISHING,<br>
ON LANDS AND WATERS OWNED BY THE UNITED STATES

Pursuant to the Supremacy Clause, U.S. Const. Art. VI , cl. 2, acts of Congress are the supreme law of the land.  Where Congress acts pursuant to one of its enumerated powers in a field traditionally occupied by state regulation, it may pre-empt inconsistent state law.  See, <u>e.g.</u>, <u>Jones v. Rath Packing Co.</u>, 430 U.S. 519, 525-526 (1977).  Congress also has the authority, where it may regulate private activity under the Commerce Clause, to offer States the choice of regulating that activity according to federal standards or having state law pre-empted by federal regulation.  <u>Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.</u>, 452 U.S. 264, 288 (1981).  However, Congress's intent to pre-empt historic the powers of states should be "clear and manifest" <u>Rice v. Santa Fe Elevator Corp.</u>, 331 U.S. 218, 230 (1947).

Alaska concedes (Br. 23-24) – as it must – that Congress provided the requisite "clear statement" of intent to effect a partial preemption of state fish and wildlife regulation in ANILCA Title VIII.  The program established in the statute is

- 31 -

clearly a federal pre-emption of subsistence fish and wildlife regulation with an opt-in clause for the State.  The statute's savings clause, 16 U.S.C. 3202, recognizes that the respective authority of the state and federal governments has been altered, stating that "nothing in this Act is intended to enlarge or diminish the responsibility and authority of the State of Alaska for management of fish and wildlife on public lands except as may be provided in [Title VIII], or to amend the Alaska constitution."

The State contends, however, that a second "clear statement" of intent to impose regulatory authority in navigable waters would be required to support the Secretaries' interpretation of the scope of the priority, which otherwise constitutes an intrusion into State sovereignty that is barred by Constitutional principles of federalism.  The double-clear-statement rule that serves as the foundation for the State's challenge, however, has no basis in the law.

As support for the proposition that Congress could not have intended to include subsistence fishing in navigable waters without making reference to their navigability, Alaska relies on Gregory v. Ashcroft, 501 U.S. 452 (1991), which addressed the question whether the Age Discrimination in Employment Act (ADEA), 29 U.S.C. 621-634, invalidated a provision of the Missouri Constitution requiring state judges to retire at the age of 70.  The Supreme Court held that the ADEA was ambiguous as to its applicability to state judges because an exception to the statute might apply to judges, but did not do so in plain language.  Because it concluded that the mandatory retirement provision of the state constitution reflected a decision of the people of Missouri that "goes to the heart of representative

- 32 -

government," a "power reserved to the States under the Tenth Amendment and guaranteed them by the provision of the Constitution under which the United States 'guarantee[s] to every State a Republican Form of Government," 501 U.S. at 463, the Supreme Court held that "we will not attribute to Congress an intent to intrude on state governmental functions."

    A. <u>Even if the state were entitled to exclusive authority in navigable waters, Gregory v. Ashcroft would not apply because "waters" is unambiguous.</u> – Alaska urges (Br. 23) that <u>Gregory v. Ashcroft</u>, <u>supra</u>, requires this Court to invalidate the Secretaries' interpretation unless it finds a separate, clear statement that Congress intended to preempt the state's authority to regulate subsistence fishing in <u>navigable waters</u> on public lands, despite the clarity of its intent to preempt the state's authority to regulate rural Alaskans' subsistence use of fish on "public lands." <u>Ashcroft</u> turned on the ambiguity of an exception to the statute under which "state employees" excluded certain state officials. The Court concluded that it could not be certain of Congress's intent to displace a state constitutional requirement regarding state judges, who were not clearly among the excepted officials, but whose responsibilities arguably qualified them for the exception. 501 U.S. at 467. No such ambiguity appears in ANILCA, which expressly applies, without exception, on "lands, waters, and interests therein" in federal ownership.

    Alaska asserts that under <u>Ashcroft</u>, "public lands" excludes navigable waters and interests therein owned by the United States because the statute does not specify that "waters" includes "navigable waters." This interpretation turns <u>Ashcroft</u> on its head. The Court there held that "state employees" did not include

- 33 -

state judges, because the ADEA applied unambiguously to all state employees not covered by a statutory exception, but judges arguably were included in the statute's exception for state appointees to policy-making positions. 501 U.S. at 467. ANILCA contains no statutory exception that might include navigable waters or interests therein. There is therefore no plausible argument that the term "waters" in the definition of "public lands" might not include navigable waters. "Public lands" unambiguously includes navigable waters, and interests therein, the title to which is in the United States. There is no place in interpreting this statutory language for the Ashcroft analysis.

Any ambiguity in the requirement that subsistence uses of fish and wildlife by rural Alaskans be accorded on "lands, waters, and interests therein, the title to which is in the United States" is unrelated to the navigability or non-navigability of waters. The statute unambiguously expresses Congressional intent to pre-empt state regulatory authority. The clear import of the statute is that customary and traditional subsistence uses of both fish and wildlife are to be protected on lands in federal ownership in order to preserve the opportunity to engage in the subsistence way of life of rural Alaskans. See 16 U.S.C. 3113. Alaska raises the question whether Congress's definition of "public lands" must be read to defeat the clear intent of the statute as to subsistence fishing. Because, as discussed above, the United States owns the necessary "interests" in waters appurtenant to the lands on which the priority is to be provided, the definition can and should be interpreted consistent with the statutory purposes.

In essence, Alaska argues that the statute must contain a separate "clear

- 34 -

statement" for each sovereign interest affected by federal preemption. But the mere fact that fish in navigable waters ordinarily are subject to the overlapping state "sovereign" power to regulate in navigable waters that is separate from the state's general sovereign authority to regulate fish and wildlife within its borders does not render unclear Congress's unambiguous statement that it intends a partial pre-emption of state authority to regulate "fish and wildlife" on public lands. By expanding ANCSA's definition of "public lands" to include waters and interests in waters, Congress explicitly ensured that the priority would be extended to fish as well as wildlife. Moreover, the United States may impliedly assume control over navigable waters, as necessary to effectuate the purpose of a federal land reservation made pursuant to the Property Clause or the Indian Commerce Clause. Arizona v. California, supra, 373 U.S. 546; United States v. New Mexico, 426 U.S. 529. And the Supreme Court has held with regard to the Clean Water Act, which preempts state regulation of navigable waters with regard to pollution, that "although courts should not lightly infer pre-emption, it may be presumed when the federal legislation is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation." International Paper Company v. Ouellette, 479 U.S. 481, 493 (1987).

B.  The clear statement rule does not apply in the manner proposed by Alaska, because Alaska's authority to regulate in navigable waters is subordinate to that of the United States. – Alaska asserts that the clear statement rule governs this case because an invasion of the exclusive state sovereign authority to regulate in navigable waters shifts the federal balance. But Alaska's premise is flawed: states

- 35 -

are not entitled to exclusive authority to regulate waters within their boundaries pursuant to the Submerged Lands Act or the Equal Footing Doctrine.

    1. <u>The Submerged Lands Act does not give states exclusive authority to regulate waters within their boundaries</u>. – Section 3(a) of the Submerged Lands Act, 43 U.S.C. 1311(a), vested in the States "the title to and ownership of the lands beneath navigable waters within [their] boundaries * * * and the natural resources within such lands and waters * * *." Section 5(a), 43 U.S.C. 1313(a), excepted from this grant any lands and resources the "title to which has been lawfully and expressly acquired by the United States or in which the United States otherwise retained a property interest." Further, Section 6(a) reserved to the United States the "navigational servitude and rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, navigation, national defense and international affairs." Alaska argues nonetheless (Br. 26-27) that by virtue of the Submerged Lands Act the State acquired exclusive control over navigation and natural resources in navigable waters within her boundaries, and that principles of federalism require that federal authority may be asserted only pursuant to a clear statement of Congressional intent to invade Alaska's dominion over such waters.

    To the contrary, the language of the Submerged Lands Act recognizes the fundamental premise of federalism that the states' authority to regulate within navigable waters is subject to the "navigational servitude," which comprises the paramount power of the United States to control the use and occupancy of navigable waterways. <u>Oregon ex rel. State Land Board v. Corvallis Sand and</u>

Gravel Co., 429 U.S. 363 (1977); Gibson v. United States, 166 U.S. 269, 271-272 (1897) and see 43 U.S.C. 1314(a).  Moreover, the Submerged Lands Act expressly excepts from state ownership any land or resources lawfully acquired or reserved by the United States.  Alaska correctly points out (Br. 16) that ownership of lands underlying navigable waters has long been considered an "essential attribute of sovereignty' because of its importance to the control of navigation, fishing, and other commercial activity on lakes and rivers.  See, e.g. Utah Division of State Lands v. United States, 482 U.S. 193, 195 (1987).  Because the thirteen original colonies therefore claimed title to such lands, later-admitted states were granted title to lands underlying their navigable waters to ensure their admission to the United States on an equal footing with the original thirteen.  However, even after the land under navigable water passes to a state, the federal government may still control, develop and use the waters for its own purposes.  Id. at 202; Arizona v. California, 373 U.S. 546, 597-598 (1963).  Ownership of submerged lands by virtue of the equal footing doctrine, therefore, does not entitle states to any rights exclusive of the United States' paramount powers.[6]

2. Alaska's authority to regulate in navigable waters is at all times subject to the navigational servitude. – The Supreme Court has held that "there can be no doubt that the Commerce Clause confers a unique position upon the Government

---

[6] In light of Alaska's assertions regarding the essential nature of its sovereign interest in regulating fishing in navigable waters (see, e.g. Br. 17), it is noteworthy that the Alaska Statehood Act provided for a continuation of federal management of fisheries after statehood, because of concern for the needs of Alaska Natives. 72 Stat. 339, 349; see Metlakatla v. Egan, 369 U.S. 45, 57-59 (1962).

in connection with navigable waters." United States v. Rands, 389 U.S. 121, 122 (1967). It gives to the federal government a "dominant servitude" which extends to the entire stream and the stream bed below ordinary high water mark." United States v. Cherokee Nation of Oklahoma, 480 U.S. 700 (1987). The proper exercise of this power is not an invasion of any property rights in the stream or the lands underlying it, but the "exercise of a power to which the interests of riparian owners have always been subject." Rands, supra, 389 U.S. at 123; Scranton v. Wheeler, 179 U.S. 141, 163 (1900). See also Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 284 (1997) (recounting historical provenance of this doctrine, under which title to submerged land under navigable waters is held subject to the sovereign's superior right to regulate those lands for public purposes). The navigational servitude is a "pre-existing limitation upon the landowner's title." Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1028-29 (1992).

States, like private landowners, hold their title to submerged lands subject to the navigational servitude. 43 U.S.C. 1314(a). The Supreme Court has consistently recognized that private owners of submerged or riparian land cannot claim entitlement to compensation under the Fifth Amendment for any loss that may result from the government's protection of those interests or the exercise of that power. See, e.g., United States v. Rands, supra, 389 U.S. at 123; United States v. Cherokee Nation, supra, 480 U.S. at 703-705 (1987). The Supreme Court in Lucas v. South Carolina Coastal Council, supra, 505 U.S. at 1027, noted that restraints on uses of land subject to the navigational servitude cannot effect a taking because such uses were "not part of [the owner's] title to begin with." Just as private

- 38 -

riparian property interests are limited by the federal government's power to regulate

pursuant to the servitude, Alaska's sovereign power over submerged lands is

limited by the federal government's paramount power pursuant to the servitude.

Accordingly, Congress's partial pre-emption of Alaska's regulation of "fish"

without a separate, clear statement of intent to invade state regulatory authority in

navigable waters does not "divest" the State of its sovereignty (see, e.g. Br. 12, 19).

The State never had that sovereignty.

3. <u>Alaska's regulatory authority in navigable waters is subordinate to the</u>

<u>federal Commerce Clause authority to legislate regarding activities substantially</u>

<u>affecting commerce.</u> – There is no question that regulation of fish on navigable

waters appurtenant to federal lands is within Congress's authority pursuant to the

Commerce Clause.   The Supreme Court has long recognized that protection of

fish and wildlife is a legitimate subject of federal regulation.  <u>Missouri v. Holland,</u>

<u>supra</u>, 252 U.S. 416; <u>Douglas v. Seacoast Products, Inc.</u>, 431 U.S. 265 (1977)

(Congress had power under the Commerce Clause to regulate the taking of fish

from state waters, thus preempting conflicting state laws).

Alaska suggests (Br.34) that the intrastate character of subsistence activities

poses "profound questions" as to Congress's constitutional authority to extend

ANILCA to navigable waters for the purpose of regulating subsistence use of fish

and wildlife, citing <u>United States v. Lopez</u>, 514 U.S. 549, 559 (1995).  The

denomination of an activity as "local" or "intrastate," activity, however, does not

resolve the question whether Congress may regulate it under the Commerce Clause.

<u>Hodel v. Virginia Surface Mining and Reclamation Assoc.</u>, 452 U.S. 264, 281

- 39 -

(1981). The commerce power extends to those intrastate activities which so affect interstate commerce, or the exertion of the power of Congress over it, as to make regulation of them appropriate means to the attainment of a legitimate end, which is the effective execution of the granted power to regulate interstate commerce. United States v. Darby, 312 U.S. 100 (1941). The subject of regulation by Title VIII, fishing for salmon and other anadromous fish of great commercial value, is without doubt an activity that "affects interstate commerce." The goal of ANILCA Title VIII is in essence a reallocation of resources from commercial to subsistence users, which, at least in the aggregate, "affects commerce." See Wickard v. Filburn, 317 U.S. 111, 127-128 (1942).

Moreover, the Commerce Clause power extends to any of a broad range of activities that may affect commerce, even if they do not have that immediate effect. For example, a unanimous Supreme Court has held that Congress may regulate abandoned railroad rights-of-way under the Commerce Clause because of Congress's belief that "every line is a potentially valuable national asset that merits preservation even if no future rail use for it is currently foreseeable." Preseault v. ICC, 494 U.S. 1, 17-18 (1990). Similarly, the Supreme Court in Hodel v. Indiana, 452 U.S. 314 (1981), upheld the prime farmlands provisions of the Surface Mining Control and Reclamation Act, pointing to congressional statements of concern regarding losses in agricultural productivity, and consequent harm to interstate commerce, attributable to surface mining on prime farmlands. 452 U.S. at 325-326. The effects on interstate commerce of subsistence use of Alaska salmon and other valuable fish stocks surely are as significant as the effects of surface mining on

- 40 -

commerce in agricultural products.

The State's theory that the clear statement rule precludes the assertion of federal regulatory authority in navigable waters thus finds no support in the law. Indeed, established principles of federalism dictate that state authority to regulate in navigable waters is limited because of the paramount federal power to regulate in such waters in the interest of interstate commerce. ANILCA's partial pre-emption of state fisheries regulation, enacted to protect the subsistence way of live in Alaska by allowing a priority for rural users of fish and wildlife on public lands is clear on the face of the statute. Its inclusion of federally reserved navigable waters among the areas on which the priority is accorded does not invade a separate state sovereign interest and does not require an independent "clear statement" of Congressional intent.

IV

THIS COURT LACKS JURISDICTION TO HEAR THIS APPEAL BECAUSE THE CHALLENGED REGULATIONS HAVE BEEN SUPERSEDED BY NEW REGULATIONS, AND THE CASE IS NOW MOOT.

As discussed above, a prior panel of this Court heard this case and remanded to the Secretaries the task of identifying the waters on which the subsistence priority is to be provided.  Alaska v. Babbitt, supra, 72 F.3d at 704. The agencies subsequently withdrew the regulations challenged in this lawsuit and issued new regulations that apply the Title VIII priority on specified waters. 64 Fed. Reg. 1276 (Jan. 8, 1999).  After the revised regulations became effective, the district court issued an order in the case, in which it stated that its earlier rulings were reaffirmed and that "Plaintiffs may or may not have justiciable claims * * * as

- 41 -

regards the Board's implementation of subsistence rights for the year 2000. No such claim is made in the present pleadings* * * and, because of the substantial administrative and regulatory changes which have taken place during the pendency of this case, it is the court's considered judgment that it will be most efficient for all concerned to strike the slate clean at this point." (SER 524). Because there was nothing left for the district court to decide with regard to the issues on which Alaska seeks further review, this Court's jurisdiction may not be invoked.

The judicial power under Article III extends only to "cases" or "controversies." U.S. Const. Art. III, sec. 2. The courts therefore lack jurisdiction to pass upon a question in the absence of a justiciable controversy. The U.S. Supreme Court has made clear that no justiciable controversy is presented when the parties are seeking advisory opinion or when questions sought to be adjudicated have been mooted by subsequent developments. Corrective or superseding action by an agency is one type of subsequent development that can moot a previously justiciable issue. See, e.g., Commissioner v. Shapiro, 424 U.S. 614, 622-623 (1976); Idaho Department of Fish & Game v. National Marine Fisheries Service, 56 F.3d 1071, 1075 (9th Cir. 1995) (issuance of superseding biological opinion moots challenge to expired biological opinion); Sannon v. United States , 631 F.2d 1247, 1250-1251 (5th Cir. 1980)("once the oft delayed amendments to the [] regulations granted the same relief ). See also U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership, 513 U.S. 18, 20 (1994) ("a case must exist at all the stages of appellate review"); Steffel v. Thompson, 415 U.S. 452, 459, n.10 (1974) (mootness can arise at any stage of litigation). As the district court here explained, the parties continue

- 42 -

to disagree regarding the implementation of the priority for subsistence uses set out in Title VIII of ANILCA, but their current disagreement is not addressed in any Complaint (SER 524).

The case in which the State now seeks this Court's review was brought by the private plaintiffs pursuant to ANILCA section 807, 16 U.S.C. 3117, to require "such actions to be taken as are necessary to provide for the [subsistence] priority." The plaintiffs' complaint alleged that the federal regulations failed to provide the priority, because they did not apply on the waters within a federal park and preserve in which the plaintiffs' traditional subsistence fishing is conducted. The private plaintiffs also sought to enjoin state regulation in these same waters. The agencies have since issued new regulations, consistent with this Court's interlocutory ruling, which remedy the plaintiffs' Complaint and which the State has not challenged. Accordingly, this case is moot, because subsequent administrative developments have remedied the plaintiffs' injury.

Although Alaska asserts (Br. 3) that its appeal is from a "final judgment giving effect to the prior panel decision and the federal regulatory regime spawned by that decision," the court's final judgment did neither. The prior panel's decision was fully effectuated when the agency issued final regulations consistent with it. Those regulations became effective October 1, 1999.

In its January 2000 order, the district court also dismissed as moot all matters not addressed in its prior substantive rulings. The district court stated that no live controversy addressed in any complaint continued to exist at the time of the final order, and its only ruling on the issues raised in this appeal was vacated in

- 43 -

1996 (SER 514). Because the challenged regulation has been withdrawn and new regulations providing the priority in the waters in which the plaintiffs' subsistence fishery exists, the Katie John case is moot. Because the district court's ruling on the issue presented here has been vacated, this Court is asked to review a final judgment that contains nothing relevant to the issue presented for review. The final judgment from which this appeal has been taken has no effect on any issue raised in this appeal. The challenge is leveled at an agency interpretation embodied in this Court's earlier ruling and codified in regulations as to which no claim has been raised in any court. The State has therefore identified no final judgment presenting this issue from which it has a right to appeal at this time.

Any challenge to federal management of the subsistence priority must be addressed to the current regulatory program, which is embodied in regulations found at 50 C.F.R. Part 100 and 36 C.F.R. Part 242. Alaska does not challenge the regulations, but rather seeks an advisory opinion regarding the theory underlying them, as expressed by the prior panel of this Court. It is not, therefore, seeking review of any order of the district court, but rather has asked that this Court now provide rehearing of the prior panel decision, even though rehearing was denied on the earlier, interlocutory appeal ( see. Br.1). Because the case is now moot, the Court lacks jurisdiction to rehear it.

- 44 -

## CONCLUSION

For the foregoing reasons, this case should be dismissed for failure to present a justiciable controversy. In the event that the Court concludes that the case presents a live controversy, the prior panel decision should be affirmed.

Respectfully submitted,


LOIS J. SCHIFFER
Assistant Attorney General

WILLIAM B. LAZARUS
JOHN A. BRYSON
DEAN K. DUNSMORE
ELIZABETH ANN PETERSON
Attorneys, Department of Justice
P.O. Box 23795
L'Enfant Plaza Station
Washington, D.C.  20016
(202) 363-6157


OCTOBER 2000
90-1-4-3662


- 45 -

## STATEMENT PURSUANT TO CIRCUIT RULE 32(e)(4)

Pursuant to Ninth Circuit Rule 32-4, I certify that this brief is printed in a proportional typeface of 14 points or more and contains approximately 11,980 words.

## STATEMENT OF RELATED CASES

Counsel is not aware of any related cases pending in this Court.

ELIZABETH ANN PETERSON
Attorney,
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 23796, L'Enfant Station
Washington, DC 20026
(202) 514-3888

- 46 -

CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing <u>En Banc</u> Brief for the Federal Appellees have been served on counsel this 1st day of November, 2000, by placing them in first-class mail, postage prepaid and addressed to:

> John G. Roberts, Jr.
> HOGAN & HARTSON, L.L.P.
> 555 Thirteenth Street, N.W.
> Washington, D.C. 20004

> Joanne M. Grace
> Assistant Attorney General
> 1031 West Fourth Avenue
> Suite 200
> Anchorage, Alaska 99501

> Heather Kendall-Miller
> Native American Rights Fund
> 420 L Street, Suite 505
> Anchorage, Alaska 99501-2043

> William E. Caldwell
> 1648 Cushman Street, Suite 300
> Fairbanks, Alaska 99701

Elizabeth Ann Peterson
Attorney, Department of Justice

- 47 -