# EXHIBIT B-11 (Part 2)

"sovereignty." She had the sovereign prerogative to reject the congressional conditions, but not the sovereign right to regulate free of them.

Alaska, of course, has a legitimate *interest* in regulating subsistence hunting and fishing on public lands. *E.g., Kleppe v. New Mexico*, 426 U.S. 529, 543 (1976) ("[A] State undoubtedly retains jurisdiction over federal lands within its territory, but Congress equally surely retains the power to enact legislation respecting those lands pursuant to the Property Clause. . . . And when Congress so acts, the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause."); *United States v. Gardner*, 107 F.3d at 1320 ("The state may exercise its civil and criminal jurisdiction over federal lands within its borders as long as it exercises its power in a manner that does not conflict with federal law.") Congress has substantially accommodated Alaska's interest by leaving sport and commercial uses of fish and wildlife on public lands subject to primary state regulation. But Congress has also established federal standards for subsistence management. Congress' undisputed constitutional power to do so entails no diminishment of Alaska's "sovereignty." *Coyle*, 221 U.S. at 574 (new States enter the Union subject to "legislation within the sphere of the plain power of Congress").

Alaska insists that it is not enough that Congress plainly and unmistakably intended to pre-empt state authority with respect to subsistence fishing and, further, that it is still insufficient that Congress explicitly defined the scope of pre-emption

as the "public lands" which encompass *waters* and *interests therein* owned by the United States. That, it is argued, is not an adequately "clear statement" of congressional intent, because Congress did not use the word "navigable" when mentioning "waters" and "interests therein"—as though the word "waters," without qualification, must be deemed to refer only to a subset of waters (i.e., *non-navigable* waters). *Cf. United States v. Alaska*, 423 F.2d 764, 767 (9th Cir. 1970) ("The argument that the [Executive] Order, in withdrawing the 'water,' did not withdraw the 'navigable water,' is patently unsound.")

As explained *infra,* the congressional purpose at issue here is plain, unambiguous, and manifest—that is, it is "plain to anyone reading the Act that it covers" subsistence fishing in navigable waters in which the United States owns interests. *Gregory v. Ashcroft,* 501 U.S. 452, 467 (1991). Whether any such clear-statement rule of statutory construction has any place in this case, however, is doubtful. Alaska mentions (Br.20-21) the most obvious source for such a rule—cases deciding whether *submerged lands* were held for, or passed to, a State under the equal-footing doctrine—where the presumption in favor of the State is overcome only when a contrary congressional "'intention was definitely declared or otherwise made very plain.'" *United States v. Idaho*, 210 F.3d 1067, 1073 (9th Cir. 2000); *United States v. Alaska*, 521 U.S. 1, 34 (1997). But these cases offer Alaska no help here, for two very obvious reasons: Alaska's ownership of the beds and banks underlying her inland navi-

19

gable waters is not at issue; "even if the land under navigable water passes to the

State, the Federal Government may still control, develop, and use the waters for its

own purposes." *Utah Div. of State Lands v. United States*, 482 U.S. 193, 202 (1987)

(citing *Arizona v. California*, 373 U.S. 546, 597-98 (1963)); *United States v. Alaska*,

521 U.S. at 38, 52.

Alaska must thus look elsewhere for the plain-statement rule on which she

grounds her case, and that search is not advanced by cases adopting the pre-emption

rule of *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947):

> The question in each case is what the purpose of Congress was.
>
> Congress legislated here in a field which the States have
> traditionally occupied. . . . So we start with the assumption that the
> historic police powers of the States were not to be superseded by the
> Federal Act unless that was the clear and manifest purpose of Congress.

As the Supreme Court recently confirmed,

> [t]he qualification given by the word 'so' and by the preceding sentences
> in *Rice* are of considerable consequence. As *Rice* indicates, an
> 'assumption' of nonpre-emption is not triggered when the State
> regulates in an area where there has been a history of significant federal
> presence.

*United States v. Locke*, 120 S. Ct. 1135, 1147 (2000). Rather, in those circumstances

"there is no beginning assumption that concurrent regulation by the State is a valid

exercise of its police powers." *Id.* at 1148. *See also Intertanko v. Locke*, 159 F.3d

1220, 1225-26 (9th Cir. 1998) (Graber, J., dissenting from denial of rehearing *en*

*banc*).[17] In ANILCA, Congress was certainly legislating where there has been a long history of significant federal presence.

Even if a plain-statement requirement were otherwise germane, moreover, it would be satisfied by the manifest purpose of Congress to pre-empt state regulation of subsistence uses on public lands unless Alaska satisfies federal standards. Alaska has already lost her contrary contention that Congress did not plainly intend to displace state management, and *res judicata* bars further pursuit of that claim. *See* p. 10, *supra*. Her attempt to circumvent that bar—by arguing that Congress must expressly contemplate any subordinate issue that might subsequently arise concerning the extent of that pre-emption—cannot be sustained. "[T]he fact that a statute can be 'applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.'" *Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998).

Congress is not required to prospectively resolve every dispute that might arise, even in Spending Clause "enticement" programs in which the conditions to which a

---

[17]    The issue in this case is not whether the statute authorizes a damages suit (or any other) against the State, as in *Vermont Agency of Natural Resources v. United States*, 120 S. Ct. 1858 (2000), and *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989); and ANILCA surely does not purport to tell Alaska how to "structure . . . its government," such as by interfering with its citizens' "'power to prescribe the qualifications of their own officers.'" *Gregory v. Ashcroft*, 501 U.S. at 460. Nor is the State authority at issue here remotely comparable to state regulation of hospital costs or occupational health and safety (involved in the other two cases cited by Alaska, Br.20n.7). Alaska's clear-statement cases are wholly inapposite.

21

State will be subject must be made clear.[18] *See Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 665-66 (1985) ("States that chose to participate in the program agreed to abide by the requirements of Title I as a condition of receiving funds," and therefore were provided with "[t]he requisite clarity"; the plain-statement rule does not require that "every improper expenditure has been identified and proscribed in advance"). There is demonstrably less reason for such a never-ending requirement, and the never-ending litigation it engenders, when Congress exercises its plenary power to pre-empt state authority in fields like Indian fishing rights and public lands, in which "Congress has legislated . . . from the earliest days of the Republic." *United States v. Locke*, 120 S. Ct. at 1148.

Doubting the applicability of any exceptional rule of statutory construction to any aspect of this case, we proceed on the opposite assumption, first addressing the relevant context, both historical and statutory. Even if context did not otherwise count, *see King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) ("the meaning of statutory language, plain or not, depends on context"), it would have to be examined here given the Supreme Court's repeated admonitions that the meaning of "lands" in statutes pertaining to Alaska is context-dependent. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 547-48 nn.14-15 (1987); *Hynes v. Grimes Packing Co.*, 337

---

[18]    The Supreme Court subjects Spending Clause programs to the requirement, among others, that "[t]he conditions imposed [must be] unambiguous." *New York v. United States*, 505 U.S. 144, 171-72 (1992).

22

U.S. 86, 110-16 (1949); *Alaska Pac. Fisheries v. United States*, 248 U.S. 78, 87-89 (1918).

As Secretary Watt summarized in 1982, based on a historical analysis prepared for him (SER162-77), "Title VIII of ANILCA may . . . be viewed as a 'capstone' implementing some of the most important elements of the numerous Congressional efforts which, for more than a century, have attempted to accommodate the special [subsistence] needs of Alaska residents." SER159-60. We briefly outline that background before analyzing the specifics of ANILCA pre-emption. The dominant feature remains today as Justice Frankfurter described it in 1962: "Long before the white man came to Alaska, the annual migrations of salmon from the sea into Alaska's rivers to spawn served as a food supply for the natives." *Metlakatla Indian Community v. Egan*, 369 U.S. 45, 46. "Many Alaska natives who are not fully part of the modern economy rely on fishing for subsistence. If their right to fish is destroyed, so too is their traditional way of life." *United States v. Alexander*, 938 F.2d 942, 945 (9th Cir. 1991).

**B.    Historical Protection**

**1.    Pre-statehood**

From the time of Alaska's purchase in 1867, until the present day, the fish-and-wildlife uses of Alaska Natives, and other rural residents and travelers, have been protected by all branches of the government—through exemptions from conservation

23

laws, land reservations and withdrawals, territorial- and rural-residency requirements, and the like.[19] In its first action to protect wildlife resources in the new territory from over-exploitation, Congress restricted the taking of fur-seals, but exempted Native hunting for food, clothing, and boat-manufacture. 16 Stat. 180 (1870).

In 1891 Congress set aside "the body of lands known as Annette islands" as a reservation for the Metlakatla Indians, which the Secretary and the Supreme Court construed as embracing the adjacent navigable waters and submerged lands, inasmuch as "[t]he Indians could not sustain themselves from the use of the upland alone. The use of the adjacent fishing grounds was equally essential." *Alaska Pacific Fisheries*, 248 U.S. at 89.

Alaska's first game law, 32 Stat. 327 (1902), amended, 35 Stat. 102 (1908), restricted the taking of game animals, but exempted hunting for food or clothing by "native Indians or Eskimos or by miners, explorers, or travelers on a journey when in need of food" (§1). The 1916 Migratory Bird Treaty exempted Natives from the closed seasons for certain species. 39 Stat. 1702, 1703. The 1925 act creating the

---

[19]    Article III of the Treaty of Cession, 15 Stat. 539, 542, left the land and land-related claims of Alaska Natives for future resolution. They were not finally addressed by Congress until the 1971 Alaska Native Claims Settlement Act ("ANCSA"). Prior to Alaska's purchase, Native subsistence rights were protected by the "laws of an antecedent government [Russia]." *United States v. Berrigan*, 2 Alaska Rep. 442, 446 (D. Alaska 1905). *See* Second (1821) and Third (1844) Charters, Russian American Company, *reprinted in Russian Administration of Alaska and the Status of the Alaska Natives*, SEN. DOC. NO. 152, at 45, 50-51 (1950).

Alaska Game Commission authorized "any Indian or Eskimo, prospector, or traveler to take animals and birds during the closed seasons when he is in absolute need of food and other food is not available," 43 Stat. 739, 744 (retained, 54 Stat. 1103, 1104 (1940); 57 Stat. 301, 306 (1943)).  The 1925 act also imposed a one-year territorial residency requirement, 43 Stat. at 740, amended in 1938 to authorize a three-year requirement for trapping licenses whenever "the economic welfare and interests of native Indians or Eskimos, or the fur resources of Alaska, are threatened by the influx of trappers from without the Territory." 52 Stat. 1169, 1170 (§2).

As to fisheries, the 1924 White Act exempted from methods and closed-season restrictions "the taking of fish for local food requirements or for use as dog food." 43 Stat. 464, 466 (§§4-5).[20]  The 1934 amending act, 48 Stat. 594, 595, further excepted the "Karluk, Ugashik, Yukon, and Kuskokwim Rivers" from the restrictions on fish fences, traps, fish-wheels, etc. (§3), as well as other methods-and-means restrictions (§4). Congress explained in §4 that the exception for the Kuskokwim and Yukon Rivers, "shall be solely for the purpose of enabling native Indians and bona fide permanent white inhabitants along the said rivers" to take king salmon "for com-mercial purposes and for export," but "no person shall be deemed to be a bona fide permanent inhabitant of the said rivers who has not resided thereon, or within fifty

---

[20]    The predecessor 1906 act did not contain the exemption in these words, but did "except Cook Inlet, the Delta of Copper River, Bering Sea, and the waters trib-utary thereto." 34 Stat. 478, 479 (§5).

miles thereof for a period of over one year."

In 1943 the Secretary established the Karluk Indian reservation on Kodiak Island, designating adjacent tidelands and coastal waters under the Indian Reorganization Act's authority to reserve "public lands which are actually occupied by Indians or Eskimos" in Alaska. *Hynes v. Grimes Packing*, 337 U.S. at 91. The Supreme Court rebuffed a challenge to the Secretary's inclusion of navigable waters in the reservation, noting that for Natives "the adjacent fisheries are as important, perhaps more important than the forests, the furbearing animals or the minerals." *Id.* at 114.

Aside from these positive protections afforded by Congress and the Executive, Alaska Natives possessed unextinguished aboriginal fishing rights. "Those rights have, in consideration of historic tradition and economic necessity, been construed to include the occupancy of water and land under water as well as land above water." *Aboriginal Fishing Rights in Alaska*, 57 Interior Dec. 461, 474 (2/13/42); *id.* at 476 ("The Indian who has been forbidden [through government callousness or indifference] from fishing in his back yard has not thereby lost his aboriginal title thereto"; "aboriginal occupancy establishes possessory rights in Alaskan waters and submerged lands, and . . . such rights have not been extinguished by any treaty, statute, or administrative action"). *See Organized Village of Kake v. Egan*, 369 U.S. 60, 65-67 (1962).

26

2. **At Statehood**

In the 1958 Statehood Act, 72 Stat. 339, Alaska was "admitted into the Union on an equal footing with the other States in all respects whatever" (§1), and the Submerged Lands Act of 1953, 43 U.S.C. §§1301-1315, was made applicable and given the same effect as in existing States (§6(m)). By §6(e), however, "Congress withheld jurisdiction over [Alaska's] fisheries until she had made adequate provision for their administration," *Metlakatla*, 369 U.S. at 47; SER168, and the transfer of that authority became effective in 1960. Further, in §4 Congress decreed that

> all right and title . . . to any lands or other property (*including fishing rights*), the right or title to which may be held by any Indians, Eskimos, or Aleuts . . . or is held by the United States in trust for said natives . . . shall be and remain under the absolute jurisdiction and control of the United States until disposed of under its authority, except to such extent as the Congress has prescribed or may hereafter prescribe.

(Emphasis added.) *Accord*, ALASKA CONST., art. XII, §12. "The fishing-rights provision is unique to Alaska . . . because fishing rights are of vital importance to Indians in Alaska." *Kake*, 369 U.S. at 66; *cf. Montana v. United States,* 450 U.S. 544, 556 (1981).

By these provisions, Alaska was given some concurrent regulatory authority over Native fishing rights, *Kake*, 369 U.S. at 67-75, unless or until Congress provided otherwise. *Metlakatla*, 369 U.S. at 58-59. "[T]he transfer of jurisdiction over fishing was subject to rights reserved in §4" (*id.* at 58), and the purpose of §4 "was to

27

preserve the *status quo* with respect to aboriginal and possessory Indian claims, so that statehood would neither extinguish them nor recognize them as compensable." *Kake*, 369 U.S. at 65.[21]

### 3.  Post-statehood

Prompted by the North Slope oil discovery, Congress enacted ANCSA in 1971 and settled the Native land-claims issue it had postponed for a century.  ANCSA conveyed title to some of the lands claimed by Alaska Natives and paid them for extinguishment of title to the remainder.  43 U.S.C. §§1601 *et seq.*  In conjunction, Congress extinguished "[a]ll aboriginal titles, if any, and claims of aboriginal title in Alaska based on use and occupancy, including submerged land underneath all water areas, both inland and offshore, and including any aboriginal hunting and fishing rights that may exist." §1603(b).[22]

---

[21]    This Court has observed that while statehood-act disclaimer clauses may be "'but declaratory, and confer no new right or power upon the United States,'" *United States v. Gardner*, 107 F.3d at 1319, quoting *Van Brocklin v. Tennessee*, 117 U.S. 151, 167 (1886), their "substance . . . is not meaningless, even if the clause itself is unnecessary in that it merely recognizes a preexisting interest." *United States v. Idaho*, 210 F.3d at 1078 n.16. *See also Alaska v. United States*, 213 F.3d 1092, 1097-98 (9th Cir. 2000); *cf. Minnesota v. Mille Lacs Band*, 526 U.S. at 202-08 (off-reservation treaty hunting and fishing rights, which exist independently of land ownership, were not extinguished by equal-footing doctrine even though not mentioned in statehood act).  The Supreme Court itself, in *Metlakatla* and *Kake*, has accorded substantive content to the Alaska act's unique fishing-rights disclaimer.

[22]    Section 1603(a) also provided that "[a]ll prior conveyances of public land and water areas in Alaska, or any interest therein, pursuant to Federal law, and all tentative approvals pursuant to §6(g) of the Alaska Statehood Act, shall be regarded as

At the same time, Congress declared its intent to continue federal protection of Native subsistence uses.[23] While the Senate and the House could not agree on how, the Conference Report expressed the conviction that "Native peoples' interest in and use of subsistence resources" could be safeguarded by the Secretary's "exercise of his existing withdrawal authority" to "protect Native subsistence needs and requirements"; "[t]he Conference Committee expects both the Secretary and the State to take any action necessary to protect the subsistence needs of the Natives." H. CONF. REP. NO. 92-746, at 37 (1971), *reprinted in* 1971 U.S.C.C.A.N. 2247, 2250. Section 1616(d)(2) of ANCSA, directing the Secretary to withdraw up to 80-million acres of public lands, also set in motion the sequence of events culminating in ANILCA.

Congress and the Executive continued to afford federal protection to subsistence rights. The very next year, the Marine Mammal Protection Act of 1972 exempted from the moratorium on taking marine mammals any Alaska Native "who

---

an extinguishment of the aboriginal title thereto, if any." "Public lands" was defined by §1602(e) as "all Federal lands and interests therein located in Alaska," except specified prior state selections.

[23]    ANCSA's extinguishment of aboriginal title did not operate *nunc pro tunc* to give Alaska equal-footing authority over the Native fishing rights Congress had reserved at statehood. *Alaska v. United States*, 213 F.3d at 1097-98 ("The key moment for the determination of title is the instant when statehood is created"; post-statehood revocation of public land order did not cause affected submerged lands to pass to Alaska).

29

resides in Alaska and who dwells on the coast of the North Pacific Ocean or the Arctic Ocean," if such taking is for "subsistence purposes" or for "creating and selling" handicrafts and clothing. 16 U.S.C. §1371(b). *See People of Togiak v. United States*, 470 F. Supp. 423 (D.D.C. 1979). Congress thus pre-empted state authority over marine-mammal hunting throughout Alaska's territorial sea and coastal inland waters.[24]

In 1973, the Trans-Alaska Oil Pipeline Act imposed strict damages liability for any harm to the subsistence resources of Natives or others, 43 U.S.C. §1653(a)(1), and the Endangered Species Act pre-emptively exempted subsistence uses by Natives and "any non-native permanent resident of an Alaskan native village." 16 U.S.C. §1539(e)(1). Later, the 1978 Fish and Wildlife Improvement Act authorized the Secretary "to assure that the taking of migratory birds and the collection of their eggs, by the indigenous inhabitants of the State of Alaska, shall be permitted for their own nutritional and other essential needs." 16 U.S.C. §712(1).

Finally, the Executive land-withdrawals precipitating passage of ANILCA contained expansive subsistence-protection mandates: fourteen of the seventeen national-monument proclamations signed by President Carter on December 1, 1978,

---

[24]   By amendment in 1981, the Secretary was further prohibited from transferring marine-mammal management authority to Alaska unless she adopted a subsistence-priority law essentially mirroring the program for fish and land mammals mandated by Title VIII of ANILCA. 16 U.S.C. §1379(f).

30

noted the presence of "the unique subsistence culture" and directed the Secretary to protect it, 43 Fed. Reg. 57009 (12/5/78), *reprinted in* 1978 U.S.C.C.A.N. 9589-9628.[25] The National Park Service and the Fish & Wildlife Service, 43 Fed. Reg. 60252-60258 (12/26/78), adopted interim implementing subsistence regulations, including providing for "subsistence fishing" in "monument area waters."

C.    **The Clear And Manifest, And Plainly Constitutional, Purpose Of Congress Was To Pre-empt Management Of Subsistence Fishing On Public Lands, Absent Alaska's Compliance**

Congress acted against that rich background, supplemented with extensive congressional committee hearings, town meetings, and workshops in Alaska and else-where. That inquiry "exhaustively chronicled" the "importance of subsistence uses of [renewable] resources to the physical, economic and cultural well-being of Alaska Natives and other rural residents," whose "more than 200 rural villages are unique in that they are the last communities in the United States in which a substantial number of residents are still dependent upon the [subsistence] harvest . . . on the public lands for their sustenance."[26]

---

[25]    Each of the withdrawals encompassed "all lands, including submerged lands, and waters owned or controlled by the United States," and each "also reserved all water necessary to the proper care and management" of the monument's purposes.

[26]    SEN. REP. NO. 96-413, at 230-31 (1979), *reprinted in* 1980 U.S.C.C.A.N. 5070, 5174-75, citing H. REP. NO. 95-1045, pt. I, at 181-87 (1978), for additional documentation. It was further noted "that the Alaska Native way of life in rural Alaska may be the last major remnant of the subsistence culture alive today in North America"; "there is also a significant non-Native population residing in rural Alaska

While "ANILCA's primary purpose was to complete the allocation of federal lands in Alaska," *Amoco,* 480 U.S. at 549, Congress intended not only to preserve "certain lands and waters" for "present and future generations" (§101(a)), but also "to provide for the maintenance of sound populations of, and habitat for, wildlife species of inestimable value," including "to protect the resources related to subsistence needs," as well as "to preserve wilderness resource values and related recreational opportunities . . . on freeflowing rivers." §101(b). Congress further expressed its "intent and purpose . . . to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so." §101(c). To fulfill the latter purpose—protecting the subsistence way of life—Congress in Title VIII generally impressed all "public lands" in Alaska with a preference for subsistence uses of renewable resources. §§801-816.[27]

--------------------------------------------------------

which in recent times has developed a subsistence lifestyle that also is a cultural value." S. REP. NO. 96-413, at 168-69.

[27] This pervasive design is, in turn, reinforced in the specific primary purposes of most of the "conservation system units" (§102(4)) established or expanded by the Act. In nearly all instances, moreover, water rights are expressly reserved as part of the reservations. Subsistence uses are specifically authorized in all or significant portions of 12 of the 13 national parks and preserves addressed in the Act (§§201-202); all of them include the protection of habitat for, and populations of, fish and wildlife, usually specifically including salmon, as well as waterfowl and other migratory birds, among their express primary purposes; and three of them specifically mention as a primary purpose protection of "the viability of subsistence resources." Similarly, 15 of the 16 national wildlife refuges established or expanded by the Act expressly include "the opportunity for continued subsistence uses by local residents" as a primary purpose. §§302-303. And each of the 16 refuges includes

32

Congress was sure of its constitutional authority "to confine subsistence uses of the resources of the public lands to Alaskan Natives, along the lines already established in such enactments as the Marine Mammal Protection Act," and equally certain that it "would be well within" its power "to assume exclusive jurisdiction over the regulation of the taking of fish and wildlife on the public lands for subsistence uses, by persons who are non-Natives as well as by Alaskan Natives."[28] But, as Congressman Seiberling had suggested to Governor Hammond early on (n.4, *supra*), Congress deemed it "appropriate for the State to have the responsibility for the day-to-day regulation of the taking of fish and wildlife for subsistence uses, under general guidelines applicable without ethnic distinctions, with the Federal role being secondary."[29] Congress thought Alaska capable of fulfilling that responsibility because she had already enacted a subsistence-priority law that was acceptable in significant respects.[30]

---

among its explicit purposes conservation of fish and wildlife populations (listing "salmon" or "salmonoids" in all refuges where they are found), fulfillment of "international treaty obligations," and assurance of "water quality and necessary water quantity."

[28]    H.R. REP. NO. 95-1045, pt. I, at 184, citing *Kleppe v. New Mexico* for the latter proposition. *Accord,* S. REP. NO. 96-413, at 267-68.

[29]    H.R. REP. NO. 95-1045, pt. I, at 184.

[30]    The §803 definition of "subsistence uses," for example, was drawn from the 1978 Alaska law, which in turn was based on the version of ANILCA passed by the House earlier that year. S. REP. NO. 96-413, at 268. Neither the state law nor the

33

Still, Congress acted with unmistakable pre-emptive force, finding in §801(4) that

> in order to fulfill the policies and purposes of the [ANCSA] and as a matter of equity, it is necessary for the Congress to invoke its constitutional authority over Native affairs and its constitutional authority under the property clause and the commerce clause to protect and provide the opportunity for continued subsistence uses on the public lands by Native and non-Native rural residents.

Section 804 accordingly mandates that the taking of *fish* and wildlife by rural residents for subsistence uses on "public lands" be given priority over takings for other purposes, and §102(1)-(3) defines "public lands" to broadly include federally-owned "waters" and "interests therein."

The scheme of pre-emption is prescribed by §805, which "directs the Secretary . . . to establish the administrative structure necessary for the implementation of the statute,"[31] but also provides that the "federal regulatory scheme is to be stayed, however, if . . . Alaska enacts [the requisite conforming] laws." *Kenaitze*, 860 F.2d at 313-14.[32] The statute thus presented Alaska "the choice between federal regulation

---

earlier House-passed version, however, contained the "rural" limitation. The final insertion of that little word had enormous unforeseen consequences.

[31]    Section 814 directs the Secretary to "prescribe such regulations as are necessary and appropriate to carry out his responsibilities under this title [VIII]."

[32]    Congress acknowledged that by these provisions it had imposed conditions on the State's authority to regulate the taking of fish and wildlife on the public domain. Section 1314 thus memorializes that "[n]othing in this Act is intended to enlarge or diminish the responsibility and authority of the State of Alaska for

34

or self-regulation with federal oversight." *Id.* at 314. *See also id.* at 318 n.8 (Alaska "is free to eschew any further entanglement with the federal government by advising the [Secretary] that it is withdrawing from its role in administering ANILCA"); *United States v. Alexander*, 938 F.2d at 945 (ANILCA "leaves implementation to the Secretary," but "also contains an opt-in clause for the state").

This Court has thus construed ANILCA as creating "a program of cooperative federalism" of the pre-emption variety, in which Alaska has the choice of accepting the federal conditions or having its authority pre-empted. The constitutionality of such a program is beyond debate. *See New York v. United States*, 505 U.S. at 167-68. Like the "strip mining law" (n.4, *supra*), ANILCA "merely made compliance with federal standards a precondition to continued state regulation in an otherwise pre-empted field." *Printz v. United States*, 521 U.S. 898, 926 (1997), citing *Hodel v. Virginia Surface Mining.*

Nor can there be any doubt as to Congress' subject-matter constitutional powers. Congress' invocation of its Indian Commerce Clause authority over Native affairs and to carry out the goals of ANCSA—a field in which Congress possesses absolute power and the States "have been divested of virtually all authority,"

―――――――――――――

management of fish and wildlife on the public lands *except as may be provided in Title VIII*, or to amend the Alaska constitution," nor "to enlarge or diminish" the Secretary's responsibility and authority over management of the public lands "[e]xcept as specifically provided otherwise by this Act."

35

*Seminole Tribe v. Florida*, 517 U.S. 44, 62 (1996)—is more than sufficient to sustain the pre-emption of state regulation of subsistence fishing by Natives, if not ("as a matter of equity" (§801(4)) by non-Natives as well. The equal-footing doctrine and the SLA certainly interpose no impediment. Whatever the effect of the explicit reservation of Native fishing rights in §4 of the Statehood Act on Alaska's claimed title to the submerged lands underlying navigable waters (an issue neither raised nor material here), it is undeniable that Congress retained plenary authority over those rights, and beyond question that those rights pertained to navigable waters. *See* pp. 24-28, *supra*.

Entirely apart from its constitutional authority over Native affairs, moreover, Congress' plenary power under the Interstate Commerce Clause to pre-emptively regulate fishing throughout Alaska's navigable waters—including the territorial sea—unimpeded by equal-footing/SLA considerations, was well-settled. *Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 281-85 (1977); *see also Hughes v. Oklahoma*, 441 U.S. 322 (1979) (interring theory of state "ownership" of fish and wildlife); *United States v. Helsley*, 615 F.2d 784 (9th Cir. 1979) (Kennedy, J.).[33]

---

[33] The prior dissent's belief that "the impact of ANILCA's subsistence priority in Alaskan navigable waters would not 'substantially affect' interstate commerce" (72 F.3d at 707), reflects a fundamental misconception. It is not one subsistence fisher over another to whom Congress accorded priority; rather, it is *non-subsistence* fishers against whom the priority operates, *to wit*, sport and commercial fishers. To suggest that giving subsistence fisheries priority over Alaska's world-class sport and commercial fisheries—and the vast interstate and international

Finally, and also independently, it was firmly established that Congress' proprietary and legislative authority over the public lands under the Property Clause was "'without limitations,'" *Kleppe v. New Mexico*, 426 U.S. at 539; that such authority "necessarily include[d] the power to regulate and protect the wildlife living there," *id.* at 541; and, further, that it embraced the power to regulate activities outside of the public lands, including on state-owned submerged lands, that interfered with the purposes of the federal lands. *United States v. Alford*, 274 U.S. 264 (1927); *United States v. Lindsey*, 595 F.2d 5 (9th Cir. 1979); *United States v. Brown*, 552 F.2d 817, 821-23 (8th Cir. 1977).

In ANILCA Congress clearly and unmistakably exercised its "paramount powers," *Missouri v. Holland*, 252 U.S. 416, 434 (1920), to pre-empt state authority over subsistence hunting and fishing on the public lands—much as it had done, though more expansively, with respect to subsistence uses of marine mammals, endangered species, and migratory birds (on submerged lands, navigable waters, and everywhere

---

markets in which they are significant components—does not substantially affect interstate (and international) commerce, is to fail to grasp the heart of this controversy. (As the district court noted, salmon reach their spawning grounds "in the shallows of far upland creeks and lakes . . . only after passing through the gauntlet of commercial fisheries in the territorial seas . . . and sport and Alaska's wide open subsistence fishing on the entire Copper River." SER470.) It is not the one percent of the salmon harvest consumed by subsistence users that Alaska begrudges in this litigation; it is control over the priority's impact on her lucrative sport and commercial fisheries that is the object of her envy. If this case is not about commerce, from Alaska's perspective, it has virtually no meaning.

else)—and Alaska's authority was thereby curtailed.  That brings us back, unen-cumbered with the rhetoric of "state sovereignty," to the question facing this Court in 1995: whether Congress intended the statutory priority to apply to subsistence fishing in any navigable waters—"e.g., salmon on the Copper River."[34]

## II. CONGRESS MANIFESTLY INTENDED TO PROTECT SUBSISTENCE FISHING IN NAVIGABLE WATERS IN WHICH THE UNITED STATES OWNS INTERESTS, AS IT DOES WITH RESPECT TO FEDERAL RESERVED WATERS

In deciding the statutory-construction issue presented by this appeal, it is immaterial that "Congress could not have anticipated" Alaska's withdrawal from the program Congress envisioned. 72 F.3d at 701. That inability does not give the courts "the option to throw up [their] hands." *Saudi Arabia v. Nelson*, 507 U.S. 349, 359 (1993). "The present case exemplifies the familiar proposition that Congress need not, and likely cannot, anticipate all circumstances in which a general policy must be given specific effect." *United States v. Haggar Apparel Co.*, 526 U.S. 380, 392 (1999). But Congress' failure to "have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning." *Union Bank v. Wolas*, 502 U.S. 151, 158 (1991). Lack of congressional prescience also is not a sufficient reason to assume the presence of ambiguity. *See Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. at 212 ("the fact that a statute can be

---

[34] S. Rep. No. 96-413, at 272.

38

'applied in situations not expressly anticipated by Congress does not demonstrate ambiguity'").

"In interpreting a statute, we 'look first to the plain language of the statute, construing the provisions of the entire law, including its object and policy, to ascertain the intent of Congress. Then, if the language of the statute is unclear, we look to its legislative history.'" *Northwest Forest Resource Council v. Glickman,* 82 F.3d 825, 830-31 (9th Cir. 1996). Here, the analysis need go no further than the statute's plain language and structure—"the provisions of the entire law, including its object and policy." *Id.*

### A. Congress Plainly And Unambiguously Intended To Protect Subsistence Fishing In Navigable Waters

Given Congress' long and intimate involvement in issues affecting Native fishing rights in Alaska—including the reservation of those rights from Alaska's control by §4 of the Statehood Act, and the explicit intent of ANILCA "to fulfill the policies and purposes of the Alaska Native Claims Settlement Act" (§801(4))—it would be truly remarkable if Congress had failed to afford federal protection for subsistence fishing in any navigable waters. Congress surely knew, as the district court (SER470) and this Court have previously found, that "[m]ost subsistence fishing (and most of the best fishing) is in the large navigable waterways rather than in the smaller non-navigable tributaries upstream and lakes where fishermen have access

39

to less fish." *Quinhagak*, 30 F.3d at 393.[35] And Congress surely understood that

Alaska Natives "could not sustain themselves from the use of the upland alone. The

use of the adjacent fishing grounds was equally essential." *Alaska Pacific Fisheries*,

248 U.S. at 89. As in *Alaska Pacific Fisheries*, it must be presumed that "Congress

intended to conform its action to their situation and needs." *Id.*[36] The plain language,

objects, and policies of the Act show that Congress did not fail to grasp these salient

facts.

One of ANILCA's primary purposes, "consistent with management of fish and

wildlife . . . and the purposes for which each conservation system unit is established,

designated, or expanded . . . [is] to provide the opportunity for rural residents engaged

in a subsistence way of life to continue to do so." §101(c). This purpose—the pro-

tection of continued subsistence uses—is a central theme that runs through the Act's

---

[35]   "[I]t is likely that few waterways of significance to fisheries will be clas-
sified as non-navigable due to the expansive definition of navigable." *Quinhagak*,
35 F.3d at 393 n.4. "As argued by the Villages, the non-navigable waters, being inac-
cessible by boat and located far from any of the Villages, cannot alone satisfy
subsistence fishing needs." *Id.*

[36]   As mentioned earlier, in developing ANILCA Congress supplemented its
historical knowledge with a fresh examination of the subsistence way of life, and that
investigation again confirmed the vital importance of subsistence fishing. *See, e.g.*,
H. REP. NO. 95-1045, pt. I, at 182 (reviewing a 1974 study, "Subsistence Harvests in
Five Native Regions," documenting a subsistence take of 5.6 million pounds of fish);
S. REP. NO. 96-413, at 269 ("in many instances the failure to obtain fish to dry for
win-ter use . . . can engender considerable individual, community, and cultural trauma
and hardship"); *id.* at 179 ("subsistence fishing in this region is the economic
mainstay for the people").

40

many titles like the rivers that run through the lands reserved by ANILCA. Thus, in addition to Title I's purpose to manage the conservation system units for continued subsistence uses: (1) Titles II, III, and V each specifically provide that the national parks, refuges, preserves, and forests are likewise to be managed to protect and permit subsistence uses;[37] (2) §804 of Title VIII expressly prioritizes the "taking on public lands of *fish* . . . for nonwasteful subsistence uses," consistent with §802(1)'s "purpose . . . to provide the opportunity for rural residents engaged in a subsistence way of life to do so," and §802(2)'s policy to protect "subsistence uses of *fish* . . . ."; and, (3) in Title XIII, the Secretary is authorized to permit "fishing" in "accordance with the provisions of this Act." §1314(c)(2).

This powerful statutory commitment to protect the fishing-dependent subsistence way of life presumptively precludes any construction of the Act that would exclude 60 percent of the total food harvested annually by subsistence users—subsistence fish taken from navigable waters. Alaska's suggestion that Congress acted only to protect *de minimis* fishing in *non*-navigable waters flies in the face of Congress' manifest intent to protect continued subsistence uses and effectively reads subsistence fishing out of the statute. In effect,

> the state is asking [the Court] to create an exception to th[is] statute[] on grounds of policy rather than to . . . 'interpret' in any sense that makes

---

[37]    *See, e.g.,* §201(1)-(9); §202(1)-(3); §203; §302(1)(B)(iii) - (9)(B)(iii); §303(1)(B)(iii) - (7)(B)(iii); §501(b); §506 (a)(2).

41

the judge subservient to the expressed intentions and visible designs of the legislators. Realistically, the state is asking [the Court] to amend [the] statute[].

*Crawford v. Indiana Dep't of Corrections,* 115 F.3d 481, 484 (7th Cir. 1997) (Posner, J.).

ANILCA does not distinguish between fishing that occurs in navigable waters and the negligible amount that occurs in non-navigable waters. It would require strong evidence to counteract this plain and unambiguous intent to protect subsistence fishing in the navigable waters where it primarily takes place. Certainly, nothing in ANILCA's extensive legislative history carries that weight.[38]

---

[38]    Alaska relies upon a 28-page "discarded draft" (Br.29-30), reproduced in the Addendum to its brief, whose only proof of authenticity is an unidentified hand-printed note on the first page (ADD 5) indicating that it was "hand delivered by Udall et al." to "Senate principals." This document, according to the State, proposed adding "the waters of Alaska" to §804. Since another change contained in this obscure "draft" eventually became part of House Joint Resolution No. 452—which was both published and enacted, 126 CONG. REC. 30495-30498 (1980)—Alaska offers this as evidence that Congress did not intend to protect subsistence fishing in navigable waters. (We note that the State has no difficulty here understanding "the waters of Alaska" to be a reference to *navigable* waters, though "navigable" is not mentioned.) Assuming that this so-called "legislative history" is what it purports to be, it hardly helps Alaska's case. The most likely explanations for the rejection of such an amendment by the "Senate principals" are: (1) "We've already protected 'subsistence fishing,' so why do we need to say it occurs 'in the waters of Alaska'"; (2) "We've already guaranteed protection for subsistence fishing in "waters and interests therein" owned by the United States, and that's as far as we're willing to go"; (3) "We've expressly asserted our authority under the Commerce Clause to protect subsistence fishing, which encompasses all navigable waters, and that's as far as we're willing to go"; or (4) any number of other possibilities. "[T]his is a case for applying the canon of construction of the wag who said, when the legislative history is doubtful, go to the statute." *Greenwood v. United States,* 350 U.S. 366, 374 (1956) (Frankfurter, J.).

42

Lacking any suggestion in the statute or its legislative history that §804 does not extend to subsistence fisheries in "navigable" waters, Alaska argues for a narrow construction of the "public lands" definition. But there is no occasion here to construe any terms narrowly or broadly, for the statute is clear and *un*ambiguous. Section 102(3) defines "public lands" as "Federal lands," §102(2) defines "Federal lands" as "lands, the title to which is in the United States after [enactment]," and §102(1) defines "land" as "lands, waters, and interests therein." As we show next, the term "public lands" is not lacking in clarity in the context of this Act and this case. By adopting these terms, and making them applicable to the whole Act (except Titles IX and XIV), Congress delineated the geographic scope of the subsistence priority to apply to all federal lands, waters, and interests therein.[39]

If Congress intended to accord priority to subsistence fishing only on non-navigable waters, its expenditure of power "amounted to nothing more than an empty gesture." *United States v. Alaska,* 423 F.2d 764, 767 (9th Cir. 1970) ("The argument that the [Executive] Order, in withdrawing the 'water,' did not withdraw the

---

[39]    Though Alaska and her *amici* dismiss the "public lands" definition as "boilerplate," Congress purposefully designed the term to fit the unique circumstances of Alaska. No other statute cited by the State includes a definition of "public lands" which distinguishes between lands owned by the United States and those selected by the State and Native corporations, much less one that demarks the scope of federal pre-emption of regulatory authority over hunting and fishing. *See Amoco Prod. Co.,* 480 U.S. at 548, n.15 (rejecting "the assertion that the phrase 'public lands,' in and of itself, has a precise meaning, without reference to a definitional section or its context in a statute").

43

'navigable water,' is patently unsound"). *See Hynes,* 337 U.S. at 110 ("[t]o interpret the clause 'or any other public lands which are actually occupied by Indians or Eskimos within said Territory' to describe only lands above mean low tide is too restrictive in view of the history and habits of Alaska natives and the course of administration of Indian affairs in that Territory").

> **B.     Federally Reserved Water Rights Are Property Interests Owned By The United States And Thus Constitute "Public Lands" Covered by ANILCA**

When the United States reserves rights to use appurtenant waters to fulfill the purposes of its land-reservations it acquires property rights. These rights pertain to "waters, and interests therein" and "title" to them is in Alaska. Thus, federal reserved water rights are squarely within ANILCA's definition of "public lands." In determining the extent of the government's power to reserve and control the use of those waters it is immaterial whether the waters happen to flow across streambeds that are owned by the United States, by the State, or by private parties. States did not gain any immunity from the exercise of congressional power to regulate the public lands by receiving title to submerged lands under navigable rivers.

> **1.     Water rights were reserved for the federal reservations set aside by Congress in ANILCA and elsewhere**

In establishing and expanding numerous conservation reservations in Alaska, Congress also reserved water rights for the United States. Under the implied-

reservation-of-water doctrine, the "Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation." *Cappaert v. United States*, 426 U.S. 128, 138 (1976).[40]

Thus, for example, where a primary purpose of a conservation unit reserved by ANILCA is to secure subsistence uses of fish and wildlife and to protect the fish and wildlife and their habitat, it would be absurd to contend that flowing water is not necessary to fulfill these purposes. The United States, then, owns reserved water rights appurtenant to the lands reserved by ANILCA or otherwise. These rights are necessary to ensure that enough water remains in the streams to protect fish popu-lations and fish habitat, the subsistence fishing they support, and the other reservation purposes. As the owner of instream flow rights, the government has the "right to prevent others appropriations from depleting the stream waters below a protected level in any area where the non-consumptive right applies." *United States v. Adair*, 723 F.2d 1394, 1411 (9th Cir. 1984); *citing Cappaert*, 426 U.S. at 143.

Alaska argues, however, that the reserved-waters doctrine cannot be invoked because there has not yet been a quantification of the exact amount of water necessary to fulfill those purposes. This is wrong. A quantification might be useful if the issue

---

[40]    Water rights can also be reserved expressly as they were in ANILCA, for example, in National Wildlife Refuges, where Congress expressly reserved "the necessary water quantity" for the express purposes of protecting migratory fish. *See, e.g.*, §§302(1)(B)-(9)(B).

here were whether and to what extent a water user could divert water from the stream. The *existence* and not the *extent* of federal reserved water rights is the only question before this Court. If the United States owns a property interest in the waters in navigable streams flowing through or adjacent to federal reservations, that brings those waters within ANILCA's definition of "public lands." Unless and until diversions of water threaten the reservation's primary pur-poses, nothing would be gained by pursuing lengthy and expensive quantification proceedings.[41]

Ever since the Supreme Court's 1908 decision in *Winters,* there has been little question about whether reservations of federal lands *create* reserved water rights. In *Arizona v. California,* 373 U.S. 564, 600-01 (1963), the Supreme Court laid to rest any doubt that such rights extended to reservations of public lands as well as Indian lands. In doing so, it determined and quantified reserved water rights in the Colorado River mainstream for Indian reservations, wildlife refuges, and national recreation areas. *See United States v. Alaska,* 423 F.2d 764 (9th Cir. 1970) (Kenai Moose Range reservation includes water).

Most reserved-rights cases concern the quantity of water that was reserved.

---

[41]    Quantification can occur later, as necessary to deal with actual or potential conflicts in water use. In *Winters v. United States,* 207 U.S. 564 (1908), the Supreme Court held that there was a reserved water right held by the Indian tribes occupying the Fort Belknap Indian Reservation that dated back to the reservation's estab-lishment in 1888. The existence of the water rights was established, yet the issue of quantification, for better or worse, remained unresolved. *See* Tarlock, Corbridge & Getches, *Water Resource Management* 768 (4th ed. 1993).

Such cases arise when a conflict becomes apparent or when a quantification action is commenced by permission of Congress. For example, in *Cappaert,* the reserved waters doctrine was asserted on behalf of Devil's Hole National Monument. established "for the preservation of the unusual features of scenic, scientific, and educational interest," the existence of "a peculiar race of desert fish," and the "outstanding scientific importance" of the pool. 426 U.S. at 141.

When ranchers began pumping water that would interfere with the level of water in the pool, the government sought injunctive relief. The Court held that the United States acquired its interest in water rights when the land was reserved. Since the ranchers had not acquired water rights as of that date, their water use could be enjoined. But the exact quantity of water rights the government could protect by asserting its rights in the future was a separate issue. The district court fixed the level of the pool to be protected, allowing the ranchers to take water in times and in a manner that did not interfere with that water level. To that extent, state water law is pre-empted once federal needs require water to be put to a particular use. *See also Federal Power Comm'n v. Oregon,* 349 U.S. 435 (1955); *United States v. New Mexico,* 438 U.S. 696, 698 (1978) (statehood does not diminish federal authority to reserve water in the future).

The federal government owns reserved water rights appurtenant to the lands reserved in Alaska, and these instream-flow rights are necessary to protect fish popu-

47