# EXHIBIT B-11 (Part 3)

lations and fish habitat, among other things—and the subsistence and other purposes they support. As the owner of these rights, the government has the power to prevent others from interfering with the flow of water required for the reservation purposes. *Adair, supra; United States v. New Mexico, supra.*

### 2. Reserved water rights are property interests of the United States

It is well-established that ownership interests in flowing waters can be obtained by appropriation or reservation. *E.g., Colville Confederated Tribes v. Walton*, 647 F.2d 42, 48 (9th Cir. 1981) (Tribe has vested property right in reserved water); *Adair*, 723 F.2d at 1411. Although usufructuary in nature, water rights constitute real property interests that may be bought and sold, assigned, mortgaged, and leased, and may not be taken without just compensation. *See, e.g., Sporhase v. Nebraska*, 458 U.S. 941 (1982); *FPC v. Niagara Mohawk Power Corp.*, 347 U.S. 239 (1954).

As recognized by this Court:

[W]ater rights are interests in land:

A water right is generally considered to be real property or "land." As Wiel says, "the right to the flow and use of water being a right in a natural resource, is real estate." A water right is real property for purposes of determining title in a quiet-title action, a mortgage recording requirement, satisfying the statute of frauds, descent and inheritance, and taxation.

*Escondido Mut. Water Co. v. F.E.R.C.*, 692 F.2d 1223, 1235-36 (9th Cir. 1982), *rev'd in part, aff'd in part*, 466 U.S. 765 (1984); *see also Arizona*, 373 U.S. at 596-97.

48

Like water rights held by private parties, reserved rights to waters appurtenant to federal lands constitute property interests. *F.P.C. v. Niagara Mohawk, supra.* Consequently, these interests in waters, the title to which is in the United States, fall completely within the definition of public lands in §102(3).

Alaska nonetheless questions whether the government holds "title" to its reserved water rights. But the Supreme Court has admonished, in construing this very Act, that since Congress explicitly employed "title" in conjunction with "interest," the terms should not lightly be read as self-nullifying. *Amoco Prod. Co.,* 480 U.S. at 549 n.15. There, the Secretary argued that §810 did not apply to submerged lands on the OCS because the United States does not hold formal "title" to the OCS or its mineral resources. Although ultimately ruling that ANILCA applies only "in Alaska," the Court rejected the notion that "title" may be construed rigidly to deny a federal-ownership interest:

> The United States may not hold "title" to the submerged lands of the OCS, but we hesitate to conclude that the United States does not have "title" to any "interests therein." Certainly, it is not clear that Congress intended to exclude the OCS by defining public lands as "lands, waters, and interests therein," "the title to which is in the United States."

*Id.* at 549 n.15. The Court thus equated "title" with ownership, consistent with the common understanding that "[t]itle is a term which is frequently used as synonymous with ownership." Cribbet, *Principles of the Law of Property* 15 (2d ed. 1975). The federal government undisputedly owns reserved water rights appurtenant to lands

49

reserved in Alaska.  That property interest is a title interest within the definition of public lands.

### 3.    Streambed ownership is distinct from the ownership or control of water in the stream

Proprietary water rights do not depend on ownership of the streambed. Streambed owners are subject to a servitude for the benefit of water-rights owners; they must not use their property so as to interfere with the water rights and they have to accommodate the use of water by water-rights owners.  *See Adair, supra.*  The principle applies no less to a State when it owns a riverbed by virtue of the river being "navigable."  Indeed, the State's proprietary interest in the bed of such streams is subservient to the government's special interests whenever navigable waters or public lands are concerned.  *Arizona v. California*, 373 U.S. at 597-98.

Alaska asserts that the equal-footing doctrine gives it the exclusive right to manage all waters and resources in navigable waters. Br.25-26 (relying on *dicta* from *Totemoff*).  But placing Alaska on an equal footing with other States leaves the waterways above the state-owned submerged lands subject to the exercise of congressional powers.  *Utah Div. of State Lands*, 482 U.S. at 202.

States cannot use their ownership of the beds of navigable waterways to defeat paramount interests of the United States.  *Arizona*, 373 U.S. at 597-598.  This is because submerged lands pass to the States subject to significant limitations.  The

50

State cannot supplant Congress' constitutional powers over public lands under the Property Clause, or navigation and commerce under the Commerce Clause. The Supreme Court has said that "[i]n the absence of specific authority from Congress a State may not by its legislation destroy the right of the United States, as the owner of the lands bordering on a stream, to the continued flow of its waters; so far at least as might be necessary for the beneficial uses of the government property," or to protect the navigable capacity of the stream. *United States v. Rio Grande Irrigation Co.*, 174 U.S. 690, 704 (1899) (government could prevent appropriation of water and dam construction pursuant to water rights granted by a territory).[42]

"[T]he Government's ability to control and develop navigable waters would not be impaired if the land beneath the navigable waters passed to the State." *United States v. Alaska,* 521 U.S. at 38. Consequently, the admission of Alaska into the Union did not divest Congress of its plenary control over navigable waterways, such as its authority to reserve waters for its own use.

> [W]hatever powers the States acquired over their waters as a result of congressional Acts and admission into the Union, however, Congress did not intend thereby to relinquish its authority to reserve unappropriated water in the future for use on appurtenant lands withdrawn from the public domain for specific federal purposes.

*United States v. New Mexico*, 438 U.S. at 698; *Winters,* 207 U.S. at 577; *Arizona,* 373

---

[42]    Although *Rio Grande* dealt with a territory, the Supreme Court has reiterated the principle in cases dealing with States. *E.g., California-Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142 (1935).

51

U.S. at 597-598; *Cappaert*, 426 U.S. at 143-146.

The Submerged Lands Act created no new rights for the States in their inland navigable waterways beyond those afforded by the equal-footing doctrine. *Bonelli Cattle Co. v. Arizona*, 414 U.S. 313, 324-325 (1973); *Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 371 n.4 (1977); *United States v. Alaska*, 521 U.S. at 5-6, 35-36. Accordingly, consistent with the settled legal background Congress used the term "navigable waters" in ANILCA to distinguish explicitly between "submerged lands" and the water column—the former being "*beneath* navigable waters of the United States." §304(c) (emphasis added). Thus, Congress did *not* view the beds and banks of a river as synonymous with the water column itself and understood that the transfer of submerged lands to the States preserved its continuing federal authority to pre-empt state regulatory authority over fish and wildlife in navigable waters. *Douglas v. Seacoast Products*, 431 U.S. at 283-84; *Natural Resources Defense Council v. E.P.A.*, 863 F.2d 1420, 1435 (9th Cir. 1988).

*Douglas* is particularly on point, for there the Court rejected the identical SLA claim made here (Br.17): that 43 U.S.C. §1311(a)(2) confers on the States the right to control fisheries exclusive of federal interests. The Court ruled that when Congress made this grant "it expressly retained for the United States 'all constitutional powers of regulation and control' over these lands and waters." 431 U.S. at 284.

52

And relevant to Alaska's claim, among the federal rights expressly withheld by §4 of the Statehood Act were Native "fishing rights." *See* pp. 27-28, *supra; Metlakatla v. Egan*, 369 U.S. at 57-59.[43]  Thus, "'[t]o put the claim of the State [to regulate fisheries] upon title [conveyed by the SLA] is . . . to lean upon a slender reed,'" *Douglas*, 431 U.S. 284, "because the primary grant of the [SLA] does not extend to any interest over free-swimming fish." *Id.* at 289 (Rehnquist J., concurring in judgment). It is thus clear that statehood could not ingrain federal authority to obtain title to water by reserving land.

## III.  CONGRESS HAS EMBRACED THE SECRETARY'S CONSTRUCTION OF "PUBLIC LANDS" AND HAS ADHERED TO THAT INTER-PRETATION IN ORDER TO BRING THE STATE BACK INTO COMPLIANCE WITH ANILCA

Congress has acknowledged and ratified the prior panel's opinion and the Secretary's construction on which it was based through the various moratoria, amendments, and appropriations legislation enacted since 1995 in response to the opinion. Indeed, Congress has added this Court's and the Secretary's interpretation to its arsenal of inducements to bring the State back into the program as originally envisioned.

As noted previously, shortly after the Secretary's announced his intent to apply

---

[43]  Section 4 of the Statehood Act also negates Alaska's claim that title conveyed by the SLA constitutes an exception to ANILCA's "public lands" definition under §102(3). Br.27n.10.

the priority to subsistence fishing in federally-reserved inland waters, Congress inter-

vened with a series of appropriations-act "moratoria." The first moratorium pre-

vented any funds from being used to implement this Court's judgment in fiscal year

1996. §336. The second moratorium was enacted several months later covering

fiscal year 1997.[44] §317. Both acts afforded the Alaska Legislature additional time

to adopt a resolution in favor of a constitutional amendment on subsistence. But by

November 1997, it appeared that the Legislature would not act without additional

enticements. Congress then adopted a stick-and-carrot approach: new legislation

carrying the threat of implementation of this Court's decision—including the

Secretary's interpretation of "public lands" as encompassing federally-reserved

waters—if the Legislature did not act,[45] and weakening amendments to ANILCA if

it did. §316.[46] To provide maximum persuasive effect, Congress added that the

---

[44]    Although these provisions prevented the Departments from implementing this Court's decision, they did not preclude the agencies from proposing regulations and seeking public comment. *See* 142 CONG. REC. H11926 (daily ed. Sept. 28, 1996).

[45]    Congress included amendments (1) making express reference to this Court's 1995 decision and (2) adding language to ANILCA's "Federal lands" defini-tion. *See* §316(b)(3)(B), adding §801(b)(5) ("the Ninth Circuit Court of Appeals determined in 1995 in State of Alaska v. Babbitt (72 F.3d 698) that the subsistence priority required on public lands under section 804 of this Act applies to navigable waters in which the United States has reserved water rights as identified by the Secretary of the Interior"); §316(b)(2) (excluding from "Federal land," lands owned by the State, a Native Corporation or other private landowner).

[46]    Section 316(b)(3)(B) amended Title VIII's "findings" section to include, among other things, a description of the Alaska Supreme Court's *McDowell* decision

54

weakening amendments would be automatically repealed if Alaska failed to enact complying laws by December 1, 1998. §316(d). But still—despite enormous pressure from the public, the Governor's office, and the Alaska Delegation—the Legislature refused. The ANILCA amendments were then automatically repealed, and the original statute in effect reenacted.

The following year Congress once again tried to move the Alaska Legislature into action, this time sweetening the pot with money. §339. This final moratorium provided a phased-in appropriation of $11 million for the Secretary to implement this Court's decision, unless the Legislature acted by October 1, 1999, to place before the electorate a state constitutional amendment on subsistence. If the Legislature did so, the Secretary was required to grant the $11 million to the State. Otherwise, the appropriation would fund the Secretary's interpretation. Again, the Legislature refused. Consequently, and pursuant to the Secretary's January 1999 regulations, on October 1, 1999, ANILCA's subsistence priority was extended to all federally-reserved waters, precisely as contemplated by Congress.

Taken together, these extensive and detailed actions spanning five years unequivocally reflect congressional acknowledgment and ratification of the prior panel's

---

(*id.*, adding §801(b)(2)), and noting: "since that time, repeated attempts to restore the validity of the State law through an amendment to the Alaska Constitution have failed, and the people of Alaska have not been given the opportunity to vote on such an amendment." *Id.*, adding §801(b)(3)).

opinion and the Secretary's construction on which it was based. *See, e.g., Food & Drug Administration v. Brown & Williamson Tobacco Corp.*, 120 S. Ct. 1291, 1312-1313 (2000) ("Under these circumstances, it is clear that Congress' tobacco specific legislation has effectively ratified the FDA's position that it lacks jurisdiction to regulate tobacco.").

The fact that the "congressional approval" here occurred in appropriations statutes is immaterial, "so long as it is demonstrated that Congress had knowledge of the precise action or project at issue and was explicitly and specifically addressing that project." *Sierra Club v. Andrus*, 610 F.2d 581, 601-02 (9th Cir. 1979), *rev'd on other grounds*, 451 U.S. 287 (1981); *Rincon Band of Mission Indians v. Harris*, 618 F.2d 569, 573 (9th Cir. 1980) (ratification by appropriation will be found where there is congressional knowledge of the precise course of action alleged to have been acquiesced in).

Here, the appropriations acts plainly show a studied intent to confirm the very authority the Secretary now claims and exercises. *Zarr v. Barlow*, 800 F.2d 1484 (9th Cir. 1986). Indeed, Congress expressly described this Court's 1995 decision in the 1997 Title VIII amendments as establishing "that the subsistence priority required on public lands under section 804 of this Act applies to navigable waters in which the United States has reserved water rights as identified by the Secretary of the

56

Interior."[47] Congress then changed the "Federal land" portion of the "public lands" definition to say that: "'Federal land' does not include lands the title to which is in the State, an Alaska Native corporation, or other private ownership," §316(b)(2), explaining that neither this amendment "nor any other provision of this section overturns, or shall be construed to overturn the decision of the Ninth [Circuit] Court of Appeals in *State of Alaska v. Babbitt* (73 F.3d 698) (commonly known as the Katie John case)." H. CONF. REP. NO. 105-337, at 94-95.

To borrow from *United States v. Sheffield Board of Commissioners,* 435 U.S. 110, 132 (1978), "[i]n [1997], Congress was clearly aware of [the prior panel's] interpretation . . . [of §102] and plainly contemplated that the Act would continue to be so construed." "When a Congress that re-enacts a statute voices its approval of an administrative or other interpretation thereof [as it has here], Congress is treated as having adopted that interpretation, and this Court is bound thereby." *Id.* at 134; *see also Ward v. Commissioner,* 784 F.2d 1424, 1430 (9th Cir. 1986) (where agency interpretations of a statute are deemed to have been approved by Congress because the statute to which they apply is reenacted unchanged "those interpretations have the force of law and can only be changed by Congress."). In short, Congress has not merely acquiesced in the panel decision and the Secretary's interpretation; Congress

---

[47]    §316(b)(3)(B), adding §801(b)(5).

57

has expressly embraced them. *Hooks v. Clark County Sch.*, 2000 WL 1357476 at *4-*5 (9th Cir. 2000).

Borrowing from *Brown & Williamson*, 120 S.Ct. at 1313, "[u]nder these circumstances it is clear that Congress' [ANILCA] specific legislation has effectively ratified the [Secretary's'] position that [public lands includes federally-reserved waters]." Given the Herculean efforts to get Alaska to come back into compliance, "it is hardly conceivable that Congress . . . was not abundantly aware of what was going on." *Bob Jones Univ. v. United States,* 461 U.S. 574, 600-601 (1983).

The evidence of congressional ratification goes beyond the 1997 amendments. Congress affirmatively manifested its ratification again in the Omnibus Consolidated Appropriations Act of 1998 which bestows upon the Secretary the authority to implement subsistence management on "public lands" effective October 1, 1999. Indeed, it appropriates money for that very purpose. §339. *Brooks v. Dewar*, 313 U.S. 354, 361 (1941) ("appropriation[] . . . not only confirms the departmental construction of the statute, but constitutes a ratification of the action of the Secretary as the agent of Congress in the administration of the act").

Given the sequence and focus of legislative action, it is hard to imagine a clearer indication of congressional knowledge and ratification of both this Court's decision and the Secretary's statutory interpretation sustained by the decision. The ratification of the Secretary's regulations is "a deliberate congressional choice with

58

which the courts should not interfere." *Central Bank v. First Interstate Bank*, 511 U.S. 164, 184 (1994). Congress has purposely left the panel decision intact in fulfillment of Title VIII's promise to protect subsistence fishing, and to coax Alaska back into the program.

## CONCLUSION

For the foregoing reasons, the judgment below should be affirmed.

Respectfully submitted this 30th day of October, 2000.


Heather R. Kendall-Miller
NATIVE AMERICAN RIGHTS FUND
420 L Street, Suite 505
Anchorage, Alaska  99501-1937
        (907) 276-0680
*Attorneys for Plaintiffs-Appellees*

William E.  Caldwell
1648 Cushman St., Suite 300
Fairbanks, Alaska 99701-6206
(907) 452-5181
*Attorney for Intervenor-Appellee AFN*