# EXHIBIT B-12 (Part 1)

No. 00-35121

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

KATIE JOHN; DORIS CHARLES; and MENTASTA VILLAGE
COUNCIL,

Plaintiffs-Appellees,

v.

UNITED STATES OF AMERICA; BRUCE BABBITT, in his capacity as
Secretary of Interior; DANIEL GLICKMAN, in his capacity as Secretary of
Agriculture; and DANIEL DEMIENTIEFF, NILES CESAR, FRAN
CHERRY, ROBERT BARBEE, DAVE ALLEN, and RICK CABLES, in
their capacity as members of the Federal Subsistence Board,

Defendants-Appellees,

and

STATE OF ALASKA and FRANK RUE, in his capacity as
Commissioner of the Alaska Department of Fish and Game,

Defendants-Appellants.

---

On Appeal from the United States District Court for the District of Alaska
(No. A90-0484-CV (HRH), consolidated with No. A92-0264-CV (HRH))

---

**EN BANC REPLY BRIEF FOR APPELLANTS
STATE OF ALASKA AND FRANK RUE**

---

(Counsel listed on inside cover)

*Of Counsel*:
John G. Roberts, Jr.
Jonathan S. Franklin
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5810


November 30, 2000

Bruce Botelho
*Attorney General*
Joanne M. Grace
*Assistant Attorney General*
STATE OF ALASKA
Attorney General's Office
1031 W. 4th Avenue
Anchorage, Alaska 99501
(907) 269-5100

*Counsel for Defendants-Appellants*
   *State of Alaska, et al*

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

I.  THE CLEAR STATEMENT DOCTRINE APPLIES BECAUSE
    A FEDERAL TAKEOVER OF FISHERIES MANAGEMENT IN
    STATE WATERS USURPS A SOVEREIGN POWER THAT HAS
    LONG BELONGED TO THE STATES. ......................................................3

    A.  Fisheries Management is Vitally Connected to State's Sovereign
        Ownership of Submerged Lands, and Alaskans Have Identified
        This Authority as One of the State's Most Important Roles. .............3

    B.  The Federal Government Historically Has Left Local
        Management of Fisheries to the States. ..............................................12

II. THE LANGUAGE OF THE STATUTE DOES NOT
    "UNMISTAKABLY" INCLUDE NAVIGABLE WATERS. .....................18

    A.  The Statute Does Not Evince An Unmistakably Clear Intent
        to Displace State Regulation of Its Navigable Waters. ......................18

    B.  The Panel Majority's Deference To The Agencies' New
        Interpretation Was Improper. ...........................................................25

III. THERE HAS BEEN NO KNOWING CONGRESSIONAL
     ENDORSEMENT OF THE PRIOR DECISION.......................................29

IV. THIS CASE IS NOT MOOT. ..................................................................37

CONCLUSION.......................................................................................................44

# TABLE OF AUTHORITIES

## CASES

*BFP v. Resolution Trust Corporation*, 511 U.S. 531 (1994).................................10

*Bielgard v. State*, 896 P.2d 230 (Alaska 1995)............................................28

*Borax Consolidated v. City of Los Angeles*, 296 U.S. 10 (1935)............................4

*City of Angoon v. Hodel*, 803 F.2d 1016 (9th Cir. 1986) .................................20

*Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163 (1989) ..............................24

*Coyle v. Smith*, 221 U.S. 559 (1911) ....................................................4

*Douglas v. Seacoast Products, Inc.*, 431 U.S. 265 (1977) .................................7

*EEOC v. CBS*, 743 F.2d 969 (2nd Cir. 1984) ..............................................36

*FDA v. Brown & Williamson Tobacco Corporation*, 120 S.Ct. 1291 (2000).........36

*Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1 (1928)................................7

*Gregory v. Ashcroft*, 501 U.S. 452 (1991)..........................................passim

*Greisen v. United States*, 831 F.2d 916 (9th Cir. 1987) .................................9

*Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964)......................24

*Herscher v. State*, 568 P.2d 996 (Alaska 1977) .........................................10

*Hoonah Indian Association v. Morrison*, 170 F.3d 1223 (9th Cir. 1999)...............14

*Hughes v. Oklahoma*, 441 U.S. 322 (1979) ...............................................7

*Idaho Department of Fish & Game v. National Marine Fisheries Service*, 56 F.3d 1071 (9th Cir. 1995) ................................................38

*Idaho v. Coeur D'Alene*, 521 U.S. 261 (1997)..................................................3

*Illinois Central Railroad Co. v. State of Illinois*, 146 U.S. 387 (1892)...................6

*Kenaitze Indian Tribe v. State*, 860 F.2d 312 (9th Cir. 1988)..............................20

*Martin v. Waddell*, 41 U.S. 367 (1842).............................................................4

*Metlakatla Indian Community v. Egan*, 362 P.2d 901 (1961)....................7, 8, 9, 13

*Metlakatla Indian Community v. Egan*, 369 U.S. 45 (1962)...................................8

*Minnesota v. Mill Lacs Band of Chippewa*, 526 U.S. 172 (1999)...........................7

*Organized Village of Kake v. Egan*, 369 U.S. 60 (1962).................................7, 14

*Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206 (1998)...........11

*Pollard's Lessee v. Hagan*, 44 U.S. 212 (1845).................................................4

*Public Service Co. v. Shoshone-Bannock Tribes*,
30 F.3d 1203 (9th Cir. 1994)...........................................................41, 42, 43

*Pullen v. Ulmer*, 923 P.2d 54 (Alaska 1996).....................................................9

*Rincon Band of Mission Indians v. Harris*, 618 F.2d 569 (9th Cir. 1980)..............30

*SEC v. Sloan*, 436 U.S. 103 (1978)................................................................35

*Sannon v. United States*, 631 F.2d 1247 (5th Cir. 1980).....................................38

*Shively v. Bowlby*, 152 U.S. 1 (1894)..............................................................4

*Skidmore v. Swift*, 323 U.S. 134 (1944)..........................................................26

*Smith v. Maryland*, 59 U.S. 71 (1855)...........................................................5, 6

*State v. Babbitt*, 72 F.3d 698 (9th Cir. 1995).............................3, 24, 39, 40

*Stearns v. Minnesota*, 179 U.S. 223 (1900).......................................................5

*Totemoff v. State*, 905 P.2d 954 (Alaska 1995)..........................................20, 23, 28

*TVA v. Hill*, 437 U.S. 153 (1978) ...........................................................32, 33, 35

*United States Term Limits, Inc. v. Thorton*, 514 U.S. 779 (1995)............................2

*United States v. Beebe*, 180 U.S. 343 (1901)..........................................................34

*United States v. Locke*, 120 S.Ct. 1135 (2000) .................................................12, 17

*United States v. Lopez*, 514 U.S. 549 (1995) .........................................................24

*United States v. Oregon*, 295 U.S. 1 (1935) .............................................................5

*Utah Div. of State Lands v. United States*, 482 U.S. 193 (1987)...............................4

## CONSTITUTIONAL PROVISIONS

Alaska Const. art. VIII, §2 ......................................................................................9

Alaska Const. art. VIII, §3 ......................................................................................9

Alaska Const. art. VIII § 4 ......................................................................................9

Alaska Const. art. VIII § 5 ....................................................................................10

Alaska Const. art. VIII, § 15 .................................................................................10

## FEDERAL STATUTES

16 U.S.C. § 3102....................................................................................1, 19, 34

16 U.S.C. § 3114(a) .....................................................................................18, 19

16 U.S.C. § 3117.....................................................................................................28

16 U.S.C. 3120(d)....................................................................................................21

16 U.S.C. 3121 ................................................................................28

16 U.S.C.A. 3192(a) ........................................................................21

43 U.S.C. § 1301(e) ..........................................................................6

43 U.S.C. § 1311................................................................................6

43 U.S.C. § 1601 *et seq.,*................................................................15

43 U.S.C. § 1602(e) ........................................................................15

48 U.S.C. § 21 ................................................................................13

P. L. 104-208, § 317, 110 Stat. 3009 ..............................................30

P.L. 105-277, 112 Stat. 2681........................................................33, 34

## FEDERAL RULES AND REGULATIONS

50 CFR 100.10(d)(4)(xviii) ............................................................20

50 CFR 100.23(a) ............................................................................15

43 Fed. Reg. 60252 (1978)..............................................................17

62 Fed. Reg. 66216 (Dec. 17, 1997)............................................39, 40

## STATE STATUTES

AS 16.05.258(b)(3) ............................................................................3

## STATE REGULATIONS

5 AAC 92.080(4) ............................................................................28

v

# OTHER

1997 Op. Att'y Gen. 1, 1997 WL 1248811 ............................................................14

1971 USCCAN 2247 .................................................................................................15

1978 U.S.C.C.A.N. 9589 ..........................................................................................17

104 Cong. Rec. 9748 (May 28, 1958) ......................................................................13

143 Cong. Rec. S11266.............................................................................................31

H. Conf. Rep. No. 746, 92nd Cong., 1st Sess. 37 ....................................................15

H. Rep. 105-337, 143 Cong. Rec. H9004-01, 9029 .................................................31

Gerald E. Bowkett, *Reaching for a Star: the Final Campaign for Alaska Statehood* 12-13 (1989).............................................................................8

L. Tribe, *American Constitutional Law* 317 (2d ed. 1988) .....................................37

# INTRODUCTION

The State files this brief in reply to the Joint Brief of the Private Appellees, the Brief of the Federal Appellees, and the briefs of *amici curiae*. Appellees and their *amici* assert that the federal government may take over fisheries regulation on most State navigable waters based on a contorted reading of statutory language. This case is not, as Appellees seem to suggest, about whether Congress intended title VIII's subsistence priority for rural residents to preempt conflicting state law on federal lands. As in *Gregory v. Ashcroft*, 501 U.S. 452 (1991), the federal statute is supreme over state law where Congress intended it to apply, and Congress intended the priority to apply to "public lands." 16 U.S.C. § 3102. As in *Gregory*, the issue here is <u>where</u>, not <u>whether</u> the federal law applies. Also as in *Gregory*, the statute has been interpreted to require a federal takeover of a traditional state authority. Therefore, the appropriate approach is the one the Supreme Court mandated in *Gregory* – asking whether Congress made "unmistakably clear in the language of the statute" that it intended the federal government to take over fisheries management in most of Alaska's navigable waters. *Gregory*, 501 U.S. at 460-61.

As shown below and in the State's opening brief, Congress did not make unmistakably clear its intent to displace State sovereignty in this

1

manner.  As the Supreme Court has explained, this clear statement rule is a vital check on overreaching federal authority.  The Supremacy Clause is a power that "Congress does not exercise lightly." *Id.* at 460.  The states "retain substantial sovereign powers," and even "as against Congress' powers," principles of federalism serve to constrain Congress' exercise of its powers.  *Id.* at 461, 464, 468.  Pursuant to the Supremacy Clause, the federal government is supreme within its own sphere, and under their reserved powers, the States have traditional police power within their domain.  "[M]ere congressional ambiguity" is insufficient to alter the federal balance. *Id.* at 464.  Dual sovereignty is "the genius of [the Framers'] idea that our citizens would have two political capacities, one state and one federal, each protected from incursion by the other." *United States Term Limits, Inc. v. Thorton,* 514 U.S. 779, 838 (1995) (Kennedy, J., concurring).

Appellees claim that the clear statement doctrine does not apply because the federal takeover of fisheries management does not affect a traditional state sovereign power.  They argue further that even if fisheries management is a traditional state authority, Congress clearly intended it to apply to navigable state waters as well as to federally-owned lands.  That fisheries management in navigable waters is a traditional state power is black-letter law as old as our Nation.  Yet the panel majority authorized a

2

wholesale federal takeover of this authority based on what it considered

merely a "permissible construction" of the statute. *State v. Babbitt*, 72 F.3d

698, 702 (9th Cir. 1995). Because the panel disregarded an important

safeguard protecting the balance of authority between States and the federal

government, its decision should be overturned.[1]

I.    **THE CLEAR STATEMENT DOCTRINE APPLIES BECAUSE A FEDERAL TAKEOVER OF FISHERIES MANAGEMENT IN STATE WATERS USURPS A SOVEREIGN POWER THAT HAS LONG BELONGED TO THE STATES.**

A.    **Fisheries Management is Vitally Connected to State's Sovereign Ownership of Submerged Lands, and Alaskans Have Identified This Authority as One of the State's Most Important Roles.**

Appellees do not contest that title to submerged lands is an "essential

attribute of state sovereignty," *Idaho v. Coeur D'Alene*, 521 U.S. 261, 283

(1997), that passes to States automatically under the constitutional equal

footing doctrine. They claim instead that the State's ownership of

submerged lands has no bearing on States' authority to manage fisheries,

and therefore that the federal takeover of fisheries management on most of

---

[1]    Alaska's interest in this case is in protecting its authority to regulate fisheries. The charge of the *amici* Professors that Alaska's motivation is to protect commercial fisheries is unsupported and simply wrong. Under Alaska law, subsistence uses have a priority over other uses. *See* AS 16.05.258(b)(3) (Requiring elimination of all other uses when necessary to provide for subsistence uses). The State law does not meet the requirements of ANILCA because the priority is not based on residency.

3

Alaska's navigable waters does not "upset the usual constitutional balance of federal and state powers." *Gregory*, 501 U.S. at 460; Joint Br. at 19-20; Fed. Br. at 36-40.

Contrary to Appellees' contentions, divesting the State of governmental authority over fisheries in its navigable waters would most certainly upset that constitutional balance. State management of fisheries is precisely the type of authority the clear statement doctrine is meant to protect. This authority has been historically recognized as belonging to the States, and the role of the federal government has been minimal. Appellees misunderstand the entire premise of the equal footing doctrine; it is not a doctrine of equal property ownership; it is a doctrine of political equality.[2]

---

[2]    Each new state enters the Union as a sovereign entity, just as each original state was independently sovereign after the revolution. *Martin v. Waddell*, 41 U.S. 367, 410 (1842). The principle that title to submerged lands is an attribute of sovereignty developed from early common law that recognized the crown's title to beds of navigable waters both in England and in the colonies. *See Shively v. Bowlby*, 152 U.S. 1, 11-13 (1894). The sovereign needed title to such lands to control navigation, fishing, and other commercial activity. *Utah Div. of State Lands v. United States*, 482 U.S. 193, 195 (1987). Thus, as sovereign successors to the crown, the thirteen original states acquired title to the beds of navigable waters. *Id.* As territorial sovereign prior to the creation of new states, the United States acquires title to the submerged lands in federal territories and holds them in trust for the future states. *See Borax Consolidated v. City of Los Angeles*, 296 U.S. 10, 15 (1935). When new states are created, they are admitted to the Union on an equal footing with the thirteen original states. *Pollard's Lessee v. Hagan*, 44 U.S. 212, 223, 229 (1845); *Coyle v. Smith*, 221 U.S. 559, 573 (1911). Upon admission, the title of the United States to lands

4

*Stearns v. Minnesota*, 179 U.S. 223, 245 (1900). The importance to a State of title to submerged lands lies in its concomitant governmental authority over the navigable waters. Naked title to soil, without corresponding governmental authority, would have no more significance to a sovereign than it does to a private individual. Rather, unlike private landowners, States hold navigable waters and the resources therein in trust for the public, with an obligation to conserve them for the common good.

The State's constitutional entitlement to the lands beneath its navigable waters is based in part on its sovereign duty to manage fisheries for the public. The Supreme Court recognized this in 1855, after the State of Maryland seized a federally licensed vessel for violating a state law intended to prevent destruction of the oyster population in state waters. *Smith v. Maryland*, 59 U.S. 71 (1855). Considering whether the statute was repugnant to the federal government's overriding constitutional authorities, the Court connected the law's validity to the State's title to the submerged land. The soil below low-water mark "is held by the State, not only subject to, but in some sense in trust for, the enjoyment of certain public rights,

---

underlying inland navigable waters within the state passes to it, as incident to the transfer to the state of local sovereignty, and is subject only to the paramount federal power to control the waters for the navigation in interstate and foreign commerce. *United States v. Oregon*, 295 U.S. 1, 14 (1935).

among which is the common liberty of taking fish, as well shellfish as floating fish ***." *Id.* at 74-75. "The State holds the propriety of this soil for the conservation of the public rights of fishery thereon, and may regulate the modes of that enjoyment so as to prevent the destruction of the fishery ***." *Id.* Authority over fisheries derives from the title that States obtain under the equal footing doctrine: "[t]his power results from the ownership of the soil, from the legislative jurisdiction of the State over it, and from its duty to preserve unimpaired those public uses for which the soil is held." *Id.*

Sovereign ownership of submerged lands is based on the belief that the public interest in fishing, navigation, and commerce is greater than the sum of private interests, and that, as local sovereign, the state is responsible for protecting that interest. "The state can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them *** than it can abdicate its police powers in the administration of government and the preservation of the peace." *Illinois Central Railroad Co. v. State of Illinois*, 146 U.S. 387, 453 (1892). Congress reaffirmed these principles in the Submerged Lands Act, providing that States have "the right and power to manage *** natural resources" along navigable waters, including "fish." 43 U.S.C. §§ 1311, 1301(e).

6

Even apart from the equal footing doctrine, fisheries management is a traditional state authority through which a "State defines itself as a sovereign." *Gregory*, 501 U.S. at 460. According to the Supreme Court, "the state *** has power to control the game and fish within its borders *** in its sovereign capacity as representative of the people." *Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1, 11 (1928). States have "important interests in regulating wildlife and natural resources within their borders," *Minnesota v. Mill Lacs Band of Chippewa*, 526 U.S. 172, 204 (1999). The Court recognizes "the importance to its people that a State have power to preserve and regulate the exploitation of an importance resource." *Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 284 (1977). It considers "the States' interests in conservation and protection of wild animals as legitimate local purposes similar to the States' interests in protecting the health and safety of their citizens." *Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979).

Fisheries management is an authority through which Alaska defines itself. Indeed, control over this resource was one of the reasons Alaskans wished to form a State. Alaskans wanted the "pitifully depleted" salmon stocks, *Metlakatla Indian Community v. Egan*, 362 P.2d 901, 915 (1961), *vacated on other grounds*, 369 U.S. 45, *aff'd sub nom. Organized Village of Kake v. Egan*, 369 U.S. 60 (1962), to be managed locally, to repair the "evils

7

of overexploitation" of the salmon by "'Stateside' colonialism." *Metlakatla*

*Indian Community v. Egan*, 369 U.S. 45, 47 (1962).

During territorial days when Alaska's fisheries were regulated by the

federal government, Alaskans became alarmed by the devastating efficiency

of fish traps owned by politically powerful outside commercial fishing

interests. *See* Gerald E. Bowkett, *Reaching for a Star: the Final Campaign*

*for Alaska Statehood* 12-13 (1989). In 1913, the first session of the Alaska

Territorial Legislature asked Congress for legislation to limit the fishing

efficiency of the trap, and continued to do so regularly thereafter.

*Metlakatla*, 362 P.2d at 905. Alaskans also voted overwhelmingly to abolish

fish traps in a referendum in 1948. *Id.* As a territory, Alaska had no power

to stop the traps' devastation. But in 1956, without a statehood act,

Alaskans drafted a constitution. With the hope that they might soon be a

State in control of preservation, Alaskan voters approved the proposed

constitution along with an ordinance to abolish commercial traps, which the

first State legislature converted to a statute immediately after statehood. *Id.*

Reflecting the deep-seated desire of Alaskans to control their own

resources, the Alaska Constitution included a number of provisions relating

to state management of fisheries and waters. "In adopting their constitution,

the people of Alaska have very clearly constituted the state as owner of the

natural resources***." *Greisen v. United States*, 831 F.2d 916, 918 (9th Cir. 1987). For example, the Alaska Constitution provides that "[w]herever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use." Alaska Const. art. VIII, §3. This provision "constitutionalize[s] historic common law principles governing the sovereign's authority over management of fish, wildlife, and water resources." *Pullen v. Ulmer*, 923 P.2d 54, 60 (Alaska 1996) (cites omitted). It imposes upon the State "a trust duty to manage the fish, wildlife, and water resources of the state for the benefit of all the people." *Id.*

The Alaska Constitution also requires the State to regulate the harvest responsibly. "Fish *** and all other replenishable resources belonging to the State shall be utilized, developed, and maintained on the sustained yield principle, subject to preferences among beneficial uses." Alaska Const. art. VIII § 4. The "migrating schools of fish, while in inland waters, are the property of the state, held in trust for the benefit of all the people of the state, and the obligation and authority to equitably and wisely regulate the harvest is that of the state." *Metlakatla*, 362 P.2d at 915; *see also* Alaska Const. art. 8, §2 ("The legislature shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land

and waters, for maximum benefit of its people."); *accord Herscher v. State*, 568 P.2d 996, 1003 (Alaska 1977).[3]

Contrary to Appellees' contentions, States' management of their fisheries is at least as important a sovereign authority as those the Court has recognized since *Gregory* as warranting application of the clear statement requirement. For example, the Court has found it "beyond question that an essential state interest" would be implicated by invalidating a state foreclosure sale of a house for not generating the house's "reasonably equivalent value" required to avoid a fraudulent conveyance under federal bankruptcy law. *BFP v. Resolution Trust Corporation*, 511 U.S. 531 544, 534 (1994). "We have said that 'the general welfare of society is involved in the security of the titles to real estate' and the power to ensure that security 'inheres in the very nature of [state] government.'" *Id.* at 544.

The Court also considered the nature of a state's interest at stake in deciding whether the Americans with Disabilities Act applies to inmates in

---

[3]     The Alaska Constitution contains other provisions addressing fisheries management. For example, it provides in part that "[n]o exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State," Alaska Const. art. VIII, § 15, and that "[t]he legislature may provide for facilities, improvements, and services to assure greater utilization, development, reclamation, and settlement of lands, and to assure fuller utilization and development of the fisheries, wildlife, and waters." *Id.* art. VIII § 5.

state prisons. *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206 (1998). Addressing the clear statement doctrine, the Court granted that "[i]t may well be that exercising ultimate control over management of state prisons *** is a traditional and essential State function subject to the plain-statement rule of *Gregory*," since "[o]ne of the primary functions of government *** is the preservation of societal order through enforcement of the criminal law, and the maintenance of penal institutions is an essential part of that task." *Id.* at 209. The Court then assumed without deciding that the clear statement doctrine did govern, and held that the statute's language unmistakably includes state prisons within its coverage. *Id.*

None of these cases requires that state authority be exclusive, and Alaska does not argue that the United States has no authority over navigable waters or could not assume fisheries authority when Congress clearly intends and properly invokes its powers to do so. *Cf.* Fed. Br. at 35-41 (discussing federal commerce clause authority and its navigational servitude); Professors' *amici* Br. at 4-7 (discussing federal interest in commerce and navigation). However, the Supreme Court requires a clear statement when Congress intends to assume a traditional state authority, and States' fisheries management in navigable waters is an historic state authority directly tied to sovereign ownership of submerged lands.

11

### B. The Federal Government Historically Has Left Local Management of Fisheries to the States.

Appellees argue that subsistence management is not a traditional state authority and attempt to establish that subsistence fisheries management is an area with "a history of significant federal presence." Joint Br. at 20 (quoting *United States v. Locke*, 120 S.Ct. 1135, 1139 (2000)). They suggest that subsistence fisheries management is similar to the federal regulation of national and international maritime commerce, where the Court does not begin with an assumption that concurrent state regulation is within the state's police powers. *Locke*, 120 S.Ct. at 1147. This principle does not apply to state fisheries management, where the strong interest of the local sovereign has been part of our nation's design since its beginning. In contrast, *Locke* arose when the state "enacted legislation in an area where the federal interest has been manifest since the beginning of our Republic," and "[t]he authority of Congress to regulate interstate navigation without embarrassment from intervention of the separate States *** was cited in the Federalist papers as one of the reasons for adopting the Constitution." *Id.* at 1143 (emphasis added).

The federal laws Appellees cite do not establish a significant federal presence and do not diminish the traditional sovereign authority of states to manage fisheries. Appellees begin their recitation with laws applicable to

12

Alaska before 1959, when the federal government was the sole sovereign. *See* Joint Br. at 23-26. Obviously, as sovereign, the United States had the duty to conserve the natural resources in the territory. This has no bearing on whether the State assumed this authority with statehood.

Alaska assumed fisheries management shortly after statehood. The Alaska Statehood Act contained a provision that withheld this authority until the State demonstrated that it had a management agency in place. *See* §6 (e), 48 U.S.C. note prec. § 21. This was simply a stopgap measure to protect commercial fisheries until the State government was up and running, and the Secretary certified its readiness in April 1959, only four months after Alaska joined the Union. *Metlakatla*, 362 P.2d at 921. "When Congress passed the Alaska Statehood Act it was well aware of the right of a state to regulate the taking of [fish and game] within its borders and *** it intended all such jurisdiction then being exercised by the Secretary of the Interior under various acts of Congress to be transferred to the State *** as soon as it was prepared to assume this responsibility." *Id.* This delay was meant to protect the resource, not to change traditional state authority.[4] "This section *** expressed Congress' intent that all control over the management of the fish

_____

[4]    It also had nothing to do with "concern for the needs of Alaska Natives," contrary to the federal Appellees' rewrite of history. Fed. Br. at 37 n.6; *see* explanation of provision, 104 Cong. Rec. 9748 (May 28, 1958).

13

and wildlife resources of the state be given to the state ***." *Id.* The provision caused a short delay in state management, but the federal government bowed out soon after certification.

Appellees and their *amici* also highlight the fact that the Statehood Act did not extinguish aboriginal fishing rights. Joint Br. at 27. The significance of this is unclear, however. Alaska's disclaimer of title to property held by Alaskan Natives, including fishing rights, was a disclaimer of <u>proprietary</u> rather than <u>governmental</u> interest. *Organized Village of Kake v. Egan*, 369 U.S. 60, 69 (1962). Congress in no way intended this provision to recognize aboriginal rights;[5] it intended it to "preserve the status quo with respect to aboriginal *** Indian claims" so that "statehood would neither extinguish them nor recognize them as compensable." *Id.* at 65. Any aboriginal fishing rights in Alaska continued under state management, and the Court "has never held that States lack power to regulate the exercise of aboriginal Indian Rights ***." *Id.* at 76.[6]

---

[5]    *See* Hearings Before the Senate Committee on Interior and Insular Affairs on S. 50, 83rd Cong., 2d Sess. 226-231 (reprinted in Addendum).

[6]    Further, ANILCA's subsistence priority is for rural residents, not exclusively Natives, and most rural residents are non-Native. *See Hoonah Indian Association v. Morrison*, 170 F.3d 1223, 1229 (9th Cir. 1999) (ANILCA's subsistence priority does not apply just to Natives and therefore is not Indian legislation); *see also* 1997 Op. Att'y Gen. 1, 9 n.1, 1997 WL 1248811 (As of 1994, most rural residents were non-Native). The Federal

The post-statehood federal actions that Appellees cite similarly fail to demonstrate federal dominance of subsistence fisheries authority. Congress' extinguishment of aboriginal fishing rights in the Alaska Native Claims Settlement Act, 43 U.S.C. § 1601 *et seq.*, did not affect fisheries management. As Appellees mention, the Senate version of this Act included provisions directing the Secretary to protect subsistence uses on public lands, but the Conference Committee version did not. The Committee Report stated that it "[expected] both the Secretary and the State to take any action necessary to protect the subsistence needs of the Natives," H. Conf. Rep. No. 746, 92nd Cong., 1st Sess. 37, reprinted in 1971 USCCAN 2247, 2250, but the Committee did not anticipate any federal assumption of state authority. Instead, it expected the Secretary to use land closure authority to limit access on public lands (which ANCSA defines to <u>exclude</u> navigable waters, 43 U.S.C. § 1602(e)). "The Secretary could, for example, withdraw appropriate lands and classify them in a manner which would protect Native subsistence needs and requirements by closing appropriate lands to entry by non-residents when the subsistence resources of these lands are in short supply ***." 1971 USCCAN at 2250. The Secretary's traditional closure

---

Subsistence Board's recent recognition of all Kenai Peninsula communities as "rural" likely has increased the percentage of non-Native rural residents. *See* 50 CFR 100.23(a).

15

authority on federal lands is land management, not fish and wildlife management, and does not supersede any state authority.

The other post-statehood federal statutes, instances where Congress clearly preempted contrary state law, *e.g.,* the Marine Mammal Protection Act, made exceptions for subsistence uses of the resource they were protecting.  These are <u>exceptions</u> to federal regulation, not attempts to displace State authority.  Characterizing these as "a history of significant federal presence," is like characterizing the exception in the Age Discrimination in Employment Act for "appointees at the policymaking level" discussed in *Gregory* as "a significant federal presence" in the field of regulating policy-making state employees.  Far from demonstrating an intent to regulate in areas historically governed by the States, exceptions in federal statutes mean that Congress does <u>not</u> intend to regulate them.

The only other federal action Appellees cite was part of the massive Antiquities Act withdrawals President Carter made in 1978.  Joint Br. at 30-31.  They point to language in most of the withdrawal orders directing the Secretary to protect subsistence, and to temporary regulations promulgated for that purpose.  Again, these actions do not constitute any usurpation of State authority to manage fisheries.  The withdrawal orders expressly <u>excluded</u> "submerged lands and waters *** not owned by the United States."

16

*See, e.g.* 1978 U.S.C.C.A.N. 9589, 9590. The regulations were necessary "to relax" the stringent existing regulations applicable to lands administered by the National Park Service, in order to permit subsistence hunting and fishing that otherwise might be prohibited within National Monuments. 43 Fed. Reg. 60252 (1978). They permitted subsistence uses to be conducted in accordance with "applicable state law," as well as with any "more restrictive federal law." *Id.* at 60253.

Congress did preempt State authority on federal lands in title VIII of ANILCA, but this marked the first time the federal government has taken over the State's role in this manner, and there is no indication in ANILCA or any prior statute—much less the required "unmistakably clear *** language," *Gregory*, 501 U.S. at 460-61—that this preemption was to divest the State of fisheries management in navigable waters historically subject to state regulation. None of the history Appellees cite infringed on the State's sovereign power in this way, and none of it represents a significant history of a federal presence in this arena until Alaska fell out of compliance with title VIII's requirement of a priority for rural residents in 1989. Unlike the situation in *Locke*, States have always been the sovereign regulating fishing and hunting activities for all uses, including subsistence, without interference from the federal government.

17

## II.   THE LANGUAGE OF THE STATUTE DOES NOT "UNMISTAKABLY" INCLUDE NAVIGABLE WATERS.

### A.   The Statute Does Not Evince An Unmistakably Clear Intent to Displace State Regulation of Its Navigable Waters.

Appellees claim that the definition of "public lands" clearly includes navigable waters in which the federal government has an implied non-consumptive water right. *Gregory,* however, requires that Congress' intention to include navigable waters be "unmistakably clear in the language of the statute," and must "be plain to anyone reading the Act." 501 U.S. at 460-61, 467. In traditionally sensitive areas such as legislation affecting the federal balance, the requirement of a clear statement "assures that the legislature has in fact faced, and intended to bring into issue, the critical matter involved in the judicial decision." *Id.* at 461.

The language of the statute, far from being "unmistakably clear," cannot reasonably be interpreted as mandating a federal takeover of fisheries management in Alaska's navigable waterways. In fact, Appellees' interpretation is irreconcilable with the language of the statute. Under ANILCA, "the taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded priority" over the taking on such lands of fish and wildlife for other purposes. 16 U.S.C. § 3114(a) (emphasis supplied). The term "public lands" is defined as "lands, waters, or interests

18

therein, title to which is in the United States." 16 U.S.C. § 3102.  Appellees

cannot argue that the navigable waters of Alaska are <u>themselves</u> "public

lands" on which the subsistence priority must be accorded, because it is

undisputed that the State owns the lands under those waters, and no one has

"title" to the water.  Instead, they assert that because the United States has

implicitly reserved a non-consumptive interest in those waters for the limited

purpose of preserving water flow, that reserved <u>interest</u> meets the statutory

definition of "public lands."

Thus, under Appellees' theory, ANILCA should be read as providing

a priority for "the taking on reserved federal water rights" of fish and

wildlife for subsistence uses.  *Cf.* 16 U.S.C. § 3114(a).  Such a reading is

absurd on its face.  Only the reserved water rights—not the navigable waters

themselves—fit the definition of public lands under Appellees' contorted

interpretation.  Yet it makes no sense to interpret the subsistence priority,

which is clearly geographic in its scope, to apply to reserved water rights.

The statute does <u>not</u> define "public lands" as "lands and waters in which the

United States has any interest."  The statute contains no language suggesting

that any federal interest in water – even an unquantified, intangible interest –

converts the <u>entire</u> <u>river</u>, bank-to-bank, into "public lands."  "Title" to a

water right is not the same as title to all the water in the river.

19

Under ANILCA's subsistence priority, the term "public lands" defines a geographic area on which the taking of fish and wildlife for subsistence purposes will be accorded priority. A water right is not a concrete area where hunting or fishing can occur, and it does not attach to any particular water. *See Totemoff v. State*, 905 P.2d 954, 967 (Alaska 1995). The non-consumptive rights the federal government claims in Alaska simply give it the right to prevent others from appropriating too much water, to prevent low water levels. *See* Appellants Br. at 33-34 n.13. That is why water rights have never before been used to define a physical area, and Appellees' attempt to do so now simply makes no sense. *Cf. Kenaitze Indian Tribe v. State*, 860 F.2d 312, 316 (9th Cir. 1988) (The Court does not "rewrite [statutory] language to conform to the policy."); *City of Angoon v. Hodel*, 803 F.2d 1016, 1028 (9th Cir. 1986) (While "a subsistence evaluation *** would be beneficial and consistent with the purpose of ANILCA," the "plain language of the statute cannot fairly be read to require such an evaluation.")

Indeed, as we have shown, under Appellees' logic the mere existence of a reserved, unused federal easement through State or private lands will convert the entire parcel to "public lands" subject to federal wildlife management. *See* Appellants Br. at 34-35; *cf.* 50 CFR 100.10(d)(4)(xviii) (agencies reserving ability to "[i]dentify *** additional *** other Federal

20

interests in lands or waters, including those in which the United States holds

less than a fee ownership, to which the Federal subsistence priority attaches

\*\*\*."").

It is not true, as the federal Appellees charge, that the State reads

"waters and interests therein" out of the statute. Fed. Br. at 27. The

definition of "public lands" applies to thirteen titles of ANILCA, which at

heart is a land conservation statute. The clear reason for including federal

"interests" in the definition of "lands" is to give the Secretary authority to

manage, or obtain and dispose of less than full fee interests, not to displace

State fish and wildlife regulation of any lands or waters in which the federal

Government has any interest. *See, e.g.*, 16 U.S.C.A. 3192(a)("[T]he

Secretary is authorized \*\*\* to acquire \*\*\* any lands within the boundaries

of any conservation system unit."); 16 U.S.C. 3120(d) ("[T]he head of the

appropriate Federal agency may manage or dispose of public lands under his

primary jurisdiction \*\*\*."). Thus, the Secretary has authority to acquire a

water right or to grant an easement.

Nor does the State read "waters" out of the statute. The State agrees

that waters overlying federal lands are included in "public lands." The

federal interpretation itself reads "waters" out of the statute, because no one

– not even the United States – holds "title" to waters. The only way the

21