# EXHIBIT B-12 (Part 2)

inclusion of "waters" makes sense is if "title" refers to lands underlying waters. This interpretation – limiting the "waters" included to both navigable and non-navigable waters overlying federal lands -- is consistent both with the Supreme Court's historical view of the connection between sovereign title to submerged lands and authority over the waters, and with Congress' property clause authority over federal lands.

Finally, and in any event, the above discussion makes clear that the interpretation adopted by Appellees and the panel is not "plain to anyone reading the Act," *Gregory*, 501 U.S. at 467, a point demonstrated by the contrary interpretation of almost everyone who has examined the issue. The United States initially did not include navigable waters in its regulations and vigorously opposed the plaintiffs' position during the first three years of this litigation. *See, e.g.,* Federal Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment at 9, No. A90-484, July 22, 1991 (Reply ER 9) (describing the definition of "public lands" as "clear on its face" in excluding navigable waters). Even when the United States flip-flopped on the issue, it did not pretend that its new interpretation was clear "in the language of the statute." In its prior briefing before this Court, it merely argued that "[t]he district court's conclusions *** establish that a reasonable interpretation of the scope of 'public lands' *** would encompass those

22

waters in which the federal government holds reserved rights ***." Brief for the Federal Appellants, No. 94-35481 at 28 (Reply ER 27).

Even now the United States concedes that the statute is ambiguous on its face. It refers to "[t]he ambiguity facing federal regulators" and argues that "there is no basis for concluding that Congress did not intend the priority to extend to federal reserved waters," a position irreconcilable with "unmistakably clear" intent "in the language of the statute." Fed. Br. at 13, 17. This argument turns the clear statement doctrine on its head. *See Gregory*, 501 U.S. at 467 ("We will not read the ADEA to cover state judges unless Congress has made it clear that judges are included.")

The Alaska Supreme Court also did not find inclusion of navigable waters subject to a federal reserved water right to be plain in the language of the statute, rejecting the argument on the merits. *Totemoff*, 905 P.2d 954. Nor did Judge Hall, who stated that "Congress left us few bread crumbs to follow because neither the statute itself nor its voluminous legislative history defines 'interest.'" 72 F.3d at 705 (Hall, J., dissenting).

Most telling, even the two judges of the panel majority did not find the statute clear. As they stated, "[u]nfortunately, ANILCA's language and legislative history do not give us the clear direction necessary to find that

23

Congress spoke to the precise question of which navigable waters are public

lands." *Id.* at 702.

The verdict thus is nearly unanimous that Congress' intent to include

waters subject to a reserved water right is not "plain to anyone reading the

Act." *Gregory*, 501 U.S. at 467. The reason for this <u>is</u> plain, however; the

notion that Congress would designate the geographic scope of a statute

based on unidentified, implied water rights is convoluted and contrived – a

theory meant to manipulate the statute to achieve a desired result. Because

that interpretation effects an invasive intrusion into an area of sovereignty

traditionally reserved to States, such manipulation is impermissible.

Congress, not the Courts, must "in fact face[] and intend[] to bring into

issue" a federal takeover of Alaska's fisheries management.[7] *Id.* at 461.

---

[7]     The clear statement doctrine also is appropriate because it may
eliminate the constitutional problems with the application of the statute to
navigable waters. *See Gregory*, 501 U.S. at 464. Supreme Court cases
decided since this case arose call into question Congress' authority to
regulate subsistence fishing in navigable waters. *See, e.g., United States v.
Lopez*, 514 U.S. 549 (1995). It is doubtful whether subsistence activities
"substantially affect[] interstate commerce." *Id.* at 559; *see also Babbitt*, 72
F.3d at 707 (Hall, J., dissenting).
      The Indian Commerce Clause also is a questionable source of
authority. Although it gives Congress plenary authority over Indian affairs,
*see Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989), it
only authorizes regulation as it relates to Indians, *Heart of Atlanta Motel,
Inc. v. United States*, 379 U.S. 241, 251 (1964), *modified on other grounds
by Lopez, supra*. ANILCA's subsistence priority applies to <u>rural</u> residents in
Alaska, most of whom are non-Native. *See* n. 6. To the extent that ANILCA

24

### B.    The Panel Majority's Deference To The Agencies' New Interpretation Was Improper.

Appellees do not address, and therefore presumably agree with, the State's point that courts required to find an unmistakably clear intent "in the language of the statute," *Gregory*, 501 U.S. at 460-61, cannot find that intent through deference to an agency's interpretation. That fact is itself sufficient to dispose of Appellees' arguments based on *Chevron* deference.

But even if *Chevron* deference applied here, the Secretaries' new found interpretation would not be entitled to it. As shown in our opening brief, deference would be improper because the agencies developed their interpretation during litigation, following a change in administration, after lobbying by plaintiffs, and in contradiction of their initial interpretation developed following temporary and final rulemaking. The agencies argue in response that they must be given "ample latitude to adapt their rules and policies to changing circumstances." Fed. Br. at 19. Yet they do not specify how circumstances changed to prompt them to reverse completely their

---

regulates activities of non-Natives, it exceeds Congress' authority under the Indian Commerce Clause.

Finally, while Congress obviously has property clause authority to regulate fish and wildlife on federally-owned lands, this authority does not extend to state waters. A water right is limited to the use for which it exists, and a non-consumptive right to limit water use of other potential appropriators does not give the United States authority to regulate fishing, an activity that does not affect water level.

25

position, other than receipt of a petition for rulemaking by the plaintiffs and a tentative opinion of the district court in this case. *Id.*

Appellees also claim that the lack of a normal rulemaking process is inconsequential because the agencies developed the new position "over the course of several months' careful consideration" of the petition and tentative opinion. Fed. Br. at 20. An agency's abrupt reversal of its regulatory interpretation is not entitled to deference, however, when it came three years into the litigation in response to the lobbying of the parties challenging the interpretation and to a tentative decision of the court, even *with* "several months" of "careful consideration." *Id.* Indeed, the tentative decision the agencies carefully considered <u>rejected</u> the position they then adopted. SER 417 (District Court statement that "administration of Alaska's fisheries under rules having their basis in the concept of reserved waters would be unworkable. This cannot be what Congress intended."). This rationalization suggests agency impulsiveness rather than a reasoned view based on experience and specialized knowledge. *See Skidmore v. Swift*, 323 U.S. 134, 140 (1944) ("The weight [given agency] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade ***.").

The federal Appellees also dispute the State's position that deference is improper because the agencies' interpretation is unreasonable. They accuse the State of failing to consider the broader purposes of the statute, and cite general statements in ANILCA's legislative history that emphasize the importance of subsistence fishing, from which they infer congressional intent to include navigable waters. Certainly Congress considered subsistence fishing important and might have thought navigable waters to be related to that activity. But Appellees fail to acknowledge the context of the snippets of legislative history upon which they rely. As they recognize, Fed. Br. at 17, Congress discussed and passed title VIII assuming that the priority would apply everywhere in Alaska under State management, including all waters. It was never concerned about the geographic scope of "public lands" because it never imagined that Alaska's already-enacted statewide subsistence priority would be struck down. Further, while Appellees claim that "Congress unequivocally expected that Title VIII would protect the subsistence way of life in rural Alaska," Fed Br. at 23, Congress did not designate the geographic reach of title VIII as "rural Alaska," much of which is not federally-owned. Congress limited the scope of the priority to "public lands" without any determination of which areas were most important to subsistence, but clearly assumed that it would apply everywhere in Alaska.

27

For example, federal Appellees and *amici* cite language in a Senate Report mentioning the Copper River in discussing the provision that became 16 U.S.C. § 3117, allowing judicial enforcement for failure to adequately provide the priority. Fed. Br. at 23 (citing S. Rep. No. 96-413 at 272). They argue that mention of this river indicates congressional intent to include navigable waters as "public lands." They do not disclose the topic of the report's discussion, however -- the possibility of "the State *** not adequately providing for the preference for subsistence uses." *Id.* (emphasis supplied). Thus, the report's underlying assumption was <u>not</u> a priority limited to "public lands," but was a statewide priority, and the statement therefore has no bearing on whether the committee considered the Copper River to be "public lands."

Nor does the Secretary's responsibility to permit motorboats for access for subsistence purposes demonstrate any consideration of the issue. Fed. Br. at 24 (citing 16 U.S.C. § 3121). Alaska has very few roads -- particularly in rural areas – so motorboats are a primary mode of transportation for hunters to find and transport game. *See, e.g., Totemoff,* 905 P.2d 954 (hunting deer from a motorboat); *Bielgard v. State,* 896 P.2d 230 (Alaska 1995) (using a motorboat for hunting bear); 5 AAC 92.080(4) (permitting caribou hunting from a motorboat). Further, many waters that

28

are not navigable for title purposes are navigable by a skiff, and many more have fish. Thousands of non-navigable rivers and lakes are located on the 60% of Alaska that is federally-owned. *See* Appellants Br. at 28.

As shown above, Appellees' position is plainly unreasonable because it misinterprets a geographic definition of the federal lands as a displacement of State regulation of hundreds of thousands of acres of waters that are at the core of the State's sovereignty. Any interpretation of the statute that bootstraps a limited water right into regulatory authority over an entire waterway is fundamentally unreasonable. If such regulation is to occur, it must occur through clear statutory language enacted after careful, deliberate consideration by Congress, not through agency fiat.

## III.  THERE HAS BEEN NO KNOWING CONGRESSIONAL ENDORSEMENT OF THE PRIOR DECISION.

Appellees argue that several moratoria delaying implementation of the panel's decision and a vague funding provision constitute congressional ratification of the Court's interpretation of "public lands" to include navigable waters. These provisions not only fail to demonstrate that Congress embraced the Court's interpretation, they do not indicate that Congress was even aware of it.

The first and second moratoria consisted of riders attached to appropriation bills that did nothing but prohibit the federal agencies from

29

using funds to promulgate regulations "pursuant to title VIII of [ANILCA] to assert jurisdiction" over waters, non-federal lands, or lands selected by, but not conveyed to Alaska or Native Corporations. *See, e.g.*, Public Law 104-208, § 317, 110 Stat. 3009-222. Alaska's Senator Ted Stevens, chairman of the Senate Appropriations Committee, attached the riders to the bills to buy time for the State to amend its constitution to permit a state priority for subsistence hunting and fishing based on residence. They can hardly be characterized as Congressional ratification of the panel's decision, however, because approving a moratorium on spending funds to promulgate regulations indicates nothing about Congress' knowledge or understanding of the Court's interpretation of ANILCA.

To demonstrate ratification by appropriation, Appellees must meet "the heavy burden of demonstrating congressional knowledge of the precise course of action alleged to have been acquiesced in." *Rincon Band of Mission Indians v. Harris*, 618 F.2d 569, 573 (9th Cir. 1980). The appropriation "must plainly show a purpose to bestow the precise authority which is claimed." *Id.* No evidence exists that Congress was aware of the underlying reasons for these riders, or that anyone other than Alaska's delegation even noticed or discussed them. Even if there were, however, the moratoria did not endorse the regulations that might otherwise have been

30

drafted.  They simply maintained the status quo.  Congress' failure to immediately pass legislation overruling an interlocutory court decision has never been deemed ratification of the decision.

After the Alaska Legislature failed to act while these moratoria were in effect, Senator Stevens attempted a more aggressive approach.  Instead of attaching another rider to simply buy the State yet more time, he negotiated an agreement with Alaskan Governor Tony Knowles and Secretary Babbitt intended to motivate the legislature to approve a constitutional amendment. 143 Cong. Rec. S11266 (Senator Stevens).  Senator Stevens asked the Conference Committee to accept another moratorium, this time tied to certain amendments to ANILCA that would take effect only if the Alaska Legislature agreed to put a constitutional amendment to a vote.  *Id.* at S11267; *see also* H. Rep. 105-337, 143 Cong. Rec. H9004-01, 9029.

The provision was explained to the Senate as "extending a moratorium preventing a Federal takeover of the management of Alaska's fisheries until December 1, 1998."  *Id.* at S11259.  There was no discussion that might give a member any idea why a federal takeover might otherwise occur, or suggesting that casting a vote for the budget bill might be construed as ratifying a congressional intent to include navigable waters in ANILCA's definition of "public lands."  The only discussion of the

31

provision were statements by Alaska's senators supporting a delay of regulations that might become unnecessary. *See Id.* Thus, even assuming that members understood the underlying issues, a vote for the moratorium was a vote <u>against</u> the takeover, not an endorsement of it.

For this reason, the 1997 moratorium is a much <u>less</u> compelling case for finding ratification than were the appropriations in *TVA v. Hill*, where the Supreme Court refused to attribute to Congress a knowing endorsement of a project, despite explicit statements to the contrary by two congressional committees. 437 U.S. 153 (1978). *Hill* raised the question of whether Congress's continuing appropriations for the Tellico Dam, after a court had ruled that its construction violated the Endangered Species Act, constituted a repeal of that Act with respect to the dam. Both the House and Senate Appropriations Committees stated that the Act did not affect the dam's construction, and Congress continued to appropriate large sums of money to the project. *Id.* at 170-71, 172. Nevertheless, the Court refused to presume that Congress <u>as a whole</u> was aware of this construction of the Act and held that continued appropriations for the dam did not, therefore, constitute repeal of the Act. *Id.* at 192.

While *Hill* considered repeal, rather than ratification by appropriation, this Court has found these issues sufficiently analogous to make the

32

Supreme Court's conclusion about the significance of Appropriations Committees' actions applicable to both. *Rincon*, 618 F.2d at 574 n.6. If the appropriations in *Hill* did not constitute repeal of the Endangered Species Act as applied to Tellico Dam despite express statements to that effect by the Appropriations Committees, the moratorium in the FY1998 budget bill cannot constitute ratification of this Court's interpretation of "public lands," when the reason for the federal regulations was never raised or discussed.

The final action that Appellees cite – a combined moratorium and appropriation – was added by Senator Stevens to the FY1999 appropriations bill to entice the Alaska Legislature with money. The provision granted the Department of Interior $8 million for subsistence management in Alaska if the State Legislature failed to amend its constitution. P.L. 105-277, 112 Stat. 2681-251. The bill contained a similar appropriation for the Department of Agriculture, in the amount of $3 million. *Id.* at 2681-271. If the Alaska Legislature put an amendment on the ballot, however, it would receive all $11 million itself. The bill presented these conditional appropriations in two paragraphs 20 pages apart in a massive 920-page spending bill.

Nothing in the language of these provisions could possibly tip off a member of Congress that he or she was "in fact fac[ing] and intend[ing] to bring into issue, the critical matters" involved in the decision to upset the

33

traditional balance of state and federal authority. *Gregory*, 501 U.S. at 461.
The provisions were worded similarly, and provided in part:

> For necessary expenses of bureaus and offices of the Department of
> the Interior to manage federal lands in Alaska for subsistence uses
> under the provisions of Title VIII of the Alaska National Interest
> Lands Conservation Act (Public Law 96-487 et seq.) except in areas
> described in section 339(a)(1) (A) and (B) of this Act, $8,000,000
> ***. [P.L. 105-277, 112 Stat. 2681-252 (1998) (emphasis added)].

The provision references only "expenses *** to manage federal lands
in Alaska for subsistence uses ***," hardly an unusual reason for
appropriating federal funds. The provision does not indicate that "federal
lands" means "state waters," and says nothing about a federal takeover of
fisheries management. It says nowhere that such a takeover would be based
on an interpretation of 16 U.S.C. § 3102 for which Congress must be very
clear in its intention to assume this authority. It says nowhere that a "yea"
vote on the spending bill might be understood to be making such a manifest
statement. It provides no basis for the "[k]nowledge of the facts" that is "the
essential element of ratification." *United States v. Beebe*, 180 U.S. 343, 354
(1901). Far from it, in order for a Member to understand these provisions as
ratifying federal regulation of fisheries in most of Alaska, he or she would
have to pick these two provisions out of a huge bill full of similar
appropriations and construe them—contrary to their plain language—as
funding something different than the agencies' normal activities.

34

These vague provisions appeared in a bill over 900 pages long. The Supreme Court has refused to find congressional acquiescence in a 34-year-old practice of the Securities and Exchange Commission despite the fact that the Senate Committee having jurisdiction over the Commission's activities had long expressed approval of the practice. *SEC v. Sloan*, 436 U.S. 103, 119-120 (1978). The Court stated that it should be "extremely hesitant to presume general congressional awareness of the Commission's construction based only upon a few isolated statements in the thousands of pages of legislative documents." *Id.* at 121.

The fact that this provision appeared in an appropriations act also is significant. Appropriation acts "have the limited and specific purpose of providing funds for authorized programs." *Hill*, 437 U.S. at 190. Legislators are not required to check the background of each authorization before voting on an appropriations measure; they are instead entitled to assume that the underlying substantive programs are valid. *Id.* "Without such an assurance, every appropriations measure would be pregnant with prospects of altering substantive legislation ***." *Id.* Since the substantive aspects of appropriations bills are subject to much less scrutiny than the substantive programs themselves, "an appropriations bill is a particularly

35

unsuitable vehicle for an implied ratification of unauthorized actions funded therein." *EEOC v. CBS*, 743 F.2d 969, 974-75 (2nd Cir. 1984).

This lack of awareness about the issue distinguishes this case from *FDA v. Brown & Williamson Tobacco Corporation*, 120 S.Ct. 1291 (2000), upon which Appellees rely. In *Brown & Williamson*, Congress was well aware that the FDA had consistently stated for many years that it had no jurisdiction to regulate tobacco. *Id. at 1306.* On several occasions Congress considered and rejected legislation that would have granted the FDA this jurisdiction. Because of Congress' knowledge and express consideration of the issue, the Court found that tobacco-specific statutes further evidenced the correctness of the agency's long-held position.. *Id.* In contrast, "[m]ere acquiescence or nonaction" is insufficient, "because explicit action, especially in areas of doubtful constitutionality, requires careful and purposeful consideration by those responsible for enacting and implementing our laws." *EEOC*, 743 F.2d at 974 (citations omitted).

The requirement that Congress have actual knowledge is particularly critical when Congress is alleged to have ratified an agency's assumption of a traditional state authority. Even if Members of Congress believed that a vague provision appropriating funds "to manage federal lands" signified a drastic shift in state authority, underlying principles of federalism still would

36

be violated by this type of stealth ratification.  The clear statement doctrine is an important complement to the political check on congressional exercise of the commerce power, because it prevents Congress from using ambiguity to conceal its failure to accommodate the competing interests bearing on the federal-state balance.  L. Tribe, *American Constitutional Law* 317 (2d ed. 1988).  It assures that Congress will give full attention to the interests of the states when it considers legislation that intrudes into their traditional authority.  *Id.*  This purpose would be frustrated if Congress could initially avoid accommodating the competing interest with an ambiguous statute, let the interests press their cause anew to federal agencies and the Court, and then passively acquiesce in the judicial solution.

## IV.    THIS CASE IS NOT MOOT.

The federal Appellees contend that this appeal is moot because they have issued regulations implementing the judicial rulings that are the subject of this appeal.  This attempt to avoid the merits of this case is itself meritless.  There remains an ongoing, live case and controversy between the State, on the one hand, and the federal and private appellees, on the other.  Appellees continue to maintain that the agencies may regulate fisheries in the navigable waters of Alaska, while the State continues to maintain that they may not.  The State has challenged the District Court's final judgment

37

on that question, which incorporated the decision of this Court rendered on interlocutory appeal. The fact that the federal Appellees have issued regulations <u>implementing</u> the ruling of the panel and the District Court, far from mooting this case, demonstrates that the controversy remains live.

Since this dispute was last before this Court, the differences between the State and Appellees as to the appropriate interpretation of ANILCA have not diminished. The only pertinent change is that the District Court issued a final judgment carrying out the panel's interlocutory ruling. With or without the new regulations, the legal issue remains whether Congress meant title VIII to include navigable waters. The federal Appellees rely on cases where intervening regulations left nothing more for the court to do. Here, by contrast, the new regulations <u>confirm</u> that the dispute remains a live one.

In the cases the federal Appellees cite, the court no longer had before it a live case or controversy, and any decision would have been advisory. In *Sannon v. United States*, 631 F.2d 1247, 1250 (5th Cir. 1980), for example, the court held that new regulations rendered an appeal moot because "[u]nder the regulations *** each named petitioner in the cases before us has the right to exactly the hearing he sought." And in *Idaho Department of Fish & Game v. National Marine Fisheries Service*, 56 F.3d 1071 (9th Cir. 1995), the Court held that a challenge to an agency decision that certain dam

38

operations would not jeopardize threatened or endangered species was rendered moot by a subsequent decision finding that such operations would jeopardize the species.

In this case, by contrast, a decision would not be advisory. This is not a case where the agencies withdrew regulations in the face of a court challenge and issued new ones no longer suffering from an alleged legal infirmity. Here, the regulations simply <u>implement</u> the legal ruling from which the State has properly appealed. Based on its statutory interpretation of "public lands," the panel held "that the federal agencies that administer the subsistence priority are responsible for identifying [the waters subject to a federal reserved water right]," and "hope[d] that [they] will determine promptly which navigable waters are public lands subject to federal subsistence management." 72 F.3d at 704.[8] The final judgment in this case incorporated that decision, which both held that the federal agencies must regulate fishing on Alaska's navigable waters and ordered them to issue regulations. If the judgment is reversed, then the legal basis for the

---

[8]    *See Proposed Rules for Subsistence Management*, 62 Fed. Reg. 66216 (Dec. 17, 1997) ( "The amendments being proposed would conform the Federal subsistence management regulations to the Ninth Circuit's ruling in *Alaska v. Babbitt*. As the Ninth Circuit directed, this document identifies Federal land units in which reserved water rights exist. These are 'public lands' under the Ninth Circuit's decision in *Alaska v. Babbitt* and thus are subject to the Federal subsistence priority in Title VIII of ANILCA.")

39

regulations will no longer exist. This fact does not make this appeal an improper challenge to the regulations; it remains an appeal challenging the legal ruling pursuant to which those regulations were issued.[9]

Further, the United States itself recognized that the District Court's final judgment would be subject to review and possible reversal. In 1996, the federal Appellees urged the Supreme Court not to review the panel decision on the State's petition for certiorari because the case would not be final until the District Court issued a final judgment, and suggested that the Supreme Court should wait until that time to review the case. They informed the Court that "there are compelling grounds to deny review in the hope that the parties will reach an accommodation through the administrative or political processes." Opp. Cert. at 19, Reply ER 40. The federal Appellees made clear, however, that "[i]f those efforts are unavailing, then the litigation will continue and the parties will have another opportunity to petition this Court for review." Id. (emphasis supplied). On

---

[9]    See Proposed Rules for Subsistence Management, 62 Fed. Reg. 66216 (Dec. 17, 1997) ( "The amendments being proposed would conform the Federal subsistence management regulations to the Ninth Circuit's ruling in Alaska v. Babbitt. As the Ninth Circuit directed, this document identifies Federal land units in which reserved water rights exist. These are 'public lands' under the Ninth Circuit's decision in Alaska v. Babbitt and thus are subject to the Federal subsistence priority in Title VIII of ANILCA.")

remand, the District Court issued a final judgment expressly providing that "the court's substantive orders in this case are reaffirmed and are now final as to all parties." Judgment (Jan. 7, 2000). *See also* Jan. 7, 2000 Order at 2 ("The court now readopts all of its rulings on the merits of plaintiffs' claims heretofore made. Those rulings shall be deemed final for all purposes and as to all parties.").

Having informed the Supreme Court that the State would have a further opportunity to litigate its claims and defenses following final judgment, the federal Appellees now contend that the State has no such opportunity. The United States, however, did not have the power to make the panel opinion a final, unappealable decision simply by issuing regulations specifying precisely which navigable waters are subject to federal regulation. Indeed, this Court has already rejected the contention that a government may preclude judicial review of its actions in such a manner. In *Public Service Co. v. Shoshone-Bannock Tribes*, 30 F.3d 1203 (9th Cir. 1994), the District Court had upheld the authority of Indian tribes to regulate shipments of nuclear fuel through their reservations. While the appeal was pending, the tribes amended their regulations to permit shipments in certain circumstances, and then moved to dismiss the appeal as moot. This Court denied that motion, stating that

41

> [t]he Tribes have merely replaced one regulation alleged to be preempted *** with another which is alleged to be similarly preempted. *** Thus, a specific controversy—whether or not the measures that the Tribes are currently taking to regulate the transportation of hazardous materials across the reservation are preempted by federal law—continues. This is no abstract or hypothetical dispute, but a continuing, concrete disagreement between the parties. [*Id.* at 1205-06.]

The same is true here. The new regulations simply carry out the panel's ruling that the federal government may regulate fishing on navigable waters in Alaska, so the live controversy as to whether the federal Appellees have such a power at all remains in full force.

Moreover, permitting the federal Appellees to avoid judicial review simply by amending their regulations without rectifying their illegality would have serious public policy implications. Because the new regulations raise precisely the same issue, principles of *res judicata* would prevent the State from challenging them. Yet according to the federal Appellees, every time they amend their regulations governing subsistence fishing in Alaska's navigable waters, any pending challenge to their authority to do so becomes moot, and the State must commence litigation challenging the new regulations. In *Public Service Co.*, the Court rejected that argument as well, holding that

42

> [t]o decline jurisdiction merely because the precise manner in which the Tribes are allegedly violating [federal law] has changed would permit the Tribes to avoid appellate review of their actions altogether, by periodically changing the nature of their continued regulation ***. We should not leave the Tribes with such a powerful incentive to change their regulations in order to avoid review of the district court's ruling ***. [30 F.3d at 1206.]

Likewise here, the federal Appellees cannot deny the State an opportunity to seek judicial review of the District Court's final judgment simply by issuing new regulations which involve the same usurpation of State authority as the judicial rulings they seek to implement.

This tactic would permit the federal Appellees to avoid the knotty clear statement doctrine problems they face in this case. If the panel failed to apply the clear statement doctrine properly, but the agencies can prevent further review simply by implementing the panel's remedy, then they could avoid forever the difficulties with the improper way the state's authority was usurped. This would undermine the safeguards to the Constitutional limit that permits only Congress to transfer power traditionally held by the states to the federal government.

43

## CONCLUSION

For the foregoing reasons, the prior panel decision should be vacated

and the judgment of the District Court should be reversed.

Respectfully,

*Of Counsel*:
John G. Roberts, Jr.
Jonathan S. Franklin
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5810

Bruce M. Botelho
*Attorney General*
Joanne M. Grace
*Assistant Attorney General*
STATE OF ALASKA
Attorney General's Office
1031 W. 4th Avenue
Anchorage, Alaska 99501
(907) 269-5100

November 30, 2000

*Counsel for Defendants-Appellants*
*State of Alaska, et al.*

44

**CERTIFICATE OF COMPLIANCE PURSUANT TO**
**FED. R. APP. 32(A)(7)(C) AND CIRCUIT RULE 32-1**
**FOR CASE NUMBER 00-35121**

I certify that:

___X___  I.  The attached brief is **not** subject to the type-volume limitations
of Fed. R. App. P. 32(a)(7)(B) because


___X___      This brief complies with a page or size-volume limitation
contained in the State's Motion to file a Consolidated Reply
Brief, delivered to the court on November 14, 2000, on which
the court has not yet ruled, and is

___X___      Proportionately spaced, has a typeface of 14 points or more and
contains 9090 words,


_____                    _____
November 30, 2000                                          Attorney for State of Alaska

1

## CERTIFICATE OF SERVICE

On  November 30, 2000, I served copies of the foregoing En Banc

Reply Brief for Appellants State of Alaska and Frank Rue on all parties in

this appeal by first class mail, postage prepaid, to:

> Heather R. Kendall-Miller, Esq.
> Native American Rights Fund
> 420 L Street, Suite 505
> Anchorage, Alaska 99501
>
> William E. Caldwell, Esq.
> 1648 Cushman Street, Suite 300
> Fairbanks, Alaska 99701
>
> *Counsel for Private Appellees*
>
> John A. Bryson, Esq.
> Elizabeth Ann Peterson, Esq.
> United States Department of Justice
> P.O. Box 23795, L'Enfant Station
> Washington, D.C. 20026
>
> *Counsel for Federal Appellees*

Joanne M. Grace

2

# KA STATEHOOD

## HEARINGS

### BEFORE THE

## COMMITTEE ON
## INTERIOR AND INSULAR AFFAIRS
## UNITED STATES SENATE

### EIGHTY-THIRD CONGRESS
### SECOND SESSION

ON

# S. 50

#### A BILL TO PROVIDE FOR THE ADMISSION OF ALASKA
#### INTO THE UNION

JANUARY 20, 21, 22, 25, 27, 28, 29, FEBRUARY 1, 2, 3, 4, and 24, 1954

Printed for the use of the Committee on Interior and Insular Affairs



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON · 1954

ADD. 1



# CONTENTS

Statement of—
Department of Defense:
  Office of the Secretary of Defense:
    Franklin G. Floete, Assistant Director of Defense, Property and Installations _____ 160
  Department of the Army:
    Lt. Col. W. H. Waugh, Facilities Branch, Service Division, G—4; Maj. S. C. Hansen, Army Communications Service Division, Office of Chief Signal Officer; and Liaison Officer, Alaska Communications System; Maj. L. L. Rainey, Plans and Operations _____ 100
  Department of the Navy:
    Comdr. W. J. Keating, Office of Chief of Naval Operations, _____ 160
  Department of the Air Force:
    Overseas Base Maintenance _____ 160
    Col. J. H. C. Alderman, War Plans Division, Directorate of Plans, Headquarters, Col. B. C. Joseph, Deputy Chief, Design Section, Directorate of Installations; Murray Comarow, Chief, Foreign Section, Directorate; Imbeau, Washington, Chief, Foreign Section, Directorate of Installations, Headquarters _____ 160
Department of the Interior:
  Orme Lewis, Assistant Secretary of the Interior _____ 194
  Bureau of Indian Affairs:
    Harry M. Critchfield, Chief, Division of Lands, Bureau of Indian Affairs _____ 194
  Bureau of Mines:
    Paul Zinner, Chief, Minerals Division; Harry Perry, Assistant Chief, Fuels and Explosives Division; and Louis Turnbull, Mining Engineer, Fuels and Explosives Division, Bureau of Mines _____ 85
  Fish and Wildlife Service:
    Clarence Rhode, regional director, Juneau, Alaska; John N. Ball, Chief, Section of Operations, Branch of Wildlife Refuges, Washington, D. C.; and A. A. Ritemer, Chief, Branch of Lands _____ 55
  Geological Survey:
    John C. Reed, Staff Coordinator, Office of the Director, Geological Survey _____ 85, 105
  National Park Service:
    Conrad Wirth, Director, National Park Service; Ben H. Thompson, Chief, Recreation Planning Division, National Park Service; Anthony W. Smith, counsel _____
  Department of Justice:
    Office of Territories; Delmas H. Nucker, Deputy Director, Office of Territories, and Robert Coote, Staff Assistant, Technical Review Staff _____
    Ralph Barney, Chief, Indian Claims Branch, Lands Division _____ 23
    Heintzleman, B. Frank, Governor of Alaska; accompanied by George Rogers, Governor's staff; Elmer F. Bennett, legislative counsel, United States Department of the Interior, and assistant legislative counsel; A. Slaughter, Chief, Reference Division, Office of Legislative Counsel; Anthony T. Lausi, Deputy Director, Office of Territories; and Robert Coote, staff assistant, technical review staff _____ 206
_____ 122

## COMMITTEE ON INTERIOR AND INSULAR AFFAIRS

HUGH BUTLER, Nebraska, *Chairman*

EUGENE D. MILLIKIN, Colorado     JAMES E. MURRAY, Montana
GUY CORDON, Oregon     CLINTON P. ANDERSON, New Mexico
GEORGE W. MALONE, Nevada     RUSSELL B. LONG, Louisiana
ARTHUR V. WATKINS, Utah     GEORGE A. SMATHERS, Florida
HENRY C. DWORSHAK, Idaho     EARLE C. CLEMENTS, Kentucky
THOMAS H. KUCHEL, California     HENRY M. JACKSON, Washington
FRANK A. BARRETT, Wyoming     PRICE DANIEL, Texas

KINSLEY B. CALKINS, *Chief Clerk and Staff Director*
N. D. McSHERRY, *Assistant Chief Clerk*

*Professional Staff*

ALBERT A. TICHAUD
ELMER K. NELSON
STEWART FRENCH
GEORGE D. HOLSTEIN

II

III

ADD. 2

# CONTENTS

Pa.

Additional information:
Data on administration—native use areas in Alaska, Bureau of Indian Affairs, submitted by Harry M. Critchfield, Chief, Division of Indian Affairs.
Disclaimer provisions affecting public and Indian lands in enabling acts, Statehood submitted to the Union, 1864-1910.
Letter from—

Arnold, W. C., managing director, Alaska Salmon Industry, Inc., to Hon. Guy Cordon, February 10, 1954, re Submerged Lands Cases .................................................. 205

Bartlett, Hon. E. L., Delegate in Congress from the Territory of Alaska, to chairman, January 18, 1954, re boundaries of Glacier Bay National Monument ............................................ 353

Bartlett, Hon. E. L., Delegate in Congress from Alaska, to Hon. Clinton P. Anderson .............................................. 350

Bartlett, Hon. E. L., to Hon. Guy Cordon, with enclosures, February 16, 1954, re declaring Bristol Bay as an historic bay ........ 49

Bartlett, Hon. E. L., to Hon. Guy Cordon, February 3, 1954, re withdrawal of land which should be taken from existing Federal withdrawals and turned over to the new State ........................ 1

Carson, Condr., of. V., Jr., USN, Director, Naval Petroleum Reserves, to chairman, November 30, 1953 ........................ 79

Cordon, Hon. Guy, to W. C. Arnold, managing director, Alaska Salmon Industry, Inc., February 18, 1954, re Submerged Lands Act .................................................. 18

Du Tont, F. V., Commissioner of Public Roads, Bureau of Public Roads, Department of Commerce, to Hon. Hugh Butler, August 14, 1953, re highway expenditures in Alaska and approximate amounts of Federal-aid funds to be apportioned to Alaska if present formula extended to include Alaska ................ 118

Flemington, Hon. Peter W., to chairman, with enclosures (quotes from the Department of Defense, Army, and Air Force), February 5, 1954 ............................................... 351

French, Stewart, committee counsel, to Hon. Guy Cordon, February 2, 1954, re effect of method of withdrawal on waters .... 251

Ferguson, Hon. Joe, chairman, Senate Interior Committee, to Hon. Guy Cordon, February 3, 1954, re sea boundaries in enabling acts of State constitutions approved by Congress ................ 188

Gates, Hon. Thomas S., Jr., Acting Secretary of the Navy, to chairman, February 11, 1954, re suggested amendment ............ 225

Heintzleman, Hon. B. Frank, Governor of Alaska, to Legislative Council, Office of the Solicitor, Department of the Interior, March 3, 1954, re suggested amendment to section 38 (b) of S. 2033 .................................................. 362

Mortion, Hon. Thruston B., Assistant Secretary of State, to chairman, January 20, 1954, re establishing of no limit beyond the 3-mile limit .................................................. 350

Stoddard, Charles H., to R. E. A., Director, United States Coast and Geodetic Survey, Department of Commerce, to Hon. Guy Cordon, February 1, 1954, re nautical, geographical, and statute miles .................................................. 152

Memorandum from Orme Lewis, Assistant Secretary of the Interior, to heads of bureaus and offices, May 18, 1953, re review of land withdrawals in Alaska .................................... 78

Native use and administration areas in Alaska established by Executive order and special acts of Congress (population and location), submitted by Harry M. Critchfield, Chief, Division of Lands, Bureau of Indian Affairs .................................. 220

Negotiations with Canada on Alaskan problems, statement by Senator Hugh Butler in the Senate, January 20, 1954 ............ 24

Proclamation No. 2089, signed by the President of the United States, September 28, 1945—Policy of the United States with respect to coastal fisheries in certain areas of the high seas .............. 205

# CONTENTS

Page

Additional information—Continued
Proposed amendments:
Freeze contributions to state for public roads as of date of passage of Statehood Act (Senator Barrett) .................. 318, 315
Carried as amended .............................................. 311
Grant to Alaska right-of-way along highways presently reserved by the Federal Government (the Chairman) .................. 320
Grant to new state all minerals enumerated in oil and gas leasing acts of 1920 (Senator Barrett) ............................ 322, 324
Defeated .......................................................... 309, 315
Make available to new state potential power sites (the Chairman) 308, 315
Prohibit Federal Government's marking further reservations of public lands in Alaska for years from date of passage of Statehood Act; Federal Government to have right of selection under Mineral Leasing Act; Alaska to have right of selection such lands and to receive royalties paid thereon (Senator Gordon) ...................................................... 310, 319
Carried (as amended) .......................................... 324
Repeal of Coal Reserves Act of 1914 (the Chairman) .......... 307, 306
Repeal of section 2 of act of May 1, 1930, and rescind certain orders of the Secretary of the Interior establishing Indian reservations .................................................. 320, 252
Report favorably pending bill, with amendments, agreed upon (Senator Jackson) ............................................ 253
Tongass National Forest Act ...................................... 329
Proposed form of bill as worked out by the subcommittee in accordance with the instructions of February 4, 1954 .......... 219, 210
Reference List:
Admission, description of new State .............................. 280
Appropriation for expenses of elections and convention ........ 310
Assumption of debts .............................................. 301
Care mentally ill ................................................ 330
Citizens entitled to new State .................................. 340
Disposal clause .................................................. 259
Disclaimer clause ................................................ 296, 297
Drafting and approval of constitution ............................ 226
Drafting of constitution—Failure of Congress to approve constitution .................................................... 226
Election of officers of State government .......................... 211, 212
Elections ........................................................ 242
Indian claims disclaimer ........................................ 258
Land grants:
  Categories and amount ........................................ 259
  Selection of land to be granted .............................. 250
  Existing claims, location, or entries, and rights thereunder 256
  Control of school and colleges, and disposition of proceeds from sale of lands granted, and dedication of purposes .... 254
  Disposition of proceeds of sales of public lands by United States ........................................................ 254
  Disposition of revenue from sale of public lands, et cetera, derived by Federal Government, which are not paid to state .......................................................... 258
  Grant of fisheries and wildlife lands and control thereof; percentage of proceeds from sale of, or leased thereof (trusts of land and structures in Juneau, et cetera) ........ 295
  Grants of land for internal improvement .................... 243
  Grant to Territory confirmed ................................ 243
  Later selection of additional lands .......................... 279, 252
Payment to Alaska of National forest income ...................... 252
Proposed amendment to Tongass National Forest Act .............. 252

ADD. 3

## ALASKA STATEHOOD

**WEDNESDAY, JANUARY 20, 1954**

UNITED STATES SENATE,
SUBCOMMITTEE ON TERRITORIES AND INSULAR AFFAIRS
OF THE COMMITTEE ON INTERIOR AND INSULAR AFFAIRS,
*Washington, D. C.*

The subcommittee met at 10:45 a. m., pursuant to call, in the committee room, 224 Senate Office Building, Senator Thomas H. Kuchel presiding.

Present: Senators Guy Cordon, Oregon (chairman of the subcommittee, presiding); Thomas H. Kuchel, California; George A. Smathers, Florida; and Henry M. Jackson, Washington.

Present also: E. L. Bartlett, Delegate from Alaska, House of Representatives.

Present also: Kirtley S. Coulter, chief clerk and staff director; N. D. McSherry, assistant chief clerk; and Stewart French, professional staff member.

Present also: Elmer F. Bennett, legislative counsel, and Herbert J. Slaughter, Chief, Reference Division, Office of Legislative Counsel, Department of the Interior.

Senator KUCHEL. The committee will come to order.

Senator ANDERSON. Mr. Chairman, I think one of the things which Jackson has another matter that he desires to bring up with reference to the fishing industry—I think one of the things that the subcommittee should deal with promptly is the proposal which was made to give Alaska just the remains after everybody else has picked it dry. He referred to the good land of Alaska, which is now tied up in reservations, and I could not agree more than I did with the Senator from Wyoming in what he said about taking away all this good land.

I have been in correspondence with the Alaska Statehood Commission trying to get from them language which might cure this. In other words, I felt it was the responsibility of the Alaska Statehood Commission to hire a lawyer to do the drafting on this rather than that it was my responsibility to hire a lawyer.

I have a letter that deals with what they say relating to reduction in the size of some of the Federal reservations, including the national parks and the national monuments. Delegate Bartlett wrote me and said:

I agree with you wholeheartedly about this, but to date I have not found a proper technical means to put this into the statehood bill or to arrive at a exact description relating to the new and smaller areas for these reservations which, incidentally, should not be the only ones cut down in size.

VI

Additional Information—Continued
Reference to—Continued

Lands retained, provision for ingress and egress by United States...... 240
Leases, permits, licenses, contracts........ 341
Mineral lands................ 341
Naval reserve.............. 341
Oil and gas areas........... 311, 345
Religious freedom.......... 343, 347
Representation in Congress........ 226
Requirements of the Constitution.... 300
Disclaimer by State of right to regulate Indian affairs... 239
Revision following language suggested by Department of Justice... 287
Provisions reserving rights and powers to the United States and providing terms and conditions of land and property grants to Alaska................ 204
Relinquishment by State of public lands not granted.... 230
State to select lands held under lease... 282
Taxes on lands and property of United States citizens non-resident in Alaska.......... 343
United States jurisdiction of land held for military purposes... 341
United States ownership and jurisdiction of Mount McKinley National Park................ 240
Waterpower.............. 302
Report of the Department of the Interior on H. R. 1921, July 30, 1953, January 14, 1954......... 301
Reservations in Alaska by act of May 1, 1936 (49 Stat. 1250), population and location, table submitted by Harry M. Critchfield, Chief, Division of Lands, Bureau of Indian Affairs............ 202
Statement and testimony of Ralph A. Barney, Chief, Indian Claims Section, Lands Division, Department of Justice, and Elmer Bennett, legislative counsel, Department of the Interior, before the House Committee on Interior and Insular Affairs, June 14, 1954... 204
Telegram from W. C. Arnold, managing director, Alaska Salmon Industry, to Stewart French, counsel, Senate Interior Committee, February 24, 1954, re Alaska citations respecting tidelands occupancy............ 200
Treaty with Russia for the purchase of Alaska, articles II, III, IV submitted by Hon. Guy Cordon.... 351
Trends of fish production and number of men employed in Alaska, 1941–51, graph submitted by Paul Zimmerman, Chief, Mineral Division, Bureau of Mines, United States Department of the Interior............ 200
White House order, January 7, 1952, reserving and setting apart St. Lawrence Island as a reindeer station... 87

145

**APPENDIX**

Appendix A.—The Library of Congress, Legislative Reference Service selected population data for the States, Alaska, and Hawaii: Statistics showing population in state of entry............ 360
Appendix B.—Acreage granted to States and Territories, as of June 30, 1953............ 301
Appendix C.—Percentage of Federal and State areas in certain States... 303
Appendix D.—Statement of licenses and taxes collected by the department of taxation of the Territory of Alaska........ 363
Appendix E.—Memorandum from Stewart French, committee counsel to Hon. Guy Cordon, February 22, 1954, re Russian treatment of Alaska natives............ 304

ADD. 4

## 226

### ALASKA STATEHOOD

it is if the State has only 3 English miles. That half-mile may be very important in the State. There is quite a hassle over it, because there may be lots of oil under that half-mile.

Attorney Studds is going to send us a report in writing on just what a nautical mile and geographical mile and statute mile are.

(The report of the Coast and Geodetic Survey is set forth on p. 220.)

Senator Cordon. That indicates we may have to say something about that. I have not checked this language carefully on page 32, but it has been checked because it has been used several times. Did you find that sentence?

Senator Anderson. Yes.

Senator Cordon. I can see no reason for it to be in there.

"The election shall be conducted without reference to the political affiliations of the candidates."

It says the ballots used shall be nonpartisan.

Senator Cordon. Each ballot shall contain (1) the name of the candidate and (2) the names of the candidates. That is all. Let's not worry about it. Let us leave the thing. It is just redundant. It has to do with the conduct of elections.

Senator Anderson. I thought it had to do with judges and clerks, too.

Senator Cordon. That is not important.

The next thing of consequence that we have to take a look at is on page 34, line 18. We substituted the language of the United States Constitution itself for this language, and I think we should do it here as we did in the Territory of Hawaii. Is there any objection?

Senator Jackson. What did you substitute?

Senator Cordon. The language used for the Territory of Hawaii, which is from the Federal Constitution.

Senator Jackson. On religious freedom, you mean. What has been the language on this for other States? Pretty much the Hawaiian pattern?

Senator Cordon. Yes.

Senator Jackson. I think it ought to be in conformity with previous enactments.

Senator Cordon. We are going to insert, in lieu of the material on lines 15 to 18, the language taken directly from the Federal Constitution.

Then we come to the provision with respect to disclaimer on the part of the State, and that is a matter that we discussed at some length with the gentlemen from the Department of Justice, Mr. Barney. There seemed to be agreement that we should eliminate from this bill entirely any reference to Indian claims. Is there any objection to that?

Delegate Bartlett. Mr. Chairman.

Senator Cordon. Mr. Bartlett?

Delegate Bartlett. I merely want to say that in inserting this language physically in the statehood bill, the objective was to follow the pattern of other enabling acts in the West. I think many of them had language substantially the same as this.

In the first place, it was thought advisable to do so out of historic precedent and, secondly, because it was felt there would be a large

## 227

### ALASKA STATEHOOD

body of opposition aroused to a bill which did not make it clear that this was being taken care of by leaving it to another forum to act on it.

Senator Cordon. Maybe we had better decide it. It is my conviction that we create an almost intolerable situation for the new State if we, in an act of admission which is law—it is not testful of any sort, it is a creation of statute and it goes to the very basic fundamental of title—if we require a disclaimer with respect to rights because there are nebulous as these, we cast more than a cloud on title, prevent a perfectly clear record when there is no claim in fact. Here we got a mighty long ways toward recognition of the claim, in fact.

Senator Jackson. Mr. Chairman, I concur in your position on this point. I think the legislative record and history to date is quite clear. It would be my interpretation that by eliminating this section we would not grant or recognize any of these alleged claims that are being made by some of the Indian groups by reason of their alleged aboriginal rights. I believe Mr. Barney's statement made a few days ago would bear that out.

On the other hand, if we leave it in, we may recognize the existence of a right on the part of the natives, and I believe the record makes this point clear; so there should not be any question, if we do eliminate the section, that we are in any wise recognizing the claims. On so the courts can make an appropriate decision, maintaining the status quo.

Senator Anderson. I want to ask Delegate Bartlett if there will not be a storm of opposition to this bill from all the Indian rights societies and the people who are greatly interested in the production of Indians and natives, and so forth, if this language comes out of the bill? Was it not put in there because of that?

Delegate Bartlett. Precisely. I can say positively that no one who favored including the language in the bill, which is similar to that language in many previous Alaska statehood bills, had any notion that by so doing the Indian claims would be confirmed in any way for that. If it was simply, as Senator Anderson stated, a very lively fear that if there were not a disclaimer paragraph all the Indian rights assumptions would any, in effect, that the enabling acts for previous States had disclaimer language, and the failure to include it in the Alaska bill would mean that the Congress was not agreeing that they had a right to make a claim.

Senator Jackson. Only this, Delegate Bartlett: In the case of Alaska, the claims being made by the Indians are unique in that their claim is based on aboriginal use and occupancy of land. In the case of the 48 States, the claims made by the Indians related almost in every case directly to some treaty right. I think there is a distinction to that extent.

The feeling of the representative of the Department of Justice was that if this language was left in the bill the court might construe this section as giving and recognizing a right which the courts refused to recognize in their decisions to date.

Mr. Bennett. There are two marked differences between the language that is offered here and the language that has become the established pattern in the admission of States here in the continental United States. In the first place, the language of the Arizona-New Mexico

220                                    ALASKA STATEHOOD

Wyoming, and Utah Admission Acts expressly reserved to the United States the power of extinguishment over these so-called aboriginal titles.

Secondly, in each case they specifically made it clear that whatever rights the Indians had must be a right which was intended to the sovereignty of the United States or some prior sovereignty. None of that language appears here, which naturally creates much greater doubt with respect to the confirmation possibilities of this language as compared with the language that was used in the case of the admission of your State, Senator Anderson.

Senator ANDERSON. Yes. That is why once before I suggested that it might be possible to so safeguard this language by something like what Senator Jackson just now said: That nothing here was intended to confirm or grant or perfect any title—I do not know the legal phraseology he used, but he used it just a moment ago—in these Indians, or I would accept as an alternative the idea of putting in the exact sort of language that has been carried in these bills for New Mexico, Arizona, Wyoming, and Montana.

Mr. BARKER. If anything is put in it, Senator, I know the Department takes a very dim view that it should at least have the safeguards of the previous admission acts.

Senator ANDERSON. I agree. Not being a lawyer, I do not know exactly what this means, but it does not read too well to me, because it has always persuaded me that it might be the basis of showing that prior to the time Russia came into the picture at all, these aboriginal Indians were enjoying certain waters for fishing, and therefore those waters should now be adjudicated as belonging to them because of the language in this act, which is not the purpose of anyone. All this language was ever put in for was to say that we wanted to leave the Indian situation in status quo. If this does not do it, then it is not the best language.

Senator JACKSON. May I interject at this point. How would it be to have some language in the report, accompanying the bill, to spell out in narrative form rather than in legalistic terms our intent with reference to this section that is being eliminated? I think what we all agree on is that the courts in 2 or 3 decisions have laid down some general rules of law on this question of aboriginal rights in Alaska, and our intention by passing this act not in any wise to change the status quo of the law on this point. It is neither to diminish nor to add to the law that has been laid down by the courts in a number of decisions. Really, is that not what we have in mind here?

Delegate BARTLETT. That has been my whole hope throughout the history of this bill.

Senator ANDERSON. Do you have to do it by taking the language out? Can you not do it just as well by leaving the language in, and writing in some clarifying language?

Senator JACKSON. Of course, when you have the two, if you put the language in the bill, no matter what you say in the report the language in the bill is going to persist over the language in the report, if the language in the bill is clearly unequivocal.

Senator ANDERSON. By the same token, no matter what you say in the report, the elimination of it is going to look as if there is a desire, maybe, to extinguish these claims, which does not exist.

Senator JACKSON. That would not hold true.

Senator ANDERSON. Is there not a middle ground where you can say something and qualify it by the report or can say something in the law that follows that has been done in other areas?

The CHAIRMAN. Senator Cordon, I am somewhat in the position of the Senator from New Mexico, not being an attorney, and I have no suggestion whether we should leave it in or take it out, but I do think that we should follow the judgment of the Department of Justice, and that we do not want to do or say anything that will interrupt the decisions of the Court that have been had in the past.

Senator ANDERSON. Could we do this: Could we leave this language out, and in the report, say there may be some question as to why this language has been left out, and then refer to the testimony of the Department of Justice and say that this bill is not intended to extinguish the rights of these Indians; that it is not intended to diminish in any way the rights that they now have or should have, and that the decisions of the courts will continue to operate in this field. They have claims filed under the Indian Claims Act, and the committee is not seeking to harm any right they may have, and the omission of this paragraph from the bill specifically needs reference to the fact that it is not against them.

Senator JACKSON. Or to add that the purpose of eliminating it is not in any wise to change whatever rights they may have had prior to their admission or as of some date, add to or decrease. That is what you are really trying to say. You are maintaining the status quo.

Senator ANDERSON. When we get to it before, we found it was very hard to say that.

Senator JACKSON. I realize that, but I think that all you have to do is put something in that the rights of the natives, whatever they may be, shall be those rights that they had as a Territory, whatever they may be if any.

Senator ANDERSON. Can you not put in the law that you do not intend to change these rights? Could you not say it that way?

Senator JACKSON. The trouble is that the Department of Justice contention is that when you say "rights," you by inference are saying of Justice, by reason of decisions to date, they do not have.

Senator ANDERSON. I have said all I care to say on this, Mr. Chairman, because, as I say, I am not an attorney and therefore I do not know how this thing ought best to be done. I am perfectly willing to leave it to the discretion of the chairman.

I would like to have it borne in mind that you might be stirring up quite a hornet's nest of all the people who believe that you are trying to take away the rights of these Indians.

Senator CORDON. It seems to me, Senator Anderson, that so far as you can by your admission statute, you ought to spell out with the utmost certainty the right of the use. State owns title or fee to the land that is granted. If you leave this—I am generous when I tell it only a cloud—this cloud on that title, you are going to face with a situation that will militate against, anywise, rapid economic development in the State of Alaska. When investors are going to put their money and the money which is in their hands, contributed by their stockholders, into a title to lands, they are going to want to know that they got what they purchased and paid for; and that is

230          ALASKA STATEHOOD

doubly true when we come to the people who may be expected to buy bonds or other evidences of debt, the security of which is the title to these lands. They just will not take it.

Unless we can find some method by which we can say to them, "So far as you are concerned, the title is in the State and it is a good title," then we cannot expect the kind of investment that is absolutely essential if that State is to develop. It cannot develop, the evidence here I think preponderantly shows, through any type of homestead law or anything of that sort, because the land just isn't susceptible to being used economically in any amount.

Senator Anderson. I think, Senator Cordon, the best evidence of what you have just said is what happened to the pulp mill. The pulp mill is being built. Sixty million dollars is being spent. The new State of Alaska will not be able to touch the revenues that ought to come to it for years and years and years, until the cloud or taint, or whatever it was, of this Indian title may be satisfactorily solved.

Senator Cordon. You know that even then, the pulp mill would not have been built had it not been for the act that authorized the sale to the pulp mill of the timber from the national-forest lands. They had to have a specific act that freed them from any responsibility whatever to anybody other than the Federal Government when they paid the stumpage.

Senator Anderson. Then they turned around and pooled the revenue, because they could not make it available. You are going to see that all the development up there is going to go along that way, just as you have pointed out, unless there is some clearing up of this situation, because the next pulp mill will have to run into the title situation, because nobody, unless, if there is any Indian cloud to the title, is going to be afraid of being available to the State, is placed in the Treasury, instead of being available to the State, is placed in the Treasury——

I think he said there was what, several million dollars——

Mr. Bennett. One million dollars.

Senator Anderson. Already in that fund, and of course now it is just beginning to roll.

The Chairman. It will increase very rapidly when the pulp mill begins operations.

Senator Anderson. It is just now beginning to start. I would not want to see that happen. It does seem to me that we ought to be able to find language that would take care of this Indian situation. The Attorney General is the law officer of this country. He is not the legal adviser of this committee particularly, but nonetheless I do feel that we ought to try to find some pattern and get it in here. I am not able to say what it ought to be, whether it ought to be an affirmative one or a negative one, but I do think that the State ought to get title to these lands.

Senator Cordon. While we are on this point, with enough time we could without question get from the Department of Justice their recommendation of substitute language for that beginning in line 19 on page 34 and going down to line 10 on page 36, but we will not be able to get it in time to put it into this bill. We just cannot do it. We might not be able to get it in time, for instance—I am assuming now—if you folks who believe that the 2 bills should be tied together would want to offer this one as a title II.

ALASKA STATEHOOD          231

Senator Anderson. That is true. I am just wondering, Mr. Chairman, in order to keep the fight down on this Indian question, if we could leave this language as it is, with the understanding that we ask the Department of Justice to prepare language to cover this one question, and with the understanding that all of us want to see it completely and adequately covered so the State gets title to something. I do. I think it is better to leave it out, I am not going to argue about keeping it out. I just wish to avoid that controversy.

Mr. Bennett. Mr. Chairman, there is a problem on that. The Department of Justice feels very strongly that there should be no language for language, actually you might have a little difficulty getting their suggestions for language, because they feel so strongly that it is inadvisable. I have discussed that with Jerry Morton and Mr. Barney.

Senator Jackson. Could they suggest some language for a report to accompany the bill?

Mr. Bennett. They might.

The Chairman. What I want to ask, Mr. Chairman, is this—he said. Unquestionably they will recommend language for this paragraph that is needed. The problem is to what extent should the disclaimer go.

I have the thought in mind that the disclaimer might be tied to these prior acts of Congress by a reference to them. To some extent, at least, they have been construed and determined by the courts. This "There is language in 1 or 2 of the decisions. Whether it be dictum or not, I do not know, because I have not read them carefully enough to reach a conclusion, and my conclusion would not bind any court if I reached it.

Whether they were a part of the issues and therefore a part of the ratio of the rule of actual possession, that I know that with respect to the application of the rule of actual possession, that is law, because that was the question in issue. That we know. That we know. It may be that by using those acts for reference, even though the act itself has not been judicially determined as to its legal effect, that might save everything that we need to save.

I am not certain about that. I am just saying that that is a thought in my mind that I expect to take up with them. I am just terrified afraid that we cannot leave what we need in time to make any change in this language now, and I hate to see this language remain in the bill when we report it.

The Chairman. Senator Cordon, my main objective—and I am sure that will permit the majority of every member of the committee—is to get a bill that will permit the new State of Alaska to get and use the resources of Alaska. One of the immediate resources that will be in the form of cash is this fund that is going to grow up from the sale of timber, and I want something in there that will dispose of that question and, instead of accumulating it there during the year 3000 or 4000, will start distributing now to the Territory of Alaska.

Is that going to be accomplished by what you have in mind?

Senator Cordon. That is what we are seeking to accomplish.

Mr. Bennett. That is a separate question which involves the proposal which you have made, Senator Butler, to amend the Tongass

ADD. 7

Forest Act to provide that at least 25 percent of it would automatically go to the new State.

The CHAIRMAN. Can that amendment be a part of this Statehood Act?

Mr. BENNETT. It would not take much language to do it.

Senator CORDON. Among other things, here is one of the problems we have. In line 19 it says—

"That said State and its people do agree and declare * * *

Now I skip over to page 35 to the semicolon in line 10. We have said that the State agrees—

that no taxes shall be imposed by said State upon any lands or other property now owned or hereafter acquired by the United States.

I have no question about that language, but now—

or which, as hereinbefore set forth, may belong to said natives, except to such extent as the Congress has heretofore or may hereafter prescribe, and except when held by individual natives in fee, until the limit of restriction on alienation.

It is that language, "which may belong to said natives as hereinbefore set forth." We have a right up here that we leave floating. We do not know what the right is. That bothers me.

Senator ANDERSON. That is a good question.

Senator CORDON. This goes right to the sovereign power of taxation. It is in another field. They may take the view that the language "belonging to said natives" means title, and I would hope that is what they would hold.

Senator ANDERSON. In the New Mexico Act, I see it says that the people of that State disclaim any right or title to those—

unappropriated and unreserved lands and to all lands lying within said boundaries owned or held by any Indian or Indian tribes the right or title to which shall have been acquired from or through the United States or any prior sovereignty, and that until the title of such Indian or Indian tribe shall have been extinguished the same shall be and remain subject to disposition and under the absolute jurisdiction and control of the Congress of the United States.

Why can we not put something of that nature in there? No violence was done to the Indians of my State by that language.

Senator CORDON. No, but the Indians in your State had treaty rights. There was an area that they might differ with the United States as to title, but the area itself was specific.

Here we are granting—at least at the present time we are planning to grant—substantially 30 percent of the area of Alaska to this State. We cannot look forward to the same situation.

Senator ANDERSON. All I am trying to say is that those Indians of my State are now actively pursuing suits against the United States in the Court of Claims, and they hope to have those claims adjudicated. The Navuhos believe that they own part of the eastern section of our State. The Lagunas believe that they own a tremendous area. All Claims are coming in before the Court of Claims for settlement now.

Senator JACKSON. But they stem from treaty.

Senator ANDERSON. Not all of them, I think. In this instance it does seem to me that, in the area up there, while they do not stem from treaty but stem from the claim that they occupied these areas in aboriginal times, that has to be settled by the courts some day. It

would seem to me that the fact of statehood's bringing this issue to the fore would permit them to be adjudicated.

The Indians of Alaska retained attorneys to file claims under the Indian Claims Act. They filed a great many of those claims. They have abandoned a great many of them already, apparently. They are not being pushed. When you come right down to the wire and the ability to prove it. Therefore, I wonder if some language in here could not act as a sort of catalyst that finally would precipitate this matter and get it down to the courts and determine what these Indians' rights are and remove the cloud from all the rest of the land you are speaking of.

I want to do it, also. I think it ought to be removed. I think the Indian rights, particularly those based on aboriginal claims, ought to be settled, and I believe it could be quickly settled. I do not know what the language might be, but I think we ought to leave language here that would bring it to settlement. If it means leaving out, all of it, I know that is going to start a terrific hornet's nest into operation.

Senator CORDON. I think we ought to bring it to a point.

Senator JACKSON. Might I suggest, as an alternative that, we take the language out and have the Department prepare for the report a narrative statement on this subject making our actions in deleting the section on this subject very clear. We have built up a legislative history on this very point. I am concerned about it. The Department of Justice representative has stated that if we leave this section out, it will in effect muddle up decisions that have been built up to this date, which in my opinion would most of these claims.

My only concern is that I do not want to do anything here to add a new cloud on the title to the property that we are trying to clarify, so we can have some more vigorous development in the area. If we get that language for the Department from the Department, which will in essence maintain the rights of the parties, whatever those rights they can kick on the question. I do not see how the people who are concerned, the representatives of the Indians, or so on, can complain under that kind of language in the report.

Senator ANDERSON. Just ask Delegate Bartlett whether they will complain.

Delegate BARTLETT. Yes, they will complain very bitterly. We know that on account of past experiences.

Let me explain just how difficult it is to arrive at a satisfactory solution. In the fall of 1951, a special subcommittee of the House Interior and Insular Affairs Committee went to Alaska and held hearings from Ketchikan to Kotzebue. Endless hearings have been held since. A bill has been introduced and has undergone many, many changes. Only last week it reached the floor. We are now look at it, and there is a changed philosophy. We find the Interior Department thinking that the bill should have deleted all reference to aboriginal occupancy and should concern itself only with possessory occupancy. We have the Department of Justice maintaining a historic attitude, that there are no valid claims there, and in effect we are not extinguishing then.