**EXHIBIT D-21**

M-36914 (Supp. III)

Department of the Interior (D.O.I.)

**1 FEDERAL RESERVED WATER RIGHTS IN WILDERNESS AREAS

July 26, 1988

*211 Water and Water Rights:  Generally

  Federal reservation of water rights may be implied from withdrawal of land from the public domain and its reservation for a particular purpose.

Water and Water Rights:  Generally-Withdrawals and Reservations:  Springs and Waterholes

  Reservation of Federal water rights may be implied only to the extent previously unappropriated water is necessary to the primary purposes of the withdrawal and reservation of land.

*212 Water and Water Rights: Generally-Withdrawals and Reservations:  Springs and Waterholes

  A finding of implied reservation of water rights requires a determination that reservation of water was the actual, albeit unexpressed, intent of Congress.

Water and Water Rights:  Federally Reserved Water Rights-Wilderness Act

  Sec. 4(d)(7) of the Wilderness Act of 1964, 78 Stat. 890, 16 U.S.C. § 1133(d)(6), provides that nothing in that Act shall constitute an express or implied claim or denial of exemption from State water law.

Water and Water Rights:  Federally Reserved Water Rights-Wilderness Act

  The legislative history of sec. 4(d)(7) establishes that its purpose was to preclude assertion of reserved water rights based upon wilderness designation, while preserving reserved rights which antedated such designation.

Water and Water Rights:  Federally Reserved Water Rights-Wilderness Act

  Designation of Federal lands as wilderness establishes wilderness purposes as "supplemental," not primary, purposes of the lands in question.

Water and Water Rights:  Federally Reserved Water Rights-Wilderness Act

  Designation of Federal lands as wilderness does not give rise to reserved Federal water rights under the Wilderness Act.

Memorandum

To:  Secretary

From:  Solicitor

Subject:  Federal Reserved Water Rights in Wilderness Area

I. INTRODUCTION

  The Solicitor's Office has recently been asked to advise the Department on the issue of whether to file claims for Federal reserved water rights for wilderness areas administered by the Bureau of Land Management (BLM) and the National Park Service (NPS). [FN1]  Although briefly examined in a prior Solicitor's Opinion, the

96 Interior Dec. 211                                                          Page 2
96 Interior Dec. 211, 1988 WL 410391 (D.O.I.)
**(Cite as: 96 Interior Dec. 211,  1988 WL 410391 (D.O.I.))**

question of whether the Wilderness Act of 1964, 78 Stat. 890, 16 U.S.C. § 1131 et
seq. (Wilderness Act), provides an adequate legal basis for claiming Federal
reserved water rights has been raised again in discussions within the Department.
As a result of those discussions, we have been asked to examine in greater detail
the issue of whether Federal reserved water rights are created when wilderness areas
are designated.

**\*213** Solicitor's Opinion No. M-36914 of June 25, 1979, 86 I.D. 553-618 (1979)
(hereinafter, Prior Opinion), analyzed the nature and extent of non-Indian Federal
water rights for the National Park Service, Fish and Wildlife Service, Bureau of
Reclamation and Bureau of Land Management. Among other matters, the Prior Opinion
defined and characterized the reserved water rights those agencies may assert under
various statutes, executive orders, and Secretarial orders. One of the statutes
discussed was the Wilderness Act. Specifically, the Prior Opinion, after a summary,
three-paragraph analysis, held that lands designated by Congress as wilderness areas
under that Act receive Federal reserved water rights necessary to accomplish
wilderness purposes. [FN2] These wilderness purposes are described in the Prior
Opinion as preserving and protecting wilderness in its natural condition without
permanent improvements or human habitation and as fulfilling the public purposes of
recreational scenic, scientific, educational, conservation, and historic use. Prior
Opinion at 86 I.D. 553, 609. [FN3]

**\*\*2** On the basis of a detailed examination of the Wilderness Act and its
legislative history, we conclude that the better legal view is that Congress did not
intend to create Federal reserved water rights when it provided for the designation
of wilderness areas. Rather, Congress intended wilderness purposes to be secondary
to the purposes for which the reservation on which wilderness areas are designated
were originally created. As such, wilderness areas enjoy the benefits of water
reserved for underlying parks, forests, or refuges but are not entitled to a
separate and additional reservation of water. To the extent that the Prior Opinion
is inconsistent with this opinion, the Prior Opinion is modified and superseded.
[FN4]

**\*214** II. FEDERAL RESERVED WATER RIGHTS IN GENERAL

The courts created the doctrine of Federal reserved water rights at the turn of
the century. [FN5] In 1899, the Supreme Court in United States v. Rio Grande Dam &
Irrigation Co., 174 U.S. 690 (1899), recognized the Federal Government's superior
authority under the Commerce Clause to preserve the navigability of navigable waters
and to receive a flow of water necessary for the beneficial uses of Federal
property. Specifically, the Court noted two limitations on the power of the states
to alter the distribution of water within its boundaries:
    First, that, in the absence of specific authority from Congress, a state cannot,
by its legislation, destroy the right of the United States, as the owner of lands
bordering on a stream, to the continued flow of its waters, so far, at least, as may
be necessary for the beneficial uses of the government property; second, that it is
limited by the superior power of the general government to secure the uninterrupted
navigability of all navigable streams within the limits of the United States.

    Id. at 703.

    Relying on its opinion in Rio Grande, the Supreme Court shortly thereafter
recognized an implied Federal reservation of water in situations in which the
Government had set aside land for Indians. In Winters v. United States, 207 U.S.
565 (1908), the Court addressed a statute that had set aside lands for an Indian
reservation but had not expressly provided for water to irrigate those lands.
Despite the absence of express language, the Court found an implicit reservation of
sufficient water to meet the needs of the Indians. The Court based this finding on
the clear intent of Congress that the Indians should become a pastoral and civilized
people and the fact that this intent would be frustrated if those Indians lacked
sufficient water to irrigate their land.

    For many years, Winters was seen as establishing a special rule applicable only to
Indian water law. [FN6] This understanding was reinforced by California Oregon

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

96 Interior Dec. 211, 1988 WL 410391 (D.O.I.)
**(Cite as: 96 Interior Dec. 211, 1988 WL 410391 (D.O.I.))**

Power Co. v. Beaver Portland Cement, 295 U.S. 142 (1935), in which a unanimous Court praised the western states' appropriative water rights doctrine as essential to "the future growth and well being of the entire region" and held that the Desert Land Act of 1877 "effected a severance of all waters upon the public domain, not theretofore appropriated, from the land itself." Id. at 157, 158. Thus, the Court concluded, "following the act of 1877, if not before, all non-navigable waters then a part of the public domain became publici juris, subject to the plenary control of the designated states ...." Id. at 163-64. Following California Oregon Power Co., Federal and state agencies and private appropriators all generally assumed that the Winters reserved water rights doctrine applied only to Indian lands, and that the Federal Government would obtain water rights for non-Indian lands only by complying with the substantive provisions of state water law.

**\*3 \*215** This assumption essentially came to an end with Federal Power Commission v. Oregon, 349 U.S. 435 (1955) (also referred to as the Pelton Dam decision), in which the Court ruled that a state agency could not deny permission to a Federal licensee under the Federal Power Act to construct a dam on lands reserved by the United States for that purpose. [FN7] The implication of this decision was that the licensee was exercising a right of the Federal Government to use water reserved at the time the dam site was reserved. The Court limited California Oregon Power to "public lands," which were defined to exclude lands reserved for a specific purpose. Id. at 448. FPC v. Oregon was followed in Arizona v. California, 373 U.S. 546 (1963), in which the Court upheld a Master's conclusion that the United States intended to reserve water sufficient for the future requirements of certain refuges, National Forests, and a recreation area. 373 U.S. at 601.

In recent cases, the Supreme Court has further defined the scope of the reserved water rights doctrine and clarified that it is a narrow doctrine, applicable only when failure to obtain water would defeat congressional purpose and intent in reserving land. In a 1976 case, the Court indicated that Federal reserved water rights may be implied when the Federal Government withdraws land from the public domain and reserves it for a particular purpose, but only to the extent that the water is the minimum amount of unappropriated water necessary to accomplish the primary purpose of the reservation. Cappaert v. United States, 426 U.S. 128 (1976). These criteria are set out in general in Cappaert, in which the Court found that reservation of Devil's Hole as a national monument under the Antiquities Act, 16 U.S.C. § 431, also reserved sufficient unappropriated water to maintain the scientific value of the reservation:

[W]hen the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water, then unappropriated to the extent needed to accomplish the purpose of the reservation. In doing so, the United States acquires a reserved right in unappropriated water which vests in the United States on the date of the reservation and is superior to the rights of future appropriators.

426 U.S. at 138.

In a case decided 2 years later, United States v. New Mexico, 438 U.S. 696 (1978), the Supreme Court considered the issue of whether reserved water rights were created for the maintenance of instream flows, **\*216** recreation and stockwatering in national forests under the Organic Administration Act of 1897, 16 U.S.C. § 473 et seq., and the Multiple-Use-Sustained-Yield Act of 1960 (MUSYA), 16 U.S.C. § 528 et seq. In briefs filed in the Supreme Court, the United States had argued that it was "entitled to reserved water rights to the extent of the purposes of the federal enclave, whatever those purposes may be." Brief for the United States, United States v. New Mexico, No. 77-510, filed March 1978 (Brief) at 20. Following this reasoning, the Government argued that water was necessary for such purposes as assuring minimum stream flow for protection against fire and erosion and desecration of the watershed, for conservation of living things and for recreation and stockwatering and that these subsidiary purposes met the ultimate purpose of improving and protecting the forests. Brief at 20, 30, 50, and 61. Water being necessary, the argument went, it must be deemed to have been reserved by Congress when the National Forest system was established. Brief at 36.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*4** However, the Court declined to take such an expansive view of the reserved water rights doctrine.  Rather, in an opinion written by then Associate Justice Rehnquist, the Court sought to limit that doctrine by tying it to the intent of Congress as expressed in the legislation creating the Federal reservation at issue.  Specifically, the Court emphasized the general rule of deference to state law and the narrow exception that the reserved rights doctrine made to that rule.  436 U.S. at 715.  The decision made clear that the presumption of the application of state law is overcome by an implied reserved water right only after a careful examination of "both the asserted water right and the specific purposes for which the land was reserved" and only if the Court could conclude that "without the water the purposes of the reservation would be entirely defeated."  Id. at 700. [FN8] Implicit in this language is the conclusion that a reservation of land alone, without any other evidence of congressional intent, is insufficient to trigger an implication that water rights are reserved.  Accordingly, the Court undertook a complete examination of the relevant statutes and their legislative histories in order to determine whether an inference could be drawn that Congress intended to create reserved water rights for the specified purposes in National Forests. [FN9]

After its examination, the Court in New Mexico denied Federal reserved rights for the purposes of maintenance of instream flows, recreation and stockwatering in National Forests, finding that these **\*217** were not among the primary purposes included in the forest Service's Organic Administration Act and that these were not included as primary purposes under the MUSYA. Building on this finding, the Court held that it could not find an implication of congressional intent to reserve water rights for these secondary purposes. The Court explained:
   [W]here water is only valuable for a secondary use of the reservation ... there arises the contrary inference that Congress intended ... that the United States would acquire water in the same manner as any other public or private appropriator. In this regard, [w]here Congress has expressly addressed the question of whether Federal entities must abide by State water law, it has almost invariably deferred to the State law.

   438 U.S. at 702.  Therefore, implied Federal reserved water rights will be found by the Court only if necessary to accomplish the specific purposes for which Congress authorized reservation of the land and not for "secondary" or incidental uses.

With these legal standards in mind, we turn to the provisions of the Wilderness Act and the specific issue of whether Federal water rights are reserved when wilderness areas are designated.

III. SCOPE AND NATURE OF THE WILDERNESS ACT

Enacted in 1964 after 8 years of consideration, the Wilderness Act established a Federal policy of preserving congressionally designated "wilderness areas" on existing public lands.  These areas remain within the jurisdiction of the agency originally responsible for them, but are to be "administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness ..." Section 2; 16 U.S.C. § 1131(a).  The land managing agency is responsible for preserving the wilderness character of a wilderness area while continuing to administer the area for such other purposes for which it may have been established originally. Section 4(b); 16 U.S.C. § 1133(b). With certain exceptions, the Act prohibits commercial enterprises, roads, motorized vehicles, and structures within areas designated as wilderness.  Section 4(c); 16 U.S.C. § 1133(c).  The Act authorizes construction of reservoirs and water conservation works within National Forest wilderness, upon authorization of the President.  Section 4(d)(4); 16 U.S.C. § 1133(d)(4).

**\*5** To date, Congress has designated about 456 segments of Federal land for admininstration under the Wilderness Act. Approximately half of these are within lands administered by this Department.

As Departmental holdings in relatively arid regions lie predominantly high in their respective watersheds where legal ownership of a right to instream flows has

little practical impact, [FN10] the issue of our ability to **\*218** assert such rights has rarely arisen.  Reports from regional offices indicate, for instance, that the Fish and Wildlife Service has filed no reserved water rights claims for wilderness areas, and the National Park Service has filed but four such claims. [FN11]

IV. APPLICATION OF THE FEDERAL RESERVED WATER RIGHT DOCTRINE TO WILDERNESS AREAS

   The Wilderness Act of 1964 contains no express reservation of Federal water rights.  Historically, subsequent statutes designating specific wilderness areas have not mentioned water rights.  Rather, they merely effected the designation and directed that the area be managed in accordance with the 1964 Act. Therefore, to find a Federal reserved water right for wilderness areas, we must find that Congress by implication intended in the 1964 Act to reserve water necessary to meet wilderness purposes and that those purposes are specific and primary.  A judicial finding of an intent to reserve a water right represents a determination that it was the actual, albeit unexpressed, intent of Congress, to so reserve water.  See United States v. New Mexico, 438 U.S. at 701-02.  In addressing the question of congressional intent, we must bear in mind the Supreme Court's admonition that a careful and searching examination of the legislative history is required. Id. at 700.

   Two portions of the Wilderness Act and their legislative history merit special attention in attempting to discern congressional intent as to water rights:  section 4(d)(7), which directly addresses water rights, and section 4(a), which delineates the status of wilderness uses.  A careful review of these sections and the legislative history thereof leads us to conclude that Congress expressed an intent not to create new Federal reserved water rights when it enacted the 1964 Wilderness Act.  This conclusion is based upon our view of section 4(d)(7) as specifically disclaiming the creation of new reserved water rights and of section 4(a) as assigning wilderness a secondary purpose on Federal reserved lands.

A. The Wilderness Act's Provision on State Water Law

   The Wilderness Act establishes the National Wilderness Preservation System by providing for congressional designation of wilderness area on forests, parks and refuges.  16 U.S.C. § 1131. The Act specifies that those areas suitable for designation are to be identified by the Secretaries of Agriculture and Interior.  16 U.S.C. § 1132.  The Act requires that the areas are then to be managed by the Secretary having jurisdiction over the underlying reservation so as to preserve **\*219** the wilderness character of the lands while still, using them for the other purposes for which they had originally been established. 16 U.S.C. § 1133.  In the section of the Act on use of wilderness areas, Congress specifies certain activities which are prohibited in wilderness areas.  Id.

   **\*\*6** Congress did not expressly reserve Federal water rights to accomplish these purposes of the Act.  In fact, water resources were mentioned only twice in the Act. In paragraph (d)(5) of section 4, Congress authorized the President to allow prospecting for water resources and the establishment and maintenance of reservoirs and water-conservation works.  16 U.S.C. §  1133(d)(6), Congress addressed the issue of whether the Act was intended to provide an exemption from state water law with the following:
   Nothing in this Chapter shall constitute an express or implied claim or denial on the part of the Federal Government as to exemption from State water laws.

   Subsequent to the 1964 Act, Congress enacted a number of statutes which designated individual wilderness areas.  Rather than clarifying the issue of reserved water rights, the vast majority of those acts merely refer back to the 1964 Act for guidance as to the Federal management of the areas designated, and in some cases, repeat the language of section 4(d)(7).  See, for example, Arizona Wilderness Act of 1984, 98 Stat. 1485, § §  101(b) and (e). [FN12]

   To the extent that the individual designating statutes refer back to the 1964 Act, then, the language of that Act would be determinant of the question of a reserved water right.  Of course, if the specific designating statute were to expressly

96 Interior Dec. 211                                                    Page 6
96 Interior Dec. 211, 1988 WL 410391 (D.O.I.)
**(Cite as: 96 Interior Dec. 211,  1988 WL 410391 (D.O.I.))**

reserve a Federal water right, then that expression would control in the specific
wilderness area designated.

   Although section 4(d)(7) is far from clear on its face, the legislative history of
the Wilderness Act gives meaning to it.  That legislative history demonstrates that
the section was intended to disclaim any new or additional reserved water rights
while not relinquishing any existing water rights.

1. Section 4(d)(7) Specifically Disclaims New Reserved Water Rights

   The legislative history of section 4(d)(7) indicates that it was intended to
achieve a particular congressional objective, i.e., to alleviate the concerns of
western states that the Wilderness Act would form the basis for the assertion of
additional Federal reserved water rights.  In this regard, Senator Hubert Humphrey
stated as follows with respect to what was to become section 4(d)(7):
   **\*220** Paragraph 5, the last in this section, contains language vital to
colleagues from the West.  When the first wilderness bill was being discussed, some
of its opponents charged that its enactment would change existing water laws and
would deprive local communities of water, both domestic and irrigation. Although
this was certainly not the intention of the sponsors, it has seemed necessary to
insert a short sentence to remove any doubts.  The sentence added says:  "Nothing in
this act shall constitute an express or implied claim or denial on the part of the
Federal Government as to exemption from State water laws."

   104 Cong. Rec. 11,555 (1958) (italics added).

   That these concerns surfaced is not surprising.  When the Wilderness Act was first
introduced, the impacts of implied water rights reservations were the subject of
significant legislative controversy.  The Winters doctrine had originally been seen
as limited to Indian water law, a belief reinforced by the statement in California
Oregon Power that Federal water rights on public lands had long ago been severed
from the land and subjected to State allocation. 295 U.S. at 158.  Then, only 2
years before the wilderness bills were introduced, the Supreme Court decided the
Pelton Dam case, which contained language implicitly extending the reserved rights
doctrine to non-Indian lands.  This development was seen as upsetting state water
allocations and even Federal agency practices. [FN13]  Legislation seeking to
overrule that controversial decision, and to revoke all existing Federal water
rights reservations, had been referred to the Senate Committee on Interior and
Insular Affairs, which held extensive hearings throughout 1956. [FN14]  When S.
1176, the predecessor of the Wilderness Act, was referred to that Committee in 1957,
it came before a body already conversant with the effects both of implicit
reservations and also of waiver of existing Federal water rights. Therefore, the
legislative history of the Wilderness Act is replete with references to water rights
issues.  These issues repeatedly surfaced during consideration of the Act, with
legislators and witnesses repeatedly expressing concern that the Act might cut off
vitally needed water. [FN15]

   **\*\*7** However, S. 1176, as introduced and referred to the Interior and Insular
Affairs Committee, contained no express provisions relating to water rights claims.
During hearings, the bill was criticized by William Berry, testifying for
California's Departments of Water Resources, Game and Fish, and Natural Resources:
[FN16]
   **\*221** The committee is very familiar with the serious problems concerning the
validity of State water law that have been brought about by court decisions in
recent years, and especially by the Pelton Dam decision-Federal Power Commission
versus Oregon, 349 U.S. 435, 1955.
   As I understand it, however, the Pelton Dam case may be a precedent for holding
that State water law has no validity on reserved or withdrawn federal land ...
   The bills now before you would include large areas of national forests and
wildlife management land in the national wilderness preservation system ... The
Federal courts might well hold that land within such a system is reserved in the
same sense as the land involved in the Pelton Dam case, that the Desert Land Act did
not apply, and that State water law need not be followed. [FN17]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

   To remedy this concern, the California agencies proposed an amendment to S. 1176
to subject all unappropriated water in wilderness areas to "appropriation and use of
the public pursuant to State law." [FN18]  This broad amendment would not only have
precluded water reservations based on a wilderness designation, but also could have
repudiated Federal water claims that antedated the designation.  In addition to
affecting claims for park and refuge use, this repudiation could also have destroyed
the long-established water claims for Indian reservations, because S. 1176 provided
for establishment of wilderness areas on Indian lands. [FN19]

   In response to those hearings, the concerns of the three California Departments
were addressed in two revised drafts of wilderness legislation. See 104 Cong. Rec.
11,551 (1958). Draft No. 2 contained the provision that was to become section
4(d)(7). Its origin was explained as follows in a report prepared by Howard Zahniser
for, and submitted for the record in Senate floor debate by, Senator Neuberger:
   Certain changes now incorporated in committee print No. 2, have been made to
meet suggestions by the Department of Water Resources of the State of California.  A
statement by this department at the hearing added to the considerations in
connection with making the changes suggested at the hearings by the Forest Service
as regards reservoirs.  After this change was made in the posthearing draft and
incorporated in committee print no. 1, further consultations with representatives of
the California Department led to the following further changes:
   1....
   2. The California Department also recommended the insertion of an added special
section which would provide that "nothing in this act shall constitute an express or
implied claim on the part of the United States for exemption from State Water laws."
Following consultations with various others, including those within Government
Departments as well as legislators and specially interested citizens, this has been
added as a clarification that would protect the California Department of Water
Resources and any other State or other agency from any misuse of the wilderness bill
in connection with water programs.  **\*222** This is in keeping with the purposes of the
wilderness bill to provide for wilderness preservation as part of an overall program
that also includes economic and other enterprise.  The added section reads as
follows:  "(5) Nothing in this act shall constitute an express or implied claim or
denial on the part of the Federal Government as to exemption from State water laws.
[FN20]

   **\*\*8** It is our conclusion that this passage, reported simultaneously with the
reporting of Committee Draft No. 2, proves that section 4(d)(7) was enacted to meet
the concerns of western states regarding water rights, i.e., to specifically avoid
the creation of new or additional reserved water rights in the wilderness areas to
be created in the future.  This conclusion is supported by other provisions of the
legislative history of the Wilderness Act and the legislative history of a later
specific wilderness bill.

   Section 4(d)(7) was described by the Committee's chairman as a "disclaimer of any
interference with State or Federal water rights" through enactment of the wilderness
legislation. [FN21]

   Senator Humphrey's assurances on the floor that his language was vital to western
Senators and would "remove any doubts" that Congress did not intend to "change local
water laws" has been mentioned previously.

   Further, legislators and the public were repeatedly assured that, in light of this
section, the wilderness bills if enacted would not interfere with state water
rights.  For example, Charles Collison of the National Wildlife Federation
interpreted the language to guarantee that "no claim is made to exemption from State
Water laws on wilderness areas."  Hearings on S. 4028 Before the Senate Committee on
Interior & Insular Affairs, 85th Cong., 2d Sess., Pt. 2 at 257 (1958) [Hereinafter
Hearings on S. 4028].  The Citizen's Committee on Natural Resources argued that
claims made by commercial interests were "completely without justification" because,
inter alia, "A special provision in the bill safeguards State water laws."  Hearings
on S. 174 at 275.  The New York Conservation Council stated that "all existing
rights ... will continue to be recognized, as will State water laws."  Id. at 341.
These statements simply cannot be reconciled with, and are completely opposite to, a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

96 Interior Dec. 211                                                          Page 8
96 Interior Dec. 211, 1988 WL 410391 (D.O.I.)
**(Cite as: 96 Interior Dec. 211,  1988 WL 410391 (D.O.I.))**

conclusion that the Wilderness Act was intended to embody an implicit exemption from
state water laws.

    In addition, subsequent legislation confirms the view that section 4(d)(7)
disclaimed the creation of new Federal reserved water rights.  A bill to designate
certain lands in Idaho as wilderness areas was considered and finally passed in the
96th Congress.  That bill, S. 2009, **223** and parallel House bills, contained a
provision referring back to section 4(d)(7) of the Wilderness Act to address the
application of state water laws to the designated wilderness area.  See section 7(b)
of S. 2009; H.R. Rep. No. 838, 96th Cong., 2d Sess. at 20 (1980).  That provision
reads as follows:
    As provided in paragraph 4(d)(7) of the Wilderness Act, nothing in this Act
shall constitute an express or implied claim or denial on the part of the Federal
Government as to exemption from State water laws.

    Senator Church explained that this provision applied State water law to the
wilderness area as, he stated, the Wilderness Act had done in section 4(d)(7):
    **9** Moreover, we desired to reiterate and underscore the jurisdiction of the
State of Idaho over the water resources and fish and game within the wilderness
areas and accomplished that by repeating the provisions of the 1964 act which relate
to these issues.
See, also 125 Cong. Rec. 17,180 (1980).  The same explanation of section 7(b) of S.
2009 was contained in the Senate Report on the bill which stated that "Section 7
further reiterates and underscores the jurisdiction of the State of Idaho over the
water resources within the wilderness area ..."  S. Rep. No. 414, 96th Cong., 1st
Sess. at 22 (1980).

    In light of these explicit statements as to the intentions of Congress in enacting
section 4(d)(7), it is clear that Congress disclaimed any intent to create new or
additional reserved water rights for wilderness areas.  Any other conclusion would
entirely ignore the political balance Congress sought to achieve to address the
concerns of western states.  That the balance was achieved and that the disclaimer
was effective is evidenced by California Senator Thomas Kuchel's support of the
wilderness bill. The bill's sponsor, Senator Humphrey, had given California Senator
Thomas Kuchel carte blanche to solve his State's problems with the bill ("I said to
Senator Kuchel, for example, about mining rights and water rights; I said 'there is
nothing in this bill that will prevent us from making whatever changes are required
so that California can have its water."'), [FN22] and Senator Kuchel found Committee
Print No. 2 satisfactory ("I am particularly pleased to note two changes, which have
eliminated the objections of certain officials in California"), adding "[t]hat the
section 4(d)(7) language seems to me to be sufficient.") [FN23]

2. Section 4(d)(7) Specifically Retains Existing Water Rights

    While section 4(d)(7) disclaimed the creation of any new or additional reserved
water rights, we believe that it specifically retained existing Federal water
rights, such as those existing on Indian reservations.  In **224** other words, it is
our conclusion that the "no denial" language was added to California's suggested "no
claim" language (and to section 4(d)(7)) to safeguard Federalreserved water rights
then existing for park, forest and Indian purposes.  As discussed above, the
Wilderness Act merely imposed certain wilderness management restrictions on existing
Federal reservations, which had recently been deemed by the courts to have implied
water rights. The legislative history of the Act indicates that while Congress did
not wish to reserve new rights, it did not intend to reopen the issue in relation to
those rights already recognized.

    The legislative history of the Wilderness Act shows that section 4(d)(7) was
intended to serve two purposes:  first, the provision was inserted to protect the
states, but, second, it was also "in keeping with the purpose of the wilderness bill
to provide for wilderness preservation as part of an overall program that includes
also economic and other enterprises." 104 Cong. Rec. 6344.  We suggest that the "no
denial" clause accomplished the second purpose, being intended to preserve water
rights already recognized at the time of the bill, especially reserved water rights
on Indian reservations (which were included as sites for wilderness areas in early

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

bills, see section 2(d) of S. 3619, 104 Cong. Rec. 5341 (1958)).  In other words, the "no denial" language recognized that wilderness preservation is simply one part of larger programs, i.e., systems of National Parks, National Forests, and Indian reservations, on which reserved rights already existed and it was those rights that had to be preserved through the "no denial" language. [FN24]  The agreement arrived at by Congress which became the Wilderness Act was prospective only; it did not go so far as to eliminate existing rights.

**\*\*10** The history of the Wilderness Act confirms this conclusion. California had originally suggested the addition of language to the wilderness bill that would disclaim all Federal exemptions from state law.  See Hearings on S. 1176, at 286-87; 104 Cong. Rec. 6344.  Senator Neuberger explained that after consultation with Government officials, legislators, and interested citizens, the California language was included in the wilderness bill, but with the addition of the "no denial" language.  104 Cong. Rec. 6344. One of the major problems here is the lack of legislative history to document the consultations referred to above and, thus, the reasons why California's suggested language was changed to the "no claim or denial" language presently in the law. However, we believe that the answer can be found in parallel legislative history concerning the same language as used in another bill.

Within the year prior to its considering the wilderness bills, the Senate Committee on Interior and Insular Affairs had considered several bills **\*225** seeking to overturn FPC v. Oregon (Pelton Dam).  The wilderness bill language suggested by California was taken from these bills.  For example, section 6 of S. 863, the Water Rights Settlement Act, 84th Cong., 2d Sess., stated as follows:
    Sec. 6.  Subject to existing rights under State law, all navigable and nonnavigable waters are hereby reserved for appropriation and use of the public pursuant to State law, and rights to the use of such waters for beneficial purposes shall be acquired under State laws relating to the appropriation, control, use and distribution of such waters.

The parallel with California's first proposal is apparent: indeed, Mr. Berry described that proposal as taken directly from H.R. 5871, S. 863's successor on the House side of the 85th Congress. Hearings on S. 1176 at 286.  However, this original S. 863 language incurred considerable criticism due to its overbroad reach.  During hearings, the Assistant Attorney General for the Office of Legal Counsel argued that section 6:
    expose[d] to loss, through appropriation by others under State law, all presently vested rights of the United States to the use of water on the Government's military establishments, national forests, Indian reservations, national parks and monuments, and other obligations in connection therewith is involved, should be noted.

Hearings on S. 863 at 55 (italics added). [FN25] The primary example, given repeatedly of rights potentially lost were rights of Indians and Indian tribes to the use of water on their reservations.  Id. [FN26]

We believe that fear of losing existing Federal reserved water rights was the reason why the same committee a year later in section 4(d)(7) substituted the "no claim or denial" language for California's "subject to existing rights" limitation, rather than any desire to extend the reserved rights doctrine to create new water rights.  Only if this interpretation of section 4(d)(7) is accepted, i.e., that it preserved preexisting Federal rights while still safeguarding the primacy of state law, do subsequent descriptions of 4(d)(7) as "disclaimer of any **\*226** interference with State or Federal water rights" make sense.  Hearings on S. 174 at 5.

**\*\*11** This reading of committee action on the future section 4(d)(7) in light of Justice objections to parallel language in S. 863 is reinforced by the only contemporaneous committee explanation of the addition of the words "no denial." Immediately following the drafting of Committee Print No. 2, the Committee was furnished a report prepared by Howard Zahniser, Washington Representative for Trustees for Conservation.  An abstract of this report was inserted in the Congressional Record by Senator Neuberger as an explanation of the changes.  104 Cong. Rec. 6343 (1958).  In that report, Mr. Zahniser stated that the "no denial"

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

96 Interior Dec. 211                                                    Page 10
96 Interior Dec. 211, 1988 WL 410391 (D.O.I.)
**(Cite as: 96 Interior Dec. 211, 1988 WL 410391 (D.O.I.))**

language had been inserted to anticipate and avoid objection on the part of the
Department of Justice:

    The [California] Department also recommended the insertion of an added Special
section which would provide that "nothing in this Act shall constitute an express or
implied claim on the part of the United States for exemption from State Water laws."
Following consultations with various others including those within Government
departments as well as legislators and specially interested citizens this has been
added as a clarification that would protect the California Department of Water
Resources and any other State or other agency from any misuse of the Wilderness Bill
in connection with water programs.  This is in keeping with the purpose of the
Wilderness Bill to provide for Wilderness preservation as part of an overall program
that includes also economic and other enterprise. In line with suggestions received
in the course of the consultations regarding the proposed new section, the words "or
denials" were also added to avoid a possible misinterpretation on the other hand and
specifically to anticipate and avoid objection on the part of the Department of
Justice.  The added section reads as follows:
    "(5) Nothing in this Act shall constitute an express or implied claim or denial
on the part of the Federal Government as to exemption in State water laws." [FN27]

    This language supports the view that Committee Print No. 2 was seen as resolving
the California agencies' problems while avoiding interference with pre-wilderness-
designation Federal water rights.

3. Arguments Against the Conclusion that Section 4(d)(7) Disclaims Federal Reserved
Water Rights

    The conclusion that section 4(d)(7) disclaimed any new Federal reserved water
rights is opposite that reached in the Prior Opinion and by some commenters. That
Opinion and those commentators support their conclusion that reserved water rights
are created when wilderness areas are designated with one of several theories:  (1)
that section 4(d)(7) is neutral, merely preserving the status quo which applies
Federal reserved water rights to wilderness areas; (2) that section 4(d)(7) was a
compromise whereby the states retained some right to construct water projects in
wilderness areas but lost the right to have water rights adjudicated under state
law; and (3) that the subsequent use of the same language in the Wild and Scenic
Rivers Act compels a conclusion that Federal water rights are reserved for **\*227**
wilderness areas.  For the reasons that follow, we find each of these theories to be
unpersuasive.

a. Congressional Neutrality

    **\*\*12** The first theory advanced to support the existence of wilderness reserved
water rights is that Congress, in enacting section 4(d)(7), sought to maintain
"neutrality" with regard to the emerging doctrine of reserved water rights, doing
nothing more than maintaining the status quo.  This position essentially maintains
that the use of "or denial" language in section 4(d)(7) either strips all meaning
from its command that the Act not be read to assert any "claim" to exemption from
State water laws, thus rendering the section completely meaningless, [FN28] or that
Congress intentionally chose, not to be silent, but to be neutral on the issue of
water rights.  The argument then proceeds from the conclusion that section 4(d)(7)
maintains the status quo to a further conclusion that water rights are thereby
created because the status quo includes the Federal reserved water rights doctrine.
[FN29]  We find these arguments unpersuasive for several reasons. [FN30]

    A finding that section 4(d)(7) is essentially without meaning is an eggregious
violation of the cardinal principle of statutory construction that congressional
enactments are not to be relegated to surplusage if there is a way of giving meaning
to them.  See, e.g., National Insulation Transp. Comm. v. I.C.C., 683 F.2d 533 (D.C.
Cir. 1982); Zigler Coal Co. v. Kleppe, 536 F.2d 398 (D.C. Cir. 1976); **\*228**Wilderness
Society v. Morton,  479 F.2d 842 (D.C. Cir. 1973), cert. denied, 411 U.S. 917
(1973). Further, there is a complete lack of evidence, or even plausible
speculation, of a legislative motive for enacting a meaningless command. [FN31]

    As noted previously, what became section 4(d)(7) was first drafted as a

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

repudiation of any "claim" to exemption.  Prior to release of Committee Print No. 2, the "or denial" language was added.  The argument that the "no denial" language strips the "no claim" language of meaning requires us to assume that Congress consciously added the "no denial" language to negate what it had already drafted. Yet the only contemporaneous explanation to be found in the Committee files mentions no such intent.  Instead, it states that "The words 'or denial' were also added to prevent any possible misinterpretation on the other hand and specifically to anticipate and avoid objection on the part of the Department of Justice." [FN32] This expression of a positive intent is in accord with Senator Humphrey's later description of section 4(d)(7) as "language vital to our colleagues from the West" and as removing "any doubt" that the bill was not intended to "change existing water laws and ... deprive local communities of water." [FN33] The negation of a guarantee against extension of reserved Federal water claims would hardly be "vital to our colleagues from the West" nor remove doubt as to impact on local water needs.

   Also, there seems little merit to the Prior Opinion's basic premise that the "status quo" that the Prior Opinion maintains was safeguarded by section 4(d)(7) was, in 1964 at the time of the Wilderness Act, understood to include the recently extended doctrine of implicitly reserved water rights.  Throughout this period, Congress was considering legislation to overturn or modify FPC v. Oregon (Pelton Dam), and in the Senate Interior and Insular Affairs Committee, such legislation was seen as restoring the legal status quo which mandated the primacy of state law. [FN34]

   **13 In advancing this "status quo" theory, proponents cite to several events in the Wilderness Act's 5-year history. Following careful examination, we must conclude that these events lend more support to the conclusion that reserved water rights were not created for wilderness areas than to the opposite view.

   *229 The first such event consists of a two-paragraph telegram from Harvey Banks of the California Department of Water Resources to the chairman of the committee considering the wilderness bill objecting to the use of the "or denial language in section 4(d)(7)."  He urged that the insertion would "leave room for further expansion of the Pelton Dam case, FPN [sic] v. Oregon ..." Hearings on S. 4028 at 198.  The hearing record shows no response by the Committee.  Such silence might be advanced as support for a view that Congress intended to apply Pelton Dam to wilderness areas.  However, a careful review of Mr. Banks' hastily written two-paragraph letter and subsequent legislative history shows that this support is illusory.  First, as noted earlier, when William Berry initially proposed the amendment to protect state water laws, he made clear that he represented three California officials-not only Mr. Banks, but also the directors of the Department of Fish and Game and of the Department of Natural Resources.  Hearings on S. 1176 at 289, 288-89. However, only Mr. Banks objected to the "no denial" language in his capacity as Director of the Department of Natural Resources; the latter two agencies, as well as the Governor, later endorsed the wilderness bill without reservation. [FN35]

   Second, even prior to receiving Mr. Banks' telegram, Senator Kuchel of California had notified the Committee chairman that he had reviewed Committee Print No. 2 and that he "was particularly pleased to note two changes, which have eliminated the objections of certain officials in California."  (Italics added.)  Quoting what became sec. 4(d)(7), he concluded "this language seems to me adequate" and endorsed the proposals; "it is my hope that the Committee can give favorable consideration at a early date to the proposed changes." [FN36] Upon receipt of Mr. Banks' telegram some 3 months later, Senator Kuchel indicated no alteration in his views, but merely transmitted the telegram to the Committee chairman with a two-sentence note requesting its inclusion to the record. [FN37] This sequence is consistent with the view that the Committee deemed no reply necessary because Mr. Banks' views involved a misreading of the Committee's intent--the objections of the California officials had in fact been "eliminated," and all save Mr. Banks understood this and supported the amended bill.

   Proponents of a "status quo" or "neutrality" argument also point to a statement made by Senator Kuchel during hearings on S. 174 in which he quotes several sections

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of the wilderness bill, including sec. 4(d)(7) and language concerning jurisdiction
over fish and wildlife. Senator Kuchel then indicates that the bill does not
resolve jurisdictional **230** questions. Hearings on S. 174 at 65.  However, Senator
Carroll clarifies this issue by stating that the jurisdictional questions they are
discussing relate to powersites and Federal Power Commission jurisdiction.  Id.

**\*\*14** Even assuming that Congress meant to draft section 4(d)(7) to explicitly
state its neutrality on water rights, it does not follow that reserved water rights
are created.  Reserved water rights, where they exist, are a creature of legislative
intent. "The reserved rights doctrine is a doctrine built on implication...."
United States v. New Mexico, 438 U.S. at 696.  When such rights are considered, "The
issue is whether the Government intended to reserve ... water." Cappaert v. United
States, 426 U.S. at 139.  If Congress genuinely had no collective intent either to
claim water or to leave it unclaimed, as the Courts have no basis to assert such a
claim without at least the ability to infer an implied congressional intention to do
so. [FN38]

b. Congressional Compromise

  A second theory advanced to support wilderness water rights is that Congress
sought a compromise on two water issues-the reserved rights doctrine and the
question of water improvement construction within wilderness areas.  This view
hypothecates a Committee agreement to accept negation of the proposed guarantee of
state water rights in exchange for protection of access for water improvements.
This explanation must be rejected for two reasons.

  First, neither the published nor the Committee's files suggest that any such quid
pro quo was intended.  So important a compromise on two controversial issues would
likely have been reflected in the record, not to mention cited in explanation of
Members' positions.  Nor is there any ready explanation of who would have been
parties to the hypothecated compromise.  The entire Committee was composed of
Senators representing states with reserved water rights concerns.  The same
Committee had reported out, without recorded dissent, a bill to essentially overrule
Pelton Dam. Senator Neuberger, first sponsor of the wilderness bill, had even sought
to amend that bill to suspend the licenses issued to the Pelton Dam under the
authority of that case.  The Committee, in short, does not appear to have considered
protection of Pelton Dam a high priority, and an explanation which requires us to
assume that Senator Neuberger would have protected that case law, let alone at the
price of incurring further opposition to his bill, simply runs contrary to all known
fact.

  **\*231** Second, this explanation is inconsistent with the subsequent course of the
wilderness bills.  If such a compromise had been reached, the proponents of water
rights who were parties to it should have ceased opposition, and those not parties
to it would have opposed the sacrifice of their desired water rights guarantees.  In
fact, the opposite appears to have occurred. Criticism of the bill's impact on water
rights became all but nonexistent after publication of Committee Print No. 2, while
Senators still in opposition to the bill roundly criticized its impact upon water
improvements.  This is consistent with the belief that problems with water rights
had been eliminated while those with water projects remained, exactly the opposite
of what the explanation offered by reserved water rights proponents requires.  The
minority views in the Committee reports in both the 87th and 88th Congresses, for
example, devote an entire section to "The Impact on Western States," yet reflect no
complaint that the bill had sacrificed protection of western water rights.  In
short, even if a compromise is assumed, it would appear to have involved a
satisfaction of water rights concerns in exchange for only a partial satisfaction of
water project difficulties-precisely the opposite of what this "compromise" theory
requires.

  **\*\*15** Proponents of the "compromise" theory seek support in a dialogue between
Senator Goldwater, who had opposed the Wilderness Act from the beginning, and
certain Forest Service officials, who were testifying in its support.  Yet a careful
reading of the dialogue demonstrates that:  (1) a distinction was drawn between
water-rights guarantees and the power to construct water improvements in wilderness

96 Interior Dec. 211, 1988 WL 410391 (D.O.I.)
**(Cite as: 96 Interior Dec. 211,  1988 WL 410391 (D.O.I.))**

areas and (2) both parties to the dialogue conceded that water rights had been
protected, while the power to construct improvements was curtailed--which
contradicts the hypothesis of a "compromise" in favor of the latter.  Senator
Goldwater began by asking whether the Wilderness bill "would give you control over
the water in these areas?" Forest Service Chief Richard McArcle replied "No, sir"
and proceeded to quote the future section 4(d)(7).  Senator Goldwater then
introduced the requirement of presidential authorization for water projects in
wilderness areas, to which the Director of the Division of Legislative Reporting and
Liaison replied:

   Senator Goldwater, the application of State water rights and the question of the
right to construct waterworks on [sic] water improvements on Federal lands are two
distinct questions.  The application of State water laws does not necessarily give
to the holder of a water right the privilege of constructing dams.

   Senator Goldwater replied, concretely, "Yes, but what good are water rights
without water?" and another Forest Service witness concluded: "you have the right,
but if the President refused, it would not implement the right."  After some
discussion of water rights in Colorado, the chairman ended with "there is nothing in
the bill that **232 changes the situation in these water rights is there?" and was
assured by these witnesses: "There is nothing that changes the situations with
respect to water rights.  It is very clear and specific in the bill."  Hearings on
S. 174 at 58-61 (italics added).

   In brief, we find that the Goldwater-Forest Service dialogue reinforces rather
than contradicts the conclusions reached in this opinion.  A distinction was clearly
drawn between State water rights, which the bill would not affect, and the
construction of improvements in wilderness areas, which it would.

c. Wild and Scenic Rivers Act

   The third theory upon which wilderness area reserved water rights have been based
is the usage of language duplicative to that found in section 4(d)(7) in another act
which appears to reserve water rights, the Wild and Scenic Rivers Act, 16 U.S.C. §
1271 et seq.  The Wild and Scenic Rivers Act does contain the same language that is
used in section 4(d)(7) of the Wilderness Act. This similarity, however, furnishes
little assistance to the task construing the Wilderness Act.  First, section 4(d)(7)
of the Wilderness Act was drafted in 1958 and enacted in 1964.  The Wild and Scenic
Rivers Act was passed in 1968.  References to congressional actions in 1968 to
explain a clause drafted a decade before necessarily run afoul of the Supreme
Court's admonition that "The views of a subsequent Congress of course afford no
controlling basis from which to infer the purposes of an earlier Congress." Haynes
v. United States, 390 U.S. 85, 87 n.4 (1968).  See also United States v. Price, 361
U.S. 304, 313 (1960); United States v. United Mine Workers, 330 U.S. 258, 282
(1947). [FN39] This is particularly so when the subsequent explanations come from
legislators who did not serve in the earlier Congress or were not members of the
committee which reported out the earlier bill. United States v. United Mine Workers,
supra.  It is noteworthy that only five of the 17 members of the Senate Committee
that considered the Wild and Scenic Rivers Act had served on the Committee when it
drafted what became section 4(d)(7) of the Wilderness Act. Compare Hearings on S.
1176, supra at II, with Hearings on S. 119 and S. 1092 Before the Senate Committee
on Interior and Insular Affairs, 90th Cong., 1st Sess. at II (1967).

   **16 Second, although the wording employed in the Wild and Scenic Rivers Act and
the Wilderness Act is the same, the statutory context and stated legislative purpose
are in sharp contrast.  The language at issue appears in the Wild and Scenic Rivers
Act in a subsection entitled "Compensation for Water Rights," the primary focus of
which was to ensure that vested water rights are not taken without just *233
compensation.  16 U.S.C. § 1284(b).  The first sentence of the subsection provides
that Federal-state jurisdictional questions will be settled by "established
principles of law"; the second guarantees just compensation for any taking of water
rights; the third contains the language at issue.  The Senate Report treats the last
sentence as having no separate significance, referring back to the first sentence as
the operative language: "Any issues relating to exemption will be determined by
established principles of law as provided in the first section."  S. Rep. No. 491,

96 Interior Dec. 211                                                      Page 14
96 Interior Dec. 211, 1988 WL 410391 (D.O.I.)
**(Cite as: 96 Interior Dec. 211,  1988 WL 410391 (D.O.I.))**

90th Cong., 1st Sess. 5 (1967).  The better legal view of the "claim or denial"
language in the Wild and Scenic Rivers Act, then, is that it was inserted not in
response to the Federal reserved water right doctrine-the reservation of waters was
made, with limitations, in the next section of the Act-but rather to prevent the
reserved water rights created in the Act from eliminating existing rights under
state laws that were being taken and which formed the basis for compensation. [FN40]

   In fact, the emphasis on composition in the Wild and Scenic Rivers Act is evident
even in the reservation language, which reserves no more water than is necessary to
meet the purposes specified in the Act, as follows:

                              * * * * * * *

(a) Compensation for water rights

   The jurisdiction of the States and the United States over waters of any stream
included in a national wild, scenic or recreational river area shall be determined
by established principles of law. Under the provisions of this chapter, any taking
by the United States of a water right which is vested under either State or Federal
law at the time such river is included in the national wild and scenic rivers system
shall entitle the owner thereof to just compensation.  Nothing in this chapter shall
constitute an express or implied claim or denial on the part of the Federal
Government as to exemption from State water laws.

(c) Reservation of waters for other purposes or in unnecessary quantities prohibited

   Designation of any stream or portion thereof as a national wild, scenic or
recreational river area shall not be construed as a reservation of the waters of
such streams for purposes other than those specified in this chapter, or in
quantities greater than necessary to accomplish these purposes.

(d) State jurisdiction over included streams

   **234** The jurisdiction of the States over waters of any stream included in a
national wild, scenic or recreational river area shall be unaffected by this chapter
to the extent that such jurisdiction may be exercised without impairing the purposes
of this chapter or its administration.

(e) Interstate compacts

   ****17** Nothing contained in this chapter shall be construed to alter, amend,
repeal, interpret, modify, or be in conflict with any interstate compact made by any
States which contain any portion of the national wild and scenic river system.

(f) Rights of access to streams

   Nothing in this chapter shall affect existing rights of any State, including the
right of access, with respect to the beds of navigable streams, tributaries, or
rivers (or segments thereof) located in a national wild, scenic or recreational
river area.

                              * * * * * * *

   16 U.S.C. §  1284.  Taken as a whole, these provisions evidence a congressional
intent to minimize the impact of the Act on state water laws and rights created
thereunder.  Recognizing that water was being reserved under the Wild and Scenic
Rivers Act, Congress made clear its intent to go no further than necessary in
exempting the areas impacted from state law.

   The contrasting uses of the provisions of the two statutes are more understandable
when viewed against a historical background.  As noted above, when the relevant
section of the Wilderness Act was drafted, reserved water rights for non-Indian
lands were very much a new issue, recently suggested (and never actually applied) by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

96 Interior Dec. 211, 1988 WL 410391 (D.O.I.)
**(Cite as: 96 Interior Dec. 211,  1988 WL 410391 (D.O.I.))**

the Court.  By the passage of the Wild and Scenic Rivers Act, the doctrine had
become established law.  The two statutes were debated and enacted against two
separate and different legal and historical backgrounds.

    Moreover, the Wilderness Act focused upon preserving land, which might or might
not affect water rights.  The Wild and Scenic River Act focused upon the water,
expressly allowed taking of water rights upon compensation, 16 U.S.C. § 1284(b),
expressly provided that the beds of designated streams and surrounding lands were
"withdrawn," 16 U.S.C. § 1279, and contained no "within and supplemental" purposes
clause.  In contemplating the Wilderness Act, there was dispute over whether water
rights should be acquired; in the Wild and Scenic Rivers Act debates, the issue was
how they should be obtained.

    Therefore, the arguments made in support of wilderness water rights are not
persuasive on the issue, and as such, do not vary our conclusion that such rights
are not reserved by the Wilderness Act of 1964.

B. Primary Purposes of Wilderness Areas

    In analyzing the existence of reserved water rights for wilderness areas, we must
next review the purposes for which wilderness areas are designated.  That review
demonstrates that Congress did not specify wilderness purposes as primary purposes
for the Federal lands in which they are designated.

    **\*235** In United States v. New Mexico, 438 U.S. at 702, the Supreme Court for the
first time distinguished between the primary and secondary purposes of a Federal
reservation of land in determining congressional intent as to the creation of
Federal reserved water rights.  In New Mexico, the Court concluded:
    Where water is only valuable for a secondary purpose of the reservation,
however, there arises the contrary inference that Congress intended, consistent with
its other views, that the United States would acquire water in the same manner as
any other public or private appropriator.

    **\*\*18** In applying this distinction to purposes of National Forests, the Supreme
Court held that in theMultiple-Use-Sustained-Yield Act, Congressdid not add
additional primary purposes to existing National Forests and thus did not intend to
create additional Federal reserved water rights.

    Section 1 of MUSYA, 16 U.S.C. § 528, states as follows in pertinent part:
    That it is the policy of Congress that the national forests are established and
shall be administered for outdoor recreation, range, timber, watershed, and wildlife
and fish purposes.  The purposes of [this Act] are declared to be supplemental to,
but not in derogation of, the purposes for which the national forests were
established as set forth in the [Organic Administration Act of 1897, 16 U.S.C. §
473 et seq.].  (Italics added.)

    The Supreme Court relied in part on the "supplemental to, but not in derogation
of" language set forth above in determining that MUSYA's purposes were secondary,
not primary, 438 U.S. at 714.  The Court then stated as follows:
    As discussed earlier, the "reserved rights doctrine" is a doctrine built on
implication and is an exception to Congress' explicit deference to State water law
in other areas. Without legislative history to the contrary, we are led to conclude
that Congress did not intend in enacting theMultiple-Use-Sustained-Yield Act of 1960
to reserve water for the secondary purposes there established ... Congress intended
the national forests to be administered for broader purposes after 1960 but there is
no indication that it believed the new purposes to be so crucial as to require a
reservation of additional water ...

    Id. at 715.  See also United States v. City & County of Denver, 656 P.2d 1, 25
(Colo. 1983). [FN41]

    Like the language of section 1 of the MUSYA, paragraph (a) of section 4 of the
Wilderness Act assigns wilderness purposes a secondary role to other purposes for
which the lands are administered:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

96 Interior Dec. 211, 1988 WL 410391 (D.O.I.)
**(Cite as: 96 Interior Dec. 211, 1988 WL 410391 (D.O.I.))**

   **\*236** The purposes of this chapter are hereby declared to be within and
supplemental to the purposes for which national forests and units of the national
park and national wildlife refuge systems are established and administered ...
(Italics added). [FN42]

   In addition, the Act specifies that it should not be deemed to interfere with the
purposes for which national forests are established and that it should not lower the
standards evolved for the "use and preservation" of park system units.  Section
4(a)(1) and (3); 16 U.S.C. § 1133(a)(1) and (3).  Section 4(a)(3) provides:
"Nothing in this chapter shall modify the statutory authority under which units of
the national park system are created."  This point is emphasized in paragraph (b) of
section 4 as follows:
   Except as otherwise provided in this chapter, each agency administering any area
designated as wilderness shall be responsible for perserving the wilderness
character of the area and shall so administer such area for such other purposes for
which it may have been established as also to preserve its wilderness character.
Except as otherwise provided in this chapter, wilderness areas shall be devoted to
the public purposes of recreational, scenic, scientific, educational, conservation,
and historical use.  (Italics added.) [FN43]

   **\*\*19** The plain language of these sections indicates an intent on the part of
Congress in the Wilderness Act to make wilderness purposes as secondary uses of the
land already reserved for other purposes, rather than adding them as primary
purposes.  As such, and in accordance with the Supreme Court's decision in New
Mexico, there is no implication that water has been reserved for these secondary
uses.

   The Prior Opinion interpreted section 4(a) in a contrary manner when it focused
upon the word "within" in that section as indicating that wilderness purposes are to
be considered primary purposes for the relevant reserved lands. [FN44]  Despite the
Wilderness Act's use of **\*237** language markedly similar to that at issue in New
Mexico, the Prior Opinion interpreted the word "within" in section 4(a) to mean that
wilderness purposes are primary. However, this conclusion ignores the "and
supplemental" language of section 4(a), which clearly suggests secondary purposes.
[FN45]

   Moreover, there is no indication in the legislative history of the Wilderness Act
that the phrase "within and supplemental" as used in section 4(a) intended
additional primary, as opposed to additional supplemental, purposes for areas
already reserved for Federal purposes. [FN46]  For example, the sponsors of the
Wilderness Act explained that its provisions make "plain that the wilderness bill is
in keeping with multiple-use policy, that wilderness preservation is to be one of
the multiple-use purposes of the National Forests, and that the forests as a whole
are to be administered with the general objectives of multiple use and sustained
yield." [FN47]

   Like those applicable to National Refuges, Parks and Forests, BLM wilderness
designations also serve a purpose additional to the other purposes for which BLM
lands are administered.  The Wilderness Act does not authorize designation of lands
as wilderness areas except within National Refuges, Parks and Forests.  See section
3; 16 U.S.C. § 1132.  Other Federal public domain lands were not designated as
wilderness areas until 1976 when Congress enacted the Federal Land Policy and
Management Act (FLPMA), 43 U.S.C. § 1701 et seq.  Within that general land
management statute, Congress directed the Secretary of the Interior to review and
recommend areas for wilderness designation.  43 U.S.C. § 1782.  Once designated as
wilderness areas, those public lands would be used and administered in accordance
with provisions of the Wilderness Act which apply to National Forest wilderness
areas.  Id.

   In general, FLPMA sets out the goals and management objectives for public lands.
In FLPMA, Congress makes it clear that the public lands **\*238** will be managed for
multiple use and sustained yield.  See 43 U.S.C. § 1732(a).  In the beginning of
the Act, Congress, included wilderness preservation as but one of these multiple
purposes, when it declared that it was the policy of the United States that:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**20 the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use ...  (Italics added.)

43 U.S.C. § 1701(a)(8).

The District of Columbia Circuit rejected an argument by the Sierra Club that this language in FLPMA effected a reservation of land that conferred by implication Federal reserved water rights in waters appurtenant to the BLM lands reserved. Sierra Club v. Watt, 659 F.2d 203 (D.C. Cir. 1981). Specifically, the Circuit Court found that FLPMA, while setting forth the "'purposes, goals and authority for the use' of the public domain," did not establish a reservation from the public domain that brought with it reserved water rights. Id. at 206.

The specific provisions in FLPMA providing that other public domain land would be designated as wilderness areas must be reviewed in light of the court's interpretation of these general provisions of the Act setting out its scope and effect.  This review inevitably concludes that the preservation of wilderness on BLM lands is not the primary purpose for those lands.

Even if those specific sections in FLPMA relating to wilderness designations are viewed in isolation, i.e., without recourse to the Act's policy statements described above, the conclusion with regard to purposes is the same.  The wilderness sections of FLPMA refer back to the Wilderness Act, specifying that BLM wilderness areas are to be used and administered according to provisions applicable to National Forests. 43 U.S.C. § 1782(c).  As discussed above, the provisions applicable to National Forests mandate multiple use, with wilderness purposes being but one management goal.  The same multiple use mandate likewise must apply to BLM wilderness areas, and, likewise, must preclude a finding that wilderness purposes are primary on BLM lands.

It has been argued that the prohibition of certain activities in areas designated as wilderness evidences congressional intent to make the preservation of wilderness the primary purpose for the lands upon which the areas are designated.  For example, the Wilderness Act prohibits commercial enterprise, motorized and mechanical vehicles, equipment and transport, and structures and installations within wilderness areas.  Section 4(c); 16 U.S.C. § 1133(c).  This argument fails to persuade, however, in that it ignores the multitude of other uses that are not prohibited, and thus are allowed, in those areas.  The Act *239 makes clear that the other purposes for which the lands on which wilderness areas are designated, e.g., park and forest purposes, are to be continued.  Section 4(b); 16 U.S.C. § 1131(b). [FN48] Furthermore, a prohibition of certain activities is insufficient to overcome the clear intent of Congress to make wilderness purposes secondary when it used the "within and supplemental" language in section 4(a) of the Wilderness Act.

**21 Here, then, as in New Mexico, Congress intended that wilderness areas "be administered for broader purposes [after the enactment] but there is no indication that it believed the new purposes to be so crucial as to require a reservation of additional water." 438 U.S. at 715. Therefore, our conclusion must be the same as that reached in New Mexico--Congress did not intend to create reserved water rights for wilderness areas under the Wilderness Act of 1964.

V. CONCLUSION

We believe that the better legal view with regard to the creation of Federal reserved water rights in wilderness areas is that Congress intended not to reserve water for those areas. Section 4(d)(7) clearly evidences a desire to avoid creating a reservation of water additional to that already created for the underlying parks, forests, and refuges.  Further, section 4(a) plainly assigns wilderness purposes to a secondary position.  To the extent that wilderness areas are in need of water to achieve their purposes, such water may be acquired by purchase or by appropriation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

96 Interior Dec. 211                                                         Page 18
96 Interior Dec. 211, 1988 WL 410391 (D.O.I.)
**(Cite as: 96 Interior Dec. 211,  1988 WL 410391 (D.O.I.))**

for wilderness or related purposes (e.g., instream flows for fish and wildlife purposes) under applicable state law.  In addition, Congress can expressly reserve water for any wilderness area.

   To the extent that the Prior Opinion is inconsistent with these conclusions, it is modified and superseded.

RALPH W. TARR

Solicitor

FN1 Presently ongoing are adjudications regarding the Beaver Dam Mountains Wilderness Area on the Virgin River, Utah, the Organ Pipe and Casa Grande National Monuments on the Gila River, Arizona, and the Saguaro and Taumacacori National Monuments on the Santa Cruz River, Arizona.  Claims for water rights were recently filed in the adjudications involving the latter two river systems.  The National Park Service did not include a claim for wilderness rights in those filings.

FN2 The conclusions of that Opinion, and their consistency with applicable rulings of the Supreme Court, have previously been drawn into question.  See Waring & Samelson, Non-Indian Federal Reserved Water Rights, 58 Den. L.J. 783, 792 (1981) ("The Solicitor's conclusions concerning reserved water rights for wilderness areas are not supported by the Supreme Court's analysis ...."); Tarlock, Protection of Water Flows for National Parks, 22 Land & Water L. Rev. 29, 44 (1986).

FN3 In addition, the question of wilderness area reserved water rights is being litigated in several cases.  In Sierra Club v. Block, 622 F.Supp. 842 (D. Colo. 1985), appeal dismissed, sub nom. Sierra Club v. Lyng, No. 86-1153 (10th Cir. Oct. 8, 1986), memorandum opinion and order issued June 3, 1987, this Department was originally one of the defendants but was deleted from an amended complaint after the Department submitted evidence that it had claimed reserved rights for "wilderness preservation" purposes in several national parks in Colorado.  Id., Motion to Dismiss (filed Mar. 26, 1984).  In the case remaining against the Department of Agriculture, the District Court has found that Federal reserved water rights are created when wilderness areas are designated. See Sierra Club v. Lyng, No. 86-1153, Slip. Op. at 4-5.  To date no appealable order has yet been entered by the District Court, therefore, the United States has not been permitted to challenge this finding on appeal.  To the extent that we would reach the opposite conclusion and withdraw wilderness claims currently pending in Colorado state adjudications, it may be appropriate to simultaneously advise the Federal court of our actions.  A conclusion opposite that in Sierra Club v. Block was reached by the Special Master in State of New Mexico v. Molybdenum Corp. of America, CV 9780C (D. N. Mex.), Report of Special Master (filed Mar. 27, 1987) at 10-11, Report of Special Master affirmed by the Court, Feb. 2, 1988, Motion for Reconsideration denied June 2, 1988.

FN4 The Prior Opinion was modified in certain non-relevant respects by supplemental Solicitor's Opinions dated Jan. 16, 1981, 88 I.D. 253-258, dated Sept. 11, 1981, 88 I.D. 1055-65, and dated Feb. 16, 1983, 90 I.D. 81-84.  In neither of these three later opinions did the Solicitor address the issue revisited in this memorandum.

FN5 For a complete description and history of the Federal reserved water rights doctrine, see the Office of Legal Counsel's June 16, 1982, memorandum, "Federal Non-Reserved Water Rights."  (6 Op. Off. Legal Counsel 329 (1982).)

FN6 See Trelease, Reserved Water Rights Since PLLRC, 54 Den. L.J. 473, 475  (1977); Tarlock, supra at 39.

FN7 The Court in Pelton Dam examined two issues:  (1) the jurisdiction of the Federal Power Commission under the Federal Power Act, 16 U.S.C. § § 791a-825r, to issue licenses for dams on Federal reserved lands; and (2) the power of the states to regulate the use of waters under the Desert Land Act of 1877, 43 U.S.C. § 321, and other statutes relating to water use.  It was only in the first examination that the Court referred to a section in the Federal Power Act providing that the Act would not interfere with state laws and water rights. 16 U.S.C. § 821, cited in 435

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

96 Interior Dec. 211                                                      Page 19
96 Interior Dec. 211, 1988 WL 410391 (D.O.I.)
**(Cite as: 96 Interior Dec. 211,  1988 WL 410391 (D.O.I.))**

U.S. at 445, n.15. The courts have interpreted this section as an answer to
questions regarding preemption of state law otherwise applying to Federal power
projects.  See, for example, First Iowa Hydro-Electric Co-operative v. Federal Power
Comm'n, 151 F.2d 11 (D.C. Cir. 1945), rev'd on other grounds 328 U.S. 152, reh'g
denied 328 U.S. 879.  The Court in Pelton Dam did not cite this section as relevant
to the question of reserved water rights.

FN8 The New Mexico Court gave several reasons for a cautious approach to a finding
of implied reserved rights.  First, any such reservation must be based upon
implication in a situation in which Congres has not remained silent, it has "almost
invariably" accepted state water law, that is, Congress has acted against the
presumption asserted.  Third, because the reserved right is unrecorded and has a
priority backdated to the withdrawal which created it, it may upset existing water
allocations, often by a "gallon for gallon reduction."  436 U.S. at 701-03, 705.

FN9 It has been argued that the intent to create reserved water rights can be
implied on the basis of a reservation of land and a showing that water is needed to
meet the central purpose of the reservation.  We do not disagree that these two
elements are essential to a finding of reserved water rights. However, we do
disagree that these are the only elements relevant to such a finding in light of the
Supreme Court's direction in New Mexico to consider carefully all facets of the
statute at issue.  Further, a reservation and need for water cannot overcome
legislative history that evidences an intent to disclaim the creation of new
reserved water rights.

FN10 See United States v. Alpine Land & Reservoir Co., 697 F.2d 851, 859  (9th Cir.
1983), citing the unlikelihood of upstream diversion as one reason for denying a
Forest Service claim for an instream flow right.

FN11 All of these claims are in Colorado, and are the same ones reported to the
court in Sierra Club v. Block as follows:  Mesa Verda National Park, Case No. W-
1633-76, Water Division No. 7, Application filed Dec. 1976, Amended Application
filed Feb. 1977; Black Canyon of the Gunnison National Monument, Case No. W-437,
Water Division No. 4, Application filed Dec. 1971; Great Sand Dunes National
Monument, Case No. 81CW164, Water Division No. 3, Application filed Nov. 14, 1981;
Rocky Mountain National Park, Case No. W-1768, Water District No. 5, Application
filed Dec. 19, 1971, and Case No. W-8788, Water Application filed Dec. 29, 1971, and
Case No. W-8788, Water District No. 1, Amended Application filed Dec. 29, 1977.

FN12 See, also The California Wilderness Act of 1984, 98 Stat. 1619, §  101(a); An
Act to Designate Certain Areas within Units of the National Park System as
Wilderness, 90 Stat. 2692, §  1; An Act to Designate Certain Lands as Wilderness; 84
Stat. 1104, §  1; An Act to Designate the Ventana Wilderness, 83 Stat. 101, §  1.

FN13 The Supreme Court noted that, prior to the Pelton Dam decision, Federal Power
Comm'n v. Oregon, and Arizona v. California, the Forest Service "apparently believed
that all of its water had to be obtained under state law."  U.S. v. New Mexico, 438
U.S. at 703, n.7.

FN14 See Hearings on S. 863 Before the Subcomm. on Irrigation & Reclamation of the
Sen. Comm. on Interior and Insular Affairs, 84th Cong. 2d Sess. (1956) [hereinafter
Hearings on S. 863].  See also Memorandum of the Chairman to the Members of the
Senate Comm. on Interior and Insular Affairs, in connection with the consideration
of S. 863, at 2 (Comm. Print 1956) (Describing S. 863 as seeking "to overcome the
ruling in the Pelton Dam case."); U.S. v. New Mexico, 438 U.S. at 702, n.5.

FN15 See, e.g., Hearings on S. 1176 Before the Senate Committee on Interior &
Insular Affairs, 85th Cong., 1st Sess. 329-32 (1957) [hereinafter Hearings on S.
1176] (testimony of National Reclamation Ass'n); id. at 417 (statement of Upper
Colorado River Comm'n) ("This legislation is hostile ... to the 17 western states
where water development practices would be prevented.")

FN16 Id. at 281.  Senator Neuberger accordingly referred to "the California agencies
represented by you" which sought amendments, and Berry cited "those agencies that I

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

96 Interior Dec. 211                                                      Page 20
96 Interior Dec. 211, 1988 WL 410391 (D.O.I.)
**(Cite as: 96 Interior Dec. 211,  1988 WL 410391 (D.O.I.))**

represent."  Id. 288-89 (italics added).

FN17 Hearings on S. 1176, supra at 286 (italics added).

FN18 Id. at 286-87.

FN19 S. 1176 would have legislatively designated 15 wilderness areas on Indian
reservations, plus such other roadless and wild areas as the Secretary might
designate with tribal approval.  S. 1176, § 2(d), Hearings on S. 1176, supra at 5-
6.  The initial proposal would thus have repudiated Winters v. U.S., as to these
areas.  Because many of the rights at issue in Winters and its pre-1955 progeny
arose out of Indian treaties, the denial of existing Federal claims might well have
raised the issue of treaty abrogation.

FN20 104 Cong. Rec. 6344 (1958) (italics added).

FN21 Hearings on S. 174 Before the Senate Comm. on Interior & Insular Affairs, 87th
Cong., 1st Sess. at 5 (1961) (italics added).  [Hereinafter Hearings on S. 174].
Others shared this view.  See id. at 61 (testimony of Forest Service spokeswoman:
"There is nothing [in the wilderness bill] that changes the situation with respect
to water rights.  It is very clear and specific in the bill."); id. at 65; 104 Cong.
Rec. 11,557 (1958) ("It has been made clear that nothing in this legislation may be
construed to modify existing water law"); Hearings on S. 4028 Before the Senate
Comm. on Interior & Insular Affairs, 85th Cong., 2d Sess., pt 2 at 257 (1959) ("No
claim is made to exemption from State water laws on wilderness areas.").

FN22 "Senator Hubert Humphrey's informal Hearing on S. 1167, known as the Wilderness
Bill," transcript dated Dec. 10, 1957, at 12 (National archives, files of the Senate
Interior & Insular Affairs Committee, Box 27 [hereinafter Committee Files].

FN23 Correspondence from Senator Thomas Kuchel to Senator James Murray, dated Apr.
4, 1958 (Committee Files).

FN24 Hearings on bills to overturn Pelton Dam evidence great uncertainty as to the
effect of the case, but it was clearly recognized that certain Federal reserved
water rights existed, e.g., on National Forests and Indian reservations.  Hearings
on S. 863, at 11, 13, 20-22.

FN25 The Assistant Attorney General, while pointing out the problem of safeguarding
existing Indian rights, also pointed out the problems with utilizing the specific
language "subject to existing rights" in the bill. Hearings on S. 863 at 275.  In
testimony, he stated his conclusion that utilizing such language would be equally
broad in the other direction by applying the concept of reserved rights to all
future Federal reservations:
  Senator BARRETT.  That matter [Indian reservations] was brought to our attention
the other day.  In order to protect the rights of the Indians on any of those we
decided the other day that line 22 would be changed by striking out the words,
"under State law," and that has been agreed to.  So that language reads:
  Subject to existing rights, all navigable and nonnavigable waters are hereby
reserved for appropriation, use-and so forth.  We think that would protect any
rights that the Indians might have.
  Mr. RANKIN.  I think it would, Senator, but I think it might destroy the effect of
your bill.
  Senator BARRETT.  Why do you say that?
  Senator RANKIN.  Because I think, under the concept of the Pelton case, that would
mean that the United States had all of the rights it has in reserve lands and the
right to the use of the water and you put yourself right back where you don't
accomplish what you appear to be trying to accomplish otherwise.
  Hearings on S. 863 at 275-76.

FN26 It could be argued, with regard to Indian Reservations, that the wilderness
bill already contained a non-abrogation clause. See S. 1176, § 2(d).  However, this
does not detract from the argument that the "no denial" language was added to
section 4(d)(7) to safeguard existing rights as:  (1) not all Indian water rights

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

96 Interior Dec. 211, 1988 WL 410391 (D.O.I.)
**(Cite as: 96 Interior Dec. 211,  1988 WL 410391 (D.O.I.))**

derive directly from treaties; and (2) the committee had thought it appropriate to add a double protection to S. 863: "Congress is fully cognizant of the problem of Indian water rights ...  In fact, this legislation not only protects all 'existing water rights' generally, it also specifically provides in section 7 that nothing in the Act shall be construed to affect ...  Such rights belonging to Indian tribes ..."  S. Rep. No. 2587, 85th Cong., 2d Sess. at 11 (1956).

FN27 Howard Zahniser, "Improvements in the Wilderness Bill," Feb. 15, 1958, at 6. (Committee Files.)  (Italics added.)

FN28 Specifically, the Prior Opinion found that:  "Giving literal effect to the "no implied claim ... as to exemption from State water laws" phrase, denies the literal effect of the "no express laws" phrase, and vice-versa.  (Italics added.)"  Prior Opinion at 86 I.D. 553, 607-08, n.99, dealing with an identical provision in the Wild and Scenic Rivers Act, 16 U.S.C. § 1271 et seq.  With regard to that provision, the Prior Opinion also noted:
  There is no clarifying legislative history.  I therefore must conclude that the provision is a non sequitur roughly designed to preserve the status quo of federal-state relations in water law under "established principles of law," including the reserved water rights doctrine.  16 U.S.C. § 1284(b).

FN29 The Prior Opinion states as follows in regard to sec. 4(d)(7):
  [I] do not view the provision of 16 U.S.C. § 1133(d)(7) (1976) as undercutting the implied reserved water rights doctrine.  Rather, the provision is intended to continue the application of then-existing principles of federal-state relations in water law, which includes the reserved water rights doctrine.  86 I.D. 553, 610.
  .......
  [R]ather, by not constituting either a new claim or a new denial or exemption from state water law, I am of the opinion that Congress intended to continue the status quo which allows for the creation and assertion of reserved water rights on lands withdrawn and reserved under the Wilderness Act.  86 I.D. 553, 610 n.106.

FN30 The District Court, in Sierra Club v. Lyng, found these arguments to be convincing, holding that sec. 4(d)(7) merely maintained the status quo.  However, as discussed infra, this interpretation renders that section surplusage, a result the rules of statutory construct would caution against.  Taking the second step, the District Court found that Congress "disclaimed any decisional responsibility" for the issue of water rights in wilderness areas.  Given that assumption, the court reasoned that it should step in and create such rights under the general Federal reserved water rights doctrine.  However, this step seems to seriously misinterpret the role of the court in carrying out the Federal reserved water rights doctrine.  That doctrine calls on the courts to interpret the intent of Congress in making reservations of Federal land.  Cappaert v. U.S., 426 U.S. at 138.  It does not, nor does the separation of powers design of the Constitution, allow the courts to create reserved water rights when Congress declines to do so, even under the guise of "harmonizing" newly created congressional programs and pre-existing state law.  The District Court seems to suggest that sec. 4(d)(7) gives a nod of approval to a judicial "legislative" process that created Federal reserved water rights absent affirmative congressional intent.  Yet the constitutional bases of the implied reservation of water doctrine are found in the Commerce and Property Clauses, art. I, § 8 and art. (IV) § 3, see Cappaert v. U.S., 426 U.S. at 138, both of which delegate powers to Congress and Congress alone.

FN31 It could be speculated that Committee staff might have held such a motive and, personally, attempted to thwart the Committee's desires.  Apart from being a most questionable premise of legislative construction, there is no evidence to support this speculation.  Moreover, this was an issue of great personal interest to the Committee in question.  As the Committee and all its subcommittees held only 22 hearings during the first session of the 85th Congress, there would have been little necessity for members to give blind dependence upon staff.  It is noteworthy that the 1957 hearings mention only one staff member in attendance-the clerk.

FN32 Zahniser, "Improvements in the Wilderness Bill," supra at 6.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN33 104 Cong. Rec. 11,555 (1958).

FN34 See, e.g., Hearings on S. 863 at 7 (1956) (Senator Barrett: "For nearly a century it has been settled law that western water rights are dependent on and determined by State law."); id. at 328-29; Hearings on S. 1275 Before the Subcomm. on Irrigation & Reclamation of the Senate Comm. on Interior & Insular Affairs, 88th Cong., 2d Sess. at 24-25 (1964) (Senator Kuchel: "it has generally been assumed that the mere fact that nonnavigable water arises upon any United States retained lands would not affect the rights ... acquired by persons or by State or local governments ...")  See generally Morreale, Federal-State Conflicts over Western Waters, 20 Rutgers L. Rev. 423, 446 (1966).

FN35 See, e.g., Hearings on S. 4028, pt. 2 at 653 (Department of Fish & Game); Hearings on S. 174, before the Subcommittee on Public Lands of the House Committee on Interior and Insular Affairs, 87th Cong., 1st Sess., pt. III at 839 (1961) (California Resources Agency, Successor to Department of Natural Resources).

FN36 Correspondence from Sen. Thomas Kuchel to Sen. James Murray, dated Apr. 4, 1958.  (Committee Files.)  (Italics supplied.)

FN37 Correspondence from Sen. Thomas Kuchel to Sen. James Murray, dated July 25, 1958.  (Committee Files.)

FN38 The view that reserved water rights are created by congressional neutrality implicitly treats water as claimed unless Congress expressly denies the claim.  This disregards the counsel of the Supreme Court that implicit reservation of water is an "exception" to the rule of congressional deference to state water allocation.  U.S. v. New Mexico, 438 U.S. at 715.  In addition, this view would violate the principle of separation of powers because it would implicitly authorize the courts to act as legislators and to create water rights when Congress had evidenced no intent to create them.  We do not believe that sec. 4(d)(7) can be read as having this effect.

FN39 The same admonition would apply to an attempt to use the National Wildlife Refuge System Act, 16 U.S.C. § § 668dd-668ee, as a guide to interpreting the Wilderness Act.  The Refuge System Act also contains language identical to that included in sec. 4(d)(7) of the Wilderness Act.  16 U.S.C. § 668dd(i). The Supreme Court, in Arizona v. California, let stand a master's conclusion that water had been reserved for one wildlife refuge.  373 U.S. at 601. However, neither the Supreme Court nor the master's decision referred to, much less analyzed or interpreted, sec. 668dd(i) of the Refuge System Act.

FN40 The District Court in Sierra Club v. Lyng also relied on the use of the sec. 4(d)(7) language in the Wild and Scenic Rivers Act to support wilderness area reserved water rights, noting that Congress used this language in conjunction with language recognizing a possible Federal taking of privately held water rights. Memorandum Opinion and Order (issued June 3, 1987) at 3. (The court relied here in part on the Department of Justice argument in response to Intervenor's Motion for Summary Judgment that the use of the same language in the Wild and Scenic Rivers Act as was used in sec. 4(d)(7) appeared to show an intent by Congress to reserve water for wilderness areas.)  However, rather than disputing it, the court's notation strengthens our argument that the "claim or denial" language is used in a different context in the Wild and Scenic Rivers Act than it is used in the Wilderness Act. Having affirmatively recognized that a taking was occurring when waters were reserved, Congress made clear with the "claim or denial" language that rights were being taken, i.e., state-appropriated water rights.  Otherwise, a court might find that the state water rights were defeated by a reservation of Federal rights and hold that no taking had occurred.

FN41 Having found that the MUSYA directs the Forest Service "to expand the purposes for which the national forests are administered," the Colorado Supreme Court in United States v. City & County of Denver, concluded that the MUSYA did not effect an additional reservation with supplemental reserved water rights, but rather, was merely a mandate to expand the purposes for which the original forest reservations are to be administered.  656 P.2d at 25 (Colo. 1983).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

96 Interior Dec. 211                                                        Page 23
96 Interior Dec. 211, 1988 WL 410391 (D.O.I.)
**(Cite as: 96 Interior Dec. 211,  1988 WL 410391 (D.O.I.))**

FN42 Sec. 4(d)(6), 16 U.S.C. § 1133(d)(6) (italics added).  This and similar
language throughout the Wilderness Act and its legislative history raises the
additional issue of whether Congress in the Act intended to "reserve" lands for
wilderness purposes. While we do not address the question of whether wilderness
designations are in fact "reservations" of land, we note that a negative finding
would preclude any argument that reserved water rights are created in wilderness
areas as a reservation of land is a prerequisite to finding a congressional intent
to create such rights.  See Cappaert, 426 U.S. at 138.

FN43 The legislative history of the Wilderness Act also makes this point.  Congress
made clear that act established only additional criteria under which wilderness
areas would be managed, not new primary purposes for the land:
  The proposed legislation simply establishes the criteria under which our
wilderness areas will be managed so that we can assure their preservation for the
cultural, inspirational, recreational, and scientific values that these areas can
offer to ourselves and future generations.  (Italics added.)
  Remarks of Senator McGovern, 109 Cong. Rec. 5942-43 (1963).
  A like comment was expressed by Senator Humphrey on a section in a predecessor
bill that substantially became sec. 1133(b):
  Section 3 on the "use of wilderness" is important, for it makes clear that the
preservation of wilderness is not inconsistent with the purposes for which national
parks, national forests, and other units have been established.  These units will be
administered for such other purposes as also to preserve their wilderness character.
104 Cong. Rec. 11,555 (1958).

FN44 The Prior Opinion addresses this issue as follows:
  [F]irst, as far as NPS and FWS areas are concerned, it is clear that wilderness
designations establish purposes for the creation of the reservation; i.e.,
designation as wilderness does more than merely authorize secondary uses entailing
no reserved water rights. 86 I.D. 553, 610.
  . . . . . . .
  [B]y stating that Wilderness Act purposes are "within" existing area purposes,
this forecloses any argument that wilderness area designation is subsidiary to other
management objectives. Cf. U.S. v. New Mexico, supra at 713-15.  85 I.D. 553, 610
n.105.

FN45 The District Court, in Sierra Club v. Lyng, basically ignored both the
"within" and "supplemental to" language. Citing a number of references in the
Wilderness Act's legislative history to the effect that the preservation purposes of
the Act are "crucial," the court reasoned that they were thus "primary" for reserved
water purposes.  Sierra Club v. Block, Memorandum Opinion and Order (issued Nov. 25,
1987).  We do not believe that this omission is consistent with the careful analysis
mandated by U.S. v. New Mexico. Particularly, we note that the court's decision is
contrary to the principle that the Federal reserved water right doctrine is to be
construed narrowly. U.S. v. City & County of Denver.  The states, as Congress
explicitly recognized in enacting the McCarran Amendment, 43 U.S.C. § 666, have a
strong interest in regulating the water within their boundaries, including water
appurtenant to Federal lands.  As the Supreme Court has noted, "if the appropriation
and use were not under the provisions of State law the utmost confusion would
prevail ...  Different water rights in the same state would be governed by different
laws and would frequently conflict."  California v. U.S., 438 U.S. 645, 667 (1978).
The courts, although acknowledging the Federal reserved water rights doctrine, have
continued to maintain strict requirements for its application and clearly regard it
as an exception, not the rule, to a general deference to state law regarding
appropriation and use of water. U.S. v. New Mexico, 438 U.S. at 703.

FN46 H.R. Rep. No. 1538, 88th Cong., 2d Sess. (1964), suggests that the purpose of
sec. 4(a) was to "preserve the integrity of several statutes governing national
forests and national parks." Accordingly, sec. 4(a) would have the same general
intention as sec. 1 of MUSYA, interpreted by the Supreme Court in U.S. v. New
Mexico.

FN47 104 Cong. Rec. 11,557 (1958).  See also id. at 6343; Hearings on S. 174, supra

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

96 Interior Dec. 211                                                    Page 24
96 Interior Dec. 211, 1988 WL 410391 (D.O.I.)
**(Cite as: 96 Interior Dec. 211,   1988 WL 410391 (D.O.I.))**

at 3.  (Sec. 4(a) declares Wilderness Act purposes "supplement but do not interfere with the purposes of the National Forest Act of 1897 or the Multiple Use-Sustained Yield Act.")  (Statement of the Chairman.)

FN48 Another flaw in this "primary purposes" argument is that it looks mistakenly at the primary purposes for wilderness areas, not at the primary purposes for the lands on which a wilderness area may be designated.  A broader view brings into perspective the true relationship between wilderness and other purposes.

END OF DOCUMENT

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.