WILLIAM P. HORN, D.C. Bar No.: 375666
Birch, Horton, Bittner and Cherot, P.C.
1155 Connecticut Avenue, Suite 1200, NW
Washington, D.C. 20036
Telephone: (202) 659-5800
Facsimile: (202) 659-1027
Email: whorn@dc.bhb.com

Attorneys for State of Alaska


IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| KATIE JOHN, et al., )<br><br>Plaintiffs, )<br><br>vs. )<br><br>UNITED STATES OF AMERICA, et al., )<br><br>Defendants. )<br>_____ )<br><br>STATE OF ALASKA, )<br><br>Plaintiffs, )<br><br>and )<br><br>ALASKA FISH AND WILDLIFE FEDERA-<br>TION AND OUTDOOR COUNCIL, et al., )<br><br>Plaintiff-Intervenors, )<br>vs. )<br><br>GALE NORTON, Secretary of the<br>Interior, et al., )<br><br>Defendants, )<br><br>and )<br><br>KATIE JOHN, et al., )<br><br>Defendant-Intervenors, )<br><br>and )<br><br>ALASKA FEDERATION OF NATIVES, )<br><br>Defendant-Intervenor. )<br>_____ ) | No. 3:05-cv-0006-HRH<br>(Consolidated with<br>No. 3:05-cv-0158-HRH)<br><br><br>**STATE OF ALASKA'S<br>OPENING BRIEF<br>ON WHICH WATERS<br>SPECIFYING TEST<br>CASE CATEGORIES<br>WITH SAMPLE<br>WATER BODIES** |

- AND -

LINCOLN PERATROVICH, et al.,                    )
                                                )
                              Plaintiffs,        )
                                                )
        vs.                                      )
                                                )
UNITED STATES OF AMERICA, et al.,               )
                                                )
                              Defendant.         )
        and                                      )        No. 3:92-cv-0734-HRH
                                                )
STATE OF ALASKA,                                 )
                                                )
                    Intervenor-Defendant.        )
                                                )

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................... i

I.    INTRODUCTION TO "WHICH WATERS" ..................................................1

II.   STANDARDS OF REVIEW ............................................................................3

    A.    Agency Interpretation of the Court-Created FRWR Doctrine Is
        Subject to De Novo Review .................................................................3

        1.    De Novo Review of Legal Issues:  Reservation Language
              Must Be Sufficient and "Appurtenant" in the Context of FRWRs
              is Narrowly Construed and Restricted to the Reservation Limits...............5
              a.    Reservation Must Be Specific and Sufficient .................................6
              b.    Federal Reserved Water Rights Exist Only in Appurtenant
                   Waters Within a Reservation...........................................................7
              c.    FRWRs, Where They Exist, Are Limited .......................................9
        2.    Specific Agency Reasoning Is Required in the
              Administrative Record .......................................................................10

    B.    Factual Elements of Agency FRWRS Claims are Subject to Arbitrary and
        Capricious Review and Must Be Overturned Where the Agency Fails
        to Examine Relevant Data and Articulate a Rational Connection
        Between the Facts Found and the Choices Made ...................................11

    C.    Standard of Review Where Statutory Provisions....................................15

        1.    Court Review of Agency Interpretations of Plain Statutory
              Language Is Not Deferential.............................................................15
        2.    Clear Statement Rule Requires Clear, Unmistakable Statutory
              Basis for Agency Actions Which Diminish Traditional State
              Authority .........................................................................................16
        3.    Failure-to-Act Claims Can Only Be Redressed Where Federal
              Agencies Have Failed to Carry Out a Mandatory, Non-Discretionary
              Statutory Duty .................................................................................16

III.  CATEGORIES OF WATERS AND LANDS AND SPECIFIC EXAMPLES.................17

    A.    Marine and Tidally Influenced Waters.................................................17

        1.    Federal Defendants Administrative Extension of Title VIII
              Authority Into Marine and Tidally Influenced Waters Beyond
              Statutorily Prescribed Boundaries and Over State-Owned
              Submerged Lands Violates Express Provisions of ANILCA
              and is Contrary to the FRWR Doctrine......................................17

2.    Example One:  Togiak Bay Marine and Tidally Influenced Waters ..........20
3.    Example Two:  Tuxedni Bay Marine and Tidally Influenced Waters ........21
4.    Example Three:  Stikine Marine and Tidally Influenced Waters ..............23
5.    Peratrovich Marine Waters Claims ............................................................23
6.    Conclusion to Marine and Tidally Influenced Waters Claims...................24

B.    Waters Bounded by Non-Federal Lands Within Reservation Boundaries ..............25

1.    Express Provisions of ANILCA Specify That State and
ANCSA Lands Within Federal Reservations are Not Part
of Those Reservations and Not Public Lands and Thus
Preclude FRWR Claims to Waters Located on These
Non-Public Lands .......................................................................................25
2.    Example One:  Chignik Lake and River System Waters
Within Non-Public Lands ...........................................................................26
3.    Example Two:  Crescent River Waters Within Non-Public Lands ...........28
4.    Example Three:  Juneau Road System Streams Within
Non-Public Lands .......................................................................................29

C.    Adjacent Waters..........................................................................................................30

1.    Federal Claims of FRWRS in Adjacent Water Bodies are Contrary
to the FRWR Doctrine, Based on an Impermissible Expansion of the
Team "Appurtenant," Rely on an Unprecedented Expansion of the
Limited "Use" Interest Associated With FRWRS and Are Not Supported
on the Record ..............................................................................................30
2.    Example One:  Colville River "Adjacent" Waters ....................................32
3.    Example Two:  Yukon River "Adjacent" Waters......................................37
4.    Example Three:  Sixmile Lake "Adjacent" Waters ...................................39

D.    Validly Selected Lands are Expressly Excluded from ANILCA's Definition
of Public Lands and Do Not Permit FRWRs........................................................42

E.    Waters Downstream or Upstream of Federal Reservations .....................................43

F.    Granting of FRWRs to Alaska Native Allotments Would Be a Radical
Expansion of the FRWR Doctrine in Contravention of ANILCA's Express
Provision That It Does Not Expand or Diminish Federal or State Water
Jurisdiction, and Nothing in ANILCA Mandates the Agencies to Extend
FRWRs to Allotments ........................................................................................45

IV.    CONCLUSION ...................................................................................................49

## **TABLE OF AUTHORITIES**

### FEDERAL AND STATE CASES

*Adams Fruit Co. v. Barrett*, 494 U.S. 638 (1990).............................................................4

*Air North America v. Dep't of Transportation*, 937 F.2d, 1427 (9th Cir. 1991) ............4

*Alaska v. Babbitt*, 72 F.3d 698 (9th Cir. 1995) ..............................................................4

*Alaska v. Fleagle, et al.,* (USDC Alaska Case No. 3:06cv0107-HRH)
    Order re Motions for summary Judgment filed June 27, 2007 (USDC
    Clerk's Doc. No. 43 at p. 36) ...............................................................25

*Alaska v. United States*, 213 F.3d 1092 (9th Cir. 2000) .................................................32

*Andrus v. Charlestone Stone Products, Co., Inc.*, 43 U.S. 604 (1978)............................9

*Arizona v. California*, 373 U.S. 546 (1963)......................................................................9

*Bonnischsen v. United States*, 367 F.3d 864 (9th Cir. 2004)..........................................14

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962)  ...............11, 13, 15

*California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142
    (1935) ......................................................................................10, 37, 44, 47

*Cappaert v. United States*, 426 U.S. 136 (1976) .................................................  passim

*Chevron U.S.A. Inc. v Natural Res. Def. Council*, 467 U.S. 837 (1984)...............  passim

*Chickaloon-Moose Creek Native Ass'n, Inc. v. Norton*, 360 F.3d 972 (9th Cir. 2004)...................4

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971)
    (D.C. Cir. 1977)...........................................................................11, 15

*Colorado v. New Mexico*, 459 U.S. 176 (1982).................................................................9

*Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976)...................47

*Colville Confederated Tribes v. Walton ("Walton II")*, 647 F.2d 42 (9th Cir. 1981)7, 9, 10, 47, 48

*Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000) ................14

*Federal Power Comm'n v. Oregon*, 349 U.S. 435 (1955)..............................................7

iii

*General Adjudication of All Rights to Use Water in the Gila River System and Source ("Gila River")* 989 P.2d 739, 748 (Ariz. 1999)..........................................8, 11, 12

*Grey v. United States*, 21 Cl. Ct. 285 (1990) ..............................................................47

*Home Box Office, Inc. v. Federal Communications Commission*, 567 F.2d 9, 35 (D.C. Cir. 1977)..................................................................................................13, 15

*Immigration & Naturalization Serv. v. Cardoza-Fonseca*, 480 U.S. 421 (1987)..........................16

*John v. United States*, 247 F.3d 1032 (9th Cir. 2001, *en banc*)..........................................4

*Kenaitze Indian Tribe v. State of Alaska*, 860 F.2d 312 (9th Cir. 1988)..........................................5

*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989)..........................................14

*Motor Vehicle Mfr's Ass'n of the U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 (1983) ........................................................................11, 13, 14, 15, 42

*Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835 (9th Cir. 2003) ..........................................13

*Natural Resources Defense Council v. U.S. Envtl. Protection Agency,* 966 F.2d 1292, (9th Cir. 1992) ..........................................................................................14

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) .....................17, 43, 45, 46, 49

*Pennsylvania Dep't of Corr. v. Yeshey*, 524 U.S. 206 (1998) .............................................3, 16, 48

*Potlatch v. United States,* 12 P.3d 1260 (Idaho 2000).......................................................8, 30, 43

*Santa Fe Trail Ranches Property Owners Association v. Harold D. Simpson*, 990 P.2d 46 (Colo. 1999) ..........................................................................................9

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) .............................................................12, 13, 14, 15

*Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476 (D.C. Cir. 1995) .............................................7

*Sierra Club v. Block*, 622 F. Supp. 842 (D. Colo. 1985) ........................................................7, 49

*Solid Waste Agency v. U.S. Army Corps. of Engr's,* 531 U.S. 159 (2001)............................ passim

*State of Alaska v. United States of America*, 546 U.S. 43 (2006).................................................23

*Totemoff v. Alaska*, 905 P.2d 954 (Alaska 1995)...................................................................9

iv

*United States v. Ahtanum Irrigation Dist.,* 236 F.2d 321 (9th Cir. 1956) ........................8

*United States v. Anderson,* 736 F.2d 1358 (9th Cir. 1984)....................................10, 47

*United States v. Bell,* 724 P.2d 631 (Colo. 1986) .............................................8, 43

*United States v. City and County of Denver,* 656 P.2d 1 (Colo. 1982)...........8, 9, 19, 41

*United States v. City of Challis,* 988 P.2d 1199 (Idaho 1999) .........................................7

*United States v. New Mexico,* 438 U.S. 696 (1978)............................................. passim

*United States v. Powers,* 305 U.S. 527 (1939)................................................47

*United States Lines, Inc. v. Federal Maritime Commission,* 584 F.2d 519
    (D.C. Cir. 1978)........................................................14

*United States v. State of Idaho,* 23 P.3d 117 (Idaho 2001) ........................................7

*West Virginia Highlands Conservancy v. Norton,* 343 F.3d 239 (4th Cir. 2003)...........4

*Winters v. United States,* 207 U.S. 564 (1908) ....................2, 3, 4, 8, 20, 28, 46, 47, 48

## STATUTES

5 U.S.C. § 706, et seq...........................................................................3

5 U.S.C. §§ 706(2)(A), (B) ...................................................................19

16 U.S.C. § 103(a) ...............................................................................19

16 U.S.C. §§ 3102(3) ............................................................................2

16 U.S.C. §§ 3102(3)(A)...................................................................18, 42

16 U.S.C. § 3103(c) ..........................................................................25, 42

16 U.S.C. § 3114...............................................................................2, 49

16 U.S.C. § 3183 ...................................................................................48

42 U.S.C. § 6501, *et seq.*........................................................................32

42 U.S.C. § 6502.........................................................................34, 35, 36

42 U.S.C. § 6504 ..................................................................................................35

42 U.S.C. § 6505 ..................................................................................................35

Administrative Procedure Act (5 U.S.C. § 706, *et seq.*) ...........................................3
    5 U.S.C. § 706(1)) ..................................................................................17, 45

Alaska Native Claims Settlement Act (ANCSA) ...................................................4, 42

Alaska National Interest Lands Conservation Act (Pub. L. No. 96-487, 94 Stat. 2371) (1980) .....1
    § 102 ..........................................................................................................20, 50
    § 102(2) ...........................................................................................................28
    § 102(3) .....................................................................................................15, 25
    § 102(3)(A) ......................................................................................................41
    § 103(a) ..........................................................................15, 19, 20, 21, 24
    § 103(c) ...............................................................................25, 39, 41
    § 201(7) .....................................................................................................21, 28
    § 201(7)(a) ................................................................................................39, 41
    § 201(7)(b) ................................................................................................15, 41
    § 302(1) ...........................................................................................................20
    § 303(6) ...........................................................................................................20
    § 1203 ..............................................................................................................48
    § 1319 ..............................................................................................................31

Alaska Statehood Act, § 6(m), 72 Stat. 339, 343 (1959) .....................................18, 42

Alaska Water Use Act, AS 46.15.010-.270 ............................................................44

Dawes Act, 24 Stat. 388 (1887) ..........................................................................47

Naval Petroleum Reserve No. 4 ("Pet 4"), by Executive Order No. 3797-A
    of President Warren G. Harding dated  February 27, 1923........................32, 33, 34, 35, 36

Submerged Lands Act of 1953, 43 U.S.C. § 1311(c) ................................................18

The General Allotment Act of 1887 ......................................................................47

## REGULATIONS

50 C.F.R. § 100.3 ..................................................................................................30

50 C.F.R. 100.3(18) ..............................................................................................39

50 C.F.R. § 100.3(20) .................................................................................22, 28, 38

50 C.F.R. § 100.3(b)(2) .................................................................................................26

50 C.F.R. § 100.3(b)(3) .................................................................................................33

50 C.F.R. § 100.4 ...........................................................................18, 22, 26, 28, 38, 39

50 C.F.R. § 100.4(2) ......................................................................................................42

50 C.F.R. § 100.27(i)(3) ................................................................................................33

50 C.F.R. § 100.27(i)(8) ................................................................................................36

64 Fed. Reg. 1276, 1287 (Jan. 8, 1999) ........................................................................18

70 Fed. Reg. 76401 ..........................................................................................20, 21, 22, 42

## ADDITIONAL AUTHORITIES

BLACK'S LAW DICTIONARY, 6th Ed. 1990 ........................................................................7

*DeLorme, Alaska Atlas & Gazetteer*, at pp. 134-136 (2004 Ed.) ...............32, 37, 39, 44

Katie John Pleading
    Third Cause of Action, at 18, ¶ 46 (Jan. 7, 2005) ...................................16, 45
    at 15, ¶ 38 (Jan. 7, 2005) .................................................................................45

94 CJS § 371, *Waters I* (2001) ......................................................................................9

S. REPT. 96-413 at 252-255 (Nov. 14, 1979) ...............................................................48

William A. Wilcox, Jr., Special Issues in Environmental Law Involving Federal Agencies,
    14 VILL. ENVTL. L.J. 39, 63-64 (2003) ...........................................................19

I.    INTRODUCTION TO "WHICH WATERS"

The Federal Defendants ("Defendants") have claimed federal reserved water rights

(FRWRs) for purposes of ANILCA[1] Title VIII subsistence jurisdiction in a great number and

variety of water bodies in Alaska in which the Plaintiff State of Alaska ("State") maintains such

rights cannot exist as a matter of law or fact.  These expansive unjustified claims by the

Defendants seek to extend federal preemptive authority over the taking of fish and wildlife and

illegally diminish the State of Alaska's traditional authority and sovereignty over these

resources.[2]

Specifically, the Defendants extend their claims into marine and tidally-influenced bodies

of water contrary to plain statutory provisions that stop federal authority at the mean, high-tide

line and contrary to the FRWR doctrine which does not recognize water rights in salt or brackish

waters.  Other Defendant claims extend to waterways or reaches of waterways that flow through

or are bounded by non-federal, non-reserved lands although FRWRs are limited by law to

waterways appurtenant to reserved federal lands.  In other instances, the Defendants improperly

claim FRWRs in waters adjacent to, but outside of, the established boundaries of federal

reservations, and illegally seek to transmute claimed fractional use interests in such water into

control over the width and breadth of that entire water body lying outside of the reservation.

Lastly, Federal authority is claimed over validly selected State (and Native Corporation) lands,

including water bodies, despite express congressional direction that such lands are not "public

lands" subject to Title VIII.

---

[1]  Alaska National Interest Lands Conservation Act, Pub. L. No. 96-487, 94 Stat. 2371 (1980) ("ANILCA").
[2]  Federal reservations constitute approximately 45% of Alaska, yet the Defendants claim FRWRs in 52% of the State's waterways.  AR 009631.

Other parties in these consolidated cases seek to warp the FRWR doctrine even more and extend its reach far beyond the scope contemplated by the U.S. Supreme Court. As noted, FRWRs can exist only in waters appurtenant to federal reservations, yet the Katie John plaintiffs ask this Court to make new law creating FRWRs in long stretches of rivers and streams both upstream and downstream (*i.e.*, not appurtenant) of such reservations. The same plaintiffs are also asking for an unprecedented holding that Alaska Native allotments have FRWRs although all case law prescribes that allotments have only derivative water rights from Indian reservation rights pursuant to *Winters v. United States*, 207 U.S. 564 (1908) – none of which exist in Alaska. The Peratrovich plaintiffs incorrectly seek to expand federal subsistence jurisdiction through unprecedented extension of FRWRs into marine waters in southeast Alaska far beyond any area reserved by the Defendants.

In accordance with the Court's scheduling orders of June 1, June 29, and July 17, 2007 (Docket Nos. 115, 130-131 and 133), each of these specific categories of waterways and lands are addressed below. In accordance with the Court's preference stated in those orders, on-the-ground factual examples (including maps for each example at Exhibits 1 through 9 and 11 through 15) are also presented in this brief to illuminate the legal and factual issues associated with each category. As contemplated by the Court, application of water law precedent and statutory provisions to these "test case waterways" (Docket No. 130 at 7-9) should establish principles and guidelines aimed at governing "which waters" in Alaska the Defendants can legitimately claim (though not conclusively adjudicate) FRWRs and treat such waters as federal "public lands."[3] This in turn should limit the application of federal authority to only those waters

---

[3]    According to ANILCA, only "public lands" as defined by § 102(3) are subject to the federal subsistence preference under Title VIII, 16 U.S.C. § 3114; 16 U.S.C. § 3102(3).

OPENING BRIEF – WHICH WATERS

where the federal agencies can marshal the necessary facts and show that proper application of

FRWR legal principles to such facts can sustain a valid FRWR identification.[4]

## II.     STANDARDS OF REVIEW

Three standard of review issues are implicated by the "which waters" phase of this case.

First, the FRWR doctrine is judicially created, not statutory.  Therefore, federal agency

interpretations or actions regarding predominantly legal elements of the doctrine are subject to *de*

*novo* review by this Court.  Second, insofar as it may be claimed that the Defendants' actions

regarding more factual determinations relating to the application of the FRWR doctrine may be

entitled to some deference under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 *et*

*seq.*, the Defendants have frequently failed to produce either facts or reasoning to support

assertions that a particular water body with an agency-identified FRWR does indeed satisfy the

legal and factual prerequisites for such rights, meaning there can be no deference.  Naked

unsupported FRWR identifications by a federal agency cannot withstand judicial review and be

affirmed even under a deferential standard.  Third, certain statutory interpretation issues (*e.g.*,

establishing "public land" boundaries at the mean, high-tide line of tidally-influenced waters and

the status of validly selected lands as non-public lands) are governed by:  (1) plain, unambiguous

provisions of ANILCA where agency action must be consistent with clear congressional intent

and (2) the Clear Statement[5] rule regarding actions that diminish or impinge on traditional State

authority.

### A.     Agency Interpretation of the Court-Created FRWR Doctrine
#### Is Subject to De Novo Review

---

[4]   As provided in the Court's July 17, 2007 Scheduling Order, the presentation of test case waterways "intended to implicate controlling substantive issues" in this phase of the case does not operate as a waiver of State claims regarding other waterways affected by the challenged agency rules.  Docket No. 133 at 3.

[5]   Agency action to diminish or impinge upon traditional State powers (*e.g.*, over fish and wildlife and water) must be based on a clear statement by Congress demonstrating unmistakable intent to authorize such action.  *Solid Waste Agency v. U.S. Army Corps of Engr's,* 531 U.S. 159, 173 (2001); *Pennsylvania Dep't of Corr. v. Yeshey,* 524 U.S. 206, 209 (1998).

The FRWR doctrine is *court-created* law: *Cappaert v. United States*, 426 U.S. 136 (1976); *United States v. New Mexico*, 438 U.S. 700 (1978); *Winters v. United States*, 207 U.S. 564 (1908).  Therefore, agency interpretations and actions based on the FRWR doctrine – especially predominantly legal determinations – are not entitled to deference but instead must be reviewed *de novo* by the court.  *See Solid Waste Agency v. Army Corps of Engineers*, 531 U.S. 159 (2001); *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649 (1990); *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984); *Air North America v. Dep't of Transportation*, 937 F.2d 1427, 1436-37 (9th Cir. 1991).  Although the Defendants' identification of waters in which they **claim** to have FRWRs is related to administering the subsistence provisions of a statute (*i.e.*, ANILCA), such FRWR identification requires construing judicially-developed law or doctrine in which the agency does not have expertise, meaning the agency interpretation should not be accorded any deference.  *See Chickaloon-Moose Creek Native Ass'n, Inc. v. Norton*, 360 F.3d 972, 980 (9th Cir. 2004) (rejecting Department of the Interior's contention that because it implemented the Alaska Native Claims Settlement Act ("ANCSA") its construction of a contract entered into pursuant to that Act is subject to *Chevron* deference; court held that Interior was construing judicially-developed law of federal contracts, not ANCSA itself); *West Virginia Highlands Conservancy v. Norton*, 343 F.3d 239, 245 (4th Cir. 2003) (no court deference to federal agency interpretation of common law principles relating to agency's rules which court is at least as competent to decide).

Agency identification of specific waters with unilaterally claimed FRWRs is also very distinct from the statutory interpretation issue addressed in the first and second *Katie John* Ninth Circuit decisions.  *See Alaska v. Babbitt*, 72 F.3d 698 (9th Cir. 1995), and *John v. United States*, 247 F.3d 1032 (9th Cir. 2001, *en banc*) (referred to hereinafter and by this Court in its May 17,

OPENING BRIEF – WHICH WATERS

2007 "what process" decision as "*Katie John II*" and "*Katie John III*", respectively (Docket No. 110 at 10-13). In those cases the issue was whether the statutory term "public lands"[6] included at least "*some*" navigable waters. 72 F.3d at 703 (emphasis added). The majority of the Ninth Circuit Court in *Katie John II* determined that the agency's interpretation of this term, as characterized by that Court (*i.e.*, those "certain" navigable waters in which FRWRs actually exist "appurtenant" to federally reserved lands are "public lands" under ANILCA) was entitled to deference under the second prong of the *Chevron* analysis, 72 F.3d at 701-704, whereas fully seven members of the subsequent *en banc* Ninth Circuit 11-member panel clearly and emphatically disagreed, instead finding that interpretation should be a matter solely for the court to decide *de novo,* without any deference, 247 F.3d at 1038, 1040, 1044-1046.[7] Here, in contrast, the Defendant agencies are not construing a statute, but interpreting the precise legal meaning, and limits of court-created constructs and terms such as "federal reserved water rights," and "reservation," and "appurtenant" in the context of court-recognized FRWRs. Clearly, interpretation regarding these strictly legal, court-created criteria is a matter entirely for the court and is not entitled to agency deference of any sort. As this Court correctly concluded in its Decision during the "What Process" phase: "[T]he court is being asked to decide a legal issue . . . [and] the Secretaries have [no] particular expertise as to the reserved waters doctrine, which was judicially created." Doc. No. 110 (May 17, 2007 Decision) at 21; *Accord, e.g., Kenaitze Indian Tribe v. State of Alaska*, 860 F.2d 312, 315 (9th Cir. 1988).

        1.    **De Novo Review of Legal Issues: Reservation Language Must Be Sufficient, and "Appurtenant" in the Context of FRWRs is Narrowly Construed and Restricted to the Reservation Limits.**

---

[6] ANILCA § 102(3).

[7] The court did so partly based on the intervening Supreme Court decision in *Solid Waste Agency v. Army Corps of Engineers*, 531 U.S. 159, 173-174 (2001) (no deference to federal agency's interpretation; rather, any interpretation of a statute that "would result in a significant impingement of the States' traditional and primary power over land and water use" will be rejected where Congress had not clearly expressed an intent to do so).

OPENING BRIEF – WHICH WATERS

This Court previously determined during the "What Process" phase of this case that for purposes of Title VIII the Defendants could claim and identify FRWRs over which they assert jurisdiction for Title VIII purposes via rulemaking, without first engaging in formal adjudication to conclusively establish such rights. The Court specifically noted that the appropriative (*New Mexico*) or in-flow (*Cappaert*) quantification element of the FRWR doctrine does not need to be satisfied for such "identification" purposes.[8] However, the Court did not reach or, the State respectfully submits, cannot excuse, at least in this "which waters" phase, the requirements for satisfying other elements of the FRWR doctrine, meaning that the federal agencies were obligated to produce a sufficient, court-reviewable record from 1999 showing they properly answered at least two legal prerequisites when they identified specific FRWRs in their rulemaking: first, that the primary purpose of each federal reservation is sufficiently specific to give rise to the implied FRWR (*New Mexico,* 438 U.S. at 701; *Cappaert,* 426 U.S. at 139-40; and, second, that the water body with the implied water right is sufficiently "appurtenant" to the reservation (*Cappaert*, 426 U.S. at 138).

        **a.**      <u>**Reservation Must Be Specific and Sufficient**</u> – The specificity and sufficiency of a reservation necessary for a valid FRWR is a purely legal inquiry which has been answered affirmatively by some courts (*e.g.*, *Cappaert*, 426 U.S. at 147) and in the negative by others (*e.g.*, *New Mexico*, 438 U.S. at 717). This issue is involved in one of the "test cases" the State will present.[9]

---

[8]  Docket No. 110 at 23-27. The State continues to be unsure of the Court's prior handling of this point. The *Katie John* decision held that the presence of an actual FRWR in a water body, where it exists, confers sufficient "title" to the United States so that the water body may be treated as "public lands" pursuant to ANILCA § 102(3) and Title VIII. The State maintains that any actual Federal title (i.e., a bona fide property right or interest) that works to diminish traditional State authority, although it may be claimed (*i.e.*, "identified") by unilateral agency rulemaking, can only be effectively established by some appropriate form of adjudication.

[9]  Identification of a FRWR in the Colville River located outside of but adjacent to the National Petroleum Reserve-Alaska (NPRA) requires a legal determination by the Court that the original 1923 withdrawal by or subsequent

As a legal matter, agency application of the court-established FRWR principles must be reviewed *de novo*.  Since the FRWR doctrine was extended by the Supreme Court for the first time to non-Indian reservations (*Federal Power Comm'n v. Oregon*, 349 U.S. 435 (1955)), courts – not agencies – have made the ultimate legal determination of whether a federal reservation was specific enough and enunciated primary purposes sufficient to create a FRWR.  *Cappaert,* at 139-140 (express purpose of protecting unique fish was sufficient to create a FRWR in the pool in which the fish lived); *New Mexico* at 718 (insufficient primary purposes in forest reservations to establish FRWRs); *United States v. State of Idaho*, 23 P.3d 117 (Idaho 2001) ("principal object" of federal wildlife reservation insufficient to create a FRWR).

      **b.**    **<u>Federal Reserved Waters Rights Exist Only in Appurtenant Waters</u>**

**<u>Within a Reservation</u>** – Which waters are sufficiently "appurtenant" to a federal reservation to enable FRWRs is also a legal issue as only "appurtenant water" can be subject to a FRWR (*Cappaert*, 426 U.S. at 138) and the FRWRs must be "appurtenant to the land."  *Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476, 1479 (D.C. Cir. 1995).  Appurtenant is defined as "*appurtenant* to land when it is by right used with the land."  BLACK'S LAW DICTIONARY, 6th Ed. 1990 (emphasis added).  In FRWR cases, courts have characterized appurtenant waters as those "in," "on," "within," "under" or not "beyond the borders" of a reservation.  *Colville Confederated Tribes v. Walton* ("Walton II") (FRWR doctrine relates "to water use *on* a federal reservation") (emphasis added), 647 F.2d 42, 53 (9th Cir. 1981); *Sierra Club v. Block*, 622 F.Supp. 842, 861 (D. Colo. 1986) (FRWRs arise from waters "*in*" the reservation) (emphasis added); *United States v. City of Challis*, 988 P.2d 1199, 1200 (Idaho 1999) (U.S. claims FRWRs "*within*" National Forests (emphasis added)); *Potlatch Corp. v. United States*, 12 P.3d 1260,

---

action validly reserved water rights to the United States, and if so to what extent and for what purpose.  *See* Brief at pp 32-35.

1266, 1268 (Idaho 2000) (FRWRs exist in waters "*within*" Hells Canyon reservation and do not exist "*beyond the borders*" of a reservation (emphasis added)); *General Adjudication of All Rights to Use Water in the Gila River System and Source ("Gila River")*, 989 P.2d 739, 748 (Ariz. 1999) (FRWR may exist in water "*under*" the reservation (emphasis added)).  In *Cappaert*, which is apparently the only case wherein the Supreme Court has found an in-flow FRWR to exist (in that case to support the existence of a unique variety of fish whose conservation that reservation was specifically created to protect), the pool of water was located entirely within the boundaries of the reservation and the Court emphasized that fact.[10]  Courts have declined to recognize a federally-claimed FRWR in waters not adjacent to a reservation. *United States v. City and County of Denver*, 656 P.2d 1 (Colo. 1982); *United States v. Bell*, 724 P.2d 631, 634, 645, n. 17 (Colo. 1986).  In other cases, the right to appropriate or divert water, usually for irrigating arid lands or some similar purpose, was also from waters within the federally reserved area.[11]

Accordingly, determination of whether or not an unquantified FRWR can possibly exist at all (whether by rulemaking claim or conclusive adjudication) in waters not within a federal reservation is a strictly legal matter, and therefore subject to judicial *de novo* review.  Moreover, as the Supreme Court has made clear, because FRWRs are a judicial construct arising by

---

[10]  *See Cappaert*, 426 U.S. at 131-132, 138-142; s*ee also Potlatch Corp.*, 12 P.3d at 1264-1266 (discussing *Cappaert* and *United States v. New Mexico*, 438 U.S. 696 (1978)).

[11]  *See, e.g., Winters v. United States*, 207 U.S. 564 (1908); *United States v Ahtanum Irrigation Dist.*, 236 F.2d 321, 325 (9th Cir. 1956) (explaining that the Indian reservation boundary in *Winters* expressly extended to the middle of the Milk River, thereby encompassing the area from which water for irrigation purposes for the reservation was being diverted on the near shore within the reservation, and applying the same principle in the case of a second Indian reservation to the middle of  the nonnavigable Ahtanum Creek by operation of riparian law, where the diversion was also taking place from the near shore clearly within the reservation).

OPENING BRIEF – WHICH WATERS

implication, their existence is ultimately a legal question for the courts and narrowly construed. *New Mexico*, 438 U.S. at 699-702.[12]

       c.      **FRWRs, Where They Exist, Are Limited** – The *scope* of federal authority in waters which the Court determines truly "appurtenant" and, therefore, reserved is another legal issue to be resolved by *de novo* review. *New Mexico*, 438 U.S. at 700-701. As a settled matter of law, FRWRs are a non-possessory limited use interest enabling the United States to block another water appropriator from using water or limiting that appropriator to the right to use a limited volume of water. *Cappaert*, 426 U.S. at 133-134, 136, 141-143 (Federal Government's in-flow FRWR limited to only so much water as absolutely necessary to maintain that level of water in pool shown crucial for the preservation and propagation of the rare pupfish unique to that pool); *Arizona v. California*, 373 U.S. 546, 600-601 (1963). Under the Appropriation Doctrine, that is the foundation of the FRWR doctrine, water rights are merely a usufructuary right to use waters – not ownership of the waterway either in whole or in part. *Santa Fe Trail Ranches Property Owners Association v. Harold D. Simpson*, 990 P.2d 46, 54 (Colo. 1999); *see also Colorado v. New Mexico*, 459 U.S. 176, 179; *Andrus v. Charlestone Stone Products Co., Inc.*, 436 U.S. 604, 615 (1978); 94 CJS § 371, *Waters I* (2001). Consistent with this settled foundational law, FRWRs have been construed to be "merely the right to use the water" and not federal title to or ownership of the water. *City and County of Denver*, 656 P.2d at 12; *see also Walton II*, 647 F.2d at 46 (citing *New Mexico*, 438 U.S. at 698) ("Congress has the power to reserve unappropriated water for *use* on appurtenant lands.") (emphasis added). Other courts have determined that a FRWR does not provide the federal government with plenary authority over a body of water subject to a FRWR. *Totemoff v. Alaska*, 905 P.2d 954, 966-968

---

[12]   The issue of appurtenance bears on several test case waterways addressed in this brief including Chignik Lake and River, Crescent River, several Juneau area streams, the Colville River, Yukon River, and Sixmile Lake.

(Alaska 1995).  Indeed, "Congress gave the States plenary control of water on the public

domain."  *Walton II*, 647 F.2d at 53 (citing *California Oregon Power Co. v. Beaver Portland

Cement Co.)* 295 U.S. 142, 163-164 (1935).  Therefore, states retain jurisdictional interests in

waters subject to FRWRs located entirely within federal reservations.  *United States v. Anderson*,

736 F.2d 1358, 1366 (9th Cir. 1984); s*ee also* Court's June 29, 2007 Order herein, Docket Nos.

130 and 131 at pp. 4-7 (same effect).

     According to their statements and actions since their 1999 regulation, where the

Defendants claim FRWRs in "adjacent" navigable waters they apparently claim such rights and

jurisdiction across the entire breadth of a wide water body (*e.g.*, the entire width of the Yukon

River), even though the reservation boundary is set on one bank at the mean, high-water mark

and the submerged bed and the far bank are not within the reserved lands.  That agency view --

seeking to transmute what is at most a fractional use interest into broad jurisdictional power over

the entire width of navigable waters lying outside the boundaries of federally reserved uplands --

is another strictly legal issue for court *de novo* review.[13]

               **2.      Specific Agency Reasoning Is Required in the Administrative Record.**

     In addition, the Defendants are obligated to present for judicial review an adequate record

showing that they properly applied these legal standards and, consistent with established judicial

precedent made correct, reasoned determinations that:  (1) that the underlying federal

reservations were sufficiently specific to create a FRWR for federal subsistence jurisdiction

purposes and (2) that specific water bodies in which the Defendants "identify" and thereby claim

FRWRs are indeed appurtenant to the reserved lands.  The administrative FRWR identifications

at issue in this case must be set aside if the action was arbitrary and capricious, an abuse of

---

[13]   This issue bears on claimed Federal authority over reaches of the Colville and Yukon Rivers and Sixmile Lake
not within reserved lands.

OPENING BRIEF – WHICH WATERS

discretion, or otherwise not in accordance with law, including established legal precedent.

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971).[14]

> **B.    Factual Elements of Agency FRWRs Claims are Subject to Arbitrary and Capricious Review and Must Be Overturned Where the Agency Fails to Examine Relevant Data and Articulate a Rational Connection Between the Facts Found and the Choices Made**

The Court's determinations in its May 17, 2007 "What Process" Decision includes the

observation that, in order to ***claim*** FRWRs, "There was no need for the Secretaries to make the

determinations [regarding the elements of a FRWR] that are necessary for a formal adjudication

of reserved water rights." Docket No. 110 at 29.  However, left unresolved is what kind of

agency factual record ***is*** necessary to ensure proper judicial review of agency identifications of

purported FRWRs.  Based on its review of the Court's May 17 Decision and comments within

subsequent scheduling Orders in this case, the State is persuaded that the Court did not intend to

allow the Defendant agencies to make naked claims of FRWRs devoid of facts and reasoning

necessary to demonstrate that their identification of a specific water body or category of water

bodies did indeed comply with FRWR criteria as a matter of law.  Furthermore, the

Administrative Record must show that the agencies marshaled sufficient facts to make reasoned

supported conclusions.  Indeed, "to determine the purpose of a reservation and to determine the

waters necessary to accomplish that purpose are inevitably fact-intensive inquiries that must be

made on a reservation-by-reservation basis." *Gila River,* 989 P.2d at 748 (referring to *New

Mexico* at 700); s*ee also Overton Park* at 420 ("bare record" inadequate); *Motor Vehicles Mfrs.

Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 48 (1983) (adequate record

mandated by "strict and demanding" APA requirements); *Burlington Truck Lines, Inc. v. United

States*, 371 U.S. 156, 168 (1962) (court must "ensure" that relevant factors considered); *SEC v.*

---

[14]   This standard of review bears on most of the specific "test cases."

OPENING BRIEF – WHICH WATERS

*Chenery*, 332 U.S. 194, 196 (1947) (record that is inadequate renders reviewing court powerless to affirm the agency action).

For example, the Supreme Court has made the demonstrated necessity requirement an absolute pre-condition to the existence of a *bona fide* FRWR.  *New Mexico*, 438 U.S. at 700-701; *Cappaert*, 426 U.S. at 141.  Unless this primarily factual standard can be met, no FRWR can exist.  In *Cappaert*, specific evidence of harm to the pupfish as a unique species expressly intended to be protected by the reservation of land and the essential need for a water right were required prerequisites to establishing a FRWR for their protection (and even then only to that amount of water necessary for their survival).  *Cappaert,* 426 U.S. at 133, 140-141.[15]  During promulgation of the 1999 regulations, the Defendants recognized their obligation to fulfill this requirement:  (1) "Any such assertion [of a FRWR] *must, of course*, be based on a determination that the inland waters are *necessary* to meet the purposes of the federal reservation."  (AR[16] 001693) (emphasis added); (2) "The Departments have also determined that it was *necessary* to include these [exterior, adjacent] waters…."  (AR 010654) (emphasis added); and (3) "The Departments have determined that it was *necessary* to include these waters [flowing through private inholdings] in the regulations" (*id.*) (emphasis added).  The difficulties of satisfying this requirement, especially in regard to claiming FRWRs in waters outside of reservation boundaries, were also recognized: "the federal agency asserting water rights beyond reservation boundaries would have to establish that those waters were *needed* for the purposes of the

---

[15]   This requirement has two parts.  The first is that a water right is per se necessary:  a FRWR "may only be found where other waters are inadequate to accomplish the purpose of the reservation."  *Gila River*, 989 P.2d at 748.  If not, the process stops there and no FRWR exists.  The second is what quantity of water is then needed.  In its prior Decision, it appears the Court has excused the Defendants from making the second determination in the context of claiming FRWRs for purposes of asserting federal subsistence jurisdiction.  It is the State's position that the Defendants cannot be excused from satisfying the requirement of making the first determination, especially since the Defendants recognized this obligation while promulgating the challenged regulations.  AR 001693.
[16]   "AR" refers to the Administrative Record in this case.

OPENING BRIEF – WHICH WATERS

reservation and that those *needs* cannot be satisfied by waters within or adjacent to[17] the reservation.  This is a component of the reserved water rights doctrine itself and may be *difficult* to establish for the federal reservations in water plentiful Alaska."  AR 001704 (emphasis added).

The Defendants' clear recognition of this threshold requirement, and the case law cited above, obligates the Defendants to produce facts and reasoning to show that a specific agency-claimed, albeit to this point unquantified, FRWR is necessary to avoid defeating a reservation's primary purposes.  This requirement affects and pre-conditions each of the Defendants' assertions to FRWRs in their challenged regulations.[18]

Judicial review of these ***factual*** conclusions necessary to administrative claims or identifications might be subject to the traditional APA arbitrary and capricious standard.  However, even under that "deferential" standard, an agency determination must be supported by an adequate administrative record demonstrating to the court that it is a proper, reasoned agency decision.  *State Farm*, 463 U.S. at 43; *Chenery*, 332 U.S. at 196.  Even under that standard, this Court's review must be "searching and careful" and "must ensure" that the federal agency "adequately considered all relevant factors and that it has demonstrated a 'rational connection between the facts found and the choice made.'"  *Home Box Office, Inc. v. Federal Communications Commission*, 567 F.2d 9, 35 (D.C. Cir. 1977) (citing *Burlington Truck Lines, Inc.*, 371 U.S. 156, 168 (1962)).  *Accord, Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841, 846-852 (9th Cir. 2003) (ruling that courts must conduct a "thorough, probing, in-depth review" of the agency action and record, will not defer to agency line-drawing that lacks

---

[17]   As previously noted, the State does not agree that waters "adjacent to" federal reservations can be considered "within" the reservation or properly support an agency claim to FRWRs, which are necessarily dependent on the terms, including boundaries, of the reservation.
[18]   Examples of failure to make the specific necessity determination include Sixmile Lake and the Yukon River by the Nowitna Wildlife Refuge.

OPENING BRIEF – WHICH WATERS

supporting rationale in the record, and that the Fish and Wildlife Service acted arbitrarily and capriciously in designating the Arizona pygmy-owl as a "distinct population segment" because it did not "articulate a rational basis" in the listing rule for doing so); *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1180 (9th Cir. 2000), (in-depth court review and agency articulation and record of rational connection required) (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989)); *Natural Resources Defense Council v. U. S. Envtl. Protection Agency*, 966 F.2d 1292, 1306 (9th Cir. 1992) (holding no deference due EPA's line-drawing which lacked support in the record).  A bare administrative record thwarts such review as the Court "has no idea what factors or data were in fact considered by the agency." *Overton Park*, 401 U.S. at 420; *see also United States Lines, Inc. v. Federal Maritime Commission*, 584 F.2d 519, 533 (D.C. Cir. 1978).

The absence of those showings, or the presentation of a record that is inadequate or improper, renders the reviewing court powerless to affirm the agency action.  *Chenery*, 332 U.S. at 196.  In addition, where the administrative record fails to include findings or analysis to justify the choices made by the agency (*e.g.*, where the agency claims a specific water body or category of water bodies has FRWRs), the APA's "strict and demanding" requirements do not permit a reviewing court to sustain the action.  *State Farm*, 463 U.S. at 48.  Furthermore, the Ninth Circuit Court has found that: "When the arbitrary and capricious standard is performing the function of assuring factual support, there is no substantive difference between what it requires and what would be required by the substantial evidence test."  *Bonnischsen v. United States*, 367 F.3d 864, 880 n.19 (9th Cir. 2004).

As the State will show through its presentation of specific "which waters" examples, the Defendants have failed to marshal such facts, could not and did not consider those necessary,

absent facts, and failed to make specific reasoned conclusions in those regards.  These repeated failures to prepare and consider the necessary record and to make legally necessary, reasoned conclusions from an adequate record render many of the agencies' FRWR identifications at issue arbitrary and capricious.[19]

### C.    Standard of Review Where Statutory Provisions Exist

Three principles of judicial review regarding statutory interpretation or duties are presented by this phase of the case:  (1) non-deferential *Chevron* review of federal agency interpretations of plain statutory provisions; (2) application of the Clear Statement Rule regarding agency actions which impact traditional State authority; and (3) application of the APA's failure-to-act standard allowing the Court to order the Defendants to take affirmative action only where the agencies have failed to carry out a mandatory, non-discretionary statutory duty.

### 1.    Court Review of Agency Interpretations of Plain Statutory Language Is Not Deferential.

Plain unambiguous provisions of ANILCA (*e.g.*, §§ 102(3), 103(a); § 201(7)(b), etc.) govern Defendants' rulemaking attempts to extend federal preemptive Title VIII authority (1) into marine and tidally influenced waters and onto State-owned submerged lands underlying those waters;[20] (2) into waters not appurtenant to federal reservations,[21] and (3) onto non-public lands validly selected by the State or ANCSA corporations – by incorrectly treating them as federal "public lands."  Court review of these regulatory interpretations is governed by a simple

---

[19]  *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 414 (1971) (D.C. Cir. 1977); *Home Box Office, Inc. v. Federal Communications Commission,* 567 F.2d 9, 35 (D.C. Cir. 1977); *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962); *United States Lines, Inc. v. Federal Maritime Commission,* 584 F.2d 519, 533 (D.C. Cir. 1978); *SEC v. Chenery Corp.,* 332 U.S. 194 (1947); *Motor Vehicle Mfr's Ass'n of the U.S. v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 48 (1983).

[20]  For example, at Togiak Bay, Tuxedni Bay, and the mouth of the Stikine River addressed in detail, *infra.*

[21]  For example, Chignik Lake and River, Crescent River, Juneau area streams, Colville River, Yukon River and Sixmile Lake addressed *infra.*

inquiry: if Congress has "directly spoken to the precise question [and] the intent of Congress is clear" that is the end of the matter. *Chevron*, 467 U.S. at 482. The federal agencies are required to give effect to the unambiguously expressed or plain intent of Congress and no deference is extended by the courts to contrary agency interpretations of such plain statutory language. *Id.*; *see also Immigration & Naturalization Serv. v. Cardoza-Fonseca*, 480 U.S. 421, 445-46 (1987).

     **2.**     **Clear Statement Rule Requires Clear, Unmistakable Statutory Basis for Agency Actions Which Diminish Traditional State Authority.**

The Defendants' 1999 rulemaking and related statutory interpretations are also governed by the Supreme Court's Clear Statement rule: agency action which serves to diminish or impinge upon traditional State powers [*e.g.*, over fish, wildlife, and waters] must be based on a clear statement by Congress demonstrating "unmistakable" intent to authorize such action. *Solid Waste Agency v. U.S. Army Corps of Engr's,* 531 U.S. 159, 174 (2001); *Pennsylvania Dep't of Corr. v. Yeshey,* 524 U.S. 206, 208-209 (1998). Federal agency actions seeking to diminish Alaska's traditional authority in these realms must be struck down by the Court absent such clear unmistakable statements in ANILCA or in other applicable statutes authorizing such actions.[22]

     **3.**     **Failure-to-Act Claims Can Only Be Redressed Where Federal Agencies Have Failed to Carry Out a Mandatory, Non-Discretionary Statutory Duty.**

Finally, the Katie John plaintiffs maintain that the agencies' "restrictive application" of the FRWR doctrine is reviewable under the APA. *See* Katie John Pleading, Third Cause of Action, at 18, ¶ 46 (Jan. 7, 2005). Katie John complains that the agencies failed to act to extend FRWRs to certain waters and ask the Court to compel the Defendants to take specific affirmative actions: namely, to extend FRWRs to waters upstream and downstream (*i.e.*, not appurtenant) of

---

[22] This standard of review impacts many of the test cases as well as the downstream/upstream and allotment claims of the Katie John plaintiffs.

OPENING BRIEF – WHICH WATERS

federal reservations and to extend FRWRs to Alaska Native allotments.  *See* Court's June 29,

2007 Order, Docket No. 130 at 4-5.  The Peratrovich plaintiffs also claim that the Defendants

improperly excluded marine waters in Southeast Alaska from their regulatory claims.  *Id.*

Agency failure to act is reviewable pursuant to section 706(1) of the APA.  *Norton v.*

*Southern Utah Wilderness Alliance*, 542 U.S. 55, 61-63 (2004).  The Supreme Court has held

that "federal courts may order agencies to act [affirmatively] only where the agency fails to carry

out a mandatory non-discretionary duty."  *Id.* at 61.  The Katie John and Peratrovich plaintiffs

must carry and satisfy this substantial burden in order to have any chance of securing relief on

their claims.

## III.    CATEGORIES OF WATERS AND LANDS INCLUDING SPECIFIC EXAMPLES

### A.    Marine And Tidally Influenced Waters

#### 1.    The Federal Defendants' Administrative Extension of Title VIII Authority Into Marine and Tidally Influenced Waters Beyond Statutorily Prescribed Boundaries and Over State-Owned Submerged Lands Violates Express Provisions of ANILCA and is Contrary to the FRWR Doctrine.

Three specific examples illustrate that the Defendants have claimed (and

exercised) jurisdiction in derogation of the applicable law:  (1) Togiak Bay outside of the Togiak

National Wildlife Refuge on the north side of Bristol Bay; (2) Tuxedni Bay off of Cook Inlet

outside of the Lake Clark National Park and Preserve; and (3) the marine area at the mouth of the

Stikine River outside of the Tongass National Forest.

The Defendants' explanation for their extraterritorial assertion of jurisdiction in these

instances is a purported need to delineate "headland-to-headland" river mouth boundary lines,

apparently as a matter of administrative convenience.  They claim that it was "reasonable" for

them to use United Nations' boundary conventions to draw lines departing from the mean high

tide line specified by statute and encompassing marine and tidally-influenced waters as well as State-owned submerged lands, while expanding federal claims to jurisdiction in the process.  *See* 50 C.F.R. § 100.4; 64 Fed. Reg. 1276, 1287 (Jan. 8, 1999).

Federal agency communications within the Administrative Record ("AR"), which discuss these international boundary conventions in the context of delineating "inland waters" from "marine waters," also note that ANILCA has its own proscriptions for seaward boundaries.  AR 001743-6, 010596.  In addition, there is also express recognition that drawing such headland-to-headland boundaries would "convert" tidally-influenced waters into "inland waters."  AR 002849, 010594  Nonetheless, subsequent agency communications state that, contrary to what ANILCA specifically provides, drawing "straight line" boundaries across river mouths will be "*preferable* to attempting to discern the meander of the high-tide line [as provided in ANILCA], at locations where the federal government is asserting reserved water rights to the coastal mouth of a river stream."  AR 001961 (emphasis added).

The Defendants' extra-legal efforts to treat these marine bays as "public lands," use unauthorized UN conventions, and engage in "convenient" boundary line drawing because ***they*** consider it "reasonable" or "preferable" must be rejected, as a matter of law, for running afoul of three plain statutory provisions and general FRWRs law.

First, ANILCA section 102(3)(A) states that "lands which have been confirmed to" the State are *not* "public lands" for ANILCA purposes, including Title VIII.  16 U.S.C. § 3102(3)(A).  As submerged lands underlying tidally-influenced waters were confirmed to the State upon its entry into the Union, these lands are not "public lands."  *See generally*, Submerged Lands Act of 1953, 43 U.S.C. § 1311(c); Alaska Statehood Act, § 6(m), 72 Stat. 339, 343 (1959).

Second, ANILCA section 103(a) specifies plainly that "boundaries of areas added to the National Park, Wildlife Refuge and National Forest Systems [*i.e.*, federal reservations] shall in coastal areas, *not extend seaward beyond the mean high tide line to include lands owned by the State of Alaska*…." ANILCA at § 103(a); 16 U.S.C. § 103(a) (emphasis added). These prescribed boundaries serve to delineate federal, public land from non-federal, non-public land in coastal areas. Defendants' action must, therefore, be reviewed pursuant to the first prong of *Chevron,* which establishes that agencies may not promulgate regulations contrary to the plain meaning of the statutory language and where the statutory meaning is clear no deference is given to agency interpretations. *Chevron*, 467 U.S. at 842-843. Regulations inconsistent with the plain meaning are considered arbitrary and capricious and not in accordance with law. *Id.*; 5 U.S.C. §§ 706(2)(A), (B).

Third, as previously noted, the Clear Statement Rule recognizes traditional State authority over its waters (and fish and wildlife) and bars Federal preemption of such authority unless Congress has unmistakably provided otherwise. In the instance of these three marine bays Congress has not stated otherwise.[23] To the contrary, Congress has clearly stated its intent that the federal public lands do not encompass these marine waters or underlying lands.

Fourth, as also previously noted, the FRWR doctrine, which is a court-created construct, has never been applied by the courts to salt or brackish waters – a point which the Defendants have acknowledged.[24]

---

[23]  *Solid Waste Agency, 531 U.S. at 174.*

[24]  The FRWR doctrine arose from and operates in conjunction with the prior appropriation doctrine of water rights. *City and County of Denver*, 656 P.2d at 9; *see also New Mexico*, 438 U.S. at 714. A critical element of both doctrines is "beneficial use" – putting the water to some specific recognized utilitarian use – traditionally agriculture, ranching, or mining. *See* William A. Wilcox, Jr., Special Issues in Environmental Law Involving Federal Agencies, 14 VILL. ENVTL. L.J. 39, 63-64 (2003). Since salt waters cannot be used for these traditional uses, those waters have never been subject to any form of appropriation, or reservation, under this doctrine. The Defendants recognize this precedent, noting in the administrative record that the FRWR doctrine arose from "disputes over rights to appropriate scarce freshwater surface or ground waters" (AR 001710) and  also

OPENING BRIEF – WHICH WATERS

2.    **Example One:  Togiak Bay Marine and Tidally Influenced Waters**

A map of Togiak Bay is shown in Exhibit 1 submitted herewith, together with other

exhibits through the Affidavit of Tina Cunning, Special Assistant to the Commissioner of the

Alaska Department of Fish and Game (Attachment 1).  In Togiak Bay the Defendants claim

FRWRs authority over marine and tidally-influenced waters that (a) are outside the prescribed

boundaries of the Togiak National Wildlife Refuge; (b) extend beyond the mean high-tide line;

and (c) overlay State-owned submerged lands established at statehood and pre-dating the

creation of that refuge.  Congress established the Togiak National Wildlife Refuge in 1980

(ANILCA § 303(6)) and fixed the boundary of that refuge along the mean high tide line at

Togiak Bay (*see* ANILCA § 103(a) and Exhibit 1).  The Bay and the State-owned submerged

lands are not within the Refuge.  As such, these lands and waters can not possibly qualify as

federal "public lands" as defined by ANILCA § 102, for FRWR purposes or otherwise.

Nonetheless, the Defendant agencies have drawn their own boundary line, seaward of the mean

high tide line crossing the head of the Bay and including marine waters.  (*See* Map, Exhibit 2).

Within this boundary line, these agencies claim preemptive Title VIII authority and treat these

marine waters and State-owned lands as federal "public lands," in derogation of ANILCA §§ 102

and 103(a).

The Defendants' action to extend the Refuge's statutory boundary seaward into Togiak

Bay and onto State-owned submerged lands is in derogation of plain provisions of ANILCA.  Per

the *Chevron* standard, this action must fail.

---

acknowledging, for the record, that "there are apparently no cases in which the federal government has asserted reservation of rights to marine waters under the *Winters* doctrine" and that extending "reserved water rights to marine waters would be without precedent." 70 Fed. Reg. at 76401.  Nothing in ANILCA provides any contrary or superseding authority allowing for such an unprecedented action.

OPENING BRIEF – WHICH WATERS

The AR is also devoid of any reasoning or facts for this specific action taken in contravention of congressional intent. The only references to Togiak in the AR are conclusory, unhelpful statements found in the Environmental Assessment (EA) for the 1999 rulemaking; namely: "the Togiak River flowing through the Togiak NWR" would be subject to federal jurisdiction under the [proposed] regulation (AR 006760 and 009630); "villages within the Togiak NWR . . . would be adjacent to waters under Federal jurisdiction" under the proposed regulation (AR 006762 and 009631); there "is a growing sport fishery on the Togiak NWR" (AR 007783); and "the Togiak *River* is within the Togiak NWR" (AR 009631; emphasis added). Nowhere is there any presentation of specific reasoning or facts outlining why the Agencies sought to extend their jurisdiction outside of the Refuge seaward into Togiak Bay. No interpretation of ANILCA provisions is presented justifying the action, nor is there any assertion or identification of FRWRs in these salt waters. *See* 70 Fed. Reg. at 76401. Rather, as earlier noted, the AR presents only generic, and conflicting, intra-agency discussion about drawing such a seaward boundary for convenience's sake. The federal agencies present no adequate rationale, factual or otherwise, to support deviating from the plain language of ANILCA in the case of Togiak Bay.

Given the "plain meaning" and *de novo* review rules which apply, established FRWR law, and the absence of pertinent administrative reasoning otherwise, this Court upon review must reverse the challenged agency action. *See* Brief and authorities at pp. 11-15 *supra*.

### 3. Example Two: Tuxedni Bay Marine and Tidally Influenced Waters

A map of Tuxedni Bay is presented in Exhibit 3. The Defendants claim FRWRs authority over marine and tidally influenced waters in Tuxedni Bay that: (a) are outside the prescribed boundaries of the Lake Clark National Park and Preserve; (b) extend beyond the mean

OPENING BRIEF – WHICH WATERS

high tide line; and (c) overlay State-owned submerged lands established at statehood and pre-dating the creation of that park and preserve. Congress established the Lake Clark National Park and Preserve in 1980 (ANILCA § 201(7)) and set the boundary of that park and preserve along the mean, high-tide line where the unit abuts Cook Inlet and other bays. ANILCA § 103(a); 50 C.F.R. §§ 100.3(20), 100.4. This statutory boundary follows the mean, high-tide line around Tuxedni Bay, and most of the Bay is bounded by non-federal, non-public uplands anyway. S*ee* Exhibit 3. The Defendant federal agencies have subsequently drawn a different boundary line across the mid-section of the Bay (*see* Map at Exhibit 4), thus departing from the ANILCA prescribed mean, high-tide line and the unit boundary fixed by Congress. Within this administratively-drawn boundary, which includes marine and tidally-influenced waters as well as State-owned submerged lands located outside the Park and Preserve boundaries, the agencies claim FRWRs and preemptive Title VIII authority. Because this action is contrary to plain provisions of ANILCA, and for the other reasons previously stated, application of the *Chevron* standard mandates that the Court reverse the agency action.

Just as in the case of Togiak Bay, the AR contains no pertinent or specific reasoning, facts, or references explaining this agency action with respect to Tuxedni Bay. Whether and why the agencies believe they can legally extend this jurisdictional boundary seaward is not revealed. How this marine, saltwater bay could legally include a FRWR is unexplained. Indeed, as previously noted, the federal agencies concur in their rule-making that there is no precedential support for asserting FRWRs in salt waters as they attempt to do. *See* 70 Fed. Reg. at 76401.

Therefore, as set out previously, this agency action claiming jurisdiction over Tuxedni Bay also cannot be sustained. *See* Brief and authorities at pp. 11-15 *supra*.

### 4.     Example Three:  Stikine River Marine and Tidally Influenced Waters

A map showing the area at the mouth the Stikine River in Southeast Alaska is presented in Exhibit 5.  In that instance as well, the Defendants claim FRWRs authority over marine and tidally-influenced waters that (a) are outside the boundaries of the Tongass National Forest; (b) extend beyond the mean high tide line; and (c) overlay State-owned submerged lands.  In addition to the reasons given previously in this brief for Court rejection of that claim, it was confirmed recently by Decree of the U.S. Supreme Court and a Federal disclaimer that the Tongass National Forest does not include the lands underlying marine or tidally-influenced waters to the line of mean, high-tide at the mouth of the Stikine River and elsewhere within three miles of the coastline and of the seaward limit of inland marine waters.  These lands are instead owned by the State.[25]  Furthermore, in *New Mexico*, 438 U.S. at 706-708, the Court expressly held that the creation of national forests like the Tongass did not include FRWRs beyond the primary purposes of conserving water flows and furnishing a continuous supply of timber for the people:  "National forests were not to be reserved for aesthetic, environmental, recreational, or wildlife-preservation purposes."  *Id.* at 708.

Notwithstanding this law and these facts, the Defendant agencies have drawn subsistence jurisdiction boundary lines straight across the tidal waters of the arms at the mouth of the Stikine River thus encompassing marine waters and State-owned submerged lands.  S*ee* Map at Exhibit 6.  As in the case of Togiak Bay and Tuxedni Bay, no legally justifiable reason is given in the AR for this agency claim of preemptive jurisdiction over non-federal waters and lands, and the Court should reverse it.

### 5.     Peratrovich Marine Waters Claims

---

[25]     *State of Alaska v. United States*, 546 U.S. 43 (2006) (Decree entered Jan. 23, 2006, at 305 ¶ 3).

For the same reasons, the Peratrovich plaintiffs' attempt to compel federal subsistence jurisdiction claims to FRWRs in marine and tidally-influenced waters within Southeast Alaska must also fail. In addition to the reasons already given for rejecting that claim, it is unlikely that the Peratrovich plaintiffs can demonstrate that the Defendants failed to carry out a mandatory non-discretionary statutory duty by excluding marine waters in Southeast Alaska from their regulatory claims. *See* Brief at 16-17 *supra*.

### 6.     Conclusion to Marine and Tidally Influenced Waters Claims

In each of the examples cited above, the Defendants have violated clear statutory provisions governing marine, including tidally-influenced, waters, and the Peratrovich plaintiffs would have them do so to an even greater extent. First, section 102(3) plainly provides that State lands, including marine submerged lands, are not "public lands" for purposes of ANILCA. Second, ANILCA § 103(a) clearly and unambiguously prohibits the boundaries of federal reservations created by ANILCA being extended seaward beyond the mean high tide line to include waters and lands of the State of Alaska and prohibits the extension of Title VIII authority over those State-owned submerged lands.

Yet in each of these instances, the Defendants have engaged in the statutorily-prohibited action, in ways that are also contrary to the Clear Statement Rule[26] and established FRWR law. There is nothing in ANILCA allowing the agencies to disregard congressional direction and intent regarding federal reservation boundaries and adopt instead contrary UN boundary conventions. ANILCA Title VIII is plainly limited to federal "public lands" and no application of UN boundary conventions, agency desires to draw easy, more "preferable" lines, or other agency sleight-of-hand should be allowed to transmute marine or tidal waters lying outside of

---

[26]     *Solid Waste Agency* at 173. These headland-to-headland boundaries improperly claimed by the Defendants serve to expand Federal authority and diminish State authority without clear unmistakable Congressional direction to take such action, thereby violating the Clear Statement Rule and warranting Court reversal upon review.

OPENING BRIEF – WHICH WATERS

federal reservation boundaries – or the State-owned submerged lands underlying such waters –

into federal "public lands."  These federal agency actions, which would serve to diminish or

impinge upon traditional State powers, are not entitled to any sort of court deference and must be

reversed as being contrary to law.  *Chevron*, 467 U.S. at 842-843; *Solid Waste Agency*, 531 U.S.

at 173-174.

> **B.     Waters Bounded By Non-Federal Lands Within Reservation Boundaries**
>
> > **1.     Express Provisions of ANILCA Specify that State and ANCSA Lands Within Federal Reservations are Not Part of Those Reservations and Not Public Lands and Thus Preclude FRWR Claims to Waters Located on These Non-Public Lands.**

ANILCA unambiguously prescribes that State lands, ANCSA lands, and other non-

public, non-federal lands within the boundaries of "conservation system units" (*i.e.*, federal

reservations) shall not be considered part of such reservations:  "only those lands within the

boundaries of any conservation system unit which are public lands (as such term is defined in

this Act) shall be deemed to be included as a portion of such unit."  ANILCA § 103(c); 16

U.S.C. § 3103(c).  Accordingly, waters bounded by and running over non-public, non-federal

lands, such as State lands and ANCSA lands (*see* ANILCA § 102(3)), are not part of those

federal units established by ANILCA and not reserved lands in which FRWRs can exist.[27]

This unambiguous legal status of such lands bars the Defendants from properly

identifying FRWRs in waters on these lands.  Waters on or flowing through these non-public

unreserved lands are not appurtenant to a federal reservation.  Both as a matter of law and fact, a

FRWR cannot exist in them and there can be no legitimate federal agency claim of a FRWR in

such waters.  The State will demonstrate that the Defendants are illegally claiming FRWRs (and

---

[27]   Notably, in another recent case this Court determined, based in part on the arguments of the federal Defendants also named in this case, that federal subsistence regulations apply only to federal public lands, and not to state lands. *Alaska v. Fleagle, et al.*, USDC Alaska Case No. 3:06cv0107-HRH, Order re Motions for Summary Judgment filed June 27, 2007 (USDC Clerk's Docket No. 43 at p. 36).

federal subsistence jurisdiction) in such waters bounded by non-public unreserved lands using the three examples given below: (1) the Chignik Lake and River system (including Black Lake) located within the Alaska Peninsula Wildlife Refuge boundaries; (2) the Crescent River area located within the Lake Clark National Park and Preserve boundaries; and (3) streams in the Juneau area.

### 2.    Example One:  Chignik Lake and River System Within Non-Public Lands.

The Chignik Lake and River system, including Black Lake, is situated on the south side of the Alaska Peninsula in southwest Alaska and within the boundaries of the Alaska Peninsula Wildlife Refuge established by ANILCA as shown on the map in Exhibit 7 accompanying this brief.  *See* ANILCA § 302(1).  However, as the map illustrates, all of the land surrounding these water bodies is non-federal land.  Virtually the entire shorelines on both sides of each body of water are ANCSA land selected[28] or owned by the Chignik village corporation, Far West, Incorporated, and not federal, reserved land.  *Id.*  The Chignik system is also navigable so the beds below the mean high water mark are in State ownership.  As a matter of law and fact, none of the land appurtenant to these water bodies is reserved federal public land.

Nonetheless, the Defendants identify and claim FRWRs in these specific waters and treat them and the underlying State-owned submerged lands as "public lands," therefore claiming Title VIII jurisdiction over these lands and waters.  AR 00672; AR 001724; 50 C.F.R. §§ 100.3(b)(2), 100.4, 100.27(i)(8); Federal Subsistence Management Map, Oct. 1, 1999, AR 010867.  The asserted basis for this alleged jurisdiction is a non-specific conclusion by the federal agencies in the AR that "inclusion of all inland water in a federal reservation containing reserved water rights is generally more practical, easier to administer, and easier for the public to

---

[28]    *See* also the related discussion of ANCSA corporation and State selected lands contained in Section III. D. of this brief *infra*.

OPENING BRIEF – WHICH WATERS

understand." AR 001698.  Similarly, those agencies maintain that "the Departments have determined that it was *necessary* to include these waters in these regulations, even where they flow through private in-holdings, in order to assure stewardship of fish and wildlife, to adequately protect subsistence uses . . . and to ensure effective management of subsistence fisheries resources." AR 010654 (emphasis added).

This generic identification is wholly contrary to a fundamental legal precondition for a FRWR: only waters appurtenant to reserved federal lands can contain a FRWR.  *See* Brief & authorities at pp. 7-9 *supra*.  In no manner is the Chignik Lake or River system appurtenant to any federal reserved lands.  No lands legally part of the Alaska Peninsula Wildlife Refuge encompass or even touch these waters.  These waters are not on or within the reserved lands.  *Id.* Accordingly, the Defendants' identification of a FRWR in these waters cannot be affirmed following de novo review of: (a) the plain ANILCA provisions – making all of the appurtenant lands non-federal (§ 102(2)), non-public (§ 102(3)), and not reserved (§ 103(c)) – and (b) the basic requirements of the FRWR doctrine that the waters be appurtenant and necessary to reserved uplands. *Id.*

The AR is also devoid of any presentation of legal reasoning and related facts explaining and supporting the Defendants' claim that this specific lake and river system possesses FRWRs. For example, there is nothing in the AR supporting or even addressing an agency determination that the Chignik waters are "necessary" to enable the primary purposes of the refuge (*New Mexico*, 438 U.S. at 700; *see also* Brief at pp. 11-15 *supra*).  Once again, unsupported, naked conclusions are given instead.  The only references in the AR to the Chignik area relate to basic observations about the existence of its commercial and subsistence fisheries (AR 006784) and conclusory representations that Chignik is "within the boundaries of the Alaska Peninsula NWR,

27

and the adjacent inland navigable waters would be under Federal jurisdiction."  AR 006762.

Failure to include any specific reasoning and facts regarding the Chignik waters renders the

agency action arbitrary and capricious.  *See, e.g.*, Brief & authorities at pp. 11-15 *supra.*

      The federal agencies also present a litany of generic policy reasons unspecific to the

Chignik waters for claiming all "waters on private lands (inholdings) within the boundaries of

CSUs as 'public lands,'" and give "ease" of administration, "ease" of understanding, and more

"effective" fishery management as the reasons.  AR 010654.  However, nothing in the FRWR

doctrine authorizes the Defendant agencies to legally claim or identify FRWRs (and diminish

State sovereignty in derogation of the Clear Statement Rule) on the basis of the agencies' own

administrative convenience ignoring Congressional intent and court-established FRWRs law.

The legal standards set forth in *New Mexico, Cappaert,* and *Winters* are far more demanding as a

matter of law and fact.  The Defendants' claim of FRWRs at Chignik and their assertion of

preemptive authority over traditional State powers over fish, wildlife and waters without clear

statements and unmistakable intent by Congress authorizing such action, utterly fail to satisfy the

applicable legal and factual requirements.

### 3.      Example Two:  Crescent River Waters Within Non-Public Lands

      The Crescent River is within the boundaries of the Lake Clark National Park and

Preserve established in ANILCA as depicted on the map at Exhibit 8.  ANILCA § 201(7).

However, all of the lands surrounding the River are held by Cook Inlet Region, Inc., an ANCSA

corporation.  *See* Exhibit 8.  As a matter of law, these non-federal, non-public lands are not part

of the Lake Clark unit even though the lands are within the boundary.  *See* ANILCA §§ 102(2),

102(3), and 103(c).  Not being part of the unit, none of these ANCSA lands are part of a federal

reservation and the Crescent River is therefore not appurtenant to a federal reservation. *See* Brief at pp. 7-8.

Despite this the Defendants assert jurisdiction over the River claiming it as "public land" by virtue of a purported FRWR in the River. 50 C.F.R. §§ 100.3(20), 100.4; AR 010654, 001698, 001720. Their assertion is based on the same kind of generic, non-specific policy rationales associated with all "waters on private lands (inholdings) within the boundaries of CSUs" referenced above in relation to the Chignik water system. AR 010654.

Like Chignik, in the Crescent River situation the Defendants have "identified" a FRWR in a water body that is not appurtenant to any federal reservation. Since appurtenance is a fundamental precondition to any legally valid and affirmable FRWR regulatory identification, their claim of a FRWR in the non-appurtenant Crescent River is invalid and illegal. *Cappaert*, 426 U.S. at 138; Brief & authorities at pp. 7-9 *supra*.

Also like the Chignik situation, there is nothing in the AR presenting any supportable legal rationale or facts demonstrating that identification of a FRWR in the Crescent River represents proper application of the FRWR doctrine to the law and facts at hand (*i.e.*, appurtenance, necessary to primary purposes of the reservation, etc.). As previously outlined, this failure and the resultant "bare" record precludes the Court from affirming this unsupported agency action. *See* Brief at pp. 11-15 *supra*.

### 4.    Example Three:  Juneau Road System Streams Within Non-Public Lands

Seven streams (Auke Creek, Cowee Creek, Lemon Creek, Mendenhall River, Montana Creek, Peterson Creek, and Salmon Creek) flow into the Gastineau Channel near Juneau. As illustrated on the map at Exhibit 9A, each arises within the Tongass National Forest and flows out of the Forest onto and through State, municipal, or privately-owned lands beyond the

boundary of the Tongass National Forest due to a pre-Statehood exclusion of these lands from the Forest (Exhibits 9A and 9C).

Although the lower reaches of these streams shown on Map Exhibit 9A and 9C are not appurtenant to any "reserved" lands, the Defendants nonetheless assert ANILCA Title VIII jurisdiction over the seven streams, *see* Exhibit 9B also attached (federal Fisheries Jurisdiction Map) & Federal Subsistence Management Map at AR 010867.  This appears to be based on identification of purported FRWRs in these non-public downstream reaches.

The agency identification of FRWRs in these lower stream reaches violates the fundamental legal requirement that waters with FRWRs must be appurtenant to reserved lands. These seven stream reaches are outside the Forest and the reaches do not flow within reserved lands.  They fail the fundamental "appurtenant waters" test.  *See* pp. 7-9, *supra.*  Moreover, these reaches are downstream of reserved lands (*i.e.*, beyond the borders) and cannot include legitimate FRWRs.  *Potlatch Corp.*, 12 P.2d at 1268.  Furthermore, there is no indication of any effort to satisfy the necessity requirement.  *New Mexico*, 438 U.S. at 700-701.  Consequently, these identifications cannot be affirmed on review.

Once again, the AR lacks any presentation of reasoning or facts by the Defendants justifying why they engaged in this purported identification of a FRWR and extension of preemptive jurisdiction to the downstream reaches of these seven streams.  This failure by the Defendants is additional justification for the Court to reject claims of FRWRs in the Juneau road system streams beyond the Tongass boundary.  *See* Brief at p. 11-15 *supra.*

C.    **Adjacent Waters**

      1.    **Federal Claims of FRWRs in Adjacent Water Bodies are Contrary to the FRWR Doctrine, Based on an Impermissible Expansion of the Term "Appurtenant," Rely on an Unprecedented Expansion of the**

**Limited "Use" Interest Associated With FRWRs, and Are Not Supported on the Record.**

The Defendants also claim FRWRs for ANILCA Title VIII purposes in all inland waters located outside of federal reservations but adjacent, or next to those unit boundaries.  50 C.F.R. § 100.3.  Three particular examples are presented here: (1) the Colville River adjacent to but outside the easternmost boundary of the National Petroleum Reserve-Alaska (NPRA) on the North Slope; (2) a reach of the Yukon River adjacent to but outside the Nowitna Wildlife Refuge boundary in central Alaska; and (3) Sixmile Lake, outside of and only partly adjacent to the Lake Clark National Park and Preserve west of Cook Inlet.  The federal agencies' "identifications" of claims to FRWRs in these water bodies are contrary to established legal elements of the FRWR doctrine, are based on an impermissible expansion of the scope of the term "appurtenant", rely on an unprecedented expansion of the limited "use" interest associated with FRWRs, and are unsupported by any reasoning or facts in the AR.

The legality of the agency identifications in these three examples hinges on the meaning of "appurtenant" and the actual nature and extent of the interest associated with a valid FRWR. As noted at pages 7-9 *supra*, the term "appurtenant" as used in FRWRs case law has been construed by the courts to apply only to waters within federal reservations.

Furthermore, a FRWR is fundamentally a limited usufructuary interest.  It is only a "use" right and only a right to use a limited quantity of water.  *Supra* at pp. 9-10.  A FRWR is limited to only some amount (*i.e.*, fraction)[29] of previously unappropriated water necessary to avoid entirely defeating the primary purpose of the appurtenant reserved land.[30]  This means that even if the Defendants could conceivably claim a FRWR in a water body adjacent to but outside the reservation, they would only have a limited use interest in a fractional portion of the water body.

---

[29] *Cappaert*, 426 U.S. at 133-134, 136, 142-143.
[30] *Id.*; *New Mexico*, 438 U.S. at 700.

OPENING BRIEF – WHICH WATERS

Nothing in the FRWR doctrine allows, and nothing in ANILCA authorizes, the Defendants to transmute any such limited usufructuary interest in a shared fractional quantity of water into plenary authority over the entire water body trumping State sovereignty over fish and wildlife and diminishing State authority over its water resources.  (*See* ANILCA § 1319).

Defendants' assertion of authority over the Colville River is also governed by another threshold legal issue: were the 1923 Executive Order originally creating NPRA and subsequent federal action transferring it from the Navy to BLM sufficiently specific to create a FRWR within the reserved land, much less the Colville River located outside the reservation boundary? This additional issue is addressed below.

### 2.    Example One:  Colville River "Adjacent" Waters.

The Colville River flows east and north across Alaska's North Slope.  It is a navigable, very wide river.  The State holds title to the submerged bed of the Colville River and adjacent uplands bordering it on the River's east bank pursuant to Statehood Act selections.[31]  To the north and west of the River, the federal government reserved the Naval Petroleum Reserve No. 4 ("Pet 4"), by Executive Order No. 3797-A of President Warren G. Harding dated  February 27, 1923 (hereinafter "Harding EO" or "Harding reservation").  *See* Exhibit 10; *Alaska v. United States*, 213 F.3d 1092 (9th Cir. 2000); *DeLorme, Alaska Atlas & Gazetteer*, at pp. 134-136 (2004 Ed.).  The area was renamed the National Petroleum Reserve Alaska (NPRA) in 1976 when it was transferred to the BLM.  *Id.*; Pub. L. 94-258 (Apr. 5, 1976), 42 U.S.C. § 6501 *et seq.*

---

[31]   The State selected these submerged lands (and received Tentative Approval from BLM in November, 1964) rather than risk not receiving title to them pursuant to the Submerged Lands Act because of Public Land Order 82 ("PLO 82").  *See Alaska v. United States*, 213 F.3d 1092 (9th Cir. 2000).   The limited history and purposes of PLO 82 – which withdrew federal lands on Alaska's North Slope in 1943 for the limited purpose to reserve minerals for use in the prosecution of World War II, was greatly modified in 1958, and then revoked in 1960, one year after the State of Alaska entered the Union – is set out in that decision and in this Court's March 29, 1996 written decision upon summary judgment motions in the case of the same name at USDC Alaska Case No. A87-0450-CV (HRH).

OPENING BRIEF – WHICH WATERS

(hereinafter "1976 Transfer Act").[32]  A Map showing the NPRA boundary and land status is presented at Exhibit 11.

Although the NPRA boundary is situated on the north and west banks of the Colville River and the River is not within the reservation, the Federal defendants identify the River as possessing FRWRs due to its "adjacency" to the NPRA and claim preemptive Title VIII jurisdiction over the River.  *See* Federal Subsistence Management Map, AR 010867; AR 001728, 50 C.F.R. §§ 100.3(b)(3), 100.27(i)(3).  The Defendants' AR includes only the following naked, unsubstantiated conclusory statement regarding alleged FRWRs in  NPRA and the Colville River: "Appendix 3, Bureau of Land Management Administered Reservations in Alaska Including Major Inland Water Boundaries Which Have Federal Reserved Water Rights; National Petroleum Reserve in Alaska (NPR-A)  Including the Portion of the Colville River ***Adjoining*** the Boundary."  AR  001728 (apparently identical document also at AR 010696) (emphasis added).  How the Defendant agencies reached this conclusion is unknown.  Among other things, the reservation document for NPRA (*i.e.*, the Harding EO) is not part of the AR.  Although this bald categorization devoid of factual or legal support was part of a "Final Katie John Issue Paper and Recommendations" issued by the "Katie John Policy Group" (AR 01684), that document notes that this (and other) conclusions regarding BLM-administered reservations were "tentative."  AR 001696; *see also* AR 001575, 001728, 002587.  There is nothing else in the AR, other than the final rule published in January, 1999, which indicates when this tentative unsupported conclusion became "final," if it did.

The Defendants also make a wholly generic, non-factual, non-specific and unjustified conclusion that FRWRs will be asserted in *all* "adjacent inland waters":  "Where a federal

---

[32]  Neither of these fundamental reservation documents were part of the AR although these documents are the only basis upon which an implied FRWR might have been reserved.

reservation with a purpose that supports the assertion of reserved water rights is bounded by or adjoins inland water, federal reserved water rights should be asserted in that portion of the inland water body adjoining the reservation.  This is consistent with the reserved water rights doctrine where the adjoining water *can be shown to be necessary* for the purposes of the reservation." AR 001700 (emphasis added); *see also* AR 010654.

In order to sustain this conclusory identification regarding the Colville River, the Defendants must first demonstrate that the reservation documents for NPRA were sufficiently specific purpose to manifest the requisite intent to reserve waters to accomplish the primary purposes of the reservation.  *Cappaert*, 426 U.S. at 139; *New Mexico*, 438 U.S. at 701.  As a matter of law, nothing in the 1923 Harding reservation (or the 1976 Transfer Act also not included in the AR) manifests any such intent.  Moreover, there is nothing in the 1999 rulemaking AR demonstrating that the Defendant agencies made this required inquiry and reached a legally or factually sustainable determination regarding any such implied reservation, subject in any event to *de novo* review by this Court.

It is also notable that the 1923 Harding EO reserved Pet 4 (*i.e.*, NPRA) only to assure the "future supply of oil for the Navy".  *See* Exhibit 10.  It specifically limited the scope of that reservation further, stating:

> "the reservation hereby established shall be for ***oil and gas only*** and shall not interfere with the use of the lands or waters within the area indicated for any legal purpose inconsistent herewith."

*Id.* (emphasis added).  Therefore, by its express terms, the reservation is for oil and gas only, was not intended to affect "waters," and cannot be construed, reasonably or otherwise, to imply a simultaneous reservation of federal water rights even if the Defendants had actually reviewed it as part of the AR.

34

The 1976 Transfer Act is also devoid of any references, express or implied, regarding a reservation of water rights.  Indeed, Section 102 of the Act, redesignating Pet 4 as NPRA, expressly confirms that only "***lands* within the *exterior boundaries*** of such reserve are hereby reserved and withdrawn."  42 U.S.C. § 6502 (emphasis added).  Conducting an oil and gas exploratory drilling program and a report to Congress on oil and gas resources within NPRA are the primary purposes expressed in the 1976 Act.  *See* 42 U.S.C. §§ 6504, 6505.  Nothing in this transfer and study act manifests any specific or primary intent to reserve waters within NPRA.[33]

Any effort by the federal agencies to identify a FRWR associated with NPRA must be reviewed *de novo* by the Court.  Based on that review, it should be concluded that there is no FRWR associated with this oil and gas reserve, especially given the absence of references to waters in either the 1923 reservation or the 1976 transfer.  As there is no FRWR in NPRA, and the reservation  was limited to the area within its ***exterior boundaries***, there can be no FRWR in the adjacent Colville River and no basis for the Defendants to assert preemptive Title VIII authority over this River running over State-owned, non-federal lands.

There is also nothing in the administrative record to demonstrate that the Defendant agencies engaged in such an analysis.  As previously noted, neither the 1923 Harding reservation document nor the 1976 Transfer Act were part of the AR or considered by the Defendants.  The final EA for the 1999 regulations includes a solitary factual reference to NPRA being within the "Arctic."  AR 009628.  The sole factual reference to the Colville is to a "small commercial whitefish fishery" in the "Colville delta."  AR 009644.  A suggested "question and answer" document, apparently prepared for the Secretary of the Interior, contains one other solitary, conclusory reference to NPRA:  "'inland waters adjacent to the exterior boundaries' means those

---

[33]  Congress ultimately opened the NPRA to general oil and gas leasing in 1980.  Pub. L. No. 96-514, Dec. 12, 1980.

OPENING BRIEF – WHICH WATERS

portions of inland waterways (such as rivers or lakes) which includes segments of the boundaries of the *national petroleum reserve in Alaska*, certain conservation system units, national recreation and conservation areas, and the national forests." AR 010653-4 (emphasis added). There are no additional references in the AR to NPRA or the Colville or any purported FRWR within either. All that exists is a bare conclusion unsupported by any facts or reasoning as to how the agencies "determined" that the 1923 Harding EO or the 1976 Transfer Act were sufficiently specific to satisfy the *New Mexico* "primary purpose" and "necessity"[34] prerequisites and *Cappaert* standards for the existence of any FRWR in NPRA or the adjacent Colville River. The Defendants' complete failure to demonstrate this kind of consideration and reasoned judgment in the record is another basis rendering their administrative action unsupportable as a matter of law. *See* Brief & authorities at pp. 11-15 *supra*.

The Defendants' assertion of authority over the Colville River outside of the NPRA boundaries is especially weak. Even assuming arguendo that a FRWR could be found to exist within NPRA, the Defendants can point to no statute or judicial doctrine which warrants them claiming a FRWR in the Colville River waters outside the "exterior boundaries"[35] of that Reserve. The NPRA reservation by its express terms is confined to lands within its boundaries and nothing in the 1923 Order, the 1976 Act, or ANILCA provides anything to the contrary. Any agency attempt to extend federal subsistence authority to the Colville River and the concomitant diminution of traditional State authority triggers the Clear Statement Rule requiring the Defendants to identify clear, unmistakable Congressional direction to make that extension.

---

[34]   The Defendants failed to carry their acknowledged burden to demonstrate that the purported FRWR is "necessary." AR 001700, AR 010654. The AR does not contain any facts or reasoning demonstrating that a FRWR in the Colville River is "necessary" to achieve the "purposes" of the adjacent NPRA. As discussed previously in this brief, the utter lack of facts and reasoning in the AR on this necessary point is additional reason this administrative determination cannot be sustained following judicial review.

[35]   42 U.S.C. § 6502.

OPENING BRIEF – WHICH WATERS

The federal Defendants cannot carry that burden, as no such clear direction exists, and the AR demonstrates they have not even attempted to do so in any cognizable, legal fashion.

The purported extension of Title VIII authority to the Colville also suffers another fundamental deficiency.  Even if (a) there were a valid FRWR within the NPRA and (b) somehow it could be extended beyond the "exterior boundaries" to reach the Colville River, there is (c) nothing in the FRWR doctrine, the underlying Appropriation Doctrine, or in ANILCA empowering the Defendants to transmute a limited usufructuary FRWR interest in some fractional portion of the Colville River's water flow into plenary authority over the entire River (*see* Brief, *supra* at pp. 9-10).  The State possesses dominant interests in the River as it owns the submerged land (and the east bank) and has plenary authority over these waters as an incident of statehood.  *California Oregon Power Co.*, 295 U.S. at 163-164.  Nothing in the law empowers the United States to take such a fractional use interest in the water column of the River, should it exist, and expand it to diminish and deny traditional State sovereignty over its submerged lands, its navigable waters, and its traditional authority over fish and wildlife, absent a clear and unmistakable grant of authority from Congress to the Defendants to do so, which does not exist in this instance.  *See, e.g., Solid Waste Agency*, 531 U.S. at 173-174; Brief, *supra*. Furthermore, the AR is devoid of Defendants' consideration of these legal principles, and of any facts to support how the Defendants came to the legally unprecedented conclusion they could extend their jurisdiction through FRWRs to the entire Colville River.

Accordingly, the Court is also requested to reject this agency action

### 3.      Example Two:  Yukon River "Adjacent" Waters.

The Yukon River bisects the State as it flows from Canada on the east to the Bering Sea on the west.  During its course, this broad River, roughly a mile wide, flows by and along, but

OPENING BRIEF – WHICH WATERS

largely outside of, the northern border of the Nowitna National Wildlife Refuge in central Alaska as shown on the map provided in Exhibit 12. *Accord, DeLorme, supra*, at pp. 110-111. The Refuge boundary is fixed on the south bank of the River but does include some of the mid-River islands. *Id.* The entire bed of this highly navigable River, in addition to lying outside the exterior boundary of the Refuge, is owned by the State, and the entire bank on the north side of the River opposite the Nowitna Refuge is also non-federal, non-reserved lands. *Id.* The Defendants assert ANILCA Title VIII jurisdiction over the entirety of this reach of the Yukon River, so that a person standing on the State-owned, non-federal north bank fishing into the River would be subject to federal rules. 50 C.F.R. §§ 100.3(20), 100.4; AR 001726, AR 001700.

In an all too familiar pattern, the AR includes no specific determinations regarding this segment of the Yukon River. Rather, the purported FRWR identification arises yet again from the generic all-encompassing, naked conclusion that the Defendants think they can assert FRWRs in all inland waters "adjoining," but lying outside of, all federal reservations in Alaska regardless of why or when the particular reservation was created. *See id.*; AR 010654.

The Defendants' claim to FRWRs and Title VIII preemptive jurisdiction to this reach of the Yukon River "adjoining" the Nowitna Refuge also relies on another non-specific, wholly non-factual determination that such FRWRs are "necessary" in the instance of each and every CSU and federal reservation. *Id.* The Nowitna Refuge itself is given only a passing, unrelated factual reference that it is situated within the "Yukon and Kuskokwim Drainages" in the Defendants' "determination". AR 009623. This complete failure to present any reasoning or facts regarding this reach of the Yukon River pertinent to the controlling legal standards applicable to FRWRs – including (but not limited to) the Defendants' failure to satisfy the

"necessity" requirement which they acknowledge (AR 001700, 010654) – renders this agency claim to a FRWR in this reach unsustainable.  *See also* Brief at pp. 11-15 *supra*.

Additionally, as in the case of the Colville River example, even if the Defendants could somehow legally support a FRWR in this reach of the Yukon that would confer, at best, only a limited usufructuary interest in the Defendants to some fractional portion of the Yukon River's water flow, presumably some portion immediately bordering upon the Nowitna Refuge boundary.  Nothing in the law authorizes transforming such a limited interest, if it is found to exist, into broader authority over the entire breadth of this mile-wide navigable river lying outside the boundaries of that federal reservation and upon non-federal lands.

Therefore, this claim of the Defendants is also not in accordance with the law and should be rejected by the Court, as a matter of law.

### 4.    Example Three:  Sixmile Lake "Adjacent" Waters

Sixmile Lake is a large lake located immediately downstream of Lake Clark.  It also constitutes the headwaters of the Newhalen River north of Iliamna Lake.  The Congressionally prescribed boundary of the Lake Clark National Park and Preserve created in 1980 by ANILCA[36] follows the eastern and southern shore of Sixmile Lake, but the Lake itself is wholly outside the boundary of that federal reserve as illustrated on the Map at Exhibit 13.  *Accord, DeLorme, supra*, at pp. 59, 66.  The bed of this navigable lake is owned by the State of Alaska.  In addition, the entire lakeshore, on all sides of the Lake including its eastern and southern banks, is in non-federal ownership.  Most of that shore-land is held by the ANCSA village corporation (Kijik Corporation) for the Nondalton area.  Nondalton itself is on the western shore and uplands of Sixmile Lake, opposite from that side of the Lake where the Lake Clark NP&P boundary ends.  *Id.*  Congress expressly provided that "no lands conveyed to the Nondalton Village Corporation

---

[36]  ANILCA § 201(7)(a).

shall be considered to be within the boundaries of the [Lake Clark] park or preserve." ANILCA §§ 201(7)(b), 103(c) (specifying that non-public lands are not part of CSUs (*i.e.*, federal reservations)).

Despite these facts and provisions of law, the Defendants have asserted a FRWR in the entirety of Sixmile Lake and claimed ANILCA Title VIII jurisdiction over the entire Lake and its submerged lands on the basis of that alleged FRWR. 50 C.F.R. §§ 100.3(18), 100.4 (2006); AR 001700, AR 006762. Once again, as in the case of other allegedly "adjoining" waters, the Defendants do so not through a specific determination for Sixmile Lake but through a generic, completely non-factual and non-specific conclusory "determination" they seek to apply to all "adjacent inland waters." AR 001700, AR 010654.

The Defendants' claim to a FRWR in this Lake located entirely outside of the boundaries of the Lake Clark NP&P is contrary to the plain statutory provisions contained in ANILCA. It is also an illegal and unaffirmable "identification" of a FRWR under FRWR law. No part of Sixmile Lake, or even its surrounding shores, is "public land" in accordance with ANILCA. The Lake is located outside the Lake Clark Park/Preserve boundary established by Congress in ANILCA. *See* Exhibit 13. No part of the Lake is "appurtenant" to, meaning within, a federal reservation. Indeed, the entire shoreline surrounding Sixmile Lake is non-public land owned by the Nondalton village corporation or the municipality of Nondalton, or is in other non-federal ownership. *Id.*; Brief at pp. 7-8. Sixmile Lake is expressly not part of the Park and Preserve, and the lake bed is non-federal land owned by the State. Under a *Chevron* analysis, the agency action must be overturned.

Even if the Defendants could somehow overcome these legal deficiencies and properly support a FRWR in Sixmile Lake on the basis of some new, unprecedented theory of

"adjacency," the purposes of such a right could not relate to subsistence and provide no legal

basis for extending of ANILCA Title VIII authority to the Lake.  FRWRs have to be tied to some

primary purpose, and courts have limited the purposes for which a water right may be reserved.

For example, in one case involving the Dinosaur National Monument, a National Park Service

unit in Colorado, a claim to FRWR instream flows for the purpose of recreational boating was

rejected, and the court instead limited the FRWR to other primary purposes of the Monument.

*City and County of Denver,* 659 P.2d at 13.  Notably, subsistence is not included within the

purposes specified in ANILCA for the Lake Clark National Park and Preserve units.  *See*

ANILCA § 201(7)(a).  Rather, there is only a secondary, permissive reference to subsistence in

regards to those units, at the very end of the section creating them; specifically:  "subsistence use

by local residents shall be permitted *in the park* where such uses are traditional."  ANILCA

§ 201(7)(b) (emphasis added).  However, as demonstrated above, Sixmile Lake is not "in the

park" as a matter of law.  Moreover, using non-subsistence purposes to claim a limited FRWR

that is then used for subsistence purpose and federal claims to preemptive jurisdiction over state

waters and lands is outside the scope of the established FRWR doctrine.  *New Mexico*, 438 U.S.

at 700-701; *City and County of Denver*, 656 P.2d at 27-29.

As discussed above regarding reaches of the Colville and the Yukon River, neither does

the judicially-created FRWR doctrine or ANILCA empower the Defendants to grossly expand a

fractional usufructuary interest in water into jurisdictional control over the entire Sixmile Lake.

The AR also is devoid of any specific reasoning or presentation of facts to demonstrate

that extending Title VIII authority over Sixmile Lake is consistent with the plain provisions of

ANILCA or the legal principles and factual requirements of a FRWR.  The federal action should

be overturned because it is contrary to court-established FRWR law and plainly stated statutory

terms (*see* ANILCA, §§ 102(3)(A); 103(c); 201(7)(a); & discussion this Brief, *supra*) and

because the agencies' "bare record" violates the "strict and demanding" requirements at the APA

(*see, e.g., Overton Park*, 401 U.S. at 420; *State Farm*, 463 U.S. at 48).

> ### D.    Validly Selected Lands are Expressly Excluded from ANILCA's Definition of Public Lands and Do Not Permit FRWRs.

As noted above, ANILCA § 102(3)(A) unambiguously excludes from the definition of

"public lands" "land selections of the State of Alaska which have been tentatively approved or

validly selected under the Alaska Statehood Act." 16 U.S.C. § 3102(3)(A). Similarly, paragraph

(B) of the same provision specifies that "land selections of a Native Corporation made under the

Alaska Native Claims Settlement Act" are not "public lands." *Id.* at 3102(B). In addition,

ANILCA section 103(c) previously cited in this brief clearly states that these kinds of non-public

lands are deemed not "to be included as a portion" of a federal conservation system unit and

shall not be "subject to the regulations applicable solely to public lands within such units." 16

U.S.C. § 3103(c).

Notwithstanding these clear directions from Congress, the Defendants' 1999 rules

incorrectly treat validly-selected State lands and ANCSA lands within ANILCA CSUs as "public

lands" and similarly treat validly-selected ANCSA lands as "public lands" and assert claims to

FRWRs based on that error. 70 Fed. Reg. 1288; 50 CFR 100.4(2). This issue affects but is not

limited to FRWRs. As this claim has previously been briefed by the State (and the Defendants)

in connection with the "What Process" phase of this case (*see* Plaintiff State of Alaska's Opening

Brief, July 14, 2006, Doc. No. 68 at pp. 39-41; Reply Brief of the State of Alaska, Nov. 6,

2006,Doc. No. 88 at 35-37) but was deferred by the Court in its May 17, 2007 Decision to this

phase instead (Doc. No. 110 at 31), the State refers the Court to the prior briefing on this matter

and incorporates it by reference herein and requests that the Court reverse the Defendants erroneous actions.

### E.     Waters Downstream or Upstream of Federal Reservations

As previously noted in this brief, according to their complaint the Katie John plaintiffs seek a radical expansion of the FRWR doctrine by asking this Court to compel the Federal Defendants to claim FRWRs in non-appurtenant reaches of waterways many miles downstream or upstream from federal reservations.  This attempt by the Katie John parties to greatly expand federal subsistence jurisdiction far beyond that intended by Congress is wholly inconsistent with the well-established principles governing FRWRs discussed previously in this brief.  There is also nothing in ANILCA or any other law which imposes a mandatory, nondiscretionary duty on the Defendants to take such a radical action, contrary to law and effectively seeking to create FRWRs and preemptive ANILCA Title VIII jurisdiction in virtually every river, stream, and lake throughout Alaska.  *Southern Utah Wilderness Alliance*, 542 U.S. at 61-63.  Instead, well-established FRWR law and ANILCA express a contrary intent.  Furthermore, once shorn of their sheep's clothing, it becomes readily apparent that the arguments now being raised by the Katie John plaintiffs for extensive "downstream/upstream" FRWRs are just another way to reach the same result giving "federal agencies control over all [navigable waters] in Alaska" that they sought and the Ninth Circuit Court rejected in *Katie John II* and *III*.  72 F.3d at 704; 247 F.3d at 1033.  Consequently, this Court should deny the relief now sought by the Katie John plaintiffs.

As previously discussed, a fundamental requirement for a FRWR is that it be in a water body "appurtenant" to, meaning on or within, the reserved land, and indeed previous attempts to establish FRWRs downstream of a reservation have failed.  *See, e.g., Potlatch Corp. v. U.S.*, 12 P.2d 1256, 1266-1267; *Bell*, 724 P.2d at 634, 645, n.17.

Many of the rivers in Alaska have very small portions of their headwaters within federal reservations, with the remaining hundreds of **downstream** miles of river located outside of and beyond the borders of any reservation. *Potlatch*, 12 P.2d at 1268. For example, the Mulchatna River arises on the western edge of Lake Clark National Park and Preserve, then flows WSW many miles, almost entirely through State-owned lands, to the Nushagak River where it joins that river to flow downstream, through additional non-federal lands, all the way to Bristol Bay (*see* Map at Exhibit 14). Only the Mulchatna River's headwaters flow for 10 or so miles within the federal reservation before exiting it. The dominant reach of the River continues flowing for another 150 miles through non-federal, non-reserved lands. Similarly, on the North Slope the Chandler River arises on the northern edge of the Gates of the Arctic National Park and Preserve in the central Brooks Range. *See DeLorme, supra*, at 136. The Chandler River flows north for only 5 miles or so within that federal reservation before exiting it. *Id.* That River continues to flow north for approximately 80 miles across non-reserved lands until it reaches the Colville River, and its waters then continue to flow north within the Colville River outside of any federal reservation until they finally empty into the Beaufort Sea north of Nuiqsut. *Id.* at pp. 135-136. Under the Katie John theory, FRWRs would exist, nevertheless, throughout these long reaches of non-appurtenant waters, thus improperly converting these waterways into "public lands" empowering Federal preemption and the concomitant diminution of traditional State authority throughout these waterways far removed from any federal reservation.

The Katie John attempt to extend FRWRs **upstream** of federal reservations also runs afoul of Congress' intent, well-established water rights precedent, and the decisions already in *Katie John II* and *III*. Again discussed at pages 9-10 *supra*, a FRWR is merely a usufructuary interest in appurtenant waters. Whereas that mere use interest in appurtenant waters can be used

to prevent or curtail an upstream user's unauthorized appropriation or *diversion* of water in derogation of the downstream appropriator's right to use a quantified, necessary amount of water granted it by proper state governmental authority (*see New Mexico,* 438 U.S. at 700-705, 717; Alaska Water Use Act, AS 46.15.010-.270), it does not confer on the downstream user any title or ownership in the upstream (or downstream) water.

As outlined in this brief, there is nothing in the FRWR doctrine, ANILCA, or any other law authorizing (or compelling) the federal Defendants to transmute this limited use interest into preemptive federal authority over the entire water body (and connecting water bodies), wherever located downstream or upstream of a federal reservation. *Id.  See e.g., California Oregon Power Co.*, 295 U.S. at 163-164.  There is also no clear unmistakable directive within ANILCA compelling the Defendants to radically expand the FRWR doctrine to extend FRWRs into non-appurtenant waters downstream or upstream of federal reservations and impinge on State sovereignty.  *Id.*; *Solid Waste Agency*, 531 U.S. at 173.  Similarly, there is certainly nothing in any applicable statute that imposes a mandatory duty on the Defendants to engage in this unprecedented expansion of FRWRs.  *Id.*; *Southern Utah Wilderness Alliance*, 542 U.S. at 61-63.

For all of these reasons, the unsupportable and unprecedented Katie John "downstream/upstream" claim must fail.

**F.      Granting FRWRs to Alaska Native Allotments Would Be a Radical Expansion of the FRWR Doctrine in Contravention of ANILCA's Express Provision That It Does Not Expand or Diminish Federal or State Water Jurisdiction, and Nothing in ANILCA Mandates the Agencies to Extend FRWRs to Allotments.**

As previously noted, the Katie John plaintiffs also make the unprecedented claim that a Native allotment in Alaska includes a FRWR and that those rights inure to the benefit of the

individual allottee and convert the affected waters into "public lands" enabling and compelling the federal Defendants to diminish the State's traditional sovereignty over fish and wildlife and its authority over Alaska's water resources.  Katie John Pleading at 15, ¶ 38 (Jan. 7, 2005). Absolutely nothing in the 1906 Alaska Native Allotment Act, 34 Stat. 197;[37] ANILCA; or established FRWR precedent offers a shred of support for this novel claim.  It should be rejected.

According to the Katie John plaintiffs, this alleged agency failure to extend FRWRs to Alaska Native allotments is reviewable under the APA.  Katie John Pleading, Jan. 7, 2005, ¶ 46 at 18.  The State concurs, but notes that an alleged agency failure to act is only reviewable per section 706(1) of the APA.  *Southern Utah Wilderness Alliance*, 542 U.S. at 61.  Such agency action "can be compelled under the APA [only if] action is legally required."  *Id.* at 63.  The Katie John plaintiffs carry the burden of demonstrating that the Defendants' failure to extend FRWRs to allotments was "a discrete agency action that it is required to take."  *Id.* at 64.  As will become evident, the Katie John parties cannot carry this burden because:  (1) extending FRWRs to Native allotments in Alaska is unprecedented and unauthorized and (2) nothing in the law requires the Defendants to take such action.

The threshold substantive question is whether an Alaska Native allotment is a federal reservation for *Cappaert* or *New Mexico* purposes.  The answer is it is not.  The 1906 Act cited above authorized the Secretary of the Interior "to *allot* not to exceed one hundred and sixty acres of vacant, unappropriated, and unreserved nonmineral" public land in Alaska to a qualified Native.  34 Stat. 197 (emphasis added).  The land "allotted" (not reserved) to an individual is to be deemed the individual's "homestead" according to the Act.  *Id.*  Thus, it is notable that "The Supreme Court has determined that a homesteader acquires no federal water rights incident to the

---

[37]   Repealed in 1971, 43 U.S.C. § 1617.

transfer of public lands into private ownership." *United States v. Anderson*, 736 F.2d 1358, 1362-63 (9th Cir. 1984) (citing *California Oregon Power Co.*, 295 U.S. 142 (1935)). There are no references in the 1906 Act to water, specific uses of the allotment, or to particular purposes for allotting the land, except that section 2 of the Act provides that allotments from reserved lands within national forests may be granted if the "allotment is chiefly valuable for agricultural or grazing purposes."

Since the *Winters* ruling in 1908 first did so, *all* FRWRs recognized and established by the courts have been associated with federal reservations of land for Indian tribes or for special public land system purposes such as "forest reserves, national parks, and national monuments. *New Mexico*, 438 U.S. at 699. "The reserved rights of the United States extend to Indian reservations and other federal lands, such as national parks and forests." *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 805 (1976). No FRWR has been recognized in an allotment, homestead or other dedication of land set aside or transferred for the benefit of an individual. Individuals have been the *derivative* beneficiaries of FRWRs but only where a *Winters* water right which was once part of an Indian tribal reservation passed from that reservation through a 1887 Dawes Act allotment[38] to an individual owner of the allotment. *See, e.g., United States v. Powers*, 305 U.S. 527, 532 (1939); *Walton II*, 647 F.2d at 49-51; *Grey v. United States,* 21 Cl. Ct. 285, 299-300 (1990). Nothing in the FRWR doctrine, the 1906 Alaska Act, or ANILCA suggests that a FRWR is intended to be reserved for an individual allottee.

As previously noted, the plain language of the 1906 Act also does not use the word "reserve" in connection with the land to be allotted. Instead, only the vacant, unreserved public

---

[38]  The General Allotment Act of 1887 or the "Dawes Act," 24 Stat. 388 (1887), provided for the breakup of Indian reservations into allotments. It has been largely inapplicable in Alaska.

OPENING BRIEF – WHICH WATERS

land (which does not carry with it a FRWR)[39] is "allotted" to an individual.  Under the Act, the individual is the beneficiary of the allotment and is expressly authorized to sell or alienate the allotted land.  § 1.  This authorization to the allottee to alienate or sell the land for private benefit is inconsistent with the notion of FRWRs in a federal "reservation."[40]

Extending FRWRs to individual allotments would also violate both (1) the Clear Statement Rule that a federal agency action having the effect of diminishing or impinging upon traditional state powers (*e.g.*, fish, wildlife, and water rights) must be based upon a clear statement by Congress demonstrating an unmistakable intent to authorize such an agency action and (2) the established judicial rule that FRWRs will not normally be implied and will be strictly and narrowly construed.  *Solid Waste Agency*, 531 U.S. at 173; *Yeshey*, 524 U.S. at 209; *New Mexico*, 438 U.S. at 700-701. Interpreting the 1906 Act and/or ANILCA Title VIII to create non-appropriative, in-flow FRWRs in waters appurtenant to Alaska Native allotments would cause a quantum expansion of "public lands" in Alaska, since there are approximately 12,000 certificated allotments, another 1,100 or more allotments pending approval, and the vast bulk of all such allotments are scattered along all of the river systems in the State.  For example, extending FRWRs to Alaska Native allotments could effectively convert the navigable Nushagak River into federal "public land" for Title VIII purposes given all of the allotments bordering that River even though the Nushagak River is surrounded throughout its length by non-federal land and even though Congress in ANILCA expressly determined *not* to establish any federal reserves

---

[39]   *Sierra Club v. Watt*, 659 F.2d 203, 206 (D.C. Cir. 1981) ("BLM waters are not considered waters in which the United States has a reserved water right.")  AR 009624.

[40]   The *Walton* cases were about the ability of Dawes Act allotments with derivative *Winters* FRWRs to be sold to non-Indians.  The 9th Circuit Court determined such water rights could be sold and transferred with the land.  647 F.2d at 50. If the Katie John theory in this case is adopted, allotments with associated FRWRs could likely be sold and the water rights held for private use by successors in interest, which would be inconsistent with the concept of reserved water rights for public purposes.

OPENING BRIEF – WHICH WATERS

encompassing this waterway.  ANILCA, § 1203, 16 U.S.C. § 3183; *see also* S. REPT. 96-413 at 252-255 (Nov. 14, 1979); s*ee also* Map at Exhibit 15 (Nushagak River).

Such a radical and unprecedented expansion of FRWRs would also violate section 1319 of ANILCA.  That section provides that nothing in ANILCA (e.g., Title VIII) shall expand or diminish federal or state jurisdiction, responsibility, interests, or rights over the control of water resources in Alaska.  Using Title VIII as the lever to affect a wholly new extension of FRWRs to Alaska Native allotments would be in derogation of this water rights savings clause.

Regarding the failure to act aspect of this issue, neither does anything in ANILCA compel or mandate the federal agencies to extend water rights to Alaska Native allotments.  S*ee Southern Utah Wilderness*, 542 U.S. at 61.  Section 804 of ANILCA sets forth the Defendants' only duty: "Except as otherwise provided in this Act and other Federal laws, the taking on public lands of fish and wildlife for nonwasteful subsistence purposes shall be accorded priority over the taking on such lands of fish and wildlife for other purposes."  16 U.S.C. § 3114.  There is no discrete, court-enforceable statutory requirement that FRWRs be identified in association with Native allotments.

## IV.    CONCLUSION

Failure to adhere to plain statutory directives, fundamental elements of the FRWR doctrine, and the administrative determination requirements of the APA render illegal the Defendants' (1) "identifications" of FRWRs in the specific water bodies presented above and (2) other actions to treat State, ANCSA, and other non-federal lands as "public lands" for the purposes of Title VIII of ANILCA.

Consistent with plain statutory provisions and established elements of the court-created FRWR doctrine, the State of Alaska respectfully urges the court to issue the following declarations:

(1)  ANILCA plainly provides that marine and tidally-influenced waters seaward of the mean, high-tide line and overlying State-owned submerged lands cannot be treated as "public lands" subject to preemptive Title VIII jurisdiction;

(2)  The FRWR doctrine specifies that only waters appurtenant to federal reservations can contain validly identified FRWR and such waters do not include (a) waters within the boundaries of such reservations but bounded by non-federal, non-reserved lands or (b) waters beyond the boundaries of such reservations;

(3)  Alaska Native allotments are not federal reservations with FRWRs and nothing in the law mandates that the Defendants treat them as such; and

(4) The definition of "public lands" for Title VIII purposes is controlled by ANILCA, § 102, not § 906(o)(2).

Court adoption of these declarations will set "ground rules" enabling the identification of "which waters" in Alaska may contain validly and legally identified FRWRs and which waters and lands may be properly treated as "public lands" for the purposes of Title VIII of ANILCA.

Respectfully Submitted,

/s/ William P. Horn
WILLIAM P. HORN, D.C. Bar No.: 375666
Birch, Horton, Bittner & Cherot, P.C.
1155 Connecticut Avenue, Suite 1200
Washington, D.C. 20036
Telephone: (202) 659-5800
Facsimile: (202) 659-1027
Email: whorn@dc.bhb.com; jlister@dc.bhb.com
Attorneys for Plaintiff State of Alaska

Dated:  October 12, 2007

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing *"State Of Alaska's Opening Brief on Which Waters Specifying Test Case Categories with Sample Water Bodies"* was served electronically, this 12th day of October, 2007 to the following:

Robert T. Anderson
Randolph H. Barnhouse
Carol H. Daniel
Steven A. Daugherty
Dean K. Dunsmore
Gregory L. Fisher
Phillip E. Katzen
Heather R. Kendall-Miller
Michael W. Sewright
William F. Sherman

/s/ William P. Horn_____
William P. Horn

G:\I01445\1\JAP4141.DOC

OPENING BRIEF – WHICH WATERS