Heather R. Kendall-Miller (AK Bar # 9211084)
NATIVE AMERICAN RIGHTS FUND
420 L Street, Suite 505
Anchorage, Alaska 99501
(907) 276-0680

Attorneys for Katie John, *et.al*.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| KATIE JOHN, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, *et al.* | ) | No. 3:05-cv-00006-HRH |
| | ) | (Consolidated with |
| Defendants, | ) | 3:05-cv-0158-HRH) |
| | ) | |

PLAINTIFFS KATIE JOHN *et al's*

OPENING BRIEF

ON THE

"WHICH WATERS" ISSUE

# TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   STATEMENT OF MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.   THE LEGAL AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . 3

      B.   THE CURRENT LITIGATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      C.   THE YUKON RIVER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

           1.   Geography . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
           2.   Subsistence Uses of Fisheries on the Yukon River . . . . . . . . . . . . . . . . 13
           3.   Yukon River Salmon Uses and Stocks . . . . . . . . . . . . . . . . . . . . . . . . 15
           4.   The Life Cycle of the Yukon River Salmon . . . . . . . . . . . . . . . . . . . . . 16
                (a)   Upstream Migration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
                (b)   Spawning and Egg Incubation. . . . . . . . . . . . . . . . . . . . . . . . . 17
                (c)   Fry and Juvenile Rearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
                (d)   Downstream Passage of Smolts and Juveniles . . . . . . . . . . . . . 19
                (e)   The Importance of Habitat Linkages to Harvest Areas . . . . . . . . 19
           5.   Treaty Rights:  U.S.-Canada Treaty to Manage Yukon River
                Salmon Stock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      D.   ALASKA NATIVE ALLOTMENTS SITUATED AT FISH SITES ON THE
           YUKON AND ITS TRIBUTARIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      A.   SCOPE OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      B.   LAW ON THE RESERVED WATER RIGHTS DOCTRINE . . . . . . . . . . . . . 25

      C.   FEDERALLY RESERVED WATER RIGHTS INCLUDE WATERS
           IN RIVERS RUNNING UPSTREAM AND DOWNSTREAM
           FROM ANILCA'S CSUs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

           1.   The Primary Purposes of the Conservation Units Created or
                Expanded by ANILCA Require Water as a Biological Necessity
                in Order to Fulfill the Purposes of the CSUs . . . . . . . . . . . . . . . . . . . . 28

2.      The Reserved Water Rights Doctrine Requires a Reservation of Waters Upstream and Downstream from ANILCA's CSUs to Fulfill the Purposes of the CSUs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

(a)      Federally Reserved Water is a Biological Necessity to Support All Life Stages of Fish and Without Which ANILCA's Purposes to Protect Fish, Fish Habitat, Subsistence Uses and International Treaty Obligations Would be Defeated . . . . . . . . 30

(b)      Courts Have Recognized That Water is a Biological Necessity to Support All Life Stages of Fish That are Subject to the Subsistence Priority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

(c)      Water is a Biological Necessity in Order to Fulfill International Treaty Obligations with Canada . . . . . . . . . . . . . . . . . . . . . . . . . . 41

3.      The Agency's Position Is Inconsistent with Supporting Authority and with the United States' Assertion Elsewhere of Off-reservation Water Rights in General Stream Adjudications . . . . . . . . . . . . . . . . . . . . 42

(a)      The Agency Misinterpreted the Definition and Case Law Concerning Appurtenancy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

D.      NATIVE ALLOTMENTS POSSESS RESERVED WATER RIGHTS AS A MATTER OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

1.      The Administrative Record Shows That the Policy Group Arbitrarily Refused to Identify Reserved Waters Appurtenant to Native Allotments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

2.      A Reservation of Water Rights Is Necessary to Accomplish the Purposes for Which Congress Authorized Alaska Native Allotments . . . . . . . . . . 46

3.      Under the *Winters* Doctrine Federally Reserved Water Rights Extend to Off-reservation Public Domain Allotments . . . . . . . . . . . . . . . . . . . . . . . 51

4.      The Administrative Record Shows That the Policy Group Incorrectly Assumed That the Restriction on Alienation, Reserved by the United States, in Lands Allotted to Alaska Natives, Does Not Constitute a Federal Interest in Lands and Waters Within the Meaning of ANILCA § 102 . . 54

ii

5.    Canons of Construction Favoring Indians and the Federal Trust
Responsibility Compel the Conclusion That Federally Reserved Waters
Attach to Alaska Native Allotments ............................ 57

E.    CONCLUSION ................................................ 58

# TABLE OF AUTHORITIES

## CASES

*Adams Fruit Co. Inc. v. Barrett*, 494 U.S. 638 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Aguilar v. United States*, 474 F. Supp. 840 (D. Alaska 1979) . . . . . . . . . . . . . . . . . . . . . . . . 49, 57

*Alaska v. Babbitt (John II)*, 72 F.2d 698 (9th Cir 1995) . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Amoco Production Co. v. Village of Gambell*, 480 U.S. 531 (1987) . . . . . . . . . . . . . . . . . . . 24, 29

*Arizona v. California*, 373 U.S. 546 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Arizona v. California*, 376 U.S. 340 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*ASARCO v. Environmental Protection Agency*, 616 F.2d 1153 (9th Cir. 1980) ) . . . . . . . . . . . 17

*Baccarat Fremont Developers, LLC v. U. S. Army Corps of Engineers*, 425 F.3d 1150 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Burgin v. Office of Pers. Mgmt.*, 120 F.3d 494 (4th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Cappaert v. United States*, 426 U.S. 128 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Cf. District Court, Water Division No. 1, State of Colorado*, No. W-8439-76 (W-8788-77) (Dec. 29, 1993, decree entered Oct. 12, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) . . . . . . . . . . 23-25

*Colville Confederated Tribes v. Walton*, 647 F.2d 42 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . 51

*Comm'r of Internal Revenue v. Engle*, 464 U.S. 206 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Confederated Salish & Kootenai Tribes v. Clinch*, 992 P.2d 244 (Mont. 1999) . . . . . . . . . . . . 40

*County of Yakima v. Confederated Tribes & Bands of the Yakima Nation*, 502 U.S. 251 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 38, 56

*Cramer v. United States*, 261 U.S. 2199 (1923) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Davis v. Michigan Dept. of Treasury*, 489 U.S. 803 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

iv

*Dept. of Ecology v. Yakima Reservation Irrigation District*, 121 Wash. 2d  257, 850 P.2d 1306 (Wash. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Earth Island Inst. v. Hogarth*, 494 F.3d 757 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) . . . . . . . . . . . . . . . . . . . . . . 24

*Good Samaritan Hospital v. Shalala*, 508 U.S. 402 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Goodyear Atomic Corp. v. Miller*, 486 U.S. 174 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Heckman v. United States*, 224 U.S. 413 (1912) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Hoonah Indian Ass'n v. Morrison*, 170 F.3d 1223 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 25

*In re Adjudication of the Existing Rights to the Use of All the Water*, 55 P.3d 396 (Mont. 2002) 40

*In re the General Adjudication of Rights to the Use of Waters from the Snake River Basin Water System*, Civ. No. 39576 (Idaho 5th Dist. Ct.) . . . . . . . . . . . . . . . . . . . . . . 43

*In the Matter of the Determination of the Rights to the Use of Surface Waters of the Yakima River Drainage Basin; Dept. of Ecology v. Acquavella,* Civ. No. 77-2-01484-5 (Wash. Super. Ct., Sept. 1, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 54

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Jicarilla Apache Tribe v. Fed. Energy Regulatory Comm'n*, 578 F.2d 289 (10th Cir. 1978) . . . 25

*John v. United States (Katie John I)*, Nos. A90-0484-CV, A92-0264-CV, 1994 WL 487830 (D. Alaska March 30, 1994) (unreported) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 4, 27

*John v. United States (Katie John III)*, 247 F.3d 1032 (9th Cir. 2001) (en banc) . . . . . . 1, 2, 5, 23

*Joint Board of Control of Flathead Irrigation Dist. v. United States*, 832 F.2d 1127 (9th Cir. 1987 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Kittitas Reclamation Dist. v. Sunnyside Valley Irr. Dist.,* 763 F.2d 1032 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 40, 42

*Kleppe v. New Mexico*, 426 U.S. 529 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*Magana-Pizano v. INS*, 200 F.3d 603 (9th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316 (1819) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Montana v. Blackfeet Tribe*, 471 U.S. 759 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S.Ct. 2518 (2007) . . . . . . . . . . . . 24

*Olympic v. United States,* 615 F. Supp. 990 (D. Alaska 1985) . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Pence v. Kleppe,* 529 F.2d 135 (9th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Pyramid Lake Paiute v. Morton,* 354 F. Supp. 252 (D.D.C. 1953) . . . . . . . . . . . . . . . . . . . . . . 57

*Seminole Nation v. United States*, 316 U.S. 286 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Sierra Club v. Lyng,* 661 F. Supp 1490 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Skeem v. United States,* 273 F. 93 (9th Cir. 1921) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Sohappy v. Smith,* 302 F.Supp. 899 (D.Or. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*State ex rel. Greely v. Confederated Salish and Kootenai Tribes of the Flathead Reservation,*
    712 P.2d 754 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Texas Gas Transmission Corp. v. Shell Oil Co.,* 363 U.S. 263 (1960) . . . . . . . . . . . . . . . . . . . 25

*United States v. Adair,* 723 F.2d 1394 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 37, 44

*United States v. Alaska,* 423 F.2d 764 (9th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Alexander,* 938 F.2d 942 (9th Cir. 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Anderson,* 591 F. Supp. 1 (E.D. Wash.1982) . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Anderson*, 736 F.2d 1358 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Bowling,* 256 U.S. 484 (1921) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. City & County of Denver,* 656 P.2d 1 (Colo. 1982) . . . . . . . . . . . . . . . . . . . . . 42

*United States v. City of Tacoma,* 332 F.3d 574 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 55

*United States v. Cappaert,* 375 F. Supp. 456 (D. Nev. 1974) . . . . . . . . . . . . . . . . . . . . . . . 36,37

*United States v. Cappaert,* 508 F.2d 313 (9th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States ex rel Ray v. Hibner,* 27 F.2d 909 (D. Idaho 1928) . . . . . . . . . . . . . . . . . . . . . 52

*United States v. New Mexico,* 438 U.S. 696 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Newmont USA Ltd.,* No. CV-05-020-JLQ (E.D. Wash. Aug. 21) . . . . . . . . . . 55

*United States v. Powers,* 305 U.S. 527 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Ramsey,* 271 U.S. 467 (1926) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Washington,* No. CV 9213RSM (Order on Cross-Motion for Summary
Judgment, Aug. 29, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Weyerhaeuser Co.,* 765 F. Supp. 643 (D. Or. 1991) . . . . . . . . . . . . . . . . . 57, 58

*United States v. Winans,* 198 U.S. 371 (1905) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Village of Gambell v. Clark,* 746 F.2d 572 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Winters v. United States,* 207 U.S. 564 (1908) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## STATUTES AND LEGISLATIVE MATERIAL

Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Alaska National Interest Lands Conservation Act, P.L. 96-487, 94 Stat. 2371 (Dec. 2, 1980)
    § 101; 16 U.S.C. § 3101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3. 28
    § 102; 16 U.S.C. § 3102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
    §§ 201-202; 16 U.S.C. § 410hh - 410hh-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 29
    §§ 301-303; 16 U.S.C. § 668dd . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    § 302(3)(B)(i)-(iv); 16 U.S.C. § 668dd . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    § 302(5)(B)(i)-(iv); 16 U.S.C. § 668dd . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    § 302(6)(B)(i)-(iv); 16 U.S.C. § 668dd . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    § 302(9)(B)(i)-(iv); 16 U.S.C. § 668dd . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    § 303(7)(B)(i)-(iv); 16 U.S.C. § 668dd . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    § 801(1); 16 U.S.C. § 3111(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4
    § 801(4); 16 U.S.C. § 3111(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    § 802; 16 U.S.C. § 3112 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    § 803; 16 U.S.C. § 3113 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

§ 804; 6 U.S.C. § 3114 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
§ 801-814 ;16 U.S.C. §§ 3111-3126. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
§ 905(a)(1); 43 U.S.C. § 1634(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

16 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

16 U.S.C. § 3632. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

16 U.S.C. § 5701- 5727 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

64 Fed. Reg. 1275 (Jan. 8, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

25 C.F.R. § 152.17–35 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

43 C.F.R. § 2561.0-2 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

43 C.F.R. § 2561.0-5(a) (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

43 C.F.R. § 2561.2 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Alaska Native Allotment Act, 43 U.S.C. § 270 . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

H.R. REP. NO. 59-3295 (1906) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Indian General Allotment Act, 25 U.S.C. § 331 . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 49

S. DOC. NO. 59-101 (1905) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

S. DOC. NO. 58-106 (1905) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

U.S. Const., art. I, § 8 (Commerce Clause) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

U.S. Const., art. I, § 3 (Property Clause) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 36

Yukon River Salmon Act of 2000, 16 U.S.C. §§ 5701- 5727 . . . . . . . . . . . . . . . . . . . . . . 53

<u>OTHER AUTHORITIES</u>

A.D. TARLOCK, LAW OF WATER RIGHTS AND RESOURCES (Thomson/West 2007) . . . . . . . . . . 27

*Alaska Subsistence Salmon Fisheries 2004 Annual Report* at 37, TECH. PAPER NO. 317 . . *passim*

*Black's Law Dictionary* 103 (6th ed. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Bureau of Land Management, *Federal Water Rights of the National Park Service*, 86 I.D. 553 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 27

F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW at 1039- 40 (2005 ed.) . . . . . . . . . . . . . . 52, 57

Federal "Non-Reserved" Water Rights, 6 Op. Off. Legal Counsel 328 (1982) . . . . . . . . 26, 30, 41

G. COGGINS & R. GLICKMAN, PUBLIC NATURAL RESOURCES LAW, 2 Pub. Nat. Resources L. § 10D:6 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

DAVID GETCHES, WATER LAW IN A NUTSHELL, 324 (2nd ed. 1990) . . . . . . . . . . . . . . . . . . . . . . 44

John Leshy, *Water Rights for New Federal Land Conservation Programs: A Turn-Of-The Century Evaluation*, 4 U. DENV. WATER L. REV. 271 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Robert T. Anderson, *Indian Water Rights and the Federal Trust Responsibility*, 46 NAT. RESOURCES J. 399 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Robert Wolfe, *Myths: What Have You Heard?*, 21 ALASKA FISH & GAME 17 (Nov.-Dec. 1989)50

Yukon River Drainage Fisheries Ass'n & Yukon River Panel, *Yukon River Salmon Agreement Handbook* 16 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Water Rights for Indian Allotments on Ceded Land & Public Domain, 2 Op. Solicitor Dep't. Interior 1688 (1979) (written on Aug. 19, 1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

I.      INTRODUCTION

This case brings this Court back to ANILCA's core "where" issue, first addressed thirteen years ago in the original *Katie John* litigation.[1]  In that litigation the Court of Appeals held that "the definition of public lands [appearing in 16 U.S.C. § 3102(3) of ANILCA] includes those navigable waters in which the United States has an interest by virtue of the reserved water rights doctrine."  *Alaska v. Babbitt (Katie John II)*, 72 F.3d 698, 703-4 (9th  Cir. 1995).  The Circuit panel rejected the State's contrary position because it "undermined congressional intent to protect and provide the opportunity for subsistence fishing."  *Id.* at 704.  The State's position (later also rejected by an en banc panel)–that ANILCA's subsistence regime did not include <u>any</u> navigable waters–was first rejected by this Court because it "thwarted Congress' intent to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so."  *John v. United States (Katie John I)*, Nos. A90-0484-CV, A92-0264-CV, 1994 WL 487830 at *18 (D. Alaska March 30, 1994) (unreported).  The Circuit then instructed the Secretaries to "identify [ ] those waters" where the federal government holds reserved waters under the "reserved water rights doctrine."  *Katie John II*, 72 F.3d at 704.  This, the Secretaries have failed to do, because they have failed to include all federal waters reserved as a matter of law.

The Secretaries have failed to identify all those waters in which the United States holds reserved water rights.  Instead, and without meaningful explanation, the Secretaries have excluded all reserved waters appurtenant to federally protected Alaska Native allotments issued

---

[1] *John v. United States (Katie John I)*, Nos. A90-0484-CV, A92-0264-CV, 1994 WL 487830 (D. Alaska March 30, 1994) (unreported); *Alaska v. Babbitt (Katie John II)*, 72 F.3d 698 (9th Cir. 1995); *John v. United States (Katie John III)*, 247 F.3d 1032 (9th Cir. 2001) (en banc).

under the Alaska Native Allotment Act,[2] and they have also excluded all federally reserved

waters in rivers running upstream and downstream from ANILCA's Conservation System Units

(CSUs).[3]  The Secretaries have excluded these waters in direct contravention of well-established

common law principles defining the reserved water rights doctrine.  By their failure, the

Secretaries have "thwarted Congress' intent" to protect subsistence fishing in vast areas of

Alaska, directly contrary to this Court's mandate in *Katie John*.  Although the reserved water

rights doctrine may admittedly be imperfect and "inadequate to achieve the express congressional

purpose of protecting and preserving traditional subsistence fishing,"  *John v. United States*

*(Katie John III)*, 247 F.3d 1032, 1034 (9th  Cir. 2001) (en banc) (Tallman, Tashima, W. Fletcher,

J.J., concurring), it is an even greater affront to Congress' purpose to arbitrarily cut back further

on that doctrine–as the Secretaries here have done.

Plaintiffs thus seek a ruling that the Secretaries' actions are contrary to law and an order

directing the Secretaries, upon remand, to identify all remaining reserved waters that constitute

"public lands" under ANILCA.  As this Court noted thirteen years ago:

> Through Title VIII of ANILCA, Congress addressed the important question of
> how <u>all public lands, and not just those in various managements systems,</u> should
> be used.  More particularly, Title VIII embodied a congressional decision that
> those who chose to should have a right to continue to live off the land and to hunt
> and fish at will for sustenance.

---

[2] Act of May 17, 1906, ch. 2469, § 1, 34 Stat. 197 (amended by Act of August 2, 1956, ch. 891, § 1(a)-(e), 70 Stat. 954, repealed by Pub. L. No. 92-203, § 18(a), 85 Stat. 710 (1971); formerly codified at 43 U.S.C. § 270-1 to 270-3, transferred from 48 U.S.C. §§ 357-357b).

[3] CSUs include National Parks, Preserves, Monuments, Wildlife Refuges, Wild and Scenic Rivers, National Recreation Areas and National Forests.

*Katie John I,* 1994 WL 487830 at *1-2. This action seeks an order compelling the Secretaries to

keep faith with that decision by properly identifying all reserved waters.

## II.    STATEMENT OF MATERIAL FACTS

### A.    THE LEGAL AND PROCEDURAL BACKGROUND

In 1980 Congress enacted the Alaska National Interests Lands Conservation Act

(ANILCA).[4] In Title VIII of that Act Congress invoked its "constitutional authority over Native

Affairs" to "fulfill the policies and purposes of the Alaska Native Claims Settlement Act and as a

matter of equity" in order to "protect and provide the opportunity for continued subsistence uses

on the public lands" in Alaska. § 801(4).[5] Congress prefaced ANILCA's principle subsistence

provisions with a declaration that "the continuation of the opportunity for subsistence uses . . . is

essential to Native physical, traditional and cultural existence." § 801(1).[6] To achieve that end,

Congress provided that "the taking on public lands of fish and wildlife for non-wasteful

subsistence uses shall be accorded priority over the taking on such lands of fish and wildlife for

other purposes. § 804.[7] The subsistence preference was made applicable to all public lands,

defined as "lands, water, and interests therein," the "title to which is in the United States."  §

102(1)-(2).[8]

---

[4] Pub. L. No. 96-487, 94 Stat. 2371-2551 (1981), (codified at 16 U.S.C. §§ 3101-3233 (2000)).

[5] 94 Stat. at 2422, 16 U.S.C. § 3111(4).

[6] 94 Stat. at 2422, 16 U.S.C. § 3111(1).

[7] 94 Stat. at 2423, 16 U.S.C. § 3114.

[8] 94 Stat. at 2375, 16 U.S.C. § 3102(1)-(2).

In *Katie John I* the plaintiffs argued that the term "public lands" in ANILCA § 102 included all waters in which the United States has an interest by virtue of the reserved water rights doctrine and the navigational servitude. After reviewing the statute and applying the Supreme Court's *Cappaert* analysis,[9] this Court concluded "it is clear that an unquantified amount of water appurtenant to the park [Wrangell-St. Elias National] was reserved [by Congress] for the purpose of providing rural Alaskans with the opportunity to pursue their subsistence rights under Title VIII." *Katie John I*, 1994 WL 487830 at *14.[10] Although the Court did not reject the notion that the reserved water rights doctrine had some application–"or that it could be of primary importance in a subsistence case in some other location in Alaska"–this Court concluded that the geographic scope of Title VIII was better determined by reference to the government's navigational servitude, "as being more compatible with the findings[11] and policies[12] of Title VIII." *Id*. at *14.

On appeal the Ninth Circuit agreed that:

> ANILCA's language and legislative history indicate clearly that Congress spoke to the precise issue of whether *some* navigable waters may be public lands. They clearly indicate that subsistence uses include subsistence fishing. *See, e.g.*, 16 U.S.C. § 3113. And subsistence fishing has traditionally taken place in navigable waters. Thus, we have no doubt that Congress intended that public lands include at least some navigable waters.

---

[9]  *Cappaert v. United States*, 426 U.S. 128, 141 (1976).

[10] The State did not dispute the existence of reserved water rights and is thus bound by that adjudication. *Id.* at 13.

[11]  *Citing* ANILCA § 801, 16 U.S.C. § 3111.

[12]  *Citing* ANILCA § 802, 16 U.S.C. § 3112.

*Katie John II*, 72 F.3d at 702 (emphasis added).  Although the Circuit disagreed with this Court that Congress intended to regulate subsistence fishing in all <u>navigable</u> waters (by virtue of the navigational servitude), the Circuit concluded that Congress intended the term "public lands" nonetheless to include all those navigable waters in which the government holds federally reserved water rights.  *Id.* at 704; *see also Katie John III*, 247 F.3d at 1032 (en banc) (per curiam affirmance of prior panel decision.).  The case was then remanded to the agencies with instructions to "identify[] those waters" where the federal government holds reserved waters under the "reserved water rights doctrine." *Katie John II*, 72 F.3d at 704.

The Secretaries issued final regulations on January 8, 1999.  64 Fed. Reg. 1275 (Jan. 8, 1999).[13]  Those regulations excluded waters upstream and downstream from the CSUs and waters appurtenant to Native allotments.  Employing an upside down and incomplete analysis, the agencies reasoned that, because the Ninth Circuit rejected the more expansive "all navigable waters" interpretation of "public lands," the Ninth Circuit must have *sub silencio* intended "public lands" to mean something less than all federally reserved waters associated with particular CSUs.[14] But nowhere did the Circuit even limit, much less hold, that "public lands" as defined by Congress means something less than <u>all</u> federal interests in <u>all</u> waters reserved as necessary to fulfill the subsistence and conservation purposes of ANILCA's CSUs.  The Ninth Circuit's reference to "some" waters was plainly a reference to fewer than <u>all</u> navigable waters, not fewer than all federally reserved waters.  The Secretaries are thus not at liberty to pick and

---

[13]  Reproduced in Admin. Rec. Tab 413 at 10126.

[14]  *See* Memorandum from Reg'l Solicitor Lauri Adams to Solicitor John Leshy 6-7 (Aug. 9, 1995) (attached as Exhibit 1).

choose *some* federally reserved waters that Congress intended to cover, while overlooking others. As this Circuit has held, Congress in ANILCA already made that decision for the Secretary. Thus, application of the reserved rights doctrine is a straight forward question of law.

In their final regulations the Secretaries also excluded waters appurtenant to Native allotments that lie outside the CSUs.  64 Fed. Reg. at 1279.[15]  The Secretaries' rationale was that, despite the Ninth Circuit's clear instruction to identify all federally reserved waters, "[t]he Ninth Circuit's *Katie John* decision does not require the Department address the Native allotment question at this time;" twelve years later this non-decision has become the Secretaries' position.[16] As discussed *infra* in Part IV. A-E, the exclusion of reserved waters appurtenant to Native allotments is unlawful.

B.    THE CURRENT LITIGATION

The history of this litigation is set out in the Court's ruling on the "what process" issue, and is thus not repeated here.  Dkt. No. 110 at 1-12.  In that decision, this Court sustained the Secretaries' procedures but did not address the substance of the regulations.

C.    THE YUKON RIVER

In this Court's briefing order, the parties were asked to place their claims in a factual context by reference to one or more specific "test case waterways."  Dkt. No. 130 at 10.  In response, Plaintiffs Katie John, *et al*., have chosen the Yukon River to illustrate why upstream and downstream waters are necessary to fulfill the congressional purposes for which the CSUs

----

[15]  Reproduced at Admin. Rec. Tab 413 at 10130.

[16]  *See* Memorandum from Reg'l Solicitor Laurie Adams to Solicitor John Leshy at 6 (Aug. 9, 1995) (attached as Exhibit 1).

along the Yukon River were set aside.  In presenting their legal arguments, Plaintiffs have

focused on facts relevant to the congressional purposes for which the CSUs along the Yukon

River were set aside.  These facts establish that salmon populations inherently require a wide

array of habitat types to complete their life cycle, habitat that in the case of the Yukon River

Basin, extend well beyond the boundaries of a specific CSU.

The Yukon River flows through or adjacent to one National Preserve (Yukon Charley)

and five National Wildlife Refuges (Yukon Flats, Nowitna, Koyukuk, Innoko and Yukon Delta),

all created by ANILCA.[17]  <u>All</u> of these CSUs has among its express primary purposes the

protection of habitat for, and populations of, fish and wildlife–usually specifically including

salmon–as well as for waterfowl and other migratory birds.  <u>All</u> of these CSUs also include as a

<u>primary</u> purpose the protection of "the viability of subsistence resources."[18]  These primary

_____

[17] *See* Map (attached as Exhibit 2).  U.S. Geological Survey.  Alaska National Interest
Lands Conservation Act, Alaska, December 2, 1980, P.L. 96-487 [map]. 1:2 500 000.  Interior-
Geological Survey.  (Virginia: USGS, 1996).

[18] ANILCA §§ 301-303.  For instance, with respect to the Yukon Flats National Wildlife
Refuge Congress provided that:

> (B) The purposes for which the Yukon Flats National Wildlife Refuge is
> established and shall be managed include -
>    (i) <u>to conserve fish and wildlife populations and habitats</u> in their natural diversity
> including, but not limited to, canvas-backs and other migratory birds, Dall sheep,
> bears, moose, wolves, wolverines and other furbearers, caribou (including
> participation in coordinated ecological studies and management of the Porcupine
> and Fortymile caribou herds) and <u>salmon</u>;
>    (ii) to fulfill the international treaty obligations of the United States with respect
> to fish and wildlife and their habitats;
>    (iii) <u>to provide, in a manner consistent with the purposes set forth in
> subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local
> residents; and</u>
>    (iv) to ensure, to the maximum extent practicable and in a manner consistent

purposes all have a common denominator: each purpose demands water as a biological necessity in order to be fulfilled. Put differently, without water none of these primary purposes can be met. These express statements of purpose require recognition of reserved water rights throughout the length of the Yukon River.[19]

  1. <u>Geography</u>.

  The Yukon River, the largest river in Alaska and one of the longest in Canada, is fed by nine major rivers and countless tributaries. Yukon River Drainage Fisheries Ass'n & Yukon River Panel, *Yukon River Salmon Agreement Handbook* 16 (2005) [hereinafter "Handbook"] (attached as Exhibit 3). It drains approximately thirty-five percent of Alaska (205,000 square miles). Admin. Rec. Tab 132 at 3121. The river originates in British Columbia and flows over 2,300 miles to its mouth on the Bering Sea.

  The Yukon-Charley Rivers National Preserve[20] is located on the U.S.-Canadian border in the Upper Yukon Region and contains approximately 1,713,00 acres of public lands. The

---

  with the purposes set forth in paragraph (i) water quality and necessary water quantity within the refuge.

ANILCA § 302(9)(B)(i)-(iv), 94 Stat. at 2388, 16 U.S.C. § 668dd note <u>(emphasis added)</u>.

 [19] As discussed in more detail, *infra* in Part III.D, these purpose statements constitute express reservations of water as a matter of federal law. *See* Fish and Wildlife Service, Bureau of Reclamation and the Bureau of Land Management, *Federal Water Rights of the National Park Service*, 86 I.D. 553, 573 (1979) (reproduced in Admin. Rec. Tab 129 at 2247).

 [20] The purposes for which the Yukon-Charley Rivers National Preserve shall be managed include: "To maintain the environmental integrity of the entire Charley River basin, including streams, lakes and other natural features, in its undeveloped natural condition for public benefit and scientific study; <u>to protect habitat for, and populations of, fish</u> and wildlife . . . ." ANILCA § 201(10), 94 Stat. at 2381-2382, 16 U.S.C. § 410hh.

preserve includes nearly 160 miles of the Yukon River between the communities of Eagle and Circle and the entire Charley River drainage system.[21]

After passing through the Upper Yukon Valley, the Yukon River spreads out through the Yukon Flats for some 200 miles. The river is at its widest in this area, spanning anywhere from ten to twenty miles, with endless sandbars and islands. In this region, the Yukon River mainstem is joined by the Porcupine and Chandalar Rivers. The Yukon Flats National Wildlife Refuge[22] is located in this area of eastern interior Alaska and consists of approximately 8,630,000 acres of public land.[23] Residents of seven villages located within or near this refuge use Yukon Flats resources for subsistence: Beaver, Birch Creek, Chalkyitsik, Circle, Fort Yukon, Stevens Village, and Venetie.[24]

The Lower Yukon River Region runs from Rampart to the coast and covers nearly 800 miles. In this region the main stem of the Lower Yukon is joined by the Koyukuk, Nulato, Nowitna, Anvik, Innoko and Andreafski Rivers, plus countless smaller tributaries. *Id.* The River flows through many channels within this large wetland area and finally emerges into the Bering Sea through three major mouths. *Id.* There are four National Wildlife Refuges in the Lower Yukon Region. The first is the Nowitna National Wildlife Refuge consisting of approximately

---

[21] *See* Map of Yukon-Charley Rivers National Preserve (attached as Exhibit 4).

[22] For the purposes for which the Yukon Flats National Wildlife Refuge are established, *see supra* at n.18.

[23] *See* Map of Yukon Flats National Wildlife Refuge (attached as Exhibit 5).

[24] Yukon Flats National Wildlife Refuge, http://yukonflats.fws.gov/culture.htm (last visited on October 9, 2007).

1,560,000 acres of public lands.[25]  In this region lie eight Native villages: Galena, Tanana, Ruby,

Koyukuk, Nulato, Kaltag, Huslia and Hughes.  (Of these, only the village of Tanana is located on

a stretch of the River that lies outside a CSU.  Under the Secretaries' Final Regulation, Tanana

residents are excluded from Title VIII's federal priority for subsistence fisheries).

---

[25] With respect to the Nowitna National Wildlife Refuge Congress provided that:

(B) The purposes for which the Yukon National Wildlife Refuge is
established and shall be managed include -

   (i) <u>to conserve fish and wildlife populations and habitats</u> in their natural
   diversity including, but not limited to, trumpeter swans, white-fronted geese,
   canvasbacks and other waterfowl and migratory birds, moose, caribou,
   martens, wolverines and other furbearers, <u>salmon</u>, sheefish, and northern
   pike;
   (ii) to fulfill <u>the international treaty obligations of the United States</u> with
   respect <u>to fish and wildlife and their habitats;</u>
   (iii) <u>to provide, in a manner consistent with the purposes set forth in
   subparagraphs (i) and (ii), the opportunity for continued subsistence uses by
   local residents; and</u>
   (iv) to ensure, to the maximum extent practicable and in a manner
   consistent with the purposes set forth in paragraph (i), water quality and
   necessary water quantity within the refuge.

ANILCA § 302(6)(B)(i)-(iv), 94 Stat. at 2387, 16 U.S.C. § 668dd note <u>(emphasis added)</u>.  *See
also* Map of Nowitna National Wildlife Refuge (attached as Exhibit 6).

The Koyukuk National Wildlife Refuge is also in the Lower Yukon Region.[26]   The Refuge consists of approximately 3,550,000 acres of public lands and is bisected by the Koyukuk River, the third largest river in Alaska.[27]   Within the Refuge's boundaries are some 15,000 lakes and over 5,500 miles of rivers and streams.[28]

---

[26] With respect to the Koyukuk National Wildlife Refuge Congress provided that:

(B) The purposes for which the Koyukuk National Wildlife Refuge is established and shall be managed include -
 (i) to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, waterfowl and other migratory birds, moose, caribou, (including participation in coordinated ecological studies and management of the Western Arctic caribou herd), furbearers and salmon;
 (ii) to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;
  (iii) to provide, in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents; and
 (iv) to ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i) water quality and necessary water quantity within the refuge.

ANILCA § 302(5)(B)(i)-(iv), 94 Stat. at 2386, 16 U.S.C. § 668dd note (emphasis added).  *See also* Map of Koyukuk National Wildlife Refuge (attached as Exhibit 7).

[27] Koyukuk National Wildlife Refuge, http://koyukuk.fws.gov/establish.htm (last visited on October 9, 2007).

[28] Koyukuk National Wildlife Refuges, http://koyukuk.fws.gov/ (last visited on October 9, 2007).

The Innoko National Wildlife Refuge is the third refuge in the Lower Yukon Region.[29]   It consists of approximately 3,850,000 acres of public lands.  The Innoko Refuge provides a vast area of wetlands that are crucial for waterfowl nesting, resting, staging and molting.[30]  The Northern Unit of the Refuge is located adjacent to the Yukon River southwest of Galena.  The Unit's primary users are the residents of the Native villages of Galena, Koyukuk, Nulato and Kaltag.

The fourth and final refuge in the Lower Yukon Region is the Yukon Delta National Wildlife Refuge.[31]  This Refuge consists of approximately 19,200,000 acres of public lands.  The

---

[29] With respect to the Innoko National Wildlife Refuge Congress provided that:

(B) The purposes for which the Innoko National Wildlife Refuge is established and shall be managed include -
   (i) to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, waterfowl peregrine falcons, other migratory birds, black bear, moose, furbearers, and other mammals and salmon;
   (ii) to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;
   (iii) to provide, in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents; and
   (iv) to ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i) water quality and necessary water quantity within the refuge.

ANILCA § 302(3)(B)(i)-(iv), 94 Stat. at 2386, 16 U.S.C. § 668dd note emphasis added.  *See also* Map of Innoko National Wildlife Refuge (attached as Exhibit 8).

[30] Innoko National Wildlife Refuge, http://innoko.fws.gov/history.htm (last visited on October 9, 2007).

[31] With respect to the Yukon Delta National Wildlife Refuge Congress provided that:

(B) The purposes for which the Yukon Delta National Wildlife Refuge is established and shall be managed include -
   (i) to conserve fish and wildlife populations and habitats in their natural

Refuge encompasses one of the largest river deltas in the world, a delta that contains both the Yukon River and the Kuskokwim River, as well as innumerable lakes and ponds.[32]  The Refuge serves as home to over 24,000 people, mostly Yup'ik Eskimos who live in thirty-five Native villages situated throughout the Refuge.[33]

     2.   <u>Subsistence Uses of Fisheries on the Yukon River</u>.

Residents of the Yukon River drainage have long relied upon fish for food and other subsistence uses.  While non-salmon species provide an important component of the overall harvest, salmon comprises the bulk of the fish harvested for subsistence.[34]  Chinook, summer chum, fall chum, and coho salmon comprise the majority of the subsistence salmon harvests in the Yukon River drainage.[35]  Unlike many marine and coastal fisheries where commercial

---

     diversity including, but not limited to, shorebirds, seabirds, whistling swans, emperor, white-fronted and Canada geese, black brant and other migratory birds, <u>salmon</u>, muskox, and marine mammals;

     (ii) <u>to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;</u>

     (iii) <u>to provide, in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents; and</u>

     (iv) to ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i) water quality and necessary water quantity within the refuge.

ANILCA § 303(7)(B)(i)-(iv), 94 Stat. at  2392, 16 U.S.C. § 668dd note <u>emphasis added</u>. *See also* Map of Yukon Delta National Wildlife Refuge (attached as Exhibit 9).

   [32] Yukon Delta National Wildlife Refuge, http://yukondelta.fws.gov/history.htm (last visited on October 9, 2007).

   [33] *Id*.

   [34]  Andersen Aff. at 9 (attached as Exhibit 10).

   [35] *Id*. at 3.

harvests predominate, within the Yukon drainage subsistence salmon harvests generally exceed commercial, sport and personal use harvests combined.[36]

The Yukon River is the largest provider of native chinook and chum salmon in North America. Admin. Rec. Tab 132 at 3121. "The fishery resources are the cornerstone to the indigenous peoples of the Yukon and others." *Id*. Over sixty Alaskan villages, most of them economically depressed, depend heavily upon Yukon River salmon resources, both for their nutritional survival and as a source of cash. *Id*. Unemployment generally exceeds sixty percent in these villages, and commercial fishing provides a vital source of income, both to the fisherman and through fish processing jobs. *Id*. This cash income, in turn, is essential for conducting subsistence activities and is used to purchase boats, gas, nets, and related gear. In these mixed subsistence-cash economies, subsistence fishing, hunting and gathering provides a major part of the local food supply. *Id.*

Annual harvests of subsistence resources average 800-1,000 pounds per person for most Yukon River villages. Chum salmon are particularly important along the Yukon, both for human consumption and for dog food, and along the river subsistence chum salmon harvests are the highest in the state (averaging 200 to 600 pounds per person annually). Admin. Rec. Tab 22 at 535; Tab 132 at 3121.

Approximately 1,300 households (nearly half of all Yukon River households) annually harvest an average of 408,000 subsistence salmon in the Yukon River drainage, Admin. Rec. Tab 132 at 3123, and nearly all households share their catches with others. *Id*. Unlike the

---

[36] *Alaska Subsistence Salmon Fisheries 2004 Annual Report*, Tech. Paper No. 317, 37 (2004).

commercial fishery, over two-thirds of the subsistence harvest occurs in the upper River. *Id*.; Admin. Rec. Tab 22 at 537. Gear types used for subsistence harvests include 700 set nets, 400 drift nets and 200 fish wheels. *Id*.

The longest standing fishery throughout the Yukon River drainage in Canada is the First Nation fishery (also referred to as an aboriginal fishery). This fishery is only open to designates of Yukon First Nations. Once spawning escapements are met, priority (in terms of allocation) is given to the First Nations fishery to address food, social and ceremonial needs. First Nations fisheries are widespread throughout the Yukon River drainage in Canada. "Handbook," *supra* at 22.

Like Alaska Native subsistence users, most First Nations fishers have a fish camp where one or more families will fish together. First Nations fishers usually begin fishing for chinook salmon in early to mid-July and continue until their needs are met. Fishing for chum in the upper Yukon River usually begins in August and is completed by mid-October. *Id*. However, on the Porcupine River, the fishery often continues operating through November with netting for chum and coho salmon frequently occurring through the ice. *Id*.

3. <u>Yukon River Salmon Uses and Stocks</u>.

There are eight uniquely different fisheries along the Yukon River, two of which have priority over all other fisheries, subsistence fisheries in Alaska and First Nations fisheries in the Yukon Territory. "Handbook," *supra* at 20. Other consumptive uses of the resource, such as commercial uses, personal uses and sport fisheries in Alaska, together with domestic, sport/recreational and commercial fisheries in the Yukon Territory, have no priority nor hierarchy and are managed accordingly. *Id*.

Plaintiffs Katie John, *et al*, Opening Brief on "Which Waters" Issue
Case No. 3:05-0006-HRH (Consolidated with No. 3:05-cv-0158-HRH )

Genetic stock identification methodology indicate that approximately fifty percent of the adult chinook salmon that return to the Yukon River originate in Canada, mostly in the Yukon Territory and some in northern British Columbia, while fifty percent originate in Alaska. "Handbook," *supra* at 26.[37]  It is assumed that thirty percent or more of Yukon River fall chum salmon originate in Yukon Territory waters. *Id.*  According to the *Yukon River Salmon Agreement Handbook*:

> The majority of the first run of salmon migrating up the Yukon River in May is presumed to be Canadian-origin Chinook heading for spawning grounds in the Yukon Territory.  Canadian-origin salmon spawn and/or rear throughout all the tributaries and streams in the Yukon Territory.  To date, spawning chinook salmon have been documented in over 100 streams, including some streams in northern British Columbia.  Some of the notable spawning rivers in Canada include: Big Salmon, Little Salmon, Teslin, Pelly, Stewart and Klondike rivers.  However, not all Yukon River stocks of Chinook salmon spawn in Canadian waters.  Spawning salmon also return to most every tributary in the Alaskan portion of the drainage – most notably, the Andreafski, Anvik, Nulato, Koyukuk, Tanana, Chena, Chandalar, and Sheenjek Rivers.  Although their distribution is not as extensive or widespread as Chinook salmon, fall chum salmon also return to tributary streams in the Alaskan portion of the drainage, most notably, the Tanana, Koyukuk, Chandalar, and Sheenjek Rivers and in upper Canadian tributaries of the Yukon River – including the Porcupine, Fishing Branch, Kluane, and Teslon rivers, and the mainstem Yukon River itself.

"Handbook," *supra* at 26.

4.    The Life Cycle of the Yukon River Salmon.

Fish taken by Plaintiff Tanana tribal members and other upriver users include several species of salmon (chinook, coho, and sockeye salmon), all of which are anadromous fish. Anadromous fish spawn in the headwaters, tributaries and mainstem of the Yukon River.  As

---

[37]  *See also* Reiser Aff. at 42 (attached as Exhibit 11).

Plaintiffs Katie John, *et al,* Opening Brief on "Which Waters" Issue
Case No. 3:05-0006-HRH (Consolidated with No. 3:05-cv-0158-HRH )

smolt, they migrate to the Pacific Ocean where they mature and spend the bulk of their adult life. After several years, they return to the river or stream of their origin, spawn, and in the case of salmon, die.

Absent a sufficient quantity of water in the streams and rivers that provide habitat and migratory routes for fish residing in or passing through the various Yukon River Refuges, resident and anadromous fish cannot survive, much less survive to be harvested by qualified rural subsistence users. Water is necessary at every stage in the fish lifecycle and without water, aquatic life, including fish, simply cannot exist.

(a)     Upstream Migration. As sexually mature adults, salmon travel hundreds, even thousands, of miles from ocean feeding areas to spawn in the same freshwater system in which they hatched. Some headwater salmon stocks migrate over 1,840 miles to reach their spawning grounds in the Yukon Territory and northern British Columbia–among the longest salmon migrations in the world. "Handbook," *supra* at 19. Without sufficient streamflow in a stream or river, adult fish cannot successfully migrate upstream to spawning areas.[38]

(b)     Spawning and Egg Incubation. Streamflow plays a direct role in determining the extent of habitats that can be used by adult fish for spawning, and the magnitude of streamflow also has an influence on the quality of the spawning gravels, and on maintaining suitable

---

[38]  Reiser Aff. at 52-54 (attached as Exhibit 11). The court may consider information outside the record when necessary to ascertain whether the process employed by the agency to reach its decision took into consideration all the relevant factors. *See ASARCO v. Environmental Protection Agency*, 616 F.2d 1153, 1160 (9th Cir. 1980) ("It will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not.").

conditions for incubating eggs within such gravels.  Discharge velocity also plays an important role in providing and maintaining the quality of the spawning gravels.  This typically occurs as part of the runoff cycle in association with high flows resulting from snow melt.  These flows serve, among other things, to mobilize and transport fine sediments from spawning gravels, which is important for increasing gravel permeability and facilitating the incubation of deposited eggs since the flows result in the transport of oxygen to and removal of metabolic wastes from the embryos.  The flushing of fine sediments that occurs in conjunction with high runoff in the spring thus serves to increase the quality of the spawning gravels and enhances potential survival and the emergence of salmon fry.[39]

(c)    Fry and Juvenile Rearing.  As with the other life stages, streamflow is the primary determinant of a number of specific factors that contribute to the habitat requirements necessary for the rearing of fry and juvenile fish.  Streamflow regulates the carrying capacity of rearing habitats.  Reductions in flow concomitantly can translate into reductions in carrying capacity.[40]  As with spawning habitats, streamflow discharges have similar effects on the quality of rearing habitat.  When high flows occur during the normal runoff cycle, they transport sediments from pools (necessary to maintain rearing space) and riffle habitats (necessary as food production areas); move and create new structures in the channel; and inundate important riparian and floodplain vegetation that serve to increase bank stability, provide shade and contribute nutrients

---

[39]  *Id.* at 54-57.

[40]  *Id.* at 58-59.

to the stream from out-of-stream areas, all in addition to providing water necessary for downstream migration of smolts and sub-yearling fish.[41]

      (d)   <u>Downstream Passage of Smolts and Juveniles</u>.  Instream flows are also necessary for the downstream passage of anadromous salmon.  In Alaska streams, the timing of the seaward migration of salmon has evolved in concert with the cycle of runoff from adjoining mountains and hills, increasing fish survival rates.  The out-migration typically occurs during the spring after ice-out and in conjunction with snowmelt runoff.  The high flows allow the smolts to conserve energy since most of the work is done by the stream, while the increased turbidities associated with high flows provides the smolts with some protection from predators.[42]

      (e)   <u>The Importance of Habitat Linkages to Harvest Areas</u>.  The production of harvestable fish populations at a given location requires that suitable conditions must exist within all sections of the watershed in which the fish populations rely for upstream adult passage, spawning, egg incubations, fry and juvenile rearing, and juvenile/smolt downstream passage.[43]  A fishery with harvestable stocks requires more than just suitable habitat conditions within the immediate harvest areas.  Indeed, because of the differing life history strategies and species life-stage-specific reliance on differing habitats, water flows must spatially and temporally protect the full range of habitats needed in all these life stages in order to maintain the species survival.[44]

     5.   <u>Treaty Rights:  U.S.-Canada Treaty to Manage Yukon River Salmon Stock</u>.

---

[41]  *Id.* at 58-62.

[42]  *Id.* at 62.

[43]  *Id.* at 64.

[44]  *Id.*

In 1985 the United States and Canada signed the Pacific Salmon Treaty to address interception of salmon originating in one nation by the fisheries of the other nation.[45]  The 1985 Treaty dealt with Yukon River stocks by incorporating a Memorandum of Understanding (MOU) in which both nations agreed to continue Yukon River negotiations in order to properly address its unique characteristics.

A Yukon River Interim Agreement was signed in 1995 that required the United States to endeavor to deliver absolute amounts of chinook and fall salmon to the Canadian border, depending upon parent year escapements.  The Interim Agreement also required coordination of conservation and management programs between the United States and Canada.  Admin. Rec. Tab 132 at 3123.  "The Agreement was negotiated on the premise that approximately 50% of Yukon River salmon harvested in Alaska are bound for spawning grounds in Canada." "Handbook," *supra* at 5.  While implementation of this temporary agreement was put into practice, negotiations were to continue for a long-term arrangement.  However, those negotiations never resumed and the Interim Agreement expired on December 31, 1997.

In 1999, major declines in salmon runs on the Yukon River resulted in renewed efforts to negotiate a permanent agreement.  In March 2001, immediately after the devastating 2000 chinook salmon run, the final Yukon River Salmon Agreement was adopted.  The Agreement represented a powerful international commitment to manage Yukon River salmon fisheries so as to ensure sufficient spawning salmon are available to meet escapement requirements and to provide harvests according to the harvest sharing arrangements.  "Handbook," *supra* at 6.

---

[45]  Pub. L. No. 99-5, 99 Stat. 8 (1985), (codified at 16 U.S.C. § 3632 (2000)).