August 9, 1995

Memorandum

To:  John D. Leshy, Solicitor

From:  Lauri J. Adams
Regional Solicitor-Alaska

Dennis Hopewell
Deputy Regional Solicitor-Alaska

Subject: Comments on DIA Recommended Approach on Reserved Water Rights Determinations in <u>Katie John</u> Litigation

    This memorandum provides a few final comments in response to the Division of Indian Affairs' (DIA) July 19, 1995, recommendations on the <u>Katie John</u> remand issues. DIA agrees with most of the approach proposed in the Alaska Policy Group's final Issue Paper and Recommendations dated June 15, 1995 (Alaska Issue Paper) and the proposed amendment to the Issue Paper dated July 12, 1995 (relating to the definition of river mouths).[1] However, there are two significant areas with respect to which DIA disagrees with the Alaska Issue Paper recommendations. This memorandum responds on the issues addressed by DIA, namely: (1) whether to assert upstream and downstream reserved water rights <u>outside</u> the boundaries of federal reservations in order fulfill subsistence purposes of the reservations; and (2) whether to assert federal reserved water rights for Alaska Native allotments adjacent to waterways.

---

[1] With regard to river mouths, one technical correction to paragraph "1.d" on page 1 of the DIA memorandum is in order. The Alaska Issue Paper did not recommend the drawing of the <u>outer boundaries of CSUs</u> across the termini of headlands on either bank of a river as the DIA memorandum reports. The boundaries of each CSU were fixed by ANILCA and the maps published pursuant to section 103 of the Act. 16 U.S.C. § 3103. The July 12, 1995, proposed amendment to the Alaska Issue Paper recommended only that <u>to the extent the termini of headlands are included in a particular reservation</u>, federal reserved water rights should be claimed to that line across a river mouth for the unit.

Exhibit 1
Page 1 of 8

DISCUSSION

I. ASSERTION OF RESERVED WATER RIGHTS UPSTREAM AND DOWNSTREAM OF FEDERAL RESERVATIONS CREATED OR EXPANDED BY ANILCA[2]

DIA recommends that water rights be reserved outside the boundaries of federal reservations in Alaska, both upstream and downstream in the watercourse. The effect of this would be to identify federal interests in waters outside the national parks, refuges, and other federal reservations which would then be included in the "public lands" definition of ANILCA, as interpreted by the Ninth Circuit in Alaska v. Babbitt, 54 F.3d 549, 554 (9th Cir. 1995) ("Katie John"). This would in turn require implementation of ANILCA's subsistence priority for fishing at locations on waterways which are outside the boundaries of federal reservations.

We would like to emphasize several points in response to this proposed application of the Katie John decision.

First, it is clear that subsistence is not the only purpose of federal reservations in Alaska which requires the assertion of reserved water rights.[3] Several other federal reservation purposes, including conservation of fish and wildlife populations and habitat, are also primary purposes which require the assertion of those water rights. In our prior communications, we have not recommended that the Department undertake to separately identify the specific purposes of each federal reservation which support water rights assertions in response to the Katie John decision. This is because a determination of interests in water as "public lands" can be made under Katie John as long as any federal reservation purpose supports the assertion of reserved water rights. However, if the Department were to decide to rely on subsistence as a "unique" purpose to support assertion of off-reservation reserved water rights, it would have to identify the specific federal

---

[2] As a preliminary matter, we note that DIA has limited its discussion of reserved water rights to conservation system units (CSUs), specifically wildlife refuges, in Alaska. Technically we believe it is more correct to use the broader term "federal reservations." There are several types of federal reservations in Alaska which are not CSUs but for which reserved water rights may be asserted, including the Chugach and Tongass National Forests, military reservations and the National Petroleum Reserve - Alaska. See Alaska Issue Paper at 4-6, and attached Appendices. Compare 16 U.S.C. § 3102(4) (definition of conservation system unit).

[3] DIA's memorandum notes this, but limits its analysis of off-reservation water rights to reserved water for subsistence purposes in wildlife refuges. DIA Memorandum at p. 3.

Exhibit 1
Page 2 of 8

reservations where subsistence constitutes a primary purpose. As a legal and policy matter, this could be a thorny issue which might best be left for another day.[4]

In addition, since not all of the federal reservations for which the Department will assert water rights under the Katie John decision include subsistence as an express purpose,[5] to the extent the Department might choose to rely on the "uniqueness" of the subsistence purpose in certain CSUs in Alaska as justification for the assertion of off-reservation water rights, the argument would lead to inconsistent assertion of off-reservation water rights for some but by no means all federal reservations, and the resulting application of a subsistence fishing priority upstream and downstream of some, but by no means all, of the parks, refuges, and other federal reservations.[6]

Second, we agree that certain of the purposes of federal reservations (including subsistence) will effectively require the protection of minimum instream flows to ensure that fish are able to migrate through the federal reservations and successfully reproduce, so that they will continue to exist in healthy populations within the federal reservations. As a practical matter, this need is substantially similar to the

---

[4] For example, a debate is currently raging on the Kenai National Wildlife Refuge concerning whether the omission of an express subsistence purpose from ANILCA's listing of the refuge's purposes means that the subsistence priority in Title VIII of ANILCA somehow carries less weight there than in all the other refuges where a subsistence purpose is expressly included. If the result of a reserved water rights analysis of specific refuge purposes led to a determination that no off-reservation water rights could be asserted for subsistence purposes with respect to the Kenai refuge, it would undoubtedly exacerbate the existing conflict concerning implementation of the subsistence priority which definitely does apply within the refuge's boundaries.

[5] For example, several parks, the national forests, and even one of the wildlife refuges (the Kenai National Wildlife Refuge) do not include subsistence as an express purpose, although they do include other purposes which will justify the assertion of federal reserved water rights. See, e.g. 16 U.S.C. § 410hh-1, 431(5), 539(b), 668dd(4).

[6] Another inconsistency in the application of DIA's proposal is that, while it would require application of the subsistence priority for fishing in the portions of rivers which are outside certain federal reservations, it would not address the parallel problem of protecting a subsistence priority for hunting of wildlife species which cross over to off-reservation lands where different state hunting rules may apply.

3

Exhibit 1
Page 3 of 8

situation in many parks and refuges in the lower 48 states.[7] However, we are unaware of any circumstance elsewhere where the United States has asserted that a park or refuge reserved water right extends outside the park or refuge boundaries in order to maintain instream flows in a portion of the watercourse located outside the boundaries.[8] Rather, the necessary protection has been achieved elsewhere by the United States' exercise of its broad extraterritorial powers to enjoin any off-reservation activities which deplete water necessary to maintain on-reservation purposes.[9] Since the purposes of many of Alaska's CSUs include the maintenance of healthy fish populations and sufficient fish to support subsistence fishing, this off-reservation enforcement power is exceedingly broad, in our view.[10] Thus, we do not think that the affirmative assertion of off-reservation reserved water rights is essential to adequately protect on-reservation federal purposes.

Third, the cases cited in the DIA memorandum regarding the United States' off-reservation water rights assertions on behalf of Indian tribes in the lower 48 states (at pps. 5-6) are distinguishable from the situation of federal reservations in Alaska. In every case we are familiar with involving an off-reservation assertion of water rights on behalf of an Indian tribe, the assertion was necessary to protect specific treaty or

---

[7] For this reason, we cannot agree that an assertion of off-reservation water rights in Alaska would have no implications for national parks and refuges in other states. In general, members of the Alaska Policy Group were quite concerned that the assertion of off-reservation water rights for parks and refuges in Alaska could have precedent-setting effects in federal parks and refuges elsewhere in the country.

[8] While Indian water rights have been asserted more extensively based on specific treaty and Indian reservation purposes, this is not the case, to our knowledge, with respect to any forest, park or refuge reserved rights.

[9] E.g., Cappaert v. United States, 426 U.S. 142 (1976) (Court enjoined off-reservation groundwater pumping that was jeopardizing on-reservation water levels necessary to protect a rare fish in a national monument).

[10] For example, we believe that the United States' power to enjoin off-reservation activities would include the ability to enjoin excessive commercial fishing off-reservation (for example, if necessary to avoid the depletion of subsistence fish resources on-reservation), as well as the authority to enjoin off-reservation water diversions or depletions that would impede fish migration to and through the federal reservation where reserved water rights have been asserted.

4

Exhibit 1
Page 4 of 8

Indian reservation hunting and fishing rights, including sites located on former Indian reservation lands where Indian fishing rights survived the termination of the reservation. These situations do not exist in Alaska where the federal reservations for which water rights are being asserted under the Katie John decision are parks, refuges, forests, etc. which are subject to a different body of water rights jurisprudence.

DIA believes that ANILCA should be should be interpreted as remedial "Indian legislation" with its broad canons of statutory construction benefiting Indians (DIA memorandum at pps. 5-6), and that these broad rules of construction support off-reservation assertion of water rights. However, to date the courts have not adopted a rule that ANILCA as a whole is Indian legislation.[11] Indeed, ANILCA has extremely broad purposes, including, of course, the establishment and enlargement of millions of acres of national parks, refuges, monuments, wild and scenic rivers, and national forest monuments in Alaska. It cannot be said that all these new and expanded CSUs were established for the primary benefit of Indians. Even the subsistence preference itself contained in Title VIII of ANILCA is broader than strictly Indian legislation in that it includes all rural residents within its scope. See State of Alaska v. Native Village of Venetie Tribal Government, No. F87-0051 CV (Slip Opinion at 46)(D. Alaska, August 3, 1995). But see Village of Gambell, discussed supra, at note 10. This is not to say that the subsistence provisions of ANILCA should not be fully and liberally applied to protect a subsistence tradition that is predominantly exemplified by Alaska Natives. However, we think it is incorrect to place canons of construction on ANILCA that construe the entire Act as remedial Indian legislation or which override its other, broader purposes.

**Fourth,** in attempting to discern what the Ninth Circuit actually intended regarding the scope of the United States' assertion of reserved water rights as a result of the Katie John

---

[11] In People of the Village of Gambell v. Clark, 746 F.2d 572, 581 (9th Cir. 1984), rev'd on other grounds sub nom., Amoco Production Co. v. Village of Gambell, 480 U.S. 531 (1987), the Ninth Circuit stated that "ambiguities in Title VIII must be resolved in favor of the Alaska Native people.'" Id. at 581 (quoting 126 Cong. Rec. 29,279 (1980). However the scope of reserved water rights (in refuges, for example) is determined by reference to the refuge purposes set forth in Title III of ANILCA, not Title VIII, and the Ninth Circuit expressed no opinion on whether Title III of ANILCA is Indian legislation. Moreover, the legislative history relied upon in the above-quoted portion of the Gambell case was criticized by the Ninth Circuit in the more recent Katie John decision. 54 F.3d at 553. The issue thus remains unresolved.

decision, we note that the court decided the <u>Katie John</u> case in the context of a well-established reserved water rights doctrine and body of jurisprudence which has developed in connection with parks and refuges in the lower 48 states. In that context, we are unaware of any situation where the United States has ever asserted (or a court has held) that a park or refuge's instream flow needs require the reservation of federal water rights in rivers (or portions thereof) located <u>outside</u> the park or refuge boundaries. In characterizing the application of the reserved water rights doctrine in Alaska, the Ninth Circuit in <u>Katie John</u> repeatedly referred to the government's reservation of waters "appurtenant" to tracts of lands withdrawn for federal purposes. 54 F.3d at 553-54. In contrast, the Ninth Circuit in the same case rejected a far more expansive interpretation of "public lands" in Alaska which would have extended the subsistence priority as a result of the navigation servitude throughout entire watersheds. Viewed against this backdrop, it is perhaps most reasonable to conclude that the Ninth Circuit meant something less than entire navigable river systems when it contemplated the assertion of reserved water rights for the parks, refuges, and other federal reservations in Alaska.

## II. ASSERTION OF RESERVED WATER RIGHTS FOR NATIVE ALLOTMENTS

We continue to urge caution on the broad assertion of reserved water rights for Alaska Native allotments as part of the Department's response to the <u>Katie John</u> decision. Assertion of reserved water rights for Alaska Native allotments raises a complex set of issues that should be addressed, if at all, separately and in a thorough fashion. The Ninth Circuit's <u>Katie John</u> decision <u>does not require</u> that the Department address the Native allotment question at this time, and we are concerned that doing so in a less than comprehensive way may create more problems than it solves.

To begin with, lands claimed or conveyed as Alaska Native allotments are not generally considered "federal reservations." The claimed or conveyed lands are not set aside for a specific federal purpose evidenced by a treaty, Indian reservation or other special reserved status. The lands are only "segregated," not reserved, by the filing of an allotment application, and once conveyed they become private lands whose title is in the individual Native allottee, subject to restrictions on alienation and taxation.

We are also concerned that the United States' interest in conveyed Alaska Native allotments does not meet the basic ANILCA definition of public lands. The United States holds neither legal nor equitable title to these allotments. <u>See</u> D. Case, <u>Alaska Native and American Laws</u>, at 152 (Univ. Alaska, 1984). While an Alaska Native allotment is subject to

restrictions on alienation and taxation, these are not interests in land "the title to which is in the United States" as required by the definition of public lands in ANILCA. 16 U.S.C. § 3102(3).

Moreover, the restrictions do not run with the land but are personal to the Native allottee. They automatically end upon conveyance of the land to a non-Native and can be terminated upon request by a "competent" Native allottee. This is analogous to the situation of lands held by a tribe subject to restrictions on alienation which was addressed in the recent Venetie decision, referenced above. In regard to such lands, the federal district court held that "[t]he federal government has no ownership interest whatever in the lands . . . ." Venetie, supra, Slip Opinion at 51.

The assertion that "restricted" Alaska Native allotments should generally be treated the same as the more standard "trust" allotments in other states does not resolve the question of whether the United States' interest in Alaska Native allotments meets the ANILCA definition of public lands. The statement in the DIA memorandum that all such allotments should generally be treated alike appears to address the United States' oversight of such lands and not the fact that various types of allotments constitute different types of real property interests. In fact, the Cohen treatise cited in DIA's memorandum specifically notes that, while trust and restricted allotments are generally treated the same, that is not true where "statutory terms [such as the ANILCA definition of public lands] turn on the specific state of the title." F. Cohen, Handbook of Federal Indian Law, at 618, note 66 (1982 Ed.) (Emphasis added).

There are also numerous practical problems with the assertion of federal reserved water rights on behalf of Alaska Native allottees. For example, BLM estimates that nearly 5,800 parcels applied for as Native allotments are still in federal ownership. These claimed allotments cannot be treated as "valid" Native allotments, even though the land is segregated and given protection from other, later claims, pending BLM's determination that the allotment claim is valid. Prior to a final decision on the allotment's validity, claimed allotments that are located within the boundaries of federal reservations (there are thousands of pending Native allotment claims in the national wildlife refuges in Alaska) will be treated as public lands for purposes of the subsistence priority in Title VIII of ANILCA.

Of the approximately 6,500 Native allotments that have been finally conveyed, the United States did not explicitly reserve any water rights and has not previously asserted that any water rights were implicitly reserved to the United States. Due to differing facts relating to the specific physical location and uses made of each allotment, any determination of reserved water

rights would have to be made on an individual case-by-case basis.[12]

Accordingly, if the Native allotment issue must be decided at the present time, we believe that the proper course is to reject the idea of asserting reserved water rights across the board in conjunction with Alaska Native allotments. A less extreme result would be to note that specific Alaska Native allotments may include reserved water rights to be identified at a future date on a case-by-case basis as necessary, and that the government does not waive any such claim by not asserting it at this time.

cc: Deborah Williams, SIO (by FAX)
Ed Cohen, SOL (by e-mail)
Bob Anderson, SOL, DIA (by e-mail)
Bob Baum, SOL, C&W (by e-mail)
Paul Smyth, SOL, E&R (by e-mail)
Sandra Ashton, SOL, DIA (by e-mail)
Anne Crichton, SOL, DIA (by e-mail)
Dave Gayer, SOL, C&W (by e-mail)
Steve Hoffman, SOL, C&W (by e-mail)
Paul Kirton, SOL, E&R (by e-mail)
Joseph Oglander, SOL, E&R (by e-mail)
Pete Raynor, SOL, C&W (by e-mail)
Barry Roth, SOL, E&R (by e-mail)
Pam Williams, SOL, DIA (by e-mail)
Chris Bockmon, SOL, AK (by e-mail)
Keith Goltz, SOL, AK (by e-mail)
Regina Sleater, SOL, AK (by e-mail)

---

[12] For example, while the majority of Alaska Native allotments probably border some type of water body, that is not true of all allotments. In addition, many allotments border marine water bodies, and neither DIA nor the Alaska Policy Group has recommended the assertion of reserved water rights for marine waters. (See Alaska Issue Paper at pps. 11-13) Further, many Native allotments that border water bodies may not entail reserved water rights. For example, if the only use of an allotment is berry picking on a hillside near a lake or river, there may not be a reserved water right which attaches. Thus, it is apparent that to properly evaluate reserved water rights in connection with Alaska Native allotments, an enormous amount of detailed attention and effort would be required.

8

Exhibit 1
Page 8 of 8

ANILCA MAP
Ex 2