1. 1-cycle rebuild: under this scenario, the goal would be to immediately rebuild the spawning escapement to 80,000 fish – this then would be the objective for the current year.

2. 2-cycle rebuild: the goal of this scenario would be to rebuild the spawning escapement of this cycle to 80,000 in two equal increments: the first increment in the current year and the second increment in four years time. If the brood year spawning escapement was 50,000, to reach the rebuilding goal of 80,000 will require 30,000 additional fish on the spawning grounds. Since there are two cycle years to accomplish this in, we would require 15,000 more spawners in the current year, and an additional 15,000 four years hence. Therefore, the objective for the current year would be 65,000 fish; the objective would become 80,000 four years later. In this case, the spawning escapement should move from 50,000 to 65,000 then to 80,000 fish; this would cover an eight-year span.

3. 3-cycle rebuild: under this scenario, the goal would be to rebuild the spawning escapement from 50,000 to 80,000 in three equal increments, or 10,000 fish per cycle. The first increment would be set, so the objective for the current year becomes 60,000 fish (50,000+10,000). Four years later, the objective would be 70,000 (60,000+10,000) and in eight years from the current year, the objective would reach 80,000 fish. So, under this scenario it would take 12 years to rebuild the spawning escapement of the cycle from 50,000 to 80,000.

To indicate the effect of the various rebuilding scenarios on harvests, assume the run size expected in the current year is 100,000 fish; in this example, this is the expected production from the spawning escapement of 50,000 fish. The following table summarizes the various scenarios with respect to harvests and escapements:

### ALLOWABLE HARVESTS UNDER EACH REBUILDING OPTION (FOR HYPOTHETICAL CURRENT YEAR)

| Rebuild Option | Expected Run Size | Spawning Escap't | Total Allowable Target | Cdn Harvest Share (32%) Catch | U.S. Harvest Share of Cdn Origin Salmon | Estimated Total U.S. Harvest[1] | Border Escap't Objective |
|---|---|---|---|---|---|---|---|
| 1-CYCLE | 100,000 | 80,000 | 20,000 | 6,400 | 13,600 | 54,400 | 86,400 |
| 2-CYCLE | 100,000 | 65,000 | 35,000 | 11,200 | 23,800 | 95,200 | 76,200 |
| 3-CYCLE | 100,000 | 60,000 | 40,000 | 12,800 | 27,200 | 108,800 | 72,800 |

[1]Assumes that 25% of the U.S. harvest is comprised of Canadian-origin mainstem fall chum salmon

### 7) How is a harvest share calculated?

The Agreement specifies two harvest sharing arrangements with two scenarios each, which can be found under Restoration and Enhancement: Appendix 1 - *Escapement Objectives for and Harvest Sharing of Canadian-Origin Chum Salmon* and Appendix 2 - *Escapement Objectives for and Harvest Sharing of Canadian-Origin Yukon River Chinook Salmon* of the Agreement. Before proceeding, please note that this is an EXAMPLE and an example only. Total allowable catch (TAC) is not a fixed figure; rather it varies from year to year as managers estimate TAC based upon salmon abundance.

### EXAMPLE:

After accounting for escapement objectives, management determines 160,000 Canadian-origin chum salmon were available for harvest, meaning that the TAC level was 160,000. Based on the harvest share arrangement as written in the Agreement, when the TAC is above 120,000 chum salmon, the guideline harvest range for Canada shall be between 29% and 35% of 120,000 (34,800 and 42,000 chum salmon) plus 50% of the portion of the TAC greater than 120,000 chum salmon (Figure 2, pg. 15).

$(29\% \times 120,000)$ to $(35\% \times 120,000) + [50\% \times (TAC - 120,000)]$ = Canadian catch
$(34,800)$ to $(42,000) + [50\% \times 160,000 - 120,000)]$ = Canadian catch
$(34,800)$ to $(42,000) + (50\% \times 40,000)$ = Canadian catch
$(34,800)$ to $(42,000) + 20,000$ = Canadian catch
$54,800$ to $62,000$ = Canadian catch

$(65\% \times 120,000)$ to $(71\% \times 120,000) + [50\% \times (TAC - 120,000)]$ = Alaskan catch
$(78,000)$ to $(85,200) + [50\% \times 160,000 - 120,000)]$ = Alaskan catch
$(78,000)$ to $(85,200) + (50\% \times 40,000)$ = Alaskan catch
$(78,000)$ to $(85,200) + 20,000$ = Alaskan catch
$98,000$ to $105,200$ = Alaskan catch

Therefore, the amount eligible for harvest in the Yukon Territory would be between 54,800 and 62,000 Canadian-origin chum salmon, and between 98,000 and 105,200 Canadian-origin chum salmon in Alaska (this number does not include U.S.-origin chum salmon). These numbers are then compared post-season to actual numbers of salmon harvested, as reported by fishers, to determine if each country did indeed receive their harvestable share, while at the same time achieving spawning escapement objectives.

Exhibit 3
Page 30 of 48

It is important to understand why it is necessary to continue to refine management tools, used to estimate TAC levels, so that managers may more easily determine TAC levels in-season, rather than after the fishing season. Done in-season, spawning escapement objectives and harvest sharing arrangements can be more accurately achieved for both countries.

### 8) WHAT IS THE HATCHERY IN THE YUKON TERRITORY FOR AND HOW MANY FISH DO THEY RELEASE? HOW MANY HATCHERY FISH RETURN ON AN ANNUAL BASIS?

The Whitehorse dam, built in 1958 to provide energy for the development of the Yukon Territory, not only caused an increase in salmon fry mortality as they migrated out, but also cut off access to spawning habitat for adult Chinook salmon returning to several tributaries on the Yukon River - including Michie Creek and the McClintock River. The Whitehorse Rapids Fish Ladder was constructed in 1959 to enable returning salmon to pass the dam and reach important spawning grounds. In 1984, after a new turbine was constructed to double the electrical capacity of the dam, the Whitehorse Rapids Fish Hatchery began operation. This hatchery was created to replace a significant number of out-migrating Chinook fry thought to be killed in the turbines of the Whitehorse Dam. Production levels for the hatchery vary, from 70,000 to 450,000 fry, and are based upon target numbers decided by a committee including members from DFO, the Yukon Territorial Government, Yukon Energy, the Yukon Fish and Game Association and Kwanlin Dun First Nation. Each year the hatchery produces fry that are released into the tributary waters upstream of the dam. Currently about 150,000-200,000 fry are released each spring, following the collection of the brood stock the previous fall.



For identification purposes, tiny coded wire tags are injected into the nose cartilage of fry and the adipose fin is removed prior to their release. Upon their out-migration, fry pass through a spillway or the turbines at the dam.

The numbers of salmon returning each year are counted at the Whitehorse Rapids Fishway. The graphs represent the number of Chinook salmon recorded past the Whitehorse Rapids Fishway from 1988 to 2003, including the number and percentage of hatchery salmon.





Exhibit 3
Page 31 of 48



### 9) WHAT AFFECTS THE NUMBER OF SALMON RETURNING TO THE YUKON RIVER TO SPAWN AND REAR?

Yukon River salmon returning to spawning grounds in Alaska and the Yukon Territory can be affected by numerous factors, including, but not limited to: parent year escapements (the number of spawners and the composition of the spawning population e.g. sex and age composition); types and intensity of fisheries operating on the high seas and in the Yukon River; water levels; water temperatures (may result in fish becoming stressed and vulnerable to disease); increased rates of infection and prevalence of disease, such as Ichthyophonaisis; and poor marine survival conditions, all of which may result in low runs.

Industries such as placer mining and road construction can also degrade fish spawning and rearing habitat from, for example, increased sediment loads into rivers. Hard-rock mining can result in discharge of heavy metals, which can be toxic to aquatic life. Inadequately treated sewage, particularly from larger communities along the Yukon River, can also have negative effects on water quality, which in turn affects the number of healthy salmon capable of spawning and rearing.

### 10) HOW ARE CANADA AND THE YUKON TERRITORY PROTECTING SPAWNING AND REARING GROUNDS FOR CHINOOK AND CHUM SALMON?

Spawning grounds in the Yukon Territory are wide spread, with over 100 known spawning streams. According to the *Yukon River Salmon Agreement*, a specific number of Canadian-origin salmon must reach these spawning grounds each year for future generations of salmon to return. In addition, the Agreement enables Yukoners to utilize the Restoration and Enhancement (R&E) Fund for "restoration, stewardship and economically viable fisheries." Therefore, Yukoners can use the fund to become involved in the restoration and protection of salmon habitat and maintain and start new economic activities to promote the salmon industry in an effort to support viable salmon fisheries. The visibility of an economically viable fishing industry and community involvement works to preserve the salmon resource.

Protection of salmon habitat in Canada is, constitutionally, a federal responsibility under the federal Fisheries Act, while management of lands and waters are a territorial responsibility. The federal and territorial governments work together and in co-operation with First Nation governments to protect salmon habitat. Currently, negative effects of past industrial activities, including mining, utilities, and road construction on/near salmon rearing and spawning habitats are being identified and mitigated.

Under the UFA, the YSC and the Renewable Resources Councils[6] work together in their roles as public advisory structures to all three orders of government (Federal, Yukon Territory and Yukon First Nations). They act as general watch dogs, checking that industries are managed to higher standards to protect salmon habitat. They also encourage all three orders of government to uphold their natural resource conservation responsibilities. These collaborative working relationships with resource managers and the users of land and water ultimately lead to the protection and conservation of salmon and their habitats.

### 11) WHO CAN APPLY TO THE R&E FUND?

Programs, projects and associated research and management activities funded by the R&E Fund must be directed towards restoration, conservation and enhancement of Canadian-origin salmon stocks of the Yukon River in Alaska and the Yukon Territory - including the Porcupine River system. Within the Canadian portion of the Yukon River drainage, programs and projects can also be directed at developing stewardship of salmon habitat and resources, and for maintaining viable salmon fisheries.

The application process is open to the public. The principles, guidelines and priorities that guide the use of the R&E Fund, as described earlier (refer to Restoration and Enhancement Fund, page 12), are followed when applying to the R&E Fund. The YR Panel's Executive Secretary can provide more detailed information regarding the annual call for proposals[7]. Assistance is also available to prospective applicants to help with the application process - including the current statement of project priorities by the YR Panel, information gaps, identification of related information available, and application formatting.

---

[6] Local Renewable Resources Councils are an advisory structure to all three orders of government (Federal, Yukon Territory and Yukon First Nations) on all matters pertaining to the management and allocation of renewable resources.

[7] Visit the Yukon River Panels website at <www.yukonriverpanel.com> for more information.

> "THE YUKON RIVER SALMON TREATY WITH CANADA TOOK MANY YEARS AND A LOT OF HARD WORK TO ACCOMPLISH... WE DID NOT TREAT THE WORK LIGHTLY. NOW WE HAVE A LONG TERM AGREEMENT, WE CAN ALL SHARE IN THE WORK TO PROTECT AND ENJOY THE SALMON RESOURCE."
> – HARRY WILDE, SERVED AS AN ADVISOR TO THE U.S. DELEGATION THROUGHOUT THE NEGOTIATIONS

Exhibit 3
Page 32 of 48

### 12) CAN MANAGING FOR CANADIAN-ORIGIN SALMON AFFECT ALASKAN HARVESTS OF STOCKS ORIGINATING IN ALASKA?

Due to the mixed-stock nature of fish moving through the Alaskan portion of the drainage, when management actions are necessary to address *Yukon River Salmon Agreement* obligations for Canadian-origin salmon, reduction in harvests for Alaskan-origin fish occur within Alaska. If one stock is weak when another stock is strong, Alaskan fishers could lose significant harvest opportunities in that year if management cannot provide any further opportunity to target the stronger stock.

Remember, approximately 50% of the Chinook salmon on the Yukon River originate in the Yukon Territory and 50% originate in Alaska. If management actions are not taken by managers in the U.S. when Canadian-origin stocks are weak, the Yukon Territory fisheries could be devastated with no other salmon stocks to depend on. The Alaskan fisheries could also see a significant reduction in harvest in future years due to poor numbers of salmon returning from weak brood/parent years. On the other hand, when Canadian-origin stocks are strong and U.S.-origin stocks are weak, the Canadian-origin stocks may sustain Alaskan fisheries through times of poor returns.

### 13) WHAT IS THE DIFFERENCE BETWEEN THE SUBSISTENCE FISHERY IN ALASKA AND THE FIRST NATION FISHERY IN THE YUKON TERRITORY?

Although both fisheries are accorded a priority over all other fisheries, distinct differences exist in the nature of the two fisheries. The subsistence fishery in Alaska is a relatively large fishery and, according to the State of Alaska statutes, the subsistence priority is open for all Alaskan residents on all lands outside of the non-subsistence use areas within Alaska, unless restricted to qualified rural residents by federal law in applicable waters. Subsistence uses are defined as "noncommercial, customary and traditional uses of wild, renewable resources...for direct personal or family consumption as food, shelter, clothing, tools, or transportation, for the making and selling of handicraft articles out of non-edible by-products of fish and wildlife resources" taken for subsistence (AS 16.05.940.(32)). Fish caught for subsistence may be used for customary trade, barter and transportation - which include food for sled dogs.

The First Nation fishery is a constitutionally protected fishery in Canada for food, social and ceremonial purposes. In the Yukon Territory, the First Nation fishery involves delegates of Yukon First Nations who may give, trade, barter or sell salmon, but not for commercial purposes, caught in their aboriginal fisheries, amongst members of their respective First Nation, other Yukon First Nations or adjacent First Nations with transboundary agreements.

Historical data from 1990-1999 shows the average subsistence Chinook salmon fishery in Alaska harvests approximately 51,000 salmon a year and the First Nation Chinook fishery in the Yukon Territory harvests about 8,000 salmon - including the Vuntut Gwich'in First Nation fishery on the Porcupine River in the Old Crow area. Likewise, subsistence fall chum harvests in Alaska average 113,000 salmon, whereas the Yukon First Nation fall chum fishery, including Old Crow, harvests approximately 8,000 salmon.

### 14) WHAT IS CUSTOMARY TRADE AND BARTER?

In Alaska, customary trade is a term for limited, non-commercial, traditional cash exchange of subsistence-caught fish and wildlife. Both state and federal law recognize customary trade as a subsistence use. However, there are no specific regulatory provisions for customary trade in state law, except for herring roe on kelp in Southeast Alaska. According to Alaska state law, unless specifically allowed by the Alaska Board of Fisheries, customary trade is prohibited. In January 2003, the Federal Subsistence Board adopted new regulations clarifying limits on the customary trade of subsistence-caught fish, their parts and their eggs. The new regulations protect traditional practices of customary trade involving subsistence fish, but reduce the potential for commercial sale of those fish by prohibiting customary trade with any business and resale by non-rural residents. Customary trade transactions between rural residents may continue, but the sale of fish to others for their personal or family consumption is limited.

Customary barter means traditional exchange of a subsistence product for another product, commonly another subsistence product such as dried salmon for seal oil. No cash is involved in barter. This provision recognizes the long-term, traditional patterns of exchange of regional products that pre-date use of money in Alaska Native cultures.

In the Yukon Territory, the First Nations may give, trade, barter or sell salmon, but not for commercial purposes, caught in their aboriginal fisheries, amongst members of their respective First Nation, other Yukon First Nations or adjacent First Nations with transboundary agreements.

> "I THOUGHT OUR MINI-EPIC [ABOUT THE PROCESS LEADING TO THE YUKON RIVER SALMON AGREEMENT] HAD LOTS OF MELODRAMA: LATE NIGHT NEGOTIATING SESSIONS; HOT TEMPERS, ACCUSATIONS, YOU KNOW... NEGOTIATING UP AND DOWNS FEATURING BREAKDOWNS, RECONCILIATION AND HOPE."
> — STETSON TINKHAM, U.S. DEPARTMENT OF STATE

Exhibit 3
Page 33 of 48



### 15) WITHIN THE YUKON RIVER DRAINAGE, HOW MANY FISH ARE TAKEN FOR DOG FOOD PURPOSES?

Historically, dogs have been used for transportation and hauling throughout the Yukon River drainage. Subsistence-caught salmon, primarily chum salmon, was an important food for these dogs. Until 1930, and the introduction of the airplane, sled dogs were the primary means for transporting mail and supplies in the winter. The gradual decline of the use of sled dogs reduced the need for salmon as dog food. The introduction of snow machines in the 1960s led to the further decline of sled dog populations throughout the drainage. However, beginning in the early 1980s a renewed interest in the recreational use and racing of sled dogs led to an increase in the number of dogs located along the Yukon River, although keeping sled dogs was much more common in the upper Yukon area as opposed to the lower Yukon area. This revival of dog sledding led to an increase in the number of chum salmon needed for dog food.

In federal and Alaska State laws, Chinook salmon must be used primarily for human consumption, and are not to be targeted for dog food. However, whole fish unfit for human consumption (due to disease, deterioration or deformities), scraps, and Chinook salmon smaller than 16 inches may be fed to dogs. As stated in the U.S. Federal Subsistence Fisheries Management Regulations, whole Chinook salmon caught incidentally during a subsistence chum fishery after August 10 in Sub-district 5-D, upstream of the city of Circle and after July 10 in the Koyukuk River drainage may be fed to dogs. State of Alaska regulations also allow whole Chinook salmon caught incidentally during a subsistence chum fishery after July 20 in District 6 and the Tanana drainage to be used as dog food

*Courtesy of Andy Bassich*

Chum and coho salmon used to feed dogs are caught in Alaskan subsistence and commercial fisheries, depending on whether opportunity for the fishery is open. Commercially-related harvests for dog food typically meant chum salmon carcasses, left over from commercial roe harvests, were utilized. After harvesting, fall chum and coho salmon are commonly 'cribbed' or frozen by natural air temperature in wooden boxes or log cribs for use later in the winter.

The number of dogs within a household is considered a major factor affecting the amount of subsistence chum salmon a household produces. Within the Alaskan portion of the Yukon River drainage, between 1992 and 1997, the average 'dog food' harvest was estimated to be approximately 225,000 salmon (including summer chum, fall chum and coho salmon) to feed an average of 8,000 dogs. However, based on averages from 1998 to 2002, the 'dog food' harvest has been estimated to be approximately 55,000 salmon to feed an average of 6,800 dogs. The recent average (55,000 salmon) 'dog food' harvest had minimal impact on commercial chum salmon fisheries, since most of the years from 1998 to 2002 were closed to roe fisheries.

First Nation fisheries, within the Yukon Territory portion of the drainage, harvest on average less than 3,000 chum salmon on the main stem and less than 5,000 within the Porcupine system. Although it is legal to feed salmon to dogs, the majority use chum salmon for dog food purposes (social). In addition, some Yukon Territory commercial fishers retain some of their commercial chum catch for personal use – including food for dogs.

### 16) CAN THE YUKON TERRITORY HAVE A COMMERCIAL FISHERY IF ALASKA DOES NOT?

Canadian managers can open for commercial, domestic and recreational fisheries if in-season run projections are sufficient to achieve spawning escapement objectives and Yukon First Nation basic needs. Due to the challenges of managing in-season, Alaska may get more or less fish to the border than expected. If this is the case, in-season decisions to open or close the Yukon Territory commercial fishery are made regardless of openings or closures within the Alaskan commercial fishery. It is, therefore, possible to have a commercial fishery in the Yukon Territory even if the commercial fishery is closed in Alaska, and vice versa.

### 17) HOW MANY COMMERCIAL PERMIT HOLDERS ARE THERE AND HOW MANY FISH DO THEY TAKE?

Commercial fishing on the Yukon River in Alaska began as early as 1918, with most of it occurring in the lower portion of the river. Since that time, the number of participants and numbers of fish harvested annually has fluctuated as fish returns, availability of buyers, and subsistence harvest

Exhibit 3
Page 34 of 48

patterns have fluctuated. Establishment of the limited entry program in 1973 began the process of stabilizing the number of permitted participants in commercial fisheries throughout Alaska. Limited entry was implemented in the Yukon River commercial fisheries in 1976 by the Commercial Fisheries Entry Commission (CFEC). Limitations stabilized the number of permitted fishermen in the Yukon River fisheries, but, as in many fisheries, efficiency of the fleet has continued to increase with modern boats, motors, communication abilities, and nets.

Presently within the lower Yukon River in Alaska there are 704 gillnet commercial permits; in the upper Yukon area there are 72 gillnet permits and 161 fish wheel permits. Most of these permits are held by local Yukon River residents. Over the past three years, fewer fishermen have used their permits due to low salmon runs and poor market conditions. In 2003 only 559 out of 703 permits were fished in the lower river due to poor runs and conservative management actions. Under Alaska state management, the historical commercial harvests of Chinook salmon have ranged from 158,018 fish sold in 1981 to zero in 2001 (ten-year average [1994-2003] is approximately 77,500 salmon).

In the Yukon Territory, there are 29 commercial fishing permits, with 21 currently issued. The historical commercial harvests of Chinook salmon in the Yukon Territory have ranged from 13,027 fish sold in 1983 to zero in 2000 (ten-year average [1994-2003] approximately 4,693 salmon). However, as in Alaska, not all permit holders in the Yukon Territory participate annually in commercial fisheries.

The commercial fisheries in Alaska and the Yukon Territory were severely restricted or closed during 1998 through 2002, making the ten-year average (1993-2002) low compared to historical harvests. Further harvest details for all fisheries can be found in the reports published annually by the JTC.

## 18) WHAT IS THE HISTORY OF THE SALMON ROE FISHERY ON THE YUKON RIVER?

In Alaska during the 1970s, commercial harvests of summer chum salmon increased throughout the Yukon River drainage. Poor statewide salmon runs in the early 1970s prompted the development of a commercial summer chum salmon fishery for flesh in the middle part of the Yukon River (District 4). From 1974 to 1977 subsistence salmon roe sales were legal and; it is likely that this sale of subsistence-caught salmon roe increased the chum salmon catches to above-normal subsistence harvest levels. Regulations allowing the sale of subsistence-caught salmon roe were retracted in late 1977.



The sale of roe taken during open commercial salmon fishing periods by commercial fishers remained legal. During the early 1980s to the early 1990s, buyers and processors experienced limited markets for summer chum salmon because of the increased state-wide salmon harvests and the relatively poor quality of salmon flesh harvested from District 4. However, during this same time, the demand for high quality chum salmon roe increased.

Within Alaska, the middle-Yukon River area summer chum salmon roe was most desirable by foreign markets because of roe maturity at this point in the river. The roe market continued to expand and, in most cases, the value of summer chum salmon roe exceeded the value of the flesh. As roe value increased summer chum salmon roe replaced summer chum salmon flesh as the primary commercial fisheries product from this area.

Approximately 95% of the summer chum salmon roe harvested in the Yukon River drainage came from Fishing District 4. Relatively small quantities of salmon roe are commercially harvested from other salmon species, including Chinook, fall chum, and coho salmon in the upper Yukon River and the salmon flesh and roe are usually sold together or separately. Commercial roe fisheries targeting fall chum salmon within the Yukon Territory did occur, but only when a market opened and only when the salmon run was large enough to sustain a commercial fishery.

The decline of the roe fishery in the mid-1990s corresponded initially to a decrease in market demands, and was followed by poor returns of summer chum salmon runs. Currently, harvesting of salmon roe during a scheduled commercial fishery is legal in the Yukon River drainage. Small amounts of roe are processed in Alaska and the Yukon Territory, but poor markets have had a significant impact on the profitability of fishing for roe.

Exhibit 3
Page 35 of 48

> "Why is the Yukon River Salmon Agreement important? Two reasons: (1) it will serve to conserve and protect salmon fisheries in the region and (2) it serves as an important reaffirmation of certain principles our two governments [U.S. and Canada] advocate internationally: good governance and the rule of law."
>
> — Paula Dobriansky, Under Secretary of State for Global Affairs

### 19) What is *Ichthyophonus* and are infected fish safe for human consumption?

Recent studies have revealed that a consistent portion of Yukon River Chinook salmon have been infected by a protist parasite commonly referred to as *Ichthyophonus*. In advanced stages, *Ichthyophonus* degrades flesh conditions, may affect the survival of adult Chinook salmon and have potential marketing implications for commercial fisheries. Infected fish typically have a normal exterior appearance, but internally may have visually detectable spots on specific organs – such as the liver and heart. The visible white spots are not the *Ichthyophonus* organism itself, but an immune response from the fish. Many other pathological conditions can cause a similar immune response. Fish showing infected organs only can typically be used in commercial markets and are fine for human consumption. If the disease is further developed, off color streaks or nodules may be distributed throughout the flesh. Some fishers have noted infected flesh will not air dry properly and become somewhat translucent/greasy with an off orange color. They generally have an unpleasant odor described as "fruity". *Ichthyophonus* is a fish pathogen not reported to infect humans. Infected fish are safe for human consumption.

Initial detection in the Yukon River occurred in Alaska in 1988. Although not verified, anecdotal reports of salmon with similar-type conditions date back earlier. Sources of infection are still unknown, but likely sources include infected forage fish or zooplankton eaten by salmon while rearing in the Bering Sea and Pacific Ocean. Disparities of infection rates between observations by fishers and samples collected during sampling programs likely results from a number of factors: one being fishers are not trained to identify *Ichthyophonus* infections. Many infected salmon have subtle signs of infection that are often impossible to recognize with the naked eye, even to a trained parasitologist. Definitive diagnosis of infection must be done using laboratory techniques.

### 20) Are salmon infected with *Ichthyophonus* being found in the Yukon Territory?

Canadian fishers of the Yukon Territory have reported relatively low numbers of Chinook salmon with possible *Ichthyophonus* infections. However, relatively high prevalence rates of infection have been detected in samples obtained at the DFO fish wheels near the international border and in the Dawson City area. These documented infection rates have been around 30%. However, infection rates for salmon sampled further upriver at the Whitehorse Rapids Fishway have tended to be lower than the samples collected further downstream.

The difference in infection rates between sample sets collected near the international border (Dawson City area), and those collected further upstream at Whitehorse suggest that there could be pre-spawning mortality. Another hypothesis is infected fish are more susceptible to harvest and sampling in the mainstem because they travel close to shore. In addition, many of the fish sampled at Whitehorse that were infected by *Ichthyophonus* looked and behaved normally. Infected fish have been successfully held in isolated tanks and used for brood stock at the Whitehorse Rapids Fish Hatchery. There are no indications that spawning ability or viability of these fish is compromised. Research has documented that some salmon, which had successfully spawned, were also found to be infected with *Ichthyophonus*. More research will continue in the future regarding *Ichthyophonus*.



A salmon heart infected with *Ichthyophonus*. Notice the white spots distributed throughout the muscle.

Courtesy of DFO, Canada

Exhibit 3
Page 36 of 48

# YUKON RIVER SALMON AGREEMENT

DIPLOMATIC NOTES

Canadian Embassy
Washington, December 4, 2002
Note No. 0098

Excellency,

I have the honor to refer to the negotiations that have been underway since 1971 concerning a long term agreement for the conservation of salmon stocks originating in the Yukon River in Canada and to propose an Agreement between our two Governments comprised of the following elements:

1. Pursuant to Article XIII of the Pacific Salmon Treaty, done at Ottawa on 28 January 1985 (hereinafter the Treaty"), Annex I of the Treaty shall be amended as set out in Attachment A and Annex IV shall be amended by the addition of a new Chapter 8, as set out in Attachment B.
2. The following Articles of the Treaty shall not apply in relation to Annex IV, Chapter 8:
   (a) Article II, paragraphs 7, 8, 18, 19, and 20;
   (b) Article IV;
   (c) Article V;
   (d) Article VII; and
   (e) Article XIII, paragraph 2.
3. Further, with regard to Article XII of the Treaty, for matters related to the Yukon River, the Yukon River Panel shall substitute for the Commission.
4. A Yukon River Restoration and Enhancement Fund shall be established in accordance with the terms and conditions set out in Attachment C.
5. The obligations under this Agreement shall be subject to the obtaining of specific legislative authority from the United States Congress for the Yukon River Restoration and Enhancement Fund. Such Congressional action (i.e., authorization and appropriation) lies within the discretion of the U.S. Congress.
6. If in any year the United States does not make an annual contribution as required in Attachment C, until the United States makes such contribution for that year the Parties' obligations under this Agreement shall be suspended.
7. Each Government shall take the necessary steps to implement the obligations under this Agreement consistent with its national laws.
8. If the Treaty is terminated in accordance with Article XV(2) thereof,
   a) this Agreement shall be suspended and enter into force under the name "Yukon River Salmon Treaty" upon an exchange of diplomatic notes indicating that the necessary internal procedures of the Parties for the entry into force of the Yukon River Salmon Treaty have been completed;
   b) the functions of the Yukon River Panel shall be assumed by a new commission, the "Yukon River Salmon Commission", and the Yukon River Panel shall thereupon cease to exist;
   c) other provisions of the Treaty, to the extent they apply to the Yukon River, shall remain in effect as part of the Yukon River Salmon Treaty, mutatis mutandis; and
   d) our two Governments shall seek to agree on other measures necessary for the continuation and application of the Yukon River Salmon Treaty.
9. At the end of the third year following its entry into force, and at any time thereafter, either Government may give notice of its intention to terminate this Agreement. The Agreement shall terminate one year following such notification.
10. A French language text of the attachments to this Note shall be verified and agreed upon by October 31, 2001 through an exchange of diplomatic notes.

If the above proposal is acceptable to the Government of the United States of America, I have the honor to propose that this Note, with its attachments, which shall be equally authentic in English and French, and your Excellency's affirmative Note in reply shall constitute an Agreement between our two Governments which shall enter into force on the date of your Note in reply, and that pending entry into force, the Agreement shall be applied provisionally from March 29, 2001.

Accept, Excellency, the renewed assurances of my highest consideration.

Signed Robert G. Thibault

Minister of Fisheries and Oceans

Exhibit 3
Page 37 of 48

Department of State: Washington
December 4, 2002

Excellency:
I have the honor to acknowledge receipt of your note with attachments, which reads as follows:

Excellency,
I have the honor to refer to the negotiations that have been underway since 1971 concerning a long term agreement for the conservation of salmon stocks originating in the Yukon River in Canada and to propose an Agreement between our two Governments comprised of the following elements:

1. Pursuant to Article XIII of the Pacific Salmon Treaty, done at Ottawa on 28 January 1985 (hereinafter" the Treaty"), Annex I of the Treaty shall be amended as set out in Attachment A and Annex IV shall be amended by the addition of a new Chapter 8, as set out in Attachment B.
2. The following Articles of the Treaty shall not apply in relation to Annex IV, Chapter 8:
   (a) Article II, paragraphs 7, 8, 18, 19, and 20;
   (b) Article IV;
   (c) Article V;
   (d) Article VII; and
   (e) Article XIII, paragraph 2.
3. Further, with regard to Article XII of the Treaty, for matters related to the Yukon River, the Yukon River Panel shall substitute for the Commission.
4. A Yukon River Restoration and Enhancement Fund shall be established in accordance with the terms and conditions set out in Attachment C.
5. The obligations under this Agreement shall be subject to the obtaining of specific legislative authority from the United States Congress for the Yukon River Restoration and Enhancement Fund. Such Congressional action (i.e., authorization and appropriation) lies within the discretion of the U.S. Congress.
6. If in any year the United States does not make an annual contribution as required in Attachment C, until the United States makes such contribution for that year the Parties' obligations under this Agreement shall be suspended.
7. Each Government shall take the necessary steps to implement the obligations under this Agreement consistent with its national laws.
8. If the Treaty is terminated in accordance with Article XV(2) thereof,
   (a) this Agreement shall be suspended and enter into force under the name "Yukon River Salmon Treaty" upon an exchange of diplomatic notes indicating the necessary internal procedures of the Parties for the entry into force of the Yukon River Salmon Treaty have been completed;
   (b) the functions of the Yukon River Panel shall be assumed by a new commission, the "Yukon River Salmon Commission", and the Yukon River Panel shall thereupon cease to exist;
   (c) other provisions of the Treaty, to the extent they apply to the Yukon River, shall remain in effect as part of the Yukon River Salmon Treaty, mutatis mutandis; and
   (d) our two Governments shall seek to agree on other measures necessary for the continuation and application of the Yukon River Salmon Treaty.
9. At the end of the third year following its entry into force, and at any time thereafter, either Government may give notice of its intention to terminate this Agreement. The Agreement shall terminate one year following such notification.
10. French language text of the attachments to this Note shall be verified and agreed upon by October 31, 2001 through an exchange of diplomatic notes.

If the above proposal is acceptable to the Government of the United States of America, I have the honor to propose that this Note, with its attachments, which shall be equally authentic in English and French, and your Excellency's affirmative Note in reply shall constitute an Agreement between our two Governments which shall enter into force on the date of your Note in reply, and that pending entry into force, the Agreement shall be applied provisionally from March 29, 2001.

Accept, Excellency, the renewed assurances of my highest consideration."

I have the further honor to inform you that the Government of the United States of America accepts the proposal contained in Your Excellency's Note and to confirm that your Note, with its attachments, and this Note in reply shall constitute an Agreement between our two Governments, which shall enter into force on the date of this Note.
Accept, Excellency, the renewed assurances of my highest consideration.

Signed for the Secretary of State,



Paula Dobriansky

Exhibit 3
Page 38 of 48

ATTACHMENT A
Amendment to Annex I
of the Pacific Salmon Treaty
The Parties agree to add a new paragraph
(e) as follows:
The following panels shall be established pursuant to Article II, paragraph 18:
a. a Southern Panel for salmon originating in rivers with mouths situated south of Cape Caution, except as specified in sub-paragraph (b);
b. a Fraser River Panel for Fraser River sockeye and pink salmon harvested in the area specified in Annex II; and
c. a Northern Panel for salmon originating in rivers with mouths situated between Cape Caution and Cape Suckling;
d. a Transboundary Panel for salmon originating in the Alsek, Stikine and Taku River systems;
e. a Yukon River Panel for salmon originating in the Yukon River.

ATTACHMENT B
Amendment to Annex IV of the Pacific Salmon Treaty
The Parties agree to add a new Chapter 8. For purposes of this handbook Annex IV, Chapter 8 will be referred to as the Yukon River Salmon Agreement

ATTACHMENT C
Restoration and Enhancement Fund
For purposes of this handbook Attachment C will be referred to as the Restoration and Enhancement Fund.

## YUKON RIVER SALMON AGREEMENT
### YUKON RIVER
1. The Parties recognize:
(a) the uniqueness of the Yukon River and its salmon fisheries; having as their principal goal to rebuild and conserve stocks and provide benefits to the fisheries of both countries on this river system, which means the maintenance in both countries of viable fisheries on the Yukon River;
(b) that subsistence fisheries in Alaska have priority over other fisheries in Alaska;
(c) that aboriginal fisheries in Yukon have priority over other fisheries in Yukon;
(d) that salmon stocks originating from the Yukon River in Canada are harvested by fishers of both Canada and the United States and that effective conservation and management of these resources are of mutual interest; and
(e) that considerable work remains to be done to understand the composition of stocks in the various Yukon River fisheries and to develop effective management techniques based on precautionary management approaches.
Definitions
2. For the purpose of this Chapter,
(a) "Enhancement" means expanding a wild salmon stock beyond its natural production level;
(b) "Main stem Yukon River in Canada" means the Yukon River drainage in Canada, excluding the Porcupine River drainage;
(c) "Restoration" means returning a wild salmon stock to its natural production level;
(d) "Yukon" means the Yukon Territory of Canada;
(e) "Yukon River" means the entire Yukon River drainage in Canada and the United States; and
(f) "Yukon River in Canada" means the entire Yukon River drainage in Canada, including the Porcupine River drainage.
(g) "Total Allowable Catch (TAC)" means the total run size of each salmon stock less the agreed spawning escapement objective for that stock.
Application
3. This Chapter applies to salmon originating in the Yukon River.
General
4. Each Party shall designate its management entity responsible for the harvest of salmon referred to in paragraph 3.
5. The Parties shall seek to ensure effective conservation and management of stocks originating in the Yukon River.
6. When a fishery is managed under a guideline harvest range regime:
(a) the United States shall manage its fishery with a view to delivering to the Alaska-Yukon border the agreed spawning objective plus the midpoint of the Canadian guideline harvest range; and
(b) Canada shall manage its fishery within its guideline harvest range with a view to achieving the agreed spawning escapement objective. In years when the number of salmon reaching the Yukon River mainstream border exceeds the upper end of the Canadian guideline harvest range plus the upper end of the agreed spawning escapement objective, Canada may, subject to paragraph 18, utilize the surplus.
7. The respective management entities shall consult closely and where possible co-ordinate pre-season management planning and in-season responses to run assessments. If it is determined in-season that pre-season management measures agreed to by the Panel are insufficient to achieve agreed spawning escapement objectives, the management entities shall consider taking further conservation measures to meet the escapement objectives.
8. The harvest sharing arrangement for Canadian-origin Main stem Yukon River chum salmon shall be specified in Appendix 1, as amended from time to time by agreement of the Parties.
9. The harvest sharing arrangement for Canadian-origin Main stem Yukon River chinook salmon shall be specified in Appendix 2, as amended from time to time by agreement of the Parties.
10. Subject to budgetary limitations, the Parties shall seek to implement the fisheries research and management programs recommended by the Panel on the advice of the Joint Technical Committee (JTC) for coordinated management of Yukon River chum and chinook salmon stocks.
11. Notwithstanding paragraph 10, each Party shall seek to implement such research and management programs as may be required to implement this Agreement
12. The Parties shall maintain efforts to increase the in-river run of Yukon River origin salmon by reducing marine catches and by-catches of Yukon River salmon. They shall further identify, quantify and undertake efforts to reduce these catches and by-catches.

### YUKON RIVER PANEL
13. Subject to the approval of the Parties, the Yukon River Panel shall make such by-laws and procedural rules for itself as may be necessary for the exercise of its functions and the conduct of its meetings.
14. The Yukon River Panel shall make recommendations to the management entities concerning the conservation and coordinated management of salmon originating in the Yukon River in Canada
15. The respective management entities shall take into account the recommendations of the Yukon River Panel in the

Exhibit 3
Page 39 of 48