Heather R. Kendall-Miller (AK Bar # 9211084)
NATIVE AMERICAN RIGHTS FUND
420 L Street, Suite 505
Anchorage, Alaska 99501
(907) 276-0680

Attorneys for Katie John, *et.al*.


## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| KATIE JOHN, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, *et al.* | ) | No. 3:05-cv-00006-HRH |
| | ) | (Consolidated with |
| Defendants, | ) | 3:05-cv-0158-HRH) |
| | ) | |


PLAINTIFFS KATIE JOHN *et al's*

OPENING BRIEF

ON THE

"WHICH WATERS" ISSUE

# TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   STATEMENT OF MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    THE LEGAL AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . 3

      B.    THE CURRENT LITIGATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      C.    THE YUKON RIVER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            1.    Geography . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
            2.    Subsistence Uses of Fisheries on the Yukon River . . . . . . . . . . . . . . . 13
            3.    Yukon River Salmon Uses and Stocks . . . . . . . . . . . . . . . . . . . . . . . 15
            4.    The Life Cycle of the Yukon River Salmon . . . . . . . . . . . . . . . . . . . . 16
                  (a)    Upstream Migration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
                  (b)    Spawning and Egg Incubation. . . . . . . . . . . . . . . . . . . . . . . 17
                  (c)    Fry and Juvenile Rearing . . . . . . . . . . . . . . . . . . . . . . . . . . 18
                  (d)    Downstream Passage of Smolts and Juveniles . . . . . . . . . . . . 19
                  (e)    The Importance of Habitat Linkages to Harvest Areas . . . . . . . 19
            5.    Treaty Rights:  U.S.-Canada Treaty to Manage Yukon River
                  Salmon Stock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      D.    ALASKA NATIVE ALLOTMENTS SITUATED AT FISH SITES ON THE
            YUKON AND ITS TRIBUTARIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      A.    SCOPE OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      B.    LAW ON THE RESERVED WATER RIGHTS DOCTRINE . . . . . . . . . . . . . 25

      C.    FEDERALLY RESERVED WATER RIGHTS INCLUDE WATERS
            IN RIVERS RUNNING UPSTREAM AND DOWNSTREAM
            FROM ANILCA'S CSUs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

            1.    The Primary Purposes of the Conservation Units Created or
                  Expanded by ANILCA Require Water as a Biological Necessity
                  in Order to Fulfill the Purposes of the CSUs . . . . . . . . . . . . . . . . . . . 28

i

2.      The Reserved Water Rights Doctrine Requires a Reservation of Waters Upstream and Downstream from ANILCA's CSUs to Fulfill the Purposes of the CSUs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

      (a)      Federally Reserved Water is a Biological Necessity to Support All Life Stages of Fish and Without Which ANILCA's Purposes to Protect Fish, Fish Habitat, Subsistence Uses and International Treaty Obligations Would be Defeated . . . . . . . . 30

      (b)      Courts Have Recognized That Water is a Biological Necessity to Support All Life Stages of Fish That are Subject to the Subsistence Priority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

      (c)      Water is a Biological Necessity in Order to Fulfill International Treaty Obligations with Canada . . . . . . . . . . . . . . . . . . . . . . . . . . 41

3.      The Agency's Position Is Inconsistent with Supporting Authority and with the United States' Assertion Elsewhere of Off-reservation Water Rights in General Stream Adjudications . . . . . . . . . . . . . . . . . . . . 42

      (a)      The Agency Misinterpreted the Definition and Case Law Concerning Appurtenancy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

D.      NATIVE ALLOTMENTS POSSESS RESERVED WATER RIGHTS AS A MATTER OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

1.      The Administrative Record Shows That the Policy Group Arbitrarily Refused to Identify Reserved Waters Appurtenant to Native Allotments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

2.      A Reservation of Water Rights Is Necessary to Accomplish the Purposes for Which Congress Authorized Alaska Native Allotments . . . . . . . . . . 46

3.      Under the *Winters* Doctrine Federally Reserved Water Rights Extend to Off-reservation Public Domain Allotments . . . . . . . . . . . . . . . . . . . . . . . 51

4.      The Administrative Record Shows That the Policy Group Incorrectly Assumed That the Restriction on Alienation, Reserved by the United States, in Lands Allotted to Alaska Natives, Does Not Constitute a Federal Interest in Lands and Waters Within the Meaning of ANILCA § 102 . . 54

5.     Canons of Construction Favoring Indians and the Federal Trust Responsibility Compel the Conclusion That Federally Reserved Waters Attach to Alaska Native Allotments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

E.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

# TABLE OF AUTHORITIES

## CASES

*Adams Fruit Co. Inc. v. Barrett*, 494 U.S. 638 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Aguilar v. United States*, 474 F. Supp. 840 (D. Alaska 1979) . . . . . . . . . . . . . . . . . . . . . . . 49, 57

*Alaska v. Babbitt (John II)*, 72 F.2d 698 (9th Cir 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Amoco Production Co. v. Village of Gambell*, 480 U.S. 531 (1987) . . . . . . . . . . . . . . . . . . . 24, 29

*Arizona v. California*, 373 U.S. 546 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Arizona v. California*, 376 U.S. 340 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*ASARCO v. Environmental Protection Agency*, 616 F.2d 1153 (9th Cir. 1980) ) . . . . . . . . . . . 17

*Baccarat Fremont Developers, LLC v. U. S. Army Corps of Engineers*, 425 F.3d 1150 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Burgin v. Office of Pers. Mgmt.*, 120 F.3d 494 (4th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Cappaert v. United States*, 426 U.S. 128 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Cf. District Court, Water Division No. 1, State of Colorado*, No. W-8439-76 (W-8788-77) (Dec. 29, 1993, decree entered Oct. 12, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) . . . . . . . . . 23-25

*Colville Confederated Tribes v. Walton*, 647 F.2d 42 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . 51

*Comm'r of Internal Revenue v. Engle*, 464 U.S. 206 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Confederated Salish & Kootenai Tribes v. Clinch*, 992 P.2d 244 (Mont. 1999) . . . . . . . . . . . . 40

*County of Yakima v. Confederated Tribes & Bands of the Yakima Nation*, 502 U.S. 251 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 38, 56

*Cramer v. United States*, 261 U.S. 2199 (1923) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Davis v. Michigan Dept. of Treasury*, 489 U.S. 803 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Dept. of Ecology v. Yakima Reservation Irrigation District*, 121 Wash. 2d  257, 850 P.2d 1306 (Wash. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Earth Island Inst. v. Hogarth*, 494 F.3d 757 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) . . . . . . . . . . . . . . . . . . . . . 24

*Good Samaritan Hospital v. Shalala*, 508 U.S. 402 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Goodyear Atomic Corp. v. Miller*, 486 U.S. 174 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Heckman v. United States*, 224 U.S. 413 (1912) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Hoonah Indian Ass'n v. Morrison*, 170 F.3d 1223 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 25

*In re Adjudication of the Existing Rights to the Use of All the Water*, 55 P.3d 396 (Mont. 2002) 40

*In re the General Adjudication of Rights to the Use of Waters from the Snake River Basin Water System*, Civ. No. 39576 (Idaho 5th Dist. Ct.) . . . . . . . . . . . . . . . . . . . . . . . 43

*In the Matter of the Determination of the Rights to the Use of Surface Waters of the Yakima River Drainage Basin; Dept. of Ecology v. Acquavella,* Civ. No. 77-2-01484-5 (Wash. Super. Ct., Sept. 1, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 54

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Jicarilla Apache Tribe v. Fed. Energy Regulatory Comm'n*, 578 F.2d 289 (10th Cir. 1978) . . . 25

*John v. United States (Katie John I)*, Nos. A90-0484-CV, A92-0264-CV, 1994 WL 487830 (D. Alaska March 30, 1994) (unreported) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 4, 27

*John v. United States (Katie John III)*, 247 F.3d 1032 (9th Cir. 2001) (en banc) . . . . . . 1, 2, 5, 23

*Joint Board of Control of Flathead Irrigation Dist. v. United States*, 832 F.2d 1127 (9th Cir. 1987 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Kittitas Reclamation Dist. v. Sunnyside Valley Irr. Dist.,* 763 F.2d 1032 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 40, 42

*Kleppe v. New Mexico*, 426 U.S. 529 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*Magana-Pizano v. INS*, 200 F.3d 603 (9th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316 (1819) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Montana v. Blackfeet Tribe*, 471 U.S. 759 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S.Ct. 2518 (2007) . . . . . . . . . . . . . 24

*Olympic v. United States,* 615 F. Supp. 990 (D. Alaska 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Pence v. Kleppe,* 529 F.2d 135 (9th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Pyramid Lake Paiute v. Morton,* 354 F. Supp. 252 (D.D.C. 1953) . . . . . . . . . . . . . . . . . . . . . . 57

*Seminole Nation v. United States*, 316 U.S. 286 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Sierra Club v. Lyng,* 661 F. Supp 1490 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Skeem v. United States,* 273 F. 93 (9th Cir. 1921) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Sohappy v. Smith,* 302 F.Supp. 899 (D.Or. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*State ex rel. Greely v. Confederated Salish and Kootenai Tribes of the Flathead Reservation,*
    712 P.2d 754 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Texas Gas Transmission Corp. v. Shell Oil Co.,* 363 U.S. 263 (1960) . . . . . . . . . . . . . . . . . . . . 25

*United States v. Adair,* 723 F.2d 1394 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 37, 44

*United States v. Alaska,* 423 F.2d 764 (9th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Alexander,* 938 F.2d 942 (9th Cir. 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Anderson,* 591 F. Supp. 1 (E.D. Wash.1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Anderson*, 736 F.2d 1358 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Bowling,* 256 U.S. 484 (1921) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. City & County of Denver,* 656 P.2d 1 (Colo. 1982) . . . . . . . . . . . . . . . . . . . . . 42

*United States v. City of Tacoma,* 332 F.3d 574 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 55

*United States v. Cappaert,* 375 F. Supp. 456 (D. Nev. 1974) . . . . . . . . . . . . . . . . . . . . . . 36,37

*United States v. Cappaert,* 508 F.2d 313 (9th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States ex rel Ray v. Hibner,* 27 F.2d 909 (D. Idaho 1928) . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. New Mexico,* 438 U.S. 696 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Newmont USA Ltd.,* No. CV-05-020-JLQ (E.D. Wash. Aug. 21) . . . . . . . . . . 55

*United States v. Powers,* 305 U.S. 527 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Ramsey,* 271 U.S. 467 (1926) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Washington,* No. CV 9213RSM (Order on Cross-Motion for Summary
Judgment, Aug. 29, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Weyerhaeuser Co.,* 765 F. Supp. 643 (D. Or. 1991) . . . . . . . . . . . . . . . . . 57, 58

*United States v. Winans,* 198 U.S. 371 (1905) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Village of Gambell v. Clark,* 746 F.2d 572 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Winters v. United States,* 207 U.S. 564 (1908) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## STATUTES AND LEGISLATIVE MATERIAL

Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Alaska National Interest Lands Conservation Act, P.L. 96-487, 94 Stat. 2371 (Dec. 2, 1980)
        § 101; 16 U.S.C. § 3101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3. 28
        § 102; 16 U.S.C. § 3102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
        §§ 201-202; 16 U.S.C. § 410hh - 410hh-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 29
        §§ 301-303; 16 U.S.C. § 668dd . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
        § 302(3)(B)(i)-(iv); 16 U.S.C. § 668dd . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        § 302(5)(B)(i)-(iv); 16 U.S.C. § 668dd . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        § 302(6)(B)(i)-(iv); 16 U.S.C. § 668dd . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        § 302(9)(B)(i)-(iv); 16 U.S.C. § 668dd . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        § 303(7)(B)(i)-(iv); 16 U.S.C. § 668dd . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        § 801(1); 16 U.S.C. § 3111(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4
        § 801(4); 16 U.S.C. § 3111(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        § 802; 16 U.S.C. § 3112 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        § 803; 16 U.S.C. § 3113 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

§ 804; 6 U.S.C. § 3114 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
§ 801-814 ;16 U.S.C. §§ 3111-3126. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
§ 905(a)(1); 43 U.S.C. § 1634(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

16 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

16 U.S.C. § 3632. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

16 U.S.C. § 5701- 5727 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

64 Fed. Reg. 1275 (Jan. 8, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

25 C.F.R. § 152.17–35 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

43 C.F.R. § 2561.0-2 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

43 C.F.R. § 2561.0-5(a) (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

43 C.F.R. § 2561.2 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Alaska Native Allotment Act, 43 U.S.C. § 270 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

H.R. REP. NO. 59-3295 (1906) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Indian General Allotment Act, 25 U.S.C. § 331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 49

S. DOC. NO. 59-101 (1905) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

S. DOC. NO. 58-106 (1905) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

U.S. Const., art. I, § 8 (Commerce Clause) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

U.S. Const., art. I, § 3 (Property Clause) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 36

Yukon River Salmon Act of 2000, 16 U.S.C. §§ 5701- 5727 . . . . . . . . . . . . . . . . . . . . . 53

## OTHER AUTHORITIES

A.D. TARLOCK, LAW OF WATER RIGHTS AND RESOURCES (Thomson/West 2007) . . . . . . . . . . 27

*Alaska Subsistence Salmon Fisheries 2004 Annual Report* at 37, TECH. PAPER NO. 317 . . *passim*

*Black's Law Dictionary* 103 (6th ed. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Bureau of Land Management, *Federal Water Rights of the National Park Service*, 86 I.D. 553 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 27

F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW at 1039- 40 (2005 ed.) . . . . . . . . . . . . . . 52, 57

Federal "Non-Reserved" Water Rights, 6 Op. Off. Legal Counsel 328 (1982) . . . . . . . . 26, 30, 41

 G. COGGINS & R. GLICKMAN, PUBLIC NATURAL RESOURCES LAW, 2 Pub. Nat. Resources L. § 10D:6 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

DAVID GETCHES, WATER LAW IN A NUTSHELL, 324 (2nd ed. 1990) . . . . . . . . . . . . . . . . . . . . . . 44

John Leshy, *Water Rights for New Federal Land Conservation Programs: A Turn-Of-The Century Evaluation*, 4 U. DENV. WATER L. REV. 271 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Robert T. Anderson, *Indian Water Rights and the Federal Trust Responsibility*, 46 NAT. RESOURCES J. 399 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Robert Wolfe, *Myths: What Have You Heard?*, 21 ALASKA FISH & GAME 17 (Nov.-Dec. 1989) 50

Yukon River Drainage Fisheries Ass'n & Yukon River Panel, *Yukon River Salmon Agreement Handbook* 16 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Water Rights for Indian Allotments on Ceded Land & Public Domain, 2 Op. Solicitor Dep't. Interior 1688 (1979) (written on Aug. 19, 1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

I.      INTRODUCTION

This case brings this Court back to ANILCA's core "where" issue, first addressed thirteen

years ago in the original *Katie John* litigation.[1]  In that litigation the Court of Appeals held that

"the definition of public lands [appearing in 16 U.S.C. § 3102(3) of ANILCA] includes those

navigable waters in which the United States has an interest by virtue of the reserved water rights

doctrine."  *Alaska v. Babbitt (Katie John II)*, 72 F.3d 698, 703-4 (9th  Cir. 1995).  The Circuit

panel rejected the State's contrary position because it "undermined congressional intent to protect

and provide the opportunity for subsistence fishing."  *Id.* at 704.  The State's position (later also

rejected by an en banc panel)–that ANILCA's subsistence regime did not include any navigable

waters–was first rejected by this Court because it "thwarted Congress' intent to provide the

opportunity for rural residents engaged in a subsistence way of life to continue to do so."  *John

v. United States (Katie John I)*, Nos. A90-0484-CV, A92-0264-CV, 1994 WL 487830 at *18 (D.

Alaska March 30, 1994) (unreported).  The Circuit then instructed the Secretaries to "identify [ ]

those waters" where the federal government holds reserved waters under the "reserved water

rights doctrine."  *Katie John II*, 72 F.3d at 704.  This, the Secretaries have failed to do, because

they have failed to include all federal waters reserved as a matter of law.

The Secretaries have failed to identify all those waters in which the United States holds

reserved water rights.  Instead, and without meaningful explanation, the Secretaries have

excluded all reserved waters appurtenant to federally protected Alaska Native allotments issued

---

[1] *John v. United States (Katie John I)*, Nos. A90-0484-CV, A92-0264-CV, 1994 WL
487830 (D. Alaska March 30, 1994) (unreported); *Alaska v. Babbitt (Katie John II)*, 72 F.3d 698
(9th Cir. 1995); *John v. United States (Katie John III)*, 247 F.3d 1032 (9th Cir. 2001) (en banc).

under the Alaska Native Allotment Act,[2] and they have also excluded all federally reserved

waters in rivers running upstream and downstream from ANILCA's Conservation System Units

(CSUs).[3]  The Secretaries have excluded these waters in direct contravention of well-established

common law principles defining the reserved water rights doctrine.  By their failure, the

Secretaries have "thwarted Congress' intent" to protect subsistence fishing in vast areas of

Alaska, directly contrary to this Court's mandate in *Katie John*.  Although the reserved water

rights doctrine may admittedly be imperfect and "inadequate to achieve the express congressional

purpose of protecting and preserving traditional subsistence fishing,"  *John v. United States

(Katie John III)*, 247 F.3d 1032, 1034 (9th  Cir. 2001) (en banc) (Tallman, Tashima, W. Fletcher,

J.J., concurring), it is an even greater affront to Congress' purpose to arbitrarily cut back further

on that doctrine–as the Secretaries here have done.

Plaintiffs thus seek a ruling that the Secretaries' actions are contrary to law and an order

directing the Secretaries, upon remand, to identify all remaining reserved waters that constitute

"public lands" under ANILCA.  As this Court noted thirteen years ago:

> Through Title VIII of ANILCA, Congress addressed the important question of
> how <u>all public lands, and not just those in various managements systems,</u> should
> be used.  More particularly, Title VIII embodied a congressional decision that
> those who chose to should have a right to continue to live off the land and to hunt
> and fish at will for sustenance.

---

[2] Act of May 17, 1906, ch. 2469, § 1, 34 Stat. 197 (amended by Act of August 2, 1956,
ch. 891, § 1(a)-(e), 70 Stat. 954, repealed by Pub. L. No. 92-203, § 18(a), 85 Stat. 710 (1971);
formerly codified at 43 U.S.C. § 270-1 to 270-3, transferred from 48 U.S.C. §§ 357-357b).

[3] CSUs include National Parks, Preserves, Monuments, Wildlife Refuges, Wild and
Scenic Rivers, National Recreation Areas and National Forests.

*Katie John I,* 1994 WL 487830 at *1-2. This action seeks an order compelling the Secretaries to keep faith with that decision by properly identifying all reserved waters.

## II.      STATEMENT OF MATERIAL FACTS

### A.      THE LEGAL AND PROCEDURAL BACKGROUND

In 1980 Congress enacted the Alaska National Interests Lands Conservation Act (ANILCA).[4] In Title VIII of that Act Congress invoked its "constitutional authority over Native Affairs" to "fulfill the policies and purposes of the Alaska Native Claims Settlement Act and as a matter of equity" in order to "protect and provide the opportunity for continued subsistence uses on the public lands" in Alaska. § 801(4).[5] Congress prefaced ANILCA's principle subsistence provisions with a declaration that "the continuation of the opportunity for subsistence uses . . . is essential to Native physical, traditional and cultural existence." § 801(1).[6] To achieve that end, Congress provided that "the taking on public lands of fish and wildlife for non-wasteful subsistence uses shall be accorded priority over the taking on such lands of fish and wildlife for other purposes. § 804.[7] The subsistence preference was made applicable to all public lands, defined as "lands, water, and interests therein," the "title to which is in the United States." § 102(1)-(2).[8]

_____

[4] Pub. L. No. 96-487, 94 Stat. 2371-2551 (1981), (codified at 16 U.S.C. §§ 3101-3233 (2000)).

[5] 94 Stat. at 2422, 16 U.S.C. § 3111(4).

[6] 94 Stat. at 2422, 16 U.S.C. § 3111(1).

[7] 94 Stat. at 2423, 16 U.S.C. § 3114.

[8] 94 Stat. at 2375, 16 U.S.C. § 3102(1)-(2).

In *Katie John I* the plaintiffs argued that the term "public lands" in ANILCA § 102 included all waters in which the United States has an interest by virtue of the reserved water rights doctrine and the navigational servitude. After reviewing the statute and applying the Supreme Court's *Cappaert* analysis,[9] this Court concluded "it is clear that an unquantified amount of water appurtenant to the park [Wrangell-St. Elias National] was reserved [by Congress] for the purpose of providing rural Alaskans with the opportunity to pursue their subsistence rights under Title VIII." *Katie John I*, 1994 WL 487830 at *14.[10] Although the Court did not reject the notion that the reserved water rights doctrine had some application—"or that it could be of primary importance in a subsistence case in some other location in Alaska"—this Court concluded that the geographic scope of Title VIII was better determined by reference to the government's navigational servitude, "as being more compatible with the findings[11] and policies[12] of Title VIII." *Id*. at *14.

On appeal the Ninth Circuit agreed that:

> ANILCA's language and legislative history indicate clearly that Congress spoke to the precise issue of whether *some* navigable waters may be public lands. They clearly indicate that subsistence uses include subsistence fishing. *See, e.g.*, 16 U.S.C. § 3113. And subsistence fishing has traditionally taken place in navigable waters. Thus, we have no doubt that Congress intended that public lands include at least some navigable waters.

---

[9]  *Cappaert v. United States*, 426 U.S. 128, 141 (1976).

[10] The State did not dispute the existence of reserved water rights and is thus bound by that adjudication. *Id.* at 13.

[11] *Citing* ANILCA § 801, 16 U.S.C. § 3111.

[12] *Citing* ANILCA § 802, 16 U.S.C. § 3112.

*Katie John II*, 72 F.3d at 702 (emphasis added).  Although the Circuit disagreed with this Court that Congress intended to regulate subsistence fishing in all <u>navigable</u> waters (by virtue of the navigational servitude), the Circuit concluded that Congress intended the term "public lands" nonetheless to include all those navigable waters in which the government holds federally reserved water rights.  *Id.* at 704; *see also Katie John III*, 247 F.3d at 1032 (en banc) (per curiam affirmance of prior panel decision.).  The case was then remanded to the agencies with instructions to "identify[] those waters" where the federal government holds reserved waters under the "reserved water rights doctrine." *Katie John II*, 72 F.3d at 704.

The Secretaries issued final regulations on January 8, 1999.  64 Fed. Reg. 1275 (Jan. 8, 1999).[13]  Those regulations excluded waters upstream and downstream from the CSUs and waters appurtenant to Native allotments.  Employing an upside down and incomplete analysis, the agencies reasoned that, because the Ninth Circuit rejected the more expansive "all navigable waters" interpretation of "public lands," the Ninth Circuit must have *sub silencio* intended "public lands" to mean something less than all federally reserved waters associated with particular CSUs.[14] But nowhere did the Circuit even limit, much less hold, that "public lands" as defined by Congress means something less than <u>all</u> federal interests in <u>all</u> waters reserved as necessary to fulfill the subsistence and conservation purposes of ANILCA's CSUs.  The Ninth Circuit's reference to "some" waters was plainly a reference to fewer than <u>all</u> navigable waters, not fewer than all federally reserved waters.  The Secretaries are thus not at liberty to pick and

---

[13]  Reproduced in Admin. Rec. Tab 413 at 10126.

[14]  *See* Memorandum from Reg'l Solicitor Lauri Adams to Solicitor John Leshy 6-7 (Aug. 9, 1995) (attached as Exhibit 1).

choose *some* federally reserved waters that Congress intended to cover, while overlooking others. As this Circuit has held, Congress in ANILCA already made that decision for the Secretary. Thus, application of the reserved rights doctrine is a straight forward question of law.

In their final regulations the Secretaries also excluded waters appurtenant to Native allotments that lie outside the CSUs.  64 Fed. Reg. at 1279.[15]  The Secretaries' rationale was that, despite the Ninth Circuit's clear instruction to identify all federally reserved waters, "[t]he Ninth Circuit's *Katie John* decision does not require the Department address the Native allotment question at this time;" twelve years later this non-decision has become the Secretaries' position.[16] As discussed *infra* in Part IV. A-E, the exclusion of reserved waters appurtenant to Native allotments is unlawful.

B.      THE CURRENT LITIGATION

The history of this litigation is set out in the Court's ruling on the "what process" issue, and is thus not repeated here.  Dkt. No. 110 at 1-12.  In that decision, this Court sustained the Secretaries' procedures but did not address the substance of the regulations.

C.      THE YUKON RIVER

In this Court's briefing order, the parties were asked to place their claims in a factual context by reference to one or more specific "test case waterways."  Dkt. No. 130 at 10.  In response, Plaintiffs Katie John, *et al*., have chosen the Yukon River to illustrate why upstream and downstream waters are necessary to fulfill the congressional purposes for which the CSUs

---

[15]  Reproduced at Admin. Rec. Tab 413 at 10130.

[16]  *See* Memorandum from Reg'l Solicitor Laurie Adams to Solicitor John Leshy at 6 (Aug. 9, 1995) (attached as Exhibit 1).

along the Yukon River were set aside.  In presenting their legal arguments, Plaintiffs have

focused on facts relevant to the congressional purposes for which the CSUs along the Yukon

River were set aside.  These facts establish that salmon populations inherently require a wide

array of habitat types to complete their life cycle, habitat that in the case of the Yukon River

Basin, extend well beyond the boundaries of a specific CSU.

The Yukon River flows through or adjacent to one National Preserve (Yukon Charley)

and five National Wildlife Refuges (Yukon Flats, Nowitna, Koyukuk, Innoko and Yukon Delta),

all created by ANILCA.[17]  <u>All</u> of these CSUs has among its express primary purposes the

protection of habitat for, and populations of, fish and wildlife–usually specifically including

salmon–as well as for waterfowl and other migratory birds.  <u>All</u> of these CSUs also include as a

<u>primary</u> purpose the protection of "the viability of subsistence resources."[18]  These primary

---

[17] *See* Map (attached as Exhibit 2).  U.S. Geological Survey.  Alaska National Interest
Lands Conservation Act, Alaska, December 2, 1980, P.L. 96-487 [map]. 1:2 500 000.  Interior-
Geological Survey.  (Virginia: USGS, 1996).

[18] ANILCA §§ 301-303.  For instance, with respect to the Yukon Flats National Wildlife
Refuge Congress provided that:

> (B) The purposes for which the Yukon Flats National Wildlife Refuge is
> established and shall be managed include -
>     (i) <u>to conserve fish and wildlife populations and habitats</u> in their natural diversity
> including, but not limited to, canvas-backs and other migratory birds, Dall sheep,
> bears, moose, wolves, wolverines and other furbearers, caribou (including
> participation in coordinated ecological studies and management of the Porcupine
> and Fortymile caribou herds) and <u>salmon</u>;
>     (ii) to fulfill the international treaty obligations of the United States with respect
> to fish and wildlife and their habitats;
>     (iii) <u>to provide, in a manner consistent with the purposes set forth in
> subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local
> residents; and</u>
>     (iv) to ensure, to the maximum extent practicable and in a manner consistent

purposes all have a common denominator: each purpose demands water as a biological necessity in order to be fulfilled.  Put differently, without water none of these primary purposes can be met.  These express statements of purpose require recognition of reserved water rights throughout the length of the Yukon River.[19]

      1.   <u>Geography</u>.

The Yukon River, the largest river in Alaska and one of the longest in Canada, is fed by nine major rivers and countless tributaries.  Yukon River Drainage Fisheries Ass'n & Yukon River Panel, *Yukon River Salmon Agreement Handbook* 16 (2005) [hereinafter "Handbook"] (attached as Exhibit 3).  It drains approximately thirty-five percent of Alaska (205,000 square miles).  Admin. Rec. Tab 132 at 3121.  The river originates in British Columbia and flows over 2,300 miles to its mouth on the Bering Sea.

The Yukon-Charley Rivers National Preserve[20] is located on the U.S.-Canadian border in the Upper Yukon Region and contains approximately 1,713,00 acres of public lands.  The

---

with the purposes set forth in paragraph (i) water quality and necessary water quantity within the refuge.

ANILCA § 302(9)(B)(i)-(iv), 94 Stat. at 2388, 16 U.S.C. § 668dd note <u>(emphasis added)</u>.

[19] As discussed in more detail, *infra* in Part III.D, these purpose statements constitute express reservations of water as a matter of federal law.  *See* Fish and Wildlife Service, Bureau of Reclamation and the Bureau of Land Management, *Federal Water Rights of the National Park Service*, 86 I.D. 553, 573 (1979) (reproduced in Admin. Rec. Tab 129 at 2247).

[20]  The purposes for which the Yukon-Charley Rivers National Preserve shall be managed include: "To maintain the environmental integrity of the entire Charley River basin, including streams, lakes and other natural features, in its undeveloped natural condition for public benefit and scientific study; <u>to protect habitat for, and populations of, fish</u> and wildlife . . . ."  ANILCA § 201(10), 94 Stat. at 2381-2382, 16 U.S.C. § 410hh.

preserve includes nearly 160 miles of the Yukon River between the communities of Eagle and Circle and the entire Charley River drainage system.[21]

After passing through the Upper Yukon Valley, the Yukon River spreads out through the Yukon Flats for some 200 miles.  The river is at its widest in this area, spanning anywhere from ten to twenty miles, with endless sandbars and islands.  In this region, the Yukon River mainstem is joined by the Porcupine and Chandalar Rivers.  The Yukon Flats National Wildlife Refuge[22] is located in this area of eastern interior Alaska and consists of  approximately 8,630,000 acres of public land.[23]  Residents of seven villages located within or near this refuge use Yukon Flats resources for subsistence: Beaver, Birch Creek, Chalkyitsik, Circle, Fort Yukon, Stevens Village, and Venetie.[24]

The Lower Yukon River Region runs from Rampart to the coast and covers nearly 800 miles.  In this region the main stem of the Lower Yukon is joined by the Koyukuk, Nulato, Nowitna, Anvik, Innoko and Andreafski Rivers, plus countless smaller tributaries.  *Id.*  The River flows through many channels within this large wetland area and finally emerges into the Bering Sea through three major mouths.  *Id.*  There are four National Wildlife Refuges in the Lower Yukon Region.  The first is the Nowitna National Wildlife Refuge consisting of approximately

---

[21]  *See* Map of Yukon-Charley Rivers National Preserve (attached as Exhibit 4).

[22]  For the purposes for which the Yukon Flats National Wildlife Refuge are established, *see supra* at n.18.

[23]  *See* Map of Yukon Flats National Wildlife Refuge (attached as Exhibit 5).

[24]  Yukon Flats National Wildlife Refuge, http://yukonflats.fws.gov/culture.htm (last visited on October 9, 2007).

1,560,000 acres of public lands.[25]  In this region lie eight Native villages: Galena, Tanana, Ruby,

Koyukuk, Nulato, Kaltag, Huslia and Hughes.  (Of these, only the village of Tanana is located on

a stretch of the River that lies outside a CSU.  Under the Secretaries' Final Regulation, Tanana

residents are excluded from Title VIII's federal priority for subsistence fisheries).

---

[25] With respect to the Nowitna National Wildlife Refuge Congress provided that:

(B) The purposes for which the Yukon National Wildlife Refuge is
established and shall be managed include -
    (i) to conserve fish and wildlife populations and habitats in their natural
diversity including, but not limited to, trumpeter swans, white-fronted geese,
canvasbacks and other waterfowl and migratory birds, moose, caribou,
martens, wolverines and other furbearers, salmon, sheefish, and northern
pike;
    (ii) to fulfill the international treaty obligations of the United States with
respect to fish and wildlife and their habitats;
    (iii) to provide, in a manner consistent with the purposes set forth in
subparagraphs (i) and (ii), the opportunity for continued subsistence uses by
local residents; and
    (iv) to ensure, to the maximum extent practicable and in a manner
consistent with the purposes set forth in paragraph (i), water quality and
necessary water quantity within the refuge.

ANILCA § 302(6)(B)(i)-(iv), 94 Stat. at 2387, 16 U.S.C. § 668dd note (emphasis added).  *See
also* Map of Nowitna National Wildlife Refuge (attached as Exhibit 6).

The Koyukuk National Wildlife Refuge is also in the Lower Yukon Region.[26]   The Refuge consists of approximately 3,550,000 acres of public lands and is bisected by the Koyukuk River, the third largest river in Alaska.[27]   Within the Refuge's boundaries are some 15,000 lakes and over 5,500 miles of rivers and streams.[28]

---

[26] With respect to the Koyukuk National Wildlife Refuge Congress provided that:

(B) The purposes for which the Koyukuk National Wildlife Refuge is established and shall be managed include -
 (i) to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, waterfowl and other migratory birds, moose, caribou, (including participation in coordinated ecological studies and management of the Western Arctic caribou herd), furbearers and salmon;
 (ii) to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;
  (iii) to provide, in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents; and
 (iv) to ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i) water quality and necessary water quantity within the refuge.

ANILCA § 302(5)(B)(i)-(iv), 94 Stat. at 2386, 16 U.S.C. § 668dd note (emphasis added).  *See also* Map of Koyukuk National Wildlife Refuge (attached as Exhibit 7).

[27] Koyukuk National Wildlife Refuge, http://koyukuk.fws.gov/establish.htm (last visited on October 9, 2007).

[28] Koyukuk National Wildlife Refuges, http://koyukuk.fws.gov/ (last visited on October 9, 2007).

The Innoko National Wildlife Refuge is the third refuge in the Lower Yukon Region.[29]    It consists of approximately 3,850,000 acres of public lands.  The Innoko Refuge provides a vast area of wetlands that are crucial for waterfowl nesting, resting, staging and molting.[30]  The Northern Unit of the Refuge is located adjacent to the Yukon River southwest of Galena.  The Unit's primary users are the residents of the Native villages of Galena, Koyukuk, Nulato and Kaltag.

The fourth and final refuge in the Lower Yukon Region is the Yukon Delta National Wildlife Refuge.[31]  This Refuge consists of approximately 19,200,000 acres of public lands.  The

---

[29] With respect to the Innoko National Wildlife Refuge Congress provided that:

(B) The purposes for which the Innoko National Wildlife Refuge is established and shall be managed include -
   (i) to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, waterfowl peregrine falcons, other migratory birds, black bear, moose, furbearers, and other mammals and salmon;
   (ii) to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;
   (iii) to provide, in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents; and
   (iv) to ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i) water quality and necessary water quantity within the refuge.

ANILCA § 302(3)(B)(i)-(iv), 94 Stat. at 2386, 16 U.S.C. § 668dd note emphasis added.  *See also* Map of Innoko National Wildlife Refuge (attached as Exhibit 8).

[30] Innoko National Wildlife Refuge, http://innoko.fws.gov/history.htm (last visited on October 9, 2007).

[31] With respect to the Yukon Delta National Wildlife Refuge Congress provided that:

(B) The purposes for which the Yukon Delta National Wildlife Refuge is established and shall be managed include -
   (i) to conserve fish and wildlife populations and habitats in their natural

Refuge encompasses one of the largest river deltas in the world, a delta that contains both the Yukon River and the Kuskokwim River, as well as innumerable lakes and ponds.[32]  The Refuge serves as home to over 24,000 people, mostly Yup'ik Eskimos who live in thirty-five Native villages situated throughout the Refuge.[33]

    2.    <u>Subsistence Uses of Fisheries on the Yukon River</u>.

Residents of the Yukon River drainage have long relied upon fish for food and other subsistence uses.  While non-salmon species provide an important component of the overall harvest, salmon comprises the bulk of the fish harvested for subsistence.[34]  Chinook, summer chum, fall chum, and coho salmon comprise the majority of the subsistence salmon harvests in the Yukon River drainage.[35]  Unlike many marine and coastal fisheries where commercial

---

diversity including, but not limited to, shorebirds, seabirds, whistling swans, emperor, white-fronted and Canada geese, black brant and other migratory birds, <u>salmon</u>, muskox, and marine mammals;
  (ii) <u>to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;</u>
  (iii) <u>to provide, in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents; and</u>
  (iv) to ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i) water quality and necessary water quantity within the refuge.

ANILCA § 303(7)(B)(i)-(iv), 94 Stat. at  2392, 16 U.S.C. § 668dd note <u>emphasis added</u>.  *See also* Map of Yukon Delta National Wildlife Refuge (attached as Exhibit 9).

[32] Yukon Delta National Wildlife Refuge, http://yukondelta.fws.gov/history.htm (last visited on October 9, 2007).

[33] *Id.*

[34] Andersen Aff. at 9 (attached as Exhibit 10).

[35] *Id.* at 3.

harvests predominate, within the Yukon drainage subsistence salmon harvests generally exceed commercial, sport and personal use harvests combined.[36]

The Yukon River is the largest provider of native chinook and chum salmon in North America. Admin. Rec. Tab 132 at 3121. "The fishery resources are the cornerstone to the indigenous peoples of the Yukon and others." *Id*. Over sixty Alaskan villages, most of them economically depressed, depend heavily upon Yukon River salmon resources, both for their nutritional survival and as a source of cash. *Id*. Unemployment generally exceeds sixty percent in these villages, and commercial fishing provides a vital source of income, both to the fisherman and through fish processing jobs. *Id*. This cash income, in turn, is essential for conducting subsistence activities and is used to purchase boats, gas, nets, and related gear. In these mixed subsistence-cash economies, subsistence fishing, hunting and gathering provides a major part of the local food supply. *Id.*

Annual harvests of subsistence resources average 800-1,000 pounds per person for most Yukon River villages. Chum salmon are particularly important along the Yukon, both for human consumption and for dog food, and along the river subsistence chum salmon harvests are the highest in the state (averaging 200 to 600 pounds per person annually). Admin. Rec. Tab 22 at 535; Tab 132 at 3121.

Approximately 1,300 households (nearly half of all Yukon River households) annually harvest an average of 408,000 subsistence salmon in the Yukon River drainage, Admin. Rec. Tab 132 at 3123, and nearly all households share their catches with others. *Id*. Unlike the

---

[36] *Alaska Subsistence Salmon Fisheries 2004 Annual Report*, TECH. PAPER NO. 317, 37 (2004).

commercial fishery, over two-thirds of the subsistence harvest occurs in the upper River.  *Id.*;

Admin. Rec. Tab 22 at 537.  Gear types used for subsistence harvests include 700 set nets, 400

drift nets and 200 fish wheels.  *Id.*

The longest standing fishery throughout the Yukon River drainage in Canada is the First

Nation fishery (also referred to as an aboriginal fishery).  This fishery is only open to designates

of Yukon First Nations.  Once spawning escapements are met, priority (in terms of allocation) is

given to the First Nations fishery to address food, social and ceremonial needs.  First Nations

fisheries are widespread throughout the Yukon River drainage in Canada.  "Handbook," *supra*

at 22.

Like Alaska Native subsistence users, most First Nations fishers have a fish camp where

one or more families will fish together.   First Nations fishers usually begin fishing for chinook

salmon in early to mid-July and continue until their needs are met.  Fishing for chum in the upper

Yukon River usually begins in August and is completed by mid-October.  *Id.*  However, on the

Porcupine River, the fishery often continues operating through November with netting for chum

and coho salmon frequently occurring through the ice.  *Id.*

3.    <u>Yukon River Salmon Uses and Stocks</u>.

There are eight uniquely different fisheries along the Yukon River, two of which have

priority over all other fisheries, subsistence fisheries in Alaska and First Nations fisheries in the

Yukon Territory.  "Handbook," *supra* at 20.  Other consumptive uses of the resource, such as

commercial uses, personal uses and sport fisheries in Alaska, together with domestic,

sport/recreational and commercial fisheries in the Yukon Territory, have no priority nor hierarchy

and are managed accordingly.  *Id.*

Genetic stock identification methodology indicate that approximately fifty percent of the adult chinook salmon that return to the Yukon River originate in Canada, mostly in the Yukon Territory and some in northern British Columbia, while fifty percent originate in Alaska. "Handbook," *supra* at 26.[37]  It is assumed that thirty percent or more of Yukon River fall chum salmon originate in Yukon Territory waters. *Id.*  According to the *Yukon River Salmon Agreement Handbook*:

> The majority of the first run of salmon migrating up the Yukon River in May is presumed to be Canadian-origin Chinook heading for spawning grounds in the Yukon Territory.  Canadian-origin salmon spawn and/or rear throughout all the tributaries and streams in the Yukon Territory.  To date, spawning chinook salmon have been documented in over 100 streams, including some streams in northern British Columbia.  Some of the notable spawning rivers in Canada include: Big Salmon, Little Salmon, Teslin, Pelly, Stewart and Klondike rivers.  However, not all Yukon River stocks of Chinook salmon spawn in Canadian waters.  Spawning salmon also return to most every tributary in the Alaskan portion of the drainage – most notably, the Andreafski, Anvik, Nulato, Koyukuk, Tanana, Chena, Chandalar, and Sheenjek Rivers.  Although their distribution is not as extensive or widespread as Chinook salmon, fall chum salmon also return to tributary streams in the Alaskan portion of the drainage, most notably, the Tanana, Koyukuk, Chandalar, and Sheenjek Rivers and in upper Canadian tributaries of the Yukon River – including the Porcupine, Fishing Branch, Kluane, and Teslon rivers, and the mainstem Yukon River itself.

"Handbook," *supra* at 26.

4.    The Life Cycle of the Yukon River Salmon.

Fish taken by Plaintiff Tanana tribal members and other upriver users include several species of salmon (chinook, coho, and sockeye salmon), all of which are anadromous fish. Anadromous fish spawn in the headwaters, tributaries and mainstem of the Yukon River.  As

---

[37]  *See also* Reiser Aff. at 42 (attached as Exhibit 11).

smolt, they migrate to the Pacific Ocean where they mature and spend the bulk of their adult life. After several years, they return to the river or stream of their origin, spawn, and in the case of salmon, die.

Absent a sufficient quantity of water in the streams and rivers that provide habitat and migratory routes for fish residing in or passing through the various Yukon River Refuges, resident and anadromous fish cannot survive, much less survive to be harvested by qualified rural subsistence users. Water is necessary at every stage in the fish lifecycle and without water, aquatic life, including fish, simply cannot exist.

(a)    Upstream Migration. As sexually mature adults, salmon travel hundreds, even thousands, of miles from ocean feeding areas to spawn in the same freshwater system in which they hatched. Some headwater salmon stocks migrate over 1,840 miles to reach their spawning grounds in the Yukon Territory and northern British Columbia–among the longest salmon migrations in the world. "Handbook," *supra* at 19. Without sufficient streamflow in a stream or river, adult fish cannot successfully migrate upstream to spawning areas.[38]

(b)    Spawning and Egg Incubation. Streamflow plays a direct role in determining the extent of habitats that can be used by adult fish for spawning, and the magnitude of streamflow also has an influence on the quality of the spawning gravels, and on maintaining suitable

---

[38] Reiser Aff. at 52-54 (attached as Exhibit 11). The court may consider information outside the record when necessary to ascertain whether the process employed by the agency to reach its decision took into consideration all the relevant factors. *See ASARCO v. Environmental Protection Agency*, 616 F.2d 1153, 1160 (9th Cir. 1980) ("It will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not.").

conditions for incubating eggs within such gravels.  Discharge velocity also plays an important role in providing and maintaining the quality of the spawning gravels.  This typically occurs as part of the runoff cycle in association with high flows resulting from snow melt.  These flows serve, among other things, to mobilize and transport fine sediments from spawning gravels, which is important for increasing gravel permeability and facilitating the incubation of deposited eggs since the flows result in the transport of oxygen to and removal of metabolic wastes from the embryos.  The flushing of fine sediments that occurs in conjunction with high runoff in the spring thus serves to increase the quality of the spawning gravels and enhances potential survival and the emergence of salmon fry.[39]

      (c)    <u>Fry and Juvenile Rearing</u>.  As with the other life stages, streamflow is the primary determinant of a number of specific factors that contribute to the habitat requirements necessary for the rearing of fry and juvenile fish.  Streamflow regulates the carrying capacity of rearing habitats.  Reductions in flow concomitantly can translate into reductions in carrying capacity.[40]  As with spawning habitats, streamflow discharges have similar effects on the quality of rearing habitat.  When high flows occur during the normal runoff cycle, they transport sediments from pools (necessary to maintain rearing space) and riffle habitats (necessary as food production areas); move and create new structures in the channel; and inundate important riparian and floodplain vegetation that serve to increase bank stability, provide shade and contribute nutrients

---

[39] *Id.* at 54-57.

[40] *Id.* at 58-59.

to the stream from out-of-stream areas, all in addition to providing water necessary for downstream migration of smolts and sub-yearling fish.[41]

(d)    <u>Downstream Passage of Smolts and Juveniles</u>.  Instream flows are also necessary for the downstream passage of anadromous salmon.  In Alaska streams, the timing of the seaward migration of salmon has evolved in concert with the cycle of runoff from adjoining mountains and hills, increasing fish survival rates.  The out-migration typically occurs during the spring after ice-out and in conjunction with snowmelt runoff.  The high flows allow the smolts to conserve energy since most of the work is done by the stream, while the increased turbidities associated with high flows provides the smolts with some protection from predators.[42]

(e)    <u>The Importance of Habitat Linkages to Harvest Areas</u>.  The production of harvestable fish populations at a given location requires that suitable conditions must exist within all sections of the watershed in which the fish populations rely for upstream adult passage, spawning, egg incubations, fry and juvenile rearing, and juvenile/smolt downstream passage.[43]  A fishery with harvestable stocks requires more than just suitable habitat conditions within the immediate harvest areas.  Indeed, because of the differing life history strategies and species life-stage-specific reliance on differing habitats, water flows must spatially and temporally protect the full range of habitats needed in all these life stages in order to maintain the species survival.[44]

5.    <u>Treaty Rights:  U.S.-Canada Treaty to Manage Yukon River Salmon Stock</u>.

---

[41]  *Id.* at 58-62.

[42]  *Id.* at 62.

[43]  *Id.* at 64.

[44]  *Id.*

Plaintiffs Katie John, *et al*, Opening Brief on "Which Waters" Issue
Case No. 3:05-0006-HRH (Consolidated with No. 3:05-cv-0158-HRH )

In 1985 the United States and Canada signed the Pacific Salmon Treaty to address interception of salmon originating in one nation by the fisheries of the other nation.[45]  The 1985 Treaty dealt with Yukon River stocks by incorporating a Memorandum of Understanding (MOU) in which both nations agreed to continue Yukon River negotiations in order to properly address its unique characteristics.

A Yukon River Interim Agreement was signed in 1995 that required the United States to endeavor to deliver absolute amounts of chinook and fall salmon to the Canadian border, depending upon parent year escapements.  The Interim Agreement also required coordination of conservation and management programs between the United States and Canada.  Admin. Rec. Tab 132 at 3123.  "The Agreement was negotiated on the premise that approximately 50% of Yukon River salmon harvested in Alaska are bound for spawning grounds in Canada." "Handbook," *supra* at 5.  While implementation of this temporary agreement was put into practice, negotiations were to continue for a long-term arrangement.  However, those negotiations never resumed and the Interim Agreement expired on December 31, 1997.

In 1999, major declines in salmon runs on the Yukon River resulted in renewed efforts to negotiate a permanent agreement.  In March 2001, immediately after the devastating 2000 chinook salmon run, the final Yukon River Salmon Agreement was adopted.  The Agreement represented a powerful international commitment to manage Yukon River salmon fisheries so as to ensure sufficient spawning salmon are available to meet escapement requirements and to provide harvests according to the harvest sharing arrangements.  "Handbook," *supra* at 6.

---

[45]  Pub. L. No. 99-5, 99 Stat. 8 (1985), (codified at 16 U.S.C. § 3632 (2000)).

The three primary salmon species of concern under the Agreement are Canadian-origin chinook ('King'), chum ('dog'), and coho ('silver').   The Agreement requires that each country ensure effective conservation and management of these three Yukon River stocks.   In particular, the United States is responsible for ensuring that enough salmon reach Canada to spawn and Canada is responsible for ensuring that enough salmon leave Canada after spawning occurs.

The Agreement was implemented immediately, then formally adopted on December 4, 2002, by American and Canadian executive orders.  "Handbook," *supra* at 7.  The Agreement, now Article VIII of the Pacific Salmon Treaty, includes rebuilding programs for Canadian-origin chinook stocks, restoration and enhancement guidelines, and maintenance of existing salmon habitat.  *Id.*  Funds necessary to address American obligations under the Agreement are authorized through the Yukon River Salmon Act of 2000.[46]

D.    ALASKA NATIVE ALLOTMENTS SITUATED AT FISH SITES ON THE YUKON AND ITS TRIBUTARIES

There are hundreds of Alaska Native allotments along the Yukon River and its tributaries. This is because Native allotments were selected for their proximity to water and frequently incorporated family fish camps.[47]  Fishing sites are usually located at or very near fish camps to facilitate ready checking of gear and transport of harvested fish for processing.  *Id.*  As illustrated by the map attached to Thelma Starr's declaration, most of the approximately 131 Native

---

[46] Pub. L. No. 106-450, 114 Stat. at 1941, (codified at 16 U.S.C. §§ 5701- 5727 (2000)).

[47] Andersen Aff. at 13 (attached as Exhibit 10).

allotments in the Tanana region are on the Yukon River.[48] "This is because subsistence fishing is the primary use made of these Native Allotments."[49]

Plaintiff Charles Erhart owns an interest in a Native allotment on the Tanana River that was conveyed to his mother, Josephine Gladys Erhart.[50] Josephine used and occupied this allotment for subsistence purposes including fishing, trapping, hunting and berry picking. Charles and other heirs continue to use this allotment for the same subsistence purposes. The allotment is situated on the left bank of the Tanana River, near Eightmile Island, approximately six and one-half miles southeasterly of Tanana. Because the allotment is on a stretch of the Tanana River that falls outside a CSU, subsistence fisheries activities along the allotment are regulated by the State under state law, and Title VIII's priority for subsistence uses – as restricted by the Secretaries' regulations – does not reach Mr. Erhart's allotment.[51]

III.    ARGUMENT

    A.    SCOPE OF REVIEW

---

[48]  *See* Starr Declaration at ¶ 8  and attachments (attached as Exhibit 12).

[49]  *Id*. at ¶ 8.  For instance, in the community of Tanana, seventy-one percent of households participated in salmon fishing, ninety-one percent of households used salmon, and the per capita harvest of salmon averaged 1,600 pounds per person in 1987.  Andersen Aff. at 9 (attached as Exhibit 10).

[50]  *See* Erhart Aff. at ¶ 3 (attached as Exhibit 13).

[51]  The federal regulations do not include the Native allotments as "public lands" under Title VIII, as a consequence of which federal subsistence hunting regulations likewise do not apply.  *See* Complaint ¶¶ 22, 45.  Given the Court's initial focus on "waters" issues, Plaintiffs do not address in this brief their claim that the exclusion of these lands is unlawful too but reserve the opportunity to do so at a later date.

The issues before this Court are whether ANILCA's "public lands" definition includes (1) federally reserved water rights upstream and downstream from ANILCA's various Conservation System Units; and (2) federally reserved waters appurtenant to Alaska Native allotments. The Secretaries have implemented ANILCA in a manner that excludes these federally reserved waters from the term "public lands."

The scope of review is governed by the Administrative Procedure Act (APA). 5 U.S.C. § 706(2)(A). Under the APA a court "may set aside an agency decision if it is 'arbitrary, capricious, or an abuse of discretion, or otherwise not in accordance with the law.'" *Baccarat Fremont Developers, LLC v. U.S. Army Corps of Eng'rs*, 425 F.3d 1150, 1154 (9th Cir. 2005). In the case of purely legal questions, "[a]n agency's interpretation or application of a statute is a question of law reviewed de novo." *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 765 (9th Cir. 2007). Here, both of the issues presented are purely legal questions, turning on the proper meaning to be attributed to the term "public lands," including federally owned "lands, waters and interests therein"–a term that includes federally reserved waters. *Katie John II*, 72 F.3d at 704.[52]

---

[52] *See also Katie John III*, 247 F.3d at 1038 (en banc) (Tallman, Tashima, and W. Fletcher, J.J., concurring):

> The agency possesses no expertise, however, that qualifies it to determine whether the rural subsistence priority applies to navigable waters. The issue "is a pure question of statutory construction for the courts to decide." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 (1987); *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 n. 9 (1984) ( "The judiciary is the final authority on issues of statutory construction."). "Because the issue presented is a question of pure law and does not implicate agency expertise in any meaningful way, we need not defer under Chevron ...." *Magana-Pizano v. INS*, 200 F.3d 603, 611 n.11 (9th Cir.1999).

In reviewing questions of law a court must determine congressional intent by employing "traditional tools of statutory construction," *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843 n.9 (1984), while paying heed to the "overall statutory scheme":

> "[A] reviewing court should not confine itself to examining a particular statutory provision in isolation." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000). Rather, "[t]he meaning–or ambiguity–of certain words or phrases may only become evident when placed in context. . . . It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Id.* at 132-33 (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S.Ct. 2518 (2007). *See also Comm'r of Internal Revenue v. Engle*, 464 U.S. 206 (1984) (selecting interpretation "most harmonious with its scheme and with the general purposes that Congress manifested"). Among those statutory rules of construction is that legislation passed for the benefit of Indians must be liberally construed, with doubtful expressions resolved in their favor. *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985) ("[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit . . . .").

Here, "[i]t is a reasonable assumption that Congress intended the preference and procedural protections for subsistence uses mandated by Title VIII [of ANILCA] to be co-extensive with the extinguishment of aboriginal rights that made those measures necessary," *Village of Gambell v. Clark*, 746 F.2d 572, 580 (9th Cir. 1984), *rev'd on other grounds sub nom. Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531 (1987). Therefore, ANILCA should be viewed as remedial legislation to which the Indian canon of construction should apply, *Village of Gambell*, 746 F.2d at 581; *County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation*, 502 U.S. 251, 269 (1992) (quoting *Blackfeet Tribe*, 471 U.S. at 766). *But see*

*Hoonah Indian Ass'n v. Morrison*, 170 F.3d 1223 (9th Cir. 1999) (declining to apply canon to the interpretation of ANILCA).  So, too, must the Alaska Native Allotment Act be liberally construed in favor of Indian allottees for whose special benefit that legislation was enacted.  *See also infra* at Part IV.E.

If after using all available tools of statutory construction the statute still remains unclear, a reviewing court defers to an agency construction only if it reflects the agency's expertise and if it is not unreasonable or impermissible.  But even here,

> Deference is due only to a 'reasonable interpretation made by the administrator of an agency.'  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 481 (2001).  Constructions that are contrary to clear Congressional intent or frustrate the policy that Congress sought to implement must be rejected. *Chevron, U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843 n.9 (1984).

*Earth Island Inst. v. Hogarth*, 494 F.3d 757, 765 (9th Cir. 2007).  Likewise, deference is not due where (1) Congress did not delegate to the agency the power to make the particular decision at issue, *see Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649 (1990); (2) the agency is interpreting case law and general common law principles, rather than an act of Congress, *see Tex. Gas Transmission Corp. v. Shell Oil Co.*, 363 U.S. 263, 270 (1960); *Burgin v. Office of Pers. Mgmt.*, 120 F.3d 494, 497 (4th Cir. 1997); *Jicarilla Apache Tribe v. Fed. Energy Regulatory Comm'n*, 578 F.2d 289, 292-93 (10th Cir. 1978); (3) the agency's position has vacillated, *see Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 417 (1993) ("the consistency of an agency's position is a factor in assessing the weight that position is due"); or (4) (and at the risk of stating the obvious) there is no agency position to defer to.

B.    LAW ON RESERVED WATER RIGHTS DOCTRINE

As this Circuit has squarely held, Congress adopted the "reserved water rights doctrine" as the touchstone for determining the scope of "public lands" under ANILCA, and thus for federally protected subsistence fishing rights. *Katie John II*, 72 F.3d at 703-04. That doctrine exists to assure that federal lands, set aside by Congress for particular purposes, will have adequate water sufficient to fulfill Congress' purposes.

The next task is thus to review the common law of reserved waters that Congress adopted, and to apply that law to the facts presented here. *Id.*

A reservation of water for federal purposes is authorized by the Commerce Clause, U.S. CONST. art. I, § 8, and the Property Clause, U.S. CONST. art. I, § 3. Congress exercises its power to reserve waters whenever it sets aside land for purposes that require water, and such reservations may be express or implied.[53] The doctrine was first applied in *Winters v. United States,* 207 U.S. 564, 576-77 (1908), where the Supreme Court addressed a statute that had set lands aside for an Indian reservation but had not expressly provided for water to irrigate those lands. Despite the absence of express language, the Court found an implicit reservation by Congress of sufficient water to meet the needs of the Indians. The Court based this finding on the clear intent of Congress that the Indians should become a "sedentary, prosperous and civilized people" and the fact that this congressional intent would be frustrated if the Indians lacked sufficient water to irrigate their land. *Winters*, 207 U.S. at 576. In ensuing years the courts have applied the reserved water rights doctrine to a variety of federal reservations of land. *See, e.g., Arizona v. California*, 373 U.S. 546, 601 (1963) (applying to Refuges, National Forests,

---

[53] *See* Federal "Non-Reserved" Water Rights, 6 Op. Off. Legal Counsel 328 (1982) (attached as Exhibit 14).

Recreation Areas); *Cappaert v. United States*, 426 U.S. 128, 141 (1976) (applying to National

Monument)*; United States v. Mexico,* 438 U.S. 696 (1978) (applying to National Forests); *United*

*States v. Alaska*, 423 F.2d 764 (9th  Cir. 1970) (applying to Kenai Moose Range).[54]  The

Supreme Court's decision in *Cappaert* contains the most succinct statement of the controlling

principle of reserved water rights:

> In determining whether there is a federally reserved water right implicit in a
> federal reservation of public land, the issue is whether the Government intended
> to reserve unappropriated and thus available water.  Intent is inferred if the
> previously unappropriated waters are necessary to accomplish the purposes for
> which the reservation was created.

*Cappaert*, 426 U.S. at 139 (emphasis added).  *See also Katie John I*, 1994 WL 487830, at *13-14

(summarizing reserved water rights doctrine).

This case law establishes that the scope and the nature of a federally reserved water right

depends upon the purpose of the reservation and the intent of the parties (usually Congress) who

created it.  The purpose and intent are reflected in the treaty, statute, agreement or executive

order establishing the reservation, and special rules are frequently employed to ascertain intent.

While courts employ a rule of liberal construction in favor of Indian treaty rights, in non-Indian

reserved rights cases the Supreme Court has instructed that reserved rights are limited to "that

amount of water necessary to fulfill the purpose of the reservation, no more." *Cappaert,* 426 U.S.

at 141.  In such situations, courts must "carefully examine[] both the asserted water right and the

---

[54]  *See also* Fish and Wildlife Service, Bureau of Reclamation and the Bureau of Land
Management, *Federal Water Rights of the National Park Service*, 86 I.D. 553 (1979); G.
COGGINS & R. GLICKMAN, PUBLIC NATURAL RESOURCES LAW, 2 Pub. Nat. Res. L. § 10D:6
(2007); A.D. TARLOCK, LAW OF WATER RIGHTS AND RESOURCES, §§ 9.51-9.53 (2007)
(canvassing the federal reserved right cases).

specific purposes for which the land was reserved, and conclude[] that without the water the

purposes for which the land was reserved would be entirely defeated." *United States v. New

Mexico*, 438 U.S. at 700.  For our purposes, the amount reserved is not important and need not be

quantified.  If a reserved right exists as a matter of law, the relevant body of water is "public

land" under Title VIII.

C.    FEDERALLY RESERVED WATER RIGHTS INCLUDE WATERS IN RIVERS
RUNNING UPSTREAM AND DOWNSTREAM FROM ANILCA'S CSUs

1.    The Primary Purposes of the Conservation Units Created or Expanded by
ANILCA Require Water as a Biological Necessity in Order Fulfill The Purposes
of the CSUs

ANILCA has two expressly stated primary purposes, *i.e.*, establishing national

conservation lands *and* protecting subsistence resources and uses.  These twin paramount goals

are apparent from the congressional purposes set forth in ANILCA § 101(a)-(c).[55]  There,

Congress expressed its intent not only to preserve "certain lands and waters" for "present and

future generations," § 101(a), but also "to provide for the maintenance of sound populations of,

and habitat for, wildlife species of inestimable value," including "to protect the resources related

to subsistence needs," as well as "to preserve wilderness resource values and related recreational

opportunities . . . on free flowing rivers."  § 101(b).  Equally significant, Congress asserted its

"intent and purpose . . . to provide the opportunity for rural residents engaged in a subsistence

way of life to continue to do so."  § 101(c).

In furtherance of its goal of protecting the subsistence way of life, Congress in Title VIII

generally impressed all federal "public lands" in Alaska with a preference for subsistence uses of

---

[55]  94 Stat. at 2374, 16 U.S.C. § 3101.

fish and wildlife over all other uses,  §§ 801-816,[56] a preference expressly made applicable to all

lands, waters, and interests therein, the title to which is in the United States.[57]  This pervasive

action to protect the Native subsistence way of life, in turn, is reinforced in the express primary

purposes for which most of ANILCA's CSUs were established, redesignated or expanded.[58]

Indeed, subsistence uses are specifically authorized in twelve of the thirteen, National Parks and

Preserves addressed in the Act (§§ 201-202)[59] and fifteen of the sixteen Refuges addressed in the

Act (§§ 301-303).[60]

Congress' clear statements of purpose in ANILCA constitute express reservations of

water as a matter of federal law.[61]  Congress legislated against a backdrop of Supreme Court

jurisprudence and Executive Branch determinations that federal reserved water rights attach to

Parks, Wildlife Refuges, National Monuments, National Recreation Areas and Forests,[62] and

Congress is presumed "knowledgeable about existing law pertinent to the legislation it enacts."

---

[56]  94 Stat. at 2422-30, 16 U.S.C. §§ 3111-3126.

[57]  *John II*, 72 F.3d at 702 (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 548 n.15 (1987) (discussing 16 U.S.C. §§ 3102(1), 3202(2) and 3102(3)).

[58]  *See, e.g., supra* note 18 (quoting purposes of the Yukon Flats National Wildlife Refuge).

[59] 94 Stat. at 2377- 83, 16 U.S.C. §§ 410hh - 410hh-1.  This unique feature further distinguishes Alaska national parks and refuges from those in the Lower 48, where no hunting (and only sportfishing) is allowed.  The exception is the Denali National Park.

[60]  94 Stat. at 2384-2393, 16 U.S.C. §§ 668dd - 668dd note.

[61]   Fish and Wildlife Service, Bureau of Reclamation and the Bureau of Land Management, *supra* note 55, at 573.

[62]  *Id*.

*Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184-85 (1988).  Indeed, *Cappaert*, *Arizona v. California*, and *United States v. New Mexico* were all decided a decade prior to ANILCA's passage.  In the wake of these landmark decisions the Executive Branch, too, conducted an exhaustive analysis of federally reserved waters and concluded that "the federal reserved water right is created by implication as well as by express language in the reservation of public land for particular purposes."[63]  Accordingly, settled law as adopted by all three branches of the federal government prior to ANILCA compels the conclusion that Congress' express statements of purpose must be viewed as reserving all waters necessary to achieving those purposes.

>    2.    The Reserved Waters Doctrine Requires a Reservation of Waters Upstream and Downstream from ANILCA's CSUs to Fulfill the Purposes of the CSUs.

>        (a)    Federally Reserved Water is a Biological Necessity to Support All Life Stages of Fish and Without Which ANILCA's Purposes to Protect Fish, Fish Habitat, Subsistence Uses and International Treaty Obligations Would be Defeated.

The Secretaries agree that federally reserved water rights exist within and adjacent to the boundaries of all the CSUs created or expanded by ANILCA.[64]  That is indisputably correct.  The

---

[63] *Id.  See also Sierra Club v. Lyng*, 661 F. Supp 1490, 1495 (1987) ("The Solicitor General's 1979 opinion has been twice supplemented.  Neither supplement, however, has disturbed that portion of the opinion which addresses federal reserved water rights. 88 I.D. 1055, 1055 n. 2 (1981); 88 I.D. 253, 254, n. 3 (1981)"); *see also* Federal "Non-Reserved" Water Rights, 6 Op. Off. Legal Counsel 328 (1982) (Congress has the constitutional power to create both federally reserved water rights and non-reserved federal water rights if its legislation makes clear that's what it was doing.) (attached as Exhibit 15); John Leshy, *Water Rights for New Federal land Conservation Programs: A Turn-of-the-Century Evaluation*, 4 U. DENV. WATER L. REV. 271, 288 (noting that the 1982 Opinion "is the modern equivalent of an Attorney General's opinion, the highest legal authority in the executive branch.").

[64] Admin. Rec. Tab 579 at 1585 (National Parks); Admin. Rec. Tab 579 at 1587 (Wildlife Refuges); Admin. Rec. Tab 579 1587 (Select BLM Units); Admin. Rec. Tab 579 at 1589 (National Forests); Admin. Rec. Tab 579 at 1589-91 (Wild and Scenic Rivers).

express primary purposes of all of the CSUs require the presence of water, both in sufficient quantities and quality for fish and wildlife habitat, to support subsistence uses and to comply with international treaties. Plainly water is a biological necessity, both in fact and in law, without which each of the purposes of the refuges would be defeated.[65]

The need for reserved water rights downstream and upstream from each CSU flows directly and inexorably from these purposes and is just as much a biological necessity to fulfill ANILCA's purposes. In the context of assessing the extent of reserved water rights, ANILCA's unprecedented legal regime results in a reserved right commensurate with the water necessary to protect anadromous fish habitat and passage and, concomitantly, subsistence fishing rights–that is, to "a natural streamflow." *United States v. Adair*, 723 F.2d 1394, 1417 (9th Cir. 1984) (quoting district court). If a downstream user were to interfere with the ability of salmon to reach their spawning grounds within a CSU or pursuant to an international treaty, this would directly and utterly defeat these purposes. If an upstream user were to interfere with the ability of a salmon to spawn, hatch and return through the CSUs to the sea, this too would directly and utterly defeat these purposes. And either way, subsistence uses of these salmon would be directly

---

[65] "Necessity" is both biological–water necessary for the existence of the fish–and legal–water necessary to fulfill the subsistence and nonsubsistence purposes of the reservations. In *United States v. Winans*, 198 U.S. 371, 380-81 (1905), Justice McKenna described the right to fish as "part of larger rights possessed by the Indians, upon the exercise of which there was not a shadow of impediment, and which were not much less necessary to the existence of the Indians than the atmosphere they breathed." And in *United States v. Adair*, 723 F.2d 1394, 1409 (9th Cir. 1984), the court noted that the scope of the water right "is circumscribed by the necessity that calls for its creation." As discussed in detail in the Affidavit of Dr. Dudley Reiser, water is biologically necessary to support fish, and it is necessary throughout the geographic range in which fish journey during their various life stages. *See* Statement of Material Facts, *supra*, at Part II.C.4.

and irrevocably impacted.  *See, e.g., United States v. Washington*, No. CV 9213RSM, 12 (W.D. Wash. Aug. 29, 2007) (stating that the right to take fish imposes duty upon state to refrain from building or maintaining off-reservation culverts under state-maintained roads that would "block the passage of fish upstream or down, to or from the Tribes' usual and accustomed fishing places.") (attached as Exhibit 16).

This is especially true in the Yukon River region where many salmon stocks have now been classified as species "of concern."[66]  Take for instance the Village of Tanana, located on the Yukon River about two miles west of the junction of the Yukon and Tanana Rivers.  Tanana villagers extensively engage in customary and traditional subsistence activities in the Yukon and its tributary the Tanana River, taking chinook, sockeye and other salmon that come upriver on their way to their spawning grounds.  Many of the salmon originate in and return to spawning grounds in Canada and the upper river tributaries therein.  All these salmon pass through one or more of the six National Wildlife Refuges abutting the Yukon River (including the nearby Nowitna National Wildlife Refuge).  As noted *supra* in Part II.C, all these Refuges have as their primary purposes the conservation of fish populations and habitats, and continued subsistence uses by local residents.[67]  Even though stretches of the Yukon River also flow by state lands and eventually into the Bering Sea,  the federal government must retain a federally reserved water right in these waters lying upstream and downstream from the Refuges because such waters are

---

[66] *Alaska Subsistence Salmon Fisheries 2004 Annual Report*, TECH. PAPER NO. 317, 39 (2004).

[67] *See supra* at 7-13, nn.18, 20, 25, 26, 29 & 30.

biologically necessary to carry out the purposes of those Refuges–the conservation of salmon and salmon habitat; subsistence; and the fulfillment of international treaty obligations.[68]

As Dr. Reisher points out in his affidavit:

salmon populations inherently require a wide array of habitat types to complete their life cycle, habitats that in the case of the Yukon River Basin, extend well beyond the boundaries of any specific CSU. Thus, to be consistent with the stated purposes of the CSU/NWR, conservation/protection of these populations within a federal reserved water right context would require an extension of these reserved water rights to all segments of the river that are used by the salmon populations to complete their life cycle. To do otherwise, i.e., to limit the reserved right only to the boundaries of the CSU would be tantamount to saying that the life cycle of the salmon population occurs entirely within the federal reserved waters bounded by a given CSU.[69]

ANILCA's stated purposes of conservation/protection of fish and fish habitat, by necessity, requires more than simply the delivery of a fixed quantity of water at the border of the reserve. It requires a right to maintain instream flows outside each reserve to protect the habitat and passage of the fish for which the CSU was created. Thus, where fish habitat and subsistence are among a CSU's primary purposes, but those fish necessarily move beyond the CSUs, the United States' right to water to support the fishery follows those fish upstream and downstream.

---

[68] The ability of downstream fishing actions to impact up-river harvests is not unprecedented. In the spring of 1918 when the Seattle-based Carlisle Packing company expanded its Alaska operations and established a floating cannery on the lower Yukon River. Record low salmon harvests that year in up-river districts caused severe shortages and hardship among the resident population. A vocal contingent of missionaries advocated on behalf of Native peoples and sent protests to the U.S. Secretary of Commerce, Bureau of Fisheries, the agency in charge of overseeing Yukon salmon stocks. As a result of extensive testimony and hearings, cannery operations were severely restricted in 1919 and eventually eliminated in 1924. As a result of the Carlisle incident, the U.S. Bureau of Fisheries was prompted to initiate a more vigorous program of annual harvest monitoring and oversight of Yukon River salmon stocks. Andersen Aff. at 10 (attached as Exhibit 10).

[69] Reiser Aff. at 66 (Exhibit 11).

In order to protect salmon populations and salmon habitat, it is axiomatic that there <u>must</u> be a water right to protect the eggs and spawning areas which lie outside the CSU's boundaries. *Kittitas Reclamation Dist. v. Sunnyside Valley Irrigation Dist.*, 763 F.2d 1032, 1034 (9th Cir. 1985) (salmon redds upstream of Yakima reservation must be protected).[70]  Such waters must, as a biological necessity, not only be reserved as the medium through which the fish swim, but to protect sufficient water flows that are determinative of other habitat factors such as channel condition or temperature. *United States v. Anderson*, 591 F. Supp. 1, 5 (E.D. Wash. 1982), *aff'd in part, rev'd in part*, 736 F.2d 1358 (9th Cir. 1985) (requiring sufficient water to maintain suitable water temperatures).[71]  All this is basic, elementary reserved water rights law.  And all this, Congress is presumed to know when, as the Ninth Circuit held, Congress defined "public lands" in ANILCA to include all federally reserved waters.

During the rulemaking, the Interior Department's Division of Indian Affairs recognized the biological imperative compelling upstream and downstream water rights, and argued that "applying the well-established principles of the reserved rights doctrine leads to the conclusion that off-reservation water rights are legally sustainable."  Admin. Rec. Tab 85 at 1668.  Going further, the memo explained:

> For non-Indian reservations, it is axiomatic that a reserved water right will be implied where the water is necessary to satisfy a primary purpose of the reservation or, in other words, where failing to recognize that water right will defeat the identified purpose. *See, e.g., United States v. New Mexico,* 438 U.S. 696, 700-02 (1978).  One of the purposes of national parks, as stated in the National Park Services Organic Act, is "to conserve . . . the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will

---

[70]  *See also* Reiser Aff. at 55 (Exhibit 11).

[71]  *See also* Reiser Aff. at 57 (Exhibit 11).

leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1. <u>Thus, where a park's wildlife includes anadromous fish, for example, sufficient water is reserved to conserve those species and provide for their unimpaired enjoyment by future generations</u>. *Cf. District Court, Water Division No. 1, State of Colorado,* No. W-8439-76 (W-8788-77) Memo. Op. Concerning the Application for Water Rights of the United States of America for Reserved Water Rights in Rocky Mountain National Park in Boulder and Laramer Counties, at 9 (Dec. 29, 1993, decree entered Oct. 12, 1994) (awarding water right to the entire streamflow in park because park's purpose is to preserve natural conditions and scenic beauty). <u>If off-reservation waters are necessary for the species maintenance, the reserved water right should extend to those waters to the extent needed to provide the requisite habitat</u>. Otherwise, off-reservation appropriations that harm habitat, resulting in a diminution of the species within the reservation, will defeat the reservation's explicit purpose. <u>We have found nothing in the case law to undermine this analysis</u>. Consequently, unless the executive order or statute creating the specific unit can be fairly interpreted to indicate congressional intent to abandon these rights, they should be asserted.

Admin. Rec. Tab 85 at 1668-1669.

But contrary to the Division's legal assessment recommendations, the so-called Alaska Policy Group rejected a straight-forward application of *Cappaert* and its progeny. Instead, the Group started from the curious premise that, because the Ninth Circuit in *Katie John II* ruled that the navigational servitude did not confer ownership interests in water, the government's federally reserved waters are limited to CSU boundaries. But that is a *non-sequitur*, it makes no sense, and it fails to properly apply the time-honored reserved water rights doctrine that Congress intended here.

The fallacy in the Policy Group's actions is clear from *Cappaert* itself. In *Cappaert* the Supreme Court upheld enforcement of on-reservation reserved rights against private users located <u>off</u> the reservation. *Cappaert*, 426 U.S. at 147. At issue was the off-reservation pumping of ground water by private wells located up to two and a half miles away from the forty-acre Devil's Hole National Monument. *Id.* at 133. The Monument was created, in part, to preserve a

small pool holding a unique species of desert fish.  *Id.* at 141.  The Court ruled that "federal water rights were being depleted" by ground-water pumping, and hence "the United States can protect its water from subsequent diversion, whether the diversion of surface or groundwater." *Id*. at 142-43.  In so ruling the Court in *Cappaert* plainly recognized a federal right not only in the pool's water but in the off-reservation groundwater supplying the pool.  The only factual predicate deemed necessary to support this determination was a finding that "the water from certain of the wells was hydrologically connected to Devil's Hole."  *Id.* at 136; *see also id.* at 142 ("the '[g]roundwater and surface water [of the pool] are physically interrelated as integral parts of the hydrologic cycle'"); *United States v. Cappaert*, 375 F. Supp. 456, 459 (D. Nev. 1974); *United States v. Cappaert*, 508 F.2d 313, 316 (9th Cir. 1974).

The Supreme Court decision in *Cappaert* simply cannot be explained away as an assertion by the government of its "extraterritorial power" to enjoin off-reservation activities that are harmful to on-reservation purposes.  For one thing, the Court's opinion in *Cappaert* is devoid of any discussion whatsoever regarding the standards necessary to sustain an extraterritorial reach of federal power.  Rather (and as described by the district court in *Cappaert*) the United States "sought to have its rights declared to the uses of so much of the waters appurtenant to the land known as Devil's Hole . . . as may be necessary for the needs and purposes of maintaining the pool and the desert pupfish therein," *Cappaert,* 375 F. Supp. at 457.  By contrast, ten days after *Cappaert* was decided the Supreme Court squarely confronted the "extraterritoriality" issue and determined to "leave open the question of the permissible reach of [federal power] over private lands under the Property Clause." *Kleppe v. New Mexico*, 426 U.S. 529, 547 (1976).  The

decision in *Kleppe* does not mention the contemporaneous decision in *Cappaert*, and it is thus fair to conclude that *Cappaert* had nothing to do with that issue.

Since anadromous fish are blissfully mindless of reservation boundaries, it is impossible to have a viable habitat for anadromous fish within a CSU unless the habitat extends continuously upstream and downstream. The migratory patterns of the salmon so demand. Consequently, without a right to use water to maintain habitat <u>throughout</u> the stream, the declared purposes of the CSUs themselves would be defeated.

None of this is new. Analogous situations to Congress' creation of the ANILCA CSUs–where statutory purposes cannot be fulfilled without off-reservation rights–have arisen under Indian treaties that secure rights to harvest anadromous fish. In such settings the Ninth Circuit has long recognized reserved in-stream water rights to off-reservation waters. For instance, in *Adair* the Klamath Tribe secured a right to take anadromous fish in certain waters. *United States v. Adair*, 723 F.2d 1394, 1411 (9th Cir. 1984). Although the Tribe's reservation was extinguished, the Court of Appeals held that the Tribe retained an aboriginal "right to use the water as it had always used it . . . to support its hunting and fishing lifestyle . . . ." *Id*. The reservation was later extinguished but the water right survived, having predated the treaty that established the reservation and never having been extinguished. The court said that this reserved water right–used to maintain the tribe's fishery–"is unusual in that it is basically non-consumptive," a right in the streamflow itself, and held that it includes "the right to prevent other appropriators from depleting the streams' waters below a protected level in an area where the nonconsumptive right applies." *Id*.

In sum, the government has reserved water rights to use all waters necessary to sustain the habitat of subsistence fishery resources, including instream flow waters running beyond the boundaries of ANILCA's CSUs.  This conclusion is compelled by the logic of the case law on reserved water rights and is compelled by Congress' purpose in setting aside the CSUs "to protect and provide the opportunity for subsistence fishing."  *Katie John II*, 72 F. 3d at 704.

(b)    Courts Have Recognized That Water is a Biological Necessity to Support All Life
        Stages of Fish That are Subject to the Subsistence Priority.

> Anadromous fish, including species of salmon and steelhead trout, are spawned in
> the tributaries, headwaters, and mainstem of the [Yukon] River, migrate to the
> Pacific Ocean where they spend the bulk of their adult life, return generally to the
> river or stream of their origin, spawn, and, in the case of salmon, die.

*Sohappy v. Smith*, 302 F. Supp. 899, 905-06 (D. Or. 1969).  Simply put, without water fish cannot live.   All the life stages of salmon–from eggs within the gravel beds of the Yukon River's tributaries to adults migrating back to their home streams to spawn–require water.  Water is necessary for spawning, incubation of eggs, juvenile rearing, migration and passage back to natal streams to spawn.  Water is essential for resident species of fish at every stage in their lives.[72]

Courts have recognized these biological imperatives, and have recognized treaty-reserved water rights in streams, both on and off-reservation, that are relied upon for habitat by fish destined to pass through a tribal harvest area.  For example, in the *Yakima Basin Adjudication*, the Washington Superior Court held that the Yakima Tribe's federally reserved

---

[72]    *See* Reiser Affidavit at 64 (attached as Exhibit 11) ("fish do not recognize nor are they constrained by arbitrary, man-imposed boundaries.  As a result, to the extent that fulfillment of a particular life stage function that is critical to the purposes of conserving and protecting salmon populations within a CSU, occurs outside of or beyond the limits of the reservation boundary, federal reserved water rights should be extended to those streams.").

water right to instream flows to preserve a treaty-reserved fishery "extends * * * to include all Yakima River tributaries affecting fish availability at the [Yakima Indian Nation's] 'usual and accustomed' fishing stations.  Such rights carry a priority right of time immemorial."  *In the Matter of the Determination of the Rights to the Use of the Surface Waters of the Yakima River Drainage Basin; Dept. of Ecology v. Acquavella*, No. 77-2-01484-5, "Memorandum Op.: Treaty Reserved Water Rights at usual and Accustomed Fishing Places," at 15 (Wash. Super. Ct. Sept. 1, 1994) (attached as Exhibit 17).  In so doing, the court explained that:

> all water courses in the Yakima Basin are connected, in regard to fish and the Project, and each cannot be looked at entirely in their individual capacity. * * * The Partial Summary Judgment defined the diminished right as an amount necessary to maintain fish life in the Yakima River.  To achieve that, in light of the anadromous fish life cycle, a diminished right is imperative for the tributaries that serve as spawning grounds.  Fish life cannot be maintained without a place for fish to spawn.  The Superintendent of the Yakima Reclamation Project, in consultation with the SOAC [System Operation Advisory Committee, composed of fisheries biologists for the governmental parties and irrigation districts], shall administer those waterways to maintain fish life and comply with this Court's opinion.

*Id.* at 9.[73]  The Order recognizes that the water right exists wherever habitat is necessary to maintain fish life.  In an earlier opinion, the *Acquavella* court also concluded that the reserved water right included "flushing flows" necessary to move juvenile fish downstream throughout the Yakima River basin.  *Department of Ecology v. Acquavella,* No. 77-2-01484-5, Memorandum Op. Re "Flushing Flows," (Wash. Super. Ct., Dec. 22, 1994) (attached as Exhibit 18).

---

[73] The "diminished right" mentioned in this case was unique to the Yakima Nation and refers to the settlement of a claim made by the Yakima Nation before the Indian Claims Commission, seeking compensation for "loss of fishing rights caused in part by the Yakima Irrigation Project," The court found that the settlement precluded the Tribe from "making a claim for undiminished water rights for fishing in this state proceeding."  *Dept. of Ecology v. Yakima Reservation Irrigation Dist.*, 121 Wash. 2d  257, 850 P.2d 1306 (Wash. 1993).

Likewise, in *Kittitas Reclamation District* the Court of Appeals affirmed a district court's order requiring water to be released from irrigation storage reservoirs to protect off-reservation salmon redds (or nests) from which salmon would emerge and be caught several years later as adults by Yakima fishermen (pursuant to Yakima treaty fishing rights). The fish to be protected were eventually to be harvested off-reservation, and the redds were located off-reservation. Nonetheless, a need for water as a biological necessity was recognized and enforced. *Kittitas Reclamation Dist. v. Sunnyside Valley Irrigation Dist.*, 763 F.2d 1032, 1034 (9th Cir. 1985).[74]

Like the cases involving off-reservation treaty fishing rights, the identical biological imperatives apply here. As the affidavit of Dr. Dudley Reiser explains, water is necessary in all of the tributaries to the Yukon River to maintain healthy fish life in the CSUs.[75] The United

---

[74] *See also* Robert T. Anderson, *Indian Water Rights and the Federal Trust Responsibility*, 46 NAT. RESOURCES J. 399, 426 n.175 (2006) (citing cases upholding a reservation of water rights for instream flow habitat to support treaty reservation of aboriginal fishing rights, including: *Joint Bd. of Control of the Flathead Irrigation Dist. v. United States*, 832 F.2d 1127, 1132 (9th Cir. 1987) ("The action of the BIA in establishing streamflow and pool levels necessary to protect tribal fisheries is not unreviewable. In making its determination, however, the BIA is acting as trustee for the Tribes. Because any aboriginal fishing rights secured by treaty are prior to all irrigation rights, neither the BIA nor the Tribes are subject to a duty of fair and equal distribution of reserved fishery waters. Only after fishery waters are protected does the BIA, acting as Officer-in-Charge of the irrigation project, have a duty to distribute fairly and equitably the remaining waters among irrigators of equal priority."); *State ex rel. Greely v. Confederated Salish & Kootenai Tribes*, 712 P.2d 754, 764-66 (Mont. 1985) (tribal reserved rights may include water for fisheries as well as agriculture and other purposes); and *Confederated Salish & Kootenai Tribes v. Clinch*, 992 P.2d 244 (Mont. 1999) (enjoining issuance of permits to non-Indians until tribal water rights are quantified) and *In re Adjudication of the Existing Rights to the Use of All the Water*, 55 P.3d 396, 405 (Mont. 2002) (same)).

[75] Dr. Reiser explains that the technical basis for similar off-reservation instream flow water claims made in the Idaho and Oregon adjudications were the need for:

biological connectivity between segments of stream within or adjoining the

States thus owns an interest in the instream flow through all streams which are necessary to produce and sustain fish, including fish passage and fish habitat on and off each CSU established by ANILCA.

    (c)    <u>Water is a Biological Necessity in Order to Fulfill International Treaty Obligations with Canada</u>.

Since water is a biological necessity to produce fish, including fish passage and fish habitat, it also follows that water is necessary for the United States to fulfill its international treaty obligation to assure that an absolute amount of fish return to Canada.  The United States must have a reserved water right commensurate with the waters necessary to achieve that purpose.  This reserved right, while not associated with a land withdrawal, is clearly within Congress' power.[76]  If the United States were to allow water diversions to take place that impacted fish habitat, spawning, escapement or passage, the federal government would be in violation of its treaty obligations with Canada.[77]  While the Policy Group noted "there may be

---

    reservation, with segments either upstream or downstream from these sites.  This connectivity between sites, regardless of whether on or beyond the legal boundaries of a reservation, reflected the need to accommodate all life history functions of target fish species such as holding, spawning, fry and juvenile rearing, as well as aquatic invertebrate production that provides food in the form of invertebrate drift.  Such functions are all essential and necessary in order for fish populations to remain healthy and viable so that the intent of the treaty rights and needs of the reservation can be met.

Reiser Aff. at 33 (Exhibit 11).

    [76]  *See* Federal "Non-Reserved" Water Rights, 6 Op. Off. Legal Counsel 328, 362-63, (1982).

    [77]  *See* Admin. Rec. Tab 80 at 1613 (5/12/95 Memorandum from Regional Director cautioning that  "[t]he very special circumstances that exist relative to jurisdiction in the Yukon River in view of the international treaty obligations should be fairly articulated as well.").

treaty issues for managing subsistence on the Yukon River that may need to be addressed," it failed to come to terms with the impact these treaty obligations have on the scope of the federal government's reserved waters.  Admin. Rec. Tab 78 at 1575.  That, too, was arbitrary, capricious and contrary to law.

      3.    <u>The Agency's Position Is Inconsistent with Supporting Authority and with the United States' Assertion Elsewhere of Off-reservation Water Rights in General Stream Adjudications</u>

Plainly the government owns reserved rights in appurtenant waters that do not run through or abut a reservation of land.  For instance, the Colorado River decree at issue in *Arizona v. California* recognized reserved rights for the Coopah Reservation located some two miles from the Colorado River.  *Arizona v. California*, 376 U.S. 340, 344 (1964).  *See also Kittitas Reclamation Dist.*, 763 F.2d 1032 (order requiring release of water from a Bureau of Reclamation dam to protect salmon redds in a stretch of river located some fifty miles upstream of the Yakima Reservation).  In *Arizona v. California*, the government also claimed off-reservation tributaries for the benefit of both Indian lands and for National Forests, Parks, Recreation Areas, Memorials and Monuments.  *Arizona v. California*, 373 U.S. 546, 595 (1963).  In other cases the United States has recognized "that there may be circumstances in which water not adjacent to a reservation would be reserved . . . ."  *United States v. City of Denver*, 656 P.2d 1, 35 (Colo. 1982) (reserving issue raised by the government).

Because of such precedents, the Division of Indian Affairs informed the Alaska Policy Group that, since the United States was consistently asserting off-reservation reserved water claims elsewhere, in order to be consistent it should likewise do so here:

> [T]he position taken by the issue paper is contrary to the position that the United States, based, on the recommendations of this Department, is taking in litigation in the lower 48 for Indian reservations. In the Snake River Basin Adjudication in Idaho, for example, the United States has filed water right claims on behalf of the Nez Perce for all off-reservation water courses that provide necessary habitat for anadromous fish for which the Nez Perce have treaty fishing rights. *See* Notice of Claim to a Water Right Reserved under Federal Law, Attachment XI (filed March 24, 1993), in re the General Adjudication of Rights to the Use of Waters from the Snake River Basin Water System, Civ. No. 39576 (Idaho 5th Dist. Ct.). Many of these water right claims are to water courses that are not within or adjacent to the reservation or usual and accustomed fishing places; the determinative factor is whether the water course provides habitat necessary for spawning, rearing, or migration.

Admin. Rec. Tab 85 at 1669 (emphasis added).[78]

Given the United States' assertion of off-reservation water rights to protect fish and fish habitat elsewhere, and the absence of any indication from Congress that the reserved water rights doctrine should be applied differently here, the Secretaries were required to use the same determinative factor in assessing whether off-reservation water courses here are biologically necessary to provide habitat necessary for spawning, rearing or migration. The Secretaries' failure to do so was, again, arbitrary, capricious, an abuse of discretion and contrary to the law.

    (a)    The Agency Misinterpreted the Definition and Case Law Concerning Appurtenancy.

Part of the Secretaries' rationale for limiting the reserved water rights doctrine stemmed from the Alaska Policy Group's narrow construction of the time-honored term of art

---

[78] *See also* Reiser Aff. at 40 (Exhibit 11) (discussing his work as an expert for the United States in both the Snake River Basin Adjudication (SRBA) in Idaho and the Klamath River Basin Adjudication (KRBA) in Oregon. In these adjudications, "both resulted in instream flow claims that extended beyond historical and existing reservation boundaries, and additionally in the case of Idaho, beyond treaty specified areas termed Usual and Accustomed (U & A) fishing locations.").

"appurtenant waters" to mean "attaches to specific federal land." *See*, *e.g.*, Admin. Rec. Tab 79 at 1601. That construction of the term was plainly wrong. "Appurtenant" in the water rights context describes a legal relation, not a physical relation, a conclusion readily apparent from the word's definition:

> A thing is "appurtenant" to something else when it stands in relation of an incident to a principal and is necessarily connected with the use and enjoyment of the latter. A thing is deemed to be incidental or <u>appurtenant</u> to land when it is by right used with the land for its benefit, as in the case of a way, or water-course, or of a passage for light, air, or heat from or across the land of another.

*Black's Law Dictionary*, 103 (6th ed. 1990). The key to the definition of "appurtenant" is the legal right of use of the benefits of something; physical proximity is not required.

Consistent with this definition, the case law on implied reserved water rights consistently turns on an analysis of the benefits received by the dominant estate, not on the physical location of the servient estate. Thus, the cases examine the purposes of the reservation, and whether water is necessary to effectuate those purposes. *See*, *e.g., Arizona v. California*, 373 U.S. at 577 (the United States claimed and the Supreme Court recognized reserved water rights for the Cocopah Indian Reservation located two miles from the Colorado River noting that "water from the river would be essential to the life of the Indian people and the animals they hunted and the crops they raised"). *See also United States v. Adair*, 723 F.2d 1394, 1409 (9th Cir. 1984) (finding an implied water rights reservation because "one of the 'very purposes' of establishing the Klamath Reservation was to secure to the Tribe a continuation of its hunting and fishing lifestyle"). *See also* DAVID GETCHES, WATER LAW IN A NUTSHELL, 324 (2d ed. 1990) ("Judicial references to such rights being 'appurtenant' to reserved lands apparently refer not to some

physical attachment of water to land but to the legal doctrine that attaches water rights to land to the extent necessary to fulfill reservation purposes.").

By misconstruing the meaning of the term "appurtenant" to mean simply "within," the Secretaries twisted the logic of the reserved water rights case law from a requirement that the water be <u>necessary to</u> the reservation, into a requirement that the water be <u>located in</u> the reservation.  No case law supports such a cribbed and unprecedented use of the term "appurtenant," and–even more importantly–nothing in ANILCA or in *Katie John II* supports such a narrow reinvention of the reserved water rights doctrine here.

D.    NATIVE ALLOTMENTS POSSESS RESERVED WATER RIGHTS AS A MATTER OF LAW

1.    <u>The Administrative Record Shows That the Policy Group Arbitrarily Refused to Identify Reserved Waters Appurtenant to Native Allotments</u>

It has long been the position of the Department of the Interior that the reserved waters doctrine applies to restricted fee public domain allotments, so long as a reservation of water is "necessary to accomplish the purposes for which" Congress authorized the allotments.[79]  *Winters v. United States*, 207 U.S. 564, 576 (1908).  Despite this long-standing legal position, the Alaska Policy Group's June 15, 1995 Final Recommendations effectively cut out reserved waters appurtenant to allotments from ANILCA's coverage by the simple expedient of deferring the issue to another day.  Twelve years later this non-decision has become the Secretaries' position.

_____

[79]  *See* Memorandum from Solicitor to All Assoc. Solicitors, Reg'l Solicitors, and Field Solicitors (July 8, 1976) (the conclusion that Indian allotments on the public domain do not have reserved water rights "conflicts with the position taken by this Office in currently existing litigation and, hence, the last paragraph of the subject Solicitor's Opinion is hereby withdrawn.") (attached as Exhibit 19).

The Policy Group's decision was based in part on a legal opinion from the Office of the Alaska Regional Solicitor opining that "[t]he Ninth Circuit's *Katie John* decision does not require that the Department address the Native allotment question at this time."[80]  That assessment was plainly wrong.  In fact, the Court of Appeals had, without qualification, extended ANILCA's reach to the full extent of the "reserved water rights doctrine," *Katie John II*, 72 F.3d at 703-04.  The Circuit never said "the reserved water rights doctrine <u>except as applied to allotments</u>."

No reasoned decision-making explains why the Policy Group disregarded the law and the information laid before it.  As explained more fully below, federally reserved water rights clearly extend to Alaska Native allotments.

> 2.    <u>A Reservation of Water Rights Is Necessary to Accomplish the Purposes for Which Congress Authorized Alaska Native Allotments.</u>

In 1887, Congress enacted the Indian General Allotment Act, 25 U.S.C. § 331 (2000).[81] The Act provided that Native Americans not residing on a reservation (or whose Tribe had no reservation) could apply to receive a 160-acre allotment of unsurveyed or otherwise unappropriated public land.  To remove any doubt over the General Allotment Act's application to the Territory of Alaska, Congress enacted the Alaska Native Allotment Act.[82]  In so doing,

---

[80]  *See* Memorandum from Reg'l Solicitor Lauri Adams to Solicitor John Leshy 6 (Aug. 9, 1995) (attached as Exhibit 1).

[81]  Act of Feb. 8, 1887, 24 Stat. 388, 25 U.S.C. §§ 348-349 (2000), also called the "Dawes Act" after its chief sponsor.  *See also* Act of June 25, 1910, 26 Stat. 855, 25 U.S.C. § 336 (2000) (amending the General Allotment Act as it relates to allotments on the public domain).

[82]  Act of May 17, 1906, ch. 2469, § 1, 34 Stat. 197, (as amended by Act of August 2, 1956, ch. 891, § 1(a)-(e), 70 Stat. 954, repealed by Pub. L. No. 92-203, § 18(a), 85 Stat. 710, (1971), formerly codified at 43 U.S.C. § 270-1-270-3, transferred from 48 U.S.C. §§ 357-357b).

Congress reserved water rights necessary to accomplish the purposes for which the allotments were authorized. This conclusion is confirmed by the language of the Act, its implementing regulations, and the Act's legislative history.

The Alaska Native Allotment Act directs the Secretary of the Interior in Section 3 to allot to an Alaska Native applicant up to 160 acres upon proof of "substantially continuous use and occupancy of the land for a period of five years."[83] The Act provides that "the land so allotted

_____

[83] The Act, in full, provides as follows:

Section 1. Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Interior is hereby authorized and empowered, in his discretion and under such rules as he may prescribe, to allot not to exceed one hundred and sixty acres of vacant, unappropriated, and unreserved nonmineral land in the district of Alaska , or, subject to the provisions of the Act of March 8, 1922 (42 Stat. 415, 48 U.S.C. 376-377), vacant, unappropriated, and unreserved land in Alaska that may be valuable for coal, oil, or gas deposits, to any Indian, Aleut or Eskimo of full or mixed blood who resides in and is a native of said district, and who is the head of a family, or is twenty-one years of age; and the land so allotted shall be deemed the homestead of the allottee and his heirs in perpetuity, and shall be inalienable and nontaxable until otherwise provided by Congress. Any person qualified for an allotment as aforesaid shall have the preference right to secure by allotment the nonmineral land occupied by him not exceeding one hundred and sixty acres: Provided, That any Indian, Aleut, or Eskimo who receives an allotment under this Act, or his heirs, is authorized to convey by deed, with the approval of the Secretary of the Interior, the title to the land so allotted, and such conveyance shall vest in the purchaser a complete title to the land which shall be subject to restrictions against alienation and taxation only if the purchaser is an Indian, Aleut, or Eskimo native of Alaska who the Secretary determines is unable to manage the land without the protection of the United States and the conveyance provides for a continuance of such restrictions.

Section 2. Allotments in national forests may be made under this Act if founded on occupancy of the land prior to the establishment of the particular forest or if the Secretary of Agriculture certifies that the land in an application for an allotment is chiefly valuable for agricultural or grazing purposes.

Section 3. No allotment shall be made to any person under this Act until said person has made proof satisfactory to the Secretary of the Interior of substantially continuous use and

shall be deemed the homestead of the allottee and his heirs in perpetuity, and also shall be

inalienable and nontaxable." *Id.*

The Native Allotment Act represented Congress' response to a report President Roosevelt

forwarded to Congress in 1905, detailing many of the problems facing Alaska Natives:

> [The Alaska Natives'] country is being overrun; their natural food supply, never
> overabundant in this north land, is being taken from them; the large game is being
> slaughtered and driven to a distance; and the waters depleted of fish . . . . All of
> these conditions they are themselves helpless to meet . . . . [T]he fact that . . . they
> have advanced their own interests unaided, does not mean that they have no
> needs, nor that the Government can through persistent neglect gain immunity
> from the fulfillment of its moral obligations.

S. DOC. NO. 106, 58-106, at 2-3 (1905) (quoting report of G.T. Emmons).  Congress concluded

that the only way to ensure protection for Alaska Natives' food supplies and continuation of their

way of life was to provide a means for Alaska Natives to obtain title to some of their lands.  As

the Ninth Circuit later recognized in *Pence v. Kleppe*, 529 F.2d 135 (9th  Cir. 1976):

> In the Report to the Full House of Representatives from the Committee on Public
> Lands which reported out the Alaska Native Allotment Act, the Committee said:
>
> > The necessity for this legislation arises from the fact that Indians in
> > Alaska . . . live in villages and small settlements along the streams
> > where they have their little homes upon land to which they have no
> > title, nor can they obtain title under existing laws . . . . Some one
> > who regards that particular spot as a desirable location for a home
> > can file upon it for a homestead, and the Indian or Eskimo, as the
> > case may be, is forced to move and give way to his white brother.
> > This has in some instances already worked severe hardship upon

---

occupancy of the land for a period of five years.

Act of May 17, 1906, ch. 2469, § 1, 34 Stat. 197, (as amended by Act of August 2, 1956, ch. 891,
§ 1(a)-(e), 70 Stat. 954, repealed by Pub. L. No. 92-203, § 18(a), 85 Stat. 710, (1971), formerly
codified at 43 U.S.C. § 270-1-270-3, transferred from 48 U.S.C. §§  357-357b).

> these friendly and inoffensive natives to the shame of our own race
> . . . .

*Id.* at 141 (quoting H.R. REP. NO. 59-3295, at 11 (1906)) (emphasis added).  To address this problem, Congress in the Act granted to Alaska Natives the opportunity to obtain title to their subsistence lands "to enable Alaska Natives to protect the lands which they used and occupied from encroachment by non-Natives."  *Olympic v. United States*, 615 F. Supp. 990, 995 (D. Alaska 1985).[84]

The Act was intended to allow individuals to convert their traditional use and occupancy of an area into a secure allotment.  As this Court recognized in *Aguilar v. United States*, 474 F. Supp. 840 (D. Alaska 1979), the use and occupancy that the Native Allotment Act protects is aboriginal use and occupancy.  The Court equated "individual Indian occupancy" and "nomadic tribal occupancy" with "the Indians' pre-existing right of possession," which the Allotment Act protects.  *Aguilar*, 474 F. Supp. at 843 (citing *Cramer v. United States*, 261 U.S. 219, 227-29 (1923)).  Although aboriginal use and occupancy is an exclusive right of use and occupancy for all purposes, the specific nature of such use and occupancy consists principally of hunting and fishing.  Accordingly, the use and occupancy to which the Act refers "contemplates the

---

[84]  The regulations promulgated under the Native Allotment Act echo this congressional goal:

> It is the program of the Secretary of the Interior to enable individual [N]atives of Alaska to acquire title to the lands they use and occupy and to protect the lands from the encroachment of others.

43 C.F.R. § 2561.0-2 (2007).

customary seasonality of use and occupancy by the applicant of any land used by him for his livelihood and well-being and that of his family."  43 C.F.R. § 2561.0-5(a) (2007).[85]

It is not possible to overstate the primacy of hunting and fishing in the Native Allotment Act's statutory scheme.  Although the Act characterizes allotted lands as the allottee's "homestead," and ensured that the land was available for that purpose, Congress understood that the Act would rarely be needed to protect actual residences:  "[T]hese natives live very generally in villages and can now secure title [to the land where they live] through the town-site laws." S. DOC. NO. 59-101, at 7 (1905).  Congress' primary objective was to protect, not literal residences, but critical lands used by Alaska Natives for hunting and fishing, and to protect such lands against competing claims (such as competing claims made through "the homestead laws and the law giving title for trade and other industrial purposes," *id*. at 7).  It follows inexorably from Congress' purpose to reserve these lands for Native hunting and fishing, that sufficient water was necessarily reserved to protect that hunting and fishing (and also provide for domestic uses)–and without which all fishing and use of the allotment would simply be destroyed.

There are hundreds of Native allotments along the Yukon River and its major tributaries.  This is no accident.  Alaskan Natives selected allotments along these rivers to secure their continued subsistence fisheries practices, for fish is the <u>most</u> dominant and intensively used food source for Alaska Natives.  Robert Wolfe, *Myths: What Have You Heard?*, 21 ALASKA FISH &

---

[85]  *See also Allotment of Land to Alaska Natives,* 71 Int. Dec. 340, 360-61 (1964) (opinion of the Acting Solicitor concluding that the Secretary should consider "(a) native custom and mode of living . . . and (c) customary seasonality of occupancy in determining whether an applicant for an allotment has shown substantially continuous use and occupancy of land for a period of five years.").

GAME 17 (Nov.-Dec. 1989).  Like this Court, the Ninth Circuit understands this well: "Alaska [N]atives who are not fully part of the modern economy rely on fishing for subsistence.  If their right to fish is destroyed, so too is their traditional way of life."  *United States v. Alexander*, 938 F.2d 942, 945 (9th  Cir. 1991).

      3.      <u>Under the *Winters* Doctrine Federal Reserved Water Rights Extend to Off-Reservation Public Domain Allotments</u>.

As discussed above in Part III.C, the *Winters* Doctrine ensures that when the United States reserves land, water rights sufficient to accomplish the purposes of the reservation are reserved as well.   In *United States v. Powers*, 305 U.S. 527 (1939), the Supreme Court recognized the reserved water rights appurtenant to Indian allotments by refusing to enjoin diversions of water by non-Indians who had acquired those allotments.  The Court held that, since agriculture was the purpose for which the allotments were originally made, and because water was necessary to agricultural use of the land, water rights for allotments were consistent with the purposes of the allotment policy and had thus been reserved.  *Id*. at 533.

In *Colville Confederated Tribes v. Walton*,  647 F.2d 42 (9th  Cir. 1981), this Circuit too, found reserved water rights attached to allotments created under the General Allotment Act.  The *Walton* allotments were held in trust by the United States for the heirs of the original Indian allottees (with the small exception of allotments acquired by a non-Indian purchaser).  The court recognized that reserved water rights are appurtenant to lands where water is necessary for the land to have any value or where it is "essential to the life of Indian people."  *Id.* at 46 (quoting *Arizona v. California*, 373 U.S. 546, 599 (1963)).  Where the purpose of the original reservation was to create a "homeland" and preserve traditional fishing grounds, and where the Tribe sought

access to water to sustain a newly-built fishery designed to preserve the Tribe's traditional way of life, a reserved right to water was necessary because without water, the Indian allotments would be useless. *Id.* at 45-48. The court found that "Congress intended to deal fairly with Indians," and in recognition that "the Indians were not in a position, either economically or in terms of their development of farming skills, to compete with non-Indians for water rights," reserved water rights were necessarily implied. *Id.* at 47. *See also Skeem v. United States*, 273 F. 93 (9th Cir. 1921) (applying canon of construction to reserved waters appurtenant to Native allotments where allottees leased allotments); *United States ex rel. Ray v. Hibner*, 27 F.2d 909 (D. Idaho 1928) (same).

Although many Indians received trust allotments from tribal common lands pursuant to the General Allotment Act, others received restricted allotments from the public domain (depending on the language of the particular act directing the allotment). *See United States v. Bowling*, 256 U.S. 484, 487 (1921) (discussing the two classifications of restricted Indian allotments). Although Congress has directed "which of the two modes shall be followed in respect of the lands of a particular tribe . . .," *id.* at 487, ultimately trust allotments are not treated materially different from restricted fee allotments for purposes of reserved water rights or other issues. F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW 1039-40 (2d ed., LexisNexis 2005) (1982). Thus, the Supreme Court has held that trust allotments and restricted fee allotments ("[b]oth have the same effect so far as the power of alienation is concerned," and "[i]n practical effect, the control of Congress, until the expiration of the trust of the restricted period, is the same." *United States v. Ramsey*, 271 U.S. 467, 470-71 (1926) (and discussing "[t]he essential identity of the two kinds of allotments"). *See also Heckman v. United States*, 224 U.S. 413

(1912).  In the Alaska setting, too, Congress has recognized that there is no meaningful distinction between trust allotments and restricted allotments, treating them identically in ANILCA. [86]

This identical treatment of trust and restricted allotments was not always clear.  In a 1955 informal opinion, the Solicitor concluded that public domain allotments had no implied reservation of waters.[87]   But the Solicitor's only reason was that no precedent yet recognized such a right.  In 1976, after the Supreme Court's *Cappaert* decision addressed reserved waters associated with a National Monument, the Office of the Solicitor changed course and squarely concluded "that off-reservation allotments are entitled to reserved water rights."[88]  The Associate Solicitor's Memorandum explained that water rights appurtenant to public domain allotments arose from the fact that farming was one of the primary purposes for issuing allotments, and it was therefore necessary for the Indian allottees to have water to successfully farm those allotments.  (This legal conclusion led the Solicitor to withdraw portions of the earlier 1955 opinion).[89]

Today it is well established that, regardless of whether Congress has chosen to convey to an Indian person a trust allotment from a former reservation, or a restricted fee allotment from

---

[86] ANILCA § 905(a)(1), 94 Stat. 2436, 43 U.S.C. § 1634(a)(1).

[87] Water Rights for Indian Allotments on Ceded Land & Public Domain, 2 Op. Solicitor Dep't. Interior 1688 (1979) (written on Aug. 19, 1955).

[88] Memorandum from the Assoc. Solicitor, Indian Affairs, to Deputy Solicitor (June 11, 1976) (attached as Exhibit 20).

[89]  *See* Memorandum from Solicitor to All Assoc. Solicitors, Reg'l Solicitors, and Field Solicitors (July 8, 1976) (attached as Exhibit 19).

the public domain, the salient factor for purposes of reserved water rights is the withdrawal of lands for a federal purpose and the retention of allotment status.  Accordingly, the United States now routinely asserts reserved water rights for public domain allotments in general stream adjudications.

For instance, in the Yakima River adjudication, the United States asserted, and the Washington court agreed, that the reserved water rights doctrine applies to all off-reservation public domain allotments created under the Indian Homestead Act of 1884, Ch. 180, 23 Stat. 76, 96.  *State of Washington, Department of Ecology v. Acquavella*, No. 77-2-01484-5 (Wash. Super. Ct. Sept. 1, 1994) (holding federal reserved water rights are created by implication wherever the United States withdraws land from the public domain in order to fulfill a federal purpose).  The federal government has asserted similar claims in the Snake River Basin Adjudication on behalf of members of the Wyandotte Tribe who own restricted fee public domain allotments in Idaho. *See* Act of Apr. 28, 1904, ch. 1767, 33 Stat. 519.[90]

Thus well-established precedent confirms that the reserved waters doctrine applies equally to trust and restricted fee public domain allotments, so long as a reservation of water is "necessary to accomplish the purposes for which" Congress authorized the allotments.  *Winters v. United States*, 207 U.S. 564, 576 (1908).  This legal principle controls in the case of restricted fee allotments conveyed pursuant to the Alaska Native Allotment Act.

4.    The Administrative Record Shows That the Policy Group Incorrectly Assumed That the Restriction on Alienation, Reserved by the United States, in Lands

---

[90]  *See also* Memorandum from the Office of the Reg'l Solicitor to Area Dir., Bureau of Indian Affairs (April 23, 1993) (attached as Exhibit 21) (discussing Act of Apr. 28, 1904, ch. 1767, 33 Stat. 519).

<u>Allotted to Alaska Natives, Does Not Constitute a Federal Interest in Lands and Waters Within the Meaning of ANILCA § 102</u>.

One curious notion that emerges from the record is the idea that restricted Native allotments are no more than private property, and that the government holds no interest in such allotments.[91]   But that notion is just another way of saying that public domain Indian allotments are different–and as just shown the law is to the contrary.  Moreover, the notion that the government holds no interest in restricted fee allotments is directly contrary to case law holding that "one of the government's interests in allotted lands is a <u>property interest</u>."  *United States v. Newmont U.S.A* Ltd., No. CV-05-020-JLQ (E.D. Wash. Aug. 21, 2007), (citing *United States v. City of Tacoma*, 332 F.3d 574, 579 (9th Cir. 2003) (holding United States has standing to bring an action for itself and as trustee for the Skokomish Indian Tribe and its members seeking to void land transfers made by the Tribe involving three allotments held in fee by the tribal members with a reversionary interest in the United States, and two allotments held in trust by the United States for tribal members' benefit, because the United States "suffered injury in its property rights in all the allotments . . . [,] suffered as the trustee . . . [,] and has an independent governmental interest when it has not been made a party in condemnation proceedings of restricted Indian lands") (citations omitted)) (emphasis added).

The federal government's restriction on alienation is one of the most significant incidents of allotment ownership–total and absolute control over the transfer of any possessory interest.  Pursuant to both the statute and the implementing regulations, the federal government's restraint

_____

[91]   *See* Memorandum from Reg'l Solicitor, Lauri Adams, to Solicitor John Leshy 6-7 (Aug. 9, 1995) (attached as Exhibit 1).

on alienation makes the land utterly inalienable, and not even taxable or subject to be leased or

pledged, unless the Secretary approves.  43 C.F.R. § 2561.2 (2007).  This federal restraint on

alienation prohibits the unconsented sale, gift, exchange or transfer of an allotment or any interest

therein, and the federal government by this interest comprehensively regulates and controls all

such transactions.  *See* 25 C.F.R. § 152.17–35 (2007).  The protection against taxation is among

the most important elements of the federal government's restraint on alienation, because "[i]n the

area of state taxation, . . . 'the power to tax involves the power to destroy.'" *County of Yakima v.*

*Confederated Tribes & Bands of the Yakima Indian Nation*, 502 U.S. 251, 258 (1992), (quoting

*McCulloch v. Maryland,* 17 U.S. 316, 431 (1819)).  The fact that alienability and taxation go

hand in hand has "counseled [the] categorical approach" of precluding state taxation of

reservations and other protected Indian lands.  *Id.*  Together, these provisions demonstrate just

the sort of comprehensive federal control–to the exclusion of the State and other private

parties–which is typical of Indian lands throughout the United States.  Such a federal right to

control certainly constitutes a federal interest in the allotment.

In sum, the Policy Group relied on an opinion that was contrary to law and, and on this

basis alone, arbitrarily failed to identify reserved waters associated with Alaska Native

allotments.  This failure was in defiance of this Court's and this Circuit's mandate; contrary to

long-established precedent concerning identical allotment water rights elsewhere; contrary to the

functional identity of the federal government's interests in restricted fee and trust allotments; and

fundamentally at odds with Congress' decision in the Native Allotment Act to set aside

allotments for subsistence hunting and fishing– together with the necessary waters required to

sustain that subsistence way of life.  The restriction on alienation, reserved by the United States

in lands allotted to Alaska Natives under the Native Allotment Act, encompasses reserved water rights and constitutes an interest in lands and waters that renders these reserved waters "public lands" within the meaning in ANILCA § 102.

5.    Canons of Construction Favoring Indians and the Federal Trust Responsibility Compel the Conclusion That Federally Reserved Waters Attach to Alaska Native Allotments.

If there were any doubt in the matter, controlling rules of statutory construction and the Secretary's trust responsibility would compel the conclusion that federally reserved water rights attach to restricted fee allotments.  *See* p 52, *supra*.

The federal restriction on the alienation of Native allotments gives rise to the federal trust responsibility to Native allottees to protect their property interests.  *Agiular v. United States*, 474 F. Supp. 840, 846 (D. Alaska 1979) ("[T]he protection of Indian property rights is an area where the trust responsibility has its greatest force."); *see also Seminole Nation v. United States*, 316 U.S. 286 (1942); *Pyramid Lake Paiute v. Morton*, 354 F. Supp. 252 (D.D.C. 1972).  *See* F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW 1195 n.208 (2d ed., LexisNexis 2005)(1982)) This trust responsibility extends equally to both trust allotments and restricted fee allotments. *See United States v. Weyerhaeuser Co.*, 765 F. Supp. 643, 646 (D. Or. 1991).

In *Weyerhaeuser*, the district court rejected the argument that the United States only has standing on behalf of Indians when either the property is held in trust or the restricted allotment came from former trust or reservation land. *Id.*  There, the allottee held a restricted patent on land that had never been part of any Indian reservation. *Id.*  But just as with Alaska Native allotments, the restriction on the fee patent rendered the allotment inalienable absent the Secretary's consent.

*Id.* at 649[92]  The court upheld the federal right to bring an action as trustee on behalf of the heirs of two allottees because "[t]he Secretary of the Interior has a trust relationship with restricted allotments [because] . . . the crucial element in determining the trust relationship of the allotment is the restriction on alienation." *Id.* at 646.  This relationship remains "until the expiration of the trust or the restricted period." *Id.*

In short, if there were any reasonable doubt in the matter–and here there is none–the liberal canon of construction and the trust responsibility to protect and advance the interests of allottees would require the Alaska Native Allotment Act to be construed to include those reserved water rights necessary to effect Congress purpose to protect Alaska Native subsistence.

V.    CONCLUSION

For the foregoing reasons, this Court should enter judgment in favor of Plaintiffs *Katie John, et. al.* declaring that the Secretaries' actions are contrary to law and an Order remanding to the Secretaries, with instructions to identify all remaining reserved waters that constitute "public lands" under ANILCA.

Respectfully submitted this 12th day of October 2007.

> s/ Heather R. Kendall Miller
> Heather R. Kendall Miller
> Alaska Bar No. 9211084
> NATIVE AMERICAN RIGHTS FUND
> 420 L Str., Suite 505
> Anchorage, Alaska 99501
> Telephone (907 276-0680
> Facsimile: (907) 276-2466
> Email: kendall@narf.org

---

[92] "[L]ands shall not be alienated without the consent of the Secretary of the Interior." *Weyerhaeuser*, 765 F. Supp. 643, 649 (D. Or. 1991).

Counsel for Katie John *et al.*

Lloyd B. Miller
SONOSKY, CHAMBERS & MILLER
900 West 5th Ave., Suite 700
Anchorage, Alaska 99501
Telephone (907) 258-6377
Facsimile (907) 258-6344
Email: Lloyd@sonosky.com

Of Counsel

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 12, 2007, a copy of foregoing Plaintiffs' Opening Brief on the "Which Waters" Issue was served electronically on:

Robert T. Anderson
William F. Sherman
Dean K. Dunsmore
William P. Horn
Gregory L. Fisher
Carol H. Daniel
Randolph H. Barnhouse
Stephen A. Daugherty
Joanne M. Grace

s/  Heather Kendall Miller