Westlaw.

6 U.S. Op. OLC 328           FOR EDUCATIONAL USE ONLY                      Page 1
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

Office of Legal Counsel
U.S. Department of Justice

FEDERAL "NON-RESERVED" WATER RIGHTS

June 16, 1982

[The following memorandum of law deals with the scope of the federal government's rights to unappropriated water flowing across federally owned lands in the western states. It discusses the background and development of the federal "non-reserved" water rights theory, and concludes that that theory does not provide an appropriate legal basis for a broad assertion of water rights by federal agencies without regard to state laws. It then sets forth the legal standards and considerations that are applicable to an analysis of federal water rights in connection with the management of particular federal lands under specific statutes authorizing federal land management.]

TABLE OF CONTENTS

I.   Introduction....329

II.  Backgorund....333

  A. Development of 'Appropriative' Water Rights in the Western States....334

  B. Role of the Federal Government....338

    (1) Federal ownership of western lands....338

    (2) Congressional recognition of state water law....341

    (3) Judicial recognition of federal water rights....345

    (a) Federal reserved rights....346

    (b) Conflicts with congressional directives....351

    (c) Administrative practice and interpretations....355

    (i) Krulitz Opinion....356

    (ii) Martz Opinion....360

    (iii) Coldiron Opinion....360

III. Analysis....362

  A. Constitutional Basis for Federal Claims....362

    (1) Congressional authority to preempt state water laws....362

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 1 of 55

Case 3:05-cv-00006-HRH    Document 141-2    Filed 10/12/2007    Page 2 of 19

6 U.S. Op. OLC 328                FOR EDUCATIONAL USE ONLY                            Page 2
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

   (2)   'Ownership' of unappropriated water...364

   (3)   Effect of Mining Acts of 1866 and 1870 and Desert Land Act%y ( 3)27367

   B.   Statutory Basis for Federal Claims...370

IV.   Conclusion...383

MEMORANDUM FOR THE ASSISTANT ATTORNEY GENERAL

LAND AND NATURAL RESOURCES DIVISION

I. Introduction

   You have asked us for our analysis and legal opinion concerning the federal government's legal rights to unappropriated water arising on or flowing across federally owned lands in the western states. Specifically, you have asked us to consider whether the federal government can assert rights to unappropriated water, without regard to state laws governing the use of such water, under what has come to be known as the federal "non-reserved" water rights theory. For the reasons set forth in detail in this opinion, we conclude that the federal non-reserved water rights theory which we address in this opinion does not provide an appropriate legal basis for assertion of water rights by federal agencies in the western states.

   The question presented to us arose in your Division in pending litigation in Wyoming State court involving, inter alia, rights of the United States Department of Agriculture, through the Forest Service, to water in the Big Horn and Shoshone National Forests. The question presented to us initially was whether an appropriate legal basis exists for the Forest Service to assert amended claims in that litigation based on the federal non-reserved water rights theory. At that time the Forest Service supported assertion of such claims, at least for the purposes of the Wyoming litigation. The Department of Agriculture has since changed its position and decided as a mater of policy that it will not assert claims based on the non-reserved water rights theory, but rather will rely on state law to obtain water rights, except where Congress has specifically established a water right or where a federal reserved right exists. See Letter from John B. Crowell, Jr., Assistant Secretary for Natural Resources and Environment, Department of Agriculture, to the Honorable David H. Leroy, Attorney General, State of Idaho (Feb. 5, 1982).

   While the question of the validity of the federal non-reserved water rights theory arose in the relatively narrow context of the Wyoming litigation, it is a *330 question that has created considerable uncertainty for you and your client agencies (the Departments of the Interior, Agriculture, and Defense), and for the western states. It is no exaggeration to say that water is the single most vital resource in the western states. The importance of the availability of water for management of federal lands in the western states and concern at the state level with allocation of dwindling water resources have led in the past to conflicts within the Executive Branch and intense controversy with the western states over the basis and scope of the federal government's right to use unappropriated water arising on or flowing across federal lands. Previous Executive Branch positions relative to federal government claims to water in the western states have been inconsistent and have produced confusion, turmoil, and significant hostility toward the federal government. [FN1] The need to establish clear, dependable,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 2 of 55

Case 3:05-cv-00006-HRH   Document 141-2   Filed 10/12/2007   Page 3 of 19

6 U.S. Op. OLC 328          FOR EDUCATIONAL USE ONLY                    Page 3
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

reliable, and sound legal policies and to avoid conflicts and uncertainty in the western states to the extent possible, and to facilitate future planning for the use of water resources by both the western states and the responsible federal agencies has led you to ask this Office to address the matter more broadly.

We address here only the legal issues raised by the federal non-reserved water rights theory. Some uncertainty may persist as to how the legal principles we outline here should be applied to specific factual situations. Policy considerations will also continue to be important, for example, in the determinations by federal agencies relative to the breadth of permissible rights which they wish to assert or in the choice of procedures and forums in which to adjudicate federal water rights, and quantification of current and future water rights may have to await comprehensive adjudications in each state. However, because much of the uncertainty has been created by contradictory analyses of the legal basis of the federal non-reserved right theory, a comprehensive resolution of the legal issues involved will go far toward reducing the uncertainty and therefore the tensions among the various federal agencies and between the Executive Branch and the western states.

At the outset, it is important to understand what we address in this opinion. First, we are concerned here only with the federal government's right to use unappropriated water--i.e., water that is not subject to any vested right of ownership under applicable state or federal law at the time the federal right accrues. We do not deal here with the scope of the federal government's right to acquire, by purchase or condemnation, existing vested ("appropriated") water rights held by private individuals or by the states. Second, the question we address is not simply whether a federal non-reserved right exists in the abstract. The federal government can, and does, acquire rights to use unappropriated water on federal lands by complying with state procedural and substantive laws. In *331 addition, the Supreme Court has recognized federal "reserved" water rights--i.e., when the federal government, acting pursuant to congressional authorization, reserves or withdraws public land for a specific federal purpose, such as a national forest, it also reserves sufficient water to accomplish that purpose, regardless of limitations that might otherwise be imposed on the use of that water under applicable state law. See Part IIB(3)(a) infra. In its broadest formulation, a federal non-reserved water right might include any use by the federal government of unappropriated water that is recognized neither under applicable state law nor under the reserved right doctrine. Defined this broadly, federal non-reserved water rights would include even uses of water that have been explicitly authorized by Congress, but that may not be recognized by state law, such as preservation of a minimum instream flow in a particular river, [FN2] or diversion of a stream and construction of a dam for flood control, improvement of navigation, or production of hydroelectric power. [FN3] Although Congress has rarely been explicit in directing the use or disposition of water by federal agencies, there is no question that, by operation of the Supremacy Clause, such a specific directive preempts inconsistent state laws. See discussion in Part IIIA(1) infra. As we discuss below, a legal basis may therefore exist under particular federal statutes for assertion of federal water rights that do not fall into the category of either reserved or state-recognized rights, and that might conceivably be classified as "non-reserved" water rights simply because they do not stem from the reserved doctrine.

This is not to say, however, that an appropriate legal basis exists for the federal non-reserved water rights theory, as it has been articulated by, among others, former Solicitor Leo Krulitz of the Department of the Interior. It is this theory that we address here. In his June 25, 1979, opinion on the legal bases for acquisition of water rights

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 3 of 55

by the Department of the Interior, Solicitor Krulitz concluded that, in the absence of an explicit congressional directive to the contrary, a federal agency may claim and use whatever unappropriated water is necessary to carry out congressionally authorized "management programs" for federal lands, without regard to state law. See Part IIB(3)(c)(i) infra. Solicitor Krulitz's theory of federal non-reserved water rights rested on the presumption that the federal government need not comply with state water law in its acquisition and use of water for federal purposes on federal lands--a presumption that could be rebutted only by an explicit statutory directive that the federal agency responsible for management of the federal lands in question abide by state law in the use, appropriation, or distribution of water on those lands. Thus, under this theory, in the absence of such a directive a federal agency may use whatever unappropriated water is necessary to carry out its land management functions without regard to state law. [FN4]

*332 We conclude that the broad federal non-reserved water rights theory asserted by Solicitor Krulitz is not supported by an analysis of the applicable statutes and judicial decisions. As we discuss below, to the extent Solicitor Krulitz relies on federal ownership of unappropriated water in the western states as a basis for federal rights to water, that reliance is misplaced. More importantly, when the question is considered as one of competing state and federal regulatory jurisdiction, rather than ownership of the water--as we believe it must--Solicitor Krulitz's opinion fails to give adequate consideration to the pattern of congressional deference to state water law, which the Supreme Court has recognized as critical in analyzing federal rights to water on federal lands. See California v. United States, 438 U.S. 645, 648-63 (1978); United States v. New Mexico, 438 U.S. 696, 701-02 (1978).

We believe that the history of federal-state relations with respect to water rights in the western states and Congress' weighing of the competing federal and state interests establish a presumption that is directly opposite to that asserted by Solicitor Krulitz: in the absence of evidence of specific congressional intent to preempt state water laws, the presumption is that federal agencies can acquire water rights only in accordance with state law. The mere assignment of land management functions to a federal agency, without more, does not create any federal rights to unappropriated water necessary to carry out those functions.

It is important to keep in mind, however, that this presumption is rebuttable. There is no question that the federal government has the constitutional authority to acquire rights to whatever water is necessary to manage federal lands, either through purchase or condemnation of existing water rights or by clear congressional action. The critical question is what evidence of congressional intent is necessary to rebut the inference that state law is controlling. The Supreme Court has addressed that question in its recent decisions in California v. United States and United States v. New Mexico, albeit in limited contexts. We believe that the Court's reasoning in those two cases provides the relevant framework for analysis here. Read together, those cases suggest that congressional intent to preempt state control over unappropriated water in the western states will be found only if conditions imposed under state law on the use or disposition of water by a federal agency conflict with specific statutory directives authorizing a federal project or directing the use of federal lands, or if application of state law would prevent the federal agency from accomplishing specific purposes mandated by Congress for the federal lands in question. The scope of the federal rights that may be asserted under those circumstances is limited to water minimally necessary to carry out the relevant statutory directives or purposes.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 4 of 55

6 U.S. Op. OLC 328                FOR EDUCATIONAL USE ONLY                          Page 5
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

Although we believe that the water rights that can be asserted by federal agencies without regard to state law are far more limited than those available under Solicitor Krulitz's non-reserved water rights theory, we do not believe it is appropriate to reach a blanket conclusion that under existing federal statutes no implied federal water rights exist except for reserved rights. The reasoning used by the Supreme Court to support federal reserved rights does not depend solely on a formal reservation of land from the public domain, but rather on Congress' *333 exercise of a constitutional authority such as the Property or Commerce Clauses, coupled with the Supremacy Clause. Therefore, that reasoning is applicable even if there has been no such reservation. We believe, for example, that the Court's decision in United States v. New Mexico is equally applicable to water necessary to fulfill the primary purposes of a federal statutory scheme where the lands in question have been acquired by the federal government from private ownership, rather than reserved from the public domain, and dedicated to particular federal purposes, such as a national forest, park, or military base. See Part IIIB infra. We also believe that it is open to federal agencies to argue that Congress has established particular mandatory purposes for the management of public domain lands that would be frustrated by the application of state water law, although, as we discuss below, the primary federal statutes authorizing management of the public domain appear to provide little basis for that argument. The New Mexico decision leaves virtually no room for arguing, however, that federal agencies can appropriate water without regard to state law if that water is necessary only to carry out a "secondary use" of federal lands, in the terminology of the Court in New Mexico--i.e., an incidental or ancillary use that is permitted by Congress, but not within the primary purposes mandated by Congress for the federal lands in question.

The scope of the federal government's rights to unappropriated water for use in the management of specific federal lands in the western states, whether characterized as "reserved" or "non-reserved," can be definitively determined only by a careful examination of the individual federal statutes that authorize management of those lands and their legislative history, and of the potential conflicts that may be created by application of state laws. We cannot undertake that analysis here with respect to all federal statutes governing the use of federal lands, but must leave that task, at least initially, to the individual agencies responsible for administration of those statutes. We outline in this opinion, to the extent possible, the legal standards and considerations that are applicable to that analysis, and the bases for our conclusions.

II. Background

The rights of the federal government to use water in the western states cannot be analyzed solely as a question of abstract constitutional or statutory interpretation. See California v. United States, supra, 438 U.S. at 648. The unique geography, history, and climate of the western states and the ownership by the federal government of substantial land within those states have shaped many of the relevant questions and conclusions. In order to analyze the scope of the federal government's rights to unappropriated water in the western states, it is therefore necessary to look in some detail at the development of western water law and the role played by the federal government in managing and disposing of the western public lands.

*334 A. Development of "Appropriative" Water Rights in the Western States

Because of different climatic, topographic and geographic conditions and the differing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 5 of 55

Case 3:05-cv-00006-HRH   Document 141-2   Filed 10/12/2007   Page 6 of 19

6 U.S. Op. OLC 328                FOR EDUCATIONAL USE ONLY                      Page 6
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

demands of agricultural and economic development, the arid and semi-arid western states have developed legal doctrines and administrative machinery governing water rights that bear little resemblance to those developed in the humid eastern states. [FN5] Most of the eastern states have adopted, with some variations and modifications, the common law riparian theory of water rights. In general, under a riparian theory, the right to use water goes with ownership of land abutting a stream. Each owner of land on a stream has the right to make reasonable use of the water, but cannot interfere unreasonably with the right of a downstream owner to the continued flow of the stream. For example, if the riparian owner diverts the water, he must return it to its natural channel, undiminished except for reasonable consumptive uses. See 1 R. Clark, Waters and Water Rights, §§ 4.3, 16.1 (1967) (hereinafter cited as Clark); F. Trelease, Water Law, at 10-11 (3d ed. 1979). Similarly, a landowner in a riparian state generally has the right to make reasonable use of ground water arising on his land, but not to make unreasonable withdrawals of that water if it comes from a pool common to other landowners. Id. A landowner's riparian rights exist whether or not he actually takes steps to use the water, and the use may be initiated at any time. See id. at 11.

The riparian doctrine has for the most part been adequate to allocate water rights in the eastern states, where water is generally abundant and water problems most often involve flooding, drainage, pollution, or navigation. [FN6] As the arid and semi-arid western states were settled, however, the riparian system proved to be inadequate to meet the needs of the early settlers, particularly the miners and, later, the farmers. [FN7] The major problem faced by early settlers in those states was a shortage of water. The two primary occupations, mining and agriculture, required large consumptive uses of water, which could be accomplished only by construction of systems to divert and store available stream and ground waters. Tying water rights to the ownership of adjacent land, and thereby retarding or *335 precluding the diversion of waters from their normal channels, would have entirely frustrated development of the west. See, e.g., California Oregon Power Co. v. Beaver Portland Cement Co., 295 U.S. 142, 157 (1935). Accordingly, based largely on customs of the early miners, the western states developed what has come to be known as the "law of the first taker," or the "appropriative" system. Under an appropriative system, unlike under a riparian system, the right to use water does not depend on ownership of underlying or appurtenant lands. Rather, the right depends on capture or "appropriation" of the water for a particular use. The first person to put water to use is entitled to that water as long as the use continues, to the exclusion of subsequent users. The principle of "first-in-time-first-in-right" embodied in this customary system was quickly confirmed by the state courts, [FN8] and refined and codified by state statute. [FN9] Most of the western states have now adopted comprehensive water codes based primarily on appropriation, which provide for recognition, administration, and enforcement of water rights and, in several of those states, for large-scale planning of water resource use. [FN10]

Although statutory and case law differ in many respects among the western states, there are several common principles that distinguish the appropriative systems from riparian systems. See generally Trelease, "Federal-State Relations," supra n. 6, at 29-33; 1 Clark, supra, § 4.

First, the right is based on the beneficial use of water, rather than on ownership of appurtenant land. Unless there has been an actual application of water to a beneficial use, there has been no valid appropriation. The beneficial use is also the measure of the right; an appropriator is entitled to only that quantity of water beneficially used in any given year upon particular land. See 5 Clark, supra, § 408.1. Uses considered

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 6 of 55

Case 3:05-cv-00006-HRH   Document 141-2   Filed 10/12/2007   Page 7 of 19

6 U.S. Op. OLC 328                FOR EDUCATIONAL USE ONLY                       Page 7
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

"beneficial" vary from state to state. Recognizing that the term must be applied pragmatically, the states have generally considered beneficial uses to include a variety of productive uses such as mining, irrigation, domestic and municipal uses, industry, power production, stock watering, and, more recently, wildlife preservation and recreation. [FN11] See id. Some states have *336 established statutory preferences to be given effect if there are competing applications for new uses that exceed the available unappropriated water supply. These preferences do not generally affect past or existing uses. [FN12]

Second, the water must be "appropriated," or reduced to possession. As a general rule, appropriation may be accomplished only by a physical diversion of a stream or capture of ground water. Although some states recognize exceptions for uses such as stock watering and irrigation by natural overflow, uses of a whole stream or lake, without diversion, for purposes such as maintenance of minimum instream flows to preserve fish and wildlife or for recreation are often not recognized. See 5 Clark, supra, § 409.2. A few states allow instream uses on a discretionary basis [FN13] or provide that state agencies may make appropriations of minimum instream flows for recreational, wildlife, or other purposes. [FN14]

Third, when there is insufficient water to meet the needs of all appropriators, priority among appropriators is established chronologically, based on the time the various appropriators first put the water to use, rather than based on any proration that takes account of the utility of the competing uses. The priority date gives an appropriative water right its primary value, because it guarantees that a senior (in time) appropriator will receive the entire quantity of water to which he is entitled prior to delivery of any water to a more junior appropriator. Originally, priority dates were established on the basis of when the water was actually put to use. Most western states, however, have enacted statutes requiring noticing or filing of applications for new water uses. In many western states, that statutory procedure is the exclusive means for acquiring water rights. In these so-called "permit states," priority dates are normally fixed by the date of application for the water right rather than the date of actual use. See 5 Clark, supra, at § 410.1. In permit states, it is possible that an appropriator who fails to make the filings or applications required by state law but actually puts the water to use may find his rights cut off by a more junior appropriator who makes a timely filing. [FN15]

Fourth, an appropriation of water is a transferable right of permanent, or at least indefinite duration, provided the use is continued. It may be sold or transferred with the land or separately. Changes in the location or nature of the use (but generally not the quantity) may be permitted, provided they do not injure the rights of other appropriators, but in most cases must be approved in advance *337 by the state. See 5 Clark, supra, at § 412; Trelease, "Federal-State Relations," supra n. 6, at 33.

All the western states have developed administrative or judicial systems to recognize, administer and enforce water rights. In most of these states, new appropriations must be approved by a state administrator (often known as the State Engineer) who has the authority, inter alia, to determine if there is sufficient unappropriated water available, if the proposed use is beneficial and, in some states, if the use is in the public interest. See Trelease, "Federal-State Relations," supra n. 6 at 135-36; 1 Clark, supra, §§ 20-21. Judicial review of administrative determinations, and adjudication of competing rights are available in each state, often in special courts or under special procedures applicable only to water rights. Id. The western states do not generally provide any

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 7 of 55

6 U.S. Op. OLC 328                FOR EDUCATIONAL USE ONLY                           Page 8
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

explicit exemption from their substantive or procedural requirements for the federal government or give any special recognition to uses of water by the federal government that may have no private counterpart, such as minimum instream flows necessary to sustain wildlife and fish or to provide recreational opportunities. [FN16]

In addition to statutes providing for the appropriation of water and enforcement of water rights, most of the western states have asserted, by statutory or constitutional provision, some form of "title" to or "ownership" of waters by the state or the people of the state. [FN17] Many of those states also recognize, however, that the federal government may have reserved some "proprietary" interests in unappropriated water appurtenant to federal lands at the time the states were admitted into the Union. In the so-called "California doctrine" and "Oregon doctrine" states, [FN18] the state courts have held that the federal government had an original property right to all non-navigable waters on the territories that formed those states, a right it did not pass to the states at the time of their admission. Those states, however, by virtue of their sovereignty over lands within their borders, can nonetheless determine rights that appertain to federal as well as private ownership of property, such as the use of water, subject to the ultimate authority of the federal government to determine such rights on federally owned lands. [FN19] In *338 the "Colorado doctrine" states, by contrast, the courts have held that the United States never acquired any proprietary interest in waters in those states, and therefore that the transfer of sovereignty to such states with their admission simultaneously transferred full power to control the disposition and use of those waters. [FN20]

B. Role of the Federal Government

The most significant role that the federal government has played in the development of water law in the western states has been that of owner of vast public lands within those states. As we discuss below, the federal government has largely acquiesced in or fostered the development of comprehensive state control over water in the western states, even with respect to water flowing over or arising on federally owned lands. With rare exceptions, Congress has not directly regulated the acquisition or use of water flowing over or arising on federal lands in the western states. The federal laws that have the greatest impact on state interests and state regulation of water rights are directions or authorizations to government agencies to construct projects, administer programs, manage property, and use water on federal lands. To the extent that a "federal" law of water rights exists--i.e., rights that can be asserted under federal statutes without regard to state law--it arises primarily because programs or projects on federal lands operated by federal agencies require the use of water, rather than because federal regulation of the uses of water overlaps with state regulation. As one commentator has noted:

Most conflicts [between federal and state agencies] have come not from direct clashes between inconsistent laws applicable to the same subject of regulation, but from federal uses or operations which in particular applications do not mesh with state laws or private rights. [For example a] federal project may be illegal, or at least unauthorized, under state water law. A private use under state law may interfere with a federal use of water or of land. A federal use may destroy a state use. A federal program may encourage uses not provided for by state law.

Trelease, "Federal-State Relations," supra n. 6, at 56-57. Therefore, Congress' policies towards the settlement, disposition, and management of federal lands in the western states provide the context for our consideration of the scope of federal water rights in those states.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 8 of 55

6 U.S. Op. OLC 328                FOR EDUCATIONAL USE ONLY                    Page 9
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

1. Federal ownership of western lands

   The federal government was the original owner of substantially all the land that comprised the western territories. [FN21] The acts of admission of the western states, *339 which guaranteed each state "equal footing with the original States in all respects whatever" (see, e.g., 9 Stat. 452 (1850)), reserved to the federal government ownership of unappropriated lands within the state, but made no provision with respect to unappropriated waters. See, e.g., California v. United States, supra, 438 U.S. at 654. Much of the land originally owned by the federal government has been sold or disposed of under the terms of the federal public land laws, [FN22] but the federal government still holds title to substantial acreage in the West. [FN23]

   The lands owned by the federal government are generally classified as either "public domain" or "reserved" lands. The public domain includes lands that are open to settlement, public sale, or other disposition under the federal public land laws, and not exclusively dedicated to any specific governmental or public purpose. See, e.g., Federal Power Commission v. Oregon, 349 U.S. 435, 443-44 (1955); United States v. Minnesota, 270 U.S. 181, 206 (1926). Public domain lands are for the most part managed by the Department of the Interior, through its Bureau of Land Management (BLM). [FN24] Reserved lands are lands that have been expressly withdrawn from the public domain by statute, executive order, or treaty, and dedicated to a specific federal purpose. Federal statutes authorize reservation of public domain land for a variety of purposes, such as national parks and monuments, [FN25] national forests, refuges and wilderness areas, [FN26] reclamation projects, [FN27] hydroelectric dams, [FN28] and military facilities. [FN29] Other withdrawals have been made by executive order, pursuant to the general authority of the Executive Branch to manage and administer federal lands, subject to congressional authorization or assent. See United States v. Midwest Oil Co., 236 *340 U.S. 459, 474 (1915). As a general rule, land that has been withdrawn from the public domain is no longer subject to laws governing the disposition or sale of public lands. See, e.g., United States v. Minnesota, supra, 270 U.S. at 206.

   The terms "public domain" and "reserved lands" are most often used to refer to land that has been owned continuously by the federal government. There is a third category of federally owned land that includes lands acquired by the federal government from private ownership by purchase, exchange, gift, or condemnation pursuant to statutory authorization. See, e.g., 43 U.S.C. § 315g(c) & (d) (grazing lands); 16 U.S.C. § 515 et seq. (1976) (national forest lands). These "acquired" lands may become part of the public domain, or may be set aside for specific federal purposes in the same manner as reserved lands. When acquired lands are set aside, they are not characterized as reserved lands, because they were not, strictly speaking, reserved from existing public domain lands. They are nonetheless usually managed under the same statutory authority and for the same purposes as reserved lands, [FN30] and therefore for most purposes can be considered as part of a federal reservation. See Rawson v. United States, 225 F.2d 855, 856 (9th Cir. 1955), cert. denied, 350 U.S. 934 (1956) ("It may be stated as a universal proposition that patented lands reacquired by the United States are not by mere force of the reacquisition restored to the public domain. Absent legislative or authoritative directions to the contrary, they remain in the class of lands acquired for special uses, such as parks, national monuments, and the like...."); Thompson v. United States, 308 F.2d 628, 632 (9th Cir. 1962).

   Until the end of the 19th century, federal policy emphasized and encouraged settlement

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 9 of 55

Case 3:05-cv-00006-HRH   Document 141-2   Filed 10/12/2007   Page 10 of 19

6 U.S. Op. OLC 328                FOR EDUCATIONAL USE ONLY                          Page 10
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

and transfer of the public lands to private ownership. See Comment, Federal Non-Reserved Water Rights, 15 Land and Water L. Rev. 67, 69 (1980); 1 Clark, supra, § 20.2. Since that time, however, federal policy has shifted increasingly towards conservation and retention of land in federal ownership and management. The emphasis on retention of lands in federal ownership began around the turn of the century, with establishment by Congress of several national parks and forests, and passage of statutes of general applicability authorizing the reservation of federally owned land for national forests, parks, and historic monuments, [FN31] and authorizing management of public domain land to promote purposes such as grazing or wide use of the resources on such lands. [FN32] In addition, the federal government began to take an active role in the promotion, financing, and use of water resources. In the Reclamation Act of 1902, supra n. 27, for example, Congress established broad authorization for federal development of facilities to reclaim arid lands. The Federal Power Act, supra n. 28, passed in 1920, authorized the Federal Power Commission to license private power projects, and other acts provided for federal development or construction *341 of large-scale multipurpose flood control, navigation, or power projects. [FN33] Most recently, in 1976 Congress declared in the Federal Land Policy and Management Act, supra n. 22, that federal policy is to retain public lands in federal ownership unless it is determined, following procedures mandated by the Act, that disposal of a particular parcel will serve the national interest.

2. Congressional recognition of state water law

As we described above, even before their admission into the Union, the western states developed customary and statutory laws governing the acquisition and use of water within their borders based primarily on appropriative rights. See Part IIA supra. Federal ownership of much of the underlying land raised the threat of a general federal law applicable to the acquisition of rights to unappropriated water on federal lands. However, in a series of statutes passed in the last half of the 19th century, Congress rejected the alternative of a general federal water law, and instead largely acquiesced in comprehensive state control over the appropriation of water, including water on federal lands, at least with respect to rights that could be asserted by private appropriators. [FN34]

The first of these acts, the Mining Act of 1866, [FN35] officially opened federally owned lands to exploration and development by miners. Act of July 26, 1866, 14 Stat. 253, codified at 50 U.S.C. §§ 51, 52 and 43 U.S.C. § 661 (1976). Although the primary purpose of the Act was to allow open mining on federal lands, [FN36] Congress included a provision that specifically disclaimed any intent to interfere with water rights and systems that had developed under state and local law:
> Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction *342 of ditches and canals for the purposes herein specified is acknowledged and confirmed; ....

43 U.S.C. § 661 (1976).

Four years later Congress amended the Mining Act of 1866 to extend its applicability to "placer" mines. Act of July 9, 1870, 16 Stat. 218, codified at 30 U.S.C. §§ 51, 52, and 43 U.S.C. § 661 (1976). In perhaps an overabundance of caution, Congress reaffirmed in the 1870 Act that water rights obtained under applicable state or local law were not to be affected by grants made under the Act:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 10 of 55

Case 3:05-cv-00006-HRH    Document 141-2    Filed 10/12/2007    Page 11 of 19

6 U.S. Op. OLC 328                FOR EDUCATIONAL USE ONLY                Page 11
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

> [A]ll patents granted, or preemption of homesteads allowed, shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such water rights, as may have been acquired under or recognized by the [Mining Act of 1866].

43 U.S.C. § 661 (1976). [FN37]

The Supreme Court has interpreted these acts as expressing congressional recognition of and acquiescence in the water rights law developed by the western states:

> Congress intended [by these acts] "to recognize as valid the customary law with respect to the use of water which had grown up among the occupants of the public land under the peculiar necessities of their condition."

California v. United States, supra, 438 U.S. at 656, quoting Basey v. Gallagher, 87 U.S. (20 Wall.) 670, 684 (1875). See also United States v. Rio Grande & Dam Irrigation Co., 174 U.S. 690, 704 (1899) ("The effect of this statute was to recognize, so far as the United States are concerned, the validity of the local customs, laws and decisions of courts in respect to the appropriation of water"). The effect of the acts was not limited to recognition of rights that had previously vested under applicable state law or custom:

> They reach[ed] into the future as well, and approve[d] and confirm[ed] the policy of appropriation for a beneficial use, as recognized by local rules and customs, and the legislation and judicial decisions of the arid-land states, as the test and measure of private rights in and to the non-navigable waters on the public domain.

California Oregon Power Co. v. Beaver Portland Cement Co., 295 U.S. 142, 155 (1935).

In 1877, Congress passed yet a third statute, the Desert Land Act, supra n. 22, which permitted persons in most of the western states to enter and claim irrigable lands "by conducting water upon the same ... [by] bona fide prior appropriation." [*343 FN38] In what has become an important proviso, Congress limited the amount of water that could be appropriated by such entrymen under the statute to that amount "actually appropriated" and "necessarily used" for irrigation and reclamation. Any excess non-navigable water was specifically saved for the public:

> [A]ll surplus water over and above such actual appropriation and use, together with the water of all lakes, rivers and other sources of water supply upon the public lands and not navigable, shall remain and be held free for the appropriation and use of the public for irrigation, mining and manufacturing purposes subject to existing rights.

43 U.S.C. § 321.

This proviso of the Desert Land Act has been given a somewhat broader reading by the Supreme Court than might be warranted by its legislative history, which suggests only that it was included to prevent any individual from monopolizing a source of water on desert lands. [FN39] In California Oregon Power Co. v. Beaver Portland Cement Co., supra, the Supreme Court construed the Act as effecting "a severance of all waters upon the public domain, not theretofore appropriated, from the land itself," and reserving those severed waters "for the use of the public under the laws of the states and territories named." 295 U.S. at 158, 162. The Court held that a land patent granted by the federal government to a settler under the Homestead Act did not carry with it any common law riparian rights not recognized by the state, because in the Desert Land Act (if not before) Congress had acquiesced in the authority of the western states to change the common law riparian system to an appropriative system. Id. at 158. Although the question before the Court in that case involved competing private rights to water arising on federal lands, the language used by the Court to describe the effect of the Desert Land Act is quite broad, and could be interpreted to apply to rights that may be asserted by the federal government:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 11 of 55

Case 3:05-cv-00006-HRH    Document 141-2    Filed 10/12/2007    Page 12 of 19

6 U.S. Op. OLC 328                FOR EDUCATIONAL USE ONLY                        Page 12
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

What we hold is that following the Act of 1877, if not before, all non-navigable waters then a part of the public domain became publici juris, subject to the plenary control of the designated states, including those since created out of the territories named, with the right in each to determine for itself to what extent the rule of appropriation or the common-law rule in respect of riparian rights should obtain .... [t]he Desert Land Act does not bind or purport to bind the states to any policy. It simply recognizes and *344 gives sanction, in so far as the United States and its future grantees are concerned, to the state and local doctrine of appropriation, and seeks to remove what otherwise might be an impediment to its full and successful operation.

295 U.S. at 163-64 (emphasis added). The Desert Land Act has been held inapplicable to federal reserved lands. See Federal Power Commission v. Oregon, 349 U.S. 435, 448 (1955), discussed at pp. 26-27, 32-33, & n. 52.

Thus, in the Mining Acts of 1866 and 1870 and the Desert Land Act, Congress deferred to development by the states of comprehensive water codes and administrative systems, at least with respect to rights of private appropriators. Notwithstanding the broad language in the statutes and in California Oregon Power Co. v. Beaver Portland Cement Co., supra, it is not so clear, as we discuss infra, that Congress also intended to subject federal uses of that water to state water law. In that regard, we must consider statutes that touch on the federal government's use of water, including, most importantly, the Reclamation Act of 1902, supra n. 27, the Federal Power Act, supra n. 28, passed in 1920, and the McCarran Amendment, July 10, 1952, 66 Stat. 560, 43 U.S.C. § 666.

The 1902 Reclamation Act authorized joint federal-state efforts to construct large-scale reclamation projects on federal lands, subject to the jurisdiction and oversight of the Secretary of the Interior through the Bureau of Reclamation. Several provisions of the Act and subsequent amendments deal explicitly with the acquisition, use, and distribution of water. Section 8 provides expressly for the application of state law:

Nothing in [this title] shall be construed as affecting or intending to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of [the Act], shall proceed in conformity with such laws, and nothing herein shall in any way affect any rights of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof.

43 U.S.C. § 383. Other specific restrictions on the use or distribution of water reclaimed in a federal project appear in § 5, 43 U.S.C. § 431, which prohibits the sale of reclamation water to tracts of land in excess of 160 acres, and § 9 of the Reclamation Project Act of 1939, 43 U.S.C. § 485h, which provides for repayment to the United States of funds expended in the construction of reclamation works and authorizes the Secretary of the Interior to make contracts to furnish reclamation water at appropriate rates for irrigation.

The Federal Power Act established a comprehensive licensing scheme for water power projects constructed by private or public entities on navigable streams or federally owned land. The Act contains two provisions referring to the *345 applicability of state laws: § 9b, which requires an applicant to present evidence of "satisfactory compliance" with certain state laws; [FN40] and § 27, which expressly saves certain state laws relating to property rights in the use of water from supersedure by the Act. [FN41]

The McCarran Amendment is not a substantive statute, but rather a limited waiver of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 12 of 55

Case 3:05-cv-00006-HRH   Document 141-2   Filed 10/12/2007   Page 13 of 19

6 U.S. Op. OLC 328                FOR EDUCATIONAL USE ONLY                      Page 13
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

sovereign immunity permitting the United States to be joined as a party in state general stream adjudications. It does not affect the federal government's substantive rights with respect to water on federal lands. However, the Act has often been relied upon as evidence of congressional recognition of the primacy of the western states' interests in regulating and administering water rights. See, e.g., California v. United States, supra, 438 U.S. at 678-79. This position is supported by the Senate Report on the Amendment, which states that:

> In the arid Western States, for more than 80 years, the law has been the water above and beneath the surface of the ground belongs to the public, and the right to the use thereof is to be acquired from the State in which it is found, which State is vested with the primary control thereof.... Since it is clear that the States have the control of water within their boundaries, it is essential that each and every owner along a given water course, including the United States, must be amenable to the law of the State, if there is to be a proper administration of the water law as it has developed over the years.

S. Rep. No. 755, 82d Cong., 1st Sess. 3, 6 (1951) (emphasis added).

In each of these statutes, Congress recognized that the western states have a legitimate interest in and responsibility for the allocation of water resources within their borders. Specific provisions of federal statutes such as the Reclamation Act and Federal Power Act, however, have led to conflicts between federally mandated uses of water and state regulation of those uses. Those conflicts were left to the courts to resolve.

3. Judicial recognition of federal water rights

The Supreme Court has grappled on several occasions with the federal government's rights to use or dispose of water in the western states in the context of particular federal statutes, including the Reclamation Act and the Federal Power Act and statutes authorizing the reservation of land for particular federal purposes. Because Congress has not legislated definitively on the scope of the *346 federal government's rights to use water on federal lands in the western states, we must look at the Court's construction of those specific statutes to determine the principles and analysis the Court would apply to questions of federal rights that have not yet been litigated.

The Supreme Court has recognized that even if a particular federal statute does not expressly authorize a federal agency to acquire water rights without regard to applicable state law, the federal government may nonetheless in some circumstances assert an implied right to use or divert unappropriated water in derogation of state law. The Supreme Court's recognition of such implied rights has rested in each case on a finding of implied congressional intent to preempt application of state law. The Court has found such intent in at least two circumstances: (1) when land is reserved from the public domain for a specific federal purpose (see United States v. New Mexico, supra); or (2) when state regulation of the use of water by a federal agency or licensee is inconsistent with specific congressional directives governing the construction or operation of a federal project requiring the use of water (see California v. United States, supra). [FN43]

a. Federal reserved rights.

It is now settled that when the federal government reserves land for a particular federal purpose, it also reserves, by implication, enough unappropriated water as is reasonably necessary to accomplish the purposes for which Congress authorized the land to be reserved, without regard to the limitations of state law. The right to that water

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 13 of 55

6 U.S. Op. OLC 328                FOR EDUCATIONAL USE ONLY                            Page 14
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

vests as of the date of the reservation, whether or not the water is actually put to use, and is superior to the rights of those who commence the use of water after the reservation date. See Cappaert v. United States, 426 U.S. 128, 138 (1976); United States v. New Mexico, supra, 438 U.S. at 698.

Although the reserved rights doctrine is now well-recognized, its contours and scope have been defined only recently. The doctrine had its origins in United States v. Rio Grande Dam & Irrigation Co., 174 U.S. 690 (1899). In that case, the Court upheld an injunction restraining the petitioner from constructing an irrigation dam that would have destroyed the navigability of the Rio Grande River. While the Court recognized that Congress had by statute acquiesced in the substitution of appropriative water rights for common law riparian rights in the western states (see p. 20 supra), it found that Congress had not waived its superior authority under the Commerce Clause to preserve the navigability of navigable waters. The Court listed two "limitations" inherent in the Supremacy Clause on the authority of the states to change the common-law rules:

First, that, in the absence of specific authority from Congress, a state cannot, by its legislation, destroy the right of the United States, as the owner of lands bordering on a stream, to the continued flow of its waters, so far, at least, as may be necessary *347 for the beneficial uses of the government property; second, that it is limited by the superior power of the general government to secure the uninterrupted navigability of all navigable streams within the limits of the United States.

174 U.S. at 703. The Court's holding rested only on the second limitation-- i.e., the federal government's superior authority under the Commerce Clause to preserve the navigability of the stream. [FN44]

Nine years later in Winters v. United States, 207 U.S. 565 (1908), the Court relied, inter alia, on the first limitation described in Rio Grande-- the inability of the state to destroy the federal government's rights to the continued flow of a stream "at least, as may be necessary for beneficial uses of government property"--to support implication of a so-called "reserved" right to water under a treaty between the federal government and the Indians of the Fort Berthold Reservation. The treaty set aside particular tracts of the public domain as a homeland for the Indians, but did not expressly provide for the water necessary to irrigate that land. The Court found nonetheless that the treaty and reservation of land impliedly set aside sufficient water for the present and future needs of the Indians, reasoning that Congress' intent that the Indians become a pastoral and civilized people could not be accomplished without sufficient water to irrigate the reservation land. 207 U.S. at 576. Citing Rio Grande, the Court opined that, "[t]he power of the Government to reserve the waters and exempt them from appropriation under the state laws is not denied, and could not be." Id. at 577.

Until 1955, the Winters, or reserved right doctrine, was generally thought to be a special rule of Indian law, rather than a general rule applicable to all federal reservations. See F. Trelease, "Federal Reserved Water Rights Since PLLRC," 54 Denver L.J. 475 (1977). In 1955, the Supreme Court suggested for the first time that other types of federal reservations might also provide a basis for federal reserved rights. In Federal Power Commission v. Oregon, 349 U.S. 435 (1955), often referred to as the Pelton Dam decision, the Court considered whether a state agency could deny permission to a federal licensee under the Federal Power Act to construct a hydroelectric dam on lands of the United States that had been reserved for that purpose. The state argued, relying on the Court's broad language in California Oregon Power Co. v. Beaver Portland Cement Co. (see pp. 21-22 supra), that by the Desert Land Act of 1877 Congress had expressly conveyed to the states the power to regulate all unappropriated water within their borders, and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 14 of 55

Case 3:05-cv-00006-HRH   Document 141-2   Filed 10/12/2007   Page 15 of 19

6 U.S. Op. OLC 328                FOR EDUCATIONAL USE ONLY                    Page 15
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

that therefore, in the exercise of its police powers, Oregon could deny use of those waters to an individual, even if the federal government had otherwise licensed the use. The Court rejected the state's arguments on the ground that the Desert Land Act applies only to public domain lands and does not apply to lands that have been reserved by the federal government, even if the land *348 was reserved after passage of the Desert Land Act. See 349 U.S. at 448. Although the Pelton Dam decision did not involve directly the federal government's right to use water because the licensee was a private party, the Court's holding implies that the licensee was exercising some right of the United States to use water that had been reserved from state control at the time the United States reserved the dam site. See, e.g., Cappaert v. United States, supra, 426 U.S. at 144 n. 10; Federal Power Commission v. Oregon, supra, 349 U.S. at 453 (Douglas, J., dissenting).

The applicability of the reserved right doctrine to all federal reservations was confirmed in Arizona v. California, 373 U.S. 546 (1963). There, the Court upheld, with little discussion, a Master's award of reserved rights to the United States in several national wildlife refuges and the Gila National Forest:

> The Master ruled that the principle underlying the reservation of water rights for Indian Reservations was equally applicable to other federal establishments such as National Recreation Areas and National Forests. We agree with the conclusions of the Master that the United States intended to reserve water sufficient for the future requirements of the Lake Mead National Recreation Area, the Havasu Lake National Wildlife Refuge, the Imperial National Wildlife Refuge and the Gila National Forest.

373 U.S. at 601.

The scope of the reserved rights doctrine on non-Indian land remained somewhat uncertain until the Supreme Court's decisions in Cappaert v. United States, supra, and United States v. New Mexico, supra. In Cappaert, the Court unanimously held that the reservation of Devil's Hole as a national monument under the American Antiquities Preservation Act, supra n. 25, also reserved sufficient unappropriated water to maintain the scientific value of the reservation--in that case, to maintain the water level in Devil's Hole at the minimal level necessary to preserve the Devil's Hole pupfish, a unique species that had been endangered by a drop in the water level. [FN45] The Court stated that:

> [t]his Court has long held that when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation. In so doing the United States acquires a reserved right in unappropriated water which vests on the date of the reservation and is superior to the rights of future appropriators. Reservation of water rights is empowered by the Commerce Clause, Art. I, § 8, which permits federal regulation of navigable streams, and the Property Clause, Art. IV, § 3, *349 which permits federal regulation of federal lands. The doctrine applies to Indian reservations and other federal enclaves, encompassing water rights in navigable and nonnavigable streams.

426 U.S. at 138 (citations omitted).

The Court made it clear that the determinative issue was whether the federal government intended to reserve unappropriated water, and that such intent would be inferred if "previously unappropriated waters are necessary to accomplish the purposes for which the reservation was created." [FN46] 426 U.S. at 139. The amount of water reserved, however, was "only that amount of water necessary to fulfill the purpose of the reservation, no more." Id. at 141 (citations omitted).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 15 of 55

6 U.S. Op. OLC 328           FOR EDUCATIONAL USE ONLY                    Page 16
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

In United States v. New Mexico, the Court upheld, for the first time, a denial of reserved rights to the federal government. In New Mexico, the Forest Service asserted reserved rights to waters within the Gila National Forest, including minimum instream flows, "for the requirements and purposes of the forests" as of the date that various tracts of public lands were withdrawn from the public domain for inclusion in the Forest. The Forest Service's claims to reserved rights for, inter alia, maintenance of instream flows, recreation, and stock watering were initially granted by the special master appointed to consider all the claims, but were denied by the New Mexico District and Supreme Courts on appeal, on the basis that those uses were not among the purposes included in the Forest Service's Organic Administration Act, pursuant to which the Gila National Forest was created. The New Mexico Supreme Court drew a distinction between the "primary purposes" for which a federal reservation is created, and "secondary uses" of federal lands that may be permitted or authorized by statute or administrative practice, finding that only the former provides a basis for reserved rights. The New Mexico Supreme Court found the primary purposes of national forest reservations to be limited to the preservation of timber and securing of water flows for public and private uses. Mimbres Valley Irrigation Co. v. Salopek, 90 N.M. 410, 564 P.2d 615, 617-18 (1977).

The United States Supreme Court agreed with both the result and analysis of the New Mexico Supreme Court. Justice Rehnquist, writing for the majority, noted that the application of the reserved right doctrine requires a careful examination of "both the asserted water right and the specific purposes for which the land was reserved" and must rest on the conclusion that "without the water the purposes of the reservation would be entirely defeated." 438 U.S. at 700 (footnote omitted). Such an examination and tailoring of the reserved right is necessary "because the reservation is implied, rather than explicit and because of the history of congressional intent in the field of federal-state jurisdiction with respect to allocation of water." Id. at 701-02. The Court noted that, "[w]here Congress has expressly addressed the question of whether federal entities must *350 abide by state water law, it has almost invariably deferred to the state law." [FN47] Id. at 702 (footnote omitted).

The Court accepted the primary purpose/secondary use distinction drawn by the New Mexico Supreme Court:
> Where water is necessary to fulfill the very purposes for which a federal reservation was created, it is reasonable to conclude, even in the face of Congress' express deference to state water law in other areas, that the United States intended to reserve the necessary water. Where water is only valuable for a secondary use of the reservation, however, there arises the contrary inference that Congress intended, consistent with its other views, that the United States would acquire water in the same manner as any other public or private appropriator.

Id. (emphasis added). Based on the legislative history of the Forest Service's Organic Administration Act, the Court concluded that Congress' intent in authorizing reservation of the Gila National Forest was "that water would be reserved only where necessary to preserve the timber or to secure favorable water flows for private and public uses under state law." Id. at 718. [FN48] The Court found recreation, wildlife, and stock watering to be secondary uses rather than primary purposes of the reservation, and therefore upheld the state court's denial of reserved rights for those uses. The Court did not address the further question whether, if the Forest Service applied under state law for appropriative rights not available under the reserved rights doctrine, the state could deny such rights. [FN49]

After Cappaert and New Mexico, it is safe to conclude that a federal agency may acquire

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 16 of 55

6 U.S. Op. OLC 328                    FOR EDUCATIONAL USE ONLY                         Page 17
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

unappropriated water on federal lands without regard to state substantive or procedural law, when that land has been reserved pursuant to congressional authorization for a specific federal purpose that requires the use of water. The right is based on implied congressional intent, and is limited in two *351 crucial respects. First, federal rights will be implied only if necessary to accomplish the specific purposes for which Congress authorized reservation of the land, not for incidental, or "secondary" uses that may be permitted by congressional authorization or acquiescence in agency practice. Drawing the line between the "primary purposes" for which water may be reserved and the "secondary uses" for which water may not be reserved requires a careful examination of congressional intent, as expressed in the particular statute authorizing reservation and management of the land in question and its legislative history. Second, the amount of water reserved is only that minimally necessary to accomplish those primary purposes--i.e., that water "without [which] the purposes of the reservation would be entirely defeated." United States v. New Mexico, supra, 438 U.S. at 700.

b. Conflicts with congressional directives.

In the second relevant line of decisions, the Court has held that a state may not veto a federally authorized water project by requiring the federal government or its licensee to obtain a state permit authorizing use of water necessary for the project, and may not impose conditions on the acquisition, use, or distribution of project water that are inconsistent with specific congressional directives authorizing the project. Although in these cases the Court has not developed a coherent theory of water rights comparable to the reserved right theory, there is a common thread: when the federal government, in the exercise of its constitutional powers, for example under the Commerce or Property Clauses, authorizes a project requiring the diversion or use of water, state laws that would effectively prevent the project from being built or operated under the conditions and terms and for the purposes prescribed by Congress must fall under the Supremacy Clause.

The Court has consistently held that a state cannot block construction or operation by the United States or its licensee of dams and reservoirs for flood control, improvement of navigation, power production, or reclamation. [FN50] For example, in Oklahoma v. Guy F. Atkinson Co., 313 U.S. 508 (1941), the Court held that Oklahoma could not block construction by the United States of a dam and reservoir for purposes of flood control and improvement of navigability on the Red River in Oklahoma and Texas. One of the objections raised by Oklahoma to the federal project was that construction of the dam and impoundment of the waters would be inconsistent with the state's water resources program. The Court rejected that argument, finding that:

> [T]he suggestion that this project interferes with the state's own program for water development and conservation is likewise of no *352 avail. That program must bow before the "superior power" of Congress.

313 U.S. at 534-35 (citations omitted).

Similarly, in cases involving federal licenses to construct hydroelectric projects awarded under the Federal Power Act, the Court has consistently rejected state attempts to block authorization of the construction of project facilities and reservoirs. See, e.g., First Iowa Cooperative v. Federal Power Commission, 328 U.S. 152, 176 (1946); Federal Power Commission v. Oregon, 349 U.S. 435, 445 (1955); City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 340 (1958). Although some of the language used by the Court in those decisions suggests that state law or permit requirements do not apply to federally licensed projects even if they are consistent with the authorization of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 17 of 55

6 U.S. Op. OLC 328          FOR EDUCATIONAL USE ONLY                    Page 18
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

project, [FN51] in each case application of state law would have prevented construction of the project. [FN52] Given a direct conflict between federal authorization and state requirements, the Court held that the state law must fall, even though the Federal Power Act contained savings provisions reserving traditional control over water resources to the individual states. See First Iowa Cooperative v. Federal Power Commission, supra, 328 U.S. at 176; City of Tacoma v. Taxpayers of Tacoma, supra, 357 U.S. at 340; Federal Power Commission v. Oregon, supra, 349 U.S. at 445.

The Court has reached similar conclusions in cases involving the reclamation laws. [FN53] Despite the direction of § 8 of the 1902 Reclamation Act that the Secretary of the Interior "proceed in conformity" with applicable state laws (see pp. 22-23 supra), the Court has held that state law or permit requirements are preempted if they are inconsistent with other, more specific provisions of the Act or of the legislation authorizing the project. In Ivanhoe Irrigation District v. McCracken, 357 U.S. 275 (1958), the Court reversed the refusal of the California Supreme Court to confirm certain reclamation contracts that contained clauses implementing § 5 of the Reclamation Act of 1902 and § 9 of the Reclamation Project Act of 1939 (see p. 23 supra) because limitations imposed by those sections were inconsistent with California law. The California Court had held that *353 § 8 required that "whenever there is a conflict between the Federal Reclamation laws and the laws of the State, the law of California must prevail." 357 U.S. at 287. The United States Supreme Court held that the general savings provision of § 8 could not override the mandatory, specific provisions of § 5 and § 9. Id. at 292. [FN54] The Court reaffirmed this view of § 8 in City of Fresno v. California, 372 U.S. 627 (1963), in which the Court held that § 8 does not require the Secretary of the Interior to ignore the explicit preference established by § 9(c) of the Reclamation Act of 1939 for irrigation over domestic and municipal uses of reclamation water (see p. 23 supra); and in Arizona v. California, 373 U.S. 546 (1963), in which the Court concluded that state law could not interfere with the power of the Secretary of the Interior, under the Boulder Canyon Project Act, supra n. 33, to determine with whom and on what terms water contracts would be made.

Language used by the Supreme Court in Ivanhoe, Fresno, and Arizona suggested that the scope of § 8 was extremely narrow. In Ivanhoe, for example, the Court stated that § 8 "merely requires the United States to comply with state law when, in the construction and operation of a reclamation project, it becomes necessary for it to acquire water rights or vested rights therein." 357 U.S. at 291. The Court suggested in Fresno that state law would not control even the acquisition of water rights when the United States exercises its power of eminent domain, but instead would only determine the "definition of the property interests, if any, for which compensation must be paid." 372 U.S. at 630. In Arizona, the Court endorsed its broad holdings in Ivanhoe and Fresno, noting "[t]he argument that § 8 of the Reclamation Act requires the United States in the delivery of water to follow priorities laid down by state law has already been disposed of by this Court...." 373 U.S. at 586.

However, in California v. United States, supra, decided the same day as United States v. New Mexico, the Court made clear that its decisions in Ivanhoe, Fresno, and Arizona could be read only to hold that state laws governing the appropriation, use, control, or distribution of water do not control federal uses if they are inconsistent with specific congressional directives, for example § 5 of the Reclamation Act or § 9 of the Reclamation Project Act of 1939. California v. United States involved construction of the New Melones Dam in California, part of the mammoth Central Valley Reclamation Project, which has spawned much of the case law under the Reclamation Act. [FN55] The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 18 of 55

6 U.S. Op. OLC 328                FOR EDUCATIONAL USE ONLY                        Page 19
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

California State Water Resources Control Board, upon application by the Bureau of Reclamation, authorized the impoundment of water for the project, but imposed several conditions on the use of that water. The Bureau of Reclamation then sought a declaratory *354 judgment that the United States could impound whatever unappropriated water was necessary for the project without complying with state law.

The District Court held that the United States must apply to the State Board for an appropriation permit as a matter of comity, but that the Board must issue the permit without condition if there is sufficient unappropriated water. United States v. California, 403 F.Supp. 847 (E.D.Cal.1975). The Ninth Circuit affirmed, but held that § 8 of the Reclamation Act of 1902, rather than comity, required the United States to apply for the permit. United States v. California, 558 F.2d 1347 (9th Cir.1977). In the Supreme Court the United States argued for affirmance of the decisions below on the ground that a state may not impose any conditions on a federal reclamation project, whether or not they may be consistent with authorization for construction and operation of the project. See Brief for the United States at 31-55, California v. United States, 438 U.S. 645 (1978). [FN56]

In its decision reversing the Ninth Circuit, the Supreme Court recognized that its prior statements regarding the effect of § 8 of the Reclamation Act of 1902 could be read to support the United States' argument, but the Court characterized those statements as dicta "to the extent [they] impl[y] that state law does not control even where not inconsistent with ... expressions of congressional intent." 438 U.S. at 671 n. 24. The Court pointed out that each of its prior decisions involved a direct conflict between state law and a specific provision of the federal reclamation laws, and therefore disavowed that dicta insofar as it "would prevent petitioners from imposing conditions on the permit granted to the United States which are not inconsistent with congressional provisions authorizing the project in question." Id. at 674. Because the courts below had not reached the question whether the conditions actually imposed were inconsistent with congressional directives authorizing the New Melones project, the Court remanded the case for further consideration. [FN57] The Court suggested that on remand the district court would be free to consider arguments that the legislation authorizing the New Melones project had "by its terms signif[ied] congressional intent that the Secretary condemn or be permitted to appropriate the necessary water rights for the project in question." Id. at 669 n. 21. [FN58]

*355 c. Administrative practice and interpretations.

Because the Supreme Court and Congress have not definitively answered many of the questions in the area of federal-state water rights, administrative practice and interpretation by the federal land management agencies have served to fill some of the interstices. We understand that there has never been a uniform policy among the agencies with primary responsibility over federal lands regarding the extent to which the federal government should or would comply with state laws and procedures in acquiring water rights or give notice to appropriate state agencies or officials of the water needs and uses of the agency. [FN59] Agencies have participated in general stream adjudications, at least since passage of the McCarran Amendment in 1952, [FN60] and have litigated water rights in individual cases, but have not developed wholly consistent policies as to whether they should file all water right claims with state agencies. See Report of the Task Force on Non-Indian Federal Water Rights at 35 (Government Printing Office 1980) (hereinafter cited as Task Force Report). For example, the Forest Service and Fish and Wildlife Service, at least since the 1930s, have generally attempted to notify the states

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 19 of 55