6 U.S. Op. OLC 328             FOR EDUCATIONAL USE ONLY                    Page 20
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

of water uses and needs and to file for some water rights pursuant to applicable state law. Task Force Report at 36. Since 1966, the Forest Service has generally not filed for water rights on reserved lands, although it has filed for water rights on acquired lands and, since 1966, has informed state officials of the scope of its reserved water rights. The policy of the National Park Service has been to comply with state water laws, particularly with respect to rights not available under the reserved right doctrine. Id. Other agencies have often complied with state procedures in acquiring water rights, but have also asserted rights or used water in many instances without compliance with state law or notice to appropriate state authorities. [FN61]

    While the ad hoc approach reflected in the practice of responsible agencies may have accommodated both state and federal concerns when water supplies were relatively ample, over-appropriation of streams in most of the western states and increasing competition for water between and among private and public users has led to efforts at the state and federal levels to achieve certainty in the definition and allocation of water rights. In 1978, President Carter submitted a Federal Water Policy Message to Congress, which recognized the difficulties created for the states by the existence of unquantified, undetermined federal *356 reserved rights to water in the western states, and recommended that priority be given to quantification of federal reserved rights. [FN62] At the same time, federal agencies were directed to expeditiously establish and quantify federal reserved rights.

    In response to this initiative, Solicitor Krulitz of the Department of the Interior issued a formal opinion in June 1979, covering both "reserved" and "non-reserved" water rights under statutes authorizing the Department of the Interior to manage federal lands. As we discuss in the next segment of this opinion, Solicitor Krulitz articulated the non-reserved water rights theory of the Department of the Interior, stating that the federal government had a right to use water for "congressionally authorized uses" irrespective of any reservation of land. Solicitor Krulitz's opinion provoked a maelstrom in the western states and an almost immediate decision by Interior Secretary Andrus not to implement segments of the Krulitz opinion except in very limited circumstances. Secretary Andrus' announcement was followed in January 1981 by an opinion by Solicitor Krulitz's successor, Solicitor Clyde O. Martz, restricting the application of the Krulitz opinion. In September 1981, the current Solicitor, William H. Coldiron, issued an opinion repudiating the legal basis and conclusions of the Krulitz opinion. Since these opinions have shaped much of the recent debate on the scope of federal water rights, [FN63] we will review them in detail here.

i. Krulitz Opinion

    In his opinion, Solicitor Krulitz set out to analyze comprehensively the legal bases for the Department of the Interior to assert rights to water on federal lands. In addition to federal reserved rights, Solicitor Krulitz concluded that the federal government has the right to make use of unappropriated water on federal lands without regard to state substantive or procedural law, so long as the water is necessary to carry out "congressionally authorized purposes" or "uses," unless Congress clearly and expressly directs otherwise--the so-called federal "non-*357 reserved" water rights theory. Dept. of Interior Solicitor's Opinion No. M-36914, "Federal Water Rights of the National Park Service, Fish and Wildlife Service, Bureau of Reclamation and the Bureau of Land Management," 86 I.D. 553 (1979) (Krulitz Op.). Solicitor Krulitz did not elaborate on the scope of "congressionally authorized purposes" or "uses," but his subsequent discussion of the availability of federal non-reserved water rights under statutes

    ©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 20 of 55

6 U.S. Op. OLC 328          FOR EDUCATIONAL USE ONLY                    Page 21
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

applicable to the Department of the Interior indicates that he thought those purposes
and uses should be broadly defined. [FN64] Thus, in Solicitor Krulitz's opinion, there
are only two prerequisites to the existence of a federal non-reserved water right: (1)
the assignment of a land management function to a federal agency, e.g., by statute,
appropriation, legislation, or acquiescence in long-standing administrative
interpretation; and (2) the actual application of water to use.

   The non-reserved water right asserted by Solicitor Krulitz is both broader and narrower
than the reserved right. It is broader in that it does not depend on a formal reservation
of land, and therefore may arise on public domain and acquired, as well as reserved,
federal lands. In addition, it is not limited to the specific "primary purposes" for
which federal land is managed, but also extends to any management use or function that
is permitted by Congress for the land, even if such uses are only incidental to the
purposes mandated by Congress for the land, or "secondary," in the language of the Court
in New Mexico. Thus, under Solicitor Krulitz's formulation, a federal agency may assert
a non-reserved right for any secondary use of reserved lands (assuming it has reserved
rights covering all primary purposes), and for all permissible uses on acquired and public
domain lands, whether characterized as primary or secondary. In one respect, however,
the non-reserved right is narrower than the reserved right, because it is based on the
appropriation of water to actual use, rather than on a reservation of land. Thus, the
priority date for non-reserved rights is the date the water was first put to use, and
its measure is the amount of water reasonably necessary for that use. By contrast,
reserved rights have priority as of the date of the reservation, regardless of when or
whether the water was put to use, and extend to all water reasonably necessary for current
and future uses. See, e.g., Cappaert v. United States, supra, 426 U.S. at 138.

   Solicitor Krulitz rested his opinion on an asserted federal proprietary interest in
unappropriated waters in the western states and the federal government's superior right
under the Supremacy Clause to make use of water in furtherance of its constitutional
powers. See Comment, "Federal Non-Reserved Water Rights," 15 Land and Water L.Rev. 67,
74-75 (1980). He started with the premise that, through cession from foreign nations,
the United States acquired ownership of the lands that now comprise the western states
and ownership of all rights appurtenant to those lands, including "the power to control
the disposition and use of water on, under, flowing through or appurtenant to such lands."
Krulitz Op. at 563, 575. He asserted that under the Property Clause of the Constitution,
the United States has plenary power to control its property; no interest in that *358
property may be acquired, by the states or private parties, "in the absence of an express
grant from Congress . . . ." Solicitor Krulitz concluded that "absent that grant or consent,
[[the property] continues to be held by the United States." [FN65] Id. (citing United
States v. Grand River Dam Authority, 363 U.S. 229, 235 (1960); Utah Power & Light Co.
v. United States, 243 U.S. 389, 404-05 (1917)). Solicitor Krulitz buttressed this
conclusion with a Supremacy Clause argument:
   Federal control over its needed water rights, unhampered by compliance with
procedural and substantive state law, is supported by the Supremacy Clause and the
doctrine that federal activities are immune from state regulation unless there is a "clear
congressional mandate," or "specific congressional action," providing for state control.
Id. at 564 (citing Kern-Limerick, Inc. v. Scurlock, 347 U.S. 110, 122 (1954)); Paul
v. United States, 371 U.S. 245, 263 (1963); Hancock v. Train, 426 U.S. 167, 178-81 (1976);
EPA v. State Water Resources Control Board, 426 U.S. 200, 214, 217, 221 (1976).

   Under either theory, the conclusion reached by Solicitor Krulitz as to the applicable
legal analysis is the same:

          ©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 21 of 55

6 U.S. Op. OLC 328          FOR EDUCATIONAL USE ONLY                    Page 22
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

[T]o the extent Congress has not clearly granted authority to the states over waters which are in, on, under or appurtenant to federal lands, the Federal Government maintains its sovereign rights in such waters and may put them to use irrespective of state law. Id. at 563. Krulitz concluded that neither the equal footing doctrine [FN66] nor the Acts of 1866 and 1870 [FN67] and the Desert Land Act [FN68] constituted the necessary clear grant of authority over unappropriated waters on federal lands to the states, and therefore that the federal government may use that water without interference *359 from the states. Thus, he asserted that by these "relatively narrow" acts, the United States did not divest itself of its authority "to use the unappropriated waters on public lands for governmental purposes." Id. at 569 (emphasis in original).

Solicitor Krulitz acknowledged that the language of the Supreme Court in United States v. New Mexico, supra, that, in the absence of a reserved right "there arises the contrary inference that Congress intended federal agencies to acquire water in the same manner as any other public or private appropriator" (438 U.S. at 702) makes it unclear whether federal agencies must conform the assertion of non-reserved federal water rights to state law. He concluded, however, that the Court could not have intended to suggest that state procedural or substantive law would control federal non-reserved uses, because requiring federal agencies to assert non-reserved water rights only for purposes recognized as beneficial under state law would lead to the "anomalous result" that federal land managers would have to manage the same kind of federal land differently in different states. Rather, he argued that the Court intended only to suggest that water rights other than those available as reserved rights must be acquired through some form of appropriation and actual use, and not merely through a reservation of land. Id. at 576-77.

As a matter of policy, Solicitor Krulitz recommended that federal agencies comply with procedures established by the states "to the greatest practicable extent." He did not conclude, however, that compliance with state procedural requirements is required as a matter of law. Id. at 577-78.

In the second portion of his opinion Solicitor Krulitz outlined reserved and non-reserved federal water rights available to the land management divisions of the Department of the Interior. He acknowledged that the Taylor Grazing Act and the Federal Land Policy Management Act (FLPMA) do not create any reserved rights, but concluded that those statutes express a congressional mandate that the public domain be managed for multiple use and sustained yield purposes, including recreational campgrounds, timber production, livestock grazing, and minimum instream flows necessary to protect and enhance fish and wildlife resources and scenic values. Therefore, he concluded that the BLM may appropriate any water on the public domain necessary to fulfill those purposes. See id. at 615. With respect to the National Park Service and the Fish and Wildlife Service, Solicitor Krulitz concluded that those agencies may appropriate (in addition to water available as reserved rights) all unappropriated water necessary to fulfill a broad range of consumptive and non-consumptive uses, including, inter alia, conservation of scenery, natural and historic objects, fish, and wildlife; provision for public recreation and enjoyment; construction and maintenance of easements, rights-of-way, and trails; operation of concession operations and construction of airports in national parks; and management of timber, range, agricultural crops, and animals in national refuges. Id. at 616-17. Only in § 8 of the Reclamation Act of 1902 did Solicitor Krulitz find a sufficiently clear congressional directive to require that water necessary for operation and maintenance of reclamation projects be acquired pursuant to state law. Id. at 615-16.

*360 ii. Martz Opinion

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 22 of 55

In 1980, Solicitor of the Interior Clyde O. Martz issued a supplemental opinion dealing with the federal non-reserved water rights theory. See Dept. of the Interior Solicitor's Opinion No. M-36914 (Supp.), "Supplement to Solicitor Opinion No. M-36914, on Federal Water Rights of the National Park Service, Fish and Wildlife Service, Bureau of Reclamation and the Bureau of Land Management," 88 I.D. 253 (1981) (Martz Op.). Solicitor Martz did not disagree with or disavow Solicitor Krulitz's analysis of the existence and nature of the federal non-reserved water rights theory, [FN69] but concluded that no federal non-reserved water rights could be asserted under FLPMA or the Taylor Grazing Act. Solicitor Martz noted that FLPMA authorizes a wide range of land management activities that require the use of water, but concluded that the savings provision in § 701(g) of the Act [FN70] indicates that Congress did not intend to provide an independent statutory basis for claims to water that would be inconsistent with the substantive requirements of state law. Martz Op. at 257-58. Without discussion, he concluded that "[t]he same analysis and conclusion is equally applicable to the Taylor Grazing Act." Id. [FN71]

iii. Coldiron Opinion

The current Solicitor of the Interior, William H. Coldiron, issued an opinion on September 11, 1981, concluding that "there is no federal 'non-reserved' water right" and disavowing the Krulitz and Martz opinions to the extent they asserted that such rights exist. See Dept. of the Interior Solicitor's Opinion M-36914 (Supp. I), "Non-Reserved Water Rights--United States Compliance with State Law," (Sept. 11, 1981) (Coldiron Op.). Solicitor Coldiron acknowledged that Congress has the power under the Commerce and Property Clauses to control the disposition and use of water appurtenant to lands owned by the federal government, and that, under the Supremacy Clause, it is "unlikely that state law could preclude reasonable water use by a federal agency if Congress specifies a *361 particular federal usage." Coldiron Op. at 5. [FN72] However, Solicitor Coldiron observed that Congress can also defer to state control over water resources, and that therefore the crucial question is whether Congress intended to delegate that authority to the states.

Solicitor Coldiron analyzed the question of congressional intent in much the same terms as did the Supreme Court in California v. United States and United States v. New Mexico--decisions which Solicitor Coldiron concluded "definitively and directly addressed" the issue of federal non-reserved water rights. Coldiron Op. at 9. Thus, Solicitor Coldiron interpreted the land management statutes of the 19th century, the Reclamation Act of 1902, and other public land use statutes to express congressional recognition of the practical importance of local control of water resources and a general policy of deference to state water law. Id. at 6-7. Solicitor Coldiron asserted that only two exceptions have been recognized to this general deference to state water law: the federal navigation servitude and the federal reserved right. Id. at 10-11. He concluded, drawing on language from California and New Mexico, that Congress has given the states broad power to provide for the administration of water rights, which can be infringed by the federal government only where necessary to accomplish the original purpose of a congressionally mandated reservation of land, or to protect the navigation servitude. Therefore, in analyzing land management statutes, the presumption should be that "the United States and its agencies must acquire water rights in accordance with state substantive and procedural law unless necessary for the original purpose of a reservation" (or, presumably, unless incident to the federal government's navigation servitude). Id. at 12.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 23 of 55

6 U.S. Op. OLC 328          FOR EDUCATIONAL USE ONLY          Page 24
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

Solicitor Coldiron did not address the question of what evidence of congressional intent is necessary to overcome the presumption that state law applies. He concluded, without an analysis of specific statutory schemes such as that undertaken by Solicitor Krulitz and Solicitor Martz, that "there is an insufficient legal basis for the creation of what has been called federal 'non-reserved' water rights.... There is no federal 'non-reserved' water right." Coldiron Op. at 12. This conclusion suggests that, in Solicitor Coldiron's opinion, no existing federal land management statute contains a congressional directive of sufficient specificity to overcome the presumption of deference to state law, and that, unless and until Congress enacts statutes specifically authorizing non-reserved rights or repeals the land management statutes that preserve control over water rights in the states, the only water rights available to federal agencies outside of state law are reserved rights or rights necessary to preserve the navigation servitude. Id.

### *362 III. Analysis

A. Constitutional Basis for Federal Claims

1. Congressional authority to preempt state water laws

As a matter of constitutional law, Congress clearly has the power to preempt state law governing the use and disposition of unappropriated water by federal agencies on federal lands. That authority arises from the constitutional provisions authorizing the federal government, for example, to regulate interstate commerce (Art. I § 8), to provide for a common defense (Art. I § 8), to enter into treaties (Art. II § 2), to manage federal property (Art. IV § 3), and to provide for the general welfare (Art. I § 8). [FN73] In the exercise of its constitutional authority under the Commerce, Property, or General Welfare Clauses, or under its treaty and war powers, Congress has the power to authorize the appropriation of unappropriated water by federal land management agencies. If Congress exercises that power, by operation of the Supremacy Clause such an exercise preempts inconsistent state laws. See United States v. Rio Grande Dam & Irrigation Co., supra, 174 U.S. at 703; Oklahoma v. Guy F. Atkinson Co., 313 U.S. 508, 534 (1941).

Congress may, for example, authorize a comprehensive interstate plan for control and disposition of water resources that preempts inconsistent or duplicating state regulation; [FN74] provide for maintenance of instream flows without regard to whether such flows are recognized under state law; [FN75] authorize federal agencies or licensees to divert streams for the construction and operation of hydroelectric projects without regard to state restrictions on such diversions; [FN76] place limitations or conditions on the use or disposition of water from federal projects that are inconsistent with state laws governing the use of such water; [FN77] or impliedly reserve water necessary to carry out specific federal purposes at the time land is withdrawn from the public domain. [FN78] The question, therefore, is not generally whether Congress has the power to establish federal rights to unappropriated water, but whether it has exercised that power. See United States v. New Mexico, supra, 438 U.S. at 698.

It is important to understand that any water rights that may be asserted by the federal government outside of state law--whether called reserved, non-reserved, *363 or by some other name--rest on this same constitutional basis. Thus, federal reserved rights are not a unique species of federal rights that arise directly out of the reservation of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 24 of 55

6 U.S. Op. OLC 328        FOR EDUCATIONAL USE ONLY                    Page 25
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

federal lands, so that, absent a reservation of land, no federal water rights can exist. As one commentator has noted, "the reservation doctrine is not a source of federal power." Trelease, "Federal-State Relations," supra n. 6, at 139 (emphasis added). The reserved right doctrine does not rest on any unique constitutional basis. Rather:

[t]he federal functions exercised in the name of the reservation doctrine rest instead on the supremacy clause, coupled with the power exercised in making the reservation of land, or with some other power incidentally exercised on the reserved land.

Id. [FN79]

Thus the willingness of the Supreme Court to recognize federal reserved rights does not, under an exclusio unius principle, necessarily preclude the federal government from asserting in other circumstances water rights not available under state law or under the reserved right doctrine. The fact that the Supreme Court has never explicitly recognized a non-reserved water right in haec verba does not mean that the Court would not recognize the federal government's implied rights to unappropriated water, arising from clear congressional intent, in a situation that has not yet been presented to it. [FN80] As we discuss below, however, *364 the reasoning used by the Court in shaping the reserved right doctrine is relevant to an analysis of what other rights the federal government may have. See pp. 70-72 infra.

2. "Ownership" of unappropriated water

Much of the confusion about the federal government's rights to unappropriated water in the western states stems from arguments based on "ownership" of the unappropriated waters on federal lands and the effect of the land management statutes of the 19th century. As we outlined supra, Solicitor Krulitz's assertion of a broad federal non-reserved water right, while not clearly stated, apparently rested in part on the assumption that the United States acquired proprietary rights to all unappropriated water on public lands at the time it acquired the territories that became the western states, and that it has never subsequently granted away that proprietary interest except to the extent that private individuals may have actually appropriated water on those lands. Some of the western states have argued that the federal government acquired ownership of unappropriated water together with the public lands, but ceded ownership of the water to the states by the acts of admission into the Union or at least by the passage of the Desert Land Act in 1877, or that the federal government never acquired ownership of those waters. [FN81] The contention is made that the states therefore own those waters and can exercise control over their use, even if the use is by the federal government. See, e.g., Morreale, "Federal-State Conflicts," supra n. 17, at 446-59; Colum. Note, supra n. 5 at 972-74. The only exception to that control is if Congress withdraws land (and water) from the applicability of those acts by a formal reservation.

This proprietary view of western water rights has significant ramifications both for the federal government and the states. As Solicitor Krulitz noted, the Supreme Court has characterized the federal government's control over the use and disposition of its property as "complete" and "without limitation," and has stated that an interest in property of the United States may be acquired only by an express grant from Congress. See Krulitz Op. at 563; Kleppe v. New Mexico, supra, 426 U.S. at 539-40; Caldwell v. United States, 250 U.S. 14, 20-21 (1919). Therefore, if the United States "owns" the water, it may be contended that all that is necessary to perfect its rights is use of that water for an authorized federal purpose; a state cannot impose any restrictions on that use unless Congress has explicitly granted an ownership interest to the states.

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 25 of 55

6 U.S. Op. OLC 328           FOR EDUCATIONAL USE ONLY                    Page 26
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
**(Cite as: 6 U.S. Op. Off. Legal Counsel 328)**

See Comment, "Federal Non-Reserved Water Rights," 15 Land and Water L.Rev. 67, 76 (1980).
At the same time, the ownership theory provides a basis for the states' argument that
statehood acts and the federal land acts passed in the 1860s and 1870s (see Part IIB(2)
supra) constituted an express grant of ownership to the states of all unappropriated
water within their borders, and that therefore they *365 may now exercise plenary
authority over that water. [FN82] If the states own that unappropriated water, the only
way the federal goverment can acquire an interest in the water is if Congress withdraws
certain lands from the scope of the acts, appropriates water under state law, or acquires
existing water rights through purchase, exchange, or condemnation.

We believe that state and federal claims of title to or ownership of unappropriated
water within the western states do not provide an adequate basis for either denial or
assertion of federal water rights. Arguments made on either side of the issue are
difficult to reconcile with the reserved rights doctrine, as it has been developed by
the Supreme Court. With respect to state claims of ownership, the theory creates
substantial questions concerning the constitutionality of the reserved water rights
doctrine. That is, if Congress, either by the statehood acts or land management statutes,
gave the states ownership of all unappropriated waters on the public domain, on what
basis can the federal government reserve some of that water for a federal use, without
compensation, by a withdrawal of land made after ownership of the waters passed to the
states? On the other hand, with respect to federal claims, the Supreme Court has clearly
limited the reserved rights that the United States can assert to those which are minimally
necessary to fulfill the explicit or necessarily implied congressional intent, and has
recognized that the United States will not, in every instance, have reserved rights to
all unappropriated water on federal reserved lands. See United States v. New Mexico,
supra, 438 U.S. at 702. If the United States owned all the unappropriated water on the
public domain at the time a particular parcel was reserved and had plenary control over
its disposition, this limitation would appear to be superfluous, and the Court's extended
analysis of the scope of the reserved right doctrine unnecessary.

Furthermore, it seems anomalous to suggest that an entity can own water that has not
yet been appropriated, if ownership is understood to mean a proprietary *366 interest
in the water. Unappropriated water, much as wild animals, has been viewed as res
nullius--the property of no one--until it has been captured. See F. Trelease, "Government
Ownership and Trusteeship of Water," 45 Calif.L.Rev. 638, 643 (1957); Trelease,
"Federal-State Relations," supra n. 6, at 147b-i; Note, "Federal Nonreserved Water
Rights," 48 U.Chi.L.Rev. 785, 770-71 (1981). In Hughes v. Oklahoma, 441 U.S. 322 (1979),
the Supreme Court noted that concepts of ownership of or title to natural resources such
as natural gas, minerals, landfill areas, birds, fish, and other wildlife is a "legal
fiction" that merely expresses legitimate state regulatory interests in the conservation
and protection of its natural resources:
    The whole ownership theory, in fact, is now generally regarded as but a fiction
expressive in legal shorthand of the importance to its people that a State have power
to preserve and regulate the exploitation of an important resource.
441 U.S. at 334, quoting Toomer v. Witsell, 334 U.S. 385, 402 (1948). The Court made
it clear that a state's power over wild animals, as over other natural resources, is
based on the state's police powers and is subject to ordinary constitutional
limitations--in that case, the Commerce Clause. [FN83]

Thus, claims of ownership of natural resources by the states or by the federal
government are best understood as claims of regulatory jurisdiction over those resources,
either under the states' police powers or under the federal government's constitutional

              © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 26 of 55

6 U.S. Op. OLC 328          FOR EDUCATIONAL USE ONLY                    Page 27
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

powers. See Kleppe v. New Mexico, 426 U.S. 529, 537 (1976) (ownership of wild horses and burros on federal lands is irrelevant to the scope of the federal government's authority under the Property and General Welfare Clauses to protect those horses and burros). This interpretation of the nature of the states' and federal government's interests in unappropriated water is consistent with the approach taken by the Supreme Court in cases involving the use or disposition of water in the western states. The Court has consistently analyzed claims by the states and the federal government over navigable and non-navigable waters as a question of competing regulatory authority, rather than as a question of property rights. [FN84] See, e.g., United States v. Rio Grande Dam & Irrigation Co., supra, 174 U.S. at 703; Winters v. United States, supra, 207 U.S. at 577; Arizona v. California, supra, 373 U.S. at 597-98; California v. United States, supra, 438 U.S. at 665-79; United States v. New Mexico, supra, 438 *367 U.S. at 698. While some of these decisions made reference to the Property Clause, in each instance federally owned land was at the center of the controversy, and the references made to the Property Clause may be best understood as relating to an exercise of power over that property. The Court made the distinction between ownership and regulatory jurisdiction clear in a slightly different context in United States v. California, 332 U.S. 19, 36 & n. 20 (1947). In that case, the Court found that California does not hold title to submerged lands off its coast by virtue of the equal footing doctrine, but that California could nonetheless exercise police powers over waters flowing over that land, limited by constitutional constraints such as the Commerce Clause or the war power. See id.

The question is not one of competing ownership, therefore, but of competing regulatory jurisdiction. As one commentator has noted:

The state and federal governments share an interest in proper regulation of water. Neither "owns" unappropriated water but each has the power to use it and to regulate its use.... The important question is whether state or federal rules of capture apply to the United States. In other words, the issue is whether Congress has established a federal regulatory jurisdiction over federal appropriations, or has recognized the inherent regulatory jurisdiction of the states and adapted federal programs to it. Note, "Federal Nonreserved Water Rights," 48 U.Chi.L.Rev. 758, 772 (1981) (footnotes omitted).

3. Effect of Mining Acts of 1866 and 1870 and the Desert Land Act

The major 19th century land acts--the Mining Acts of 1866 and 1870 and the Desert Land Act of 1877 (see pp. 18-21 supra)--can thus best be understood as an allocation of jurisdiction to regulate the use of unappropriated water on federal lands between the states and the federal goverment, rather than a conveyance of property interests in that water. See Trelease, "Federal-State Relations," supra n. 6, at 147; Morreale, "Federal-State Conflicts," supra n. 17, at 432. Since Congress has the power to cede its constitutional authority over federal uses of such water to the states, the question is whether those acts divested the federal government of that authority. [FN85]

The Supreme Court's treatment of those acts, particularly the Desert Land Act, has been ambiguous and far from definitive. In California Oregon Co. v. Beaver *368 Portland Cement Co., supra, for example, the Court stated that, "[the Desert Land Act] ... recognizes and gives sanction, in so far as the United States and its future grantees are concerned, to the state and local doctrine of appropriation." 295 U.S. at 164 (emphasis added). Even if that language could be interpreted as an unambiguous statement that the Desert Land Act applies to federal uses, the case involved only competing claims by private parties, not claims by the federal government, and the Court's statement must

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 27 of 55

be regarded as dictum. See pp. 21-22 supra. In the Pelton Dam decision, which did involve, at least indirectly, claims by the federal government (i.e., through its licensee), the Court characterized the Desert Land Act as severing, "for purposes of private acquisition, soil and water rights on public lands." Federal Power Commission v. Oregon, supra, 349 U.S. at 448 (first emphasis added; second emphasis in original). Again, however, the Court's statement is not definitive, because the Court refused to rule on the general question of the effect of the Desert Land Act or the 1866 and 1870 Acts on a state's exercise of jurisdiction over unappropriated water within its borders, holding only that the acts do not apply to federal reserved lands. [FN86] Id. In Cappaert v. United States, supra, the court characterized the Desert Land Act as "provid[ing] that patentees of public land [i.e., private purchasers or grantees] acquire only title to land through the patent and must acquire water rights in nonnavigable water in accordance with state law." 426 U.S. at 143. Although that characterization appears to limit the effect of the Act (and, by implication, the preceding Mining Act of 1866 and 1870) to rights that may be acquired by private appropriators, [FN87] the Court rested its holding, as in the Pelton Dam decision, on the inapplicability of the Act to federal reserved lands. Id. at 144 & n. 9.

Although the issue is not free from doubt, we believe that the sounder view is that the Mining Acts and Desert Land Act authorize state control only over appropriations by private individuals of unappropriated water on federal lands, and do not, by their terms, cede to the states control over the federal government's use of water for federal purposes and programs. That interpretation is suggested by the Supreme Court's language quoted above from the Pelton Dam decision and Cappaert v. United States. Moreover, it is consistent with the legislative background and history of the Acts. At the time the Mining Acts and Desert Land Act were passed, the concern at the state and federal level was not with possible federal-state conflicts over the use of water on the public lands, but rather with settlement of private disputes between private claimants. See generally 2 Clark, supra, § 102.5. The somewhat sparse legislative history of the acts suggests that the primary--if not the only--contemplated purpose of provisions of the acts dealing with water rights was to clarify that private patentees or users of federal lands would not acquire, by virtue of that ownership or use, any rights to *369 unappropriated water except as recognized by state law. See generally Grow & Stewart, supra n. 36, at 468-69. [FN88]

It was not until the end of the 19th century that federal users of water within the western states began to be of major concern. In United States v. Rio Grande Dam & Irrigation Co., supra, one of the first cases to discuss a federal-state conflict over the use of water resources within those states, the Court noted that the Mining Acts and Desert Land Act must be interpreted "in the light of existing facts," i.e.:

... that all through this mining region in the West were streams, not navigable, whose waters could safely be appropriated for mining and agricultural industries, without serious interference with the navigability of the rivers into which those waters flow. And in reference to all these cases of purely local interest the obvious purpose of Congress was to give its assent, so far as the public lands were concerned, to any system, although in contravention to the common-law rule, which permitted the appropriation of those waters for legitimate industries. To hold that Congress, by these acts, meant to confer upon any state the right to appropriate all the waters of the tributary streams which unite into a navigable water course, and so destroy the navigability of that water course in derogation of the interests of all the people of the United States, is a construction which cannot be tolerated. It ignores the spirit of the legislation, and carries the statute to the verge of the letter, and far beyond what, under the

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 28 of 55

circumstances of the case, must be held to have been the intent of Congress. 174 U.S. at 706-07 (emphasis added). The Court clearly affirmed that the intent of the Mining Acts and the Desert Land Act was to deal with issues of local concern--i.e., private appropriations--and not to interfere with Congress' superior right, in the exercise of a constitutional power such as that over navigation, to use water within the western states. [FN89] See, e.g., Colum. Note, supra n. 5, at 980.

We believe the conclusion that the acts by their terms do not cede regulatory authority over federal uses to the states is consistent with the Supreme Court's holding in the Pelton Dam decision that the acts do not apply to federal reserved lands. In the Pelton Dam decision, the Court rested its conclusion on its *370 interpretation of the term "public lands" in the Desert Land Act to include only public domain lands--i.e., those open for settlement and disposition. See p. 27 supra. The Act therefore did not apply to reserved lands. At the time of the Court's decision, because the federal reservation in question had been made subsequent to passage of the Act, the relevant public domain was not the public domain as of the time the Act was passed, but the public domain as of 1954. The Court's decision has consistently been interpreted to mean therefore that the federal government can withdraw unappropriated water from the state appropriation system at any time by withdrawing appurtenant lands from the public domain for a particular federal purpose. See, e.g., Cappaert v. United States, supra, 426 U.S. at 145; Morreale, "Federal-State Conflicts," supra n. 17, at 432.

The basis upon which the federal government can make such a withdrawal is not clear from the Court's discussion in Federal Power Commission v. Oregon, 349 U.S. 435 (1955). Commentators have suggested that the appropriate analysis is repeal-by-implication. The argument is that, although Congress granted the states plenary authority over unappropriated water within their borders by the 1866, 1870, and 1877 Acts (including authority over federal uses), the subsequent reservation of land for a specific federal purpose impliedly repeals those acts to the extent of the water rights involved. See, e.g., Grow & Stewart, supra n. 36, at 466-67. That argument is subject, however, to the serious objection that implied repeals are highly disfavored, particularly as many reservations may be made simply by executive order or administrative action. See, e.g., TVA v. Hill, 437 U.S. 153, 189-90 (1978); C. Sands, Statutes and Statutory Construction, § 23.09 (4th ed. 1973). We believe that the more tenable explanation is that the Acts gave the states authority only to control and administer private rights to water on federally owned lands, and did not grant away the federal government's power, if properly and clearly exercised, to use unappropriated water on federal lands without regard to state law. The significance of a reservation of land from the public domain is not that it repeals the effect of the Mining Acts or Desert Land Act, but that it is an exercise by Congress of that power and therefore, by reason of the Supremacy Clause, preempts inconsistent state control of federal uses.

B. Statutory Basis for Federal Claims

Although we do not believe that Congress ceded its regulatory authority over federal use of unappropriated water on federal lands to the western states by the Mining Acts and the Desert Land Act, Congress clearly recognized and indeed fostered, by those acts and subsequent land management statutes, the development of comprehensive state water codes and administrative systems applicable to unappropriated water on federal, as well as privately or state-owned land. It is clear that federal law may displace those state systems, however, at least with respect to unappropriated water on federal lands. See, e.g., United States v. Rio *371 Grande Dam & Irrigation Co., supra. What is not clear--and

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 29 of 55

6 U.S. Op. OLC 328          FOR EDUCATIONAL USE ONLY          Page 30
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

what we address here--is when and how federal law displaces state water law.

Because Congress has seldom directly regulated the acquisition or use of water by federal agencies or their licensees, [FN90] and has not enacted comprehensive legislation dealing with federal water rights in the western states, [FN91] the federal state conflicts that are of primary concern are conflicts between federal uses of water for the management of federal lands and state substantive or procedural law. For example, state law may not recognize certain federal uses as beneficial or in the public interest [FN92] or may deny a priority date to a federal use because of the *372 failure of the agency to comply with state procedural or permitting requirements. [FN93] The question, therefore, is whether, by authorizing certain uses of federal lands, Congress intended also to authorize acquisition of water for those uses without regard to limitations imposed by state law. As the Supreme Court commented in New Mexico with respect to federal reserved rights, this "is a question of implied intent and not power." 438 U.S. at 698 (emphasis added).

Under the federal non-reserved right theory articulated by Solicitor Krulitz, the requisite intent to displace state control over the appropriation of unappropriated water could be inferred merely from Congress' authorization to federal agencies to manage federal lands; no specific congressional intent to displace state control over water would need to be shown. Thus, for example, a federal agency would be entitled to water necessary for preservation of minimum instream flows for stock watering, recreation, and fish and wildlife purposes whether or not state law recognized such uses as beneficial, and would not be bound by state permitting or other procedural requirements, so long as the agency was acting within its congressionally mandated authority. The contrary view is that, unless Congress has set specific conditions on the acquisition or use of water by federal agencies or has reserved the underlying land, federal agencies are limited to water rights obtainable under state substantive and procedural law. If, for example, applicable state law does not recognize minimum instream flows, Congress has not explicitly recognized a federal right to those flows, and the agency cannot claim an implied reserved right to such flows because the underlying land was not reserved from the public domain or the use is not a primary purpose of a reservation, the agency is not entitled to that water. [FN94] Similarly, except when the agency may be able to assert reserved rights (which have a priority date based on the date the land was reserved), the priority date of its water rights must be established in accordance with state substantive and procedural law.

As both Solicitor Krulitz and Solicitor Coldiron recognized, the Supreme Court's decisions in California v. United States and United States v. New Mexico are highly relevant to an analysis of the federal non-reserved water rights theory, both because those decisions are the most recent pronouncements of the Supreme Court on federal rights to unappropriated water in the western states and because the Court suggested in those opinions that there may be limitations on the federal government's ability to acquire or use water on federal lands without complying with applicable state laws. It is important to understand, however, that the *373 holdings in those decisions were relatively narrow, limited to the effect of § 8 of the Reclamation Act of 1902 (California v. United States) and the scope of the Forest Service's reserved rights under its Organic Administration Act (United States v. New Mexico). Unfortunately, much of the debate about the meaning of California and New Mexico focuses on isolated language used by the Court, which is interpreted by critics of the non-reserved right theory to preclude assertion of any federal non-reserved rights and by proponents of the theory as limited to the narrow holdings in the cases before the Court. As we discuss now, both interpretations

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 30 of 55

6 U.S. Op. OLC 328          FOR EDUCATIONAL USE ONLY
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

of the Court's language are selective and do not provide an entirely satisfactory
rationale for either conclusion.

    Critics of the non-reserved right theory argue that, in the following three passages
from California and New Mexico, the Court definitively disposed of the contention that
any federal non-reserved water rights exist:
        The Court noted [in United States v. Rio Grande Dam & Irrigation Co.] that there
are two limitations to the State's exclusive control of its streams--reserved rights
"so far at least as may be necessary for the beneficial uses of the government property,"
and the navigation servitude. The Court, however, was careful to emphasize with respect
to these limitations on the States' power that, except where the reserved rights or
navigation servitude of the United States are invoked, the State has total authority
over its internal waters.
California v. United States, supra, 438 U.S. at 662 (citations omitted).
        Where water is only valuable for a secondary use of the reservation ... there arises
the contrary inference that Congress intended, consistent with its other views, that
the United States would acquire water in the same manner as any other public or private
appropriator.
United States v. New Mexico, supra, 438 U.S. at 702.
        [T]he "reserved rights doctrine" is a doctrine built on implication and is an
exception to Congress' explicit deference to state water law in other areas.
Id. at 715.

    None of these statements, however, can be interpreted as conclusively as critics of
the non-reserved rights theory urge, when read in context. [FN95] In the language *374
quoted from California, for example, the Court was merely characterizing its holding
in the Rio Grande case. [FN96] The Court clearly recognized in the remainder of its opinion
that there may be circumstances other than the navigation servitude or reserved rights
doctrine under which a federal statute would preempt the state's exclusive control of
its stream-- i.e., if conditions imposed by state law on the operation or construction
of a federal reclamation project are "inconsistent with clear congressional directives
respecting the project." See 438 U.S. at 672. Consequently, the Court could not have
intended, by that language, to establish a rule of law applicable to all water rights
that could be asserted by the federal government.

    Likewise, the often-cited language in New Mexico that a "contrary inference" arises
that the United States must acquire water "in the same manner as any other public or
private appropriator," if reserved rights are not available, must be considered in
context. The only issue before the Court in New Mexico was the scope of the Forest
Service's reserved rights under its Organic Administration Act. [FN97] The Court did
not have before it any argument or evidence relevant to rights that might have been
asserted by the Forest Service on some other basis, such as appropriation under state
law, or relevant to rights arising on public domain lands. Thus, the Court's statement
about the ability of the Forest Service to obtain water in excess of its reserved rights
was made only in the context of federal reserved lands; as we discuss infra, even with
respect to reserved lands it can be argued that the language does not mean that federal
agencies are necessarily bound by state law in acquiring water necessary only for
"secondary" uses of the land. See p. 68 infra.

    Finally, the Court's characterization of the reserved rights doctrine as an "exception"
to Congress' explicit deference to state water law in other areas does not imply that
reserved rights are the only exception. The Court clearly recognized in California, as

Exhibit 14
Page 31 of 55

we have discussed, that other exceptions may exist. See Part IIB(3)(b) supra.

    While we believe that these selected passages from California and New Mexico do not
therefore definitively dispose of the federal non-reserved water rights theory, we
believe that they reflect the Court's view and its interpretation of Congress' intent
over the years that substantial deference will be accorded to state water laws. We do
not believe, therefore, that the decisions should be read as narrowly as has been
suggested by proponents of the non-reserved theory. Solicitor Krulitz, for example,
argued that when the Court suggested in New *375 Mexico that, absent a reserved right
the Forest Service should acquire water rights "in the same manner" as other appropriators,
it intended only to draw a distinction between the rights that could be obtained by a
reservation of land (which have priority as of the date of the reservation and are measured
by reasonable present and future uses of the land) and rights obtained by appropriation
(which have priority as of the date of actual use and are measured by the extent of that
use). That is, when the Court stated that federal agencies must acquire water for
secondary uses of federal reservations "in the same manner" as other appropriators, it
meant only that the right must be acquired through "appropriation," or actual use of
the water, rather than by "reservation" of the land. If a federal agency had actually
appropriated water to fulfill an authorized agency function, Krulitz concluded that the
Court would not hold that a state, by application of its substantive or procedural law,
could deny a right to that water to the agency. See Krulitz Op. at 577.

    While there is evidence to suggest that the Court was concerned with the possibility
that reserved rights could cut off the rights of private appropriators because of their
senior priority date, [FN98] we believe that the Court intended "in the same manner as
any other public or private appropriator" to mean "under applicable state law." On three
occasions, the Court referred expressly to congressional intent that water be acquired
under state law. In the sentence immediately following the language quoted above, for
example, the Court remarked that "Congress indeed has appropriated funds for the
acquisition under state law of water to be used in federal reservations." 438 U.S. at
702 (emphasis added). Similarly, the Court noted that "[t]he agencies responsible for
administering the federal reservations have also recognized Congress' intent to acquire
under state law any water not essential to the specific purposes of the reservation,"
and that "the 'reserved rights doctrine' is a doctrine built on implication and is an
exception to Congress' explicit deference to state water law in other areas." Id. at
703, 715 (emphasis added). Thus, the most logical reading of the Court's language is
that water that is not necessary to carry out the particular primary purposes mandated
by Congress for the federal reservation in question must be acquired in compliance with
applicable state substantive and procedural law. [FN99]

    With respect to the effect of California v. United States, Solicitor Krulitz argued
that the Court's recognition that state law must fall if "inconsistent" with
congressional directives supports the federal non-reserved rights theory. Krulitz *376
Op. at 576. This argument requires that we construe the mere assignment of a land
management function or delegation of responsibility for construction and operation of
a federal project to a federal agency as a "congressional directive" within the Court's
meaning. If so, any state laws or conditions that would prohibit the acquisition of water
to carry out those responsibilities would fall.

    Because the Court in California remanded the proceedings for a determination of whether
the conditions imposed by California on the New Melones Dam would be "inconsistent" with
authorization of the dam, it is difficult to speculate as to the type of conditions the

              ©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

                                                                        Exhibit 14
                                                                        Page 32 of 55

6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
**(Cite as: 6 U.S. Op. Off. Legal Counsel 328)**

Court would have found impermissible. Plainly, if a state-imposed condition would make the entire project impossible, it would be struck down. See First Iowa Cooperative v. Federal Power Commission, 328 U.S. 152 (1946). If Congress specifically authorized construction of a dam of a certain size, placed express conditions on the use of water from the dam, or prescribed particular uses or purposes of the project, it is relatively clear that state-imposed conditions that are inconsistent with those provisions would be preempted. See, e.g., California v. United States, supra, 438 U.S. at 669 n. 21; Ivanhoe Irrigation District v. McCracken, supra, and City of Fresno v. California, supra. However, we do not believe the Court intended that any conditions that might interfere with construction or operation of the project must fall. Such an interpretation would be inconsistent with the Court's analysis in New Mexico, in which the Court contemplated that state law might control some aspects of the operation of federal lands. We believe that, read in context and in light of New Mexico, the Court contemplated in California that "inconsistent" state conditions include those, for example, that would conflict with explicit statutory provisions directing a federal agency to acquire or dispose of water under certain conditions or limitations (such as the provisions of the reclamation laws discussed in Ivanhoe, Fresno, and Arizona v. California), conditions, or specifications established by Congress in the authorizing legislation for a federal project, or conditions that would entirely frustrate the purposes for which the project was authorized. This leaves open the possibility, for example, that the state may place conditions on secondary, or incidental, features of the project, or may impose conditions, for state purposes, that do not frustrate the specific federal purposes for which the project or management of the lands was authorized.

The primary importance of the Court's decisions in California and New Mexico to the federal non-reserved right theory lies in the Court's mode of analysis, particularly in the significance attributed by the Court to Congress' history of deference to state water law. As we discussed above, the constitutional basis for federal water rights, however denominated, is the Supremacy Clause coupled with a proper exercise of federal authority. Therefore the issues addressed by the Court in California and New Mexico are precisely those which must be addressed whenever federal water rights are asserted, whether the asserted rights arise under the Reclamation Act of 1902, the Forest Service's Organic Administration Act, or some other federal land management statute. The issues are (1) in an exercise of a constitutional grant of power, did Congress intend to preempt state laws governing the acquisition and use of unappropriated *377 water within the western states? and (2) if so, what is the scope of that preemption?

The Supreme Court made it clear in California and New Mexico that the existence of federal water rights depends on a finding of congressional intent to preempt state water law. That congressional intent cannot be analyzed without consideration of Congress' overall role in the development of water law in the western states and the importance to the western states of control over scarce water resources. The Court found the most significant aspect of Congress' role to be a negative one--i.e., Congress' general deference to and acquiescence in the development of comprehensive water codes by the western states. For example, in California the Court interpreted the Reclamation Act of 1902 not only in light of its unique legislative history, but also in light of "the consistent thread of purposeful and continued deference to state water law by Congress." 438 U.S. at 653. In New Mexico, both the majority and the dissent agreed that the determination of reserved rights under a particular statutory scheme, such as the Forest Service's, requires a "careful examination" of the asserted right and the specific purpose for which the land was reserved, "both because the reservation [of water] is implied, rather than expressed, and because of the history of congressional intent in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 33 of 55

6 U.S. Op. OLC 328          FOR EDUCATIONAL USE ONLY              Page 34
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

the field of federal-state jurisdiction with respect to allocation of water." 438 U.S.
at 701-02; see also id. at 718 (Powell, J., dissenting).

   The deference to state water law found relevant by the Court includes both specific
instances in which Congress directed federal agencies to abide by state water law, such
as § 8 of the 1902 Reclamation Act and--perhaps more importantly--Congress' acquiescence
in the development by the states of comprehensive procedural and substantive codes to
recognize and enforce private rights to water, including water on federal lands. The
significance of statutes such as the Mining Acts of 1866 and 1870, the Desert Land Act
of 1877, the Reclamation Act of 1902, and the McCarran Amendment is thus not that they
directly regulate federal uses of water, but that they demonstrate Congress' recognition
that the allocation of water within the western states is primarily a matter of concern
to the states, rather than a subject for uniform comprehensive federal regulation. See
United States v. New Mexico, supra, 438 U.S. at 702 & n. 5. Although Congress may in
specific instances create federal water rights that do not depend on state law, such
rights must be seen as the exception, rather than the rule, particularly as they could
substantially disrupt or disturb expectations of private appropriators under existing
state systems. See United States v. New Mexico, supra, 438 U.S. at 715.

   The effect of Congress' deference to state water law can best be understood as
establishing a "presumption" to be read into the language and legislative history of
federal statutes that authorize the management of federal lands-- i.e., that in the
absence of evidence to the contrary, it will be presumed that Congress did not intend
to alter or affect its policy of deference to state water law. Therefore, as a general
rule, it will be assumed that Congress intended federal agencies to acquire water rights
in accordance with state law and contemplated that a state *378 could deny some federal
uses of water. This is squarely inconsistent with the non-reserved water rights theory
advanced by Solicitor Krulitz.

   Solicitor Krulitz argued that the presumption of deference to state law is an
unwarranted exception to the established doctrine that "federal activities are immune
from state regulation unless there is a 'clear congressional mandate,' or 'specific
congressional action.' " Krulitz Op. at 564 (citations omitted). The cases relied upon
by Solicitor Krulitz in support of this argument, however, involve federal statutory
schemes that are ill-adapted to state law, [FN100] or state statutes that operate to
frustrate specific federal purposes. [FN101] If we look at other areas in which the Court
has recognized that state rules may apply to federal programs, it is clear that the
approach taken and result reached by the Court in California and New Mexico are not
aberrations, but rather are consistent with the approach of the Court in those areas.

   The Court's recent decision in United States v. Kimbell Foods, Inc., 440 U.S. 715 (1979),
is particularly instructive. In that case, the Court considered whether contractual liens
arising from certain federal loan programs take precedence over private liens established
under state commercial laws. The federal statutes in question, the Small Business Act
and the Federal Housing Act, authorized federal agencies to secure certain loans and
provided for liens arising out of those loans, but did not establish any priority for
the liens. Analyzing the question as one of "federal common law," [FN102] the Court
refused to fashion specific federal rules governing the relative priority of private
liens and liens arising under the government's lending program; it held that priorities
should be determined under applicable state laws. The Court recognized that federal law
governed the rights of the United States arising under the loan programs, because the
lending agencies derived their authority from specific acts of Congress passed in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 34 of 55

exercise of a constitutional power and "their rights, [therefore] should derive from
a federal source," but held that application of federal law does not require, in every
instance, the creation of uniform federal rules. 440 U.S. at 726, 728. [FN103] *379 In
some cases, federal law may require no more than the adoption or borrowing of rules created
by state law:

Whether to adopt state law or to fashion a nationwide federal rule is a matter of
judicial policy "dependent upon a variety of considerations always relevant to the nature
of the specific governmental interests and to the effects upon them of applying state
law."
440 U.S. at 728, quoting United States v. Standard Oil Co., 332 U.S. 301, 310 (1947);
see also United States v. Little Lake Misere Land Co., supra, 412 U.S. at 594-95.

The Court identified three considerations relevant to the choice of federal or state
rules:
(1) the need, if any, for uniform nationwide rules governing implementation or
administration of federal programs;
(2) the extent to which application of state law would frustrate specific objectives
of the federal program; and
(3) the extent to which application of a federal rule would disrupt relationships
predicated on state law.
See 440 U.S. at 728-29. In the circumstances presented in Kimbell, the Court concluded
that none of these considerations required fashioning of specific federal rules governing
the priority of liens under the SBA or FHA.

The Court's reasoning in Kimbell is analogous in several respects to its reasoning
in California and New Mexico. For example, in rejecting the government's contention that
administration of the SBA and FHA programs required a uniform national rule of priority,
the Court found it significant that the practice and policies of the responsible agencies
in administering the loan programs were in many respects adapted to state law, with
apparently little disruptive effect on the accomplishment of the goals of the program.
See 440 U.S. at 730-33. Similarly, in California and New Mexico, the Court found it
relevant that the Bureau of Reclamation and the Forest Service had in the past conformed
their acquisition of water rights to state law as a matter of administrative practice
and interpretation. See California v. United States, supra, 438 U.S. at 675-76; United
States v. New Mexico, supra, 438 U.S. at 717 n. 24. In Kimbell, as in New Mexico and
California, the Court recognized that creation of special federal rules would
substantially disrupt expectations built on established state law. The Court's comments
in Kimbell in that regard are equally applicable to the potentially disruptive effect
of federal water rights that could be asserted without regard to state substantive or
procedural law:
In structuring financial transactions, businessmen depend on state commercial law
to provide the stability essential for reliable evaluation of the risks involved. However,
subjecting federal contractual liens to the doctrines developed in the lien area *380
[giving such liens priority] could undermine that stability. Creditors who justifiably
rely on state law to obtain superior liens would have their expectations thwarted whenever
a federal contractual security interest suddenly appeared and took precedence.
440 U.S. at 739 (citations omitted).

Most importantly, the Court indicated in Kimbell that it would be willing to fashion
special federal rules of priority only if application of state rules would frustrate
the specific purposes for which Congress had authorized the loan programs. The Court
concluded that the interest of the United States as a "quasi-commercial lender" did not

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 35 of 55

6 U.S. Op. OLC 328          FOR EDUCATIONAL USE ONLY          Page 36
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

require the same sort of extraordinary priority that had been accorded other liens created under federal programs, such as tax liens, which are intended to secure adequate revenues in order that the United States can discharge its obligations. In reaching this conclusion, the Court found it highly relevant that Congress had recognized by statute that state claims may in some instances have priority even over federal tax liens:

We do not suggest that Congress' actions in the tax lien area control our choice of law in the commercial context. But in fashioning federal principles to govern areas left open by Congress, our function is to effectuate congressional policy. To ignore Congress' disapproval of unrestricted federal priority in an area as important to the Nation's stability as taxation would be inconsistent with this function.
440 U.S. at 738 (citations omitted). The significance attributed by the Court to such expressions of congressional policy and its unwillingness to create federal rules of priority absent a showing that application of state rules will frustrate specific federal interests echoes the reasoning of the Court in both California and New Mexico. Thus, where application of state law will not frustrate specific federal purposes or interests, where the federal program has been and can be adopted to state law, and where implication of federal rights would substantially disrupt expectations of private individuals based upon an existing comprehensive state regulatory scheme, the teaching of Kimbell, California, and New Mexico is that state law may control federal rights and liabilities arising under federal programs.

The next step of the analysis is to determine whether, in a particular statutory scheme authorizing the management of federal lands or federal water projects, Congress intended to carve out an exception in that instance to its general policy of deference to state water law. This is precisely what the Court did in California and New Mexico. In both cases, the Court looked in detail, on a case-by-case basis, at the statutes in question and their legislative history to determine whether, or under what circumstances, Congress intended that the Bureau of Reclamation or the Forest Service could use water without regard to state water laws.

Because California and New Mexico dealt only with two particular statutes, they do not provide a definitive answer as to federal rights that can be asserted *381 under other statutes. That determination can be made only by examining each statute in light of its legislative history and the possible conflicts that could be created by application of state law. Nonetheless, the Court's reasoning in New Mexico and California provides the relevant framework for that examination.

We believe that California and New Mexico must be read to limit the bases upon which federal water rights may be asserted without regard to state law to specific congressional directives or authorizations that override inconsistent state law, and the establishment of primary purposes for the management of federal lands or construction and operation of federal projects that would be frustrated by the application of state law. As we noted supra, we believe that specific congressional directives must be construed narrowly, and do not include all authorized functions or uses of federal property. The clearest example of such directives would be provisions that place express limitations or conditions on the use or distribution of water from federal projects or express conditions or specifications included in congressional authorizations of federal projects. In the abstract, pending clarification by the Court of its holding in California, however, it is difficult for us to provide more detailed guidance.

The determination of whether there has been a sufficient manifestation of federal power in order to invoke the Supremacy Clause is difficult to make in the abstract, and may

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 36 of 55

be clarified only through administrative interpretation or litigation. The starting point, however, is unquestionably the content and the context of the act, usually a statute, but occasionally an executive order, expressing the exercise of a constitutional federal power. As we have discussed above, the Court's analysis of federal-state conflicts in other areas may provide some guidance in determining the validity of the exercise of the power. In particular, the Court has found relevant such factors as: the extent to which federal programs can be or have been adapted to state law; [FN104] the role played by the federal government, the significance of the federal interests at stake, and the risk to federal goals and interests posed by application of state law; [FN105] and the extent to which application of federal rules will disrupt private expectations. [FN106] See United States v. Kimbell Foods, Inc., supra, 440 U.S. at 728-29; Wilson v. Omaha Indian Tribe, 442 U.S. 653, 671-74 (1979). These factors, together with the legislative history of the statute in question, must be weighed in determining the basis for federal water rights.

We do not view the Court's discussion in New Mexico of primary purposes and secondary uses as necessarily limited to federal lands that have been formally withdrawn from the public domain. We believe, for example, that the implied right analysis used by the Court in New Mexico and other reserved right cases supports a parallel implication on "acquired" lands that have been set aside for specific federal purposes, for example, national forest lands acquired under the ***382** provisions of the Weeks Act, 16 U.S.C. § 515. [FN107] Much of the language used by the Court to describe the scope of the reservation doctrine, in fact, is broad enough to cover all lands set aside for a particular federal purpose, regardless of the prior ownership of the land. For example, in Arizona v. California, supra, in which the Court recognized that the reserved right doctrine applies to non-Indian lands, the Court agreed with the conclusion of the Master "that the principle underlying the reservation of water rights for Indian Reservations was equally applicable to other federal establishments such as National Recreation Areas and National Forests." 373 U.S. at 601 (emphasis added). In Cappaert v. United States, supra, the Court noted that the reserved right doctrine "applies to Indian reservations and other federal enclaves." 426 U.S. at 138 (emphasis added). Finally, in New Mexico, the Court did not suggest that the reserved right doctrine applies only to lands that may be formally reserved from the public domain; it recognized rather that the doctrine applies to any land that has been set aside as a national forest (which could be reserved or acquired lands). See 438 U.S. at 698-99. [FN108]

Similarly, we believe that Congress could establish "primary purposes" for the management of public domain lands that could be the basis for federal water rights. As we have noted, the reservation of land for a federal purpose does not, in and of itself, create federal water rights. It is rather the specification of particular purposes for which the lands should be maintained and managed and the implicit intent that water be available for those purposes that give rise to those rights. [FN109] It may be possible to argue, therefore, that in the relevant statutes Congress intended that the public domain be managed for specific purposes that cannot be accomplished without implication of federal water rights. [FN110] However, as Solicitor Martz concluded, given the language and legislative history of the Taylor Grazing Act and FLPMA, it is highly doubtful that those statutes could be read to reflect the requisite congressional intent to displace existing state water laws. See ***383** Martz Op. at 257-58; see generally Sierra Club v. Watt, 659 F.2d 203, 206 (D.C.Cir.1981). While we believe it is theoretically possible for federal water rights to exist on public domain lands, such rights probably cannot be asserted under the current statutory schemes authorizing management of the public domain. We have not, however, undertaken an independent analysis of those

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.