Case 3:05-cv-00006-HRH   Document 141-4   Filed 10/12/2007   Page 1 of 18

6 U.S. Op. OLC 328          FOR EDUCATIONAL USE ONLY                    Page 38
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

statutes.

## IV. Conclusion

We conclude that the rationale of California and New Mexico must be applied to any assertion of federal water rights in the western states. To the extent the federal non-reserved water rights theory would suggest that federal water rights are created merely by the assignment of land management functions to a federal agency or authorization of a federal project, we believe that it does not have a sound legal or constitutional basis and does not provide an appropriate legal basis for assertion of water rights by federal agencies. New Mexico and California make it clear that the federal constitutional authority to preempt state water law must be clearly and specifically exercised, either expressly or by necessary implication. Otherwise, the presumption is that the western states retain control over the allocation of unappropriated water within their borders. Although we have not undertaken an independent analysis of the various federal land management statutes, we believe that, as a practical matter, because statutes authorizing management of the public domain probably do not provide a basis for assertion of federal water rights, the federal rights that can be asserted are limited to federal reserved rights and rights implied from specific congressional directives, if the concept of "reserved" rights is understood to apply as well to acquired federal lands that are part of a federal reservation. This does not mean that the federal government is helpless to acquire the water it needs to carry out its management functions on federal lands. If that water cannot be acquired under state law or by purchase or condemnation of existing rights, the remedy lies within the power of Congress. The Supremacy Clause provides Congress ample power, when coupled with the commerce power, the Property Clause, or other grants of federal power, to supersede state law. The exercise of such power must be explicit or clearly implied, however, and federal rights to water will not be found simply by virtue of the ownership, occupation, or use of federal land, without more.

The next logical step, to the extent it is necessary in order to apply this analysis to particular statutes, lands, or claims, is for the agencies with responsibility for enforcement and administration of the various land management statutes to review their statutory authority and water needs in light of the principles we have outlined here. We have not attempted that task here, because of its scope and because those agencies are more familiar with the scope and administration of those statutes and the possible problems presented by application of state law.

Theodore B. Olson

Assistant Attorney General

Office of Legal Counsel

FN1 The Attorney General for the State of Wyoming has stated, for example, that "the non-reserved right doctrine creates a nightmare for Western States' water resources management." Letter from the Honorable Steven F. Freudenthal, Attorney General, State of Wyoming, to Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel (Apr. 1, 1982). The Montana Attorney General has suggested that failure to resolve the non-reserved water rights dispute would lead to "a long and acrimonious confrontation between the federal and state governments." Memorandum from the Honorable Mike Greely, Attorney General, State of Montana, to Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel (Apr. 1, 1982) at 12.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 38 of 55

FN2 See, e.g., 16 U.S.C. § 577b (1976) (prohibiting any "further alteration of the natural water level of any lake or stream" in the Lake Superior National Forest).

FN3 See, e.g., Oklahoma v. Guy F. Atkinson Co., 313 U.S. 508, 535 (1941); First Iowa Coop. v. Federal Power Comm'n, 318 U.S. 152, 176 (1946), discussed in Part IIB(3)(b) infra.

FN4 As we discuss in Part IIB(3)(c)(i) infra, Solicitor Krulitz concluded that federal agencies are immune from both substantive and procedural state law, but recommended as a matter of policy that the agencies comply with state procedures wherever possible.

FN5 Land is generally considered arid or semi-arid if it cannot be cultivated without irrigation. See Note, Federal-State Conflicts Over the Control of Western Waters, 60 Colum.L.Rev. 967 n. 2 (1960) (hereinafter cited as Colum. Note). Seventeen western states are usually included in this category: Arizona, California, Colorado, Idaho, Kansas, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, and Wyoming. These states, where water is relatively scarce, have developed systems of legal rights to water based on the doctrine of "appropriation" or capture of the water for a productive use. See discussion at pp. 8-11 infra. The remaining 31 contiguous states have adopted some form of a riparian system for the allocation of water rights, based on ownership of land. See discussion at pp. 7-8 infra. Alaska appears to have largely rejected a riparian doctrine in favor of an appropriative system, while Hawaii has a mixed system based on custom, ancient rights, and legislation. See 1 Clark, supra, § 4.4.

FN6 Although most of the states outside of the seventeen arid or semi-arid western states still adhere to riparian rights, in many of those states the common law has been codified or preempted by statutes governing specific uses such as construction of dams and use of water by cities, districts and state agencies, or preserving public uses such as minimum flows or, more recently, aesthetic and environmental values. See F. Trelease, Water Law, supra, at 12. Some riparian states now require administrative permits prior to the initiation of new water uses. Id; see also F. Trelease, "Federal-State Relations in Water Law" (Legal Study No. 5, prepared for the National Water Commission) at 15-18 (Sept. 7, 1971) (hereinafter cited as "Federal-State Relations").

FN7 A riparian system was particularly ill-suited for use by the first wave of miners, who staked their claims at a time when most of the western lands were still owned largely by the federal government and not legally open for settlement. Thus, for the most part there was no private ownership of land to which riparian rights could attach. See Colum. Note, supra n. 5, at 969.

FN8 See, e.g., Irwin v. Phillips, 5 Cal.P. 140, 63 Am.Dec. 113 (1855); Lux v. Haggin, 69 Cal. 255, 10 P. 674 (1886); Coffin v. Lefthand Ditch Co., 6 Colo. 443 (1882).

FN9 See, e.g., Cal.Civ.Code, tit. 8, pt. 4, div. 2, §§ 1410-22 (1872); Colo.Laws 1862, ch. 28, § 13; Colo.Laws 1864, § 32; Mont.Laws 1865, p. 30; §§ 1-2 Bannack Stats. 367; §§ 69-70 Mont.Sess.Laws 57; Laws of Dec. 9, 1850, Laws of Utah (1866) ch. 110-111; Law of Feb. 18, 1852, Laws of Utah (1866), ch. 117; Law of Jan. 17, 1862, Laws of Utah (1866) ch. 119; Hills Laws Ann. (Oregon) § 3832 (1864); Howell Code (Arizona) §§ 1, 3 (1864).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 39 of 55

Case 3:05-cv-00006-HRH   Document 141-4   Filed 10/12/2007   Page 3 of 18

6 U.S. Op. OLC 328                    FOR EDUCATIONAL USE ONLY                         Page 40
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

FN10 For a general description of state water laws, see R. Dewsnup & D. Jensen, A Summary-Digest of State Water Laws (1973) (study prepared for the National Water Commission) and 3 W. Hutchins, Water Rights Laws in the Nineteen Western States (U.S. Dept. of Agriculture Misc. Pub. No. 1206, 1971). Nine of the western states, most notably California, have in the past recognized some limited forms of riparian rights on private lands, in addition to appropriative rights. See 1 Clark, supra, § 18.2(B). By statute or constitutional amendment those states have largely eliminated or severely circumscribed reliance on riparian ownership, and consequently riparian rights now have, for the most part, only historic significance. See 5 Clark, supra, § 420. The only states in which new uses may be initiated by exercising a riparian right are California and, to a limited extent, Nebraska. See F. Trelease, Water Law, supra, at 11-12.

FN11 The Montana and Washington water codes contain examples of broad definitions of beneficial use:
   "Beneficial use" .... means a use of water for the benefit of the appropriator, other persons, or the public, including but not limited to, agricultural (including stock water), domestic, fish and wildlife, industrial, irrigation, mining, municipal, power and recreational uses.
Mont. Rev. Code 1979 § 85-2-102(2).
   Uses of water for domestic stock watering, industrial, commercial, agricultural, irrigation, hydroelectric power production, mining, fish and wildlife maintenance and enhancement, recreational, and thermal power production purposes, and preservation of environmental and aesthetic values, and all other uses compatible with the enjoyment of the public waters of the state, are declared to be beneficial.
Wash. Rev. Code Ann. § 90.54.020.

FN12 See, e.g., Ariz. Rev. Stat. Ann. § 45-147B (West Supp.) (relative values are (1) domestic and municipal; (2) irrigation and stock watering; (3) power and mining; and (4) recreation and wildlife, including fish); Wyo. Stat. § 41-3-102 (1977); 5 Clark, supra, §§ 408.1, 408.4.

FN13 See, e.g., Wyo. Stat. § 41-3-306 (1977) (State Engineer can make allowances for instream stock watering, without recognizing a right to such use).

FN14 See, e.g., Colo. Rev. Stat. § 37-92-102(3), 37-92-103(3)(4) & (10) (1973) (state agency may make appropriations of minimum instream flows).

FN15 Particularly where water rights may antedate water codes or adjudication statutes, rights in those states may in some cases be awarded priority by equity decrees or other adjudicative procedures, despite a failure to make the requisite filing. See 5 Clark, supra, § 410.1.

FN16 Some states have, however, recognized that state agencies may have particular interests and rights not available to private parties. See nn. 13, 14 supra.

FN17 See, e.g., Colo. Const. art. XVI, § 5 ("The water of every natural stream, not heretofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided"); Wyo. Const. art. VIII, § 1 ("The water of all natural streams, springs, lakes or other collections of still water, within the boundaries of the state, are hereby declared to be the property of the state"); N.D. Const. art. XVII, § 210. States such as California, Nevada and Oregon have provided

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 40 of 55

Case 3:05-cv-00006-HRH   Document 141-4   Filed 10/12/2007   Page 4 of 18

6 U.S. Op. OLC 328         FOR EDUCATIONAL USE ONLY                    Page 41
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

by statute that all water within the state "is the property of" or "belongs to" the public or the people of the state. See Cal. Water Code § 102; Nev. Rev. Stat. § 533.025 (1979); Ore. Rev. Stat. § 537.110 (1963). See generally E. Morreale, Federal-State Conflicts over Western Waters--A Decade of Attempted "Clarifying Legislation," 20 Rutgers L. Rev. 423, 446-59 (1966) (hereinafter cited as Federal-State Conflicts).

FN18 The "California doctrine" states are California, Kansas, Nebraska, North Dakota, Oklahoma, Texas and Washington. The "Oregon doctrine" is followed in Oregon and South Dakota. See Colum. Note, supra n. 5, at 972-75; Note, Federal Nonreserved Water Rights, 48 U. Chi. L. Rev. 758, 766 n. 46 (1980); 2 Clark, supra, § 102.3.

FN19 The "Oregon doctrine" differs from the "California doctrine" in that it construes the Desert Land Act as establishing a uniform rule of appropriation applicable to private and federal rights. The "California doctrine" holds that the Desert Land Act, together with the Mining Acts of 1866 and 1870 (discussed at pp. 18-24, infra) merely recognized and affirmed whatever state system had been developed for allocation of water rights, including systems such as California's that recognized some riparian rights. See Colum. Note, supra, n. 5, at 972-75; 2 Clark, supra, § 102.3.

FN20 The "Colorado doctrine" states are Arizona, Colorado, Idaho, Montana, Nevada, New Mexico, Utah, and Wyoming. 2 Clark, supra, § 102.3(C) n. 21. For a full discussion of the origins and holdings of the California, Oregon, and Colorado doctrines, see 5 Clark, supra, § § 401, 405, 420; Colum. Note, supra n. 5, at 972-75.

FN21 Title to most of the western territories was obtained by the United States from foreign powers through purchase and treaty during the first half of the 19th century. Generally, the terms of acquisition provided for recognition of the few existing private property rights, but granted title over the vast non-private lands to the United States. Texas was an exception; it was admitted by annexation in 1845, and retained title to all its public lands. See Morreale, Federal-State Conflicts, supra n. 17, at 431 & n. 41; Colum. Note, supra n. 5, at 968-69 & nn. 8, 9.

FN22 The term "public land laws" is generally used to refer to statutes providing for the sale or disposition of public lands, such as the Homestead Act, 12 Stat. 392 (1862), 43 U.S.C. § 161 (1970), and the Desert Land Act of 1877, 19 Stat. 377, 43 U.S.C. § 321 et seq., which provided for land grants to settlers of western lands, and various statutes providing for the sale or grant of public lands to private individuals or the states under conditions set by Congress. See, e.g., Act of Aug. 18, 1894, 28 Stat. 422, 43 U.S.C. § 641 (1976); Public Lands Act of 1964, Pub. L. No. 88-606, 78 Stat. 982, 43 U.S.C. § 1391 et seq. (1970). The sale and disposition of public lands are now governed primarily by the Federal Land Policy and Management Act of 1976, Pub. L. No. 94-579, 90 Stat. 2743, 43 U.S.C. § 1701 et seq. Public land laws are usually distinguished from mining laws, which govern the mining of hard minerals on public lands, and mineral leasing laws, which provide for leasing of public lands for gas and oil. See generally 63 Am. Jur. 2d "Public Lands," § 2.

FN23 In 1978 the Supreme Court recited that the percentage of federally owned land in the western states, excluding Indian reservations and trust properties, ranged from 29.5 percent of the land in the State of Washington to 86.5 percent of the land in the State of Nevada, with an average of approximately 46 percent. See United States v. New Mexico, supra, 438 U.S. at 699 n. 3 (1978).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 41 of 55

FN24 The two major statutes authorizing management of the public domain by the BLM are the Taylor Grazing Act, 48 Stat. 1269 (1934), as amended, 43 U.S.C. § 315 et seq., which authorizes the Secretary of the Interior to manage the public domain for grazing purposes, and the Federal Land Policy and Management Act, supra n. 22, which directs the Secretary of the Interior to manage the public domain on the basis of "multiple uses" and for "sustained yield." See 43 U.S.C. § 1702(c), (h).

FN25 See, e.g., National Park Service Act of 1916, 39 Stat. 535, as amended, 16 U.S.C. § 1 et seq.; American Antiquities Preservation Act of 1906, 34 Stat. 225, 16 U.S.C. § 431 (1976).

FN26 See, e.g., Forest Service Creative Act of 1891, 26 Stat. 1103, 16 U.S.C. § 471 (1976); Forest Service Organic Administration Act of 1897, 30 Stat. 34, 36, as amended, 16 U.S.C § 473 (1976); National Wildlife Refuge Administration Act of 1966, Pub.L. No. 89-669, 80 Stat. 927, 16 U.S.C. § 668dd (1976); Wild and Scenic Rivers Act, Pub.L. No. 90-542, 82 Stat. 906 (1968), 16 U.S.C. § 1271 et seq.; Wilderness Act of 1964, Pub.L. No. 88-577, 78 Stat. 890, 16 U.S.C. § 1131 et seq. (1976).

FN27 See Reclamation Act of 1902, 32 Stat. 390, as amended, 43 U.S.C. § 371 et seq. (1976).

FN28 See Federal Power Act, 41 Stat. 1075 (1920), as amended, 16 U.S.C. § 818 (1976).

FN29 See State of Nevada ex rel. Shamberger v. United States, 165 F.Supp. 600 (D.Nev.1958), rev'd on sovereign immunity grounds, 279 F.2d 699 (9th Cir.1960); Act of Feb. 28, 1958, Pub.L. No. 85-337, 72 Stat. 27, 43 U.S.C. § 155 (withdrawal, reservation or restriction of public lands for defense purposes)

FN30 For example, § 521 of the Forest Service statute provides that acquired forest service lands "shall be permanently reserved, held and administered as national forest lands under the provisions of section 471 of this title and Acts supplemental to and amendatory thereof." 16 U.S.C. § 521.

FN31 See nn. 25, 26 supra.

FN32 See n. 24 supra.

FN33 See, e.g., Boulder Canyon Project Act, 45 Stat. 1057 (1928), 43 U.S.C. § 617 (1976); Colorado River Storage Project, 70 Stat. 105 (1956), as amended, 43 U.S.C. § 620 (1976).

FN34 This deference to state control can be contrasted with Congress' approach to control over mining on federal lands, as to which Congress authorized comprehensive procedures and standards for assertion and protection of mineral claims. See 30 U.S.C. § 22 et seq. (1976). The Supreme Court has recently noted that "although mining law and water law developed together in the West prior to 1866, with respect to federal lands Congress chose to subject only mining to comprehensive federal regulation." Andrus v. Charlestone Stone Products Co., 436 U.S. 604, 613 (1978).

FN35 The Homestead Act, passed in 1862 (see n. 22 supra), did not contain any reference to water rights or to the appropriation of water by homesteaders.

FN36 The 1866 Mining Act was passed to thwart legislative initiatives calling for the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 42 of 55

Case 3:05-cv-00006-HRH   Document 141-4   Filed 10/12/2007   Page 6 of 18

6 U.S. Op. OLC 328                FOR EDUCATIONAL USE ONLY                        Page 43
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

sale of mining interests on federal lands. Its effect was to legalize the system of "free mining" that had been established by custom and local rules of the western mining communities. The legislative history of the provision indicates that proponents of the legislation believed it would merely confirm the existing rules and customs. See R. Grow & M. Stewart, "The Winters Doctrine as Federal Common Law," 10 Natural Res. Law 457, App. at 486 n. 16 (1980) (hereinafter cited as "Grow & Stewart").

FN37 The legislative history of this provision of the 1870 Act is sparse, and indicates only that Congress wanted to assure that water rights vesting under the 1866 Act would not be adversely affected by the new act. See Grow & Stewart, supra n. 36, App. at 493-94.

FN38 The Desert Land Act applies only to California, Colorado, Oregon, Nevada, Washington, Idaho, Montana, Utah, Wyoming, Arizona, New Mexico, and North and South Dakota. 43 U.S.C. § 323 (1976). It does not apply to Kansas, Nebraska, Oklahoma, or Texas.

FN39 See F. Trelease, Federal Reserved Water Rights Since PLLRC, 54 Denver L.J. 473, 476 (1977). At the time the Act was proposed, concern was voiced that the language "conducting water" upon the desert lands might work a partial repeal of the 1866 and 1870 Acts, and would permit a settler to monopolize available water by conducting it across his land and selling it to contiguous owners. See Grow & Stewart, supra n. 36, App. at 495 & n. 48. The language quoted above was included to make it clear that an entryman could acquire only such rights as are available by appropriation under state law (i.e., limited to the quantity necessary for actual beneficial use). Id.

FN40 Section 9(b) requires an applicant to provide the Federal Power Commission with "satisfactory evidence that [he] has complied with the requirements of the laws of the State or States within which the proposed project is to be located with respect to bed and banks and to the appropriation, diversion, and use of water for power purposes and with respect to the right to engage in the business of developing, transmitting, and distributing power, and in any other business necessary to effect the purpose of a license under this chapter." 16 U.S.C. § 802(b).

FN41 Section 27 provides that "[n]othing herein contained shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein." 16 U.S.C. § 821.

FN42 See n. 91 infra.

FN43 As we discuss infra, the constitutional basis for federal water rights is the same in both circumstances enumerated above, whether the rights fall within the "reserved" rights category or within the category of "specific congressional directives." Because the Supreme Court has developed the reserved right doctrine in a few, well-defined cases, for clarity we will set out the decisions in these two categories separately.

FN44 Nearly seventy years later, the Supreme Court stated that the holding in Rio Grande was limited, and to be construed as reaffirming the rights of the states over disposition and use of water except in narrow and specific circumstances. "[E]xcept where the reserved rights or navigation servitude of the United States are invoked, the State has total authority over its internal waters." California v. United States, supra, 438 U.S. at 662 (emphasis added).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 43 of 55

Case 3:05-cv-00006-HRH   Document 141-4   Filed 10/12/2007   Page 7 of 18

6 U.S. Op. OLC 328                FOR EDUCATIONAL USE ONLY                      Page 44
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

FN45 The case arose as an action by the United States to enjoin pumping of wells by owners of a ranch near the Devil's Hole Monument. The pumping had been authorized by a state permit after the date of reservation of the monument. See 426 U.S. at 134-35.

FN46 The Court actually found the requisite congressional intent to be explicit, rather than implied, because the 1952 presidential proclamation reserving the land recited that the "pool . . . should be given special protection." 426 U.S. at 140.

FN47 In California v. United States, supra, decided the same day as New Mexico, Justice Rehnquist, again speaking for the majority, discussed at length the "purposeful and continued deference to state water law by Congress," including principally the Mining Acts of 1866 and 1870, the Desert Land Act and the Reclamation Act of 1902. 438 U.S. at 653-70.

FN48 The opinion of the Court also concluded that the Multiple-Use Sustained-Yield Act of 1960, 16 U.S.C. § 528 (MUSYA), which provides that national forests "shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes," does not provide any basis for assertion of reserved rights in forests existing as of the effective date of the MUSYA "for the secondary purposes there established." 438 U.S. at 715. The Court "intimate[d] no view as to whether Congress [in the MUSYA] authorized the subsequent reservation of national forests out of public lands to which a broader doctrine of reserved water rights might apply." Id. at n. 22. As Justice Powell pointed out in his partial dissent from the Court's opinion, the Court's statements on the effect of the MUSYA are probably dicta because the United States did not argue that the MUSYA reserved additional water for use on national forests, but only that the Act confirmed Congress' intent in the Organic Administration Act to establish multiple purposes that include fish, wildlife, and recreation. See id. at 718 n. 1.

FN49 New Mexico was a split decision, with Justices Brennan, White, and Marshall joining in a dissent written by Justice Powell. The dissenters, however, did not take issue with the conclusion of the majority that Congress had generally deferred to state water law and therefore "that the implied-reservation doctrine should be applied with sensitivity to its impact upon those who have obtained water rights under state law and to Congress' general policy of deference to state law," and concurred in the majority's conclusion that the Organic Administration Act could not be read "as evidencing an intent to reserve water for recreational or stock watering purposes." 438 U.S. at 718. The dissenters disagreed rather with the majority's narrow reading of the legislative history of the Organic Administration Act to exclude preservation of wildlife as a primary purpose of the reservation of national forests. Id. at 719.

FN50 The Supreme Court has recognized that Congress' constitutional authority to construct or license such projects can stem from any of several constitutional grants of power, such as the Commerce Clause, which provides the basis, inter alia, for regulation and promotion of the navigability of streams, the Property Clause, which authorizes Congress to manage federal lands, or the General Welfare Clause. See, e.g., Oklahoma v. Guy F. Atkinson Co., 313 U.S. 508, 534 (1941) (flood control and navigation project authorized under Commerce Clause); First Iowa Coop. v. Federal Power Comm'n, 328 U.S. 152, 176 (1946) (hydroelectric project on navigable stream authorized under Commerce Clause); Federal Power Comm'n v. Oregon, 349 U.S. 435, 445 (1955) (hydroelectric project on non-navigable stream authorized under Property Clause, because project to be constructed on federal lands); United States v. Gerlach Live Stock Co., 339 U.S. 725, 737-38 (1950) (reclamation project authorized under General Welfare Clause).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 44 of 55

Case 3:05-cv-00006-HRH   Document 141-4   Filed 10/12/2007   Page 8 of 18

6 U.S. Op. OLC 328                 FOR EDUCATIONAL USE ONLY                          Page 45
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

FN51 For example, in First Iowa Coop., the Court, discussing the effect of the savings provisions of the Act, noted broadly that "in those fields where rights are not thus 'saved' to the States, Congress is willing to let the supersedure of the state laws by federal legislation take its natural course." 328 U.S. at 176. See generally Federal Power Comm'n v. Oregon, supra, 349 U.S. at 444-45 ("There thus remains no question as to the constitutional and statutory authority of the Federal Power Commission to grant a valid license for a power project on reserved lands of the United States, provided that, as required by the Act, the use of the water does not conflict with vested rights of others. To allow Oregon to veto such use, by requiring the State's additional permission, would result in the very duplication of regulatory control precluded by the First Iowa decision.") (citations omitted).

FN52 In First Iowa Coop., the power cooperative's development plan required diversion of the Cedar River into another basin in order to get a greater drop and head for water power. That plan would have been barred by an Iowa statute requiring that any water taken from a stream for power purposes be returned to the same stream at the nearest practicable location. See 328 U.S. at 166. In Federal Power Comm'n v. Oregon, the State of Oregon sought to prevent construction of the dam because it would cut off anadromous fish from their spawning and breeding grounds. 349 U.S. at 449-50. City of Tacoma involved a conflict between the terms upon which the FPC issued a license to the City to construct a power dam on the Cowlitz River, and a Washington statute prohibiting the construction of dams over 25 feet in height on the Cowlitz or other state streams tributary to the Columbia, for protection of salmon. See 357 U.S. at 328 n. 11.

FN53 Most large federal reclamation projects are authorized by specific legislation and appropriations, but incorporate by reference the provisions of the federal "reclamation laws," including, most importantly, the 1902 Act. See, e.g., California v. United States, supra, 438 U.S. at 651 n. 6.

FN54 The Court also rejected a constitutional challenge to the reclamation projects in question, finding that "[t]here can be no doubt of the Federal Government's general authority to establish and execute" the projects under the General Welfare Clause and Property Clauses of the Constitution. 357 U.S. at 294-95. Those clauses give the federal government the power "to impose reasonable conditions on the use of federal funds, federal property, and federal privileges," and prohibit the states from "compel[ling] uses of federal property on terms other than those prescribed or authorized by Congress." Id. at 295.

FN55 See, e.g., United States v. Gerlach Live Stock Co., 339 U.S. 725 (1950); Ivanhoe Irrigation District v. McCracken, supra; City of Fresno v. California, supra; Dugan v. Rank, 372 U.S. 609 (1963).

FN56 The United States also argued that the conditions imposed on the permit granted by the California Board were inconsistent with the terms upon which construction and operation of the project had been authorized. See U.S. Brief at 57-85. Because the lower courts had both found that California could not impose any substantive conditions on the permit, this argument was not considered below.

FN57 Three justices (White, Brennan, and Marshall) dissented from the majority's decision, on the ground that § 8 should be read narrowly, as it was in Ivanhoe, Fresno, and Arizona, to deal only with the acquisition of water rights and to require only that the United

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 45 of 55

Case 3:05-cv-00006-HRH   Document 141-4   Filed 10/12/2007   Page 9 of 18

6 U.S. Op. OLC 328                FOR EDUCATIONAL USE ONLY                        Page 46
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

States respect water rights that have been vested under state law. See 438 U.S. at 691. The dissent would have upheld the lower court decisions "that the State was without power under the reclamation laws to impose conditions on the operation of the New Melones Dam and on the distribution of project water developed by that Dam, which would be undertaken with federal funds." Id. at 693. Justice Powell, who wrote the dissent in United States v. New Mexico, joined in the majority in California.

FN58 On remand, the district court found that certain conditions imposed by the California Board on the amount and purposes of water to be appropriated, the times of the year in which water could be appropriated, and the distribution of water outside certain counties were not inconsistent with Congress' purpose in authorizing the New Melones project. Other conditions, for example, those imposing limitations on the use of impounded water for the production of power were rejected as inconsistent with the congressional intent. United States v. California, 509 F.Supp. 867 (E.D.Cal.1981). Cross-appeals were filed in the Ninth Circuit. Those appeals have been briefed and argued and are pending decision. United States v. State of California, C.A. Nos. 81-4189 and 81-4309 (appeals docketed Apr. 10, 1981, and June 5, 1981).

FN59 These agencies include, most importantly, the Department of the Interior, which has jurisdiction over all public domain lands and some reserved lands, such as national parks, refuges, and wilderness areas; the Department of Agriculture, which, through its Forest Service, has jurisdiction over the national forests; and the Department of Defense, which has jurisdiction over military bases and reservations and, through the Army Corps of Engineers, over flood control and navigational public works.

FN60 See, e.g., United States v. District Court in and for Water Division No. 5, 401 U.S. 527 (1971); Colorado River Conservation District v. United States, 424 U.S. 800 (1976).

FN61 For example, following the Pelton Dam decision in 1955, the Department of the Navy apparently ceased filing any claims for water with state agencies. See Nevada ex rel. Shamberger v. United States, supra n. 29, 165 F.Supp. at 606. That has not, however, been the consistent position of the Department of Defense since then. We understand, for example, that the Air Force has agreed that water necessary for deployment of the MX missile system in Nevada and Utah will be appropriated only under state laws. See Letter from Grant C. Reynolds, Assistant General Counsel, Department of the Air Force, to Myles E. Flint, Chief, General Litigation Section, Land and Natural Resources Division, Dept. of Justice (Nov. 19, 1981).

FN62 Pub. Papers of Jimmy Carter, 1978, pp. 1044-51. Pursuant to this initiative, a Task Force on Non-Indian Reserved Rights was established. The Task Force issued a final report in 1980, in which it recommended, inter alia, that federal agencies attempt to quantify all current and future water requirements, that state law be used to the fullest extent possible for water uses not subject to existing reserved rights, and that the Executive Branch attempt, as a matter of policy, to obtain future water rights by purchase, exchange, condemnation, or appropriation under state law. Task Force Report, supra, at 3-6. This last recommendation was "grounded on the belief that, to the extent neither existing state law nor existing federal reserved rights provide an adequate base for federal water needs to carry out congressionally established management objectives, in some cases a new reserved right might be created and in other cases a federal non-reserved right might be asserted." The Task Force urged, however, "that neither course be followed except where it is absolutely essential to carry out congressionally mandated management

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 46 of 55

Case 3:05-cv-00006-HRH   Document 141-4   Filed 10/12/2007   Page 10 of 18

6 U.S. Op. OLC 328                FOR EDUCATIONAL USE ONLY                Page 47
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

objectives." Task Force Report at 66-67. The Report did not address in any detail the legal basis for assertion of any federal non-reserved water rights.

FN63 Solicitor Krulitz's opinion, in particular, has been the subject of considerable comment. See, e.g., The Western States Water Council, "Response to the Solicitor's Opinion on Federal Water Rights of June 25, 1979" (Oct. 25, 1979); Note, "Federal Nonreserved Water Rights," 48 U.Chi.L.Rev. 758 (1981); F. Trelease, "Uneasy Federalism--State Water Laws and National Water Uses," 55 Wash.L.Rev. 751 (1980); Comment, "Federal Non-Reserved Water Rights," 15 Land and Water L.Rev. 67 (1980); Note, "Federal Acquisition of Non-Reserved Water Rights after New Mexico," 31 Stan.L.Rev. 885 (1979). Solicitor Coldiron's opinion has been the subject of at least one recent comment. See Gould, "Solicitor Rejects Non-Reserved Rights," 14 Water Law Newsletter No. 3 (Rocky Mountain Mineral Law Foundation 1981).

FN64 See discussion infra.

FN65 However, Solicitor Krulitz disavowed statements made by a prior Interior Department Solicitor that the United States is the "owner of unappropriated non-navigable water on the public domain" as "broad and irrelevant to the right of the United States to make use of such water." He stated that "concepts of 'ownership' of unappropriated waters are not determinative in federal-state relations in non-reserved water rights." Krulitz Op. at 613. Solicitor Krulitz's partial disavowal of the proprietary basis for federal claims is somewhat confusing and seems inconsistent with his statements that the federal government has a retained "proprietary interest" in waters not otherwise appropriated pursuant to state law and "plenary power" over unappropriated waters on federal lands by virtue of the Property Clause. See, e.g., id. at 563, 575.

FN66 Solicitor Krulitz concluded that the equal footing doctrine (see p. 15 supra), which is generally relied on to support state claims of ownership of unappropriated waters, did not divest the United States of its ownership interests in unappropriated waters, because (1) the state acts of admission into the Union contained no express grant of ownership, such as is required when the United States divests itself of its property rights; and (2) state ownership of unappropriated water at the time of admission into the Union is "difficult to square with the reserved rights doctrine .... as appl[ied] to reservations of land in a state after statehood." Krulitz Op. at 564.

FN67 Solicitor Krulitz interpreted the 1866 and 1870 Mining Acts to waive the United States' "proprietary and riparian rights to water on the public domain [[only] to the extent that water is appropriated by members of the public under state law ...." Krulitz Op. at 565. By negative implication, because the acts did not deal with the federal government's rights to use that water, they recognized the United States' "inchoate federal water rights to unappropriated waters that exist at any point in time." Id. at 565-66.

FN68 Solicitor Krulitz interpreted the Desert Land Act as a statute of limited applicability that "does not directly address federal rights to use water for congressionally authorized purposes on the federal lands, but instead is aimed at appropriation and use 'by the public.'" Krulitz Op. at 566.

FN69 Solicitor Martz reaffirmed Solicitor Krulitz's conclusion that situations exist in which the federal government has a legal basis for asserting a federal right to use water in a manner not conforming to all substantive requirements of state law, and not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 47 of 55

Case 3:05-cv-00006-HRH   Document 141-4   Filed 10/12/2007   Page 11 of 18

6 U.S. Op. OLC 328                FOR EDUCATIONAL USE ONLY                    Page 48
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

available as a matter of a reserved right. "Federal claims in such cases may be founded on Federal supremacy if and where clearly mandated by Act of Congress. Such claims may also be supported by the dominion the United States has and continues to exercise over unappropriated waters arising on the public lands." Martz Op. at 256.

FN70 Section 701(g) provides, in relevant part:
   Nothing in this Act shall be construed as limiting or restricting the power and authority of the United States or (1) as affecting in any way any law governing appropriation or use of, or Federal right to, water on public lands; (2) as expanding or diminishing Federal or State jurisdiction, responsibility, interests or rights in water resource development or control.
Reprinted at 43 U.S.C. § 1701.

FN71 Solicitor Martz also noted that the Department of the Interior had previously decided, as a matter of policy, to refrain from asserting non-reserved rights, except if specifically approved in individual cases by the Assistant Secretary or Secretary of the Department, or if the Department was required to submit all claims for water rights in litigation. Martz predicted that in the future most federal water rights would be founded on appropriation or purchase. Martz Op. at 255 n. 4.

FN72 Although Solicitor Coldiron's analysis is rooted primarily in the Supremacy Clause, he also found a basis for congressional authority in the United States' ownership of unappropriated water on the public domain. He suggested in his opinion that the United States' power over unappropriated non-navigable water located on the public domain "arises from retention of federal property, including the streams and lakes thereon at the time of statehood," and characterized the pattern of ownership of waters with the western states as follows: "[w]hen the various western states were admitted to the Union, the title to the beds and waters of the navigable streams and lakes passed to the new states, with the United States retaining title to the non-navigable waters on the public domain." Coldiron Op. at 5.

FN73 For the most part, the authorizations to federal agencies that are of concern here are based directly on the Property Clause, which grants Congress the power "to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." Art. IV § 3 cl. 2. As we discuss at pp. 51-56 infra, we believe the proper analytical approach is to consider that the "property" that is subject to federal control in this context is not the unappropriated water arising on federal lands, but the lands themselves. See generally Kleppe v. New Mexico, 426 U.S. 529, 537-39 (1976).

FN74 See, e.g., Arizona v. California, 373 U.S. 546 (1963) (Boulder Canyon Project); Oklahoma v. Guy F. Atkinson Co., 313 U.S. 508, 534 (1941) (navigation and flood control project).

FN75 See, e.g., 16 U.S.C. § 557b (prohibiting any "federal alteration of the natural water level of any lake or stream" in the Lake Superior National Forest).

FN76 See, e.g., Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 350 (1936); First Iowa Coop. v. Federal Power Comm'n, 328 U.S. 152, 176 (1946); Federal Power Comm'n v. Oregon, 349 U.S. 435, 445 (1955); Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 340 (1958); United States v. Grand River Dam Authority, 363 U.S. 229, 232-33 (1960).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 48 of 55

Case 3:05-cv-00006-HRH   Document 141-4   Filed 10/12/2007   Page 12 of 18

6 U.S. Op. OLC 328                FOR EDUCATIONAL USE ONLY                      Page 49
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

FN77 See, e.g., Ivanhoe Irrigation District v. McCracken, 357 U.S. 275 (1958); City of Fresno v. California, 372 U.S. 627 (1963); California v. United States, 438 U.S. 645 (1978).

FN78 See, e.g., Cappaert v. United States, 426 U.S. 128 (1976); United States v. New Mexico, 438 U.S. 696 (1978).

FN79 Similarly, the navigation servitude, which has been characterized as one of only two "exceptions" to Congress' deference to state law (see California v. United States, supra, at 602; Coldiron Op. at 8), is not a unique source of federal constitutional authority or federal rights. The navigation servitude is a doctrine which holds that the federal government is not constitutionally required to pay compensation if, in the exercise of its power over navigable streams, it takes, destroys, or impairs private property rights that depend on the use or presence of the water. See United States v. Rands, 389 U.S. 121, 122-23 (1967); see generally Trelease, "Federal-State Relations," supra n. 6, at 72, 175; E. Morreale, "Federal Power in Western Waters: The Navigation Power and the Rule of No Compensation," 3 Natural Resources J. 1, 64-65, 74-75 (1963). The navigation servitude stems from Congress' power to preserve and promote the navigability of waters, which in turn rests on the Commerce Clause. See, e.g., Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1 (1824); United States v. Rio Grande Dam & Irrigation Co., 174 U.S. 690, 707 (1899); United States v. Grand River Dam Authority, 363 U.S. 229, 232-33 (1960). As with other exercises of constitutional authority, inconsistent state laws, programs, or permit requirements must fall by operation of the Supremacy Clause. See Oklahoma v. Guy F. Atkinson Co., 313 U.S. 508, 534-35 (1941); First Iowa Coop. v. Federal Power Comm'n, 328 U.S. 152, 176 (1946). The analysis of federal water rights under Congress' navigation power is the same as the analysis of any federal water rights. Has Congress exercised its power under the Commerce Clause over navigable waters? If so, what is the scope of the congressional mandate? Would state law conflict with or frustrate that mandate?

FN80 Although the Court has recognized under specific statutes such as the Reclamation Act and the Federal Power Act that the federal government has certain rights to unappropriated water outside of the reserved right doctrine (see pp. 31-37 supra), the Court has not addressed directly a broad assertion of federal implied water rights such as that asserted by Solicitor Krulitz--i.e., that a federal agency may assert a federal water right based solely on the assignment of land management functions to a federal agency. In Nebraska v. Wyoming, 325 U.S. 589 (1945), an action between Nebraska, Wyoming, Colorado, and the United States for allocation of water of the North Platte River, the Court specifically declined to rule on an argument analogous to that made by Solicitor Krulitz. The United States argued that, given the federal ownership of unappropriated water on federal lands, the federal government could acquire all water necessary to carry out two reclamation projects using water from the river regardless of state law, because "if the right of the United States to these water rights is not recognized [by state law], its management of the projects will be jeopardized." 325 U.S. at 615. The Court declined to rule on that contention, however, as it found that all necessary rights had been acquired by the United States under applicable law. The Court expressly reserved decision on the broader claim:
  We do not suggest that where Congress has provided a system of regulation for federal projects it must give way before an inconsistent state system. We are dealing here only with an allocation, through the States, of water rights among appropriators. The rights of the United States in respect to the storage of water are recognized.
Id. at 615.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 49 of 55

Case 3:05-cv-00006-HRH    Document 141-4    Filed 10/12/2007    Page 13 of 18

6 U.S. Op. OLC 328                FOR EDUCATIONAL USE ONLY                   Page 50
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

FN81 See Part IIA supra.

FN82 Aside from the effect of the Mining Acts of 1866 and 1870 and the Desert Land Act, the western states have also asserted other theories to support claims of ownership in unappropriated waters within their borders, viz, (1) in the original thirteen (riparian) states, the federal government had no interest in water as a sovereign and, therefore, under the constitutional equal footing doctrine, which guaranteed admission to the western states on an "equal footing" with the original thirteen states, the federal government relinquished all claims to water within the new states; or (2) Congress by the various acts of admission impliedly accepted or ratified state constitutional and statutory provisions asserting the ownership of water. Neither theory provides an adequate or consistent basis for state claims of ownership of unappropriated water. Although in California v. United States, supra, 438 U.S. at 654, the Court noted, without elaboration, that "[o]ne school of legal commentators held the view that, under the equal-footing doctrine, the Western States, upon their admission to the Union, acquired exclusive sovereignty over the unappropriated waters in their streams," the Court's interpretation of the equal footing doctrine in other cases has been limited. In enera, the Court has interpreted the doctrine to apply only to political rights of sovereignty granted the original states, not to property or economic rights. See, e.g., United States v. Texas, 339 U.S. 707, 716 (1950). In Arizona v. California, 373 U.S. 546, 597-98 (1963), the Court rejected the contention that the equal footing doctrine could limit "the broad powers of the United States to regulate navigable waters under the Commerce Clause and to regulate government lands under Art. IV, § 3 of the Constitution." See discussion at 2 Clark, supra, § 102.6. The ratification and compact theories also suffer from several deficiencies. Most notably, the language and meaning of the various constitutional and statutory provisions relied upon by the states vary considerably, as do the admission procedures followed by the western states. It is impossible to construct a coherent theory that would apply to each state, especially as several of the western states either have no constitutional or statutory provision asserting ownership or passed such a provision only after admission. The ratification or compact theory would make a state's ownership of unappropriated water within its borders turn on the fortuitous language of its constitution and the circumstances of its admission into the Union. As several commentators have noted, the theory therefore provides little support for state claims of ownership. See, e.g., Morreale, "Federal-State Conflicts," supra n. 17, at 446-55; Trelease, "Federal-State Relations," supra n. 6, at 117 n *; Goldberg, "Interposition--Wild West Water Style," 17 Stan. L. Rev. 1, 12-16 (1964).

FN83 In Hughes v. Oklahoma, the Court overruled Geer v. Connecticut, 161 U.S. 519 (1896), which had sustained against a Commerce Clause challenge a Connecticut statute forbidding the transportation beyond the state of game birds that had been lawfully killed within the state. The Court's decision in Geer rested on its conclusion that no interstate commerce was involved, because the state had the power as representative for its citizens, who owned all wild animals within the state, to control both the taking and ownership of game that had been lawfully reduced to possession in the state. See 441 U.S. at 322. In Hughes, the Court noted that the Geer rationale had been considerably eroded and limited in subsequent decisions dealing with state authority over other natural resources. See 441 U.S. at 329-335. Faced with an Oklahoma statute prohibiting the transport or shipping outside the state of minnows procured from waters within the state, the Court explicitly overruled the holding in Geer, and concluded that the Oklahoma law unconstitutionally interfered with interstate commerce. Id.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 50 of 55

Case 3:05-cv-00006-HRH   Document 141-4   Filed 10/12/2007   Page 14 of 18

6 U.S. Op. OLC 328                FOR EDUCATIONAL USE ONLY                         Page 51
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

FN84 In several cases in which the Court has been faced with claims of "ownership" of the unappropriated waters by the states or the federal government, it has refused to address the question, and found a narrower ground for its decision. See, e.g., Ickes v. Fox, 300 U.S. 82, 96 (1937); Nebraska v. Wyoming, 325 U.S. 589, 615-16 (1945).

FN85 At one time the Justice Department took the position that Congress could not provide for state administration of federal property rights because to do so would be in contravention of Article IV, § 3 of the Constitution and the separation of powers principle. See Letter of Deputy Attorney General William P. Rogers to Sen. James E. Murray, Chairman, Senate Committee on Interior and Insular Affairs, dated March 19, 1956, reprinted in S.Rep. No. 2587, 84th Cong., 2d Sess. 25 (1956). This Office has since rejected that position. See Memorandum for James W. Moorman, Assistant Attorney General, Land and Natural Resources Division, from Larry L. Simms, Deputy Assistant Attorney General, Office of Legal Counsel (Jan. 22, 1980), at 13 n. 10. As we stated in that memorandum, "[t]he Supremacy Clause charges the States with protecting federal rights and, other than sovereign immunity limitations, we perceive no constitutional or common law limitations on state administration of those rights." See generally United States v. New Mexico, 438 U.S. 696 (1978); California v. United States, 438 U.S. 645 (1978).

FN86 In Federal Power Comm'n v. Oregon, supra, the state argued that the 1866, 1870, and 1877 legislation constituted express congressional conveyances to the states of the power to regulate the use of non-navigable waters. The Supreme Court found it unnecessary "to pass upon the question whether this legislation constitutes the express delegation or conveyance of power that is claimed by the State, because these Acts are not applicable to the reserved lands and waters here involved." 349 U.S. at 448.

FN87 See Cappaert v. United States, supra, 426 U.S. at 143 n. 8.

FN88 In particular, it is difficult to construe the Desert Land Act as ceding the federal government's control over its use of water on federal lands in the 17 western states, because the Act does not apply to all 17 states or to navigable waters within those states. See n. 38 supra.

FN89 This part of the Court's holding in Rio Grande cannot be dismissed as dealing only with the federal government's power over navigable waters and therefore inapplicable to the Desert Land Act, which applied by its terms only to non-navigable waters. As we noted supra at n. 79, the federal government's authority to preserve the navigability of streams is not a source of federal power, but rather an example of federal power that can be exercised under the Commerce Clause. Therefore, the Court's comments would be equally applicable if some other constitutional power--for example the Property or General Welfare Clauses--were the basis of the United States' attempt to enjoin diversion of the river by private appropriators. In any event, the Court's comments were directed not at state-approved diversions of navigable waters, but state-approved diversions of non-navigable waters, waters that are clearly within the scope of the Desert Land Act.

FN90 Exceptions include certain provisions of the reclamation laws, such as § 5 and § 8 of the Reclamation Act of 1902 and § 9 of the Reclamation Project Act of 1939, which prescribe terms upon which the Secretary of the Interior can use or dispose of water from federal reclamation projects (see pp. 22-23 supra); § 9 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 401, which requires the consent of Congress to construct dams and other obstructions on navigable waters; and the Federal Power Act, supra n. 28, which provides for licensing of hydroelectric dams on navigable and some other waters

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 51 of 55

Case 3:05-cv-00006-HRH   Document 141-4   Filed 10/12/2007   Page 15 of 18

6 U.S. Op. OLC 328                FOR EDUCATIONAL USE ONLY                          Page 52
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

(see p. 23 supra).

FN91 In the last 30 years, a number of "water rights settlement bills" have been introduced into Congress but have not been passed. For the most part, these bills would have given the states considerable control over federal uses of unappropriated water. The "Barrett bill," introduced in 1956, for example, would have provided that:

> [A]ll navigable and non-navigable waters are hereby reserved for appropriation and use of the public pursuant to State law, and rights to the use of such waters for beneficial purposes shall be acquired under State laws relating to the appropriation, control, use, and distribution of such waters. Federal agencies and permittees, licensees, and employees of the Government, in the use of water for any purpose in connection with Federal programs, projects, activities, licenses, or permits, shall, as a condition precedent to the use of any such water, acquire rights to the use thereof in conformity with State laws and procedures relating to the control, appropriation, use, or distribution of such water.

S. 863, 84th Cong., 2d Sess. § 6 (1956), reprinted in Morreale, "Federal-State Conflicts," supra n. 17, at 514.

The "Kuchel bill," introduced in the 88th Congress, provided that:

> Any right claimed by the United States to the beneficial diversion, storage, distribution, or consumptive use of water under the laws of any State shall be initiated and perfected in accordance with the procedures established by the laws of that State.

S. 1275, 88th Cong., 1st Sess. § 3 (1962), reprinted in Morreale, "Federal-State Conflicts," supra n. 17, at 494.

Sponsors of bills granting control over water resources to the states generally have argued that such provisions would merely "confirm" the status quo. See id. at 446. Hearings were held on various aspects of federal-state relations in the field of water rights in 1950, 1956, 1960-61, and 1964. See Water Rights Settlement Act: Hearings on S.863 Before the Subcomm. on Irrigation and Reclamation of the Senate Comm. on Interior and Insular Affairs, 84th Cong., 2d Sess. (1956); Water Rights Settlement Act of 1956: Hearings Before the House Comm. on Interior and Insular Affairs, 84th Cong., 2d Sess. (1956); Federal-State Relations in the Field of Water Rights: Hearings Before the Subcomm. on Irrigation and Reclamation of the House Comm. on Interior and Insular Affairs, 86th Cong., 1st Sess. (1959); Federal-State Water Rights: Hearings Before the Senate Comm. on Interior and Insular Affairs, 87th Cong., 1st Sess. (1961); Federal-State Water Rights: Hearings on S.1275 Before the Subcomm. on Irrigation and Reclamation of the Senate Comm. on Interior and Insular Affairs, 88th Cong., 2d Sess. (1964). For a detailed discussion of various water rights settlement bills, see Morreale, "Federal-State Conflicts," supra n. 17, and 2 Clark, supra, § 107.

In 1973, the National Water Commission proposed a "National Water Rights Procedure Act," which would have required federal agencies to proceed in conformity with state laws and procedures relating to the appropriation or use of water and the administration and protection of water rights, except "where state law would conflict with the accomplishment of the purposes of a federal program or project." The Act would also have established a procedure for recording and quantifying existing non-Indian federal water uses and would have eliminated the non-compensation features of the reserved right doctrine and the navigation servitude. See National Water Commission, Water Policies for the Future (Water Information Center, Inc. 1973), at 461-64.

FN92 The Forest Service has expressed concern in the past, for example, that it might not be able to obtain state recognized rights for certain instream or in-situ uses such as livestock watering, recreation, or preservation of fish and wildlife, because applicable state law requires a diversion of water or does not recognize such uses as

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 52 of 55

beneficial. See Department of Agriculture Position Statement, submitted to Office of Legal Counsel on Nov. 5, 1981. An analogous problem has been identified by the Department of the Army with respect to water rights available for Fort Carson, in Colorado, which is located on acquired federal lands. Concerns have been raised by the Army that Colorado law would not recognize the uses of water for military training and emergency preparedness. See Department of the Army, Legal Memorandum, "Federal Non-Reserved Water Rights" (Nov. 5, 1981).

FN93 In many cases federal agencies have failed to apply for permits recognizing state appropriative rights at the time the water was first put to use because of inadvertence, policy decisions, or legal advice. In "permit" states, which award priority based on the date an application is filed, those agencies risk having their rights cut off by a junior appropriator who has complied with state procedural requirements. Assertion of federal non-reserved rights, if sustained, would allow the federal agencies to antedate their water rights--i.e., to get the benefit of a priority date based on the first actual use of the water.

FN94 The western states have argued that in those states that do not recognize minimum instream flows, the flows may nevertheless be preserved by the acquisition (by purchase or condemnation) and exercise of senior downstream state-awarded water rights, which will ensure the continued upstream flows. See Memorandum to Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, from the Honorable Mike Greely, Attorney General, State of Montana (Apr. 1, 1982).

FN95 Solicitor Coldiron concluded in his opinion that "this issue of 'non-reserved' federal water rights was definitively and directly addressed on July 3, 1978, by the Supreme Court in two separate opinions regarding the water rights of the United States [United States v. New Mexico and California v. United States]." Coldiron Op. at 9. The western states, relying primarily on the "contrary inference" language from New Mexico, argue that "New Mexico dictates that when the federal government claims water for a national forest (assuming the navigation servitude does not apply), it has only two mechanisms available to it: the reserved rights doctrine or the law of the state in which the reservation is located." See Memorandum to Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, from the Honorable Mike Greely, Attorney General of Montana (Apr. 1, 1982) at 8-9.

FN96 Arguably, this construction mischaracterizes the scope of the language used in Rio Grande, which was that a state cannot "destroy the right of the United States, as the owner of lands bordering on a stream, to the continued flow of its waters; so far at least as may be necessary for the beneficial uses of the government property." 174 U.S. at 703. It was not until nine years later, in Winters v. United States, supra, that the Court first used the term "reserved" rights to describe federal water rights. Furthermore, the Court's holding in Rio Grande rested on the federal government's navigation power under the Commerce Clause. Hence its holding is somewhat narrower than was described in California v. United States.

FN97 The Court defined the question before it as "what quantity of water, if any, the United States reserved out of the Rio Mimbres when it set aside the Gila National Forest in 1899." 438 U.S. at 698. The briefs before the Court dealt only with the scope of reserved rights available under the Forest Service's Organic Administration Act; no evidence or argument was advanced to indicate that the Forest Service would not be able to acquire water necessary for the management of the national forests under applicable state law,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 53 of 55

6 U.S. Op. OLC 328           FOR EDUCATIONAL USE ONLY                        Page 54
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

if it did not have reserved rights to that water.

FN98 The Court noted that "[w]hen, as in the case of the Rio Mimbres, a river is fully appropriated, federal reserved water rights will frequently require a gallon-for-gallon reduction in the amount of water available for water-needy state and private appropriators" and suggested that "[t]his reality has not escaped the attention of Congress and must be weighed in determining what, if any, water Congress reserved for use in the national forests." 438 U.S. at 705.

FN99 It could be argued that the Court meant only that federal agencies should comply with state procedural law in the filing of claims or applications for water rights, but would not be bound by limitations imposed by state substantive law on water rights to carry out secondary uses of the reservation. The Court did not, however, draw any distinction between substantive and procedural law in its discussion. Moreover, the Court rejected a similar argument in California v. United States with respect to the language of § 8 of the Reclamation Act, stating that limiting the effect of § 8 to compliance with only the form of state water law "would trivialize the broad language and purpose of § 8." 438 U.S. at 675.

FN100 See, e.g., Hancock v. Train, 426 U.S. 167 (1976) (Clean Air Act); EPA v. State Water Resources Control Board, 426 U.S. 200 (1976) (Clean Water Act); Kleppe v. New Mexico, 426 U.S. 529 (1976) (Wild Free-Roaming Horses and Burros Act).

FN101 See, e.g., United States v. Little Lake Misere Land Co., 412 U.S. 580, 597 (1973) (Louisiana statute governing mineral rights in land conveyance to the United States is "hostile" to federal interests under the Migratory Bird Conservation Act and discriminates against federal interests).

FN102 The Supreme Court has generally not characterized questions of federal water rights as involving federal common law. See, e.g., United States v. New Mexico, supra; but see Hinderlider v. LaPlata River & Cherry Creek Ditch Co., 304 U.S. 92 (1938) (federal common law applied to reverse a decision of the Colorado Supreme Court concerning the appropriation of water in an interstate stream). However, as at least two commentators have noted, the analogy is apt. See Grow & Stewart, supra n. 36; Note, "Federal Nonreserved Water Rights," 48 U.Chi.L.Rev. 758 (1981). That is, the task undertaken by the courts in the name of federal common law is to fill interstices left by congressional authorization of a federal program that fails to deal specifically or comprehensively with rights and liabilities that may arise under that program. See Clearfield Trust Co. v. United States, 318 U.S. 363, 367 (1943) ("In the absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards"); see generally P. Bator, P. Mishkin, D. Shapiro, and H. Wechsler, The Federal Courts and the Federal System, 691-708 (2d ed. 1973). An analysis of federal water rights similarly requires the courts or administrative agencies to determine what rules should apply to water necessary to carry out congressionally authorized programs, where Congress has expressly authorized only the use of the underlying land.

FN103 The Court's use of the term "federal law" in this context connotes only that the federal judiciary is competent to determine rights arising under the federal programs. See 440 U.S. at 727.

FN104 See, e.g., United States v. Yazell, 382 U.S. 341, 354-57 (1966); United States v. Standard Oil Co., 332 U.S. 301, 311 (1947).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 54 of 55

Case 3:05-cv-00006-HRH   Document 141-4   Filed 10/12/2007   Page 18 of 18

6 U.S. Op. OLC 328                FOR EDUCATIONAL USE ONLY                     Page 55
6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)
(Cite as: 6 U.S. Op. Off. Legal Counsel 328)

FN105 See, e.g., RFC v. Beaver County, 328 U.S. 204, 209-10 (1946); United States v. Little Lake Misere Land Co., supra n. 101, 412 U.S. at 595-97; United States v. Yazell, supra n. 104, 382 U.S. at 352-53.

FN106 See, e.g., United States v. Brosnan, 363 U.S. 237, 241-42 (1960); Wallis v. Pan American Petroleum Corp., 384 U.S. 63, 68 (1966).

FN107 The implied water rights that could be asserted on acquired federal lands that have been, in effect, "withdrawn" from the public domain under a particular statutory scheme would theoretically be the same in all respects as reserved rights that could be asserted under that scheme, unless the statute itself sets out different purposes or different conditions for the use of acquired lands. Most importantly, a priority date for implied water rights on such acquired lands could be asserted based on the date the lands were set aside for federal purposes, whether or not the water was actually put to use at that time. However, we understand that, in general, priority dates for water rights on acquired lands have been claimed in the past only based on the date of first use. As a matter of policy, federal agencies could, of course, continue to assert priority for water rights on acquired lands based on the date of first use, in order to minimize dislocation or disruption of state and private expectations.

FN108 The forest lands comprising the Gila National Forest were, insofar as we are aware, all reserved lands. As we pointed out in Part IIB(1) supra, in other contexts the Supreme Court and lower federal courts have generally recognized a clear distinction between lands that are open to acquisition, use, and settlement under the public land statutes and lands that have been set aside for particular federal purposes, including lands acquired or reacquired from private ownership.

FN109 The reservation of land, however, may be probative evidence of congressional intent, because it demonstrates that Congress intended that the land should be managed for particular purposes to the exclusion of other purposes--a showing which would buttress the argument that Congress did not contemplate that state law could defeat those purposes.

FN110 Nothing in the recent decision in Sierra Club v. Watt, 659 F.2d 203 (D.C.Cir.1981), in which the court held that no federal reserved rights could be created under FLPMA, necessarily precludes this argument, because the court's conclusion rested only on whether the land in question had been withdrawn from the public domain. Since it had not been withdrawn, the court found no reserved rights had been created. The court did not consider whether, independent of the reserved rights doctrine, FLPMA provides a basis for other federal water rights. 659 F.2d at 205.

6 U.S. Op. Off. Legal Counsel 328, 1982 WL 170701 (O.L.C.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 14
Page 55 of 55