UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA, et al.,

    Plaintiffs,

v.

STATE OF WASHINGTON, et al.,

    Defendants.

CASE NO. CV 9213RSM
Subproceeding No. 01-01

ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT

This matter was initiated by a Request for Determination ("Request") filed in 2001 by plaintiffs Suquamish Indian Tribe, Jamestown S'Klallam, Lower Elwha Band of Klallam, Port Gamble Clallam, Nisqually Indian Tribe, Nooksack Tribe, Sauk-Suiattle Tribe, Skokomish Indian Tribe, Squaxin Island Tribe, Stillaguamish Tribe, Upper Skagit Tribe, Tulalip Tribe, Lummi Indian Nation, Quinault Indian Nation, Puyallup Tribe, Hoh Tribe, Confederated Bands and Tribes of the Yakama Indian Nation, Quileute Indian Tribe, Makah Nation, and Swinomish Tribal Community (hereafter, "the Tribes"). It is now before the Court for consideration of cross-motions for summary judgment filed by defendant State of Washington ("State") and by the plaintiff Tribes.[1] Dkt. ## 287, 295. Oral argument was heard on the motions on February 1, 2007. The parties were then referred to the Honorable J. Kelley Arnold, United Magistrate Judge, for a settlement conference. The Court was advised on May 10, 2007 that the mediation was unsuccessful, and the matter was ripe for issuance of a decision on the summary judgment motions. The matter is set for trial on September 24, 2007.

The memoranda, exhibits, and arguments of the parties have been fully considered by the Court,

---

[1] Plaintiff United States of America has substantially joined in the Tribes' opposition to the State's motion. Dkt. # 313.

ORDER ON CROSS-MOTION FOR
SUMMARY JUDGMENT - 1

Exhibit 16
Page 1 of 12

as has the prior case history. For the reasons set forth below, the Court shall grant the Tribes' motion for partial summary judgment, and shall deny the summary judgment motion filed by the State of Washington.

## BACKGROUND

This is a designated subproceeding of *United States, et al., v. State of Washington, et al.*, C70-9213. The United States, in conjunction with the Tribes, initiated this sub-proceeding in early 2001, seeking to compel the State of Washington to repair or replace any culverts that are impeding salmon migration to or from the spawning grounds. The Request for Determination, filed pursuant to the permanent injunction in this case, maintains that the State has a treaty-based duty to preserve fish runs so that the Tribes can earn a "moderate living". The State's original Answer asserted cross- and counter-Requests for Determination, claiming injunctive and declaratory relief against the United States for placing a disproportionate burden of meeting the treaty-based duty (if any) on the State. The State also asserted that the United States has managed its own lands in such a way as to create a nuisance that unfairly burdens the State.

In 2001, the United States moved to dismiss the counterclaims, contending that it has not waived sovereign immunity with respect to these claims, and that the State lacks standing to assert tribal rights derived from the Treaties. The Court originally denied the motion to dismiss, but upon reconsideration the motion to dismiss the counterclaims was granted. The Court found that it lacked jurisdiction over the State's counterclaims because sovereign immunity has not been waived. A subsequent motion by the State for leave to file an amended Answer asserting counter-claims was denied. These cross-motions for summary judgment followed.

The parties have cooperated fully with one another throughout these proceedings, including discovery and settlement negotiations. They agree that material facts are not in dispute. Nevertheless, they have been unable to arrive at a settlement, and now ask the Court to resolve the legal issues presented.

## DISCUSSION

This subproceeding arises from the language in Article III of the 1855 Treaty of Point Elliot ("Stevens Treaties") in which the Tribes were promised that "[t]he right of taking fish, at all usual and

ORDER ON CROSS-MOTION FOR
SUMMARY JUDGMENT - 2

Exhibit 16
Page 2 of 12

accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory . . ." Dkt. # 287-2. The Tribes, in their Request for Determination, state that they brought this action

> to enforce a duty upon the State of Washington to refrain from constructing and maintaining culverts under State roads that degrade fish habitat so that adult fish production is reduced, which in turn reduces the number of fish available for harvest by the Tribes. In part due to the reduction of harvestable fish caused by those actions of the State, the ability of the Tribes to achieve a moderate living from their Treaty fisheries has been impaired.

Request for Determination, Dkt. # 1, p. 1.

The Tribes requested mandatory relief "requiring Washington to identify and then to open culverts under state roads and highways that obstruct fish passage, for fish runs returning to or passing through the usual and accustomed grounds and stations of the plaintiff tribes."[2] *Id.* Specifically, they request a declaratory judgment, establishing that (1) the right of taking fish secured by the Treaties imposes a duty upon the State of Washington to refrain from diminishing the number of fish passing through, or to or from, the Tribes' usual and accustomed fishing grounds by improperly constructing or maintaining culverts under State-owned roads and highways; and that (2) the State has violated, and continues to violate, the duty owed the Tribes under the Stevens Treaties. Further, the Tribes request a prohibitory injunction, prohibiting the State of Washington and its agencies from constructing or maintaining any culverts that reduce the number of fish that would otherwise return to or pass through the usual and accustomed fishing grounds of the Tribes. Finally, they request a mandatory injunction, requiring the State to (1) identify, within eighteen months, the location of all culverts constructed or maintained by State agencies, that diminish the number of fish in the manner set forth above, and (2) fix, within five years after judgment, and thereafter maintain all culverts built or maintained by any State agency, so that they do not diminish the number of fish as set forth above. *Id.*, pp. 6-7.

The State has moved for summary judgment as to all aspects of the Request. The Tribes have moved for partial summary judgment as to the declaratory judgment portion of their Request. Shortly before the February 1, 2007 hearing, the parties stipulated to define the scope of this subproceeding to

---

[2] According to testimony and exhibits provided by the Tribes, culverts may become impassable to fish either because they are blocked by silt or debris, or because they are "perched"—that is, the outfall of the culvert is several feet or more above the level of the stream into which it flows. Salmon migrating upstream to spawn are stopped by a perched culvert and cannot reach their spawning grounds.

ORDER ON CROSS-MOTION FOR
SUMMARY JUDGMENT - 3

Exhibit 16
Page 3 of 12

include "only those culverts that block fish passage under State-owned roads." Dkt. # 341. Therefore, culverts that do not actually block fish passage, as well as tidegates, are not within the scope of this subproceeding. *Id.*

The Tribes, in their Request, assert that between 1974, the year that this case was originally decided, and 1986, Tribal harvests of anadramous fish (salmon and steelhead) rose dramatically, eventually reaching some 5 million fish. Then harvests declined, so that by 1999 harvests were back down to the 1974 levels.[3] The Tribes contend that "[a] significant reason for the decline of harvestable fish has been the destruction and modification of habitat needed for their survival." Request for Determination, Dkt. # 1, ¶¶ 2.5, 2.6, 2.7.

The Request addresses one specific type of habitat modification: the placement of culverts rather than bridges where roadways cross rivers and streams. The Tribes allege that when such culverts are improperly built or maintained, they block fish passage up or down the stream, "thereby preventing out-migration of juvenile fish to rearing areas or the salt water, or the return of adult fish to spawning beds, or both." *Id.*, ¶ 3.1. According to the Tribes, culverts under State-owned or maintained roads block fish access to at least 249 linear miles of stream, thus closing off more than 400,000 square meters of productive spawning habitat, and more than 1.5 million square meters of productive rearing habitat for juvenile fish. *Id.*, ¶ 3.7. The Tribes state that, by the State's own estimates, removal of the obstacles presented by blocked culverts would result in an annual increase in production of 200,000 fish, many of which would be available for Tribal harvest. *Id.*, ¶ 3.8.

The State does not dispute the fact that a certain number of culverts under State-owned roads present barriers to fish migration. The State notes that 18% of the culverts on land managed by the

---

[3]These figures are supported by the Declaration of Keith Lutz, a fisheries biologist with the Northwest Indian Fisheries Commission, filed in support of the Tribes' motion for partial summary judgment. The table presented by Mr. Lutz indicates that harvest levels in 1974 and 1975 were 860,537 and 1,001,041 fish respectively. The number of fish harvested rose steadily to 5,494,973 in 1985. Numbers of fish harvested then fluctuated between approximately three and four million fish for the next several years, higher in the odd-numbered years when large numbers of pink salmon were harvested. After 1991, harvests of four million fish were not seen again, and after the 1993 harvest of 3,497,537 fish the numbers declined dramatically, dipping as low as 575,958 in 1999. While post-1999 harvest numbers have risen somewhat, to 2,148,802 fish taken in 2003, the Tribal harvest through 2004 (the last year reported in this exhibit) remained less than half that of the years 1985 to 1991. Declaration of Kieth Lutz, Dkt. # 299.

ORDER ON CROSS-MOTION FOR
SUMMARY JUDGMENT - 4

Exhibit 16
Page 4 of 12

Department of Natural Resources ("DNR") were identified as barriers in a 2000 inventory. Washington State Parks ("WDP") have identified 120 culverts as fish passage barriers. And of the thousands of culverts passing under roads maintained by the Washington State Department of Transportation ("WSDOT"), the State asserts that "most", but not all, allow free passage of migrating fish—meaning that many do not.[4] Motion for Summary Judgment, pp. 8-11.

The State argues that the Tribes have produced no evidence that the blocked culverts "affirmatively diminish[] the number of fish available for harvest". State's Reply, Dkt. # 319, p. 2. The Tribes have, however, produced evidence of greatly diminished fish runs. While there may be other contributing causes for this, the conclusion is inescapable that if culverts block fish passage so that they cannot swim upstream to spawn, or downstream to reach the ocean, those blocked culverts are responsible for some portion of the diminishment. It is not necessary for the Tribes to exactly quantify the numbers of "missing" fish to proceed in this matter.

The issue then becomes a purely legal one: whether the Tribes' treaty-based right of taking fish imposes upon the State a duty to refrain from diminishing fish runs by constructing or maintaining culverts that block fish passage. The State asserts that this question has already been answered, and the Tribes' position rejected, by the Ninth Circuit Court of Appeals. However, that is not a correct characterization of the appellate court's prior rulings in this matter.

In 1976, after the Tribes won recognition of their treaty-based right to a fair and equitable share of harvestable fish in Phase I of this case, this Court turned to address environmental issues raised earlier. One of two questions addressed by the Court in Phase II was "whether the right of taking fish incorporates the right to have treaty fish protected from environmental degradation." *United States v. Washington*, 506 F. Supp. 187, 190 (1980). The district court held that "implicitly incorporated in the treaties' fishing clause is the right to have the fishery habitat protected from man-made despoilation." *Id.*, at 203. The Court then assigned to the State a burden "to demonstrate that any environmental degradation of the fish habitat proximately caused by the State's actions (including the authorization of

---

[4] Although the State's motion did not set the number, an expert declaration filed in support of the Tribe's motion found 1,113 barrier culverts in the combined jurisdiction of the WSDOT and the Washington Department of Fish and Wildlife ("WDFW"), in addition to those included in the WDP and DNR culvert counts. Declaration of Ronald McFarlane, Dkt. # 300, ¶ 8.

ORDER ON CROSS-MOTION FOR
SUMMARY JUDGMENT - 5

Exhibit 16
Page 5 of 12

third parties' activities) will not impair the tribes' ability to satisfy their moderate living needs." *Id.* at 207

The Ninth Circuit Court of Appeals reversed this portion of the district court's order, but not as conclusively as the State suggests.

> Let us repeat the essence of our interpretation of the treaty. Although we reject the environmental servitude created by the district court, we do not hold that the State of Washington and the Indians have no obligations to respect the other's rights in the resource. Instead, . . . we find on the environmental issue that the State and the Tribes must each take reasonable steps commensurate with the resources and abilities of each to preserve and enhance the fishery when their projects threaten then-existing levels.

*United States v. Washington*, 694 F. 2d 1374, 1389 (9th Cir. 1982).

Upon request for rehearing *en banc*, the three-judge panel's opinion was vacated. *United States v. Washington*, 759 F. 2d 1353, 1354 (9th Cir. 1985). A highly divided eleven-member court issued a *per curiam* decision vacating the district court's declaratory judgment on the environmental issue. The court's order did not contain broad and conclusive language necessary to reject the idea of a treaty-based duty in theory as well as in practice. Instead, the Court found that the declaratory judgment on environmental issues was imprecise and lacking in a sufficient factual basis.

> We choose to rest our decision in this case on the proposition that issuance of the declaratory judgment on the environmental issue is contrary to the exercise of sound judicial discretion. The legal standards that will govern the State's precise obligations and duties under the treaty with respect to the myriad State actions that may affect the environment of the treaty area will depend for their definition and articulation upon **concrete facts which underlie a dispute in a particular case**. Legal rules of general applicability are announced when their consequences are known and understood in the case before the court, not when the subject parties and the court giving judgment are left to guess at their meaning. It serves neither the needs of the parties, nor the jurisprudence of the court, nor the interests of the public for the judiciary to employ the declaratory judgment procedure to announce legal rules imprecise in definition and uncertain in dimension. Precise resolution, not general admonition, is the function of declaratory relief. These necessary predicates for a declaratory judgment have not been met with respect to the environmental issues in this case.
>
> The State of Washington is bound by the treaty. If the State acts for the primary purpose or object of affecting or regulating the fish supply or catch in noncompliance with the treaty as interpreted by past decisions, it will be subject to immediate correction and remedial action by the courts. In other instances, **the measure of the State's obligation will depend for its precise legal formulation on all of the facts presented by a particular dispute.**

*Id.* at 1357 (emphasis added).

The appellate court's ruling, then, cannot be read as rejecting the concept of a treaty-based duty to avoid specific actions which impair the salmon runs. The court did not find fault with the district

ORDER ON CROSS-MOTION FOR
SUMMARY JUDGMENT - 6

Exhibit 16
Page 6 of 12

court's analysis on treaty-based obligations, but rather vacated the declaratory judgment as too broad, and lacking a factual basis at that time.[5] The court's language, however, clearly presumes some obligation on the part of the State; not a broad "general admonition" as originally imposed by the district court, but a duty which could be defined by concrete facts presented in a particular dispute. This dispute, limited as it is to "only those culverts that block fish passage under State-owned roads", is capable of resolution through the declaratory relief requested by the tribes. The Tribes have presented sufficient facts, in the form of fish harvest data and numbers of blocked culverts, to meet the appellate court's stated requirements for issuance of a declaratory judgment. A narrowly-crafted declaratory judgment such as the one requested here does not raise the specter of a broad "environmental servitude" so feared by the State.

In moving for summary judgment, the State also asserts that "[n]o treaty language supports 'moderate living' as the measure of any servitude". Motion for Summary Judgment, p. 16. The State argues that the Tribes have proposed that the State has a duty to avoid impairing their ability to earn a "moderate living", but no tribal member can define the term "moderate living". The State further asserts that the term "moderate living" does not appear in the treaty, and that since the treaty is a contract, its provisions must be definite in order to be enforceable. According to the State, "the term is inherently ambiguous." Motion for Summary Judgment, p. 17.

The term "moderate living" was coined by the courts, not the parties. It is thus indeed not a part of the treaty "contract"; it is an interpretation that has been applied by the courts. In *State of*

---

[5] Neither the majority opinion, nor any of the dissenting or concurring opinions rejected the district court's analysis on treaty-based obligations. Indeed, three of the dissenting judges would have affirmed the district court's declaratory judgment on environmental issues. Judge Nelson flatly stated, "I agree with the district court that the Tribes have an implicit treaty right to a sufficient quantity of fish to provide them with a moderate living, **and the related right not to have the fishery habitat degraded to the extent that the minimum standard cannot be met. I also agree that the State has a correlative duty to refrain from degrading or authorizing others to degrade the fish habitat in such a manner.**" *Id.* at 1367 (emphasis added). Judge Skopil joined in this dissent. *Id.* Judge Norris dissented "for the reasons articulated in Judge Nelson's dissenting opinion." *Id.* at 1368. Judges Sneed and Anderson, who sat on the original three-judge panel and formulated the "reasonable steps" standard set forth above, concurred in the opinion in the interests of collegiality, but did not retreat from the position they took in hearing the case originally. *Id.* at 1360. Judges who concurred in the opinion did so because of the absence or a case or controversy (Judges Ferguson and Schroeder), or because the declaratory judgment was deemed not an appealable decision (Judge Sneed). And nowhere in the majority opinion did the court state that no duty arises from the treaties.

ORDER ON CROSS-MOTION FOR
SUMMARY JUDGMENT - 7

Exhibit 16
Page 7 of 12

*Washington, et al., v. Washington State Commercial Passenger Fishing Vessel Association, et al.*, 443 U.S. 658 (1979), the Supreme Court stated,

> We also agree with the Government that an equitable measure of the common right should initially divide the harvestable portion of each run that passes through a "usual and accustomed" place into approximately equal treaty and nontreaty shares, and should then reduce the treaty share if tribal needs may be satisfied by a lesser amount. . . .
>
> The division arrived at by the District Court is also consistent with our earlier decisions concerning Indian treaty rights to scarce natural resources. In those cases, after determining that at the time of the treaties the resource involved was necessary to the Indians' welfare, the Court typically ordered a trial judge or special master, in his discretion, to devise some apportionment that assured that the Indians' reasonable livelihood needs would be met. *Arizona v. California*, 373 U.S. at 600. . . .
>
> Thus, [the district court] first concluded that at the time the treaties were signed, the Indians, who comprised three-fourths of the territorial population, depended heavily on anadromous fish as a source of food, commerce, and cultural cohesion. Indeed, it found that the non-Indian population depended on Indians to catch the fish that the former consumed. Only then did it determine that the Indians' present-day subsistence and commercial needs should be met, subject, of course, to the 50% ceiling.
>
> . . . . As in *Arizona v. California* and its predecessor cases, the central principal here must be that Indian treaty rights to a natural resource that once was thoroughly and exclusively exploited by the Indians **secures so much as, but no more than, is necessary to provide the Indians with a livelihood—that is to say, a moderate living.**

*Id.* at 686 (citations omitted) (emphasis added).

The State's argument that the term "moderate living" is ambiguous and unenforceable in contract terms is thus without merit. It is neither a "missing term" in the contract, nor a meaningless provision; it is a measure created by the Court. To the extent that it needs definition, it would be for the Court, not the Tribes, to define it. No party has yet asked that the Court do so, and the Court finds it unnecessary at this time. The Tribes' showing that fish harvests have been substantially diminished, together with the logical inference that a significant portion of this diminishment is due to the blocked culverts which cut off access to spawning grounds and rearing areas, is sufficient to support a declaration regarding the culverts' impairment of treaty rights.

In finding a duty on the part of the State to refrain from blocking fish access to spawning grounds and rearing habitat, the Court has been guided by well-established principles of treaty construction. These were set forth as they applied to the treaties at issue here by the Supreme Court in *State of*

ORDER ON CROSS-MOTION FOR
SUMMARY JUDGMENT - 8

Exhibit 16
Page 8 of 12

1  *Washington v. Washington State Commercial Passenger Fishing Vessel Association.*

2   [I]t is the intention of the parties, and not solely that of the superior side, that must control
any attempt to interpret the treaties. When Indians are involved, this Court has long given
3   special meaning to this rule. It has held that the United States, as the party with the presumptively
superior negotiating skills and superior knowledge of the language in which
4   the treaty is recorded, has a responsibility to avoid taking advantage of the other side.
"[T]he treaty must therefore be construed, not according to the technical meaning of its words
5   to learned lawyers, but in the sense in which they would naturally be understood by the Indians."
This rule, in fact, has thrice been explicitly relied on by the Court in broadly interpreting these
6   very treaties in the Indians' favor.

7   Governor Stevens and his associates were well aware of the "sense" in which the Indians
were likely to view assurances regarding their fishing rights. During the negotiations, the
8   vital importance of the fish to the Indians was repeatedly emphasized by both sides, and **the
Governor's promises that the treaties would protect that source of food and commerce were**
9   **crucial in obtaining the Indians' assent.** It is absolutely clear, as Governor Stevens himself
said, that neither he nor the Indians intended that the latter "should be excluded from their ancient
10  fisheries", see n. 9, *supra*, and it is accordingly inconceivable that either party deliberately agreed
to authorize future settlers to crowd the Indians out of any meaningful
11  use of their accustomed places to fish. That each individual Indian would share an "equal
opportunity" with thousands of newly arrived individual settlers is totally foreign to the spirit
12  of the negotiations. Such a "right", along with the $207,500 paid the Indians, would hardly
have been sufficient to compensate them for the millions of acres they ceded to the Territory.
13  Moreover, in light of the far superior numbers, capital resources, and technology of the non-
Indians, the concept of the Indians' "equal *opportunity*" to take advantage of a scarce resource
14  is likely in practice to mean that the Indians' "right of taking fish" will net them virtually no catch
at all. . . .

15
*Id.* at 675-677 (citations omitted; emphasis in bold added, emphasis in italics in original).
16
After rejecting the State's "equal opportunity" theory, the Court went on to discuss the meaning
17
of "in common with" as used in the treaties.
18

19  But we think greater importance should be given to the Indians' likely understanding of the
other words in the treaties and especially the reference to the "right of *taking* fish"—a right
20  that had no special meaning at common law but that must have had obvious significance to
the tribes relinquishing a portion of their pre-existing rights to the United States in return for
21  this promise. This language is particularly meaningful in the context of anadromous
fisheries—which were not the focus of the common law—because of the relative predictability
22  of the "harvest". In this context, it makes sense to say that a party has a right to "take"—rather
than merely the "opportunity" to try to catch—some of the large quantities of fish that will almost
23  certainly be available at a given time.

24  . . .

25  This interpretation is confirmed by additional language in the treaties. The fishing clause
speaks of "securing" certain fishing rights, a term the Court has previously interpreted as
26  synonymous with "reserving" rights previously exercised. Because the Indians had always
exercised the right to meet their subsistence and commercial needs by taking fish from treaty
27  area waters, they would be unlikely to perceive a "reservation" of that right as merely the
chance, shared with millions of other citizens, occasionally to dip their nets in to the territorial
28  waters.

ORDER ON CROSS-MOTION FOR
SUMMARY JUDGMENT - 9

Exhibit 16
Page 9 of 12

*Id.* at 678-680 (citations omitted; emphasis in italics in original).

It was thus the right to **take** fish, not just the right to fish, that was secured by the treaties. The significance of this right to the Tribes, its function as an incentive for the Indians to sign the treaties, and the Tribes' reliance on the unchanging nature of that right, have been set forth in expert declarations provided by the Tribes. Historian Richard White, Ph.D., who has researched the history of the Stevens Treaties, including the intentions, expectations, and understandings of the negotiators on both sides, states that

> [o]ne vital part of the relations that Stevens sought to perpetuate was Indian fishing, both for subsistence and for trade. Stevens and the other treaty negotiators knew well that Puget Sound Indians relied heavily on their fisheries. . . .
>
> The Indians themselves expressed the importance of fishing to their way of life, and Stevens and the other negotiators assured them of their continued access to the fisheries. Treaty minutes record that at Point-No-Point, One-lun-teh-tat, an "Old Sko-komish Indian" worried how they were to feed themselves once they ceded so much land to the whites, while Hool-hole-tan-akim also wanted to retain half the land. "Why," he asked, "should we sell? We may become destitute. Why not let us live together with you?" In the face of such objections, Benjamin F. Shaw, the interpreter, reassured the Indians that they were "not called upon to give up their old modes of living as places of seeking food, but only to confine their houses to one spot." And Michael Simmons, the special Indian agent for Puget Sound, explained that if they retained a large amount of land they would be confined to it, but that "when a small tract alone was left, the privilege was given of going wherever they pleased to fish and work for the whites." In negotiations at Neah Bay, the Makah raised questions about the role that the fisheries were to play in their future. Stevens replied that "far from wishing to stop their fisheries, he intended to send them oil, kettles and fishing apparatus." What Stevens and his negotiators explicitly promised in response to Indian objections was access to the usual places for procuring food and continued economic exchange with the whites.
>
> Stevens also sought to preserve Indian fishing rights to reduce the cost of implementing the treaties. In his instructions to Stevens, Mix had emphasized that whatever the form of the treaties, they should incur minimal expenses for the government. . . . As the Treaty Commissioners noted in their meeting of December 26, 1854, "it was necessary to allow them to fish at all accustomed places" because this "was necessary for the Indians to obtain subsistence." And securing the Indians a subsistence was critical if Stevens was to follow his very clear instructions to keep the cost of the treaty down. By guaranteeing the Indians a right to their share of the bounty of the land, rivers, and Sound, the treaties would enable them to feed themselves at little cost to the government.

Declaration of Richard White, Dkt. # 296, ¶¶ 8, 9, 11.

It was thus the government's intent, and the Tribes' understanding, that they would be able to meet their own subsistence needs forever, and not become a burden on the treasury.

Stevens and the other negotiators believed that the abundant fisheries they had observed in

ORDER ON CROSS-MOTION FOR
SUMMARY JUDGMENT - 10

Exhibit 16
Page 10 of 12

1   Puget Sound would continue unabated forever. Early white accounts of these fisheries
    breathlessly reported that they were inexhaustible. . . . It was not until the 1890's that
2   scientists began to caution that salmon and other stocks might not remain abundant forever.

3   Stevens and the other negotiators anticipated that Indians would continue to fish the inexhaustible
    stocks in the future, just as they had in the past. Stevens specifically assured
4   the Indians that they would have access to their normal food supplies now and in the future.
    At the Point Elliot Treaty, Stevens began by speaking of subsistence. "[A]s for food, you
5   yourselves now, as in time past, can take care of yourselves." The question, however, was
    not whether they could now feed themselves, but rather whether in the future after the huge
6   cessions that the treaties proposed the Indians would still be able to feed themselves. Stevens
    assured them that he intended that the treaty guarantee them that they could.
7   **"I want that you shall not have simply food and drink now but that you may have them
    forever."** The negotiators uniformly agreed on the abundance of the fisheries, the dependence
8   of the Indians upon them, their commercial possibilities, and their future "inexhaustibility."
    Stevens and Gibbs could both foresee and promote the commercial development of the
9   territory, the creation of a commercial fishery by whites, and the continuation of an Indian
    fishery. They did not see any contradiction between them.
10

11  *Id.* at ¶¶ 13, 14 (emphasis added).

12       Thus, the Tribes were persuaded to cede huge tracts of land—described by the Supreme Court as

13  "millions of acres"---by the promise that they would forever have access to this resource, which was

14  thought to be inexhaustible. It was not deemed necessary to write any protection for the resource into

15  the treaty because nothing in any of the parties' experience gave them reason to believe that would be

16  necessary. According to historian Joseph E. Taylor II, Ph.D.,

17       [d]uring 1854-1855, white settlement had not yet damaged Puget Sound fisheries. During
         those years, Indians continued to harvest fish for subsistence and trade as they had in the past.
18       Given the slow pace of white settlement and its limited and localized environmental impact,
         Indians had no reason to believe during the period of treaty negotiations that white settlers
19       would interfere, either directly through their own harvest or indirectly through their environmental
         impacts, with Indian fisheries in the future. During treaty negotiations,
20       Indians, like whites, assumed that their cherished fisheries would remain robust forever.

21  Declaration of Joseph Taylor III, Dkt. # 297, ¶ 7.

22       As Professor White stated, the representatives of the Tribes were personally assured during the

23  negotiations that they could safely give up vast quantities of land and yet be certain that their right to take

24  fish was secure. These assurances would only be meaningful if they carried the implied promise that

25  neither the negotiators nor their successors would take actions that would significantly degrade the

26  resource. Such resource-degrading activities as the building of stream-blocking culverts could not have

27  been anticipated by the Tribes, who themselves had cultural practices that mitigated negative impacts of

28  their fishing on the salmon stocks. Declaration of Robert Thomas Boyd, Dkt. # 298, ¶ 6.

ORDER ON CROSS-MOTION FOR
SUMMARY JUDGMENT - 11

Exhibit 16
Page 11 of 12

In light of these affirmative assurances given the Tribes as an inducement to sign the Treaties, together with the Tribes' understanding of the reach of those assurances, as set forth by the Supreme Court in the language quoted above, this Court finds that the Treaties do impose a duty upon the State to refrain from building or maintaining culverts in such a manner as to block the passage of fish upstream or down, to or from the Tribes' usual and accustomed fishing places. This is not a broad "environmental servitude" or the imposition of an affirmative duty to take all possible steps to protect fish runs as the State protests, but rather a narrow directive to refrain from impeding fish runs in one specific manner. The Tribes have presented sufficient facts regarding the number of blocked culverts to justify a declaratory judgment regarding the State's duty to refrain from such activity. This duty arises directly from the right of taking fish that was assured to the Tribes in the Treaties, and is necessary to fulfill the promises made to the Tribes regarding the extent of that right.

## CONCLUSION

Accordingly, the State's motion for summary judgment is DENIED. The Tribes' cross-motion for partial summary judgment is GRANTED. The Court hereby declares that the right of taking fish, secured to the Tribes in the Stevens Treaties, imposes a duty upon the State to refrain from building or operating culverts under State-maintained roads that hinder fish passage and thereby diminish the number of fish that would otherwise be available for Tribal harvest. The Court further declares that the State of Washington currently owns and operates culverts that violate this duty.

This matter is currently set for trial on September 24, 2007. In light of this ruling, a full trial on the merits is no longer necessary. However, further proceedings are needed to determine an appropriate remedy in this matter, so the September 24 date shall remain on the calendar for such proceedings. Counsel shall appear for a status conference on **Wednesday, August 29, 2007 at 1:30 p.m.** to discuss further proceedings.

DATED this 22 day of August 2007.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER ON CROSS-MOTION FOR
SUMMARY JUDGMENT - 12

Exhibit 16
Page 12 of 12