

RECEIVED DEC 27 1994
Y.I.N. Legal Counsel

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR YAKIMA COUNTY

| | |
|---|---|
| IN THE MATTER OF THE DETERMINATION OF THE RIGHTS TO THE USE OF THE SURFACE WATERS OF THE YAKIMA RIVER DRAINAGE BASIN, IN ACCORDANCE WITH THE PROVISIONS OF CHAPTER 90.03, REVISED CODE OF WASHINGTON, STATE OF WASHINGTON, DEPARTMENT OF ECOLOGY, <br><br> Plaintiff, <br><br> vs. <br><br> JAMES J. ACQUAVELLA, et al., <br><br> Defendants. | NO. 77-2-01484-5 <br><br><br><br><br><br><br><br> Memorandum Opinion Re: "Flushing Flows" |

## I. INTRODUCTION

May 11, 1994, Roza Irrigation District (Roza) moved this Court for an Order Pendente Lite "directing the Bureau of Reclamation not to release storage water from the reservoirs serving the Yakima Project for the purported purpose of aiding the out-migration of anadromous fish smolt." Essentially, it is Roza's position (and later joined by Kennewick Irrigation District, City of Yakima, Naches-Selah Irrigation District and Kittitas Reclamation District) that these pulse flows are not "scientifically substantiated." Alternatively, the irrigation districts argue if pulse flows are "scientifically substantiated" and successful, they promote "enhancement" of fish life, not "maintenance" as directed by this Court's November 20, 1990 Partial Summary Judgment.

In requesting an Order Pendente Lite preventing releases of pulse flows from storage, the districts are essentially asking for injunctive

Memorandum Opinion: "Flushing Flows" - 1

Exhibit 18
Page 1 of 13

relief. However, the motion, as broadened, also seeks clarification of the Partial Summary Judgment insofar as it applies to that minimum amount of water absolutely necessary to maintain fish life. See Petitioner's Memorandum in Support of Motion for Order Pendente Lite, p. 10. A ruling on the injunction and the issue of clarification are intertwined and will be taken up together below.

II. <u>OPINION</u>

In regard to these flushing flows, it appears there are two matters to be clarified. First, on what criteria or directives from this Court should the Yakima Field Office Manager make his decision to release flushing flows. Secondly, on what basis should such decisions of the Yakima Field Office Manager be reviewed by this Court.

A. <u>Judicial Directive</u>

Inasmuch as the irrigation districts are requesting further clarification of the original opinion to facilitate and provide guidance to the decision making of the Yakima Field Office Manager, the Partial Summary Judgment must first be examined.

In that opinion, the Court determined in regard to fish flow treaty water rights, that "the maximum limits of the diminished treaty fishing rights is the minimum amount of instream flow that is absolutely necessary for the mere maintenance of fish life in the river." Memorandum Opinion Re: Motions for Partial Summary Judgment as Amended, October 22, 1990. This decision was unanimously affirmed on appeal by the Washington State Supreme Court. <u>Ecology v. YRID</u>, 121 Wn.2d 257, 850 P.2d 1306 (1993).

Memorandum Opinion: "Flushing Flows" - 2

Exhibit 18
Page 2 of 13

However, this Court went well beyond simply determining this fluctuating minimum instream flow amount in the 1990 Partial Summary Judgment. First, it vested the Project Superintendent (Yakima Field Office Manager) with authority to determine the minimum instream flow in light of the annual prevailing conditions. Additionally, the Court gave special attention to the function and makeup of the Yakima River System Operations Advisory Committee (SOAC). That Committee, composed of fishery biologists from the Yakama Indian Nation, Washington Department of Fisheries, U.S. Fish and Wildlife Service and the irrigation districts, advises and assists the Yakima Field Office Manager on fishery-related issues in the Yakima Basin on an annual basis. Additionally, the irrigation districts can personally influence any decision-making by the Yakima Field Office Manager as part of the consultation process. Partial Summary Judgment p. 8, November 29, 1990. Indeed, the irrigators must find that input valuable as they pointedly argued for a similar inclusion in this Court's recent order extending the minimum instream flow to certain tributaries.

However, the Court went even beyond that. Beginning at page 58 of the Memorandum Opinion, the Court discussed the difficulty in setting a discrete amount as the minimum instream flow in light of natural variables, etc. At line 13 of the opinion, it says,

> "Even with a successful "flip-flop" operation, there are other variables that may enter into the determination, on an annual basis, of how much instream flow may be necessary to merely preserve fish life in the river— such things as water quality, climatic and temperature changes, changes in substrate locations within the stream, etc. (Cite omitted). <u>The material presented indicates varying opinions by various agencies and experts as to</u>

Memorandum Opinion: "Flushing Flows" - 3

Exhibit 18
Page 3 of 13

<u>which discrete amounts of instream flow are required at different points of the river system to maintain fish life. With the SOAC Committee, these variables can be, and apparently have been, addressed on an annual basis to determine the timing and the measure of instream flows to maintain the fishery.</u>

. . . .

<u>In view of ever changing circumstances, it would be inappropriate for the Court to set specific, discrete quantifications to accomplish that purpose for all times and conditions.</u> That can be done by the SOAC Committee and the Project Superintendent on an annual basis. As was stated in <u>Sohappy v. Smith</u>, 302 F. Supp. 899, 911:

"... proper anadromous fishery management in a changing environment is not susceptible of rigid predeterminations. ... The variables that must be weighed in each given instance make judicial review of state (Project Superintendent) action, through retention of continuing jurisdiction, more appropriate than overly-detailed judicial predetermination." Emphasis added.

While it certainly would be convenient if the Yakima River was as simple to operate as a goldfish bowl, in regard to providing for maintenance of fish life, obviously such is not the case. The quotation above defines one of the Court's primary goals in delegating maintenance flow determinations to the Yakima Field Office Manager: to place responsibility with an entity capable of responding to changing conditions and thereby narrowly tailor flows to the needs of the fish. The Field Office Manager and others can operate swiftly and modify decisions based on unexpected natural events. This is so because they are not constrained by concerns of Due Process, etc., which attach to court proceedings. Thus, only the absolute minimum amount of water would be used at the expense of irrigation needs.

Such was the case here. On May 3, after waiting twice as long as their own guidelines required, SOAC made the request for flushing flows

Memorandum Opinion: "Flushing Flows" - 4

Exhibit 18
Page 4 of 13

in the amount of 3500 acre-feet. Based on last-minute natural events, the BOR was able to reduce this amount to 1400 acre-feet, a sizable 60% reduction in storage pass-through. Additionally, in the last few years, the SOAC stood ready to make similar recommendations to the Yakima Field Office Manager and declined, again based on last-minute, up-to-date river information. Finally, the fact that SOAC has made only four requests for pulse flows in thirteen years demonstrates the exact flexibility this Court envisioned in the previous Memorandum Opinion.

Another objective of the Court in referring this matter to the BOR, as quoted above, was to obtain the scientific expertise of the BOR and the scientists comprising SOAC. If even possible, which this Court seriously doubts, it would take much too long a time for this Court to get up to speed in regard to the specific (and everchanging) scientific knowledge necessary to make these rapid decisions in light of changing natural conditions. It would also seriously impede the progress of the sometimes forgotten goal of this case; to determine water rights in the Yakima River Basin.

Therefore, this Court will not stray from its objectives in the Partial Summary Judgment. To do so would defeat the goal of the quantified treaty water right, which is to maintain fish life with use of the absolute minimum amount of water possible in light of the various life stages of anadromous fish. The process as set up (which includes a representative of the irrigators) can respond to the widest array of variables and can react much more quickly to changes in light of fluctuating environmental conditions. The May 3-8 events further

Memorandum Opinion: "Flushing Flows" - 5

Exhibit 18
Page 5 of 13

confirm this.

The Court, however, can give the following clarification. In delegating the Yakima Field Office Manager with the task of maintaining fish life, it did not limit him to rescuing only adult fish. Such a limitation runs counter to the intent of the original formation of SOAC by Judge Quackenbush in Kittitas Reclamation District v. Sunnyside Valley Irrigation District, Civil No. 21 (E.D. Wash. 1980), i.e., protection of salmon redds (ultimately by way of the "flip-flop") and this Court's own pronouncement from the bench November 8, 1990 (wherein it was made clear once fish reach the Yakima River, spawn and establish their redds, then the responsibility is to ensure only enough water that these fish do not die). As the DOE argues, flushing flows are simply another tool to protect existing fish life, only in a different phase. So long as the Yakima Field Office Manager can show that a good faith decision has been made to maintain fish life, regardless of the life phase, with the sparest amount of water possible, then this Court will defer to their scientific expertise. See Department of Ecology v. PUD 1, 121 Wn.2d 179, 201 (1993)(an agency with specialized knowledge and expertise as to the amount of river flow necessary to maintain fish life must be given due deference.)

B. Judicial Review

At page 2 of their initial memorandum, the DOE asserts "[t]he burden is on Roza Irrigation District to prove that the Bureau's decision was arbitrary and capricious." The Court is not sure upon what they base this assertion. The Court agrees with DOE that this is the

Memorandum Opinion: "Flushing Flows" - 6

Exhibit 18
Page 6 of 13

applicable standard for measuring the actions of a federal agency acting pursuant to specific statutory authorization. See Administrative Procedure Act (APA), 5 U.S.C. §§ 551, 706. However, in the context of this case, the Yakima Field Office Manager acts pursuant to the request of the Court and in consultation with a <u>judicially</u> created committee. Furthermore, the Court sets the standard by which the BOR operates and reviews the decisions it makes. Accordingly, the Court does not believe it is necessarily constrained by the APA's "arbitrary and capricious" standard. See <u>Farkas v. Ellis</u>, 780 F. Supp. (S.D.N.Y. 1992)(administrator appointed by district court to oversee affirmative action program established under consent decree could be considered a court for purposes of the APA and thus excluded from definition of "agency" under the Act.); <u>see also</u> 5 U.S.C. § 551(1)(E)(APA definition of "agency" does not include agencies composed of representatives of the parties... to the disputes determined by them). The governing Washington law appears to be similar. See RCW 34.05.010 ("Agency means any state board...authorized by law to make rules or to conduct adjudicative proceedings <u>except those in the legislative or judicial branches</u>)(Emphasis added).

    Although it may not be applicable in every imaginable scenario, it appears likely any controversy as to SOAC/Yakima Field Office Manager decisions will result in a motion to enjoin some act, as it is here. A motion to enjoin could result in an injunction. Accordingly, the standards and burdens applicable to injunctions would be the basis for that decision as it likely will be in similar future disputes.

Memorandum Opinion: "Flushing Flows" - 7

Exhibit 18
Page 7 of 13

To grant injunctions is a remedy within the equitable powers of the superior court. RCW 7.40.010-020; Tyler Pipe Indus. v. Dep't of Revenue, 96 Wn.2d 785, 792, 638 P.2d 1213 (1982). To obtain injunctive relief, the one seeking it must show

> "(1) that he has a clear legal or equitable right, (2) that he has a well-grounded fear of immediate invasion of that right, and (3) that the acts complained of are either resulting in or will result in actual and substantial injury to him." Tyler Pipe, supra.

Since injunctions are addressed to the equitable powers of the court, these criteria "must be examined in light of equity including balancing the relative interests of the parties and, if appropriate, the interests of the public." Id. Additionally, the trial court is vested with a broad discretionary power to shape and fashion injunctive relief to fit the <u>particular facts, circumstances, and equities of the case before it.</u> Brown v. Voss, 105 Wn.2d 366, 372, 715 P.2d 514 (1986)(emphasis in original).

Taking into account these judicial clarifications, the legal rights of the affected parties and the affidavits of the various biologists, this Court cannot find that a permanent injunction as to flushing flows is warranted. Nor can it hold that the pulse flow released in the May 5-8 period was unjustified and not in accord with this Court's previous ruling.

First, although the irrigation districts at issue here have water rights, the Yakama Indian Nation treaty right for fish is the oldest priority date on the river, that of "time immemorial". Thus, their right takes precedence over all other water users on the river. Partial

Memorandum Opinion: "Flushing Flows" - 8

Exhibit 18
Page 8 of 13

Summary Judgment, p. 55 ("in the event of an unusually low water year, these diminished treaty fishing rights will take precedence over other vested rights..."). John Easterbrooks affidavit indicates that SOAC has been poised to make a flushing flow request almost every year since it was delegated this responsibility in 1980. If the action was not scientifically bona fide then, it seems odd that it has not been earlier challenged in order to protect against releases during water-tight years like last seasons. The Yakama Nation, and therefore anadromous fish, cannot be penalized because of this unusually low water year.

Secondly, although some evidence exists to the contrary, the vast majority of the evidence and the opinions of neutral scientists demonstrates that flushing flows have a positive influence on smolt outmigration and survival. Cada Report, p. 32-33 (Declaration of Bruce Watson, Attachment B)("the general relationship of increasing survival with increasing flow in the Columbia River Basin still appears to be reasonable); Affidavit of James A. Esget, p. 4; Declaration of Phillip R. Mundy, p. 3, 19-21; C. Dell Simmons, p. 6; Declaration of Bruce Watson, Attachment B, p. 3; Affidavit of Walter Larrick, p. 4 ("SOAC's recommendation was a consensus of all members and was based on sound biological principles, real time biological data and demonstrated experiences in the Yakima River"). The flush was successful, assisting outmigration of 10% of the 1994 smolt migration. Affidavit of James Esget. There is considerable evidence in the affidavits cited above that smolts remaining in the river after the major spring runoffs face a grim chance of survival due to increased water temperature, predation

Memorandum Opinion: "Flushing Flows" - 9

Exhibit 18
Page 9 of 13

and possible "desmoltification." In sum, this Court is convinced that the decision of Brian Person, Yakima Field Office Manager, reflected the best available scientific knowledge.

It is also evident that the decision was narrowly tailored to achieve the best results with use of the least possible water. In his affidavit, Don Schramm, former District Engineer for Roza Irrigation District, current Yakima Field Office Chief Hydrologist, describes the events that led to the decision to allow the pulse flows. Numerous meetings were held with the affected irrigation districts and companies between February and April to refine the decision process in the event a pulse flow was requested. Pulse flow Guidelines were developed by Reclamation in consultation with SOAC, irrigation districts and others. On 5/4/94, after the request for a pulse flow was made by all four members of SOAC, a meeting was held where the irrigation districts expressed their disapproval. An informal memo then came from Reclamation asking SOAC to revise their request to utilize less of the Total Water Supply Available. The revised hydrograph, shorter in duration but higher in intensity, was expected to accomplish the same result with a savings of 1500 AF of water. Additional natural changes allowed for further reduction of the pulse flow. In conjunction, historical operation data indicated that only 50% of the usual annual outmigration had occurred by May 5, 1994, suggesting a real need to push the remaining smolts along. See also, Affidavit of Brian Person.

Based on this information, the Court is convinced Reclamation made this decision in good faith, keeping the interests of all parties in

Memorandum Opinion: "Flushing Flows" - 10

Exhibit 18
Page 10 of 13

mind. It is evident everything possible was done to limit these releases, including limiting the amount of release to the minimum flow necessary; developing guidelines to help ensure reasoned decision-making; waiting several days longer than required to facilitate a fish passage event; involving all parties in the decision process; and a good faith belief based on reasonable evidence that approximately 50% of the smolts were awaiting increased flows. Obviously, such action will only take place after a thorough investigation. This must be the case since such releases have taken place quite infrequently. Additionally, the irrigators involved in this dispute do not cite to any other action by the Yakima Field Office Manager/SOAC that they construe to be intentionally arbitrary. It also cannot go unsaid that even the biologist representing the irrigators originally signed the request (although he has qualified this signing after the fact). Last and most important, the ends justified the means. A great number of smolts that might otherwise have perished were successfully flushed down the river into the Columbia.

The last question which needs to be addressed is whether this release was an effort to "maintain" fish life or "enhance" it. While the irrigators have offered a method for establishing a maintained population, the Court will hold steadfast to its original opinion which avoided such predeterminations. The majority of evidence presented in this dispute indicates that "maintenance" of a fish population remains a goal yet to be reached. According to Robert Tuck, fish biologist for the Yakama Nation, "the current status of the spring chinook salmon run

Memorandum Opinion: "Flushing Flows" - 11

Exhibit 18
Page 11 of 13

in the Yakima Basin is approaching extinction." Affidavit at p. 6. The number of returning adults was approximately 1,300-1,500 fish, the lowest return in over ten years and an 85% drop since 1986. The expectation for 1995 is considerably less. Id. at p. 7. The steelhead figures are similar, with a return this year of a mere 554, an 80% reduction since 1987-88. Together with the continuing drop in outmigrating smolt, the Court believes the evidence is adequate to support the Yakima Field Office Manager's decision to release flushing flows as a means to <u>maintain</u> fish life. As was said by C. Dell Simmons, a member of SOAC:

> "...[d]uring the spring months, a minimum, but sufficient, instream flow is required by smolts to allow them to migrate out of the Yakima River Basin. Without adequate flows for downstream migration, the smolts will be subject to excess predation and high water temperature, and will die. It is a true waste of water to provide sufficient flows for upstream migration of adults, sufficient spawning flows for adults, sufficient incubation flows for the eggs in the gravel, sufficient rearing flows for juveniles, and then not provide sufficient downstream passage flows for smolts. Each spring, if unregulated streamflows do not provide sufficient streamflow for outmigration, SOAC must recommend to the Bureau minimum, but sufficient, instream flows for smolt outmigration so that the fish don't die."

See affidavit of C. Dell Simmons, October 3, 1994, p. 3-4.

### III. CONCLUSION

Certain irrigation districts have asked this Court to clarify its original holding in the November, 1990 Partial Summary Judgment and enjoin the Yakima Field Office Manager from continuing the practice of "flushing flows." In this Memorandum Opinion, the Court has once again basically declined that request. If anything, the Court is reassured by

the information produced in this dispute that the objectives and intent of the Partial Summary Judgment are being achieved. The decision-making process is inclusive; it is reactive to changing events, and it is based on the scientific expertise of experienced officials far more qualified in that area than this Court. The decisions appear to be based on the best, if not unanimous, available science and it is absolutely clear that this decision was reviewed several times to ensure that the goals were accomplished with the absolute minimum amount of water.

The Court does request that SOAC and the Yakima Field Office Manager continue to operate the river system cautiously and in good faith, keeping the rights of all of the parties in mind. Additionally, the Court asks that fish life be maintained with the absolute minimum amount of water which is necessary for maintenance of fish life in the Yakima River, regardless of the life stage of the fish.

Dated this 22rd day of December, 1994.

_____
Judge Walter A. Stauffacher

Memorandum Opinion: "Flushing Flows" - 13

Exhibit 18
Page 13 of 13