RANDOLPH H. BARNHOUSE
SAMUEL D. HOUGH
Luebben Johnson & Barnhouse LLP
7424 4th Street NW
Los Ranchos de Albuquerque, New Mexico 87107
(505) 842-6123
(505) 842-6124 (fax)
Email: dbarnhouse@luebbenlaw.com

Attorneys for Related Case Plaintiffs
  Peratrovich, *et al.*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ALASKA

| | | |
|---|---|---|
| KATIE JOHN, *et al.*, | ) | No.  3:05-cv-00006 (HRH) |
| | ) | (Consolidated) |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | SUPPLEMENTAL BRIEF OF |
| | ) | RELATED CASE PLAINTIFFS |
| | ) | PERATROVICH, et al., ON THE |
| | ) | "WHICH WATERS" ISSUE |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS.................................................................................I

TABLE OF AUTHORITIES ........................................................................IV

I.    INTRODUCTION .................................................................................. 1

II.   STANDARD OF REVIEW ..................................................................... 2

III.  PROCEDURAL HISTORY .................................................................... 2

IV.   STATEMENT OF FACTS....................................................................... 3

      A.    The Marine Forests of Southeast Alaska........................................... 3

      B.    The Presidency of Theodore Roosevelt............................................. 4

      C.    The Need to Protect the Resources of Alaska. ................................... 5

      D.    Creation of the Tongass National Forest. ........................................ 6

            1.    President Roosevelt's Federal Reservations............................. 6

                  a.    The First Piece:  Alexander Archipelago Forest
                        Reserve. ...................................................................... 6

                  b.    The Second Piece: Tongass National Forest................... 8

                  c.    President Roosevelt's Consolidation and
                        Expansion of the Tongass.............................................. 10

                  d.    President Roosevelt Intended to Include
                        Marine Waters in the Tongass........................................ 11

            2.    Presidential and Congressional Recognition of the
                  Marine Boundaries of the Tongass from 1925 to 1958. ........... 12

            3.    Congressional Inaction Confirms that Submerged
                  Lands and Marine Waters in the Tongass are
                  "public lands" for purposes of ANILCA. .................................. 13

            4.    President Carter Reserved Submerged Lands and
                  Marine Waters in the Misty Fiords National Monument. .......... 15

            5.    Congress Reserved Marine Waters and Submerged
                  Lands in ANILCA........................................................................ 16

_____

*Katie John, et al. v. United States, et al.*
Case No.:  3:05-cv-00006-HRH (Consolidated)
Supplemental Brief of Related Case Plaintiffs Peratrovich, et al., On The "Which Waters" Issue
- i -

## TABLE OF CONTENTS

**PAGE**

**V.    ARGUMENT** ................................................................ 17

**A.    Federal Water Rights Can be Reserved in Marine Water.** .................. 17

1.    The Doctrine of Federal Reserved Water Rights. ..................... 17

a.    The Four Corners of the Doctrine. ................................. 17

b.    The only two elements necessary to create a federal reserved water right are reserved land and a purpose requiring water. ....................... 17

c.    Federal Reservation of Water Rights preempts State Law .......................................... 18

d.    Excluding an entire category of water would be contrary to the historic development of the Law of Federal Reserved Water Rights. ................... 20

2.    An Abundance of Water Does Not Obviate the Need to Reserve the Water for Specific Federal Purposes. .................. 21

3.    The United States correctly recognizes that Federal Reserved Water Rights can and do exist in Marine Waters. ...................................................... 22

a.    The United States concedes the Issue, but looks for a line. .......................................... 22

b.    The United States' position that Marine and tidally influenced waters overlying state owned submerged lands are subject to regulation by the Secretaries under ANILCA is correct. ................................. 23

4.    The State of Alaska correctly recognizes that water rights can be reserved in Marine Waters and that Marine Waters can be put to Beneficial use. ........................... 25

a.    Water Rights in Alaska include rights in Marine Waters. ........................................ 25

b.    Alaska puts Marine Waters to beneficial use. ................ 26

**B.    Federal Reservation of Marine Water Rights in other Contexts.** ........ 26

1.    Annette Islands Indian Reservation. ......................... 26

2.    Alaska Maritime National Wildlife Refuge. ................... 26

3.    Alaska National Wildlife Refuge .............................. 28

## TABLE OF CONTENTS

**PAGE**

C.    The Federal Reservations that Established the Tongass Demonstrate Federal Intent to Reserve Water Rights in Marine Water. ................................................................... 28

    1.    The Federal Government has federal reserved water rights in the marine waters of the Behm Canal. ....................... 28

    2.    Reservation of federal rights in marine waters was necessary to the purpose of the reservations that created the Tongass. ................................................. 30

        a.    Reservation of Federal Land. ......................................... 30

        b.    The Purpose for the Reservation Required Water......... 30

    3.    Federal Reserved Water Rights in Marine Waters in the Tongass were confirmed when the United States created the Misty Fiords National Monument. ......................... 32

    4.    The "Disclaimer of Title" Filed By the United States Department of Justice in Alaska v. United States Did Not Divest the Federal Government of its Reserved Rights in Marine Water in the Tongass. ................................................. 33

    5.    Federal Reserved Water Rights exist in the Marine Waters of the Tongass that are appurtenant to federally reserved land and Marine Water Outside but Adjacent to Alaska. ......... 36

    6.    The Federal Government has federal reserved water rights in the marine waters at the mouth of the Stikine River. ....................................................................... 39

    7.    Summary of the State's Arguments and Peratrovich plaintiffs' Counter Arguments. ................................... 42

IV.    CONCLUSION ..................................................................... 42

TABLE OF CONTENTS EXHIBITS ................................................... A-1

_Katie John, et al. v. United States, et al._
Case No.: 3:05-cv-00006-HRH (Consolidated)
Supplemental Brief of Related Case Plaintiffs Peratrovich, et al., On The "Which Waters" Issue
- iii -

## TABLE OF AUTHORITIES

**PAGE**

### *Cases*

*Alaska Pacific Fisheries v. United States*
  248 U.S. 78 (1918) ................................................................. 26

*Alaska v. Babbitt (Katie John III)*
  72 F.3d 698 (9th Cir. 1995)................................................passim

*Alaska v. United States*
  546 U.S. 413 (2006) .............................................................. 33

*Amaco Prod. Co. v. Village of Gambell*
  480 U.S. 531 (1987) ......................................................... 28, 38

*Arizona v. California*, 373 U.S. 546 (1963) ................................passim

*Cappaert v. United States*, 426 U.S. 128 (1976) ........................passim

*General Adjudication of All Rights to Use Water in the Gila River System and Source*
  ("*Gila River*")
  989 P.2d 739 (Ariz. 1999) .......................................... 1, 18, 21

*In re Snake river Basin Adjudication*
  134 P.3d 1256 (Idaho 2000) ................................................. 25

*In re Snake River Basin Adjudication*
  23 P.3d 117 (Idaho 2000) ..................................................... 19

*New Mexico v. United States*
  438 U.S. 696 (1978) ........................................................passim

*The Paquete Habana*
  175 U.S. 677 (1900) .............................................................. 37

*Tlingit & Haida Indians v. United States*,
  182 F.2d 778 (Ct. Cl. 1968) ............................................ 29, 31

*U.S. v. Truckee Carson Water Dist*
  428 F.3d 902 (9th Cir. 2005).................................................. 19

*United States v. Adair*
  723 F.2d 1394 (9th Cir. 1983).................................... 19, 22, 33

## TABLE OF AUTHORITIES

**PAGE**

*United States v. Alaska*
  521 U.S. 1 (1997) ........................................................................................ 6, 19

*United States v. Anderson*
  6 I.L.R. F-129 (E.D. Wash. 1979) ............................................................... 33

*United States v. Louisiana*
  339 U.S. 699 (1950) ..................................................................................... 37

*United States v. Orr Water Ditch Co.*
  309 F. Supp. 2d, 1245 (D. Nev. (2004) ....................................................... 19

*United States v. Washington*
  506 F. Supp. 187 (W.D. Wash. 1980) .................................................... 19, 33

*Winters v. United States*,
  207 U.S. 564 (1908) ............................................................................... passim

### *Statutes And Legislative Materials*

Act to Abolish Old Kasaan
  P.L. No. 84-179, 69 Stat. 380 (1955) (not codified) ............................... 13,14

Alaska Admin. Code § 70.020 ......................................................................... 26

Alaska National Interest Lands Conservation Act (ANILCA),
  P.L. 96-487, 94 Stat. 2371 (Dec. 2, 1980) ........................................... passim

Alaska Native Claims Settlement Act (ANCSA)
  43 U.S.C. § 1616(d)(2), P.L. 92-203, 85 Stat. 688 (1971) ......................... 15

Alaska Statehood Act
  P.L. No. 85-508, 72 Stat. 339 (1955) ......................................................... 13

Alaska Water Use Act §§ 46.15.010 *et seq.* (2007) ............................... 19, 25

        Alaska Stat. § 46.15.035(e)(2) ............................................................ 25

        Alaska Stat. § 46.15.040 ...................................................................... 25

        Alaska Stat. § 46.15.260(3) ................................................................. 26

        Alaska Stat. § 46.15.260(6) ................................................................. 25

_____

*KATIE JOHN, ET AL. V. UNITED STATES, ET AL.*
CASE NO.: 3:05-CV-00006-HRH (CONSOLIDATED)
SUPPLEMENTAL BRIEF OF RELATED CASE PLAINTIFFS PERATROVICH, ET AL., ON THE "WHICH WATERS" ISSUE
- v -

# TABLE OF AUTHORITIES

**PAGE**

Alaska Stat. § 46.15.260(8) ........................................................... 25, 26

Alaska Stat. § 46.15.260(9) ........................................................... 25

Creative Act of 1891, § 24, 26 Stat. 1095 (Mar. 3, 1891) ........................................ 13, 26

Executive Order 1040 (Feb. 27, 1909) ........................................................... 28

Executive Order 1458 (Jan.11, 1912)........................................................... 28

Executive Order 1459 (Jan. 11, 1912)........................................................... 28

Executive Order, No. 908 (July 2, 1908) ........................................................... 10

Executive Order, No. 9114 (March 28, 1942) ........................................................... 12

Organic Act of 1897, 30 Stat. 34,
 (codified at 16 U.S.C. § 473 *et seq.*) (June 4, 1897)................................... 14, 30, 42

Outer Continental Shelf Lands Act ("OCSLA")
 43 U.S.C. § 1331 *et seq.,* at 1332(3) ........................................................... 38

Proclamation No. 4623
 43 Fed. Reg. 57087 (1978).................................................................passim

Proclamation, 35 Stat. 2148 (July 23, 1907) ........................................................... 10, 36

Proclamation, 35 Stat. 2152 (Sep. 10, 1907) ........................................................... 10

Proclamation, 35 Stat. 2226 (Feb. 16, 1909)........................................................... 11

Proclamation, 37 Stat. 2025 (Aug. 20, 1902). ........................................................... 7, 9

Proclamation, 44 Stat. 2578 (June 10, 1925) ........................................................... 12

Proclamation No. 2667
 3 C.F.R. 67 (1943-1948)........................................................... 36

Proclamation No. 8031
 71 Fed. Reg. 36443 (June 15, 2006) ........................................................... 24

Proclamation, No. 5030
 3 C.F.R. 22 (1984)........................................................... 37

---

## TABLE OF AUTHORITIES

**PAGE**

Proclamation, No. 5928
  3 C.F.R. 547 (1989) ................................................................................. 36

Quiet Title Act of October 25, 1972
  P.L. No. 99-272, 86 Stat. 1176 .............................................................. 34

Submerged Lands Act of 1953,
  43 U.S.C. §§ 1301, *et. seq* ................................................................. 19, 38

Tongass Timber Act
  P.L. No. 80-385, 61 Stat. 920 (1947) (not codified) .................................... 13

U.S. Constit. (Commerce Clause), Art. I, § 8.............................. 17, 19, 21, 32

U.S. Constit. (Property Clause), Art. IV, § 3 .................................... 17, 19, 38

### *Other Authorities*

Department of Interior Notice, 72 Fed. Reg. 47067 (Aug. 22, 2007) ...................... 40, 41

Opinion of the Office of Legal Counsel,
  "Administration of Coral Reef Resources in the Northwest Hawaiian Islands,"
  2000 OLC Lexis 46, (Sep.15, 2000) ........................................... 15, 24, 35

Restatement (Third) of the Foreign Relations Law of the United States
  § 514(1)(a) ............................................................................................. 37

Restatement (Third) of the Foreign Relations Law of the United States
  § 512 (1987) ......................................................................................... 36

White House Press Office, "Alaskan Lands Status Report" (July 12, 1980). ................ 15

## I.    INTRODUCTION

The "which waters" issue before the Court in the jointly managed Peratrovich case is simple and straightforward:  Is it impossible, as a matter of law, for the federal government to have federal reserved water rights in marine waters?

The State claims, without citation to any statutory or case law, that the answer is "yes" simply because, according to the State, "the federal reserved water rights doctrine, which is a court-created construct, has never been applied by the courts to salt or brackish waters."[1]  However, the history of federal reserved water rights is one of clarification, not exclusion.  As noted by the Arizona Supreme Court when rejecting this "no one's done it before" argument: "That no previous court has come to grips with an issue does not relieve a present court, fairly confronted with the issue, of the obligation to do so."  *General Adjudication of All Rights to Use Water in the Gila River System and Source* ("*Gila River*"), 989 P.2d 739, 745, 747 (Ariz. 1999) ("the cases we have cited lead us to conclude that if the United States implicitly intended, when it established reservations, to reserve sufficient unappropriated water to meet the reservations' needs, it must have intended that reservation of water to come from whatever particular sources each reservation had at hand").

The Peratrovich plaintiffs focus this supplemental brief on the law affording federal reserved water rights in marine waters[2] where ownership of the submerged lands is not held by the United States, or title to those lands is disputed or unclear.[3]  In

---

[1] State of Alaska's Opening Brief on "Which Waters", Docket No. 131-1 ("State's Opening Brief") at 19. *See also* State's Opening Brief at 1 ("the Defendants extend their claims into marine and tidally influenced bodies of water contrary to . . . the federal reserved water rights doctrine which does not recognize water rights in salt or brackish waters"); at 2 ("the Peratrovich plaintiffs incorrectly seek to expand federal subsistence jurisdiction through unprecedented extension of Federal reserved water rights into marine waters in southeast Alaska"); at 19-20 n. 24 (arguing: "Since salt waters cannot be used for these traditional uses, those waters have never been subject to any form of appropriation, or reservation, under this doctrine").

[2] The Peratrovich plaintiffs use the term "marine water", to include sea water, ocean water, salt water, and brackish water whether found in the open sea, or tidally influenced areas.

[3] The federal government has authority under ANILCA to regulate marine waters above submerged land owned by the federal government.  E.g., May 31, 2006 Order on the Motion For Judgment on the Pleadings (Docket 178 in case number 3:92-cv-00734-HRH) at 27 ("If the United States still holds title to some of the submerged lands within the Tongass National Forest, and it appears that it may, then the federal defendants are not entitled to judgment as a matter of law on plaintiffs' first theory").

doing so, the Peratrovich plaintiffs respond to the State's claims regarding marine waters at the mouth of the Stikine River, and use the Behm Canal as their "test case waterway" for placing their arguments in a factual context.

## II.    STANDARD OF REVIEW

As recognized by the State of Alaska in Section II of its brief, and for the reasons set forth by the Katie John plaintiffs in section III (A) of their brief, the question of whether it is impossible, as a matter of law, for federal reserved water rights to exist in marine waters is a question of law reviewed de novo by this Court.

The State's claim in the "Standard of Review" section of its opening brief regarding the standard of review applicable to "failure to act" claims is not germane to the issues identified by the Court to be briefed in this "which waters" phase of briefing. Moreover, the State fails to include the judicial review provisions of the Alaska National Interest Lands Conservation Act (ANILCA), 16 U.S.C. §§ 3103 – 3233,. in its analysis of the standard applicable to the Peratrovich Plaintiffs' claims.  See May 31, 2006 Order on Motion For Judgment on the Pleadings (Docket 178 in case number 3:92-cv-00734-HRH) at 22 (the relief sought by the Peratrovich Plaintiffs "is plainly available under the judicial enforcement provision of ANILCA, 16 U.S.C. § 3117, if available administrative remedies have been exhausted.  Here, the available administrative remedies have been exhausted").

The Peratrovich Plaintiffs otherwise address below the argument contained in the fourteen page "Standard of Review" section of the State's opening brief to the extent it relates to the Peratrovich Plaintiffs' claims.

## III.    PROCEDURAL HISTORY

The Peratrovich Plaintiffs adopt the litigation history provided by this Court in its May 31, 2006 Order on the Motion For Judgment on the Pleadings (Docket 178 in case number 3:92-cv-00734-HRH), as well as the procedural and legal history provided by the John Plaintiffs in sections II (A) and (B) of their Opening Brief, (Docket 139-2 in case number 3:05-cv-00006-HRH.  For purposes of addressing the "which waters" issue

_Katie John, et al. v. United States, et al._
Case No.: 3:05-cv-00006-HRH (Consolidated)
Supplemental Brief of Related Case Plaintiffs Peratrovich, et al., On The "Which Waters" Issue
- 2 -

before the Court in the pending motions, the Peratrovich Plaintiffs' case is being jointly managed with the Katie John case pursuant to this Court's Order of March 9, 2006 (Docket 144 in case number 3:92-cv-00724-HRH.  In its July 17, 2007 order (Docket 133 in case number 3:05 cv- 00006-HRH, the Court required that in this phase of briefing, "Issues briefed shall be related to the following issue categories," and then specified six categories of issues.  Two of those [(1) marine waters and tidally influenced waters, and (3) waters adjacent to federal reservations] impact the issues in the Peratrovich case and are therefore addressed in this brief.

## IV.     STATEMENT OF FACTS

### A.     The Marine Forests of Southeast Alaska.

Southeast Alaska is a region that is marked by bare rock, glaciers, tundra, muskeg bogs, and one third of the old growth temperate rain forests left in the world.  At only 500 miles long it possesses approximately 18,000 miles of shoreline due in large part to the over 1,000 islands of the Alexander Archipelago and the numerous fjords, channels, canals, sounds, bays and inlets that crosshatch the mainland and larger islands.  Recognized as a "marine forest" at the time it was established as a federal reserve, today the Tongass National Forest ("Tongass") comprises 82.5 percent of the area.[4]  The marine waters along that shoreline are critical to the Sitka spruce, Alaska cedar, red cedar and Western hemlock forests of the Tongass.  The warm Alaska marine current creates the temperate wet environment in which these trees thrive.[5]  For millennia, the marine waters have also served as the primary, if not singular, means of accessing the timber of both the mainland and islands that comprise the Tongass.  As Assistant Forester, F.E. Olmsted, wrote of the Tongass in 1906: "The reserve is a maritime forest.  Communication and transportation are by water only and the sea is really a part of the reserve."[6]  Olmsted felt that the marine waters were so essential to

---

[4] The rest is owned by the State, Alaska Natives, or is part of the Glacier Bay National Park. National Geographic at 109-110.  Douglas H. Chadwick, "The Truth About the Tongass," 212 Nat. Geo. 102-125, 109-110 (July 2007).
[5] The average rainfall in the Tongass is 160 inches annually.  Patricia Roppel, Misty Fiords National Monument Wilderness Alaska, 17 (Far West Research 2000).
[6] Exhibit 1.  Letter of F.E. Olmsted to the Forester (October 4, 1906) Record Group 95, Records of the

the Tongass that the ecology of the forest could only be understood in its relationship to the sea:  A relationship that had to be "felt" to be understood because it stood in bold contrast to the forests in the lower states and territories.[7]

### B.    The Presidency of Theodore Roosevelt.

In 1901 Theodore Roosevelt became the 26th President of the United States, a position he retained until succeeded by William Taft in 1909.  President Roosevelt is renowned as an environmentalist, naturalist, and President committed to the concept that the president's powers were extensive.  Indeed, in his first annual message to Congress, President Roosevelt told lawmakers that "the forest and water problems are perhaps the most vital internal problems of the United States."[8]  President Roosevelt believed that "the national forests in the West were wholly inadequate in area to meet the purposes for which they were created, while the need for forest protection in the East had not yet begun to enter the public mind."[9]  He recognized that "the preservation of our forests is an imperative business necessity."[10]

While Roosevelt worked hard to preserve forests in the eastern part of the country, he found it easier from an administrative and political standpoint as well as more cost effective to concentrate on the western forests in the lower United States and Alaska.[11]  Indeed, President Roosevelt was vitally concerned with the development and future of Alaska, and in his second annual message to Congress of December 1902 he stated:  "No country has a more valuable possession—in mineral wealth, in fisheries, furs, forests, and also in land available for certain kinds of farming and stock growing."[12]

---

Forest Service, Office of the Chief, General Records, Entry 7, Reports of the Section of Inspection, 1906-08, District 10, Alexander Archipelago Forest Reserve Box 1, National Archives. (Olmsted, Letter to the Forester).
[7] Exhibit 2.  F.E. Olmsted, "Alexander Archipelago Forest Reserve, Organization," at 4 (September 1906) Record Group 95, Records of the Forest Service, Office of the Chief, General Records, Entry 7, Reports of the Section of Inspection, 1906-1908, District 10, Alexander Archipelago Forest Reserve, Box 1, National Archives. (Olmsted, Organization).
[8] Theodore Roosevelt, Autobiography: The Works of Theodore Roosevelt XX, at. 387 (20 vols., Charles Scribner's Sons, 1926) ) (Autobiography).
[9] Id.
[10] "First Annual Message," 3 December 1901, in State Papers as Governor and President, 1899-1909: The Works of Theodore Roosevelt XV, at 103 (20 vols., Charles Scribner's Sons, 1926) (State Papers).
[11] Theodore Roosevelt, The New Nationalism, 54-58 (New Outlook Company, 1910).
[12] State Papers at 162-163.

A year later he said that Alaska's products were "a steady and material contribution to the wealth of the nation."[13]

When he addressed conservation issues, Roosevelt brought to them his philosophy as chief executive. Though it would take time to evolve, his attitude toward the powers of his office was one of expansive presidential power.[14]  President Roosevelt operated on the theory that "the executive power was limited only by specific restrictions and prohibitions appearing in the Constitution or imposed by Congress under its constitutional powers."  He was likewise convinced that the President should have great discretion to act in matters of natural resources because he saw the larger picture in ways that parochial Representatives and Senators did not.  He firmly believed the executive should act as "a steward of the people bound actively and affirmatively to do all he could for the people, and not to content himself with the negative merit of keeping his talents undamaged in a napkin."[15]

To ensure he acted in ways intended to most effectively and responsibly fulfill his duties as President, he surrounded himself with trusted advisors.  Some of these held official government positions, others were close confidants and friends.[16]  When acting to preserve the natural wonders of Southeast Alaska, he relied on retired Navy Lt. George T. Emmons, Chief of Forestry Gifford Pinchot, Chief Forest Inspector F.E. Olmsted, and Tongass Forest Supervisor William A. Langille.  Roosevelt's decisions about the Tongass from the spring of 1902 through February 1909 provide an excellent illustration of how his reliance on these trusted advisors worked in practice.

### C.    The Need to Protect the Resources of Alaska.

The United States purchased the territory of Alaska from Russia on October 18, 1867.  Following the purchase, the United States owned and controlled all of the waters

---

[13] Id. at 250.

[14] As Gifford Pinchot put it, Roosevelt "used the whole Government of the United States consciously, and with the most conspicuous success, as a means of doing good to the people of this country."  Gifford Pinchot, "Roosevelt as President," State Papers, at xxix.

[15] Roosevelt, Autobiography, at 347. The reference in the last clause is to President William Howard Taft whom President Roosevelt attacked throughout his autobiography.

[16] Lewis L. Gould, The Presidency of Theodore Roosevelt, 74, 197-198 (University Press of Kansas, 1991).

and the submerged lands within the territory and the three mile territorial sea.[17]  In other words, following its purchase from Russia in 1867, all of Alaska belonged to the federal government.  At the time Theodore Roosevelt became president, different levels of protection of these federal holdings existed, depending in part on actions taken by Congress or the President to reserve specific lands for federal purposes.  The need for additional protection was clear to President Roosevelt, and drove his remarkable efforts to provide substantial protections to significant portions of Alaska through Presidential order and proclamations.  That history is critical because those reservations did not pass to Alaska when it became our 49th state in 1958.

### D.    Creation of the Tongass National Forest.

#### 1.    President Roosevelt's Federal Reservations.

##### a.    The First Piece:  Alexander Archipelago Forest Reserve.

President Roosevelt created the Alexander Archipelago Forest Reserve ("Alexander Archipelago") in 1902 following a proposal from George Thornton Emmons, a retired Navy lieutenant.[18]  Emmon's career had taken him to Alaska and made him an expert on that remote and little known possession of the United States.  Emmons and President Roosevelt worked together on the Canadian boundary issue and the naval officer became the key figure in shaping White House policy toward Alaska.[19] Roosevelt wrote in 1904 that "Lt. Emmons has given me more aide in reference to Alaska than any other man; he knows the Indians down to the ground and is absolutely trustworthy."[20]  Theodore Roosevelt often used informal agents in his domestic policy-

---

[17] See *United States v. Alaska*, 521 U.S. 1, 33 (1997) (citing the Property Clause, Art. IV, § 3, cl. 2 and the holding in *Shively v. Bowlby* that the United States can use this power to defeat a future state's equal footing title, 152 U.S. 1, 48 (1894).

[18] Exhibit 3.  David E. Conrad, "Creating the Nation's Largest Forest Reserve: Roosevelt, Emmons, and the Tongass National Forest," The Pacific Historical Review 46, 65-83 (February, 1977).  Emmons was a renowned collector of Alaska Native artifacts and was respected as an ethnologist.  (Conrad, Forest Reserve).

[19] Id.

[20] Exhibit 4.  Theodore Roosevelt to Ethan Allen Hitchcock, (undated, but 1904), in Private Papers of Ethan Allen Hitchcock, 1880-1909, Box 1, National Archives;  Conrad, "The Nation's Largest Forest Reserve," at 75.

making and in shaping foreign policy.[21]  His reliance on Lieutenant Emmons for Alaskan affairs was very much part of the President's style.

In early 1902, Emmons drew upon his friendship with the president to send a report to Roosevelt proposing a forest reserve in Alaska.  In his report, "The Woodlands of Alaska," Emmons described the area of the Alexander Archipelago and then recommended Roosevelt create a federal reservation in the area that would include the "Prince of Wales Island & Associated Islands to seaward, Zarembo Island, Kuiu Island, Kupreanof Island, and Chichagof Island and associated islands to seaward."[22]

In his report to Roosevelt, Emmons displayed an acute sensitivity to the impact of the ocean and its currents on the forests in this proposed federal reservation.  He referred to "the warm Japan ocean current" which produced on the land "an almost tropical luxuriance of vegetable life on every hand."  He also referred to "the influence of the warmer ocean atmosphere being very perceptible both in temperature and humidity."  In addition to the climatic conditions created by the sea, Emmons made Roosevelt acutely aware of the effect of the sea on the geography of the forests.  For instance, he pointed out that on Prince of Wales Island "the southern portion is much cut up by deep, far reaching arms of the sea which almost meet at sword points."[23]  Thus, Emmons recommended that "in the approximate areas of the islands the inland waterways and shore line indentations" should be included within the reserve.[24]

Upon review of Emmon's report and recommendations, President Roosevelt wrote to Secretary of the Interior Ethan Allen Hitchcock on April 15, 1902 that "this Alaska forest reservation scheme strikes me favorably. Let us look into it and if it is proper have it done."[25]  On August 20, 1902, President Roosevelt signed the Presidential Proclamation creating the Alexander Archipelago federal reserve.[26]

---

[21] Gould, The Presidency of Theodore Roosevelt, at 74, 197-198.
[22] Exhibit 5.  George T. Emmons, "The Woodlands of Alaska," at 9 (February 1902), File 3841-02, National Archives) (Emmons, Woodlands).
[23] Emmons, Woodlands, at 10. (Exhibit 5).
[24] Emmons, Woodlands, at 16. (Exhibit 5).
[25] File 3841-02.  It is most readily available in Elting E. Morison, et al., eds., The Letters of Theodore Roosevelt, III, at 252 (8 vols., Harvard University Press, 1951-1954).
[26] Exhibit 6.  Proclamation, 37Stat. 2025 (August 20, 1902).

The creation of the Alexander Archipelago reserve evoked a mixed response from the residents of Southeast Alaska.  One mine owner, U. S. Rush, lobbied the White House to have the reserve abolished.[27]  In response to his complaints, Chief Forester Gifford Pinchot sent F. E. Olmsted of the Forestry Bureau's inspection service to Alaska to investigate and consider whether the Alexander Archipelago should be abolished or additional reserves should be established.

### b.    The Second Piece: Tongass National Forest.

In fulfilling his instructions, Olmsted filed a report that argued in favor of reserving the "whole of Southeast Alaska."[28]  Recognizing the importance of the Pacific Ocean in shaping the character of this federal forest, Olmsted observed that:

> The most striking feature of the whole region is the wonderful system of deep water-ways. Until this is thoroughly comprehended no true idea of the general conditions can be had. It is the sea which makes this region unique. The islands are fairly cut to pieces by innumerable tongues of the ocean, and upon this ocean and its numberless inlets transportation is wholly dependent. The sea is the life of the country; without it there would be no life, no industry.[29]

Olmsted added that "[m]en and freight move by boat only, subject to the ever changing moods of sea, wind and tide.  In this lies the great distinction between the inland reserves of the States and the marine forest of south-east Alaska."[30]

Olmsted specifically addressed the uncertainty as to the jurisdiction of the Forestry Service within the Alexander Archipelago over the marine waters in this federal reserve.  He noted that the description of the reserve boundaries was unclear as to what waters and what islands to seaward were included. At that time logging was done by hand and the trees were selected from those growing close to shore.  For the most part, loggers would fell a tree that was certain to fall into the water where it could be floated.  At the very least, the loggers would choose a tree that could be felled and

---

[27] Olmsted, Organization, at 9.  (Exhibit 2).
[28] Olmsted Letter to the Forester.  (Exhibit 1); See also, Exhibit 7.  Lawrence Rakestraw, "A History of the United States Forest Service in Alaska" (USDA Forest Service (2002).  (Rakestraw, "History").
[29] Exhibit 8.  F.E. Olmsted, "Alexander Archipelago Forest Reserve, General Forest Conditions" Record Group 95, Records of the Forest Service, Office of the Chief, General Records, Entry 7, Reports of the Section of Inspection, 1906-1908, District 10, Alexander Archipelago Forest reserve, Box 1, National Archives (General Forest Conditions).
[30] Id.

jacked into the water without too much effort.  Olmsted and William Langille were uncertain as to the Forestry Service jurisdiction over such logs once they were in the waters offshore.  In his 1906 report on the Alexander Archipelago, Olmsted believed that because the 1902 Proclamation lacked specificity as to the surrounding waters and islands that the Forest Service lost jurisdiction once log rafts were no longer tethered to the shore.[31]  Thus, he proposed that the forest be greatly expanded to include the waters and open ocean such that "the whole country" would be a reserve (emphasis in original).[32]  This report formed the basis for the expansion of the Tongass in 1909.

Given the importance of the sea to the ecology of the forest and the necessity of the waters to proper administration of the reserve, in September 1906, Olmsted recommended that the name of the Alexander Archipelago Forest Reserve be dropped and the area renamed as a National Forest with boundaries from the border with Canada on the east and extending far out into the Pacific Ocean.[33]

This ambitious proposal came to Washington at a time when creation of national forests was under attack both in Congress and within the bureaucracy in the Department of the Interior. In February and March 1907, as the session of Congress came to an end, western senators attached a rider to the agricultural appropriation bill that barred "except by act of Congress" the creation of forest reserves in six western states. Knowing he could not veto such an important appropriation measure, Roosevelt, working with Pinchot, proclaimed on March 2, 1907 the establishment of twenty-one new reserves in the states covered by the appropriation rider.[34]

Within the Interior Department, moreover, the new commissioner of the General Land Office, Richard Ballinger, was making clear his distaste for more national forests. There was before the Land Office a proposal to create a Chugach National Forest in March 1907.  In a letter to Secretary Garfield of April 24, 1907, Ballinger said: "The creation of a national forest will greatly hamper and to large extent defeat the provisions

---

[31] Olmstead, General Forest Conditions, at 17. (Exhibit 8).
[32] Id., at 9; Olmsted, Organization at 27 and 38.  (Exhibit 2).
[33] Olmsted, Organization at 37, 38, 48.  (Exhibit 2).
[34] Exhibit 9  Fred Dennett, Acting Commissioner, to James R. Garfield, July 1907, Draft of proclamation with report, Record Group 49, Bureau of Land Management (GLO), Entry UD 918, Division R, National Forest Files, 1894-1955, Tongass NF, Box 176, National Archives.  See also Gould, Presidency of Theodore Roosevelt, at 203-204.

of the homestead laws, which Congress made exceedingly liberal to induce the settlement and development of the country."[35]  Notwithstanding Ballinger's recommendation, Theodore Roosevelt signed the proclamation for the Chugach Forest which Garfield had submitted after dismissing Ballinger's objections.

When Olmsted's report on expanding the Tongass Forest reached Washington, it ran into some opposition from Commissioner Ballinger. As a result, the Alexander Archipelago forest supervisor, William A. Langille, prepared a smaller version of Olmsted's proposal consisting of some two million acres. [36]  Relying on the reports from Olmstead and Langille, Garfield and President Roosevelt enlarged the Alexander Archipelago on July 20, 1907 and created the Tongass National Forest on September 10, 1907.[37]

### c.    President Roosevelt's Consolidation and Expansion of the Tongass.

During the remainder of Theodore Roosevelt's term, additional action on the Tongass went forward. These events underscore the influence of Olmsted's 1906 reports upon Roosevelt, Pinchot and the decisions made regarding the expansion of the Tongass.  On July 1, 1908, the president issued an executive order that combined the Alexander Archipelago and Tongass forests into a single entity comprising more than 6,756,000 acres named the Tongass National Forest.[38]

In addition, Gifford Pinchot had W.A. Langille review the 1906 Olmsted Reports again.  Langille responded with a report providing for another expansion of the Tongass. Langille's report recommended that the Tongass be expanded along the international boundary with Canada on the south from Dixon's Entrance to a point 60 miles seaward of Cape Muzon on the southern tip of Prince of Wales Island.  On the north, Langille chose a point that was approximately 20 miles seaward from Cross Sound.[39]  Roosevelt

---

[35] Rakestraw, "History," at 22 -23 (Exhibit 7).

[36] Rakestraw, "History," at 22-24. (Exhibit 7).

[37] Exhibit 10.  Proclamation, 35 Stat. 2148 (July 23, 1907); Exhibit 11.  Proclamation, 35 Stat. 2152 (September 10, 1907).

[38] Exhibit 12.  Executive Order No. 908 (July 2, 1908.

[39] Rakestraw, "History", at 22-23.  (Exhibit 7).  Langille also recommended that the Yukatat Bay and Russel Fjords area be added to the Tongass.

issued his final proclamation enlarging the Tongass as proposed by Langille's report on February 16, 1909.[40]

### d. President Roosevelt Intended to Include Marine Waters in the Tongass.

It cannot be disputed that President Theodore Roosevelt was concerned about the development of Alaska and conservation of its natural resources. He believed that the federal government should supervise that process of development and preservation.[41] As discussed above, the administrative records of the President supporting his presidential proclamations creating the Tongass are replete with references to the marine waters surrounding the Tongass and the need to include those waters within the reservation because the marine waters of the Tongass are crucial to the proper conservation and administration of the forests.

To work his will in Alaska, President Roosevelt relied upon Chief Forester Gifford Pinchot.[42] Pinchot selected F.E. Olmsted and William A. Langille as his agents to evaluate options available to Roosevelt in that part of Southeast Alaska that would become the Tongass. Following extensive on site evaluation and detailed considerations of the forest and its needs, Olmsted and Langille both recommended the expansion of the Tongass with boundaries extending to the west well into the Pacific Ocean.

Pinchot approved the report and draft proclamation expanding the Forest and forwarded it to the Department of the Interior for consideration. The Department of the Interior approved the proclamation, and forwarded it to President Roosevelt for his consideration.[43] President Roosevelt issued the proclamation under his authority as

---

[40] Exhibit 13. Proclamation, 35 Stat. 2226 (February 16, 1909).

[41] In his last message to Congress in December 1908, President Roosevelt recognized that "One of the great industries of Alaska, as of Puget Sound and the Columbia, is salmon-fishing. Gradually, by reason of lack of proper laws, this industry is being ruined; it should now be taken in charge and effectively protected, by the United States Government." State Papers, at 457. These were not the comments of White House speechwriters. Roosevelt wrote his annual message himself.

[42] Roosevelt is reported to have said "in all forestry matters I have put my conscience in the keeping of Gifford Pinchot." Robert Underwood Johnson, Remembered Yesterdays (Boston 1923) (cited in Roderick Nash, Wilderness and the American Mind, at 163 (New Haven 3rd Edition 1982).

[43] See Rakestraw, "History" for description of the process. (Exhibit 7).

chief executive, expanding the Tongass to include marine waters and submerged lands within the boundaries.  It cannot be disputed that these boundaries were established by President Roosevelt following sustained and thoughtful deliberations within the Roosevelt administration and definitive and explicit presidential decisions in favor of the boundaries of the Tongass.

As Pinchot wrote in his autobiography, Roosevelt's administration had "converted the Public Domain from private spoils into a great instrumentality for the public good."[44] It is beyond doubt that President Roosevelt intended to include marine waters and submerged lands within the Tongass.  At the time he did so, there was no State of Alaska, and the United States alone owned and controlled all of the marine waters and submerged lands in the Territory.  Yet Roosevelt nevertheless included them even though his specific inclusion of those waters and submerged lands in the Tongass was unnecessary to bring them under federal control.  Their inclusion was to reserve that control in the federal government, and further a public need that President Roosevelt perceived in order to conserve the forests and other resources in the Tongass.

### 2.    Presidential and Congressional Recognition of the Marine Boundaries of the Tongass from 1925 to 1958.

The Tongass remains for the most part as it was originally established by President Roosevelt during his administration.  However, certain changes primarily in the form of additions have been made to the Tongass in the intervening years, and his marine boundaries extending far out into the Pacific Ocean have been confirmed by subsequent administrations and by Congress.  First, on June 10, 1925, President Calvin Coolidge added lands and excluded the Sitka, Wrangell, Skagway, Ketchikan, Hyder, Petersburgh and Juneau townsites from the Tongass.[45]  Thereafter, on March 28, 1942, President Franklin Delano Roosevelt withdrew for military purposes approximately 2,215 acres that had been added to the Tongass by President Coolidge.[46]

---

[44] Pinchot, Breaking New Ground, at 383.
[45] Exhibit 14.  Presidential Proclamation, 44 Stat. 2578 (June 10, 1925)
[46] Exhibit 15.  Executive Order, No. 9114, March 28, 1942. CIS Index 1942 EO 9114..

The exterior boundaries of the Tongass were recognized by joint resolution of both houses of Congress on August 8, 1947 in the Tongass Timber Act.[47]  The result of this act was to open the Tongass to pulp mills and the development of a major timber industry in the region.  The act did not alter the boundaries of the Tongass, and instead congressionally confirmed the western marine boundaries that extend into the Pacific Ocean.  Again, on July 26, 1955, Congress took action on the Tongass by abolishing the Old Kasaan National Monument and adding the monument's lands to the Tongass.[48]

Finally, in 1958, Congress reserved the United States' interests in all real property in the State of Alaska including public lands in Section 5 of the Alaska Statehood Act.[49]

### 3.    Congressional Inaction Confirms that Submerged Lands and Marine Waters in the Tongass are "public lands" for purposes of ANILCA.

President Roosevelt's expansion of the Tongass to include submerged lands and the open sea has never been rejected or withdrawn by Congress.  At the time the Tongass was created, if Congress desired to remove lands from reservations, abolish reservations, or alter the president's authority to create reservations, Congress acted quickly and decisively.  For example, shortly before leaving office, President Grover Cleveland established forest reserves containing more than 21 million acres under the authority of the Creative Act of 1891.[50]  President Cleveland had previously established 17.5 million acres of forest reserves.  His action in February 1897 more than doubled the existing forest acreage and Congress immediately reacted with legislative language to overturn the President's action.[51]  President Cleveland vetoed the initial appropriations bill that contained the provision to negate his proclamations.[52]  However, in the first days of President William McKinley's administration Congress reintroduced

---

[47] Exhibit 16.  Pub. L. No. 80-385, 61 Stat. 920 (1947) (not codified).
[48] Exhibit 17.  Pub. L. No. 84-179, 69 Stat. 380 (1955) (not codified).
[49] Exhibit 18.  Pub. L. No. 85-508, 72 Stat. 339, 340 (1955).
[50] Exhibit 19, Creative Act of March 3, 1891, § 24, 26 Stat. 1095..
[51] Gifford Pinchot, Breaking New Ground, at 107-113.
[52] Gifford Pinchot, Breaking New Ground, at 107-113.

legislation to abolish Cleveland's reservations and amend the law granting to the President the authority to set aside forest reserves.[53]

Although Congress has specifically acted in a similar fashion on other occasions to remove lands from other reservations, Congress has never taken any action to remove marine waters or submerged lands from the Tongass. Rather, Congress has acted on numerous occasions, including in ANILCA, to increase the acreage of the Tongass leaving the submerged lands and marine waters intact. Through its decision not to act to modify the marine boundaries of the Tongass established by President Roosevelt, Congress has affirmed that action and those boundaries are valid to this day.

Inaction of Congress has long been recognized as acquiescence in the exercise of executive power over the public domain. This Congressional confirmation by inaction was the basis upon which the United States Supreme Court upheld action by President William H. Taft to protect oil reserves during his administration. *United States vs. Midwest Oil Co.*, 236 U.S. 459, 475 (1915). In *Midwest Oil*, the Supreme Court considered a challenge to reservations made by President Taft in response to a rapidly depleting supply of oil available to the federal government. President Taft issued a proclamation withdrawing several million acres of oil rich lands from private mineral entry pending legislation to keep the lands in federal ownership. Called upon to consider whether President Taft had the authority to make the withdrawals at issue, the Supreme Court affirmed the president's power to withdraw public lands in the public interest without specific statutory authorization, relying on a long historical practice that Congress affirms a president's action through its acquiescence. As the Court said in connection with the 252 instances of presidential withdrawal that it had identified:

> The Executive, as agent, was in charge of the public domain; by a multitude of orders extending over a long period of time, and affecting vast bodies of land, in many States and Territories, he withdrew large areas in the public interest. These orders were known to Congress, as principal, and in not a single instance was the act of the agent disapproved. Its acquiescence all the more readily operated as an implied grant of power in

---

[53] Exhibit 20. Organic Act of June 4, 1897, 30 Stat. 34, (codified at 16 U.S.C. § 473 *et seq.*).

*Katie John, et al. v. United States, et al.*
Case No.: 3:05-cv-00006-HRH (Consolidated)
Supplemental Brief of Related Case Plaintiffs Peratrovich, et al., On The "Which Waters" Issue
- 14 -

lieu of the fact that its exercise was not only useful to the public, but did not interfere with any vested right of the citizen.

*United States vs. Midwest Oil Co.*, 236 U.S. 459, 475 (1915).

This presidential power included the power to withdraw marine waters and the lands submerged beneath them.[54]  Congress acquiesced to President Roosevelt's boundaries for the land and waters he withdrew for the Tongass.  Under *Midwest Oil Co.,* that inaction amounts to Congressional confirmation of the boundaries of the Tongass, and is Congressional confirmation that the marine waters and submerged lands in the Tongass are "public lands" for purposes of ANILCA.

### 4.    President Carter Reserved Submerged Lands and Marine Waters in the Misty Fiords National Monument.

On December 1, 1978, President Jimmy Carter created the Misty Fiords National Monument (Misty Fiords) at the southeastern end of the Tongass by Presidential Proclamation.[55]  His action was deliberately taken just days before the December 18, 1978, deadline established in section 17(d)(2) of the Alaska Native Claims Settlement Act (ANCSA) for Congress to take action to identify and reserve "national interest" lands from selection by the State of Alaska and private individuals.[56]  The efforts in Congress stalled with a filibuster by Senator Mike Gravel of Alaska in May 1978.  When the Ninety-Fifth Congress ended in November, President Carter knew that if he did not act swiftly the preservation of parks, national monuments and wildlife areas in Alaska would become incredibly complicated.  Thus on December 1, Carter reserved 56,000,000 acres in Alaska with national monument status. [57]  As Carter himself remarked, "[t]he top environmental priority of my administration, perhaps my entire life, has been a carefully considered proper protection of the wild and precious lands of Alaska."[58]

---

[54] Opinion of the Office of Legal Counsel, "Administration of Coral Reef Resources in the Northwest Hawaiian Islands," 2000 OLC Lexis 46, (September 15, 2000).

[55] Exhibit 21.  Proclamation No. 4623, Fed. Reg. 57087 (1978), *and in* 93 Stat 1446.

[56] 43 U.S.C. § 1616(d)(2), Pub. L. 92-203, 85 Stat. 688 (1971).

[57] Roderick Nash, Wilderness and the American Mind, at 296-298 (Yale U. Press 3rd Ed. 1982)at 296-298.

[58] White House Press Office, "Alaskan Lands Status Report" (July 12, 1980), Cited in Id. at 298..

The boundaries of Misty Fiords run adjacent to the Canadian border on the east, down to Dixon Entrance in the south, west across the Behm Canal and including part of Revillagigedo Island and north to encompass the Unuk River watershed.  The total area encompasses approximately 2,285,000 acres, and President Carter expressly included "submerged lands, and waters owned or controlled by the United States within the boundaries."[59]  The area was chosen for its "outstanding value for continuing scientific study" to be preserved because it was "an essentially untouched," "unspoiled coastal ecosystem" containing all of the climates, ecosystems, fish and wildlife of Southeast Alaska in a compact area.

On fish and the marine environment, President Carter noted that "Misty Fiords is a major producer of all five species of Pacific salmon" and that "[n]umerous other saltwater, freshwater and anadromous fish species and shellfish are plentiful in this area, which is an extraordinarily fertile interface of marine and freshwater environments."[60]  As a national monument within a national forest, Misty Fiords is jointly managed by the Forest Service and the Department of the Interior.[61]

### 5. Congress Reserved Marine Waters and Submerged Lands in ANILCA.

Congress added additional forest lands and waters to the Tongass through ANILCA in 1980.  In addition to the lands added, Congress designated areas within the Tongass as Wilderness Areas, and consolidated national wildlife refuges into the Alaska Maritime National Wildlife Refuge.[62]  The consolidation of the existing national wildlife refuges into one maritime refuge included a recognition of the water already reserved as well as an express reservation of all water necessary to fulfill the purpose of preserving the marine life within the refuge.[63]

---

[59] 93 Stat. 1466, 1467.
[60] Id. at 1467.
[61] 2000 OLC Lexis 46, 56 (September 15, 2000).
[62] ANILCA, Title III, Title V and Title VII, Pub. L. 96-487, 94 Stat. 2371, (December 2, 1980) (not codified).
[63] Id. at § 303(i)(B) (ii), Pub. L. 96-487, 94 Stat. 2371, (December 2, 1980) (not codified).

## V.    ARGUMENT

### A.    Federal Water Rights Can be Reserved in Marine Water.

#### 1.    The Doctrine of Federal Reserved Water Rights.

##### a.    The Four Corners of the Doctrine.

The four corners of the federal reserved water rights doctrine, as now applied to Indian and non-Indian federal reservations, are set out in *Winters v. United States*, 207 U.S. 564 (1908), *Arizona v. California*, 373 U.S. 546 (1963), *Cappaert v. United States*, 426 U.S. 128 (1976), and *New Mexico v. United States*, 438 U.S. 696 (1978).  The first principle of the doctrine is that the rights are determined by federal and not state law whether the rights are reserved prior to or following statehood.  *Winters*, 207 U.S. at 577; *Arizona,* 373 U.S. at 598; *Cappaert*, 426 U.S. at 138; *New Mexico*, 438 U.S. at 698.  The second principle is that the priority of the water right is established as of the date the reservation was established and the rights are not lost through non-use.  *Cappaert*, 426 U.S. at 138; *New Mexico* at 438 U.S. at 698.  The third principle is that the federal reservation of land reserves enough unappropriated water in navigable and non-navigable waters to fulfill the primary purpose of the reservation.  *Arizona,* 375 U.S. at 601; *Cappaert,* 426 U.S. at 138, *New Mexico*, 438 U.S. at 698.[64]  The fourth principle is that the rights apply to waters both on and off of the federal reservation of land.  *Cappaert*, 426 U.S. at 147.  Finally, the doctrine of federal reserved water rights is empowered by the Commerce Clause, Art. I, § 8, and the Property Clause, Art. IV, § 3, which together allow Congress to regulate navigable waters and federal lands.  *Cappaert*, 426 U.S. at 138.

#### b.    The only two elements necessary to create a federal reserved water right are reserved land and a purpose requiring water.

The proper inquiry into the existence of a federally reserved water right does not include a court determination of saline content, but instead requires a determination

---

[64] This principle does not apply to Indian reserved rights. Those rights are not restricted by primary versus secondary purposes.

regarding only two necessary elements: (1) has the federal government reserved lands for a particular purpose; and (2) if so, does that purpose require water?  If the answer to both of these questions is yes, then a federal reserved water right to as much unappropriated water as is reasonably necessary to accomplish that purpose exists by implication. *Arizona,* 373 U.S. at 601; *Cappaert,* 426 U.S. at 138.

The State's primary objection to this Court's recognition of federal reserved water rights in marine waters is that no case has ever held that federal reserved water rights apply to salt or brackish waters.  E.g., State's Brief at 19.  However, the illogic of this exact claim was pointed out by the court in *Gila River*, 989 P.2d 739.  The *Gila River* court, in rejecting the same argument, correctly recognized:  "That no previous court has come to grips with an issue does not relieve a present court, fairly confronted with the issue, of the obligation to do so."  Id. at 745.  The Arizona court went on to hold that federal water rights can be reserved in groundwater which, under controlling Arizona state law, cannot be appropriated.  In doing so, the court noted that it need not "write on a blank slate" because the doctrine of federal reserved water rights provides "guideposts."  Id. at 745-746.  The first two guideposts are straightforward and simple: Where there is a federal reservation of land requiring water to achieve its purpose, federal reserved water rights exist.  The *Gila River* court went on to confirm that "the cases we have cited lead us to conclude that if the United States implicitly intended, when it established reservations, to reserve sufficient unappropriated water to meet the reservations' needs, it must have intended that reservation of water to come from whatever particular sources each reservation had at hand."  Id. at 747.

### c.    Federal Reservation of Water Rights preempts State Law.

The State fails to distinguish between an "appropriation" of water, and a federal "reservation" of water.  (State's Brief at 19, n.24.)  Simply put, whether water is not or cannot be appropriated has no bearing on whether rights to it can be reserved by the federal government.  *Cappaert*, 426 U.S. at 138; *Gila River,* 989 P.2d at 743 (holding federal reserved water rights can exist in groundwater which is non-appropriable under Arizona law).  The federal government reserves water for federal purposes by

---

*Katie John, et al. v. United States, et al.*
Case No.: 3:05-cv-00006-HRH (Consolidated)
Supplemental Brief of Related Case Plaintiffs Peratrovich, et al., On The "Which Waters" Issue
- 18 -

application of the Commerce Clause and the Property Clause.  The State of Alaska, on the other hand, allocates water through application of the appropriation doctrine.  Alaska Water Use Act, Alaska Statutes §§ 4615.010, *et. seq.*

No court has ever held that the reservation of federal reserved water rights are dependent upon state law.  The converse is in fact true.  Federal reserved water rights rest on the implied congressional intent to preempt application of state law to fulfill the purpose of a reservation. *Cappaert* 426 U.S. at 145, *New Mexico*, 438 U.S. *at 698*.  This is so whether the reservation is made prior to or following statehood.  *Cappaert* 426 U.S. at 138.  See also*, United States v. Adair*, 723 F.2d 1394, 1411 n.19 (9th Cir. 1983) (holding that "[t]he fact that water rights of the type reserved … are not generally recognized under state prior appropriations law is not controlling as federal law provides an unequivocal source of such rights"); *In re Snake River Basin Adjudication*, 23 P.3d 117, 122 (Idaho 2000) ("the existence or absence of a reserved water right is a matter of federal law");  *United States v. Orr Water Ditch Co.,* 309 F. Supp. 2d, 1245, 1248 (D. Nev. (2004) (same).  Affirmed by, *U.S. v. Truckee Carson Water Dist.*, 428 F.3d 902 (9th Cir. 2005).

Indeed, one of the issues in the seminal *Winters* case was whether statehood and the operation of the equal footing doctrine divested the reservation of its water right.  The Supreme Court held that such a result would not have been contemplated by Congress.  *Winters* 207 U.S. at 577.  The Supreme Court refused to apply the equal footing doctrine in a manner that would defeat the purpose for the reservation and render it meaningless.  Id.; See also, *United States v. Washington*, 506 F. Supp. 187, 205 (W.D. Wash. 1980) (declining to apply federally reserved water rights doctrine in a manner that would render a reserved water right meaningless).

The equal footing doctrine was incorporated into the Submerged Lands Act of 1953, 43 U.S.C. §§ 1301, *et seq. United States v. Alaska*, 521 U.S. at 15.  Both applied to the State of Alaska upon statehood to provide Alaska with title to some, though clearly not all, of the submerged lands beneath navigable rivers, lake beds, tidally influenced lands, and the marginal sea.  Submerged Lands Act Section 6(m).  However, applying the operation of the Submerged Lands Act in such a way as to divest the

*Katie John, et al. v. United States, et al.*
Case No.:  3:05-cv-00006-HRH (Consolidated)
Supplemental Brief of Related Case Plaintiffs Peratrovich, et al., On The "Which Waters" Issue
- 19 -

United States of federally reserved water rights in navigable waters overlying state owned submerged lands would be an aberration of the doctrine of federally reserved water rights as well as the Commerce Clause. *Winters* 207 U.S. at 577; *Cappaert* 426 U.S. at 138. As a result, and contrary to the State's assertions in its brief, the strictures of the State's prior appropriation doctrine, including "beneficial use" and "abandonment" are irrelevant to a determination of federal reserved water rights (State's Opening Brief at 9-10).

> **d.    Excluding an entire category of water would be contrary to the historic development of the Law of Federal Reserved Water Rights.**

No Party in this litigation disputes that a federal reserved water right exists where "those waters are necessary to accomplish the purposes for which the [federal] land was reserved." *Alaska v. Babbitt*, 72 F.3d 698, 703 (9th Cir. 1995) (*Katie John III*). Moreover, no party has cited any authority to support the claim that a court can adopt a per se exclusion of certain categories of water from application of the federal reserved water rights doctrine. To the contrary, the history of judicial recognition of federally reserved waters rights is one of increasing recognition and not of exclusion. In *Winters v. United States*, the Court held that the reservation of Indian lands from the public domain impliedly sets aside sufficient water to meet the present and future needs of the reservation. 207 U.S. at 576. In *Arizona*, the Court expanded the doctrine of reserved rights to all federal reservations. 373 U.S. at 601. In *Cappaert*, the Court again expanded the doctrine of federal reserved water rights to enjoin ground water pumping that negatively impacted the quantity of a federally reserved water right. 426 U.S. at 146.

*United States v. New Mexico*, is not to the contrary. In that case, the Supreme Court confirmed that the reserved water rights doctrine requires a careful examination of "both the asserted water right and the specific purposes for which the land was reserved" and whether "the purposes of the reservation would be entirely defeated" without the water. 438 U.S. at 700. Thus, the presence of federally reserved water

_____

*KATIE JOHN, ET AL. V. UNITED STATES, ET AL.*
CASE NO.: 3:05-CV-00006-HRH (CONSOLIDATED)
SUPPLEMENTAL BRIEF OF RELATED CASE PLAINTIFFS PERATROVICH, ET AL., ON THE "WHICH WATERS" ISSUE
- 20 -

rights rests not upon the category of water but upon the intent of the federal government and the purpose for which the reservation was created. *Gila River,* 989 P.2d at 743.

Moreover, to accept the State's argument that federal reserved water rights cannot exist in salt or brackish water would require this court to hold that while Congress and the President have the power to reserve water rights sufficient to protect fresh water species, such as the endangered Devil's Hole pupfish protected in *Cappaert*, they do not, as a matter of law, have the power to reserve water rights sufficient to protect threatened or endangered marine species, should they choose to do so. For instance, the threatened Saltmarsh topminnow, which breeds in shallow flooded salt marshes from the north-central coast of the Gulf of Mexico to Western Florida[65] and the Ventura marsh milkvetch with its habitat on bluffs or flats near bodies of brackish water,[66] as well as thousands of other plants and animals that rely on salt and brackish water, both inland and marine, for their very existence would be beyond protection if protection was reliant on salty, brackish or marine water. That arbitrary distinction simply does not exist, nor can it be read into federal reserved water rights law. To hold otherwise would effectively strip Congress and the President's power to reserve water based solely on its saline content, would force courts to address how much salt content is required to make water immune from reservation by the federal government, and would call into question federal rights in thousand of miles of waters, inlets, bays, fiords, estuaries, marshes and canals along this Country's coasts, and in brackish and saline waters inland from coastal areas.

### 2.    An Abundance of Water Does Not Obviate the Need to Reserve the Water for Specific Federal Purposes.

Simply because there is an abundance of water does not convert it into a worthless resource or undercut the analysis necessary to determine whether it is

---

[65] Florida Fish and Wildlife Conservation Commission, Freshwater Fishes: Endangered, Threatened or of Special Concern; http://myfwc.com/fishing/fishes/threatened.html.
[66] Less than 50 of these federally designated as endangered plants are known to exist, represented by a single population on an abandoned oil-field waste site. That is perhaps the most hostile brackish water environment one could imagine and one for which, in any event, the State of Alaska would be hard pressed to identify another beneficial use. Center for Plant Conservation, National Collection of Endangered Plants; http://www.centerforplantconservation.org/ASP/CPC_Viewprofile.asp?CPCNum=475.

necessary to fulfill an essential purpose of a federal reservation of land.  The difference is a matter of scale, and even when the right is an implied one only, it must nonetheless exist.  *Cappaert*, 426 U.S. at 140; *New Mexico* 438 U.S. at 696-700.

Moreover, the State's claim that because it believes marine waters cannot be used for irrigation or other consumptive purposes there can be no federal reservation of rights in those waters is simply contrary to law.  (*E.g.* State's Opening Brief at 19, n. 24).  For example, the federal reserved water right confirmed by the United States Supreme Court in *Cappaert* was a non-consumptive right to protect the environment necessary for the endangered pupfish to survive.  426 U.S. at 139-140.  Likewise, in *United States v. Adair*, 723 F.2d 1394,  1410 (9th Cir. 1983) the Ninth Circuit Court of Appeals specifically held that "the right to water reserved to further the Tribe's hunting and fishing purposes is unusual in that it is basically non-consumptive."  The court noted that although the holder of such right "is not entitled to withdraw water from the stream for agricultural, industrial, or other consumptive uses" the holder of such right could prevent the depletion of water "in any area where the non-consumptive right applies."  *Id.* at 1411.

Finally, no court has ever held that the federal government cannot be the first entity to reserve water rights in a body of water.  Indeed, in the majority of cases, the United States enjoys the senior rights to the water because the date of the federal reservation often predates the majority of appropriative right holders.  *New Mexico*, 48 U.S. at 705.

### 3.    The United States correctly recognizes that Federal Reserved Water Rights can and do exist in Marine Waters.

#### a.    The United States concedes the Issue, but looks for a line.

The actions of the United States in the cases before this Court speak much louder than its words.  In briefs before this Court and in its regulations, the United States expresses the opinion that federal reserved water rights do not exist in marine waters.  However, and much more tellingly, the United States has conceded that the boundaries of the National Wildlife Reserve units expanded by ANILCA as reflected on maps

published in the federal register include **marine** waters. (U.S. Brief Doc. 103 at 20.[67] And in briefs before this Court, the United States argues that the boundaries of its jurisdiction to regulate under ANILCA extends into marine waters, granting it authority to regulate those waters from headland to headland at the mouth of rivers. The mouth of the Yukon River is a superb example. The John plaintiffs have identified that river as their factual example for purposes of this phase of briefing. Exhibits 4-9 show the line drawn by the federal government to delineate its regulatory authority at the mouth of that river. That line incorporates marine waters in the area over which the United States asserts regulatory jurisdiction under ANILCA.

In sum, the federal government attempts to make the issue of whether it is ever possible to have federally reserved water rights in marine matters a matter of degree. That alone answers the issue before the Court here. If the federal government can have federal reserved water right in marine waters at the mouths of rivers, then the answer is federal reserved water rights can exist in marine waters. Once that issue is resolved, the determination of the specific marine water locations in which such rights have been reserved is a question for subsequent proceedings.

>    **b.    The United States' position that Marine and tidally influenced waters overlying state owned submerged lands are subject to regulation by the Secretaries under ANILCA is correct.**

The State of Alaska, in Section III of its brief, argues that marine and tidally influenced waters overlying state owned submerged lands and other state-selected lands are not subject to regulation by the Secretaries under ANILCA. However, the Ninth Circuit has determined that federally reserved water rights are public lands for the purposes of ANILCA because of the definition adopted for public lands in ANILCA. *Katie*

---

[67] 48 Fed. Reg. 7928, 7936, 7941, 7949, and 8017 (Feb. 24, 1983). The Alaska Peninsula National Wildlife Refuge includes large inland marine water bays and tidally influenced river mouths. Id. at 7928. Exhibit 22. The Artic National Wildlife Refuge includes the marine waters within the low and mean high tide. Id. at 7936. Exhibit 23. The Becharof national Wildlife Refuge includes portions of marine water bays. Id. at 7941. Exhibit 24. The Izembeck National Wildlife Refuge includes within its boundaries the marine water Izembeck Lagoon and the tidally influenced mouths of river. Id. at 7949. Exhibit 24. The Yukon Delta National Wildlife Refuge includes the tidally influenced mouth of the Yukon River, three miles of marine waters surrounding Nelson Island, the marine water Uounak Bay, Hazan Bay, Hooper Bay, and numerous other small marine bays inlets and river mouths. Id. at 8017. Exhibit 25.

*Katie John, et al. v. United States, et al.*
Case No.: 3:05-cv-00006-HRH (Consolidated)
Supplemental Brief of Related Case Plaintiffs Peratrovich, et al., On The "Which Waters" Issue
- 23 -

*John III*, 72 F.3d at 703. Therefore, according to the Ninth Circuit's holding, the Secretaries can regulate marine and tidally influenced waters overlying state lands if the United States has federally reserved water rights in those waters. The State is impermissibly seeking to re-litigate an issue that has already been decided against it. The only questions at this phase before the Court are in "which waters" does the United States have a federally reserved water right, and more specifically, is it impossible for such rights to exist in marine waters? Indeed, within the doctrine of federally reserved water rights the right to use water does not depend on the ownership of the underlying land, or even land adjacent to the stream. *Arizona*, 373 U.S. at 595 (federal government claimed water in off-reservation tributaries for the benefit of non-Indian federal reservations including monuments and national forests).

Moreover, the United States has asserted elsewhere that title to the land underlying marine waters is specifically NOT required in order for the federal government to reserve rights in those marine waters for federal purposes. See, e.g., Opinion of the Office of Legal Counsel, Administration of Coral Reef Resources in the Northwest Hawaiian Islands, 2000 OLC LEXIS 46 (Sep. 15, 2000); Proclamation No. 8031, 71 Fed. Reg. 36443 (June 15, 2006) (President George W. Bush establishing Northwestern Hawaiian Islands Marine National Monument).

Therefore, the Secretaries can treat as public lands those waters subject to federally reserved water rights regardless of the title to the bed underlying those waters, or whether the waters are within the federal reservation. As to this issue, the Peratrovich Plaintiffs also adopt the arguments made regarding off-reservation water rights and the definition of appurtenancy in Section III.C.3 of the Katie John Plaintiffs' Opening Brief.

Contrary to the State's conclusory argument in its Introduction (that extending federal reserved water rights "into marine and tidally-influenced bodies of water [is] contrary to plain statutory provisions that stop federal authority at the mean, high-tide line"), and contrary to the same summary claim in the Conclusion of its Opening Brief (at 50), ANILCA did not dispose of federal reserved water rights in marine and tidally-influenced waters seaward of the mean, high-tide and overlaying State-owned

_____

*Katie John, et al. v. United States, et al.*
Case No.: 3:05-cv-00006-HRH (Consolidated)
Supplemental Brief of Related Case Plaintiffs Peratrovich, et al., On The "Which Waters" Issue
- 24 -

submerged lands.  Nor did it provide that prior federal reserved water rights in such waters could not fall under the regulatory authority granted in ANILCA.  Instead, ANILCA provides that nothing within the Act effects federal reserved water rights in Alaska.  16 U.S.C. § 3207.[68]

### 4.    The State of Alaska correctly recognizes that water rights can be reserved in Marine Waters and that Marine Waters can be put to Beneficial use.

#### a.    Water Rights in Alaska include rights in Marine Waters.

The State's position that water rights cannot exist in marine waters is undermined by Alaska state law.  The Alaska Water Use Act, Alaska Statutes §§ 46.15.010 *et seq.* (2007), provides that marine water can be appropriated for consumptive use and reserved to maintain a specified level of water.  See Alaska Statutes § 46.15.040 (governing appropriation); Id. at § 46.15.145 (governing reservations).

The Alaska Water Use Act defines water for the purposes of "appropriation" or "reservation" as "all water of the state, surface and subsurface, occurring in a natural state, except mineral and medicinal water." Alaska Statutes § 46.15.260(9). [69]  The definition does not exclude marine, brackish or salt water.[70]  Nor does the definition of source of water exclude such waters.  Alaska Statutes § 46.15.260(8).

---

[68] A fundamental principle of statutory construction is that a provision within a statute should not be interpreted in a manner that makes a surplusage of other provisions within the act.  *In re Snake river Basin Adjudication*, 134 P.3d 1256, 1259 (Idaho 2000).  ANILCA plainly provides that federal reserved water rights are not divested by the Act. 16 U.S.C. § 3207.  As confirmed by the Ninth Circuit, the definition of public lands in ANILCA includes navigable waters subject to a federal reserved water right. Katie John III, 72 F.3d at 703; see also 16 U.S.C. § 3102(1).  The State would have this Court interrupt the subsistence priority established by Title VIII of ANILCA as it applies to marine resources in Southeast Alaska.  To do so would divest ANILCA of the Congressional intent of allowing the subsistence lifestyle of rural Alaskans in Southeast Alaska to continue.  See 16 U.S.C. § 3111.  See Exhibit 31 (providing a list of marine resources upon which the Tlingit, Haida, and Tsimshian peoples of Southeastern Alaska have traditionally relied upon for subsistence).

[69] "Mineral and medicinal water" is defined as the "water of a hot spring or spring with curative properties which has been reserved by the federal government" and "geothermal fluid." Alaska Statutes § 46.15.260(6).
[70] The definition of "hydrologic unit" includes ocean waters adjacent to a hydrologic unit within the state. Alaska Statutes § 46.15.035(e)(2)).

---

### b.    Alaska puts Marine Waters to beneficial use.

The Alaska Water Use Act applies to all sources of water of "substantial quantity… capable of being put to beneficial use."  Alaska Statutes § 46.15.260(8).  The beneficial uses of water within the statutory scheme include, among other uses, industrial, manufacturing, fish and shellfish processing, navigation and transportation, power, fish and wildlife, recreational uses, and maintenance of water quality.  Alaska Statutes § 46.15.260(3).  Of the uses listed here, Alaska state law clarifies that marine water is regulated for water quality to insure that it is available for municipal, industrial, and fish and shellfish processing.  Alaska Admin. Code § 70.020.  Indeed, only marine water may be used for seafood processing.  Id.

### B.    Federal Reservation of Marine Water Rights in other Contexts.

There are innumerable examples of federally reserved rights in marine water within the State of Alaska.  These examples include, but are not limited to, the specific examples below.

### 1.    Annette Islands Indian Reservation.

Water rights in marine waters were held to have been reserved by the federal government in connection with the establishment of the Annette Islands Indian Reservation.  The reservation was established by Congress in section 15 of the Creative Act of March 3, 1891, 26 Stat. 1095.  Exhibit 19.  The language creating the reservation makes no reference to water, submerged lands, or fish.  Nonetheless, the Supreme Court held that reservation to include the adjacent marine waters in order to protect the purpose of the reservation, which was to provide the Indians with a self-sustaining home.  *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 87-89 (1918).  The Indians relied upon fish, thus, the Supreme Court found that the water was essential to the purpose of the reservation.  Id. at 89.

### 2.    Alaska Maritime National Wildlife Refuge.

Another excellent example of a federal marine water right exists in ANILCA itself.  In ANILCA, Congress established the Alaska Maritime National Wildlife Refuge

*Katie John, et al. v. United States, et al.*
Case No.: 3:05-cv-00006-HRH (Consolidated)
Supplemental Brief of Related Case Plaintiffs Peratrovich, et al., On The "Which Waters" Issue
- 26 -

(AMNWR) (the pre-existing Saint Lazaria Islands, Hazy Islands, and Forrester Islands National Wildlife Refuges are in the Tongass, see Exhibits 27, 28, and 29), and specifically reserved a right to sufficient quantity and quality of marine waters, stating:

> The purposes for which the Alaska Maritime National Wildlife Refuge is established and shall be managed include–
>
> (i) **to conserve fish** and wildlife populations and **habitats** in their natural diversity including, but not limited to **marine mammals, marine birds** and other migratory birds, **the marine resources upon which they rely**, bears, caribou and other mammals; (ii) to fulfill the international treaty obligations of habitats; United States with respect to fish and wildlife and their **habitats**; [Section 303(1)(B)(i)-(ii)](emphasis added). ANILCA, § 303(1)(B)(i) - (ii), Pub. L. 96-487, 94 Stat. 2371 (1980).

The purpose of the reservation expressly includes preservation and conservation of the fish and wildlife populations, including marine birds and marine mammals, and the marine resources and the habitats upon which they rely.  Congress recognized that no marine resource or marine habitat could be more essential to marine species of fish and wildlife than marine water.  Thus, Congress expressly provided a water right in marine waters by stating that the AMNWR "shall consist of eleven existing refuges, including all lands (including submerged lands) **waters** and interests therein which were a part of such refuges." ANILCA § 303(1)(A).  In addition Congress provided that among the purposes of the AMNWR is "to ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i), **water quality and necessary water quantity within the refuge**." ANILCA § 303(1)(B)(v).  As the name suggests, the refuge is primarily a maritime refuge.  The express reservation of a water right in marine water is consistent with the exercise of congressional authority in other contexts to reserve a right to water necessary to fulfill the purpose of the reservation as recognized by the Ninth Circuit in *Katie John III*, 72 F.3d at 703.  See also, *Cappaert*, 426 U.S. at 138.

Furthermore, section 1319 of ANILCA provides that "[n]othing in this Act shall be construed as limiting or restricting the power and authority of the United States or… as affecting in any way any law governing appropriation or use of, or Federal right to, water

on lands within the State of Alaska." 16 U.S.C. § 3207. Indeed, the Ninth Circuit Court of Appeals expressly recognized the power of the United States to reserve unappropriated appurtenant navigable waters for federal reservations, including those created by ANILCA. *Katie John III*, 72 F.3d at 703 n.10

### 3. Alaska National Wildlife Refuge.

Federal reserved water rights in marine waters also exist in the Alaska National Wildlife Refuge (ANWR) for the protection of coastal habitat and the wildlife that depend on it. *United States v. Alaska*, 521 U.S. 1, 54 (1997). In that case, Supreme Court held that submerged lands within the marginal sea (3 miles of mean high tide line), whether reserved by the Statehood Act or not, are in the State of Alaska by operation of the Submerged Lands Act. *Amaco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 549 (1987). Thus, the tidally influenced marine waters and "adjacent seas of Alaska" surrounding islands within the ANWR were reserved by ANILCA. Moreover, the preexisting wildlife refuges that were consolidated to form the ANWR all had exterior boundaries that fell offshore of the islands in the surrounding waters and contained similar language designed to protect species and habitats.[71]

### C. The Federal Reservations that Established the Tongass Demonstrate Federal Intent to Reserve Water Rights in Marine Water.

#### 1. The Federal Government has federal reserved water rights in the marine waters of the Behm Canal.

The Peratrovich plaintiffs place their claims in the factual context of the Behm Canal as their test case waterway pursuant to this Court's briefing order.[72] Docket No. 130 at 10. The Behm Canal illustrates that the federal government has federally reserved water rights in that body of marine water based on National Forest as well as

---

[71] Exhibit 27, Exec. Order 1040 (February 27, 1909) Map of Saint Lazaria Islands National Wildlife Refuge, Exhibit 28, Exec. Order 1459 (January 11, 1912) Map of Hazy Islands National Wildlife Refuge, Exhibit 29, Exec. Order 1458 (January 11, 1912) Map of Forrester Islands National Wildlife Refuge.
[72] Unless otherwise indicated, the facts on the Behm Canal are from gorp.com. http:gorp.away.com/gorp/resources/us_wilderness_area/ak_misty.htm (last accessed Oct. 16, 2007).

National Monument status and purposes as discussed at length in subsections 2 through 5 below.

The Behm Canal is a semi-circular marine waterway that is over 110 miles in length that borders the east, north and west side of Revillagigedo Island and separates that island from the mainland.[73]  Exhibit 30, Map of Behm Canal.  The East Behm Canal is the major inlet between the mainland of Southeast Alaska and Revillagigedo Island. This 50 mile long portion of the canal is located entirely within the exterior boundaries of the Misty Fiords National Monument, the Misty Fiords Wilderness, and the Tongass National Forest. The West Behm Canal runs from Bell Island on the north between the Cleveland Peninsula and Revillagigedo Island and terminates at the Guard Islands in the Clarence Strait.  This 60 mile long portion of the canal is located entirely within the exterior boundaries of the Tongass.  The canal has historically served as the exclusive means of accessing the timber in this area of the Tongass.  See *Tlingit & Haida Indians v. United States*, 182 Ct. Cl. 130, 138, 389 F.2d 778 (Ct. Claims 1968)(finding that "[o]f the commercial [timber], 22 percent of the acreage supported stands of timber considered, in 1907, accessible, and 78 percent inaccessible" because only timber on or near shores accessible by boat was considered commercially viable).

The Behm Canal as a whole is an extraordinarily diverse marine environment due to its depth and the interaction of marine and fresh water.  Proclamation No. 4623, 43 Fed. Reg. 234, 57087 (1978).  The canal provides habitat for marine and anadromous species of fish such as herring, steelhead, eulochon and all 5 species of Pacific salmon, especially Chinook salmon.  The fish species support a wide array of water fowl, nesting populations of bald eagles, as well as marine mammals.  The canal is frequented by Dall's porpoise, killer whales, humpback whales, sea lions, and harbor seals.

As discussed above in IV.D.4 of this brief, President Carter preserved the Behm Canal as "the heart" of the Misty Fiords National Monument because of the interface of marine and freshwater environments and the extraordinary environment that was created by it.  Indeed, it was the extraordinarily fertile interface of these environments

---

[73] Patricia Roppel, Misty Fiords National Monument Wilderness Alaska 91 (Far West Research 2000).

that forms the backbone of the "intact coastal ecosystem" that is the Monument. President Carter described all of the freshwater basins of the Monument in their relationship to the Behm Canal and expressly appropriated and reserved the submerged lands and "all waters within the boundaries" of Misty Fiords "necessary to the proper care and management of those objects protected by this Monument." Proclamation No. 4623, 43 Fed. Reg. 57087.

### 2. Reservation of federal rights in marine waters was necessary to the purpose of the reservations that created the Tongass.

#### a. Reservation of Federal Land.

As discussed in detail in section IV of this brief, the Tongass National Forest was created through a series of executive actions beginning in 1902. At each stage, President Roosevelt and his advisors recognized and confirmed the importance of the marine waters to the forest reservation. Roosevelt was indeed mindful of the fact that he was reserving marine waters within the reserve and acted with the intent of including those marine waters and the underlying submerged lands.[74]

#### b. The Purpose for the Reservation Required Water.

The purpose of the Tongass is determined in accordance with the Organic Administration Act of 1897 (Organic Act) Act of June 4, 1897, 30 Stat. 11, 34-36 (codified as amended at 16 U.S.C. §§ 473-482, 551). The Organic Act provides:

> No national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States…

16 U.S.C. § 475.

---

[74] The intent to include marine waters in the Tongass manifests an equally strong intent to include submerged lands within the Tongass. The submerged lands issue is discussed in subsection 4 below.

The Supreme Court has held that this language provided two primary purposes of a national forest: (1) securing favorable conditions of water flows, and (2) furnishing a continuous supply of timber.  *New Mexico*, 438 U.S. at 708.[75]

Roosevelt's administration expanded the boundaries of the Tongass to include the mainland, the Alexander Archipelago, and all of the seaward islands and waters out to a point 60 miles to the west of the southernmost point of the Alexander Archipelago. These boundaries were adopted by Roosevelt's administration because inclusion of the marine waters was necessary to establish the jurisdiction necessary to protect the timber.[76]  By reserving the marine waters for forest purposes, the federal government could protect the Tongass by confirming the jurisdiction of the forest service over the waters that provided the only means of access to the forest.[77]

The Tongass is unique among forests because the forests there can only be accessed by boat.  The United States recognized this fact in its initial Response Brief to the State in the "What Process" phase of briefing, when it acknowledged that the Tongass "can be reached and its timber removed only through marine facilities."  Doc. 103 at 20.  See *Tlingit & Haida Indians v. United States*, 182 Ct. Cl. at 138 (finding that "[o]f the commercial [timber], 22 percent of the acreage supported stands of timber considered, in 1907, accessible, and 78 percent inaccessible" because only timber near the shore was considered commercially viable).  Thus, the only means for the government to protect its interests in the forest was to preserve to itself the marine waters that provide for the proper administration and protection of the forest.

The Roosevelt administration also knew that the marine waters were essential to the "favorable conditions of the forest."  Both Emmons and Olmsted recognized that the warm marine waters created the favorable environment in which the forest thrived. Exhibits 5 and 2.  [Emmons, Woodlands at 10][Olmsted, Organization at 28].  Olmsted was so convinced of the sea's ecological role in the Tongass that he wrote "the sea [is]

---

[75] The water flow of the Alaska current, or Japan current, is critical to the forest ecology of Tongass.  *See* USDA Forest Service, Tongass Land and Resources Management Plan, Plan Amendment, Draft Environmental Impact Statement, Chapter 3 Environment and Effects, 3-7 – 3-8, 3-11 (January 2007)(Available at http://tongass-fpadjust.net/Documents/Draft_EIS_part_2.pdt) (last accessed Oct. 25, 2007).

[76]  Olmsted, Organization, at 38.  Exhibit 2.

[77]  Id.

the heart of the country" and that the reserve was to include "the whole country." Exhibit 2. [Olmsted, Organization at 38].

With the marine waters thus reserved, the United States is entitled to so much of the marine water as is reasonably necessary to fulfill the purpose for which the Tongass was reserved:  to preserve the environment in which the timber grows and exercise jurisdiction over the navigable marine waters to control access to the timber and protect it.  *New Mexico* 438 U.S. at 700.  *See also Cappaert*, 426 U.S. at 138 (the Commerce Clause empowers the United States to reserve unappropriated appurtenant water when it reserves land for a federal purpose to the extent needed to accomplish the purpose of the reservation).

### 3. Federal Reserved Water Rights in Marine Waters in the Tongass were confirmed when the United States created the Misty Fiords National Monument.

President Jimmy Carter created the Misty Fiords National Monument in 1978. The Presidential Proclamation creating the monument reserved the unspoiled coastal ecosystem of extraordinarily deep and long fiords headed by active glaciers on the Canadian border.  This national monument's name confirms that the purpose of the reservation included preservation of the marine waters in these fiords.  Further confirming this purpose, President Carter described the marine water Behm Canal as the "heart of the area."  Of the qualities to be protected by the monument, he provided that the area was an "[e]xtraordinary fertile interface of marine and freshwater environments" important to five species of salmon, especially important for king salmon, and numerous other freshwater, saltwater and anadromous fish species and shellfish. Proclamation No. 4623, 43 Fed. Reg. 234, 57087 (1978).

To ensure that the marine water bodies for which the monument is named were protected, Carter expressly reserved a water right for the monument including:

> All lands, including submerged lands, and **all waters** within the boundaries of this Monument are hereby appropriated and withdrawn from entry, location, selection, sale or other disposition under the public land laws, other than exchange.  There is also **reserved all water necessary**

---

*Katie John, et al. v. United States, et al.*
Case No.: 3:05-cv-00006-HRH (Consolidated)
Supplemental Brief of Related Case Plaintiffs Peratrovich, et al., On The "Which Waters" Issue
- 32 -

to the proper care and management of those objects protected by this
Monument and for the proper administration of the Monument in
accordance with applicable laws."

Proclamation No. 4623, 43 Fed. Reg. 234, 57087 (1978).

There can be no doubt that Carter reserved all unappropriated fresh and marine
water necessary to preserve the extraordinary marine environment within the Misty
Fiords National Monument for its own scientific value as well as that of the fish.

Courts consistently have recognized implied federal water rights for the
protection of fish habitat.  Thus, it cannot be questioned that an express reservation can
be made for the same purpose in other waters and types of waters, including marine
waters. *United States v. Adair*, 723 F.2d 1394 (9th Cir. 1983)(upholding district court's
finding that at the time the Klamath Reservation was established, the government
reserved a quantity of water necessary for maintaining treaty right to hunt and fish);
*United States v. Anderson*, 6 I.L.R. F-129 (E.D. Wash. 1979)(holding reserved water
rights existed sufficient to preserve fishing on the Spokane Indian Reservation); *United
States v. Washington*, 506 F. Supp. 187, 205 (W.D. Wash. 1980)("Indeed, courts have
already recognized implied water rights for the specific purpose of preserving fish."
(citations omitted)).

**4.      The "Disclaimer of Title" Filed By the United States
Department of Justice in Alaska v. United States Did Not
Divest the Federal Government of its Reserved Rights in
Marine Water in the Tongass.**

The State once again argues that the disclaimer in *Alaska v. United States*
defeats all claims of the Peratrovich plaintiffs.  However, as this Court already has held,
it remains to be determined what the impact will be on the issues in the Peratrovich
case of the "disclaimer of title" to certain submerged lands in the Tongass filed by
lawyers for the United States in *Alaska v. United States,* No. 128, Original, decree
entered at 546 U.S. 413 (2006).  May 31, 2006 Order on Motion For Judgment on the
Pleadings (Docket 178 in case number 3:92-cv-00734-HRH) at 24-27.  Whatever that
result may be, it is clear the disclaimer has no impact on the issue of whether it is

_____

impossible, as a matter of law, to have federal reserved water rights in marine waters.[78] First, the disclaimer by its express provisions does not purport to disclaim any interests of the United States in waters above the submerged lands at issue. Second, although water rights are property interests, they are not within the scope of those property interests to which title can be quieted under the Quiet Title Act. 28 U.S.C. § 2409a(a).[79] *See Duval Ranching Co. v. Glickman*, 965 F. Supp. 1427, 1444 (D. Nevada 1997)("the Quiet Title Act) expressly disallows suits to quiet title to water rights even when the action is brought under the Act").

Moreover, a holding in this case that the waiver defeated the federal government's reserved water rights would turn the entire doctrine of federal reserved water rights on its head. The doctrine is one grounded in the implication that when the federal government reserves land for a particular purpose, it also reserves as much unappropriated water as is reasonably necessary to accomplish that purpose. *Arizona* 373 U.S. at 600-601. It does so without regard to the limitations of state law. *Cappaert*, 426 U.S. at 145, *New Mexico*, 438 U.S. at 698. This is so whether the reservation is made prior to or following statehood. Indeed, one of the issues in *Winters* was whether statehood and the operation of the equal footing doctrine divested the reservation of its water right. The Supreme Court held that such a result would not have been contemplated by Congress. *Winters*, 207 U.S. at 577. The equal footing doctrine does not provide for such a result and the Submerged Lands Act is an extension of the equal footing doctrine. Therefore even if, as the State argues, some portion of the submerged lands of the Tongass passed to Alaska at statehood, that transfer of title to the

---

[78] This Court, in its order granting in part the federal defendants' motion for judgment on the pleadings, described the disclaimer as a "disclaimer of title to certain marine waters within [the] Tongass National Forest." May 31, 2006 Order on Motion For Judgment on the Pleadings (Docket 178 in case number 3:92-cv-00734-HRH) at 26. However, the disclaimer, by its terms, was limited entirely to submerged lands, and does not purport to disclaim any title or rights in marine waters.

[79] "The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights."

*Katie John, et al. v. United States, et al.*
Case No.: 3:05-cv-00006-HRH (Consolidated)
Supplemental Brief of Related Case Plaintiffs Peratrovich, et al., On The "Which Waters" Issue
- 34 -

submerged lands did not affect the federal reserved water rights to the marine waters above those lands.[80]

Additionally, in terms of the Behm Canal, the Peratrovich plaintiffs' factual example, the disclaimer is irrelevant. The disclaimer by its terms only purported to affect submerged land under the jurisdiction of the Department of Agriculture. Yet in 1978 President Carter created the Misty Fiord National Monument within the Tongass National Forest. President Carter provided that "[n]othing in this Proclamation shall be deemed to revoke any existing withdrawal, reservation or appropriation… however, the National Monument shall be the dominant reservation." Proclamation No. 4623, 43 Fed. Reg. 234, 57087 (1978). The United States Department of Interior has jurisdiction over National Monuments and Wildlife Refuges. National Monuments established within National Forests are subject to the jurisdiction of both the Forest Service and the National Park Service. See, Hawaiian Islands Opinion at 56 [2000 OLC Lexis 46] (providing that the Department of Agriculture and the Department of Interior are authorized to participate in the management of national monuments created within the national forest). As a result, the disclaimer does not even purport to effect title to submerged lands and marine water in the Misty Fiord National Monument, nor that portion of the Behm Canal within the Monument.

The extent to which the disclaimer impacts claims of the Peratrovich plaintiffs, including how, if at all, the claims in the Peratrovich case intersect with the exceptions in the United States' disclaimer of title, is not at issue in this phase of briefing in these jointly managed cases. The disclaimer, purporting to disclaim the United States' ability to prosecute a claim to title of certain submerged lands within the Tongass National

---

[80] The disclaimer submitted by the United States contains two exceptions. First, it excepts "any submerged lands that are subject to the exceptions set out in Section 5 of the Submerged Lands Act , ch. 65, Tit. II, Section 5, 67 Stat. 32, 43 U.S.C. 1313." Section 5, 43 U.S.C. Section 1313(a) excepts from the transfer of title to the states accomplished under the Submerged Lands Act, among other lands, "any rights the United States has in lands presently and actually occupied by the United States under claim of right," and excepts lands, "expressly retained by or ceded to the United States when the State entered the Union." The United States retains title to at least some of the submerged lands in the Tongass. E.g., Reply in Support of Federal Defendants' Motion for Judgment on the Pleadings (Docket 171 in case number 3:92-cv-00734-HRH) at 11 ("Plaintiffs do not dispute that the submerged lands beneath the marine waters of the Tongass are owned either by the United States or the State of Alaska"). The State of Alaska admitted at least some of these claims in its answer to the First Amended Complaint in the Peratrovich case.

*Katie John, et al. v. United States, et al.*
Case No.: 3:05-cv-00006-HRH (Consolidated)
Supplemental Brief of Related Case Plaintiffs Peratrovich, et al., On The "Which Waters" Issue
- 35 -

Forest that at the time of the disclaimer were under the jurisdiction of the Department of Agriculture, does not decide the issue of whether it is ever possible to have federal reserved water rights in marine waters.

> **5.    Federal Reserved Water Rights exist in the Marine Waters of the Tongass that are appurtenant to federally reserved land and Marine Water Outside but Adjacent to Alaska.**

On December 27, 1988, just days before the end of his second term as president, Ronald Reagan issued a proclamation extending the sovereignty and jurisdiction of the United States to twelve nautical miles into the oceans and seas surrounding our Country, and extending the United States Economic Zone of Interest to 200 miles into those seas and oceans. He did so relying on "the authority vested in me as President by the Constitution of the United States of America, and in accordance with international law." President Reagan took this action just as President Truman did before him,[81] and Theodore Roosevelt did before Truman. He did so under his authority as president, within the bounds of the Constitution, to extend the boundaries of the land and water reserved by the United States well into the territorial seas. In doing so each of these presidents reserved the lands and waters within these boundaries to the United States of America.[82]

At the time he reserved the Tongass, President Roosevelt was well aware of the maritime issues facing the United States. He dealt with those issues in a number of contexts, including as part of the Canada boundary dispute and when he established the boundaries of the Panama Canal. Given the difficulties Roosevelt faced when addressing the Canada boundary dispute, it is no surprise that in his 1907 proclamation establishing the Tongass forest reserve, Roosevelt included not only land on the mainland of southeast Alaska but also marine waters and the submerged land beneath

---

[81] Proclamation No. 2667, 3 C.F.R. 67 (1943-1948)(President Truman proclaims that "the United States regards the natural resources of the subsoil and sea bed of the continental shelf beneath the high seas but contiguous to the coasts of the United States as appertaining to the United States, subject to its jurisdiction and control").

[82] "[S]ubject to [innocent passage rules], the coastal state has the same sovereignty over its territorial sea, and over the air space, sea-bed, and subsoil thereof, as it has in respect of its land territory." Restatement (Third) of the Foreign Relations Law of the United States § 512 (1987)

those waters.  The eastern boundary he established for the Tongass ran from the international border in the south up the center of the Portland Canal.  The southernmost boundary he drew for the Tongass ran along the international boundary of the United States and Canada in marine waters. And tellingly, he set the western boundary sixty miles into the Pacific Ocean.  No action has been taken by Congress or any successor to President Roosevelt to redraw this western boundary, making it the boundary of the Tongass today.  *United States v. Midwest Oil Co.*, 236 U.S. 459, 475 (1915)(Congress' "acquiescence all the more readily operated as an implied grant of power in view of the fact that its exercise was not only useful to the public, but did not interfere with any vested right of the citizen").

Just as President Reagan would do 81 years later, President Roosevelt used his authority as president to reserve land and waters for the United States of America. Similar to President Reagan's proclamation eight decades later extending the United States' Exclusive Economic Zone 200 miles into the ocean, President Roosevelt's extension of the boundaries of the Tongass sixty miles into the Ocean gave the United States sovereign rights for the purpose of exploring, exploiting, conserving, and managing the natural resources of the sea-bed and subsoil and of the superjacent waters.  Restatement (Third) § 514(1)(a); *see The Paquete Habana*, 175 U.S. 677, 700 (1900)(customary international law constitutes U.S. domestic law in the absence of controlling executive or legislative action).  Even if Roosevelt's designation of the Tongass' western boundary was insufficient at the time to reserve those lands in the United States, Presidents Truman and Reagan's subsequent actions leave no doubt that these submerged lands are reserved to the United States today, along with the marine waters above them.  *United States v. Louisiana*, 339 U.S. 699, 705 (1950)("If, as we held in California's case, the three-mile belt is in the domain of the Nation rather than that of the separate States, it follows a fortiori that the ocean beyond that limit also is")

Although Alaska disputes that the United States owns all of the submerged lands in the area three miles from the coast within the Tongass, it concedes the U.S. owns at least some of those submerged lands, and it does not nor can it dispute that the United

*Katie John, et al. v. United States, et al.*
Case No.:  3:05-cv-00006-HRH (Consolidated)
Supplemental Brief of Related Case Plaintiffs Peratrovich, et al., On The "Which Waters" Issue
- 37 -

States reserves submerged lands beneath marine waters outside Alaska for federal purposes. *E.g.,* Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq.,* at 1332(3)("the outer Continental Shelf is a vital national resource reserve held by the Federal Government"); *Village of Gambell*, 480 U.S. at 547 ("the seaward boundary of a coastal State extends to a line three miles from its coastline.  At that line, the OCS commences."  Citing OCSLA §2(a), 43 U.S.C. §1331(a)).  As to "ownership" of the land in these areas, the Supreme Court has held that the Constitution's Property Clause authorizes Congress to dispose of lands within the territorial sea.  *See Alabama v. Texas*, 347 U.S. 272, 273-74 (1954) (per curiam).

In *Village of Gambell*, 480 U.S. 531 (1987) the Supreme Court interpreted the meaning of "public lands in Alaska" 16 U.S.C. § 3102(3). The Court looked at the Alaska Statehood Act and the Submerged Lands Act to conclude that "in Alaska" meant all of the state of Alaska within the exterior boundaries of the state. The exterior boundaries were established by the application of the Submerged Lands Act., Section 4, 43 U.S.C. § 1312, to include submerged lands within three miles of the high tide line.  "The phrase 'in Alaska' has a precise geographic/political meaning.  The boundaries of the state of Alaska can be delineated with exactitude." *Village of Gambell*, 480 U.S. at 547. Thus, by definition, any lands more than three miles from the mean high tide line are not within the state of Alaska and are not public lands for the purpose of the ANILCA subsistence priority.  However, those lands at least out to twelve nautical miles remain lands reserved in the United States and the marine waters of the Tongass are appurtenant to that federal reservation.  As such, those marine waters in that portion of the Tongass that is "in Alaska" are subject to federal regulation under ANILCA because those waters are appurtenant to the federal reservation west of Alaska.

Moreover, even though not "public lands in Alaska," the lands east of the three nautical mile state border included by Roosevelt within the boundaries of the Tongass remain to this day in the Tongass.  President Reagan identified his authority to extend United States territory to twelve nautical miles as deriving from nothing more than "the authority vested in me as President by the Constitution of the United States of

*Katie John, et al. v. United States, et al.*
Case No.: 3:05-cv-00006-HRH (Consolidated)
Supplemental Brief of Related Case Plaintiffs Peratrovich, et al., On The "Which Waters" Issue
- 38 -

America."[83]  President Roosevelt had that same authority in 1907 and could exercise it to extend the territorial sea boundaries of the United States in one area alone, similar to President Reagan's extension of the territorial sea in all ocean waters along the coast of the United States.

It cannot be disputed that the reservation of the federal lands beyond the three nautical mile limit require the marine waters over that land to fulfill the purposes of the federal reservation.  Those marine waters extend into that portion of the Tongass "in Alaska."  The marine waters in the Tongass in Alaska are appurtenant to the federal reservations west of Alaska.[84]  Similar to the reasoning set forth in the John Plaintiffs' brief in section III (C)(adopted by the Peratrovich plaintiffs here), the federal reservation of marine land and waters west of Alaska requires the reservation of federal water rights in marine waters appurtenant to that reservation in the Tongass in Alaska.

6.    **The Federal Government has federal reserved water rights in the marine waters at the mouth of the Stikine River.**

Other than the name of the river and a map, the State fails to provide a single fact relevant to the issue of whether federal reserved water rights exist in marine and tidally influenced waters at the mouth of the Stikine River.  Surprisingly, it fails to do so after vigorously and successfully arguing that the briefing on the "which waters" issue should "focus on the specific, fact driven 'which waters' issues key to this case" (State's Response to Katie John, AFN, and Peratrovich motions to "amend" briefing schedule, Docket 121 in the Katie John Case at 3).  Indeed, in that brief, the State recognized that the briefing schedule ordered by the Court, "simply requires the parties to make their best cases on the specific categories of waterways and to do so by advancing tangible, fact-based test cases appropriate to the specificity logically associated with an inquiry into 'which waters' can be treated as public lands for Title VIII purposes."  Id. at 8.  After pages of criticism directed at the federal defendants for the alleged insufficiency of the

_____

[83] Although he made the proclamation "in accordance with international law," that was a limitation, not a source of authority.  *See* Proclamation No. 5928,.3 C.F.R. 547 (1989).

[84]  This is consistent with the State's own concessions that appurtenant means, at a minimum, waters not "beyond the borders" of a reservation.  State's Opening Brief at 7.  *See also* page 13 n. 17, federal reserved water rights "are necessarily dependent on the terms, including boundaries, of the reservation;" and at 31.

factual record, and promises by the State to place its argument in a specific, factual context, the State simply typed in the name of a river and attached a map. [85] Indeed, it is enlightening to compare the State's fact specific five pages of argument committed to the Colville River adjacent waters (State's Opening Brief at 32-37) to the conclusory statements made in the not quite one page treatment given the Stikine River (at 23). The State elected to ignore the Stikine notwithstanding a plethora of facts developed by the State in connection with its application for ownership of the bed of the entire river, om its mouth to the Canadian border.  See Department of Interior Notice, 72 Fed. Reg. 47067 (Aug. 22, 2007).  The State failed to cite its effort in that proceeding to this Court.

The Stikine River is the only marine water "test case waterway" identified by the State in the Tongass National Forest.  State's Opening Brief § III(A)(4) at page 23 (containing a single citation to the State's exhibits:  the map at Exhibit 6).  Having advanced the proposition that "scrutiny of the facts associated with a particular waterway" is imperative, and then having failed to provide such facts for its Tongass "test case waterway", the State's argument that federal reserved water right's cannot exist in marine/tidally influenced waters in the Tongass, including such waters at the mouths of rivers in the Tongass, should be rejected.

In its argument addressing the Stikine River as a test waterway, the State ignores the history of the Tongass and the federal government's creation of the Stikine Wilderness Area in ANILCA.[86]  The Stikine-LeConte Wilderness is on the mainland of southeast Alaska, southeast of Petersburg and north of Wrangell. The boundary extends from Frederick Sound on the west to the Alaska-Canada boundary on the east. The most frequently used means of access is small boat, float plane during the summer or by snowmobiles during the winter. The Stikine River provides access via small boat from salt water, through the Wilderness, across the Alaska boundary and into the interior of Canada.[87]

---

[85] E.g., State's opening Brief at 14-15 ("As the State will show through its presentation of specific 'which waters' examples, the Defendants have failed to marshal such facts, could not and did not consider those necessary, absent facts, and failed to make specific reasoned conclusions in those regards."
[86] ANILCA Title VII § 703(a)(10).
[87] Unless otherwise stated, the facts in the text are drawn from Wilderness.net.  This webpage is a partnership project of the Wilderness Institute at The University of Montana's College of Forestry and

*Katie John, et al. v. United States, et al.*
Case No.: 3:05-cv-00006-HRH (Consolidated)
Supplemental Brief of Related Case Plaintiffs Peratrovich, et al., On The "Which Waters" Issue
- 40 -

The Stikine River flows through the southern portion of the Stikine-LeConte Wilderness.  The river delta is highly braided with three main navigable channels.  Two warm and one hot springs are found along the river.  The grass and sedge flats of the Stikine delta form one of the largest coastal marshes in the Pacific Northwest.  The U.S. Forest service reports that 123 bird species have been observed on the delta during spring migration.  It is a major stopover site for shorebirds that use fresh, brackish or salt water habitats, and is particularly vital for migrating Western sandpipers and Dunlins.[88]

The lower mountain slopes near salt water at the mouth of the Stikine River support a dense spruce-hemlock rainforest.  Stands of cottonwood are common on the many islands of the Stikine. The valley floor along the river is a combination of muskegs and dense alder and willow thickets. The Stikine River delta is approximately 17 miles wide and consists of grass flats, tidal marsh, and sand bars.  The Stikine River is tidally influenced as far as 20 miles from the mouth of the river.[89]

Much of the area, particularly the Stikine River drainage, is recognized as an important fish and wildlife area. Moose, mountain goats, brown bear and black bear, deer, and wolves inhabit the area. The delta flats of the Stikine River are a major resting and nesting area for migratory birds. A variety of fish, including king and other species of salmon, are found in the waters of the area. Up to 2000 eagles congregate in the mouth of the river, following a run of smelt.  The Stikine River is designated as a transboundary river of commerce through an 1871 treaty with Canada.  The Stikine

---

Conservation, the Arthur Carhart National Wilderness Training Center, and the Aldo Leopold Wilderness Research Institute.

[88] Demerjian, Bonnie; Roll On! Discovering the Wild Stikine River, at 102.

[89] Draft Determination on Navigability of Stikine River, Southeast Alaska, File AA-085787 (1864), at 5(Aug. 20, 2007)(Draft Determination)(<http://www.blm.gov/ak/ak930/ rdi/se_region/stikine_river/stikine_drftnavrpt.pdf>)(last accessed Oct. 25, 2007).  The State has an application pending for title to the bed of the Stikine River based upon its navigability.  Department of Interior Notice, 72 FR 47067 (Aug. 22, 2007).  No official determination has been entered on the navigability of the river.  However, the report does note that the State is claiming the entire 27 mile length of the river from the mean high tide line to international boundary with Canada. Draft Determination at 1. Thus, according to the State's position, the United States cannot claim federal reserved water rights in the Stikine River for most of its length within the United States.

Flats, at the mouth of the river, "are one of the greatest intertidal wetland areas in the United States.[90]

      **7.**     **Summary of the State's Arguments and Peratrovich plaintiffs' Counter Arguments.**

The State's LEGAL argument in its brief are addressed in this Brief as follows: 1. Marine and tidally influenced waters are outside the boundaries of the Tongass – Sections V.A.1.d, V.C.2, V.C.3, V.C.4, V.C.5 and V.C.6 of this Brief; 2. Marine and tidally influenced waters extend beyond the mean high tide line – they do so by definition – Section V.A.3.b; 3. Federal Reserved Water Rights cannot exist in marine waters above state owned submerged lands or selected lands – Sections V.A.1.d and V.A.3.b of this Brief.

Moreover, in *New Mexico*, contrary to the State's assertion, the Supreme Court did not hold that federally reserved water rights do not exist in national forests. The holding was that federal reserved water rights exist in national forests to fulfill the primary purposes of the reservation. *New Mexico*, 438 U.S. at 698. The Tongass was created to preserve the forest for continuous supply of timber and to protect the flows of rivers within the forest by preserving the watershed. That purpose requires an implied reservation of water rights in marine and tidally influenced waters. *New Mexico*, 438 U.S. at 700; Organic Act, 30 Stat. 11, 34-36.

## IV.    CONCLUSION

A holding that it is impossible, as a matter of law, for the federal government to reserve water rights in marine waters would impact federal water rights and regulatory authority over millions of square miles of marine, salt and brackish waters not at issue in this case. Such a holding would be contrary to the history of federal reserved water rights jurisprudence, contrary to specific holdings of federal courts in other cases, and in contravention of actions by federal agencies and Presidents in similar situations where they have exercised federal rights in marine waters. It would require this Court and

---

[90] NatureWatch: Alaska; Stikine Flats Wildlife Viewing Area at a Glance, http://www.fs.fed.us/r10/ro/naturewatch/southeast/stikine_flats/stikine.htm.

others, on a case by case basis, to determine the saline content of the water and determine whether the saline content is too high for a reserved water right. Such an expansive ruling would not only be wrong as a matter of law, but it is not necessary in this case.

Instead, this Court should hold that the saline content of water is irrelevant when applying well accepted concepts of federal reserved water rights law to waters in which federal reserved water rights may exist. Such a holding will allow the Court to consider whether, in this individual case, the federal government holds reserved water rights in marine waters of the Tongass National Forrest sufficient to support the federal government's regulatory authority over those marine waters under ANILCA.

October 29, 2007

Respectfully submitted,

RANDOLPH H. BARNHOUSE, Esq.

/s/ Randolph H. Barnhouse
Luebben Johnson & Barnhouse LLP
7424 4th Street NW
Los Ranchos de Albuquerque, New Mexico 87107
Phone: (505) 842-6123
Fax: (505) 842-6124
E-mail: dbarnhouse@luebbenlaw.com

Attorneys for Related Case Plaintiffs
Peratrovich, *et al.*

*Katie John, et al. v. United States, et al.*
Case No.: 3:05-cv-00006-HRH (Consolidated)
Supplemental Brief of Related Case Plaintiffs Peratrovich, et al., On The "Which Waters" Issue
- 43 -

CERTIFICATE OF SERVICE

I certify that on October 29, 2007, a copy of the foregoing *Supplemental Brief of Related Case Plaintiffs Peratrovich, et al. on the "Which Waters" Issue* was served electronically on:


Dean K. Dunsmore
Joanne Grace
Steven A. Daugherty
Heather Kendall Miller
Gregory L. Fisher
William P. Horn
William F. Sherman
Robert T. Anderson
Carol H. Daniel


/s/ Randolph H. Barnhouse