Case 3:05-cv-00006-HRH   Document 151-2   Filed 10/29/2007   Page 1 of 15

REPRODUCED AT THE NATIONAL ARCHIVES

September 1906

Alexander Archipelago Forest Reserve.
Olmsted. Sept. 1906.


FOREST SERVICE
INSPECTION
OCT 11 1906
RECEIVED

Organization.

## INTRODUCTION.

This inspection of the Alexander Archipelago Forest Reserve was largely in the nature of an examination into forest conditions throughout all of south-east Alaska. There is a striking uniformity of both economic and timber conditions in the region as a whole. About one third of the total area is now within a reserve. The remainder is unreserved public timber land, administered in accordance with a policy absolutely at variance with that now applied by the Forest Service upon the reserve. Here are public lands of precisely the same nature, lieing side by side, governed by two different policies with hardly a single point in common. It is clear that there is something wrong. Either the forest reserve is uncalled for, or the system of timber management on the unreserved lands is unwise. This is one of the most important subjects to be discussed, and enters into all of the various topics reported upon.

The complaints against the reserve and the general sentiment of the people toward it will be taken up first; then the administration under present regulations will be discussed in detail and recommendations made for improvement; lastly, the necessity for extending or reducing the present reserve area will be brought out

RG 95, Records of the Forest Service
Office of the Chief, General Records
Entry 7, Reports of the Section of Inspection, 1906-08
District 10
Alexander Archipelago Forest Reserve
Box 1

EXHIBIT 2
Page 1 of 50

2.

as clearly as possible.

The cruise around the islands was made in company with Mr. Langille in the launch "Walrus". A week after our return this launch was burned to the waters edge, causing the death of two Indian children who were bottled up in the forecastle. She was beached and is a total wreck.

The points visited included Kasaan, Baldwin, Niblack, Dolomi, Gravina, Sunny Point, The Portage, Metlakahtla, Klinkwan, Hunter Bay, Howkan, Grace Harbor, Coppermount, Sulzer, Bruce, Copper City, Sukkwan, Klawak, Shakan, Marble Creek, Kake, Woewoodski, Petersburg, Wrangell, Hadley, Mt. Andrew, Karta Bay and Kiam.  Juneau, Douglass and Treadwell were reached by the regular steamers. At all these places a special point was made of seeing everyone in any way concerned with forest reserve matters and the whole question was very thouroughly discussed from all sides. As a rule the people gave their views quite freely in accordance with their understanding and experience.

## THE RESERVE.

In order to clearly understand the complaints and general sentiment, and in fact in order to make this report intelligent as a whole, it seems quite necessary, before all, to explain just what this reserve is. Mr. Langilles various reports give a good idea of the conditions, but it might be well to bring out, if possible, the marked differences between this Alaska reserve and those in the

EXHIBIT 2
Page 2 of 50

3.

States. The following description may help along.

Take the Sierra Reserve and place it directly on the coast, sinking it down until the highest peaks are from three to four thousand feet above sea level. Let the Pacific break through the main divide in three or four big straits making as many islands out of the principal range. To seaward, at distances of from ten to fifty miles, sprinkle in innumerable islands of all sizes and drop a few also to the eastward. In place of rivers, creeks and canyons let the reserve be cut into on all sides by countless deep water ways with soundings of from ten to one hundred fathoms, the shores rising abrubtly. Throw in many small streams with precipitous falls and cascades. Then strip off the whole surface down to bedrock and bowlders. In spots put on a thin layer of muddy soil and cover the whole with moss. Over all except the highest elevations plant a dense forest of spruce, hemlock and cedar, leaving some of the flat places as swamp or "muskeag" dotted with a scrubby growth of pine. Throughout this forest, cover the ground with an exceedingly dense and often almost impenetrable undergrowth of all kinds of brush(chiefly devils club) and let the ground be as rough as possible. Spread patches of brush, grass and meadow on the higher tops and let the bare rock stick out occasionaly. On this area of over 5,000,000 acres imagine a population of only 1,500 Indians and about 500 whites, industries represented by a dozen small copper mines, as many salmon canneries and half a dozen little saw-

EXHIBIT 2
Page 3 of 50

4.

mills. Then consider that, practically speaking, there are no roads or trails and that travel by land is out of the question. Remember that communication is by water only and very uncertain at the best. Picture three or four work horses, a couple of cows and one mule in the whole region. To the climate of the Sierras add perpetual rain in the summer and rain and snow in the winter and the characteristics of the south-eastern Alaskan forest may be partly understood. To be thoroughly understood, they must be felt.

## COMPLAINTS AND SENTIMENT.

It seems best to here give the gist of interviews with all representative men who have direct interests on the reserve. This will show the feeling in general and will also be valuable as a matter of record.

Mr. U. S. Rush, of Kasaan Bay.
As Mr. Rush pleaded directly to the President for the abolishment of the reserve, as he feels very strongly in the matter and as his views are in many ways unique, his remarks will be discussed in detail at the end of this section.

Mr. J. R. Heckman. The leading merchant of Ketchikan and Manager of the Alaska Packers Association's Cannery at Loring (one of the largest in Alaska). Mr. Heckman stated that the reserve had not affected him one way or the other. Many misstatements had been made to him in reference to it. When informed of the objects and regulations he expressed himself to the effect that it was quite unobjectionable and probably a wise thing.
(The hatchery in connection with the cannery at Loring is the largest in the world: 70,000,000 fry are hatched out yearly)

Mr. H. Z. Burkhardt. Proprietor of the Ketchikan Sawmill and Ketchikan Power Co. Mr. Burkhardt operates one of the largest sawmills in Alaska and obtains part of his timber from the reserve. He said he would prefer to see all the country placed in a reserve and

EXHIBIT 2
Page 4 of 50

5.

purchase his timber accordingly. He would then know just what he had to pay and under what conditions he could purchase, as opposed to settling up in a very uncertain way as an "innocent trespasser" for timber cut on unreserved lands(a matter discussed later on).

Mr. Geo. E. Green, Engineer in charge of the Wales Copper Co. at Hadley. Mr. Green objects to the reserve on general priciples. He seems to have had no personal difficulties(except that he was about to locate some timberland by means of scrip just as the reserve was proclaimed) but believes the reserve works a hardship on prospectors and settlers. He was not very familiar with the law and regulations.

Mr. Geo. Irving, of Ketchikan.
Mr. Irving is Chairman of the Republican Committee of the Ketchikan district, owns and operates a small gold mine on Gravina Island and has recently been appointed Assistant U. S. District Attorney. He objects to the reserve on account of restrictions thrown in the way of miners and others who want to get timber. He does not object to government control of the timber nor does he object to paying for it, but he believes he ought to be allowed to take it whenever he needs it, without delay or restriction and without anybody's consent. He also objects to the Forest Service making reports on mining claims(a matter refered to below).

Mr. Robert Rae. Superentendent of the American Coral Marble Co. at Baldwin. Mr. Rae has no objection whatever to the reserve.

Mr. B. D. Nieding. Superintendent of the Niblack Copper Co., one of the largest and most successfull mines on the reserve. Mr. Nieding approved of the policy of the reserve, but objected to paying for timber cut on an unpatented claim for use on a claim not connected with the group upon which the timber was cut. That was his only complaint.

Mr. B. A. Eardley. Owner and operator of gold mine properties at Dolomi. Mr. Eardley said he had no objection to the forest reserve, nor was he particularly strong in its favor. He believed some law should be obtained so that title could be had for manufacturing sites and home lots, without cultivation, within the reserves(this is also discussed later on).

Mr. Raymond, the merchant at Dolomi, was opposed to the reserve because he thought it must interfere with the settling up of the country. It interfered with town developement.

Mrs. A. E. King. Owner of the salmon saltery at Sunnyside, in Chumly Sound. Mrs. Kings complaint rests entirely on the matter

EXHIBIT 2
Page 5 of 50

6.

of her not being able to get title to the land occupied by her saltery and home, because the manufacturing site law does not apply on reserves. Her complaint is a good one, but due to a faulty law rather than to the reserve. She is now satisfied to take out a lease and await an amendment in the law.

Mr. Charles A. Sulzer, Superintendent of the Alaska Industrial Company's mining operations at Sulzer.
Mr. Sulzer stated to me that he believed in the principle of forest reserves but objected to delays in doing business which seemed to accompany them. A part of his delay was due to a misunderstanding of the terms of his contract, a part to his own negligence, and a part to the difficulties of administration.

Mr. Andrew Miller. In charge of the Northwest Fishery's Cannery at Hunter Bay. Mr. Miller said he had had no trouble with the reserve. He was not sure whether he had to pay for drift-wood.

Mr. Ferguson, of Grace Harbor, was in Washington last year and explained his troubles. His difficulty is simply in not being able to get title to land for a saltery and fertilizer plant. During our call upon him he took out a lease for the land and expressed the hope that the law would soon be amended. Outside of this matter he made no complaint.

Mr. Frank W. Hale. Resident Manager of the Alaska Copper Company, at Coppermount. Mr. Hale complained of the delays connected with the purchase and scaling of timber. He thought they were serious and should be remedied. With this exception he thought the principle of the reserve was all right and that any company beyond the pioneer stage should pay for its timber. This Company is one of the largest working concerns on the reserve.
Its President, Mr. H. W. Mellen, was in Nome at the time of my visit and I failed to meet him later on. He was the democratic candidate for delegate to Congress, and defeated at the recent election. I understand he is decidedly opposed to the reserve from all standpoints. He has consistently refused to abide by its laws and regulations and was only brought into line by the seizure of timber at his mill, an action which in my mind was entirely justifiable under the circumstances. Mr. Hale now controls matters and no more trouble may be expected.

Mr. Geo. E. Dent. Part owner and manager of the copper properties at Bruce. He stated that he had had no trouble with the reserve and believed it a good thing.

EXHIBIT 2
Page 6 of 50

7.

Mr. Harry Swift. Manager of the Cannery at Klawak(North Pacific Trading and Packing Co.). Mr. Swift said he met delays at first in obtaining timber but that he now has nothing to complain of. He can see no particular object in the reserve as he believes none of the mines will ever amount to much and that most of the timber will never be used.

Col. C. E. Nason. Superintendent of the Alaska Marble Co., at Marble Creek. Col. Nason has no objection to the reserve, although he sees no particular need for it as he looks for no great development in south-east Alaska. He is willing to trust to the judgement of those who know more about it and have made a study of it.

Mr. L. P. Hunt. Manager of the Cannery at Shakan(Shakan Salmon Co., formerly the Alaska Fish and Lumber Co., now in hands of receivers). Mr. Hunt has no difficulty with the reserve. This is the point at which Congressman Tawney proposed setting up a large sawmill.

Mr. P. D. Brown. Manager of the Cannery at Petersburg(Pacific Coast and Norway Packing Co.). A mill is run here in connection with the cannery. Mr. Brown said he purchased his timber from the public domain entirely. He would not buy from the reserve because there was too much red tape and because he had to pay thirty cents more per thousand than on the main-land.

Mr. S. L. Hogue. Merchant at Petersburg. Mr. Hogue objected to the reserve because it kept back settlement and because there was too much delay and red tape. He believed in the principle of keeping the timber in the hands of the government.

Mr. E. V. N. Snyder and Mr. Geo. Snyder, owners of the "Sentinel" at Wrangell. They have vigorously opposed the reserve in their paper, largely for the reason that they understood that no timber whatever could be cut upon it and that it was closed to all kinds of entries. After a better understanding of the matter they could offer no reasonable objection.

Mr. W. J. Thomas. Ex U. S. Commissioner at Wrangell.
Mr. Thomas objected to the reserve on two grounds; first, that the expense of maintaining it was not justified and was an unjust tax on the people. He believed no reserve was needed now because the laws were such that the timber could not be monopolized anyway. If there was danger of this later on a reserve could then be made and the expense would then be all right; and secondly, that there was not enough timber on the reserve to call for a regular administration. He believed the government should set a stumpage price on all timber and let it be logged and settled for according to the mill

EXHIBIT 2
Page 7 of 50

8.

cuts. No forest officers are needed as the Commissioners could tend to the business in connection with their other duties.

Mr. W. D. Grant, Depy. U. S. Marshall at Wrangell.
Thought it was foolish not to allow any timber to be cut on the reserve and believed the mature timber ought to be taken out to give the young stuff a chance. When informed that that is what we are doing he thought the reserve was a good thing.

At Hadley I missed Mr. Parker, Superintendent of the Brown Alaska Copper Co., although I had a brief talk with him at Ketchikan. He is apparently opposed to the reserve on account of his failure to obtain patent to certain lands occupied by the smelter and other buildings. They were entered as mineral claims and Mr. Langilles report recommended that patent be not granted because of no mineral discovery and no assessment work. This was quite right. They should have been entered as manufacturing sites, as originally intended. This is not the fault of the reserve. (The subject is discussed below).

Mr. William C. Freeburn. Superintendent of the copper mines at Mt. Andrew(Brittania Copper Co. of Brittish Colombia). Mr. Freeburn had no complaints whatever about the reserve.

Mrs. Wyman, who is the active personage in the management of her husbands copper properties at Copper City, objected to the whole reserve business on general principles. She thought the mines ought to have free timber timber whenever and wherever they wanted it and that the reserve was in general nothing but foolishness.

Mr. Coutant, of the "Mining Journal", Ketchikan, is very favorable toward the reserve. His father was formerly in the newspaper business in Wyoming.

Mr. Kinzie, Superintendent of the Alaska Treadwell Gold Mining Co. (the largest mine in Alaska and the largest stamp mill in the world) said he had rather have a forest reserve to purchase from than to buy from the public domain and expressed himself very favorably toward the reserve policy.

Mr. James, owner of the saw-mill at Douglass(or rather lessee of this mill, which is owned by the Treadwell Co.) is favorable to the reserve policy and would prefer to purchase his timber from reserve lands. He cuts all the lumber used by the Treadwell company.

EXHIBIT 2
Page 8 of 50

9.

Hon. W. B. Hoggatt, Governor of Alaska, was unfortunately at Valdes when I visited Juneau, and I therefor failed to get his views on the subject. I have written him, suggesting that he write the Secretary of Agriculture in regard to the forest reserve situation, so that the Forest Service may have the advantage of his recommendations.

Mr. U. S. Rush, of Kasaan Bay.

Mr. Rush is part owner of the Rush and Brown Copper Mine at Karta Bay (now leased to the Alaska Copper Co.) and is also discoverer of the "Venus" claim, also at the head of Karta Bay. He has been a U. S. Commissioner, and resigned that position (I am told) in order to attend the Republican Convention at Juneau and see that the platform included a plank calling for the abolishment of the present reserve. (It did, as well as the Democratic platform). He wrote The President on October 17, 1905, asking that the reserve be done away with. He may be called the leader of the opposition forces, although only a self-appointed leader.

I had a lengthy talk with Mr. Rush on July 31, and was with him again on August 27. Most of his objections are contained in his letter of October 17, herewith attached, although the real basis of his feeling appears only in his conversations with me and in his several newspaper articles. I discussed his written objections to The President as follows:

1. That there is not enough good timber to justify a reserve.

    This is absurd. It is true that the best timber is found in patches only, but from the briefest kind of a look at the reserve

EXHIBIT 2
Page 9 of 50

REPRODUCED AT THE NATIONAL ARCHIVES

10.

it is clearly evident that there is an immense amount of timber which is either merchantable at present or which soon will be merchantable when the demand increases. A large part of the area is covered with timber which is not at present regarded as merchantable by the mills because it is more or less inaccessible and because under present methods of logging only the very pick of the trees within a few hundred feet of the beach are taken out. For the sake of argument, let us admit that only one-tenth of the reserve supports merchantable timber; even that would give us a total stand of five billion feet, assuming an average of ten thousand per acre, which is very conservative. This, of course, is well worth the cost of administration.

2. That the preservation of the forest is not necessary to insure ample rain fall in this district.

Quite true. The Forest Service never had the idea that it was, nor was it created with any such object in view. Its chief purpose is to keep the timber in the hands of the government for the present and future use of the people. That's the main object of the reserve lands on the west slope of the Cascades in Washington and Oregon.

3. That the country is chiefly valuable for the mineral it contains.

Also quite true. The mines must have timber, and this is an argument for, not against, the reserve.

4. That all the available timber will be needed in the developement of the resources of the region.

EXHIBIT 2
Page 10 of 50

11.

Whether or not this is true, it is no argument against the reserve. If the local demand requires all of it, none will be exported. Local industries can have every stick they apply for. That's what the reserve is for.

5. That the use of the timber and occupancy of the ground should not only be a privilege but a right, etc.

By this I find that Mr. Rush means that he objects to anyone, from the Secretary down, having the authority to approve or disapprove the sale of timber or other use of reserve lands and resources. He would take away all discretionary powers and have <u>use</u> of all kinds fixed by statute; by hard and fast law.

In his conversations he brought this out quite clearly. For example, he considered the Secratery's statement on page 17 of the "Use Book" a very excellent one, but was much concerned lest the forest officers should fail to carry out the principles there laid down. He pointed out that under Reg. 5 the Forester <u>might</u> grant privileges for the use of the reserve, but that it was wholly at his pleasure; that under Reg. 10 the Officer In Charge had authority to decide who was entitled to the free use of timber, and that here was a <u>possibility</u> that the officer <u>might</u> decide unjustly; that the privilege to purchase timber depended very largely on the pleasure of the Officer in Charge or upon his recommendations to the Forester, and that here was a <u>possibility</u> that grave injustice <u>might</u> be done. He called attention to the fact that the Secretary

EXHIBIT 2
Page 11 of 50

12.

was empowered, at his pleasure, to sell all the timber on the Alexander Forest Reserve, at one time and to one purchaser, and to allow its export out of the District; that no one in the Forest Service was capable of deciding what restrictions were necessary for the cutting of timber; that a prospector who cut brush in order to work his way to the top of a ridge <u>might</u> be classed as a trespasser, and that a man shipwrecked on the beach who built himself a fire without first getting a permit for the wood was really a trespasser and <u>might</u> technically be prosecuted by an unjust forest officer. He is, in short, very much concerned over the grave injustice of all kinds which <u>might</u> arrise from this descretionary power and as a remedy would have all these details fixed by hard and fast statutes. He asked me how I would feel in case I were dependent on the "whims and fancies" of the local officer in all these little matters. I replied that I should be inclined to place a little more confidence in the integrity and common sense of that local officer; whereupon he replied that he had seen a good deal of federal officials in Alaska and prefered not to do so. I inquired whether he had had any trouble with the reserve himself or whether it had handicapped his work at all. He said he had had no difficulty at all and that his operations had not been interfered with. He stated to me that in the matter of getting a permit to build a trail to the "Venus" claim he had purposely carried through his application so that it would meet with all possible delays and form a very intricate

EXHIBIT 2
Page 12 of 50

12. A.

mass of detailed correspondence.(He had verbal permission from the officer in charge at the very beginning to go ahead and build his trail).

He has worked himself into a very serious state of suspense for fear that all these discretionary powers will be unjustly and unwisely used. He has'nt the slightest confidence in any officer of the Forest Service, from the Secretary down.

Toward the end of my conversation with him on August 27" he remarked that he believed I had come out to Alaska with the preconceived idea of trying to convince the people that the present regulations were all that could be desired and that I had no intention of giving serious consideration to any complaints which might be made. He also took occasion to remark that the Department of Agriculture had built up a great and wonderfully strong system of forest management, and one which was perfectly constructed for the intrusion of graft.

Upon this the small amount of self control which still remained with me gave out and I at once refused to discuss the forest reserve question with him any further.

Mr. Rush is one of that very small minority which believes that discretionary powers are for monarchs and princes and not for the ordinary type of man. Neither the Secretary nor anybody else has any right to have a policy; all these things ought to be laid down by statute.  As I understand it the object(not tosay policy)

EXHIBIT 2
Page 13 of 50

13.

of the Forest Service is to make things just as elastic as possible so that the many varied conditions can be met and dealt with locally by men on the ground; and I also believe that a good deal of confidence is placed in these men. Which in my mind is all very wise. So much for objection No. 5.

6. The inability to secure title to ground, other than through permit, retards developement, etc.

This would be so if it were true. As a matter of fact every single one of the land laws of Alaska, except that which applies to trading and manufacturing sites, may now be applied to forest reserve lands and patent obtained. The manufacturing site law should also be extended to the forest reserve, and recommendations to this effect are made below.

7. That the rules and regulations governing forest reserves, when applied to that section, are unjust and impracticable.

Here is an objection based upon common sense. Conditions in Alaska are peculiar and I believe that many of the present regulations are unnecessarily strict and that they should be modified to suit conditions. I may also add that in my mind it is a most excellent thing, just in this connection, that the Secretary and other officers have a good deal of discretionary power and that it is a very simple matter, under these circumstances, to slightly modify the regulations and remove all the trouble.

EXHIBIT 2
Page 14 of 50

REPRODUCED AT THE NATIONAL ARCHIVES

14.

From a review of the various points of objection and the general sentiment expressed above it will be seen that opposition to the reserve comes first from ignorance and misunderstanding, which are not good grounds of objection; secondly, from the feeling that some of the regulations are unnecessarily strict, which *is* a good ground of objection and which can be easily met simply by modifying certain of the regulations to meet local conditions; and thirdly from the belief that the whole principle underlieing all forest reserve legislation is bad, which objection is of course not admitted.

I believe that, with certain modifications in the regulations, the forest reserve policy is an excellent thing for southeast Alaska. Far from recommending any reduction in the present area I shall recommend below that *all* of the country (with certain exclusions) from Mt. St. Elias to the Portland Canal be proclaimed as a forest reserve.

### RESERVE ORGANIZATION.

Personnel.

W. A. Langille, Forest Inspector In Charge.

Mr. Langille has been in charge of the reserve since June, 1905. In addition to his familiarity with conditions in southeast Alaska he has had a wide experience along the coast to the westward and is also well acquainted with the Nome, Tanana and Yukon districts. His position for the past year has been a very

EXHIBIT 2
Page 15 of 50