REPRODUCED AT THE NATIONAL ARCHIVES

30.

## Extension of the reserve area.

As a discussion of this subject involves a consideration of the public land laws in Alaska, as well as the general policy of the government in the management of all its timberlands, it might be well for the Sections of Law and Reserve Boundaries to cooperate in the matters mentioned below.

That portion of south-east Alaska not now included within the reserve is of precisely the same nature, both in respect to timber and economic conditions, as the portion reserved. In order to give a clear insight into present conditions an outline of the policy now followed by the General Land Office in the disposal of timber on the public domain is essential. It is briefly this. The logger or sawmill man goes wherever he pleases and cuts whatever he wants, without permission from anyone and without notifying any official of his doings. Once a year each mill is visited by the Special Agent who inquires as to the amount of its cut. An innocent trespass case is then made out against the owner who settles(if he does settle) on the basis of the lumber sawed. As a rule the amount reported to the authorities for payment of the statutory license fee of 10 cents per thousand feet is accepted as a basis for the stumpage charge. In south-east Alaska the General Land Office collects 20 cents per thousand for saw timber, one-half cent per foot for piling and 25 cents per cord for wood. Every

EXHIBIT 2
Page 31 of 50

REPRODUCED AT THE NATIONAL ARCHIVES

31.

bit of timber and wood cut from the public domain is settled for
as a trespass only. Each and every mild man sawing such timber is
classed as a trespasser. He can obtain timber from the public do-
main in no other way. As one of them expressed it to me, they are
all "innocent thieves". Moreover, they have no assurance whatever
that this matter will continue to be looked upon as an innocent
trespass and settlement allowed as such.  The price _may_ be raised
at any time. It is also difficult for me to see how the General
Land Office can continue to settle these matters as **innocent** tres-
passes; it may be all very well for the first offense, but how
about the second time? All the mills cut from the public domain
year after year. Are they "innocent" trespassers when they come to
make the second settlement?  When the second case comes up how can
the General Land Office avoid the Supreme Court decision(printed
on all of its trespass forms) to the effect that a willfull tres-
pass must be settled for on the basis of the manufactured product?
Is'nt it altogether wrong for the United States to be in such a
position that it can not dispose of a stick of timber(and be paid
for it) from the public domain in Alaska without classing the users
as trespassers, even if they are called "innocent thieves"? Is'nt
it a rather unbusiness-like proceedure?

　　　In this connection I should like to quote the 11th Section
of the Act of May 14, 1898, 11 Supplement, chapter 299, page 756:

　　　"That the Secretary of the Interior, under such rules and

EXHIBIT 2
Page 32 of 50

REPRODUCED AT THE NATIONAL ARCHIVES

32.

regulations as he may prescribe, may cause to be appraised the timber or any part thereof upon public lands in the District of Alaska, and may from time to time sell so much thereof as he may deem proper for not less than the appraised value thereof, in such quantities to each purchaser as he shall prescribe, to be used in the District of Alaska, but not for export therefrom.

And such sales shall at all times be limited to actual necessities for consumption in the District from year to year, and payments for such timber shall be made to the receiver of public moneys of the local land office of the land district in which said timber may be sold, under such rules and regulations as the Secretary of the Interior may prescribe, and the moneys arising therefrom shall be accounted for by the receiver of such office to the Commissioner of the General Land Office, in a separate account, and shall be covered into the Treasury.

The Secretary of the Interior may permit, under regulations to be prescribed by him, the use of timber found upon the public lands in said District of Alaska by actual settlers, residents, individual miners, and prospectors for minerals, for firewood, fencing, buildings, mining, prospecting, and for domestic purposes, as may actually be needed by such persons for such purposes.


This looks to me like a remarkably simple and also a very

broad law.  Under this law the Secretary made the following reg-

ulations for the sale of timber: (Circular of Jan. 15, 1904, General Land Office).

While sales of timber are optional, and the Secretary of the Interior may exercise his discretion at all times as to the necessity or advisability of any sale, petitions from responsible persons for the sale of timber in particular localities will be received by this Department for consideration.

Such petitions must describe the land upon which the timber stands, as definitely as possible by natural land marks; the character of the country, whether rough, steep or mountainous, agricultural or mineral, or valuable chiefly for its forest growth; and state whether or not the removal of the timber would injuriously affect the public interests. If any of the timber is dead, estimate the quantity in feet, board measure, with the value, and state whether killed by fire or other cause. Of the live timber, state the different kinds and estimate the quantity of each kind in trees per acre. Estimate the average diameter of each kind of timber, and estimate the number of trees of each kind per acre above the average

EXHIBIT 2
Page 33 of 50

REPRODUCED AT THE NATIONAL ARCHIVES

33.

diameter. State the number of trees of each kind it is desired to
have offered for sale, with an estimate of the number of feet, board
measure, therein, and an estimate of the value of the timber as it
stands.

Before any sale is authorized the timber will be examined and
appraised. Notice thereof will be given by publication  by the Com-
missioner of the General Land Office.

The time and place of filing bids and other information for a
correct understanding of the terms of each sale will be given by
published notices or otherwise. Timber is not to be sold for less
than the appraised value. The Commissioner of the General Land Of-
fice must approve all sales, and he may make allottment of quantity
to any bidder or bidders if he deems proper. The right is also re-
served to reject any or all bids. A reasonable cash deposit, to ac-
company each bid, will be required.

(The rest of the regulations relate to payments, supervision,
and restrictions as to the free use clause, and need not here be
quoted).

Since the passage of this Act in 1898 not a stick of timber
in Alaska has ever been sold under its provisions(at least so far as
I can discover.

The trouble is that the above regulations are absolutely im-
practicable as applied to Alaskan conditions; they have the effect
of making the law null and void. The information called for in the
petitions from those who wish to purchase timber could be obtained
only at such an expenditure of time and money as to make the prac-
tical application of this law simply out of the question. After all
this the timber must be examined and appraised, by which time the
mill would probably be out of business.

In discussing the method of disposing of timber on the unre-
served public domain in Alaska I have aimed simply to show that
in my mind it is a very unfortunate method. I can not avoid this
subject.  The only object of a forest reserve in south-east Alaska

EXHIBIT 2
Page 34 of 50

REPRODUCED AT THE NATIONAL ARCHIVES

34.

is to keep the timber in the hands of the government for the use
of the people, and especially to provide for machinery which will
dispose of the timber promptly and in a business-like way to those
who apply for it.  If these objects were already accomplished in
the disposal of timber on the unreserved public domain the neces-
sity of any forest reserve in that region would be very much open
to question.  On the other hand, if the system on the public do-
main is unsatisfactory(and I believe it could not be worse) there
is certainly a very strong reason for extending the forest reserve
to cover all public timberlands in that part of the District.

These remarks are not made in the spirit of criticism against
any branch of the government service; actual conditions are dis-
cussed as they appear to me with the sole object of showing that
the general situation is badly in need of improvement and that this
improvement can be brought about through an extension of the forest
reserve system.

As already stated the lands of south-east Alaska not included
within the present reserve are in every way similar to the reserve
lands. They have been described in detail and mapped by Mr. Langille
in his report on the proposed Panhandle addition to the present
reserve. Before including them in the reserve it is necessary to
consider two things only; first, whether timber can be disposed of
promptly and without red tape; and secondly, whether the forest

EXHIBIT 2
Page 35 of 50

REPRODUCED AT THE NATIONAL ARCHIVES

35.

reserve laws and regulations will in any way interfere with the developement of the country.

With the modifications of the regulations recommended below I am convinced that there is absolutely no question as to the ability of the Forest Service to handle the timber business promptly and to the satisfaction of all purchasers.

Forest reserve laws and regulations will not interfere with legitimate developement, because the use and also the ownership of lands under patent is now, for all practical purposes, just as open and unrestricted within a reserve as on the public domain. If the Trading and Manufacturing Site law in Alaska is extended to forest reserves(as it should be) the reserve lands will be as open as the public domain to all kinds of use and patent under the Alaskan land laws. It must be frankly admitted that there will be this dif-ference, however; applications for patent and the use of lands will be examined into and reported upon by officers of the Forest Ser-vice, which is not the case on the public domain. I can see no ob-jection to this whatever, although as I have mentioned above it is the cause of grave apprehensions in certain minds.

Generally speaking, there is no agricultural land in south-east Alaska. Since the homestead law was made to apply there there has been just one patent granted under it.  Little patches of garden vegetables and berries are occasionally found and cultivation of

EXHIBIT 2
Page 36 of 50

REPRODUCED AT THE NATIONAL ARCHIVES

36.

this description, covering usually but a fraction of an acre, will
doubtless continue to increase. A forest reserve would not interfere
with this in the least; it would be the policy to encourage it.
Agriculture on any extended scale is out of the question, and al-
ways will be, for the simple reasons that there is no soil and the
growing season is too short. In a talk with the Register of the
Land Office at Juneau I learned that numerous locations under the
Homestead Law had recorded with the various U. S. Commissioners.
According to the law, entries are not made at the Land Office until
the claims come up for final proof(which may not be for seven years).
He informed me that so far as he knew these locations were inva-
riably made on timber lands, for the sake of the timber, and would
be rejected when they came up for final proof.

An important point in the present situation, where reserved
and unreserved forests lie side by side, is the fact that saw timber
on the reserve is charged for at the rate of 50 cents a thousand
feet, whereas just across the channel on the public domain precise-
ly the same kind of timber may be procured for a settlement of 20
cents. This is absurd, unless it is the policy of the government to
give away its timber on the public domain. Timber is worth 50 cents,
and more, beyond the shadow of a doubt. When the Special Agent came
to south-east Alaska there was already an established price of 50
cents on the reserve, but he tells me he thought best to make all

EXHIBIT 2
Page 37 of 50

REPRODUCED AT THE NATIONAL ARCHIVES

37.

settlements at 20 cents because owing to the very uncertain laws

he had to back him up it was extremely doubtfull whether he could

have induced the mill men to settle at a higher rate. He had to

approach them very delicately to get even that. All of which I be-

lieve is quite true, and which is another absurdity in the present

situation.

The Timber and Stone law does not apply to Alaska, nor is there

any way in which title may be obtained to timber lands(except by

using Soldiers Additional Homestead Scrip, which is too expensive).

Hence there is no present danger of large bodies of timber falling

into the hands of corporate interests. I am inclined to think, how-

ever, that in the not very distant future timber conditions in the

Puget Sound region will have changed to such an extent that the big

timber corporations will think it worth while to have a look at

south-east Alaska with a view to possible speculative investments

in that region; and in that event there would be a hard fight waged

for such changes in the timber laws as would allow title to pass to

private ownership.  If the establishment of additional forest re-

serves is postponed any considerable length of time it is possible

that determined opposition from these interests might then be met

with.

The present reserve can not be enlarged without calling forth

EXHIBIT 2
Page 38 of 50

REPRODUCED AT THE NATIONAL ARCHIVES

38.

much unfavorable sentiment; there is no question about that. At the same time the opposition will come wholly from those who are un-informed or misinformed on the subject, from those who merely im-agine their interests will suffer, or from those who object to the government exercising any control in the timber business. Forest Reserves have been created in the western states(in many instances) in the face of just such opposition; and after the lapse of a year or two the sentiment has turned about and become so strong in their favor that it would now be a very difficult matter to abolish them. It will come about just so in Alaska.

> I therefor recommend that all that part of south-east Alaska bounded by the inter-national boundary on the south, east and north, and by the 141st meridian and the open sea on the west, be proclaimed as a Forest Reserve, or better as a National Forest; provided that the Officer In Charge and the Deputy Supervisors can be furnished with suitable boats, as recommended above; and provided also that action be not taken on this matter until recommendations are submitted for certain exclu-sions within this area surrounding the principal towns and settlements.

It seems desirable to exclude certain area in the vicinity of the towns, and recommendations to this effect are now in preparation. It is a very difficult matter to describe such exclusions, because the whole country is unsurveyed; hence the delay.

EXHIBIT 2
Page 39 of 50

REPRODUCED AT THE NATIONAL ARCHIVES

39.

The West Coast and the Interior.

South-east Alaska, the country examined, is but a drop in the bucket. It can hardly be considered a part of the real Alaska, which stretches two thousand miles westward toward Siberia and a thousand miles northward to the Arctic, a country three times the size of California.  I can not make definite recommendations as to a forest policy for a region I have not personally visited, but as I had a chance to pick up a good deal of reliable information of various kinds I should like to make some suggestions, merely, which may serve as matters of consideration in connection with any possible future action.

The Forest Service is already in possession of Mr. Langille's reports on timber conditions in the Prince William Sound, Kenai and Nome regions. I am not in a position to add anything of importance. There is no apparent objection to making forest reserves in each of these districts at any time. On the other hand, there seems to be no pressing need of doing so. But very little timber is cut, and the principal objects in making reserves would be to try and control the fires, to get a fair price for what timber was cut, and to hold a certain check on Homestead filings which are now being made, it is reported, in order to gain possession of and cut off the timber(each claim 320 acres). There are several railroads under construction in the Williams Sound and

EXHIBIT 2
Page 40 of 50

REPRODUCED AT THE NATIONAL ARCHIVES

40.

Kenai regions, which will undoubtedly open things up a good deal.
It is questionable whether any of these reserves would pay ex-
penses.  If created, there should be a Supervisor at Seward to
tend to the Kenai Peninsular, one at Orca to look after the business
of the Williams Sound country and one at Council for the Norton
Bay and Nome regions.  No rangers would be needed. These officers
must receive at least $1500.00 at Orca and Seward and $1800.00
at Nome.  Common wages are a little above these figures. Under
any circumstances it would be exceedingly difficult to get men
competent and experienced enough to run the business; and more
difficult still to keep them. And here again not much of anything
could be done without boats(except at Council).

    The forests of the Interior present an entirely different
problem.  In the Tanana and Yukon basins the timber occurs in
strips along the streams and scattered promiscuously about over
the hills and mountains. It is small and largely scrubby, but of
great local value, of course, in connection with the placer work-
ings and buildings. It is so irregularly distributed and so little
of the region is really known that it would be impossible to
establish reserves without including great areas which should be
left outside. Moreover, the innumerable mineral locations would
create a constant turmoil in the reserve administration.

EXHIBIT 2
Page 41 of 50

REPRODUCED AT THE NATIONAL ARCHIVES

41.

    Besides this, it is the aim of a forest reserve to keep the land producing timber for future use. Here it is merely a matter of guess-work whether the future will need any timber. The life of the placer industry is variously estimated at from 5 to 50 years, depending upon new discoveries and improved methods. For example, in Fairbanks nobody figures upon real estate having any value after 10 years at the longest, and many believe it will be of little value after 4 or 5 years. The Canadians dispose of their timber with the sole idea that it is of present value only and that it is foolish to provide for a future supply when the whole country is soon to be abandoned. And there is a good deal in this.

    The General Land Office makes trespass settlements here in the Interior just as in south-east Alaska, and on the same basis, 20 cents per thousand. In this region common lumber sells at from $50.00 to $70.00 per thousand feet, and finished stuff for about $100.00. The Canadian Government charges not less than $2.00 per thousand feet stumpage. Although still bearing in mind the fact that the laws under which these trespass settlements are made are far from satisfactory it is nevertheless very difficult for me to believe that the United States must sell its stumpage for 20 cents when common lumber brings from $50.00 to $70.00(unless, as before mentioned, it is the governments policy to _give_ away its timber).

    I have not been instructed to report upon the public land

EXHIBIT 2
Page 42 of 50

REPRODUCED AT THE NATIONAL ARCHIVES

42.

laws of Alaska; but I was instructed to "size up the general situa-

tion". This, in my mind, includes the question of the advisability

of making forest reserves in the Interior; and I can not discuss

this matter without taking into account the methods now applied

by the General Land Office in the disposal of timber from the

public domain. So I shall go ahead and make a suggestion.

It seems to me that in the Interior, just as in south-east

Alaska, it is very poor business for the United States not to be

able to sell a stick of timber without making a trespass case out

of it. In addition to this it strikes me that it is open to ques-

tion whether it is worth while to go to the expense of collecting

20 cents a thousand stumpage for lumber selling at $50.00 to $70.00.

Grant that on account of high wages the expense of logging and manu-

facture is higher than in south-east Alaska, where common labor is

$3.50 per day.  In the Interior lumber is about five times as val-

uable; but wages and the scale of living are nowhere near five

times as high, and I believe the government might just as well give

away its timber absolutely as to collect 20 cents.

Forest reserves are impracticable in this region; but why

can't the Act of May 14, 1898, be put in working order?(see pages

32, 33 and 34). Are there any legal objections to the following

proceedure:

Let the Secretary at once appraise all the timber in the

Tanana and Yukon watersheds; no examination will be necessary, as

EXHIBIT 2
Page 43 of 50

REPRODUCED AT THE NATIONAL ARCHIVES

43.

the value of the timber may be determined from the recommendations

of men who have already made extensive examinations in the region.

One price may be set for the whole district, or two or three dif-

ferent prices may be made for two or three different districts. If

desirable, the prices may vary according to species and condition.

Then let the Secretary give public notice of this appraisal and

call for bids, stating, at the same time, that after a certain date

timber cut from the public domain will be disposed of under this

Act only and that innocent trespass settlements will no longer be

made. Let the Secretary authorize his agents in Alaska to approve

all sales and make allottments of quantity to all bidders, selling

the timber as applied for right on the ground(under such arrange-

ments for payments, etc. as the Secretary may make).

It may be objected that the Secretary can not delegate his au-

thority to sell timber; under the regulations he has already made

he states---"The Commissioner of the General Land Office must ap-
prove all sales, and he may make allottment of quantity to any bid-
der or bidders if he deems proper." The law reads---"That the Secre-
tary of the Interior..........may from time to time sell so much
thereof as he may deem proper, for not less than the appraised value
thereof, in such quantities to each bidder as he shall prescribe...."

He has therefor already delegated his authority to the Commissioner

in the matter of making allottments to purchasers; can he not like-

wise delegate his authority to an Agent in the field?

Under this arrangement the timber need be applied for according

EXHIBIT 2
Page 44 of 50

REPRODUCED AT THE NATIONAL ARCHIVES

44.

to general location only(such as a watershed or slope); the approximate amount and kinds desired should be named. No other details are necessary, nor need any restrictions whatever be imposed as to the cutting and removal(except as to the time allowed). The logs could be scaled at the mill or on the ground, or if more desirable payment could be made on the basis of the lumber cut. Cordwood should be appraised seperately and scaled and paid for under a seperate arrangement.

Three men could tend to the whole business in the Interior; for the Yukon, one at Eagle and one at Circle; for the Tanana, one at Fairbanks.

The chief advantages of this system over the present one would be that timber and wood could be sold outright according to a business-like method, rather than according to a plan in which every user is a trespasser; and the government would get a fair return for its own resources.

If reserves are not made in the Williams Sound, Kenai and Nome regions,(and I am not at all sure that they should be) this plan would undoubtedly bring about a great improvement in those districts also. In fact, how would it do to make it apply to all that part of Alaska not included within the proposed enlarged reserve?

Here is another suggestion; would it be advisable to ask Congress to transfer the execution of this law to the Secretary of Agriculture, with an amendment providing that expenses shall be paid

EXHIBIT 2
Page 45 of 50

REPRODUCED AT THE NATIONAL ARCHIVES

45.

from, and returns go into the Special Fund?

All the matters refered to under this heading are merely sug-
gestions, not recommendations.

National Monuments.

Mr. Langille has already recommended the reservation of cer-
tain Totem Poles at Tuxikan and Old Kassan. I believe this is an
excellent idea and that totems at other old Indian villages should
also be preserved by the Federal Government. It seems much more
appropriate to keep these most interesting relics in their natural
surroundings than to allow their removal(on any extensive scale) out
of the country. If properly looked after they will remain in a good
state of preservation for many years. The Indians themselves are
fast losing all interest in them and it is probable that they will
be destroyed, sold or given away unless steps are taken to look after
them right away. As one of the younger and civilized(?) Indians re-
marked, "No good; old fashioned; cut'em down pretty soon".

The title to the ground rests with the United States, the Indians
having a possessory right only. But the poles themselves are the
property of the various clans which lived in the now abandoned vil-
lages. Members of these clans, or their descendants, are still liv-
ing and would undoubtedly claim ownership in the various totems. I
believe they would gladly relinquish all claim to them if they are

EXHIBIT 2
Page 46 of 50

REPRODUCED AT THE NATIONAL ARCHIVES

46.

made to understand that The Great White Chief wants to keep them just as they are so long as they will stand. The trouble will come in getting some kind of written consent to this from the very numerous owners. Each family, or each group of families living together in a communal house, had a totem pole in the yard, or near by. So far as I can make out, consent must be obtained from the oldest men of these families for the transfer to the government of each pole.

I recommend that Mr. Langille be instructed to look into this matter and submit recommendations for a definite course of proceedure. Also that he be given all possible information as to how to go about it. Perhaps the Office of Indian Affairs can offer some suggestions.

EXHIBIT 2
Page 47 of 50

47.

Reserve Organization.

SUMMARY OF RECOMMENDATIONS.

1. That Mr. Langille be commended for his excellent work as Officer
   In Charge, that he be cautioned about the tone of his letters to
   those doing business on the reserve, and that he be promoted to
   a salary of $2,000.00.

2. That examinations for Deputy Supervisors in Alaska be held at
   once, at Ketchikan, Wrangell and Juneau; and that a chief part
   of the examination consist of written questions and practical
   demonstrations in seamanship(small boat navigation). Also that
   the paper as a whole be prepared with special regard to Alaskan
   conditions.

3. That as soon as a list of eligibles is available, one Deputy
   Supervisor be appointed for the west coast of the present re-
   serve, and one for the northern division of the enlarged reserve,
   provided the addition recommended is made; the salary of such
   Deputy Supervisors to be $1,500.00 each.

4. That a boat, with general specifications as recommended, be at
   once procured for the Officer In Charge; that this officer be
   instructed(during his coming leave of absence) to see whether a
   suitable boat may be purchased ready built in the Puget Sound
   or Columbia River districts; that in case one is not found, a
   boat be built for the Service, not to exceed the cost mentioned
   in this report, at such a ship yard and according to such a con-
   tract as may be recommended by Mr. Langille.

   That the Service also purchase boats for the two Deputy Super-
   visors, when appointed, their cost not to exceed $1,000.00 each,
   and that Mr. Langille be instructed to look up suitable boats
   for this purpose and recommend their purchase.

EXHIBIT 2
Page 48 of 50

REPRODUCED AT THE NATIONAL ARCHIVES

48.

(Summary of recommendations, continued).

5. That in case the reserve is enlarged as recommended, the allott-
   ment for 1907-1908 be not less than $12,000.00, and that this
   amount be expended substantially as indicated in the detailed
   estimate.

6. That in case the present reserve is not enlarged, its eastern
   boundary be more definitely defined in an amended proclamation.

7. That a special circular for Alaska be prepared, explaining
   briefly the objects of a forest reserve in that District and
   containing the amended regulations for Alaska, omitting all de-
   tailed instructions to forest officers; and that the widest
   possible circulation be given to this publication.

8. That the Alexander Archipelago Forest Reserve be extended to
   include all of south-east Alaska, with boundaries as recommended;
   but only in case the officers are furnished with boats, also as
   recommended, and action not to be taken until recommendations
   for certain exclusions are submitted.

   That this reservation be proclaimed and known, if practicable,
   as the "Baranof National Forest" or the "Panhandle National
   Forest".
   ("Alexander Archipelago" is much too cumbersome a name, and
   should be done away with, no matter what the new name may be.
   The Forester's suggestion that the reserves be called "National
   Forests" would have an excellent effect in Alaska, where the word
   "Reserve" creates an immense amount of obnoxious feeling. I be-
   lieve it would practically do away with all opposition based on
   ignorance and misinformation).

SUMMARY OF SUGGESTIONS.

1. That no immediate action be taken toward the creation of forest
   reserves in the PrinceWilliam Sound, Kenai Peninsular and Norton
   Bay regions.

EXHIBIT 2
Page 49 of 50

REPRODUCED AT THE NATIONAL ARCHIVES

49.

(Summary of Suggestions, continued).

2. That consideration be given to the possibility and desirability
of disposing of all timber and wood on the public domain in
Alaska(outside of forest reserves) under the Act of May 14, 1898;
sales to be made by agents on the ground, without restrictions
of any kind(except as to time) as to the cutting and removal.

3. That the possibility and desirability of transfering the execu-
tion of this law to the Secretary of Agriculture be considered.

4. That steps be taken to make "National Monuments" of certain
Indian villages which contain remarkable specimens of Totem
Poles.

F. E. Olmsted.

EXHIBIT 2
Page 50 of 50