DEAN K. DUNSMORE
Department of Justice
Environment & Natural Resources Division
801 B Street, Suite 504
Anchorage, Alaska  99501-3657
Telephone: (907) 271-5452
Facsimile: (907) 271-5827
Email: dean.dunsmore@usdoj.gov

Attorney for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

KATIE JOHN, et al.           )
                             )
            Plaintiffs,      )    Case No. 3:05-cv-00006-HRH
                             )    (CONSOLIDATED)
     v.                      )
                             )
THE UNITED STATES OF AMERICA, )
DIRK KEMPTHORNE, et al.,     )
                             )
            Defendants.      )
_____)

BRIEF OF THE UNITED STATES

(WHICH WATERS)

TABLE OF CONTENTS

STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . -2-

    A. The Regulations. . . . . . . . . . . . . . . . . -3-

    B. Plaintiffs' Claims. . . . . . . . . . . . . . . . -5-

I. THE SCOPE OF REVIEW TO BE APPLIED IN ASSESSING THE
   VALIDITY OF THE AGENCIES' REGULATIONS IS LIMITED . . . . -7-

    A. Review Is Limited And Deferential. . . . . . . . . -7-

    B. Narrow Construction Is Not Required. . . . . . . . -10-

    C. The Indian Canon of Construction Is Not Applicable.
     . . . . . . . . . . . . . . . . . . . . . . . . . -11-

    D. Remand Is The Court's Limited Remedy. . . . . . . -12-

    E. Review Is Limited To The Administrative Record. . -12-

II. THE SECRETARIES' DETERMINATIONS AS TO THE SCOPE OF
    PUBLIC LAND WATERS SHOULD BE AFFIRMED . . . . . . . . -13-

III. THE CRITERIA FOR FEDERAL RESERVED WATER RIGHTS . . . . -15-

IV. THE CONTENTIONS REGARDING ALASKA NATIVE ALLOTMENTS AND RESERVED
    WATER RIGHTS ARE WITHOUT MERIT AND SHOULD BE REJECTED
    . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

    A. Alaska Native Allotment Act. . . . . . . . . . . . -21-

    B. Federal Reserved Water Rights for Indian and Alaska Native
     Allotments. . . . . . . . . . . . . . . . . . . . -24-

    C. Additional Legal And Factual Issues Related To Alaska
     Native Allotments. . . . . . . . . . . . . . . . . -27-

V. THE SECRETARIES HAVE PROPERLY DETERMINED THAT WATERS
   UPSTREAM AND DOWNSTREAM FROM CONSERVATION
   SYSTEM UNITS ARE NOT PUBLIC LANDS . . . . . . . . . . -32-

    A. Upstream and Downstream Waters Are Not Deemed In The
     Regulations To Be Public Lands. . . . . . . . . . -33-

    B. Upstream And Downstream Waters Are Not Public Lands. -35-

VI. THE STATE'S CONTENTIONS ARE WITHOUT MERIT . . . . . . .   -39-

    A.  The Secretaries Have Properly Determined That Waters
        Immediately Adjacent To CSUs Are Public Lands. .  -40-

    B.  The Waters Of The Colville River Outside Of The NPRA Are
        Not Public Lands. . . . . . . . . . . . . . . .  -43-

    C.  The Waters Of The Yukon River Adjacent To The Nowitna NWR
        Have Properly Been Determined To Be Public Lands.
        . . . . . . . . . . . . . . . . . . . . . . .  -45-

    D.  The Adjacent Waters Of Sixmile Lake Have Properly Been
        Determined To Be Public Lands. . . . . . . . .  -50-

        (1) Sixmile Lake Is Adjacent To The Park And Preserve.
            . . . . . . . . . . . . . . . . . . . . .  -51-

        (2) The United States Holds FRWRs in Sixmile Lake.
            . . . . . . . . . . . . . . . . . . . . .  -54-

    E.  The Secretaries Have Properly Concluded That All Waters
        Within A CSU Or National Forest Are Public Lands.
        . . . . . . . . . . . . . . . . . . . . . . .  -55-

        1.  Waters On Selected But Not Yet Conveyed Lands Are
            Properly Deemed To Be Subject To The Title VIII
            Priority. . . . . . . . . . . . . . . . .  -55-

        2.  All Inland Waters Within A Federal Reservation Are
            Properly Deemed To Be Public Lands. . . . .  -60-

            (a) All Waters Within The Chignik Lake And River
                System Have Properly Been Determined To Be Public
                Lands. . . . . . . . . . . . . . . . .  -62-

            (b) The Crescent River Has Properly Been Determined
                To Be Public Lands. . . . . . . . . . . .  -64-

            (c) The Juneau Road System Streams Have Properly
                Been Determined To Be Public Lands. . . . .  -66-

    F.  The Regulations Properly Include Tidally Influenced Inland
        Waters. . . . . . . . . . . . . . . . . . . .  -70-

        1.  The Inland Waters Of Togiak Bay Have Been Properly
            Delineated. . . . . . . . . . . . . . . .  -75-

2. The Inland Waters Of Tuxedni Bay Are Not Deemed To Be Public Lands. . . . . . . . . . . . . . . . -77-

3. The Inland Waters Of The Stikine River Are Properly Determined To Be Public Lands. . . . . . . -78-

VI. THE PERATROVICH PLAINTIFFS' CONTENTIONS ARE WITHOUT MERIT . . . . . . . . . . . . . . . . . . . . . . . . -79-

A. Plaintiffs' Theory One. . . . . . . . . . . . . . . -80-

B. Plaintiffs' Theory Two. . . . . . . . . . . . . . . -81-

C. The Secretaries Have Properly Determined That FRWRs Are Not Held In Marine Waters. . . . . . . . . . . . . . -83-

1. The Court Lacks Jurisdiction Over Plaintiffs' Action. . . . . . . . . . . . . . . . . . . . . . -83-

2. The Determination That FRWRs Are Not Held In Marine Waters Was Proper. . . . . . . . . . . . -87-

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . -90-

TABLE OF EXHIBITS . . . . . . . . . . . . . . . . . . . -92-

TABLE OF AUTHORITIES

FEDERAL CASES

Aguilar v. United States, 474 F. Supp. 840 (D. Alaska 1979)
. . . . . . . . . . . . . . . . . . . . . . . . . . . -23-, -30-

Akootchook v. United States, 271 F.3d 1160 (9th Cir. 2001)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-

Alaska Pac. Fisheries v. United States, 248 U.S. 78 (1918
. . . . . . . . . . . . . . . . . . . . . . . . . )-24-, -26-

Alaska v. United States, 545 U.S. 75 (2005) . . . . . . -80--83-

Alaska v. United States, 546 U.S. 413, 416 (2006) . . . . . -81-

Allen v. Wright, 468 U.S. 737 (1984) . . . . . . . . . . -85-

American Hospital Management Corp. v. Harris, 638 F.2d 1208 (9th
Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . -9-

Arizona v. California, 373 U.S. 546 (1963) . . . . . -16-, -18-,
                                                -24-, -42-, -88-

Arizona v. California, 376 U.S. 340 (1964) . . . . . -42-, -44-

Arizona v. Thomas, 824 F.2d 745 (9th Cir. 1987) . . . . . . -8-

ASARCO, Inc. v. EPA, 616 F.2d 1153 (9th Cir. 1980)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-

Baelelo v. Baldridge, 724 F.2d 753 (9th Cir. 1984) . . . . . -9-

Baker v. Carr, 369 U.S. 186 (1962) . . . . . . . . . . . . -84-

Barron v. Ashcroft, 358 F.3d 674 (9th Cir. 2004) . . . . . -73-

California Oregon Power Co. v. Beaver Portland Cement Co., 295 U.S.
142 (1935) . . . . . . . . . . . . . . . . . . . . . . . -24-

Cappaert v. United States, 426 U.S. 128 (1976) . . . . -16--18-,
                                                -24-, -37-, -38-

Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971)
. . . . . . . . . . . . . . . . . . . . . . . . . . -7-, -8-

Colville Confederated Tribes v. Walton, 647 F.2d 42 (9th Cir. 1981)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . -25-


Exxon Mobile Corporation v. U.S. Environmental Protection Agency,
217 F.3d 1246 (9th Cir. 2000) . . . . . . . . . . . . . . . -73-

Federal Power Commission v. Oregon, 349 U.S. 435 (1955) . . -24-

Florida Power & Light Co. v. Lorion, 470 U.S. 729 (1985) . -12-

Friends of the Earth v. Hintz, 800 F.2d 822 (9th Cir. 1986). -12-

FW/PBS, Inc. v. Dallas, 493 U.S. 215 (1990) . . . . . . . . -85-

Garcia v. United States, 469 U.S. 70 (1984) . . . . . . . . -54-

Gladstone Realtors v. Village of Bellwood, 441 U.S. 91 (1979
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . )-84-

Hoonah Indian Assoc. V. Morrison, 170 F.3d 1223 (9th Cir. 1999)-12-

Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333
(1977) . . . . . . . . . . . . . . . . . . . . . . . . . . -87-

Independence Acceptance Co. v. State of California, 204 F.3d 1247
(9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . -8-

John v. United States, 247 F.3d 1032 (9th Cir. 2001)  . -2-, -47-

Kleppe v. New Mexico, 426 U.S. 529 (1976) . . . . . . . . . -37-

Leisnoi, Inc. v. United States, 170 F.3d 1188 (9th Cir. 1999)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . -40-

Lujan v. National Wildlife Federation, 497 U.S. 871 (1990)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . -85-

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) . . . . -84-

McMichael v. Napa County, 709 F.2d 1268 (9th Cir. 1983). . . .-84-

Metlakatla Indian Cmty. v. Egan, 369 U.S. 45 (1962) . . . . -26-

Minidoka Irrigation Dist. v. Department of the Interior, 406 F.3d
567 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . -11-

Mitchell Irrigation District v. Sharp, 121 F.2d 964 (10th Cir. 1941) . . . . . . . . . . . . . . . . . . . . . -37-

Motor Vehicle Manufacture's Ass'n v. State Farm Mutual Automobile Ins., 463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . -8-

Mourning v. Family Publications Service, 411 U.S. 356 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . -9-

National R.R. Passenger Corp. V. Boston and Maine Corp., 503 U.S. 407 (1992) . . . . . . . . . . . . . . . . . . . . . -32-

Ninilchik Traditional Council v. United States, 227 F.3d 1186 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . -7-

Nome Eskimo Community v. Babbitt, 67 F.3d 813 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . -87-

Old Person v. Brown, 312 F.3d 1036 (9th Cir. 2002) . . . . -11-

Oregon v. United States, 467 U.S. 1252 (1984) . . . . . . . -37-

O'Shay v. Littleton, 414 U.S. 488 (1974) . . . . . . . . . -85-

Pacific Coast Fed'n of Fisherman's Ass'n v. United States Bureau of Reclamation, 426 F.3d 1082 (9th Cir. 2005) . . . . . . . . -32-

Pence v. Kleppe, 529 F.2d 135 (9th Cir. 1976) . . . . . . . -22-

Pyramid Lake Paiute Tribe v. United States Department of the Navy, 898 F.2d 1410 (9th Cir. 1990) . . . . . . . . . . . . . . -8-

Ramirez v. Immigration & Naturalization Service, 550 F.2d 560 (9th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . -8-

Ranchers Cattlemen Action Legal Fund United Stockgrowers v. U.S. Department of Agriculture, 499 F.3d 1108 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . -13-

Red Top Mercury Mines, Inc. V. United States, 887 F.2d 198 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . -73-

S & M Investment Co. v. Tahoe Regional Planning Agency, 911 F.2d 324 (9th Cir. 1990), . . . . . . . . . . . . . . . . . . -54-

Scott v. United States, 316 U.S. 691 (1942) . . . . . . . . -37-

SEC v. Chenery Corp. 318 U.S. 80 (1943) . . . . . . . . . -32-

Secretary of Maryland v. Joseph H. Munson Co., 467 U.S. 947 (1984) . . . . . . . . . . . . . . . . . . . . . . . -86-

Shields v. United States, 504 F. Supp. 1216 (D. Alaska 1981),-22-

Sierra Club v. Morton, 405 U.S. 727 (1972) . . . . . . . -86-

Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26 (1976) . . . . . . . . . . . . . . . . . . . . -84-, -86-

Skeem v. United States, 273 F. 93 (9th Cir. 1921) . . . . . -25-

State of Alaska v. Babbitt, 182 F.3d 672 (9th Cir. 1999) . -40-

State of Alaska v. Babbitt, 72 F.3d 698 (9th Cir. 1995) . . . . . . . . . . . . . . . -2-, -10-, -15-, -28-, -39-, -41-

State of Nevada v. Burford, 918 F.2d 854 (9th Cir. 1990) . -85-

Steel Company v. Citizens for a Better Environment, 523 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . -85-, -87-

Thorpe v. Housing Authority of City of Durham, 393 U.S. 268 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . -9-

United States Department of Labor v. Triplett, 494 U.S. 715 (1990) . . . . . . . . . . . . . . . . . . . . . . . . -86-

United States ex rel. Ray v. Hibner, 27 F.2d 909 (D. Idaho 1928) . . . . . . . . . . . . . . . . . . . . . . . -25-

United States v. Adair, 723 F.2d 1394 (9th Cir. 1984). -37-, -88-

United States v. Ahtanum Irrigation Dist., 236 F.2d 321 (9th Cir. 1956) . . . . . . . . . . . . . . . . . . . . -42-

United States v. Alpine Land and Reservoir Co., 887 F.2d 207 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . -12-

United States v. Anderson, 591 F. Supp. 1 (E.D. Wash.1982) -42-

United States v. Anderson, 736 F. 2d 1358 (9th Cir. 1984) . -24-

United States v. Atlantic Richfield Co., 435 F. Supp. 1009 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . -26-

United States v. Celestine, 215 U.S. 278 (1909) . . . . . . -29-

United States v. Clark, 912 F.2d 1087 (9th Cir. 1990) . . . . -8-

United States v. District Court in and for Eagle County, Colo., 401 U.S. 520 (1971) . . . . . . . . . . . . . . . . . . -16-, -18-

United States v. Hays, 515 U.S. 737 (1995) . . . . . -85-, -86-

United States v. Hoflin, 880 F.2d 1033 (9th Cir. 1989) . . -58-

United States v. James, 478 U.S. 597 (1986) . . . . . . . -54-

United States v. Mead Corp., 533 U.S. 218 (2001) . . . . . -10-

United States v. New Mexico, 438 U.S. 696 (1978) . . . . . -16-, -18-, -36-, -68-, -69-, -88-, -89-

United States v. Powers, 305 U.S. 527 (1939) . -25-, -47-, -88-

United States v. Preston, 352 F.2d 352 (9th Cir. 1965) . . -42-

United States v. Ramsey, 271 U.S. 467 (1926) . . . . . . . -29-

United States v. Rio Grande Dam & Irrigation Co., 174 U.S. 690 (1899) . . . . . . . . . . . . . . . . . . . . . . . . . -42-

United States v. Tilley, 124 F.2d 850 (8th Cir. 1942) . . . -37-

United States v. Winans, 198 U.S. 371 (1905) . . . . . . . -18-

United States. Block v. North Dakota, 461 U.S. 273 (1983) . -40-

Universal Health Services, Inc. V. Thompson, 363 F.3d 1013 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . -73-

Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464 (1982) . . . . -84-, -86-

Warth v. Seldin, 422 U.S. 490 (1975) . . . . . . . . -84-, -87-

Wilderness Public Rights Fund v. Kleppe, 608 F.2d 1250 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . -8-

Winters v. United States, 207 U.S. 564 (1908)
. . . . . . . . . . . . . . . . . -17-, -18-, -24-, -41-, -42-

Yellen v. Hickel, 352 F. Supp. 1300 (S.D. Calif. 1972)  . .  -37-


STATE CASES

Department of Ecology v. Acquavella, 100 Wash. 2d 651, 674 P.2d 160
(1983) . . . . . . . . . . . . . . . . . . . . . . . . . . -25-

Mimbres Valley Irrigation Co. v. Salopek, 564 P.2d 615 (N.M. 1977)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . -68-

Potlatch Corp. v. United States, 134 Idaho 912, 12 P.3d 1256 (Idaho
2000) . . . . . . . . . . . . . . . . . . . . . . . . . . -16-

State of Washington v. Yakima Reservation Irrigation Dist., 850
P.2d 1306 (WA 1993) . . . . . . . . . . . . . . . . . . . -88-

United States v. City and County of Denver, 656 P.2d 1 (Colo. 1982)
. . . . . . . . . . . . . . . . . . . . . . . . . . . -18-, -88-

United States v. Idaho, 959 P.2d 449 (Idaho 1998) . . . . . -24-


FEDERAL STATUTES

5 U.S.C. §§ 701-706 . . . . . . . . . . . . . . . . . . . . -7-

16 U.S.C. § 3101(b) . . . . . . . . . . . . . . . . . . . . -45-

16 U.S.C. § 3102 . . . . . . . . . . . . . . . . . . . . . -58-

16 U.S.C. § 3102(12) . . . . . . . . . . . . . . . . . . . -9-

16 U.S.C. § 3102(2) . . . . . . . . . . . . . . . . -28-, -58-

16 U.S.C. § 3102(3) . . . . . . . . . . . . . . . -2-, -3-, -75-

16 U.S.C. § 3102(4) . . . . . . . . . . . . . . . . . -6-, -44-

16 U.S.C. § 3103 . . . . . . . . . . . . . . . . . . -47-, -76-

16 U.S.C. § 3103(3)(a) . . . . . . . . . . . . . . . . . . -75-

16 U.S.C. § 3103(a) . . . . . . . . . . . . . . . . . . . . -52-

16 U.S.C. § 3103(b) . . . . . . . . . . . . . . . -51-, -52-

16 U.S.C. § 3103(c) . . . . . . . . . . . . . . . -61-, -62-

16 U.S.C. § 3124 . . . . . . . . . . . . . . . . . -9-, -10-

16 U.S.C. § 410hh(7) . . . . . . . . . . . . . . . -65-, -66-

16 U.S.C. § 410hh(7)(a) . . . . . . . . . . . . . -54-, -55-

16 U.S.C. § 410hh(7)(b) . . . . . . . . . . . . . -50-, -51-

16 U.S.C. § 473 . . . . . . . . . . . . . . . . . . . . -68-

16 U.S.C. §§ 3111-3126 . . . . . . . . . . . . . . . . . -1-

16 U.S.C. §§ 3113-3114 . . . . . . . . . . . . . . . . . -2-

25 U.S.C. § 381 . . . . . . . . . . . . . . . . . . . . -25-

28 U.S.C. § 2401(a) . . . . . . . . . . . . . . . . . . -56-

28 U.S.C. § 2409a . . . . . . . . . . . . . . . . . . . -40-

43 U.S.C. § 1603 . . . . . . . . . . . . . . . . . . . -22-

43 U.S.C. § 1618(a) . . . . . . . . . . . . . . . . . . -26-

43 U.S.C. § 1632(a) . . . . . . . . . . . . . . . . . . -56-

43 U.S.C. § 1634(a)(1)(A) . . . . . . . . . . . . . . . -28-

43 U.S.C. § 1635 . . . . . . . . . . . . . . . . . . . -57-

43 U.S.C. § 1635(f)(1) . . . . . . . . . . . . . . . . -59-

43 U.S.C. § 1635(o) . . . . . . . . . . . . . . . -56-, -57-

43 U.S.C. § 270-1 (1970) . . . . . . . . . . . . -26-, -28-

43 U.S.C. § 270-1 thru 270-3 (1970) . . . . . . . . . -22-

43 U.S.C. § 270-2 (1970) . . . . . . . . . . . . . . . -23-

43 U.S.C. § 270-3 (1970) . . . . . . . . . . . . . . . -23-

43 U.S.C. §§ 270-1 thru 270-3 (1970) . . . . . . -6-, -19-, -20-

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . -7-

24 Stat. 388(codified . . . . . . . . . . . . . . . . -21-

34 Stat. 197 (1906 Act or Act) . . . . . . . . -22-, -28-

35 Stat. 2226 . . . . . . . . . . . . . . . . . . . -69-

70 Stat. 954 . . . . . . . . . . . . . . . . . . . -22-

94 Stat. 2371 . . . . . . . . . . . . . . . . . -1-, -46-

94 Stat. 2385 . . . . . . . . . . . . . . . . . -63--65-

94 Stat. 2392 . . . . . . . . . . . -77-, -79-, -80-, -82-

94 Stat. 2437-44 . . . . . . . . . . . -57- 30 Stat. 11-68-


FEDERAL REGULATIONS

36 C.F.R. § 242.3(b) . . . . . . . . . . . . . . . -3-

43 C.F.R. § 2561.0-3 (2007) . . . . . . . . . . . . -26-

43 C.F.R. § 2561.0-8 . . . . . . . . . . . . . -23-, -24-

43 C.F.R. § 2561.3 . . . . . . . . . . . . . . . . -28-

50 C.F.R. 100.4 . . . . . . . . . . . . . . . . . . -71-

50 C.F.R. § 100.3(b) . -5-, -21-, -33-, -34-, -36-, -44-, -45-,
                                                         -71-

50 C.F.R. § 100.3(b)(2005) . . . . . . . . . . . . . -3-

50 C.F.R. § 100.3(c) . . . . . . . . . . . . . . -3--5-

50 C.F.R. § 100.3(c)(25) . . . . . . . . . . . . . . -67-, -68-

50 C.F.R. § 100.4 . . . . . . . . . . . . . -3-, -4-, -70-, -74-

50 C.F.R. § 100.4(2) . . . . . . . . . . . . . . . . . . -57-

50 C.F.R. § 100.5 . . . . . . . . . . . . . . . . . . . -49-

OTHER AUTHORITIES

H.R. Rep. No. 96-97 . . . . . . . . . . . . . . . . . . -53-

S. Rep. 96-413 . . . . . . . . . . . . . . . . . -53-, -54-

S. Rep. No. 96-413 . . . . . . . . . . . . . . . . -53-, -54-

M-36662, Allotment of Land to Alaska Natives, 71 Interior Dec. 340,
342 (Sept. 21, 1964) . . . . . . . . . . . . -23-, -24-, -26-

State of Alaska v. Marcia K. Thorson, State of Alaska v. Phyllis
Westcoast (On Reconsideration), 91 Interior Dec. 331, 341 .  -30-

Defendants United States et al. respond herein to (1) Plaintiffs Katie John et al's Opening Brief on the "Which Waters" Issue(Docket Entry No. 139),[1] (2) State of Alaska's Opening Brief on Which Waters Specifying Test Case Categories With Sample Water Bodies (Docket Entry No. 134),[2] and (3) Supplemental Brief of Related Case Plaintiffs Peratrovich et al., on the "Which Waters"Issue (Docket Entry No. 150).[3] The intervenor-plaintiffs, Alaska Fish and Wildlife Federation and Outdoor Council et al. filed a joinder (Docket Entry No. 147) in the State's brief without presenting any additional arguments. Judicial review is sought by each plaintiff of the Final Rule jointly promulgated by the Secretaries of the Interior and Agriculture at 64 Federal Register 1276, 1286-1313 (Jan. 8, 1999), implementing in part the subsistence use priority of Title VIII of the Alaska National Interest Lands Conservation Act (ANILCA) of December 2, 1980, Pub. L. No. 96-487, 94 Stat. 2371, 2422-430, 16 U.S.C. §§ 3111-3126. For the reasons that follow, their contentions should be rejected, the regulations sustained and the respective actions should be dismissed.[4]

---

[1]      Hereinafter referred to as "KJ Br."

[2]      Hereinafter referred to as "State Br."

[3]      Hereinafter referred to as "Perat Br."

[4]      These three actions are *Katie John et al v. United States et*
(continued...)

**STATEMENT**

The actions of the various plaintiffs and the claims presented by these parties have already been summarized by the Court in its Decision The Process for Identification of Federally Reserved Waters (Docket Entry No. 110) filed May 17, 2007, at 2-7.[5] These actions are an extension of the proceedings that resulted in the decisions in *State of Alaska v. Babbitt*, 72 F.3d 698 (9th Cir. 1995), *cert. denied*, 517 U.S. 1187 (1996), *adhered to en banc following remand sub nom.*, *John v. United States*, 247 F.3d 1032 (9th Cir. 2001). The issue presented at that time was the extent to which navigable waters in Alaska are "public lands" subject to the ANILCA Title VIII subsistence use priority set forth in 16 U.S.C. §§ 3113-3114. These decisions and their proceedings will hereinafter be referred to as *Katie John #1*. The Court of Appeals agreed that the definition of public lands, 16 U.S.C. § 3102(3), includes those navigable waters in which the United States holds reserved water rights, and remanded to the agencies to identify those waters. 72 F.3d at 702-03. The present cases seek judicial

---

[4]/(...continued)
*al.*, No. 3:05-cv-0006-HRH, which is consolidated with *State of Alaska v. Dirk Kempthorne et al.*, No. 3:05-cv-0158-HRH; and *Lincoln Peratrovich et al. v. United States et al.*, No. 3:92-cv-0734-HRH. The Alaska Fish and Wildlife Federation and Outdoor Council et al. was granted leave to intervene as a plaintiff in Case No. 3:05-cv-0158-HRH.

[5]/    Hereinafter referred to as "Decision (Dkt 110)."

review of the Secretaries' action following this remand.

**A. The Regulations**. A final rule was published on January 8, 1999, 64 Federal Register 1276, 1286-88, 18 AR Tab 413,[6] identifying the waters that were deemed to be public lands. This rule was made effective October 1, 1999. *Id*. at 1276. In this rule the Secretaries determined that waters were public lands "where the Federal Government holds a water right or holds title to the waters or submerged lands." *Id*. at 279. All navigable waters and non-navigable waters within and inland waters[7] adjacent to the specifically listed areas were deemed by these regulations to be public lands. *Id*. at 1286-87, codified at 36 C.F.R. § 242.3(b), 50 C.F.R. § 100.3(b)(2005).[8] The regulations also acknowledged that these determinations were subject to change. 64 Federal Register at 1287, 50 C.F.R. § 100.3(c).

Subsequently, proposed amendments to the January 1999 final rule were published on December 8, 2004, 69 Federal Register 70940-

---

[6]   AR refers to the Administrative Record certified to the Court on October 3, 2005 (Docket Entry No. 17). References will be to the volume, tab and where relevant a specific page number.

[7]   Inland waters are defined in 50 C.F.R. § 100.4 and that definition is quoted in full at, 70, *infra*.

[8]   The regulations are identical but separately codified. The Department of the Interior's regulations are codified at Title 50 of the Code of Federal Regulations, Part 100; the Department of Agriculture's are codified at Title 36 of the Code of Federal Regulations, Part 242. Hereinafter, references will be made only to the regulations found in Title 50.

44,[9] to "revise and clarify the jurisdiction of the Federal Subsistence Management program in coastal areas in southwestern Alaska." *Id.* at 70940. As stated therein, the purpose of the proposal was to exclude "saltwater embayments" that "were never intended to fall under subsistence management jurisdiction." *Id.* Following public review and comments on this proposal, a final rule was published in 70 Federal Register 96400-08 (December 27, 2005). As stated therein:

> This rule revises and clarifies the jurisdiction of the Federal Subsistence Management Program for certain coastal areas in Alaska in order to further define, in part, certain waters that may never have been intended to fall under the Subsistence Management Program jurisdiction.

*Id.* at 76400. The preamble to this final rule, clarifies and explains the scope of the 1999 regulations. *Id.* at 76402-404. It also further clarifies that the United States was not claiming to hold reserved water rights in marine waters,[10] *id.* at 76401, 76403, and that marine water are public lands only if they are above submerged lands that were reserved in the United States at the time of Alaska statehood. *Id.* at 76402, 76403.

The 1999 final rule did not, however, separately denominate the waters that were public lands by reason of a reserved water

---

[9]    This proposal proceeded the filing of and is referenced in the State's Complaint for Declaratory and Injunctive Relief ¶¶ 33, 54.

[10]    Marine waters are defined in 50 C.F.R. § 100.4, and that definition is quoted in full at, 70, *infra*.

right or by reason of their lying above reserved submerged lands. *Id*. at 76404. With the 2005 Amendment the regulations now separately lists the categories of waters deemed to be public lands. *Id*. Section ___.3(b)(codified as previously indicated in the Code of Federal Regulations, in both Title 36 and 50)[11] identifies those areas in which the waters are determined to be public lands by reason of pre-statehood reservations. *Id*. at 76405, 76407. Section ___.3(c) lists those areas where marine waters are not included, but where the regulations apply to all inland waters both navigable and non-navigable. *Id*. at 76405, 76407-08. Finally, where lands have not been withdrawn from the public domain for specific purposes (*e.g.* "unassociated BLM lands"), the regulations apply only to non-navigable waters on federal lands. *Id*. at 76405.[12]

    **B. Plaintiffs' Claims**. Generally the Secretaries determined that all inland waters, both navigable and non-navigable, within

---

[11]    The State agrees that waters overlying federal lands are public lands. *Katie John et al v. United States*, No. 00-35121 (9th Cir.), En Banc Reply Brief for Appellants State of Alaska and Frank Rue at 21, Exhibit 1 to Brief of the United States (Docket Entry No. 78) filed October 10, 2006: "The State agrees that waters overlying federal lands are included in "public lands." None of the briefs to which the United States is now responding seek review of the identifications in 50 C.F.R. § 100.3(b), of these overlying waters.

[12]    The 2005 final rule acknowledged that the public lands waters determinations remain subject to change. *Id*. at 76408, section ___.3(e). Subsequently, a proposal to determine that certain waters in the Makhnati Island area are also public lands based on a pre-statehood reservation was published. 71 Federal Register 25528-31 (May 1, 2006). A rule finalizing that determination, effective September 25, 2006, was published on August 24, 2006. 71 Federal Register 49997.

the boundaries of a conservation system unit[13] or a National Forest and the waters immediately adjacent thereto are public lands for purposes of the Title VIII priority.[14] The *Katie John* plaintiffs contend that this determination is too limited. They contend that waters both upstream and downstream from conservation system units and on or adjacent to allotments issued under the Alaska Native Allotment Act, 43 U.S.C. §§ 270-1 thru 270-3 (1970), should also be public lands.

The *Peratrovich* plaintiffs also contend that the designation of public land waters is too narrow. They contend that marine (non-inland) waters within the exterior boundaries of the Tongass National Forest should also be public lands.

On the other hand, the State contends that the designation of the waters that are public lands is too broad.[15] The State contends that the regulations improperly include waters on non-Federally owned lands within conservation system units and National Forests, improperly include marine and tidally influenced waters, improperly include waters adjacent to conservation system units, and

---

[13] Defined in 16 U.S.C. § 3102(4) to include Alaska units of the National Park, National Wildlife Refuge, National Wilderness Preservation, National Wild and Scenic River, National Trail and National Forest Monument systems.

[14] Immediately adjacent in practice as applied by the Federal Subsistence Board means contiguous to, but not upstream or downstream from the respective unit. Declaration of Theo Matuskowitz ¶ 4, Exhibit 1 hereto.

[15] The State's prior contention in this action that defendants could not identify the public land waters in a rule making was addressed and rejected in the Court's Decision (Dkt 110).

improperly include waters on lands selected by but not yet conveyed to the State or to Alaska Native corporations.

## I. THE SCOPE OF REVIEW TO BE APPLIED IN ASSESSING THE VALIDITY OF THE AGENCIES' REGULATIONS IS LIMITED

The State recognizes that judicial review in its action is governed herein by the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706. Plaintiff State of Alaska's Opening Brief Regarding What Rules of Law Govern Establishment of Federal Reserved Water Rights in Alaska and Determinations of "Public Lands" (Docket Entry No. 68) at 4. The *Katie John* plaintiffs also agree that the court's scope of review is governed by the APA. KJ Br. at 23.

The *Peratrovich* plaintiffs do not specifically acknowledge that the scope of review over their action is also governed by the APA. Perat Br. at 2. However, as recognized in *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1192-93 (9th Cir. 2000), the APA establishes the scope of review over the *Peratrovich* action as well.

**A. Review Is Limited And Deferential**. Pursuant to 5 U.S.C. § 706, judicial review is limited to whether the Secretaries' decisions were arbitrary, capricious or an abuse of discretion, or otherwise not in accordance with law, and whether the agency complied with all applicable procedural requirements.[16]/ *Citizens to*

---

[16]/ No procedural issues are presented in any of the plaintiffs' current briefs.

*Preserve Overton Park v. Volpe*, 401 U.S. 402, 413-14 (1971); *Pyramid Lake Paiute Tribe v. United States Department of the Navy*, 898 F.2d 1410, 1414 (9th Cir. 1990). Under the arbitrary and capricious standard, courts are to engage in a substantial inquiry, but should not substitute their judgment for that of the agency. *Citizens to Preserve Overton Park*, 401 U.S. at 415-16; *Arizona v. Thomas*, 824 F.2d 745, 748 (9th Cir. 1987). An agency's action would be arbitrary and capricious:

> [I]f the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Manufacture's Ass'n v. State Farm Mutual Automobile Ins.*, 463 U.S. 29, 43 (1983). *Accord United States v. Clark*, 912 F.2d 1087, 1090 (9th Cir. 1990).

A very heavy burden is placed on those who seek to overturn a regulation. *Ramirez v. Immigration & Naturalization Service*, 550 F.2d 560, 563 (9th Cir. 1977). The presumption is that the administrative action is correct. *Wilderness Public Rights Fund v. Kleppe*, 608 F.2d 1250, 1254 (9th Cir. 1979): "There is a judicial presumption favoring the validity of administrative action." *Accord Independence Acceptance Co. v. State of California*, 204 F.3d 1247, 1251 (9th Cir. 2000)(The standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision.").

ANILCA provides that the Secretaries of the Interior and Agriculture "shall prescribe such regulations as are necessary and appropriate to carry out his responsibilities under this subchapter." 16 U.S.C. § 3124.[17] When Congress confers this type of broad implementing responsibility, the review of implementing regulations is particularly deferential, and limited to ensuring that the regulations are "reasonably related to the purposes" of the enabling legislation:

> Where the empowering provision of a statute states simply that the agency may "make...such rules and regulations as may be necessary to carry out the provisions of this Act," we have held that the validity of a regulation promulgated thereunder will be sustained so long as it is "reasonably related to the purposes of the enabling legislation."

*Mourning v. Family Publications Service*, 411 U.S. 356, 369 (1973), quoting *Thorpe v. Housing Authority of City of Durham*, 393 U.S. 268, 280-81 (1969). *Accord Baelelo v. Baldridge*, 724 F.2d 753, 760 (9th Cir. 1984), *cert. denied* 467 U.S. 1252 (1984); *American Hospital Management Corp. v. Harris*, 638 F.2d 1208, 1212 (9th Cir. 1981)("Our review . . . is limited to determining whether the regulation is reasonably related to the purpose of the relevant enabling legislation, as well as to the more particular purpose through which the particular regulation implements those objectives in a particular area.").

The State and the *Peratrovich* plaintiffs contend that no

---

[17]     Secretary is defined in ANILCA to be either the Secretary of the Interior or the Secretary of Agriculture depending on the land unit at issue. 16 U.S.C. § 3102(12).

deference should in this instance be given to the agencies' determinations. State Br. at 3-5: Perat Br. at 2. They contend that whether or not a reserved water right is held by the United States (hereinafter referred to as "FRWR") in any water is a legal issue which should be reviewed by the Court *de novo*.

It is true that the Secretaries determinations of which waters are public lands for purposes of the ANILCA subsistence priority is based in part on their identification of waters in which the United States holds FRWRs. However, as more fully set forth below, such identification of FRWR's involves legal interpretations of the particular purposes for which federal lands have been dedicated by treaty, statute, regulation, and/or executive order. Such legal interpretations, made through notice-and-comment rulemaking, are entitled to substantial judicial deference. *See*, *e.g.*, *United states v. Mead Corp.*, 533 U.S. 218, 229-31 (2001). Moreover, the determinations of public land waters here also involve the necessary recognition of the purposes and intent of ANILCA to both provide a meaningful subsistence use priority for rural Alaska residents while also recognizing that ANILCA did not intend to totally supplant the State's authority over all waters in Alaska. *Katie John #1*, 72 F.3d at 703. These are precisely the type of determinations that ANILCA, 16 U.S.C. § 3124, intends the Secretaries to make and to which deference is to be accorded.

**B. Narrow Construction Is Not Required.** The State contends that the agencies and the Court must adopt an interpretation of the extent of the public land waters and of FRWRs that is narrowly

construed and requiring a clear statement of intent to defeat the State's traditional authority to regulate the taking of fish and game. State's Br. at 16-17. This argument is merely a reprise of the arguments presented in the State of Alaska's Opening Brief Regarding What Rules of Law Govern Establishment of Federal Reserved Water Rights in Alaska and Determinations of "Public Lands" (Docket Entry No. 68) at 11-12; and Reply Brief of the State of Alaska (Docket Entry No. 88) at 29-31. The Court has rejected this argument recognizing that sections 1314 and 1319 of ANILCA provide for the substitution of State authority with respect to the Title VIII priority. Decision (Dkt 110) at 29-31. That decision should now be law of the case. A court is generally precluded from reconsidering and re-deciding an issue previously decided by that court or by a higher court. *Minidoka Irrigation Dist. v. Department of the Interior*, 406 F.3d 567, 573 (9th Cir. 2005); *Old Person v. Brown*, 312 F.3d 1036, 1039 (9th Cir. 2002).

**C. The Indian Canon of Construction Is Not Applicable.** The *Katie John* plaintiffs contend that Title VIII is remedial Indian legislation and should be liberally construed and doubtful expressions resolved in their favor. KJ Br. at 24. Therefore, the *Katie John* plaintiffs argue that the agencies and the Court should broadly apply the reserved water rights doctrine and expand the areas in which FRWRs are held and the waters deemed to be public lands. The Secretaries rejected this contention noting that the Title VIII priority is a preference for all rural Alaskans and not

just Alaska Natives. 70 Federal Register 76400, 76402 (Dec. 27, 2007). Further, the Court of Appeals has held that ANILCA's subsistence use provisions are not Indian legislation and, therefore, not subject to this canon of construction. *Hoonah Indian Assoc. V. Morrison*, 170 F.3d 1223, 1228-29 (9th Cir. 1999). The *Katie John* plaintiffs' reliance on the Indian canon of construction should, accordingly, be rejected.

**D. Remand Is The Court's Limited Remedy**. The State contends that the agencies have failed to adequately explain the basis for their determinations as to the waters they have identified as public lands. State Br. at 3, 10-14. In the arguments that follow defendants will show that this contention is in error. However, should the Court decide that any necessary explanation is inadequate as alleged, the Court's remedy under the APA is to remand to the agencies for further consideration and explanation. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *United States v. Alpine Land and Reservoir Co.*, 887 F.2d 207, 213 (9th Cir. 1989), *cert. denied Truckee-Carson Irrigation Dist. v. United States*, 498 U.S. 817 (1990).

**E. Review Is Limited To The Administrative Record**. Judicial review under the APA is confined to the administrative record before the agency. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985); *Friends of the Earth v. Hintz*, 800 F.2d 822, 828-

29 (9th Cir. 1986). A court may consider material from outside the record only in exceptional circumstances, as where this is necessary to obtain background information or to explain technical terms and complex subject matter. *Ranchers Cattlemen Action Legal Fund United Stockgrowers v. U.S. Department of Agriculture*, 499 F.3d 1108, 1117 (9th Cir. 2007); *ASARCO, Inc. v. EPA*, 616 F.2d 1153, 1159-60 (9th Cir. 1980). Consideration of extra-record material to determine the correctness or wisdom of an agency's decision is, however, not permitted. *ASARCO, Inc.* 616 F.2d at 1160.

The *Katie John* plaintiffs have attached two exhibits that the Court may not consider in addressing the merits of the agencies action. These are their Exhibits 10 and 11. These Exhibits are affidavits and attached reports dated 2007 by experts that were clearly prepared after the challenged rulemaking. Plaintiffs have also not shown that either of these documents offer background or other information necessary to understand the agencies' action.[18]

## II. THE SECRETARIES' DETERMINATIONS AS TO THE SCOPE OF PUBLIC LAND WATERS SHOULD BE AFFIRMED

With the focus of each of the plaintiffs in their briefs being on their specific contentions, the real issue before the Court

---

[18]    The *Katie John* plaintiffs also attach as Exhibit 1 a document that is not in the certified record. Defendants have no objection to the Court's consideration of that document. The document is authentic and similar to other documents in the record. This document simply was not located, and thus inadvertently was not included in the administrative record.

becomes lost. What is being reviewed herein are the Secretaries' determinations, following the remand in the *Katie John #1* case, of which waters are within the statutorily intended scope of the public lands and, therefore, subject to Title VIII's subsistence use priority. While the majorities in both of the Court of Appeals' decisions in *Katie John #1* agreed that waters in which the United States holds a FRWR are public lands for purposes of the Title VIII priority, the majority and concurring decisions all recognizing the difficulties in ascertaining just what Congress intended and the essentially imperfect solution that FRWRs provides in defining public lands waters.

The use of FRWRs to determine public land waters is a problem unique to ANILCA. As is evident in the authorities referenced in Part III which follows, issues pertaining to whether a FRWR exists in any specific waters and the decisions in regard thereto usually arise in the context of consumptive uses of water and a shortage of the amount of water available for such uses. The principles regarding FRWRs derived from these cases, therefore, do not always precisely fit the determinations of the waters that are subject to the Title VIII subsistence use priority.

The clearest element in the majority's decision in *Katie John #1* is the recognition, if the State did not or could not administer the priority, that Congress intended that both the State of Alaska and the Federal government would have significant, meaningful areas

of retained jurisdiction. 72 F.3d at 704, *affirmed*, 247 F.3d at 1033. As part of this recognition, the Court of Appeals rejected the inclusion of all navigable waters recognizing this would defeat this purpose by excluding the State from any meaningful areas of fishery management. *Id*. 72 F.3d at 703. Similarly, the State's contention that only waters in which the United States had a strictly defined title interest was rejected in part because it would have undermined the intent of Congress that the Title VIII priority include a meaningful subsistence fishery priority.

Each of the plaintiffs, by focusing on the technical aspects of the judicially developed FRWRs law, overlook this recognized congressional intent: that the scope of public lands waters are intended to continue meaningful areas of jurisdiction for both the State and the Federal government. Their respective interpretations of the FRWRs' doctrine which would either effectively exclude the State from any meaningful authority over navigable waters or exclude the Federal government from providing a meaningful Title VIII priority should be rejected.

### III. THE CRITERIA FOR FEDERAL RESERVED WATER RIGHTS

The issues presented by each of the plaintiffs is whether the United States holds a Federally reserved water right (FRWR) in specific types of waters. If it does, then the *Katie John* and *Peratrovich* plaintiffs contend that these waters should be deemed to be public lands to which the Title VIII subsistence use priority

should be extended. If a FRWR is not held in these category of waters, the State contends that the Title VIII priority does not extend to these waters. There is no real dispute as to the basic criteria for the presence of FRWR. The disputes are to the application of these principles to the Alaska factual situation.

It is recognized that Congress and congressionally authorized executive agencies have the power "to reserve waters for the use and benefit of federally reserved lands." *United States v. District Court in and for Eagle County, Colo.*, 401 U.S. 520, 522 (1971), quoting *Arizona v. California*, 373 U.S. 546, 597 (1963). That authority stems from the Constitution's Commerce Clause, Art. I, sec. 8, cl. 3, and Property Clause, Art. IV, sec. 3, cl. 2. See *Arizona v. California*, 373 U.S. at 598 ("We have no doubt about the power of the United States under the [Commerce and Property] clauses to reserve water rights for its reservations and its property."). See also *United States v. New Mexico*, 438 U.S. 696, 698-99 (1978); *Cappaert v. United States*, 426 U.S. 128, 138 (1976).

Whether there has been a federal reservation of water is a question of Government intent. See *New Mexico*, 438 U.S. at 699. Where Congress or the Executive makes its intent to reserve water explicit on the face of a statute, treaty, executive order, or other reservation instrument, that expression is sufficient to establish a federal water right. For instance, an express reservation of water has been recognized to exist under the Wild

and Scenic Rivers Act. *Potlatch Corp. v. United States*, 134 Idaho 912, 12 P.3d 1256 (Idaho 2000).

Alternatively, when the United States reserves land for specific federal purposes, it impliedly reserves unappropriated water to the extent necessary to fulfill those purposes. The Supreme Court succinctly explained the doctrine of the implied federal reservation of water as follows:

> [W]hen the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation. In so doing, the United States acquires a reserved right in unappropriated water which vests on the date of the reservation and is superior to the rights of future appropriators.

*Cappaert*, 426 U.S. at 138.[19/]

In its most recent statement of this principle, the Court said:

---

[19/]    The principles of the implied reservation of water rights doctrine were first set forth with respect to Indian Reservations in the seminal case of *Winters v. United States*, 207 U.S. 564 (1908). Winters, involved the Fort Belnap Indian reservation which had been established in Montana. That reservation, which is bordered by a non-navigable river, had been set aside, and the Indians settled upon it, in furtherance of the federal policy of converting the Indians into a "pastoral and civilized" people. Winters, 207 U.S. at 576. Accordingly, the United States Supreme Court held that the federal government, by setting aside the Indian reservation, had also impliedly reserved for the benefit of the Indians that portion of the waters of the adjoining stream necessary to irrigate the reservation's lands and to provide water for other actions to "civilize" the tribe. The Court stated that "[t]he power of the [federal] government to reserve the waters and exempt them from appropriation under the state laws is not denied, and could not be." *Id*. at 577.

> Where water is necessary to fulfill the very purposes for which a federal reservation was created, it is reasonable to conclude, even in the face of Congress' express deference to state water law in other areas, that the United States intended to reserve the necessary water.

*New Mexico*, 438 U.S. at 702. The intent to reserve water "is inferred if the previously unappropriated waters are necessary to accomplish the purposes for which the reservation was created." *Cappaert*, 426 U.S. at 139. This inferred intent applies to the primary purposes of non-Indian federal reservations, but does not extend to its secondary purposes. *New Mexico*, 438 U.S. at 714. The determination of a FRWR is not governed by state law, but derives from the purposes of the federal reservation. *Cappaert*, 426 U.S. at 145.[20]/

Although initially developed in connection with Indian Reservations, see *Winters*, 207 U.S. 564, the implied federal reserved rights doctrine applies to "any federal enclave," *United States v. District Court for Eagle County*, 401 U.S. 520, 522-23 (1971), including "National Recreation Areas and National Forests." *Arizona v. California*, 373 U.S. 546, 601 (1963). See also *United States v. City and County of Denver*, 656 P.2d 1, 20 (Colo. 1982) ("After *Cappaert* and *New Mexico*, it is clear that the implied

---

[20]/    The Federal Government has the authority both before and after statehood to "reserve waters for the use and benefit of federally reserved lands." *United States v. District Court in and for County of Eagle,* 401 U.S. 520, 522-23 (1971). This is so even if the State has been granted title to the submerged lands. *United States v. Winans,* 198 U.S. 371, 383-84 (1905).

reservation doctrine applies to all federal enclaves and that the federal government may acquire rights to unappropriated water on federal lands when the land has been reserved pursuant to congressional authorization for a specific federal purpose that requires the use of water.").

## IV. THE CONTENTIONS REGARDING ALASKA NATIVE ALLOTMENTS AND RESERVED WATER RIGHTS ARE WITHOUT MERIT AND SHOULD BE REJECTED

The *Katie John* plaintiffs contend that the Secretaries should have found the waters both upstream and downstream from conservation system units, and on or adjacent to allotments issued under the Alaska Native Allotment Act, 43 U.S.C. §§ 270-1 thru 270-3 (1970), to be public lands for purposes of the Title VIII priority. Conversely, the State of Alaska argues that Alaska Native Allotments cannot hold any FRWR's whatsoever, State Br. at 45-49, regardless of whether those waters are within the boundaries of federal lands. For the reasons that follow, the court should not address the merits of these contentions.

The Secretaries have not determined whether a FRWR is held on waters located on or adjacent to Alaska Native allotments that lie outside of the federal lands. Instead they have stated only that whether the United States holds a FRWR in such waters should be determined on a case-by-case basis. In response to a comment with respect to allotments, the agencies stated:

> One commentator said that waters flowing through or adjacent to Native allotments should be subject to the

Federal subsistence jurisdiction. Many Native Allotments are within the boundaries of the Federal lands identified in § ____.3 of this rule, and therefore waters flowing through or adjacent to those allotments are subject to a Federal reserved water right and Federal subsistence jurisdiction. ***However, Native allotments falling outside of the lands and waters identified in § ____.3 are not included. Whether there are Federal reserved water rights associated with any of these small scattered parcels would have to be determined on a case-by-case basis.*** These regulations contain a process for the Board to make recommendations to the Secretaries for additions, if necessary. (Emphasis added)

64 Federal Register 1276, 1279 (Jan. 9, 1999). Therefore, the proper issue before the Court is whether this determination to proceed on a case-by-case basis is arbitrary and capricious or contrary to law.[21]/ *See*, 7-10, *supra*.

Given the nature of Alaska Native allotments, the unresolved issue of FRWRs for these allotments, and the appropriateness of interpreting any water rights for these *individual* allotments to fit ANILCA's definition of "public lands," this deferral was

_____

[21]/ The Katie John plaintiffs do not complain about the Secretaries' determinations concerning the many Native Allotments that lie within the boundaries of the Federal lands identified in § ____.3 of the rule, with waters flowing through or adjacent to them. The Secretaries determined that the waters on or adjacent to such allotments are already subject to a Federal reserved water right and Federal subsistence jurisdiction by reason of their inclusion within the boundaries of a reservation. *See* 64 Federal Register 1276, 1279 (Jan. 9, 1999). However, the Secretaries determined that a determination on Native allotments falling outside of the lands and waters identified in § ____.3 would have to be evaluated on a case-by-case basis. It is these allotments that the Katie John plaintiffs contend should be recognized as public land waters. *See*, Exhibits 12 & 13 to KJ Br.

reasonable and not arbitrary, capricious, or contrary to law.  For the reasons that follow, the court should reject the contentions of both the *Katie John* plaintiffs and the State.[22]/

    **A. Alaska Native Allotment Act.**  In 1887, Congress passed the General Allotment Act, which provided that certain land both on and off Indian reservations could be allotted for the exclusive use of individual Indians. *See* Act of Feb. 8, 1887, ch. 119, 24 Stat. 388(codified as amended in scattered sections of 25 U.S.C.); *Akootchook v. United States*, 271 F.3d 1160, 1162 (9th Cir. 2001). Because several decisions had held that Alaska Natives were not within the definition of "Indian," there was doubt as to whether

---

[22]/    The Katie John plaintiffs have not, however, shown standing to present this claim. Therefore, the Court should dismiss this claim for lack of jurisdiction. The principles and showing required for standing are discussed commencing at, 83, *infra*. Exhibit 13 shows that plaintiff Charles Erhart has an interest in an allotment that is not within in any of the units listed in 50 C.F.R. § 100.3(b) or (c), and lies adjacent to a portion of the Tanana River that is not deemed to be public lands. However, Mr. Erhart has not shown that he is a rural Alaska resident or a resident of an area that would be entitled to participate in Title VIII priority on the waters at issue. Thus, he has failed to show that he has standing to present his claim.

    Exhibit 12 is the Declaration Thelma Starr. This declaration is too general to establish standing for any specific allotments for plaintiffs' claim regarding allotments. While Exhibit 12 shows that there are allotments on or along portions of the Yukon River that have not been determined to be public lands, that declaration does not identify any specific allotment and the holders of an interest in the specific allotments, or show that any of the *Katie John* plaintiffs have standing to represent the holders of interests in any specific allotment.

the General Allotment Act applied in Alaska. *Shields v. United States*, 504 F. Supp. 1216, 1217 (D. Alaska 1981), *affirmed*, 698 F.2d 987 (9th Cir.), *cert. denied*, 464 U.S. 16 (1983).

Congress eliminated any doubt regarding the general applicability of the allotment policy in Alaska with the passage of the Alaska Native Allotment Act, Act of May 16, 1906, ch. 2466, 34 Stat. 197 (1906 Act or Act).[23/]  Under the 1906 Act, Congress authorized the Secretary of the Interior to provide Alaska Natives with allotments, not to exceed 160 acres, within the District of Alaska. *See Pence v. Kleppe*, 529 F.2d 135, 140 (9th Cir. 1976) (discussing origins of 1906 Act). The Act provided in full:

> That the Secretary of the Interior is hereby authorized and empowered, in his discretion and under such rules as he may prescribe, to allot not to exceed one hundred and sixty acres of nonmineral land in the district of Alaska to any Indian or Eskimo of full or mixed blood who resides in and is a native of said district, and who is the head of a family, or is twenty-one years of age; and the land so allotted shall be deemed the homestead of the allottee and his heirs in perpetuity, and shall be inalienable and nontaxable until otherwise provided by Congress. Any person qualified for an allotment as aforesaid shall have the preference right to secure the allotment to the nonmineral land occupied by him not

---

[23]    As amended by the Act of August 2, 1956, Pub. L. No. 931, 70 Stat. 954, the 1906 Act was last codified at 43 U.S.C. § 270-1 thru 270-3 (1970). In 1971, the Alaska Native Claims Settlement Act (ANCSA) extinguished aboriginal title and claims in Alaska, including hunting and fishing rights, and terminated the authority to establish allotments under the 1906 Act.  43 U.S.C. §§ 1603, 1617(a). Allotment applications pending at the time of ANCSA's passage can still be approved, *id.* § 1617(a) (excepting applications "pending before the Department of the Interior on December 18, 1971").

exceeding one hundred and sixty acres.
The 1906 Act, as later amended, allowed allotments to be alienated with the approval of the Secretary; permitted certain allotments to be granted within national forests, 43 U.S.C. § 270-2 (1970); and provided that no allotment was to be made until the applicant submitted "proof satisfactory to the Secretary . . . of substantially continuous use and occupancy of the land for a period of five years."  43 U.S.C. § 270-3 (1970).

The Department of the Interior set out its position on the allotment process in a formal legal opinion issued in 1964.  The Solicitor's opinion stated that the use and occupancy required to sustain an allotment application should recognize the standards of an Alaska native "in his present culture and environment." M-36662, Allotment of Land to Alaska Natives, 71 Interior Dec. 340, 342 (Sept. 21, 1964). The opinion stated that "the home of an Alaska native may include a fishing site, a hunting and trapping site, reindeer headquarters and corrals, and tracts regularly used for other purposes." *Id*. This Court later observed, the 1906 Act was intended "to create or to recognize rights in Alaska Natives to the land they occupy for the statutory period...." *Aguilar v. United States*, 474 F. Supp. 840, 843 (D. Alaska 1979).

While an allotment may be 160 acres in total, that may be in a single allotment parcel or in multiple separate tracts. 43 C.F.R. § 2561.0-8; M-36662, *supra*. It is not uncommon for applications to

seek more than one and as many as four separate parcels. Declaration of James R. Szender ¶ 7, Exhibit 2 hereto. The size of the parcels may vary and are not uncommonly ten acres or less. *Id.*

**B. Federal Reserved Water Rights for Indian and Alaska Native Allotments**. As discussed above, federal reserved water rights arise by implication when lands are dedicated to serve as Indian or other federal reservations or to accomplish other federal purposes, for which water is necessary. *E.g., Winters v. United States*, 207 U.S. 564, 577 (1908); *Alaska Pac. Fisheries v. United States*, 248 U.S. 78, 87-89 (1918); *Arizona v. California*, 373 U.S. 546, 600-01 (1963); *Cappaert v. United States*, 426 U.S. 128, 138-39 (1976).[24/] Establishment of reservations may occur by treaty, statute, or executive action such as executive orders.

---

[24] Defendants disagree with the State's contention that FRWRs may only arise from formally established federal reservations. *See* State Br. at 46-48. For example, implied FRWRs have been recognized for lands re-acquired by a Tribe and taken back in trust by the United States. *See*, *United States v. Anderson*, 736 F. 2d 1358, 1361-62 (9th Cir. 1984). In addition, courts have also found that the United States holds FRWRs in public springs and water holes that were withdrawn from entry by Public Water Reserve 107, an executive order issued in 1926. *See United States v. Idaho*, 959 P.2d 449, 450-53 (Idaho 1998). Contrary to the State's reliance on *California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142 (1935), the Supreme Court later clarified that its holding does not apply to reserved lands. *See Federal Power Commission v. Oregon,* 349 U.S. 435, 448 (1955). Finally, the 1964 Solicitor's opinion, M-3662, 71 Interior Dec. at 344-45, specifically noted that the 1906 Alaska allotment act did not necessarily "superimpose the requirements of the general homestead laws on the express requirements" of that act.

Courts have also generally recognized that allotments owned by individual Indians are entitled to FRWRs. In the typical case, allotments on Indian reservations to individual Indians, as well as the transfer of these allotments to non-Indians, have been found to carry with them a share of the reservation's FRWRs pursuant to section 7 of the General Allotment Act, 25 U.S.C. § 381. *E.g.*, *United States v. Powers*, 305 U.S. 527, 532 (1939); *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 48 (9th Cir. 1981). Courts have similarly concluded that individual Indian allotments within areas ceded by Indian tribes back to the United States also have FRWRs. *See Skeem v. United States*, 273 F. 93, 95 (9th Cir. 1921). *See Also United States ex rel. Ray v. Hibner*, 27 F.2d 909, 911-12 (D. Idaho 1928) (analyzing same treaty provisions, court follows *Skeem* and holds that non-Indian successors acquire same right as held by the Indian transferor).

In the present situation, however, no court has concluded that FRWRs exist for Alaska Native allotments,[25] and these allotments do

---

[25]    The *Katie John* plaintiffs cite an unpublished 1994 order from a Washington state court in support of their contention "that the reserved water rights doctrine applies to all off-reservation public domain allotments created under the Indian Homestead Act of 1884 . . . ." KJ Br. at 54. The order cited by Plaintiffs appears to be from the Yakima County Superior Court in the ongoing general stream adjudication of water rights in the Yakima River. *See Department of Ecology v. Acquavella*, 100 Wash. 2d 651, 674 P.2d 160 (1983). It is unclear how an unpublished order from a lower court in another state has any relevance here. Moreover, Plaintiffs have not attached a copy of the order to
(continued...)

not derive from any previously existing Indian reservations such as the instances discussed.[26]/

Contrary to *Katie John* plaintiff's suggestion, KJ Br. at 45, 53, the Department of the Interior has made no prior determination that Alaska Native allotments hold FRWRs, and previous statements regarding the applicability of FRWRS in the context of other Indian allotments do not resolve the point.[27]/ The record regarding this

---

(...continued)
their brief, as required by the rules of this Court. *See* D. Ak. LR 7.1(c)(1)[B]. Consequently, the order should not be considered by this Court.

[26]/    The unique derivation of Native allotments in Alaska arises from two related concepts. First, the 1906 Act as amended specified that the allotments would be selected "of vacant, unappropriated, and unreserved nonmineral land in Alaska...." 43 U.S.C. § 270-1 (1970). *See also* 43 C.F.R. § 2561.0-3 (2007). Second, Alaska Natives had little or no ability to take allotted lands from Indian reservations because the United States essentially abandoned the reservation policy in Alaska. *See United States v. Atlantic Richfield Co.*, 435 F. Supp. 1009, 1015 (1977); M-36662, *supra*, 71 Interior Dec. at 348 n.18. In 1971, Congress abolished all prior reservations set aside for Alaska Native purposes except for the Metlakatla (Annette Island) Reservation in section 19 of ANCSA. 43 U.S.C. § 1618(a). *See generally* David S. Case & David A. Voluck, ALASKA NATIVES AND AMERICAN LAWS, ch. 3 (2d ed. 2002). In addressing the interests held for that reservation, the Supreme Court previously concluded that the statute that "set apart as a reservation [the body of lands known as Annette Islands]" impliedly reserved adjacent fishing grounds and surrounding waters. *Alaska Pac. Fisheries v. United States*, 248 U.S. 78, 86-89 (1918); *see also Metlakatla Indian Cmty. v. Egan*, 369 U.S. 45, 59 (1962). However, waters associated with that reservation are not at issue.

[27]/    For both legal and historical reasons, there may exist differences in the law governing the allotment of and rights thereto in the lower 48 states compared to Alaska. This brief

(continued...)

issue clearly shows the matter to be unresolved, *e.g.*, Ex. 1 to KJ Br., and the Secretaries decided to address this issue on a case-by-case basis. 64 Fed. Reg. 1276, 1279 (Jan. 9, 1999); 70 Fed. Reg. 76400, 76401 (Dec. 27, 2005).

Thus, Defendants agree that courts have recognized FRWRs to support Indian allotments in other contexts. In the context of Alaska Native allotments, however, recognition of FRWRs presents a matter of first impression. In publishing the regulations for Title VIII, therefore, the Secretaries appropriately concluded that it would be better to address this issue on a case-by-case basis instead of concluding that FRWRs do or do not attach to any or all Alaska Native allotments. As discussed more fully below, several related issues provide further support for this approach.

**C.    Additional Legal And Factual Issues Related To Alaska Native Allotments.** Even if the courts or the Secretaries were to conclude that Alaska Native allotments may be entitled to FRWRs, that conclusion itself does not end the inquiry here. As noted below, additional legal and factual issues complicate whether the Secretaries should find not only that some or all such allotments have FRWRS but also that those allotments thereby meet the "public land" definition under ANILCA.

---

[27]/(...continued)
addresses only Alaska Native allotments and does not address the government's position on Indian allotments in the lower 48 states.

First, the legal status of Alaska Native allotments raises the issue whether the United States retains a sufficient interest in the allotment and any water right in order to qualify as "public lands" under ANILCA.[28] In addition to the Ninth Circuit's conclusion regarding FRWRs, *Katie John I*, 72 F.3d at 704, ANILCA specifically defines "public lands" as lands, waters, or interests therein the "title to which is in the United States." 16 U.S.C. § 3102(2) & (3).

The 1906 Act specified that allotments withdrawn from the public domain for Alaska Natives "shall be inalienable and nontaxable until otherwise provided by Congress." 34 Stat. 197; *see also* 43 U.S.C. § 270-1 (1970); 43 C.F.R. § 2561.3. ANILCA subsequently approved all Alaska Native allotment applications pending prior to the passage of ANCSA, with certain exceptions, and provided that the Secretary to "shall issue trust certificates therefor." 43 U.S.C. § 1634(a)(1)(A).[29] Accordingly, the United

---

[28]    In *Katie John #1*, the plaintiffs stated that "[t]he United States does not hold title to allotments; patents are held by individual Natives subject to restrictions on alienation." Katie John et al. v. United States et al., No. A90-484 Civil (D. Alaska), Memorandum in Opposition to Federal Defendants' Motion to Dismiss, at 9, copy attached. Exhibit 9 hereto at 2.

[29]    Although this provision employs the term "trust," Congress did not clarify its intent regarding the use of this term. The term first arose in S. 1787 (1977), an early version of ANILCA introduced by Senator Stevens, yet the Interior Board of Land Appeals (IBLA) ruled during the interim of ANILCA's introduction and passage that the 1906 Act process conveyed full legal title

(continued...)

States has an interest in these allotments because of their restricted fee status.

*Katie John* plaintiffs rely primarily on *United States v. Ramsey* to conclude that the United States holds a sufficient interest in Alaska Native allotments to meet the requirements of ANILCA. KJ Br. at 52. In its analysis of restricted fee and trust title to Indian lands, the *Ramsey* Court held that "[i]n practical effect, the control of Congress, until the expiration of the trust or the restricted period, is the same." 271 U.S. 467, 471 (1926); *accord United States v. Celestine*, 215 U.S. 278, 287 (1909). Such an interest in the United States, however, does not necessarily equate to the proprietary interest required by ANILCA's definition of "public lands" in section 3102.

Moreover, the varying status of allotments for which Alaska Natives applied further complicates the matter. The Declaration of Thelma Starr, ¶ 8, identifies 131 allotments in the Tanana service area, yet the list of such allotments found at pages 5-11 includes allotment applications for which the application has been denied

---

(...continued)

to Alaska Native allottees, and thus they were more in the nature of patents than trust allotments. *State of Alaska*, 45 IBLA 318, 322-23 (Feb. 6, 1980); *State of Alaska*, 35 IBLA 140, 141-42 (May 22, 1978). Thus, although ANILCA retained the "trust certificate" terminology first drafted in 1977 and although it evidences a special relationship between the United States and Alaska Native allottees, it does not necessarily evidence that the United States retains title interest in Alaska Native allotments.

and the application closed; the application is still pending and not yet granted; or the application is subject to *Aguilar* proceedings.[30]/ *See* Declaration of James R. Szender ¶ 5, Exhibit 2 hereto. Thus, the declaration offers instances in which there would be no allottee interest, instances in which there may be a federal interest, and instances (in the *Aguilar* context) complicated by intervening dispositions of land to the State or Alaska Native corporations.

Further, even assuming a positive determination on the legal issues noted above, it would remain to be determined whether the

---

[30]    *Aguilar* proceedings arise out of a situation unique to Alaska, where lands on which Alaska Natives had commenced use and occupancy as an allotment had already been conveyed to the State of Alaska at the time the application for the allotment was filed. *Aguilar v. United States*, 474 F. Supp. 840, 841 (D. Alaska 1979). Where this had occurred, this Court held that the Federal government had a duty to determine if the applicant would have been entitled to the allotment but for the prior conveyance to the State and, if so, to take steps to seek recovery of title from the State. *Id.* at 846-47. Following that decision, procedures were agreed upon for meeting that obligation. (A copy of these Stipulated Procedures for Implementation of Order are attached as Exhibit 3 hereto).

While the stipulated *Aguilar* procedures apply only "to land patented to the State," Exhibit 3 at 1, the same basic factual situation also arose with respect to lands selected by and conveyed to Alaska Native corporations under ANCSA. The Department of the Interior has voluntarily been applying the *Aguilar* procedures to allotment applications for other lands that had already been conveyed. *State of Alaska v. Marcia K. Thorson, State of Alaska v. Phyllis Westcoast (On Reconsideration)*, 91 Interior Dec. 331, 341, 83 IBLA 237, 254 (Oct. 22, 1984); *Aguilar* and Title Recovery Handbook for Native Allotments (1992) at 2 (Copy attached as Exhibit 4 hereto).

specific purposes for each Alaska Native allotment and whether navigable waters (as required in the Title VIII context) were necessary to support those purposes. As noted above, Congress authorized these allotments in the 1906 Act to serve as homesteads for Alaska Natives, but the specific uses of a particular tract could vary from basic residential or domestic uses, to reindeer herding or berry picking, to hunting and fishing. *See supra* at 23 (citing M-36662). The purposes of an allotment, therefore, would need to be determined before the extent of any FRWRs for that allotment could be determined.

It is precisely because of the complex and varied status of Alaska Native allotment applications, as well as for the other reasons noted above, that the Alaska Regional Solicitor's Office of the Department of the Interior recommended with respect to the issue of whether waters associated with Alaska Native allotments are public lands that the proper course is to reject the idea of asserting water rights across the board in conjunction with Alaska Native allotments. Exhibit 1 to KJ Br. at 6-8.[31] Instead, the recommendation was that the determination should be made on a case-by-case basis, and the Secretaries ultimately adopted this approach

---

[31]    No opinion has been issued or a position taken by the Department of the Interior regarding FRWRs on Alaska Native Allotment Act allotments. Declaration of Richard Myers ¶ 4, Exhibit 6 hereto.

in publishing the Title VIII regulations. *Id*. at 8.[32]/

For the reasons discussed above, the Court should reject the contentions made by plaintiffs and confirm the regulations and their case-by-case treatment of Alaska Native allotments.[33]/

### V.   THE SECRETARIES HAVE PROPERLY DETERMINED THAT WATERS UPSTREAM AND DOWNSTREAM FROM CONSERVATION SYSTEM UNITS ARE NOT PUBLIC LANDS.

The *Katie John* plaintiffs seek to extend the scope of public lands and thus the Title VIII priority to include as public lands waters that are beyond those immediately adjacent to the boundaries of the conservation system units (CSUs). They contend that FRWRS are held in waters upstream and downstream from the CSUs; therefore, these waters too must be deemed to be public lands for purposes of the Title VIII priority. KJ Br. at 28-45.

---

[32]/   The Secretaries' decision may be upheld only on the grounds relied upon by the agency. *National R.R. Passenger Corp. V. Boston and Maine Corp.*, 503 U.S. 407, 420 (1992), *citing*, SEC v. Chenery *Corp*. 318 U.S. 80, 88 (1943); *Pacific Coast Fed'n of Fisherman's Ass'n v. United States Bureau of Reclamation*, 426 F.3d 1082, 1091 (9th Cir. 2005). Therefore, the Court may only determine if the Secretaries decision to proceed on a case-by-case basis was reasonable. It may not as the State requests, State Br. at 45-49, determine that FRWRs are not held in Alaska Native Allotments.

[33]   To date, no request for a determination that a FRWR is held in any specific allotment has been submitted to either the Secretaries or the Federal Subsistence Board. Declaration of Peter Probasco, ¶ 4, Exhibit 5 hereto.

**A. Upstream and Downstream Waters Are Not Deemed In The Regulations To Be Public Lands.** The subsistence regulations extend beyond the boundaries of CSUs only so far as to include as public lands all inland waters that are within or adjacent to the exterior boundaries of a CSU. 50 C.F.R. § 100.3(b), (c). Other than for these immediately adjacent waters, "any waters falling outside of the designated units identified [in the regulations] are not included" within the scope of the Title VIII priority.[34]/ 64 Federal Register 1279. With respect to such adjacent waters, the Secretaries concluded:

> We have determined that a Federal reserved water right exists in those waters and that their inclusion is necessary for the effective management of subsistence fisheries.

*Id.*

The *Katie John* plaintiffs seek to greatly expand this jurisdiction. This is shown in the sample water they have selected, the Yukon River. KJ Br. at 6-8. Because there is a CSU at the mouth of the Yukon River (Yukon Delta National Wildlife Refuge ["NWR"])[35]/ and upstream at the Canadian border (Yukon-Charley Rivers National

---

[34]/   The State of Alaska objects to the inclusion of adjacent waters as public lands. That related claim is discussed commencing at 40, *infra*.

[35]/   This area is labeled No. 15 on Exhibit 2 to the KJ Br.

Preserve)[36]/ and flowing through or adjacent to several other CSUs (Yukon Flats NWR, Nowitna NWR, Innoko NWR)[37]/ along the length of the river, plaintiffs contend that the entire length of the Yukon River in Alaska is public land subject to the Title VIII priority. *Id.* at 8.

Since the Yukon River has CSUs at both the mouth and at the Canadian border as well as intervening units, plaintiffs do not address how far up or downstream from a CSU the waters should be deemed to be public lands. However, given the arguments presented in the KJ Br., there presumably would be no such limit. The effect of this upstream and downstream argument thus goes well beyond the Yukon River.

For example, currently only the inland waters on the Kuskowim River within the boundaries of the Yukon Delta NWR are deemed to be public lands.[38]/ If all waters upstream of the Yukon Delta NWR are also public lands, then Title VIII would extend to at least Medfra, and even further if the North and South Forks thereof are also

---

[36]/    Shown as area No. 29 on Exhibit 2.

[37]/    Shown as area Nos. 16, 11 and 5 respectively on Exhibit 2. Plaintiffs contend that the Koyukuk NWR (Exhibit 2, area No. 10) is in the lower Yukon region. KJ Br. at 11. While the Koyukuk NWR is in close proximity to the Yukon River, it does not actually border on the Yukon River itself. 48 Federal Register 7890, 7976 (Feb. 24, 1983).

[38]/    Shown as area No. 15 on Exhibit 2.

deemed to be public lands. Exhibit 2.[39]

There are also other examples of rivers on which there are more than one CSU. For example the Innoko River is found on both the Yukon Delta NWR and the Innoko NWR.[40] Under plaintiffs' theory the intervening waters on the Innoko River between these two refuges would also be public lands.

There are also CSUs that include upstream portions of rivers on which there are downstream portions that are not within a CSU. This is the situation of the Goodnews River. A upstream portion of this river is within the Togiak NWR[41] while it later flows on lands not within a CSU as it enters Goodnews Bay. A similar situation exists with respect to both the Fox and Kenai Rivers on the Kenai NWR.[42] If there are downstream waters only, plaintiffs do not state whether those waters should or should not also be public lands. However, since they do not so limit their contentions, presumably they contend that such waters are also public lands and subject to the Title VIII priority.

**B. Upstream And Downstream Waters Are Not Public Lands.** The decision of the Secretaries not to extend the scope of public land

---

[39]    This is depicted in more detail in the Alaska Atlas & Gazetteer, (DeLorme 4th Ed. 2001) at 90, 101, 131.

[40]    Shown respectively as areas 15 and 5 on Exhibit 2.

[41]    Show as area 14 on Exhibit 2.

[42]    Shown as area 8 on Exhibit 2.

waters to include upstream and downstream waters has been explained as follows:

> We believe that including all upstream and downstream reaches would constitute an overly broad interpretation of "Federal reserved waters." The Ninth Circuit Court in *Katie John* found the government's interpretation that public lands for the purposes of the Title VIII priority include navigable waters in which the United States holds reserved water rights reasonable and thus upheld it. Consequently, we did not propose to add and are not adding those stretches of water to the Federal Subsistence Management Program area of jurisdiction.
>
> A Federal reserved water right is a usufruct which gives the right to divert water for use on specific land or the right to guaranty flow in a specific reach of a water course. As such the water right does affect the water downstream of the use area and does not have an effect on upstream areas except in times of shortage when a junior use may be curtailed. There is no shortage; therefore, up and downstream waters have not been included.

70 Federal Register 76400, 76402 (Dec. 27, 2005). The same essential reasons were set forth in the recommendations of the Alaska Policy Group in its recommendations for compliance with the *Katie John #1* decision. 3-4 AR Tab 88 at 1704-08. As noted therein, reserved water rights have only been asserted extraterritorially in the situation of treaty rights or where reservations were subsequently diminished in size. *Id.* at 1704.[43/]

---

[43/]    *See* 3-4 AR Tab 88 at 1704, Exhibit 1 to KJ. Br. at 3-5. Courts have upheld this distinction between interpreting the purposes for federal reservations and for Indian reservations. As the Ninth Circuit observed, "[w]hile the purpose for which the federal government reserves other types of land may be strictly construed, *United States v. New Mexico*, 438 U.S. 696 (1979)

(continued...)

Water rights are recognized as usufructuary rights; a right to use of the water and not title thereto. *Yellen v. Hickel*, 352 F. Supp. 1300, 1306-07 (S.D. Calif. 1972). *Accord United States v. Tilley*, 124 F.2d 850, 861 (8th Cir. 1942), *cert. denied sub nom. Scott v. United States*, 316 U.S. 691 (1942); *Mitchell Irrigation District v. Sharp*, 121 F.2d 964, 967 (10th Cir. 1941), *cert. denied* 314 U.S. 667 (1941). If some use should arise of waters at other locations that imposes a threat to the availability of the reserved waters at the location of their use, that use can be protected by injunction or other relief. *Kleppe v. New Mexico*, 426 U.S. 529, 538 (1976)(under the property clause, Congress has the power to regulate activities off of public lands necessary to protect its interests in the public lands). This is exactly what the Government did in *Cappaert v. United States*, 426 U.S. 128 (1976), where the suit was brought seeking to enjoin the pumping of groundwater in certain wells so as to maintain water level in Devils Hole National Monument. As noted therein, "the United States can protect itself from subsequent diversion, whether the diversion is of surface or

---

43/(...continued)
[sic](national forest), the purposes of Indian reservations are necessarily entitled to broader interpretation if the goal of Indian self-sufficiency is to be attained." *United States v. Adair*, 723 F.2d 1394, 1408 n. 13 (9th Cir.), *cert. denied sub nom. Oregon v. United States*, 467 U.S. 1252 (1984)(quoting William J. Canby, AMERICAN INDIAN LAW 245-46 (1981).

groundwater." 426 U.S. at 143.[44] Thus, the agencies are correct, 3-4 AR Tab 88 at 1708; Exhibit 1 to KJ Br. at 4, it is not necessary for the waters not on or adjacent to the CSUs to be deemed to be public lands in order to preserve the FRWRs associated with the CSUs.[45]

The *Katie John* plaintiffs also contend that the United States's treaty obligations with respect to the Yukon River require that the entire length of the river be deemed to be public lands. KJ Br. at 41-42. While the United States has treaty obligations with respect to the Yukon River, those obligations are not a reservation of lands and rights to waters. These treaty obligations are similar to the retained power under the navigational servitude

---

[44]    This ability to protect water rights on or adjacent to Federal reservations was specifically noted as a reason why it was not necessary for the entire length of a stream to be deemed public lands. 3-4 AR Tab 88 at 1707-08.

[45]    It large part the Katie John plaintiffs' arguments are based on essentially undisputed, but non-relevant facts. Defendants do not dispute that the maintenance of sufficient water flows throughout the whole length of the Yukon River in Alaska is important to preserving and maintaining the fishery resources of that river, and that Alaska rural residents have customarily taken, relied on and continue to rely those resources. However, as noted by the Secretaries, the importance of the waters for subsistence use is not determinative of whether those waters are public lands for purposes of the Title VIII priority. *See* 70 Federal Register 97402: "The jurisdiction of the Federal Subsistence Board depends not on the whether saltwater bays are important for subsistence, but whether they are public lands." If importance alone were the criteria for defining the scope of public lands, the Court of Appeals in *Katie John #1* would likely have concluded that all navigable waters were public lands.

which was found to be insufficient to make waters public lands. *Katie John #1*, 72 F.3d at 702-03.

Further, if the *Katie John* plaintiffs' upstream and downstream contentions were to be accepted, this would greatly expand the scope of Federal jurisdiction and substantially limit the scope of the State's jurisdiction. The agencies noted that the effect of this extension of jurisdiction would be to effectively exclude the State from any meaningful authority over inland navigable waters. 3-4 AR Tab 88 at 1706. As noted therein, this would conflict with the recognition in *Katie John #1* that ANILCA intended a meaningful bifurcation of jurisdiction between the State and the Federal government. *Id*. *See also* arguments commencing at 13-15, *supra*.

For the foregoing reasons, the Secretaries' decision not to include upstream and downstream waters was reasonable and not arbitrary or capricious or contrary to law. Therefore, the *Katie John* plaintiffs' contention that waters upstream and downstream from CSUs are public lands subject to the Title VIII priority should be rejected.

## VI. THE STATE'S CONTENTIONS ARE WITHOUT MERIT

The State of Alaska contends that the Secretaries have improperly determined that the following waters are public lands subject to the ANILCA Title VIII priority: (1) waters adjacent to but not within the reservation boundaries, (2) waters on non-Federal lands within the reservation boundaries, (3) waters on

validly selected but not yet conveyed lands, and (4) marine and tidally influenced waters. For the reasons that follow, these contentions should be rejected.[46/]

**A. The Secretaries Have Properly Determined That Waters Immediately Adjacent To CSUs Are Public Lands**. The Secretaries determined that "[a] Federal reserved water right exists in inland waters within or adjacent to Federal conservation system units and national forests." 64 Federal Register 1276, 1279 (Jan. 8, 1999). In response to comments objecting to the inclusion of inland waters adjacent to CSUs as public lands, the Secretaries further stated:

> We have determined that a Federal reserved water right exists in those waters and that their inclusion is

---

[46/]    In the State Br. at 43-49, contentions are also made with respect to waters upstream and downstream of CSUs and on or adjacent to Native allotments. These arguments are directed to the claims of the *Katie John* plaintiffs and not to actions of the Federal defendants and will not be addressed herein.

At numerous places the State also represents that it owns the submerged lands under various waters. *E.g.* State Br. at 18, 20, 22, 23, 25, 26, 32, 38, 39. None of the waters placed at issue in the State Br. were determined to be public lands based on ownership of submerged lands. Moreover, the court lacks jurisdiction in this action to determine the ownership of any submerged lands. The law is well established that the Quiet Title Act, 28 U.S.C. § 2409a, is the sole and exclusive means of determining title to lands vis-a-vis the United States. *Block v. North* Dakota, 461 U.S. 273, 286 (1983); *State of Alaska v. Babbitt*, 182 F.3d 672, 674 (9th Cir. 1999); *Leisnoi, Inc. v. United States*, 170 F.3d 1188, (9th Cir. 1999). The State's action herein is not brought pursuant to the Quiet Title Act. Therefore, the Court cannot determine herein whether the State does or does not own certain lands. Accordingly, the United States will not address or respond herein to any claims by the State of ownership of lands beneath any waters.

necessary for effective management of subsistence fisheries.

*Id*. Therefore, the regulations included within the scope of waters subject to the Title VIII priority, "inland waters adjacent to the exterior boundaries of the following areas" which comprise 34 different areas listed in the regulation. *Id*. at 1287.

The preamble to the December 17, 2005 amendments to those regulations states that only immediately adjacent waters are deemed to be public lands. 70 Federal Register 76400, 76403:

> Further, the issuance of "adjacent" has only been applied to inland rivers and lakes immediately adjacent to Federal areas. Those waters immediately adjacent provide some of the necessary waters for achieving the purposes for which each Federal area was established.

Thus, it is clear that only waters actually next to or contiguous to the Federal reservations are included as public lands. As will be shown below, this becomes relevant to one of the three sample waters utilized by the State (the Colville River) and may be relevant to a second (Sixmile Lake).

The seminal *Winters* decision recognized FRWRs in a bordering or adjacent water source to a federal reservation. *Winters v. United States*, 207 U.S. 564, 565-66, 577 (1908). *Winters* relied in part on a previous Supreme Court decision which stated that "the right of the United States, as owners of the lands *bordering* on a stream, to the continued flow of its waters, so far, at least, as may be necessary for the beneficial uses of the government

property." *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 703 (1899)(emphasis added). *See Winters*, 207 U.S. at 577. Other court decisions further support this proposition. *United States v. Preston*, 352 F.2d 352, 357 (9th Cir. 1965); *United States v. Ahtanum Irrigation Dist.*, 236 F.2d 321, 326-27 (9th Cir. 1956), *cert. denied* 352 U.S. 988 (1957); *United States v. Anderson*, 591 F. Supp. 1, 8 (E.D. Wash.1982).

The State discredits the inclusion of waters adjacent to federal reservations by relying on decisions that describe the water sources for FRWRs as being "appurtenant" or otherwise "on" or "within" the reservation. State Br. at 7-9. The State, however, ignores decisions, such as the Supreme Court's 1963 decision and subsequent decree in *Arizona v. California*, 373 U.S. 546, which concluded that FRWRs could extend to water sources beyond reservation land. *See* 376 U.S. at 340, 344 (1964) (decree)(water from off-reservation river used for on-reservation Indian purposes on the Cocopah Reservation); *In the Matter of the Determination of the Rights to the Use of the Surface Waters of the Yakima River Drainage v. James J. Acquavella*, No. 77-2-01484-5 (Wash. Super Ct. Sept. 1, 1994), Memorandum Opinion: Treaty Reserved Water Rights at Usual and Accustomed Fishing Places at 9, 15 (holding tribe has right to water throughout the river basin whenever necessary to

support fisheries).[47]

**B. The Waters Of The Colville River Outside Of The NPRA Are Not Public Lands.** The State offers three sample waters to support its argument that the waters adjacent to but not within the boundaries of a Federal reservations are not public lands. These are the Colville River which lies along the eastern boundary of the National Petroleum Reserve - Alaska ("NPRA"), Sixmile Lake that lies along a portion of the Lake Clark National Park and Preserve, and the Yukon River where it flows adjacent to the Nowitna NWR. State Br. at 31.

With respect to the NPRA, the State's contentions are stated in an overly broad fashion. While the State phrases its argument in terms of the entire Colville River, its contentions actually pertain only to the Navigable portions of that river that are not within the boundaries of the NPRA and presumably only to those portions shown on Exhibit 11 to the State Br.[48] The Coville River is a much longer river, a substantial portion of which is actually within the NPRA. Exhibit 19 hereto.

Moreover, the State's contentions with respect to the portion of the Colville River shown on Exhibit 11 are misplaced.

---

[47]    A copy of the latter decision is attached as Exhibit 17 to the KJ Br.

[48]    Exhibit 11 also shows that a substantial portion of the Colville River is clearly not adjacent to the NPRA.

Jurisdiction for purposes of the Title VIII priority is not asserted over those portions of the Colville River depicted on Exhibit 11. Declaration of Theo Matuskowitz ¶ 6, Exhibit 1 hereto. All waters within the external boundaries of the NPRA are deemed to be subject to the Title VIII priority. *Id.* ¶ 7. This includes those portions of the Colville River that are shown on Exhibit 19 as within the NPRA.

Further, and contrary to the State's representations, the Secretaries have not determined that FRWRs are held in the waters adjacent to the NPRA. The Secretaries concluded only that "[a] Federal reserved water right exists in inland waters within or adjacent to ***Federal conservation system units and national forests.***" 64 Federal Register at 1279 (emphasis added). The NPRA is not a national forest, and is not one of the lands units within the definition of CSUs in 16 U.S.C. § 3102(4). The Secretaries did determine that waters within the NPRA are public lands, but this is based on a pre-statehood reservation. 50 C.F.R. § 100.3(b).[49] The State raises no grounds for objection with respect to those portions of the Colville River that are within NPRA, and were determined to be public lands.

---

[49]    The Alaska Policy Group did conclude that FRWRs are held in waters of the NPRA. 3-4 AR Tab 88 at 1728. The Secretaries did not adopt, or even address, that recommendation. Thus, there is no need for the Court to reach the issue of whether or not water waters within the NPRA are subject to FRWRs.

   **C. The Waters Of The Yukon River Adjacent To The Nowitna NWR Have Properly Been Determined To Be Public Lands.** There is no dispute that the waters of the Yukon River immediately adjacent to the Nowitna NWR are deemed to be public lands and subject to the Title VIII priority under the challenged regulations. The Nowitna NWR is depicted as Area 11 on Exhibit 2 to the KJ Br. Thus, the portion of the Yukon River that lies along the northern boundary of the refuge is deemed to be public lands.

   There can be no dispute that the purposes for which the Nowitna NWR was created include purposes for which a reservation of waters is necessary. *See* Part III commencing at 15, *supra*.[50]/ With respect to all units created by ANILCA, including the Nowitna NWR, their purpose was to protect specific resources and activities for which a reservation of water rights was necessary. 16 U.S.C. § 3101(b):

> **It is the intent of Congress** in this Act to preserve unrivaled scenic and geologic values associated with natural landscapes; **to provide for the maintenance of sound populations of, and habitat for, wildlife species** of inestimable value to the citizens of Alaska and the Nation, including those species dependent on vast

---

[50]/    The State erroneously contend throughout their brief that the Secretaries have set forth no statements as to the basis for their conclusions that FRWRs are held in any waters, State Br. at 11-15, or in these waters in particular. *Id*. at 38. That is incorrect. The Secretaries have stated that where Congress included among the purposes of a reservation that maintenance of fish and wildlife resources and water quality and quantity are purposes of the reservation that is sufficient to create a FRWR. 70 Federal Register 76400, 76403 (Dec. 27, 2005).

relatively undeveloped areas; to preserve in their
natural state extensive unaltered arctic tundra, boreal
forests, and coastal rainforest ecosystems; **to protect
the resources related to subsistence needs**; to protect
and preserve historic and archeological sites, rivers and
lands, and **to preserve the wilderness resource values and
related recreational opportunities including but not
limited to** hiking, canoeing, **fishing**, and sport hunting,
within large arctic and subarctic wildlands and **on
freeflowing rivers**; and to maintain opportunities for
scientific research and undistorted ecosystems. (Emphasis
added)

Further, the purposes for which the Nowitna NWR was created
specifically include: "to conserve fish and wildlife populations
and habitats in their natural diversity...," "to fulfill
international treaty obligations of the United States with respect
to fish and wildlife and their habitat...," and "to provide...the
opportunity for continued subsistence uses by local residents...,
and "to ensure...water quality and necessary water quantity." Act
of December 2, 1980 (ANILCA), Pub. L. No. 96-487, § 302(6)(b), 94
Stat. 2371, 2387.

These purposes clearly require water, and thus justify an
implication of FRWRs. Therefore, the Nowitna NWR clearly contains
FRWRs. The only issue then is whether those rights are held in the
portions of the Yukon River adjacent to the refuge.

First, contrary to the State's representations, the boundaries
of the Nowitna NWR include some portions of the Yukon River and
islands within that river. 48 Federal Register 7890, 7981 (Feb. 24,

1983).[51]  The conservation of fish and wildlife within these portions of the river and the islands within the river, and of the continued opportunity for subsistence use of fish and wildlife resources clearly require a reservation of water rights sufficient to preserve the necessary habitat and to provide for that opportunity.

Further, even dissenters to the *en banc* decision that affirmed the decision in *John v. United States*, 247 F.3d 1032, 1047 (9th Cir. 2001)(Kozinski, O'Scanlin and Rhymer, J. dissenting), agreed that such water rights can extend to adjacent waters and not just waters on Federally held lands. *See also United States v. Power*, 305 U.S. 527, 531 (1939) (recognizing that fee allotments within a reservation that abutted or were adjacent to the Little Big Horn River retained their reserved water right.) Thus, even if no portion of the Yukon River was within the boundary of the Nowitna NWR, that would not preclude a Federal reservation of unappropriated water in the adjacent Yukon River if those waters were necessary for the purposes of the reservation. The conservation of wildlife including "moose, caribou, martens, wolverines and other furbearers" set forth in ANILCA section 302(6)(b)(1), impliedly requires the reservation of water rights of the Yukon River necessary to support those populations, and

---

[51]    This is the boundary map published pursuant to 16 U.S.C. § 3103.

especially to support those populations that are found in the portions of the Refuge along the Yukon River.

Further, in this instance there can be no doubt that reservation of the waters adjacent to the Nowitna NWR are also necessary to fulfill treaty obligations with respect to the Yukon River. These obligations are discussed generally in the KJ Br. at 19-21, 41-42. While the United States does not agree that these obligations are sufficient to make the entire Yukon River public lands, where the specific Federal reservation includes as a purpose the fulfillment of these obligations, the waters adjacent as well as within the reservation are impliedly reserved for this purpose.

The State contends that any FRWR the United States may hold in the Yukon River adjacent to the Nowitna NWR is so limited that it is not sufficient to justify finding these waters to be public lands. State Br. at 39. This is merely a variation on the argument the State made in support of its contentions that quantification and adjudication of rights was required and that was rejected in the Court's Decision (Docket Entry No. 110) at 23-29. Plaintiff State of Alaska's Opening Brief Regarding What Rules of Law Govern Establishment of Federal Reserved Water Rights in Alaska and Determinations of "Public Lands" (Docket Entry No. 68) at 31-32. First, the decision and remand in *Katie John #1* clearly recognized that, if the United States holds a FRWR of any amount, the waters in which that right is held are public lands. Second, the State has

acknowledged that pursuant to the panel decision of the Court of Appeals in *Katie John #1*, which was specifically adhered to without change *en banc*, that all waters "from bank to bank" are public for purposes of the Title VIII priority "no matter how small" that water right may be. En Banc Brief for Appellants State of Alaska, at 34, Exhibit 6 to Brief of the United States (Docket Entry No. 78) filed October 10, 2006. Thus, if the United States holds a FRWR in any amount of the waters of the Yukon River adjacent to the Nowitna NWR, the Secretaries have properly concluded that the entire river adjacent to the refuge are public lands.

The State also erroneously represents, State Br. at 38, that if the adjacent waters of the Yukon River are public lands, then persons standing on non-federally owned lands on the north bank of the river would be subject to the federal rules. This misstates the scope of the Federal regulations. The Federal subsistence regulations are not general hunting and fishing regulations applicable to all persons. The Federal regulations apply only to and may be exercised only by Federally qualified subsistence users. 50 C.F.R. § 100.5. Non-qualified Federal subsistence users may, unless there has been a specific closure for all users or for just non-Federally qualified subsistence users, still take fish and wildlife as permitted by the State regulations. 64 Federal Register 1276, 1284 (Jan. 8, 1999):

Individuals who do not meet the requirements under

these regulations may still harvest fish and wildlife on Federal lands and waters in accordance with State fishing and hunting regulations, except in those instances where Federal lands or waters have been specifically closed to non-Federally qualified subsistence users.

The State's contentions are also merely a re-packaging of its prior argument that the challenged regulations improperly impinge on its authority to regulate the taking of fish and game in Alaska. That argument has already been rejected by the Court. Decision (Docket Entry No. 110) at 29-31.

The State's contentions also ignore the fact that its interpretation of the statute would present a corollary inconsistent situation. If the State's interpretation were to be adopted, it would operate to preclude a qualified Federal subsistence user from standing on the south bank of the Yukon River within the Nowitna NWR from exercising any rights under the Title VIII of ANILCA. That is inconsistent with the recognized congressional intent to provide a meaningful Federal subsistence use priority on some navigable waters. *See* 13-15, *supra.*

For the foregoing reasons, the Secretaries have properly determined that the waters of the Yukon River adjacent to the Nowitna NWR are public lands.

**D. The Adjacent Waters Of Sixmile Lake Have Properly Been Determined To Be Public Lands.** The State makes two arguments with regard to Sixmile Lake. One, the waters thereof are not adjacent to the Lake Clark National Park and Preserve. Two, even if the waters

of the lake were adjacent to the park and preserve, the United States does not hold FRWRs in the lake. For the reasons that follow, both of these contentions should be rejected.

(1) **Sixmile Lake Is Adjacent To The Park And Preserve**.

Sixmile Lake is located just beyond the narrows that forms the outlet to Lake Clark. Lake Clark is within the Lake Clark National Park and Preserve. Sixmile Lake is not. The area of claimed adjacency to the Sixmile Lake is that portion of the lands that lies along the east shore of the lake. The State contends that by operation of section 201(7)(b) of ANILCA, 16 U.S.C. § 410hh(7)(b), the Lake Clark National Park and Preserve is not adjacent to Sixmile Lake because these lands have been conveyed to the Nondalton Village Corporation. State Br. at 39-40. Section 201(7)(b) provides in pertinent part:

> No lands conveyed to the Nondalton Village Corporation shall be considered to be within the boundaries of the [Lake Clark National] park or preserve; if the corporation desires to convey such lands, the Secretary may acquire such lands with the consent of the owner, and any such lands so acquired shall become part of the park or preserve, as appropriate.

The Park and Preserve is shown as Area 26 on Exhibit 2 to the KJ Br. Sixmile Lake and the lands immediately surrounding it are shown on the Map that is attached to the Declaration of Charles M. Gilbert, Exhibit 8 hereto at 3. The Green line shown along the east bank of Sixmile Lake on that map is the boundary of the Lake Clark National Park and Preserve as published pursuant to 16 U.S.C. §

3103(b) in 57 Federal Register 45166, 45220 (Sept. 30, 1992). *Id.* ¶ 4. The area shown in solid red on that map is land to which, pursuant to the Alaska Native Claims Settlement Act, the surface estate has been conveyed to the Kijik Corporation and the subsurface estate has been conveyed to the Bristol Bay Native Corporation. *Id.* The Kijik Corporation is the successor to Nondalton Village Corporation. *Id.* Therefore, if the lands shown in red on Exhibit 8 at 3, are not within the boundaries of the Lake Clark National Park and Preserve, then Sixmile Lake is not immediately adjacent to the park and preserve, and the waters of Sixmile Lake would not be public lands for purposes of the Title VIII priority.[52]/

While the language of Section 201(7)(b) quoted above might appear to place the lands conveyed to the Kijik Corporation outside of the Lake Clark National Park and Preserve, that language conflicts with the language of section 103(a) of ANILCA, 16 U.S.C. § 3103(a). Pursuant to section 103(a) the boundaries and maps to be published in the Federal Register establish the boundaries of various units including the Lake Clark National Park and Preserve. As already noted above, the map for the Lake Clark National Park and Preserve published at 57 Federal Register 45220 clearly places

---

[52]/     There is one parcel of land at the north end of the Lake shown as acquired Federal land. This parcel was, however, an Alaska Native allotment and not lands conveyed to the Kijik Corporation. Declaration of Gilbert ¶ 4d.

the boundaries of the preserve along the bank of Sixmile Lake. This map should, therefore, be deemed controlling, as section 103(a) provides that in the event of discrepancies in the acreages in the ANILCA and the maps, "the maps shall be controlling."

Ambiguity is clearly created by sections 103(a) and 201(7)(b), with respect to the location of the boundary of the Lake Clark National Park and Preserve. However, the legislative history shows that Congress only intended section 201(7)(b) to deem the lands conveyed to the Nondalton Village Corporation to be outside of the park and preserve for a very limited purpose. This section (which is unique to the Lake Clark National Park and Preserve), originated in the Senate. *Compare* S. Rep. No. 96-413, 96th Cong. 1st Sess. 8 (Nov. 14, 1979) *with* H.R. Rep. No. 96-97, 96th Cong. 1st Sess. 11-12 (April 18, 1979). The Senate Committee explained that the purpose of this provision was not to change the boundaries of the reserve but only so that these lands were not to be treated as inholdings. S. Rep. 96-413 at 154:

> The Committee also adopted an amendment which excludes those lands conveyed to the Village of Nondalton from the preserve. ***This amendment does not change the boundary*** of the preserve but provides that the lands which the village receives pursuant to ANCSA which are not part of the village proper shall not be treated as inholdings. (Emphasis added)

Thus, it is clear that section 201(7)(b) was not intended to change the actual boundaries of the Lake Clark National Park and

Preserve.[53]/ Therefore, the boundary of the park and preserve remain immediately adjacent to Sixmile Lake, and the waters of Sixmile Lake are pursuant to the regulations public lands subject to the Title VIII priority.

    **(2) The United States Holds FRWRs in Sixmile Lake.** There can be no dispute that the purposes for which the Lake Clark National Park and Preserve was created include purposes for which a reservation of waters is necessary. *See* Part III commencing at 15, *supra*. As stated in section 201(7)(a) this park and preserve:

> shall be managed for the following purposes, among others: To protect the watershed necessary for the perpetuation of the red salmon fishery in Bristol Bay, to maintain unimpaired the scenic beauty and quality of portions of the Alaska Range and the Aleutian Range, including active volcanos, glaciers, wild rivers, lakes, waterfalls, and alpine meadows in their natural state; and to protect habitat for and populations of fish and wildlife including but not limited to caribou, Dall sheep, brown/grizzly bears, bald eagles, and peregrine falcons.

16 U.S.C. § 410hh(7)(a).

    The protection of the habitat for and the populations of fish

---

[53]/ Even if there where no ambiguity in the statute, Courts may look to legislative history in interpreting a statute where the clearly expressed intent is contrary to what may have otherwise be the unambiguous language of the statute. *United States v. James*, 478 U.S. 597, 606 (1986), *referencing*, *Consumer Product Safety Comm'n*, 447 U.S. 102, 108 (1980); *S & M Investment Co. v. Tahoe Regional Planning Agency*, 911 F.2d 324, 327 (9th Cir. 1990), *cert. denied* 498 U.S. 1087 (1991). Committee reports such as S. Rep. No. 96-413 are recognized as providing the most authoritative expression of congressional intent. *Garcia v. United States*, 469 U.S. 70, 76 (1984), *rehearing denied* 469 U.S. 1230 (1985).

and wildlife requires water. For the reasons already set forth above regarding the Nowitna NWR, water rights are equally necessary to meet the habitat and population purposes of this park and preserve in the waters immediately adjacent thereto. Therefore, the United States similarly holds a reserved water right in the waters of Sixmile Lake, and these waters have properly determined to be public lands subject to the Title VIII subsistence use priority.

**E. The Secretaries Have Properly Concluded That All Waters Within A CSU Or National Forest Are Public Lands**. As already shown at 3, *supra*, the Secretaries have determined that all inland waters, both navigable and non-navigable within a CSU or a National Forest are public lands subject to the Title VIII priority. The State contends that this is in error. One, they contend this improperly includes waters on lands selected by but not yet conveyed to either the State or an Alaska Native corporation. State Br. at 42-43. Two, they contend that this improperly includes waters on non-Federally owned lands within the respective units. *Id*. at 25-30. For the reasons that follow, these contentions should be rejected.

**1. Waters On Selected But Not Yet Conveyed Lands Are Properly Deemed To Be Subject To The Title VIII Priority**. The Secretaries have determined that they are required to regulate all lands within any unit of the National Park System, National Wildlife Refuge System, National Wildlife and Scenic Rivers

Systems, National Forest Monument, National Recreation Area, National Conservation Area, new national forest or forest addition that have been selected by but not yet conveyed to the State or a Native corporation as if they were public lands. This includes the waters thereon. Contrary to the State's contentions, this is not because these lands and waters are public lands, but because a separate provision of ANILCA, section 906(o), 43 U.S.C. § 1635(o), requires the Secretaries to do so.

While the State's contentions herein are addressed specifically to waters on such selected but not yet conveyed lands, this claim is related to the more broadly stated Count III of the State's Complaint for Declaratory and Injunctive Relief, ¶¶ 60-66 at 16-17.[54/] As will be shown below, the reasons for applying the Title VIII priority to waters on selected but not yet conveyed lands are the same as for the applying that priority to such lands generally. Therefore, defendants agree that the Court need not limit its consideration to only the authority to regulate such waters. The Court may also proceed to address the claim in Count III, and for the reasons that follow the Court should find for the

---

[54/] Defendants moved for dismissal of Count III as barred by statute of limitations. This motion was denied. Order Motion for Judgment on the Pleadings (Docket Entry No. 50) filed March 10, 2006. Defendants contended that Count III was subject to the two-year statute of limitations of 43 U.S.C. § 1632(a), and not the six-year statute of limitations in 28 U.S.C. § 2401(a). In ruling on defendants' motion, the Court did not address the merits of Count III.

defendants on Count III and dismiss that count in its entirety.

First, and contrary to the State's description, the challenged regulation **does not define** selected but not yet conveyed lands as "public lands." It provides only that where selected but not yet conveyed lands are within the boundaries of certain listed reservations, they "shall be treated as public lands" for management purposes. 64 Federal Register 1288 (Jan. 8, 1999), 50 C.F.R. § 100.4(2):

> (2) Notwithstanding the exceptions in paragraphs 1(I) through (iii) of this definition, until conveyed or interim conveyed, all Federal lands within the boundaries of any unit of the National Park System, National Wildlife Refuge System, National Wildlife and Scenic Rivers Systems, National Forest Monument, National Recreation Area, National Conservation Area, new national forest or forest addition **shall be treated as public lands for purposes of the regulations in this part pursuant to section 906(o)(2) of ANILCA**. (Emphasis added)

The Secretaries determined that they are required to manage the selected but not yet conveyed lands by section 906(o) of ANILCA, 43 U.S.C. § 1635(o). 64 Federal Register 1280.

Section 906 of ANILCA, 94 Stat. 2437-44, *codified in part in* 43 U.S.C. § 1635, addresses lands selected by the State pursuant to the Alaska Statehood Act and by Native corporations pursuant to the Alaska Native Claims Settlement Act. Section 906(o), 43 U.S.C. § 1635(o), specifically addresses the status of these lands to the extent they lie within a unit of the National Park System, National Wildlife Refuge System, National Wildlife and Scenic Rivers Systems, National Forest Monument, National Recreation Area,

National Conservation Area, or new national forest or forest addition including those being created by ANILCA. Section 906(o)(2) provides how those lands are to be managed:

> (2) **Until conveyed**, all Federal lands within the boundaries of a conservation system unit, National Recreation Area, National Conservation Area, new national forest or forest addition, **shall be administered in accordance with the laws applicable to such unit**.

Since Title VIII of ANILCA is applicable to the units referred to in section 906(o), the Secretaries determined that they are required by section 906(o) to apply the Title VIII priority to selected but not yet conveyed lands. 64 Federal Register 1280.

While the definitions in 16 U.S.C. § 3102, including the definition of "Federal land" in 16 U.S.C. § 3102(2), do not apply to Title IX of ANILCA and thus to section 906, that does not limit the requirements of section 906. As already shown, section 906(o) applies to "all Federal lands." While for purposes of Title IX that phrase is not defined in ANILCA, its ordinary meaning certainly includes all lands owned by the United States.

Therefore, it is reasonable and consistent with the statute for the Secretaries to conclude that section 906(o) requires them to apply the subsistence use priority to selected but not yet conveyed lands. To do otherwise would be to effectively write into the statute an exception that does not exist there so that section 906(o) would effectively read: "shall be administered in accordance with the laws applicable to such unit except for Title VIII of this Act...." The courts are not to write into statutes that which Congress left out. *United States v. Hoflin*, 880 F.2d 1033, 1038 (9th

Cir. 1989), *cert. denied sub nom.* 493 U.S. 1083 (1990).

Selected but not yet conveyed lands are also merely a potential inholding. Until they are actually conveyed, legal title remains in the United States. A determination must still be made as to eligibility for the conveyance. If the lands are ultimately not conveyed to either the State or a Native Corporation, then title will remain in the United States.[55] It is, therefore, reasonable for Congress to require, and the Secretaries to apply and administer these lands under all general laws applicable to the units in which they may be located.

The Secretaries' determination that they are required in their management of selected but not yet conveyed lands, including the waters thereon, to provide for the Title VIII subsistence use on the priority is fully supported by the explicit language of section 906(o). The court should, therefore, reject any contention by the State that the lands and the waters on selected but not yet conveyed lands within the exterior boundaries on units of the National Park System, National Wildlife Refuge System, National Wildlife and Scenic Rivers Systems, National Forest Monument, National Recreation Area, National Conservation Area, new national forest or forest addition are not subject to the ANILCA Title VIII priority.

Once these lands are conveyed to the State or a Native Corporation, all inland waters on or adjacent thereto are deemed to

---

[55] For example, over selection is permitted. 43 U.S.C. § 1635(f)(1). Therefore, some lands now subject to section 906(o) may well never be conveyed.

be public lands for purposes of Title VIII. However, as will be discussed in the arguments that follow, this is for reasons other than the requirements of section 906(o) of ANILCA.

**2. All Inland Waters Within A Federal Reservation Are Properly Deemed To Be Public Lands.** There is no dispute that the Secretaries have determined that all inland waters within a conservation system unit or a national forest are public lands, and that this includes all waters physically located on non-Federally owned lands within those units. 64 Federal Register 1276, 1279 (Jan. 8, 1999).[56] With respect to these waters it was determined that "a Federal reserved water right exists in those waters and that their inclusion is necessary for effective management of subsistence fisheries." *Id*. These management concerns were explained in 70 Federal Register 76400, 76401 (Dec. 27, 2005):

> As work began following the *Katie John* decision to identify these waters discussion centered on the problem of "checkerboard jurisdiction" (a complex interspersion of areas of State and Federal jurisdiction) as it occurred on rivers within Conservation System Units. Federal officials recognized that in order to provide a meaningful subsistence use priority that could be readily implemented and managed, unified areas of jurisdiction were required for both Federal land managers and the subsistence users. The problems associated with the dual State and Federal management caused by the State's inability to take actions needed to implement the required subsistence use priority are difficult enough without imposing on that situation elaborate and scattered areas of different jurisdictions. Therefore, we determined in the January 1999 regulations that all waters within or adjacent to the boundaries of the areas listed in § ___.3(b) of those regulations were public

---

[56]    Non-Federally owned lands outside of and not adjacent to such units are not included. 64 Federal Register 1279.

lands. This determination provided both the land managers and the public with a means of identifying those waters that are public lands for purposes of the subsistence use priority.

These concerns are legitimate, and the inclusion of all waters within a CSU or national forest with the publically established and published boundaries provides both the managers and the public with notice of where the Federal regulations are and are not applicable. *See* 64 Federal Register 1279. The inclusion of all waters within CSUs and national forests, also reflects an reasonable balancing that provides and areas of meaningful waters that are subject to the Title VIII priority, while leaving other meaningful waters that remain subject only to State jurisdiction. *See* 13-15, *supra*.

The determination that waters on non-public lands within a CSU or national forest are public lands is not contrary to the provision in section 103(c) of ANILCA, 16 U.S.C. § 3103(c), that: "[o]nly those lands within the boundaries of any conservation system unit which are public lands (as such term is defined in this Act) shall be deemed to be included as a portion of such unit." Consistent with this provision, the Federal subsistence regulations do not purport to regulate the taking of wildlife on private lands within a CSU or national forest for the lands themselves are not public lands. However, pursuant to the decision in *Katie John #1*, if FRWRs are held in waters on any these lands, they are public lands as defined in ANILCA.

(a) **All Waters Within The Chignik Lake And River System Have Properly Been Determined To Be Public Lands.** The State has selected three sample waters to support its contentions that waters on non-Federal lands within a CSU or a national forest should not be public lands. State Br. at 26-30. These are the Chignik Lake and River system, the Crescent River, and Juneau road system streams. *Id.*

The Chignik Lake and River system is within the Alaska Peninsula NWR.[57] However, the status map that is attached as Exhibit 7 to the State Br. is not accurate and is subject to limitations noted in the margin of the map. Declaration of Tom Jennings ¶ 4e, attached as Exhibit 10 hereto.

One significant error in Exhibit 7 is that it does not show that the Chignik Lagoon is not deemed to be public lands. *Id.* ¶ 5b and Attachment 2 at page 5 of Exhibit 10. An accurate map showing the correct status of the relevant area is attached as Appendix 2 to the Declaration of Tom Jennings. Other maps attached as Attachments 3 and 4 to the same declaration show that there are lands along Black Lake and Chignik Lake that are still in Federal ownership, but which have been selected by but not yet conveyed to an Alaska Native corporations. Declaration of Tom Jennings ¶ 6. Therefore, as set forth commencing at 55, *supra*, these lands and

---

[57]   Shown as Area 2 of Exhibit 2 to the KJ Br.

the waters thereon are lands that are properly subject to the Title VIII priority.

The State is largely correct, however, in that most of the lands adjacent to Chignik Lake, Black Lake and the Chignik River from Chignik Lagoon to Black Lake are not in Federal ownership. Nevertheless, these waters have been properly determined to be public lands by reason of the determination that FRWRs are held in such waters and the management considerations already discussed above.

The purposes as set forth in section 302(1)(B) of ANILCA, 94 Stat. 2385, for which the Alaska Peninsula NWR was established and is to be managed include:

> (i) to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, brown bears, the Alaska Peninsula caribou herd, moose, sea otters and other marine mammals, shorebirds and other migratory birds, raptors, including bald eagles and peregrine falcons, and salmonoids and other fish;
> (ii) to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;
> (iii) to provide, in a manner consistent with the purposes set forth in paragraphs (i) and (ii) above, the opportunity for continued subsistence uses of local residents; and
> (iv) to ensure, to the maximum extent practical and in a manner consistent with the purposes set forth in paragraph (i), water quality and necessary water quantity within the refuge.

These are all unquestionably primary purposes for which water is necessary. Therefore, FRWRs have been impliedly reserved in waters

necessary to fulfill these purposes. *See* 15-19, *supra*.

Further, in this instance Congress was explicit. The purpose set forth in subsection (iv) of ensuring the water quality and necessary quantity is for the waters "within the refuge," and not just to waters on Federally owned lands within the refuge. This alone is sufficient basis to reject the State's contentions with respect to these waters.

The purpose in subsection (iii) of also providing "the opportunity for continued subsistence uses" of fishery resources would be substantially defeated if these waters were not public lands for it is axiomatic that fish must be taken from waters. While their may be other non-privately owned lands in the area from which wildlife may be taken, there would be little if no meaningful opportunity for the taking of fish for subsistence uses if the State's contentions herein were to be adopted for this would exclude the major waters of the State's sample area from the scope of the Title VIII priority. This would be contrary to the intent that ANILCA intended to provide a meaningful Federal subsistence use opportunity on navigable waters. *See*, 13-15, *supra*.

(**b**) **The Crescent River Has Properly Been Determined To Be Public Lands**. The State contends that the waters of the Crescent River, (depicted in tan or flesh color on Exhibit 8 of its brief as being on or adjacent to lands owned by Native Corporations) are not public lands. State Br. at 28-29. There is no dispute that these

waters are within the boundaries of the Lake Clark National Park and Preserve. Defendants also do not dispute that the lands shown on Exhibit 8 as owned by Native Corporations are not owned by the United States, and that the lands themselves are not deemed to be public lands for purposes of the Title VIII subsistence use priority. There is also no dispute that the waters of the Crescent River are pursuant to the challenged regulations deemed to be public lands for purposes of Title VIII.

As already shown commencing at 54, *supra*, the purposes for which the Lake Clark and National Park and Preserve has been created by 16 U.S.C. § 410hh(7) include purposes which include a reservation of FRWRs. The protection of habitat for and the populations of fish and wildlife within the preserve impliedly requires water and access thereto within the park and preserve whether or not the waters are on or adjacent to federally owned or Native Corporation owned lands. Thus, the Secretaries have properly determined that all of the waters of the Crescent River within the Lake Clark National Park and Preserve are public lands for purposes of Title VIII.

Further, as shown on the State's Exhibit 8, the Crescent River is similar to the waters of the Chignik River and Lake discussed immediately above. There would be little if no meaningful opportunity for the taking of fish for subsistence uses on the Crescent River if the State's contentions herein were to be adopted

for it would exclude the major waters of the State's sample area from the scope of the Title VIII priority. This would be contrary to the intent that ANILCA intended to provide a meaningful Federal subsistence use opportunity on navigable waters. *See*, 13-15, *supra*.

(c) **The Juneau Road System Streams Have Properly Been Determined To Be Public Lands.** Finally, the State identifies seven streams (Auke Creek, Cowee Creek, Lemon Creek, Mendenhall, Montana Creek, Peterson Creek, and Salmon Creek) that flow into the Gastineau Channel near Juneau as waters it contends have been improperly designated as public lands. State Br. at 29-30. These waters are depicted on the State's Exhibit 9A. There is no dispute that the sample waters placed at issue by the State all arise within the Tongass National Forest. There is also no dispute that these waters are within the broad exterior boundaries of the Tongass National Forest as created in 1909. Exhibit 13 to Perat Br. at 4.

The State contends that portions of these waters were, however, excluded from the Tongass National Forest prior to Alaska statehood. State Br. at 29-30. Defendants do not dispute that there was an original, interior exclusion in the 1909 Proclamation in the Juneau area of five-mile radius circles around the settlements at Juneau, Douglas and Treadwell. Perat Br. 13 at 2. There is also no dispute that subsequent to the 1909 proclamation there were both internal additions and exclusions from the Tongass National Forest

including portions of the areas where these seven streams are located. The depiction of these exclusions on State Exhibit 9c is not, however, completely accurate or clear. The map attached as Exhibit 11 hereto sets forth more clearly these additions and internal exclusions.[58]/ Copies of the Executive Orders and Public Land Orders referred to in the Legend on Exhibit 11 are attached as Exhibits 12 through and including 17, hereto.

Each of the seven streams are within the exterior boundaries of the Tongass National Forest. While the portions of the seven streams at issue are within an internal exclusion, they are deemed to be public lands pursuant to 50 C.F.R. § 100.3(c)(25) which includes all inland waters within the "exterior boundaries" of the Tongass National Forest. For the reasons that follow, this determination should be sustained.

The State contends that no reasons were offered for a finding a FRWRs in these waters. State Br. at 30. It is correct that the Federal Register notices states only the basis for the conclusion that FRWRs are held in reservations created by ANILCA, 70 Federal Register 76400, 76403 (Dec. 27, 2005), and does not state a

---

[58]/    Exhibit 11 shows a Kowee Creek on Douglas Island that flows into the Gastineau Channel. There is a Cowee Creek spelled with a "C" in the Juneau area that flows from the mainland into Berners Bay near Point Bridge State Park. Alaska Atlas & Gazetteer (4th Ed. 2002) at 32. The reference in the State Br. to "Cowee" Creek appears to have been intended to refer to the "Kowee" Creek on Douglas Island.

specific basis for concluding that FRWRs are held in the portions of the Tongass National Forest that were not created by ANILCA. The administrative record shows that it was determined that FRWRs were held in the waters of the Tongass National Forest. 3-4 AR Tab 88 at 1696, 1730. The exterior boundaries of the Tongass National Forest were recognized as including the seven streams at issue. *Id.* at 1736.

However, a statement that FRWRs are held in the Tongass National Forest and the basis therefor is not really necessary. It is judicially established that national forests have FRWRs pursuant to the Forest Service Organic Act, Act of June 4, 1897, Ch. 2, 30 Stat. 11, 34-36, *codified as amended* 16 U.S.C. § 473 *et seq.*[59]/

The Supreme Court of New Mexico in *Mimbres Valley Irrigation Co. v. Salopek,* 564 P.2d 615, 617, 619 (N.M. 1977), held that the purposes for which the 1897 Organic Act authorized the reservation of the lands for national forest reserves were to improve and protect the forest, securing favorable conditions of water flow and to furnish a continuous supply of timber." It rejected the claim that these purposes also included the reservation of rights for minimum instream flows and recreational purposes. *Id.* at 618-19. This decision was affirmed in *United States v. New Mexico*, 438 U.S.

---

[59]/    A copy of the Act of June 4, 1897, is Exhibit 20 to the Perat Br.

696, 718 (1978). The Court stated therein:

> *Congress intended that water would be reserved only where necessary to preserve the timber or to secure favorable water flows* for private and public uses under state law. This intent is revealed in the purposes for which the national forest system was created and Congress's principled deference to state water law in the Organic Administration Act of 1897 and other legislation. (Emphasis added)

As shown at 48-49, *supra*, if the United States holds any FRWR in any amount, the subject waters are public lands. *See also* Brief of the United States (Docket Entry No. 78) at 34-35.

The Tongass National Forest was created and reserved pursuant to the 1897 Organic Act. Presidential Proclamation of February 16, 1909, 35 Stat. 2226.[60]/ Consequently, there can be no dispute that the Tongass National Forest holds FRWRs in waters within that reserve. Since, as set forth in *Katie John #1,* that is sufficient to make those lands public lands subject to the Title VIII priority, the Juneau area streams have properly been determined to be public lands.[61]/

Further, as already shown commencing at 60-61, *supra*, the Secretaries' had a legitimate concern with the difficulties in a

---

[60]/   Exhibit 13 to Perat Br.

[61]/   If the Court determines that reliance on the judicial establishment that there are FRWRs in the waters of national forest system pursuant to the Organic Act is insufficiently explained or that any further explanation is required, the Court should only remand for that explanation. It should not proceed to determine *de novo* if FRWRs are held in any of these waters. *See*, 12, *supra*.

checkerboard jurisdictional system and for the need for clear unified areas of management. Therefore, the Secretaries' decision to include the inland waters within the exterior boundaries of the forest for purposes of the Title VIII priority is reasonable and should be sustained.

**F. The Regulations Properly Include Tidally Influenced Inland Waters.** The State contends that the regulations unlawfully include within the definition of public lands marine and tidally influenced waters. State Br. at 17-25. The State contends that any waters that are tidally influenced cannot be public lands.

First, the challenged regulations do not purport to include any marine waters based on reserved water rights. 70 Federal Register 96400, 96401 (Dec. 27, 2005):

> Thus, neither the 1999 regulations nor this final rule claims that the United States holds a reserved water right in marine waters as defined in the existing regulations.

Marine waters are defined as;

> [T]hose waters located seaward of the mean high tide line or the waters located seaward of the straight line drawn from headland to headland across the mouths of rivers or other waters as they flow into the sea.

50 C.F.R. § 100.4. The regulations also contain a corollary definition of inland waters:

> *Inland Waters* means, for the purposes of this part, those waters located landward of the mean high tide line or the waters located upstream of the straight line drawn from headland to headland across the mouths of rivers or other waters as they flow into the sea.

50 C.F.R. 100.4.

Since no reserved water rights are claimed in marine waters, unless the United States reserved the lands beneath the specific waters prior to Alaska statehood, marine waters are not generally deemed to be public lands. 70 Federal Register 96401, 76403. The waters that are deemed to be public lands by reason of a pre-statehood reservation are set forth in 50 C.F.R. § 100.3(b). *Id.* at 97405, 76407. The State does not challenge those determinations.

However, the problem naturally remains of determining which waters are marine waters and which are inland waters. The State contends that the high tide line should be used to make this determination. The Secretaries, however, decided to use a standard and accepted methodology for determining water boundaries to make this determination.

The Secretaries explained that it was necessary to define inland waters because reserved water rights can be held in rivers and lakes; and that it is necessary "to determine where the river ends and the sea begins." 70 Federal Register 76402. As they further explained therein:

> Some rivers are tidally influenced for a significant distance above their mouths. Although submerged lands under portions of rivers which are tidally influenced may be owned by the State or other entity, those stretches are still a part of the river and remain subject to potential Federal reservation of water rights. Rivers and streams have high water marks rather than lines of mean high tide.

Since there is no dispute that a FRWR may exist in a river, lakes or other inland waters, the Secretaries were clearly correct

in determining they needed to define where a river or other inland water ended for purposes of any Title VIII public lands determination.

Further, many rural Alaskans have traditionally lived along or near coastal and tidal waters. The exclusion of all tidally influenced waters from the definition of public lands would have eliminated for many of these rural Alaskans a meaningful opportunity for the taking of fish for subsistence uses that the Court of Appeals recognized was intended in ANILCA. *Katie John #1*, 74 F.2d at 704. *See also* arguments at 13-15, *supra*. Given that a definition was needed, the only issue before the Court is whether the means selected (use of the headlands-to-headlands methodology) by the Secretaries was reasonable, consistent with established law, and not arbitrary and capricious. The State's complaint is, thus with the use of the definitions of "inland waters" and "marine waters" so as to include as public lands that are tidally influenced.

As explained by the Secretaries, the headlands-to-headlands methodology set forth in those definitions is internationally used precisely for this purpose:

> [T]he regulations use the methodology found in the Convention on the Territorial Sea and Contiguous Zone from the United Nations Law of the Sea for closing the mouths of rivers."

70 Federal Register 76402 (Dec. 27, 2005). *See* Shalowitz, Aaron L.,

Shore and Sea Boundaries, vol 1, U.S. Dept. Of Commerce (1962),
Exhibit 8 to the Brief of the United States (Docket Entry No. 78),
and *also generally* Ch. 3, Reed, Michael, Shore and Sea Boundaries,
vol. 3, U.S. Dept. Of Commerce (2000), describing the determination
of boundaries of bay and rivers. The decision to use such an
established methodology is clearly reasonable and not arbitrary or
capricious. The State also does contend that this methodology is
not an established one.

Nor does the State challenge how the headlands-to-headlands
methodology has actually been applied to any its sample waters. It
contends only that it should not be applied at all. The State,
however, did not timely object to the proposal to use this
methodology, and should be barred for failure to exhaust
administrative remedies from now challenging the use of headlands-
to-headlands methodology to define inland and marine waters.[62]/

In their proposed regulations, the Secretaries specifically
proposed in the definition of inland waters the use of the
headlands-to-headlands to define these waters. 62 Federal Register

---

[62]/    The State may not present it for the first time in this
action, issues that could have been, but were not presented
during the rulemaking. *Barron v. Ashcroft*, 358 F.3d 674, 676-77
(9th Cir. 2004); *Red Top Mercury Mines, Inc. V. United States*,
887 F.2d 198, 206 (9th Cir. 1989). In *Universal Health Services,
Inc. V. Thompson*, 363 F.3d 1013, 1019 (9th Cir. 2004), *citing and
quoting*, *Exxon Mobile Corporation v. U.S. Environmental
Protection Agency*, 217 F.3d 1246, 1249 (9th Cir. 2000), the Court
of Appeals found that parties were barred from raising issues in
court that had not been presented in comments to a proposed rule.

66216, 66223 (Dec. 17, 1997). The definition as proposed was identical to the definition of inland waters promulgated in 50 C.F.R. § 100.4. 64 Federal Register 1276, 1287 (Jan. 8, 1999). The State did not object to the proposal to use the headlands-to-headlands procedure to define where rivers ended and marine waters commenced. 15 AR Tab 352 at 8440. Nor does it appear that any other person or entity objected to this definition or to the use of the headlands-to-headlands methodology in response to the proposed rule making. 64 Federal Register 1280 (responses to comments on proposed definitions).

An objection was raised by the State to the use of the headlands-to-headlands procedure to define waters in response to the amendments proposed in 69 Federal Register 70940 (Dec. 8, 2004), and the Secretaries addressed that objection in the final rule. 70 Federal Register 76402. However, the 2005 final rule is not before this court and is not challenged by the State.[63]

---

[63]    The State had ample opportunity to challenge that rule making in this action. The parties were requested to propose a schedule for proceedings in this consolidated action by Order (Docket Entry No. 18) filed October 6, 2005. The obligation to file this report was extended by the court. Order (Docket Entry No. 34) filed November 22, 2005); Order From Chambers (Docket Entry No. 57) filed April 5, 2006. A report was filed that requested a scheduling conference. Joint Report (Docket Entry No. 58) filed April 6, 2006. That conference was held on April 24, 2006, following which the court entered its Order (Docket Entry No. 66) on April 26, 2004, scheduling proceedings in this case. The State could have, but did not, during this scheduling process request an opportunity to amend its complaint to seek review of
(continued...)

The State's contention that the inland and marine waters determinations conflict with its title to lands is incorrect. The Secretaries were clear that they were determining only the waters to which the Title VIII subsistence use priority applies, and that they were not determining the boundaries of federal reservations or State owned lands. 70 Federal Register 76403, 76404. Further, as shown above, there is no conflict with 16 U.S.C. § 3102(3) or § 3103 for there is no claim, except where there is a pre-statehood reservation, that any non-inland waters are public lands subject to the Title VIII subsistence use priority. Where FRWRs are held in inland waters, pursuant to the decision in *Katie John #1*, those waters are public lands as defined in 16 U.S.C. § 3102(3). Further as already shown at 61, *supra*, if FRWRs are held in waters there is no conflict with 16 U.S.C. § 3103(3)(a).

For the foregoing reasons, the Secretaries's use of the headlands-to-headlands methodology to determine the boundary between inland and marine waters is a reasonable and appropriate solution that is consistent with established law. That determination should be sustained.

**1. The Inland Waters Of Togiak Bay Have Been Properly Delineated.** The State has selected three waters as samples to illustrate its contentions regarding the location of inland waters.

---

[63]/(...continued)
the December 27, 2005 final rule.

These are the marine and tidally influenced waters of Togiak Bay, Tuxedni Bay and the Stikine River. State Br. at 21-23.

Togiak Bay is within and adjacent to the Togiak NWR.[64] With respect to Togiak Bay, the State's depiction on its Exhibit 2 of the boundary between inland and marine waters is incorrect. Declaration of Tom Jennings ¶¶ 4d- 4e, attached as Exhibit 10 hereto. The correct boundaries between the inland and marine waters of Togiak Bay are shown on the map that appears as Attachment 1 to Declaration of Tom Jennings, Exhibit 10 at 4. The only portion of Togiak Bay that is deemed to be public lands is what might be described as the inner bay at the very northern end of the Togiak Bay itself. The waters depicted on State Exhibit 2 along the eastern shore line of the Togiak Bay are not public lands for purposes of Title VIII. Declaration of Tom Jennings ¶ 4e.[65]

The State's depiction of the boundaries of the Togiak NWR on Exhibit 1 to the State Br. is also incorrect. Exhibit 1 excludes the inner bay from the refuge. The map published pursuant to 16 U.S.C. § 3103 in 48 Federal Register 7890, 7994 (Feb. 24, 1983)(a copy of which is also Attachment 1 to the Tom Jennings declaration), clearly includes this inner bay within the boundaries

---

[64]    Shown as Area 14 on Exhibit 2 to the KJ Br.

[65]    The errors in State Exhibit 1 may be the result of using data from different maps with different scales and data bases in the creation of the Exhibit. Declaration of Tom Jennings ¶ 4e.

of the Togiak NWR. Therefore, also contrary to the State's contentions, the only waters of Togiak Bay that have been determined to be public lands are within the boundaries of the refuge.

The purposes of for which the Togiak NWR was created in section 303(6) of ANILCA, 94 Stat. 2392, clearly include purposes for which the reservation of FRWRs is to be implied. *See*, 15-19. These purposes included:

> (i) to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, salmonids, marine birds and mammals, migratory birds and large mammals (including the restoration of their historic levels)
> (ii) to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;
> (iii) to provide, in a manner consistent with the purposes set forth in paragraphs (i) and (ii) above, the opportunity for continued subsistence uses of local residents; and
> (iv) to ensure, to the maximum extent practical and in a manner consistent with the purposes set forth in paragraph (i), water quality and necessary water quantity within the refuge.

These purposes are essentially identical to the purposes of the Alaska Peninsula NWR discussed at 63-64, *supra*, and for the reasons stated therein all waters within the boundaries of the Togiak NWR have properly been determined to be public lands.

**2. The Inland Waters Of Tuxedni Bay Are Not Deemed To Be Public Lands**. The State's mapping (Exhibits 3 and 4 to State Br.) with respect to Tuxedni Bay is not clear. This especially true with

Exhibit 4. That map contains the annotation: "Claimed Federal Subsistence Boundary Note Added by ADF&G." It is not clear to what this annotation refers. However, it appears to point to a black boundary line that includes most of the area shown in blue on Exhibit 4 including waters surrounding Chisik Island. This depiction is incorrect.

The Federal Subsistence has determined that Tuxedni Bay is not within the scope of the waters deemed to be public lands. 70 Federal Register 1337, 13379 (March 21, 2005):

> In the final rule, we deleted the reference to the Holitna River in § ____.27(h)(4), because the Holitna River is not within jurisdiction as identified in § ___3.(b). *Similarly, we also deleted reference to Tuxedni Bay in § ___24.(a)(3).* (Emphasis added)

Further, an opinion was rendered in 2002 that there was no pre-Statehood reservation of the waters of Tuxedni Bay; therefore, these waters are not subject to the Title VIII priority. Exhibit 18 hereto at 1-2.

**3. The Inland Waters Of The Stikine River Are Properly Determined To Be Public Lands.** The State is correct in stating, State Br. at 23, that the agencies have determined in accordance with the headlands-to-headlands methodology which portions of the openings or bays to the Stikine River and North Arm thereof are public lands. These determinations (headlands-to-headlands lines) are shown as yellow lines on State Exhibit 6. The State does not challenge the accuracy of the application of the headlands-to-

headlands methodology at these locations, but only that this methodology is used at all. As already shown above that contention should be rejected, and the court should find that the Secretaries have properly determined that the identified portions of the Stikine River are public lands for purposes of the Title VIII priority.[66]/

## VI. THE PERATROVICH PLAINTIFFS' CONTENTIONS ARE WITHOUT MERIT

The court has identified and discussed the four causes of action stated by the Peratrovich plaintiffs in the Order Motion for Judgment on the Pleadings (Docket Entry No. 178) filed May 31, 2006, in *Lincoln Peratrovich et al. v. United States et al.*, No. 3:92-cv-00734-HRH, at 23-31.[67]/ The court noted that these actually stated four different theories in support of but what is really only one claim: that federal defendants have failed to provide plaintiffs[68]/ the subsistence use priority to which they allege they are entitled. *Id.* at 23. Plaintiffs contend they are entitled to a subsistence use priority for the taking of herring roe on kelp from marine waters within the Tongass National Forest. *Id.* at 13-14. To

---

[66]/    As already shown at 68-69, *supra*, FRWRs are held in the inland waters within the Tongass National Forest.

[67]/    This same order at 19-23 rejected certain threshold defenses of the United States. The United States does not acquiesce in those determinations, but deems them to be law of the case.

[68]/    "Plaintiffs" in this section shall refer to the Peratrovich plaintiffs.

the extent that plaintiffs contended (identified by the court as Theories Three and Four) that these waters should be deemed to be public lands by reason of the Submerged Lands Act and the Commerce Clause to the Constitution, the court held that their claims fail on the merits. *Id.* at 28-31.

**A. Plaintiffs' Theory One.** One of the remaining bases for plaintiffs' claim is the allegation (denominated by the Court as "Theory One") that the marine waters of the Tongass National Forest are public lands by reason of the alleged pre-statehood reservation of title to those lands by the United States. *Id.* at 24-27. While the Court did not rule on the merits of that claim, it acknowledged that it remains as a claim that plaintiffs are entitled to a subsistence use priority on waters above any lands that may have been excepted from the approved disclaimer of title filed by the United States in *Alaska v. United States*, 545 U.S. 75, 110 (2005). *Id.* at 26-27.

At many locations in their brief plaintiffs represent that certain specific reservations reserved both water rights and the submerged lands within the Tongass. *E.g. Perat Br.* at 12, 30, 35, 37. However, plaintiffs concede that any issues regarding title to any retained submerged lands and of any exceptions to the disclaimer of title in *Alaska v. United States* are not presently at issue before that court in this phase of the proceedings. *Id.* at 35-36. Accordingly, the United States will not respond herein to

any specific contentions regarding ownership of submerged lands, but will confine their response to plaintiffs' Theory Two.

Defendants, however, note that the disclaimer of interest approved by the Supreme Court does not except from its operation many of the specific proclamations and orders discussed by plaintiffs (including those of August 20, 1902, September 10, 1907, February 16, 1909 and June 10, 1925).[69] *Alaska v. United States*, 546 U.S. 413, 416 (2006). The contention that President Carter's December 1, 1978 Proclamation (Perat Br. Exhibit 21) would reserve title to the submerged lands fails because it was issued after Alaska became a state. *Alaska v. United States*, 545 U.S. at 79.

**B. Plaintiffs' Theory Two.** Plaintiffs' second theory is that the United States holds FRWRs to all waters within the boundaries of the Tongass National Forest; therefore, the marine waters of the Tongass should have been determined to be public lands. Order Motion for Judgment on the Pleadings (Docket Entry No. 178) at 27-28. This is the issue plaintiffs identify as now before the Court. Perat Br. at 1: "Is it impossible, as a matter of law, for the federal government to have federal reserved water rights in marine waters?" With respect to this issue, the Secretaries have determined that the FRWRs doctrine does not apply to marine waters if the State owns the submerged lands beneath those waters. 70

---

[69] Exhibits 6, 11, 13 and 14 to Perat Br.

Federal Register 76400, 76401 (Dec. 27, 2005).[70] The Secretaries have noted that the extension of FRWRs to marine waters would be "'without precedent and would represent a considerable leap in reasoning....'" *Id. quoting from and adopting* Alaska Policy Group Final Issue Paper, 3-4 Admin Record, Tab 88 at 1708-14.

As noted by the Alaska Policy Group, the doctrine of FRWRs arose in the context of arid lands where there was a shortage, not an abundance of water, and where there was a need to protect lands from appropriations of water that would defeat the purposes of the Federal reservation. Admin Record Tab 88 at 1710. As noted by the Alaska Policy Group, marine waters are instead the most abundant waters on earth for which "[p]otential appropriation of such waters remains implausible to any degree that could substantially affect marine water quantity or levels as all above the most restricted of locations (such as salt chucks)." *Id*. at 1712. Therefore, it was concluded:

> The Ninth Circuit <u>Katie John</u> opinion repeats the well-established <u>Winters</u> doctrine rule that reserved water rights appurtenant to any federal reservation of land are restricted to only those waters necessary to accomplish the purposes for which the land was reserved. Given the implausibility of any presently conceivable appropriation of water that would be sufficient to defeat the purposes of a federal reservation, the rationale behind the federal reserved water rights doctrine would not apply to these marine waters. From this standpoint, it would be

---

[70]    The Secretaries limited FRWRs to only inland waters, as has already been discussed at 70-75, *supra*, in response to the related contentions of the State.

difficult to establish a need to reserve water in marine waters in order to accomplish the purposes of a reservation, even such a reserve as the Alaska Maritime Refuge that specifically includes the adjacent seas.

*Id.*

**C. The Secretaries Have Properly Determined That FRWRs Are Not Held In Marine Waters.** First, the Court should not address the issue of whether FRWRs are held in marine waters. Plaintiffs have failed to show that they have been injured by the Secretaries' decision. Therefore, they have failed to show that they have standing to bring this action. Second, the Secretaries determination that FRWRs are not held in marine waters was reasonable, not arbitrary and capricious or contrary to law, and should be sustained. However, if the Court does not agree and finds that the FRWRs doctrine can apply to marine waters, then it should only remand to the Secretaries to make the determination whether such rights are held in any of the waters for which plaintiffs contend they are entitled to the Title VIII priority. *See* 12, *supra.*

**1. The Court Lacks Jurisdiction Over Plaintiffs' Action.**

While plaintiffs seek an affirmative determination of the Court that the Secretaries have improperly concluded that FRWRs are not held in marine waters, they have offered no affidavits, declarations or any other evidence that plaintiffs or any one they represent have suffered an injury in fact because of the

Secretaries' decision. It is axiomatic that an actual or threatened injury is a prerequisite to standing and to jurisdiction of the Court to entertain plaintiffs' action.  Article III of the United States Constitution requires a "case or controversy." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Plaintiffs must have "a personal stake in the outcome of the controversy" *Baker v. Carr*, 369 U.S. 186, 204 (1962). This is a threshold jurisdictional question. *Warth v. Seldin*, 422 U.S. at 527-18 (1975); *McMichael v. Napa County,* 709 F.2d 1268, 1269 (9th Cir. 1983). As stated in *Lujan v. Defenders of Wildlife*, 504 U.S. at 560: "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."

The party invoking the Court's jurisdiction must show that he or she has suffered an actual or threatened injury as a result of the actions of a defendant.[71]/ *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471-72 (1982); *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99 (1979); *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 39 (1976); *Warth v. Seldin*, 422 U.S. at 498-99. The burden is on plaintiffs to show the necessary elements

---

[71]/    The United States has pursuant to Fed. R. Civ. P. 8(b) denied plaintiffs' allegations of injury. *Compare* First Amended Complaint for Injunctive and Declaratory Relief (Docket Entry No. 79) ¶¶ 5-7, 30-39, 56, 57, 61-63 *with* Answer to Amended Complaint (Docket Entry No. ) ¶¶ 5-7, 30-39, 56, 57, 61-63.

for standing. *United States v. Hays*, 515 U.S. 737, 743 (1995); *Lujan v. Defenders of Wildlife*, 504 U.S. at 561; *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990).

The injury requirement embraces three related elements: (1) an actual or threatened injury, (2) which is fairly traceable to the defendant's alleged unlawful conduct and is not the result of the actions of some third party who is not before the court, and (3) which is likely to be redressed by the relief requested. *Steel Company v. Citizens for a Better Environment,* 523 U.S. 83, 102-03 (1998); *Lujan v. Defenders of Wildlife*, 504 U.S. at 560; *Allen v. Wright*, 468 U.S. 737, 751 (1984). The injury in fact must be actual or imminent, and not hypothetical or speculative. *Lujan v. Defenders of Wildlife,* 504 U.S. at 560-61. The courts are not to create jurisdiction by embellishing or to presume facts to supplement otherwise deficient allegations of standing. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 889 (1990); *Whitmore v. Arkansas,* 495 U.S. at 158. *O'Shay v. Littleton*, 414 U.S. 488, 494 (1974); "[t]he injury or threat must be both 'real and immediate,' not 'conjectural' or 'hypothetical'."

There is also no standing merely to compel the Government to comply with the law. *Lujan v. Defenders of Wildlife*, 504 U.S. at 573-74; *State of Nevada v. Burford*, 918 F.2d 854, 857 (9th Cir. 1990). Vindication of the public interest in Government observing

the law is a function of Congress and the Executive, not the courts. *Lujan v. Defenders of Wildlife*. 504 U.S. at 576. Further, the presentation of abstract questions, even of wide public significance, amount to generalized grievances and are not to be addressed by the courts. *United States v. Hays*, 515 U.S. at 743; *Valley Forge Christian College,* 454 U.S. at 475. An organization's concern with a subject does not substitute for the concrete injury required by Article III of the Constitution. *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 40 (1976). A mere interest in a problem no matter how long standing or how qualified the organization, does not confer standing. *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).

A party must also generally assert an injury that is personal to himself, and not an injury to a third party. *United States Department of Labor v. Triplett*, 494 U.S. 715, 720 (1990); *Secretary of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 955 (1984).

In this instance there are two individual plaintiffs, Lincoln Peratrovich and J.K. (Joe) Samuel, and two organizational plaintiffs, the Skakan Kwaan and the Taanta Kwaan. First Amended Complaint for Injunctive and Declaratory Relief (Docket Entry No.) ¶¶ 4-7 at 3-5. Organizations may have standing to represent their members if (1) the members would have standing to sue in their own right, (2) the organization seeks to protect interests germane to

its organizational purpose, and (3) participation by the individual members is not required for proper disposition of the litigation. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). An organization may also have standing if the organization itself suffers or will suffer a legally cognizable injury. *Warth v. Seldin*, 422 U.S. at 511.

As no proof of the requisite injury has been shown by either of the individual plaintiffs, and neither of the organizational plaintiffs have shown either any injury to the organizations or to any members who they purport to represent, the Court may not address the merits of the claims they have presented. *Steel Company v. Citizens for a Better Environment,* 523 U.S. 83, 93-95 (1998); *Nome Eskimo Community v. Babbitt,* 67 F.3d 813, 816 (9th Cir. 1995). Accordingly, plaintiffs are not entitled to relief in this action.

**2. The Determination That FRWRs Are Not Held In Marine Waters Was Proper.** Even if the Court had jurisdiction to review the Secretaries' determination, the court should find that the doctrine of FRWRs is not applicable to marine waters. As has already been shown, the basis for the Secretaries' decision was that this doctrine has never been applied to marine waters, and that the doctrine which is founded on the lack of sufficient water is not applicable to the undisputably abundant marine waters.

Plaintiffs do not dispute that the doctrine of FRWRs has never been applied to marine waters such as the waters of the Behm Canal

which is their chosen sample water. They contend only that if the purposes of a reservation include the need for waters that is sufficient to create a FRWR.

The Secretaries' determination that the FRWR doctrine is not applicable to abundant marine waters is reasonable, not arbitrary and capricious, and is consistent with the established law. The Secretaries are correct, the FRWRs doctrine arose and was developed within the context of the shortage of fresh water judicially in order to assure that the availability of water to meet the present and future needs of the reservation, and where, in the absence of an implied reservation of water, the purposes of the reservations could not have been fulfilled. *United States v. New Mexico*, 438 U.S. 696, 699-700 (1978); *Arizona v.* California, 373 U.S. 546, 599-600 (1963); United *States v. Powers*, 305 U.S. 527, 531-33 (1939); *United States v. Adair*, 723 F.2d 1394, 1408 (9th Cir. 1984); *State of Washington v. Yakima Reservation Irrigation Dist.*, 850 P.2d 1306, 1316 (WA 1993); *United States v. City and County of Denver*, 656 P.2d 1 (Col. 1983). The FRWRs doctrine is built on implication. *United States v. Adair*, 723 F.2d at 1411 n. 19. If water were abundant it would not have been necessary to determine and imply the reservation of waters. *United States v. New Mexico*, 438 U.S. at 699.

Here, as the sample water selected by the Peratrovich plaintiffs--the Behm Canal--shows, there is an unlimited supply of

water. The water at issue is a water way of the Pacific Ocean lying on three sides of Revillagigedo Island. Perat Br. Exhibit 30. There is no reasonably foreseeable likelihood that there will be or can ever be any diversion or consumptive use of these waters that would prevent their use for any purposes or of any use of the Tongass National Forest. There is simply no need to imply a reservation of these waters in order to insure sufficient water remains in order to meet the purposes of the Forest. Therefore, the Secretaries, consistent with the limits of the established law, reasonably decided not to extend the doctrine of implied FRWRs where that clearly was not necessary.

The Secretaries' decision is also reasonable given the recognition in the *Katie John #1* decision that Congress intended that, that there were to be two areas of meaningful management. Some areas by the State, and some by the United States. *See* 13-15, *supra*. Given that the boundaries of the Tongass National Forest extend so as to include virtually all of the marine waters of the Tongass and thus of Southeast Alaska, Perat. Br. Exhibit 13 at 1-2, 4, adoption of the plaintiffs' contentions would effectively lead to the complete exclusion of State authority over any of the marine waters within the Tongass National Forest. That exclusion would be contrary to the intent of Congress recognized in *Katie John #1*.[72/]

---

[72/]    Since the Alaska Maritime National Wildlife Refuge created

(continued...)

## CONCLUSION

For the foregoing reasons the respective contentions of the Katie John plaintiffs, the State of Alaska, and the Peratrovich plaintiffs should be rejected, and their respective claims that the Secretaries regulations designating those waters that are public lands for purposes of the ANILCA Title VIII priority should be dismissed.

Dated this 28th day of January, 2008.

s/Dean K. Dunsmore
DEAN K. DUNSMORE
Department of Justice
Environment & Natural Resources Division
801 B Street, Suite 504
Anchorage, Alaska  99501-3657
Telephone: (907) 271-5452
Facsimile: (907) 271-5827
Email: dean.dunsmore@usdoj.gov
Attorney for Defendants

---

[72]/(...continued)
by ANILCA not only includes extensive coastal lands along the Chukchi, Beaufort, and Bering Seas, the Aleutian Islands, the Alaska Peninsula, and Gulf of Alaska, "and adjacent seas of Alaska," 94 Stat. at 2389, a determination that FRWRs can be held in marine waters would also potentially lead to Federal jurisdiction over most of the marine waters of the State.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 28ᵗʰ day of January 2008 a copy of the foregoing BRIEF OF THE UNITED STATES (WHICH WATERS) and exhibits thereto were served electronically to the following:

Heather R. Kendall-Miller
Robert T. Anderson
William F. Sherman
Randolph H. Barnhouse
Steven A. Daugherty
Michael Sewright
William P. Horn
Gregory S. Fisher
Carol H. Daniel


s/Dean K. Dunsmore
Dean K. Dunsmore

TABLE OF EXHIBITS

| Exhibit | Document |
|---------|----------|
| 1 | Declaration of Theo Matuskowitz. |
| 2 | Declaration of James R. Szender. |
| 3 | *Ethel Aguilar, et al. V. United States*, No. A76-271 Civil (D. Alaska), Stipulated Procedures for Implementation of Order, filed Feb. 2, 1983. |
| 4 | *Aguilar* and Title Recovery Handbook for Native Allotments (Excerpts). |
| 5 | Declaration of Peter Probasco. |
| 6 | Declaration of Richard Myer. |
| 7 | Exhibit No. 7 not used. |
| 8 | Declaration of Charles M. Gilbert. |
| 9 | *Katie John, et al. v. USA, et al.*, No. A90-484 Civil I(D. Alaska) Memorandum in Opposition to Federal Defendants' Motion to Dismiss (Excerpts). |
| 10 | Declaration of Tom Jennings. |
| 11 | Map, Juneau Townsite Eliminations. |
| 12 | Presidential Proclamation of February 16, 1909. |
| 13 | Presidential Proclamation of February 7, 1922. |
| 14 | Presidential Proclamation of June 10, 1925. |
| 15 | Executive Order 7088, June 27, 1935. |
| 16 | Executive Order No. 7624, May 29, 1937. |
| 17 | Public Land Order 842, June 19, 1952. |
| 18 | Memorandum of July 16, 2002, from Regina L. Sleater to David B. Allen with attachments. |

19    Map 1-1, National Petroleum Reserve - Alaska and the North Slope, from Northeast National Petroleum Reserve - Alaska, Final Amended Integrated Activity Plan/Environmental Impact Statement, Vol. 3, U.S. Dept. Of the Interior (Jan. 2005).