# United States Department of the Interior

OFFICE OF THE SOLICITOR
Alaska Region
4230 University Drive, Suite 300
Anchorage, Alaska 99508-4626
Tel: (907)271-4131  Fax: (907)271-4143

July 16, 2002

FWS.AK.1617

TO:     David B. Allen
        FWS Regional Director - Region 7

FROM: Regina L. Sleater
        Attorney

SUBJECT: Status of Submerged Lands - Tuxedni Subunit, Gulf of Alaska Unit, Alaska
        Maritime National Wildlife Refuge

This is in response to your request of May 1, 2002 for a review of the status of submerged lands within Tuxedni Bay. This is the fourth in a series of requests dealing with the status of submerged lands within national wildlife refuges in Alaska. The previous requests dealt with the Chukchi Sea and the Aleutian Islands Units of the Alaska Maritime National Wildlife Refuge, and Izembek National Wildlife Refuge.[1] In none of those instances was it found that the original withdrawals included the marine submerged lands not on the uplands. The conclusion regarding the Tuxedni Subunit is similar: the submerged lands surrounding the islands were not withdrawn by Executive Order 1039 or by other action prior to Alaska statehood. This conclusion was reached by this office on February 4 and February 22, 1972[2] and is a correct reading of the executive order under current legal standards.

These requests seem to arise from confusion over the proper way to read the early withdrawals for the units that became the Alaska Maritime National Wildlife Refuge. In the areas which we have been asked to review, the withdrawing documents describe an area by a dotted line and then

---

[1]The opinion on the Chukchi Sea Unit was issued March 22, 1999. At the request of your office, the opinion on the Aleutian Islands Unit and Izembek NWR was not issued but was circulated in draft form on October 25, 2000. Both opinions are attached to this opinion.

[2]Opinion of Regional Solicitor Robert E. Price, February 4, 1972, and Opinion of Regional Solicitor Robert E. Price, February 22, 1972, based on opinion of Assistant Solicitor Charles H. Vaughn, February 18, 1971.

EXHIBIT 18
Page 1 of 14

withdrawn. The executive order segregates an area out of which certain surface features are withdrawn.

2) The official ANILCA maps and Federal Register publication of February 24, 1983, depict the uplands and submerged lands around Chisik Island as within the boundaries of the Alaska Maritime Refuge. Are they correct?

ANSWER: Both are correct but neither the ANILCA map nor the Federal Register boundary publication, 48 Fed.Reg. 7903 (1983), include the submerged lands surrounding Chisik Island as within the boundaries of the Alaska Maritime Refuge. The Federal Register publication expressly states that the Tuxedni Subunit includes only those lands, including submerged lands, which were described in Executive Order 1039 which are located within a specified location. Since the executive order did not include the submerged lands surrounding Chisik Island, neither does the Federal Register description.

The ANILCA map for the Tuxedni Subunit of the Alaska Maritime National Wildlife Refuge, AMNWR Map # 26, contains the following notation: "Refuge includes offshore public lands on islands, islets, rocks, reefs and spires." This notation implies that the lines shown are not the boundary of the refuge but merely area depictions indicating where the refuge lands are located. This reading is consistent with section 303(1) of ANILCA which states that the Alaska Maritime National Wildlife Refuge shall consist of areas that were part of existing reservations. Since the original reservation for Tuxedni only included surface features within a designated area, the notation on map #26 may be interpreted as accurately reflecting the original reservation.

3) If correct, what is the disposition of the two 1972 Solicitor's Opinions rendered by Regional Solicitor Robert E. Price?

ANSWER: The opinions issued by Robert E. Price still reflect the state of the law and are hereby reaffirmed.

4) If the answer to question 2 is yes, do Federal subsistence rights attach to these submerged land areas?

ANSWER: Since the marine submerged lands surrounding the islands were not included in the 1909 withdrawal and do not appear to have been withdrawn at any other time prior to Alaska statehood, they are not lands to which federal subsistence rights attach under Title VIII of ANILCA. In addition, the marine submerged lands surrounding the islands are not within the boundaries of any unit specified in 36 C.F.R. § 242.3(b)(1)-(34) and 50 C.F.R. § 100.3(b)(21)-(34) and therefor are not subject to subsistence regulation.

Attachments: opinion dated 3/22/99 and draft opinion of 10/25/2000

EXHIBIT _18_
Page _2_ of _14_

OFFICE OF THE SOLICITOR
Alaska Region
4230 University Drive, Suite 300
Anchorage, Alaska 99508-4626
Tel: (907)271-4131  Fax: (907)271-4143
March 22, 1999

FWS.AK.1261

TO:     David B. Allen
        Regional Director
        FWS Region 7

FROM: Regina L. Sleater
        Attorney

SUBJECT: Jurisdiction at Chukchi Sea

This is in response to your opinion request of April 17, 1998.  In this request you ask two questions:

    1.  Were public lands within the exterior boundaries of the NPR-A as described in section 102 of Public Law 94-258, 90 Stat. 303, explicitly or implicitly withdrawn by section 303(1)(A)(i) of the Alaska National Interest Lands Act (ANILCA), Pub. L. 96-487, 94 Stat. 2374, for inclusion within the Alaska Maritime National Wildlife Refuge?

    2.  If the answer to Question No. 1 is that the islands and submerged lands north of Icy Cape are included in both the NPR-A and the Alaska Maritime National Wildlife Refuge, which agency has jurisdiction?

## CONCLUSION

No public lands within the NPR-A were explicitly or implicitly withdrawn by section 303(1)(i) of ANILCA for the Alaska Maritime National Wildlife Refuge.  The Bureau of Land Management (BLM) has exclusive jurisdiction over the lands, including submerged lands, within the NPR-A.[1]

---

    [1]*Had our conclusion been that an administrative overlap did exist, your second question has been previously answered.  This office issued an opinion on October 21, 1982 which addressed how to manage overlapping jurisdiction in national wildlife refuges in Alaska.*

EXHIBIT 18
Page 3 of 14

# DISCUSSION

Executive Order 3797A of February 27, 1923 created the Naval Petroleum Reserve, currently denominated NPR-A. The land withdrawn was described, in part, by:

> ...thence following said highest highwater mark downstream along said Colville River and the western bank of the most western slough at its mouth to the highest highwater mark on the Arctic coast. From here, following the highest highwater mark westward to the point of beginning [Icy Cape].

> The coast line to be followed shall be that of the ocean side of the sandspits and islands forming the barrier reefs and extending across small lagoons from point to point, where such barrier reefs are not over three miles off shore, except in the case of Plover Islands, from Point Tangent to Point Barrow..where it shall be the highest highwater mark on the outer shore of the islands forming the groups and extending between the most adjacent points of these islands and the sandspits at either end. In cases where the barrier reef is over three miles off shore the boundary shall be the highest highwater mark of the coast of the mainland.

The Supreme Court in United States v. Alaska, 521 U.S. 1, 117 S.Ct. 1888, 138 L.Ed.2d 231 (1997) (Original 84), determined, inter alia, where the coast line was for purposes of establishing the boundary of the NPR-A. Although before the Special Master the State of Alaska differed with the United States as to the location of the coastal boundary,[2] Alaska did not pursue an exception to the part of the Special Master's Report which decided against its position. 138 L.Ed.2d 231, 259-260 (1997). Therefore, the decision of the Special Master becomes controlling on that issue. The Special Master's relevant discussion is contained at pages 370-381 of the Report where the meaning of the terms "coast" and "coastline" as used in the 1923 withdrawal are discussed. Generally speaking, "coast" is the land adjacent to the sea and "coastline" is where the coast meets the sea. The master then specifically discusses the inclusion of certain features, such as Peard Bay, as being within the NPR-A, that is, on the landward side of the coastline. The Special Master found that the coast line as used in the 1923 withdrawal defined a "relatively smooth boundary defined by small water crossings" rather than "one that would follow the sinuosities of the shore into small inlets and go part way up rivers." Report of the Special Master, 380. The Special Master recommended, and the Supreme Court did not overturn his recommendation, that the 1923 withdrawal be interpreted so that the NPR-A includes:

---

[2]Figures 8.1, 8.2 and 8.3 , located between pages 348 and 349 in the Report of the Special Master, illustrate the parties contentions with regard to the coastal boundary of the NPR-A.

-2-

EXHIBIT 18
Page 4 of 14

1. Wainwright Inlet and the Kuk River.
2. Kugrua Bay and River.
3. Other small inlets, bays and river estuaries, between Icy Cape and point Barrow and between Point Tangent and the Colville River, to the extent that they constitute either (a) small lagoons with barrier reefs less than three miles offshore, in the sense of the foregoing discussion, or (b) rivers.

Report of the Special Master, 381.

Section 303(1) of ANILCA establishes the Chukchi Sea Unit of the Alaska Maritime National Wildlife Refuge as

> (1) ALASKA MARITIME NATIONAL WILDLIFE REFUGE–(A) The Alaska Maritime National Wildlife Refuge shall consist of eleven existing refuges, including all lands (including submerged lands)...[and] approximately four hundred and sixty thousand acres of additional public lands on islands, islets, rocks, reefs, spires and designated capes and headlands in the coastal area and adjacent seas of Alaska, and an undetermined quantity of submerged lands, if any, retained in Federal ownership at the time of statehood around Kodiak and Afognak Islands, as generally depicted on the map entitled "Alaska Maritime National Wildlife Refuge," dated October 1979, including the--
>> (i) Chukchi Sea Unit–including Cape Lisburne, Cape Thompson, the existing Chamisso National Wildlife Refuge, and all other public lands on islands, islets, rocks, reef, spires and designated capes and headlands in the Chukchi Sea, but excluding other offshore public lands within the Bering Land Bridge National Preserve. That portion of the public lands on Cape Lisburne shall be named and appropriately identified as the "Ann Stevens-Cape Lisburne" subunit of the Chukchi Sea Unit..

The Chukchi Sea unit is to be constituted from surface features[3] on public lands "in the Chukc

---

[3]*Your second question implies that submerged lands may have been included within the Chukchi Sea Unit. However, as can be seen from the quoted ANILCA language, submerged land was included only in the eleven old refuges and around Kodiak and Afognak Islands. This is consistent with our conclusion that the Chukchi Sea Unit contains only those features outside of the NPR-A. The only way submerged land would have been available for Congressional action in 1980 was if the submerged lands had been set aside, with sufficient intent, prior to statehood. There was no withdrawal that extended into the Chukchi Sea, therefore, there was no possibility of federally owned submerged land in the Chukchi Sea.*

-3-

EXHIBIT 18
Page 5 of 14

**DISCUSSION**

Executive Order 3797A of February 27, 1923 created the Naval Petroleum Reserve, currently denominated NPR-A. The land withdrawn was described, in part, by:

> ...thence following said highest highwater mark downstream along said Colville River and the western bank of the most western slough at its mouth to the highest highwater mark on the Arctic coast. From here, following the highest highwater mark westward to the point of beginning [Icy Cape].
>
> The coast line to be followed shall be that of the ocean side of the sandspits and islands forming the barrier reefs and extending across small lagoons from point to point, where such barrier reefs are not over three miles off shore, except in the case of Plover Islands, from Point Tangent to Point Barrow..where it shall be the highest highwater mark on the outer shore of the islands forming the groups and extending between the most adjacent points of these islands and the sandspits at either end. In cases where the barrier reef is over three miles off shore the boundary shall be the highest highwater mark of the coast of the mainland.

The Supreme Court in United States v. Alaska, 521 U.S. 1, 117 S.Ct. 1888, 138 L.Ed.2d 231 (1997) (Original 84), determined, *inter alia,* where the coast line was for purposes of establishing the boundary of the NPR-A. Although before the Special Master the State of Alaska differed with the United States as to the location of the coastal boundary,[2] Alaska did not pursue an exception to the part of the Special Master's Report which decided against its position. 138 L.Ed.2d 231, 259-260 (1997). Therefore, the decision of the Special Master becomes controlling on that issue. The Special Master's relevant discussion is contained at pages 370-381 of the Report where the meaning of the terms "coast" and "coastline" as used in the 1923 withdrawal are discussed. Generally speaking, "coast" is the land adjacent to the sea and "coastline" is where the coast meets the sea. The master then specifically discusses the inclusion of certain features, such as Peard Bay, as being within the NPR-A, that is, on the landward side of the coastline. The Special Master found that the coast line as used in the 1923 withdrawal defined a "relatively smooth boundary defined by small water crossings" rather than "one that would follow the sinuosities of the shore into small inlets and go part way up rivers." Report of the Special Master, 380. The Special Master recommended, and the Supreme Court did not overturn his recommendation, that the 1923 withdrawal be interpreted so that the NPR-A includes:

---

[2] *Figures 8.1, 8.2 and 8.3 , located between pages 348 and 349 in the Report of the Special Master, illustrate the parties contentions with regard to the coastal boundary of the NPR-A.*

-2-

EXHIBIT 18
Page 6 of 14

1. Wainwright Inlet and the Kuk River.

2. Kugrua Bay and River.

3. Other small inlets, bays and river estuaries, between Icy Cape and point Barrow and between Point Tangent and the Colville River, to the extent that they constitute either (a) small lagoons with barrier reefs less than three miles offshore, in the sense of the foregoing discussion, or (b) rivers.

Report of the Special Master, 381.

Section 303(1) of ANILCA establishes the Chukchi Sea Unit of the Alaska Maritime National Wildlife Refuge as

> (1) ALASKA MARITIME NATIONAL WILDLIFE REFUGE–(A) The Alaska Maritime National Wildlife Refuge shall consist of eleven existing refuges, including all lands (including submerged lands)...[and] approximately four hundred and sixty thousand acres of additional public lands on islands, islets, rocks, reefs, spires and designated capes and headlands in the coastal area and adjacent seas of Alaska, and an undetermined quantity of submerged lands, if any, retained in Federal ownership at the time of statehood around Kodiak and Afognak Islands, as generally depicted on the map entitled "Alaska Maritime National Wildlife Refuge," dated October 1979, including the--
>> (i) Chukchi Sea Unit--including Cape Lisburne, Cape Thompson, the existing Chamisso National Wildlife Refuge, and all other public lands on islands, islets, rocks, reef, spires and designated capes and headlands in the Chukchi Sea, but excluding other offshore public lands within the Bering Land Bridge National Preserve. That portion of the public lands on Cape Lisburne shall be named and appropriately identified as the "Ann Stevens-Cape Lisburne" subunit of the Chukchi Sea Unit..

The Chukchi Sea unit is to be constituted from surface features[3] on public lands "in the Chukchi

---

[3] *Your second question implies that submerged lands may have been included within the Chukchi Sea Unit. However, as can be seen from the quoted ANILCA language, submerged land was included only in the eleven old refuges and around Kodiak and Afognak Islands. This is consistent with our conclusion that the Chukchi Sea Unit contains only those features outside of the NPR-A. The only way submerged land would have been available for Congressional action in 1980 was if the submerged lands had been set aside, with sufficient intent, prior to statehood. There was no withdrawal that extended into the Chukchi Sea, therefore, there was no possibility of federally owned submerged land in the Chukchi Sea.*

-3-

EXHIBIT 18
Page 7 of 14

Sea [emphasis added]." The area in which these surface features may exist is "generally depicted" on a map. The map of October 1979 has been reviewed and it appears to closely resemble the mapping of the State of Alaska's [losing] contentions in Original 84 as depicted on Figures 8.1, 8.2 and 8.3.[4]

The October 1979 map does not establish the boundaries of the Chukchi Sea Unit but merely set out the general area in which the specific descriptions of the area set aside for the refuge may be located.[5] In the case of the Chukchi Sea Unit, the specific establishment language specifies that the unit is composed of features "in the Chukchi Sea." The "coast line" is the line along the coast in direct contact with the sea; it is the line between the shore and inland waters and the sea. See Original 84, 138 L.Ed. 2d at 244-246; Report of the Special Master at 3709-372. ANILCA establishes the Chukchi Sea Unit as being in the Chukchi Sea or the seaward side of the coast line. The 1923 withdrawal establishes the NPR-A as being on the landward side of the coast line. Therefore, the Chukchi Sea Unit of the Alaska Maritime National Wildlife Preserve does not overlap the NPR-A

We have discussed this conclusion with your staff and advised that it will be necessary for the United States Fish and Wildlife Service to publish an amendment to the descriptions promulgated under section 103(b) of ANILCA for the Chukchi Sea Unit of the Alaska Maritime National Wildlife Refuge and that management and conservation plans for the unit reflect this conclusion

---

[4] *Since it was not known in 1979 whether the Supreme Court would ultimately find in favor of the United States with respect to the location of the coast line on the northern side of the NPR-A, caution would dictate that the map include any area that might not be in the NPR-A. Until the Supreme Court decision in 1997 it was not possible to state whether a given coastal feature was in the NPR-A or in the Alaska Maritime National Wildlife Refuge.*

[5] *The combination of general mapping and description used in ANILCA to designate the Chukchi Sea Unit provided a means that the Chukchi Sea Unit would abut the NPR-A whether the United States prevailed in Original 84 or the State prevailed.*

– 4 –

EXHIBIT 18
Page 8 of 14

**DRAFT**

FWS.1462.AK
October 25, 2000

TO:    David B. Allen
        Regional Director - Region 7
        U.S. Fish and Wildlife Service

FROM:  Regina L. Sleater
        Attorney

SUBJECT: Interest Reserved to the United States for the Aleutian Islands Reserve and Izembek
        National Wildlife Refuge

Pursuant to your request regarding what is now the Aleutian Islands Unit of the Alaska Maritime
National Wildlife Refuge, this office has reviewed Executive Order 1733 of March 3, 1913
establishing the Aleutian Islands Reservation, Executive Orders 4076 of September 20, 1924,
4251 of June 10, 1925, 5000 of November 23, 1928, 5243 of December 19, 1929 and 5318 of
April 7, 1930 amending said reservation, Executive Orders 5281, 5364 and 8680 made for
military purposes, withdrawal application A-044920 of August 15, 1958, and the various legal
memoranda listed in your request. Pursuant to your request for a similar review of the
documents creating what is now the Izembek National Wildlife Refuge, we have reviewed Public
Land Order 2216 of December 6, 1960, establishing the Izembek National Wildlife Range, as
well as Executive Orders 5214 of October 30, 1929, and 8736 of April 14, 1941, Public Land
Orders 103 of March 27, 1943, 945 of March 18, 1954, 1001 of September 2, 1954 and 2451 of
August 2, 1961. We also we reviewed the Alaska National Interest Lands Conservation Act,
Pub. L. 96-487, 94 Stat. 2374 (1980). The purpose of these reviews was to determine if the
rulings in United States v. Alaska, 482 U.S. 193 (1987) (*Original 84*) or Alaska v. United States
& Arctic Slope Regional Corporation, 213 F. 3d 1092 (9th Cir. 2000) (*Kukpowruk River*) have
changed or modified any of the previously rendered decisions.

## CONCLUSIONS

As discussed below, neither *Original 84* nor the *Kukpowruk River* case change the conclusions
that E.O. 1733 and PLO 2216 did not withdraw and reserve submerged lands underlying

1

**DRAFT**

Submerged Land

EXHIBIT 18
Page 9 of 14

**DRAFT**

navigable waters, whether seaward of the mean high tide line or inland. The referenced cases deal with the affect of applications and withdrawals on the state's ownership rights under the Alaska Statehood Act and the Submerged Lands Act, if the application or withdrawal shows intent to include submerged lands underlying navigable waters. However, in the withdrawals establishing both the Aleutian Islands Unit and Izembek, it appears that the intent was not to include submerged lands. This intent was memorialized by contemporaneous materials. Therefore, neither the Aleutian Islands Unit or Izembek National Wildlife Refuge include submerged lands under navigable waters.

The answers to the three specific questions asked in the Aleutian Islands Unit request are:

1. Were certain submerged lands within the boundary of the Aleutian Island [sic] Reservation as depicted on the diagram or map accompanying E.O. 1733 intended to be reserved along with the islands on March 3, 1913?

*ANSWER*: No, the submerged land depicted on the diagram accompanying E.O. 1733 was not intended to be reserved, except where such submerged land is located on the upland of the islands. Further, the dotted line on the diagram accompanying EO 1733 is not the boundary of the Aleutian Islands Reservation. The boundary is the mean high tide line of each island. The dotted line merely indicates the area in which the islands constituting the Reservation are located.

2. Further, did the purposes of the Aleutian Island [sic] Reservation reflect a clear intent to reserve all submerged lands within the boundaries of the Reservation sufficient to defeat the State of Alaska's title to the submerged lands in question?

*ANSWER*: No. The analysis of the Solicitor on July 22, 1969, drafted by Associate Solicitor Edwards, expressly addressing the issue posed in your question is still the interpretation of E.O. 1733 and E.O. 5318.

3. If it is determined EO 1733 failed to withdraw the submerged lands and waters surrounding the Aleutian Islands Reservation, did the withdrawal application for the submerged lands and waters of the Aleutian Islands National Wildlife Refuge filed by the Bureau of Sport Fisheries and Wildlife on August 15, 1958, noted as A-044920 to the public land records on that date and published in the Federal Register on October 23, 1958 (23 F.R. 8163), before Alaska's admission to the Union in January 1959, segregate or set apart all of the submerged land for the purpose of a wildlife refuge for "protection of and to facilitate the management of the sea otter inhabiting the coastal waters" prevent title to the submerged lands within the Reservation from passing to Alaska at statehood in accordance with Section 6(e) of the Alaska Statehood Act?

2

**DRAFT**

**Submerged Land**

EXHIBIT 18
Page 10 of 14

# DRAFT

DRAFT

*ANSWER:* Since application A-044920 was rejected by the Secretary on August 21, 1959, the submerged lands and water described therein and surrounding the Aleutian Islands National Wildlife Refuge was not included within the refuge. The refuge area is discontinuous and its boundary is the mean high tide line around each island.

## DISCUSSION  DRAFT

## A.  ALEUTIAN ISLANDS UNIT OF ALASKA MARITIME NWR

DRAFT

E.O. 1733 established the Aleutian Islands Reservation on March 3, 1913 by reserving "all islands of the Aleutian chain, Alaska, including Unimak and Sannak Islands on the east, and extending to and including Attu Island on the west…as a preserve and breeding ground for native birds, for the propagation of reindeer and fur bearing animals, and for the encouragement and development of the fisheries." Jurisdiction was divided between the Department of Agriculture and the Department of Commerce and Labor. As noted in the review request, the Reservation was diminished by E.O. 4076, 4251, 5000 and 5243. E.O. 5318 enlarged the Reservation to include "Amak Island, the Sealion Rock, and a small unnamed island lying southeast of Amak Island…within the boundary indicated by the broken line upon the diagram." "These islands and rocks are hereby added to and made part of the Aleutian Islands Reservation, Alaska." The Amak enlargement was placed under the jurisdiction of the Department of Agriculture "as a refuge and breeding ground for birds and wild animals." By Proclamation 2416, on July 25, 1940 the name was changed to the Aleutian Islands National Wildlife Refuge and in 1980 the Alaska National Interest Lands Act (ANILCA) included the Aleutian Islands National Wildlife Refuge as part of the Aleutian Islands Unit of the Alaska Maritime National Wildlife Refuge. ANILCA defined the Aleutian Islands Unit as "including the existing Aleutian Islands and Bogoslof National Wildlife Refuges, and all other public lands in the Aleutian Islands."

DRAFT

The current test for determining whether submerged land has been withdrawn so as to defeat a state's ownership under the Submerged Land Act, which is the codification of the equal footing doctrine, was established in <u>Utah Division of Public Lands v. United States</u>, 482 U.S. 193 (1987) (*Utah Lake*). The test has two distinct prongs. First, does the withdrawal document clearly establish that it was intended to withdraw or reserve submerged lands underlying navigable waters and, second, is there a clear indication of Congressional intent to defeat a state's entitlement.

The legal opinions of the Department have been remarkably consistent in holding that the reservation created by E.O. 1733 does not include the submerged land and waters seaward of the mean high tide line surrounding the various islands. Between 1959 and 1974, eleven legal

3

DRAFT

# DRAFT

DRAFT

**Submerged Land**

EXHIBIT 18
Page 11 of 14

**DRAFT**

opinions were issued relating to the ownership and jurisdiction over the submerged lands seaward of the mean high tide line surrounding the various islands. All of the drafters, except for Omar Halvorson, an attorney in the Portland Regional Solicitor's Office, whose opinion was overturned by the Associate Solicitor for Conservation and Wildlife on April 16, 1974, concluded that the Aleutian Islands Reservation did not include the seaward submerged lands. Furthermore, there is evidence that management was of the opinion that the Reservation did not include the seaward submerged lands otherwise it would not have filed the application for withdrawal of the submerged lands and surrounding waters in 1958. Immediately after statehood the conclusion, that submerged lands surrounding the Aleutian Islands were conveyed to Alaska at statehood, was transmitted to Governor Egan by Secretary Seaton's letter of August 24, 1959. All of this history would be relevant to a determination of whether there was intent to include submerged lands within the area withdrawn for the refuge. It seems clear that at or about the time of statehood the withdrawing officials and those officials who managed the withdrawn land did not think that submerged lands had been included within the withdrawal.

Neither *Original 84* nor the *Kukpowruk River* case change the above conclusions with regard to the inclusion of the water and submerged lands surrounding the Aleutian Islands within the Aleutian Islands Unit of the Alaska Maritime National Wildlife Refuge, since the applications of those opinions go to other parts of the test articulated in *Utah Lake*. In its relevant part, the opinion in *Original 84* held that an application for withdrawal of submerged lands for a wildlife refuge which later ripened into a refuge was sufficient under the language of section 6(e) of the Alaska Statehood Act to indicate Congressional intent to defeat the State's entitlement to submerged lands underlying tidal waters. In the *Kukpowruk River* case the Ninth Circuit held, *inter alia*, that if, submerged land is reserved prior to statehood by military withdrawal, the fact that the reservation is cancelled after statehood does not revive the State's entitlement to nonreserved submerged land underlying navigable waterways. Had application A-044920 been granted, these cases would possibly have influenced the analysis of the question of whether the submerged lands seaward of the mean high tide line surrounding the individual islands were withdrawn for refuge purposes at time of statehood and thus covered under section 6(e) of the Alaska Statehood Act. However, on August 21, 1959 the Secretary rejected the request to reserve these submerged lands and thereby increase the Aleutian Islands National Wildlife Refuge.

ANILCA , section 303(1)(iii), created the Alaska Maritime National Wildlife Refuge Aleutian Islands Unit. This designation did not add additional submerged land underlying the territorial sea to the refuge. The Aleutian Islands Unit was delineated as

4

**DRAFT**

**Submerged Land**

EXHIBIT 18
Page 12 of 14

**DRAFT**

The Alaska Maritime National Wildlife Refuge shall consist of eleven existing refuges, including all lands (including submerged lands), waters and interests therein which were a part of such refuges and are hereby redesignated as subunits of the Alaska Maritime National Wildlife Refuge; approximately four hundred and sixty thousand acres of additional public lands on islands, islets, rocks, reefs, spires and designated capes and headlands in the coastal areas and adjacent seas of Alaska, and an undetermined quantity of submerged lands, if any, retained in Federal ownership at the time of statehood around Kodiak and Afognak Islands...including the....

Aleutian Islands Unit -- including the existing Aleutian Islands and Bogoslof National Wildlife Refuges, and all other public lands in the Aleutian Islands. (ANILCA §503(1)(A)(iii)).

ANILCA made it clear that whatever land that was owned by the United States on the Aleutian Islands was to be within the Aleutian Unit without regard to the fact that the U.S. Fish and Wildlife Service may not be the managing agency. What is also clear, however, is that the expansion only related to land (defined by ANILCA § 102(1) as "lands, waters, or interests therein") on the islands[1]. There was no inclusion of submerged land underlying the territorial sea which might have remained in public ownership.[2] Therefore, even if these submerged lands remain in federal ownership after statehood, they were not put under refuge management as part of the Aleutian Islands Unit of the Alaska Maritime National Wildlife Refuge.

## 2. IZEMBEK NATIONAL WILDLIFE REFUGE

The analysis for whether submerged lands underlying navigable waters were included in the Izembek National Wildlife Refuge is similar to that for the Aleutian Islands Unit. There is relevant difference, however. The Izembek National Wildlife Range was created by PLO 2216 on December 6, 1960 and express excluded "lands beneath navigable waters as defined in section 2 of the Submerged Lands Act of 1953 (67 Stat. 29; 43 U.S.C. 1301." The Submerged Lands Act of 1953 defines "lands beneath navigable waters" as:

---

[1] For a related interpretation, see memorandum opinion of this office on the Chukchi Sea Unit issued on March 3, 1999.

[2] This opinion does not address whether any such submerged land remained in federal ownership after the admission of Alaska to the union. In view of the public statements of our Department it would be hard for any agency of the Department of the Interior to successfully argue that, at statehood, it was intended that these submerged lands not transfer to the State of Alaska.

5

**DRAFT**

**Submerged Land**

EXHIBIT 18
Page 13 of 14

**DRAFT**

(1) all lands within the boundaries of each of the respective States which are covered by nontidal waters that were navigable under the laws of the United States at the time such State became a member of the Union, or acquired sovereignty over such lands and waters thereafter, up to the ordinary high water mark as heretofore or hereafter modified by accretion, erosion, and reliction;

(2) all lands permanently or periodically covered by tidal waters up to but not above the line of mean high tide and seaward to a line three geographical miles distant from the coast line of each such State and to the boundary line of each such State where in any case such boundary as it existed at the time such State became a member of the Union, or as heretofore approved by Congress, extends seaward (or into the Gulf of Mexico) beyond three geographical miles, and

(3) all filled in, made, or reclaimed lands which formerly were lands beneath navigable waters, as hereinabove defined.

Therefore, submerged lands under navigable waters were not within the range at its creation, whether or not the submerged lands were owned by the federal government or Alaska.

ANILCA § 303(3) created the Izembek National Wildlife Refuge from "[t]he existing Izembek National Wildlife Range including the lands, waters and interests of the unit which shall be redesignated as the Izembek National Wildlife Refuge." ANILCA did not change or add to the area within PLO 2216. So the submerged lands underlying navigable waters were not given to the U.S. Fish and Wildlife Service to manage.

Your request notes several overlapping military withdrawals and FWS applications for withdrawal. Those that were in effect at date of statehood, January 3, 1959, might conceivably have provided grounds for arguing that the submerged lands did not transfer to Alaska, if those areas had been included within the Range. Such an argument would be countered with the public statements of Secretary Seaton at the time that the submerged lands went to Alaska and the 1966 legal opinion of the Associate Solicitor, both of which are indications that there was no intent to defeat the statehood entitlement.

It is clear from the applications and the communications both before and after the establishment of the Range that the Service intended that the Izembek Range include the lands underlying navigable waters. However, it is equally clear from PLO 2216 and the accompanying Secretarial statement that the Secretary did not grant the application without amendment. The public land order controls what lands were to be managed as Izembek National Wildlife Range and it did not include the submerged lands underlying navigable waters.

6

**DRAFT**

**Submerged Land**

EXHIBIT _18_
Page _14_ of _14_