WILLIAM P. HORN, D.C. Bar No.: 375666
Birch, Horton, Bittner and Cherot, P.C.
1155 Connecticut Avenue, Suite 1200, NW
Washington, D.C. 20036
Telephone: (202) 659-5800
Facsimile: (202) 659-1027
Email: whorn@dc.bhb.com

Attorney for State of Alaska

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| KATIE JOHN, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| vs. ) | |
| ) | |
| UNITED STATES OF AMERICA, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |
| STATE OF ALASKA, ) | |
| ) | |
| Plaintiffs, ) | |
| and ) | |
| ) | |
| ALASKA FISH AND WILDLIFE FEDERA- ) | |
| TION AND OUTDOOR COUNCIL, et al., ) | |
| ) | |
| Plaintiff-Intervenors, ) | No. 3:05-cv-0006-HRH |
| vs. ) | (Consolidated with |
| ) | No. 3:05-cv-0158-HRH) |
| DIRK KEMPTHORNE Secretary of the ) | |
| Interior, et al., ) | |
| Defendants, ) | |
| ) | |
| and ) | **STATE OF ALASKA'S** |
| ) | **BRIEF IN OPPOSITION TO THE** |
| KATIE JOHN, et al., ) | **KATIE JOHN AND** |
| ) | **PERATROVICH PLAINTIFFS'** |
| Defendant-Intervenors, ) | **OPENING BRIEFS ON "WHICH** |
| ) | **WATERS"** |
| and ) | |
| ) | |
| ALASKA FEDERATION OF NATIVES, ) | |
| ) | |
| Defendant-Intervenor. ) | |

- AND -

\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\{G:/101445/1/JAP5106.DOC}ALASKA'S "WHICH WATERS" OPPOSITION
BRIEF

LINCOLN PERATROVICH, et al.,              )
                                          )
                           Plaintiffs,    )
                                          )
        vs.                               )
                                          )
UNITED STATES OF AMERICA, et al.,         )
                                          )
                           Defendant.     )
        and                               )        No. 3:92-cv-0734-HRH
                                          )
STATE OF ALASKA,                          )
                                          )
                 Intervenor-Defendant.    )
                                          )

**TABLE OF CONTENTS**

I.    **INTRODUCTION AND SUMMARY OF ARGUMENT** — 1

II.    **TEST CASE FACTS** — 7

III.    **STANDARD OF REVIEW** — 9

IV.    **ARGUMENT** — 10

  A.  **The Agencies Are Not Under A Mandatory Non-Discretionary Duty to Assert The Tenuous FRWR Claims In Upstream/Downstream Allotment, And Marine Waters That Katie John And Peratrovich Want Them To Assert.** — 10

    1.  Non-Assertion of a FRWR is Agency Inaction. — 10

    2.  ANILCA and the Katie John Decisions do not Provide a Clear Statutory Directive to Assert Tenuous FRWR Claims. — 14

    3.  The Federal Defendants Did Not Refrain From Asserting a Clearly Valid FRWR. — 16

    4.  ANILCA is not "Indian Legislation". — 17

    5.  The Federal Defendants Are Not Required to "Improve" FRWR Law. — 18

  B.  **Katie John's Arguments For Radically Extending The FRWR Doctrine to Encompass Virtually All Navigable Waters in Alaska Lack Merit.** — 19

    1.  FRWRs Do Not Exist in Waters and Waterway Reaches Many Miles Downstream and Upstream from Federally Reserved Land. — 19

      a.  ANILCA Plainly Limits FRWRs for Wildlife Refuges to Waters Within a Reservation, Contrary to Katie John's Novel Downstream/Upstream Claims. — 20

      b.  Katie John's Unprecedented Downstream/Upstream Theory Relies on Inapplicable Lower 48 *Winans* Case Law Regarding Treaty Rights and Aboriginal Rights. — 23

      c.  Katie John's Downstream/Upstream Theory Confuses the Nature of the Limited Interest Associated with FRWRs. — 28

         d.     Katie John's Downstream/Upstream Claims Would     36
Radically Extend Federal Control Contrary to *Katie
John II* and the FRWR Doctrine.

         e.     There Are No Federal Non-Reserved Water Rights     39
Created by ANILCA.

     2.     Alaska Native Allotments Do Not Succeed to *Winters* FRWRs     39
Derived from Prior Reservations, and the U.S. Restrictions on
Allotment Alienation and Disposition Are Not "Reservations"
Creating FRWRs per *Cappaert* and *New Mexico*.

**C.**     **Peratrovich's Unprecedented Attempt To Compel The Federal**     **46**
**Defendants To Assert FRWRs In Extensive Marine Waters Contrary**
**To ANILCA and FRWR Law Should Be Rejected.**

     1.     Salt Water Is Not Needed to Make Trees Grow or Freshwater     47
Rivers Flow.

     2.     Peratrovich Uses the Wrong Definition of Public Lands.     49

     3.     Peratrovich Relies on a Repealed Presidential Declaration.     53

     4.     ANILCA Controls and Places the Behm Canal Outside of the     54
Misty Fjords Monument and Wilderness.

     5.     The Alaska Maritime National Wildlife Refuge is Irrelevant     57
to the Behm Canal, Which is Nowhere Near any Portion of That
Refuge and Not Appurtenant to That Refuge.

     6.     The Peratrovich Parties Long Ago Acknowledged that Their     60
Theory Depended on Federal Ownership of the Submerged Lands
Adjacent to the Tongass Uplands Which the Supreme Court
Had Decreed the State Owns.

**V.**     **CONCLUSION**     **62**

## TABLE OF AUTHORITIES

## FEDERAL AND STATE CASES

*Acquavella* (Katie John Exhibit 17) .............................................................25

*Aguilar v. United States*
    474 F.Supp. 840, 842 (D. Alaska 1979) ..................................................6, 41

*Alaska v. United States*
    534 U.S. 1103 (2002) (Order)...........................................................61

*Alaska v. United States*
    546 U.S. 413, 416-17 (Jan. 23, 2006) .............................................47, 49, 52

*Andrews v. North Side Canal Co.*
    12 P.2d 263, 266 (Idaho 1932).........................................................34

*Amoco Production Company v. Village of Gambell*
    480 U.S. 531 (1987).....................................................................52

*Arizona v. California*
    373 U.S. 546, 600-01 (1963) ...........................................................30

*Arizona v. California*
    376 U.S. 340, 344 (1964)............................................................30, 42

*California v. United States*
    438 U.S. 696 (1978).....................................................................11

*California Oregon Power Co. v. Beaver Portland Cement Co,*
    295 U.S. 142 (1935) ....................................................................6

*Cappaert v. United States*
    426 U.S. 136 (1976)........................................................... *passim*

*Center for Biological Diversity v. Veneman*
    394 F.3d 1108 (9th Cir. 2005) ........................................................13

*Chevron U.S.A. v. Natural Resources Defense Council*
    467 U.S. 837 (1984)......................................................................8

*City of Overton Park v. Volpe*
    401 U.S. 402, 420 (1971)................................................................8

*City of Tulsa v. Tyson Foods, Inc.*
258 F.Supp.2d 1263, 1273-74 1289 (N.D. Okla. 2003)....................................35

*Colville Confederated Tribes v. Walton*
647 F.2d 42, 50 (9th Cir. 1981) ......................................6, 22, 40, 42, 43

*Defenders of Wildlife v. Administrator E.P.A.*
882 F.2d 1294, 1303 (8th Cir. 1989) ..................................................9

*Desert Irrigation, Ltd. v. State*
944 P.2d 835, 842 (Nev. 1997)........................................................34

*Elephant Butte Irr. Dist. v. Regents of New Mexico State University*
849 P.2d 372, 376 (N.M. App. 1993) ...............................................34

*Finch v. United States*
387 F.2d 13 (10th Cir. 1967) ...........................................................41

*General Adjudication of All Rights to Use Water in the Gila River System and Source* ("Gila River")
989 P.2d 739, 746, 748 (Ariz. 1999)..................................................22

*Heckler v. Chaney*
470 U.S. 821, 830 (1985)................................................................16

*Heckman v. U.S,*
224 U.S. 413 (1912).................................................................6, 42

*Hoonah Indian Association v. Morrison*
170 F.3d 1223 (9th Cir. 1999) .........................................................17

*Institute for Wildlife Protection v. Norton*
303 F. Supp.2d 1175, 1180 (W.D. Wash. 2003,
*affd.*, 149 Fed. Appx. 627 WL 2250718 (C.A. 9 (Wash.)..................................9

*John v. United States ("Katie John I")*
1994 WL 487830 (D. Alaska March 30, 1994) (unreported) ...........................18

*John v. United States*
247 F.3d 1032 (9th Cir. 2001) ("*Katie John III*") ................................18

*Kittitas Reclamation Dist. v. Sunnyside Valley Irr. Dist.*
763 F.2d 1032 (9th Cir. 1985) ........................................................24

*Meltzer v. Zoller*
530 F.Supp. 847 (D. N.J. 1981)......................................................54

*North Side Canal Co. v. State Board of Equalization of Wyoming*
    17 F.3d 55, 60 (8th Cir. 1926) ...............................................................34, 35

*Norton v. Southern Utah Wilderness Alliance*
    542 U.S. 55 (2004).................................................2, 12, 13, 17, 18

*Pallin v. United States*
    496 F.2d 27 (9th Cir. 1974) ...................................................................41

*Pence v. Kleppe*
    529 F.2d 135 (9th Cir. 1976) ............................................................41, 44

*Peratrovich v. United States*
    No. A92-734 (Civil (D. Alaska, Aug. 18, 2000).............................................61

*Potlatch Corp. v. United States*
    12 P.3d 1260, 1264-1266 (Idaho 2000) .....................................................22

*Scheufler v. General Host Corp.*
    126 F.3d 1261, 1264-67 (10th Cir. 1997) .........................................................35

*Seven Lakes Water Users' Ass'n v. Fort Lyon Canal Co.*
    4 P.2d 1112, 1114-5 (Colo. 1931)................................................................35

*Shoshone-Bannock Tribes v. Reno*
    56 F.3d 1476 (D.C. Cir. 1995) .....................................................14, 16, 17, 21

*Sierra Club v. Block*
    622 F.Supp. 842 (D. Colo. 1985) ...............................................................13

*Sierra Club v. Lyng*
    661 F.Supp. 1490 (D. Colo. 1987).................................................................13

*Sierra club v. Watt*
    659 F.2d 203 (DC Cir. 1981) ....................................................................14

*Sierra Club v. Yeutter*
    911 F.2d. 1405, 1419 (10th Cir. 1990) ........................................12, 13, 15, 16

*Skeem v. United States*
    273 F.2d 93 (9th Cir. 1921) ....................................................................41

*Sohappy v. Smith*
    302 F.Supp. 899 (D. Ore. 1966)................................................................24

*State of Alaska v. Ahtna, Inc.*
   891 F.2d 1401, 1403-04, 1406 (9th Cir. 1989) ....................................................52

*State of Alaska v. Babbitt*
   72 F.3d 698, 703 (9th Cir. 1995)("*Katie John II*").................................. *passim*

*Sun Vineyards, Inc. v. Luna County Wine Development Corp.*
   760 P.2d 1290, 1292-93 (N.M. 1988) ...............................................................34

*Totemoff v. State*
   905 P.2d 954 (Alaska 1995)..............................................................................19

*United States v. Adair*
   723 F.2d 1394 (9th Cir. 1983) .............................................................................6

*United States v. Adair*
   723 F.2d 1398, 1412-13 (9th Cir. 1984) ....................................27, 28, 29, 36, 40

*United States v. Ahtanum Irrigation District*
   236 F.2d 321 (9th Cir. 1956) ............................................................................25

*United States v. Alaska*
   521 U.S. 1, 5-7 (1997) ......................................................................................52

*United States v. Anderson*
   736 F.2d 1358, 1362 (9th Cir. 1984) ......................................................,6, 40, 41

*United States v. Atlantic Richfield Co.*
   435 F.Supp. 1009 (D. Alaska 1977) ...................................................................3

*United States v. Bell*
   724 P.2d 631, 634, 645 n. 17 (Colo. 1986).......................................................23

*United States v. Bowling*
   256 U.S. 484, 487 (1921)..............................................................................6, 42

*United States v. California*
   436 U.S. 32 (1978)................................................................................50, 51, 53

*United States v. City of Challis*
   988 P.2d 1199, 1200 (Idaho 1999)....................................................................22

*United States v. City and County of Denver, By and Through Bd. of Water Com'rs,*
   656 P.2d 1, 35 (Colo. 1982)..............................................................................31

*United States ex rel. Ray v. Hibner*

27 F.2d) 900 (D. Idaho 1928) ........................................................................................41

*United States v. Juvenile No. 1*
118 F.3d 298 (5th Cir. 1997) ......................................................................................56

*United States v. New Mexico*
438 U.S. 696 (1978) ................................................................................................ *passim*

*United States v. Powers*
305 U.S. 527 (1939) .......................................................................................................41

*United States v. Ramsey*
271 U.S. 467, 470 (1926) ...............................................................................................42

*United States v. Washington*
Case No. CV 9213RSM (U.S. Dist. Ct. (W.D. Wash. 2007)) ...........................................25

*United States v. Weyerhauser Co.*
765 F.Supp. 643 (D. Or. 1991) .....................................................................................42

*United States v. Winans*
198 U.S. 371 (1905) ................................................................................................ *passim*

*Utah Div. of State Lands v. United States*
482 U.S. 193, 195-198 (1987) .......................................................................................52

*Village of False Pass v. Clark*
733 F.2d 605, 609-610 (9th Cir. 1984) ............................................................................9

*West Winds, Inc. v. M.V. Resolute*
720 F.2d 1097 (9th Cir. 1983) .....................................................................................54

*Wheatland Industrial Co. v. Johnson*
186 P.2d 377, 380 (Wyo. 1947) ...............................................................................34, 35

*Winters v. United States*
207 U.S. 564 (1908) ................................................................................................ *passim*

## STATUTES

5 U.S.C. § 701 ...............................................................................................................12

5 U.S.C. § 704 .................................................................................................................9

5 U.S.C. § 706 ...................................................................................................8, 10

5 U.S.C. § 706(1) ...............................................................................................2, 12

5 U.S.C. § 706(2) ....................................................................................................9

16 U.S.C. § 431 note ...............................................................................................9,

16 U.S.C. § 473 *et seq.* ........................................................................................47

16 U.S.C. § 668dd note .........................................................................................57

16 U.S.C. § 1132 note ...........................................................................................54

16 U.S.C. § 1603 ...................................................................................................43

16 U.S.C. § 1617 ...................................................................................................40

16 U.S.C. § 3111 .....................................................................................................3

16 U.S.C. § 3114 .....................................................................................................3

16 U.S.C. § 3117 .....................................................................................................9

16 U.S.C. § 3102(3) ...............................................................................................40

16 U.S.C. § 3103(a) ..........................................................................................55, 59

16 U.S.C. § 3103(c) ...............................................................................................53

16 U.S.C. § 3103(A) ..............................................................................................53

16 U.S.C. § 3207 ...................................................................................................16

16 U.S.C. § 3209 .....................................................................................................9

16 U.S.C. § 3209(a) ...............................................................................................53

16 U.S.C. § 4321 note ......................................................................................55, 56

25 U.S.C. 334 ..................................................................................................41, 44

42 U.S.C. § 431 note ........................................................................................54, 55

43 U.S.C. § 1301 *et seq.* ......................................................................................51

43 U.S. § 1301(a)(2), (b) & (c) .............................................................................52

43 U.S. § 1301(e) ................................................................................52

43 U.S.C. § 1311(a) ........................................................................50, 52

43 U.S.C. § 1313a ..............................................................................50

43 U.S.C. § 1314(a) ............................................................................51

43 U.S.C. § 1603(b) and (c) ................................................................17

43 U.S.C. § 1701, et seq. .....................................................................14

43 U.S.C. § 1782(c) ............................................................................12

24 Stat. 388 (1887) ..........................................................................1, 3

24 Stat. 389, § 4 ................................................................................41

24 Stat. 390 § 7 .................................................................................41

30 Stat. 34 ........................................................................................47

34 Stat. 197 ......................................................................................41

67 Stat. 29 ........................................................................................51

67 Stat. 30 ........................................................................................52

67 Stat. 32 ........................................................................................51

72 Stat. 339 ......................................................................................50

94 Stat. 2399-2400 ............................................................................54

94 Stat. 2410 ....................................................................................54

ANILCA, § 102(3)(A) ........................................................................53
        § 103(a) ..........................................................................55, 57
        § 201(10) ..............................................................................21
        § 302 ......................................................................................4
        § 302(3)((B)(iv) .....................................................................20
        § 302(6)(B)(iv) ......................................................................20
        § 302(9)(B)(iv) ......................................................................20
        § 303 ......................................................................................4
        § 303(1)(A) .....................................................................57, 58

§ 303(1)(A)(i)-(v)........................................................................................57

§ 303(1)(B)(v)............................................................................................59

§ 303 (7)(B)(iv)..........................................................................................20

§ 503(a) & (b)............................................................................................56

§ 503(a)-(c)................................................................................................50

§ 503(c)......................................................................................................56

§503(f)........................................................................................................55

§ 503(f)(1)..................................................................................................53

§§ 802(1) and (2)  ........................................................................................3

§ 703(a)(5)..................................................................................................54

§ 804....................................................................................................3, 15, 17

§§ 804-815..................................................................................................31

§ 807....................................................................................................9, 15

§ 1319(1)....................................................................................................16

§ 1322(a)....................................................................................................53


AS 09.45.225 ...............................................................................................35

AS 09.45.230(a)...........................................................................................35

AS 46.15.010 *et seq.* ..................................................................................47

## REGULATIONS

50 C.F.R. § 100.3(c)(25)..............................................................................11

50 C.F.R. § 100.3(B)(28)..............................................................................11

64 Fed. Reg. 1276........................................................................................11

70 Fed. Reg. 76400-01.................................................................................11

## ADDITIONAL AUTHORITIES

*State of Alaska v. United States of America*, No. 128, Original Report of the
        Special Master on the Motion to Intervene by Franklin H. James, the
        Shakan Kwaan Thling-Git Nation, Joseph K. Samuel, and the Taanta Kwaan
        Thling-git Nation, Gregory E. Maggs, Special Master, November, 2001,
        "Special Master Report" ........................................................................60

*DeLorme, Alaska Atlas & Gazetteer* (2004 ed.) ..........................................58

Sutherland Statutory Construction, § 22:30 (7th ed. 2007) ...........................54

Sutherland Statutory Construction, § 47:38 (7th ed. 2007) ............................................................56

Beck, Robert E., Waters and Water Rights, §§ 37.01 & 37.02(a)(2) (1996 ed.) ................4, 27, 28

## I.    <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

The purpose of this "which waters" phase of this case is to provide initial answers to the fundamental questions arising from the majority opinion in *Katie John II*,[1] which held that the Federal Defendants have federal subsistence jurisdiction over "certain" navigable waters in which the Federal Defendants hold FRWRs. Consequently, the which waters briefing will assist the Court in determining for specific "test case" navigable waters: (1) whether the Federal Defendants improperly asserted FRWRs that are not supported by the law and facts, and therefore challenged by the State; and (2) whether the Federal Defendants must be compelled to assert additional novel FRWR claims that the Katie John and Peratrovich parties contend exist, but which neither the Federal Defendants nor the State believe are supported by the law and facts.  The State's opening brief (Doc. No. 134) focuses on question (1), and this brief focuses on question (2).

As the Ninth Circuit has made clear, FRWRs can exist only in "some specific navigable waters"; ANILCA does not authorize "federal control…over all such waters".[2]  Nevertheless, the present Katie John plaintiffs take this opportunity to try to extend FRWRs to virtually all stretches of all rivers, streams, and lakes in Alaska, navigable and non-navigable, contrary to the determination in *Katie John II*.  They seek to convert this inquiry into the scope of FRWRs into an Indian treaty fishing rights matter instead – which it is not – and into an 1887 Dawes Act[3] Indian reservation allotment case – which it also is not.  In addition, they want this Court to force

---

[1]    *State of Alaska v. Babbitt*, 72 F.3d 698, 703 (9th Cir. 1995) ("*Katie John II*").

[2]    *Id.*  There the Ninth Circuit Court cautioned:  "If we were to adopt Katie John's position, that public lands include all navigable waters, we would give federal agencies control over all such waters in Alaska. ANILCA does not support such a complete assertion of federal control…."  This Court has  recognized this posture of this case in its previous orders issued herein, including its Order filed May 31, 2006 in *Peratrovich*, Case 3:92-cv-00734-HRH (Doc. No. 178), summarizing *Katie John II* (referred to as "Katie John III" in that Order) and rejecting several of the Peratrovich plaintiffs' claims as a matter of law based on *Katie John II*'s rejection of arguments not based on FRWRs (*id., e.g.*, at pp. 11-13, 29-31).

[3]    24 Stat. 388 (1887).

the Federal Defendants to undertake this unprecedented expansion and radical rewrite of the

FRWR doctrine as an affirmative administrative action, where those federal agencies have no

affirmative duty under the law to do so.

Similarly, the Peratrovich plaintiffs ask this Court to go where no court has gone before

and extend the FRWR doctrine to marine waters.  They argue that since it is not "impossible"

that FRWRs might exist in such waters (Doc. No. 150 at 10; ("Peratrovich Brief")), the Court

should compel the Federal Defendants to make such claims despite the utter lack of precedent for

such action.  Peratrovich also claims, contrary to all plain facts, that a FRWR in marine (i.e., salt)

waters is needed to provide a "continuous supply of timber and to protect flows of rivers within

the [Tongass] forest" (*id*. at 42).  There are no circumstances, factual or legal, in which salt

waters are put to beneficial use on reserved lands to make trees grow or freshwater rivers flow.

As explained in Argument A which follows, the Federal Defendants cannot be compelled

to assert the novel and dubious FRWR claims in entire river lengths and marine waters that the

Katie John and Peratrovich plaintiffs advocate.  The Defendants deliberately chose not to make

unprecedented FRWR claims in non-appurtenant downstream and upstream waters, in

association with Alaska Native allotments, or in marine waters generally.  Federal non-assertion

of those FRWR claims constitutes agency inaction, which is reviewed under Section 706(1) of

the Administrative Procedure Act, 5 U.S.C. § 706(1).  Under Section 706(1), as construed by the

Supreme Court in *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 62-64 (2004), a

federal court may compel an agency to act only if the agency is under a non-discretionary duty to

take that specific action.   Nothing in ANILCA specifically compels the agencies to aggressively

assert every conceivable tenuous, far-fetched FRWR claim.  Accordingly, there is no non-

discretionary duty on the part of the Federal Defendants to assert the FRWR claims that the Katie

John and Peratrovich plaintiffs wish those Defendants had asserted, and the Katie John and Peratrovich complaints must be dismissed.

Alternatively, even if the Court had the theoretical power under the APA and ANILCA to compel the Federal Defendants to assert tenuous FRWR claims, which it does not, this is not the case to exercise that power. As is explained in Arguments B and C which follow, the FRWR claims that the Katie John and Peratrovich plaintiffs want the Federal Defendants to assert are entirely without substantive merit. Thus those novel FRWR claims were properly not asserted by the Federal Defendants.

Katie John Arguments. With respect to the Katie John arguments, Indian treaty law and mid-1800s treaties with Indian tribes outside of Alaska involving hunting and fishing rights and associated water rights[4] have absolutely nothing to do with the determination of "which" of "some" or "certain" waters in Alaska can possess valid FRWRs.[5] Congress expressly extinguished aboriginal hunting and fishing rights as well as land rights in Alaska in the 1971 Alaska Native Claims Settlement Act (ANCSA), in return for the provisions of that Act, which contain no "treaties."[6] Rather, Title VIII of ANILCA offers only a highly regulated privilege, to Alaska rural Natives and non-Natives alike,[7] for the "opportunity" to engage in "nonwasteful subsistence uses" if and when fish and wildlife resources are sufficient to sustain such uses.[8]

A linchpin of the Indian treaty/aboriginal rights cases which Katie John seeks to import from the Lower 48 is the necessity of downstream water flows to ensure that salmon can ascend

---

[4]  Cases relied on in the Katie John brief [Doc. No. 139-2 at 24, 34, 38-40, 42, 49-51, 54, 56] ("Katie John Brief") relate to treaties executed in 1855 and 1859 with tribes in Oregon and Washington (Yakimas, Warm Springs, Umatillas), in 1864 with the Klamath tribe in California and Oregon, in 1867 with the Ft. Hall tribe in Idaho, and in 1887 with the Crows in Montana.

[5]  *Katie John II*, 72 F.3d at 703.

[6]  *Katie John II*, 72 F.3d at 700, citing ANCSA at 43 U.S.C. § 1603(b); *United States v. Atlantic Richfield Co.*, 435 F.Supp. 1009 (D. Alaska 1977).

[7]  ANILCA § 801(1) [16 U.S.C. § 3111]; *Katie John II*, 72 F.3d at 700.

[8]  *Katie John II*, 72 F.3d at 700; ANILCA §§ 802(1) & (2), § 804 [16 U.S.C. §§ 3112, 3114].

the rivers to reach the on-reservation fishing grounds protected by the applicable treaty rights. *United States v. Winans*, 198 U.S. 371 (1905), the foundation of this line of cases, determined that tribal treaty fishing rights were entitled to protection. It also recognized that these treaty rights could, depending on the terms of the treaty as in that case, extend beyond reservation boundaries. 198 U.S. at 381. However, "*Winans* rights differ fundamentally from *Winters*[9] [water] rights. *Winans* rights essentially are recognized as aboriginal rights,"[10] which no longer exist in Alaska, and so are not relevant to this case.

Instead, deciding which waters can contain FRWRs, and be treated as "public lands" for the purposes of Title VIII of ANILCA, requires application of that specific statute as well as the FRWR doctrine. Applicable case law stands squarely for the proposition that FRWRs can exist only in waters appurtenant to, meaning "within", federally reserved lands, especially those lands reserved for general public purposes such as national refuges, parks, and forests rather than by Indian reservations or treaties.[11] ANILCA only reserved lands for conservation and other public purposes (i.e., parks, wildlife refuges, forests, etc.).

Boundaries are thus crucial in this "which waters" case, as they define and limit the federal reservations to which federal reserved water rights might possibly apply according to federal law and limit "public lands" under *Katie John II* and ANILCA to only some or certain waters. No amount of argument can turn this ANILCA "privileges"/*Cappaert and New Mexico*[12] FRWRs boundaries case into a *Winans* Indian treaty rights/aboriginal rights no-boundaries case. The *Winans* line of treaty rights cases is simply inapplicable here.

---

[9]   *Winters v. United States*, 207 U.S. 564 (1908).
[10]   Beck, Robert E., *Waters and Water Rights*, § 37.02(a)(2) at 239 (1996 ed.).
[11]   *See* legal citations at pp. 22-24 of this Brief *infra*. *See also, e.g.*, ANILCA §§ 302 and 303 reserving national wildlife refuges and plainly providing that each such refuge only applies to "water quality and necessary water quantity **within** the refuge" (emphasis added).
[12]   *Cappaert v. United States*, 426 U.S. 128 (1976); *United States v. New Mexico*, 438 U.S. 696 (1978).

There is also a clever attempt by Katie John to twist the "biological necessity" of water and fish passage downstream and upstream of national reservation lands into a FRWR outside of those lands. However, that argument (in addition to treating reservations created by ANILCA as if they were Indian reservations or tribal treaty rights) confuses FRWRs with the potential *extra-territorial impact* that *Winans*-type tribal fishing rights, which exist *on* Indian reservation lands or at treaty-reserved fishing sites, may sometimes have on the users of lands and waters located *outside of* those aboriginal areas. Whereas a tribal fishing right in one location may result in judicially-imposed restrictions on activities such as the development of a dam or a major water diversion in another location up or down stream of that fishing site – in order to allow the passage of migratory fish to and from that fishing site or to maintain specific quantities of water when determined necessary to support fishing *within* that site – that does mean that the tribal priority right to take fish or a FRWR exists in those outside locations which become impacted. As those cases Katie John cites make clear, in instances where a treaty right to take fish exists, it exists to take fish within the reserved area or treaty right location, rather than in the waters upstream or downstream of that location. *See* Argument Point B.1.b *infra*. Further, as this Court held, no such "extraterritorial" jurisdiction issue has been concretely presented here.[13]

Similarly, Katie John confuses the location of FRWRs recognized under *Winters* with the means of enforcing FRWRs. Because water flows, an upstream diversion may impact the waters appurtenant to a downstream reservation which holds a FRWR. Consequently, it will sometimes be necessary to enforce a FRWR against an upstream user. In that situation, the FRWR being enforced does not extend all the way to the upstream user's location; rather, the upstream users' off-reservation conduct (similar to a nuisance) is enjoined so that it does not impact the

---

[13]     *See* Order filed herein on March 13, 2006 (Doc. No. 51) at 4-8.

geographically-limited FRWR in the limited stretch of downstream water appurtenant to the reservation holding the FRWR.  *See* Argument B.1.c. *infra*.

In addition, Katie John relies on inapplicable Indian General Allotment, or Dawes Act,[14] "tribal allotment" case law involving Indian reservation *Winters* waters rights passed on as an incident of that reservation to Indian allotments which were formerly part of that reservation.[15] Although no such allotments exist in Alaska (nor are there any *Winters* water rights ), the Katie John plaintiffs rely on these cases to advance their novel argument that Alaska Native allotments, which were established under a completely different statute and were not previously part of an Indian reservation,[16] are "reservations" with FRWRs.  However, the case law cited in their brief demonstrates that Alaska Native allotments do not derive from "reservations" at all and are akin to homesteads[17] which do not have FRWRs.[18]  Such allotments are really lands in private ownership with limited alienation restrictions held by the United States to guard against "improvident disposition" by the allottee, but such restrictions do not prevent disposition by the allottee,[19] nor satisfy the requirements needed to properly claim a FRWR.

The downstream and upstream extension of water rights which the Katie John plaintiffs propose, combined with granting FRWRs to thousands of individual allotments, would result in virtually every river and stream in Alaska (and every lake bordered by an allotment or Conservation System Unit ("CSU")) suddenly and without precedent becoming subject to

---

[14]  24 Stat. 388 (1887).

[15]  *See, e.g., United States v. Anderson*, 736 F.2d 1358, 1362 (9th Cir. 1984) (citing *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 50 (9th Cir. 1981), *cert. denied*, 454 U.S. 1092 (1981), and *United States v. Adair*, 723 F.2d 1394 (9th Cir. 1983), and describing that type of Indian allotment as carrying with it "the appurtenant right to share in tribal reserved waters").

[16]  *Aguilar v. United States*, 474 F.Supp. 840, 842 (D. Alaska 1979) ("The Alaska Native Allotment Act of 1906 was the first statute passed which allowed the Natives of Alaska to perfect their title to the land occupied and used by them", which did not derive from "reservations").

[17]  *Id.*, 474 F.Supp. at 842 & 845.

[18]  *Anderson*, 736 F.2d at 1362-63 (citing *California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142 (1935)).

[19]  *U.S. v. Bowling*, 256 U.S. 484, 487 (1921); *see also Heckman v. U.S.*, 224 U.S. 413 (1912).

FRWRs and the full length of these waterways converted to "public lands."  As shown below, such expansive consequences would effectively nullify the Ninth Circuit Court's determination that only "some" or "certain" waters "appurtenant" to parcels of land "reserved" by the United States in Alaska might contain FRWRs (*Katie John* II, 72 F.3d at 703), revive in another form the "navigational servitude" theory of federal subsidence jurisdiction that the Ninth Circuit rejected, and violate the Alaska Statehood Act and the federal Submerged Lands Act as well as ANILCA.

Peratrovich Arguments.  In addition to implausibly suggesting that a FRWR in abundant salt waters is necessary to make sure that trees grow and fresh waters flow from their sources through the Tongass Forest uplands to the sea, Peratrovich relies heavily on early prestatehood Tongass Forest presidential proclamations that make no mention of marine waters and on a Proclamation by President Jimmy Carter in 1978 that was soon repealed by Congress in ANILCA in 1980.  In ANILCA, Congress placed the "test case" waterway chosen by Peratrovich, the Behm Canal, outside the Misty Fjords reservation, and also far outside the Alaska Maritime refuge unit on which Peratrovich also relies.  Any FRWRs associated with those reservations do not help Peratrovich's attempt to show the Federal Defendants must assert a FRWR in the Behm Canal, or in any other marine waters in southeast Alaska.

## II.    TEST CASE FACTS

Katie John selected the entire length of the Yukon River flowing throughout Alaska (approximately 1,324 miles) as her "test case" to compel the Federal Defendants to assert FRWRs in waters upstream and downstream from federally reserved lands.  The Yukon River flows across the State from east to west emptying into the Bering Sea.  Approximately 677 miles of the River flow within the boundaries of three federal CSUs:  the Yukon Delta National

Wildlife Refuge ("NWR") (approximately 285 miles); the Yukon Flats NWR (approximately 262 miles); and the Yukon Charley National Preserve (approximately 130 miles). Two other reaches of approximately 280 miles of the Yukon River in which the Federal Defendants also assert FRWRs flow adjacent to but outside of the Innoko and Nowitna NWRs.[20]   Therefore, about 367 miles of the Yukon River are neither within nor adjacent to federally reserved lands, and the Federal Defendants have not claimed FRWRs in these reaches of the Yukon River. Katie John wants the Court to compel the Federal Defendants to claim FRWRs in these additional reaches of the Yukon River; namely, the reach between the Yukon Charley National Preserve and the Yukon Flats NWR; the long reach between the Yukon Flats and Nowitna unit; a stretch between the Nowitna and Innoko NWRs; reaches between the separate sections of the Innoko Refuge; and another reach between the Innoko and Yukon Delta units. Katie John also seeks improperly to develop these expansive "test case" arguments through massive, first-time affidavits and associated documents of purported "expert" witnesses which are inappropriate for this administrative review proceeding, and the State objects.[21]

        The Peratrovich plaintiffs selected the marine and tidal waters of the Behm Canal in southeast Alaska for their test case regarding FRWRs in marine waters.  Located approximately

---

[20]   The State has challenged these and other "adjacent waters" claims by the Federal Defendants as one of its test case categories.  The State selected the approximately 75 mile reach of the Yukon River adjacent to but outside of the Nowitna unit as one of its test waterways in the State's opening brief.

[21]   By virtue of this Court's Order dated May 17, 2007 at 32 (Doc. No. 110), that the Federal Defendants properly utilized rulemaking under the Administrative Procedure Act to identify and assert FRWRs, this is a judicial review proceeding under the APA.  It is therefore restricted to the administrative record plus those materials (such as maps, public records, and standard references) of which the Court may properly take judicial notice.  5 U.S.C. § 706 (review is on the record or such parts of record as parties bring to Court's attention); *City of Overton Park v. Volpe*, 401 U.S. 402, 420 (1971).  The affidavits of purported "expert" witnesses and other affidavits and documents that Katie John attaches to her brief at Docket Nos. 137-4 though 140-6 are not part, nor should they be part, of the administrative record and are therefore not proper material for consideration on judicial review.  The State does not object to other exhibits submitted by the Katie John plaintiffs which either should have been part of the administrative record or are otherwise permissible.

30 miles east of Ketchikan, the Behm Canal is within the exterior boundaries of the Tongass

National Forest, is far-removed from any Alaska Maritime NWR areas or other CSUs mentioned

in Peratrovich's brief, and is also outside the Congressionally-designated boundaries of the Misty

Fjords National Monument which occupies the uplands on either side of this marine waterway.

Although that Monument was initially created in 1978 by President Jimmy Carter, Congress

expressly rescinded Carter's action and established a wholly new unit in 1980 in ANILCA.  *See*

ANILCA §§ 1322, 503(a); 16 U.S.C. § 3209, 431 note.

### III.    <u>STANDARD OF REVIEW</u>

Under the Administrative Procedure Act ("APA"), a reviewing court sets aside agency

action that is contrary to the law, was taken not in observance of proper procedure, or is arbitrary

and capricious.  5 U.S.C. § 706(2).  However, when the claim is that the agency has failed to take

some action desired by the Plaintiff, the Court applies the alternative standard set forth in 5

U.S.C. § 706(1).  Under that standard, the Court may order the agency to act only if the agency is

under a non-discretionary mandatory duty to take that specific action and has failed to do so.

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 62-64 (2004).

The Peratrovich plaintiffs also rely on the "judicial review provisions" of ANILCA

Section 807 (16 U.S.C. § 3117) (Peratrovich Br. at 2), but that section does not provide a

*standard* of review independent of the APA.  It is well settled that a statute (e.g., ANILCA) may

provide the mechanism for review but the APA sets the scope of review.  *See* 5 U.S.C. § 704;

*Defenders of Wildlife v. Administrator E.P.A.*, 882 F.2d 1294, 1303 (8th Cir. 1989); *Village of*

*False Pass v. Clark*, 733 F.2d 605, 609-610 (9th Cir. 1984).  ANILCA § 807 does not provide a

standard of review and therefore does not change the APA standard of review set forth in 5

U.S.C. § 706. [22]

## IV.    ARGUMENT

**A.    The Agencies Are Not Under A Mandatory Non-Discretionary Duty To Assert The Tenuous FRWR Claims In Upstream/Downstream, Allotment, And Marine Waters That Katie John And Peratrovich Want Them To Assert.**

The Secretary of the Interior and the Secretary of Agriculture are not under mandatory,

non-discretionary duty to assert the FRWR's claims advocated by Katie John and Peratrovich,

and so cannot be compelled to assert those FRWR claims.

### 1.    Non-Assertion of a FRWR is Agency Inaction.

Katie John and Peratrovich challenge agency inaction.  Katie John argues that the Federal

Defendants should have asserted FWRSs in non-appurtenant waters downstream and upstream

from federal reservations, and waters associated with Alaska Native allotments.  *See* State's

Opening Brief at pp. 16-17, 43-46.  *See also* the August 9, 1995 Memorandum of the DOI

Alaska Regional Solicitor submitted as Exhibit 1 (Docket No. 137-2) of Katie John's brief, at p.

1 (recognizing that *Katie John II* called for the agency to decide where to "***assert***" FRWRs for

purposes of asserting ANILCA Title VIII jurisdiction) (emphasis added).  Katie John thus

contends that "the Secretaries have ***failed***" to claim or identify all waters in Alaska with FRWRs.

Katie John Opening Brief at 1(emphasis added).

Peratrovich similarly argues that, although the federal government has claimed FRWRs

"headland to headland" in the marine mouths where rivers meet the sea,[23] it has failed to do so in

---

[22]   Closer inspection of ANILCA section 807 also reveals that it was designed to enable rural residents to challenge fish and game harvest or allocation actions.  The legislative history refers to the "failure to adequately restrict the harvest of a particular fish or wildlife population" as the kind of action to be addressed by this provision.  S. Rept. 96-413, Nov. 14, 1979 at 272.  A court order compelling the Federal agencies to make broad FRWRs claims is not the kind of relief contemplated by section 807.

other marine waters, particularly the seas surrounding the Tongass National Forest lands.

Peratrovich Op. Br. at 23-24.  Instead of satisfying their burden and presenting a specific agency

duty or mandate to expand the FRWR doctrine to encompass abundant and virtually unlimited

marine or salt waters, the Peratrovich plaintiffs chiefly argue that such claims are not

"impossible."  Peratrovich Brief at 1-2, 23-24, 34.  They argue that the history of FRWRs is "one

of increasing recognition and not of exclusion" (*id.* at 20) —apparently overlooking the latest

authority from the Supreme Court on the subject, *New Mexico* (1978), and *California v. United

States*, 438 U.S. 696 (1978), expressly limiting FRWRs to those instances and amounts

absolutely necessary.  The Federal Defendants exercised their discretion not to claim FRWRs in

the marine waters adjacent to the Tongass Forest, including the Behm Canal.  64 Fed. Reg. 1276

(Jan. 8, 1999); 50 C.F.R. § 100.3(b)(28) (1999); Administrative Record ("AR") pp.1708-14,

1716, 1946-47 & 1960-62.  *See also* May 31, 2006 Court Order, Doc. No. 178 at 5, in

*Peratrovich*, Case 3:92-cv-00734-HRH; 70 Fed. Reg. 76400-01; 50 C.F.R. § 100.3(c)(25)

(2006).  They made this decision not to assert such claims on the basis that there is no precedent

for FRWRs in salt waters.  *Id.*[24]  Peratrovich argues that these claims should have been made.

---

[23]   The State has requested that this agency claim be set aside by the Court as contrary to the law of
FRWRs, in the State's Opening "Which Waters" Brief filed October 12, 2007, at pages 17-25 (Doc. No.
134 at 26-34).

[24]   The Federal Defendants concluded:

> Extending the *Winters* doctrine assertion of reserved water rights to marine waters would be
> without precedent and would represent a considerable leap in reasoning.  Instead of asserting a
> federal need to protect a given level of water in a stream or other freshwater body against
> diversions or other appropriations of the water that could significantly diminish that level, the
> federal government would be asserting a need to reserve part of the most abundant waters on
> earth.  Potential appropriation of such waters remains implausible to any degree that could
> substantially affect marine water quantity or levels at all but the most restricted of locations (such
> as some salt chucks).

*See* Final Katie John Issue Paper and Recommendations of the Alaska Policy Group, issued by the DOI,
Office of the Solicitor Alaska Region, at pp. 12-13 [AR Tab 88 at pp. 1684 & 1710-12; also repeated at
AR Tab 100 pp. 2354-2412 including appendices].

In *Sierra Club v. Yeutter*, 911 F.2d 1405, 1410 (10th Cir. 1990), the Tenth Circuit held that a claim that the U.S. Forest Service should have asserted FRWRs in order to fulfill its duty under the Wilderness Act to protect Wilderness lands was a "failure to act" claim.[25]

Thus, Katie John and Peratrovich ask this Court to compel the Defendants to make claims or identifications the Defendants chose not to make. In both circumstances, the Defendants' failure to make these particular claims constitutes, from those plaintiffs' perspective, "agency action unlawfully withheld." 5 U.S.C. § 706(1).[26]

Judicial review of agency inaction under this prong of the APA, however, is limited to cases where "an agency failed to take a *discrete* agency action that it is *required to take*." *Southern Utah Wilderness Alliance*, 542 U.S. at 62-64 (emphasis in original). Section 706(1) authorizes the court only to "compel agency action *unlawfully* withheld," meaning "enforcement of a specific, unequivocal command." 542 U.S. at 63. The court can only order a "precise, definite act … about which [an official] had no discretion whatever." *Id.* Where the agency is under a duty to act but no duty to act in a specific manner, the court may only compel an agency "to take action upon a matter, without directing *how* it shall act." *Id.* (emphasis in original; citations omitted). This is very similar to the "traditional … mandamus remedy." *Id.*

In *Southern Utah Wilderness Alliance,* the Supreme Court held that the Bureau of Land Management's (BLM) statutory duty under 43 U.S.C. § 1782(c) to manage Wilderness Study

---

[25] *Yeutter* then evaluates non-assertion of FRWRs for reviewability under § 701 of the APA, 5 U.S.C. § 701. The opinion concludes reviewability has not been established, relying on § 701 and ripeness principles. The Supreme Court's recent *Southern Utah Wilderness Alliance* decision (2004) applies APA § 706(1) to reach the same result reached in *Yeutter* under § 701 -- that the agency cannot be compelled to act because there is no specific non-discretionary duty to act. 542 U.S. at 62-64. Both §§ 701, 706(1) thus support the conclusion that the Federal Defendants cannot here be compelled to assert FRWRs. Because of that recent Supreme Court decision, this Brief focuses on § 706(1).

[26] For waters in which the Federal Defendants did not assert FRWRs, they did not exercise federal subsistence jurisdiction before the FRWR rulemaking being challenged in this case, and they have not exercised federal subsistence jurisdiction in those waters after the FRWR rulemaking. That is inaction. By contrast, for waters in which the Federal Defendants identified and asserted FRWRs, they now exercise federal subsistence jurisdiction, where previously they did not. That is agency action.

Areas "in a manner so as not to impair the suitability of such areas for preservation as wilderness," although mandatory, nevertheless left "BLM with a great deal of discretion in deciding how to achieve it" and could not be the basis of an order compelling BLM to take action to prohibit off-road vehicle (ORV) use on those lands – because the statute "assuredly does not mandate, with the clarity necessary to support judicial action under § 706(1), the total exclusion of ORV use."  542 U.S. at 66.

In another recent decision, *Center for Biological Diversity v. Veneman*, 394 F.3d 1108 (9th Cir. 2005), the Ninth Circuit Court applied *Southern Utah Wilderness Alliance* to reject an effort to compel the Forest Service to consider 57 rivers and streams eligible for inclusion in the Wild and Scenic Rivers System while planning for the use and development of water and related land resources in the national forests of Arizona.  The court held that the duty in the Wild and Scenic Rivers Act to consider wild and scenic status for qualifying rivers and streams while making federal land use plans was not sufficiently specific or discrete to constitute legally required action as to any of the 57 water bodies.  394 F.3d at 1110-13.

In *Yeutter*, the Tenth Circuit Court addressed a series of orders, some reported and some not, upon which the district court had entered final judgment as requested by Sierra Club.  911 F.2d at 1407-10. [27] The Tenth Circuit Court reversed and remanded with directions to dismiss the complaint.  *Id.* at 1421.  It determined that the duty imposed on the Forest Service by the Wilderness Act of 1964 to "preserve wilderness character" was not sufficiently specific to enable

---

[27]    As noted in the *Yeutter* Circuit Court decision, at 911 F.2d 1408-09, one of the district court orders was reported in *Sierra Club v. Block*, 622 F.Supp. 842 (D. Colo. 1985), wherein the district court opined that federal reserved water rights exist in the designated Colorado wilderness areas, and in *Sierra Club v. Lyng*, 661 F.Supp. 1490 (D. Colo. 1987), relied on by Katie John in her Opening Brief, in which the district court reaffirmed that earlier holding.  The Circuit Court held that the district court erred in granting declaratory judgment to that effect.  *Yeutter*, 911 at 1421.

the court under the APA to compel the federal agency to claim FRWRs in twenty-four wilderness areas. *Id.* at 1407-08, 1414; *see* 5 U.S.C. §§ 701, 706(1).

In *Sierra Club v. Watt*, 659 F.2d 203 (D.C. Cir. 1981), the appellate court addressed an action brought "to require officials of the Interior Department to assert and protect" FRWRs in specific water courses in southern Utah and northern Arizona threatened by proposed energy projects, pursuant to various congressional enactments including the Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1701 et seq. ("FLPMA"). 659 F.2d at 204-05. Although the court in that instance reached the merits of the issue "since we find it totally without merit",[28] it ruled: "that the district court did not err when it *declined to decide* whether [FLPMA] implicitly conferred federal reserved water rights in waters appurtenant to land managed by the BLM." *Id.* at 205-06 (emphasis added).

Similarly, in *Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476 (D.C. Cir. 1995), the Circuit Court ruled that the United States Government's decision ***not*** to assert instream flow water rights in off-reservation waters as sought by the Tribes was not reviewable, because the Government had no "clear and undisputable" duty to assert such claims, even as trustee holding such rights as exist for the Indians. 56 F.3d at 1478-80, 1484.

## 2. ANILCA and the Katie John Decisions Do Not Provide a Clear Statutory Directive to Assert Tenuous FRWR Claims.

---

[28]   659 F.2d at 205.  In an analysis having some applicability to this case, the Circuit Court concluded that, because FLPMA served as the "organic" act for lands administered by the BLM and those lands constitute public domain rather than reserved lands, no FRWRs could exist in the water courses at issue, citing *Cappaert* and *New Mexico* and stating that it agreed with the Government's argument as follows:

> Under the controlling decisions of the Supreme Court, the distinction between reservation and unreserved public lands is fundamental.  Reserved rights attach only to the former, and then only when water is necessary to fulfill the primary purpose of the reservation.  No water is reserved for uses that are merely permissive on a reservation.  A fortiori, then, no reserved rights arise under [FLPMA], for no reservation of land is affected.

*Id.* at 206.

In this case there is no statutory directive, in ANILCA or otherwise, nor anything in the general holding of the court in *Katie John II* "that the federal agencies that administer the subsistence priority are responsible for identifying those waters [in which the United States asserts FRWRs]", 72 F.3d at 704, which required the Defendants to claim FRWRs in the specific areas and manner which Katie John and Peratrovich seek.

Nothing in the *Katie John II* decision or ANILCA constitutes a discrete mandatory direction to the Federal Defendants to make the broadest FRWR claims imaginable, as the Katie John and Peratrovich plaintiffs now request, and it would be against established precedent for this Court to now direct those Defendants to do so. ANILCA § 804 directs that the Federal Defendants provide a subsistence priority "on public lands," ANILCA § 807 confirms that this duty is enforceable, and the Federal Defendants provide the subsistence priority. However, neither ANILCA provision directs the Federal Defendants to assert novel ownership theories that try to squeeze as much land and water as possible into the definition of public lands.

Similarly, the *Katie John II* decision explains that the Federal Defendants "are responsible for identifying" waters in which FRWRs exist. 72 F.3d at 704. However, the decision stops there. It contains no directive commanding the Federal Defendants to "assert any remotely arguable FRWR claim in the hope, however implausible, that it is ultimately upheld" or to "assert any FRWR claim that could be asserted on a non-frivolous basis." *See Yeutter*, 911 F.2d at 1411 (Wilderness Act has NO provision stating that a FRWR claim "shall" be asserted if "probable cause" or some other evidentiary threshold is met) (internal quotations omitted). The Federal Defendants have identified and asserted those FRWRS they believe to be valid, including several that in fact are not valid. *See* State's Opening Brief at 17, 25, 30.

Moreover, as the federal agencies have recognized, the broad Katie John and Peratrovich claims are contrary to both (1) FRWRs law regarding national purpose reservations, such as those established or expanded by ANILCA, and (2) *Katie John II*'s express limitation of its FRWRs analysis to just "some" or "certain" navigable waters.  *See, e.g.*, AR 1706, 1712 & Katie John's Exh. 1 (Doc. No. 137-2), at pp. 5-6.  Indeed, there is no reference to FRWRs anywhere in ANILCA except the savings clause which prescribes that "nothing in this Act shall be construed . . . as affecting in any way law governing appropriation or use of, or Federal right to, water on lands within the State of Alaska."  § 1319(1); 16 U.S.C. § 3207.  There are also good practical reasons for not asserting FRWRs, which should be accorded deference, as the Federal Defendants recognized in the case of Native allotments in Alaska, which are numerous, very small, and scattered across Alaska.  Katie John's Exh. 1 at 6-8.  There is no mandate in law compelling the Defendants to claim broad FRWRs that they chose not to claim.

3.     **The Federal Defendants Did Not Refrain From Asserting a Clearly Valid FRWR.**

The Court need not reach the interesting, but in this case academic, issue of whether a federal agency has a non-discretionary duty to assert a clearly meritorious FRWR claim.  The FRWRs alleged by Katie John and Peratrovich constitute novel, speculative FRWR claims that federal agencies using their judgment have the discretion not to assert.  *Yeutter*, 911 F.2d at 1407-08, 1414; *Shoshone-Bannock Tribes*, 56 F.3d at 1480-84; *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *see* Argument Points B and C below.  Nothing in ANILCA requires the Federal Defendants to push the outermost bounds of the "legal envelope" and claim FRWRs under the novel, unprecedented theories advanced by Katie John and Peratrovich.  Accordingly, the Court need not consider what would happen if the Federal Defendants saw a clearly valid FRWR yet chose not to assert it.  Whether to assert a tenuous, contestable claim is inherently an exercise of

discretion involving policy-making judgment, legal judgment, and risk analysis, and is not the type of mandatory non-discretionary duty that a court under the APA and ANILCA can order a federal agency to perform. *Southern Utah Wilderness Alliance*, 542 U.S. at 63 (APA § 706(1) is similar to mandamus action); *Shoshone-Bannock Tribes*, 56 F.3d at 1478-80, 1484.

    **4.**    **ANILCA is not "Indian Legislation".**

Katie John additionally argues that the Federal Defendants were obligated to assert FRWRs in the broad manner those plaintiffs desire because ANILCA is "Indian legislation" intended to be construed for their benefit. Katie John Brief No. 139-2 at 24, 57. However, as detailed below, the Federal Defendants, relying on applicable case law, recognized that assertion is incorrect. As Katie John reluctantly acknowledges (Katie John Br. at 24-25), in *Hoonah Indian Association v. Morrison*, 170 F.3d 1223 (9th Cir. 1999), the Ninth Circuit Court directly rejected her argument that ANILCA, including its subsistence provisions, is "Indian legislation" intended to be liberally construed "for the benefit of dependent Indian tribes." 170 F.3d at 1228-29. The subsistence provisions of ANILCA apply on a non-racial basis to Indians and non-Indians alike. ANILCA § 804.

The Federal Defendants' analysis of this issue in the administrative record is clear and captures the essential point that all aboriginal hunting and fishing rights were extinguished by the Alaska Native Claims Settlement Act:

> The situation in Alaska would not support either of these types of off reservation water rights for Indians. The United States has not entered into treaties with the Tribes in Alaska and so there are no treaty rights to be supported. [Moreover,] [b]y the Alaska Native Claims Settlement Act (ANCSA), Congress specifically extinguished all aboriginal hunting and fishing rights and all claims based on aboriginal right, title or use of land or water areas in Alaska [citing 43 U.S.C. §§ 1603(b) and (c)].").

<u>Final Katie John</u> Issue Paper and Recommendations issued by the DOI, Office of the Solicitor, at pp. 9-10 [AR Tab 88 at pp. 1704-06]. [29]

**5.    <u>The Federal Defendants Are Not Required to "Improve" FRWR Law.</u>**

In part, the Katie John plaintiffs seek to justify their unjustified attempt at expanding FRWRs law by characterizing it as "imperfect" and "inadequate" to achieve the "congressional purpose of protecting and preserving traditional subsistence fishing" (*see* Katie John Op. Br. at 1-3), quoting from the "concurring" view of three judges in the 11-judge en banc decision in *John v. United States*, 247 F.3d 1032 (9th Cir. 2001)("*Katie John III*"), and from this Court's early view expressed in *John v. United States* ("*Katie John I*"), 1994 WL 487830 (D. Alaska March 30, 1994) (unreported). As this Court has previously noted (*see, e.g.*, *Peratrovich* Doc No. 178, *supra*, at 11-13, 29-31), those views were based on a much more, "highly expansive" analysis relying on navigational servitude and Commerce Clause "power" theories rejected by the Ninth Circuit Court – rather than the FRWRs' "property right" analysis actually applied by the *Katie John II* court (72 F.3d at 700, 702-04) and allowed to stand "[un]disturbed and [un]altered" in the per curiam opinion of the *Katie John III* court (247 F.3d at 1033). Katie John

---

[29]    *See also* the conclusions of the Alaska Regional Solicitor for the Department of the Interior in her August 9, 1995 Memorandum attached as Exhibit 1 to Katie John's brief:

> "[We disagree] that ANILCA should be interpreted as remedial "Indian legislation" with its broad canons of statutory construction benefiting Indians (DIA memorandum at pps. 5-6), and that these broad rules of construction support off-reservation assertion of water rights. …Indeed, ANILCA has extremely broad purposes, including, of course, the establishment and enlargement of millions of acres of national parks, refuges, monuments, wild and scenic rivers, and national forest monuments in Alaska. [I]n attempting to discern what the Ninth Circuit actually intended regarding the scope of the United States' assertion of reserved water rights as a result of the <u>Katie John</u> decision, we note that the court decided the <u>Katie John</u> case in the context of a well-established reserved water rights doctrine and body of jurisprudence which has developed in connection with parks and refuges in the lower 48 states. In that context, we are unaware of any situation where the United States has ever asserted (or a court has held) that a park or refuge's instream flow needs require the reservation of federal water rights in rivers (or portions thereof) located <u>outside</u> the park or refuge boundaries."

Katie John's Exhibit 1, Doc. No. 137-2, at pp. 5-6 (emphasis in original).

cannot fairly argue that the Federal Defendants are under a mandatory, non-discretionary duty to mount a campaign to convince Courts that the FRWR doctrine needs to be fundamentally abandoned or transformed in order to satisfy Katie John's perception of its imperfections.

**B.     Katie John's Arguments For Radically Extending The FRWR Doctrine To Encompass Virtually All Navigable Waters In Alaska Lack Merit.**

      **1.     <u>FRWRs Do Not Exist in Waters and Waterway Reaches Many Miles Downstream and Upstream from Federally Reserved Land.</u>**

As noted in the Test Case Facts above, the Katie John plaintiffs selected the entire 1,324 miles of the Yukon River in Alaska as their "test case" for their unprecedented assertion that the Court must compel the Federal Defendants to identify FRWRs in waters not appurtenant to federally reserved lands.  Adoption of these novel claims would extend FRWRs (and claims of preemptive Federal jurisdiction[30]) to hundreds of miles of the Yukon River far removed from federal reservations – miles where the River flows over State-owned submerged lands and through State-owned or privately-owned uplands.  Only three reaches of the Yukon River flow within and are therefore appurtenant to federally reserved lands: two reaches within the Yukon Flats and Yukon Delta National Wildlife Refuges (NWRs) and one reach within the Yukon-Charley National Preserve (a National Park Service unit). *See* discussion at pp. 7-8 *supra.*  Two other NWR units, the Nowitna NWR and the Innoko NWR, border the Yukon River, but the River flows outside of those reservation boundaries.  Altogether, approximately 647 miles of the

---

[30]   Although the Alaska Supreme Court opined in *Totemoff v. State*, 905 P.2d 954,  958-968, 973 (Alaska 1995), that the federal subsistence laws administered by the Defendants pursuant to Title VIII of ANILCA do not preempt state law, the Federal Defendants have taken a contrary position, including asserting the power to close (and closing) entire areas of Alaska to hunting or fishing under state law and asserting that the Secretaries have authority to exercise extraterritorial jurisdiction outside federal lands in order to favor the ANILCA subsistence priority.

Yukon River flow outside of federally reserved lands and cannot be considered appurtenant to such lands. *Id.*[31]

The Federal Defendants deliberately chose not to claim FRWRs in five non-appurtenant reaches of the River – (1) between the Yukon-Charley and Yukon Flats units; (2) between the Yukon Flats and the Nowitna unit; (3) between the Nowitna and Innoko units; (4) between the separate sections of the Innoko Refuge; and (5) between Innoko and the Yukon Delta NWR. The Katie John plaintiffs now argue that the Defendants have a mandatory duty to extend their claims to these non-appurtenant reaches although they can point to nothing in ANILCA or the FRWR doctrine that specifies or compels such a duty.

> **a.    ANILCA Plainly Limits FRWRs for Wildlife Refuges to Waters Within a Reservation, Contrary to Katie John's Novel Downstream/Upstream Claims.**

The Federal Defendants' decision to not claim FRWRs in these five non-appurtenant reaches is consistent with applicable law. Among other things, the ANILCA provisions providing for the NWR units along the Yukon River expressly and plainly provide that only "water quality and necessary water quantity ***within*** the refuge" is among the purposes of those units. ANILCA §§ 302(3)((B)(iv); (6)(B)(iv); (9)(B)(iv); 303 (7)(B)(iv) (emphasis added). Therefore, the geographic extent of any FRWR that may exist must be limited, at the very least, to waters within the exterior boundaries of these NWR units, thereby limiting any legally valid FRWRs as might eventually be shown necessary according to the requirements enunciated by the Supreme Court in *New Mexico* and *Cappaert*[32] to only the two reaches of the Yukon River

---

[31]    The State also maintains that the reaches of the Yukon River adjacent to, but not within, the Innoko and Nowitna unit boundaries which were claimed by the Federal Defendants to possess FRWRs cannot possess legally valid FRWR identifications, as presented in the State's "Which Waters" Opening Brief at pages 30-41. These two FRWR claims account for 280 of the 647 miles in which the Yukon flows outside of federal reservations. *See* pp. 7-8, *supra*.

[32]    438 U.S. 696 (1978); 426 U.S. 136 (1976).

within the Yukon Flats and Yukon Delta Refuges.  Nothing in the ANILCA provisions creating

the Yukon-Charley Preserve specify a purpose that would necessitate FRWRs even in that reach

of the Yukon River flowing within the Preserve, meaning that the Federal Defendants would

certainly have no basis for asserting FRWRs in that stretch of the River flowing up or down

stream of that unit.  ANILCA § 201(10) establishing that Preserve limits its water references to

only the Charley River – a tributary of the Yukon River.[33]  The only express reference to the

Yukon River in that section of ANILCA relates to protection of "historical sites and events

associated with the gold rush on the Yukon River and the geological and paleontological history

and cultural prehistory of the area."  *Id.*  Subsistence is not listed as a purpose of the unit, and

there is no necessity for FRWRs in that reach of the Yukon River in support of the purposes

listed for that Preserve.[34]

 These ANILCA provisions are reinforced by the FRWR doctrine's fundamental

requirement, recognized in *Katie John II* (72 F.3d at 703) that FRWRs may properly exist only in

those waters appurtenant to reserved lands.  *Cappaert*, 426 U.S. at 138-142; *New Mexico,* 438

U.S. at 698-702.  Only "appurtenant water" can be subject to a FRWR (*Cappaert*, 426 U.S. at

138), and FRWRs must be appurtenant "to the land" (*Katie John II*, 72 F.3d at 703; *Shoshone-

Bannock Tribes v. Reno*, 56 F.3d 1476, 1479-80 (D.C. Cir. 1995) (United States Government

determined tribes' claim to water rights outside the reservation "meritless")).

 In order to be "appurtenant to land" something must be "by *right* used with the land."

BLACK'S LAW DICTIONARY, 6th Ed. 1990 (emphasis added).  Moreover, at least in the context of

---

[33]  ANILCA § 201(10) provides:  "The preserve shall be managed for the following purposes, among others: To maintain the environmental integrity of the entire Charley River basin, including streams, lakes and other natural features, in its undeveloped natural condition for public benefit and scientific study."
[34]  As the Federal Defendants have noted before, "the scope of reserved water rights (in refuges, for example) is determined by reference to the refuge purposes set forth in Title III of ANILCA, not Title VIII…."  *See* Katie John's Exhibit 1, Doc. No. 137-2, at 5 n.11.

national purpose reservations such as refuges, parks and national forests (and also generally in

the context of Indian reservations), "appurtenant" means waters within, or at least underlying, the

reservation – similar to the plain "within" language contained in sections 302 and 303 of

ANILCA.  For example, in *Cappaert* – which is apparently the only case wherein the Supreme

Court has found an in-flow FRWR to exist in the case of a reservation for a national purpose (in

that case to support the existence of a unique variety of fish whose conservation that reservation

was specifically created to protect) – the pool of water was located entirely within the boundaries

of the reservation (a national monument) and the Court emphasized that fact.[35]

FRWR cases since *Cappaert* support the conclusion that FRWRs are only in waters

within reservations.  "Appurtenant" waters are those "on" or "within", or at least "underlying", a

reservation.  *See Colville Confederated Tribes v. Walton* ("*Walton II*") 647 F.2d 42, 53 (9th Cir.

1981) (FRWR doctrine relates "to water use on a federal reservation"); *United States v. City of

Challis*, 988 P.2d 1199, 1200 (Idaho 1999); *Potlatch Corp. v. United States*, 12 P.3d 1260, 1266,

1268 (Idaho 2000) (FRWRs exist only "within" and "within the confines" of a national

reservation, and require a "standard for quantification"); *General Adjudication of All Rights to

Use Water in the Gila River System and Source ("Gila River")*, 989 P.2d 739, 746, 748 (Ariz.

1999) (opining that, although the United States Supreme Court has never so held, a FRWR may

exist in water "underlying" an Indian reservation where surface waters within the reservation are

---

[35]   *See Cappaert*, 426 U.S. at 131-132, 138-142; s*ee also Potlatch Corp. v. United States*, 12 P.3d 1260,
1264-1266 (Idaho 2000) (discussing *Cappaert* and *United States v. New Mexico*, 438 U.S. 696 (1978)).
As part of their *Katie John* analysis, the Federal Defendants have previously characterized *Cappaert* as a
case wherein the Supreme Court enforced the exercise of the United States' "extraterritorial" power by
enjoining the off-reservation pumping of groundwater to the extent necessary to maintain on-reservation
water levels in that non-navigable pool within the monument in order to protect the existence of that rare
species of fish.  *See* Exhibit 1 to Katie John's Opening Brief, Doc. No. 137-2, at 4.  In its opinion the
Supreme Court, after acknowledging that it has never applied the doctrine of implied reservation of water
rights to groundwater, emphasized that the water in the pool is surface water, and that the United States
can protect its right to the water in that pool "from subsequent diversion, whether the diversion is of
surface or groundwater."  *Cappaert*, 426 U.S. at 142-143.

inadequate, such as where "reservations lack perennial streams and depend for present or future survival substantially or entirely upon pumping of underground water");[36] *United States v. Bell*, 724 P.2d 631, 634, 645 n. 17 (Colo. 1986) (waters not "located in or on the lands" considered "not appurtenant to the reserved land").[37]

In short, "appurtenant" cannot mean reaches of waterways many miles downstream or upstream from a national purpose reservation.

> **b.    Katie John's Unprecedented Downstream/Upstream Theory Relies on Inapplicable Lower 48 *Winans* Case Law Regarding Treaty Rights and Aboriginal Rights.**

Faced with the insurmountable legal obstacle of the appurtenancy requirement, Katie John asks the Court to shift away from FRWR cases and instead consider a string of Indian treaty cases that have nothing to do with the standards for establishing FRWRs under *Cappaert* and *New Mexico* on national-purpose federal public land reservations.

It is true, as Katie John contends, that a series of Indian treaties executed in the conterminous United States in the 19th Century, generally with the Indian nations within the area which later became the State of Washington, sought to protect Indian fishing rights – and related water interests – on and off the tribal reservations also established by those treaties.  It is true that, starting with the *Winans* case in 1905,[38] those particular treaties have been construed to create protected treaty rights with extraterritorial effects.  In most of those cases, the Indians by treaty ceded their vast lands to the United States, with the Tribe reserving some land for its exclusive use and also often reserving or retaining use rights (including fishing rights) on some ceded sites outside reservation boundaries.  For example, in *Winans* the Supreme Court

---

[36]    As the Federal Defendants have noted on the record, such a situation would appear inapplicable to "water plentiful Alaska" – and also irrelevant to any of Katie John's arguments.  AR 1704, 2374.

[37]    In the State's Opening Brief, *United States v. Bell* was cited for the proposition that FRWRs have not been recognized in waters "not adjacent" to a reservation, whereas "not appurtenant" was intended.

[38]    *United States v. Winans*, 198 U.S. 371.

concluded that, according to an 1859 treaty between the United States and "certain Indians of the Yakima Nation", those Indians had retained rights to fish at certain sites outside of the reservation boundaries, including a site which the Winans brothers later obtained by grant and sought to monopolize using a high-volume fish wheel under a license with the state.  198 U.S. at 377-382.  The cases on which the Katie John plaintiffs rely in their opening brief are *Winans*-type cases.  They involved the reach of Indian treaty rights beyond Indian reservation boundaries (and generally through the same treaties) so as to impact, and sometimes prohibit, other persons and activities using lands and waters (or their fish and wildlife resources) downstream or upstream of the reservations proper.  However, the treaty right being protected was to fish within the limits of the reservation, and did not itself extend upstream or downstream from the reservation. [39]

*Kittitas Reclamation Dist. v. Sunnyside Valley Irr. Dist.*, 763 F.2d 1032 (9th Cir. 1985), one case Katie John cites, was another Yakima Nation treaty case involving off-reservation fishing rights under an 1855 treaty common to many of these cases cited by Katie John, including the unreported opinions attached as Exhibits 16-18 to Katie John's brief.  In *Kittitas* the appellate court affirmed emergency actions taken by the district court under that treaty which impacted water use  beyond the boundaries of the Indian reservation.

*Sohappy v. Smith*, 302 F.Supp. 899 (D. Or. 1966), also cited by Katie John, concerned off-reservation fishing rights reserved in four separate 1855 treaties with the Yakimas, Tribes of Middle Oregon, Umatillas, and the Nez Perce.  302 F.Supp. at 904.

---

[39]  As was noted in the <u>Final Katie John</u> Issue Paper and Recommendations issued by the DOI, Office of the Solicitor [AR 1704]:

> Although these flow rights [claimed for Indian reservations or continuing tribal fishing rights] may have the effect of curtailing consumptive use with a junior priority date, either up or down stream of the site of the protected activity, the water rights are claimed for or are attached to specific sites.

The unreported Order in *United States v. Washington*, Case No. CV 9213RSM (U.S. Dist. Ct., W.D. Wash. Aug. 22, 2007), also construed the 1855 "Stevens Treaties" to specifically provide for off-reservation fishing rights to 20 different tribes and bands in present Washington state "at all usual and accustomed" fishing sites. Katie John's Exh. 16 (Doc. No. 142-2) at 1-3, 10-12. A prior district court ruling that the treaties created an environmental servitude on off-reservation ceded lands had been rejected by the Ninth Circuit Court (*id.* at 6), but on remand the District Court concluded that "the right of taking fish, secured to the Tribes in the Stevens Treaties, imposes a duty upon the State to refrain from building or operating culverts under State-maintained roads that hinder fish passage and thereby diminish the number of fish that would otherwise be available for Tribal harvest." *Id.* at 12.

The Memorandum Opinion of a State of Washington trial court in 1994 adjudicating water rights in accordance with state law in the *Acquavella* case, attached as Exhibit 17 to the Katie John brief, also addressed the terms of Governor Stevens' Treaty of 1855 and subsequent federal agreements with the Yakima Indian Nation ("YIN") – specifically with respect to the "unique" circumstances involving Ahtanum Creek, which "defines part of the northern boundary of the Yakima Reservation" and was also the subject of *United States v. Ahtanum Irrigation District*, 236 F.2d 321 (9th Cir. 1956).[40] As noted in Exhibit 17, that treaty reserved to the YIN the right to take fish from all streams "running through or bordering said reservation" and also "at all usual and accustomed places". In addition, by a subsequent federal agreement the Ninth Circuit Court had found "practically without precedent" in its *Ahtanum* decision,[41] the Indians were allotted a 25% share of the water within Ahtanum Creek for irrigation and related

---

[40] *See* Katie John's Exhibit 17, Doc. No. 142-3 at 3, 10-15. The Ninth Circuit Court's opinion in 1956 in *Ahtanum Irrigation District* was also briefly discussed in the State's Opening Brief, at p. 8 n.11 (Doc. No. 134 at 17).

[41] 236 F.2d at 331.

consumptive purposes.  Katie John's Exh. 17 at 11-12.  Those circumstances and rights do not at all resemble the FRWRs appurtenant to non-Indian lands addressed in *Cappaert* and *New Mexico*.

This *Winans*-related case law has no application to the present controversy.  First, as previously noted, there are no treaties or treaty rights at issue in this case, as there are no *Winans*-type treaties in effect with Alaska Natives.  Second, Alaska Natives have not retained any aboriginal rights to fish, hunt, or use lands or waters.  As a matter of incontrovertible fact and law, any such aboriginal rights were expressly and plainly extinguished with the 1971 enactment of the Alaska Native Claims Settlement Act.  *See* p. 3 at n. 6, *supra* this Brief.  Third, the ability to engage in subsistence fishing or hunting in Alaska under Title VIII or State law is a revocable privilege and not a right.  *See* p. 4 at nn. 10-11, *supra* this Brief.  Consequently, cases about off-reservation Indian treaty rights, aboriginal rights, or the imposition of duties on downstream or upstream off-reservation water users related to such rights have absolutely no relevance to this Alaska "which waters" case. As was concluded in the August 9, 1995 Alaska Regional Solicitor's Memorandum attached as Exhibit 1 to the Katie John brief (Doc. No. 137-2) at pp. 4-5)[42]:

> [W]e are unaware of any circumstance elsewhere where the United States has asserted that a park or refuge reserved water right extends outside the park or refuge boundaries in order to maintain instream flows in a portion of the watercourse located outside the boundaries.  While Indian water rights have been asserted more extensively based on specific treaty and Indian reservation purposes, this is not the case, to our knowledge, with respect to any forest, park or refuge reserved rights. … [T]he cases cited in the DIA [Division of Indian Affairs] memorandum regarding the United States' off-reservation water rights assertions on behalf of Indian tribes in the lower 48 states (at pps. 5-6) are distinguishable from the situation of federal reservations in Alaska.  In every case we are familiar with involving an off-reservation assertion of water rights on

---

[42]  This Memorandum was inexplicably missing from the Administrative Record ("AR") provided by the Federal Defendants in this case.  It should have been included in the list of AR.  The State joins Katie John in requesting that this document be considered by the Court and thus included as part of the AR.

behalf of an Indian tribe, the assertion was necessary to protect specific treaty or Indian reservation hunting and fishing rights, including sites located on former Indian reservation lands where Indian fishing rights survived the termination of the reservation.[43]  These situations do not exist in Alaska where the federal reservations for which water rights are being asserted under the Katie John decision are parks, refuges, forests, etc. which are subject to a different body of water rights jurisprudence.[44]

The Katie John brief argues that Congress "knew" all of this Indian fishing treaty rights law when it enacted ANILCA in 1980.  Brief at 34.  If so, Congress also would have been aware that these *Winans* cases are ***not*** about FRWRs, especially FRWRs for public land reservations. Express Congressional action to extinguish any and all aboriginal hunting and fishing rights in ANCSA nine years before ANILCA demonstrates a clear intent to bar *Winans* cases from being applicable in Alaska.

The Katie John brief also misrepresents the *Winans*-related case law as "basic, elementary reserved waters right law."  Katie John Brief 34.  To the contrary, it is basic hornbook law that *Winans* is not about FRWRs and is fundamentally different from *Winters*, *Cappaert,* and *New Mexico* FRWRs.  See Beck, *supra* this Brief at p. 4 n.10.  In addition, ANILCA was enacted in 1980 hard on the heels of the *Cappaert* (1976) and *New Mexico* (1978) decisions, which established appurtenancy as a fundamental limitation on FRWRs for non-Indian reserved lands like refuges, parks, preserves, monuments, and forests.  What Congress should be imputed to have "known" in 1980 was that the then recently articulated FRWR doctrine regarding such lands meant (a) only waters appurtenant to, meaning within, such reserved lands could have FRWRs and (b) only where a water right was absolutely necessary to avoid entirely

---

[43]  *See, e.g., United States v. Adair*, 723 F.2d 1394, 1408-19 (9th Cir. 1984).  *Adair*, cited by Katie John, concerned the Klamath Indians' 1864 treaty water rights associated with fishing and hunting.  In that treaty the Klamath Tribe relinquished all of its aboriginal "right, title and claim" to some 12 million acres of its ancestral domain in return for reserving for its exclusive use and occupancy an 800,000 acre reservation in south-central Oregon established by the treaty.  723 at 1398, 1413-14.

[44]  *Accord*, Final Katie John Issue Paper and Recommendations, *supra*, at AR Tab 88 pp. 1704-06 (citing *Adair*).

defeating the primary purpose of such reservation.  The Court must (1) reject Katie John's efforts

to turn this case about which of some or certain waters in Alaska can possess legally valid

FRWRs into a treaty rights or *Winans* case and (2) reject the notion that it must compel the

Federal Defendants to identify FRWRs in non-appurtenant reaches of the Yukon River.

### c.    Katie John's Downstream/Upstream Theory Confuses the Nature of the Limited Interest Associated with FRWRs.

Katie John's argument that preserving subsistence fishing in waters flowing through

federal CSUs requires recognizing FRWRs in upstream and downstream waters also confuses the

*location* of FRWRs with the *means of enforcing* FRWRs.  Conceptually speaking, their argument

also seeks to convert the ability of a property owner to protect its land from a nuisance on other

land into an actual property or ownership interest in that other land contrary to all accepted

principles of law.

A FRWR protects the ability of the FRWR holder to use water, or maintain a specific

flow of water, in waters appurtenant to reserved lands.  As shown by the Ninth Circuit's

description of the FRWR involved in *Adair*, which was an instream flow right for fishing

purposes, a FRWR is defined by and limited to the ***location of the associated reserved lands***:

> "[T]he [United States] Government and the Tribe intended to reserve a quantity of the water flowing ***through the reservation*** not only for the purpose of supporting Klamath agriculture, but also ***for the purpose of maintaining the Tribe's treaty right to*** hunt and ***fish on reservation lands***."

*Adair*, 723 F.2d at 1410 (emphasis added).  *See also* Robert E. Beck, Water and Water Rights,

§ 37.01 at 218 (1996 ed.) ("[L]ike riparian rights, reserved rights are appurtenant to land; that is,

land ownership is the basis of the right.")

A recognized means for enforcing FRWRs (or other water right) is to sue an upstream

user for an injunction restraining a diversion of waters , including damming and constructing

reservoirs, that prevents sufficient water from reaching the portion of the river appurtenant to the FRWR holder's downstream reservation.  *See, e.g., Winters*, 207 U.S. at 565-66.  That unlawful diversion may be occurring many miles upstream, off of the reservation.  *Id.*  Another, similar circumstance can occur where the pumping of underground water a couple of miles away from a pool which diverts water away from the pool and dangerously depletes it is enjoined.  *See, e.g., Cappaert*, 426 U.S. at 141-143.  In either situation, the ***potential location of defendants*** in a FRWR enforcement action is not defined by or limited to the location of the FRWR or its associated reserved lands.

Thus, the Ninth Circuit in *Adair* recognized that the Klamath tribe members had "the right to prevent ***other appropriators*** from depleting the stream waters below a protected level in any area where the non-consumptive right applies," i.e., in waters "flowing through" the lands where the tribe members retained treaty rights to fish and hunt.  *Adair* at 1411 (emphasis added).[45]  An "other appropriator" whose off-reservation use depleted waters "flowing through" the reserved lands could be enjoined, but the FRWR still existed only in waters flowing through the reserved lands.

Similarly, the opening sentence of *Winters* explains: "[t]his suit was brought by the United States to restrain appellants and others from constructing or maintaining dams or reservoirs on the Milk River in the state of Montana, or in any manner preventing the water of the river or its tributaries from flowing ***to*** *the Fort Belknap Indian Reservation*."  *Winters*, 207

---

[45]   Under the unique factual circumstances in *Adair (cf.,* 723 F.2d at 1418 n.31), the Klamath Tribe members ceded possession and ownership of most of  their reservation lands, while retaining the right to hunt and fish within those lands.  723 F.2d 1397-98, 1408-1419.  Therefore, the "reservation" rights which survived in *Adair,* after rights to otherwise possess and enjoy the lands had been terminated, were the fishing and hunting rights which had been retained in that land, and for which a FRWR was implied. *Id.* at 1411-12.  Thus *Adair* supports the principle that FRWRs remain attached to, and do not become severed from, an interest in land.  In *Adair* the retained hunting and fishing rights remained attached to the reserved land in which the Klamath's had previously held a broader, more complete interest.  *Id.*

U.S. at 565 (emphasis added).  The United States on behalf of the Indians won an injunction

against upstream off-reservation diversion which depleted the downstream waters appurtenant to

the reservation.  207 U.S. at 209.  However, the Indians' water right was confined to their

reservation.  For example, the Indians were not given any priority right to travel upstream and

pump water from the off-reservation points where the non-Indian defendants had farms.  The

decree enjoined the defendants "from using or in any manner interfering with the use by the

government of the United States or the Indians, ***upon*** *the Ft. Belknap Indian Reservation*, of

5,000 inches of" water.  *Winters,* 148 Fed. 684, 685 (9th Cir. 1906), *affd*., 207 U.S. 564, 565

(1908) (describing decree as barring defendants "from interfering in any manner with the use ***by***

***the reservation*** of 5,000 inches of the water of the river.") (emphasis added).  No subsequent

case recognizes a FRWR in off-reservation waters, especially in the instance of a national

purpose, non-Indian reservation as is the situation in this case.[46]

---

[46]  The Katie John plaintiffs try to suggest otherwise, but by citing *Winans*-type cases and misstating other circumstances.

    For example, at page 42 of her Opening Brief (Docket No. 139-2 at 52) Katie John asserts that the Cocopah Indian Reservation, one of five Indian reservations in which the Supreme Court recognized a FRWR for irrigation purposes in *Arizona v. California*, 373 U.S. 546, 595-96 (1963), is "located some two miles from the Colorado River."  However, that representation is not quite correct, and the separate decree in *Arizona v. California*, 376 U.S. 340, 344 (1964), which Katie John cites, does not at all support it or address the location of that reservation.  In fact, tract and area maps and aerial photographs of that reservation available online reveal that, whereas one remnant portion of that reservation is now located away from the Colorado River (perhaps even "two miles" away), other portions of the Cocopah Indian Reservation still abut and straddle channels and watercourses of the Colorado River, and water canals promised to the Indians in their treaties still provide water from the Colorado River to that remnant focused on by Katie John.  In fact, as the Supreme Court recognized in one of its subsequent decisions during the ongoing half-century history of that case, the Cocopah Indian Reservation had an additional 883 acres added to it between 1964 and 1983 due to "accretion" (460 U.S. 605, 633).  That long series of Supreme Court decisions and the Congressional treaties and Executive orders establishing the Cocopah and four other Indian reservations addressed in *Arizona v. California* evidence that treaty water rights for those Indians included surface waters of the "Colorado River and its tributaries" located within reservation boundaries, from irrigation canals promised them by the Federal Government, and from groundwaters deriving from the Colorado River system which they were allowed to pump within those reservations, specifically for irrigation and related uses.  That water was provided to them in part under a comprehensive, unique federal water allocation Compact, the Boulder Canyon Project Act of 1928, which gave the Federal Government unusual powers over that water system, according to the Supreme Court in that decision and subsequent decisions during the long history of that case.  *See Arizona v. California*,

Here the Katie John Plaintiffs seek to travel hundreds of miles both upstream and downstream from federal CSUs and fish under the special privilege of a federal subsistence priority for the entire length of the Yukon River and other Alaskan rivers, even though only a few stretches of those rivers are appurtenant to federal reservations.  The incorrect premise of their argument is that the United States holds but unlawfully failed to assert FRWRs in the entire length of these rivers.

Because this case is about judicial review of the specific geographic boundaries within which the Federal Defendants can lawfully exercise subsistence jurisdiction, what matters is not the geographic location of potential defendants in hypothetical future suits to enforce FRWRs, but rather the actual location of the FRWRs themselves.  *Katie John II*, 72 F.3d at 703-04 (federal subsistence jurisdiction exists where FRWRs exist).  In those reaches of waterways with FRWRs properly identified by the Federal Defendants, under *Katie John II* the Federal Defendants have authority to provide the subsistence priority.  ANILCA §§ 804-815.  Based on *Adair*, *Cappaert*, and *Winters* and the fundamental purpose of the FRWR doctrine, which is to reserve only that water necessary for federal reservations, the FRWR exists only in those reaches of waterways running through those CSUs which possess FRWRs, not in entire rivers.

This crucial distinction between the location of a FRWR and the means of enforcing it is illustrated by the example of an upstream diversion that does not negatively impact a FRWR in

---

373 U.S. 546, 550-600 (1963), 376 U.S. 340 (1964), 460 U.S. 605, 631-633 (1983), 530 U.S. 392, 401-402, 418-419 (2000), and 547 U.S. 150, 153-161 (2006).  In any event, it is clear the FRWR recognized for the Cocopah Indian Reservation and other nearby tribes was for the express purpose of irrigating the reserved Indian lands, and not for some off-reservation use, such as catching fish upstream and downstream of the national purpose reservations established or enlarged by ANILCA.

Likewise, whereas Katie John argues at p. 42 of her brief that "In other cases the United States has *recognized* 'that there may be circumstances in which water not adjacent to a reservation would be reserved'", she only cites *U.S. v. City and County of Denver, By and Through Bd. Of Water Com'rs*, 656 P.2d 1, 35 (Colo. 1982), and in fact the United States only **argued** that position in that case and the court dismissed it as "hypothetical" (*id.*), which is of no use to deciding this case.

waters appurtenant to downstream reserved lands.  Consider a river that flows past Point A, then Point B, then is joined by another river, and then flows through a CSU at Point C on its way to the sea.  Assume that, based on the document creating the CSU, the Federal Government has a FRWR in the waters within Point C.  In this scenario, a diverter of water at Point A may impact a use at Point B without adversely impacting the flow of water at downstream Point C where the FRWR exists.  Because the Federal Government would not have a FRWR in the non-appurtenant waters flowing past impacted Point B, but rather has only the right to protect its FRWR in waters flowing past point C, the Federal Government would not likely prevail in a suit to enjoin the use at Point A.[47]  If the diversion at Point A then increases to the point where the waters at Point C are threatened, a geographically broader FRWR would not suddenly spring into existence.  Rather, the pre-existing FRWR in the waters at Point C might then be enforced against the expanded and new-threatening use at Point A.

Alternatively, if a new use at Point B was depleting the protected waters at nearby Point C, but the use farther away at Point A posed no threat to the waters at Point C, a suit to enforce the FRWR in the waters at Point C could yield an injunction against the use at Point B but not an injunction against the use at Point A.  However, again, no new FRWR would spring into existence in the waters flowing past Point B – that would just be the defendant's location.  The location of the defendant is unrelated to the location of the FRWR.

The latter example is essentially the facts of *Cappaert*.  There a 4,500 square mile connected underground aquifer system included a 65 foot long by 10 foot wide pool (Point C) that was the sole known home of the rare pupfish for which the Devils Hill National Monument was reserved by President Truman.  *Cappaert,* 426 at 131, 142-143 & n.7.  Pumping at the

---

[47]   If the user at Point B had taken steps to obtain a water right in the waters flowing past Point B, then he could sue to enjoin the use at Point A.

Cappaerts' ranch (Point B) 2.5 miles from the Monument's boundaries was depleting the pool within the Monument and endangering the pupfish. *Id.* at 134-135. By contrast, pumping by others from the aquifer at places farther away (Point A) posed no immediate threat to the pool, although such pumping might "over decades" reduce water levels in the pool by some "small" amount. *Id.* at 143 n.7.

Rejecting arguments that recognizing a FRWR in the Devils Hole pool also required restricting pumping from other, more distant locations (Point A), the Supreme Court explained that the purpose of the FRWR was to protect water levels at the pool only (Point C), so, based on the existing facts, all that was needed to enforce the FRWR was an injunction restricting the nearby use at the Cappaerts ranch (Point B). *Id.* Stated the Court:

> "The pool need only be preserved, consistent with the intention expressed in the Proclamation, to the extent necessary to preserve its scientific interest. … The District Court thus tailored its injunction, very appropriately, to minimal need, curtailing pumping only to the extent necessary to preserve an adequate water level ***at Devil's Hole***, thus implementing the stated objectives of the Proclamation."

*Cappaert*, 426 U.S. at 141 (emphasis added).

Thus, it was not the extent of the enforcement action, or the location of its defendants, that determined the geographic location of the FRWR. Rather, detrimental uses by potential defendants located off the reservation could trigger a right to enforce the fixed FRWR in the pool itself. In all their cases, the Supreme Court and the Ninth Circuit have recognized the location of FRWRs as being limited to only these waters appurtenant to the reserved land for which the FRWR is implied. Enforcement off-reservation may be necessitated by the flowing nature of water, but it is simply a means of enforcing the FRWR in the on-reservation waters and does not fix or establish the FRWR within distant off-reservation waters, as the Katie John plaintiffs seek to do.

Although FRWRs are not controlled by the principles applicable to state-created water rights, it is worth noting that state-created water rights in appropriation states are also tied to specific land. *Elephant Butte Irr. Dist. v. Regents of New Mexico State University,* 849 P.2d 372, 381 (N.M. App.1993) ("Water rights are real property rights that are generally tied to specific land."). Even state appropriation rights which can be severed from land are always tied to a particular tract of land; that tract can be changed, but only after following proper administrative procedure designed to prevent detrimental impact on other water rights holders. *Sun Vineyards, Inc. v. Luna County Wine Development Corp.*, 760 P.2d 1290, 1292-93 (N.M. 1988); *Desert Irrigation, Ltd. v. State*, 944 P.2d 835, 842 (Nev. 1997) (same as *Sun Vineyards*, applying Nevada law); *Andrews v. North Side Canal Co.*, 12 P.2d 263, 266 (Idaho 1932) (same). Accordingly, where a river flowed from Wyoming into Idaho, the water rights of Idaho farmers were appurtenant to and had the "situs" of their Idaho farms, and did not extend the entire length of the rivers, so those water rights could be taxed by Idaho but not Wyoming, even though diversion equipment was in Wyoming:

> The [water] right is said to be a right in a natural resource, hence classed as real estate. It is not land, but when used for irrigation it becomes appurtenant to the land to which it is applied, an incorporeal hereditament. *An appurtenant thing is attached to and belongs to another thing as the principal thing. And its **situs** is the same as the principal thing.*

*North Side Canal Co. v. State Board of Equalization of Wyoming*, 17 F.2d 55, 60 (8th Cir. 1926) (emphasis added, internal citations omitted); *accord, Wheatland Industrial Co. v. Johnson*, 186 P.2d 377, 380 (Wyo.1947) (river flowing through two counties – the location of water right was the location of the irrigated land, so only the county in which that land was located could tax the

water right).[48]  Here, the situs of any FRWRs is the land of the federal reservation for which they are implied.

Enforcement of FRWRs and state-law water rights is thus very similar to abatement of nuisances.  One can sue to enjoin an activity on a neighbor's property that impacts one's own property, including water, without having or obtaining any property interest in that neighbor's property.  Alaska by statute defines "nuisance [to] mean[] a substantial and unreasonable interference with the use or enjoyment of real property, including water."  AS 09.45.255.  "A person may bring a civil action to enjoin or abate a private nuisance."  AS 09.45.230(a).  As will often be the case with a nuisance involving water, the defendant in a nuisance case need not be a neighbor, and can even be far away.  *City of Tulsa v. Tyson Foods, Inc.*, 258 F.Supp.2d 1263, 1273-74, 1289 (N.D. Okla. 2003) (denying motion to dismiss nuisance suit by Tulsa, Oklahoma against Decatur, Arkansas for pollution detrimentally affecting Tulsa's water rights in Spavinaw Creek, which drew from the Columbia Hollow aquifer extending from Arkansas into Oklahoma);[49] *Scheufler v. General Host Corp.*, 126 F.3d 1261, 1264-67 (10th Cir. 1997) (successful nuisance action by farmers to remedy salt company's discharge of salt into waters connected to waters flowing by plaintiffs' farms, although the farmers did not have water rights in the affected waters); *Seven Lakes Water Users' Ass'n v. Fort Lyon Canal Co.*, 4 P.2d 1112, 1114-15 (Colo. 1931) (use of nuisance theory to enforce water rights).

Thus FRWR law, state water rights law, and the closely-related tort of private nuisance are all fully capable of protecting land owners' interests in waters appurtenant to their property, without granting those landowners actual property rights or title in the waters being used by a defendant who is diverting water, polluting or otherwise harming that landowner.  In short, Katie

---

[48]  These water rights tax cases (*North Side Canal* and *Wheatland Industrial*) are cited not for anything to do with taxation but because they pinpoint the precise location of water rights in a flowing stream.
[49]  The *City of Tulsa* decision was subsequently vacated due to settlement.

John is wrong in its argument that the Federal Government must hold FRWRs in the full lengths of rivers in order to protect FRWRs in waters appurtenant to CSUs.  Harmful diversion of water may be stopped by an injunction enforcing the FRWR, or alternatively by a nuisance abatement injunction, without awarding a FRWR in the waters flowing by a diverter.

This analysis applies also to Katie John's claim for downstream FRWRs.  Suing a downstream user to enjoin diversion of water that fish need to swim up to a CSU would radically extend the FRWR doctrine, as FRWRs have generally been thought of as a means to restrain upstream diversion to ensure water gets downstream.  However, even if the FRWR doctrine were expanded to allow enforcement of FRWRs against downstream diverters, the downstream diversion could be stopped by an injunction without awarding FRWRs in the downstream waters, just as harmful upstream diversions are enjoined without awarding FRWRs in the upstream waters.  The fact that the water is important as a medium in which fish swim does not change this analysis.  If an upstream or downstream diverter drains so much water that the fish cannot swim past the diverter and so could not reach a CSU which is shown[50] to have a FRWR, the remedy is a suit to enjoin the offending use as in *Winters* and *Cappaert*.  There would be neither a legal basis nor a need to award the Federal Defendants a FRWR in the entire length of the river.  *See also Adair*, 723 F.2d at 1410 (recognizing a FRWR to protect treaty fishing rights in the waters "flowing through the reservation").

### d.    Katie John's Downstream/Upstream Claims Would Radically Extend Federal Control Contrary to *Katie John II* and the FRWR Doctrine.

The Katie John argument is also nothing more than a repackaging of its previous attempts – rejected specifically by the appellate court in *Katie John II*  – to extend Federal control to

---

[50]   As set forth in the State's Opening Brief, the Federal Defendants have not administratively identified a purpose or requisite need supporting any of their assertions to FRWRs as to any specific CSU or other national purpose reservation created or expanded by ANILCA, but that is a separate issue.

virtually all waters in Alaska:  "If we were to adopt Katie John's position, that public lands include all navigable waterways, we would give federal agencies control over all such waters in Alaska.  ANILCA does not support such a complete assertion of federal control."  72 F.3d at 704.  Taken together, the federal CSUs and other national purpose reservations (e.g., national forests, National Petroleum Reserve-Alaska) contain some short reach of virtually every river system in Alaska.  For example, a few miles of the headwaters of the Mulchatna River are located within Lake Clark National Park, headwater tributaries of the Susitna River run within the Denali National Park, the Kenai River starts within the Kenai Refuge and the Chugach Forest, and some tributary headwaters of the Kuskokwim River system arise in Denali Park and lower reaches of the River flow through the Yukon Delta NWR.  If the Court accepts the Katie John argument, it will expand claims to Federal preemption to virtually every river system and tributary thereto in the State.  Such an overreach is neither compelled nor authorized by ANILCA or the FRWR doctrine and is clearly contrary to the limitations envisioned by the *Katie John II* court.

The heart of the Katie John argument is the unprecedented assertion that FRWRs follow the anadromous salmon (and by implication other migratory fish and wildlife), rather than being tied to or appurtenant to reserved land.  Katie John Op. Br. at 37.  As previously demonstrated, that assertion is incorrect.  It is only a clever effort to improperly use the *New Mexico* "necessity" test to destroy the appurtenant requirement by claiming that "biological necessity" trumps or eliminates restricting FRWRs to only those waters appurtenant to (i.e., within) reserved lands.  However, a FRWR can only properly exist if it satisfies ***both*** primary requirements established by the U. S. Supreme Court – that it is appurtenant ***and*** necessary.  It is not an either/or choice.  *New Mexico*, 438 U.S. at 699-700; *Cappaert*, 426 at 138-139, 141-142.

The scope and consequences of Katie John's assertion are alarming and would have the effect of extending FRWRs to virtually all waters used or susceptible to use by any migratory fish or wildlife. Katie John's argument is that since salmon need to migrate from the Bering Sea to reach a stretch of the Yukon River hundreds of miles upstream within the Yukon Flats Refuge, a FRWR must be extended downstream hundreds of miles from that Refuge to the Sea. Taken to its logical extreme, applying Katie John's "biological necessity" argument to fish and other migratory wildlife would create FRWRs within every water body used by a duck hatched within that same Refuge during its migration to California and back. Under Katie John's radical theory, FRWRs would be found to exist in virtually every river, stream, lake, pond, marsh, and puddle throughout the United States on which it could be shown that a migratory fish or migratory bird ever relied during some stage of its life cycle. Such a radical and almost infinite expansion of FRWRs is clearly inconsistent with the FRWR principles mandated by the U. S. Supreme Court in its FRWRs decisions, especially as those relate to national purpose, non-Indian reservations, such as in *New Mexico* and *Cappaert*. The Federal Defendants' Regional Solicitor also concluded that "the Ninth Circuit Court meant something less than entire navigable river systems when it contemplated the assertion of reserved water rights for the parks, refuges, and other federal reservations in Alaska." *See* Katie John's Exhibit 1 (Doc. No. 137-2) at p. 6. As earlier explained, the argument for such expansion also confuses extra-territorial enforcement of on-reservation FRWRs, should such enforcement become necessary in some manner not yet shown in this case, with the on-reservation location of the FRWR itself. There is no "necessity", biological or otherwise, which supports a FRWR extending throughout the 1,324 miles of the Yukon River in Alaska, as Katie John seeks.

      **e.**    **There Are No Federal Non-Reserved Water Rights Created by ANILCA.**

Katie John also slips in long-rejected notions that ANILCA's land management directives create FRWRs by themselves – the so-called Federal Non-Reserved Water Rights theory.  *See* Katie John's Op. Br. at 29-30, n.63 & Exhibit 15.  This long-rejected theory is not the law, and is no longer asserted even within the federal agencies, as is clearly demonstrated by the Office of Legal Counsel Opinion regarding "Federal 'Non-Reserved' Water Rights" submitted as Exhibit 14 with the Katie John brief.  As that Opinion clearly states, such a broad "federal non-reserved water rights theory … is not supported by an analysis of the applicable statutes and judicial decisions.  …  The mere assignment of land management functions to a federal agency, without more, does not create any federal rights to unappropriated water necessary to carry out those functions."  Exhibit 14 at 4.  *Accord, New Mexico*, 438 U.S. at 702-718.  Only specific reservations of land with explicit purposes requiring water rights in order not to be entirely defeated give rise to FRWRs.  Exhibit 14 at 37 (citing *Cappaert* and *New Mexico*).  The highly generalized purposes provisions in ANILCA section 101 and elsewhere cited by Katie John do not satisfy these requirements and do not create FRWRs "expressly or by necessary implication."  *Id.* at 38.

      **2.**    <u>**Alaska Native Allotments Do Not Succeed to Winters FRWRs Derived from Prior Reservations, and the U.S. Restrictions on Allotment Alienation and Disposition Are Not "Reservations" Creating FRWRs per Cappaert and New Mexico**</u>.

The Katie John brief advances another novel argument regarding FRWRs and Alaska Native allotments that would illegally extend FRWRs, and Federal claims of preemptive authority, to virtually every river, stream, and lake in Alaska – which is also contrary to the Ninth Circuit Court's express recognition in *Katie John II* that only "some" or "certain" waters

within lands expressly reserved by the Federal Government might contain FRWRs and

"ANILCA does not support such a complete assertion of federal control" in Alaska. Katie

John improperly intertwines and misconstrues the 1906 Alaska Native Allotment statute (34 Stat. 197,

repealed in 1971 by 43 U.S.C. § 1617, a provision of ANCSA) with (1)Indian allotments granted

from Indian reservation lands pursuant to a provision of the1887 Indian General Allotment Act,

or "Dawes Act" (24 Stat. 388 (1887)), and (2) the Indian reservation *Winters* water rights which

the courts have held attached to those Dawes Act allotments derived from Indian reservations.

The agencies' analysis of this issue reflected in the administrative record was correct and

supports their decision not to assert thousands of FRWRS related to individual allotments. [51]

It is well-settled law in the Ninth Circuit that Dawes Act allotments derived from Indian

reservations may succeed to or derive a portion of the *Winters* water rights associated with the

reservation. *See, e.g., Anderson*, 736 F.2d at 1362-63; *Walton II*, 647 F.2d at 50; *Adair*, 723 F.2d

1394. There are also highly specific circumstances in which Congress enacted special legislation

for a specified tribe and members to acquire "agricultural lands", and the U.S. has sought

FRWRs to enable those individuals to make agricultural use of those lands. *See* 1904 Absentee

Wyandotte Indians legislation, 33 Stat. 519, Katie John Exhibit 21. However, these situations

are completely different – legally and factually – from Alaska Native Allotments which are not

"reservations" of the kind that create a FRWR.

---

[51]    *See* DOI Alaska Regional Solicitor's Memorandum dated August 9, 1995 and filed herein as Exhibit 1 to the Katie John plaintiffs' opening brief as Doc. No. 137-2, at pp. 6-7 ("[L]ands claimed or conveyed as Alaska Native allotments are not generally considered 'federal reservations.' The claimed or conveyed lands are not set aside for a specific federal purpose evidenced by a treaty, Indian reservation or other special reserved status. The lands are only 'segregated,' not reserved, by the filing of an allotment application, and once conveyed they become private lands whose title is in the individual Native allottee, subject to restrictions on alienation and taxation. … The United States holds neither legal nor equitable title to these allotments. *See* D. Case, Alaska Native and American Laws, at 152 (Univ. Alaska, 1984). While an Alaska Native allotment is subject to restrictions on alienation and taxation, these are not interests in land 'the title to which is in the United States' as required by the definition of public lands in ANILCA. 16 U.S.C. § 3102(3).")

The 1906 Alaska Native Allotment Act, like another provision of the Dawes Act (24 Stat. 389 § 4),[52] authorized the Secretary of the Interior to "allot" up to 160 acres of "nonmineral" public domain land to a qualified Alaska Native, which, in the terms of the Alaska act, "shall be deemed the homestead of the allottee." 34 Stat. 197.[53] The title of the 1906 Act was also "An Act Authorizing the Secretary of the Interior to allot *homesteads* to the natives of Alaska." *Id.* (emphasis added). As was noted in the State's Opening Brief at pages 46-47, "homesteads" and homesteaders acquire no water rights associated with their use and occupancy of land previously public domain or public lands. *Anderson*, 736 F.2d at 1362-63 (citing *California Oregon Power Co.*, 295 U.S. 142). This District Court has also previously characterized Alaska Native allotments as homesteads. *Aguilar*, 474 F.Supp. at 845.

Much like the misplaced reliance on the inapplicable *Winans* line of cases, the Katie John brief cites a series of Dawes Act cases involving the transfer of *Winters* waters rights from an Indian reservation to the individual Indian allotments carved out of that reservation. *See, e.g., Anderson,* 736 F.2d 1358 (former Yakima Reservation lands); *United States  v. Powers*, 305 U.S. 527 (1939) (former Crow Reservation lands); *Skeem v. United States*, 273 F. 93 (9th Cir. 1921)(former Ft. Hall Reservation lands); *United States ex rel. Ray v. Hibner*, 27 F.2d 909 (D.

---

[52]   The Dawes Act provided for the creation of individual Indian allotments from Indian reservation lands in the case of Indians located on those reservations, together with the distribution of water rights from the reservation to those allottees to irrigate their allotments (24 Stat. 390 § 7), and the right of the tribes to consent to the sale of excess lands from the reservations.  24 Stat. 388-390.  However, the Dawes Act also provided, in section 4 (24 Stat. 389; 25 U.S.C. § 334), that  Indians "not residing upon a reservation, or for whose tribe no reservation has been provided by treaty, act of Congress, or executive order" were allowed to apply for an allotment from unappropriated, public domain lands.  Court decisions addressing those separate "non-reservation" or "off-reservation" allotments from unreserved lands under the Indian General Allotment Act include *Pallin v. United States*, 496 F.2d 27 (9th Cir. 1974), and *Finch v. United States*, 387 F.2d 13 (10th Cir. 1967).

[53]   In *Pence v. Kleppe*, 529 F.2d 135 (9th Cir. 1976), a decision cited by Katie John at page 48 of her brief, the Ninth Circuit Court concluded that the 1906 Alaska Native Allotment Act derived from section 4 of the 1887 General Allotment Act, 25 U.S.C. § 334, providing for allotments from the public domain by Indians not on a reservation, rather than those provisions of the 1887 Act providing for Indian allotments from reservation lands.  529 F.2d at 140.

Idaho 1928) (former Ft. Hall Reservation lands); *Walton II*, 647 F.2d 42 (former Yakima Reservation lands).  Those cases involve wholly different case law and principles having no relevancy or bearing on this "which waters" Alaska case.

Since none of the Alaska Native allotments derive from a previous Indian reservation and cannot succeed to any *Winters* waters right associated with an Indian reservation, Alaska Native allotments are incapable of qualifying as reserved lands capable of satisfying FRWR doctrine requirements per the *Winters* standards.  Under a *Winters* analysis, Alaska allotments do not qualify for FRWRs.  They neither arise from Indian reservations nor satisfy the long-established measure of a *Winters* right, which is the amount of water needed to irrigate "practically irrigable acreage" on the reserved lands.  *Arizona v. California*, 373 U.S. 546, 600-01 (1963).

Even the case law cited by Katie John demonstrates that Alaska Native allotments are not "reservations."  She argues that, since Alaska Native allotments are restricted lands initially held in trust by the United States that turns those allotments into federally reserved lands with an associated FRWR.  However, the primary purpose of such restrictions on allotments – and the continuing federal interest in them – has nothing to do with water or a necessity for water rights.  Instead, the allotments are restricted (and the United States retains a limited interest) in order to prevent allottees "from improvidently disposing of allotted lands."  *Bowling*, 256 U.S. at 486.  S*ee also Ramsey*, 271 U.S. 467; *Heckman*, 224 U.S. 413; *Weyerhauser Co.*, 765 F.Supp. 643 (D. Or. 1991) (Katie John Brief at 52, 57 and 58).  A limitation on improvident disposition reserves no water and needs no FRWR to make it effective.

As was noted in the State's Opening Brief at page 48 n.40, Alaska allotments may also be sold and fee title transferred to a non-Native purchaser.  In all of the Dawes Act cases involving an allotment derived from Indian reservation lands, the new owner of the allotment (usually a

non-Indian) also obtained the associated *Winters* water right derived from the original

reservation.  *See Walton*, 647 F.2d at 50.  If the Katie John argument prevails and an Alaska

Native allotment is subsequently sold, what part of the FRWR transfers with the allotment?

Furthermore, does the new owner acquire property rights in the associated waterway hundreds of

miles downstream or upstream per the other leg of the Katie John theory?  This unauthorized,

unprecedented mixing of legal apples and oranges will yield a nightmare of enormous

proportions if adopted by the Court and forced on the Federal Defendants and the State.[54]

       There is also an attempt by Katie John to invoke aboriginal hunting and fishing rights and

interests as a basis for a FRWR for thousands of these allotments.  Katie John Brief at 49.

However, that argument can provide no basis for a FRWR today, since, as previously noted, any

and all aboriginal rights and claims in Alaska were expressly extinguished 37 years ago by the

Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. § 1603.  Furthermore, as also

previously noted, reliance on aboriginal interests is a hallmark of the *Winans* line of cases which

is not applicable to this "which waters" case.

       The August 19, 1955 Memorandum Opinion of the Department of Interior ***Solicitor*** (M-

36289), which is mentioned at page 53 of the Katie John brief but not attached to it, is also

significant.  It squarely supports the position of the Federal Defendants and the State that off-

reservation Indian allotments, such as those created under authority of the 1906 Act operative in

Alaska,[55] do ***not*** have FRWRs, and why.  That formal Memorandum Opinion of the DOI

---

[54]   The legal and practical inapplicability of  FRWRs to Alaska Native allotments was considered by the
Federal Defendants in their administrative considerations rejecting such claims, as set out in some detail
at pages 6-8 of the Alaska Regional Solicitor's August 9, 1995 Memorandum submitted as Exhibit 1
(Doc. No. 137-2) to Katie John's Brief.

[55]   Katie John provides no support for another of her representations (Br. p. 46), that Congress enacted
the Alaska Native Allotment Act in 1906 "to remove any doubt" over the 1887 General Allotment Act's
"application" to the Territory of Alaska.  As explained earlier in footnotes 52 and 53 of this brief, the
statement is only partly true, and in no way helpful to Katie John's case.  As the Ninth Circuit Court

Solicitor, which is attached as Exhibit 1 to this Brief, correctly distinguishes between Indian

allotments arising out of *Winters* reservation rights and Dawes Act section 4 Indian allotments

carved from the public domain.  It provides, in the last paragraph:

> After rather extensive search no case has been found where an Indian allotment
> on the public domain, never a part of an Indian reservation, has been held to have
> a reservation water right.  There would be no basis for extending the reservation
> right to such a case.  The theory of the Winters doctrine (207 U.S. 564), is based
> on a right belonging to the Indian tribe which was not given up when the
> reservation was created by treaty or otherwise.

Instead, Katie John attaches, as Exhibit 20 to her brief, a poorly reasoned informal

memorandum of an ***Associate*** Solicitor for ***Indian Affairs*** on June 11, 1976 misreading

*Cappaert*, which had just been decided by the U. S. Supreme Court, by emphasizing the "water

necessary for the intended purpose" language in *Cappaert* and from that arguing that "it is

reasonable to argue" that Section 4 of the General Allotment Act of 1887 authorizing "off-

reservation allotments" reserved water for the allottees because "Certainly, it was necessary for

the Indian owners of the off-reservation allotments to have a water right if they were to

successfully farm those allotments."  That argument ignores, among other things, that *Cappaert*

is a ***reservation*** case, as are the allotments from Indian reservation cases, whereas the General

Allotment Act "non-reservation" allotments, like the "homestead" allotments provided for under

the 1906 Alaska Native Allotment Act, were not derived from reservations.

---

concluded in *Pence*, 529 F.2d at 140, the 1906 Alaska Act, expressly providing for Alaska Native
"homesteads" from vacant, unappropriated, and unreserved lands, derived from the "non-reservation"
Indian allotment section, 25 U.S.C. § 334, of the General Allotment Act, rather than the "reservation"
Indian sections of that 1887 Act.  The 1906 Alaska Act, which Katie John repeats (as later amended) in
full at pages 47-48 her brief, makes *no* provision for allotments created out of pre-existing Indian
***reservations,*** as does the 1887 General Act.

    There is also no support for Katie John's additional representation (Br. p. 53) that "In the Alaska
setting, too, Congress has recognized that there is no meaningful distinction between trust allotments and
restricted allotments, treating them identically in ANILCA."  The ANILCA provision she cites for that
argument, Section 905(a)(1), actually makes reference *only* to the 1906 Alaska Act – specifically the
approval of allotments under that Act.

Katie John also argues, also at page 53 of her Brief, that this informal "legal conclusion" of the Indian Affairs' Associate Solicitor "led" the Solicitor to withdraw the last paragraph of the 1955 formal Solicitor's Opinion (and mischaracterizes that "withdrawal" as the long-held "position of the Department of the Interior" in her lead-in sentence to the Allotment issue at p. 45 of her brief). In fact, the terse June 30, 1976 Memorandum of the Solicitor she attaches as Exhibit 19 to her brief withdraws that paragraph only because that conclusion "conflicts with the position taken by this Office in currently existing [unnamed] litigation" – very possibly *Indian Affairs* litigation the Solicitor had just found out about associated with that informal memorandum 19 days before.

In any event, the Division of Indian Affairs' position on that subject, which apparently did not change, was squarely rejected, with good, detailed reasoning, in relation to *Katie John II* FRWRs at pages 6-8 of the ***August 9, 1995 Memorandum from the Alaska Regional Solicitor to the DOI Solicitor*** – including the conclusion that the Secretaries should not, and did not have to, "assert" such an "extreme result" in their assertions of FRWRs in response to that court decision. That 1995 Memorandum, prominently attached as Exhibit 1 to Katie John's brief, warrants this Court's attention on that subject.

The novel Katie John theory regarding Alaska Native allotments would convert every river, stream and lake in Alaska bordered by an allotment (of which there are approximately 10,000) into "public lands" subject to federal preemptive authority under Title VIII. In that regard, the Court's attention is again directed to the conclusion in *Katie John II*, "If we were to adopt Katie John's position that public lands includes all navigable waters, we would give the federal agencies control over all such waters in Alaska. ANILCA does not support such a complete assertion of federal control ...." 72 F.3d at 704. Allotments border hundreds of

navigable and non-navigable water bodies throughout Alaska.   Court adoption of this Katie John

argument, just like Court adoption of Katie John's upstream/downstream argument, would

establish federal control even beyond all navigable waters in Alaska, contrary to the holding in

*Katie John II*.

**C.     Peratrovich's Unprecedented Attempt To Compel The Federal Defendants To Assert FRWRS In Extensive Marine Waters Contrary To ANILCA And FRWR Law Should Be Rejected.**

The Peratrovich plaintiffs want this Court to take a totally unprecedented and

unauthorized action: compel the Defendants to assert FRWRs within the marine, salt waters

adjacent to the Tongass National Forest uplands and overlying State-owned submerged lands

recently disclaimed by the United States.  They have selected the Behm Canal as their "test

case."  *See* Peratrovich Br. at 28.  They argue for the mandatory identification of FRWRs within

the salt and marine waters of the Canal even though (1) there is no specific mandate or duty in

law enabling the Court to compel the Federal Defendants to take such action, (2) FRWRs have

never been claimed within salt waters, (3) the Behm Canal is not within the Misty Fiords

National Monument and not reserved in any manner, and (4) Congressional designation of the

Monument boundaries in ANILCA demonstrates that no FRWRs were reserved in these specific

marine waters.  The Peratrovich claims are contrary to the FRWRs doctrine, the terms of the

national purpose reservations in the area of the Peratrovich claims, express provisions of

ANILCA, and all other pertinent law including the law of submerged land ownership.

Furthermore, there are collateral estoppel principles that bar this new Peratrovich theory or, at

the least, should persuade the Court to reject these novel claims.

1.     __Salt Water Is Not Needed to Make Trees Grow or Freshwater Rivers Flow__.

Peratrovich claims, contrary to all plain facts, that a FRWR in marine (i.e., salt) waters is necessary to provide a "continuous supply of timber and to protect flows of rivers within the [Tongass] forest." Peratrovich Br. at 42. He expends great effort throughout his brief and attaches many exhibits extolling the natural splendor of the Southeast Panhandle and personal intentions he attributes to President Theodore Roosevelt and his Foresters a century ago, all of which prove immaterial. The National Forest statutes enabling the Presidential Proclamations creating and expanding the Tongass National Forest cited in the Supreme Court's recent Decree in *Alaska v. United States*, 546 U.S. at 416-417, are the same statutes which the U. S. Supreme Court in *New Mexico*, 438 U.S. at 705-708, found strictly limited any FRWRs in National Forests. As held in that decision, through that legislation (chiefly the Organic Administration Act of 1897, 30 Stat. 34, 16 U.S.C. § 473 *et seq*.) "Congress intended national forests to be reserved for only two purposes – '[t]o conserve the water flows, and to furnish a continuous supply of timber for the people.'" 438 U.S. at 707. There are no circumstances, factual or legal, in which salt waters, or fish or fish roe taken from them, are put to beneficial use on reserved lands of the Tongass National Forest to make trees grow or freshwater rivers flow. Asking hypothetically whether a FRWR in salt water could ever theoretically be necessary to achieve the different primary purpose of some other hypothetical federal reservation, or whether salt water could ever be reserved under the state water appropriations statutes, is irrelevant – as it is the federal reservations now in existence that matter. [56]

---

[56]   Because FRWRs are created by federal law, Peratrovich's reliance (Br. at 25-26) on the lack of any explicit exclusion of salt water from the coverage of the State Water Use Act, AS 46.15.010 *et seq*., is unavailing. The lack of any federal case recognizing FRWRs in salt water is far more telling. As Peratrovich and Katie John argue elsewhere, the FRWRs doctrine recognized in *Katie John II* and so far at issue in this case depends on federal, not state, law for its existence (other than quantification).

Furthermore, the actual Roosevelt proclamations relative to the Tongass National Forest during the period 1902-1909 on which Peratrovich so heavily relies, and even Congressional action in 1947 which Peratrovich also cites, make no mention of waters, and in particular any marine waters, being reserved as part of that Forest.  *See, e.g.,* Peratrovich Exhibits 6, 13 & 16 (Doc. Nos. 153-2, 154-4 & 154-7).  For example, the original Proclamation of 1902 (Exhibit 6), refers only to the timber-bearing ***lands*** being set aside, including ***islands***.  The 1909 Proclamation (Exhibit 13) refers only to setting aside "public lands" which are "in part covered with timber", and the Joint Resolution of 1947 to which Peratrovich refers (Exhibit 16) chiefly authorizes the Secretary of Agriculture "to sell timber within the Tongass National Forest" notwithstanding any aboriginal rights claims any Alaska Natives might have.  There would be no good reason, or authorization from Congress, to reserve any marine water rights through those proclamations, because those salt waters are abundant, do not constitute rivers, are not used to water trees, and are unnecessary to the only two cognizable, primary purposes of the Tongass Forest.  *See New Mexico*, 438 U. S. at 699-709 (implied FRWRs come into issue in the instance of non-abundant water and apply only to that amount of water absolutely necessary to fulfill the specific, primary purposes "for which the [appurtenant] land was reserved"; in this case to conserve the freshwater flows within the forests and to furnish a continuous supply of timber for the people).  As the federal agencies responsible for identifying the FRWRs they would assert in response to *Katie John II* noted:

> Extending the *Winters* doctrine assertion of reserved water rights to marine waters would be without precedent and would represent a considerable leap in reasoning. Instead of asserting a federal need to protect a given level of water in a stream or other freshwater body against diversions or other appropriations of the water that could significantly diminish that level, the federal government would be asserting a need to reserve part of the most abundant waters on earth.  Potential appropriation of such waters remains implausible to any degree that could

substantially affect marine water quantity or levels at all but the most restricted of locations (such as some salt chucks).

See Final Katie John Issue Paper and Recommendations of the Alaska Policy Group, issued by the DOI, Office of the Solicitor Alaska Region, at pp. 12-13 [AR Tab 88 at pp. 1710-12].

Therefore, contrary to Peratrovich's strained arguments, no portion of ANILCA Titles III or V relating to ANILCA-created refuges and monuments, or any other provision of law including prior legislation enabling creation of the Tongass National Forest, can justify extending the FRWR doctrine to salt or marine waters in the Behm Canal and elsewhere in southeast Alaska as sought by those plaintiffs. Requiring the Defendants to do so would require unprecedented court action ignoring ANILCA and pushing FRWRs into marine waters where such rights have never been recognized before.

## 2. Peratrovich Uses the Wrong Definition of Public Lands.

Further, Peratrovich wrongly argues that the marine submerged lands within the exterior boundaries of the Tongass National Forest are federal "public lands" for purposes of ANILCA. Peratrovich Br. at 13-15. That assertion is incorrect. By operation of the Equal Footing Doctrine and the Submerged Lands Act of 1953 made applicable to Alaska upon statehood in 1959, the United States had no "ownership or control" of the marine submerged lands or waters within Tongass National Forest in any way pertinent to the Peratrovich plaintiffs' claims. As this Court has previously recognized in the context of this consolidated action (see May 31, 2006 Order, Doc. No. 178 in Case 3:92-cv-00734-HRH, at 18, 24-27) , the United States, in response to the State's complaint to quiet title, recently disclaimed any title to or interest in those submerged lands, which the U. S. Supreme Court then confirmed and decreed in *Alaska v. United States*, 546 U.S. 413 (Jan. 23, 2006) (in particular, Paragraph 3 of that Decree at 546 U.S. 415-417). Whereas that Disclaimer contains some exceptions, the Peratrovich plaintiffs do not at all

demonstrate that any of those exceptions apply to the issues in this matter – and in particular to their challenge based on federal agency denial of their applications for permits to harvest and sell herring roe on kelp under the federal subsistence priority (specifically, in the area of the Behm Canal),[57] which, as this Court has noted, is the only possible remaining justiciable basis for their claims. *See* May 31, 2006 Order in *Peratrovich*, Case 3:92-cv-00734-HRH (Doc. No. 178). As this Court also noted, absent such demonstration:

> [P]laintiffs are unlikely to persuade the court that the Government's disclaimer could mean anything other than that the State of Alaska has title to the submerged lands beneath the marine waters of the Tongass National Forest by operation of the Statehood Act, Pub. L. No. 85-508, § 6(m), 72 Stat. 339 (1958), and the Submerged Lands Act, 43 U.S.C. § 1311(a).

Doc. No. 178 at 26.

---

[57] The only two "boilerplate" exceptions in the United States' Disclaimer that this Court indicated might need to be considered further are those for: (1) "any submerged lands that are subject to the exceptions set out in § 5 of the Submerged Lands Act" and (2) "any submerged lands that were under the jurisdiction of an agency other than the United States Department of Agriculture on the date of the filing of the complaint in this action [June 12, 2000]." *See* May 31, 2006 Order in *Peratrovich*, Doc. No. 178, at 25. However, those two exceptions do not help Peratrovich pursue any claim in the Behm Canal or elsewhere within Southeast Alaska. As to the first exception, Peratrovich's brief never identifies any submerged lands underlying the Behm Canal or elsewhere in Southeast Alaska that would somehow fall within § 5 of the Submerged Lands Act ("SLA"). Although his brief discusses the SLA twice, he never mentions § 5. Peratrovich Br. at 19 & 38 (Docket 150). As to the second exception, the only reservation (other than the Tongass) near the Behm Canal is the Misty Fjords Monument created in 1980, which is by law a unit of the Tongass National Forest expressly under the jurisdiction of the Department of Agriculture. *See* ANILCA § 503(a)-(c) & further discussion *infra*. Thus neither exception applies.

Further, as set out in *United States v. California*, 436 U.S. 32 (1978), more fully discussed *infra*, the "[r]eservation of federally controlled public lands for national monument [or similar ] purposes … means no more than that the land is shifted from one federal use, and perhaps from one federal managing agency, to another … and cannot operate to escalate the underlying claim of the United States to the land in question [in that case granted by Congress to California pursuant to the SLA]." 436 U.S. at 40-41. As was also determined in that decision, the SLA § 5 exception is narrowly construed, applies only to (1) express acquisitions of specific tracts or parcels of land by the United States *from* a State or person where the United States is in "actual occupancy" (such as in the case of a federal installation) and (2) "lands *expressly* retained by or ceded to the United States when the State entered the Union (otherwise than by a general retention or cession of lands underlying the marginal sea)," and does not normally apply to general reservations of land such as national forests or monuments. *Id.* at 38-41; s*ee also* 43 U.S.C. § 1313(a). The narrow boilerplate exception may protect the occasional isolated Naval installation or other similar federal facility but has nothing to do with Peratrovich's claims in this case.

Even if, as Peratrovich argues, the prestatehood presidential proclamations creating and expanding the Tongass National Forest had reserved marine submerged lands and/or marine waters, which they did not,[58] all such title and interest passed to the State of Alaska upon statehood in 1959, as squarely decided by the U.S. Supreme Court in *United States v. California*, 436 U.S. 32 (1978). Furthermore, designation in ANILCA of any part of the "public lands" within the boundaries of that National Forest as a wilderness area, national monument, or national maritime refuge in no way changes that statehood grant or enhances the Peratrovich claims. In *United States v. California* the United States argued that a Presidential Proclamation in 1949 expanding the Channel Islands National Monument within three miles of the coast of California to include the submerged lands and marine waters within one-mile belts surrounding those Islands, so as to protect "a variety of marine life, some rare or endangered … and other 'objects of geological and scientific interest'," constituted a federal reservation of those lands and waters. 436 U.S. at 33-36. The Court held, however, that, regardless of whether intended to be "reserved", dominion over those marine lands and waters, including resources, was in California and not the United States. *Id.* at 33. In a passage relating directly to this case, the Court concluded:

> [E]ven assuming that President Truman intended to reserve the submerged lands and waters within the one-mile belts for Monument purposes, … the Submerged Lands Act, 67 Stat. 29, 43 U.S.C. § 1301 *et seq.*, [made applicable to Alaska through § 6(m) of the Alaska Statehood Act] ***subsequently transferred dominion over them*** to California. The very purpose of the Submerged Lands Act was to undo the effect of this Court's 1947 decision in *United States v. California*, 332 U.S. 19 (1947). In enacting it, Congress "recognized, confirmed, established, and vested in and assigned to," § 6(a), 67 Stat. 32, 43 U.S.C. § 1314(a), the States "(1) title to and ownership of the lands beneath navigable waters [including marine waters] within the boundaries of the respective States, and the natural resources within such lands and waters, and (2) the right and power to manage, administer, lease, develop, and use the said lands and natural resources …." § 3(a), 67 Stat.

---

[58] *See* discussion *supra*.

30, 43 U.S.C. § 1311(a).  The **submerged lands and waters** within one mile of Anacapa and Santa Barbara Islands **plainly fall within this general grant**.

*Id.* at 37 (emphasis added).  Furthermore, the Court noted that, according to the terms of the Submerged Lands Act, the "natural resources within such lands and waters" granted to the states by that Act included, but were not limited to, specifically, all "fish [and] kelp"[59] located within the greater of three geographical miles seaward "from the coast line of each such State" or "the boundary line of each such State" [60] (in addition to all such lands, waters and natural resources for inland navigable water bodies within State boundaries, also granted and confirmed by that Act made applicable to Alaska upon statehood).[61]  436 U.S. at 37 n.11.[62]

Therefore, those State-owned submerged lands and waters (and, according to the Submerged Lands Act and the Supreme Court, the fish and kelp therein) are not "public lands" subject to Title VIII of ANILCA.  As expressly and plainly defined by ANILCA, "the term 'public lands' means lands situated in Alaska which, after the date of enactment of this Act, are

---

[59]  43 U.S.C. §§ 1301(e), 1311(a).

[60]  In *Amoco Production Company v. Village of Gambell*, 480 U.S. 531 (1987), the Supreme Court held that the State of Alaska's boundary extended, according to the Submerged Lands Act, to a line three miles from Alaska's coastline.  480 U.S. at 546-551.  *Accord, Alaska v. United States*, 546 U.S. at 415-416; Submerged Lands Act of 1953, at 43 U.S.C. § 1301(a)(2), (b) & (c), § 1311(a).

[61]  43 U.S.C. §§  1301(a)(1),(b), 1311(a); *United States v. Alaska*, 521 U.S. 1, 5-7 (1997); *Utah Division of State Lands v. United States*, 482 U.S. 193, 195-198 (1987); *State of Alaska v. Ahtna, Inc.*, 891 F.2d 1401, 1403-04, 1406 (9th Cir. 1989).   As the Supreme Court has declared, such "[o]wnership of submerged lands … carries with it the power to control … fishing, and other public uses of water." *United States v. Alaska*, 521 U.S. at 5 (1997). There is a strong presumption that such title lies in the sovereign state, as to all navigable water bodies, which can be overcome only if Congress' prestatehood intention to defeat such title "was definitely declared or otherwise made very plain, or was rendered in clear and especial words." *Utah Div. of State Lands*, 482 U.S. at 198 (1987).

[62]   The foregoing principles, in addition to placing in question much of the underpinnings of the majority decision in *Katie John II*, at least suggest that the court's reference there – to "some" or "certain" navigable waters with FRWRs existing in some federal reservations to a degree permitting a federal subsistence priority  for taking fish – should be construed as being limited to those few refuges or reservations established pre-statehood in which it is demonstrated that a clear, definite and authorized federal intention existed to retain and defeat state title to the submerged lands and resources of  specific navigable water bodies within those refuges or reservations.  *Katie John II*, 72 F.3d at 703-04. *Cf.*, *United States v. Alaska*, 521 U.S. at 61.

Federal lands *except* – ... "lands which have been confirmed to ... the State under any other provision of Federal law."  ANILCA § 102(3)(A) [16 U.S.C. § 3102(3)(A)] (emphasis added).[63]

### 3.      <u>Peratrovich Relies on a Repealed Presidential Declaration</u>.

Inexplicably, Peratrovich also relies heavily on President Jimmy Carter's December 1, 1978 Monument Proclamation No. 4623 to make the argument that marine submerged lands and waters were reserved within the Misty Fiords unit, even though that Proclamation has been repealed.  Peratrovich Br. at 15-16; 32-33.  Peratrovich makes particular reference to the express statement in the Proclamation that the 1978 Monument included "submerged lands, and waters owned or controlled by the United States within the boundaries."  *Id.* at 16.  However, Peratrovich's argument ignores that, by operation of the Equal Footing Doctrine and the Submerged Lands Act of 1953 made applicable to Alaska upon statehood in 1959, the United States had no "ownership or control" of the marine submerged lands or waters within the boundaries of that Monument by 1978, as the recent Disclaimer of the United States decreed by the Supreme Court confirms.[64]  Peratrovich also fails to disclose that the Carter Proclamation was expressly rescinded by Congress in 1980: "The withdrawals and reservations of public lands made by ... Proclamations No. 4611 through 4627, inclusive, of December 1, 1978 ... are, on the effective date of this Act, hereby rescinded and superseded by the withdrawals and reservations made by this Act."  ANILCA § 1322(a) [16 U.S.C. § 3209(a)].  Congress then created a new 2.285 million acre Misty Fjords Monument in ANILCA section 503 which limited the withdrawals and reservations to only "the lands within the Monument[s]."  ANILCA § 503(f)(1);

---

[63]   In addition, ANILCA Section 103(c) [16 U.S.C. § 3103(c)] provides: "No lands which, before, on, or after the date of enactment of this Act, are conveyed to the State, to any Native Corporation, or to any private party shall be subject to the regulations applicable solely to public lands within such units."
[64]   *See* discussion *supra*, including *United States v. California*, 436 U.S. 32.

94 Stat. 2399-2400; 42 U.S.C. § 431 note.  Most of the Monument was also designated as Wilderness.  ANILCA § 703(a)(5); 94 Stat. 2410; 16 U.S.C. § 1132 note.

Insofar as President Carter's rescinded 1978 Proclamation could be argued to assert a lesser interest in marine "FRWRs", it is well established that legislative action to change the material terms of a previous act or to withdraw a previously asserted right, such as the ANILCA provisions rescinding the 1978 Proclamation, is presumed to effect a change in legal rights. Sutherland Statutory Construction, § 22:30 (6th ed., 2007); *West Winds, Inc. v. M.V. Resolute*, 720 F.2d 1097 (9th Cir. 1983).  It is also presumed that Congress knew the structure and terms of the prior action and by making a change deliberately limited the scope of the new act.  *See Meltzer v. Zoller*, 520 F.Supp. 847 (D. N.J. 1981). Therefore, to the degree it might be argued that the Carter Proclamation did intend to reserve marine waters surrounding the Monument when President Carter proclaimed it, the fact that Congress plainly rescinded that action and materially changed and limited the new withdrawal to "lands," pointedly dropping any references to waters, is a clear demonstration that Congress did not intend FRWRs to be reserved within the 1980 Monument or in waters outside of the Monument's statutorily established boundaries, such as in the Behm Canal.  The statutorily rescinded Carter Proclamation for the Misty Fjords Monument has no legal force and effect and can have no bearing on this case.

### 4.   ANILCA Controls and Places the Behm Canal Outside of the Misty Fjords Monument and Wilderness.

What instead matters are the applicable 1980 ANILCA provisions that superseded the 1978 Proclamation. Those provisions establish that the Behm Canal is not within or part of the Misty Fjords Monument or Wilderness established by ANILCA.  They establish that neither the submerged lands underlying the Canal nor marine waters within the Canal overlying those State-owned lands were attempted to be reserved or withdrawn by those provisions.  ANILCA section

503(a) locates the Monument boundary line on either side of the Behm Canal, clearly excluding the Canal from the unit. 16 U.S.C. § 431 note; *see* Map at Exhibit 2 attached to this Brief. In addition, Congress prescribed that "the boundaries of areas" added to the land systems "shall, in coastal areas not extend beyond the mean high tide to include lands owned by the State of Alaska." § 103(a) [16 U.S.C. § 3103(a)]. This provision confirms that the boundaries are on the uplands and do not include Behm Canal within the Monument or Wilderness (and the same holds true for the mouth of the Stikine River, which Peratrovich briefly references[65]). In addition, ANILCA § 503(h)(8) provides that designation of the Misty Fjords National Monument Wilderness shall not be deemed to affect "offshore waters ***adjacent to*** the Monument Wilderness", also demonstrating that these waters (i.e., Behm Canal) are ***not within*** or part of the Monument or Wilderness. 94 Stat. 2402 (emphasis added). The Peratrovich claims that the Behm Canal is reserved or withdrawn as part of the Misty Fjords Monument are without legal foundation.

In the same vein, nothing else in the applicable statute purports to reserve FRWRs in adjacent marine waters. As noted above, Congress specified only that "subject to valid existing rights, the ***lands within*** the Monuments is hereby withdrawn." ANILCA § 503(f) [16 U.S.C. § 4321 note] (emphasis added). There are no references in ANILCA to water, fresh or salt, within the provisions reserving and establishing the Misty Fjords Monument or its Wilderness portion. This is in marked contrast to some other ANILCA provisions establishing National

---

[65]    Although Peratrovich argues that Stikine River delta and mouth are within the exterior boundaries of the Stikine-LeConte Wilderness area, that Wilderness, like all ANILCA reservations, stops at the high-tide mark, and so does not include the marine waters at the river mouth. ANILCA § 103(a); *see also* State's Opening "Which Waters" Brief (Doc. No. 134) at 17-25. Neither was there anything "insufficient" (Peratrovich Br. at 39-40) – for the purpose of challenging the Federal Defendants' "headland to headland" rule and referencing the Peratrovich claim – about the State's identification, description and mapping in its Opening Brief of the Stikine River's marine and tidal waters overlying submerged lands clearly disclaimed "up to … the line of mean high tide" by the United States in the Decree reported at 546 U.S. 413-417.

Wildlife Refuges which expressly reference protection of "water quality and necessary water quantity within" refuges. *See* ANILCA Title III & discussion this Brief at p. 27 *supra*. It is a well established canon of statutory construction that where Congress includes particular language in one section (i.e., water references in Title III) but omits it in another section of the same statute, it is presumed that Congress acts intentionally and purposely. *See* Sutherland, Statutory Construction, § 47:38 (7th ed. 2007); *United States v. Juvenile No. 1*, 118 F.3d 298 (5th Cir. 1997). The omission of "water quantity" references in section 503 of ANILCA demonstrates that Congress did not reserve or intend to reserve any FRWRs for the Misty Fjords Monument.

Similarly, Congress outlined only the most general "protection" of this Misty Fjords unit. Congress provided only that it be managed "to protect objects of ecological, cultural, geological, historical, prehistorical, and scientific interest." ANILCA § 503(c); 16 U.S.C. § 4321 note.[66] This very general management direction does not rise to the level of particularity needed to infer a reservation of FRWRs, such as to preserve some "peculiar race of fish" in the "abundant marine waters" of Southeast Alaska. *Compare* Federal Defendants' comments at AR 1710-12 with *Cappaert*, 426 U.S. at 141, & *New Mexico*, 438 U.S. 696.

---

[66]   Section 503(c) also expressly provides that the Misty Fjords Monument, as well as the Admiralty Island National Monument, both of which are expressly established within the Tongass National Forest (ANILCA §§ 503(a) & (b)), "shall be managed by the Secretary of Agriculture as units of the National Forest System" – thus refuting another of Peratrovich's claims, that the Disclaimer by the United States at 546 U.S. 413-417 does not apply because the Misty Fjord Monument was "under the jurisdiction of an agency other than the United States Department of Agriculture." *See* Peratrovich Br. at 35 & 546 U.S. at 415. (As an aside, insofar as the Court might refer to the only source Peratrovich refers to for that claim, the federal agency "Hawaiian Islands Opinion" referenced at pages 15, 24 and 35 of Peratrovich's Brief, it should find that that source actually does not support several of Peratrovich's arguments.)

5.     **The Alaska Maritime National Wildlife Refuge is Irrelevant to the Behm Canal, Which is Nowhere Near any Portion of that Refuge and Not Appurtenant to that Refuge.**

Peratrovich also argues that Congressional designation of the Alaska Maritime National Wildlife Refuge ("Alaska Maritime NWR") units purportedly created FRWRs in salt waters actually outside of those units.  Peratrovich Br. at 26-28.  In fact, the designation of those units is irrelevant, since none of the "islands, islets, rocks, reefs, spires and designated capes and headlands" that make up those Refuge units is within the Behm Canal, or even close to it – or even within the outermost boundaries of the Tongass National Forest.  *See* ANILCA § 303(1)(A)(i)-(v); 16 U.S.C. § 668dd note.  Nonetheless, Peratrovich strives to argue that establishment of the Alaska Maritime NWR is "evidence" that Congress intended to extend FRWRs to salt and marine waters outside of or "adjacent to" those Refuge lands, and that somehow this imagined intent means that FRWRs should also be extended to salt and marine waters, including Behm Canal, outside of or "adjacent to" Tongass Forest uplands.  Peratrovich Br. at 27.

Even a cursory review of ANILCA makes it clear that this claim has no merit.  First, it must be recognized that the Alaska Maritime NWR, although spread out, consists of:  (1) eleven national refuges (mostly very small) which pre-existed ANILCA and were re-designated portions of the Alaska Maritime NWR, (2) together with "approximately four hundred and sixty thousand acres of additional ***public lands on*** islands, islets, rocks, reefs, spires and designated capes and headlands in the coastal areas and adjacent seas of Alaska, and an undetermined quantity of submerged lands, if any, retained in Federal ownership at the time of statehood around Kodiak and Afognak Islands…."  ANILCA § 303 (1)(A) [16 U.S.C. § 668dd note] (emphasis added).  Clearly, the second, "additional" lands category of that provision applies by its terms only to

public lands *on* islands, islets and such, which in no way assists the Peratrovich claims, and the only possible exception is "an undetermined quantity of submerged lands, *if any*, retained in Federal ownership at the time of statehood around Kodiak and Afognak Islands" which are absolutely irrelevant to the Peratrovich plaintiffs' standing and claims in this case based some 600-800 miles away in Southeast Alaska and the Behm Canal.  *Id.* (emphasis added); *DeLorme, Alaska Atlas &Gazetteer* (2004 ed.), map and mileage chart at p. 5.

Second, all lands included within the Alaska Maritime NWR were grouped into five specifically named Units, only one of which, the fifth Unit, designated the "Gulf of Alaska Unit", has any proximity to Southeast Alaska – and even most of that Unit's refuge lands are located *hundreds* of miles from Southeast Alaska, in the areas of the Kenai Peninsula and Kodiak.[67]  *Id.*, at (A)(i-v).  *See also* additional place-name maps in *DeLorme, supra*.  That Gulf of Alaska Unit includes four named refuges which pre-existed ANILCA, one of which was the Tuxedni National Wildlife Refuge on the other side of Cook Inlet across from Ninilchik.  The three others – the Forrester Island, Hazy Islands, and Saint Lazaria Refuges – all existed before statehood (and still exist as part of the Alaska Maritime NWR) in Southeast Alaska but miles outside of the outermost boundaries of the Tongass National Forest and far from the Behm

---

[67]  This observation also applies to Peratrovich's representations, at pages 22-23 and n. 67 of his brief, that other reservations, namely some national wildlife refuges located 1000 miles or more away on the other side of Alaska, include marine waters.   Peratrovich tries to support his assertion by attaching imprecise maps (*see* Peratrovich Br. Exhibits 22-26 [Doc. Nos. 157 & 159]) lifted out of context from the Federal Government's public Notice dated February 24, 1983 and published at 48 Fed. Reg. 7890 *et seq*. In fact, as that Notice expressly provides, it only:  (1) purports to "set[ ] out the legal descriptions of the *external boundaries* of the national wildlife refuges" established by ANILCA; (2) states that the maps "included in this notice" and "at this scale" [as used by Peratrovich] "*cannot accurately* depict the actual boundaries and *should be used only as general location references*"; and (3) , most importantly, *[w]ithin the coastal boundaries of areas added to the National Wildlife Refuge System, Federal ownership does not extend below mean high tide to include lands owned by the State of Alaska* except where the State may agree to that extension."  48 Fed. Reg. at pp. 7890-91 (emphasis added).

Canal.  *DeLorme, supra*, at pp. 16, 18, 26-27 & 68.[68]  Only for those pre-existing refuges is it asserted in ANILCA that the Alaska Maritime NWR includes "submerged lands, waters and interests therein" insofar as they "were a part of such refuges".  ANILCA § 303(1)(A).

Third, section 303(1)(A)(v), specifically dealing with the Gulf of Alaska Unit, expressly provides that the Alaska Maritime NWR "*exclud[es]* such lands ["on islands, islets, rocks, reefs, spires and designated capes and headlands within the Gulf of Alaska"] within existing units of the National Park System, Nuka Island and lands *within the National Forest System* except as provided in section 1427 of this Act."[69]  (Emphasis added).

Fourth, as previously explained in this section of this brief, any possible basis for FRWRs for the Alaska Maritime NWR units, like all other ANILCA refuge units, is expressly limited to "water quantity within the refuge" (ANILCA § 303(1)(B)(v)), and, like other refuge units established or designated by ANILCA, the coastal boundaries of the Alaska Maritime refuge units are statutorily fixed at the mean high tide line and do not extend seaward to include State-

---

[68]   Forrester Island and the Hazy Islands lie many miles out in the open Gulf seas, far from the "Alaska Panhandle" and the outermost boundaries asserted for the Tongass National Forest.  Tiny St. Lazaria Island that is also now part of the Alaska Maritime NWR is located about 30 miles seaward from Sitka, about five miles from the Kruzof Island coastline, and two miles beyond the outermost boundaries asserted for the Tongass National Forest.  *Id.*  As shown by Peratrovich's Exhibits 27-29 [Doc. Nos. 159 & 160], all three island sets were reserved and set apart in 1909-1912 by presidential Executive Orders "for the use of the Department of Agriculture as a preserve and breeding ground for native birds" and purport to reserve and set apart only the "islands" located within the area segregated, in addition to making it unlawful to hunt, trap, capture, disturb, kill, or take the eggs of any such birds on those lands.  Although two of those Orders represented then, almost a hundred years ago, that the Hazy and Forrester islands were at that time within the boundaries of the Tongass National Forest – perhaps according to the broad, angular "International Boundary" line drawn and attached to President Roosevelt's February 16, 1909 Proclamation (Peratrovich's Exhibit 13 [Doc. No. 154]) – the more recent DeLorme maps referred to in this brief show a different, much less expansive boundary for the Tongass National Forest.  In any event, these islands were reserved for different purposes and far different times and neither support nor relate to Peratrovich's distant claims.
[69]   ANILCA section 1427, which addresses fulfilling land selections of the Koniag village and regional corporations and State of Alaska in the vicinity of the far-off Alaska Peninsula and Afognak Island, is also irrelevant to the Peratrovich plaintiffs' claims in this case.

owned submerged lands (or adjacent marine waters) (ANILCA § 103(a); 16 U.S.C. § 3103(a)).[70]
The few possible exceptions are those already mentioned as set out in ANILCA section
303(1)(A) which are far distant from and totally unrelated to the Peratrovich claims.

>        **6.    The Peratrovich Parties Long Ago Acknowledged that Their Theory
>        Depended on Federal Ownership of the Submerged Lands Adjacent to the
>        Tongass Uplands Which the Supreme Court Has Decreed the State Owns.**

Finally, the Peratrovich parties acknowledged long ago that the fate of their claim
depends on the United States holding title to the submerged lands adjacent to the Tongass
uplands.  However, the Supreme Court recently decreed that the State owns that land.

The Peratrovich parties sought to intervene as Defendants in the State's original action
against the United States in the United States Supreme Court seeking to quiet title to the
submerged lands adjacent to the Tongass National Forest uplands.[71]  The Peratrovich parties
maintained there that establishing Federal ownership of the submerged lands (e.g., those
underlying the Behm Canal) would enable them to secure a subsistence preference to harvest
herring roe in the marine waters overlying those lands, just as they do in this action.  See
Supreme Court Special Master's Report, attached as Exhibit 3 to this brief, at 5.

The Supreme Court Special Master in Original No. 128 agreed that "thus determination
of title to the submerged lands in question will likely determine the existence of federal

---

[70]   This point also applies to Peratrovich's suggestion (Peratrovich Br. p. 23) that the Federal Defendants'
assertion of FRWRs in marine waters "headland to headland" at river mouths means they should be
compelled to claim FRWRs in all marine waters.  Where the mouths of freshwater rivers meet the sea is
its own situation, and, as the State has previously pointed out including in its Opening "Which Waters"
Brief (Doc. No 134, at pp. 17-25), the Federal Defendants' assertion of FRWRs in those areas for reasons
of  administrative "convenience" or "preference" contrary to express provisions of ANILCA, the Clear
Statement Rule, and general FRWRs law should be rejected as a matter of law.
[71]   *State of Alaska v. United States of America*, No. 128 Original, Special Master's Report of November,
2001, on the Motion to Intervene as Defendants filed by Franklin H. James, for the Shakan Kwaan
Thling-Git Nation, Joseph K. Samuel, for the Taanta Kwaan Thling-Git Nation.  The Peratrovich case
now combined with this case was filed before the Original 128 action but involves the same real parties in
interest.  Lincoln Peratrovich filed for Shakan Kwaan and J. K. Samuel filed for Taanta Kwaan in Case
No. A92-734.

subsistence harvesting rights in the water column above the land." Special Master's Report at 7 n.5. The Special Master also concluded that "if the [Supreme] Court rules in favor of Alaska on the issue of title [to the submerged lands], the Proposed Intervenors [*Peratrovich*] apparently cannot gather herring roe under applicable Alaska law." *Id.* at 23. Ultimately the Special Master recommended that the Supreme Court reject the intervention petition on the grounds that the United States, pursuant to principles of parens patriae, adequately represented the interests of the Peratrovich parties. *Id.* at 11-13, 23. The Supreme Court accepted the recommendation and denied the intervention petition. *Alaska v. United States*, 534 U.S. 1103 (2002) (Order).

When the Special Master issued his report, he noted at page 10 that this Court (the District of Alaska) had ruled "it would not be a good use of resources for this Court to undertake to resolve an issue which will be resolved by the United States Supreme Court in a fashion which will be controlling for purposes of this and other cases." Order Status Conference, in *Peratrovich, et al. v. United States*, No. A92-734 Civil (D. Alaska, Aug. 18, 2000).

Thus, Peratrovich, in seeking intervention in the Supreme Court litigation maintained, and this Court and others agreed, that determination of ownership, as between the State of Alaska and the Federal Government, of the submerged lands in southeast Alaska, including Behm Canal, would resolve the Peratrovich claim. That issue of ownership has now been resolved in the State's favor. What we see now is a collateral attack on this resolution in the form of a totally novel and unprecedented legal theory – that FRWRs can and do exist in the marine, salt waters of Southeast Alaska, regardless of State ownership of the submerged lands. This history only underscores the multiple layers of novelty in the Peratrovich argument, and reinforces the conclusion that the Federal Defendants, having disclaimed ownership of the submerged lands in a consent decree entered by the Supreme Court, are not under a mandatory

non-discretionary duty to turn around and assert FRWRs in the water column overlaying those State-owned submerged lands.

## V.     CONCLUSION

Accordingly, the State of Alaska opposes the arguments made and relief sought by the Katie John and Peratrovich plaintiffs in this "which waters" phase of the case.  The Federal Defendants should not be compelled by the Court to assert, and then be forced to defend, FRWRs in (1) navigable waters upstream and downstream of national purpose, non-Indian reservations in Alaska or (2) navigable waters flowing through, adjacent to, or upstream or downstream of Native allotments in Alaska, as sought by the Katie John plaintiffs, or (3) marine waters as sought by the Peratrovich plaintiffs.

Respectfully submitted,

/s/ William P. Horn
William P. Horn, D.C. Bar No. 375666
James H. Lister, D.C. Bar No. 447878
Birch, Horton, Bittner and Cherot, P.C.
1155 Connecticut Avenue, NW, Suite 1200
Washington, D.C.  20036
Telephone:  202-659-5800
Facsimile:  202-659-1027
Email:  whorn@dc.bhb.com
Email:  jlister@dc.bhb.com

Attorneys for State of Alaska

Dated:  January 28, 2008

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing "State of Alaska's Brief in Opposition to the Katie John and Peratrovich Plaintiffs' Opening Briefs on Which Waters*"* was served electronically, this 28 day of January, 2008 to the following:

Robert T. Anderson
Randolph H. Barnhouse
Carol H. Daniel
Steven A. Daugherty
Dean K. Dunsmore
Gregory L. Fisher
Phillip E. Katzen
Heather R. Kendall-Miller
Michael W. Sewright
William F. Sherman


_____
William P. Horn