**STATE OF ALASKA'S BRIEF IN OPPOSITION
TO THE KATIE JOHN AND PERATROVICH
PLAINTIFFS' OPENING BRIEFS ON
"WHICH WATERS"**

**No. 3:05-cv-0006-HRH
(Consolidated with No. 3:05-cv-0158-HRH)**

**EXHIBIT 1**

10/31/2007 09:26 FAX 907 271 4143   SOL AK REGION                    ☒002/003

This opinion to the effect that the Federal supervision and control and responsibility for these roads will cease on or before the termination date of December 31, 1958, certainly does not preclude the continued improvement and working out of amicable agreements between the Menominee Indians, the State and the counties involved, to provide for the transfer of such roads. It is noted in Mr. Trier's memo of September 15, 1954, which accompanied your request for an opinion, that in recent years the Bureau has been engaged in an intensified program of turning Indian Bureau roads over to local governmental units for maintenance and improvement and that the agreements cover first an improvement of the road to local government standards at Bureau expense before making the dedication.

EDMUND T. FRITZ,
*Acting Solicitor.*

## WATER RIGHTS FOR INDIAN ALLOTMENTS ON CEDED LANDS AND PUBLIC DOMAIN

M-36289                                    August 19, 1955.

Indian Lands: Ceded Lands—Indian Lands: Allotments: Generally—Indian Lands: Water Rights

An allotment to an Indian of the Colville Reservation made under Section 4 of the Act of July 1, 1892 (27 Stat. 62), on the ceded area of the reservation became entitled to share in the available waters for the irrigation thereof under the doctrine of the Winters case.

Indian Allotments on Public Domain: Generally— Indian Lands: Water Rights

Public domain allotments made subsequent to the creation of the State in which situated and which were never a part of an Indian reservation would be subject to the laws of the State in the acquisition of a water right for such land.

*Memorandum*

To:      Regional Solicitor, Portland
From:    Solicitor
Subject: Water right for public domain allotments made to Indians of the Colville Reservation

We have carefully considered the draft of tentative opinion on the above subject submitted by your memorandum of April 29.

Section 1 of an Act of Congress approved July 1, 1892 (27 Stat. 62) restored to the public domain an area of approximately 1,500,000 acres of land of the Colville Reservation created by Executive Order of July 2, 1872. Section 4 of the Act of July 1, 1892, accorded Colville Indians then residing on the restored portion of the Reservation the right to take allotments of land thereon, selections to be made within six months after the date of the President's Proclamation opening the lands for settlement. The Act of July 1, 1898 (30 Stat. 593) contained a similar provision. The President's Proclamation opening the lands was dated April 10, 1900 (31 Stat. 1963).

The Department held in an opinion rendered October 6, 1906 (35 L.D. 220), that it was not the purpose of the 1892 Act to break up the Colville Tribe but rather to permit certain members to retain their established rights on the restored lands and that they should be considered with respect to determining the rights of their children for allotments "* * * just as if no division of the reservation had been made."

In two decided cases on the Fort Hall Reservation where Indians elected to take allotments on the ceded area, the courts have held that the lands have reservation water rights. See *Scheem, et al. v. United States, et al.*, 273 F. 93, and *United States v. Hibner*, 27 F. (2d) 909. In the recent case of *Merrill v. Bishop*, 237 Pac. (2d) 186 (1951), the court held that under the agreement of March 3, 1905 (33 Stat. 1016), waters were available to irrigate lands allotted to Indians on the ceded portion of the Wind River Reservation allotments. There was an earlier case on the Wind River Reservation, unreported, entitled *United States v. Albert Hampleman*, No. 753 in the United States District Court of Wyoming, involving the right of the State Engineer to close the ditches leading to a ceded area allotment for the delivery of water. Pending determination of the case by the court, arrangements were made under which water was delivered to the lands. On June 26, 1916, the court entered its decree which held that the lands, ditches and water rights of the Indian allottee named in the plaintiff's bill of complaint "are within the absolute and exclusive jurisdiction of the plaintiff."

It is not stated in the record submitted by you whether the two allotments in question were selections made by Indians on the restored part of the Colville reservation. If they were they would have a reservation or Winters doctrine water right which was not lost by the Government reducing the size of the reservation after the Indians had settled on the lands and were permitted to retain their rights thereto to the allotments.

Case 3:05-cv-00006-HRH   Document 169-2   Filed 01/28/2008   Page 3 of 3
10/31/2007 09:26 FAX  907 271 4143    SOL AK REGION                    ☒003/003

After rather extensive search no case has been found where an Indian allotment on the public domain, never a part of an Indian reservation, has been held to have a reservation water right. There would be no basis for extending the reservation right to such a case. The theory of the Winters doctrine (207 U.S. 564), is based on a right belonging to the Indian tribe which was not given up when the reservation was created by treaty or otherwise. No such reservation right could exist in the case of a public domain allotment if the particular State, in which the allotment was made, had been created prior to the making of the public domain allotment. The allottee, in order to obtain a water right for such an allotment, would have to comply with the laws of the State, as the water would belong to the State in trust for the people of the State and could be acquired only by compliance with the law of prior appropriation and beneficial use applicable in the particular State.

J. REUEL ARMSTRONG,
*Solicitor.*

INDIAN PREFERENCE IN EMPLOYMENT

M-36297                                   August 24, 1955.

Indians: Receipt of Government Benefits—Indian Tribes: Terminal Legislation

Upon the issuance of a proclamation, Indians who are subject to section 23 of the act of August 27, 1954 (68 Stat. 868, 877), will not be entitled to preferment in employment by the Bureau of Indian Affairs.

Indians: Receipt of Government Benefits—Indian Tribes: Terminal Legislation

The positions of Indians subject to section 23 of the act of August 27, 1954, who are presently employed by the Bureau of Indian Affairs will remain in the excepted category in which they have been placed by the Civil Service Commission so long as the Commission's regulations remain unchanged.

*Memorandum*

To:      Commissioner, Bureau of Indian Affairs
From:    The Solicitor
Subject: The effect of section 23 of the act of August 27, 1954 (68 Stat. 868, 877) on Indian preference in employment

You have asked me whether the laws providing a preference for the employment of Indians in the Bureau of Indian Affairs will be applicable to certain Uintah and Ouray Indians of mixed blood as to whom a proclamation is issued pursuant to section 23 of the act of August 27, 1954 (68 Stat. 868, 877), and how the Indians to whom the act applies who are presently serving in the Bureau of Indian Affairs under excepted appointments will be affected.

I.

Section 23 of the act of August 27, 1954 (68 Stat. 868, 877) reads as follows:

"Upon removal of Federal restrictions on the property of each individual mixed-blood member of the tribe, the Secretary shall publish in the Federal Register a proclamation declaring that the Federal trust relationship to such individual is terminated. Thereafter, such individual shall not be entitled to any of the services performed for Indians because of his status as an Indian. All statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to such member over which supervision has been terminated, and the laws of the several States shall apply to such member in the same manner as they apply to other citizens within their jurisdiction."

It seems clear that the language used in the provision quoted is broad enough to exclude the Indians to whom it is applicable from the operation of all Federal laws affecting Indians because they are Indians. This interpretation is confirmed by the construction which the Department put upon identical language which it drafted with respect to the Klamath Indians. In its submission to the Congress on January 4, 1954, of the draft of a proposed bill to provide for the termination of Federal supervision over the property of that tribe, it stated with reference to a comparable provision:

"Section 18 of the bill provides that when Federal restrictions are removed from the property of the tribe and its members a proclamation will be published in the Federal Register, and thereafter such Indians will have the same status under State and Federal law as any other person or citizen. * * *"[1]

---

[1] Similar language was used in a number of departmental reports concerning other termination legislation. Language substantially identical to that used in section 23 is to be found in the following acts: