# STATE OF ALASKA'S BRIEF IN OPPOSITION TO THE KATIE JOHN AND PERATROVICH PLAINTIFFS' OPENING BRIEFS ON "WHICH WATERS"

No. 3:05-cv-0006-HRH
(Consolidated with No. 3:05-cv-0158-HRH)

# EXHIBIT 3

RECORDS AND BRIEFS

No. 128, Original

Supreme Court, U.S.
FILED
NOV 26 2001
CLERK

IN THE SUPREME COURT OF THE UNITED STATES

OCTOBER TERM, 2001

STATE OF ALASKA,
*Plaintiff*,

v.

UNITED STATES OF AMERICA,
*Defendant*.

ON MOTION FOR LEAVE TO INTERVENE
AND FILE ANSWER

REPORT OF THE SPECIAL MASTER ON THE MOTION TO
INTERVENE BY FRANKLIN H. JAMES, THE SHAKAN KWAAN
THLING-GIT NATION, JOSEPH K. SAMUEL, AND THE TAANTA
KWAAN THLING-GIT NATION

GREGORY E. MAGGS
Special Master
Washington, D.C.

November 2001

LIBRARY OF CONGRESS
LAW LIBRARY

# Table of Contents

I. Introduction .................................................. 1

II. Subject Matter of No. 128, Original ............................ 1

III. The Proposed Intervenors ...................................... 4
   A. Identity and Interest ..................................... 4
   B. The *Peratrovich* Litigation .............................. 6

IV. *Parens Patriae* Principles ................................... 11

V. Exceptional Circumstances ..................................... 13
   A. *Compelling Interest* .................................... 13
   B. *Indian Tribes* .......................................... 16
   C. *Policy Arguments* ....................................... 18
      1. Potential Number of Participants .................... 19
      2. Burden Imposed on the Litigation .................... 21
      3. Fairness ............................................. 22

VI. Federal Rule of Civil Procedure 24 ............................ 24

VII. Assessment of Costs .......................................... 26

VIII. Conclusion .................................................. 27

ii

**Table of Authorities**

**Statutes**

Act of July 7, 1958, Pub. L. No. 85-508, 72 Stat. 339
(Alaska Statehood Act) .................................................. 3

Act of March 21, 1891, ch. 561, 26 Stat. 1095, 1103 ............ 8

Alaska National Interest Lands Conservation Act
(ANILCA), 16 U.S.C. § 3111 et seq. .............................. 5, 20

Quiet Title Act of 1972, 28 U.S.C. § 2409a ......................... 1

Submerged Lands Act of 1953, 43 U.S.C. §§ 1301-1315 ..... 2, 9

**Regulations and Administrative Materials**

36 C.F.R. § 242.10(a) (2001) ............................................. 6

57 Fed. Reg. 22,942 (1992) ............................................... 7

65 Fed. Reg. 13,298 (2000) ............................................... 4

**Court Rules**

Federal Rule of Civil Procedure 24 ............................... 24, 25

Supreme Court Rule 17.2 ................................................. 25

**Cases**

Alaska Public Easement Defense Fund v. Andrus, 435 F. Supp.
664 (D. Alaska 1977) ...................................................... 7

Alaska v. United States, 120 S. Ct. 2681 (2000) ..................... 1

Alaska v. United States, 121 S. Ct. 1731 (2001) ..................... 4

Alaska v. United States, 121 S. Ct. 753 (2001) ...................... 2

Arizona v. California, 460 U.S. 605 (1983) ............. 16-18, 21, 25

Arizona v. California, 530 U.S. 392 (2000) ....................... 14, 15

Crosby Steam Gage & Valve Co. v. Manning, Maxwell
& Moore, Inc., 51 F. Supp. 972 (D. Mass. 1943) .......... 21-22

Environmental Defense Fund, Inc. v. Higginson, 631 F.2d
738 (D.C. Cir. 1979) ..................................................... 25

iii

Grutter v. Bollinger, 188 F.3d 394 (6th Cir. 1999) ................... 25

Heckler v. Community Health Services of Crawford Cty., Inc.,
467 U.S. 51 (1984) ........................................................ 23

Hopwood v. Texas, 21 F.3d 603 (5th Cir. 1994) ..................... 25

Kentucky v. Indiana, 281 U.S. 163 (1930) ........................ 13, 16

Maryland v. Louisiana, 451 U.S. 725 (1981) ........................ 19

Mausolf v. Babbitt, 85 F.3d 1295 (8th Cir. 1996) .................. 25

Nebraska v. Wyoming, 515 U.S. 1 (1995) ............................. 12

Nebraska v. Wyoming, 530 U.S. 1259 (2000) ....................... 26

New Jersey v. New York, 345 U.S. 369 (1953) (per curiam) ... 11,
                                                       13, 14, 19-20

Oklahoma Tax Com'n v. Citizen Band Potawatomi Indian
Tribe of Oklahoma, 498 U.S. 505 (1991) ........................ 18

Utah Div. of State Lands v. United States, 482 U.S. 193 (1987)
............................................................................... 2, 9

Utah v. United States, 394 U.S. 89 (1969) ...................... 12, 15, 16

**Materials from Case Records**

Peratrovich et al. v. United States, No. A92-734 Civil
(D. Alaska) ............................................................... 6-10

State of Alaska v. United States, No. 128, Orig. (U.S.) ...... 1-4, 10,
                                                         17, 18, 20, 21

**Secondary Source**

7C Charles A. Wright and Arthur R. Miller, Federal Practice
& Procedure § 1909 (1986 & Supp. 2000) ..................... 25

## I. Introduction

This report concerns a motion by two individuals and two communities of native Alaskans to intervene and file an answer in No. 128, Original, *State of Alaska v. United States*. The report recommends that the Supreme Court deny the motion on the basis of *parens patriae* principles.

## II. Subject Matter of No. 128, Original

This original action began on June 12, 2000, when the Supreme Court granted the State of Alaska leave to file a bill of complaint against the United States. *See Alaska v. United States*, 120 S. Ct. 2681 (2000). Alaska's complaint asks the Court to quiet title to vast expanses of marine submerged land pursuant to the Quiet Title Act of 1972, 28 U.S.C. § 2409a. The submerged land is located in southeastern Alaska's Alexander Archipelago. This Archipelago includes more than 1000 islands, and covers an area nearly 600 miles long and 100 miles wide. The submerged land at issue lies off the mainland coast of Alaska and off the shores of the numerous islands in the Archipelago. The papers filed in the present action do not specify why Alaska values the underwater lands in controversy.[1]

Alaska claims that title to the submerged lands involved in this case passed from the United States to Alaska when Alaska became a state in 1959. Although this action has not progressed beyond its early stages, Alaska already has outlined the legal argument that it intends

---

[1] In past litigation, Alaska and the United States have disputed the ownership of other marine submerged lands for various reasons. One case involved construction of an obstacle to navigation. *See United States v. Alaska*, 503 U.S. 569 (1992) (No. 118, Orig.). In other cases, the submerged lands have contained oil or gas. *See United States v. Alaska*, 530 U.S. 1021 (2000) (No. 84, Orig.); *United States v. Alaska*, 422 U.S. 184 (1975).

1

2

to present in support of its position. *See* Brief in Support of Motion for Leave to File a Complaint, *Alaska v. United States*, No. 128 Orig. (U.S. Nov. 24, 1999). The state has indicated that it will rely principally on the "Equal Footing" doctrine and the Submerged Lands Act of 1953, 43 U.S.C. §§ 1301-1315. *See* Brief in Support of Motion for Leave to File a Complaint, *supra*, at 4.

The Equal Footing doctrine says that new states entering the Union have the same sovereign powers and jurisdiction as the original thirteen states. *See Coyle v. Smith*, 221 U.S. 559, 573 (1911). Under this doctrine, subject to certain limitations, a new state generally acquires title to the beds of inland navigable waters. *See Utah Div. of State Lands v. United States*, 482 U.S. 193, 197 (1987). The Submerged Lands Act of 1953 declares that states generally have title to all lands beneath inland navigable waters and offshore marine waters within their "boundaries." *See* 43 U.S.C. § 1311(a)(1). Under the Act, a state's boundaries may extend three geographic miles from the coast line. *See id.* § 1301(b). The Act, however, contains an exception for lands expressly retained by the United States when a state enters the Union. *See id.* § 1313(a).

Alaska's complaint, as amended on January 8, 2001, states four claims. *See* Amended Complaint to Quiet Title, *Alaska v. United States*, No. 128 Orig. (U.S. Dec. 14, 2000); *Alaska v. United States*, 531 S. Ct. 753 (2001) (granting leave to amend complaint). Counts I and II both claim that the submerged lands in the Alexander Archipelago lie beneath inland waters and therefore passed to the state under the Equal Footing doctrine. *See* Amended Complaint to Quiet Title, *supra*, ¶¶ 4-41. Count I alleges that the waters of the Archipelago historically have been considered inland waters. *See id.* ¶ 7. Count II asserts that the waters also qualify as inland waters because they lie within several juridical bays defined by the Archipelago's geographic features. *See id.* ¶ 25.

3

Count III concerns an area within the Alexander Archipelago designated as the Tongass National Forest. Subject to certain exceptions, the United States retained title to the Tongass National Forest when Alaska became a state. *See* Act of July 7, 1958, Pub. L. No. 85-508 § 5, 72 Stat. 339, 340 [hereinafter Alaska Statehood Act]. Alaska, however, claims title to "all lands between the mean high and low tide and three miles seaward from the coast line inside the boundaries of the Tongass National Forest." Amended Complaint to Quiet Title, *supra*, ¶ 43.

Count IV concerns another area within the Alexander Archipelago formerly designated as the Glacier Bay National Monument and now called the Glacier Bay National Park and Preserve. Again, subject to certain exceptions the United States retained title to the Glacier Bay National Monument when Alaska became a state. *See* Alaska Statehood Act, *supra*, § 5. Alaska, however, claims title to "all the lands underlying marine waters within the boundaries of Glacier Bay National Monument" under the Equal Footing doctrine and the Submerged Lands Act. Amended Complaint to Quiet Title, *supra*, ¶ 61.

The United States has not undertaken to outline the arguments that it intends to present in defense. With Alaska, however, the United States has identified in some detail the issues that it believes this litigation will present. *See* Joint List of Subsidiary Issues, *Alaska v. United States*, No. 128 Orig. (U.S. Apr. 16, 2001); Brief for the United States On Motion for Leave to File a Bill of Complaint at (I), *Alaska v. United States*, No. 128 Orig. (U.S. Apr. 12, 2000). Ultimately, the Court most likely will have to decide whether the waters of Alexander Archipelago truly are inland waters for the purpose of the Equal Footing doctrine and the extent to which the United States retained marine submerged lands when it reserved the Tongass National Forest and the Glacier Bay National Monument.

## II. The Proposed Intervenors

On February 26, 2001, Franklin H. James, the Shakan Kwaan Thling-Git Nation, Joseph K. Samuel, and the Taanta Kwaan Thling-Git Nation (the "Proposed Intervenors") filed a motion to intervene as defendants and sought leave to file an answer to Alaska's complaint. The State of Alaska and the United States each filed an opposition to the motion, and the Proposed Intervenors filed a reply. The Court deferred this motion to the Special Master. *See Alaska v. United States*, 121 S. Ct. 1731 (2001). The Special Master requested and received supplemental briefs, and heard oral argument.

### A. Identity and Interest

According to the Proposed Intervenors, Franklin H. James is the First Chairholder and Tribal Spokesman for the Shakan Kwaan Thling-Git Nation, which is a band of Thling-Git natives whose ancestral home is in Southeast Alaska. Joseph K. Samuel is the First Chairholder and Tribal Spokesman for the Taanta Kwaan Thling-Git Nation, which is another band of Thling-Git natives whose ancestral home also is in Southeast Alaska. *See* Brief in Support of Motion for Leave to Intervene and File Answer at 1-2, *Alaska v. United States*, No. 128 Orig. (U.S. Feb. 20, 2001).

The Shakan Kwaan and Taanta Kwaan Nations are described by the Proposed Intervenors as "both a 'community' and an 'extended family.'" *Id.* All of their members are native Alaskans. The two nations, however, are not recognized as Indian Tribes having a government-to-government relationship with the United States. *See* 65 Fed. Reg. 13,298 (2000) (listing federally recognized tribes).

The answer that the Proposed Intervenors seek leave to file in this case denies that Alaska has title to the submerged land located within the Tongass National Forest. *See* Proposed Answer of Intervention ¶ 27, *Alaska v. United States*, No. 128 Orig. (U.S. Feb. 20, 2001). The Proposed Intervenors do not claim that they own this land.

Instead, the Proposed Intervenors seek to intervene in support of the United States's claim to ownership of the property.

The Proposed Intervenors care whether title to submerged lands in the Tongass National Forest belongs to Alaska or the United States because the answer may affect their ability to harvest herring roe on kelp.[2] They allege that members of the Shakan Kwaan and Taanta Kwaan Thling-Git Nations have harvested herring roe on kelp in the waters of Southeastern Alaska since time immemorial. This harvesting stopped in 1968 when Alaska prohibited customary trade in herring roe. The Proposed Intervenors believe that if the United States has title to the land they could resume the harvesting pursuant to Title VIII of the Alaska National Interest Lands Conservation Act (ANILCA), 16 U.S.C. § 3111 *et seq.*

Title VIII of ANILCA provides that "the taking on public lands [of the United States] of fish and wildlife for nonwasteful subsistence uses shall be accorded priority over the taking on such lands of fish and wildlife for other purposes." 16 U.S.C. § 3114. The statute defines "subsistence uses" to include "the customary and traditional uses by rural Alaska residents of wild, renewable resources for direct personal or family consumption, as food, shelter, fuel, clothing, tools, or transportation, . . . for barter or sharing for personal or family consumption; and for customary trade." *Id.* at § 3113. The Proposed Intervenors believe that their harvesting of herring roe would satisfy each of these requirements.

---

[2] Herring is an important food fish found in the waters off Alaska's coast and elsewhere. Roe is the name given for a mass of fish eggs. Kelp is an underwater plant. Herring roe attached to kelp traditionally has been harvested for human consumption.

## B. The *Peratrovich* Litigation

The Proposed Intervenors do not believe that the United States will oppose in a zealous manner Alaska's claim to the submerged lands in the Tongass National Forest. Their distrust stems from positions taken by the United States in a federal district court case styled *Peratrovich et al. v. United States*, No. A92-734 Civil (D. Alaska).[3] The proceedings of the *Peratrovich* litigation, therefore, require careful description.

In 1991, according to information found in the *Peratrovich* record, members of the Shakan Kwaan and Taanta Kwaan Nations applied to the Federal Subsistence Board for a permit to engage in the gathering of roe in the Tongass National Forest. The Federal Subsistence Board is a body established by the Secretary of the Interior and the Secretary of Agriculture. *See* 36 C.F.R. § 242.10(a) (2001). It has responsibility for administering the subsistence taking and uses of fish and wildlife on "public lands" of the United States. *Id.*

In their application, the members of the Shakan Kwaan and Taanta Kwaan Nations claimed a right to engage in the gathering of roe under ANILCA. The Federal Subsistence Board, however, refused to consider and act upon their applications. The Board explained that its regulations did not permit it to exercise jurisdiction in part because navigable waters were not "public lands" of the United States. The Board explained that "the United States generally does not hold title to navigable waters." Complaint for Injunctive and Declaratory Relief exh. E, *Peratrovich et al. v. United States*, No. A92-734 Civil (D. Alaska Dec. 2, 1992).

After failing to obtain a federal permit from the Federal Subsistence Board, these members of the Shakan Kwaan and Taanta

---

[3] The Special Master has requested, received, and reviewed pertinent portions of the *Peratrovich* record.

Kwaan commenced the *Peratrovich* litigation by suing the United States in the United States District Court for the District of Alaska.[4] The complaint asserts that the Federal Subsistence Board violated its duty to act on the merits of their application. *See id.* ¶ 40.

The *Peratrovich* litigation and this original action have an important issue in common, namely, whether the United States or Alaska has title to the marine submerged lands within the area designated as the Tongass National Forest.[5] The Proposed Intervenors argue that, in *Peratrovich*, the United States "has previously not taken a strong position in regard to this issue." Brief in Support of Motion for Leave to Intervene and File Answer at 5, *Alaska v. United States*, No. 128 Orig. (U.S. Feb. 20, 2001). Accordingly, they assert that the United States in this original action "cannot ensure adequate representation sufficient to guarantee the Proposed Intervenors the level of advocacy their members demand." *Id.*

To support this contention, the Proposed Intervenors have focused on the *Peratrovich* plaintiffs' request for a preliminary injunction. In their complaint, the plaintiffs asked the district court to order that the

---

[4] "The named plaintiffs in the *Peratrovich* litigation are the same as the Proposed Intervenors, except that the complaint names Lincoln Peratrovich rather than Franklin James as the Spokesman for the Shakan Kwaan.

[5] "Under Alaska state law, ownership of submerged lands does not give rise to a claim of title to the waters in the water column above the land. *See Alaska Public Easement Defense Fund v. Andrus*, 435 F. Supp. 664, 677 (D. Alaska 1977). The Federal government, however, has determined by regulation to treat the navigable waters above federal lands as "public lands" for purposes of ANILCA. *See* 57 Fed. Reg. 22,942 (1992). Thus the determination of title to the submerged lands in question will likely determine the existence of federal subsistence harvesting rights in the water column above the land.

United States immediately issue the roe harvesting permits that the plaintiffs had sought from the Federal Subsistence Board. *See* United States' Response to Motion for Preliminary Injunction, *Peratrovich v. United States*, No. A92-734 Civil, (D. Alaska Dec. 24, 1992).

The United States argued against granting the injunction in part because title to the marine submerged lands within the Tongass National Forest "Has Not Been Shown to Have Been Reserved by the United States." *Id.* at 20. The United States took the position that it would have title to the submerged lands only if it had affirmatively reserved them when Alaska became a state. *See id.* at 20-22 (citing *Utah Div. of State Lands v. United States*, 482 U.S. 193 (1987)). The United States then asserted the inadequacy of three legal sources that the plaintiffs had relied upon to demonstrate that the United States had reserved title to the Tongass National Forest.

The first source cited by the plaintiffs was Section 24 of the Act of March 21, 1891, ch. 561, 26 Stat. 1095, 1103, which authorized the President to establish reservations of land like the Tongass National Forest. With respect to this source, the United States argued: "There is no indication in the legislative language of the necessary affirmative intent by Congress that any action by the President under that statute was 'affirmatively intended to defeat' any future state's title to submerged lands.'" *Id.* at 22.

The second source cited by the plaintiffs was a collection of proclamations by President Roosevelt creating the Tongass forest reserve. With respect to this source, the United States argued: "While the President clearly intended to create the forest reserve, there is no showing in those proclamations that these reserves were intended to defeat the title of the future state of Alaska to submerged lands at issue." *Id.*

8

---

The third source was Section 4 of the Alaska Statehood Act, Pub. L. No. 85-508, 72 Stat. 339, note prec. 48 U.S.C. § 21, which identified certain lands that Alaska would not claim title to after statehood, but that did not include marine submerged lands in the Tongass area. The United States argued that another provision of the Statehood Act referred to 43 U.S.C. § 1311(a), a provision of the Submerged Lands Act. Section 1311(a), as noted above, generally vests ownership in lands beneath navigable waters in the states. The United States said: "Therefore, Section 4 of the Statehood Act does not operate as a disclaimer by the State of title to submerged lands." *Id.* at 23.

The United States concluded its argument by saying: "For the foregoing reasons, plaintiffs have failed to show a likelihood of success on the merits of their claim that title to the submerged lands within the Tongass National Forest was reserved to the United States at the time of statehood." *Id.* The district court did not grant the preliminary injunction.

In a later filing, the United States asked the district court to dismiss the *Peratrovich* case for failure to join an indispensable party, namely, Alaska. Here the United States argued: "Title to lands beneath navigable waters is generally held in trust for and conveyed to the respective state upon statehood. *Utah Division of State Lands v. United States*, 482 U.S. 193, 196-97 (1987). Therefore, the State's claim of ownership of the submerged lands under the marine waters within the exterior boundaries is not frivolous on its face." Defendant's Motion for Judgment on the Pleadings or to Dismiss at 10, *Peratrovich v. United States*, No. A92-734 Civil (D. Alaska Apr. 29, 1996).

In addition, in answering the plaintiffs' amended complaint, the United States did not claim ownership of the property. Paragraph 16 of the amended complaint said: "As a matter of fact and of law, at all times material to this lawsuit the title to all lands (including submerged

9

lands) within the exterior boundaries of the Tongass National Forest has been, and continues to be, in the United States." First Amended Complaint for Injunctive and Declaratory Relief at 15, *Peratrovich v. United States*, No. A92-734 Civil (D. Alaska Oct. 29, 1996). The United States answered: "The allegations of paragraph 16 of the Complaint constitute conclusions of law and are not factual allegations to which a response is required." Answer to Amended Complaint at 9, *Peratrovich v. United States*, No. A92-734 Civil (D. Alaska, Dec. 6, 1996).

The *Peratrovich* case has not reached a conclusion. After Alaska filed the present original action against the United States, the district court stayed the litigation. The district court explained that "it would not be a good use of resources for this court to undertake to resolve an issue which will be resolved by the United States Supreme Court in a fashion which will be controlling for purposes of this and other cases." Order Status Conference, *Peratrovich v. United States*, No. A92-734 Civil (D. Alaska Aug. 18, 2000).

The United States, strictly speaking, is not making contrary arguments in this case and *Peratrovich*. In *Peratrovich*, the United States argued that the plaintiffs had not shown that the United States had title to the marine submerged lands in the Tongass National Forest area. The United States, however, never actually admitted that Alaska has title to the submerged lands.

On the other hand, without prejudging this issue in any way, the Special Master notes that the United States may find it awkward to contradict some of what it contended in *Peratrovich*. For example, as described above, the United States said that the Act of March 21, 1891, the Alaska Statehood Act, and President Roosevelt's promulgations do not show that the United States retained title to the Tongass National Forest. Alaska has now adopted some of these arguments to support its position in the present original action. *See* Brief in Support of Motion to File A Complaint, *supra*, at 19-23.

10

## IV. *Parens Patriae* Principles

Original jurisdiction cases against a state or the federal government often involve issues that concern not only the initial parties, but many others as well. For instance, the question whether a state or the federal government holds title to particular land may interest persons who live in the area or wish to use the property. Perhaps for this reason, motions to intervene in original jurisdiction cases are not uncommon.

In ruling on motions to intervene in original actions, the Supreme Court often has relied on *parens patriae* principles. These principles have led the Court to presume that a sovereign represents the interests of all of its citizens whenever the sovereign litigates a matter of sovereign interest. As a result, the Court generally has rejected motions to intervene by private parties in original actions involving states or the federal government, unless the private parties can show a reason for overcoming this presumption.

In *New Jersey v. New York*, 345 U.S. 369 (1953) (per curiam), New Jersey filed an original action against New York State and New York City. New Jersey asked the Court to enjoin the defendants from diverting certain amounts of water from the Delaware river. *See id.* at 370. Later, Pennsylvania joined the lawsuit to protect its own rights. *See id.* at 371. The Court entered a decree establishing an apportionment of the water and retained jurisdiction. *See id.* Some time afterward, when New York moved for modification of the decree, the City of Philadelphia moved to intervene so that it could assert its own interest in the use of the Delaware River. *See id.* at 372.

The Supreme Court denied Philadelphia's motion to intervene on grounds that the State of Pennsylvania already represented Philadelphia's interests. The Court explained:

The "*parens patriae*" doctrine . . . is a recognition of the principle that the state, when a party to a suit involving a matter of sovereign interest, "must be deemed to represent all its

11

12

citizens." Com. of Kentucky v. State of Indiana, 1930, 281 U.S. 163, 173-174. The principle is a necessary recognition of sovereign dignity, as well as a working rule for good judicial administration. Otherwise, a state might be judicially impeached on matters of policy by its own subjects, and there would be no practical limitation on the number of citizens, as such, who would be entitled to be made parties.

345 U.S. at 372-73.

The Court used similar reasoning in *Utah v. United States*, 394 U.S. 89 (1969). In that case, Utah sued the United States seeking to clear title to relicted lands resulting from the shrinking of the Great Salt Lake. *See id.* at 90. A private corporation, Morton International, Inc., claimed title to some of the land and sought to intervene. *See id.* The Court denied Morton's application. *See id.* at 96. Although the Court did not cite *New Jersey v. New York*, it emphasized the same concerns. In particular, the Court worried that the number of parties might become impractical if private citizens could intervene. The Court said: "If Morton is admitted, fairness would require the admission of any of the other 120 private landholders who wish to quiet their title to portions of the relicted lands, greatly increasing the complexity of this litigation." *Id.* at 95-96.

The Court also has relied on *parens patriae* principles when deciding whether and how to exercise its original jurisdiction. *See, e.g., Nebraska v. Wyoming*, 515 U.S. 1, 21-22 (1995) (dismissing fears that private citizens might later intervene in an original action because, under *New Jersey v. New York*, a state "is presumed to speak in the best interest of those citizens"); *United States v. Nevada*, 412 U.S. 534, 538 (1973) (per curiam) (declining to exercise original jurisdiction so that private citizens, "who ordinarily would have no right to intervene in an original action in this Court, *New Jersey v. New York*, 345 U.S. 369 (1953), would have an opportunity to participate in their own behalf if this litigation goes forward in the

13

District Court."); *Kentucky v. Indiana*, 281 U.S. 163, 173-174 (1930) (dismissing individual defendants from an original action on grounds that a "state suing, or sued, in this court, by virtue of the original jurisdiction over controversies between states, must be deemed to represent all its citizens").

In this case, the Proposed Intervenors are citizens of both Alaska and of the United States. Accordingly, under *parens patriae* principles Alaska and the United States are presumed to represent their interests. The Proposed Intervenors therefore cannot intervene unless they can show some basis for overcoming this presumption.

V. Exceptional Circumstances

The Proposed Intervenors have advanced a number of contentions that might be construed as arguments for overcoming the general presumption, based on *parens patriae* principles, that the United States and Alaska will represent their interests. In the end, however, they have not shown the existence of any established bases for overcoming the presumption. Nor have they presented any other sufficient reason for dispensing with the presumption.

A. *Compelling Interest*

In *New Jersey v. New York*, the Court identified a possible circumstance in which a private party could participate in an original action notwithstanding ordinary *parens patriae* principles. The Court indicated that a private party may intervene if the private party has a "compelling interest" in the litigation. The Court said more fully:

An intervenor whose state is already a party should have the burden of showing some compelling interest in his own right, apart from his interest in a class with all other citizens and creatures of the state, which interest is not properly represented by the state.

345 U.S. at 373.

The Court ruled that Philadelphia could not show a compelling interest in *New Jersey v. New York* because its interests did not diverge from those of Pennsylvania. The Court explained that "[c]ounsel for the City of Philadelphia have been unable to point out a single concrete consideration in respect to which the Commonwealth's position does not represent Philadelphia's interests." *Id.* at 374.

In this case, the Proposed Intervenors cannot claim a compelling interest in their own right; nor can they show that their interest is not properly represented by the United States. This is a case between two sovereigns to determine whether Alaska or the United States has title to the submerged lands at issue. The Proposed Intervenors are not claiming they have title to any property. They also are not seeking to claim, in this action, any rights that they may have under ANILCA. Instead, as noted above, they seek to argue exactly what the United States is arguing, namely, that the United States has title to certain marine submerged lands.

True, the Proposed Intervenors have a specific reason for wanting the United States to have title. In particular, a determination that the land belongs to the United States might allow them to assert rights under ANILCA in another forum. In the past, however, the Court has not considered derivative interests of this kind sufficient to permit intervention. In *Arizona v. California*, 530 U.S. 392 (2000), the United States participated in settling a dispute concerning the Colorado River Indian Reservation. *See id.* at 418-19. An association of families who were leasing property from the United States within the Reservation objected to the settlement and sought to intervene. *See id.* at 419 n.6. The Court, however, denied intervention because the association's members did not own the land and made no claim to title or water rights. *See id.*

The Proposed Intervenors also argue that, despite the present agreement between their views and those of the United States, they cannot trust the United States to protect its own interests in the Tongass area. They say that in the *Peratrovich* litigation the United States did not support their claim that the United States had title to the marine submerged land in the Tongass National Forest. Although the United States now insists that it does have title, the Proposed Intervenors ask: "What assurance do the Proposed Intervenors have that the United States will not once again change its position on the ownership of the submerged lands in the Tongass National Forest?" Reply Brief in Support of Motion to Intervene and File Answer at 3, *Alaska v. United States*, No. 128 Orig. (U.S. Apr. 17, 2001).

The Proposed Intervenors, without question, have some basis for their concern. In *Peratrovich*, although the United States never actually asserted that Alaska owns the property, it made arguments that now support Alaska's position. As described at length above, the United States asserted that certain statutes and proclamations did not show an intent by the United States to retain title to submerged lands within the Tongass National Forest. The United States, moreover, has not ruled out the possibility that it might settle the case with Alaska and agree that Alaska has title to all or part of the submerged lands in dispute.

Concern about how the United States will conduct litigation to protect its position, however, does not rise to the level of a "compelling interest." The Court, in fact, has addressed this type of concern in two previous cases. In *Utah v. United States*, Morton International asked to intervene in part because the company felt that the Solicitor General was not protecting the United States's interests. *See* 394 U.S. at 94. Morton objected in particular to a stipulation by the Solicitor General that could deprive the United States of a claim to some of the subject property. *See id.* The Court rejected this line of argument. The Court recognized that Congress had entrusted the Solicitor General with authority to conduct the federal government's litigation. *See id.* at 95 (citing 28 U.S.C. § 518 (1964)). The Court, accordingly, reasoned that the Solicitor General had authority to

remove issues from the case if he believed that he could advance no argument to vindicate the government's interest. *See* 394 U.S. at 94-95. The Court concluded by saying "we can perceive no compelling reason requiring the presence of Morton in this lawsuit." *Id.*

In *Kentucky v. Indiana*, 281 U.S. 163 (1930), the Court similarly refused to allow individuals who doubted their state's litigation strategy to participate in an original action. In that case, Kentucky and Indiana agreed to build a bridge over the Ohio River. *See id.* at 169. A group of Indiana taxpayers and citizens sued Indiana in state court to block the construction. *See id.* Kentucky then brought an original action in the Supreme Court against Indiana and the individuals who were plaintiffs in the state action, seeking to restrain any breach of contract by Indiana. *See id.* The Court dismissed the individuals. *See id.* at 175. Although the individuals had cause to doubt Indiana's willingness to oppose Kentucky in the original action, the Court explained that the state of Indiana "must be deemed to represent all its citizens" and that the individuals had "no separate individual right to contest in such a suit the position taken by the state." *Id.* at 173.

For these reasons, the Proposed Intervenors have not shown a compelling interest in participating in the litigation.

### B. *Indian Tribes*

The Supreme Court has permitted intervention in original actions more generously when the parties seeking intervention are Indian tribes. In *Arizona v. California*, 460 U.S. 605 (1983), five Indian tribes sought to intervene in an original action concerning water rights to the Colorado River. Although the United States already was litigating on the Tribes' behalf, the Court decided that the Tribes should have a right to speak for themselves. *See id.* at 615. The Court said:

The Tribes . . . ask leave to participate in an adjudication of their vital water rights that was commenced by the United

16

States. . . . The Tribes' interests in the waters of the Colorado basin have been and will continue to be determined in this litigation since the United States' action as their representative will bind the Tribes to any judgment. . . . Moreover, the Indians are entitled "to take their place as independent qualified members of the modern body politic." *Poafpybitty v. Skelly Oil Co.*, 390 U.S. 365, 369 (1968), *quoting Board of County Commissioners v. Seber*, 318 U.S. 705 (1943). Accordingly, the Indians' participation in litigation critical to their welfare should not be discouraged.

460 U.S. at 614-15. The Court added: "For this reason, the States' reliance on *New Jersey v. New York*, 345 U.S. 369 (1953) (*per curiam*), where the Court denied the City of Philadelphia's request to intervene in that interstate water dispute on the grounds that its interests were adequately represented by the State of Pennsylvania, is misplaced." *Id.* at 615 n.5.

In their briefs, the Proposed Intervenors emphasize that they are native Alaskans. *See* Brief in Support of Motion for Leave to Intervene and File Answer, *supra*, at 1-2. At oral argument, they further suggested that their status as native Alaskans should limit the application of *parens patriae* principles to them. *See* Transcript of Oral Argument on Motion to Intervene at 9, *Alaska v. United States*, No. 128 Orig. (U.S. Sept. 11, 2001).

Even if the Proposed Intervenors' status as native Alaskans made them the equivalent of recognized Indian Tribes, they would still lack a direct interest in the subject matter of the present litigation comparable to the interests of the Tribes that were permitted to intervene in *Arizona v. California*. In that case, the litigation concerned water rights and the intervening Tribes had their own water rights which were being determined in the litigation. *See* 460 U.S. at 615. The present case concerns title to land, and the Proposed Intervenors, as noted earlier, make no claim of title; they argue only

17

that the Court's determination of which sovereign has title will affect their ability to use the land.

Moreover, as the United States and Alaska both point out, and as the Proposed Intervenors concede, *see* Transcript of Oral Argument on Motion to Intervene, *supra*, at 8-9, the United States has not recognized the Shakan Kwaan Thling-Git Nation or Taanta Kwaan Thling-Git Nation as Indian Tribes. As noted above, a federal regulation lists all recognized Indian Tribes, and it does not include them. *See* 65 Fed. Reg. 13,298. These Nations, moreover, do not have any government-to-government relations with either the United States or the state of Alaska.

The Court's reasoning in *Arizona* should apply only to recognized Indian Tribes. Recognized Tribes "exercise inherent sovereign authority over their members and territories." *Oklahoma Tax Com'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 509 (1991). In contrast, although the Proposed Intervenors may have some special rights or privileges because of their status as native Alaskans, they lack sovereignty and therefore should not have a special claim to participation in an inter-sovereign original action. The doctrine of *parens patriae* should apply equally to them as to other citizens. For these reasons, the Proposed Intervenors cannot avail themselves of the special principles applicable to Indian Tribes.

C.  *Policy Arguments*

The Supreme Court has not always strictly followed the *parens patriae* principles expressed in *New Jersey v. New York*. On the contrary, it has sometimes allowed private parties to intervene in original actions even though a state or the federal government already may have been representing their interests. For instance, in *Maryland v. Louisiana*, 451 U.S. 725 (1981), eight states initiated an original action against Louisiana, seeking to invalidate a tax imposed on

18

natural gas brought into the state. The Court allowed seventeen gas pipeline companies to intervene. It explained:

Given that the Tax is directly imposed on the owner of imported gas and that the pipelines most often own the gas, those companies have a direct stake in this controversy and in the interest of a full exposition of the issues, we accept the Special Master's recommendation that the pipeline companies be permitted to intervene, noting that it is not unusual to permit intervention of private parties in original actions. *See Oklahoma v. Texas*, 258 U.S. 574 (1922).

451 U.S. at 745 n.21.

Two aspects of this reasoning merit attention. First, the Court did not address the possibility that states or the federal government might be representing the interests of the pipeline companies as *parens patriae*. Second, the Court did not explain why the pipeline companies had a compelling interest in the litigation given that the states also were challenging the Louisiana tax.

These two features of the case suggest that the rules applied in *New Jersey v. New York* are somewhat discretionary in their application. For this reason, even if the Proposed Intervenors cannot show a compelling interest for participating in this action, other considerations might justify their intervention. In this regard, the Proposed Intervenors have raised three substantial arguments.

1.  *Potential Number of Participants*

In *New Jersey v. New York*, the Court was concerned that, if it allowed the City of Philadelphia to intervene, other political subdivisions or even large industrial corporations might want to intervene. *See* 345 U.S. at 373. The Court found this possibility troublesome, saying: "Our original jurisdiction should not be thus expanded to the dimensions of ordinary class actions." *Id.* Although the Court did not state the rationale explicitly, it presumably reasoned

19

that district courts are better equipped to handle complex trial litigation.

The Proposed Intervenors contend that their motion to intervene does not raise this concern. They assert that they are the only persons who wish to engage in subsistence gathering under ANILCA in the area. Accordingly, allowing them to intervene would not open the doors to numerous other parties. *See* Reply Brief in Support of Motion to Intervene and File Answer, *supra*, at 2.

This argument fails for two reasons. First, despite their allegations, whether the Proposed Intervenors are the only persons who might want to intervene remains uncertain. Even if they are the only rural Alaskans who wish to exercise rights under ANILCA in the Tongass National Forest, allowing them to intervene might prompt others to seek leave to participate. ANILCA establishes a priority for taking fish and wildlife. *See* 16 U.S.C. § 3114. To the extent that a ruling for the United States would give the Proposed Intervenors priority, it might diminish the rights of others. Indeed, counsel for Alaska averred at oral argument that commercial fishers are watching this case with interest. *See* Transcript of Oral Argument on Motion to Intervene, *supra*, at 34.

Second, the determination whether Alaska or the United States has title to the property may affect rights beyond those granted under ANILCA. Title to the property may determine the rights of other persons under different state and federal laws. For example, Alaska points out that Article VIII, § 3 of the Alaska Constitution gives all residents certain rights to use State-owned lands and waters. *See* Opposition of Plaintiff State of Alaska to Motion for Leave to Intervene and File Answer at 7, *Alaska v. United States*, No. 128 Orig. (U.S. Apr. 4, 2001). Any number of Alaska residents thus might intervene in support of Alaska's position.

True, at this stage of the litigation, the possibility of additional intervenors remains theoretical. Although others might want to intervene, no one else has filed any papers. But that was also the situation when the Court denied the City of Philadelphia's motion to intervene in *New Jersey v. New York*. The question the Court considered in that case was whether "there would be [a] practical limitation on the number of citizens . . . who would be entitled to be made parties." 345 U.S. at 373. Here, as in that case, any number of persons might desire to intervene.

2. Burden Imposed on the Litigation

In *Arizona v. California*, when the Court allowed five Indian Tribes to intervene, it noted that the parties opposing intervention had "failed to present any persuasive reason why their interest would be prejudiced or this litigation unduly delayed by the Tribes' presence." 460 U.S. at 615. In this case, the Proposed Intervenors emphasize that they also do not intend to burden the litigation. They represent in their brief that they "do not seek to bring new claims or issues against the state or the federal government." Motion for Leave to Intervene and File Answer, *supra*, at 7.

Neither the United States nor Alaska have identified specific problems that intervention might cause in this case. Alaska, however, contends the intervenors are inherently burdensome. Even if the schedule for the litigation does not change, Alaska suggests that the addition of another party will necessarily complicate the proceedings. Moreover, so long as the Proposed Intervenors are not attempting to raise new and different arguments, neither they nor the Court can expect to gain much from their participation.

In an often cited passage from *Crosby Steam Gage & Valve Co. v. Manning, Maxwell & Moore, Inc.*, 51 F. Supp. 972 (D. Mass. 1943), Judge Wyzanski expressed similar concerns and advocated participation as *amicus curiae* an alternative to intervention:

It is easy enough to see what are the arguments against intervention where, as here the intervenor merely underlines

20

21

issues of law already raised by the primary parties. Additional parties always take additional time. Even if they have no witnesses of their own, they are the source of additional questions, objections, briefs, arguments, motions and the like which tend to make the proceeding a Donnybrook Fair. Where he presents no new questions, a third party can contribute usually most effectively and always most expeditiously by a brief amicus curiae and not by intervention.

*Id.* at 973.

For these reasons, the possibility that the Proposed Intervenors might impose only a limited burden on the proceedings is not a strong argument for intervention. The Proposed Intervenors, however, may participate as *amicus curiae*.[6] The United States and Alaska both have said that they do not in general object to this participation.

  3.  Fairness

The Proposed Intervenors also argue that the entire history of their efforts to regain permission to harvest roe on kelp makes denying intervention unfair. They emphasize that they have litigated their rights under ANILCA with the United States for almost ten years, only to have the case stayed when Alaska filed this original action. Without intervention, they cannot participate here. Making matters worse, they fear that the United States will settle with Alaska, thus preventing any court from ever ruling on their arguments.

"The Proposed Intervenors have not asked to participate in this case as *amicus curiae*, but have indicated that they may make this request in the future. *See* Transcript of Oral Argument on Motion to Intervene, *supra*, at 27. The Special Master believes that the Proposed Intervenors have demonstrated sufficient interest to participate as *amicus curiae*, and will decide questions that may arise about the details of their possible participation by future order, should such a request be made.

22

The personal circumstances of the Proposed Intervenors and the nature of their interests contributes to the sense of unfairness. The Proposed Intervenors are neither numerous nor wealthy. This litigation concerns an issue whose resolution may affect their right to continue subsistence gathering and customary trade as their ancestors did since time immemorial. If the Court rules in favor of Alaska on the issue of title, the Proposed Intervenors apparently cannot gather herring roe under applicable Alaska law. Denying them power to intervene would sweep them aside entirely, trusting only their former opponent in litigation, the United States, to represent their position.

Without denying the validity of any of these points, three factors put into perspective the seeming hardship of denying intervention to the Proposed Intervenors. First, *parens patriae* principles regularly produce this type of hardship because they presume that a state or the United States may speak for all citizens, even though the citizens may disagree with each other or may have special concerns. These principles, however, have an important justification. In our democratic society citizens empower governmental officials to represent their interests and are bound by their actions on behalf of all citizens.

Second, similar types of unfairness often arise when citizens deal with sovereign parties. For example, as a general rule, private parties may not estop the government. *See Heckler v. Community Health Services of Crawford Cty., Inc.*, 467 U.S. 51, 60 (1984). This rule may cause individuals who have relied on what the government has done in the past to bear a disproportionate burden when the government changes positions. Yet, their individual interests cannot bar the government from taking actions that may benefit the citizenry as a whole and that the present representatives choose to pursue.

Third, as explained previously, *see supra* n.6, the Proposed Intervenors may choose to participate in the role of *amicus curiae*. This is not a perfect substitute for participating as a party. Yet, to the

23

extent that the Proposed Intervenors avail themselves of this opportunity, they can make the legal arguments that they want. Accordingly, even though the Proposed Intervenors justly may feel unfortunate, the circumstances do not suffice to require intervention. The representatives of the United States have the power to decide what arguments the United States will offer in contesting Alaska's claim to the submerged land.

## V1. Federal Rule of Civil Procedure 24

The Proposed Intervenors rely heavily in their briefs on Federal Rule of Civil Procedure 24(a) and (b).[7] This Rule governs motions to intervene in federal district court actions. The Proposed Intervenors have discussed the elements of the Rule at length, and cited many lower court decisions interpreting the Rule.

Rule 24 does not alter the conclusion that the Supreme Court should deny intervention in this action based on *parens patriae* principles. The Supreme Court does not necessarily follow Rule 24 when ruling on motions to intervene in original actions. Indeed, under Supreme Court Rule 17.2, the Federal Rules of Civil Procedure serve only "as guides" in original jurisdiction cases and the Court specifically has identified Rule 24 as one that serves merely as a guide without controlling force. *See Arizona v. California*, 460 U.S. 605, 614 (1983). Accordingly, the principles articulated in *New Jersey v. New York* and the other decisions cited above take precedence over the text of Rule 24 and any lower court interpretations of the provision.[8]

Rule 24(a) provides for "Intervention as of Right" as follows: "Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." Fed. R. Civ. P. 24(a).

Rule 24(b) specifies the following rule for "Permissive Intervention": "Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order or upon any regulation, order, requirement, or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Id.* Rule 24(b).

"Even if Rule 24 directly applied to this action, the Special Master would, nonetheless, recommend the same result. Under Rule 24(b), *parens patriae* principles would provide reason for denying permissive intervention. In addition, the Special Master is persuaded by the reasoning of the many federal courts that have considered *parens patriae* principles when ruling on motions to intervene as of right under Rule 24(a). Although these courts have not applied the same rules that the Supreme Court uses in original actions, they have held applicants to a higher standard on the issue of adequacy of representation when they seek to intervene on the same side as a governmental entity. *See, e.g., Hopwood v. Texas*, 21 F.3d 603, 605 (5th Cir. 1994); *Mausolf v. Babbitt*, 85 F.3d 1295, 1303 (8th Cir. 1996); *Environmental Defense Fund, Inc. v. Higginson*, 631 F.2d 738, 740 (D.C. Cir. 1979); 7C Charles A. Wright and Arthur R. Miller, Federal Practice & Procedure § 1909 (1986 & Supp. 2000). *But see Grutter v. Bollinger*, 188 F.3d 394, 400 (6th Cir. 1999) (rejecting this approach).

24

25

## VII. Assessment of Costs

In their supplemental briefs, the parties and the Proposed Intervenors addressed the Proposed Intervenors' responsibility for paying a portion of the Special Master's future fees and expenses. The United States and Alaska each have argued that, if the Court permits intervention, the Proposed Intervenors should pay a substantial portion of the fees. In contrast, citing financial hardship, the Proposed Intervenors have requested that their financial responsibility be limited to their own out-of-pocket expenses.

If the Court agrees with the recommendation of this report, and decides not to permit intervention, then it need not address the issue of what costs the Proposed Intervenors would have to pay once they became parties. If the Court disagrees and permits intervention, the responsibility of the Proposed Intervenors to pay the Special Master's fees and expenses may depend on the scope of the permitted intervention. Prior to knowing what role the Proposed Intervenors might play in this litigation if allowed to participate, a recommendation regarding responsibility for fees and expenses would be premature.

The Special Master has incurred fees and expenses in preparing this report on the motion to intervene. One issue raised at oral argument was whether the Proposed Intervenors have any responsibility for these costs. Although the Court sometimes has ordered non-parties to pay a portion of a special master's fees and expenses, see, e.g., *Nebraska v. Wyoming*, 504 U.S. 982 (1992) (assessing costs on *amici curiae* who did not object), neither the United States nor Alaska has asked for such an assessment in this case. Accordingly, the Proposed Intervenors should not have responsibility for the costs of resolving this motion.

## VIII. Conclusion

For the foregoing reasons, the Special Master recommends denying the Proposed Intervenors' motion to intervene. Unless otherwise directed by the Court, the proceedings in this action will continue, without a stay, pending the Supreme Court's action on this report.[9]

Respectfully submitted,

GREGORY E. MAGGS
Special Master

Washington, D.C.
November 26, 2001

---

[9] The Supreme Court Rules do not establish a time limit for filing exceptions to the report of a special master. Instead, the Supreme Court typically specifies the time limit by order upon receiving the special master's report. See, e.g., *Kansas v. Colorado*, 531 U.S. 921 (2000).