WILLIAM P. HORN, D.C. Bar No.: 375666
Birch, Horton, Bittner and Cherot, P.C.
1155 Connecticut Avenue, Suite 1200, NW
Washington, D.C. 20036
Telephone: (202) 659-5800
Facsimile: (202) 659-1027
Email: whorn@dc.bhb.com


TALIS J. COLBERG
ATTORNEY GENERAL

Michael W. Sewright, AK Bar No. 7510090
Assistant Attorney General
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK  99501
Telephone: 907-269-5100
Facsimile: 907-279-2834
Email:  mike.sewright@alaska.gov

Attorneys for State of Alaska

IN THE UNITED STATES DISTRICT COURT<br/>FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| KATIE JOHN, et al., | ) |
|                Plaintiffs, | ) |
| | ) |
|    vs. | ) |
| | ) |
| UNITED STATES OF AMERICA, et al., | ) |
| | ) |
|    No. 3:92-cv-0734-HRH | ) |
|    Defendants. | ) |

| | |
|---|---|
| STATE OF ALASKA, | )  No. 3:05-cv-0006-HRH |
| | )   (Consolidated with |
| | )  No. 3:05-cv-0158 HRH) |
|                Plaintiffs, | ) |
|       and | ) |
| | )  **STATE OF ALASKA'S** |
| ALASKA FISH AND WILDLIFE FEDERATION | )  **REPLY BRIEF ON "WHICH** |
| AND OUTDOOR COUNCIL, et al., | )  **WATERS"** |
| | ) |
|             Plaintiff-Intervenors, | ) |

vs.                                        )
                                           )
                                           )
DIRK KEMPTHORNE, Secretary of the          )
Interior, et al.,                          )
                                           )
                        Defendants,        )
        and                                )
                                           )
KATIE JOHN, et al.,                        )
                                           )
                Defendant-Intervenors,     )
        and                                )
                                           )
ALASKA FEDERATION OF NATIVES,              )
                                           )
                Defendant-Intervenor.      )
_____  )
                                           )
            - AND -                        )
                                           )
LINCOLN PERATROVICH, et al.,               )
                                           )      No. 3:92-cv-0734-HRH
                Plaintiffs,                )
                                           )
vs.                                        )
                                           )
UNITED STATES OF AMERICA, et al.,          )
                                           )
                Defendant.                 )
        and                                )
                                           )
STATE OF ALASKA,                           )
                                           )
                Intervenor-Defendant       )
_____  )

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................iii

INTRODUCTION ...........................................................................................1

ARGUMENT..................................................................................................2

I.    REPLY TO THE STANDARD OF REVIEW ARGUMENTS OF THE
      FEDERAL DEFENDANTS AND KATIE JOHN. ...................................2

      A. FEDERAL DEFENDANTS' ARGUMENTS. .......................................2

      B. KATIE JOHN'S ARGUMENTS. ..........................................................5

II.   THE FEDERAL DEFENDANTS' DETERMINATION THAT FRWRs
      EXIST IN NAVIGABLE WATERS OUTSIDE OF BUT "ADJACENT"
      TO FEDERAL CSUs IS INCORRECT. ....................................................6

      A. THE FEDERAL DEFENDANTS MISSTATE THE CASE LAW. ......8

      B. THE STATE'S SAMPLE WATER BODIES DEMONSTRATE WHY
         THE FEDERAL DEFENDANTS' IMPROPER ASSERTION OF
         FRWRs IN ADJACENT WATERS SHOULD BE SET ASIDE.........11

          1. No FRWRs Exist in the Colville River Running Adjacent to the
             NPRA ..........................................................................................11

          2. No FRWRs Exist in the Yukon River Running Adjacent to the
             Nowitna NWR, including that Refuge's Segregated Islands...........14

          3. The Federal Defendants Also Incorrectly Assert FRWRs in Sixmile
             Lake..............................................................................................17

              a.  Sixmile Lake is not adjacent to LCP&P lands............................17

              b.  Even if Sixmile Lake were treated as "adjacent" waters, there
                  would be no FRWRs there.......................................................19

      C. CONCLUSION TO "ADJACENT" WATERS. ...................................20

III.  THE FEDERAL DEFENDANTS' FICTIONAL "HEADLAND TO
      HEADLAND" LINE-DRAWING VIOLATES THE PLAIN "MEAN
      HIGH TIDE" PROVISIONS OF ANILCA AND IS CONTRARY TO
      THE FRWR DOCTRINE. ........................................................................20

      A. THE FACTS REGARDING THE MEAN HIGH TIDE LINE TEST
         CASES ARE UNDISPUTED...............................................................21

B. IN ADDITION TO BEING CONTRARY TO LAW, THE FEDERAL DEFENDANTS' CONVENIENCE CLAIMS ARE MISPLACED ...................23

C. THE STATE DID NOT WAIVE COMPLIANCE ................................24

IV.  WATERS SURROUNDED BY STATE AND PRIVATE INHOLDINGS ARE NOT APPURTENANT TO FEDERALLY RESERVED LANDS AND CANNOT POSSESS VALID FRWRS UNDER ANILCA...........................27

A. THERE IS NO MATERIAL DISPUTE AS TO THE STATE'S SAMPLE WATERS .....................................................................................28

B. THE FEDERAL DEFENDANTS' ARGUMENTS ARE WITHOUT MERIT .................................................................................................29

1. Chignik River System including Chignik Lake and Black Lake (SOA Exh. 10)........................................................................................29

2. Crescent River (SOA Exh. 8). ...........................................................31

3. Juneau Area Streams (SOA Exhs. 9A-9C)........................................31

V.  WATERS WITHIN SELECTED BUT NOT YET CONVEYED LANDS ARE NOT "PUBLIC LANDS" WITH FRWRS ......................................33

VI.  THE FEDERAL DEFENDANTS CORRECTLY DETERMINED THAT FRWRs DO NOT EXIST IN WATERS UPSTREAM OR DOWNSTREAM OF FEDERAL RESERVATIONS AS CONTENDED BY KATIE JOHN.................................................................................................37

VII.  THE FEDERAL DEFENDANTS CORRECTLY CONCLUDED THAT FRWRs DO NOT ARISE FROM ALASKA NATIVE ALLOTMENTS AS CONTENDED BY KATIE JOHN. ....................................................37

VIII. THE FEDERAL DEFENDANTS CORRECTLY DETERMINED THAT FRWRs DO NOT EXIST IN MARINE WATERS AS CONTENDED BY PERATROVICH. ...................................................................................38

IX.  OTHER ABUNDANT WATERS. ................................................................39

CONCLUSION AND RELIEF ......................................................................40

## TABLE OF AUTHORITIES

### Cases

*Alaska v. United States*, 546 U.S. 413 (2006) ............................................................. 1, 24

*Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531 (1987) ........................................ 22

*Arizona v. California*, 376 U.S. 340 (1964) ................................................................... 10

*Boise Cascade Corp. v. U.S. E.P.A.*, 942 F.2d 1427 (9th Cir. 1991) ................................ 35

*Bullfrog Films, Inc. v. Wick*, 847 F.2d 502 (9th Cir. 1988)............................................. 13

*Cappaert v. United States*, 426 U.S. 128 (1976) ....................................................... passim

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984) ......................... 2, 4

*Chickaloon-Moose Creek Native Ass'n, Inc. v. Norton,*
360 F.3d 972 (9th Cir. 2004) ............................................................................................. 2

*Colorado River Indian Tribes v. Nat. Indian Gaming Comm'n.,*
338 F.Supp.2d 123 (DDC 2005)........................................................................................ 4

*Davis v. Michigan Dept. of Treasury,* 489 U.S. 803 (1989) ........................................... 19

*Fleming Companies, Inc. v. U.S. Dep't of Agric.,*
322 F. Supp. 2d 744 (E.D. Tex. 2004) .............................................................................. 4

*Forbes v. Napolitano*, 236 F.3d 1009 (9th Cir. 2000) ..................................................... 13

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ........................................................ 13

*Green v. Bock Laundry Machine Co.*, 490 U.S. 504 (1989) ........................................... 35

*John v. United States*, 247 F.3d 1032 (9th Cir 2001) ............................................. 3, 7, 27

*Love v. Thomas*, 858 F.2d 1347 (9th Cir. 1988)................................................................ 3

*Lynch v. Lyng*, 872 F.3d 718 (6th Cir. 1989) ................................................................... 3

*Morris v. Commodity Futures Trading Corp.*, 980 F.2d 1289 (9th 1992) ......................... 3

*Motor Vehicle Manuf. Assoc. v. State Farm Mut. Auto. Ins.,* 403 U.S. 29 (1983)............. 7

*Mourning v. Family Publication Service*, 411 U.S. 356 (1973).................................... 3, 4

*National Ass'n of Mfrs. v. U.S. Dept. of Interior,*
134 F.3d 1095 (D.C. Cir. 1998)....................................................................................... 27

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004).................................. 6

*Planned Parenthood v. Arizona*, 718 F.2d 938 (9th Cir. 1983 ........................................... 13

*Portland Gen. Elec. Co. v. Bonneville Power Admin.*,
501 F.3d 1009 (9th Cir. 2007) ........................................................................................ 26

*Shays v. FEC*, 337 F. Supp. 2d 28 (D.D.C. 2004), *aff'd*, 414 F.3d 76 (D.C. Cir.
2005) ...................................................................................................................................... 4

*Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476 (D.C. Cir. 1995) ................................... 6

*Sierra Club v. Yeutter*, 911 F.2d 1405 (10th Cir. 1990) ....................................................... 6

*State of Alaska v. Ahtna, Inc.*, 891 F.2d 1401 (9th Cir. 1989) ........................................... 14

*State of Alaska v. Babbitt*, 72  F.3d 698 (9th Cir. 1995) ...................................................... 5

*United States v. Ahtanum Irrigation Dist.*, 236 F.2d 321 (9th Cir. 1956) ........................... 8

*United States v. Alaska*, 521 U.S. 1 (1997) .......................................................................... 1

*United States v. Anderson*, 736 F.2d 1358 (9th Cir. 1984) ............................................... 38

*United States v. California*, 436 U.S. 32 (1978) ............................................................... 14

*United States v. City and County of Denver*, 656 P.2d 1 (Colo. 1982) ............................ 10

*United States v. Idaho*, 959 P.2d 449 (Idaho 1998) ......................................................... 38

*United States v. Mead Corporation*, 533 U.S. 218 (2001) .................................................. 2

*United States v. New Mexico*, 438 U.S. 696 (1978) .................................................. passim

*United States v. Powers*, 305 U.S. 527 (1939) .................................................................. 8

*United States v. Preston*, 352 F.2d 352 (9th Cir. 1965) ................................................... 11

*United States v. Rio Grande Dam & Irrigation Company*, 174 U.S. 690 (1899) ............. 10

*Utah Division of State Lands v. United States*, 482 U.S. 193 (1987) ......................... 14, 26

*Village of False Pass v. Clark*, 733 F.2d 605 (9th Cir. 1984) ........................................... 6

*West Virginia Highlands Conservancy  v. Norton*, 343 F.3d 239 (4th Cir. 2003) ............. 3

*Winters v. United States*, 207 U.S. 564 (1908) ....................................................... 8, 9, 10

## Statutes

5 U.S.C. § 701 ....................................................................................................................... 6

5 U.S.C. § 704 ....................................................................................................................... 5

5 U.S.C. § 706(1) ...................................................................................... 6

5 U.S.C. § 706(2) ...................................................................................... 6

5 U.S.C. § 706(2)(A) ............................................................................. 3, 4

16 U.S.C. § 1271 *et seq.* ......................................................................... 33

16 U.S.C. § 1277(g) ................................................................................ 33

16 U.S.C. § 3102 ................................................................................ 28, 36

43 U.S.C. § 1301(a) ........................................................................... 20, 24

43 U.S.C. § 1301(a)(2) ............................................................................ 24

43 U.S.C. § 1301(c) ................................................................................. 20

43 U.S.C. §1635(o)(2) ............................................................................ 36

ANILCA § 102 ......................................................................... 34, 35, 36

ANILCA § 102(1) ................................................................................... 24

ANILCA § 102(2) ............................................................................. 24, 28

ANILCA § 102(3) (16 U.S.C. § 3102) ................................................... 34

ANILCA § 102(4) ................................................................................... 33

ANILCA § 103(a) .......................................................................... passim

ANILCA § 103(c) (16 U.S.C. § 3103(c)) ..................................... passim

ANILCA § 201(7) ............................................................................ 18, 19

ANILCA § 201(7)(b) ....................................................................... 18, 19

ANILCA § 302 ....................................................................................... 14

ANILCA § 302(1)(B) ...................................................................... 29, 30

ANILCA § 302(6)(B)(6) ......................................................................... 15

ANILCA § 302(6)(B)(ii) ......................................................................... 16

ANILCA § 302(6)(B)(iv) ................................................................... 14, 16

ANILCA § 303 ....................................................................................... 14

ANILCA § 601 ....................................................................................... 33

ANILCA § 603 ....................................................................................... 33

ANILCA § 605(e) ....................................................................................... 33

ANILCA § 706(1) ....................................................................................... 6

ANILCA § 706(2) ....................................................................................... 6

ANILCA § 804 (16 U.S.C. § 3114) ............................................................ passim

ANILCA § 807 ........................................................................................... 5

ANILCA § 906(o) ...................................................................................... 36

ANILCA § 906(o)(2) ........................................................................ 34, 35, 36

ANILCA § 1319 (16 U.S.C. 3207) ................................................... 4, 28, 30

ANILCA 1324 ........................................................................................... 3

## Regulations

11 AAC 53.120 .......................................................................................... 23

11 AAC 112.990(a)(6) ............................................................................... 23

36 C.F.R. § 242.3 ...................................................................................... 40

36 C.F.R. § 242.4 ................................................................................. 40, 41

50 C.F.R. § 100.3 ................................................................................... 6, 40

50 C.F.R. § 100.3(b) ........................................................................... 12, 13

50 C.F.R. § 100.4(2) ................................................................................. 34

48 Fed. Reg. 7890 (1983) ......................................................................... 22

62 Fed. Reg. 66216 .................................................................................. 25

69 Fed. Reg. 70940 (Dec. 8, 2004) .......................................................... 27

70 Fed. Reg. 13379 (Mar 21, 2005) ......................................................... 22

70 Fed. Reg. 76400 (Dec. 27, 2005) ........................................................ 22

70 Fed.Reg. 76402 ................................................................................... 27

70 Fed. Reg. 97402 .................................................................................. 31

## Court Rules

Fed. R. Evid. 201 ..................................................................................... 22

Fed. R. Evid. 801(d)(2) .........................................................................................22

Fed. R. Evid. 803(8) .............................................................................................22

## Other Authorities

1964 Solicitor's Opinion at 71 Interior Dec. 340-361 ......................................38

*DeLorme, Alaska Atlas & Gazetteer* (2004 ed.) .................................... 7, 21, 22

http://maps.live.com/print.aspx?mkt=en-
us&z=15&s=h&cp=32.7393495542504,-114.69795227050784&pt=pb ........................ 10

http://terraserverusa.com/image.aspx?T=2&S=16&Z=11&X=58&Y=294&W=
2 ............................................................................................................................ 11

http://www.topozone.com/map.asp?lat=32.62088&lon=-
114.76329&datum=nad83&u=4&layer=DRG100&size=l&s=250 .................................. 10

http://www.topozone.com/map.asp?lat=32.63344&lon=-
114.59842&s=500&size=l&u=4&datum=nad27&layer=DRG250 ................................. 10

S. Rep. No. 96-413 (Nov. 14, 1979).......................................................... 17, 19

## INTRODUCTION

The State of Alaska's case is simple at its core:  Whatever "preferences" the Federal Defendants might have for expanding "meaningful" opportunities for the subsistence priority on what they consider public lands, they must still follow the applicable law.  That law includes ANILCA, which created the subsistence priority but subject to certain provisions and limitations (including what constitutes public "lands"), and the law of federal reserved water rights (FRWRs), which the Ninth Circuit Court accepted as the only basis for a federal interest permitting federal subsistence jurisdiction in navigable waters over which the State otherwise has sovereign dominion.[1]  Furthermore, whereas Congress may have the *power* to create rights to use waters outside of reservation boundaries where it expressly does so, as in the case of some past Indian treaties, *implied* FRWRs have been recognized in waters only *within* reservations, particularly non-Indian reservations, and never have they been recognized in abundant waters, especially those lying outside of federal national purpose reservations or within lands expressly excluded from those reservations.  Such principles set this case apart from the situations and case law on which the other parties rely.  With those as its starting points, the State submits the following arguments and requested relief in Reply, primarily to the Brief of the United States

---

[1]      The Federal Defendants also assert federal subsistence jurisdiction in some navigable waters which they claim overlie submerged lands owned by the United States under exceptions to the State's otherwise established ownership and dominion over the beds, waters, and resources of navigable water bodies according to the Submerged Lands Act (SLA), Alaska Statehood Act, and the Equal Footing Doctrine.  In their Response Brief, the Federal Defendants suggest that the State does not challenge those assertions.  *See, e.g.,* U.S.Br. at 4-5 & 44 (Doc. 167 at 17-18 & 57).  The State does challenge them, but not in the context of this lawsuit, filed on January 5, 2005.  As the United States notes, *id. (see also* 1999 published regulations, 64 Fed. Reg. at p. 1287 §___.3(c), reserving such claims to later rulemaking), it first made those assertions in a later set of regulations published December 27, 2005 first effective on January 26, 2006, which the State still has the right to challenge.  In addition, such challenges normally involve in-depth, often fact-intensive proceedings for each assertion challenged, as evidenced for example by *Alaska v. United States*, 546 U.S. 413 (2006), and *United States v. Alaska*, 521 U.S. 1 (1997).

("U.S.Br."; Doc. 167) and related exhibits, but also to the Katie John plaintiffs' Response Brief

(Doc. 168) and the AFN's late Response Brief (Doc. 176).[2]

## <u>ARGUMENT</u>

I.  **REPLY TO THE STANDARD OF REVIEW ARGUMENTS OF THE FEDERAL
     DEFENDANTS AND KATIE JOHN.**

A.  **FEDERAL DEFENDANTS' ARGUMENTS**

The Federal Defendants claim that the legal interpretations they made in their assertions

of FRWRs being challenged by the State are owed great deference.  U.S.Br. at 7-10 (Doc. 167 at

20-23).  They cite, among other cases, the customs importation case of *United States v. Mead

Corporation,* 533 U.S. 218, 229-31 (2001), for its discussion of *Chevron*[3] deference.  *Id.* at 10.

However, neither *Chevron* deference nor the lesser standard of *Mead* deference apply.  Agency

expertise over the subject matter (here FRWRs) is a pre-requisite for such deference and, as this

Court has already found, the Federal Defendants have no particular expertise or experience

applying the judge-made law of FRWRs.  *See* "What Process" Decision filed May 17, 2007

(Doc. 110) at 21 ("[N]or do the Secretaries have any particular expertise as to the reserved water

rights doctrine, which is judicially created."); *Mead*, 533 U.S. at 234-235.

The Federal Defendants fail to acknowledge or distinguish the numerous cases holding

that deference does not apply in areas where the agency lacks expertise.  *Chickaloon-Moose

Creek Native Ass'n, Inc. v. Norton*, 360 F.3d 972, 980 (9th Cir. 2004) (pertinent law was

---

[2]     Rather than file a timely opening brief by October 26, 2007 permitting the State to respond by
December 14, 2007 (later extended to January 28, 2008), as was ordered by the Court (Doc. 133 at 3), the
Alaska Federation of Natives ("AFN") chose, without leave of Court, to file a "Response Brief" on
February 11, 2008 (Doc. 176) as its first brief, responding to all previous briefs including the response
briefs of the State and other parties filed on January 28, 2008.  By responding to that extremely late filing
in this Reply, the State is trying to address that situation and objects to any further AFN "reply".
[3]     *Chevron, U.S.A., Inc. v. Nat. Res.  Def. Council*, 467 U.S. 837 (1984).  The Federal Defendants
do not actually cite *Chevron*.

judicially-developed law); *John v. United States*, 247 F.3d 1032, 1038, 1040, 1044-46 (9th Cir

2001) (seven members of the 11-member *en banc* panel concluded interpretation of the statutory

term "public lands" under ANILCA should be a matter for the court to decide de novo, without

deference to the agency); *Morris v. Commodity Futures Trading Corp.*, 980 F.2d 1289, 1293 (9th

1992) (where agency applies common law, the agency's "application of law to facts" is reviewed

under "the more probing de novo standard"); *Love v. Thomas*, 858 F.2d 1347, 1352 n. 9 (9th Cir.

1988) (agency lacked expertise over statutory interpretation matter); *West Virginia Highlands*

*Conservancy  v. Norton*, 343 F.3d 239, 245 (4th Cir. 2003) (court decided common law issue).

In a second bid for deference, the Federal Defendants cite cases for the proposition that a

party challenging a regulation must show its invalidity.   U.S.Br. at 8.  However, like any other

type of agency action, a rulemaking order based on an incorrect legal determination must be set

aside, with no deference due on matters that are outside the agency's area of expertise or do not

involve a gap or ambiguity in the statutory text.  "The reviewing court shall decide all relevant

questions of law …" and "shall set aside" any action, including adoption of a rule, that is "not in

accordance with law." 5 U.S.C. § 706(2)(A).  *Accord, Lynch v. Lyng*, 872 F.2d 718, 724 (6th Cir.

1989) ("There is nothing about the Secretary's expertise in administering the food stamp program

that would make him better able to divine congressional intent as to effective dates" than the

court – overturning regulation purporting to set effective dates as to food stamp statute).

In a third bid for deference, the Federal Defendants cite *Mourning v. Family Publication*

*Service*, 411 U.S. 356, 369 (1973), and other pre-*Chevron* opinions for the general proposition

that an agency authorized to adopt rules that are necessary and proper to carry out the statute can

adopt rules reasonably related to achieving the statutory purpose.   U.S.Br. at 9 (citing ANILCA

§ 1324, which authorizes adoption of rules).  *Mourning* is now understood to be a pre-cursor to

*Chevron*, and so has no application in a case to which *Chevron* does not apply. *See Colorado River Indian Tribes v. Nat. Indian Gaming Comm'n.,* 383 F.Supp.2d 123, 144 (D.D.C. 2005); *Shays v. FEC*, 337 F. Supp. 2d 28, 104 n.81 (D.D.C. 2004), *aff'd*, 414 F.3d 76 (D.C. Cir. 2005); *Fleming Companies, Inc. v. U.S. Dep't of Agric.*, 322 F. Supp. 2d 744, 756 (E.D. Tex. 2004). *Mourning* may apply where the reviewing court has found the agency has expertise over the subject matter and that a gap or ambiguity exists in the statutory structure, and so must decide under *Chevron*'s second prong whether the expert agency has selected a reasonable way to fill that gap or resolve that ambiguity. However, *Mourning* does not authorize the agency to adopt a rule contrary to a specific provision of law nor impact the first *Chevron* inquiry of whether a statutory gap or ambiguity exists in the first place. *Id.; see also* 5 U.S.C. § 706(2)(A).

Here, even if the Federal Defendants had the expertise in FRWR law necessary to satisfy the first prong of the Chevron analysis, which they do not, ANILCA § 1319 (16 U.S.C. 3207) provides that ANILCA does not alter existing water law – just as the Court has previously found in this case. "What Process" Decision, Doc. 110, at 30. That existing water law was fully developed in court decisions such as *United States v. New Mexico*, 438 U.S. 696 (1978), and *Cappaert v. United States*, 426 U.S. 128 (1976), when ANILCA was enacted. Thus, there is no gap in ANILCA for the Federal Defendants to fill on that subject, and *Mourning* does not apply.

The Federal Defendants' fourth and final bid for deference seeks to portray the validity of FRWRs as involving discretionary policy-making considerations, when it does not. The claims the State has presented turn on disputed legal issues. The Federal Defendants acknowledge that "[i]t is true" that the validity of FRWRs depends on "legal interpretations." U.S.Br. at 10. Nevertheless, they suggest that in asserting FRWRs they must also consider and balance their perceptions of two competing objectives: (1) providing a "meaningful" federally-managed

subsistence opportunity and (2) preserving "meaningful" State jurisdiction over at least some of the State's waterways. *Id.* However, their argument for court deference to this alleged policy-making puts the cart (existence of federal subsistence jurisdiction) before the horse (existence of FRWRs). The Ninth Circuit settled the broader policy and interpretive issues by deciding that waters in which the United States possesses valid FRWRs are "public lands" to which federal subsistence jurisdiction applies. *State of Alaska v. Babbitt,* 72 F.3d 698, 703-04 (9th Cir. 1995). Under that decision, whether an asserted FRWR is valid depends ***not*** on the Federal Defendants' results-orientated "meaningful balance" test, which appears nowhere in ANILCA or FRWR case law, but rather on the narrow legal question of whether the statute or executive order creating a particular reservation did indeed reserve a FRWR in particular waters. *Id.* at 703. In its decision, the Ninth Circuit cited the controlling FRWR case law for public reservations of the type involved in this case (*New Mexico* and *Cappaert*) and authorized no deviations from it. *Id.*

In short, because the State's claims present legal issues regarding the validity of FRWRs and the Federal Defendants have no experience or expertise applying the law of FRWRs, there is no basis for deference, and APA review is *de novo.*

### B. KATIE JOHN'S ARGUMENTS

In their most recent brief, the Katie John plaintiffs contend their case arises "primarily" under the ANILCA judicial review provision and not the APA. KJ.Opp.Br. at 7 (Doc. 168). However, as the State showed before in responding to the Peratrovich plaintiffs ("SOA.Opp.Br." at pp. 9-10 (Doc. 169 at 22-23)), the APA sets the standard of judicial review of the agency rulemaking even though ANILCA § 807 may provide a mechanism for review. *See* 5 U.S.C. § 704 (APA applies both to matters reviewable under another agency-specific statute such as ANILCA § 807 and to final agency action for which no other statute provides a right of judicial

review); *Village of False Pass v. Clark*, 733 F.2d 605, 609-610 (9th Cir. 1984).  Indeed, Katie

John's own complaint identifies this case as an APA case.  *See* Katie John Complaint, 3rd Cause

of Action, at p. 18 ¶ 46 (Jan. 7, 2005).[4]

## II.    THE FEDERAL DEFENDANTS' DETERMINATION THAT FRWRs EXIST IN NAVIGABLE WATERS OUTSIDE OF BUT "ADJACENT" TO FEDERAL CSUs IS INCORRECT.

The State seeks a Court declaration that the federal regulations do not apply to waters

adjacent to but outside the boundaries of the 34 CSUs and other federal reserves listed in the

1999 regulations.  In their brief the Federal Defendants, by referring to the preamble to their

2005 regulations rather than their 1999 regulations, profess to clarify that their assertion of

FRWRs in "all inland waters adjacent" to the federal "areas" listed in 50 C.F.R. § 100.3 – which

they repeatedly refer to as "CSUs" – really means that they are asserting FRWRs only in waters

"***immediately*** adjacent" to those areas.[5]  U.S.Br. at 41 (emphasis added).  However, the

regulations read "all adjacent" waters, and the Defendants do not adhere to their own

---

[4]    Application of these APA standards to Katie John's claims – including the threshold standard that the Federal Defendants cannot be forced to assert and prosecute novel, contestable FRWR claims they choose not to – was addressed in the State's Opposition Brief at pages 10-14.  In her most recent filing, Katie John argues that ANILCA § 804 imposes a mandatory non-discretionary duty on the Federal Defendants to assert the FRWR claims she wants them to, but cites no provision of § 804 that requires such action, contrary to the prevailing case law.  *See* SOAOpp.Br. at 10-14 (reviewing, *e.g.*, *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004); *Sierra Club v. Yeutter*, 911 F.2d 1405 (10th Cir. 1990); and *Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476 (D.C. Cir. 1995)).  Katie John's alternative argument that non-assertion of a FRWR claim constitutes agency action reviewable under 5 U.S.C. § 706(2) rather than agency inaction subject to § 706(1) also fails.  That argument, if accepted, would eviscerate the holdings in *Southern Utah* and *Yeutter*, because it would permit a plaintiff to transmute any explanation by an agency of reasons why it was not taking action (here not asserting FRWRs) into "action" reviewable under § 706(2).  Such a result would create a rule-swallowing exception collapsing the distinction between § 706(1) and § 706(2).  Katie John also does not attempt to distinguish the holding under 5 U.S.C. § 701 in *Shoshone-Bannock Tribes* that whether to prosecute a FRWR claim is an enforcement matter committed to agency discretion, such that § 701 bars judicial review.  SOAOpp. at 12, n. 25.  Katie John does argue that *Shoshone-Bannock Tribes* left open an option for Indian Tribes to pursue FRWR claims relating to their reservations independently of the United States, but, even if that were so, the CSUs at issue here are not Indian reservations to which a Tribe allegedly holds beneficial title.  This case instead concerns judicial review of federal administrative rulemaking.
[5]    The Federal Defendants elsewhere represent that those "Federal areas" in which they have asserted FRWRs consist solely of "Federal conservation system units and national forests".  U.S.Br. at 44.

"clarification". Instead, in their brief they purport to assert federal subsistence jurisdiction over the entire width of any waterway that is at all "next" to the reservation's exterior boundaries – including the full width of the Yukon River and Sixmile Lake, although one to two miles wide at places.[6] That expansive "full width" application of what is purportedly an "immediately adjacent" standard thus "fails to consider an important aspect of the problem": whether a FRWR in a more limited band of water next to the CSU would satisfy ANILCA objectives – a failure which in itself renders the regulations arbitrary and capricious. *Motor Vehicle Manuf. Assoc. v. State Farm Mut. Auto. Ins.,* 463 U.S. 29, 43 (1983). More fundamentally, FRWRs do not exist in waters outside of CSU boundaries, whether "immediately adjacent" to the CSU or more distant,[7] and the Defendants' regulations should be set aside on that point.

---

[6]    *See* U.S.Br. at 49 ("Thus, if the United States holds a FRWR *in any amount* of the waters of the Yukon River adjacent to the Nowitna NWR, *the Secretaries* have properly concluded *that the entire river adjacent to the refuge are public lands*.") (emphasis added). Notably, however, nowhere in the regulations, the rulemaking decision, or the AR in this case do the Secretaries offer counsel's post-hoc interpretation as the agencies' contemporaneous interpretation, *or provide any interpretation*, of "adjacent" or "immediately adjacent."

[7]    The Federal Defendants assert, without any explanation or case or page citation, that one of the prior "*Katie John*" decisions supports their expansive interpretation. U.S. Br. at 48. The State disagrees and knows of no such holding. There was no "adjacent waters" issue presented or considered in that case. To the contrary, the *Katie John* court stated its understanding that the "fishery at Batzulnetas" which was at issue there "lies near the confluence of Tanada Creek and the Copper River *within* Wrangell-St. Elias National Park", 72 F.3d at 700 (emphasis added), which appears to be the case in fact (s*ee DeLorme, Alaska Atlas & Gazetteer* (2004 ed.), at p. 98).

       Moreover, the Defendants seek to give the State credit for their idea by citing out of context a brief addressing other issues submitted by the State to the *Katie John III* en banc panel eight years ago. U.S.Br. at 48-49.  In that submittal, the State hypothesized that the *Katie John II* majority panel's holding, if left uncorrected, could be construed to convert an entire navigable river or lake within a CSU into "public lands" if an implied FRWR were found to exist to any extent within that waterway, but then added: "the [ANILCA] definition actually reads, however, 'public lands' include only the federal 'interests' in land or water, *not the entire waterway*, and thus under the reserved water rights theory only the water rights themselves would be 'public lands' …." Alaska's En Banc Br. dated Sept. 13, 2000, at pp. 33-34 (emphasis added).  That State brief did not at all address the Defendants' present "adjacency" issue, and the prior *Katie John* litigation did not address where FRWRs exist. That was left for this case.

## A.  THE FEDERAL DEFENDANTS MISSTATE THE CASE LAW.

The cases the Federal Defendants cite do not support their assertion that FRWRs exist to maintain flow levels in water bodies lying outside of the boundaries of a national purpose reservation such as an ANILCA CSU.  The Secretaries rely chiefly on three decisions:  *Winters v. United States*, 207 U.S. 564 (1908); *United States v. Powers*, 305 U.S. 527 (1939); and *United States v. Ahtanum Irrigation Dist.*, 236 F.2d 321 (9th Cir. 1956).  U.S.Br. at 17 n.19, 41-42 & 47.  However, contrary to their discussion of these cases, and as set out in some detail in prior State briefs (*see* SOAOpen.Br. at 8 n. 11 (Doc. No. 134) & SOAOpp.Br. at 25-26 (Doc. No. 169)), the Indian reservation FRWRs recognized in *Winters, Ahtanum*, and  *Powers* were for the purpose of drawing irrigation water *onto* reservation uplands and were *within* reservation boundaries.[8]

In addition to not recognizing FRWRs in waters outside of reservation boundaries, those Indian FRWR cases are also distinguishable on other grounds. One of those additional grounds is that none of the national public purpose, non-Indian reservations established or expanded by ANILCA or at issue in this case are subject to the same rules of law or construction which apply

---

[8]     *See Winters*, 207 U.S. at 565 ("[The Fort Belknap Indian Reservation's] boundaries were fixed and defined as follows:  'Beginning at a point *in the middle* of the *main channel* of Milk river, … thence due south to a point …; thence due east …; thence in a northerly direction in a direct line to a point *in the middle* of the *main channel* of Milk river …; *thence up Milk river, in the middle of the main channel thereof, to the place of beginning.*'") (Emphasis added); *Ahtanum*, 236 F.2d at 325 & 331 (boundary placed at middle of the stream and reservation Indians expressly allocated 25% share of water by federal agreement).  Both streams in those cases were also nonnavigable, *id.*, as compared to the large, navigable waterways over which the State has ownership and sovereign dominion but the Federal Defendants seek to assert water rights outside of the reservation boundaries in this case.  *Powers* also concerned two "non-navigable streams *within* the Crow Creek [Indian] Reservation", the Lodge Grass Creek and Little Big Horn River (305 U.S. at 528) (emphasis added), a major Congressional appropriation ($200,000 in 1891), and specific acts of irrigation "within the diminished reservation" following sale by the Crows of some of their reservation lands and the allotment of others (*id.* at 529-30).  Therefore, the fact that in-reservation "allotments … abutting or adjacent to the Little Big Horn River or Lodge Grass Creek" which were created from that reservation possessed FRWRs should come as no surprise and should not be cited out of context by the Federal Defendants in their brief for the proposition that waters adjacent to but outside of a federal, non-Indian reservation contain FRWRs.  The waters in *Powers* "abutted or were adjacent to" the allotments but were *within* the Indian reservation.  *Id.*

to Indian reservations or tribal or aboriginal rights established by treaty in waters or fish.
Rather, as the Federal Defendants acknowledged during the development of the regulations
while evaluating the upstream/downstream issue, national purpose (non-Indian) reservations are
"subject to a different body of waters rights jurisprudence" and the case law does not recognize
FRWRs in waters "located <u>outside</u> the park or refuge boundaries."[9]  That reasoned statement by
agency counsel during the development of the regulations should apply equally to the Federal
Defendants' adjacent waters assertions.  Whether a CSU boundary runs alongside but not within
a river (the adjacent waters situation) or crosses a river or terminates at some point alongside it
(the upstream/downstream situation), all waters outside of the boundary are outside of the
reservation.[10]  Where those waters are intentionally excluded by Congress' establishment of
CSU boundaries, no FRWR in them can be implied.

That "different body" of FRWRs law recognized by the Federal Defendants as being
applicable to non-Indian national purpose reservations is chiefly reflected in the *Cappaert* and
*New Mexico* decisions, which those Defendants do ***not*** address in attempting to defend their
assertion of FRWRs in adjacent waters outside reservation boundaries.  With only two
exceptions, the pre-*Winters* case of *United States v. Rio Grande Dam & Irrigation Company,*

---

[9]     Memorandum of the Alaska Regional Solicitor to the Solicitor, Department of the Interior,
attached as Katie John's Exhibit 1, Doc. No. 137-2, at pp. 4-6 (emphasis in original).  *See also* U.S.Br. at
13 n.18 (agreeing that Memorandum is properly considered a part of the administrative record) & AR Tab
88 (<u>Final Katie John</u> Issue Paper and Recommendations) at 1704-06.

[10]     Contrary to the detailed administrative analysis which exists for why the Federal
Defendants rejected asserting FRWRs or Title VIII jurisdiction upstream or downstream of
federal CSUs (*see, e.g.,* Katie John's Exh. 1 at pp. 4-6 and AR Tab. 88 at pp. 1704-06), the
rulemaking record fails to contain any reasoned explanation for why the Defendants asserted
FRWRs in "adjacent waters". The only "explanation" given was the general conclusion that "Where a
federal reservation with a purpose that supports the assertion of reserved water rights is bounded by or
adjoins inland water, federal reserved water rights should be asserted in that portion of the inland water
body adjoining the reservation."  AR 1700.  That arbitrary assertion was unsupported by any legal citation
or a discerning analysis.

174 U.S. 690 (1899), which concerned the power of Congress to reserve water and not the more pertinent standards for determining if, when, where, and for what purpose Congress has reserved water in a particular case,[11] and the dissenting opinion in the *Katie John III* en banc decision at 247 F.3d 1047,[12] the Federal Defendants' case law citations in the adjacent waters section of their brief are all to "Indian rights" cases.   U.S.Br. at 40-54.  Those Indian rights cases were either cited in Katie John's opening brief and distinguished in the State's opposition brief[13] or

---

[11]     The Defendants lift one riparian rights "sound bite" out of context from dicta in *Rio Grande Dam* unrelated to this navigable waters case or even to the cases cited in that decision.  *See* 174 U.S. 702-703. As the Court later noted in *Winters*, that dicta spoke to the **power** of Congress to reserve water rights, which is not at issue here.  207 U.S. at 577.  *Rio Grande Dam* has very limited vitality for determining the contours of the modern FRWR doctrine initiated later in *Winters*.  As earlier noted, *Winters* found FRWRs **within** the Indian reservation boundary, which was fixed at the middle of the Milk River, *id.* at 565 & note 8 *supra*, whereas in this case Congress fixed the boundaries of the ANILCA reservations on the near shores, and not within the adjacent waters the Federal Defendants now seek to appropriate. Taking a similar "sound bite" approach, AFN represents (Doc. 176 at 3) that in *United States v. City and County of Denver*, 656 P.2d 1, 35 (Colo. 1982) (a decision discussed at SOAOpp.Br. pp. 3-31 n. 46), the state supreme court "affirmed" the lower water court's restriction of FRWRs to waters on, under, or "touching" the reserved lands, and from that leaps to the conclusion that FRWRs must exist in waters "adjacent" to but outside of ANILCA CSU boundaries.  However, in that brief passage from that decision the Colorado Supreme Court merely characterized the lower court's action, without reaching or "affirming" it or explaining what was meant by "touching".  That mere reference does not establish FRWRs outside of ANILCA reservation boundaries established by Congress.

[12]     That dissenting passage, which is not controlling, is also taken out of context and did not purport to resolve issues regarding where FRWRs exist (which were left for this litigation).  Notably, the passage there on which the Defendants rely, that FRWRs "can extend to adjacent waters", cited *Cappaert v. United States*, 426 U.S. 128 (1976), in which the Supreme Court emphasized that the FRWR **itself** was in the pool lying **within** the national monument, although rights to off-reservation "adjacent" waters could be affected by the protection of that on-reservation FRWR.

[13]     *See esp.* SOAOpp. Br. at pp. 1-49.  Among other things, in its Opposition Brief at pages 30-31 note 46 the State rebutted Katie John's unsupported, erroneous assumptions regarding the significance between *Arizona v. California*, 373 U.S. 546 (1963) and 376 U.S. 340 (1964), and a remnant sliver of the Cocopah Indian Reservation, which the Federal Defendants repeat, unquestioningly, at page 42 of their brief.  For further information and verification of the State's representations regarding that situation, including the promises and existence of federally-constructed irrigation canals carrying the Colorado River waters to all reaches of that reservation as it originally existed, *see also* 9/27/1917 Exec. Order creating Cocopah Indian Reservation and online maps and aerial photographs at http://www.topozone.com/map.asp?lat=32.62088&lon=-114.76329&datum=nad83&u=4&layer=DRG100&size=l&s=250; http://maps.live.com/print.aspx?mkt=en-us&z=15&s=h&cp=32.7393495542504,-114.69795227050784&pt=pb; and http://www.topozone.com/map.asp?lat=32.63344&lon=-114.59842&s=500&size=l&u=4&datum=nad27&layer=DRG250.  Indeed, portions of the Cocopah Indian Reservation which still remain now constitute a golf resort on the Colorado River.  *Id.*  Moreover,

STATE'S "WHICH WATERS" REPLY BRIEF

describe earlier opinions in dicta while addressing some other issue (*see, e.g., United States v. Preston*, 352 F.2d 352, 357 (9th Cir. 1965) (addressing attorney fees)).  They are inapplicable to the type of reservations presently at issue.

**B.    THE STATE'S SAMPLE WATER BODIES DEMONSTRATE WHY THE FEDERAL DEFENDANTS' IMPROPER ASSERTION OF FRWRs IN ADJACENT WATERS SHOULD BE SET ASIDE.**

As the Federal Defendants note in their Brief, the State submits three sample water bodies to demonstrate those Defendants' erroneous, over-reaching assertion of FRWRs in "adjacent" waters:  (1) the Colville River where it runs next to but outside of the boundary of the National Petroleum Reserve Alaska ("NPRA"); (2) the Yukon River where it runs next to but outside the boundary of the Nowitna NWR; and (3) Sixmile Lake near Lake Clark National Park and Preserve.  The State should prevail on those examples and the issue they exemplify.

**1.   No FRWRs Exist in the Colville River Running Adjacent to the NPRA**

In its Opening Brief the State demonstrated that there could be no FRWRs within the Colville River where it runs adjacent to but outside of the NPRA.  SOAOpen.Br. at 32-37.  In their response the Federal Defendants agree that neither FRWRs nor federal subsistence jurisdiction exists in the Colville River where it runs adjacent to but outside of the NPRA

the Colorado River clearly runs ***through*** the Indian reservation the Supreme Court chose to focus on in its decision, "the great Colorado River Indian Reservation."  373 U.S. at 599.  S*ee* online map at http://terraserverusa.com/image.aspx?T=2&S=16&Z=11&X=58&Y=294&W=2.  In her latest filing (Doc. 168 at 3-5), Katie John persists in resting her case on the dissimilar Cocopah situation, repeating Blumm, *Reserved Water Rights*, and Getches, *Water Law*, for misinformation on that reservation and further unsupported "suggestions" and "apparent" inferences based on that which are inapplicable, in any event, to this CSU situation.  In its late-filed brief, the AFN repeats Katie John's latest suppositions and also refers to a Master's Report in the *Arizona* case which reported that, as of the December 5, 1960 date of that report, the Colorado River ran within the Colorado River Reservation and both that Reservation and the remaining Cocopah Indian Reservation tracts already received water from the Colorado River through established irrigation canals.  *See* "Rifkind Report" at 86 & 88, cited in AFN Doc. 176 at 3 n.1.

boundaries.  U.S.Br. at pp. 43-44 (announcing that "The Waters of the Colville River Outside of the NPRA Are Not Public Lands.").  They even represent that they never asserted otherwise.  *Id.*

The State is prepared to accept this disclaimer of federal jurisdiction by the United States. However, it is also necessary to reflect the United States' concession in the judgment of this case because that concession, although warranted, is ***contrary*** to the plain text of the regulations under review.  The final 1999 rule codified at 50 C.F.R. § 100.3(b) (1999) specified that the Secretaries' federal subsistence regulations apply on all "inland waters ***adjacent to*** the exterior boundaries of the following [34 listed] areas: …(21) ***National Petroleum Reserve in Alaska***; …."  Likewise, rewritten 50 C.F.R. § 100.3(b) of the 2005 regulations still claims that their federal subsistence regulations apply on "all inland waters, both navigable and non-navigable, within ***and adjacent to*** the exterior boundaries of the following areas … (3) ***National Petroleum Reserve in Alaska*** …."  (Emphasis added).  They have asserted otherwise.

The Federal Defendants also contend that a portion of the Colville River, specifically its uppermost reach illustrated on their Exhibit 19 (Doc. 167-19), just above and west of where the NPRA boundary takes a sharp turn due south, is within and not adjacent to the NPRA.  U.S.Br. at 43.  However, the State did not address any waters of the Colville River within the NPRA.  Its example addresses those reaches of the Colville River lying outside the NPRA boundaries. There is no need for the Court to determine NPRA boundaries to enter judgment that adjacent waters outside the NPRA are not public lands subject to ANILCA Title VIII.  Likewise, the Court need not address the Federal Defendants' claim – based on unsupported representations in their brief and the "Declaration" of a federal employee created especially for this litigation[14] –

---

[14]    The Federal Defendants submit the January 25, 2008 Declaration of Theo Matuskowitz (Doc 167-2), a Regulations Specialist for the U.S. Fish and Wildlife Service, to tell the Court that, based on his personal "review" – but wholly outside of the AR in this case, the Federal Register, or the regulations

that they assert federal subsistence jurisdiction in navigable waters within the NPRA on grounds

other than the FRWRs doctrine relied on by the Ninth Circuit Court in its *Katie John* decisions.[15]

The United States' concession regarding the outlying waters of the Colville River

contrary to the provisions of its own regulations, and the fact that it found it necessary to rely on

an extra-record, hearsay affidavit in an attempt to explain where it is actually asserting

jurisdiction, is implicit acknowledgement that the regulations as written are too vague to be

understood. Thus the Federal Defendants, by their response, provide the court with another

ground for setting aside the regulations. As the Ninth Circuit Court has repeatedly recognized,

"due process requires that insufficiently clear regulations be held void for vagueness."[16] Where

neither the State nor the United States can discern the extent of a federal regulatory jurisdictional

---

themselves – all waters within the external boundaries of the NPRA are "deemed" to be part of the federal subsistence management program. Mr. Matuskowitz relies in his Declaration on his "review" of unidentified and unexplained "records relating to the [FSB's] administration of lands in the vicinity of the Colville River" for that conclusion, but he does not reveal by whom in authority, how correctly, or on what basis that decision was allegedly made. Doc. 167-2. Federal counsel represents that "the Secretaries" did so, on the alleged basis of a "pre-statehood reservation", but only cites 50 C.F.R. § 100.3(b) (apparently the 2005 version), which gives no support to that allegation. *Id.* Mr. Matuskowitz's representations constitute inadmissible hearsay upon hearsay. Furthermore, as noted above, they are not part of the AR on the 1999 regulations and, for that reason, should not be considered by the Court anymore than the affidavits and attached reports submitted as Katie John's Exhibits 10 and 11 (and also the Declarations submitted as Katie John's Exhibits 12 and 13). All constitute unacceptable, "extra-record" opinions and post-determination interpretations "clearly prepared after the challenged rulemaking" and should be excluded on that basis. U.S. Br. at 12-13, citing authorities. The same concerns apply to other after-the-fact, extra-record Declarations of the Defendants expressing opinions and interpretations based on each declarant's personal "review".

[15]    Those are not issues presently before the Court in this litigation. *See, e.g.*, footnote 1 *supra*. The State does not waive its right to challenge such parts of the Federal Defendants' 2005 regulations, or the justifications the United States now ascribes to them, as it later timely chooses, or its right to present claims to waterways within federal units not yet presented as test case waters or categories, in accordance with this Court's previous orders in this case (Docs. 115, 130-131 & 133).

[16]    *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 512 (9th Cir. 1988) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (vague laws "trap the innocent by not giving fair warning," "impermissibly delegate basic policy matters," and lead citizens to "steer far wider of the unlawful zone" than if the boundaries are clearly marked.)). *See also Forbes v. Napolitano*, 236 F.3d 1009, 1011 (9th Cir. 2000) (citing *Planned Parenthood v. Arizona*, 718 F.2d 938, 947 (9th Cir. 1983) for holding "statute is void for vagueness if persons of common intelligence must necessarily guess at its meaning"). Persons misled by the content of federal subsistence regulations and other federal publications to fish in the wrong waters under different limitations can be cited under Alaska law.

claim based on the text of the regulation, there can be no reasonable opportunity for members of the public to discern whether conduct is proscribed or allowed under federal regulations.

Based on the State's arguments, the FRWRs doctrine, and the United States' concession, that part of the Federal Defendants' regulations asserting Title VIII jurisdiction in waters adjacent to the NPRA, including most of the Colville River, should be set aside.

### 2. No FRWRs Exist in the Yukon River Running Adjacent to the Nowitna NWR, including that Refuge's Segregated Islands.

The Yukon River runs outside of the Nowitna NWR boundaries, and so is not "within" the area reserved for that reservation by ANILCA § 302(6)(B)(iv).[17]  That includes the Refuge's large mid-River islands, which are clearly restricted to the island uplands and contain no part of the River itself.  *See* SOAOpn.Br. at 37-39 & SOA Exh. 12;[18] *also* KJ Open.Br. Exhs. 2 & 6. Because of the express intention in ANILCA § 302(6)(B)(iv) to confine water preservation objectives to waters "within" the unit, as opposed to say waters "within or adjoining the unit", no FRWR can be implied in waters outside of the unit.[19]

---

[17]    ANILCA's Wildlife Refuges Title also expressly and plainly provides that only waters "within" a refuge unit may be reserved.  *See* ANILCA §§ 302 & 303; *see also* SOAOpp.Br. at pp. 4 & 20.

[18]    For the record, all Exhibits 1-15 (Docs. 134-3 through 134-19) filed electronically with the State's Opening Brief (Doc. 134) were meant to be attached to the Affidavit of Tina Cunning (Doc. 136), as shown by the content of that Affidavit and Brief.

[19]    As urged more fully elsewhere in the State's briefing in this "which waters" phase, any "implied" intention to the contrary would have to be stated clearly by Congress, and narrowly applied, especially where the FRWRs allegedly asserted are, as here, to inland (or marine) navigable waters and their submerged lands, over which the State was granted sovereign dominion, together with title to all "natural resources within such lands and waters" including fish specifically, according to the Equal Footing Doctrine, the federal Submerged Lands Act, and the Alaska Statehood Act.  *See, e.g.*, State's Op. Br. (Doc. No. 134) at p. 3 n.5 & p. 16; State's Opp. Br. (Doc. No. 169) at pp. 51-52; 43 U.S.C. §§ 1301-1315; *United States v. California*, 436 U.S. 32, 33-37 (1978); *Utah Division of State Lands v. United States*, 482 U.S. 193, 195-198 (1987); *State of Alaska v. Ahtna, Inc.*, 891 F.2d 1401, 1403-04, 1406 (9th Cir. 1989).

STATE'S "WHICH WATERS" REPLY BRIEF

The Federal Defendants do not materially dispute the State's description of the Refuge boundaries, or that the waters of the Yukon River lie outside those boundaries.[20]  Rather, they mainly argue that they are not bound by the "within" restriction of ANILCA § 302(6)(B)(iv) because the in-Refuge fish and "furbearers" also use the adjacent Yukon River waters and, therefore, that FRWRs must exist in those adjacent waters "to preserve the necessary habitat" in "support" of their "conservation" in the Refuge.  U.S. Br. at 45-48.

None of those argued purposes make it necessary to imply a FRWR in adjacent waters in order to fulfill a fundamental reservation purpose.  *New Mexico*, 438 U.S. at 701.  Just because fish and furbearers and their "populations" moving within (and without) the Nowitna NWR use the Yukon River waters outside that Refuge at times to swim, drink, or (in the case of furbearers to walk across while frozen in winter) does not mean a FRWR in those adjacent waters is necessary to fulfill reservation purposes.  As the Federal Defendants point out elsewhere in their brief, such as in response to the Katie John "upstream/downstream" arguments (U.S.Br. at 36-38), the biological necessity for salmon to swim up the Yukon River downstream of a CSU in order to reach a stream or lake within a CSU, just like the proclivity of moose and marten to range from outside of CSUs into CSUs and back outside again, does not create in-flow FRWRs (or a Title VIII priority to take fish and game) in those outside waters.[21]  FRWRs are site

---

[20]    Although the United States in a general statement suggests that "some portions of the Yukon River" may be included within the Refuge, by reference to large, established Refuge islands "within that river" (U.S.Br. at 47), the maps cited above and the small map at 48 FR 7890, 7981 cited in the United States' brief show otherwise.  In any event, just as in the case of the Colville River, the State is not asking that the Court definitively determine boundaries.  It is requesting a ruling setting aside the Federal Defendants' regulatory claim to Title VIII jurisdiction in waters adjacent to but outside of federal reservations, including those lying outside of the Nowitna Refuge and its segregated islands, which is all the 1999 (and even 2005) regulations do (they do not address boundaries either).

[21]    The general preamble to ANILCA, which the Defendants also cite as generally referencing "unrivaled" splendors and resources found throughout Alaska, is also nonspecific to any particular CSU or other federal reservation provided for in ANILCA, creates no FRWRs, and is of no particular help to the issues in this case.

specific.  They exist no more one foot across from the reservation boundary in adjacent waters than they exist one foot downstream or upstream of the reservation.[22]

Contrary to the United States' argument (*id*. at 50), the application of these rules and principles is not "inconsistent" with the *Katie John II* majority's imputation of a congressional intent to provide a meaningful Federal subsistence use priority "on some navigable waters."  As Katie John's large Exhibit 2 map shows, other rivers (like the Nowitna River) and additional major, named streams lie within the boundaries of the Nowitna NWR, just as they do within the other CSUs located along the Yukon River and throughout Alaska.  Insofar as the flows for the waters within those CSUs might be jeopardized by some activity or use in the waters outside of those CSUs, the remedy, as the United States also recognizes elsewhere in its brief, is an injunction against that outside interruption just as occurred in the *Cappaert* case, rather than asserting FRWRs where they do not rightly belong.  U.S.Br. at 36-39.  *See also* SOAOpp.Br. at 28-35 (FRWRs may be enforced off-reservation without expanding FRWRs).  Subsistence users still have many other waters within those Refuge boundaries to meaningfully satisfy that priority *on federal public lands*, without extending that priority into other waters like the Yukon River.  Clearly, Congress provided differently for different CSUs, even along the Yukon River, specifically excluding the Yukon waters from some Units, such as the Nowitna and Innoko

---

[22]     The same analysis applies to the United States' argument in its brief that the purpose of fulfilling unspecified "international treaty obligations of the United States with respect to fish and wildlife and their habitats" listed for establishment of the Nowitna NWR in ANILCA expresses an implied Congressional intent to create FRWRs in the adjacent Yukon River waters.  U.S.Br. at 48.  As the United States recognizes elsewhere in its Brief while responding to Katie John's "upstream/downstream" arguments: "While the United States has treaty obligations with respect to the Yukon River, those obligations are *not* a reservation of lands and rights to waters."  *Id.* at 38 (emphasis added).  The United States' cursory attempt to distinguish the two situations at page 48 of its Brief is illogical and unavailing.  The same "purposes" provision mentioning treaties in that portion of ANILCA only mentions preserving water "within" the refuge.  *See* ANILCA §§ 302(6)(B)(ii) & (iv).

STATE'S "WHICH WATERS" REPLY BRIEF

NWRs (*see, e.g.*, KJ Exhs. 2, 6 & 8),[23] and including the Yukon River within other Units, such as the Yukon Flats NWR and Yukon-Charley Rivers National Preserve ( *e.g.*, KJ Exhs. 2, 4 & 5).[24]

Accordingly, the Defendants' regulations claiming FRWRs in the Yukon River waters adjacent to but outside of the Nowitna NWR must be set aside.

### 3.   The Federal Defendants Also Incorrectly Assert FRWRs in Sixmile Lake.

Despite the demonstrations in the State's Opening Brief (pp. 39-42), the Federal Defendants argue that Sixmile Lake is (1) adjacent to the Lake Clark Park and Preserve ("LCP&P") and (2) contains FRWRs for Title VIII purposes.  They are wrong on both points.

**a.**     **Sixmile Lake is not adjacent to LCP&P lands.**   The Federal Defendants agree that their "claimed adjacency" to Sixmile Lake depends upon whether the "lands shown in red" that lie alongside the east side of Sixmile Lake on the map they filed at Docket 175-2 are part of the LCP&P.  U.S.Br. at 52.  The Federal Defendants further explain that the "lands shown in red" are the lands conveyed to the Kijik Corporation, which is the successor to the Nondalton Village Corporation (the "Nondalton lands").  *Id*.  Consequently, as the Federal Defendants acknowledge, their assertion of a FRWR in any waters of Sixmile Lake depends entirely on whether the Nondalton lands are part of the LCP&P.  "Therefore, if the lands shown in red on Exhibit 8 at 3 [Docket 175-2] are not within the boundaries of the [LCP&P], then Sixmile Lake

---

[23]     As is also reported in the ANILCA Senate Report relied on at page 53 of the United States' Brief, "The western boundary of the [Innoko] refuge was determined to be the east **bank** of the Yukon River, except that the **islands** in the river are included within the Refuge."  S. Rep. No. 96-413 (Nov. 14, 1979) at p. 187 (emphasis added).

[24]     Contrary to representations by Katie John (*e.g.*, KJ Op. Br. at p. 7 (Doc. 139-2 at 17)), other Units, in particular the Koyukuk NWR, are not adjacent to the Yukon River at all and instead separated from it by several miles of uplands (*see, e.g.*, KJ Exhs. 2 & 7).

is not immediately adjacent to the [LCPP], and the waters of Sixmile Lake would not be public lands for purposes of the Title VIII [subsistence] priority." U.S.Br. at a 52 (brackets added). [25]

Section 201(7)(b) of ANILCA expressly provides: "*No lands* conveyed to the Nondalton Village Corporation shall be considered to be within the boundaries of the [Lake Clark] park or preserve" or "part of the park or preserve …." (Emphasis added.) Accordingly, the Nondalton lands cannot be considered "park or preserve lands" in any way supporting FRWRs in the adjacent Sixmile Lake, even if the law otherwise supported FRWRs in waters next to but outside of the exterior boundaries of a CSU, which it does not. Sixmile Lake is not even "immediately" adjacent to the CSU created by ANILCA.

Despite ANILCA's clear statement in § 201(7)(b) that those Nondalton lands shall ***not*** be considered "within the boundaries" or "part of " the LCP&P, the Federal Defendants suggest a contrary meaning. They argue incorrectly that the National Park Service "established" the "boundary" of the Lake Clark preserve along Sixmile Lake in 1992 "pursuant to" ANILCA § 103(a) by publishing a map that included the Nondalton lands within the LCP&P and that therefore a "conflict" exists between ANILCA § 103(a), which supplies general rules of construction regarding boundaries, and § 201(7), which creates the LCP&P. However, there is no conflict. As ANILCA § 103(a) clearly provides, the "boundary maps" referred to there, whether "described in this Act" or (as the Defendants' contend) prepared by the Park Service 12

---

[25]    The Federal Defendants represent that the "subsurface" estate in those same lands has been conveyed to Bristol Bay Native Corporation but do not argue that is relevant, and it is not. They also explain that they have separately acquired a Native allotment parcel not within the Nondalton lands abutting Sixmile Lake, which they have colored yellow rather than red on their map (Doc. 175-2), but do not claim FRWRs based on it, consistent with their decision to not assert FRWRs based on allotments. U.S.Br. at 52-54. As is discussed elsewhere in both the State and United States briefs, Alaska Native allotments do not have FRWRs (or at least the United States does not claim FRWRs for any such allotments in its regulations), meaning acquisition of such an allotment (which has not been established) would also be without FRWRs, whether purchased by the United States or someone else. S*ee* SOA.Opp.Br. at 39-45; U.S.Br. at 19-27.

years later, shall control only "[i]n the event of discrepancies between the *acreages* specified in this Act [such as the "approximate" acreages described for the LCP&P in § 201(7)(a)] and those depicted on such maps". (Emphasis added). Those maps are not intended to "control" over other specific provisions in ANILCA such as § 201(7)(b). Therefore, there is no "conflict" or "ambiguity" on that point in ANILCA. The Defendants' self-serving interpretation of legislative history cannot override the unambiguous text of §§ 103(a) and 201(7). *Davis v. Michigan Dept. of Treasury,* 489 U.S. 803, 808, n.3 (1989) ("legislative history is irrelevant to the interpretation of an unambiguous statute."). In any event, the same page of the Senate report the Defendants cite provides that the amendment to ANILCA which Congress adopted "*excludes* those lands conveyed to the Village of Nondalton *from* the preserve." S. Rep. 96-413 at p. 154 (emphasis added). It also reported expressly "*excluding Six Mile Lake*" from the LCP&P – thus removing any possible intent, implied or otherwise, to create FRWRs in those waters. *Id.* (emphasis added). Given those clear statutory provisions and legislative history, placement of that empty "boundary" on the east shoreline of Sixmile Lake by the Park Service carries with it no title interest – or even a park or preserve management purpose. The drawing of that map by the Park Service does not override the statute by somehow transforming the excluded "Nondalton" lands into part of the LCP&P or create a FRWR in waters adjacent to those excluded lands.

   **b.    Even if Sixmile Lake were treated as "adjacent" waters, there would be no FRWRs there.** Even if Congress had not excluded the Nondalton lands from the preserve and its administration and bona fide federal public lands instead made up the east shore of Sixmile Lake, FRWRs would not exist in any of the waters of Sixmile Lake, nor extend across the full width of that wide Lake[26] to the opposite shores of Nondalton and beyond as the Defendants

---

[26]    As shown by the United States' Exhibit 8, portions of Sixmile Lake are over a mile wide.

contend, based on the law of FRWRs applicable to such reserves as set out elsewhere in this Reply and in the State's previous "which waters" briefings.[27]

### C.    CONCLUSION TO "ADJACENT" WATERS.

In sum, FRWRs do not exist for purposes of harvesting fish or wildlife in "adjacent" waters located outside of such reserves.  The Federal Defendants have failed to demonstrate otherwise, as to *any* of their assertions of FRWRs in adjacent waters.

### III.    THE FEDERAL DEFENDANTS' FICTIONAL "HEADLAND TO HEADLAND" LINE-DRAWING VIOLATES THE PLAIN "MEAN HIGH TIDE" PROVISIONS OF ANILCA AND IS CONTRARY TO THE FRWR DOCTRINE.

Another type of "adjacent" waters issue is presented by the Federal Defendants' contention that they have properly asserted Title VIII jurisdiction over marine and tidal waters up to and seaward of the line of mean high tide in river mouths, bays, sounds, and similar waters. U.S.Br. at 75-79.  The Federal Defendants are obligated to delineate their jurisdictional boundaries by adhering to the FRWRs doctrine, the federal Submerged Lands Act (SLA) (43 U.S.C. § 1301(a)), and the plain language of section 103(a) of ANILCA that federal reservation boundaries shall not extend seaward of the mean high tide line.  They may not apply their own preferences about administrative convenience, non-ANILCA United Nations boundary conventions,[28] and creating more "meaningful opportunities" for federal subsistence users (U.S.Br. at 71-72) in order to draw "headland-to-headland" boundaries extending far beyond the line of mean high tide and, not surprisingly, expanding their jurisdiction.  The mean high tide line stipulated by Congress is the only permissible standard and must be adhered to.

---

[27]    Furthermore, were the Nondalton lands treated as being within the exterior boundary of the LCP&P, they would at least constitute an in-holding that is excluded from being part of the unit by ANILCA § 103(c), and so could not support a FRWR for that reason either, as discussed *infra*.

[28]    Those U. N. boundary conventions refer instead to rules for determining sovereign coast lines, as referenced at 43 U.S.C. § 1301(c) of the SLA, which is a different matter.

A.    THE FACTS REGARDING THE MEAN HIGH TIDE LINE TEST CASES
       ARE UNDISPUTED.

There is no dispute material to this issue with regard to the specific test case waterways

presented by the State.  Indeed, as to one of those waterways, Tuxedni Bay, the United States

now represents it claims no FRWR or Title VIII jurisdiction.[29]

Togiak Bay, like Tuxedni Bay, is undeniably tidal and marine in its entirety.

Nevertheless, the Defendants claim a subsistence jurisdiction boundary in Togiak Bay located

seaward of the line of mean high tide, so as to encompass tidally influenced marine waters within

at least the "northern end" of Togiak Bay.  There they admit to administering at least a

preemptive federal subsistence herring fishery in an area they portray as "small", but which

really encompasses about six square miles (plus expansive marine/tidal areas within the mouth of

the wide Togiak River).[30]  U.S.Br.at p. 76 & Exh. 10 (Doc 167-10).  The Defendants also

---

[29]      Citing an Opinion of the Office of the Solicitor dated July 16, 2002 (also submitted as Exhibit 18
to the United States' Brief (Doc. 167-18)) and revisions made in their 2005 regulations published in the
Federal Register, the Federal Defendants, rather than meet the State's claim regarding Tuxedni Bay,
assert, at pages 77-78 of their Brief (Doc. 167 at 90-91), that they are not asserting Title VIII jurisdiction
within "the waters of Tuxedni Bay" – presumably meaning *anywhere* within Tuxedni Bay.  However, if
that is the case then they should not be advertising to the public, as they do in their regulation pamphlets
for the federal subsistence harvest of fish and shellfish issued for the periods April 1, 2006 – March 31,
2007 (Reg. Pamph. pp. 50-51) and April 1, 2007 – March 31, 2008 (Reg. Pamph. pp. 52-53) that they are
asserting jurisdiction "within that portion of Tuxedni Bay within the [Lake Clark National] Park".
Neither should they be drawing a headland to headland line across part of Tuxedni Bay, as also shown on
the maps for the Cook Inlet Area  in those regulation pamphlets (at the same pages) and as magnified and
shown on the State's Exhibit 4 (Doc. 134-6) as "Claimed Federal Subsistence Boundary".  The State
therefore requests that the Court provide in its decision and judgment in this matter that, consistent with
Defendants' Exhibit 18, the FRWRs doctrine, ANILCA, and the SLA and Alaska Statehood Act, the
Defendants assert (and possess) no FRWRs or other claim to ANILCA Title VIII jurisdiction within any
marine or tidal waters of Tuxedni Bay up to and seaward of the line of mean high tide.
[30]      *See DeLorme, Alaska Atlas & Gazetteer* (2004 ed.), at p. 55.  Although the United States does not
say so in its Brief, federal priority subsistence harvesting of saltwater salmon, Pacific Cod and all other
manner of saltwater "fish", including shellfish, is also allowed in this "northern" Togiak saltwater area,
and elsewhere throughout many huge salt water bays and river "mouths" closed off "headland to
headland" by dark Federal Subsistence Program lines within the Kuskokwim and Bristol Bay Areas
where the Togiak NWR is located.  This is shown in the Federal Defendants' public regulation pamphlets
referenced in the immediately preceding footnote, such as at pages 34-42 (including Maps 6 and 7) of the
2007-2008 federal pamphlet.  The 2007-2008 pamphlet is being separately submitted by the State to the

recognize that the definition of "inland waters" in their regulations and as applied to Togiak Bay encompasses tidal waters. *Id.*

The same holds true at the Stikine River where the Defendants acknowledge the wide River, containing several main channels, is tidally influenced many miles upstream from their drawn-in headland-to-headland boundaries. These tidally influenced, predominantly marine waters located outside of all relevant boundaries in ANILCA are also clearly not fresh waters above the mean high tide line. The Defendants' assertion of FRWRs in them in the 1999 rules renders those regulations contrary to law and arbitrary and capricious.[31]

The United States' concessions and admissions regarding Tuxedni Bay, Togiak Bay, and

---

Court, as made necessary by representations made in the Federal Defendants' Brief, and pamphlets from 2006-07 and earlier years can be submitted. These pamphlets help demonstrate the magnitude of the "headland to headland" line-drawing problem, such as by the line drawn across Kulukak Bay, over 4 miles across and 8 miles deep, shown just south of Togiak and Togiak Bay on the 2007-08 pamphlet Maps 7 and 6, and also in *DeLorme,* at p. 47. *DeLorme,* which is also used by the United States in its brief, *e.g.,* at p. 35 n.39 & p. 67 n.58, shows a mileage scale on each map page, whereas the much smaller maps in the federal pamphlets do not. Another example is on Map 6 of the 2007-2008 pamphlet, where the Federal Defendants draw a line about 15 miles long across the "mouth" of the Kuskokwim River enclosing extensive saltwaters outside the refuge boundaries established by ANILCA or claimed at 48 Fed. Reg. 7890 (1983) and overlying State-owned submerged lands (or, where not, outside the ANILCA 3-mile Title VIII jurisdictional limits (*Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 546-551 (1987)). Pursuant to Federal Rules of Evidence §§ 201, 801(d)(2), and 803(8), the Court should admit and take judicial notice of the official representations to the public the Defendants make in those pamphlets, including on those maps. They are more reliable and much more admissible than the several hearsay "Declarations" the Federal Defendants submit with their brief (except insofar as constituting party admissions). Larger copies of the several area maps used by the Federal Defendants in those pamphlets are also publicly available and can be provided to the Court.

[31] Although the Federal Defendants purported to exclude certain named "marine waters and saltwater bays", including Kulukak Bay, from their jurisdiction in comments to their 2005 revised regulations made effective in 2006 (*see, e.g.,* 70 Fed. Reg. at 13379 (3/21/2005) & 70 Fed. Reg. 76400 (12/27/05), at 76400-401, 76405), they insist elsewhere in their brief that those regulations are not yet placed in issue and have supplied no AR as to them. In any event, even with the revisions in 2005 they failed to exclude "hundreds of thousands of acres" of saltwater bays and similar areas they did not list, but should have listed, like Togiak Bay, and other so-called "river mouths" like the Stikine River's several wide delta tidal channels and sea arms (*see* SOAOpen.Br.Exh. 6 (Doc. 134-8)) and the long Kuskokwim terminus (*see* footnote 30 *supra*). Instead, they expressly included that huge Kuskokwim River marine area (70 Fed. Reg. at 76404). Moreover, as just discussed in the immediately preceding footnotes, they still represent to the public in their regulation pamphlets that areas like Kulukak Bay, Tuxedni Bay, and at least several square miles of Togiak Bay are within their Title VIII jurisdiction.

the Stikine River channels, combined with its attempts to still engage in unfettered line-drawing and to regulate fisheries in those and similar marine/tidal areas, also provide another implicit acknowledgement that its regulations are too vague and another ground for setting aside the headland to headland regulation.  The rule, like its other challenged rules, is so broad and vague in its terms as to permit widely different applications encompassing far more than freshwater river mouths.  It allows unfettered agency discretion in the rule's application denying the State and public the ability to discern where and what conduct is proscribed or allowable.[32]

## B.  IN ADDITION TO BEING CONTRARY TO LAW, THE FEDERAL DEFENDANTS' CONVENIENCE CLAIMS ARE MISPLACED.

As the State has explained before (and incorporates herein), federal and state governments have been routinely delineating tidal from non-tidal waters according to the line of mean high tide for hundreds of years.  SOA What Process Reply Br. at p. 34 (Doc. 88 at 40).  That is the boundary used in the SLA and ANILCA.  In Alaska, tidal and non-tidal waters are routinely delineated under state regulations, including the State's survey provisions, often referencing federal provisions.[33]  Identifying and "eyeing" these shoreline boundaries is not difficult and is more convenient for the regulated public and enforcement personnel than some artificial line, indiscernible on the water, drawn out away from the shoreline.  As the Federal Defendants themselves initially recognized and recommended in their <u>Katie John</u> Policy Group analysis, under the topic "TIDALLY INFLUENCED PORTIONS OF INLAND WATER BODIES":

> Where a federal reservation with reserved water rights includes rivers and streams flowing into marine water, reserved water rights will apply to all waters ***above the mean high tide line***.  ***The freshwater influence will be considered dominant above the point of the mean high tide line and the channel of these waters will be more defined for***

---

[32] *See supra* footnote 16 and accompanying text.

[33] *See, e.g.*, 11 AAC 53.120 (survey instructions for readily fixing line of mean high tide "as the landward boundary line" including using tide tables); 11 AAC 112.990(a)(6) (defining "coastal waters" as containing "sea water, including bays, lagoons, ponds, estuaries, and tidally influenced waters").

***management purposes.*** Assertion of federal reserved water rights relating to marine waters [no assertion made] will be further addressed in sections V and VI.[34]

The SLA defines tidal areas as those areas "permanently or periodically covered by tidal waters up to but not above the line of mean high tide and seaward" and fresh waters as "nontidal waters". 43 U.S.C. § 1301(a). ANILCA § 103(a), which the Federal Defendants cite elsewhere, also provides that the boundaries of CSU areas established by that Act "shall, in coastal areas not extend seaward beyond the mean high tide line." That is the lawful, meaningful bifurcation of jurisdiction between the State and the Defendants which the United States recognizes and touts elsewhere in its Brief, such as when addressing the Katie John and Peratrovich claims.[35]

## C.    THE STATE DID NOT WAIVE COMPLIANCE.

The Federal Defendants also assert that, if they violated the statutory mean high tide line rule by adopting their headlands-to-headlands regulation, the Court can do nothing to remedy that violation. U.S.Br. at 73-74. They allege that no one objected to their headland-to-headland assertions over marine waters during the rulemaking process leading up to the 1999 regulations and that, therefore, all claims relating to that "methodology" were waived for failure to exhaust

---

[34]     *See* June 15, 1995 Final Katie John Issue Policy Group Paper and Recommendations, AR Tab 88 at p. 1700 (emphasis added).

[35]     *See, e.g.*, U.S.Br. at p. 38 n.45 ("The jurisdiction of the Federal Subsistence Board depends ***not*** on whether saltwater bays are important for subsistence, but whether they are public lands." (emphasis added)); at p. 39 ("this extension of jurisdiction [sought by Katie John in this case] would conflict with the recognition in *Katie John* that ANILCA intended a meaningful bifurcation of jurisdiction between the State and the Federal government."); at p. 81 ("the FRWRs doctrine does not apply to marine waters if the State owns the submerged lands beneath those waters"); at p. 82 ("the extension of FRWRs to marine waters would be 'without precedent and would represent a considerable leap in reasoning ....'"); and at p. 88 ("the FRWRs doctrine arose and was developed within the context of the shortage of fresh water"). *Accord*, *Alaska v. United States* Decree and Disclaimer, 546 U.S. 413, 416 (2006) (defining "marine submerged lands" owned by the State of Alaska as "all lands permanently or periodically covered by tidal waters up to but not above the line of mean high tide" as provided in the Submerged Lands Act, 43 U.S.C. § 1301(a)(2)); 48 Fed. Reg. at 7890 (Feb. 24, 1983) (conceding that "Within the coastal boundaries of areas added to the National Wildlife Refuge System, Federal ownership does not extend below mean high tide to include lands owned by the State of Alaska except where the State may agree to that extension."); U.S. Exh. 18 (legal opinion). *See also, e.g.*, ANILCA §§ 103(a) & (c) & 102(1) & (2).

STATE'S "WHICH WATERS" REPLY BRIEF

administrative remedies. *Id*.  Their waiver argument fails for multiple reasons.

First, the State did raise the issue.  Although not using the precise phrase "headland-to-headland" by which the issue has since become identified, State comments on the proposed 1999 rules objected, both generally and specifically, to any assertion by the Federal Defendants of jurisdiction over "marine waters" and "saltwaters", including at river "mouths", "lagoons", "creeks", "dock areas", "bays", "bay areas", "sounds" and "inlets", and to the Defendants' proposed harvest provisions for marine fish and shellfish, including "herring", "capelin", "shrimp", "abalone", "scallop" and "salmon" in "saltwaters".  These timely objections in 1998 stated repeatedly, that "no federal jurisdiction exists in these waters" and that any such claims were insufficiently identified or delineated.[36]  The State's comments regarding marine waters in such areas put the Federal Defendants on notice that, insofar as the "headland-to-headland" language in their proposed regulation included marine waters,[37] it was under challenge.

---

[36]     *See, e.g.,* SOA's Comments on Proposed Subsistence Regulations at 62 Fed. Reg. 66216, submitted Apr. 16, 1998, AR Tab 352, *e.g.* at pp. 8424-26, 8436-42, 8446-50 & 8490.  As is also evident from those comments, due to the vagueness of the proposed regulations it was very difficult to determine at the time if, and in what areas, the federal agencies might be asserting jurisdiction over marine waters.  No part of the proposed regulations directly mentioned or asserted jurisdiction over marine waters.  The **proposed** regulations at 62 FR 66216, 66223 (Dec. 17, 1997) contained **no** reference to or definition for "marine waters", and even the proposed definition for "inland waters" was "landward of the mean high tide line *or* … upstream of the straight line drawn from headland to headland across the mouths of rivers *or* other [unspecified] waters as they flow into the sea", without stating which line, when, or where.  The proposed regulation also provided:  "Inland waters include, but are not limited to, **lakes, reservoirs, ponds, streams, and rivers**," which are all generally considered freshwaters. *Id.* (emphasis added).  Only later, in conjunction with their initial final rules published on January 8, 1999, did the Federal Defendants add a definition for "marine waters" (still vaguely listing their same variable lines in the disjunctive).  Only later still, did they get a bit more specific, in the comments to their revised regulations (*see, e.g.,* 70 FR 76400, 76401-02 (Dec. 27, 2005)) -- finally addressing the subject in terms of the "termini of the headlands" of river "mouths" and discussing previously undisclosed agency papers relating to the "headland-to-headland" rule, in ways inconsistent with the treatment they otherwise give "marine waters".  Among other things, this may explain why those Defendants repeatedly "bootstrap" their arguments in their brief by referring to those 2005 comments, purportedly intended to "clarify and revise" their 1999 regulations (70 FR 76400) – rather than rely on their comments for the 1999 regulations (while simultaneously protesting, incongruously, that their 2005 regulations are "not in issue").
[37]     Marine waters include tidal waters, as demonstrated by the definitions contained in the SLA and elsewhere.  *See, e.g.,* discussion footnote 34 *supra*.

STATE'S "WHICH WATERS" REPLY BRIEF

Nevertheless, the Defendants decided to adopt that language.

The Federal Defendants' waiver argument also fails because, as previously noted, their own internal analysis during the development of the original 1999 rule spotlighted the precise issue of compliance with the statutory mean-high-tide-line limitation. In fact, they initially recognized that the limitation applied, and that it also provided a management advantage. [38] Only later, after further "research", was that Policy Group's "consensus … using the mean high tide line to delineate reserved water rights on rivers and streams flowing into marine waters" reversed in favor of asserting jurisdiction over marine/tidally influenced waters within river or stream "mouths" defined "by a line drawn between the termini of the headlands on either bank of the river." AR Tabs 90, 91 & 94. It is well-established that the waiver rule cannot be invoked "if the agency had an opportunity to consider the issue … [and] [t]his is true *even if the issue was considered sua sponte by the agency* or was raised by someone other than the petitioning party." *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1024 (9th Cir. 2007) (emphasis added). That is the case here.

While these two points alone dispose of the Federal Defendants' waiver argument, the argument also fails for other reasons including futility. [39]

---

[38]    *See* discussion *supra* and June 15, 1995 <u>Final Katie John</u> Issue Policy Group Paper and Recommendations, AR Tab 88 at pp. 1698-1700 & 1712-16 (discussing issue and recommending [at para.IV.C., AR 1716] that "Where a federal reservation with reserved water rights includes rivers and streams flowing into marine waters, *reserved water rights will be asserted to all freshwater above the mean high tide line*." (Emphasis added). That Policy Paper also provided: "Reserved water rights will *not* be asserted in marine waters except [where the United States already claims ownership of submerged lands as part of a prestatehood reservation meeting the "doctrine discussed at length in *Utah Division of Lands v. United States*, 482 U.S. 193 (1987)]." AR 1716 para. VI & AR 1714 n.36 (emphasis added).

[39]    It surely would have been futile for the State to have used the "magic" words "headland-to-headland" in its comments on the original rulemaking, which seems to be the essence of the Federal Defendants' argument, given those Defendants' rejection of the objections the State did make then and their further rejection, as they admit (U.S.Br. at 74), of the State's objections when those Defendants affirmatively reconsidered, sought to "clarify", and reaffirmed that assertion of jurisdiction in their rulemaking process in 2004 and 2005. *See, e.g.,* 69 Fed. Reg. 70940 (Dec. 8, 2004 proposed rule); 70

## IV.    WATERS SURROUNDED BY STATE AND PRIVATE INHOLDINGS ARE NOT APPURTENANT TO FEDERALLY RESERVED LANDS AND CANNOT POSSESS VALID FRWRS UNDER ANILCA.

Using explanations given in their 2005, rather than 1999, regulations,[40] the Federal

Defendants argue that management "concerns", "reasonable balancing", and a need to identify

"meaningful waters" enable them to claim FRWRs in waters not appurtenant to federally

reserved lands.  U.S.Br. at 60-61 (Doc. 167 at 73-74).  However, those arguments cannot

overcome the fundamental, irreducible requirement that only waters appurtenant to reserved

lands can have a valid FRWR. *Cappaert*, 426 U.S. at 138; *New Mexico*, 438 U.S. at 698, 700.

Neither can they overcome the controlling points that ANILCA expressly (1) deems non-

federally owned inholdings located within the exterior boundaries of federal reservation units ***not***

to be part of the federal unit and (2) provides that such inholdings are not "public lands" subject

---

Fed.Reg. at 76402 (final rule and comments rejecting State's objections to proposed rule's inclusion of marine waters below mean high tide line, including "headland-to-headland" component, in definition of "inland waters" ); 50 CFR § 100.4 (defining "inland waters"); Doc. 110 at 21 (5/17/07 Court Decision recognizing and invoking the futility exception to the waiver doctrine).  By engaging in that reconsideration rulemaking and inviting further comments on what became identified as the "headland-to-headland" issue, the Federal Defendants also reopened that issue and so themselves waived any waiver argument they might otherwise have had.  *National Ass'n of Mfrs. v. U.S. Dept. of Interior,* 134 F.3d 1095, 1103-04 (D.C. Cir. 1998) (waiver/exhaustion issue is itself waived by the federal government where it republishes the regulatory provision for comment and re-consideration or explanation, thus re-opening it).  In addition, the same two circumstances which this Court applied before in this case to excuse the State's alleged failure to object to the "what process" issue during the course of the 1999 rulemaking apply:  (1) whether the Federal Defendants' rule complies with ANILCA § 103(a) and other applicable law is purely a legal issue, and (2) the State's appeal of the underlying *Katie John* ruling that led to the rulemaking was still pending at the time the State submitted comments in the original rulemaking proceeding.  *See* Doc. 110 at 20-22.  Moreover, avoiding the issue now or requiring the State to amend its complaint or file a new one under the APA within six years of the 2005 rule publication, as the Defendants apparently seek, would only serve form over substance.  Because the "headland-to-headland" rule being reconsidered by the United States when the State filed its complaint on January 5, 2005 did not change the 1999 rule already being challenged by that complaint – despite providing the opportunity to do so – there should be no requirement to file an amended or supplemental complaint.

[40]    As previously noted, elsewhere those Defendants seek to argue, somewhat inconsistently, that the 2005 regulations (and therefore their comments and the Defendants' explanations of them) are "not at issue".  Neither has an AR applicable to those 2005 regulations been provided in this case, which could provide information helpful to the State's position, as has the AR for the regulations published in 1999.  Therefore, the Federal Defendants should not be permitted to rely on their 2005 explanations.

STATE'S "WHICH WATERS" REPLY BRIEF

to federal subsistence jurisdiction.  ANILCA § 103(c) (16 U.S.C. § 3103(c) (inholdings);

ANILCA § 102(2) & (3) (16 U.S.C. § 3102) (defining "federal lands" and "public lands").  Thus

reaches of rivers and waterbodies bounded on all sides by non-federal inholdings, such as the test

waters the State has presented, are not appurtenant to any part of the federal unit, or any

federally-owned lands, and so cannot have valid FRWRs.  See SOAOpen.Br. at pp. 25-30

(Doc.134 at 34-39); SOAOpp.Br. at 21-23 (Docket 169 at 34-36) (cases defining "appurtenant").

Furthermore, ANILCA § 1319 "ensures that ANILCA does not alter existing water law."

Court Decision, Doc. 110 at 30.  Therefore, the Federal Defendants cannot justify their deviation

from the FRWR requirements established in *New Mexico, Cappaert*, and other applicable law

based on their administrative preferences.  Their assertion of FRWRs in waters surrounded by

non-federal inholdings is contrary to law and must be set aside.

A.     **THERE IS NO MATERIAL DISPUTE AS TO THE STATE'S SAMPLE WATERS.**

Despite their claims by "Declaration" that the maps provided by the State include some

errors,[41] the Federal Defendants do not materially dispute the State's showings that the test case

waters identified in the State's brief (SOAOpen.Br. at 25-30; Doc. 134 at 25-30) are bounded by

non-federal inholdings. The Federal Defendants concede that the reaches of the Chignik River,

Crescent River, and seven Juneau road system streams addressed in the State's Opening Brief are

not bounded by any federal lands.  U.S.Br. at 62-67.  They also concede that all of Chignik Lake

and Black Lake are surrounded by non-federal lands except for four small parcels – one on

---

[41]     The maps were prepared by the Alaska Departments of Natural Resources and Fish and Game using information publicly provided by the Federal Defendants.  If there are errors, they are the result of erroneous information being disseminated by the Defendants, including in their own regulation pamphlets and maps being disseminated to the public as discussed previously in this Brief.  The State requests that the Court address the United States' concession that it is claiming no FRWRs or Title VIII subsistence jurisdiction in Chignik Lagoon in its Judgment in the same manner as the State requested in footnote 29 *supra* of this brief with respect to the United States' concession regarding Tuxedni Bay.

Chignik Lake and three on Black Lake.  U.S.Br. at 62-63 & U.S. Exh. 10 (Doc. 167-10) at 2-3.

Those four parcels, they concede, "are Native corporation selected land that has not yet been

conveyed, thus coming within the "selected-but-not-yet-conveyed" category addressed in the

next section of this brief.  Any alleged "errors" have no material bearing on the State's claims.

### B.  THE FEDERAL DEFENDANTS' ARGUMENTS ARE WITHOUT MERIT.

The Federal Defendants make virtually identical arguments as to each inholdings test case

waterway identified by the State.  In addition to the "agency preference" arguments already

referenced, they essentially argue that they "deem" any waterway surrounded by non-federal

land – including those lands and waters expressly excluded from the federal reservation as in the

case of the Juneau area waterways – to be within the "exterior boundaries" of the reservation and

thus federally reserved waters.  The State responds further, as to each of those waterways.

### 1.  Chignik River System including Chignik Lake and Black Lake (SOA Exh. 10).

The Federal Defendants argue that the language in ANILCA § 302(1)(B) seeking to protect

water quality and quantity "within" the Alaska Peninsula Wildlife Refuge reserves a water right

throughout all waters inside the exterior boundaries they have set for that unit (U.S.Br. at 64),

notwithstanding State ownership of the bed of the navigable Chignik river and lake system and

the more specific provision in ANILCA § 103(c) that inholdings, such as that bed and the non-

federal, mostly Native corporation lands surrounding that river and lake system, shall not "be

included as a portion of such unit."  However, read together, ANILCA §§ 302(1)(B) and 103(c)

show that, whatever Congress' desires regarding purposes of the unit, inholdings are not to be

considered as being within or part of the unit.  FRWRs may thus exist in waters within the

exterior boundaries of the unit if also appurtenant to reserved unit lands, but not in waters

appurtenant to non-federal inholdings, because they are not reserved unit lands.   The broader

reading of § 302(1)(B) desired by the Federal Defendants would do away with the FRWRs appurtenancy requirement, because waters bounded by inholdings would be treated as having FRWRs even though those waters are not appurtenant to federal lands.  As this Court has previously emphasized, ANILCA § 1319 specifies that ANILCA "does not alter existing water law."  Doc. 110 at 30.  Thus, the Defendants' broader, altered reading must be rejected.

The Federal Defendants also seek to justify their position by temporarily adopting the Katie John "upstream/downstream" argument that less of a "meaningful opportunity" for federal subsistence priority takings would exist if FRWRs are not permitted to exist in non-appurtenant water reaches surrounded by inholdings upstream and downstream from waters appurtenant to federal lands.  U.S.Br. at 64.  Elsewhere in their brief (U.S.Br. at pp. 36-39) the Defendants persuasively demonstrate that the Katie John argument for FRWRs in water stretches upstream or downstream of federal lands is incorrect, including making the point that "the importance of the waters for subsistence use is not determinative of whether those waters are public lands" and is "non-relevant" (*id.* at 38 n.45).  Yet, in the case of these water stretches appurtenant to non-federal lands the Defendants incongruously attempt to justify their assertion of FRWRs on precisely such 'non-relevancies".  By construing "public lands" in ANILCA to include only those waters in which the United States holds valid FRWRs, the Ninth Circuit Court has already defined the parameters of the "meaningful opportunity" under Title VIII of ANILCA in navigable waters, and by law it does not exist where FRWRs do not exist.  As the United States notes elsewhere in its brief (and as the State has demonstrated in its briefs)[42], "A federal reserved water right is a usufruct which gives the right to divert water for use on specific land or the right to guaranty flow in a ***specific reach of a water course***."  U.S.Br. at 36 (emphasis added).

---

[42]    *See, e.g.,* SOAOpen.Br. at pp. 9-10, 31-32, 39 & SOAOpp.Br. at pp. 28-35.

Further, as was noted in the preceding discussion in this brief on the Nowitna and Innoko NWRs, many meaningful opportunities exist for exercising the federal subsistence priority to take fish in the many rivers and streams and many reaches of rivers and streams not surrounded by non-federal lands – so that stretching beyond the federal reaches in which there exist valid FRWRs in order to satisfy personal perceptions of what is "meaningful" enough, contrary to ANILCA and FRWRs law, is both unnecessary and impermissible. As the United States notes elsewhere in its brief, "The jurisdiction of the Federal Subsistence Board depends not on whether [waters] are important for subsistence, but whether they are public lands." *Id.* at 38 n.45, *citing* 70 Fed. Reg. 97402. In addition, because the non-federal lands underlying and surrounding the Chignik river and lake system are not reserved, there can be no necessary federal primary purpose creating a FRWR in those waters as is required (*New Mexico,* 438 U.S. at 701).

**2. Crescent River (SOA Exh. 8).** The Federal Defendants concede that the 20 miles or so of the navigable Crescent River shown by the State's Exhibit 8 is surrounded by privately-owned, non-federal lands which they also admit are not "public lands for purposes of the Title VIII subsistence use priority." U.S.Br. at 64-65. They argue the same sorts of extra-legal justifications for claiming a FRWR in these non-appurtenant, extraterritorial waters that they argued in relation to the Chignik river and lake system. *Id.* Those arguments fail for the reasons given by the State in relation to the Chignik waters.

**3. Juneau Area Streams (SOA Exhs. 9A-9C).** Similarly, the Federal Defendants concede that the downstream reaches of the seven Juneau area streams identified in the State's opening Brief[43] all flow through lands (a) owned by non-federal parties and (b) actually excluded from the Tongass National Forest (TNF) by official federal executive actions, including but not

---

[43] These reaches are all downstream from the upstream reaches of those streams that are in fact within and appurtenant to reserved Forest lands.

limited to the original 1909 Proclamation creating the Forest.  U.S.Br. at 66-67.  Nevertheless,

the Defendants argue that these downstream reaches are "deemed" by them to possess FRWRs

and thus constitute "public lands".  *Id.* at 67.  Although acknowledging the streams' exclusion by

prestatehood executive actions, they incorrectly characterize it as merely an "internal" exclusion

somehow inferior to the so-called "exterior boundary" lines once drawn tens of miles out to sea

in a "Diagram" attached to the 1909 Proclamation.  *Id.* at 66-67.  However, that argument fails;

the downstream reaches were properly excluded.[44]  The Defendants also reference some of their

"preferential management" arguments raised previously with regard to the Chignik and Crescent

waterways (*id.* at 69-70) which have already been countered in this Reply.  Finally, they appear

to argue that, although they failed to provide the necessary justification for asserting FRWRs

within the TNF in their administrative record, the 1897 Organic Act by its terms excuses this

failure.  However, they then admit that, according to *United States v. New Mexico*, 438 U.S. 696,

which they cite, the 1897 Organic Act created FRWRs "***only*** [1] where necessary to preserve the

---

[44]     For their identification of "broad exterior boundaries" of the TNF the Federal Defendants rely on
the roughly drawn Diagram, Part One, which accompanied the 1909 Proclamation and is included at page
4 of Peratrovich's Exhibit 13 and at AR Tab 88 p. 1736 also cited by the United States as "including the
seven streams at issue."  U.S.Br. at 66-68.  However, as previously explained (SOAOpp.Br. at 48 & 59),
that broad line-drawing – far into international waters beyond any possible point of United States
jurisdiction at the time and obviously done as a matter of simplicity from distant Washington,
D.C. rather than for accuracy or reservation intent – was not meant as the true "boundaries" of the
"public lands" actually intended to be reserved by the Proclamation.  That Proclamation, also attached as
the first three pages of the Federal Defendants' Exhibit 12 (minus the Diagram), expressly provides that it
is limited to "the ***public land*** [elsewhere described as "in part covered with timber"] lying within
boundaries [after which follow descriptions tracing, among other things, shorelines]" and expressly
"***Excepting from the force and effect of this proclamation*** the several areas ***contained within
boundaries formed by circles described with a radius of five miles, each, from the centers of the
following named towns and settlements, to wit:  Juneau,*** …[and other named areas]."  U.S. Exh. 12 at 1-
3 & Peratrovich Exh. 13 at 1-3 (emphasis added).  Other exceptions by executive action "from the force
and effect" of that proclamation followed, including those described in the State's Opening Brief and
conceded in the United States' Brief.  As the Federal Defendants also admit elsewhere (*e.g.*, U.S.Br. at
78) – chiefly by reference to the 2002 legal opinion of their Solicitor's Office and opinions of that Office
in 1999 and 2000 attached to that opinion and constituting U.S. Exhibit 18, but also by reference to
comments published in connection with their 2005 regulations at 70 Fed. Reg. p. 76401 – such line-
drawing is not intended as the actual boundary of reserved lands or the actual area of federal jurisdiction.

timber or [2] to secure favorable water flows for private and public purposes **under state law**" (emphasis added) and **not** for "minimum instream flows and recreational purposes."[45]   Despite these acknowledged failures and legal restrictions, they incorrectly urge that the Organic Act, by creating FRWRs in "any amount" for limited purposes, thus created FRWRs in all amounts and transformed all TNF waters into "public lands" for all purposes – contrary to the holdings and reasoning in *New Mexico*. *Id.* at 67-69.  In any event, even such FRWRs as might exist would stop at the downstream points where the streams are no longer within reserved lands but rather flow only through and over non-federal lands.  All of the Federal Defendants' arguments fail.[46]

## V.    WATERS WITHIN SELECTED BUT NOT YET CONVEYED LANDS ARE NOT "PUBLIC LANDS" WITH FRWRS.

This subject, like State and private inholdings, relates to dry land as well as water.  For the reasons which follow and those set out in the State's Opening Brief – as well as those reasons set out in the State's detailed written comments on this subject expressed in the administrative record at AR Tab 352 pp. 8466-70 fully incorporated herein by reference, Federal

---

[45]    More precisely, the Court in *New Mexico* held that Congress did not intend to reserve minimum instream flows within national forests for "aesthetic" or "fish-preservation" purposes.  438 U.S. at 705.
[46]    In addition, AFN in its February 11 Response Brief (Doc. No. 176) argues that the Wild and Scenic River Act creates FRWRs in designated rivers "regardless of land ownership." *Id.* At 3. That is not correct in Alaska.  First, Wild and Scenic Rivers (WSRs) in Alaska are CSUs (ANILCA § 102(4)).  Second, non-federal, non-public lands along these WSRs are not part of the WSR and not subject to WSR (federal) jurisdiction (ANILCA § 103(c)).  No similar limitation is applicable to WSRs outside of Alaska (*see* 16 U.S.C. § 1271 *et seq.*).  In fact, private lands and interests within WSRs outside of Alaska are subject to federal use limitations (16 U.S.C. § 1277(g)).  This, of course, means that in Alaska reaches of a WSR that flow by these non-reserved, non-federal lands are not appurtenant to any reserved lands and not capable of possessing valid FRWRs.  Third, 18 WSRs in Alaska are already "within" the boundaries of federal reservations such as parks, preserves, and refuges (ANILCA §§ 601, 602) and only seven are outside of such CSUs (ANILCA § 603).  The status of waters within the 18 WSRs are governed largely by the provisions establishing the "host" park, preserve or refuge within which the rivers flow.  The other seven are governed by their own statutory limitations:  "the Secretary may seek cooperative agreements with the owners of non-public lands adjoining the WSRs."  ANILCA § 605(e).  This provision further demonstrates the lack of Federal control and that such non-public lands along WSRs have not been reserved.  There can be no FRWRs in the reaches of a WSR not appurtenant to a federal reservation in Alaska.

claims to Title VIII jurisdiction on lands selected but not yet conveyed to the State or Alaska Native corporations, and to the waters within such lands, should be set aside.

ANILCA Title VIII expressly restricts the subsistence preference (and concomitant federal jurisdiction) to "public lands". ANILCA § 804 (16 U.S.C. § 3114). It is a term which ANILCA Title I defines to *exclude* selected-but-not-yet-conveyed lands.[47] As set out in the opening sentence of ANILCA § 102, the Title I definitions and rules expressly apply to the Title VIII subsistence provisions. Together, ANILCA §§ 102 and 804 address the intersection of both concepts pertinent to this issue: the extent of federal subsistence jurisdiction and the treatment of selected-but-unconveyed lands. Together, they provide that selected-but-unconveyed lands are not subject to federal subsistence jurisdiction.

The Federal Defendants nevertheless persist in arguing that another ANILCA provision overrides § 804 and allows them to assert federal subsistence jurisdiction in their regulations over selected-but-unconveyed lands, even though those lands are not public lands. *See* 50 C.F.R. § 100.4(2); 64 Fed. Reg. 1280, 1288; U.S.Br. at 57. This other provision, ANILCA § 906(o)(2), provides generally that: "Until conveyed, all Federal lands within the boundaries of a [CSU] ... shall *be administered* in accordance with the laws applicable to such unit." (Emphasis added).

As seen from this quotation, § 906(o)(2) and the title of which it is a part, Title IX, do not address the pertinent topic of federal subsistence jurisdiction. They instead address the far broader topic of "administering" federal land. Because ANILCA §§ 804 and 102 together address both federal subsistence jurisdiction and selected-but-unconveyed lands, while ANILCA § 906(o)(2) addresses selected-but-unconveyed lands but *not* federal subsistence jurisdiction, §§

---

[47]    ANILCA § 102(3) (16 U.S.C. § 3102), specifically excludes from the definition of public lands: "(A) land selections of the State of Alaska which have been tentatively approved or validly selected [and] (B) land selections of a Native Corporation made under the Alaska Native Claims Settlement Act which have not been conveyed." (emphasis added).

STATE'S "WHICH WATERS" REPLY BRIEF

102 and 804 are the more specific provisions that control under the canon of statutory construction that the specific governs over the general. *Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 524 (1989).

A second reason why the State's reading of these provisions is correct is that application of the canon that the specific governs over the general does not strip § 906(o)(2) of meaning and effect, but failure to apply that canon would strip § 804 of meaning and affect. *Boise Cascade Corp. v. U.S. E.P.A.*, 942 F.2d 1427, 1432 (9th Cir. 1991). Under the State's reading, there are many ways in which the Federal Defendants can "administer" selected-but-unconveyed lands, such as by setting speed limits, restricting pollutants, or regulating some other matter not covered by a specific ANILCA provision. Exercising preemptive federal subsistence jurisdiction is not one of those ways because that particular topic is governed specifically by another ANILCA provision: the "public lands" limitation in § 804. Conversely, interpreting § 906(o)(2) to allow the Federal Defendants to exercise subsistence jurisdiction over lands that are not public lands would read out of the statute the language in § 804 expressly limiting federal subsistence jurisdiction to "public lands" Out of the statute.

Further, Title VIII (subsistence) is specifically tied to Title I by the provision of ANILCA § 102 that states that the Title I definitions apply to Title VIII. In contrast, Title IX (along with Title XIV) is a stand-alone title addressing implementation and amendment of separate statutes – the Alaska Native Claims Settlement Act and the Alaska Statehood Act – and so must be construed independently of Titles I and VIII.[48]  Further evidence of the stand-alone nature of Titles IX and XIV is provided by Title I itself, which specifically provides that its definitions do

---

[48]     *Compare* Title IX (entitled "Implementation of Alaska Native Claims Settlement Act and Alaska Statehood Act) and Title XIV ("Amendments to the Alaska Native Claims Settlement Act and Related Provisions") *with* Title VIII ("Subsistence Management and Use") and Title I ("Purposes, Definitions and Maps.").

***not*** apply to Title IX and XIV.  ANILCA § 102 (opening sentence).  The Title I definitions are

far more relevant to implementation of Title VIII than the unrelated provisions in Title IX and

XIV.  This Court has previously determined that Title I, not Title IX (or § 906(o)(2) within it),

governs the determination of "public lands" under Title VIII:

> "Because the term 'public lands' is defined in Title I of ANILCA, 16 U.S.C. §
> 3102, Count III [the State's challenge to assertion of Federal jurisdiction over
> selected by unconveyed lands within CSU's] arises in part under Title I.  Title I
> expressly provides that the definitions in Title I do not apply to Title IX."

 Order dated March 10, 2006 at 6 (Doc. 50).   In the same Order the Court further explained:

>  "Title IX is entitled 'Implementation of Alaska Native Claims Settlement and
> Alaska Statehood.' The challenged regulation has nothing to do with
> implementing ANCSA or the Statehood Act. The federal defendants' decision to
> promulgate the challenged regulation cannot reasonably be deemed to arise under
> Title IX.  In addition, § 906(o) makes no reference to 'public lands' but instead
> indicates that 'federal lands' with CSUs remain subject to federal authority until
> they are conveyed.  See 43 U.S.C. §1635(o)(2). Because Count III concerns the
> definition of 'public lands', not 'Federal lands', Count III cannot reasonably be
> deemed to arise under Title IX."

 Id. at 7.

In addition, as previously discussed in this brief,  ANILCA § 103(c) (16 U.S.C. §

3103(c)) prescribes that  "Only those lands ... which are public lands (as such term is defined in

this Act) shall be deemed to be included as a portion of [any CSU]."  Not being public lands,

selected-but-unconveyed lands are not part of the CSUs.    It would be highly counter-intuitive

for Congress to exclude selected-but-unconveyed lands from the federal units and jurisdiction

being created by ANILCA Titles II through VII yet impose the federal subsistence program

created by ANILCA Title VIII on those very same lands. There is no support for such a counter-

intuitive reading contradicting § 804.    Titles II through VII and Title VIII are all covered by the

Title I definitions and rules of construction and so must be construed and applied together.

STATE'S "WHICH WATERS" REPLY BRIEF

Page 36

The selected-but-not-conveyed lands and the waters appurtenant to them are not a part of CSUs and contain no FRWRs. Federal Defendants' regulations imposing Title XIII jurisdiction over such lands and waters, contrary to express provisions of ANILCA, should be set aside.

## VI. THE FEDERAL DEFENDANTS CORRECTLY DETERMINED THAT FRWRs DO NOT EXIST IN WATERS UPSTREAM OR DOWNSTREAM OF FEDERAL RESERVATIONS AS CONTENDED BY KATIE JOHN. [49]

As shown in the State's briefs (*see, e.g.*, State's Opp. Br. at pp. 19-39 (Doc. 169 at 32-52)) and in the Federal Defendants' Brief (U.S.Br. at pp. 32-39 (Doc. 167 at 45-52)), the Federal Defendants correctly declined to assert FRWRs in waters upstream and downstream of CSU and other federal reservation boundaries. Furthermore, as noted previously (*see, e.g.*, pp. 8-9 of this Reply), the primary reason they gave for that exclusion in their Policy Group Paper and Regional Solicitor's Memorandum relied on by the United States for the 1999 regulations at issue[50] – that in-flow FRWRs have never been asserted or found to exist "outside of the park and refuge [also "forest, etc."] boundaries"[51] – applies equally to other claims of the Defendants to FRWRs, such as to "adjacent" waters, also lying *outside* of those boundaries.

## VII. THE FEDERAL DEFENDANTS CORRECTLY CONCLUDED THAT FRWRs DO NOT ARISE FROM ALASKA NATIVE ALLOTMENTS AS CONTENDED BY KATIE JOHN.

The State agrees that the Federal Defendants correctly asserted no FRWRs arising from Alaska Native allotments in their regulations, both for the reasons stated in the State's briefing

---

[49]     As noted previously in this Brief (*see* p. 6 n.10, *supra*) and in the States' Opposition Brief (SOA Opp. at 10-14), the Court need not consider the Katie John and Peratrovich upstream/downstream, allotment, and marine waters issues on the merits if it finds that the Federal Defendants are under no mandatory, nondiscretionary obligation to assert FRWRs where they choose not to.

[50]     U.S.Br. at 36-37. The United States also refers at page 36 of its Brief to justifications given by the Secretaries in connection with the subsequent regulations published on December 27, 2005, but as it insists elsewhere in its brief those regulations are "not before this court" (U.S.Br. at p. 74) and "The Secretaries' decision must be upheld only on the grounds relied upon by the agency " (*id*. at p. 32 n.32) – in this case, in relation to the 1999 regulations.

[51]     Exhibit 1 to Katie John's Br. at pp. 4-6 (Alaska Regional Solicitor's Memo. relied on at U.S.Br. p. 36) (emphasis in original)).

STATE'S "WHICH WATERS" REPLY BRIEF

and for most of the reasons stated in the Federal Defendants' Brief.  *See* SOAOpenBr. at 45-49;

SOAOpp.Br. at 39-46; U.S.Br. at 19-32.  As set forth in the State's briefs, there is no basis for

FRWRs to exist in waters flowing within or adjacent to the boundaries of Alaska Native

allotments based on the law applicable to those allotments, since they are not themselves federal

reservations or derived from Indian reservations.[52]  In its briefs the State noted that the law does

not at all support FRWRs in the instance of Alaska Native allotments – a position with which the

Alaska Regional Solicitor clearly agreed.  *E.g.,* SOAOpp.Br. at pp. 40-46.   In addition to making

the same points in its brief, the United States shows that the Katie John plaintiffs lack standing

and that the Federal Defendants' decision to defer whether to assert FRWRs based on allotments

to a "case-by case" deferral process is not unreasonable or contrary to law.  Those grounds also

support the Federal Defendants' "inaction" in this instance and can be relied on, alternatively, by

the Court.[53]

## VIII.   THE FEDERAL DEFENDANTS CORRECTLY DETERMINED THAT FRWRs DO NOT EXIST IN MARINE WATERS AS CONTENDED BY PERATROVICH.

---

[52]      The State agrees with the United States that Alaska Native allotments created from pre-existing federal reservations such as CSUs and national forests ***may*** have a FRWR in some situations where the pre-existing federal reservation had a valid FRWR, but the FRWR would derive from the pre-existing federal purpose reservation, not from the Alaska Native Allotment statute, and would really appear to be in the nature of fulfilling a primary federal national purpose not actually part of the allotment.  As the United States notes, the Katie John plaintiffs have also taken the position before that "[t]he United States does not hold title [and hence no title interest] to [Alaska Native] allotments; patents are held by individual Natives subject to restrictions on alienation."  U.S.Br. at p. 28 n.28.

[53]      The State also disagrees with a few statements made by the Defendants in that section of their brief not material to resolving that allotment issue. For example, the United States at one point takes issue with the State's representation that FRWRs must arise from federal reservations.  U.S.Br. at p. 24 n.24.  However, both cases the United States cites on that point involved FRWRs arising from federal reservations, *see United States v. Anderson*, 736 F.2d 1358, 1361-63 (9th Cir. 1984) (ruling that FRWRs arose from Indian reservation lands lost but re-acquired by the Tribe pursuant to federal statutes with the pre-existing in-reservation FRWRs intact); *United States v. Idaho*, 959 P.2d 449, 450-53 (Idaho 1998) (ruling that FRWRs for the limited purpose of stock-water consumption arose from Public Water Reserve 107 created by Executive Order pursuant to enabling Act by Congress), as did the cases it cites in the main text of its brief preceding that note.  Further, the United States' quotation from the 1964 Solicitor's Opinion at 71 Interior Dec. 340-361 is taken out of context and unrelated to FRWRs issues in this case.

For the reasons previously stated in the State's briefs (*see, e.g.*, SOAOpp.Br. at 46-62) and also in the Federal Defendants' Brief (U.S.Br. at pp. 79-90 (Doc. 167 at 92-103)), the Federal Defendants correctly chose not to assert FRWRs in marine waters generally, including Behm Canal.[54]  However, reasons those Defendants give for not asserting that claim are inconsistent with their assertion of FRWRs in other areas, such as in the abundant inland waters "adjacent" to but outside of the federal reserves Congress created and in marine waters encircled by an agency-inflicted "headland to headland" rule also contrary to Congressional intent.

## IX.    OTHER ABUNDANT WATERS

As the Defendants admit, in explaining their non-assertion of FRWRs in Behm Canal, "[t]he FRWRs doctrine is built on implication" and "is founded on the lack of sufficient water" necessary to fulfill the purpose for which the federal reservation was created.  U.S.Br. at 82, 87-89.  However, the Federal Defendants' rationale – that marine waters are abundant and therefore it is not necessary to reserve them by implication – applies equally to other abundant waters in which the Defendants asserted but should not have asserted FRWRs, such as in the Yukon River[55] and other rivers and lakes and in marine waters "headland to headland" expressly lying outside the reservations created by Congress in ANILCA.  More than "sufficient" waters lie within those reservations.[56]  No FRWRs can be implied in those ***outside*** waters either.

---

[54]    The Federal Defendants also assert (U.S.Br. at pp. 83-87) that the Peratrovich plaintiffs fail to show standing to present their claims, which can provide an alternative basis for denying those claims.
[55]    *See* AR Tab 353 at pp. 9180-81, reporting that the portion of the Yukon River in Alaska is supplied by an immense watershed draining 205, 000 square miles, equal to the land mass of the Pacific Northwest and covering roughly 35% of the state.
[56]    *New Mexico*, 438 U.S. at 699, 715 ("If water were abundant, Congress' silence would pose no problem" and there would be no need to imply FRWRs).

**CONCLUSION AND RELIEF**

For the foregoing reasons and those set out in its Opening Brief (Doc. 134) and

Opposition Brief (Doc. 169), the State requests the following relief:

1.      That the Court deny and dismiss the Katie John and Peratrovich plaintiffs' claims;

2.      That the Court declare unlawful, set aside, and vacate those portions of 50 C.F.R.

§ 100.3 and 36 C.F.R. § 242.3, and all other representations of the Federal Defendants such as in

their regulatory pamphlets, asserting federal subsistence jurisdiction in any waters of (a) the

Colville River lying outside of the NPRA boundaries; (b) the Yukon River adjacent to but lying

outside of the boundaries of the Nowitna NWR; (c) Sixmile Lake; (d) Tuxedni Bay up to and

seaward of the mean high tide line; (e) Togiak Bay and the Togiak River up to and seaward of

the mean high tide line; (f) the Stikine River up to and seaward of the mean high tide line; (g) the

Chignik River and Lake system including Black Lake and Chignik Lagoon; (h) the Crescent

River where surrounded by non-federal lands; and (i) the seven identified Juneau area streams

where surrounded by non-federal lands;

3.      That the Court declare unlawful, set aside, and vacate the definitions of "inland

waters" and "marine waters" in 50 C.F.R. § 100.4 and 36 C.F.R. § 242.4 containing the headland

to headland provision contravening the mean high tide line limitation provided by law;

4.      That the Court declare unlawful, set aside, and vacate the definition of "public

lands" in 50 C.F.R. § 100.4 and 36 C.F.R. § 242.4 where it purports to treat State and Native

Corporation selected-but-unconveyed lands including appurtenant waters as "public lands";

5.      That, based on those examples and other water body examples and law addressed

in the State's briefs, the Court declare unlawful, set aside, and vacate all other claims of the

Federal Defendants'  to FRWRs and ANILCA Title VIII jurisdiction (a) in "adjacent waters", (b)

in marine/tidal waters including all waters enclosed "headland-to-headland" up to and seaward of the line of mean high tide, (c) in waters appurtenant to non-federal inholdings, and (d) in waters and lands within State and Native Corporation selected but not yet conveyed lands;[57]

6.      That the Federal Defendants' claims to ANILCA Title VIII jurisdiction based on alleged rights in other waters within the exterior boundaries of federal conservation system units, national forests, and other federal public purpose reservations within Alaska be set aside or remanded with instructions to the Secretaries to provide greater specification of purposes, reasons, and affected waterbodies by name and precise area; and

7.      That the Court award such other and further relief as is just and proper leading to the conclusion of this matter, including any other specific relief with respect to specific water bodies or waterway sub-categories requested elsewhere within this Reply and the State's Opening and Opposition "Which Waters" briefs (Docs. 134 & 169).

//

//

//

//

//

//

//

---

[57]      Contrary to suggestions in the Federal Defendants' Brief, the Federal Defendants are not entitled to a remand if the Court determines that particular waters are not "public lands" because federal subsistence jurisdiction applies only to public lands.  ANILCA § 804.  There would be no point to remand proceedings following such a determination.  The Court should also enter judgment without a remand in any other circumstance in which it makes a final determination that particular waters or lands are not subject to federal subsistence jurisdiction.  During the course of any remand that is ordered, the agency rules should be set aside.  5 U.S.C. § 706(2) (reviewing Court "shall … set aside" agency action that is contrary to law or proper procedure, or is arbitrary and capricious).

Respectfully submitted this 17th day of March, 2008.

TALIS J. COLBERG
 ATTORNEY GENERAL

s/ Michael W. Sewright
Michael W. Sewright
Assistant Attorney General
Alaska Bar No. 7510090
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501
Phone: (907) 269-5257
Fax: (907) 279-2834
Email: mike.sewright@alaska.gov
Co-counsel for Plaintiff State of Alaska

s/ William P. Horn
WILLIAM P. HORN, D.C. Bar No.: 375666
JAMES H. LISTER, D.C. Bar No. 447878
Birch, Horton, Bittner & Cherot, P.C.
1155 Connecticut Avenue, Suite 1200
Washington, D.C. 20036
Telephone: (202) 659-5800
Facsimile: (202) 659-1027
Email: whorn@dc.bhh.com;
jlister@dc.bhh.com
Co-counsel for Plaintiff State of Alaska

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 17, 2008, a copy of the foregoing **STATE OF ALASKA'S REPLY BRIEF ON "WHICH WATERS"** was served electronically, on the following:

      Robert T. Anderson
      William P. Horn
      Randolph H. Barnhouse
      Carol H. Daniel
      Steven A. Daugherty
      Dean K. Dunsmore
      Gregory L. Fisher
      Phillip E. Katzen
      Heather R. Kendall-Miller
      James H. Lister
      William F. Sherman

      /s/ Michael W. Sewright