RANDOLPH H. BARNHOUSE
SAMUEL D. HOUGH
Luebben Johnson & Barnhouse LLP
7424 4th Street NW
Los Ranchos de Albuquerque, New Mexico 87107
(505) 842-6123
(505) 842-6124 (fax)
Email: dbarnhouse@luebbenlaw.com

Attorneys for Related Case Plaintiffs
  Peratrovich, *et al.*

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| KATIE JOHN, GERALD NICOLIA, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>Defendants. | No. 3:05-cv-00006 (HRH)<br>(Consolidated)<br><br>RELATED CASE PERATROVICH PLAINTIFFS' SUPPLEMENTAL REPLY BRIEF ON THE "WHICH WATERS" ISSUE |

## I. INTRODUCTION

The Federal Defendants and State of Alaska ask this Court to take a totally unprecedented action: exclude an entire category of water from application of the federal reserved water rights ("FRWRs") doctrine. Yet neither the Federal Defendants nor the State can cite a single decision where a court has taken such far reaching action. Indeed, the only reported case addressing the propriety of excluding an entire category of water from application of the FRWR doctrine rejected the idea as inappropriate. That court held, as this court should, that if the purpose of a federal reservation requires water, the source of that water is irrelevant. *In re General Adjudication of the Gila River*, 195 Ariz. 411, 420, 989 P.2d 739, 748 (1999). Moreover, the Federal Defendants' and State's related argument that reserved water rights cannot exist in abundant waters has similarly been rejected. *See Cappaert v. United States*, 426 U.S. 128, 143 n.7 (1976)(FRWR held to exist despite the abundance of water in the 4,500 square mile

SUPPLEMENTAL REPLY BRIEF OF RELATED CASE PERATROVICH PLAINTIFFS, ET AL.
PERATROVICH PLAINTIFFS
3:05-cv-00006 – HRH                                   1

hydrologically connected aquifer); *see also, Mattaponi Indian Tribe v. Virginia*, 72 Va. Cir. 444, 460-62 (Va. Cir. 2007).

Apparently recognizing the inadequacy of their argument on the one question now before the Court, both the Federal Defendants and the State weave a Gordian knot of attacks directed at the merits of the Peratrovich Plaintiffs' underlying claims.[1] Those matters are irrelevant to the single issue the Court ordered the parties to address in this round of briefing. The Court should cut through this chaff to the one issue now being briefed in *Peratrovich*, and rule that as a matter of law the federal government can reserve water rights in marine waters. As recognized by the Federal Defendants, such a ruling will resolve the issues in Peratrovich and allow the Court to enter final judgment in that case directing the Federal Defendants to identify specific navigable marine waters in which FRWRs exist, thus making them public lands subject to federal regulation under the Alaska National Interest Lands Conservation Act ("ANILCA"), Pub. L. 96-487, 94 Stat. 2371 (Dec. 2, 1980), codified at 16 U.S.C. § 3101 *et seq*. *See Alaska v. Babbitt*, 72 F.3d 698, 704 (9th Cir. 1995)(*Katie John II*).[2]

## II. STANDARD OF REVIEW

The question of whether it is impossible, as a matter of law, for FRWRs to exist in marine waters is a question of law reviewed de novo by this Court, and is not, as alleged by the Federal Defendants in their brief (Document 167, Case No. 3:05-dv-00006-HRH ("U.S. Which Waters Br.") at 7) and the State in its brief ( Document 169, Case No. 3:05-dv-00006-HRH ("State Response Br.") at 9), limited to the arbitrary and capricious standard of the Administrative Procedures Act, 5 U.S.C. §§ 701-706 ("APA").[3] ANILCA Section 807 provides for judicial enforcement of the subsistence priorities established by ANILCA when administrative remedies

---

[1] These red herring arguments are numerous and contained throughout the Federal Defendants' and State's briefs. Two examples are the Federal Defendants' dedication of four full pages of its brief to argue issues of standing, and the State's commitment of two pages of its brief to the argument that an unsuccessful attempt to intervene in *Alaska v. United States*, No. 128 Original, prohibits this Court from deciding whether FRWRs exist in marine waters.

[2] The Peratrovich Plaintiffs adopt the citing convention outlined by the Katie John Plaintiffs in their opening brief on "which waters" (Document 139-2, Case No. 3:05-dv-00006-HRH at 1 n.1).

[3] Neither the U.S. (U.S. Which Waters Br. at 12) nor the State (State Response Br. at 8 n.21) raise any objection to the Peratrovich Plaintiffs exhibits. Nevertheless, the Peratrovich Plaintiffs note that this Court's review is not limited to the administrative record. That is especially true here where the Court specifically asked that a factual context be provided to put the legal argument into context. Although the U.S. objected to specific exhibits offered by the Katie John Plaintiffs (U.S. Which Waters Br. at 13), it did not raise any similar objections to the exhibits submitted by the Peratrovich Plaintiffs.

are exhausted. 16 U.S.C. § 3117. This Court found that the Peratrovich Plaintiffs exhausted available administrative remedies and that the judicial enforcement mechanism applies to the Peratrovich claims. Peratrovich Document 178, Case No. 3:92-CV-00734-HRH ("Peratrovich Document 178") at 22.

In addition, the State's argument regarding the standard of review applicable to "failure to act" claims (State Response Br. at 10) is not germane to the issues identified by the Court to be briefed in this "which waters" phase of briefing. It is also simply incorrect. In the rulemaking, the Secretaries applied a narrow interpretation of FRWRs to their own definition of marine waters and found that "the rationale behind the [FRWRs] doctrine would not apply to… marine waters," including those waters expressly reserved by Congress. 69 Fed. Reg. 70940, 70941 (Dec. 8, 2004). That is not a failure to act, but rather specific action taken to exclude an entire category of water in derogation of ANILCA. *See Environmental Defense Fund, Inc. v. Hardin*, 428 F.2d 1093, 1099 (D.C. Cir. 1970)("when administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief").

Moreover, judicial deference to agency inaction only applies if there is no specific mandatory duty prescribed by statute. ANILCA Section 814, codified at 16 U.S.C. § 3124, mandates that the federal agencies provide regulations to protect subsistence priorities and provide for subsistence priorities in waters subject to FRWRs. *Katie John II*, 72 F.3d at 703-704. This mandate includes the duty to identify those marine waters subject to FRWRs. *Id*. at 704. Therefore, as the State concedes, the APA authorizes a court to require a federal agency to take specific action to fulfill a non-discretionary mandatory duty that the agency has failed to fulfill. State Response Br. at 9, citing *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004).

The Federal Defendants further assert that deference should be accorded to the Secretaries' determination of FRWRs. U.S. Which Waters Br. at 10. However, an agency interpretation of the common law doctrine of FRWRs is not entitled to substantial judicial deference. *Texas Gas Transmission Corp. v. Shell Oil Co.*, 363 U.S. 263, 270 (1960). The Peratrovich Plaintiffs adopt the arguments of the Katie John Plaintiffs in Section II of their reply brief (Document 181, Case No. 3:05-dv-00006-HRH ("John Reply Br.") at 2-8) and the State in Section IA of its reply brief (Document 182, Case No. 3:05-dv-00006-HRH ("State Reply Br.") at 2-3) on the inappropriateness of judicial deference to the Secretaries' identification of FRWRs.

### III.  PROCEDURAL HISTORY

As recognized by the Federal Defendants, the only issue the Court asked the parties to brief at this juncture is the Federal Defendants' regulatory "which waters" determination. U.S. Which Waters Br. at 13-14. As noted by the Federal Defendants, they simply rejected, without further analysis, the existence of ANY FRWR in marine waters. U.S. Which Waters Br. text at 4 and at n.10. The Federal Defendants also correctly summarized the complexity of the FRWRs analysis as applied to Alaska for purposes of ANILCA.[4] As further recognized by the Federal Defendants, ownership of submerged lands is not an issue now. U.S. Which Waters Br. at 40 n.46.

### IV.  ARGUMENT

**A.  The Federal Defendants' Attack on Standing is Untimely, and Merely Reargues their Mootness Claim that this Court Rejected.**

Ignoring this Court's directive to brief specific "which waters" issues, the Federal Defendants raise, in the Katie John proceedings, a claim that the Peratrovich Plaintiffs do not have standing to pursue their claims in the separate, but jointly managed, Peratrovich proceedings. The Federal Defendants base their entire argument in that regard on their assertion that the Peratrovich Plaintiffs have offered no "evidence" that they "have suffered an injury in fact." U.S. Which Waters Br. at 83. This is little more than a reassertion of the federal government's mootness argument that this Court already rejected. Peratrovich Document 178 at 22-23.

The first amended complaint contains sufficient specific allegations to support standing, supported by evidentiary material set forth and incorporated into the first amended complaint and attached as exhibits to the original complaint. Based on that material, this Court has held that the Peratrovich Plaintiffs "applied for the permits necessary to take herring roe on kelp," those applications were rejected, and that "it is entirely clear that any further administrative recourse would be futile." Those findings not only confirm that the Peratrovich Plaintiffs' claims are not moot, but also establish that the Peratrovich Plaintiffs have suffered an injury in fact sufficient to establish their standing. *Id.*

---

[4] "Issues pertaining to whether a FRWR exists in any specific waters and the decisions in regard thereto usually arise in the context of consumptive uses of water and a shortage of the amount of water available for such uses. The principles regarding FRWRs derived from these cases, therefore, do not always precisely fit the determinations of the waters that are subject to the TITLE VIII subsistence use priority." U.S. Which Waters Br. at 14. *See Mattaponi*, 72 Va. Cir. at 460-62.

There is no motion to dismiss based on standing before the Court, either in these proceedings, or in the jointly managed Peratrovich proceedings.[5] Moreover, there has yet to be an evidentiary hearing of any type in the Peratrovich matter. It cannot be disputed that at such an early stage of proceedings, all that is necessary to establish standing is that the complaint allege the requisite injury in fact. *Bennett v. Spear*, 520 U.S. 154, 167-69 (1997)(rejecting federal government's claim that plaintiffs lacked standing and holding that "at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim").

**B.    ANILCA "Compels" the U.S. to Provide Subsistence Fishing Priority in All Waters Where a FRWR Exists.**

**1.  The Federal Agencies provide no reasoned basis in law for failing to identify FRWR in Marine Waters.**

The Katie John Ninth Circuit decisions recognize that the existence of FRWRs makes those waters "public lands" for purposes of ANILCA. Those decisions reflect the Ninth Circuit's understanding that the Peratrovich claims are limited to marine waters in the Tongass. *See e.g.*, *Katie John II*, 72 F.3d at 703-704. In drafting its opinions, the Ninth Circuit could easily have said the Peratrovich Plaintiffs have no FRWR claims because their claims are limited to marine waters. But the Ninth Circuit never made that monumental leap. This Court should not do so now.

**2.  ANILCA compels the Federal Defendants to assert specific claims.**

Contrary to the State's unsupported assertion, the issue now before this Court is not about forcing the United States to assert "tenuous" FRWR claims, it is about requiring the Federal Defendants to review whether FRWRs exist in certain marine waters of the Tongass which make those waters public lands pursuant to ANILCA. As recognized by the court in *Katie John II*, this is an undertaking the Federal Defendants are required to make under ANILCA. 72 F.3d at 704. Once made, that determination will allow the Peratrovich Plaintiffs to secure the priority subsistence fishing rights to which they are entitled under ANILCA.

---

[5] This Court's May 31, 2006, order in Peratrovich sets out the procedural status of that case, which to date has only involved refinement of the pleadings resulting from motions to amend and motions to dismiss based on the pleadings. Peratrovich Document 178 at 6-19.

The State concedes the issue when it argues that, "[b]ecause this case is about judicial review of the specific geographic boundaries within which the Federal Defendants can lawfully exercise subsistence jurisdiction, what matters is not the geographic location of a potential defendant in hypothetical future suites to enforce FRWRs, but rather the actual location of the FRWRs themselves." State Response Br. at 31, citing *Katie John II*, 72 F.3d at 703-04 for the proposition that "federal subsistence jurisdiction exists where FRWRs exist." The State goes on to recognize that, "In those reaches of waterways with FRWRs properly identified by the Federal Defendants, under *Katie John II* the Federal Defendants have authority to provide the subsistence priority." State Response Br. at 31. The State explicitly concedes, "[t]his crucial distinction between the location of a FRWR and the means of enforcing it" *Id.*

This is not about this Court forcing the Federal Defendants to create FRWRs. Instead, it is about this Court requiring the Federal Defendants to identify waters in which the federal government holds FRWRs. The proper course of action once this Court rules that FRWRs can exist in marine waters will be for judgment to be granted in the Peratrovich case, ordering these federal bureaucracies to engage in the regulatory process necessary to determine the specific marine waters in which the federal government has reserved water rights. U.S. Which Waters Br. at 83.

3. **The Federal Defendants must provide subsistence fishing priority in all waters in which the federal government holds FRWRs.**

It is the settled law of the case that ANILCA mandates that the Secretaries provide for subsistence priorities on public lands in Alaska including navigable waters subject to FRWRs. *Katie John II*, 72 F.3d at 703-704. Yet, the Federal Defendants assert that the application of FRWRs to Alaska must maintain a balance between federal and state authority over fish and wildlife because Congress did not intend to diminish the State's authority over hunting and fishing. U.S. Which Waters Br. at 39. To strike this balance, the Federal Defendants adopted a schizophrenic approach to the FRWRs doctrine that all other parties agree fails miserably.[6]

Moreover, the Federal Defendants' argument that a balance must be struck between the State and the federal government is a rehashing of a claim litigated by the State that this Court has already considered, and rejected. (Document 110, Case No. 3:05-cv-00006-HRH ("Document

---

[6] The Peratrovich Plaintiffs also adopt the argument of the Katie John parties (John Reply Br. at 10-12) on this issue.

110") at 29-31). Section 1314 of ANILCA, as codified, expressly provides that the adoption of subsistence regulations by the Secretaries pursuant to Title VIII of ANILCA may diminish the authority of the State over management of fish and wildlife on the public lands. 16 U.S.C. § 3202(a).[7].

Furthermore, to the extent there may be any diminishment of the State's regulatory authority over fish and wildlife on the public lands, it is primarily due to the State's failure to adopt enforceable subsistence statutes and regulations. *See McDowell v. State*, 785 P.2d 1 (Alaska 1989) (State's subsistence statute held to be unconstitutional under the State's constitution). ANILCA Section 805(d) provides that if the State fails to implement the subsistence priority, then the Secretaries are required to adopt regulations that provide the subsistence priority. 16 U.S.C. § 3115(d). Thus, Congress not only anticipated that such action by the Secretaries may curtail State authority, Congress struck the balance in favor of protecting the subsistence way of life. *See John v. United States*, 247 F.3d 1032, 1037 (9th Cir. 2001)(*Katie John III*)(Judge Tallman concurring in en banc decision, providing that Congress intended for traditional state authority to be curtailed if the state failed to enforce the subsistence priorities). Therefore, the Secretaries' duty includes the identification of all marine waters subject to FRWRs in Alaska and the application of subsistence priorities to those waters.

**C.   Federal Water Rights Exist in Marine Water.**

   **1. Excluding an entire category of water from application of the FRWR doctrine would require this Court to go where no other court has gone.**

Contrary to the State's assertion to the contrary (e.g., State Response Br. at 2 and 46), it is the State and federal government, not the Peratrovich Plaintiffs, who are asking this Court to "go where no court has gone before." Neither the State nor the Federal Defendants can cite a single case in which a court has summarily excluded an entire category of water from application of the FRWRs doctrine. Yet they nevertheless request that this Court do so for the first time in the history of FRWRs jurisprudence. Reservation of water rights has never been limited to consumption, but instead has in every instance been based upon the water's necessity to fulfill the purpose for which a reservation was created. *Mattaponi*, 72 Va. Cir. at 460-62. As *Winters*

---

[7] Section 1314 of ANILCA, in pertinent part, and as codified, provides: "Nothing in this Act is intended to enlarge or diminish the responsibility and authority of the State of Alaska for management of fish and wildlife on the public lands *except as may be provided in subchapter II of this chapter* [for adoption of subsistence priorities], or to amend the Alaska constitution. 16 U.S.C. § 3202(a).

and all cases considering the FRWRs doctrine that have followed have clearly held, the doctrine is applied when there is a necessity for water, regardless of the water's source, location or salinity. *See e.g.*, *In re General Adjudication of the Gila River*, 195 Ariz. 411, 420, 989 P.2d 739, 748 (1999). This Court should decline to be the first to exclude an entire category of water based merely on its salinity, and instead rule that FRWRs can exist in marine waters.

2. **Alaska state law confirms that the State of Alaska, in other contexts, recognizes the beneficial uses of marine waters.**

The State's opening position in the "which waters" briefing was that water rights cannot exist in marine waters. However, its position is contradicted by its own recognition of water rights and beneficial uses of marine water in the Alaska Water Use Act, Alaska Statutes §§ 46.15.010 *et seq*. Now the State attempts to flee its concession regarding water rights in and the beneficial uses of marine waters by simply claiming that its admission in that regard is "unavailing." State Response Br. at 47 n.56. As the State must concede, it is federal not state law that establishes the scope of FRWRs. *Id.* Indeed, the Peratrovich Plaintiffs have never claimed the FRWRs exist in marine water pursuant to state law. Rather, the Peratrovich Plaintiffs assert that the United States possesses FRWRs in marine water to the extent necessary to fulfill the primary purposes of its reservations. They support that position by noting the State's own recognition of water rights in and beneficial uses of marine waters.[8]

3. **The Federal Defendants and State concede the issue.**

The Federal Defendants concede that FRWRs can and do exist in marine waters. Document 150-1, Case No. 3:05-cv-00006-HRH ("Peratrovich Supplemental Br.") at 22-24. In their most recent brief, the Federal Defendants go on to recognize that:

> [I]ssues pertaining to whether a FRWR exists in any specific waters and the decisions in regard thereto usually arise in the context of consumptive uses of water and a shortage of the amount of water available for such uses. The principles regarding FRWRs derived from these cases, therefore, do not always precisely fit the determinations of the waters that are subject to the TITLE VIII subsistence use priority.

---

[8] It is not the case that the State's statutory and regulatory scheme failed to provide any "explicit exclusion of salt water"; rather, the State prescribes specific uses for it. Peratrovich Supplemental Br. at 26.

U.S. Which Waters Br. at 14.[9] The Federal Defendants also concede that*:* "[t]he Secretaries have stated that where Congress included among the purposes of a reservation that maintenance of fish and wildlife resources and water quality and quantity are purposes of the reservation that is sufficient to create a FRWR." U.S. Which Waters Br. at 45 n.50.

Even the State recognizes that it is USE, not consumption of water that is the issue when it argues that enforcement of FRWRs "is thus very similar to abatement of nuisances."[10] State Response Br. at 35. That analysis helps explain the importance of FRWRs in marine waters. The protection those rights provide from "nuisance" impairments under the State's analysis is just as important in marine waters as it would be in rivers and lakes. State Response Br. at 35-36.

Moreover, both the Federal Defendants (U.S. Which Waters Br. at 82) and the State (State Response Br. at 48-49) cite with approval the Alaska Policy Group Final Issue Paper in which it is recognized that FRWRs should exist in certain marine waters, such as salt chucks.[11] And the State concedes that the United States does have FRWRs in marine waters above lands reserved by the United States prior to Alaska's statehood. State Response Br. at 71.

The Federal Defendants and the State take the untenable position that FRWRs NEVER exist in marine waters, EXCEPT when they sometimes do. If they ever exist in marine waters, which their claimed "exceptions" prove they do, then this Court must find they can exist in marine waters, and must order the Federal Defendants, pursuant to ANILCA, to identify the specific marine waters in which the United States holds FRWRs.

**D.    The State, Having Gone to Great Lengths to Have the Parties Put Their Argument in a Factual Context, Now Argues the Facts are "Immaterial."**

Somewhat surprisingly, given its aggressive efforts to have this Court adopt a briefing approach that used "test case" waterways to place claims in a factual context,[12] the State seeks to dismiss the Peratrovich factual context out of hand without refuting in any way the facts

---

[9] See also U.S. Which Waters Br. at 16 ("There is no real dispute as to the basic criteria for the presence of FRWRs. The disputes are to the application of these principles to the Alaska factual situation.").

[10] The Peratrovich Plaintiffs do not agree that the enforcement issue addresses the existence issue, and adopt the argument of the Katie John Plaintiffs. John Reply Br. at 12-20. The State's recognition of this distinction is, however, instructive in the marine water context. State Reply Br. at 38 n.52.

[11] Alaska Policy Group Final Issue Paper, 3-4 Admin. Record, Tab 88 at 1712.

[12] *E.g.,* Peratrovich Document 113, Case No. 3:05-cv-00006-HRH ("Peratrovich Document 113") at 5 ("it is evident that these substantive 'which waters' issues cannot be decided purely in the abstract, but need concrete examples to illustrate those issues for the Court. For each of these substantive issues that remain to be decided, the Court needs to be presented with the facts specific to at least one waterway whose status turns on the issue").

themselves. State Response Br. at 46-49. Unable to refute that the primary purpose behind creation of the Tongass requires water, the State simply makes condescending remarks about the argument, then claims (without support) that the facts are "immaterial." State Response Br. at 47. As the facts demonstrate, the primary purpose for creation of the Tongass required water, and establishment of FRWRs.

### 1. The primary purpose for creation of the Tongass requires a reservation of water.

In *New Mexico v. United States*, the Supreme Court specifically held that Congress intended national forests to be reserved to furnish a continuous supply of timber for the people. 438 U.S. 696, 707 (1978). As set out with specificity in the Peratrovich Supplemental Br. (at 30-32) (and not in any way contested by the State or Federal Defendants), the ONLY WAY to "furnish" timber in the Tongass was, upon its creation, OVER THE MARINE WATERS in the forest. The State fails to address the facts, and thus must be held to have conceded this factual issue.

Additionally, and contrary to the State's unsupported protestations to the contrary, what the "true" facts show is that fish DO make trees grow.[13] The science supporting the link between decaying salmon and trees in the nutrient cycles of the American temperate rainforests recognizes that the forest and the sea are intimately connected in this ecosystem.[14] This nutrient connection includes "salmon derived nutrient" also known as "marine derived nitrogen."[15] In the Tongass, it was found that 47% of the forested area falls within 0.5 km of a salmon stream and 90% of the overall forested area is within 5 km of a salmon stream.[16] It has also been found that there is a bi-directional flow of nutrients among marine, freshwater and terrestrial ecosystems

---

[13] Scott M. Gende, Richard T. Edwards, Mary F. Willson, and Mark S. Wipfly, *Pacific Salmon in Aquatic and Terrestrial Ecosystems* 52 BioScience 917, 924 (Oct. 2002)("Pacific Salmon")(available at http://www.nps.gov/glba/naturescience/upload/Gende%20et%20al_Pacific%20salmon%20in%20aquatic%20and%20terrestrial%20ecosystems.pdf , last accessed 4/3/08)("The links between ocean and land mean that management of an ocean fishery can have far-reaching effects on different ecosystems, and vice versa.") attached as Exhibit 1 to this brief; and DD Mathewson, MD Hocking, and TE Reimchen, *Nitrogen Uptake in Riparian Plant Communities Across a Sharp Ecological Boundary of Salmon Density*,"BMC Ecology (May 3, 2003)("Nitrogen Uptake")(available at http://www.pubmedcentral.nih.gov/articlerender.fcgi?artid=156615, last accessed 3/19/08). Attached as Exhibit 2 to this brief.
[14] The Great Bear Rainforest (available at http://greenpeace.org/comms/97/forest/gbr_ecology.html last accessed 3/19/08). (2000).
[15] Pacific Salmon at 217; and Nitrogen Uptake "Background".
[16] Pacific Salmon at 219.

suggesting that the health of the salmon streams, marine estuaries, forests, and the plant and animal species therein are interdependent.[17]

Again, contrary to the State's assertions, the proclamations establishing the Tongass need not mention water to establish FRWRs, hence the use of the word "implied." *Winters v. United States*, 207 U.S. 564, 577 (1908); *New Mexico*, 438 U.S. at 698. Under well settled FRWR law, if water is required to fulfill the primary purpose of the federal reservation, as it is here, then an implied FRWR is created. As the facts left undisputed by the State and the Federal Defendants show, the ONLY way to provide timber from the Tongass at the time of its creation was over the marine waters INCLUDED WITHIN THE BOUNDARIES OF THE MAPS creating the Tongass. It is likewise undisputed that those same marine waters were viewed as a vital and necessary part of the coastal rainforest ecosystem of the Tongass that created the temperate environment in which the trees grew. Peratrovich Supplemental Br. at 31-32.[18]

    **a. The "Test Case" Facts presented by the Peratrovich Plaintiffs are uncontested.**

Although the State takes issue with certain of the exhibits submitted by the Katie John Plaintiffs in this stage of the briefing process (State Response Br. at 8 n.21), the State does not object to the submission of the Peratrovich Plaintiffs, and concedes that the Court can rely on "those materials (such as maps, public records, and standard references) of which the Court may properly take judicial notice." *Id.*[19]

    **b. The federal government has judicially conceded that the proclamations creating the Tongass included taking of marine water.**

As the Federal Defendants concede, the creation of the Metlakatla (Annette Island) Reservation included the reservation, and thus taking, of fisheries, and thus a reservation by the United States of marine waters supporting those fisheries. U.S. Which Waters Br. at 26 n.26. The Federal Defendants recognize that:

> The purpose in [ANILCA Section 302(1)(B)(iii)] of also providing "the opportunity for continued subsistence uses" of fishery resources would be substantially defeated if these

---

[17] Nitrogen Uptake, "Conclusions".

[18] *See also,* U.S. Which Waters Br. at 45-47 (implied reservation when purpose requires water).

[19] The United States and the State failed to address the argument in the Peratrovich Supplemental Brief (at 36) demonstrating that FRWRs exist in the marine waters of the Tongass that are appurtenant to federally reserved land and marine water outside, but adjacent to Alaska. That failure should be deemed a concession by those parties on the issue of FRWRs in those marine waters. *Scognamillo v. Credit Suisse First Boston LLC*, 2005 U.S. Dist. LEXIS 20221, 22 (N.D. Cal. 2005)("failure to respond to arguments essentially concedes them").

> waters were not public lands for it is axiomatic that fish must be taken from waters. . . . This would be contrary to the intent that ANILCA intended to provide a meaningful Federal subsistence use opportunity on navigable waters.

U.S. Which Waters Br. at 64. The State similarly concedes that, "where a right to take fish exists, it exists to take fish within the reserved area." State Response Br. at 24.

Applying these concessions to the Court of Claims cases, in which Tlingit Native Alaskans were compensated for property taken from them when the Tongass was created, confirms that the creation of the Tongass included marine waters within the federal reservation, and thus taking, of the marine waters. Those judicial determinations are conclusive on the United States and its successor in title, the State of Alaska, in these proceedings.

In *Tlingit and Haida Indians of Alaska v. United States*, the court held that takings occurred, including takings of "land and water," when the Tongass was reserved in 1902, 1907 and 1909. 177 F. Supp. 452, 467-68 (Ct. Cl. 1959).[20] These takings dates were stipulated to by the United States in *Tlingit and Haida Indians of Alaska v. United States*, 389 F.2d 778, 781-82 (1968). Based on those takings, the court in this second opinion established the payments to be made by the United States for, among other property taken, the value of fisheries. *E.g., Id*., 1968 U.S. Ct. Cl. LEXIS 49 at 340-347.

The United States has stipulated that land and water were taken, and thus marine water reserved by the United States, when the Tongass was created. Neither the Federal Defendants nor the United States' successor in title should now be allowed to claim that marine water was not included in the federal reservations that established the Tongass National Forest. *See* U.S. Which Waters Br. discussion of Tongass at 66-70 ("[T]here can be no dispute that the Tongass National Forest holds FRWRs in waters within that reserve."); *Cf.* State Response Br. at 29 n.45 (FRWRs implied for fishing rights – citing *United States v. Adair*, 723 F.2d 1398, 1411-12 (9th Cir. 1984)).

---

[20] *See also Tlingit and Haida*, 1959 U.S. Ct. Cl. LEXIS 122, 66-68, 115-118, and 210-12 (*e.g.,* "The Tlingit and Haida Indians were so oriented to the water in their customs and habits that they are commonly referred to as 'coast' Indians. The great bulk of their resources came from the beach, river or sea.").

2. **The primary purpose of the reservations confirmed in ANILCA requires a reservation of water.**

ANILCA confirmed the establishment of the Tongass as a national forest, added acreage to the Tongass and addressed the primary purposes of the reservation. ANILCA § 501, codified at 16 U.S.C. § 539, and § 505, codified at 16 U.S.C. § 539b. In ANILCA Section 505 Congress added fisheries protection as a primary purpose of the Tongass. Both ANILCA and the subsequent Tongass Timber Reform Act of 1990, Pub. L. 101-626, 104 Stat. 4428, make it abundantly clear that protection of fisheries takes precedence over mining operations and timber sales within the Tongass. 16 U.S.C. § 539d(e). Mining operations must be conducted in accordance with an approved plan of operations that provides protection for fisheries habitat including "water quality and sufficient water quantity." 16 U.S.C. § 539b(b). The habitat protection further includes protecting the habitat and food chain for the various life stages of anadromous fish and other foodfish.[21] Two critical life stages for anadromous fish take place in marine waters: (1) the estuary stage, a high nutrient intake stage for young salmon where fresh water and marine water mix; and (2) the coastal waters stage which lasts for 1 to 7 years.[22]

Likewise, the logging in the Tongass National Forest must be done in accordance with a provision that requires a riparian buffer for fish habitat. 16 U.S.C. § 539d(e) (added in 1990). Moreover, in areas added to the Tongass by ANILCA, the protection of fisheries takes precedence over all other multiple uses of the forest, including recreation. 16 U.S.C. § 539(b). Thus, fisheries and their habitat, including water quality and quantity, is the primary management goal of the Tongass.

3. **Test Case Waterways put FRWR issue in a factual context.**

   a. **Behm Canal.**

Although the United States does assert that President Jimmy Carter did not, and could not have, reserved additional submerged lands when he created the Misty Fjords National

---

[21] See Exhibit 31 attached to the Peratrovich Supplemental Br. discussing the many marine subsistence foodfish in Southeastern Alaska upon which Alaska Natives relied.

[22] Ted Gresh, Jim Lichatowich & Peter Schoonmaker, *Salmon Decline Creates Nutrient Deficit in Northwest Streams*, Tide Pool (Feb. 4, 2000)(available at http://www.tidepool.org/findings/gresh.cfm, last accessed 3/19/08)(discussing the importance of marine nutrient resources, released from the decaying bodies of salmon, for survival of young salmon in streams and estuaries). Attached as Exhibit 3 to this brief. *See also*, Pacific Salmon at 918.

Monument, they do not raise a specific challenge to the Peratrovich Plaintiffs' factual submission showing that President Carter could, and did, reserve federal water rights in the marine waters of the Misty Fjords National Monument. Indeed, as the United States concedes, FRWRs can be reserved even after statehood. U.S. Which Waters Br. at 18 n.20.

Neither the Federal Defendants nor the State dispute that, when President Jimmy Carter created the Misty Fjords National Monument in 1978, he reserved federal water rights necessary to fulfill the purposes for which he created this federal reservation. Although the State incorrectly argues that Congress "repealed" President Carter's proclamation creating the Misty Fjords National Monument (State Response Br. at 7 and 53), the State ignores the underlying relevant fact: President Carter explicitly reserved FRWRs in the marine waters of the Misty Fjords National Monument. Indeed, if the State's argument is to be given any credence, then Congress must have felt it necessary to rescind President Carter's reservation of marine FRWRs (State Response Br. at 54). That concession alone is fatal to the State's argument as it demonstrates Congressional recognition that FRWRs can and do exist in marine waters.

Moreover, and again contrary to the State's assertions, Section 503(f)(1) of ANILCA (not codified) does not address the boundaries of the Misty Fjords National Monument. Rather, that section provides that the "lands" that are included within the monument are not open to settlement or to selection by the State or Alaska Native Corporations. Second, the State contends that the FRWRs created by President Carter were excluded by Congress when it did not use the word "water" within the ANILCA section discussing the monument. However, what the State either overlooked or chose to ignore is that Congress defined the term "land" as "lands, water, and interests therein."[23] 16 U.S.C. § 3102(1). Thus, whatever effect the non-use of the word "water" in ANILCA's adoption of the Misty Fjords National Monument may have had on the express reservation of FRWRs in marine waters made by President Carter, demonstrates that an implied FRWR may exist in the unappropriated marine waters adjacent to the monument that are necessary to fulfill the purposes of the reservation. *New Mexico*, 438 U.S. at 702; *Cappaert*, 426 U.S. at 139. Indeed, the Federal Defendants (U.S. Which Waters Br. at 18 n.20) recognize that the federal government has the authority both before and after statehood to "reserve waters for the use and benefit of federally reserved lands." *United States v. District Court in and for County*

---

[23] This definition of land is what led to the briefing on "which waters" are "public lands" subject to subsistence regulation by the Secretaries under ANILCA.

*of Eagle*, 401 U.S. 520, 522-23 (1971). This is so even if the State has been granted title to the submerged lands. *United States v. Winans*, 198 U.S. 371, 383-84 (1905).

Furthermore, Section 103(a) only provides that the boundaries of areas "added" to "the National Forest Systems shall, in coastal areas not extend seaward beyond the mean high tide line to include lands owned by the State of Alaska." 16 U.S.C. § 3103(a). Section 503(a) of ANILCA, not codified, did not "add" Misty Fjords to the National Forest. Instead, it provides that Misty Fjords is established "within" the Tongass National Forest.[24] Indeed, the size of Carter's monument and that established in ANILCA are exactly the same. *Id.*[25]

Even if, as the State claims, waters are not "within" the Misty Fjords monument as depicted on the map, it does not follow that federally reserved water rights do not exist in the adjacent waters. The Ninth Circuit in *Katie John II* held that federally reserved water rights can exist in waters adjacent to federal lands if those waters are necessary for the purpose of the federal reservation. 72 F.3d at 703-704.[26]

Indeed, ANILCA section 1322, codified as 16 U.S.C. § 3209, provides that Misty Fjords is to be managed by the Secretary of Agriculture pursuant to all laws applicable to the national forests. These laws include the Antiquities Act of 1906, codified as 16 U.S.C. § 431, when National Monuments are located on the lands of the Agency. Section 503(c) provides that the Monument is to be managed by the Secretary of Agriculture "to protect objects of ecological,

---

[24] Subsection 503(a) of ANILCA provides that: "There is established *within* the Tongass National Forest, the Misty Fjords National Monument, containing approximately two million two hundred and eighty-five thousand acres of public lands as generally depicted on a map entitled (Misty Fjords National Monument – Proposed dated July 1980)."

[25] The controlling provision on whether the submerged lands and waters that are within the Misty Fjords National Monument are included within the ANILCA reservation is Section 103(c) that provides:

> Only those lands within the boundaries of any conservation system unit which are public lands (as such term is defined in this Act) shall be deemed to be included as a portion of such unit. No lands which, before, on, or after the date of enactment of this Act, are conveyed to the State… shall be subject to the regulations applicable solely to public lands within such units.

This language does not affect federally reserved water rights as there has been no conveyance of water rights to the State in ANILCA. In addition, the operation of the Statehood Act and the Submerged Lands Act and the effect on the reservation of submerged lands within the Tongass is not at issue in this briefing cycle.

[26] In support of its argument that ANILCA section 1322, codified as 16 U.S.C. § 3209, rescinded the boundaries of the Misty Fjords National Monument as established by Carter's Presidential Proclamation, the State attaches a 2002 map prepared by the State of Alaska including disclaimers as to its accuracy for any purpose. Exhibit 2 to the State's Brief. The map is of little use for any purpose because the map does not indicate any boundaries crossing waters of any type, including inland water ways. In addition, it is not the map prepared for ANILCA purposes and does not contain the official borders designated by Congress in ANILCA.

cultural, geological, historical, prehistorical, and scientific interest." This language is similar to that of the Antiquities Act. Indeed, the Tongass Land and Resources Management Plan, Forest Service, R10-MB-603b, at 3-7 (January 2008)("Forest Plan"), provides that Misty Fjords is to be managed in accordance with the Wilderness Act, ANILCA and the presidential proclamation creating the monument. (Exhibit 4 attached to this brief provides the pertinent provision of the plan).[27] Therefore, the question of whether federally reserved water rights exist within or adjacent to the monument must be determined, as with all FRWRs, based on whether water is necessary to fulfill the primary purposes of the monument to protect objects of ecological, cultural, geological, historical, prehistorical, and scientific interest, including fish.[28]

The cases cited by the State in its brief to support its allegation that the purposes of the monument were abolished do not support their contention. Rather, one of those cases involved whether an amendment to a statute is dispositive of the legislature disapproving of a court's interpretation of the previous statute. *See West Winds, Inc. v. M.V. Resolute*, 720 F.2d 1097, 1100 (9th Cir. 1983). However, what *West Winds* does provide that is useful to the discussion here is that an amended statute or new statute is evidence only that changed circumstances are evident and there is a presumption that some legal rights have changed per the statute. *Id*. The other case provides the familiar principle of statutory construction that the language of a statute is the best indication of legislative intent. *Meltzer v. Zoller*, 520 F. Supp. 847, 855 (D.N.J. 1981). The ANILCA sections 1322 and 503 taken as a whole provide that what has changed is the primary managing agency and the manner in which mineral interests in the monuments may be developed. Where President Carter's proclamation recognized existing rights and interests, the ANILCA sections explain how those existing rights may be developed in a manner that is consistent with the status of the land as a National Monument. Proclamation No. 4623, 43 Fed. Reg. 57087 (Dec. 1, 1978); *C.f.* ANILCA § 503. The use of coastal waters and the protection of fish, fisheries and fish habitat are specifically included within the sections discussing the development of mineral interests in the National Monument. ANILCA § 503.

---

[27] The plan specifically provides:
   The goal of preservation was to ensure continued opportunities for study of Misty Fiord's geology and ecology, including the complete range of ***coastal*** to interior climates and ecosystems. Protection and study of the geology, plant and animal succession, historical resources, and ***fish*** and wildlife resources are specifically directed. (Emphasis added). Forest Plan at 3-7.

[28] 16 U.S.C. § 539b.

### b. Stikine River.

The State, having chosen the Stikine River as its test waters example in the Tongass, has abandoned any effort to present facts on this "test waterway" to the Court. The State's only attempt to refute the Peratrovich argument is in a footnote (State Response Br. at 55 n.65), simply stating, without support, that its earlier failures were not insufficient. Earlier insufficient factual presentation combined with the State's decision not to present any further evidence taken as a whole support a determination by this Court that FRWRs exist in marine waters at the mouth of the Stikine River.

### E.  FRWRs Exist in Marine Water Above Submerged Lands Owned By the United States.

#### 1. Title to At least some submerged lands in the Tongass Remains in the United States.

As this Court has held, and no party has disputed, "[i]f the United States still holds title to some of the submerged lands within the Tongass National Forest, and it appears that it may, then the Federal Defendants are not entitled to judgment as a matter of law on plaintiffs' first theory." Peratrovich Document 178 at 27. *Cf. Tongass Conservation Society v. Cheney*, 924 F.2d 1137 (1991)(United States Navy permitted to lay sonar acoustic testing cable across entire breadth of the West Behm Canal); 28 U.S.C. § 2409a(h)(jurisdictional bar to State challenges of United States title while needed for national defense purposes). If, in later proceedings, facts are presented showing the United States still holds title to some submerged lands in the Tongass, the waters above those lands are "public lands" under ANILCA for purposes of requiring subsistence fishing priorities. Of import to the issue before this Court, those marine waters would have FRWRs sufficient to demonstrate that FRWRs can and do exist in marine waters over submerged lands and to adjacent waters as well.

#### 2. The "disclaimer" in Alaska v. United States is irrelevant to the question of whether FRWRs exist in marine waters.

This Court has rejected the State's allegation that the "disclaimer" in No. 128, Original precludes the possibility of FRWRs in marine waters in the Tongass.[29] Peratrovich Document 178 at 26 ("the court is presently unconvinced that the exceptions to the Untied State's

---

[29] State Response Br. text at 49 and half page single spaced footnote 57; *see also,* Peratrovich Supplemental Br. at 33.

disclaimer in No. 128 Original could not, as a matter of law support plaintiffs' first theory of their case"). The State's effort to revive that argument now to prevent this Court from determining whether FRWRs can ever exist in marine waters should be rejected.

### 3. The Peratrovich attempt to intervene in Alaska v. U.S. is irrelevant to these proceedings.

In two pages of argument devoid of any citation to supporting case law, the State makes the remarkable argument that an unsuccessful attempt to intervene in a separate action by one of the two individual plaintiffs in this case should prevent this Court from deciding if FRWRs can exist in marine waters. The State's claim that judicial estoppel should be applied to prevent this Court from reaching the "which waters" issue regarding marine waters is simply contrary to law and the facts now before the Court. *Hamilton v. State Farm Fire & Casualty Co.*, 270 F.3d 778, 782 (9th Cir. 2001)(factors to consider are whether position is clearly inconsistent with earlier position, whether court relied on or "accepted" the party's previous position, and whether party would derive an unfair advantage or impose unfair disadvantage on opposing party). As this Court has recognized in the Peratrovich case, the Peratrovich Plaintiffs "were not a party to No. 128, Original." Peratrovich Document 178 at 25. The extent to which the "disclaimer" affected claims regarding ownership of submerged lands has not yet been determined by this or any other court. Because the Peratrovich Plaintiffs were not parties to Original 128, were not successful in any argument presented in that case, were not taking a position "clearly inconsistent" with their position before this Court, and would derive no advantage nor the State suffer an unfair disadvantage if not estopped from having this Court address whether FRWRs exist in marine waters, the State's estoppel argument must be rejected.

### F.  The Federal Defendants and the State's Briefs do not Dispute that FRWRs Exist in Marine Waters Identified in Section V(B) of the Peratrovich Supplemental Brief.

Once again, the issue is not whether FRWRs exist in any given stretch of marine water, but rather whether they exist at all.[30] Therefore, claims by the State that FRWRs in the Alaska Maritime National Wildlife Refuge are "irrelevant" to the Behm Canal miss the point. State

---

[30] Contrary to the State's claim that this Court now will determine specific issues as to test case waterways (State Response Br. at 1), the "test case waterways" place the legal claims in a factual context. As the State itself reiterated in earlier briefing, the Court's determination at this stage of the general "which waters" question is not determinative to the issue of whether that legal ruling ultimately applies to the specific "test case" waterways chosen. Peratrovich Document 113 at 5.

Response Br. at 57. If there are FRWRs in the marine waters of the Alaska Maritime National Wildlife Refuge as the State concedes,[31] then the issue at this stage is resolved, and the answer is FRWRs can and do exist in marine waters.

Indeed, the Federal Defendants concede that where Congress makes its intent to reserve water explicit in the face of the statute, that expression is sufficient to establish the water right. U.S. Which Waters Br. at 16. In creating the Alaska Maritime National Wildlife Refuge ("Alaska Maritime NWR"), Congress explicitly included "all lands, waters and interests therein… including the coastal areas and adjacent seas." In addition, Congress specifically provided that "water quality and sufficient water quantity within the refuge" was reserved to fulfill the purpose of the reservation, which includes fish and marine mammal habitat and continued subsistence uses. ANILCA § 303(1)(B)(i)-(ii). The Federal Defendants rely in their brief on identical language to support their determination regarding the creation of FRWRs in the Alaska Peninsula National Wildlife Refuge and the Nowitna National Wildlife Refuge. U.S. Which Waters Br. at 46 and 64.[32]

## V. CONCLUSION

This Court should hold that: (1) it is not impossible, as a matter of law, for FRWRs to exist in marine waters; and (2) FRWRs exist in the marine waters of the Behm Canal to fulfill the primary purpose of the Tongass National Forest and the Misty Fjords National Monument.

---

[31] The State concedes that the use of the term "water quantity" creates an express reservation of FRWRs. State Response Br. at 59-60. The State then attempts to limit the FRWRs to the pre-existing Forrester Islands, Hazy Islands, and Saint Lazzaria Islands NWRs that are all within the exterior boundaries of the Tongass as established in 1902, 1907, and 1909. *See* Peratrovich Supplemental Br. at 26-27.

[32] The Federal Defendants also concede that the language used by Congress to create the Lake Clark National Park and Preserve providing for the protection of fish, fisheries and fish habitat created an implied FRWR. U.S. Which Waters Br. at 65, citing 16 U.S.C. § 410hh(7). *C.f.* 16 U.S.C. § 539b (providing for the protection of fisheries, fish habitat, and water quality and quantity in the Tongass and Chugach National Forests).

DATED:  April 7, 2008 Respectfully submitted,

RANDOLPH H. BARNHOUSE, Esq.

/s/ Randolph H. Barnhouse
Randolph H. Barnhouse
Samuel D. Hough
Luebben Johnson & Barnhouse LLP
7424 4th Street NW
Los Ranchos de Albuquerque, N.M. 87107
Phone:  (505) 842-6123
Fax:  (505) 842-6124
E-mail:  dbarnhouse@luebbenlaw.com

Attorneys for Related Case Plaintiffs
 Peratrovich, *et al.*

CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2008, a copy of the foregoing document was served electronically on:

Robert T. Anderson
Carol H. Daniel
Dean K. Dunsmore
Gregory L. Fisher
William P. Horn
Heather Kendall-Miller
James H. Lister
Michael W. Sewright
William F. Sherman

/s/ Randolph H. Barnhouse